ROBERT S. ARNS (#65071, rsa@arnslaw.com)
JONATHAN E. DAVIS (#191346, jed@arnslaw.com)
STEVEN R. WEINMANN (#190956, srw@arnslaw.com)
**THE ARNS LAW FIRM**
515 Folsom Street, 3rd Floor
San Francisco, CA 94105
Tel:   (415) 495-7800
Fax:   (415) 495-7888

JONATHAN M. JAFFE (# 267012, jmj@jaffe-law.com)
**JONATHAN JAFFE LAW**
3055 Hillegass Avenue
Berkeley, CA 94705
Tel:   (510) 725-4293
Fax:   (510) 868-3393

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ANGEL FRALEY; PAUL WANG; SUSAN MAINZER; JAMES H. DUVAL, a minor, by and through JAMES DUVAL, as Guardian ad Litem; and WILLIAM TAIT, a minor, by and through RUSSELL TAIT, as Guardian ad Litem; individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC., a corporation; and DOES 1-100,<br><br>Defendants. | Case No. CV 11-01726 LHK PSG<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS**<br><br><br>Date: September 29, 2011<br>Time: 1:30 p.m.<br>Courtroom: 4<br>Judge: Hon. Lucy H. Koh<br>Trial Date:   December 3, 2012 |

**Table of Contents**

I.     STATEMENT OF ISSUES TO BE DECIDED ...................................................... 1

II.    INTRODUCTION ................................................................................................ 1

III.   STATEMENT OF FACTS ................................................................................... 3

IV.    ARGUMENT ....................................................................................................... 5

   A.  Plaintiffs Have Alleged Injury Which Confers Standing Under Article III ..................... 5

   B.  The SAC States A Claim Under Civil Code Section 3344 ................................................ 7

       1.  Plaintiffs have pleaded an economic loss stemming from misappropriation ............... 8

       2.  Cohen v. Facebook does not support Facebook's argument on injury. ........................ 9

       3.  This case is about violation of the right of publicity, not marketing information ....... 11

   C.  Facebook's Use Of Plaintiffs Information Is Advertising And Therefore Not
       Newsworthy And Not Exempt Under § 3344(D). ......................................................... 12

   D.  Plaintiffs Never Consented To Use Of Their Names And / Or Likenesses in
       Association With Sponsored Stories. ........................................................................... 15

       1.  Plaintiffs could not and cannot opt out of Sponsored Stories. ................................... 15

       2.  The Court in Cohen v. Facebook, Inc. rejected Defendant's Positions on consent ..... 16

   E.  Plaintiffs Have Alleged Injury In Fact In Their UCL Claim. ........................................ 17

       1.  The "unlawful" prong of the UCL is satisfied. .......................................................... 17

       2.  The UCL "fraudulent" prong is satisfied. .................................................................. 19

       3.  The UCL "unfair" prong is satisfied. ......................................................................... 20

   F.  The Claim For Unjust Enrichment Is Properly Pleaded. ............................................... 21

   G.  The CDA Was Not Designed To And Does Not Protect Content
       Providers / Creators Such As Facebook. ..................................................................... 21

V.    CONCLUSION ................................................................................................... 26

**Table of Authorities**

## Constitutions

United States Constitution Article III ............................................................................ 1, 2, 5, 6

## State Cases

*Bank of the West v. Superior Court,* 2 Cal. 4th 1254 (1992) ...................................................... 17

*Blakemore v. Sup. Ct.,* 129 Cal. App. 4th 36 (2005) .................................................................. 19

*Camacho v. Auto Club of S. Cal.,* 142 Cal. App. 4th 1394 (2006) ............................................ 20

*Cel-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal. 4th 163 (1999) ...................... 17

*Christoff v. Nestlé USA, Inc.,* 47 Cal. 4th 468 (2009) ................................................................ 18

*Comedy III Productions Inc. v. Gary Saderup, Inc.,* 25 Cal. 4th 387 (2001) .......................... 9, 11

*Cortez v. Purolator Air Filtration Products,* 23 Cal. 4th 163 (2000) ........................................ 18

*Davis v. Ford Motor Credit Co.,* 179 Cal. App. 4th 581 (2009) ................................................ 20

*Dora v. Frontline Video, Inc.* 15 Cal. App. 4th 536 (1993) ................................................... 11, 14

*Dwyer v. Am. ExpressCo.,* 273 Ill. App. 3d 742 (1995) ............................................................... 8

*Eastwood v. Superior Court,* 149 Cal. App. 3d 409 (1983) ....................................................... 14

*F.D.I.C. v. Dintino,* 167 Cal. App. 4th 333 (2008) ................................................................... 21

*Fairfield v. American Photocopy Equipment,* 138 Cal. App. 2d 82 (1955) ......................... 10, 11

*Ghirardo v. Antonioli,* 14 Cal. 4th 39 (1996) ........................................................................... 21

*Gregory v. Albertson's, Inc.,* 104 Cal. App. 4th 845 (2002) ...................................................... 19

*LaCourt v. Specific Media, Inc.,* No. SACV 10-1256-GW(JCGx)
    (C.D. Cal. April 28, 2011) .................................................................................................. 8, 12

*Lugosi v. Universal Pictures,* 25 Cal. 3d 813 (1979) .............................................................. 8, 11

*Mass. Mut. Life Ins. Co. v. Super. Ct.,* 97 Cal. App. 4th 1282 ................................................ 19

*McBride v. Boughton,* 123 Cal. App. 4th 379 (2004) ............................................................... 21

*Miller v. Collectors Universe, Inc.,* 159 Cal. App. 4th 988 (2008) ........................... 8, 10, 11, 18

*Montana v. San Jose Mercury News,* 34 Cal. App. 4th 790 (1995) ........................................... 14

*Overstock.com, Inc. v. Gradient Analytics, Inc.,* 151 Cal. App. 4th 688 (2007) ....................... 20

*Paradise Hills Associates v. Procel,* 235 Cal. App. 3d 1528 (1991) ......................................... 15

*Robins v. Spokeo,* Inc. No. CV 10-050306 ODW, 2001 WL 597867
    (C.D. Cal. Jan. 27, 2011) ........................................................................................................ 7

*Schnall v. Hertz Corp.,* 78 Cal. App. 4th 1144 (2000) .............................................................. 19

*Shulman v. Group W Prods., Inc.,* 18 Cal. 4th 200 (1998) ................................................... 12, 13

*Slivinsky v. Watkins-Johnson Co.*, 221 Cal. App. 3d 799 (1990) ................................................. 11

*Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700 (2001) ................................. 17, 24

*Smith v. Wells Fargo Bank*, 135 Cal. App. 4th 1463 (2006) ............................................................. 17

*South Bay Chevrolet v. GM Acceptance Corp.*, 72 Cal. App. 4th 861 (1999) ........................... 20

*Weitzenkorn v. Lesser*, 40 Cal. 2d 778 (1953) ........................................................................................ 21

**Federal Cases**

*Adbul-Jabbar v. GMC*, 85 F.3d 407 (9th Cir. 1996) ............................................................................. 13

*Asia Econ. Inst. v. Xcentric Ventures LLC*, No. CV 10-01360 SVW (PJWx),
   2011 WL 2469822, (C.D. Cal. May 4, 2011) .................................................................................. 25

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) .................................................................................... 24

*Ben Ezra, Weinstein, & Co. v. America Online, Inc.*, 206 F.3d 980 (10th Cir. 2000) .............. 24

*Black v. Google, Inc.*, No 10-01281 CW, 2010 WL 3222147
   (N.D. Cal. Aug. 13, 2010) ..................................................................................................................... 25

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) ......................................... 22, 23

*Cohen v. Facebook, Inc.*, No.C 10-5282 RS 9 (N.D. Cal. June 28, 2011) ................ 9, 10, 11, 16

*Doe II v. Myspace, Inc.*, 528 F.3d 413 (5th Cir. 2008) ....................................................................... 25

*Doe IX v. Myspace.Com*, 629 F. Supp. 2d 663 (E.D. Tex. 2009) ................................................... 25

*DoubleClick Inc. Privacy Litigation*, 154 F. Supp. 2d 497 (S.D.N.Y. 2001) ............................. 12

*Downing v. Abercrombie & Fitch*, 265 F.3d 994 (9th Cir. 2001) .................................................. 14

*Facebook Privacy Litig.*, No. C 1.0-02389 JW (N.D. Cal. May 12, 2011) ................................. 18

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ....................................................................................................... 23, 24

*Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979) ..................................................... 7

*Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193 (N.D. Cal. 2009) ................................................ 25

*JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299 (E.D.N.Y.2005) ............................ 8

*Jones v. Corbis Corp.*, No. 10-8668 SVW(CW) (C.D. Cal. May 25, 2011) ............................. 15

*Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117 (E.D. Cal. 2010) ..................................................... 24

*L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644 (9th Cir. 2011) ............................................. 6

*Lee v. Chase Manhattan Bank*, No. C07-04732 MJJ, 2008 WL 698482
   (N.D Cal. Mar. 14, 2008) ......................................................................................................................... 7

*Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718 (9th Cir. 2007) ........................................ 20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ......................................................................... 6

*Mendiondo v. Centinela Hosp.Med. Ctr.*, 521 F.3d 1097 (9th Cir. 2008) ................................... 5

*New Kids on the Block v. News Am Publishing*, 745 F. Supp. 1540 (C.D. Cal. 1990) .............. 14

*Perfect 10, Inc. v. CC Bill, LLC*, 488 F.3d 1102  (9th Cir. 2007) ............................................ 25

*Ramey v. Darkside Prods., Inc.*, No. 02-730 (GK), 2004 WL 5550485
    (D.D.C. May 17, 2004) ..................................................................................... 25

*Sorrell v. IMS Health Inc.*,  -- U.S. -- 131 S.Ct.2653 (2011)...................................................... 15

*Thompson v. Home Depot, Inc.*, No. 07-cv-1058 IEG (WMc), 2007 WL 2746603,
    (S.D. Cal. Sept. 18, 2007) ................................................................................... 8

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, (9th Cir. 2003).............................................. 19

*Yang v. Moua*, 2010 U.S. Dist. LEXIS 21837 (E.D. Cal. Feb. 18, 2010) ........................... 16, 21

*Young v. Facebook, Inc.*, No. 5:10-cv-03579, 2010 WL 4269304
    (N.D. Cal.  Oct. 15, 2010) ................................................................................... 25

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) ........................................................ 24

**Statutes**

Bus. & Prof. Code § 17200......................................................................................... 1, 2

Cal. Civ. Code § 3344 ........................................................................................ passim

Communications Decency Act, 47 U.S.C. § 230 ........................................................ passim

Consumer Fraud and Abuse Act, 18 U.S.C. Section 1030(g) ................................................. 12

Fed. R. Civ. Proc. 12(b)(6) ................................................................................................... 5

Fed. R. Civ. Proc. 8(a)(2) ...................................................................................................... 5

## I.      STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Facebook's Motion to Dismiss should be denied because Plaintiffs have alleged injury in fact which gives them Article III standing.

2.      Whether the Motion should be denied because the Communications Decency Act, 47 U.S.C. § 230, does not apply to content creators such as Facebook.

3.      Whether the Motion should be denied because Plaintiffs have stated a cause of action for misappropriation of their likenesses and names under Civil Code Section 3344.

4.      Whether the Motion should be denied because Plaintiffs have stated a claim under Business and Professional Code Section 17200 for unfair competition based upon Facebook's unlawful, fraudulent, and unfair practices in connection with Sponsored Stories.

5.      Whether the Motion should be denied because the Plaintiffs have stated a cause of action for unjust enrichment.

## II.     INTRODUCTION

This nationwide class action involves a critical issue as to whether a person is entitled to compensation for the use of his or her likeness and name in connection with paid advertisements to which he or she has not given consent.  The right of publicity and the interrelated right of privacy are of keen interest to anyone who seeks to do anything on the Internet.  This suit concerns a new form of advertising which drafted millions of users of the Facebook social network as unpaid and unknowing spokespersons for various products. Under California law, all persons who are subjected to such nonconsensual uses of their names and likenesses are entitled to fair compensation for such use.

The claims in the Second Amended Complaint ("SAC") involve Facebook's new advertising vehicle, "Sponsored Stories."    A Sponsored Story is simply a paid advertisement that appears on a Facebook member's "page;" it generally consists of another Member's name, profile picture, and an assertion that the person "likes" the advertiser, e.g Starbucks. The ad is shown to the Member's friends on Facebook.  Facebook does not get the consent of the Members to create and sell these advertisements, and thus violates the Member's right of publicity, which is expressly protected by Civil Code Section 3344, and by the common law. A Sponsored Story advertisement is not a traditional news story, and it is not a republication of

-1-

exactly what the user has posted. It is something new and pernicious. Absent the consent of the Members, it is also in violation of the law.

Contrary to Facebook's assertions, Plaintiffs have standing under Article III of the Constitution. They have asserted that they have been injured by Facebook's violations of Civil Code Section 3344 and the Unfair Competition Law (Business & Professions Code §17200 et seq. ("UCL"). Nor are the claims preempted under the Communications Decency Act, 47 U.S.C. § 230 ("CDA"), as Facebook bases its arguments upon an incorrect reading of the CDA. Facebook also incorrectly asserts that there is no cause of action for unjust enrichment in California. None of Facebook's arguments have any merit.

Facebook argues that because it is a free service, the Plaintiffs cannot have "lost money or property" as required by the UCL. The fact that Facebook sells Sponsored Stories for more than its other types of ads demonstrates the value of Plaintiffs's imputed endorsements, and that they have suffered an injury as their personal right to publicity has been taken from them without compensation. Facebook asserts to the Court that the use of Plaintiffs' names and likenesses has no value, but Facebook asserts to its advertisers that the recommendation of a friend is the "Holy Grail" of advertising. Pls.' 2d. Am. Compl. ("SAC") ¶ 43. The very existence of Sponsored Stories, a pay service for advertisers, is premised on this concept. In essence, Plaintiffs are celebrities—to their friends. Indeed, according to Facebook, their endorsements are far more valuable than those of well-known celebrities when it comes to ads which garner a response and attention from a viewer.

The CDA was not intended to protect creators of content such as Facebook, but rather, it was intended to protect only those companies who acted as mere intermediaries, those who have so-called "secondary" liability. Contrary to Facebook's painting of what it is doing, Sponsored Stories are ads which it is creating and to which it is providing the content. It is not simply "republishing." The motion should be denied in its entirety. [1]

---

[1] Plaintiffs amended once as of right after filing in state court, before Defendant responded, primarily to add additional class representatives. They then chose to amend, again as of right, in response to Facebook's Motion to Dismiss after removal to federal court, in order to add additional details as to matters already pleaded, such as the specific Sponsored Stories ads shown about them. Plaintiff have yet to have any court review or reject any of the allegations,

### III.   STATEMENT OF FACTS

Defendant Facebook is an advertising company that owns and operates the world's largest social networking site, facebook.com.  Facebook.com has become an integral part of the lives of approximately 600 million people around the world. SAC ¶ 13. Facebook.com has over 153 million Members in the United States; over 51 million of these are minors.  *Id.*

Facebook requires Internet Members to register ("Members") in order to post content to the site, establish social network relationships within the site, and view most of the content produced by other facebook.com Members. To become a Member of facebook.com, a person must register a profile, and Facebook requires its Members to submit their names, email addresses, birth dates, and gender at the time of registration.   Members may upload a Facebook Profile Photo—often, a photograph of themselves—which is viewable by anyone, regardless of whether they are a Member or not.  One key aspect of Facebook is that a Member establishes a connection with persons, whom they do not necessarily know outside of Facebook, by offering and accepting invitations to be their Facebook "friends."[2]

A Facebook "story" ("Facebook Story") is text posted by a Member, or a Facebook action taken by a Member on facebook.com, or results from other action such as an interaction with other websites on the Internet where they click on Facbook's ubiquitous "Like" button that may appear on a Member's Facebook Profile Page, or in the Facebook News Feeds of other Members.  A Facebook Story is almost always a single sentence, not an account of an evolution of events about a person or thing.  SAC ¶ 15.

On or around January 25, 2011, Facebook launched a new advertising service called "Sponsored Stories." Since that time, when a Member Posts, "Likes," Checks-in, or uses an application that integrates with Sponsored Stories, and the content relates to an advertiser in some predetermined way, the posted content, along with the Member's profile image and name may appear as an endorsement in a paid advertisement on the pages viewed by some or

---

nor have they been able to prise any discovery beyond the required initial disclosures from Facebook prior to filing this Opposition.
[2] A Facebook "friend" is anyone to whom a Member has given explicit privileges to send and receive messages, see postings, photos, or other facebook.com actions taken by the Member. SAC ¶ 15.

all of the Friends of that Member.  SAC ¶ 26.  Unlike other entries which appear in the Member's Newsfeed, these Sponsored Stories ads appear in the right-hand table along with other ads which have been paid for by Facebook's advertisers or which were posted by Facebook for its own services, and do not appear on pages seen by the Member whose name and/or likeness are being used.

The Sponsored Stories service is already enabled for all Members when they sign up, and Members are unable to opt-out of the service. SAC ¶ 30.  Plaintiffs did not and could not have anticipated that their names and likenesses would be combined with the logos of the advertisers at some later point solely for advertising purposes, as Sponsored Stories did not exist as a method of advertising at the time they became Members of Facebook.  SAC ¶ 38.

The user has no way to avoid his or her action from being turned into a Sponsored Story.  SAC ¶ 34.  Currently, the most common action is when a user clicks on a Facebook Like button anywhere on the Internet.  The reasons a user may do this vary widely, but a prevalent reason is simply that they must in order to take advantage of some offer, or simply in order to be able to see content on a page.  SAC ¶ 13.  When a user clicks on a Facebook "Like" button, the member's profile image and name are retrieved from data entered by the member at the time of registration or modified thereafter.  A typical Sponsored Story ad will look like this one for Plaintiff Angel Fraley, whose Facebook name, by which she is known to her friends, is Angel Frolicker:



SAC, Ex. 2.

Ms. Fraley never authored the sentence "Angel Frolicker likes Rosetta Stone," she simply hit the "Like" button in order to avail herself of a free trial of the product; nor did she upload the Rosetta Stone logo. SAC ¶ 68.  Those words and images were added by Facebook.  Neither Ms. Fraley nor any other of the class representatives or Class members are paid for having their names and likenesses used for such publicity.  SAC ¶ 47.  The Nielsen Company,

frequently quoted by Facebook, has determined that advertising consisting of recommendations by friends, such as "Sponsored Stories," is the most effective form of advertising. SAC ¶ 42. Facebook's CEO Mark Zuckerberg has stated: "[n]othing influences people more than a recommendation from a trusted friend. A trusted referral influences people more than the best broadcast message. A trusted referral is the Holy Grail of advertising." SAC ¶ 43. Facebook COO Sheryl Sandberg stated that ads bearing a personal endorsement of a friend are twice as memorable than those that do not, and a person seeing them is 300 per cent more likely to purchase a product. SAC ¶ 45.

## IV.   ARGUMENT

Plaintiffs are required to give only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). *See also Mendiondo v. Centinela Hosp.Med. Ctr.,* 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.") Plaintiffs have provided ample factual support upon which their claims for relief can be granted.

### A.   Plaintiffs Have Alleged Injury Which Confers Standing Under Article III

Plaintiffs have alleged that an injury exists and that the class representatives have had Sponsored Stories created and distributed about them, without compensation. SAC ¶ 63. Plaintiffs are entitled to $750 for Facebook's injury to them based on the right to publicity under Civil Code section 3344, which was designed to provide the non-celebrity with a ready means of recompense when his or her likeness or name are used for commercial purposes without consent.[3] This loss of this money to which they are entitled, is injury under Article III of the United States Constitution, and "loss of money or property" under the UCL.   "To invoke the jurisdiction of the federal courts, a plaintiff must demonstrate that it has Article III standing—i.e., that it has suffered an injury-in-fact that is both 'concrete and particularized,' and 'actual or imminent, not conjectural or hypothetical'; that the injury is 'fairly . . . traceable

---

[3] *See infra* pp. 10-11

to the challenged action of the defendant'; and that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision' on the plaintiff's claims for relief." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 119 L. Ed. 2d 351 (1992) (internal citations omitted); *accord*, *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 656 (9th Cir. 2011). Plaintiffs' SAC meets each of these requirements.

"The injury required by Article III can exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" Fulfillment Servs.*v.* UPS, 528 F.3d at 618-19 (9th Cir. 2008) (*quoting* Warth v. Seldin, 422 U.S. 490, 45 L. Ed. 2d 343 (1975)). The Ninth Circuit in *L.A. Haven Hospice,* held that "[i]t is well established that less tangible forms of injury, **such as the deprivation of an individual right conferred by statute**, may be sufficiently particularized and concrete to demonstrate injury-in-fact." 638 F.3d at 655-656 (emphasis added). Thus, the Court of Appeal held that there was standing under Article III based on a statutory right. *Id.* at 656 (finding that "Haven Hospice has a statutory right to reimbursement . . . . up to the limits of the aggregate annual [statutory] cap'").

Here, as set out more fully below, the SAC alleges that the loss of the monies for the endorsement of products and companies (which is of course not only a deprivation of a statutorily granted right of publicity but also an "economic" loss to Plaintiffs) is directly traceable to Facebook's actions in selling and creating the ads featuring Plaintiffs, in violation of Civil Code Section 3344. That right includes a minimum monetary award of $750 for each such violation. [4] This is a "deprivation of an individual right created by statute." *L.A. Haven Hospice*, 638 F. 3d atat 655-56. Furthermore, the SAC also alleges grounds for recovery of money lost under the UCL, , and the common law of unjust enrichment based on the ascertainable economic value of those endorsements. The loss of money that is alleged satisfies the standing requirements of Article III. These losses are "particularized" in that it is alleged to have affected each class representative individually. *See* Lujan, 504 U.S. at 561 n.1.

---

[4] Civil Code Section 3344(a) provides in part that: "[I]n any action brought under this section, the person who violated the section shall be liable to the injured party ... in an amount equal to *the greater of* seven hundred fifty dollars ($ 750) or the actual damages suffered by him ... *as a result of the unauthorized use*, and any profits from the unauthorized use..." (emphasis added). Cal. Civ. Code § 3344(a) (Deering 2011).

The injury to each class representative is also not hypothetical, and is an "injury in fact," as the SAC pleads that each of the class representatives have <u>already had</u> Sponsored Stories run using their names and likenesses, and that they have not been compensated for having their names and likenesses appropriated for such ads. SAC ¶¶ 47, 63-84.[5] Finally, it is clear that a judgment by this Court favorable to Plaintiffs, that Facebook violated these laws, can result in a judgment which redresses these wrongs in the form of restitution, damages, and injunctive relief.

**B.      The SAC States A Claim Under Civil Code Section 3344**

Facebook also asserts that there is a failure to allege injury under Civil Code Section 3344. Plaintiffs have plainly alleged the elements of a Section 3344 claim, including injury. The SAC states that "[d]uring the Class period, FACEBOOK *knowingly* used Plaintiffs' names, photographs, or likenesses to *directly advertise* or sell a product or service," SAC ¶ 109; that Defendant's "[u]se of Plaintiffs' names, photographs, and likenesses were *directly connected* to FACEBOOK's commercial use," SAC ¶ 113; and, critically, that "FACEBOOK did not have Plaintiffs' consent to do so." SAC ¶ 110. The SAC also specifies the particular Sponsored Stories as to the Class representatives. SAC ¶¶ 66-68 (Angel Fraley, Rosetta Stone); ¶¶ 71-72 (Susan Mainzer, Unicef); ( ¶¶ 73-75 (Paul Wang, Warrior Dash); ¶¶ 77-79 (Jimmy Duval, PopCorners); ¶¶ 82-84 (William Tait, Warrior Dash). The SAC also attaches copies of some of the actual Facebook pages as they appeared on others' facebook.com pages. SAC Exs. 2, 6, 7.

These are facts sufficient to support Plaintiffs' claims that Defendant violated their rights of publicity under Section 3344. Plaintiffs were harmed by Defendant's appropriation of their likenesses for advertising purposes because they received no compensation or other consideration for Defendant's use of their images in Defendant's Sponsored Stories advertisements. SAC ¶ 47. Section 3344 is explicit in its provision that *any* non-consensual use

---

[5] Thus, these are not "mere allegations" of a statutory violation, and there is no issue about the losses being "imminent," or "palpable;" they are based on facts showing the violations have already happened. Cf. *Lee v. Chase Manhattan Bank*, No. C07-04732 MJJ, 2008 WL 698482 (N.D Cal. Mar. 14, 2008); *Robins v. Spokeo, Inc.* No. CV 10-050306 ODW, 2001 WL 597867 (C.D. Cal. Jan. 27, 2011); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979).

of someone's likeness for "purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services," results in liability.

### 1.   Plaintiffs have pleaded an economic loss stemming from misappropriation

The legislative history reveals the statute was intended to protect the rights of people, like Plaintiffs, who are not celebrities and whose names did not have immediate value on the commercial market. *Miller v. Collectors Universe, Inc.*, 159 Cal. App. 4th 988, 1002 (2008). The legislature intended the statute would provide "a simple, civil remedy for the injured individual." *Id.* The class of Plaintiffs here represents countless individuals of exactly the type the legislature sought to protect. Facebook is misappropriating the names and likenesses of the Plaintiffs, and being deprived of the economic value of these "endorsements" is injury. Facebook is arguing that the noncelebrity has to prove he or she is injured, by showing he or she has a "track record" of being paid for endorsements. But the difficulty of assigning a specific value to the noncelebrity's right to publicity is precisely why Civil Code Section 3344 was enacted. The statute itself does not require the noncelebrity to allege some sort of specific entitlement or track record of being paid in order to be entitled to the $750 penalty.[6]  The California Supreme Court has held:

> The so-called right of publicity means in essence that the reaction of the public to name and likeness, which may be fortuitous or which may be managed or planned, **endows the name and likeness of the person involved with commercially exploitable opportunities.**  The protection of name and likeness from unwarranted intrusion **or exploitation** is the heart of the law of privacy.

*Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 825 (1979) (emphasis added).[7]

---

[6] Plaintiffs are not asserting that the personal information has an economic value in and of itself, only as it can be used for applications such as endorsements. Thus, the cases cited by Facebook to dispute this point, none of which involved endorsements (or implied endorsements) by a plaintiff are not relevant to this motion. *See* Def.'s Mot. to Dismiss 8-9, citing *LaCourt v. Specific Media, Inc.*, No. SACV 10-1256-GW(JCGx) (C.D. Cal. April 28, 2011), 2011 WL1661532; *Thompson v. Home Depot, Inc.*, No. 07-cv-1058 IEG (WMc), 2007 WL 2746603, (S.D. Cal. Sept. 18, 2007); *In re JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299 (E.D.N.Y.2005); and *Dwyer v. Am. ExpressCo.*, 273 Ill. App. 3d 742, 749 (1995).
[7] That this right of publicity was just one aspect of the "right of privacy" as stated in *Lugosi* was recognized more recently in *Dora v. Frontline Video, Inc.* 15 Cal. App. 4th 536, 542 (1993). Oddly, Facebook cites *Eastwood v. Superior Court,* 149 Cal.App.3d 409 (1983), and *Downing v. Abercrombie & Fitch*, 265 F.3d 994 (9th Cir. 2001) on the subject of injury. In both

The Plaintiffs and other Class members' names and likenesses are "commercially exploitable opportunities" for Facebook, which form the basis for the success of Sponsored Stories. They are celebrities to their friends, even if not to the general public. In *Comedy III Productions Inc. v. Gary Saderup, Inc.,* 25 Cal. 4th 387 (2001), the California Supreme Court held that "the right of publicity is essentially an economic right. What the right of publicity holder possesses is not a right of censorship, but a right to prevent others from misappropriating the economic value generated by the celebrity's fame through the merchandising of the 'name, voice, signature, photograph, or likeness' of the celebrity." *Id.* at 403.

Before social media advertising, a non-celebrity would have had difficulty showing commercial value in her identity because there was no way to distribute highly-personalized ads; now, there is measurable commercial value in one's identity. The scale is smaller than for a well-known public figure, but the value is measurable by the fact that friend-endorsed ads have higher market value among advertisers than non-friend-endorsed ads, as evidenced by the fact that Facebook sells Sponsored Story ads for more than other ads. The increased cost of the ad is due to the use of the identity and apparent endorsement of Plaintiffs; this is the commercial value in the Member's identity. The deprivation of that value is the member's injury in fact.

No better evidence of the value of these endorsements by Plaintiffs could exist than the admissions by Facebook's own CEO and COO that the friend endorsed ad is the "Holy Grail" of advertising, resulting in double the recognition and 300% of the likelihood of purchase. SAC ¶¶ 43, 45. There are also, however, the empirical claims of the Nielsen Company which support these assertions. SAC ¶ 42.

### 2. Cohen v. Facebook does not support Facebook's argument on injury.

Facebook cites the unpublished opinion in *Cohen v. Facebook, Inc.,* No.C 10-5282 RS 9, in which the court dismissed the case with leave to amend. While *Cohen* also involves implied (and unwilling) endorsements, the two cases are actually quite different. *Cohen* concerns Facebook's own "Friend Finder" service, from which endorsements Facebook did not

---

cases, a cause of action was held stated under Civil Code § 3344, in the former for Clint Eastwood and in the latter for a noncelebrity whose image was used in a clothing catalog.

derive <u>any</u> economic benefit.   In contrast, Plaintiffs herein allege that Facebook derives <u>substantial</u> benefit in the form of advertising revenue from its Sponsored Stories product.

The District Court in *Cohen* based the dismissal on the ground that there was no injury pleaded under the facts of that case, because "mental anguish" had not been pleaded.   For authority for this element, which does not appear in Civil Code Section 3344 or indeed in the common law formulation of the right to privacy / publicity, the court cited to *Miller*. *Miller* in turn relied upon *Fairfield v. American Photocopy Equipment*, 138 Cal. App. 2d 82 (1955), which it claimed was the genesis of Civil Code Section 3344. *Miller*, 159 Cal. App. 4th at 1002.

In *Fairfield*, the plaintiff was a lawyer who purchased but returned a photocopier because it was defective, but who was nevertheless included in an advertisement listing him as a satisfied customer.   138 Cal. App. 2d at 85. The principal ground for the granting of a demurrer below had been the absence of proof of injury. The California Supreme Court held that it was error to exclude testimony where the plaintiff attempted to prove more than nominal damages. *Id.* at 90.   It also referred to out of state opinions, in which courts had held that a person was entitled to "substantial damages" even in the absence of proof of special damages. *Id.*   In essence, the *Miller* court assumed from *Fairfield* that Civil Code Section 3344 was enacted to provide the noncelebrity with recourse for his or her mental anguish—but there is absolutely nothing in that subsequently enacted statute that supports the proposition that a noncelebrity <u>must</u> plead mental anguish, if he or she can show that his or her endorsement has a provable economic value, of whatever amount. *Miller*, 159 Cal. App. 4th at 1002.

While Section 3344 certainly <u>allows</u> a plaintiff to plead and recover under a theory of mental anguish, there is nothing to suggest that the Legislature did not <u>also</u> intend to allow the non-celebrity to also recover that penalty where there is misappropriation of his or her name or likeness for the economic advantage of a defendant.   There is simply no reason to limit Section 3344 in that manner, when the structure the statute does not even suggest such a limitation. The Legislature could have, but did not, expressly tie the recovery of the $750 penalty to the pleading of mental anguish.   Since it did not, this Court should not follow the opinions in

*Miller* and *Cohen.*  The $750 is a floor, as Section 3344 provides that the plaintiff is entitled to the *greater* of actual damages or $750.

The California Supreme Court's analysis in *Comedy III, supra,* that there is an **economic** right being protected, counsels against the gloss on Section 3344 put on by the court in *Miller* that "mental anguish" must be pleaded to recover the $750 penalty, which argument was followed, without any analysis, by the Court in *Cohen.*[8]  Clearly, Plaintiffs have pleaded that their endorsements, as noted in *Lugosi* and *Dora,* have "commercially exploitable opportunities." That is, they have a value which can be established through Facebook's own records as to what it charges for Sponsored Stories.  Plaintiffs have pleaded that they have been deprived of the value of their endorsements, which can be measured by the value assigned by Facebook itself—twice or three hundred percent that of other types of advertising.  *See* SAC ¶¶ 44, 45,91.  The information as to the dollar values which are charged for the ads is currently within Facebook's sole control.[9]

### 3.   This case is about violation of the right of publicity, not marketing information

Facebook's reliance upon cases which hold that "personal information" in the abstract has no "intrinsic value" or "compensable value in the economy at large" is misplaced.  The cases in question dealt only with the possible use of an individual's personal information for the purpose of marketing to him or her, or as part of some large pool of persons to whom generic advertisements might be directed.  This is qualitatively very different from the co-opting of one's name and likeness as a personal endorsement to show to someone with whom one has a connection, even in the loose definition of a Facebook Friend.  In Facebook's own words, such an endorsement is the "Holy Grail" of advertisers. SAC ¶ 43.  It is the difference

---

[8] The *Cohen* court also cited to *Slivinsky v. Watkins-Johnson Co.*, 221 Cal. App. 3d 799 (1990), but that case also does not support the proposition that a plaintiff must always allege mental anguish in a case involving the right of publicity.  The case involved a right of privacy claim, and there was no commercial use or benefit to the defendant.  *Id.* at 807.

[9] If the Court nevertheless holds that mental anguish must be pleaded, Plaintiffs can allege that they did suffer mental anguish of the type described in *Fairfield.*  The Supreme Court in *Fairfield* noted that injury in such cases is "presumed." 138 Cal.App.2d at 90.

between a name for a mailing list, and what appears to be a personally tailored recommendation.

Thus, in *DoubleClick Inc. Privacy Litigation*, 154 F. Supp. 2d 497 (S.D.N.Y. 2001), the plaintiff sought to be compensated for advertising revenue but there was no issue of the right of publicity. DoubleClick, Inc. runs a service which places cookies on a user's computer, in order to tailor "banner" ads to the user of the computer. *Id.* at 502. That court held only that the giving of one's attention, such as choosing to watch a television show or newspaper with ads, does not result in a "deprivation" of one's attention, and that "although **demographic information** is valued highly... the value of its collection has never been considered a economic loss to the subject." *Id.* at 525 (emphasis added). The Court also held that the other causes of action were not supported by the statute being sued under, the Consumer Fraud and Abuse Act, 18 U.S.C. § 1030(g), and that those types of injury were far removed from the purpose of that statute, which was to prevent damage to computers from hackers. *Id.* at 525, n.33, n.34. Thus, the types of information being considered and the statute being relied upon were both different, and did not involve the personal information at issue here, the names and likenesses of the class members, or Section 3344. *Doubleclick* is irrelevant here.[10]

### C.    Facebook's Use Of Plaintiffs Information Is Advertising And Therefore Not Newsworthy And Not Exempt Under § 3344(D).

The "newsworthy" exemption of Section 3344(d) grants an exception to the consent requirement of subdivision (a), for use of a likeness "in connection with any news, public affairs, or sports broadcast or account, or any political campaign." Facebook supports its contention that this exception applies by selectively quoting cases that define the term "newsworthy" broadly. *See* Def.'s Mot. to Dismiss 20, citing *Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200, 225 (1998). This overly broad reading is not the law. *See Shulman*, 18

---

[10] Similarly inapposite, for the same reasons, is *LaCourt v. Specific Media, Inc.*, No. SACV 10-1256-GW(JCGx), 2011 WL1661532 (C.D. Cal. April 28, 2011), which also involved cookies and 18 U.S.C. § 1030. As in *Doubleclick*, the "personal information" was at best browsing history, and the plaintiffs failed to show how that information had economic valued. Further, the court noted that it was **not** holding that it was impossible to allege either a claim for the value of the personal information or invasion of privacy, just that the Plaintiffs had not pled enough facts to support such claims. *Id.* at *11 and n.1.

Cal. 4th at 223 ("All material that might attract readers is not, simply by virtue of its attractiveness, of *legitimate* public interest. Second, the evaluation of newsworthiness depends on the degree of intrusion and the extent to which the plaintiff played an important role in public events."). That Plaintiffs chose to interact in some way with a website does not turn them into public figures, or constitute their consent or agreement that such actions are "newsworthy." The Court is not required to shy away from enforcing the law based on Facebook's unfounded assertion that "constitutional avoidance" finding Sponsored Stories to be ads under Civil Code Section 3344 rather than "republications" would somehow impinge on the Class members' right to free speech. The line is not as fine as Facebook wants it to be in this case.

Once a member's likeness has been appropriated by Defendant for use in a Sponsored Story advertisement, it is removed from the member's control and instead becomes a saleable commodity. It is thus no longer being used "for purposes of education, amusement or enlightenment," *Shulman,* 18 Cal.4th at 225, but rather to sell products, services and brand recognition. Facebook acknowledges the monetary value of this type of advertising, and accordingly charges a high premium for advertisers to use this service. *See* SAC ¶ 43-45. It was held in *Adbul-Jabbar v. GMC,* 85 F.3d 407, 416 (9th Cir. 1996), that the commercial use of a person's newsworthy acts can still result in liability under Section 3344. ("While [Kareem Abdul-Jabbar's] basketball record may be said to be 'newsworthy,' its use is not automatically privileged. GMC used the information in the context of an automobile advertisement, not in a news or sports account. Hence GMC is not protected by section 3344(d).") Similarly, even if Facebook's argument was correct that the actions in question are newsworthy, the use it is making of them is not within the newsworthy exception in Section 3344.

Facebook also attempts to hide its purely commercial activity behind the First Amendment to the Constitution. Facebook's assertion that "[w]hen a User Likes or Posts certain content or Checks In—whether in relation to a product, a politician, or an organization—that User is telling her Friends that that she has a connection to or an affinity for that content", Def.'s Mot. to Dismiss 20, is a distortion and half-truth. "Connection" is another

deliberately chosen, vague term. What Facebook has done is filter disparate actions and used the Sponsored Stories to imply that they are necessarily a positive endorsement. The supposed "affinity" is not necessarily there, and indeed, one could choose to "Like" or even "Friend" a company or politician or individual for who one has a strong dislike—for the purposes of finding out what they are doing. Given the multiple reasons why someone might click on a "Like" button (including simply to access a product offer, SAC, ¶15), the message, as changed by Facebook, is not entitled to protection as a mere statement of unvarnished "fact."[11]  It is instead an action which is being interpreted by Facebook in new content.   Similarly, Facebook's statement that "Plaintiffs could never have been paid to endorse products they do not actually endorse," Def.'s Mot. to Dismiss 9, is absurd.  It is a common sense proposition that a celebrity who is paid to endorse a product does not necessarily have a deep affection for the the product they are endorsing.   Furthermore, "the appearance of an 'indorsement' is not the sine qua non of a claim for commercial appropriation." *Eastwood v. Sup Ct.,* 149 Cal. App. 3d 409, 419 (1983). On the other hand, "[t]he first step toward selling a product or service is to attract a customer's attention," and thus a magazine which gains a commercial advantage by using a celebrity's name or picture in a false news account can be held to have employed "a subterfuge or coverup for commercial exploitation." *Id.*  A noncelebrity also has a right to publicity that is not trumped by the First Amendment where the real motivation is commercial gain, such as using a person's photo surfing in a clothing catalog. *See Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1002 (9th Cir. 2001).

Facebook's cases do not support the proposition that Sponsored Stories are entitled to protection as "expressions of consumer opinion" which are matters of public interest under the

---

[11] The cases cited by Facebook, involving celebrities of one sort or another, also do not concern attempts to use the images and names of parties simply as ads, and also do not stand for the proposition that the actions of Plaintiffs, who are not public figures, are items of general public interest. *See Montana v. San Jose Mercury News,* 34 Cal. App. 4th 790 (1995)(plaintiff was NFL player); *Dora,* 15 Cal.App.4th 536 (plaintiff was a "surfing legend"); *New Kids on the Block v. News Am Publishing,* 745 F. Supp. 1540 (C.D. Cal. 1990)(boy band); *Gionfriddo v. Major League Baseball,* 94 Cal.App.4th 400)(baseball players); *Paulsen v. Personality Posters, Ltd.,* 299 N.Y.S.2d 501 (1968)(nationally known comedian staging fake Presidential campaign).

First Amendment.   These "interactions" are simply being classified by Facebook as "expressions of consumer opinion," whereas the reality is that the motives of the person clicking a "like" button or "checking in" may be quite different from the "affinity" which Facebook seeks to force upon it through its warping of the language in play. SAC ¶15, 25, 73, 77.  That the public in general might be more interested in the abstract in commercial speech or opinions does not alter the fact that the speech in question, may not be in fact what Facebook is saying it is—an opinion.   Thus, the holdings in cases standing for such general statements do not help Facebook.  *See Sorrell v. IMS Health Inc.*, -- U.S. –131 S.Ct.2653 (2011), *Paradise Hills Associates v. Procel*, 235 Cal. App. 3d 1528, 1544 (1991).  Facebook admits on the one hand that the Members' private reasons for interacting with the web pages are not relevant (citing to *Jones v. Corbis Corp.*, No. 10-8668 SVW(CW), slip op. at 8 n.2 (C.D. Cal. May 25, 2011), Def. Mot. to Dismiss 18), and on the other, seeks to assert that they mean what Facebook says they mean.  In other words, Facebook is saying if you hit the "like" button, you really "have an affinity" for the product, regardless of whether you had some other reason such as getting a trial offer of Rosetta Stone—for doing so.   It cannot have it both ways.

**D.      Plaintiffs Never Consented To Use Of Their Names And / Or Likenesses in Association With Sponsored Stories.**

Facebook's contention that by using or accessing Facebook the Plaintiffs consented to Facebook's Statement of Rights and Responsibilities ("SRR") and have therefore consented to the use of their likenesses in the Sponsored Stories advertisements is mistaken.  First, when Plaintiffs signed up to use the Facebook service, prior to January 25, 2011, Sponsored Story advertisements did not exist and were thus not included in the SSR. SAC ¶¶ 37, 38, 51. Facebook has not required, or even asked, members to re-affirm their consent to the SSR.  Thus, a member's initial consent to the SSR, if given at all, is the only consent given and any claim that they consented to the terms of the SSR after January 25, 2011 fails.

**1.  Plaintiffs could not and cannot opt out of Sponsored Stories.**

Facebook also relies upon the fallacy that members of the Facebook service may adjust their privacy settings in order to limit their appearance in Sponsored Stories.  However, any such capabilities, if they exist at all,  are not readily accessible or limiting in any meaningful

way.  Moreover, it is clear that Members may **not** opt out of them entirely.  In other words, members are actually *forced* to participate if they use any functionality upon which Sponsored Story advertisements are triggered.  This is directly acknowledged on the Facebook Help Center page which admits: "there is no way to opt out of seeing all or being featured in any Sponsored Stories."  SAC ¶ 34.

Even if the new pages for which Facebook seeks judicial notice are considered—and Plaintiffs vigorously oppose such notice in their Opposition and Objections to the Request for Judicial Notice—Plaintiffs still cannot opt out.  Facebook admits that the only way to not have a Sponsored Story created is to not interact with any "Like" buttons as to companies or products or otherwise take any actions which might end up on a Member's Newsfeed, and by not uploading a profile picture.  Def.'s Mot. to Dismiss 24.   Moreover, that Plaintiffs **needed** to take (or not take) these actions to avoid being in Sponsored Stories was **never communicated to the Plaintiffs** by Facebook before these Sponsored Stories were run.  The Class consists of persons who were Members before Sponsored Stories existed, and who were never asked to consent to appear in them.  Facebook's other assertion, that one can limit who sees one's "Likes" by adjusting Privacy Settings (Yang Decl ¶ 5 and Ex. D), is not at all apparent from reading the page (which was "last accessed July 1, 2011).  There is no evidence that this page was accessible to Plaintiffs at any time before, on, or after July 1, 2011, or that taking the actions discussed in Ex. D –which are not fully specified—would actually result in no Sponsored Stories being created, it only says one can control who sees what the Member "Posts."   There are also other actions, such as "checking in," that can trigger them.  Furthermore, there is no evidence that Sponsored Stories might not still be created as to actions Plaintiffs have already taken in the past.  Finally, the members of the Minor Subclass cannot have consented, only their legal guardians can.  Cal. Civil Code § 3344(a).

### 2.   The Court in Cohen v. Facebook, Inc. rejected Defendant's Positions on consent

Despite citing to the opinion, Facebook fails to mention that the Court in *Cohen* **rejected** Facebook's argument that there was consent to the **commercial** use of the putative

Class members' likenesses and names. *See Cohen*, slip. op. at 6-7 ("Nothing in the provisions of the Terms documents to which Facebook has pointed constitutes clear consent by users to have their name or profile picture shared in a manner that discloses what services on Facebook they have utilized, or to endorse those services.")(emphasis in original)

### E.    Plaintiffs Have Alleged Injury In Fact In Their UCL Claim.

The UCL, Business & Professions Code section 17200 et seq., "defines 'unfair competition' as any unlawful, unfair or fraudulent business practice." *Bank of the West v. Superior Court,* 2 Cal. 4th 1254, 1266-67 (1992) *see also Cel-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal. 4th 163, 180 (1999). Plaintiffs have pleaded facts to support each of the three prongs.

### 1.    The "unlawful" prong of the UCL is satisfied.

An 'unlawful' business activity includes anything that can properly be called a business practice and that at the same time is forbidden by law." *Smith v. State Farm Mut. Auto. Ins. Co.,* 93 Cal. App. 4th 700, 718 (2001) (internal citations omitted). Facebook's actions violate the express terms of Section 3344. An "unlawful" prong claim under the UCL, essentially "piggybacks" upon other statutes. "By 'borrowing' violations of other laws, the UCL deems those violations independently actionable under the UCL." *Smith v. Wells Fargo Bank,* 135 Cal. App. 4th 1463, 1480 (2006) (quoting *Cel-Tech,* 20 Cal. 4th at 180). Here, the UCL claim is "borrowing" Section 3344, which provides a $750 penalty for the unauthorized use of a person's name or likeness.

Plaintiffs have alleged that they have lost money or property, in that they been deprived of monies which they should have been paid for their endorsements in Sponsored Stories using their names and likenesses under Civil Code Section 3344. SAC ¶ 93. At a minimum, they each had an expectation interest of $750, the "floor" created by Section 3344 for a misappropriation of the right of publicity as to each Sponsored Story run about them. That

Facebook is a "free" service to join, is simply irrelevant to the issue of whether Plaintiffs have lost money or property. [12]

Plaintiffs can also prove that they have a right to be paid for their endorsements as a matter of common law, and have further pleaded that they can establish how much these endorsements are worth. *See* SAC ¶ 91. Facebook's own records as to what it charges for ads can be used for this purpose. Facebook has admitted that endorsements from friends—noncelebrity Facebook users—are worth twice to three hundred percent what an ordinary endorsement would be worth. SAC ¶¶ 42, 43, 45. Furthermore, as noted, there are cases which hold that statutory damages can form the basis for a claim of damages. Here, the $750 in damages for each violation of Section 3344 serves that role. [13] The purpose of the $750 is actually as a liquidated damages substitute, for persons who are not celebrities. Under the UCL, a person is entitled to restitution of any monies in which they have an expectation interest, such as unpaid wages. [14]

The appropriation of their likenesses and names entitles the Class members to be paid for their right to publicity. *See Miller*, 159 Cal. App. 4th at 1002 ("The statute's legislative history reveals section 3344(a) was intended to fill "a gap which exist[ed] in the common law tort of invasion of privacy" as applied to noncelebrity plaintiffs whose names lacked 'commercial value on the open market'"). The Class members also have a right under the common law to be compensated for the use of their likenesses and names; this right is pleaded under the rubric of unjust enrichment. [15]

---

[12] Facebook cites *In re Facebook Privacy Litig.*, No. C 1.0-02389 JW, at 11-12 (N.D. Cal. May 12, 2011) (Ware, J.) for the proposition that there can be no injury because using Facebook is free. However, the allegations in that case did not involve the misappropriation of likenesses for paid advertising such as here, but rather the bare gathering of information. The cases are different and *In Re Facebook Privacy Litigation* does not mean that there can never be an injury where a service is free; that overbroad proposition is absurd on its face.

[13] *See Christoff v. Nestlé USA, Inc.*, 47 Cal. 4th 468 (2009) (model whose image used on coffee containers sued under Section 3344 for actual damages, and for common law misappropriation of likeness and unjust enrichment).

[14] *See, e.g., Cortez v. Purolator Air Filtration Products*, 23 Cal. 4th 163, 177-178 (2000)(employee whose employer obtained monies based on his labor had vested interest in unpaid wages, which were a proper subject for restitution under the UCL).

[15] *See infra* page 21.

## 2.     The UCL "fraudulent" prong is satisfied.

A fraudulent business practice is one which is likely to deceive the public. *Mass. Mut. Life Ins. Co. v. Sup. Ct.,* 97 Cal. App. 4th 1282, 1290 (2002).   It may be based on representations to the public which are untrue, and "'also those which may be accurate on some level, but will nonetheless tend to mislead or deceive. . . . A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under'" the UCL. *Id.* at 1289-1290. Under the UCL, unlike common law fraud, <u>no actual deception, reliance or damage</u> need to be shown. *See, e.g., Blakemore v. Sup. Ct.,* 129 Cal. App. 4th 36, 49 (2005).

Plaintiffs satisfy the requirements of pleading with particularity under Federal Rule of Civil Procedure 9(b) to the extent that it applies to a UCL "fraud" claim.   They allege the "who, what, when and where" of the statements. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003).   Plaintiffs allege that Facebook in its Terms of Use misled them into believing that they "have full control to prevent their appearance in Facebook advertising, including Sponsored Story advertisements," and thus could choose privacy options which would protect them from having their likeness and names used, but that this was untrue. *See* SAC ¶ 122, 123.

"Whether a practice is deceptive or fraudulent "cannot be mechanistically determined under the relatively rigid legal rules applicable to the sustaining or overruling of a demurrer." *Schnall v. Hertz Corp.,* 78 Cal. App. 4th 1144, 1167 (2000).   Rather, the determination is one question of fact which requires consideration and weighing of evidence from both sides before it can be resolved. *Gregory v. Albertson's, Inc.,* 104 Cal. App. 4th 845, 857 (2002); *Schnall*, 78 Cal. App. 4th at 1167.     Thus, any determination of the issues of whether these statements were misleading or not at this stage of the litigation would be premature, as it will be an issue of fact as to whether Facebook is injuring plaintiffs.   Facebook's assertion that "Plaintiffs *could have* limited the use of their name and profile image in Sponsored Stories is the subject of a dispute. Plaintiffs deny that this is the case, and Defendant's reliance on webpages it claims are to the contrary are neither admissible (see Plaintiffs' Opposition to the Request for Judicial Notice) nor conclusive evidence of the truth of these statements.

The SAC states that the Sponsored Stories advertising product was rolled out on January 25, 2011, and at that time, the Members up to that point were unaware that their interactions could result in their names and likenesses being included in Sponsored Stories. SAC ¶ 26. Furthermore, it is alleged that Sponsored Stories did not exist at the time the Class members became Facebook Members, SAC ¶¶ 38, 50; that "Plaintiffs each registered a facebook.com account prior to January 25, 2011", SAC ¶ 51; and that no plaintiff consented to his or her inclusion in a Sponsored Story. SAC ¶62. From these, it is apparent that the Complaint alleges that all Plaintiffs were members before January 25, 2011, and up to that time, the Terms of Use or SSR contained these omissions and misrepresentations, as detailed and excerpted in paragraphs 31 through 36 of the SAC. This satisfies the "who, what, when and where" required by Rule 9(b).

### 3.     The UCL "unfair" prong is satisfied.

Facebook incorrectly asserts that the controlling test for deciding what is an "unfair" practice is that stated in *Camacho v. Auto Club of S. Cal.*, 142 Cal. App. 4th 1394 (2006), and *Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th 581 (2009), which look to the Federal Trade Communication Act and require "substantial" injury and that the injury is not "one which could have been avoided." However, the standard advocated by Facebook has been **expressly** rejected by other California courts. *See Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 715 (2007). Indeed, the Ninth Circuit in *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 735-36 (9th Cir. 2007) **expressly declined** to use the standard espoused in *Camacho* and *Davis*, holding "we decline to apply the FTC standard [used in *Camacho* and *Davis*] in the absence of a clear holding from the California Supreme Court." Instead, after reviewing the competing tests, the Ninth Circuit held that "the district court did not apply the wrong legal standard by relying on the balancing test from *South Bay*. In the absence of further clarification by the California Supreme Court, we endorse the district court's approach to the law as if it still contained a balancing test." *Lozano*, 504 F.3d at 736.

Thus, the proper test is the balancing test in a consumer case is that used in *South Bay Chevrolet v. GM Acceptance Corp.*, 72 Cal. App. 4th 861 (1999). Plaintiffs have pleaded facts sufficient to show that they have been deprived of their right to publicity and the

minimum $750 to which they are entitled, and there is **no** countervailing public policy which allows Facebook to use them as unpaid advertisers without their consent.

        **F.**     **The Claim For Unjust Enrichment Is Properly Pleaded.**

Defendant is simply wrong that there is no recognized cause of action in California for unjust enrichment, despite the statements to that general effect in the cases it cites. It was recently held that:

> [U]njust enrichment is **a common law obligation implied by law** based on the equities of a particular case and not on any contractual obligation. (*McBride v. Boughton,* 123 Cal. App. 4th 379, 388-389, 20 Cal.Rptr.3d 115 (2004).) Whether termed **unjust enrichment**, quasi-contract, or quantum meruit, the equitable remedy of restitution when **unjust enrichment** has occurred "is an *obligation* (not a true contract [citation]) created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money."…'Quasi-contracts, unlike true contracts, are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. **They are obligations created by law** for reasons of justice.'" (*Weitzenkorn v. Lesser,* 40 Cal. 2d 778, 794, 256 P.2d 947 (1953).)"

*F.D.I.C. v. Dintino,* 167 Cal. App. 4th 333, 346 (2008) (emphasis added); *see also Ghirardo v. Antonioli,* 14 Cal. 4th 39, 50-52 (1996); *Yang v. Moua,* 2010 U.S. Dist. LEXIS 21837 (E.D. Cal. Feb. 18, 2010), at *39-*40.

Facebook is keeping monies to which Plaintiffs would otherwise be entitled—monies for their endorsements of products or companies. Whether intended or not by Plaintiffs, the Sponsored Stories are perceived as positive endorsements by the persons who view them. Facebook knows and relies on this, in persuading advertisers to use the Sponsored Stories service. Plaintiffs' situation is no different from any other where someone has been exploited, whether by working based on a promised compensation or having their property taken from them.

        **G.**     **The CDA Was Not Designed To And Does Not Protect Content Providers / Creators Such As Facebook.**

The CDA offers limited protections against *secondary* liability for service providers, not primary liability for content *creators*.[16] Plaintiffs have pleaded that Facebook has *created new*

---

[16] *See* SAC, ¶¶ 58, 59. ("FACEBOOK was solely responsible for the creation and development of each advertisement, the content, and the advertisement scheme by which each advertisement

and original content—the advertisements in question—by cobbling together the actions of Plaintiffs with their Facebook names and profile pictures, together with advertiser's names, and often in conjunction with the names of other Facebook Friends.

Section 230(e)(3) of the CDA defines an "Internet Content Provider" as "any person or entity that is responsible, **in whole or in part,** for the creation or development of information provided through the Internet or any other interactive computer service." Plaintiffs do not contest the fact that Facebook is an "interactive computer service." However, Section 230 bars a plaintiff's claim if a website publishes another content provider's information, **unless** the website creates or develops the particular information at issue. *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003). Plaintiffs are not claiming that Facebook should be held liable for information posted by third party information content providers, but rather that Facebook uses its account holder's image and identity without the user's permission for financial gain.

Facebook **creates** content by grouping together various images and words. The resulting Sponsored Stories are thus **not** identical to the Newsfeed "stories" generated by their interactions with web pages. In some instances, Facebook combines the Member's name with those of others—for example, "Jane Doe and 3 others like Rosetta Stone." The Member does not have the information to state that she and "three other""Facebook Friends" "like" a company or product, Facebook does.[17] Even in the example used by Facebook—which is not included in the SAC—the "Sponsored Story" about Jessica Gronski differs from what appeared in the NewsFeed, as it added the Starbuck's logo. *See Def. Mot. to Dismiss 6.*[18] The Member

---

was created," "Each advertisement was new, original and unique content created and developed in whole or in part by FACEBOOK.")

[17] Facebook is playing on the very ambiguity in the language with which it has imbued the "Like" button. The "Sponsored Story" it developed, does **not** say "Angel Frolicker clicked on the 'Like' button on Rosetta Stone's page," it says "Angel Frolicker likes Rosetta Stone." Facebook knows that when turned into a Sponsored Story where a person's name and likeness are married to the logo and name of an advertiser, the resulting statement will be perceived as an endorsement.

[18]Contrary to Facebook's mischaracterization, Plaintiffs did **not** allege that "advertisers provide their company names and logos for the Sponsored Stories," FB Brief at 14. The SAC states in paragraph 56 that "Each advertisement described below used the respective name of the

has no control over these decisions as to whether to post a particular logo or company name, or to include the fact that others "like" a product or company. Facebook's assertion that it does not create the content thus fails as it has at minimum created the content "in part." 47 U.S.C.A. § 230(f)(3).

As the Ninth Circuit Court of Appeals held, "Section 230 of the CDA immunizes providers of interactive computer services against liability arising from content **created by third parties.**" *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (emphasis added) ("*Roommate*"). The Ninth Circuit Court of Appeals pointed out that language of the Act itself emphasizes immunity only for secondary liability:

> Congress sought to immunize the *removal* of user-generated content, not the *creation* of content: '[S]ection [230] provides `Good Samaritan' protections from civil liability for providers . . . of an interactive computer service for actions to *restrict* . . . access to objectionable online material.

*Roommate*, 521 F.3d at 1163-64 (emphases in original).

The Court of Appeal then analyzed how Roommate.com itself developed part of the content by creating questions subscribers were required to answer, the posting of which was unlawful. *Id.* at 1164.[19] In finding that there was no immunity, the Ninth Circuit expressly rejected the very argument Facebook is raising here, that the fact that because the subscriber /user (or here, "Member") contributed some of the content means that CDA immunity attaches, holding:

> [T]he fact that users are information content providers does not preclude Roommate from also being an information content provider by helping "develop" at least "in part" the information in the profiles. As we explained in *Batzel*, the party responsible for putting information online may be subject to liability, even if the

---

advertiser and an image related to the advertiser." Facebook, not the advertisers, is essentially creating a collage by combining Plaintiffs' personal information with advertiser information.
[19] Contrary to Facebook's insinuation, *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir 2003) did <u>not</u> hold that Section 230 bars claims for misappropriation of the right of publicity, but rather that the defendant was not an information content provider with respect to various comments posted by a third party on a profile on Matchmaker.com. Id. at 1124-1125. *Gentry v. Ebay, Inc.*, 99 Cal. App. 4th 816, 820 (2002) is also inapposite because there the plaintiffs sought to "hold eBay responsible for misinformation or misrepresentations originating with other defendants or third parties." Here, Facebook did add content.

information originated with a user. *See Batzel v. Smith*, 333 F.3d 1018, 1033 (9th Cir. 2003).

*Roommate*, 521 F.3d at 1163.

Facebook is not acting as a "good Samaritan," and it is doing more than simply publishing another content provider's information in creating "Sponsored Stories" on other users' Facebook pages without the owner's consent, it is creating new content. Facebook plays "a significant role in creating, developing or 'transforming' the relevant information." A "Sponsored Story" is something that the class representatives never said as stated. (*E.g.* SAC ¶ 68).

Thus, Facebook's reliance on the "editorial" changes exception to being deemed a content provider in *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) is misplaced. In *Batzel* the Court of Appeal noted that the reference in Section 230 to "'*another* information content provider' distinguishes the circumstance in which the interactive computer service itself meets the definition of 'information content provider' with respect to the information in question." *Batzel*, 333 F.3d at 1031. The defendant did not create any content, because the defendant "composed the [offending] e-mail entirely on his own." *Id.* at 1031. The Court further stated that "the exclusion of "publisher" liability necessarily precludes liability for exercising the usual prerogative of publishers **to choose among proffered material** and to edit the material published while retaining its basic form and message." *Id.* (emphasis added). Here, the Sponsored Stories were not composed "entirely" by Plaintiffs, if at all, and Facebook is not merely "choosing among proffered material," it is adding material such as logos and the number of other persons who "like" a product or company.

Moreover, *Batzel* and the other cases cases cited therein as well as the other case relied upon by Facebook for the "publishers' liability" exclusion, only address instances where the "editing" consisted of keeping the "basic form and message" intact, and where the content from which "portions" are being selected were all provided initially by the original content provider / third party.[20] In *Jurin v. Google, Inc.,* 695 F. Supp. 2d 1117 (E.D. Cal. 2010), the court

---

[20] *See, e.g., Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)( defamatory speech initiated by a third party); *Ben Ezra, Weinstein, & Co. v. America Online, Inc.*, 206 F.3d 980 (10th Cir. 2000), 986  (no evidence AOL provided content) *Young v. Facebook, Inc.*, No. 5:10-

MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

rejected CDA liability for Google for suggesting keywords used in its Adwords ads, because the  defendant did not "provide the content of the 'Sponsored Link' advertisements… Defendant's keyword suggestion tool hardly amounts to the participation necessary to disqualify it of CDA immunity." *Id.* at 1123.

Facebook's assertion that "by republishing a User's name or profile image **along with the actions the User has taken**—Liking or Posting content, Checking In, or playing games— Facebook provides a forum for authentic communications or suggestions by persons who have expressed their approval of or connection with a particular product or service." Def.'s Mot. to Dismiss 21, also illustrates that Facebook **is** providing content by combining the name and profile image "along with" those actions.

The "users" here do not include the advertisers themselves, thus, they are not the ones "choosing" what to display. See *Goddard v. Google, Inc.,* 640 F. Supp. 2d 1193, 1197-98 (N.D. Cal. 2009)  Nor is this an instance where an ad has been edited only to make it more "visible," such as by adding HTML meta tags, as in *Asia Econ. Inst. v. Xcentric Ventures LLC,* No. CV 10-01360 SVW (PJWx), 2011 WL 2469822, (C.D. Cal. May 4, 2011); instead, the changes were to the substantive content and visible to the consumers.  *See id* at *6 (Absent a changing of the [] substantive content **that is visible** to consumers, liability cannot be found." (emphasis added)).  Nor is this the type of editing of an ad as in *Ramey v. Darkside Prods., Inc.*, No. 02-730 (GK), 2004 WL 5550485 (D.D.C. May 17, 2004), where it was undisputed that the advertisement at issue was created by a third party, and the Defendant's minor alterations of the advertisement included printing its website address on every advertisement published on its website, placing a watermark on the photos used, and categorizing the advertisements by subject matter.   Again, that is not the situation here, as Facebook has added words and graphics which were not created or provided by Plaintiffs.

cv-03579, 2010 WL 4269304 (N.D. Cal.  Oct. 15, 2010) (third party content, did not involve a right of publicity and only mentioned the CDA in passing); *Perfect 10, Inc. CC Bill, LLC*, 488 F.3d 1102,  (9th Cir. 2007)(third party content) *Black v. Google, Inc.*, No 10-01281 CW, 2010 WL 3222147 (N.D. Cal. Aug. 13, 2010)(third party content); *Doe IX v. Myspace.Com*, 629 F. Supp. 2d 663 (E.D. Tex. 2009)(Myspace held not an "information content provider" as to the content); *Doe II v. Myspace, Inc.*, 528 F.3d 413 (5th Cir. 2008)(third party content, alleged violence against minor.).

## V.   CONCLUSION

For all the foregoing reasons, Facebook's Motion to Dismiss should be denied.

THE ARNS LAW FIRM


By: ___ /s/ Robert S. Arns _____
       ROBERT S. ARNS
       Jonathan E. Davis


By: _____
       STEVEN R. WEINMANN


JONATHAN JAFFE LAW


By: ___ /s/ Jonathan M. Jaffe _____
       JONATHAN M. JAFFE
       **Attorneys for Plaintiffs**