1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ANGEL FRALEY, et al., | )    Case No.: 11-CV-01726-LHK |
|                                            Plaintiffs, | ) |
|           v. | )    ORDER GRANTING IN PART AND |
| | )    DENYING IN PART DEFENDANT'S |
| FACEBOOK, INC, a corporation; and DOES | )    MOTION TO DISMISS |
| 1-100, | ) |
| | ) |
|                                  Defendants. | ) |
| | ) |
| | ) |

Facebook, Inc. ("Facebook") owns and operates Facebook.com, a social networking site with over 600 million members worldwide and over 153 million members in the United States. While members join Facebook.com for free, Facebook generates its revenue through the sale of advertising targeted at its users. At issue here is one of Facebook's advertising practices in particular, "Sponsored Stories," which appear on a member's Facebook page, and which typically consist of another member's name, profile picture, and an assertion that the person "likes" the advertiser, coupled with the advertiser's logo. Sponsored Stories are generated when a member interacts with the Facebook website or affiliated sites in certain ways, such as by clicking on the "Like" button on a company's Facebook page.

In this putative class action, Plaintiffs Angel Fraley; Paul Wang; Susan Mainzer; J.H.D., a minor, by and through James Duval as Guardian ad Litem; and W.T., a minor, by and through Russell Tait as Guardian ad Litem (collectively "Plaintiffs"), on behalf of themselves and all others

1

United States District Court

For the Northern District of California

1   similarly situated, allege that Facebook's Sponsored Stories violate California's Right of Publicity

2   Statute, Civil Code § 3344; California's Unfair Competition Law, Business and Professions Code §

3   17200, *et seq.* ("UCL"); and the common law doctrine of unjust enrichment.  Plaintiffs allege that

4   Facebook unlawfully misappropriated Plaintiffs' names, photographs, likenesses, and identities for

5   use in paid advertisements without obtaining Plaintiffs' consent.  Second Am. Compl. ("SAC") ¶¶

6   107-136, June 6, 2011, ECF No. 22. [1]  Defendant filed a motion to dismiss pursuant to Federal

7   Rules of Civil Procedure 12(b)(1) and 12(b)(6) arguing lack of Article III standing, immunity

8   under § 230 of the federal Communications Decency Act ("CDA"), and failure to state a claim

9   upon which relief can be granted.  Mot. to Dismiss at 1-2, July 1, 2011, ECF No. 30 ("Mot.").  The

10  Court held a hearing on this motion on September 29, 2011.  Having considered the parties'

11  submissions and argument and the relevant law, and for the reasons discussed below, the Court

12  GRANTS in part and DENIES in part Defendant's motion to dismiss.

13  **I.      BACKGROUND**

14          Unless otherwise noted, the following allegations are taken from the Complaint and

15  judicially noticeable documents and are presumed to be true for purposes of ruling on Defendant's

16  motion to dismiss.[2]  *See Marder v. Lopez*, 450 F.3d 445, 447 n.1 (9th Cir. 2006).  Facebook is a

17  free, web-based social networking site with over 153 million members in the United States.  SAC ¶

18  13.  To join Facebook, a user must provide his or her name, age, gender, and a valid e-mail

19  address, and agree to Facebook's terms of service.  *Id.* at ¶ 16; Mot. at 2.  Once registered, a

20  member receives a "Profile" page, may upload a "profile photo" representing him or herself, and

21  may establish connections with other members by approving them as Facebook "Friends."  SAC ¶¶

22  _____

23  [1] Plaintiffs amended once as of right in state court, before Defendant filed a response, primarily to
    add additional class representatives.  After Defendants removed the case to federal court and filed a
24  first motion to dismiss, *see* ECF No. 16, Plaintiffs filed a Second Amended Complaint, again as of
    right, for the purpose of adding supplemental details regarding matters already pleaded, such as the
25  details about the specific Sponsored Stories published about them on Facebook.

26  [2] Defendant filed a Request for Judicial Notice in Support of its Motion to Dismiss the Second
    Amended Class Action Complaint ("RJN"), asking the Court to take judicial notice of Facebook's
27  Statement of Rights and Responsibilities and of various screenshots of Facebook.com's Help
    Center.  ECF No. 31.  Plaintiffs oppose this request.  ECF No. 54.  Defendant also submits
28  declarations with similar types of exhibits attached.  The Court addresses these evidentiary issues
    in Section III.

2

17-18.  In addition, Facebook allows members to share information with their Friends in a variety of ways: members may "Post" by adding text, images, videos, and hyperlinks to their own profile page, *id.* at ¶ 23; "Check-in" by announcing their geographical location within the feature "Places," *id.* at ¶ 24; and "Like" content by clicking on a thumbs-up button that appears next to certain items on the Internet, both within Facebook.com and on external sites, *id.* at ¶ 25.  Whenever members take one of these actions, Facebook generates a "Story," which then appears on their Friends' "News Feed."  *Id.* at ¶¶ 15, 17, 20.

Facebook earns revenue primarily through the sale of targeted advertising that appears on members' Facebook pages.  *Id.* at ¶¶ 13, 21.  Plaintiffs challenge one of Facebook's advertising services in particular, known as "Sponsored Stories," which Facebook launched on January 25, 2011, and which was enabled for all members by default.  *Id.* at ¶¶ 26, 30.  A Sponsored Story is a form of paid advertisement that appears on a member's Facebook page and that generally consists of another Friend's name, profile picture, and an assertion that the person "likes" the advertiser.  A Sponsored Story may be generated whenever a member utilizes the Post, Like, or Check-in features, or uses an application or plays a game that integrates with the Facebook website, and the content relates to an advertiser in some way determined by Facebook.  *Id.* at ¶ 26.  For example, Plaintiff Angel Fraley, who registered as a member with the name Angel Frolicker, alleges that she visited Rosetta Stone's Facebook profile page and clicked the "Like" button in order to access a free software demonstration.  Subsequently, her Facebook user name and profile picture, which bears her likeness, appeared on her Friends' Facebook pages in a "Sponsored Story" advertisement consisting of the Rosetta Stone logo and the sentence, "Angel Frolicker likes Rosetta Stone."  *Id.* at ¶¶ 65-68.  Plaintiffs Susan Mainzer, Paul Wang, J.H.D., and W.T. were similarly featured in "Sponsored Story" advertisements after clicking on a "Like" button on a company's website, which they did for various reasons, such as to access a special offer code for a new product, to access photographs of an event, or to become eligible for a promotional prize.  *Id.* at ¶¶ 69-85; *see also id.* at ¶ 25.  Plaintiffs allege that they were unaware at the time they clicked those "Like" buttons that their actions would be interpreted and publicized by Facebook as an endorsement of those advertisers, products, services, or brands.  *Id.* at ¶¶ 26, 61.  Plaintiffs further allege that members

Case No.: 11-CV-01726-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

**United States District Court**
For the Northern District of California

1  are often enticed to click on a "Like" button simply to receive discounts on products, support social

2  causes, or to see a humorous image.  *Id.* at ¶ 25.

3       Unlike ordinary "Stories" that appear in a member's News Feed, Sponsored Stories are off-

4  set along with other advertisements paid by Facebook advertisers.  The SAC quotes Facebook CEO

5  Mark Zuckerberg explaining that "[n]othing influences people more than a recommendation from a

6  trusted friend" and that "[a] trusted referral is the Holy Grail of advertising."  *Id.* at ¶ 43.  On

7  average, actions taken by Facebook members are shared with 130 people, the average number of

8  friends a member has.  *Id.* at ¶ 45.  The SAC also quotes Facebook COO Sheryl Sandberg stating

9  that "[m]aking your customers your marketers" is "the illusive goal we've been searching for."  *Id.*

10  These beliefs about the marketing value of friend endorsements have been corroborated by the

11  Nielsen Company, a leading marketing research firm.  *Id.* at ¶ 42.  According to Facebook,

12  members are twice as likely to remember seeing a Sponsored Story advertisement compared to an

13  ordinary advertisement without a Friend's endorsement and three times as likely to purchase the

14  advertised service or product.  *Id.* at ¶¶ 44-45.  Plaintiffs therefore assert that the value of a

15  Sponsored Story advertisement is at least twice the value of a standard Facebook.com

16  advertisement, and that Facebook presumably profits from selling this added value to advertisers.

17  *Id.* at ¶¶ 44, 47.

18       Plaintiffs assert that Sponsored Stories constitute "a new form of advertising which drafted

19  millions of [Facebook members] as unpaid and unknowing spokepersons for various products," for

20  which they are entitled to compensation under California law.  Opp'n at 1; *see* SAC ¶ 46.

21  Although Facebook's Statement of Rights and Responsibilities provides that members may alter

22  their privacy settings to "limit how your name and [Facebook] profile picture may be associated

23  with commercial, sponsored, or related content (such as a brand you like) served or enhanced by

24  us," *id.* at ¶ 32, members are unable to opt out of the Sponsored Stories service altogether, *id.* at ¶¶

25  30, 34.  Furthermore, although the Statement of Rights and Responsibilities provides that "[y]ou

26  give us permission to use your name and [Facebook] profile picture in connection with

27  [commercial, sponsored, or related] content, subject to the limits you place," *id.* at ¶ 32, Plaintiffs

28  all registered for a Facebook account prior to January 25, 2011.  Therefore, they could not have

4

1    known about Sponsored Stories at the time they agreed to Facebook's Terms of Use, nor did

2    Facebook ask them to review or re-affirm the Terms of Use upon introduction of the Sponsored

3    Story advertising feature. *Id.* at ¶¶ 50-53.

4          Plaintiffs allege that Facebook's practice of misappropriating their names and likenesses for

5    commercial endorsements without their consent (1) violated their statutory right of publicity under

6    California Civil Code § 3344; (2) violated the UCL; and (3) unjustly enriched Facebook.  Plaintiffs

7    bring this putative class action on behalf of all persons in the United States who were registered

8    members of Facebook.com as of January 24, 2011, and whose names, photographs, likenesses, or

9    identities associated with their account were used by Facebook in a "Sponsored Story"

10   advertisement.  SAC ¶ 95.  Plaintiffs seek declaratory and injunctive relief, as well as damages and

11   other equitable relief.  *Id.* at ¶ 136.

12   **II.    LEGAL STANDARDS**

13       **A.  Motion to Dismiss Under Rule 12(b)(1)**

14         A Rule 12(b)(1) motion to dismiss tests whether a complaint alleges grounds for federal

15   subject matter jurisdiction.  If the plaintiff lacks standing under Article III of the U.S. Constitution,

16   then the court lacks subject matter jurisdiction, and the case must be dismissed.  *See Steel Co. v.*

17   *Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998).

18         A jurisdictional challenge may be facial or factual.  *Safe Air for Everyone v. Meyer*, 373

19   F.3d 1035, 1039 (9th Cir. 2004).  Where the attack is facial, the court determines whether the

20   allegations contained in the complaint are sufficient on their face to invoke federal jurisdiction,

21   accepting all material allegations in the complaint as true and construing them in favor of the party

22   asserting jurisdiction.  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975).  Where the attack is factual,

23   however, "the court need not presume the truthfulness of the plaintiff's allegations."  *Safe Air for*

24   *Everyone*, 373 F.3d at 1039.  In resolving a factual dispute as to the existence of subject matter

25   jurisdiction, a court may review extrinsic evidence beyond the complaint without converting a

26   motion to dismiss into one for summary judgment.  *See id.*; *McCarthy v. United States*, 850 F.2d

27   558, 560 (9th Cir. 1988) (holding that a court "may review any evidence, such as affidavits and

28   testimony, to resolve factual disputes concerning the existence of jurisdiction").  Once a party has

**United States District Court**
For the Northern District of California

5

moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the opposing party

bears the burden of establishing the Court's jurisdiction.  *See Kokkonen v. Guardian Life Ins. Co.*,

511 U.S. 375, 377 (1994); *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th

Cir. 2010).

### B.  Motion to Dismiss Under Rule 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief

can be granted "tests the legal sufficiency of a claim."  *Navarro v. Block*, 250 F.3d 729, 732 (9th

Cir. 2001).  Dismissal under Rule 12(b)(6) may be based on either (1) the "lack of a cognizable

legal theory," or (2) "the absence of sufficient facts alleged under a cognizable legal theory."

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  While "'detailed factual

allegations'" are not required, a complaint must include sufficient facts to "'state a claim to relief

that is plausible on its face.'"  *Ashcroft v. Iqbal*, 555 U.S. 662, 129 S. Ct. 1937, 1949 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."  *Id.*

For purposes of ruling on a Rule 12(b)(6) motion to dismiss, the Court accepts all

allegations of material fact as true and construes the pleadings in the light most favorable to the

plaintiffs.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  The

Court need not, however, accept as true pleadings that are no more than legal conclusions or the

"'formulaic recitation of the elements' of a cause of action."  *Iqbal*, 129 S. Ct. at 1949 (quoting

*Twombly*, 550 U.S. 555).  Mere "conclusory allegations of law and unwarranted inferences are

insufficient to defeat a motion to dismiss for failure to state a claim."  *Epstein v. Wash. Energy Co.*,

83 F.3d 1136, 1140 (9th Cir. 1996); *accord Iqbal*, 129 S. Ct. at 1949-50.

### C.  Leave to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely

given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate

decision on the merits, rather than on the pleadings or technicalities."  *Lopez v. Smith*, 203 F.3d

1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and alterations omitted).  When

6

1    dismissing a complaint for failure to state a claim, "'a district court should grant leave to amend

2    even if no request to amend the pleading was made, unless it determines that the pleading could not

3    possibly be cured by the allegation of other facts.'" *Id.* at 1130 (quoting *Doe v. United States*, 58

4    F.3d 494, 497 (9th Cir. 1995)).  Generally, leave to amend shall be denied only if allowing

5    amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the

6    moving party has acted in bad faith.  *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532

7    (9th Cir. 2008).

8    **III.    EVIDENTIARY ISSUES**

9            In support of its arguments that members consent to the use of their name and likeness in

10   Sponsored Stories, and that Facebook did not engage in unlawful, unfair, or fraudulent business

11   practices, Defendant asks the Court to take judicial notice of (1) Facebook's Statement of Rights

12   and Responsibilities; (2) a screenshot of a page from Facebook's website entitled "Where can I

13   view and edit my privacy settings for sponsored content? – Facebook Help Center," accessed on

14   July 1, 2011; (3) a screenshot of a page from Facebook's website entitled "How can I control what

15   my friends see in their News Feeds? – Facebook Help Center," accessed on July 1, 2011; (4) a

16   screenshot of a page from Facebook's website entitled "How can I control who can see things I

17   post (for example: status updates, links, videos)? – Facebook Help Center," accessed on July 1,

18   2011; (5) a screenshot of a page from Facebook's website entitled "How do I create Sponsored

19   Stories? – Facebook Help Center," accessed on July 1, 2011; and (6) a screenshot of a page from

20   Facebook's website entitled "How do I unlike something? – Facebook Help Center," accessed on

21   July 1, 2011.  ECF No. 31 at 2 & Exs. A through F.[3]

22

23

24   ─────────────────
     [3] Defendant also submitted a supplemental declaration in support of its reply to Plaintiffs'
     opposition, through which Defendant seeks to introduce copies of the "Terms of Use" and
25   Statement of Rights and Responsibilities purportedly in effect at the time the various named
     Plaintiffs registered for their Facebook accounts.  *See* Supp. Muller Decl., ECF No. 59, at 2.
26   However, Defendant does not formally request that the Court take judicial notice of these
     supplemental exhibits, and thus the Court will not do so.  Furthermore, the Court will not convert
27   Defendant's motion to dismiss into one for summary judgment by relying on extrinsic materials.
     *See Swedberg v. Marotzke*, 339 F.3d 1139, 1146 (9th Cir. 2003); *Anderson v. Angelone*, 86 F.3d
28   932, 934 (9th Cir. 1996); *cf.* Fed. R. Civ. P. 12(d).

Case No.: 11-CV-01726-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

United States District Court
For the Northern District of California

1    As previously discussed, the Court generally may not look beyond the four corners of the

2    complaint in ruling on a Rule 12(b)(6) motion, with the exception of documents incorporated into

3    the complaint by reference, and any relevant matters subject to judicial notice. *See Swartz v.*

4    *KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007); *Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir.

5    2001). Under the doctrine of incorporation by reference, the Court may consider on a Rule

6    12(b)(6) motion not only documents attached to the complaint, but also documents whose contents

7    are alleged in the complaint, provided the complaint "necessarily relies" on the documents or

8    contents thereof, the document's authenticity is uncontested, and the document's relevance is

9    uncontested. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010); *see Lee*, 250 F.3d

10   at 688-89. The purpose of this rule is to "prevent plaintiffs from surviving a Rule 12(b)(6) motion

11   by deliberately omitting documents upon which their claims are based." *Swartz*, 476 F.3d at 763.

12   The Court may take judicial notice of matters that are either (1) generally known within the trial

13   court's territorial jurisdiction, or (2) capable of accurate and ready determination by resort to

14   sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b).

15   The SAC cites the Statement of Rights and Responsibilities, and therefore the Court will

16   take judicial notice of this document. *See* SAC ¶ 32. However, as to the remaining documents, the

17   Court finds that they are neither documents on which the Complaint "necessarily relies," nor

18   documents whose relevance and authenticity are uncontested. *See Coto Settlement*, 593 F.3d at

19   1038. First, Exhibits B through F were all accessed on July 1, 2011. It is thus unclear whether the

20   particular web pages Defendant submits were even in existence at the time Facebook first launched

21   the Sponsored Stories feature or at the time Plaintiffs took the actions that rendered them subject to

22   Sponsored Stories. *Cf. Cohen v. Facebook, Inc.*, No. 10-cv-5282-RS, 2011 WL 3100565, at *3

23   (N.D. Cal. June 28, 2011) ("*Cohen I*") (rejecting Facebook's request to take judicial notice of

24   various Terms of Use documents because "substantial questions . . . remain in this instance as to

25   when various versions of the documents may have appeared on the website and the extent to which

26   they necessarily bound all plaintiffs."). Second, although Plaintiffs cite one excerpt from a Help

27   Center page on Facebook's website in their SAC, *see* SAC ¶ 34, it does not follow that a member

28   would necessarily see the other Help Center pages Facebook submits. *Cf. Knievel v. ESPN*, 393

8

F.3d 1068, 1076-77 (9th Cir. 2005) (considering surrounding web pages under the incorporation by reference doctrine upon finding that "in order to access the [allegedly defamatory] photograph, one must first view, at minimum, the nine photographs that precede it").   For these same reasons, even if the Court were to find these documents to be susceptible of judicial notice, the Court concludes that they would not give rise to proper grounds for dismissal, as discussed more fully below. Defendant's request for judicial notice of Exhibits B through F is therefore denied.

## IV.   DISCUSSION

Defendant moves to dismiss on grounds that (1) Plaintiffs fail to allege a cognizable injury and therefore lack Article III standing necessary to maintain an action in federal court; (2) the federal Communications Decency Act ("CDA") bars Plaintiffs' claims; (3) Plaintiffs fail to state a claim for misappropriation under California Civil Code § 3344 because they have not alleged any actionable injury, they consented to the use of their names and likenesses, and the republished content is newsworthy under § 3344(d); (4) Plaintiffs fail to state a claim under the UCL because they have not alleged, and cannot allege, loss of money or property, and therefore lack standing, and furthermore because they fail to allege unlawful, unfair, or fraudulent conduct; and (5) Plaintiffs fail to state a claim for Unjust Enrichment because there is no such independent cause of action in California.  The Court addresses each ground for dismissal in turn.

### A.  Article III Standing

To establish Article III standing, Plaintiffs must demonstrate that they satisfy three irreducible requirements: (1) they have suffered an "injury in fact," *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations, quotation marks, and alterations omitted); *accord Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  In a class action, named plaintiffs representing a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they

United States District Court
For the Northern District of California

purport to represent." *Gratz v. Bollinger*, 539 U.S. 244, 289 (2003) (internal quotation marks and citations omitted).  "[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974); *accord Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003).  Here, there is no dispute that Plaintiffs satisfy the second and third requirements of constitutional standing.  Solely at issue is whether Plaintiffs have properly alleged injury-in-fact.

Because "injury" is a requirement under both Article III and Plaintiffs' individual causes of action, the Court notes at the outset that "the threshold question of whether [Plaintiffs have] standing (and the [C]ourt has jurisdiction) is distinct from the merits of [Plaintiffs'] claim." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011).  Standing "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth*, 422 U.S. at 500; *accord Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo*, 548 F.3d 1184, 1189 n.10 (9th Cir. 2008) ("The jurisdictional question of standing precedes, and does not require, analysis of the merits.").  At the same time, it is well established that "[t]he actual or threatened injury required by Art[icle] III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Warth*, 422 U.S. at 500 (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973)); *see also Massachusetts v. EPA*, 549 U.S. 497, 516 (2007) ("Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." (quotation marks and citation omitted)).  Although "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing," *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997), a plaintiff may be able to establish constitutional injury in fact by pleading violation of a right conferred by statute, so long as she can allege that the injury she suffered was specific to her, *see Warth*, 422 U.S. at 501.

Here, Plaintiffs' primary asserted injury is violation of their statutory right of publicity under California Civil Code § 3344.  As discussed more fully below, § 3344 prohibits the nonconsensual use of another's name, voice, signature, photograph, or likeness for advertising, selling, or soliciting purposes, and creates a cause of action for persons injured by such actions.

10

United States District Court
For the Northern District of California

Cal. Civ. Code § 3344. Plaintiffs assert that Defendant used their names, photographs, likenesses, and identities to sell advertisements for products, services, or brands without obtaining Plaintiffs' consent, and that Plaintiffs were economically injured when denied compensation for such unauthorized use. *See* SAC ¶ 2; Opp'n at 5-6. Without assessing the merits of Plaintiffs' claim, the Court finds that they have alleged a violation of their individual statutory rights under California Civil Code § 3344, and therefore, an invasion of a legally protected interest for Article III purposes. *See, e.g.*, *DeMando v. Morris*, 206 F.3d 1300, 1303 (9th Cir. 2000) ("[Plaintiff] has suffered the loss of a statutory right to disclosure [under the Truth in Lending Act, 15 U.S.C. §§ 1601-1693] and has therefore suffered injury in fact for purposes of Article III standing."); *see also Graczyk v. W. Publ'g Co.*, 660 F.3d 275, 278 (7th Cir. 2011) (holding that plaintiffs had constitutional standing where plaintiffs alleged that defendant engaged in bulk compilation and distribution of their personal information contained in motor vehicle records, in violation of the Drivers' Privacy Protection Act ("DPPA"), 18 U.S.C. § 2722); *In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 711-13 (N.D. Cal. 2011) (Ware, C. J.) (holding that plaintiffs had constitutional standing where they alleged violation of their rights under the Wiretap Act, 18 U.S.C. §§ 2510, *et seq.*, even though dismissal was warranted for failure to state a claim for relief thereunder); *cf. Downing v. Abercrombie & Fitch*, 265 F.3d 994 (9th Cir. 2001) (exercising jurisdiction over surfer's § 3344 claim against clothing retailer).

Furthermore, Plaintiffs' alleged injury is both "concrete and particularized," as well as "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560-61. The SAC contains specific allegations describing exactly what information belonging to each named Plaintiff was used by Defendant, how Defendant used that information, and to whom that information was published. The SAC alleges that each named Plaintiff clicked the 'Like' button on a company's Facebook page, and then each Plaintiff's name and profile photograph bearing his likeness was subsequently featured, without his consent, in a Sponsored Story advertisement displayed to his Facebook Friends. *See* SAC ¶¶ 65-85. The SAC further alleges that each named Plaintiff was featured in a Sponsored Story advertising that the Plaintiff 'likes' a certain product, company, or brand, irrespective of Plaintiff's motive in clicking the 'Like' button on the company's page. *Id.* ¶¶

Case No.: 11-CV-01726-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

25-26. The alleged commercial misappropriation is thus concrete and particularized with respect to each individual named Plaintiff. *Cf. Low v. LinkedIn Corp.*, No. 11-cv-01468-LHK, 2011 WL 5509848, at *3-4 (N.D. Cal. Nov. 11, 2011) (plaintiff asserting privacy violations stemming from alleged disclosure of his personally identifiable browsing history to third party advertising and marketing companies lacked standing where he was unable to articulate what information of his, aside from his user identification number, had actually been transmitted to third parties, nor how disclosure of his anonymous user ID could be linked to his personal identity); *In re iPhone Application Litig.*, No. 11-md-02250-LHK, 2011 WL 4403963, at *4 (N.D. Cal. Sept. 20, 2011) (plaintiffs asserting privacy violations resulting from mobile device maker's alleged disclosure of their personal information to third party application developers lacked standing where they failed to identify what devices they used, what apps they downloaded, or which defendant (if any) actually accessed or tracked their personal information); *LaCourt v. Specific Media, Inc.*, No. SACV-10-1256-GW (JCGx), 2011 WL 1661532, at *3-4 (C.D. Cal. Apr. 28, 2011) (plaintiffs asserting privacy violations stemming from online ad network's installation of Flash cookies on users' computers to track browsing history and thereby target ads at users based on their behavioral profiles lacked standing where they alleged neither that defendant actually tracked the online activity of any named plaintiff nor that they were personally affected by defendant's alleged conduct).

Nor can the Court say that the alleged injury is merely "conjectural or hypothetical." Defendant argues that Plaintiffs' theory of economic harm is merely speculative, pointing to a line of privacy cases involving the alleged disclosure of personal information that have been dismissed for failure to show injury. *See Low*, 2011 WL 5509848, at *4-6 (plaintiff's general allegation that the data collection industry considers consumer information valuable was insufficient to establish standing where he failed to allege what personal information of his was purportedly collected by a third party and how such collection deprived him of the economic value of his data); *In re iPhone Application*, 2011 WL 4403963, at *5-6 (plaintiffs' mere "general allegations" about the mobile device market for apps and about abstract concepts such as "lost opportunity costs" and "value-for-value exchanges" were insufficient to establish a concrete theory of injury); *Specific Media*, 2011

12

WL 1661532, at *4-6 (plaintiffs' reference to "academic articles concerning the nature of Internet business models driven by consumers' willingness to supply data about themselves" was insufficient, on its own, to establish standing in the absence of "some particularized example of their application in this case" (internal quotation marks, citations, and alterations omitted)); *In re JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 327 (E.D.N.Y. 2005) (rejecting plaintiffs' attempt to recover the loss of the economic value of their personal information as a contract damage where airline disclosed their personal data to a third-party data mining company in violation of airline's privacy policy); *In re Doubleclick, Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 525 (S.D.N.Y. 2001) (rejecting argument that the economic value of the collection of demographic consumer data is an economic loss to the individual consumer); *but see Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010) (holding that plaintiffs "alleged a credible threat of real and immediate harm stemming from the theft of a laptop containing their unencrypted personal data," which included their names, addresses, and social security numbers); *Doe 1 v. AOL LLC*, 719 F. Supp. 2d 1102, 1109-11 (N.D. Cal. 2010) (holding that plaintiffs were injured by defendant's collection and publication of "highly sensitive personal information," including credit card numbers, social security numbers, financial account numbers, and information regarding plaintiffs' personal issues, including sexuality, mental illness, alcoholism, incest, rape, and domestic violence).

While instructive, all of these cases are distinguishable. Not one of these cases involved the statutory right of publicity at issue here or the asserted economic value of an individual's commercial endorsement of a product or brand to his friends. Rather, in *In re iPhone Application*, *Specific Media*, *In re Doubleclick*, and *Low*, the plaintiffs' theories of economic injury were all grounded in the alleged economic value of their personal information either as used by advertisers to target advertising at plaintiffs themselves, or as used in the aggregate by marketing and analytics companies. The courts in those cases found that the plaintiffs were unable to articulate how they were economically injured by the use of their own information to advertise to themselves and unable to articulate how the collection of demographic information was an economic loss to them. *See, e.g.*, *In re DoubleClick*, 154 F. Supp. 2d at 525; *In re JetBlue Airways*, 379 F. Supp. 2d at 327

13

1   ("[T]here is absolutely no support for the proposition that the personal information of an *individual*

2   JetBlue passenger had any value for which that passenger could have expected to be compensated."

3   (emphasis added)).  In *Specific Media*, the court "recognize[d] the viability in the abstract of such

4   concepts as 'opportunity costs,' value-for-value exchanges,' 'consumer choice,' and other

5   economic concepts," but found that plaintiffs there simply failed to "give some particularized

6   example of their application in this case."  2011 WL 1661532, at *4.  Similarly, this Court

7   observed in *In re iPhone Application* that "'it is not obvious that Plaintiffs cannot articulate some

8   actual or imminent injury in fact.  It is just that at this point they haven't offered a coherent and

9   factually supported theory of what that injury might be.'"  2011 WL 4403963, at *6 (quoting

10  *Specific Media*, 2011 WL 1661532, at *6).

11          Here, by contrast, Plaintiffs have articulated a coherent theory of how they were

12  economically injured by the misappropriation of their names, photographs, and likenesses for use

13  in paid commercial endorsements targeted not at themselves, but at *other* consumers, without their

14  consent.  Unlike the plaintiffs in *In re iPhone Application*, *Specific Media*, *In re Doubleclick*, and

15  *Low*, Plaintiffs here do not allege that their personal browsing histories have economic value to

16  advertisers wishing to target advertisements at Plaintiffs themselves, nor that their demographic

17  information has economic value for general marketing and analytics purposes.  Rather, they allege

18  that their individual, personalized endorsement of products, services, and brands to their friends

19  and acquaintances has concrete, provable value in the economy at large, which can be measured by

20  the additional profit Facebook earns from selling Sponsored Stories compared to its sale of regular

21  advertisements.  *See* SAC ¶¶ 47, 63, 93; Opp'n at 11, 17.  Furthermore, Plaintiffs do not merely

22  cite abstract economic concepts in support of their theory of economic injury, but rather point to

23  specific examples of how their personal endorsement is valued by advertisers.  The SAC quotes

24  Facebook CEO Mark Zuckerbeg stating that "[a] trusted referral influences people more than the

25  best broadcast message.  A trusted referral is the Holy Grail of advertising."  SAC ¶ 43.  The SAC

26  also quotes Facebook COO Sheryl Sandberg explaining that "[m]arketers have always known that

27  the best recommendation comes from a friend. . . . This, in many ways, is the Holy Grail of

28  advertising."  *Id.*  According to Sandberg, the value of a Sponsored Story advertisement is at least

14

**United States District Court**
For the Northern District of California

1    twice and up to three times the value of a standard Facebook.com advertisement without a friend

2    endorsement.  *Id.* at ¶ 44-45.  Plaintiffs allege that the Nielsen Company, a well-respected

3    marketing research firm frequently quoted by Facebook, has also determined that advertising

4    consisting of recommendations by friends is the most effective form of advertising.  *Id.* at ¶ 42.

5    Based on these concrete allegations, Plaintiffs assert that they have a tangible property interest in

6    their personal endorsement of Facebook advertisers' products to their Facebook Friends, and that

7    Facebook has been unlawfully profiting from the nonconsensual exploitation of Plaintiffs' statutory

8    right of publicity.  Thus, in the same way that celebrities suffer economic harm when their likeness

9    is misappropriated for another's commercial gain without compensation, Plaintiffs allege that they

10   have been injured by Facebook's failure to compensate them for the use of their personal

11   endorsements because "[i]n essence, Plaintiffs are celebrities—to their friends."  Opp'n at 2.  The

12   Court does not find Plaintiffs' alleged injury so speculative as to deny them standing.

13        Only one case identified by Defendant is directly on point.  In *Cohen v. Facebook, Inc.*, No.

14   10-cv-5282-RS, 2011 WL 3100565, at *3 (N.D. Cal. June 28, 2011) ("*Cohen I*"), Facebook users

15   brought similar misappropriation claims against Facebook in connection with promotion of its

16   "Friend Finder" service, which enables a user to identify which of its e-mail address book contacts

17   are not yet Facebook members and to invite them to join Facebook.  In *Cohen I*, plaintiffs

18   challenged Facebook's practice of placing notifications on members' homepages stating that

19   certain of their Facebook Friends had used the Friend Finder service, and encouraging members to

20   "give it a try!"  2011 WL 3100565, at *1.  Facebook did not raise an Article III defense, but the

21   district court dismissed the misappropriation claim under Rule 12(b)(6) upon finding plaintiffs

22   failed to show "how the mere disclosure to their Facebook friends that they have employed the

23   Friend Finder service . . . causes them any cognizable harm, regardless of the extent to which that

24   disclosure could also be seen as an implied endorsement by them of the service."  *Id.* at *5.  The

25   court granted plaintiffs leave to amend, but later dismissed their amended complaint with prejudice

26   in a second order.  *See Cohen v. Facebook, Inc.*, No. C10-5282 RS, 2011 WL 5117164, at *1, 3

27   (N.D. Cal. Oct. 27, 2011) ("*Cohen II*").  In *Cohen II*, the court was not persuaded by plaintiffs'

28   argument that "Facebook's use of plaintiffs' names and likenesses can be seen as serving a

15

**United States District Court**
For the Northern District of California

1   commercial purpose, undertaken with at least the intent of achieving growth in Facebook's user

2   base, thereby ultimately resulting in monetary gain for Facebook." *Id.* at *2.

3          Although at first blush the *Cohen* cases appear highly similar to the one at bar, the Court

4   finds this case distinguishable.  The *Cohen* plaintiffs were unable to show that their names and

5   likenesses had any general commercial value—and in fact plaintiffs denied that they were required

6   to make such a showing to maintain their § 3344 claims.  *See Cohen II*, 2011 WL 57117164, at *2.

7   By contrast, Plaintiffs here have quoted explicit statements by Facebook's own CEO and COO that

8   friend endorsements are two to three times more valuable than generic advertisements sold to

9   Facebook advertisers.  Plaintiffs here have furthermore identified a direct, linear relationship

10  between the value of their endorsement of third-party products, companies, and brands to their

11  Facebook friends, and the alleged commercial profit gained by Facebook.  Thus, Plaintiffs have

12  alleged facts showing that their personal endorsement has concrete, measurable, and provable value

13  in the economy at large.  For all these reasons, the Court finds this case distinguishable from the

14  cases cited by Defendant.

15         Defendant would have the Court evaluate the merits of Plaintiffs' § 3344 claim before even

16  allowing Plaintiffs through the courthouse door.  But as the Ninth Circuit recently reminded,

17  "standing analysis, which prevents a claim from being adjudicated for lack of jurisdiction, [may

18  not] be used to disguise merits analysis, which determines whether a claim is one for which relief

19  can be granted if factually true." *Catholic League for Religious and Civil Rights v. City & Cnty. of*

20  *S.F.*, 624 F.3d 1043, 1049 (9th Cir. 2010) (en banc); *accord Maya*, 658 F.3d at 1068.  At this stage,

21  the Court must presume "that general allegations embrace those specific facts that are necessary to

22  support the claim." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted); *see also Ruiz v.*

23  *Gap, Inc.*, 540 F. Supp. 2d 1121, 1126 (N.D. Cal. 2008) (denying motion to dismiss for lack of

24  standing where plaintiff's alleged injury was an increased risk of identity theft resulting from theft

25  of defendant's laptop containing applicant's unencrypted personal information, but noting that

26  "[s]hould it become apparent that Ruiz's alleged injury is in fact too speculative or hypothetical,

27  the Court will conclude, as it must, that Ruiz lacks standing").  Accordingly, the Court does not

28  find it appropriate to import its analysis of the merits of Plaintiffs' § 3344 claim into its analysis of

constitutional standing.  The Court finds that Plaintiffs have set forth sufficient "general factual allegations of injury resulting from the defendant's conduct" to survive a 12(b)(1) motion to dismiss.  *See Lujan*, 504 U.S. at 561.  Defendant's motion to dismiss for lack of constitutional standing is accordingly denied.

## B.  Communications Decency Act § 230

Defendant next argues that Plaintiffs' claims are barred by § 230 of the CDA, which provides, in relevant part, that "[n]o provider or member of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).  Section 230 was enacted "to promote the continued development of the Internet and other interactive computer services and other interactive media" and "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." *Id.* §§ 230(b)(1)-(2).

Defendant insists that it is an "interactive computer service" and that Plaintiffs themselves provided the information content at issue, citing various cases for the blanket proposition that "CDA immunity encompasses all state statutory and common law causes of action," including "claims alleging misappropriation of name and likeness." *See* Mot. at 11-13 (citing *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118-19 (9th Cir. 2007); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003); *Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008); *Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117, 1122-23 (E.D. Cal. 2010); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1197 (N.D. Cal. 2009); *Doe IX v. MySpace, Inc.*, 629 F. Supp. 2d 663 (E.D. Tex. 2009); *Doe II v. MySpace, Inc.*, 175 Cal. App. 4th 561 (2009); and others).  Defendant's reliance on these cases is misplaced.  There is no question that § 230 "provides broad immunity [to websites that publish] content provided primarily by third parties." *Carafano*, 339 F.3d at 1123.  But Defendant ignores the nature of Plaintiffs' allegations, which accuse Defendant not of publishing tortious content, but rather of creating and developing commercial content that violates their statutory right of publicity.  The SAC alleges that Facebook takes Plaintiffs' names, photographs, and likenesses without their consent and uses this information to create new content that it

17

United States District Court
For the Northern District of California

publishes as endorsements of third-party products or services. *See* ¶¶ 26-27, 40, 53-54, 57-59, 86, 89. While members provide some of the information used in Sponsored Stories by taking an action such as clicking the "Like" button on a third-party's website, Plaintiffs allege that Facebook contributes, at least in part, to the creation or development of the Sponsored Story that ultimately appears on other members' Facebook pages in the form of a product or service endorsement.

Although Facebook meets the definition of an interactive computer service under the CDA, *see* 47 U.S.C. § 230(f)(2) (defining an interactive computer service, in part, as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server"), in the context of Plaintiffs' claims, it also meets the statutory definition of an information content provider, *see id.* § 230(f)(3) (defining an information content provider as "any person or entity that is responsible, in whole *or in part*, for the creation or development of information provided through the Internet or any other interactive computer service" (emphasis added)). "A website operator can be both a service provider and a content provider. . . . [A]s to content that it creates itself, or is 'responsible, in whole or in part' for creating or developing, the website is also a content provider." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc). Furthermore, "that [members] are information content providers does not preclude [Facebook] from *also* being an information content provider by helping 'develop' at least 'in part' the information" posted in the form of Sponsored Stories. *Id.* at 1165 (emphasis in original). As the Ninth Circuit has clearly stated, "the party responsible for putting information online may be subject to liability, even if the information originated with a user." *Id.* (citing *Batzel v. Smith*, 333 F.3d 1018, 1033 (9th Cir. 2003)). Here, Plaintiffs allege that Facebook creates content by deceptively mistranslating members' actions, such as clicking on a 'Like' button on a company's page, into the words "Plaintiff likes [Brand]," and further combining that text with Plaintiff's photograph, the company's logo, and the label "Sponsored Story." *See, e.g.*, SAC ¶¶ 66-68. Plaintiffs allege that they themselves have no control over whether to post a particular company's name or logo, and that Facebook maintains sole control over whether to display a Sponsored Story at all. Based on Plaintiffs' allegations, Defendant appears to be a content provider, in addition to

18

1    being an interactive computer service provider.  CDA immunity "applies only if the interactive

2    computer service provider is not also an 'information content provider,'" *Roommates.com*, 521

3    F.3d at 1162, and therefore, construing all facts in the light most favorable to Plaintiffs, Defendant

4    is not at this stage entitled to CDA immunity.

5          For the same reasons that Defendant appears to be a content provider, Defendant's assertion

6    that its actions are "well within the editorial function for which websites receive immunity" is

7    unpersuasive.  Mot. at 13.  Although "the exercise of a publisher's traditional editorial functions . .

8    . do not transform an individual into a 'content provider' within the meaning of § 230," Facebook's

9    actions in creating Sponsored Stories go beyond "a publisher's traditional editorial functions[,]

10   such as deciding whether to publish, withdraw, postpone or alter content."  *Batzel*, 333 F.3d at

11   1031 n.18 (internal quotation marks omitted); *accord Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816,

12   828-29 (2002).  Plaintiffs do not allege merely that Facebook "edit[ed] user-created content – such

13   as by correcting spelling, removing obscenity or trimming for length."  *Roommates.com*, 521 F.3d

14   at 1169.  Rather, Plaintiffs allege not only that Facebook rearranged text and images provided by

15   members, but moreover that by grouping such content in a particular way with third-party logos,

16   Facebook transformed the character of Plaintiffs' words, photographs, and actions into a

17   commercial endorsement to which they did not consent.  Defendant's alleged actions go far beyond

18   simply adding HTML meta tags to make user-provided text more visible, *see Asia Econ. Inst. v.

19   Xcentric Ventures LLC*, No. CV 10-01360-SVW (PJWx), 2011 WL 2469822, at *6-7 (C.D. Cal.

20   May 4, 2011), or simply placing its own watermark on photographs and printing its website

21   address on advertisements created by others and published on its website, *see Ramey v. Darkside

22   Prods., Inc.*, No. 02-730 (GK), 2004 WL 5550485, at *6-7 (D.D.C. May 17, 2004).

23         For all of these reasons, Defendant's actions are distinguishable from the actions taken by

24   other web providers granted CDA immunity in the cases Defendant cites, and thus Defendant's

25   motion to dismiss under CDA § 230 is denied.

26                          **C.  Individual Causes of Action**

27         Finally, Defendant moves to dismiss all three causes of action for failure to state a claim

28   upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).  That

**United States District Court**
For the Northern District of California

19

Case No.: 11-CV-01726-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

Plaintiffs have satisfied the injury-in-fact requirement for constitutional standing does not necessarily mean they have properly stated a claim for relief.  A plaintiff may have "injury enough to open the courthouse door, but without more [may have] no cause of action" under which he can successfully obtain relief."  *Doe v. Chao*, 540 U.S. 614, 624-25 (2004); *accord In re Facebook Privacy Litig.*, 791 F. Supp. 2d at 712 n.5.

Plaintiffs assert three causes of action: (1) commercial misappropriation under California Civil Code § 3344; (2) unlawful, unfair, and fraudulent business practices in violation of the California UCL; and (3) unjust enrichment.  Both Plaintiffs' § 3344 and UCL claims appear to present novel issues of state law for which there is no binding authority.  "'Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it.  In answering that question, this [C]ourt looks for 'guidance' to decisions by intermediate appellate courts of the state and by courts in other jurisdictions.'"  *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986), *modified on other grounds*, 810 F.2d 1517 (1987) (internal citations omitted)).  The Court addresses each cause of action in turn.

### 1.  Misappropriation Under California Civil Code § 3344

California has long recognized a right to protect one's name and likeness against appropriation by others for their advantage.  *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001) (citing *Eastwood v. Superior Court*, 149 Cal. App. 3d 409, 416 (1983)).  California law provides two vehicles for asserting such a right: a common law cause of action for commercial misappropriation, and a statutory remedy for commercial misappropriation under California Civil Code § 3344.  To state a common law cause of action for misappropriation, a plaintiff must plead sufficient facts to establish "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury."  *Id.* (quoting *Eastwood*, 149 Cal. App. 3d at 417).  To state a statutory cause of action under § 3344, a plaintiff must plead all the elements of the common law action and must also prove (5) "a knowing use by the defendant," and (6) "a direct connection

20

between the alleged use and the commercial purpose." *Id.* (citing *Eastwood*, 149 Cal. App. 3d at 417).

The SAC alleges that Facebook's nonconsensual use of Plaintiffs' names, photographs, and likenesses in Sponsored Stories violates § 3344, which provides, in relevant part:

> [a]ny person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent, or, in the case of a minor, the prior consent of his parent or legal guardian, shall be liable for any damages sustained by the person or persons injured as a result thereof.

Cal. Civ. Code § 3344(a). The statute further provides that a party in violation of § 3344 "shall be liable to the injured party or parties in an amount equal to the greater of [$750] or the actual damages suffered by him or her as a result of the unauthorized use," and shall disgorge "any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages." *Id.*

Defendant moves to dismiss on grounds that (1) Facebook's actions fall within § 3344(d)'s "newsworthy" exception for which consent is not required; (2) in any event, Plaintiffs consented to the use of their names, photographs, and likenesses; and (3) Plaintiffs fail to allege sufficient injury under § 3344(a). Notably, Defendant does not at this juncture dispute that it knowingly used Plaintiffs' identity, or that the use of Plaintiffs' names or likenesses was to Defendant's advantage.

### a. Newsworthiness

Defendant argues that Plaintiffs' § 3344 claim must be dismissed for failure to state a claim because the Sponsored Stories fall within the newsworthy exception under § 3344(d) for which consent is not required. Section 3344(d) provides that the "use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account, or any political campaign, shall not constitute a use for which consent is required under [§ 3344(a)]." Cal. Civ. Code § 3344(d). Under California law, the "newsworthiness" exception under § 3344(d) tracks the constitutional right to freedom of speech under the First Amendment. *See Shulman v. Group W. Prods, Inc.*, 18 Cal. 4th 200, 214-16 (1998). A statutory cause of action for commercial appropriation therefore will not lie for "'the publication of matters in the public

21

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    interest, which rests on the right of the public to know and the freedom of the press to tell it.'"

2    *Downing*, 265 F.3d at 1001 (quoting *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th

3    790, 793 (1995)).  "This First Amendment defense extends 'to almost all reporting of recent

4    events,' as well as to publications about 'people who, by their accomplishments, mode of living,

5    professional standing, or calling, create a 'legitimate and widespread attention' to their activities.'"

6    *Id.* (quoting *Eastwood*, 149 Cal. App. 3d at 422).

7          Defendant's argument is twofold.  Facebook argues that its republication of members'

8    names or profile images next to statements about pages or content they "Like" or other actions they

9    have taken is newsworthy because (1) Plaintiffs are "public figures" to their friends, and (2)

10   "expressions of consumer opinion" are generally newsworthy.  Mot. at 20-21.  Plaintiffs deny that

11   they are public figures and dispute whether their act of clicking on a "Like" button—which they

12   may do simply out of curiosity rather than affinity—may be accurately characterized as

13   "expressions of consumer opinion."

14         The Court agrees with Defendant that Plaintiff "cannot have it both ways"—Plaintiffs

15   cannot assert economic injury under the theory that they are "celebrities" to their Facebook

16   Friends, while at the same time denying that they are "public figures" to those same friends for

17   newsworthy purposes.  *See* Opp'n at 14 & n.11.

18         Nonetheless, the Court is not convinced that Defendant gains much from its own argument.

19   While the Court agrees that Plaintiffs' assertion of their status as local "celebrities" within their

20   own Facebook social networks likewise makes them subjects of public interest among the same

21   audience, even newsworthy actions may be subjects of § 3344 liability when published for

22   commercial rather than journalistic purposes.  *See Downing*, 265 F.3d at 1002 (rejecting clothing

23   retailer's newsworthiness argument where retailer used plaintiff's photograph "essentially as

24   window-dressing to advance the catalog's surf-theme").  The Ninth Circuit has squarely held that

25   the commercial use of a person's newsworthy acts may nonetheless still result in liability under §

26   3344.  *See Abdul-Jabbar v. GMC*, 85 F.3d 407, 416 (9th Cir. 1996) ("While [Kareem Abdul-

27   Jabbar's] basketball record may be said to be 'newsworthy,' its use is not automatically privileged.

28   GMC used the information *in the context of an automobile advertisement*, not in a news or sports

                                                    22

account.  Hence GMC is not protected by section 3344(d)." (emphasis added)).  Thus, even if the

underlying actions taken by Plaintiffs are newsworthy, Plaintiffs assert that Facebook's *commercial*

*use* of those actions in Sponsored Stories removes them from the scope of § 3344(d)'s newsworthy

privilege.  The Court agrees.  Because Facebook's publication of Plaintiffs' 'Likes' is alleged to be

for commercial advertising purposes and not part of "any news, public affairs, or sports broadcast

or account, or any political campaign," the Court does not find it appropriate to dismiss the claim

under the newsworthiness exception provided in § 3344(d).

### b.  Consent

Defendant next argues that even if consent was required, Plaintiffs gave the necessary

consent by registering for and using the Facebook website under its Terms of Use, which informs

members that "[y]ou can use your privacy settings to limit how your name and profile picture may

be associated with commercial, sponsored, or related content (such as a brand you like) served or

enhanced by us.  You give us permission to use your name and [Facebook] profile picture in

connection with that content, subject to the limits you place."  SAC ¶ 32 (quoting Section 10.1 of

the Statement of Rights and Responsibilities).  According to Facebook, "Sponsored Stories are

only delivered to your confirmed friends and respect the privacy settings you configure for News

Feed."  Mot. at 17.  Members may also prevent a specific story from being republished as a

Sponsored Story by clicking the 'X' displayed in the upper right side of a story and choosing the

appropriate option when prompted.  SAC ¶ 34.  Thus, although members may not opt out of the

Sponsored Stories feature wholesale, they exercise control over whether to take actions that can

become Sponsored Stories, whether individual actions may be republished as Sponsored Stories,

and the precise audience to whom their Sponsored Stories are shown.  Mot. at 17 n.6.

Facebook made a similar argument in *Cohen I*, but the court there was not persuaded,

concluding that "[n]othing in the provisions of the Terms documents to which Facebook has

pointed constitutes a clear consent by members to have their name or profile picture shared in a

manner that discloses what services on Facebook they have utilized, or to endorse those services."

*Cohen I*, 2011 WL 3100565, at *4.  Plaintiffs here contend that they never consented in any form

to the use of their names or likenesses in Sponsored Stories, noting that Sponsored Stories were not

23

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

even a feature of Facebook at the time they became registered members, and alleging that Plaintiffs were never asked to review or renew their Terms of Use subsequent to Facebook's introduction of the Sponsored Stories feature, which operates on an opt-out basis.  Opp'n at 15.  The gravamen of Plaintiffs' consent argument is that even if the Statement of Rights and Responsibilities can be broadly construed to encompass Sponsored Stories, such "consent" was fraudulently obtained and thus not knowing and willful.  As was the case in *Cohen I*, the Court determines that whether Facebook's Statement of Rights and Responsibilities, Privacy Policy, or Help Center pages unambiguously give Defendant the right to use Plaintiffs' names, images, and likenesses in the form of Sponsored Story advertisements for Facebook's commercial gain remains a disputed question of fact and is not proper grounds for dismissal at this time.

### c.  Injury

The right to prevent others from appropriating elements of one's identity for commercial gain has evolved from the common law right of privacy, which is often described as comprising four separate and distinct torts: "(1) intrusion upon the plaintiff's seclusion or solitude; (2) public disclosure of private facts; (3) placing the plaintiff in a false light in the public eye; and (4) appropriation, for defendant's advantage, of plaintiff's name or likeness."  *Motschenbacher v. R.J. Reynolds Tobacco Co.*, 498 F.2d 821, 824 (1974) (citing Dean Prosser, Law of Torts (4th ed. 1971), at 804); *accord KNB Enterprises v. Matthews*, 78 Cal. App. 4th 362, 366 (2000).  While violation of one's right to privacy may result in "injury to the feelings" that is wholly mental or subjective, California law has long recognized that "where the identity appropriated has a commercial value, the injury may be largely, or even wholly, of an economic or material nature."  *Motschenbacher*, 498 F.2d at 824.  The right of publicity has therefore "become a tool to control the commercial use and, thus, protect the economic value of one's name, voice, signature, photograph, or likeness."  *KNB Enterprises v. Matthews*, 78 Cal. App. 4th 362, 366 (2000).

Here, Plaintiffs allege not that they suffered mental anguish as a result of Defendant's actions, but rather that they suffered economic injury because they were not compensated for Facebook's commercial use of their names and likenesses in targeted advertisements to their Facebook Friends.  *See Downing*, 265 F.3d at 1002-03 (remanding for trial surfer's common law

Case No.: 11-CV-01726-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

United States District Court
For the Northern District of California

and § 3344 misappropriation claims against clothing retailer based on retailer's use of surfer's photo in advertising catalogue without permission).  Defendant does not deny that Plaintiffs may assert economic injury, but insists that, because they are not celebrities, they must demonstrate some preexisting commercial value to their names and likenesses, such as allegations that they "previously received remuneration for the use of their name or likeness, or that they have ever sought to obtain such remuneration."  Mot. at 15-16.

First, the Court finds nothing in the text of the statute or in case law that supports Defendant's interpretation of § 3344 as requiring a plaintiff pleading economic injury to provide proof of *preexisting* commercial value and efforts to capitalize on such value in order to survive a motion to dismiss.  The plain text of § 3344 provides simply that "[a]ny person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner . . . for purposes of advertising or selling . . . without such person's consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof."  Cal. Civ. Code § 3344.  The statutory text makes no mention of preexisting value, and in fact can be read to presume that a person whose name, photograph, or likeness is used by another for commercial purposes without their consent is "injured as a result thereof."  Consistent with this reading, at least one court has suggested, after surveying California court decisions, that "courts generally presume that the fourth element of the applicable test has been established if there is sufficient evidence to prove the first three elements."  *Del Amo v. Baccash*, No. CV 07-663-PSG, 2008 WL 4414514, at *6 (C.D. Cal. Sept. 16, 2008) (presuming that injury was satisfied for purposes of a § 3344 claim seeking only minimum statutory damages, where plaintiff established use of non-celebrity models' identity, appropriation of their name or likeness to defendant's advantage, and lack of consent).[4]  Indeed, in cases involving celebrity plaintiffs, the mere allegation that the plaintiff was not compensated has been deemed sufficient to satisfy the injury prong.  *See, e.g.*, *Solano v. Playgirl, Inc.*, 292 F.3d

---

[4] Judge Gutierrez acknowledged the apparent tension between the test for § 3344 misappropriation claims as articulated and as applied, but nonetheless noted that the presumption of injury upon establishing the first three elements of a § 3344 claim "is present both in precedent that is binding upon this Court . . . and precedent that the Court finds persuasive . . . ."  2008 WL 4414514, at *7 n.4.

Case No.: 11-CV-01726-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

1078, 1090 (2002) (holding that actor who was featured on the cover of an adult magazine without his consent could assert injury because "the measure of damages available for misappropriation claims includes the economic value of the use of an individual's name and likeness," and "[s]ection 3344 specifically provides that a plaintiff may recover 'any profits from the unauthorized use' in addition to actual damages or the $750 minimum statutory damage amount and punitive damages" (internal citations omitted)); *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 693 (9th Cir. 1998) (holding that former major-league baseball player "was injured because he was not compensated for the use of his likeness").

Nor does the Court find any reason to impose a higher pleading standard on non-celebrities than on celebrities. California courts have clearly held that "the statutory right of publicity exists for celebrity and non-celebrity plaintiffs alike." *KNB Enterprises*, 78 Cal. App. 4th at 373 n.12. As the Ninth Circuit recognized long ago, although "[g]enerally, the greater the fame or notoriety of the identity appropriated, the greater will be the extent of the economic injury suffered . . . the appropriation of the identity of a relatively unknown person may result in economic injury *or may itself create economic value in what was previously valueless*." *Motschenbacher*, 498 F.2d at 825 n.11 (emphasis added). Thus, courts have long recognized that a person's "name, likeness, or other attribute of identity can have commercial value," even if the individual is relatively obscure. *Id.* at 825 n.10. For example, in *KNB Enterprises*, the owner of copyright to erotic photographs of relatively obscure models sued for misappropriation. In recognizing the models' right of publicity, the California appellate court explained that, although the models were not celebrities, their anonymity was itself "allegedly a valuable asset in the marketing of erotic photographs." 78 Cal. App. 4th at 368.[5] Similarly, in *Downing*, the Ninth Circuit sustained the § 3344 claim of a surfer

---

[5] Although the legal issue in *KNB Enterprises* was not whether the noncelebrity models properly pled economic injury under § 3344 but rather whether the noncelebrity models' § 3344 claims were preempted by federal copyright law, the California appellate court impliedly accepted that the models had stated a claim under § 3344, notwithstanding their noncelebrity status. In fact, the court reasoned that "determining preemption of a plaintiff's section 3344 claim on the basis of the plaintiff's celebrity status would be violative of California law [because] [u]nder California law, the statutory right of publicity exists for celebrity and non-celebrity plaintiffs alike." *KNB Enterprises*, 78 Cal. App. 4th at 373 n.12.

26

alleging that a clothing retailer had unlawfully used a photograph of him surfing for advertising purposes.  *See* 265 F.3d at 1002.  As explained by the California appellate court, "[a]lthough the unauthorized appropriation of an obscure plaintiff's name, voice, signature, photograph, or likeness would not inflict as great an economic injury as would be suffered by a celebrity plaintiff, California's appropriation statute is not limited to celebrity plaintiffs."  *KNB Enterprises*, 78 Cal. App. 4th at 367 (citing *Hetter v. District Court*, 110 Nev. 513, 519 (1994), in which the Nevada Supreme Court explained that the legislative purpose for providing a minimum recovery for non-celebrities under a similar Nevada statutes is "to discourage such appropriation").

Admittedly, these previous non-celebrity plaintiffs have typically been models, entertainers, or other professionals who have cultivated some commercially exploitable value through their own endeavors.  Nevertheless, the Court finds nothing requiring that a plaintiff's commercially exploitable value be a result of his own talents or efforts in order to state a claim for damages under § 3344.  *See White v. Samsung Elecs. of Am., Inc.*, 971 F.2d 1395, 1399 (9th Cir. 1992) ("Television and other media create marketable celebrity identity value. . . . The law protects the celebrity's sole right to exploit this value whether the celebrity has achieved her fame out of rare ability, *dumb luck*, or a combination thereof." (emphasis added)); *see also Motschenbacher*, 498 F.2d at 825 n.11 (recognizing that the act of exploitation may itself imbue someone's likeness with commercial value).  In a society dominated by reality television shows, YouTube, Twitter, and online social networking sites, the distinction between a "celebrity" and a "non-celebrity" seems to be an increasingly arbitrary one.

Moreover, even if non-celebrities are subject to a heightened pleading standard under § 3344, the Court finds that Plaintiffs' allegations satisfy the requirements for pleading a claim of economic injury under § 3344.  Plaintiffs quote Facebook CEO Mark Zuckerberg stating that "[n]othing influences people more than a recommendation from a trusted friend.  A trusted referral influences people more than the best broadcast message.  A trusted referral is the Holy Grail of advertising."  SAC ¶ 43.  They also quote Facebook's COO Sheryl Sandberg similarly explaining that:

Case No.: 11-CV-01726-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

United States District Court
For the Northern District of California

[m]arketers have always known that the best recommendation comes from a friend. . . . This, in many ways, is the Holy Grail of marketing. . . . When a customer has a good experience . . . on Facebook, the average action is shared with the average number of friends, which is 130 people.  This is the illusive goal we've been searching for, for a long time; [m]aking your customers your marketers.  On average, if you compare an ad without a friend's endorsement, and you compare an ad with a friend's [Facebook] 'Like,' these are the differences: on average, 68% more people are likely to remember seeing the ad with their friend's name.  A hundred percent—so two times more likely to remember the ad's message; and 300% more likely to purchase.

*Id.* ¶¶ 43, 45.  Plaintiffs allege that these assertions made by Facebook's chief officers are corroborated by the Nielsen Company, a leading marketing research firm, which Facebook frequently quotes.  *Id.* ¶ 42.  "'The so-called right of publicity means in essence that the reaction of the public to name and likeness . . . endows the name and likeness of the person involved with commercially exploitable opportunities.'"  *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 811 (9th Cir. 1997) (quoting *Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 824 (1979)).  Thus, Plaintiffs have alleged that, in the same way that celebrities enjoy commercially exploitable opportunities among consumers at large, they enjoy commercially exploitable opportunities to advertise among their immediate friends and associates because "[i]n essence, Plaintiffs are celebrities—to their friends." Opp'n at 2.  While traditionally, advertisers had little incentive to exploit a non-celebrity's likeness because such endorsement would carry little weight in the economy at large, Plaintiffs' allegations suggest that advertisers' ability to conduct targeted marketing has now made friend endorsements "a valuable marketing tool," just as celebrity endorsements have always been so considered.  *See KNB Enterprises*, 78 Cal. App. 4th at 366.  Given that "[t]he protection of name and likeness from unwarranted intrusion *or exploitation* is the heart of the law of privacy,'" *Wendt*, 125 F.3d at 811 (quoting *Lugosi*, 25 Cal. 3d at 824), the Court finds Plaintiffs' arguments sufficiently compelling to withstand dismissal.[6]  *See also Fairfield v. Am. Photocopy Equip. Co.*, 138 Cal. App. 2d 82, 86

---

[6] Defendant further argues that Plaintiffs' claim that their action of clicking on a 'Like' button may not reflect genuine affinity for the product, event, company, or cause at issue, renders their theory of economic injury even more implausible, because advertisers would not have paid them to endorse products they do not actually like. Mot. at 15-16. This argument merits little discussion, for as common sense dictates, the value of a celebrity endorsement does not necessarily correlate with the celebrity's actual affinity for the advertised product.

Case No.: 11-CV-01726-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

(1955) ("The exploitation of another's personality for commercial purposes constitutes one of the most flagrant and common means of invasion of privacy.").

The specificity of Plaintiffs' allegations distinguishes this case from *Cohen I* and *Cohen II*. There, plaintiffs accused Facebook of violating their rights by sharing their names and profile pictures with other users to promote Facebook's "Friend Finder" service in a manner that constituted "(1) an express representation that plaintiffs had utilized the Friend Finder service, and (2) at least arguably, an implied *endorsement* by plaintiffs of that service." *Cohen I*, 2011 WL 3100565 at *4. The court dismissed their § 3344 claim, holding that "[p]laintiffs have not shown how the mere disclosure to their Facebook friends that they have employed the Friend Finder service (even assuming some of them did not) causes them any cognizable harm, regardless of the extent to which that disclosure could also be seen as an implied endorsement by them of the service." *Id.* at *5. Reviewing their amended complaint, the court found that plaintiffs had not shown entitlement to relief simply by alleging that Facebook's use of their names and likenesses to attract a larger user base resulted in monetary gain for Facebook. *Cohen II*, 2011 WL 5117164, at *2. Unlike in *Cohen I* or *Cohen II*, however, Plaintiffs here have made specific allegations that their personal endorsement of Facebook advertisers' products are worth two to three times more than traditional advertisements on Facebook, and that Facebook presumably profits from exploitation of this calculable commercial value.

Of course, at summary judgment or at trial, Plaintiffs may not simply demand $750 in statutory damages in reliance on a bare allegation that their commercial endorsement has provable value, but rather must "prove actual damages like any other plaintiff whose name has commercial value." *See Miller v. Collectors Universe, Inc.*, 159 Cal. App. 4th 988, 1006 (2008). At this stage, however, the Court finds their allegations of provable commercial value sufficient to survive a motion to dismiss and accordingly denies Defendant's 12(b)(6) motion with respect to the § 3344 claim.

## 2. Violation of Unfair Competition Law ("UCL")

Plaintiffs also allege that Defendant's actions violate California's UCL, which does not prohibit specific activities but instead broadly proscribes "any unfair competition, which means

Case No.: 11-CV-01726-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

United States District Court
For the Northern District of California

'any unlawful, unfair or fraudulent business act or practice.'" *In re Pomona Valley Med. Group,*

*Inc.*, 476 F.3d 665, 674 (9th Cir. 2007) (quoting Cal. Bus. & Prof. Code § 17200, *et seq.*); *see*

*Boschma v. Home Loan Ctr., Inc.*, 198 Cal. App. 4th 230, 251-52 (2011).  The UCL is designed to

ensure "fair business competition" and governs both anti-competitive business practices and

consumer injuries.  *Boschma*, 198 Cal. App. 4th at 252 (internal quotation marks omitted).  Its

scope is "sweeping," and its standard for wrongful business conduct is "intentionally broad,"

allowing courts "maximum discretion to prohibit new schemes to defraud."  *In re First Alliance*

*Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006) (internal citation omitted).  Each of the three UCL

prongs provides a "separate and distinct theory of liability" and an independent basis for relief.

*Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (internal quotation marks and

citations omitted); *accord Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007).

Plaintiffs assert that Defendant's conduct violates all three prongs of the UCL.  Defendant contends

that Plaintiffs lack standing to assert a UCL claim and that, even if they have standing, their claim

fails on its merits.

### a.  Standing

Only those who have both suffered injury in fact and lost money or property as a result of

the alleged unfair competition may bring suit under the UCL.  Cal. Bus. & Prof. Code § 17204; *see*

*Rubio*, 613 F.3d at 1203-04; *Lozano*, 504 F.3d at 731-32 (explaining how Proposition 64 amended

the UCL in November 2004 by eliminating private attorney general standing for UCL claims);

*Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1590 (2008) (same).  If Plaintiffs cannot allege

both that they suffered injury in fact *and* that they lost money or property as a result of an unlawful,

unfair, or fraudulent business practice, then they lack statutory standing to sue under the UCL.

*Peterson*, 164 Cal. App. 4th at 1590; *accord Rubio*, 613 F.3d at 1203; *Kwikset Corp. v. Superior*

*Court*, 51 Cal. 4th 310, 323-24 (2011).

Plaintiffs contend they assert sufficient facts to meet both requirements for standing under §

17204.  The Court agrees that they have asserted an injury in fact under § 17204, which is defined

as either "a distinct and palpable injury suffered as a result of the defendant's actions," or "an

invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or

30

1    imminent, not conjectural or hypothetical," *see Peterson*, 164 Cal. App. 4th at 1590 (internal

2    quotation marks omitted), the latter of which is identical to the injury-in-fact standard for

3    establishing constitutional standing.  As previously discussed, Plaintiffs have adequately alleged

4    injury in fact for purposes of establishing Article III standing.  Thus, they likewise have alleged

5    injury in fact under § 17204.

6            The more difficult question is whether Plaintiffs have adequately alleged loss of money or

7    property caused by unfair competition.  Defendant argues that Plaintiffs are unable to allege loss of

8    money or property because "Facebook is, and always has been, a free service," and because

9    "'personal information does not constitute property for purposes of a UCL claim.'"  Mot. at 23

10   (quoting *In re Facebook Privacy Litig.*, 2011 WL 2039995, at *6).  It is undisputed that Plaintiffs

11   did not pay for Facebook's services, and several courts have held that the unauthorized release of

12   "personal information" does not constitute a loss of money or property for purposes of establishing

13   standing under the UCL.  *See, e.g.*, *In re Facebook Privacy Litig.*, 791 F. Supp. 2d at 714-15

14   (finding no loss of money or property where alleged injury consisted of unlawfully sharing

15   plaintiffs' "personally identifiable information" with third-party advertisers who then sent plaintiffs

16   targeted advertising); *Ruiz*, 540 F. Supp. 2d at 1127 (finding no loss of money or property where

17   job applicant alleged that employer negligently permitted laptops containing his unencrypted

18   personal information to be stolen); *In re iPhone Application Litig.*, 2011 WL 4403963 at *14

19   (finding no loss of money or property where plaintiffs, users of mobile devices, alleged that

20   defendants violated their privacy rights by allowing third-party application developers to collect

21   and make use of their personal information for commercial purposes, without user consent or

22   knowledge); *Thompson v. Home Depot, Inc.*, No. 07-cv-1058-IEG, 2007 WL 2746603, at *3 (S.D.

23   Cal. Sept. 18, 2007) (finding no loss of money or property where plaintiff alleged that defendant

24   required customers to provide their personal information as a condition to performing a credit card

25   transaction and used such information for marketing purposes); *cf. In re JetBlue Airways*, 379 F.

26   Supp. 2d at 327 (holding that airline's disclosure of passengers' personal information to third-party

27   data mining company in violation of airline's privacy policy did not amount to a compensable

28   economic loss); *In re Doubleclick*, 154 F. Supp. 2d at 525 (holding that website visitors did not

United States District Court
For the Northern District of California

31

1    suffer a cognizable economic loss from the collection of their data for purposes of stating a claim

2    under the Computer Fraud and Abuse Act).

3         Nevertheless, the Court finds the reasoning in this line of cases inapplicable to Plaintiffs'

4    misappropriation claim, which, as previously discussed, is of an entirely different nature than a

5    privacy tort claim.  Plaintiffs here do not assert that their personal information has inherent

6    economic value and that the mere disclosure of such data constitutes a loss of money or property.

7    Rather, Plaintiffs insist they have sustained economic loss resulting from Facebook's failure to

8    compensate them for their valuable endorsement of third-party products and services to their

9    Facebook Friends, and that under § 3344, they have an expectation interest in a minimum statutory

10   damages award of $750.  *See* SAC ¶¶ 128-29.

11        To the extent Plaintiffs allege they have a right to be paid for their endorsements and can

12   establish how much these endorsements are worth, *see* SAC ¶ 91, the Court finds that they have

13   alleged a loss of money or property sufficient to state a claim under the UCL.  Under the UCL,

14   "'the concept of restoration or restitution . . . is not limited only to the return of money or property

15   that was once in the possession of that person.  Instead, restitution is broad enough to allow a

16   plaintiff to recover money or property in which he or she has a vested interest.'"  *Lozano*, 504 F.3d

17   at 733-34 (quoting *Juarez v. Arcadia Fin., Ltd.*, 152 Cal. App. 4th 889 (2007)).  For example, a

18   plaintiff has a vested interest in unpaid wages and therefore may state a restitution claim under the

19   UCL to recover such lost money or property.  *See Cortez v. Purolator Air Filtration Prods.*, 23 Cal.

20   4th 163, 177-78 (2000).  Though Plaintiffs are not models or celebrities per se, the Court agrees

21   that they have a vested interest in their own right of publicity, which Plaintiffs allege Defendant

22   has unlawfully appropriated without their consent.  To the extent Plaintiffs allege they can prove

23   that their endorsement of commercial products to their Facebook Friends has concrete, quantifiable

24   value for which they are entitled to compensation, the Court finds that Plaintiffs have properly

25   alleged loss of money or property for purposes of establishing standing under the UCL.

26        However, to the extent Plaintiffs rely on the $750 minimum statutory damages award under

27   § 3344, the California Supreme Court has recently made clear that a mere "expectation interest" in

28   a statutory damage award is not a "vested interest" for purposes of stating a claim for restitution

Case No.: 11-CV-01726-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

under the UCL.  *See Pineda v. Bank of America*, 50 Cal. 4th 1389, 1401-02 (2010).  In a case where plaintiff-employees sought to recover under the UCL not only unpaid wages but also additional statutory penalties provided for under § 203 of the Labor Code, the California Supreme Court explained that while "[t]he vested interest in unpaid wages . . . arises out of the employees' action, i.e., their labor, . . . [b]y contrast, . . . it is the employers' action (or inaction) that gives rise to section 203 penalties. . . . Until awarded by a relevant body, employees have no comparable vested interest in section 203 penalties."  *Id.*  Similarly here, Plaintiffs may have suffered loss of money or property in the form of unpaid compensation for the use of their names, photographs, and likenesses in Sponsored Stories, and therefore have adequately alleged standing to bring a UCL claim, but the $750 minimum statutory damage award provided for under § 3344 is not a vested interest to which they have a restitution claim under the UCL.

For the reasons stated above, Defendant's motion to dismiss Plaintiffs' UCL claim for lack of standing is denied.

### b.  Unlawful

An unlawful business practice proscribed by the UCL "includes 'anything that can properly be called a business practice and that at the same time is forbidden by law.'"  *Farmers Ins. Exchange v. Superior Court*, 2 Cal. 4th 377, 383 (1992) (internal citation omitted).  "By 'borrowing' violations of other laws, the UCL deems those violations independently actionable under the UCL."  *Smith v. Wells Fargo Bank*, 135 Cal. App. 4th 1463, 1480 (2006) (quoting *Cal-Tech Comm'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)).  Facebook's alleged commercial misappropriation of Plaintiffs' names and likenesses without their consent can properly be characterized as a business practice.  Plaintiffs' properly pled § 3344 claim may therefore serve as the predicate unlawful business practice under the UCL.  By properly alleging a § 3344 violation, Plaintiffs have also alleged a UCL violation under the "unlawful" prong.  *See Rubio*, 613 F.3d at 1204.  Accordingly, the Court denies Defendant's motion to dismiss for failure to allege unlawful conduct.

### c.  Unfair

Case No.: 11-CV-01726-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    The UCL also creates a cause of action for a business practice that is "unfair" even if not

2  specifically proscribed by some other law.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.

3  4th 1134, 1143 (2003).  In consumer cases, however, the question of what constitutes an unfair

4  business practice appears to be unsettled.[7]  *See Lozano*, 504 F.3d at 735-36; *Boschma*, 198 Cal.

5  App. 4th at 252.  Some appellate state courts have applied the balancing test under *South Bay*

6  *Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861 (1999), which requires the Court

7  to "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged

8  victim."  72 Cal. App. 4th at 886-87; *see McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457

9  (2006).  Others have required a plaintiff to show that a practice violates public policy as declared

10  by "specific constitutional, statutory or regulatory provisions."  *Bardin v. Daimlerchrysler Corp.*,

11  136 Cal. App. 4th 1255, 1260-61 (2006).  Still others have adopted the three-pronged test

12  contained in the Federal Trade Commission Act, 15 U.S.C. § 45(a), holding that a business practice

13  is unfair under the UCL if (1) the consumer injury is substantial; (2) the injury is not outweighed

14  by any countervailing benefits to consumers or competition; and (3) the injury could not reasonably

15  have been avoided by consumers themselves.  *See Camacho v. Auto. Club of S. Cal.*, 142 Cal. App.

16  4th 1394, 1403-05 (2006).  However, the Ninth Circuit has rejected this last test as inapplicable to

17  claims of anti-consumer, as opposed to anti-competitive, conduct, and "decline[s] to apply [it] in

18  the absence of a clear holding from the California Supreme Court."  *Lozano*, 504 F.3d at 736; *see*

19  *also Rubio*, 613 F.3d at 1204-05 (assessing plaintiff's UCL claim for unfair conduct under only the

20  first two tests).

21    Regardless of which of the first two tests endorsed by the Ninth Circuit is employed,

22  Plaintiffs have stated a claim for unfair conduct under the UCL.  *See Rubio*, 613 F.3d at 1204-05

23  (analyzing plaintiff's UCL claim for unfair conduct under both the balancing and public policy

24  approaches); *Lozano*, 504 F.3d at 736 (same).  To the extent Plaintiffs have alleged that

---

[7] The UCL protects "both consumers and competitors by promoting fair competition in commercial markets for goods and services."  *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 251 (2010) (internal quotation marks and citation omitted).  The standards for determining what constitutes an "unfair business practice" under the UCL currently appear to differ depending on whether the UCL claim is brought by a competitor or a consumer.  Plaintiffs here appear to bring their claim only as consumers.

34

1    Defendant's conduct is unlawful under § 3344, Plaintiffs have also successfully alleged that

2    Defendant's practice is contrary to a statutorily declared public policy of preventing the

3    nonconsensual appropriation of an individual's name, photograph, or likeness for commercial gain.

4    Presently, the Court has no basis for finding that Defendant's conduct has any utility, much less

5    that its utility outweighs the gravity of the alleged harm to Plaintiffs.  Accordingly, the Court finds

6    that under either accepted test for unfair business practices in a consumer action, Plaintiffs have

7    stated a claim upon which relief can be granted.  The Court therefore denies Defendant's motion to

8    dismiss for failure to allege unfair conduct.

9                                    **d.  Fraudulent**

10          To state a claim under the "fraudulent" prong of the UCL, a plaintiff must show that

11   "'[reasonable] members of the public are likely to be deceived'" by the alleged unfair business

12   practice, though the "deception need not be intended." *Rubio*, 613 F.3d at 1204 (quoting *Williams*

13   *v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008)); *accord Morgan v. AT&T Wireless Servs.,*

14   *Inc.*, 177 Cal. App. 4th 1235, 1255 (2009).  Claims sounding in fraud are subject to the heightened

15   pleading requirements of Federal Rule of Civil Procedure 9(b).  A plaintiff alleging fraud "must

16   state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), including "an

17   account of the time, place, and specific content of the false representations as well as the identities

18   of the parties to the misrepresentations," *Swartz*, 476 F.3d at 764 (internal quotation marks and

19   citation omitted).

20          Here, Plaintiffs do not allege that others were deceived into buying products advertised on

21   Facebook.com as a result of their endorsements.  Instead, they allege that a reasonable Facebook

22   member was likely to be deceived into believing he had full control to prevent his appearance in

23   Sponsored Story advertisements while otherwise engaging with Facebook's various features, such

24   as clicking on a 'Like' button, when in fact members lack such control.  SAC ¶¶ 122-23.  Plaintiffs

25   point to language in the Statement of Rights and Responsibilities indicating that members "can use

26   your privacy settings to limit how your name and [Facebook] profile picture may be associated

27   with commercial, sponsored, or related content," and to language in the Privacy Policy stating,

28   "[y]ou can control exactly who can see [your posts] at the time you create [them]," which they

35

Case No.: 11-CV-01726-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

1    argue led them to believe they have control over Facebook's use of their likeness in advertising

2    such as Sponsored Stories.  In reality, however, members are unable to opt out of the Sponsored

3    Stories service, which was introduced after Plaintiffs became Facebook members, and instructions

4    on how to disable an individual post from appearing on Friends' News Feeds or as a Sponsored

5    Story are only available on a "buried Help Center page, not connected by any link within the

6    Privacy Policy or Statement of Rights and Responsibilities pages." SAC ¶ 34.  Plaintiffs allege that

7    their false belief of control over the use of their names, photographs, and likenesses led them to

8    join Facebook and to engage with Facebook in ways that rendered them unwitting commercial

9    spokepersons without compensation, in violation of their statutory right of publicity.  Alternatively,

10   Plaintiffs argue that to the extent Facebook modified its Terms of Use at a later time to truthfully

11   represent a member's inability to meaningfully opt out of Sponsored Stories, Facebook acted

12   fraudulently by knowingly and intentionally failing to seek and acquire members' informed

13   consent regarding changes to the Terms of Use.  SAC ¶ 123.  Plaintiffs have properly alleged

14   fraudulent conduct, and Defendant's motion to dismiss for failure to do so is therefore denied.

15       For all the reasons stated above, the Court finds that Plaintiffs have adequately alleged

16   unlawful, unfair, and fraudulent conduct under the UCL, and accordingly denies Defendant's

17   motion to dismiss this claim.

18                              **3.  Unjust Enrichment**

19       Notwithstanding earlier cases suggesting the existence of a separate, stand-alone cause of

20   action for unjust enrichment, the California Court of Appeals has recently clarified that "[u]njust

21   enrichment is not a cause of action, just a restitution claim."  *Hill v. Roll Int'l Corp.*, 195 Cal. App.

22   4th 1295, 1307 (2011); *accord Levine v. Blue Shield of Cal.*, 189 Cal. App. 4th 1117, 1138 (2010);

23   *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003); *Durell v. Sharp Healthcare*,

24   183 Cal. App. 4th 1350, 1370 (2010).  In light of this recent persuasive authority, this Court has

25   previously determined that "there is no cause of action for unjust enrichment under California

26   law."  *In re iPhone Application Litig.*, 2011 WL 4403963, at *15 (internal quotation marks and

27   citations omitted); *accord Ferrington v. McAfee, Inc.*, No. 10-cv-01455-LHK, 2010 WL 3910169,

28   at *17 (N.D. Cal. 2010) (citing *Durell*, 183 Cal. App. 4th at 1370).  Other courts have similarly

Case No.: 11-CV-01726-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

reached this conclusion.  *See Robinson v. HSBC Bank USA*, 732 F. Supp. 2d 976, 987 (N.D. Cal.

2010) (Illston, J.) (dismissing with prejudice plaintiffs' unjust enrichment claim brought in

connection with claims of misappropriation and violation of the UCL because unjust enrichment

does not exist as a stand-alone cause of action); *Specific Media*, 2011 WL 1661532 at *8

(dismissing unjust enrichment claim because it "cannot serve as an independent cause of action");

*In re DirecTV Early Cancellation Litig.*, 738 F. Supp. 2d 1062, 1091-92 (C.D. Cal. 2010) (same).

Thus, Plaintiffs' unjust enrichment claim does not properly state an independent cause of action

and must be dismissed.  *See Levine*, 189 Cal. App. 4th at 1138.

Plaintiffs note that California courts have recognized multiple grounds for awarding

restitution, and that Facebook's actions alleged here qualify for such relief.  *See McBride v.

Boughton*, 123 Cal. App. 4th 379, 388 (2004) ("Under the law of restitution, an individual is

required to make restitution if he or she is unjustly enriched at the expense of another.").  To the

extent Plaintiffs have pled causes of action that give rise to restitution as a remedy, the Court

agrees that they may properly seek restitution as a form of relief in connection with those claims.

*See* Cal. Civ. Code § 3344(a) (providing for disgorgement of defendant's profits attributable to the

unlawful misappropriation); Cal. Bus. & Profs. Code § 17203 (providing for restitution of any

money or property, real or personal, acquired by defendant attributable to the unfair competition).

Indeed, Plaintiff has already done so.  *See* SAC ¶¶ 118, 129, 136.  Because Plaintiffs have already

properly pleaded restitution in their demand for relief under § 3344 and the UCL, and because they

cannot cure through amendment the fact that unjust enrichment is not an independent cause of

action under California law, the Court finds no need to grant Plaintiffs leave to amend their third

cause of action.  The Court therefore grants Defendant's motion to dismiss Plaintiffs' third cause of

action for unjust enrichment with prejudice.

## V.  CONCLUSION

For the reasons discussed herein, Defendant's motion to dismiss is GRANTED in part and

DENIED in part.  Defendant's motion to dismiss the Complaint based on lack of Article III

standing, immunity under CDA § 230, failure to state a claim under California Civil Code § 3344,

Case No.: 11-CV-01726-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

and failure to state a claim under the UCL is DENIED.  Defendant's Rule 12(b)(6) motion to

dismiss Plaintiffs' claim for unjust enrichment is GRANTED with prejudice.

**IT IS SO ORDERED.**

Dated: December 16, 2011

*Lucy H. Koh*

LUCY H. KOH
United States District Judge

38