1   MICHAEL G. RHODES (116127) (mrhodes@cooley.com)
    MATTHEW D. BROWN (196972) (brownmd@cooley.com)
2   JEFFREY M. GUTKIN (216083) (gutkinjm@cooley.com)
    COOLEY LLP
3   101 California Street, 5th Floor
    San Francisco, CA 94111-5800
4   Telephone:   (415) 693-2000
    Facsimile:   (415) 693-2222
5

6   S. ASHLIE BERINGER (263977) (ABeringer@gibsondunn.com)
    GIBSON DUNN & CRUTCHER LLP
7   1881 Page Mill Road
    Palo Alto, CA 94304-1211
8   Telephone:   (650) 849-5219
    Facsimile:   (650) 849-5333

9   Attorneys for Defendant FACEBOOK, INC.

10                  UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                        SAN JOSE DIVISION

13

14  ANGEL FRALEY; PAUL WANG; SUSAN          CASE NO. CV 11-01726 LHK (PSG)
    MAINZER; JAMES H. DUVAL, a minor, by
15  and through JAMES DUVAL, as Guardian ad  DEFENDANT FACEBOOK, INC.'S
    Litem; and W.T., a minor, by and through  OPPOSITION TO PLAINTIFFS' MOTION TO
16  RUSSELL TAIT, as guardian ad Litem;      CERTIFY A CLASS
    individually and on behalf of all others
17  similarly situated,                      Date:       May 24, 2012
                                             Time:       1:30 p.m.
18               Plaintiffs,                 Courtroom:  4
                                             Judge:      Hon. Lucy H. Koh
19        v.                                 Trial Date: December 3, 2012

20  FACEBOOK, INC, a corporation; and DOES
    1-100,                                   **[PUBLIC REDACTED**
21                                           **VERSION]**
                 Defendants.
22

23

24

25

26

27

28

TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................. 1

II.  STATEMENT OF FACTS .................................................................................... 3

    A.   Facebook Website ...................................................................................... 3

    B.   Facebook Marketing Tools ......................................................................... 4

    C.   Named Plaintiffs and Putative Class ........................................................... 5

III. ARGUMENT ........................................................................................................ 7

    A.   The Text and History of § 3344 Preclude Class Remedies ......................... 7

    B.   Plaintiffs Have Not Affirmatively Shown Their Compliance with Rule 23 ........ 8

        1.   Plaintiffs Have Not Proved Commonality (Rule 23(a)(2)) ...................... 9

            a.   Lack of consent is an individualized issue ...................................... 9

            b.   Individualized proof is required to determine whether Users'
                names or likenesses actually appeared in Sponsored Stories ........ 15

            c.   Individualized proof is needed to test whether each
                Sponsored Story advertises "products, merchandise, goods,
                or services." ................................................................................ 17

            d.   Individualized proof is necessary for Plaintiffs to establish
                that a class member was injured ..................................................... 17

            e.   Individualized proof is necessary for Plaintiffs to determine
                each class member's measure of damages ..................................... 22

             f.   Exemption under § 3344(d) and Facebook's free-speech
                defenses are highly individualized inquiries ................................. 23

            g.   Plaintiffs' UCL claims will turn on individualized evidence ........ 24

            h.   Plaintiffs have not proved commonality for any other issue ........ 25

         2.   Plaintiffs Have Not Proved Predominance (Rule 23(b)(3)) .................... 26

        3.   Plaintiffs Have Not Proved Superiority (Rule 23(b)(3)) ........................ 27

        4.   Plaintiffs Have Not Proved Typicality (Rule 23(a)(3)) .......................... 28

        5.   Plaintiffs Have Not Proved Adequacy (Rule 23(a)(4)) ........................... 29

IV.  CONCLUSION .................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abdul-Jabbar v. Gen. Motors Corp.*,
   85 F.3d 407 (9th Cir. 1996)................................................................................................ 15, 16

*Aburto v. Verizon Cal., Inc.*,
   No. CV 11-03683, 2012 WL 10381 (C.D. Cal. Jan. 3, 2012)................................................. 26

*Ackerman v. Ferry*,
   No. B143751, 2002 WL 31506931 (Cal. App. Nov. 12, 2002)............................................. 15

*Alberghetti v. Corbis Corp.*,
   263 F.R.D. 571 (C.D. Cal. 2010) .................................................................................... 27, 29

*Am. Booksellers Ass'n v. Barnes & Noble, Inc.*,
   135 F. Supp. 2d 1031 (N.D. Cal. 2001) .......................................................................... 19, 20

*Am. Pipe & Constr. Co. v. Utah*,
   414 U.S. 538 (1974)............................................................................................................. 28

*Amchem v Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)............................................................................................................. 26

*Arch v. Am. Tobacco Co., Inc.*,
   175 F.R.D. 469 (E.D. Pa. 1997)........................................................................................... 10

*Badella v. Deniro Mktg. LLC*,
   No. 10-03908, 2011 WL 5358400 (N.D. Cal. Nov. 4, 2011) ............................................... 27

*Bateman v. Am. Multi-Cinema, Inc.*,
   623 F.3d 708 (9th Cir. 2010)............................................................................................... 27

*Bello v. Power Test Corp.*,
   100 F.R.D. 1 (E.D. Pa. 1982) ................................................................................................ 8

*Blanco v. CEC Entm't Concepts*,
   No. CV 07-0559, 2008 WL 239658 (C.D. Cal. Jan. 10, 2008).............................................. 27

*Blatty v. N.Y. Times Co.*,
   42 Cal. 3d 1033 (1986) ....................................................................................................... 23

*Block v. Major League Baseball*,
   65 Cal. App. 4th 538 (1998)........................................................................................... 10, 11

*Bodner v. Oreck Direct, LLC*,
   No. C 06-4756, 2007 WL 1223777 (N.D. Cal. Apr. 25, 2007) ............................................. 30

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii.

**FACEBOOK'S OPP. TO CLASS CERTIFICATION
CASE NO. 11-CV-01726-LHK (PSG)**

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Bolger v. Youngs Drug Prods. Corp.,*
  463 U.S. 60 (1983) ............................................................................................. 24

*Caesar v. Chem. Bank,*
  460 N.Y.S.2d 235 (1983) ................................................................................... 11

*Cairns v. Franklin Mint Co.,*
  292 F.3d 1139 (9th Cir. 2002) ............................................................................. 7

*Cruz v. Dollar Tree Stores, Inc.,*
  No. 07-2050, 2011 WL 2682967 (N.D. Cal. Jul. 8, 2011) ................................. 22

*Downing v. Abercrombie & Fitch,*
  265 F.3d 994 (9th Cir. 2001) ............................................................................. 17

*E. Tex. Motor Freight Servs., Inc. v. Rodriguez,*
  431 U.S. 395 (1977) ........................................................................................... 29

*Ellis v. Costco Wholesale Corp.,*
  657 F.3d 970 (9th Cir. 2011) ............................................................................... 9

*FDIC v. Garner,*
  126 F.3d 1138 (9th Cir. 1997) ........................................................................... 30

*Gene & Gene, LLC v. BioPay, LLC,*
  541 F.3d 318 (5th Cir. 2008) ............................................................................. 10

*Gionfriddo v. MLB,*
  94 Cal. App. 4th 400 (2001) ......................................................................... 23, 24

*Gonzales v. Comcast Corp.,*
  No. 10-cv-01010, 2012 WL 10621 (E.D. Cal. Jan. 3, 2012) ............................. 17

*Greenstein v. Greif Co.,*
  No. B200962, 2009 WL 117368 (Cal. App. Jan. 20, 2009) .................................. 9

*Haley v. Medtronic, Inc.,*
  169 F.R.D. 643 (C.D. Cal. 1996) ....................................................................... 27

*Hanni v. Am. Airlines, Inc.,*
  No. C 08-00732, 2010 WL 1576435 (N.D. Cal. Apr. 19, 2010) ........................ 10

*Hanon v. Dataprods. Corp.,*
  976 F.2d 497 (9th Cir. 1992) ............................................................................. 28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii.

**FACEBOOK'S OPP. TO CLASS CERTIFICATION
CASE NO. 11-CV-01726-LHK (PSG)**

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Hansberry v. Lee,*
   311 U.S. 32 (1940) ................................................................................. 28

*In re Facebook, Inc., PPC Advertising Litig.,*
   No. C 09-3043, 2012 WL 1253182 (N.D. Cal. Apr. 13, 2012) ..................................... passim

*In re Flash Memory Antitrust Litig.,*
   No C 07-0086, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ................................. 19

*In re GPU Litig.,*
   253 F.R.D. 478 (N.D. Cal. 2008) ................................................................... 19

*In re Packaged Ice Antitrust Litig.,*
   779 F. Supp. 2d 642 (E.D. Mich. 2011) ........................................................ 8

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.,*
   No. 1:08-WP-65000, 2010 WL 2756947 (N.D. Ohio July 12, 2010) ...................... 8

*Ion Equip. Corp. v. Nelson,*
   110 Cal. App. 3d 868 (1980) ...................................................................... 17

*Johnson v. Boeing Airplane Co.,*
   175 Kan. 275 (1953) ................................................................................. 9

*Jones v. Corbis Corp.,*
   815 F. Supp. 2d 1108 (C.D. Cal. 2011) .............................................. 9, 10, 14

*Jones v. Murphy,*
   256 F.R.D. 519 (D. Md. 2009) ................................................................... 27

*Jordan v. Jewel Food Stores,*
   No. 10 C 340, 2012 WL 512584 (N.D. Ill. Feb. 15, 2012) .................................. 24

*Juarez v. Jani-King of Cal., Inc.,*
   273 F.R.D. 571 (N.D. Cal. 2011) ............................................................... 24

*Kirby v. Sega of Am.,*
   144 Cal. App. 4th 47 (2006) ...................................................................... 27

*Lewallen v. Medtronic USA, Inc.,*
   No. C 01–20395, 2002 WL 31300899 (N.D. Cal. Aug. 28, 2002) ......................... 10

*Mayfield v. Dalton,*
   109 F.3d 1423 (9th Cir. 1997) ................................................................... 29

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv.

**FACEBOOK'S OPP. TO CLASS CERTIFICATION**
**CASE NO. 11-CV-01726-LHK (PSG)**

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Mazur v. eBay Inc.,*
    257 F.R.D. 563 (N.D. Cal. 2009) ................................................................. 17, 18

*Mazza v. Am. Honda Motor Co., Inc.,*
    666 F.3d 581 (9th Cir. 2012)..................................................... 8, 17, 24, 26

*McKenna v. First Horizon Home Loan Corp.,*
    475 F.3d 418 (1st Cir. 2007) .................................................................... passim

*McKinney v. Bayer Corp.,*
    744 F. Supp. 2d 733 (N.D. Ohio 2010) ............................................................... 8

*Menagerie Prods. v. Citysearch,*
    No. 08-4263, 2009 WL 3770668 (C.D. Cal. Nov. 9, 2009).................................... 24

*New Kids on the Block v. News Am. Publ'g, Inc.,*
    971 F.2d 302 (9th Cir. 1992)................................................................. 23

*Newcombe v. Adolf Coors Co.,*
    157 F. 3d 686 (1998) .................................................................. 16

*Newton v. Thomason,*
    22 F.3d 1455 (9th Cir. 1994)................................................................. 10

*O'Donovan v. CashCall, Inc.,*
    No. C 08–03174, 2011 WL 5573845 (N.D. Cal. Nov. 15, 2011) ......................... 10

*Pryor v. Aerotek Sci.,*
    No. 10-0675, 2011 WL 6376703 (C.D. Cal. Nov. 15, 2011)................................ 26

*Quacchia v. DaimlerChrysler Corp.,*
    122 Cal. App. 4th 1442 (2004)............................................................. 24

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992)......................................................................... 23

*Robidoux v. Rosengren,*
    638 F.3d 1177 (9th Cir. 2011)............................................................. 28

*S. Bay Chevrolet v. GMAC,*
    72 Cal. App. 4th 861 (1999)............................................................... 25

*Sanchez v. Wal-Mart Stores, Inc.,*
    No. 06-CV-02573, 2009 WL 1511435 (E.D. Cal. May 28, 2009) ......................... 30

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Sepulveda v. Wal-Mart Stores, Inc.,*
No. 06-56090, 2011 WL 6882918 (9th Cir. 2011) ............................................................. 30

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
130 S. Ct. 1431 (2010) (Stevens, J., concurring) ............................................................. 8

*Stewart v. Rolling Stone,*
181 Cal. App. 4th 664 (2010) .......................................................................................... 23

*Stilson v. Reader's Digest Ass'n, Inc.,*
28 Cal. App. 3d 270 (1972) ...................................................................................... 11, 12

*T.W. ex rel. Enk v. Brophy,*
124 F.3d 893 (7th Cir. 1997) ........................................................................................... 28

*Tait v. BSH Home Appliances Corp.,*
No. 10–711, 2011 WL 1832941 (C.D. Cal. May 12, 2011) ............................................... 8

*Taylor v. FDIC,*
132 F.3d 753 (D.C. Cir. 1997) .................................................................................... 28, 29

*Uhlaender v. Henricksen,*
316 F. Supp. 1277 (D. Minn. 1970) ................................................................................. 11

*Vinci v. Am. Can Co.,*
9 Ohio St. 3d 98 (1984) ................................................................................................... 11

*Wal-Mart Stores, Inc. v. Dukes,*
131 S. Ct. 2541 (2011) ............................................................................................ passim

*Welling v. Alexy,*
155 F.R.D. 654 (N.D. Cal. 1994) ............................................................................... 29, 30

*Wright v. Schock,*
742 F.2d 541 (9th Cir. 1984) ........................................................................................... 28

**STATUTES**

California  Civil Code
§ 3344 ................................................................................................................... passim

California Business and Professions Code
§ 17200 ........................................................................................................................ 1, 24

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vi.

**FACEBOOK'S OPP. TO CLASS CERTIFICATION**
**CASE NO. 11-CV-01726-LHK (PSG)**

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Rules Enabling Act,
28 U.S.C.§ 2072 .................................................................................................. 1, 8, 9

**OTHER AUTHORITIES**

Cal. Civ. Code § 3344 Legislative History
A.B. 826, Reg. Sess. (Cal. 1971) (as introduced Mar. 8, 1971)................................ 7
A.B. 826, Reg. Sess. (Cal. 1971) (as amended June 16, 1971)........................ 7, 14
Comm. on Judiciary, Analysis of A.B. 826 ............................................. 7
Press Release, Mar. 8, 2011 ............................................................. 7

Cal. Constitution
Article I, § 2 ................................................................................ 23, 24

Federal Rules of Civil Procedure
17........................................................................................................ 28
23...................................................................................................... passim

Judicial Council of Cal. Civil Jury Instructions No. 1804A ........................................ 17

Restatement (Second) of Torts § 892 (1979) ...................................................... 9

U.S. Constitution
Amendment I.................................................................................... 2, 23, 24, 26
Article III.......................................................................................... 28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vii.

FACEBOOK'S OPP. TO CLASS CERTIFICATION
CASE NO. 11-CV-01726-LHK (PSG)

## I.   INTRODUCTION

Plaintiffs propose an immense, highly diverse, and judicially unmanageable class action that includes nearly one of every three Americans, seeking billions of dollars in damages arising from their use of Facebook's free website.  Despite knowing and accepting that the display of their names and profile pictures is part of the basic functioning of the Facebook site, Plaintiffs claim that one particular feature, "Sponsored Stories," violates their rights of publicity under California Civil Code § 3344 ("§ 3344") and violates California's Unfair Competition Law ("UCL").  Plaintiffs' motion for class certification turns a blind eye to the countless individualized questions that will control the outcome of this case.  If certified, this class action would deprive Facebook of its right to defend itself against the claims of individual class members.  This class was not certifiable even before the Supreme Court's watershed decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011); certification now is clearly untenable.

*First*, certification of § 3344 claims here would expand the substantive scope of the statute beyond what the California legislature intended—a limited remedy available only in individual actions—in violation of the Rules Enabling Act, 28 U.S.C. § 2072(b).

*Second*, Plaintiffs have failed to meet Rule 23(a)(2)'s commonality requirement, as the issues central to each class member's claim can only be resolved with highly individualized inquiries and evidence.  For example, Plaintiffs bear the burden of showing how common evidence could prove that Facebook lacked consent as to each class member.  But they have failed to address abundant evidence that individual class members (including the named Plaintiffs) consented, among other ways, by knowingly taking actions on Facebook that could lead to the appearance of their names and likenesses in commercial or sponsored content, including Sponsored Stories.  Plaintiffs also cannot prove on a classwide basis that each class member's actual name and likeness appeared in Sponsored Stories, and the evidence is to the contrary (some Facebook users do not use their real names, and Users' profile pictures often are objects, symbols, or other images not containing their likenesses).  Nor is there common evidence showing that each Sponsored Story advertised "products, merchandise, goods, or services" as required by § 3344, because Sponsored Stories relate to a much broader range of subjects.

1    Moreover, Plaintiffs have no viable method for proving injury (and, if there were injury, the

2    measure of damages) on a classwide basis, and instead propose to use formulas and averages that,

3    as Plaintiffs' own expert admits, would sweep millions of uninjured Users into the class.

4    Individualized inquiries would also be required to determine which Sponsored Stories are exempt

5    from liability under § 3344(d)—to the extent they relate to news, public affairs, sports, or

6    politics—or under the First Amendment (because many Sponsored Stories are core protected

7    speech).

8         *Third*, even if Plaintiffs had demonstrated commonality (they have not and cannot), they

9    cannot meet Rule 23(b)(3)'s more demanding predominance standard, as any question common to

10   the class would be swamped by the many issues requiring highly individualized inquiries and

11   evidence to adjudicate each class member's claim and Facebook's defenses.

12        *Fourth*, Plaintiffs have not shown that a class action is superior to other litigation

13   methods.  Section 3344 was intended to support individual actions, not class actions, and it

14   contains three provisions that render individual actions superior: statutory damages, punitive

15   damages, and prevailing-party attorneys' fees.  Moreover, Plaintiffs have not shown that class

16   proceedings can adequately guard the rights of the minor subclass, and have not explained how

17   Facebook will recover its attorneys' fees under § 3344(a), should it prevail.

18        *Fifth*, the named Plaintiffs fail Rule 23(a)(3)'s typicality requirement, as each is

19   susceptible to unique defenses. ███████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████████████████████

23   ████████████████

24        *Finally*, the named Plaintiffs have not shown that they "will fairly and adequately protect

25   the interests of the class," as required by Rule 23(a)(4).  They seek injunctive relief that would

26   obstruct other Users' enjoyment of the site, and which would interfere with Facebook's ability to

27   maintain a free and innovative website. ████████████████████████

28   ████, and have made no effort to oversee or check the discretion of putative class counsel.

## II.  STATEMENT OF FACTS

### A.  Facebook Website

Facebook is a free social networking service that allows 845 million Users across the globe, more than 145 million of whom are in the United States, to connect and share with one another.  (Squires[1] ¶¶ 2-4.)  Users log in to Facebook to keep up with friends, share photos, organize events, share links and videos, play games, and learn more about the friends, family, causes, businesses, and organizations they care about.  (*Id.* ¶ 3.) To join, a prospective User need only provide her name, gender, date of birth, and an email address, and agree to Facebook's terms of use, known as the Statement of Rights and Responsibilities ("Terms").  (*Id.* ¶ 5.)  Although Facebook's Terms require Users to sign up using their real names, many Users sign up with pseudonyms.  (*Id.* ¶ 6.)  Facebook has no way of verifying every Facebook User's name.  (*Id.*)

Most Users' Facebook experience centers around sharing content with their Facebook "Friends" and viewing their Friends' shared content.  Some Users have a handful of Friends, while many have hundreds or even thousands.  (*Id.* ¶ 9.)  Users typically allow all Friends to see the content they share on Facebook.  (*Id.* ¶ 3.)  But a User may limit the audience that can view content to subsets of Friends or to "Only Me," making content visible to the User alone.  (*Id.* ¶ 78.)

For most Users, the "News Feed" on the "Home" page is the center of their Facebook activity.  (Squires ¶ 20.)  Each User's News Feed contains a customized and constantly-updated stream of "stories" from and about the User's Friends and about items the User has connected with, such as musical groups, news outlets, organizations, or companies.  (*Id.* ¶ 21.)  Each Facebook User also has a unique "Profile" page (known today as a "Timeline") that displays content the User has shared.  (*Id.* ¶ 23.)

Users may (but need not) select and upload a "Profile Picture," which is displayed in various places on the website.  (Squires ¶¶ 26, 30.)  Profile Pictures may be changed at any time and can be images of virtually anything, including pets, landscapes, objects, or the User herself.

---

[1] Citations to declarations in support of this Opposition are denoted by the declarant's last name.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   (*Id.* ¶ 27.)  Facebook has no way of verifying if, at any given time, a Profile Picture is an actual

2   image of the User (*id.* ¶ 29), and many Users, ████████████████████████, have used

3   Profile Pictures that do not depict their likenesses (Brown ¶ 42.)

4     Among the numerous ways to share thoughts and opinions on Facebook, one of the most

5   popular is "Liking" content.  (Squires ¶ 40.)  The Facebook "Like" button appears next to most

6   content on Facebook—including on the Facebook "Pages" of brands, politicians, causes, and

7   other entities—and on non-Facebook websites.  (*Id.* ¶¶ 41, 42.)  By clicking on the Like button—

8   whether on or off Facebook—a User posts a Like statement, or "story," to his or her Timeline

9   (e.g., "Susan Mainzer likes UNICEF").  (*Id.* ¶ 43.)  As with most things Users share, the same

10  Like story may be redisplayed throughout the site: (1) in the News Feeds of the User's Friends,

11  (2) in Friends' "Tickers" (an extension of the News Feed on the top-right-hand side of the Home

12  Page), (3) on the Facebook Page or third-party website that was Liked, or (4) in a "Recommended

13  Pages" unit, which suggests Pages that may interest a User.  (*Id.* ¶¶ 44, 46.)

14    Users click the Like button for a variety of reasons: to communicate their affinity for the

15  content; for self-promotion; to promote a cause or business; to access content; to get discounts or

16  deals; and more.  (Brown ¶ 43; Squires ¶ 50; Tucker ¶¶ 50-67.)  Whatever their motivation, Users

17  know and expect that, as with other content they share on Facebook, their Like stories will be

18  shared with their Friends; indeed, that frequently is the point.  (*E.g.*, Brown ¶ 44.)  A User does

19  not need to Like the Rolling Stones to remind *herself* that she likes them; she does it to tell her

20  Friends on Facebook.  That said, Users can choose to set the privacy of their Like stories to "Only

21  Me," in which case they are not visible to the User's Friends.

22    **B.** **Facebook Marketing Tools**

23    Like many free websites, Facebook funds its operation—which currently costs nearly \$2

24  billion per year—primarily by allowing marketers to display various types of advertisements and

25  sponsored content on the site.  (Squires ¶ 56.)

26    The most common type of advertising on Facebook is "Facebook Ads."  Facebook Ads

27  are designed by third-party advertisers and displayed on the right-hand side of the Facebook

28  website according to anonymous targeting criteria provided by the advertiser.  (*Id.* ¶ 61.)  Since

November 2007, Facebook has allowed marketers to pair their Ads with "social context," i.e., stories about actions (such as Like statements) that Facebook Users have taken with respect to the advertised brand, organization, or company (such ads are sometimes called "Social Ads"). (*Id.* ¶ 64, 65.) Thus, if Nordstrom ran an ad campaign on Facebook, a User's Friends might see an "ad creative" supplied by Nordstrom (e.g., Nordstrom 20% off Thanksgiving Sale), paired with a statement that "Jane Doe likes Nordstrom." (*See id.*)  Plaintiffs do *not* complain about the appearance of Users' names or Profile Pictures alongside Social Ads.

On January 25, 2011, Facebook introduced "Sponsored Stories," a new marketing tool that redisplays stories that have been organically generated by Facebook Users. (Squires ¶ 70.) Since Users' News Feeds constantly update with new content, a User's story might not be seen by her Friends. Sponsored Stories allow individuals, organizations, and companies to pay a small fee to increase the chances that User-generated stories related to their causes, brands, or products will be seen by a User's Friends. Sponsored Stories are displayed only to the same audience that the User allowed to see the original story. (*Id.* ¶ 72.)

Facebook has undertaken extensive efforts to educate Users about its marketing tools. For example, Facebook's online "Help Center" explains how Sponsored Stories work, including the fact that Sponsored Stories respect Users' privacy settings. (*Id.* ¶¶ 88, 89, Ex. A.) In late 2011, Facebook also initiated a site-wide User-education campaign during which it displayed a message at the top of each User's Home Page that read, "About Ads: Ever wonder how Facebook makes money?  Get the Details." (*Id.* ¶ 94.) The message linked to a webpage about Facebook's marketing tools that explained Sponsored Stories in detail. (*Id.* ¶¶ 94, 96, Ex. I.) In addition, Facebook's Terms have long made clear that Users' names and likenesses could be used in sponsored and commercial content. (*See* Muller ¶¶ 13-22.)

C.    **Named Plaintiffs and Putative Class**

The named Plaintiffs—Susan Mainzer, James Duval, and W.T.—plus former Plaintiff Angel Fraley, ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████



Mainzer—a public relations consultant—testified that she often Likes client-related Pages in order to help publicize them.  (*Id.* ¶ 53.)

1 ███████████████████████

2      Plaintiffs' putative class, defined to include all U.S. Users who have appeared in a

3 Sponsored Story, was comprised of approximately ███████ people as of December 31, 2011

4 (Plambeck ¶ 13), and now is likely to include over 100 million people—*almost one-third of the*

5 *population of the country*.   Unlike their complaint, Plaintiffs' motion proposes a class that

6 includes Users who joined Facebook on or after January 25, 2011, when the Sponsored Stories

7 feature was introduced.  (*Compare* Sec. Am. Compl. ("SAC") ¶ 95 *with* Mot. 8.)

**III.   ARGUMENT**

**A.   The Text and History of § 3344 Preclude Class Remedies**

10      On its face, § 3344 does not permit class actions, but accords a remedy only for an

11 "injured party or parties," in the amount of "damages suffered by him or her."  Cal. Civ. Code

12 § 3344(a).  This language represented a deliberate choice by the California legislature to limit

13 § 3344 to individual claims and to foreclose class actions.  This, alone, bars certification.

14      As introduced, § 3344's enacting bill would have expressly permitted class actions,

15 providing: "Any person bringing an action may, if the tort has caused damage to other persons

16 similarly situated, bring an action on behalf of himself and such other persons to recover

17 damages."  A.B. 826, Reg. Sess. § 2 (Cal. 1971) (as introduced Mar. 8, 1971) (Brown Ex. EE);

18 *see id.* (Digest) (A.B. 826 "specifically permits class-action"); Press Release, Mar. 8, 2011

19 ("[A.B. 826] will make class actions possible") (Brown  Ex. EE).  Shortly after its introduction,

20 the Judiciary Committee expressed grave doubt whether A.B. 826 addressed the "type of conduct

21 . . . which is [the] proper subject for class action."  A. Comm. on Judiciary, Analysis of A.B. 826,

22 at 1 (June 14, 1971) (Brown Ex. EE.)  In the Committee's view, class action legislation was more

23 properly directed to consumer protection claims, not invasion of the right to control one's name

24 and likeness.  *Id.*  The Committee additionally observed that, while four states had enacted similar

25 statutes "[n]o other states ha[d] class action provisions."  *Id.*  Thereafter, the legislature stripped

26 the bill of its class action provision, *see* A.B. 826 (as amended June 16, 1971) (Brown Ex. EE),

27 signaling its intent to limit § 3344 to individual claims and to bar class action, *see Cairns v.*

28 *Franklin Mint Co.*, 292 F.3d 1139, 1148 (9th Cir. 2002) ("California courts give substantial

weight to the deletion of a provision during the drafting stage." (citations omitted)).

Because the state substantive law does not permit class actions, certifying § 3344 claims under Rule 23 would violate the Rules Enabling Act.  *See* 28 U.S.C. § 2072(b) (rules shall not "abridge, enlarge or modify any substantive right"); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1451, 1456 (2010) (Stevens, J., concurring).[2]  Under the Rules Enabling Act, Rule 23 must yield where it would displace "a state rule that is procedural in the ordinary sense of the term but sufficiently interwoven with the scope of a substantive right or remedy."  *Id.* at 1448, 1453 & n.9, 1456 (internal quotations and citations omitted).  Applying *Shady Grove*, courts have repeatedly refused to certify classes where, as here, the state substantive statute creating plaintiffs' cause of action precludes class relief.[3]  Additionally, legislative intent is highly relevant in defining the scope of a statutory right.  *See, e.g.*, *McKenna v. First Horizon Home Loan Corp.*, 475 F.3d 418, 426 n.3 (1st Cir. 2007) (class improperly certified where statute's "structure and its legislative history" manifested "express congressional intent" to bar class claims); *Bello v. Power Test Corp.*, 100 F.R.D. 1, 3 n.7 (E.D. Pa. 1982) ("[T]he legislative history evinces a clear expression of congressional intent to preclude class actions[.]").  Here, because the bar on § 3344 class actions arises from the text and history of § 3344 itself—and governs only the rights under that statute—it must control in federal court.  28 U.S.C. § 2072(b); *Shady Grove*, 130 S. Ct. at 1456.

**B.**     **Plaintiffs Have Not Affirmatively Shown Their Compliance with Rule 23.**

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 131 S. Ct. at 2551.  The Court must conduct a "rigorous analysis," overlapping with the

---

[2] Justice Stevens's concurring opinion is widely regarded as controlling.  *See, e.g.*, *Tait v. BSH Home Appliances Corp.*, No. 10–711, 2011 WL 1832941, at *8 (C.D. Cal. May 12, 2011).

[3] *See In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 661 n.4 (E.D. Mich. 2011); *McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733, 748-49 (N.D. Ohio 2010); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, No. 1:08-WP-65000, 2010 WL 2756947, at *2 (N.D. Ohio July 12, 2010) (same); *Tait*, 2011 WL 1832941, at *8-9.

merits, to ensure that all applicable requirements are met.  *Id.*; *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).   Plaintiffs must show their compliance with Rule 23(a)(1)–(4) (numerosity, commonality, typicality, and adequacy) and Rule 23(b)(3) (predominance and superiority). Except for numerosity, Plaintiffs have not met these requirements.

### 1.       Plaintiffs Have Not Proved Commonality (Rule 23(a)(2)).

*Dukes* transformed Rule 23(a)(2)'s commonality requirement, overturning the "permissive[]" standards on which Plaintiffs' Motion purports to rely.  (Mot. 12); *see Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 974 (9th Cir. 2011) (*Dukes* is "new precedent altering existing case law").  Under *Dukes*, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  131 S. Ct. at 2551 (citations omitted).  Plaintiffs must affirmatively show that common questions exist that are "capable of classwide resolution—which means that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* Moreover, "[b]ecause the Rules Enabling Act forbids interpreting Rule 23 to 'abridge . . . a substantive right,'" a finding of commonality must not limit the defendant's right to litigate its defenses to individual claims.  *Id.* at 2561 (citing 28 U.S.C. § 2072(b)).

### a.       Lack of consent is an individualized issue.

Although Plaintiffs bear the burden of showing, through common evidence, how they will prove that each class member did not consent to the appearance of their names and likenesses in Sponsored Stories, their discussion of consent is little more than an argument that Facebook's Terms do not *expressly* authorize this.  This argument ignores settled law that consent under § 3344 can be "implied from [Plaintiffs'] conduct and the circumstances of the case."  *See Jones v. Corbis Corp.*, 815 F. Supp. 2d 1108, 1113 (C.D. Cal. 2011).[4]  Courts have found implied

---

[4] *See also Greenstein v. Greif Co.*, No. B200962, 2009 WL 117368, at *9-10 (Cal. App. Jan. 20, 2009) (plaintiff consented where he was "aware that [he was] being recorded as part of the reality television program" and "did not object"); *Johnson v. Boeing Airplane Co.*, 175 Kan. 275, 282 (1953) (plaintiff consented because he "knew the photograph would be published somewhere"); Restatement (Second) of Torts § 892(1) & cmt. B & illus. 1 (1979) ("Consent . . . may be manifested by action or inaction and need not be communicated to the actor.").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    consent to the use of individuals' names or likenesses when, for example, they pose for "red

2    carpet" photos, knowing that photographers may use their photos to solicit sales, *id.* at 1114-15,

3    or express excitement over the use and never object, *Newton v. Thomason*, 22 F.3d 1455, 1461

4    (9th Cir. 1994).  Because many putative class members *impliedly* consented to the appearance of

5    their names and likenesses in commercial or sponsored content, such as Sponsored Stories,

6    Facebook's Terms are incapable of establishing *absence of consent* on a classwide basis.

7    Courts consistently deny certification where, as here, questions of consent depend on

8    individualized evidence.  *E.g.*, *O'Donovan v. CashCall, Inc.*, No. C 08–03174, 2011 WL

9    5573845, at *14 (N.D. Cal. Nov. 15, 2011); *Lewallen v. Medtronic USA, Inc.*, No. C 01–20395,

10   2002 WL 31300899, at *4 (N.D. Cal. Aug. 28, 2002) ("various affirmative defenses require

11   individualized proof, including . . . consent"); *Arch v. Am. Tobacco Co., Inc.*, 175 F.R.D. 469,

12   491 (E.D. Pa. 1997) ("[t]he defense of consent . . . would necessarily require an examination of

13   the facts peculiar to each and every plaintiff; a highly individual issue").  Class certification is

14   even less likely where, as here, the *absence of consent* is an element of the claims.  *See, e.g.*,

15   *Gene & Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 329 (5th Cir. 2008) (vacating certification

16   where plaintiff "failed to advance any viable theory employing generalized proof concerning the

17   lack of consent" such that "myriad mini-trials cannot be avoided"); *Hanni v. Am. Airlines, Inc.*,

18   No. C 08-00732, 2010 WL 1576435, at *6 (N.D. Cal. Apr. 19, 2010) ("consent is individual. . .

19   [and] precludes a finding that common issues predominate").

20   Courts addressing certification under California's right-of-publicity laws have specifically

21   recognized that lack of consent is an individualized inquiry.  For example, in *Block v. Major*

22   *League Baseball*, 65 Cal. App. 4th 538 (1998), the court denied certification of § 3344 and

23   common law claims by 800 former baseball players because "some [players] objected to some

24   [uses of their names/likenesses] . . . and some objected not at all. . . .  [F]or each player it will be

25   necessary to conduct a factual inquiry into. . . his knowledge of the use of his name, likeness, etc.

26   and his response[.]"  *Id.* at 544 (quotation omitted); *see also Jones*, 815 F. Supp. 2d at 1117

27   (§ 3344 class not viable because "[the] consent analysis . . . is highly individualized" and turns on

28   "evidence of . . . conduct that would reasonably imply consent"); *Stilson v. Reader's Digest*

*Ass'n, Inc.*, 28 Cal. App. 3d 270, 274 (1972) (barring class action because "[i]t cannot be assumed that each of the millions in the class objects to such use of his name").[5]

Plaintiffs do not (and cannot) provide a classwide method for proving the absence of consent. A User's decision to Like a charity, check in at a business, or share a link —by its very nature—implies consent to publish that statement to others on behalf of the entity that created the content. Most, if not all, Users understand that taking these steps broadcasts their statement to their Friends (along with their names and Profile Pictures) in many different ways and places on the site—and that is the reason Users take these actions in the first place. There can be no credible claim that Facebook somehow lacked consent to publish those statements in Sponsored Stories, but not in the myriad *other* contexts, including commercial and marketing contexts, where Likes and social actions have appeared on Facebook during the past several years.

But even if the very nature of sharing such stories on Facebook did not defeat Plaintiffs' bid for certification, there is abundant evidence that large swaths of class members impliedly consented to their appearance in commercial and sponsored content, including Sponsored Stories. *First,* Facebook's Terms have long given Users notice that their names and Profile Pictures could be used in sponsored and commercial content. Indeed, three years before the first Sponsored Story was ever displayed, the Terms authorized Facebook to "use" Users' "photos [and] profiles (including your name, image, and likeness)" for "any purpose, commercial, advertising, or otherwise." (Muller Ex. C, at FB_FRA_00275.) By 2009, the Terms authorized Facebook to "use your name, likeness, and image for any purpose, including commercial or advertising." (Ex. E, at FB-FRA_00329.) And the Terms in place well before the launch of Sponsored Stories explained, "You can use your privacy settings to limit how your name and profile picture may be

---

[5] Facebook has identified only three class actions involving right-of-publicity claims outside of California, each of them distinguishable. *See Uhlaender v. Henricksen*, 316 F. Supp. 1277, 1278-79 (D. Minn. 1970) (class of "several hundred" players; no dispute as to use of players' names); *Caesar v. Chem. Bank*, 460 N.Y.S.2d 235 (1983) (38 bank employees' names used in advertisements; defendant admitted lack of express written consent); *Vinci v. Am. Can Co.*, 9 Ohio St. 3d 98 (1984) (68 former Olympic athletes' names and likenesses used on disposable cups; no discussion of consent); *see also Block*, 65 Cal. App. 4th at 546 ("[T]here was no hint in Vinci that any . . . members of the class might have consented[.]"). None of these cases remotely resembles the unprecedentedly large, diverse class sought here.

Cooley LLP
Attorneys At Law
San Francisco

11.

FACEBOOK'S OPP. TO CLASS CERTIFICATION
CASE NO. 11-CV-01726-LHK (PSG)

1    associated with commercial, sponsored, or related content (such as a brand you like) served or

2    enhanced by us.  You give us permission to use your name and profile picture in connection with

3    that content, subject to the limits you place."  (*Id.* ¶¶ 21-22.)  Facebook contends—and will show

4    if this case proceeds to summary judgment—that its Terms establish express consent to

5    Sponsored Stories for all Users.[6]  But as relevant here, these Terms have long included provisions

6    granting Facebook consent to use User names and Profile Pictures in association with commercial

7    or sponsored content, such as Sponsored Stories.  Because these terms put millions of Users on

8    notice that Facebook could and would make such use of their names and Profile Pictures, it is

9    impossible to conclude on a classwide basis that no Users consented to Sponsored Stories.

10       *Second*, since November 2007, Facebook has displayed User Like statements, along with

11    User names and/or Profile Pictures, ███████ of Social Ads.  (Squires ¶ 65.)  Thus, millions of

12    Users have seen their Friends' social actions (and names and/or Profile Pictures) paired with Ads.

13    It is impossible to conclude on a classwide basis that none of these Users understood that their

14    own social actions, names, and Profile Pictures could be republished in a sponsored context.

15       *Third*, many Users have known they could opt out of Social Ads but have declined to do

16    so (Facebook has offered a single-click opt-out setting for Social Ads since March 2008).

17    (Squires ¶ 66.)  In fact, as of January 2011, when Sponsored Stories were introduced, ███ of

18    U.S. Users had not opted out of Social Ads.  (Plambeck ¶ 31.)  Any of these Users who knew

19    about the opt-out setting but did not use it plainly have consented to the association of their names

20    and likenesses with sponsored content. ████████████████████████

21    ███████████████████████ (Brown Ex. J, No. 4.)[7]

---

[6] Having invoked the Terms' choice-of-law provision (Mot. 19), Plaintiffs concede that they are bound by the Terms, including the consent provision.  Indeed, had they not made that concession, the application of 50 states' laws to Plaintiffs' claims would render the putative class uncertifiable.  *See Mazza*, 666 F.3d at 590.  Moreover, if Plaintiffs' theory is that consent "was fraudulently obtained and thus not knowing and willful" (MTD Order 24; *see* SAC ¶¶ 32-35; Pls.' Opp. to Mot. to Dismiss 19), Plaintiffs cannot prove (and have not tried to prove) that class members uniformly were exposed to, deceived by, and relied upon a common misrepresentation by Facebook.  The element of reliance alone precludes certification on this theory.  *Mazza*, 666 F.3d at 596 (vacating certification "because common questions . . . do not predominate where an individualized case must be made for each [class] member showing reliance").

[7] These first three grounds for implied consent rebut Plaintiffs' assertion that consent was

Cooley LLP
Attorneys At Law
San Francisco

12.

FACEBOOK'S OPP. TO CLASS CERTIFICATION
CASE NO. 11-CV-01726-LHK (PSG)

Before launching Sponsored Stories, Facebook revised the Social Ads opt-out page to clarify that the setting does not apply to Sponsored Stories, linking that page to content about how Sponsored Stories work.  (Squires ¶ 67.)  Since then, nearly ████████ Users have visited that page and have thus received clear notice that the Social Ads opt-out does not apply to Sponsored Stories.  (Plambeck ¶ 32.)  These Users are surely among the millions who Like Pages each day.

*Fourth*, many Users actually click on the Like button *inside* a Sponsored Story featuring a Friend's name and Profile Picture (some ████████ unique U.S. Facebook Users do this *each day*).  (*Id.* ¶ 27; Tucker ¶ 48.)  Many, if not all, of these Users no doubt realize their actions could lead to a Sponsored Story.  Yet these Users knowingly Like the same content themselves.

*Fifth*, between January and August 2011 alone, U.S. Facebook Users saw over ████████ Sponsored Stories featuring their Friends.  (Plambeck ¶ 12.)  Yet Users continue to Like more than ████████ Pages daily.  (*Id.* ¶ 24.)  In a random sample of anonymous User data, Professor Bucklin found that, after the launch of Sponsored Stories, roughly equal numbers of Users increased, decreased, and did not change their Page-Liking rates.  (Bucklin ¶¶ 99-103.)  This, too, is flatly inconsistent with the notion that no class members consented to Sponsored Stories.

*Sixth*, Facebook Users have learned about Sponsored Stories through a variety of other means, both on and off Facebook.  Some Users have read the relevant pages of Facebook's online Help Center, such as Frequently Asked Questions about "Sponsored Stories" and "Interacting with Ads and Sponsored Stories"—pages viewed by over ████████ Users since October 2011.  (Plambeck ¶ 19.)  Others learned about Sponsored Stories during Facebook's site-wide effort to educate Users on Facebook's marketing tools and how they work.  (*See* Squires ¶ 94.)  And numerous news outlets have published articles about Sponsored Stories.  (Brown Exs. FF-MM.)

*Finally*, many Users take steps to restrict which (if any) Likes and other actions are displayed as stories to their Friends, which steps also prevent these Users from appearing in Sponsored Stories.  Approximately ████████ Users have made Page Likes visible to "Only Me," and more than ████████ Users "Unliked" Pages in the second half of 2011.  (Plambeck ¶¶ 23,

---

necessarily absent for Sponsored Stories based on Like activity prior to January 25, 2011.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13.

FACEBOOK'S OPP. TO CLASS CERTIFICATION
CASE NO. 11-CV-01726-LHK (PSG)

1  24.)  These figures suggest that millions of Users know they can exercise control whether they

2  appear in Sponsored Stories, but choose not to do so, either on a per-story or a broad-scale basis.

3  Tellingly, ███████████████████████████████████████████

4  ████████████████████████  even after filing this lawsuit.  (Brown ¶ 64.) ████

5  ████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████

8  ██████████████████  It cannot seriously be disputed that ██████ consented to the use of

9  his name and likeness in Sponsored Stories *he intentionally triggered.*

10  ███████████, a class member who clearly consented to Sponsored Stories, illustrates

11  the need for individualized discovery.  After initiating this lawsuit, █████████████████

12  ████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████

16  To certify a class, the Court would have to ignore *all* of this evidence and accept

17  Plaintiffs' *ipse dixit* that every class member was "unaware that their interactions could result in

18  their names and likenesses being included in Sponsored Stories ads."  (Mot. 9.)  Facebook has an

19  absolute right to disprove that ludicrous claim, and would use individualized evidence to do so.

20  Plaintiffs would have this Court foreclose Facebook from developing and introducing this

21  evidence, in direct conflict with the Supreme Court's admonition in *Dukes*.  131 S. Ct. at 2561.

22  Individualized questions of consent are magnified with respect to the minor subclass.  As

23  a threshold matter, ascertaining which class members are minors would require individualized

24  inquiry, given the use of false birthdates by many minor Users, ██████████████████

25  (Brown Decl. ¶ 67.)  Even if that obstacle could be cleared, it would be impossible to determine

26  on a classwide basis who the parents or legal guardians are for each minor class member.  And

27  even if that could be done, the parental consent inquiry would devolve into ████████████ of

28  individual inquiries concerning each minor's parents' specific parenting decisions and oversight

Cooley LLP
Attorneys At Law
San Francisco

14.

Facebook's Opp. to Class Certification
Case No. 11-CV-01726-LHK (PSG)

of their children's use of Facebook.[8]  Indeed, for one of the two minors class representatives, the facts establish parental consent under highly individualized circumstances. ███████████

███████████████████████████████ (Brown ¶ 68), ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████

For a putative class comprised of ███████████ there are sure to be countless other fact patterns establishing parental consent.  Millions of parents are aware of their teenagers' use of Facebook; some are Facebook Friends with their teenagers.  Some may even have seen their teenager's social actions paired with Social Ads or Sponsored Stories, or in other commercial contexts, and may even have clicked on a Sponsored Story publishing their teenager's Like (such as to support a school fundraiser).  A recent study found that, ██████████, 72 percent of parents monitor their teens' social networking accounts. (Brown Ex. NN 3).  Indeed, as of December 2011, over █████████ minor Users were Friends with at least one of their parents.  (Plambeck ¶ 21.)  Facebook is entitled to establish parental consent by, for example, showing that some parents were aware of Facebook's Terms or otherwise knew their teenagers' names and Profile Pictures could be displayed in commercial contexts, and either approved or took no steps to prevent it (e.g., through privacy settings, avoiding actions that trigger Sponsored Stories, etc.). Absent individualized discovery, these minors cannot be identified and excluded from the class.

**b.    Individualized proof is required to determine whether Users' names or likenesses actually appeared in Sponsored Stories.**

Use of a fictitious name or pseudonym can give rise to liability under § 3344 only if the

---

[8] As with adults, parental consent under Section 3344 may be implied.  *See, e.g., Jones*, 815 F. Supp. 2d at 1113 (interpreting "consent" under statute to include implied consent).  Indeed, the California legislature specifically deleted language that would have required "written consent" for both parents of minors and adults.  *See* A.B. 826 (as amended June 16, 1971) (Brown Ex. EE).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15.

**FACEBOOK'S OPP. TO CLASS CERTIFICATION
CASE NO. 11-CV-01726-LHK (PSG)**

name is "widely known to the public as closely identified with the plaintiff." *Ackerman v. Ferry*, No. B143751, 2002 WL 31506931, at *19 (Cal. App. Nov. 12, 2002); *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 416 (9th Cir. 1996) (whether plaintiff's birth name, Lew Alcindor, "'equals' Kareem Abdul-Jabbar . . . is a question for the jury"). Plaintiffs cannot prove this element of their claim without individualized evidence.

The prevalence of pseudonyms on Facebook is undeniable. ██████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

Further, § 3344 imposes liability for the use of photographs only to the extent that "when one who views the photograph with the naked eye [he or she] can reasonably determine that the person depicted in the photograph is the same person who is complaining of its unauthorized use." § 3344(b)(1); *see Newcombe v. Adolf Coors Co.*, 157 F. 3d 686, 692 (1998). Facebook Users are not required to upload any Profile Picture at all, much less a picture that bears their likeness. (Squires ¶¶ 26-27.) ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████     ██████████

---

[9] Nor can Plaintiffs plausibly claim (or prove with classwide evidence) that the combination of names and Profile Pictures solves this. For example, ██████████

████████████████████████████████████████████     (Brown ¶ 76.)

1 ███████████████████████████████████████████████████████

2 ██████████████████████████████████ (*Id.* ¶ 77.)  Individualized discovery is needed

3 to determine whether any User's name or likeness was misappropriated, yet Plaintiffs would

4 foreclose Facebook from developing such evidence, much less presenting it to the trier of fact.[10]

5       **c.**      **Individualized proof is needed to test whether each Sponsored
6                 Story advertises "products, merchandise, goods, or services."**

7       Plaintiffs contend that Sponsored Stories are "advertisements" (*see* SAC ¶¶ 3, 26; Mot.

8 13), but a defendant can be liable under § 3344 for using a person's name or likeness "for

9 purposes of advertising" only in connection with "products, merchandise, goods or services."

10 § 3344(a), (e); *see id.* § 3344.1(a)(1), (n) (same with respect to deceased celebrities); CACI No.

11 1804A(1) (plaintiff must prove use of name or likeness "on merchandise [or] *to advertise or sell*

12 *. . . products, merchandise, goods or services*" (emphasis added)). Yet Sponsored Stories

13 frequently appear for charitable, political, or religious organizations or causes, such as ███████

14 █████████████████████ "John Doe likes ███████████" or "Jane Doe likes ██████████".

15 (Squires ¶ 76; Tucker ¶¶ 65-67.) Although none of these alleged advertisements are actionable

16 under § 3344, they cannot be excluded from the class without individualized fact determinations.

17       **d.**      **Individualized proof is necessary for Plaintiffs to establish that
18                 a class member was injured.**

19       Injury is an element of a § 3344 claim, § 3344(a); *Downing v. Abercrombie & Fitch*, 265

20 F.3d 994, 1001 (9th Cir. 2001), and Plaintiffs therefore bear the burden of demonstrating that all

21 putative class members suffered the "same injury," and that this injury can be established "in one

22 stroke." *Dukes*, 131 S. Ct. at 2550-51. A class cannot be certified if individualized evidence is

23 needed to determine whether class members were injured.  *See Mazza*, 666 F.3d at 596 (class

24 ██████████████████████████████████ (a digital graphic with geometric shapes and the

25 words "geometric," "dancing," and ██████████ (Brown Ex. Z.)

26 [10] ██████████████████████████████████████████████████████
(Brown Ex. V.)  Groups

27 are not covered by the statutory right of publicity.  *See, e.g., Downing*, 265 F.3d at 1004; *Ion
Equip. Corp. v. Nelson*, 110 Cal. App. 3d 868, 878-79 (1980).  Individualized inquiry would be

28 needed to determine which Facebook Users are not individuals.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17.

**FACEBOOK'S OPP. TO CLASS CERTIFICATION
CASE NO. 11-CV-01726-LHK (PSG)**

definition must exclude uninjured plaintiffs); *Gonzales v. Comcast Corp.*, No. 10-cv-01010, 2012 WL 10621, at *18 (E.D. Cal. Jan. 3, 2012) (class should not be certified if the court would be required "to determine [the] individualized *fact* of damages"); *Mazur v. eBay Inc.*, 257 F.R.D. 563, 570 (N.D. Cal. 2009).  As this Court made clear, Plaintiffs must show "that they suffered economic injury *because they were not compensated* for Facebook's commercial use of their names and likenesses  . . . ."  (Order Granting in Part MTD ("MTD Order") at 24 (emphasis added); *accord id.* at 11.)

Plaintiffs have not carried their burden of showing that injury—i.e., that individual members "were not compensated"—can be proved with common evidence.  Plaintiffs' primary methodology for proving injury is so fundamentally flawed that Plaintiffs' own expert admits that ██████████████ who have no injury whatsoever would be treated as though they were injured.  In addition, Plaintiffs do not even attempt to explain how they can show that each individual class member "was not compensated" for the publication of his or her Likes and actions, even though many Users receive are benefited by their appearance in Sponsored Stories.

In their motion, Plaintiffs argue that putative class members are injured by "being deprived of the economic value of [their] 'endorsements,'" which they contend is "the commercial value in the Member's identity" measured by "increased revenue to Facebook." (*Id.*)[11]  Plaintiffs' expert Fernando Torres proposes to measure class members' "endorsement value" by comparing the rate at which Users click on groups of Sponsored Stories (the "CTR")[12] to the rate at which they click on a comparison group of Ads with no User content, which he calls "Standard Ads."  (Torres ¶ 8u-w.)  Wherever these comparisons show that Users click more often on Sponsored Stories, Torres claims that the difference is attributable to the "endorsement," and injury should be found.

---

[11] Facebook does not concede that looking to what Facebook earned from a Sponsored Story, in whole or in part, is the proper basis for determining whether a User was injured.

[12] A click-through rate (CTR) is the number of billable clicks an ad or Sponsored Story receives divided by the number of times the ad or Sponsored Story was shown to Facebook Users (called "impressions").  (Torres ¶ 8f.)  A Sponsored Story that received 12 clicks out of 1,000 impressions would have a CTR of 0.012.

Cooley LLP
Attorneys At Law
San Francisco

18.

Facebook's Opp. to Class Certification
Case No. 11-CV-01726-LHK (PSG)

Torres testified that he will *not* run his comparisons at the individual class member level. (Brown, Ex. BB 104, 106, 109.)  Instead, he proposes to aggregate click-through data for large (or massive) numbers of Users for his analysis.  The options he is considering are to: (1) run one comparison per Sponsored Story campaign (i.e., assigning a single damages factor to all the Users that appeared in that campaign); (2) run one comparison per "industry" (i.e., assigning a single damages factor to all the Users that appeared in a Sponsored Story within that industry); (3) run one comparison for each of the six Sponsored Story types (e.g., Page Like stories or Check-In stories) (i.e., assigning a single damages factor to all the Users that appeared in each type); or even (4) run one comparison for all Sponsored Stories that would identify a single damages factor for all class members.  (*Id.* at 106, 205.)

The accompanying Bucklin declaration details the many errors in Torres's CTR comparison approach, but several critical flaws bear emphasis here.  First, Torres concedes that his use of class member aggregation and averaging will lead to findings of injury for class members who, even under Plaintiffs' theory, were not injured.  Torres testified that he would "expect" that the endorsement value of between 5%-10% of putative class members is likely zero or even negative.  (*Id.* at 134-35.)  Because Facebook earned no additional revenue from these Users' appearance in Sponsored Stories, according to Torres, the "maximum total amount [these] Class Members would have been able to negotiate as compensation" is *nothing*.  (Torres ¶ 8(q).)  Incredibly, however, Torres admits that he does not even attempt to identify these uninjured Users.  Instead, "averages . . . are used to negate the effect of those outliers."  (Brown Ex. BB 135.)  In other words, in the proposed class, there are ███████████ Users who Plaintiffs' own formula show have no injury. Plaintiffs' use of averages, by design, sweeps them under the proverbial rug.  (*Id.* at 135, 137-38; *see id.* at 227-28 ("averaging would be eliminating the bias of outliers . . . [s]o that's why we would have used averages").)  This is antithetical to settled law.

Numerous courts in this district have rejected the use of averages that may conceal uninjured individuals in larger groups of class members.  *In re Flash Memory Antitrust Litig.*, No C 07-0086, 2010 WL 2332081, at *12-13 (N.D. Cal. June 9, 2010); *In re GPU Litig.*, 253 F.R.D. 478, 504 (N.D. Cal. 2008); *Am. Booksellers Ass'n v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031,

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19.

FACEBOOK'S OPP. TO CLASS CERTIFICATION
CASE NO. 11-CV-01726-LHK (PSG)

1038-40 (N.D. Cal. 2001). In *In re GPU*, Judge Alsup rejected the testimony of Plaintiffs'
economists, in part, for the impermissible use of averages. 253 F.R.D at 493-95, 504. The court
explained that the use of averages had "evaded the very burden that [the expert] was supposed to
shoulder . . . to show that individual differences between products and purchasers *could* be
accounted for, *not* that individual differences could be ignored." *Id.* at 493-94. The court held
further that "[i]f this class were certified, [plaintiffs' expert's] regressions would either be overly
reliant on averages and would thus sweep in an unacceptable number of uninjured plaintiffs, or
they would be unmanageably individualized." *Id.* at 504. *Dukes* also expressly forbids, as
contrary to the Rules Enabling Act, any "Trial by Formula" approach that impedes a defendant's
ability to assert individual defenses, as Plaintiffs' methodology plainly would. *See Dukes*, 131 S.
Ct. at 2561; *see also In re Facebook, Inc., PPC Ad. Litig.*, No. C 09-3043, 2012 WL 1253182, at
*13 (N.D. Cal. Apr. 13, 2012) ("*Facebook PPC*") (denying class certification where expert's
methodology awarded damages to "false positives"—i.e., class members with no injury).

Torres's proposed CTR-comparison approach also ignores the many factors other than a
User's "endorsement" that may explain why Users click more often on Sponsored Stories. *First*,
for example, ██████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████     ████████████████ *Second*, Torres ignores the effect of
"homophily," which is the tendency of individuals to associate with others who share their
interests. (Brown Ex. BB 244-45.) Because they tend to share interests, a User's Friends are
more likely to find a Sponsored Story interesting or relevant, regardless of the presence (or
absence) of the User's name or Profile Picture. Homophily may account for any observed
difference in the frequency of clicks on Sponsored Stories and other ad units, and Torres admits
his methodology does not measure or isolate this effect. (Bucklin ¶¶ 72-74; Tucker ¶¶ 75-76;
Brown Ex. BB 246-47, 250-51.) *Third*, ██████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

1  ███████████████████████████  Plaintiffs' methodology would treat such displays as

2  causing "injury" to the featured User in the Sponsored Story, even though there is no incremental

3  revenue—and thus no injury under Plaintiffs' own theory—associated with the display.

4      Moreover, Plaintiffs' methodology inexplicably assumes that only ads *without* social

5  context would have run instead of Sponsored Stories.  (Torres ¶ 8v.)  But the pool of hypothetical

6  alternate Ads that could have run also includes Social Ads[13]—which are not challenged in this

7  action.  Plaintiffs' methodology thus completely ignores a major segment of alternative Ads.[14]

8      In addition to these fatal defects, Torres's methodology is impossibly inchoate.  He has

9  never seen more than a tiny fraction of the data he proposes to analyze (Brown Ex. BB 200-01,

10  228) and has no concrete plan for implementing his approach.  For example, there are over

11  ██████  Sponsored Story campaigns (Plambeck ¶ 14), precluding any campaign-by-campaign

12  analysis.  Regarding Torres's industry-by industry option, he has not identified what the needed

13  subgroups would be and does not even know whether or 10 or 1,000 such groups would have to

14  be created and populated.  (Brown Ex. BB 113-14.)  His approach is little more than an

15  undeveloped concept.

16      Plaintiffs' alternative approach (*see* Mot. 24-25) amounts to no methodology at all.

17  Plaintiffs argue, based on cherry-picked statements in a handful of documents, that every class

18  member is entitled to one-half the revenue Facebook earned from Sponsored Stories in which

19  they were featured.  (*Id.*)  They cite no accepted economic theory permitting this result, ignore

20  facts concerning the Sponsored Story and "Standard Ad" campaigns run on Facebook, and base

21  their 50% damage figure on isolated sound bites, none of which purport to set forth universally

22  applicable rules.  Moreover, as even a cursory review of Plaintiffs' citations show, these

23  statements refer to the benefit *to marketers* of using Sponsored Stories, and not to Facebook's

24  revenue.  (*Id.*)  In fact, for the calendar year 2011, Facebook's average per-impression revenue

---

[13] Torres admitted that he intends to measure "the difference between the revenue generated by
the sponsored story and the revenue that would have been generated by the hypothetical ad that
would have run in its place if Facebook didn't show the sponsored story."  (Brown Ex. BB at 94-
95.)

[14] ████████████████████████████████████████████  (Plambeck ¶ 30.)

21.

1   from Sponsored Stories was ███████████ for ads displayed with no social context.

2   (Plambeck ¶ 16.)  Moreover, this proof-by-public-statements approach suffers from the same fatal

3   flaws as Plaintiffs' CTR-comparison methodology—impermissibly using aggregate "data" to

4   disguise Users who suffered no injury and ignoring other factors that may independently explain

5   the increased average effectiveness of Sponsored Stories.[15]

6       Finally, as the declaration of Professor Catherine Tucker shows, Plaintiffs' approach to

7   injury impermissibly ignores that millions of individual class members were compensated for the

8   broadcast of their endorsement in Sponsored Stories—and thus were not injured at all.  (*See* MTD

9   Order at 11, 24.; Tucker ¶¶ 69-71, 81-85.)   Millions of Users—and some of the named

10  Plaintiffs—receive tangible and intangible benefits when their Likes and social actions are

11  broadcast in Sponsored Stories, ranging from charitable fund-raising, to political organizing, to

12  free samples or discounts, to opportunities for self-expression.  (*Id.* ¶¶ 50-67, 69-71.)   And the

13  value of compensation received by individual Users for broadcast of these actions is often many

14  multiples of the economic benefits (if any) received by Facebook from publishing these actions.

15  (*Id.* ¶¶ 81-84.)  As one example, Professor Tucker explains that she derives significant benefits

16  from the broadcast of her Like of an organization that raises funds and awareness for the Twin-to-

17  Twin Transfusion Syndrome that afflicts her children, which far exceed any per-click revenue

18  Facebook earns if users click on Sponsored Stories featuring her support for that organization.

19  (*Id.* ¶ 85.)

20          **e.     Individualized proof is necessary for Plaintiffs to determine
21                   each class member's measure of damages.**

22      Because Plaintiffs claim economic injury, they must demonstrate how, on a classwide

23  basis, they can "'prove actual damages like any other plaintiff whose name has commercial

24  value.'"  (MTD Order 29 (citation omitted).)  *See Cruz v. Dollar Tree Stores, Inc.*, No. 07-2050,

25  2011 WL 2682967, at *6 (N.D. Cal. Jul. 8, 2011) (decertifying class because "it is not clear to the

---

[15] Nor can there be recovery on a classwide basis on Plaintiffs' briefly referenced "profits"
theory.  (Mot. 29.)  Section 3344(a) makes explicit that plaintiffs are entitled only to profits "that
are attributable to the [misappropriation]."  Therefore, this inquiry is not common for the reasons
just discussed regarding Plaintiffs' CTR methodology for establishing injury and actual damages.

Cooley LLP
Attorneys At Law
San Francisco

22.

FACEBOOK'S OPP. TO CLASS CERTIFICATION
CASE NO. 11-CV-01726-LHK (PSG)

Court how, even if class-wide liability were established, a week-by-week analysis of every class member's damages could be feasibly conducted"); *Facebook PPC*, 2012 WL 1253182, at *13 ("Based on the difficulty of determining injury on a classwide basis, the court finds that the calculation of damages will require an individualized injury.").  Yet Plaintiffs propose the same flawed methodologies for measuring each class member's damages as they do to establish injury. (*See* Mot. 9.)  Plaintiffs' damages methodologies must therefore be rejected for the same reasons that Plaintiffs fail to establish injury based on common evidence: they use averages to obscure dramatic differences in the class and thereby transfer recovery from influential endorsers to Users whose endorsement has no effect, or even a negative effect, on their Friends.  They thereby create insoluble conflicts among class members (Bucklin ¶¶ 106-09), and improperly prevent Facebook from litigating its defenses to each class member's claim.  *See Dukes*, 131 S. Ct. at 2561.

### f.    Exemption under § 3344(d) and Facebook's free-speech defenses are highly individualized inquiries.

Plaintiffs' burden under § 3344 requires them to "pro[ve] that the disputed uses [of their names or likenesses] f[all] outside the exemptions" granted by § 3344(d). *Gionfriddo v. MLB*, 94 Cal. App. 4th 400, 417 (2001).  Under § 3344(d), there is no liability for the use of a person's likeness "in connection with any news, public affairs, or sports broadcast or account, or any political campaign."  Section 3344(d) is broader than the First Amendment; "it is designed to avoid First Amendment questions in the area of misappropriation by providing extra breathing space for the use of a person's name in connection with matters of public interest." *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 310 n.10 (9th Cir. 1992).  Section 3344(d) thus exempts millions of Sponsored Story impressions from liability, including Stories run by ███ (e.g., "John Smith Here's a link to a great analysis of the gun control debate"), ██████ (e.g., "Jane Doe likes ██████████"), ████████, the Democratic Party, and the ████████.  (*See* Squires ¶ 76; Tucker ¶¶ 65-67.)  These must be excluded from the class.

Facebook also has free-speech defenses to these uses and, indeed, many Sponsored Stories are entitled to the highest protection under the First Amendment and the California Constitution (e.g., "Jane Doe likes ██████"). *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992) ("Core

1    political speech occupies the highest, most protected position[.]"); *Stewart v. Rolling Stone*, 181

2    Cal. App. 4th 664, 681 (2010) ("Publication of matters in the public interest . . . rests on the right

3    of the public to know, and the freedom of the press to tell it[.]"); *Blatty v. N.Y. Times Co.*, 42 Cal.

4    3d 1033, 1041 (1986) (Art. I, sec. 2 of California Constitution is broader than First Amendment).

5         Whether these Sponsored Stories are also "advertisements" is of no consequence.  Section

6    3344(d) *exempts* commercial uses of names and likenesses that would otherwise violate

7    § 3344(a). *See* Civ. Code § 3344(d). Likewise, under the First Amendment, an "advertisement" is

8    generally treated as core protected speech so long as it does not "propose a commercial

9    transaction." *Jordan v. Jewel Food Stores*, No. 10 C 340, 2012 WL 512584, at *3 (N.D. Ill. Feb.

10   15, 2012); *see Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983)).

11        Thus, determining whether any particular Sponsored Story is entitled to exemption under

12   § 3344(d) or defenses under the First Amendment or the California Constitution would require an

13   individualized review of billions of unique Sponsored Story impressions, including an inquiry

14   concerning each sponsor's purposes and each speaking User's intent.  *See Gionfriddo*, 94 Cal.

15   App. 4th at 414 (even if used to "advertise," courts must "balance" individual right to avoid

16   unauthorized publicity with "public interest in the dissemination of news and information").

17   Certification of a class would thus deprive Facebook of the opportunity to establish that, for any

18   given User and any given Sponsored Story, the balance tilts in favor of free expression.

19           **g.**     **Plaintiffs' UCL claims will turn on individualized evidence.**

20        Plaintiffs have failed to show any common issue under the UCL that is likely to drive the

21   resolution of this case.   To establish "fraud" under the UCL, the Ninth Circuit requires

22   individualized proof of reliance, unless plaintiffs can show that class members were exposed to

23   uniform representations. *See Mazza*, 666 F.3d at 595-96.  Yet far from establishing that the entire

24   putative class was exposed to allegedly misleading documents—Facebook's Terms and Privacy

25   Policy (*see* SAC ¶¶ 31-33)—Plaintiffs, even as they concede Facebook's Terms are binding (*see*

26   *supra* n.6), assert that they (and other class members) never reviewed such documents.  (Brown ¶

27   78.)  Moreover, Plaintiffs cannot allege uniform reliance, as many Users consented to Sponsored

28   Stories.  (*See supra* § III(B)(1)(a)); *Mazza*, 666 F.3d at 596.

24.       **Facebook's Opp. to Class Certification**
**Case No. 11-CV-01726-LHK (PSG)**

Plaintiffs have similarly failed to show common questions as to the UCL's "unfair" prong. *See, e.g.*, *Menagerie Prods. v. Citysearch*, No. 08-4263, 2009 WL 3770668, at *14 (C.D. Cal. Nov. 9, 2009) (denying certification where "unfairness" prong implicated "individual expectations about the business practice"); *Quacchia v. DaimlerChrysler Corp.*, 122 Cal. App. 4th 1442, 1453 (2004) (same); *Juarez v. Jani-King of Cal., Inc.*, 273 F.R.D. 571 (N.D. Cal. 2011) (same). Whether conduct is "unfair" entails an "examination of [the conduct's] impact *on its alleged victim*, balanced against the reasons, justifications and motives of the alleged wrongdoer." *S. Bay Chevrolet v. GMAC*, 72 Cal. App. 4th 861, 886-87 (1999) (citation omitted). Yet here, the "impact" to individual class members varies dramatically, as many Users derive significant *benefits* from the rebroadcast of their Likes and social actions in Sponsored Stories. For example, by appearing in Sponsored Stories, Users may promote an organization or politician they support, or promote themselves or their business (like Susan Mainzer); others receive direct compensation in the form of coupons, discounts, or loyalty points. (Tucker ¶¶ 50-67.)

### h.    Plaintiffs have not proved commonality for any other issue.

Finally, Plaintiffs' recitation of purportedly common questions (Mot. 13) does not "affirmatively demonstrate" common issues "capable of classwide resolution . . . in one stroke." *Dukes*, 131 S. Ct. at 2551 ("Reciting . . . questions is not sufficient to obtain class certification."). Nor does recitation of the elements of their claims (Mot. 16-17), assertions that something is "obviously" "uniform[]" across 100 million individuals (*id.* 18), or promises to "show [one element of a claim] for the Class as a whole" (*id.*). Such assertions do not "prove that there are *in fact* . . . common questions of law or fact," and so fail Rule 23(a)(2). *Dukes*, 131 S. Ct. at 2551.

Four of Plaintiffs' purportedly common questions involve highly individualized inquiries incapable of resolution in a single stroke ("whether Plaintiffs and the class consented," "whether Facebook gained a commercial benefit," "whether Plaintiffs and the class were harmed," "whether Class Members are entitled to damages [and what measure]" (Mot. 13)). Two issues ("what law applies," "[w]hether Sponsored Stories are ads" (*id.*)) are subsidiary to the main issues in the case and are incapable of "driv[ing] the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551. Plaintiffs' final question ("whether Facebook . . . violated Civil Code § 3344 and [the]

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25.

FACEBOOK'S OPP. TO CLASS CERTIFICATION
CASE NO. 11-CV-01726-LHK (PSG)

UCL" (Mot. 13)) flies in the face of *Dukes*, which forbids certification where class members simply "suffered a violation of the same provision of law."  131 S. Ct. at 2551.  As in *Dukes*, these issues "give[] no cause to believe [Plaintiffs'] claims can productively be litigated at once" and therefore fail a "rigorous analysis" under Rule 23(a)(2).  *Id.*

### 2. Plaintiffs Have Not Proved Predominance (Rule 23(b)(3)).

Because Plaintiffs seek certification under Rule 23(b)(3) (*see* SAC ¶ 94), they must show not only that common questions exist, but that they "predominate over any questions affecting only individual members" of the alleged class.  *Mazza*, 666 F.3d at 589.  The predominance test is "far more demanding" than the commonality test and asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem v Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997).  This inquiry "begins with the elements of the underlying causes of action" and "requires the weighing of the common questions in the case against the individualized questions."  *Facebook PPC*, 2012 WL 1253182, at *8 .

Because Plaintiffs have not shown the existence of a single common question, they "necessarily fail[] to establish that common questions predominate under Rule 23(b)(3)."  *Aburto v. Verizon Cal., Inc.*, No. CV 11-03683, 2012 WL 10381, at *6 n.2 (C.D. Cal. Jan. 3, 2012).  Moreover, any common question would be engulfed by the need for individualized inquiries as to *virtually every element of Plaintiffs' claims*, including whether each class member: (1) did not consent; (2) had her actual name or likeness used in a Sponsored Story; (3) appeared in a Sponsored Story advertising "products, merchandise, goods or services;" (4) was injured and, if so, (5) the measure of actual damages).  Individualized inquiries also abound (6) in determining whether § 3344(d) or a free-speech defense applies.  Each of these issues will require discovery from each class member and, ultimately, a decision by the factfinder, necessitating 100 million mini-trials on a wide range of issues.  *Pryor v. Aerotek Sci.*, No. 10-0675, 2011 WL 6376703, at *18 (C.D. Cal. Nov. 15, 2011) (no predominance where "hundreds of mini-trials" required); *Facebook PPC*, 2012 WL 1253182, at *16 (no predominance where plaintiffs "have not shown they can establish injury through common proof").

As recently affirmed in *Dukes*, "a class cannot be certified on the premise that [Facebook]

Cooley LLP
Attorneys At Law
San Francisco

26.

Facebook's Opp. to Class Certification
Case No. 11-CV-01726-LHK (PSG)

1    will not be entitled to litigate its . . . defenses to individual claims." 131 S. Ct. at 2561 (citations

2    omitted).   In light of Facebook's right to present evidence on each of the elements above,

3    Plaintiffs cannot meet the predominance requirement of Rule 23(b)(3).

### 3.    Plaintiffs Have Not Proved Superiority (Rule 23(b)(3)).

5        Plaintiffs have failed to show that a class action would be a superior method for

6    adjudicating Plaintiffs' claims.   Section 3344's history and structure defeat superiority, as the

7    California legislature expressly rejected § 3344 class actions in favor of an individual remedy.

8    (*See supra* § III(A)); *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 716 (9th Cir. 2010) (class

9    treatment must be consistent with legislative intent).   Just as important, the legislature deliberately

10   fortified § 3344 with provisions to make individual actions viable—statutory damages of $750

11   per person, prevailing party attorneys' fees and costs, and punitive damages.   § 3344(a).   These

12   provisions obviate the need for class actions, making individual actions superior.   *See Alberghetti*

13   *v. Corbis Corp.*, 263 F.R.D. 571, 582 (C.D. Cal. 2010) (finding "little reason why a [§ 3344] class

14   action is more efficient than individual actions," given attorneys' fees provision); *Blanco v. CEC*

15   *Entm't Concepts*, No. CV 07-0559, 2008 WL 239658, at *2 (C.D. Cal. Jan. 10, 2008) (attorneys'

16   fees and punitive damages provisions made "individual litigation [] superior").

17       The superiority of *individual* actions is further reinforced by the unprecedented magnitude

18   of the class—100 million individuals.   In this context, the need for *any* individualized inquiry—

19   even something so limited as whether a particular User is an actual person (*see supra* p. 6)—

20   would render the class unmanageable.   *See Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 654 (C.D.

21   Cal. 1996) (certification precluded by need for individual inquiries across 66,000-member class,

22   even though common questions predominated); *see also Jones v. Murphy*, 256 F.R.D. 519, 526

23   (D. Md. 2009) (class unmanageable where it "likely number[ed] in the hundreds of thousands,"

24   despite likelihood of predominance); *Badella v. Deniro Mktg. LLC*, No. 10-03908, 2011 WL

25   5358400, at *13 (N.D. Cal. Nov. 4, 2011).   Moreover, because individualized inquiries are

26   necessary for the *key* issues in the case (*see supra* § III(B)), it could not feasibly be litigated

27   consistent with Facebook's right to defend against class members' individual claims.   *See Dukes*,

28   131 S. Ct. at 2561 (size of class precluded trial plan allowing defendant to litigate defenses).

Section 3344(a)'s "mandatory" provision awarding attorneys' fees to the "prevailing party" also bars certification. *Kirby v. Sega of Am.,* 144 Cal. App. 4th 47, 62 (2006). Plaintiffs have not explained how Facebook would recover its fees should it prevail after certification. Fee awards should be assessed against every class member who does not opt out, as all such individuals elect to accept both the benefits and costs of the litigation. *See Am. Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 549 (1974); *Wright v. Schock,* 742 F.2d 541, 545 (9th Cir. 1984). But this raises intractable adequacy and manageability problems, which Plaintiffs do not address. *See* Fed. R. Civ. Proc. 23(a)(4), (b)(3)(D). Moreover, if Facebook were left to recover its fees only from three individuals, including two minors, this would impermissibly abridge its statutory right to recoup fees. *See Dukes,* 131 S. Ct. at 2561.

Finally, Plaintiffs' proposed minor subclass cannot be certified consistent with due process and Rule 17. Class actions bind absent persons to a judgment, which implicates their due process rights, *see Hansberry v. Lee,* 311 U.S. 32, 40-41 (1940), and defendants may assert such rights, *see Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 803-05 (1985). Rule 23(b)(3)'s procedural protections sufficiently protect the due process rights of absent *adult* class members, *see Dukes,* 131 S. Ct. at 2558-59, but courts have a higher burden to protect minors, *see, e.g.*, *Robidoux v. Rosengren,* 638 F.3d 1177, 1181 (9th Cir. 2011). Likewise, Rule 17 requires appointment of a guardian ad litem for each minor litigant or "another appropriate order." Fed. R. Civ. Proc. 17(c)(2); *see T.W. ex rel. Enk v. Brophy,* 124 F.3d 893, 897 (7th Cir. 1997). A sufficient classwide guardian cannot exist here where the interests of minor putative class members substantially diverge and where the rights and expressive interests of minors are at stake. (*See* Tucker ¶¶ 53, 92; Brown ¶ 79.)

### 4. Plaintiffs Have Not Proved Typicality (Rule 23(a)(3)).

Certification should be denied if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); Fed. R. Civ. Proc. 23(a)(3). As detailed above, the named Plaintiffs are all subject to defenses that make them atypical of the putative class.

1  ████████████████████████████████████  (Brown ¶ 80.)  ████████

2  ████████████████████████████████████████████████████████

3  ████████████████████  *see Taylor v. FDIC*, 132 F.3d 753, 767 (D.C. Cir. 1997) (Article III

4  standing absent where plaintiffs "seek a remedy for injury that is in large part self-inflicted").

5  ████████████████████████████████████████████████████████

6  ████████████████████  (*Id.* ¶ 82.) These atypical defenses make the named Plaintiffs

7  inappropriate class representatives.

### 5.  Plaintiffs Have Not Proved Adequacy (Rule 23(a)(4)).

Prospective class representatives must also show they can "fairly and adequately protect the interests of the class." Fed. R. Civ. Proc. 23(a)(4). Representation is inadequate if named plaintiffs seek relief that putative class members do not wish to seek. *See E. Tex. Motor Freight Servs., Inc. v. Rodriguez*, 431 U.S. 395, 405 (1977); *Alberghetti*, 263 F.R.D. at 577-78 (denying certification for inadequacy because plaintiffs sought injunctive relief that class members might oppose); *Mayfield v. Dalton*, 109 F.3d 1423, 1427 (9th Cir. 1997). Class representatives must also fulfill their fiduciary duties, such as familiarizing themselves with their allegations, to "serve the necessary role of checking the otherwise unfettered discretion of counsel[.]" *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994) (internal quotation omitted).

Plaintiffs seek relief that conflicts with the interests of other putative class members. *See Rodriguez*, 431 U.S. at 405. Facebook Users are highly diverse and include individuals who view Sponsored Stories as an acceptable *quid pro quo* for their use of a free site (Tucker ¶¶ 87-90; Brown Ex. U) or who benefit from Sponsored Stories, either through their own campaigns or those of their employers (Tucker ¶ 57). Many of these Users will oppose the draconian injunctive relief sought by Plaintiffs, which would prohibit minors from *ever* appearing in Sponsored Stories, require Users to opt in on a per-sponsor basis, and place obtrusive and repetitive dialog boxes, pop-ups, banners, and other distractions across the Facebook website. (*See* SAC ¶ 136.) This proposed relief conflicts directly with the interests of the presumably millions of putative class members who would prefer that Facebook remain an innovative, free service, supported by relatively unobtrusive, socially relevant marketing. (*See* Tucker ¶¶ 86-97; Brown Ex. AA.)

1      Further, Plaintiffs and the guardians ad litem have shirked their responsibility to oversee

2   counsel and familiarize themselves with the claims.  *See Facebook PPC*, 2012 WL 1253182, at

3   *8, *13, *16 (named plaintiff inadequate where he "indicated that he would defer to counsel in

4   prosecuting this action").  ████████████████████████████████████

5   ██████████████████████████████████████████████████████

6   ██████████████████████████████████████████████████████

7   ██████████████████████████████████████████████████████

8   ██████████████████████████████████████████████████████

9   ███████████████████████████████████████████████  (*Id.*

10   ¶ 85.)   These Plaintiffs manifestly have no willingness or ability to "check the otherwise

11   unfettered discretion of counsel."   *Welling*, 155 F.R.D. at 659 (denying certification where

12   plaintiff had no involvement with  complaint or overseeing ongoing litigation); *Sanchez v. Wal-

13   Mart Stores, Inc.*, No. 06-CV-02573, 2009 WL 1511435, at *3 (E.D. Cal. May 28, 2009) ("[T]he

14   Court must ensure that the litigation is brought by a named Plaintiff who understands and controls

15   the major decisions of the Case.").[16]

16   **IV.   CONCLUSION**

17      For the foregoing reasons, Plaintiffs' motion should be denied.

18   Dated:  April 19, 2012                COOLEY LLP

19                                         /s/ Michael G. Rhodes
20                                         Michael G. Rhodes (116127)

21                                         Attorneys for Defendant FACEBOOK, INC.

     1265904/SF

22

23

24   ────────────────────
25   [16] Plaintiffs' passing references to Rule 23(b)(2) and 23(c)(4)—which are not pled in the SAC,
     supported with authority, or even explained (Mot. at 11)—are waived.  *See FDIC v. Garner*,
26   126 F.3d 1138, 1145 (9th Cir. 1997).  And, neither provision applies.  Certification under Rule
     23(b)(2) is not available where, as here, monetary relief is not incidental to other relief.  *Dukes*,
27   131 S. Ct. at 2557; *see* Pls.' Initial Disclosures 5-6 (seeking up to $3 trillion in damages).
     Certification under Rule 23(c)(4) is also improper, as Plaintiffs have not satisfied Rule 23(b).  *See*
28   *Sepulveda v. Wal-Mart Stores, Inc.*, No. 06-56090, 2011 WL 6882918, at *1 (9th Cir. 2011).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO