# EXHIBIT A

## TO DECLARATION OF MATTHEW D. BROWN IN SUPPORT OF FACEBOOK, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## [PUBLIC REDACTED VERSION]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

---o0o---

ANGEL FRALEY; PAUL WANG, et al., )
Plaintiffs, )
vs. ) No. CV-11-01726LHK
FACEBOOK, INC., a corporation; and Does 1-100, )
Defendants. )
________________________________)

VIDEOTAPED DEPOSITION OF SUSAN MAINZER

TUESDAY, DECEMBER 20, 2011

PAGES 1 - 230

Deposition of SUSAN MAINZER, taken on behalf of Defendants, at COOLEY, LLP, 101 California Street, 5th Floor, San Francisco, California, commencing at 9:43 a.m., Tuesday, December 20, 2011, before Kelli Combs, CSR 7705.

APPEARANCE OF COUNSEL:

FOR PLAINTIFFS:
THE ARNS LAW FIRM
BY: ROBERT S. ARNS, ESQ.
515 Folsom Street, 3rd Floor
San Francisco, California 94105
(415) 495-7800
rsa@arnslaw.com
-and-
JONATHAN M. JAFFE
Attorney at Law
3055 Hillegass Avenue
Berkeley, California 94705
(415) 425-1474
jmj@jaffe-law.com

FOR DEFENDANTS:
COOLEY, LLP
BY: MATTHEW BROWN, ESQ.
BENJAMIN KLEINE, ESQ.
101 California Street, 5th Floor
San Francisco, California 94111
(415) 693-2026
mbrown@cooley.com

Also present: Alexei Dias, Videographer

SUSAN MAINZER,
after having been duly sworn, testified as follows:
---o0o---

THE VIDEOGRAPHER: Good morning. We're on the video record at 9:43 a.m. on December 20th, 2011. This is the videotaped deposition of Mrs. Susan Mainzer. 9:43:18AM
My name is Alexei Dias and our court reporter is Kelli Combs. We are here from Veritext National Deposition & Litigation Services. 9:43:33AM
This deposition is being held at Cooley, LLP, 101 California Street, Fifth Floor, in the City of San Francisco. The caption of this case is Fraley, et al. versus Facebook, Case Number CV-11-01726LHK. 9:43:51AM
At this time, will counsel and all present please identify themselves for the record.
MR. BROWN: Matthew Brown for Defendant Facebook. 9:44:07AM
MR. ARNS: Robert Arns for Plaintiffs.
MR. JAFFE: Jonathan Jaffe for Plaintiffs.
THE VIDEOGRAPHER: Thank you.
The witness will be sworn in and we can proceed. 9:44:18AM

(Deponent sworn.) 9:44:18AM
EXAMINATION
BY MR. BROWN:
**Q Please state and spell your name for the record. 9:44:31AM**
A My name is Susan Mainzer. That's S-U-S-A-N M-A-I-N-Z, as in zebra, E-R.
**Q And is that your current legal name?**
A That is my current legal name.
**Q And I see in some documents and the like references to Susan von Seggern. 9:44:47AM**
**So I take it that, then, is not your legal name or is that --**
A That's my married name.
**Q But your legal name is still Susan Mainzer? 9:45:00AM**
A Yes.
**Q When did you get married?**
A July 19th, 2008.
**Q And what name did you use to register for Facebook? 9:45:17AM**
A Susan Mainzer.
**Q Okay.**
**And then did you change the name on your Facebook account to Susan von Seggern at some point? 9:45:29AM**

A I think about a week after my wedding, 9:45:36AM after I got back from my honeymoon.

**Q And you didn't --**

**You didn't register for Facebook again, you just changed the name on that existing account, 9:45:47AM correct?**

A Yes.

**Q Have you ever been deposed before?**

A No.

**Q Okay. 9:45:55AM**

**So just a couple things about this deposition process, and I'm sure Mr. Arns has probably already talked to you about a little of this.**

**But try to wait for me to finish my 9:46:04AM question before you start answering. There are going to be times where we talk over each other, but we'll both do our best not to.**

**It's important, since all of this is being transcribed by the court reporter, to try to answer 9:46:18AM vocally, rather than with just a shake of your head, and it's important to try to remember to say "yes" or "no," as opposed to "uh-huh" or "huh-uh," which is harder for the court reporter to pick up.**

**You understand that you're under oath and 9:46:35AM**

**you're sworn to tell the truth just like you were in 9:46:38AM court?**

A Yes.

**Q Also, from time to time your lawyer may make objections for the record to some of my 9:46:45AM questions, but unless he specifically instructs you not to answer, then you should go ahead and answer my question.**

**Do you understand that?**

A Yes. 9:46:57AM

**Q Any reason your deposition should not go forward at this time?**

A No.

**Q Okay.**

**Any reason you wouldn't be able to testify 9:47:03AM truthfully today?**

A No.

**Q Okay.**

**Are you on any sort of prescription drugs or anything that would impair your ability to 9:47:12AM testify?**

A No.

**Q And that's a common question I ask everybody, so sometimes it takes people by surprise, but... 9:47:19AM**

**What did you do to prepare for the 9:47:21AM deposition today?**

A I met with my lawyers last night and this morning.

**Q Anything beyond that? 9:47:30AM**

A No.

**Q Did you review any documents to refresh your recollection --**

A No.

**Q -- in preparation? 9:47:41AM**

**What's your current age?**

A I am 43 years old.

**Q And your birthdate was?**

A August 17th, 1968.

**Q And what's your current home address? 9:47:54AM**

A 6600 Leland Way, Los Angeles, California 90028.

**Q And how long have you lived at that address?**

A A little over four months. 9:48:06AM

**Q And --**

A I mean -- I'm sorry -- a little over four years.

**Q And where did you live before that?**

A I lived at 853 Larrabee, L-A-R-R-A-B-E-E, 9:48:18AM

Street in West Hollywood, California, and I lived 9:48:21AM there for almost 12 years.

**Q And who is your primary e-mail service provider? What e-mail do you normally use?**

A My e-mail that I use is 9:48:37AM Susan@SusanvonSeggern.com, and I use a private e-mail service provider, which is VisitUsAt.com.

**Q And do you use Facebook as an e-mail service, as well?**

A I sometimes use the messaging function of 9:48:56AM Facebook.

**Q Have you claimed your Facebook.com e-mail address?**

A I'm not sure.

**Q Did you -- 9:49:10AM**

**At some point, did you sign up to have like a special user name that shows up in the URL when you go onto your profile page?**

A Yes.

**Q And are you aware that then that user name 9:49:21AM also basically gets used as like a Facebook e-mail address, so it might be SusanvonSeggern@Facebook.com?**

A I have seen those Facebook addresses before, but I wasn't aware that that was how you got 9:49:40AM

Veritext National Deposition & Litigation Services
866 299-5127

**Q But do you do any -- 9:54:37AM**
**Do you have ongoing consulting responsibilities or anything like that?**
A No.
**Q After the Kucinich campaign, what did you do next professionally? 9:54:45AM**
A I was doing freelance consulting for PR.
**Q And how long did you do that?**
A About a year.
**Q So what timeframe does that get us to? 9:55:06AM**
A That would be -- actually started consulting a little before the Kucinich campaign ended, so I started consulting in March of 2004 and I -- and I was consulting until March of 2005.
**Q Just going back for one second, what was your role in the Kucinich campaign? 9:55:27AM**
A My title was national media coordinator and I did a lot of things. I handled all non-mainstream national media, so everything that wasn't the New York Times or Nightline kind of fell in my lap. So it was all -- any kind of niche media, so Entertainment Green, JLBT, what have you. 9:55:47AM
And I also handled all the local media all over the country. So whenever Dennis would go to a city, I would handle the radio and the television 9:56:08AM

and the newspapers in that city. 9:56:10AM
And I also managed a 50-state volunteer media team and I also handled all of California media and did all of that, Rich Forell and myself. I was busy. 9:56:21AM
**Q I was going to say political campaigns have a way of having amorphous roles.**
A It was really a joy to work on that one.
**Q That's interesting.**
**So in the freelance consulting work, do you recall what sorts of clients you had at that time? 9:56:33AM**
A I had the Artivist Film Festival, which is an activism film festival, and I had some music clients. I can't really remember what else I did. 9:56:46AM
**Q So I think you said that that went through about March 2005; is that correct?**
A Uh-huh.
**Q So what did you do professionally after that? 9:56:58AM**
A I became the head of PR for Bodog Entertainment.
**Q How do you spell that?**
A B-O-D-O-G.
**Q And what does Bodog do or what did it do at that time? 9:57:11AM 9:57:15AM**
A It was a large online gambling website and then at a later point they also launched a record label and mixed martial arts fighting league and some television shows. 9:57:29AM

**Q What was your title at Bodog Entertainment?**
A I think I was -- I was the head of PR and then towards the end I became the global head of media relations. 9:57:46AM
**Q And what were the dates of --**
A April 2005 to April 2008.
**Q And just generally speaking, what was -- what were your marching orders there at Bodog? What were you supposed to accomplish in your role as the PR person there? 9:58:08AM**
A Getting them covered in newspapers and magazines and online and television and radio and -- both in North America and Europe and Latin America and the Caribbean and Asia. 9:58:25AM
**Q So essentially, to increase the visibility of the company --**
A Uh-huh.
**Q -- or I guess, put another way, increase the visibility of the events or products or services 9:58:36AM**

**that they sold? 9:58:39AM**
A Uh-huh.
THE REPORTER: Is that "yes"?
THE WITNESS: Yes.
BY MR. BROWN: 9:58:46AM
**Q She's better at catching that than I am.**
A Sorry.
**Q After you left Bodog Entertainment in April 2008, what was your next job after that?**
A Wedding planner for myself and then -- 9:58:58AM
**Q That can be a full-time job.**
A It really was. And -- because I had done nothing wedding planning, really, before that.
And -- and then I started -- I started consulting again in August of 2008. 9:59:15AM
**Q And were you with a company when you started back up doing consulting in August 2008?**
A No. I've just been doing consulting on my own since then.
**Q And do you have like a doing business as type name or is it -- you just go by your own? 9:59:33AM**
A Yeah, I just use my married name, Susan von Seggern.
**Q And so is Susan von Seggern the name you use professionally or personally or both at this 9:59:57AM**

**point?** 9:59:59AM

A Both.

**Q And can you give me kind of an overview of the type of work that you have been doing since August 2008?** 10:00:11AM

A Same PR stuff, getting my clients covered in the media, and -- and a -- a fair amount of social media marketing/PR, too.

**Q And can you give me some more detail on what kind of social media marketing you do?** 10:00:36AM

A A fair amount of Facebook. I, you know, will do invites if it's an event client or sometimes creating pages.

I manage peoples' Twitter accounts. Sometimes I'll set up a LinkedIn page -- cover page. 10:01:00AM

**Q So let me just ask a few follow-up questions. I think I understand, but just to make sure it's clear.**

**So you will have a client that will retain you for your PR services, and one of the things you** 10:01:21AM **might do on Facebook would be to help them set up a Facebook page, in other words?**

A Yes.

**Q And then another way you might use Facebook to do your work would be if your client is** 10:01:33AM

**holding an event of some sort, you would use the** 10:01:39AM **invitation feature of Facebook in order to try to get people to come to the event?**

A Yes.

**Q On Facebook, are there any other kind of** 10:01:52AM **mechanisms that you use on behalf of your clients?**

A I work with a lot of festivals, so -- film festivals and music festivals, and so sometimes like I'll -- I'll -- I'll go and "Like" all the artist pages for all the artists that are in that festival 10:02:12AM and then I'll post information about the festival on those -- on the walls of those pages so that other fans of those artists can know that they are playing at that festival or movie, same thing.

**Q Okay.** 10:02:28AM

**Anything else that you can think of beyond those? We've talked about pages and we've talked about liking bands, for instance, posting on those walls. Anything else?**

A Sometimes I'll post things on my wall or I 10:02:43AM might post things on my friends' walls if it's appropriate. I try not to do that, really.

**Q And really, the overarching goal in all of those activities on Facebook is essentially to, again, increase the visibility of whatever it is** 10:03:01AM

**that your clients are trying to accomplish?** 10:03:05AM

A That is correct.

**Q And if it's --**

**For instance, if you have got a client that's selling a product, ultimately the goal is --** 10:03:12AM **maybe it's obvious, but the goal is to ultimately try to get people to buy the product, right?**

A Yes.

**Q And if it's a service that your client is offering, the ultimate goal is to try to get people** 10:03:25AM **to use the service?**

A Yes.

**Q And if it's an event that they are -- your client is holding, the ultimate goal is to try to get people to attend the event?** 10:03:39AM

A Yes.

**Q And generally, aside from those ultimate goals, you have the goal, generally, of trying to create buzz about the clients that you work with, right?** 10:03:51AM

A Yes.

**Q And then since August 2008, have you been doing any other kind of work or just your sort of own consulting business?**

A I develop television shows. 10:04:10AM

**Q What percentage of your time, let's just** 10:04:15AM **say these days, is devoted to that, as opposed to the PR work?**

A 10 percent.

**Q Anything else beyond that?** 10:04:30AM

A I handle the business management for my husband.

**Q What does your husband do?**

A He's a musician and a -- and a music technology consultant. 10:04:49AM

**Q About what percentage of your time would you estimate you spend doing that?**

A 5 percent.

**Q And your TV show production, are there any shows that I've heard of?** 10:05:15AM

A My Cat From Hell is starting its second season on Animal Planet January 7th.

**Q Speaking of buzz, that's gotten a lot of buzz recently.**

**Anything else?** 10:05:26AM

A I have a few other things in development, but nothing that has gotten green-lit yet.

**Q Excellent.**

**Are you generally familiar with the complaint that was filed on your behalf against** 10:05:40AM

**Facebook? 10:05:43AM**

A Yes.

**Q Okay.**

**What is your understanding of the basis for the complaint? 10:05:49AM**

MR. ARNS: Excuse me. Object; calls for a legal conclusion. The complaint was prepared by lawyers who set forth legal theories of liability, and it wouldn't be expected that you would understand those theories at all. She's not a 10:06:04AM lawyer.

Go ahead. If you know, you can say so. If you don't know, say that, please.

THE WITNESS: I mean, my general understanding is that -- 10:06:18AM

MR. ARNS: Also -- I'm sorry for interrupting -- I'm just going to object this also would invade the attorney/client privilege, as the communication that we have given her has given her understanding what this case is about. 10:06:33AM

If you want to answer the question with just a general understanding, that would be fine, if you can do that.

THE WITNESS: Yeah, you know what, I think most of my understanding comes from my discussions 10:06:43AM

Page 22

with my lawyer, so I think that I -- can I pass? 10:06:45AM Should I pass? How does that work?

BY MR. BROWN:

**Q Let me just try to ask it in a different way. What I'm definitely not asking you to do is to 10:06:54AM convey, either directly or indirectly, communications you have had with your lawyers.**

**But putting aside legal theories for a minute, what's your understanding of the factual basis for the complaint? 10:07:11AM**

A That Facebook uses my name and likeness in advertising without my knowledge or permission.

**Q And you understand that as a named Plaintiff in a class action case like this one, that you're essentially representing a class or a group 10:07:35AM of people, correct?**

A Yes.

**Q And what is your understanding of the scope of that group that you're representing?**

A Well, my understanding is that it would be 10:07:49AM everyone who has had their likeness or name used in a sponsored story. And I'm not sure --

MR. ARNS: You answered it.

THE WITNESS: Yeah. I'm -- I'm not -- I'm not sure if that -- if that's everyone in America or 10:08:06AM

Page 23

if that's just people in California, because I'm not 10:08:11AM sure about the --

MR. ARNS: It's -- for your knowledge, it's everybody in the United States.

THE WITNESS: It's everybody in the United 10:08:19AM States.

BY MR. BROWN:

**Q And again, when I ask this question, I don't want you to reveal communications that you had with your lawyers, so just with that premise. 10:08:29AM**

**So what was the extent of your involvement in developing the complaint?**

MR. ARNS: Okay. Object; vague and ambiguous. "Developing the complaint"? That phrase is vague and ambiguous. She had nothing to do with 10:08:46AM that whatsoever.

THE WITNESS: Yeah, I had nothing to do with that.

BY MR. BROWN:

**Q What involvement did you have, if any, in 10:08:55AM planning for the ultimate preparation of the complaint?**

MR. ARNS: Object; vague and ambiguous, unintelligible.

Do you understand that? 10:09:10AM

Page 24

THE WITNESS: Yeah, no. 10:09:11AM

BY MR. BROWN:

**Q Well, let me ask you this: Do you know what legal claims you brought against Facebook?**

MR. ARNS: Okay. Object; calls for a 10:09:23AM legal conclusion, invades the attorney/client privilege.

Do you understand any of those legal claims?

MR. BROWN: Well, wait a minute. I just 10:09:31AM want to make it clear. So I'm not asking for her to be a lawyer and give a treatise on the legal theories. I'm also not asking her what communications she had with you about -- I'm just asking does she know what the legal claims are. 10:09:47AM

MR. ARNS: Yes. And let me just say this: Any of that information would obviously have been based on a discussion with her attorneys, so I think -- object; invade the -- invades the attorney/client privilege. 10:10:00AM

MR. BROWN: So you're going to instruct her not to answer even as to her knowledge of what causes of action are alleged in the complaint?

MR. ARNS: If you have any separate knowledge above and beyond what you learned from the 10:10:10AM

Page 25

lawyers, you can state that. 10:10:13AM
THE WITNESS: All right. No, I don't.
BY MR. BROWN:
**Q Have you ever --**
MR. ARNS: Hold on one second. 10:10:20AM
By the way, you're doing a fantastic job. In normal conversations, we don't wear microphones and stuff and I guess -- did she have her arm on the microphone?
THE VIDEOGRAPHER: Yes. 10:10:31AM
MR. ARNS: Okay. Very good. Every time you get up, you will forget to take the microphone off. I will, too. This is just the pain that goes with this video stuff.
MR. BROWN: My microphone is going to come 10:10:46AM off at least 10 times as I go over to get these exhibits.
MR. ARNS: Yeah.
BY MR. BROWN:
**Q Have you reviewed any of the complaints 10:10:54AM that were filed in this case?**
A No.
**Q Have you ever heard of Business and Professions Code Section 17200?**
A No. 10:11:14AM

**Q Have you ever heard of Civil Code -- 10:11:14AM California Civil Code Section 3344?**
MR. ARNS: Excuse me. Let me just say this: Object; invades the attorney/client privilege. The briefings that she has received 10:11:23AM about the theories of liability have all been from her lawyers and so all of this, as far as her understanding of these areas, come from that. So object; invades the attorney/client privilege.
She may not remember the definitions or 10:11:46AM the numbers, but obviously, there have been long discussions about this with her and --
THE WITNESS: Yeah, I definitely don't know the names or the numbers.
BY MR. BROWN: 10:12:01AM
**Q So let me see if I have any more questions along these lines. You should pause if you want and give your counsel time to object.**
**Are you aware that one of the causes of action alleged in the complaint has a fee-shifting 10:12:14AM provision for the prevailing party in the case?**
MR. ARNS: Excuse me. I doubt she knows what a cause of action is, to start with.
Do you know what the term "cause of action" means? 10:12:29AM

THE WITNESS: (Shakes head.) Not in a 10:12:30AM legal context.
MR. ARNS: So have you heard of any of this information other than from your lawyers?
THE WITNESS: No. 10:12:37AM
MR. ARNS: Okay. Object; attorney/client privilege.
BY MR. BROWN:
**Q So let me see if I can clarify that. And again, just wait in case your lawyer wants to 10:12:45AM interpose an objection.**
**So I think it's possible that last question was a little bit cryptic, so are you aware that one of the laws that's being alleged in this case provides that whoever is the prevailing party 10:13:00AM in the case is entitled to get an award of the attorneys' fees of the other party in the case?**
MR. ARNS: Object; invades the attorney/client privilege.
MR. BROWN: And are you instructing her 10:13:23AM not to answer?
MR. ARNS: She can answer it if she knows anything about that that wasn't involved with discussions of attorney/client -- within the attorney/client privilege context. 10:13:34AM

THE WITNESS: Yeah, so I have nothing to 10:13:36AM say then.
BY MR. BROWN:
**Q Do you know what a Facebook friend is?**
A I do. 10:13:45AM
**Q I figured as much.**
**Just in your own words --**
**I mean, I think we all understand what it is, but in your own words, how would you characterize a Facebook friend? 10:13:57AM**
A A Facebook friend is a contact in real life who I have become linked with on Facebook.
**Q Some of these questions and answers are just going to be kind of laborious, so just have to kind of bear with me. 10:14:14AM**
**Why do you use Facebook?**
A I love Facebook. Well, I use it to communicate with friends and business associates and people I know and I use it for inviting people to events, some private events, some public events. 10:14:37AM
I love that little IM. Let's see.
**Q Meaning instant messaging?**
A Yeah.
I've done a little location checking in, not that much. Yeah, I -- I think it's an -- I 10:14:56AM

think it's an excellent communications medium and -- 10:15:03AM
oh, I use the photo stuff a good amount.
**Q I've just got a few follow-up questions on that and some of it you may have already covered.**
**Do you use it to learn things about what 10:15:25AM your friends are doing?**
A Yes.
**Q Do you use it to learn what your friends like and what they are interested in?**
A I rarely look at other people's "Like" 10:15:35AM lists.
**Q When people --**
**When you have -- not people. Strike that.**
**When your friends on Facebook "Like" things, do you see those "Like" statements show up 10:15:51AM in your news feed?**
A Very rarely. I only look at my news feed about once a day and so it's just whatever is in there.
And I don't know if my friends are not big 10:16:09AM likers or what, but I would say it's -- my friends are more like article posters than likers.
**Q So -- yeah, all right. That's useful.**
**So one thing that people will share on there are, let's say, links to articles that they 10:16:25AM**

**like, correct? 10:16:28AM**
A Uh-huh. Yes.
**Q And regardless of what the frequency is, you sometimes at least will see in your news feed statements that one of your friends "Likes" 10:16:39AM something on Facebook, correct?**
A Yes.
**Q And friends can see -- kind of referred to this before, but it might be that one of your friends has "Liked" a certain page of a company on 10:16:49AM Facebook?**
A Yes.
**Q And you said earlier that sometimes you will "Like" the page of, let's say, a music group that's going to be performing at a festival that is 10:17:04AM a client of yours, correct?**
A Yes.
**Q And your understanding is that when you click the "Like" button, that your "Like" statement is going to then show up in the news feeds of your 10:17:16AM friends, correct?**
A I understand that, but that is not why I click that "Like" button.
**Q Why do you click the "Like" button?**
A I click the "Like" button so I can post on 10:17:28AM

that page. 10:17:32AM
**Q And then when you -- so let's kind of break that down.**
**So you're unable to post on a Facebook page of a band or a company or an organization 10:17:45AM unless you "Like" the page first, correct?**
A Yes.
**Q And then once you have "Liked" the page and you -- that gives you the ability to post a comment on the page? 10:18:06AM**
A Uh-huh, yes.
**Q Then when you post a comment on the page, what's your understanding of what happens after that?**
A Visitors to that page will see that 10:18:15AM comment and it might show up in a news feed and it used to show up -- or maybe it still shows up a little bit on my page that I made a comment on that page, which is like the first couple words of that comment. 10:18:37AM
**Q So on the Facebook page of the group or the business or the organization that you're trying to promote, where does your comment that you posted actually show up on the page?**
A It shows up on the wall of the page, but 10:19:03AM

then when other people comment after me it moves 10:19:07AM down.
And in some cases, it only shows up when people hit the -- you know, like whatever it is and others. So it doesn't show up when you -- when you 10:19:25AM just look at the page, you have to hit the owner of the page and others to see the comments from other people.
**Q So maybe we should just use an example. What's a client that you've had that has a page on 10:19:44AM Facebook and then you've "Liked" that page in order to be able to post comments?**
A Ravi Coltrane, son of John, played at the Angel City Jazz Festival last year, and he has a page on Facebook. And I "Liked" his page and then I 10:20:02AM posted about the show at the Angel City Jazz Festival on his page.
**Q Then -- so your understanding is that the comments will appear on his page, but then those comments will also appear on your wall, as well, 10:20:21AM correct?**
A Yeah, usually only the first couple letters -- words.
**Q And then if someone is looking at your wall, they can, you know, click usually on a 10:20:33AM**

**Q And in what way? 10:25:54AM**
A Truly, I use LinkedIn much more for professional networking. Sometimes I might look up somebody that I'm working with or thinking about working with on Facebook and occasionally I will 10:26:13AM reach out to a journalist on Facebook. But I would say I -- I've used LinkedIn more for that or e-mail.
**Q I think you alluded to this before: You use Facebook to share pictures of yourself or your activities with your friends? 10:26:39AM**
A Yeah. You know, I was more -- I was more on the photo tip a few years ago than I am recently.
**Q Sorry, what was that?**
A I -- I -- I used the photo -- I -- I was posting more photos in the past than I have 10:26:53AM recently. Like there is a lot of pictures of my wedding. I'm sure you've seen them.
**Q Well, hey, you know, I'm just going to let that one lie. There is nothing wrong with posting pictures of your wedding on Facebook. 10:27:10AM**
MR. ARNS: Thank you for that authorization.
BY MR. BROWN:
**Q So in terms of using Face- --**
**So in terms of using Facebook as a -- sort 10:27:43AM**

**of a marketing tool, at this point in time in the 10:27:45AM year 2011, do you feel like using Facebook is something that you essentially need to do as a PR professional?**
MR. ARNS: Excuse me. She already 10:28:02AM testified she rarely uses Facebook for professional communication. Are you talking about those very limited times?
MR. BROWN: I don't think that she said she rarely used it for professional communication; I 10:28:12AM think she said for professional networking.
MR. ARNS: I have "communication" and as you know, I'm a very fast typist. I'll do another $5,000 bet if you want.
BY MR. BROWN: 10:28:29AM
**Q So the question is: Do you consider having -- being active on Facebook to be an essential tool as a PR person in the year 2011?**
MR. ARNS: I'm going to object; asked and answered. She's already said she rarely uses 10:28:45AM Facebook professionally.
MR. BROWN: Bob, if you have an objection, the objection is "asked and answered." You don't need to coach the witness how to answer.
MR. ARNS: I said, "Object; asked and 10:28:57AM

answered. She already answered" such and such. 10:28:57AM
MR. BROWN: And then you went on to try to include the language that you thought that she used. So the right objection, if you want to make it -- you can make your record -- is "asked and answered." 10:29:06AM It's not okay to coach the witness on how she's supposed to respond.
MR. ARNS: Well, I don't think I'm really coaching the witness; what I'm doing is citing to the record, and she's already said that. How is 10:29:16AM that coaching?
MR. BROWN: It's coaching because you're trying to suggest what her next answer should be and you know better. You've been around for a while.
THE WITNESS: I'll -- I'll give you an 10:29:33AM answer.
As a communications professional, it is basically a requirement of my job that I have a presence on Facebook, because otherwise what year am I living in? And so, therefore, I -- I do have -- 10:29:45AM you know, have -- have that platform that I use.
And, you know, for some of my clients, especially event-related clients, it is a useful tool. But overall, I would say that it is not -- that I don't use it for professional uses as much as 10:30:09AM

e-mail, as much as press release services, as much 10:30:12AM as LinkedIn. I -- I think Twitter has -- has become an important professional tool.
BY MR. BROWN:
**Q How do you use Twitter to help advance 10:30:29AM your clients' interests?**
A You know, similarly with how I use Facebook.
You know, in the case of jazz festivals, film festivals, you know, going and following all of 10:30:46AM those people or actually setting up a Twitter account for my clients and then having that account, you know, follow all the people that are in the festival and then using -- you know, getting conversations going on Twitter about the festival 10:31:02AM with those people.
**Q So with respect to Twitter, if you have a client that hires you, will they sometimes hire you and one of the services you provide is to basically, you know, write up tweets for them and get the word 10:31:16AM out about things?**
A Yes.
**Q Have you ever paid any money to Facebook for any purpose?**
A No. 10:31:29AM

**Q The service is free for users, correct? 10:31:30AM**
A Yes.
**Q How often do you typically log on to Facebook?**
A Monday through Friday, every day. 10:31:39AM
**Q And what about on weekends?**
A Occasionally on weekends on my computer and occasionally on weekends on my phone.
**Q And so I was going to ask you that question, but we can just jump to that now. 10:31:58AM**
**So how do you typically access Facebook? Is it from a laptop computer? A desktop computer? Phone? Can you just --**
A My -- my laptop is my desktop. I have a dock and I typically access it from my laptop. 10:32:12AM
**Q And then occasionally you'll also access it from your phone?**
A Yes.
**Q What kind of phone do you have?**
A I have an HTC Droid with the little 10:32:26AM keyboard.
**Q So in the time period, you know, January 1st, 2011 to present, do you have an estimate of how many times you post something on Facebook per day? 10:32:52AM**

A I really have no idea. 10:32:57AM
**Q Any estimate of how many messages you send per day using the messaging feature?**
A I really have no idea.
**Q When you're using Facebook using your 10:33:16AM laptop, you said you have a dock?**
A Uh-huh.
**Q Okay.**
A Yes.
**Q And do you sometimes also access Facebook 10:33:27AM when you're just on your laptop itself, in other words, not docked in?**
A If I'm on a business trip and I've just taken my laptop, then -- sorry. If I'm on a business trip and I've taken my laptop, then I won't 10:33:45AM have my dock so then yes.
**Q When the laptop is docked at your desk, what kind of screen do you have? Do you use the laptop screen or do you have another screen?**
A No, no, I have a -- yeah, that's why I 10:34:00AM have a dock. I have a -- I have a rather large, nice screen. I don't know what kind.
**Q And when you're using Facebook, are you normally using it in a windowed setting where you've got multiple windows open or by itself on its own 10:34:27AM**

**window? 10:34:30AM**
A I typically have -- I typically have it by itself in its own window, but I have all the other things I have open at the bottom and then I can maximize them and then they are in their own window. 10:34:46AM
**Q Do you maintain or administer any pages on Facebook? It sounds like maybe you do from what you said before.**
A I don't think I am right now, but I certainly have. 10:35:01AM
**Q What about, for instance, like the Angel City Jazz Festival that you mentioned earlier?**
A I -- I -- I think I am an admin on the Angel City Arts page. I am an admin on several pages on Facebook. 10:35:22AM
**Q Other than --**
**Other than the Angel City page that you just mentioned, can you recall any of the others that you're an admin for?**
A Well, one is for my dog, Cooper, and I 10:35:32AM think one is for a book I worked on earlier this year and one is for a movie I worked on like two years ago.
And I think I'm still an admin on the Artivist Film Festival page and I -- I'm an admin on 10:35:54AM

the Rhino Records pop-up store page. 10:35:59AM
And my husband and I are big fans of Romanesco and we have a page for Romanesco. It's a vegetable like broccoli. Many -- we have like 100 fans of Romanesco. We got to put up that recipe. 10:36:18AM
**Q So with respect to the book, the movie, the film festival, and the Rhino Records page, you have admin privileges on those pages because those are all clients of yours?**
A Actually, none of them are current 10:36:38AM clients, but they all were clients or are things -- are projects that are on hiatus because they're -- you know, only happen once a year or what have you.
**Q Maybe this goes without saying, but then the Cooper page for your dog and the Romanesco page 10:36:50AM I take it have nothing to do with your client base or your professional activities?**
A Not at all.
**Q How many Facebook friends do you have currently? 10:37:06AM**
A I think I'm closing in on about 1400.
**Q That's a lot of Facebook friends.**
A My -- my personal database that I maintain for PR purposes that I've been maintaining for 20 years has 20,000 people in it. So 1400 is like a 10:37:19AM

smallish number if you're me. 10:37:24AM
**Q 20,000.**
**So in terms of the Facebook friends that you have -- I'm just trying to figure out the easiest way to ask this question. 10:37:45AM**
**So out of these nearly 1400 Facebook friends that you have, I take it some of them are relatives?**
A A few of them are relatives.
**Q Some of them are just personal friends? 10:37:59AM**
A Many of them are personal friends.
**Q Former school classmates?**
A A few of them are former school classmates.
**Q Work colleagues? 10:38:11AM**
A A lot of them are work colleagues.
**Q Contacts in your industry and the like?**
A Yes.
**Q Are you friends with any of the other named Plaintiffs in this case? 10:38:24AM**
A Nope.
**Q Are you friends with any of the lawyers working on this case?**
A Jonathan and I were friends. We've known each other since 1997. 10:38:36AM

**Q And you're referring to Jonathan Jaffe? 10:38:38AM**
A Uh-huh.
**Q How do you typically decide whether to accept friend requests or not?**
A I -- usually, I really have to know the 10:38:49AM people or I have to have had some kind of interaction with them. Or maybe if they are super cool, even if I don't know them, I'll accept them.
MR. ARNS: Like Matt Brown. He would fit that category. 10:39:09AM
THE WITNESS: Yes.
BY MR. BROWN:
**Q Matt Brown and Ravi Coltrane, I think, two peas in a pod.**
A I ignore a lot of friend requests. 10:39:16AM
**Q Do you ever comment on your friends' posts?**
A I do.
**Q Why do you do that?**
A Because I have, I hope, something relevant 10:39:30AM to add to the conversation.
**Q Depending on what it is, you might be discussing some sort of issue?**
A Yeah. I mean, certainly that is -- that's something that comes up a lot with -- with my 10:39:54AM

friends is issues, political issues and economic 10:39:55AM issues and global warming and things like that.
**Q And at least in some instances, you may be trying to sort of educate or enlighten your friends?**
A Yes. 10:40:13AM
**Q And at other times might be just something humorous or light-hearted?**
A Sometimes.
**Q So given the amount that you use Facebook, I take it you also know what a profile page is? 10:40:40AM**
A Yes.
**Q Okay.**
**And what's sort of your description of what a profile page is?**
A That's the individual page that people 10:40:47AM have, like my profile page is my page or Jonathan's profile page would be his page.
THE WITNESS: You know what, this looks like it's going to get tricky. Can I go to the bathroom -- 10:41:03AM
MR. BROWN: Yes.
THE WITNESS: -- before we start getting papered?
MR. BROWN: Yes.
MR. ARNS: Excellent. Yes. 10:41:07AM

THE VIDEOGRAPHER: Off the record, 10:41:09AM 10:41 a.m.
(Recess taken.)
THE VIDEOGRAPHER: And we are back on the record at 10:58 a.m. 10:58:10AM
BY MR. BROWN:
**Q Okay.**
**So the court reporter just handed you what's been marked as Exhibit 1015 and also Exhibit 1016. 10:58:21AM**
**(Defendants' Exhibit 1015 and 1016 marked for identification.)**
BY MR. BROWN:
**Q So looking first at Exhibit 1015, is that a printout of your Facebook profile page as of 10:58:28AM October 6, 2011?**
A Looks like it.
**Q And then if you take a look at Exhibit 1016, is that essentially another printout of your profile page as of October 13, 2011? 10:58:48AM**
A Looks like it.
**Q So focusing first on Exhibit 1015, so if you look over to the left-hand side about midway down the page, do you see there it says "Friends" and then "(1,341)"? 10:59:12AM**

BY MR. BROWN: 11:05:10AM

**Q And do you remember when you made those settings changes?**

A I don't. Sometime in the last couple of years. I don't remember. 11:05:23AM

**Q And so I'll just ask, to see if we can narrow it down a little bit: So to the best of your recollection, was it before January 1st, 2011?**

A I can't -- I really can't remember.

**Q To the best of your recollection, was it 11:05:48AM before January 1st, 2010?**

A I really don't know.

**Q And in your recollection, has it just been a single time that you've tried to go make changes to your privacy settings? 11:06:00AM**

A At the most, two times that I remember.

**Q Let me ask you this: After the date that the -- that the original complaint was filed in this case, have you ever tried to go change your privacy settings? 11:06:36AM**

MR. ARNS: Object; lack of foundation.

THE WITNESS: I turn on Facebook first thing in the morning when I get into my office and I turn it off one of the last things, and I'm doing 20 million things every day. I don't know. 11:06:53AM

BY MR. BROWN: 11:07:00AM

**Q Do you believe that you have --**

**So we talked earlier that when you "Like" something on Facebook, that that statement, "Susan von Seggern likes" that thing on Facebook, may 11:07:36AM appear in your friends' news feeds, correct?**

A It may.

**Q When it does appear in your friends' news feed, do you believe that you're harmed in any way by that? 11:07:50AM**

MR. ARNS: Excuse me. You're talking about just news feed when she "Likes" something?

MR. BROWN: That's correct.

THE WITNESS: Hard to say. I don't know what other people's reactions are. I have many 11:08:06AM friends. They might not always agree with me on political things or matters of musical taste.

BY MR. BROWN:

**Q The question I was asking was: Do you believe that you personally have been harmed in any 11:08:23AM way when your "Like" statement appears in your friends' news feeds?**

A Probably not, but I wouldn't know for sure.

**Q And what would it depend on? 11:08:39AM**

A Perhaps they don't like Dennis Kucinich or 11:08:45AM Barack Obama or Romanesco or jazz, you know, they think jazz is for losers. Then I'm a loser.

**Q So let me -- it's possible I may not be asking the question the right way. 11:09:03AM**

**So the answer you just gave -- let me just strike all of that and see if I can ask another question.**

**So is what you're saying right now that you can't be sure whether your friends have suffered 11:09:17AM any harm as a result of seeing your "Like" statement in their news feed?**

A No, I can't be sure whether or not I've suffered any harm because they have seen something I've "Liked" in their news feed that they disagree 11:09:29AM with.

**Q Okay. So I think I understand what you're saying.**

**So I guess my question, then, is: If they -- if your friends disagreed with your "Like" 11:09:39AM statement that appeared in their news feed, how would that result in harm to you?**

A Maybe they're thinking about hiring a publicist and they would rather hire a publicist who doesn't like Barack Obama or Romanesco or Ravi 11:09:58AM

Coltrane. People are influenced by very small 11:10:02AM things these days.

**Q And has --**

**Have you ever had a situation where someone you were Facebook friends with -- strike 11:10:15AM that. That was going to be a bad, unintelligible question.**

**Have you ever had a Facebook friend express to you any sentiment like that, that they would not want to hire you as a professional based 11:10:31AM on the "Like" statement that they saw in their news feed?**

A No.

**Q Are there any other ways in which you -- well, strike that. 11:10:53AM**

**Have you ever suffered any sort of economic or financial harm, to your knowledge, by "Liking" something on Facebook?**

A Not to my knowledge.

MR. ARNS: Object. Whoa, whoa, whoa. If 11:11:09AM it appears in a sponsored story versus on the news feed that she's approved?

MR. BROWN: Can you just read back the question?

MR. ARNS: Okay. Listen very carefully, 11:11:27AM

THE VIDEOGRAPHER: This is the beginning 11:37:43AM
of Disk Number 2. The time is 11:37 a.m. and we are
now going back on the record.
BY MR. BROWN:
**Q How did you first become aware of 11:37:52AM**
**sponsored stories?**
A Jonathan brought it up to me.
**Q And when was that?**
A Earlier this year.
**Q Do you remember more specifically when? 11:38:09AM**
A I don't. I'm sorry.
**Q Was it like after March 1st of this year?**
A Yeah, it was definitely in the late spring
or early summer.
**Q And by "Jonathan," you're referring to 11:38:28AM**
**Jonathan Jaffe?**
A Yes.
**Q And what's your understanding of the kinds**
**of actions on Facebook that can result in a**
**sponsored story? 11:38:39AM**
A Well, I thought it was just "Liking"
something.
But in discussions with my attorneys, I've
found out that it's "Liking" something, checking in,
"Liking" something on a page not on Facebook. And 11:38:52AM

there is a couple of other ones, but I don't 11:38:56AM
remember what those are.
MR. ARNS: Again, a lot of this
information -- because we believe Facebook does not
explain sponsored stories and doesn't show the 11:39:04AM
member that they are in a sponsored story, a lot of
this information comes from the attorneys --
THE WITNESS: Yeah.
MR. ARNS: -- which is attorney/client
privileged, and we are not waiving our 11:39:16AM
attorney/client privilege with respect to the last
answer.
And you're doing fantastically. It's hard
to march in between that. All of the lawyers know
that when you're saying, "The lawyer said...," that 11:39:29AM
it's that type of invasion.
And I'll cut you off if I want to, okay?
THE WITNESS: Okay.
MR. ARNS: But I don't want to get you
nervous at all about that. 11:39:38AM
THE WITNESS: Okay.
BY MR. BROWN:
**Q Do you know when sponsored stories first**
**started appearing?**
A I don't, really. Maybe in the last year. 11:39:50AM

**Q Are you aware of whether it was before 11:39:57AM**
**January 1st, 2011 or after?**
A I'm not.
**Q And what is your understanding of what**
**information about you appears in a sponsored story, 11:40:07AM**
**to the extent that there is a sponsored story**
**that -- about you?**
A From -- from the one I've seen, it's my
photograph and my name and that I like -- in the
case I've seen -- UNICEF, and that -- and then the 11:40:25AM
sponsored stories I've seen on Facebook, because I
am a Facebook junkie, you know, it's the name and
the -- and the -- and the picture, and then
sometimes it will be more than one person's name or
picture, so it will be like other people that that 11:40:44AM
person whose page it appears on knows, and -- and
most prominently the logo of the advertiser.
**Q And have you seen any of your friends'**
**actions on Facebook appear as sponsored stories?**
A I have. 11:41:12AM
**Q When did you first see a sponsored story**
**with one of your Facebook friends?**
A I think in the last year.
**Q And approximately how many of those**
**sponsored stories have you seen? 11:41:25AM**

A Oh, a huge number, because I -- they pop 11:41:26AM
up all the time.
**Q Any estimate of the number that you've**
**seen since you first started seeing sponsored**
**stories? 11:41:42AM**
A Well, like -- if I estimate that it's been
400 days of sponsored stories and I've seen at least
3 a day, then I would go for -- what's that, 1200?
I don't really -- I'm one of those
Internet users who doesn't really look at the -- the 11:42:04AM
ad space, but, I mean, I do see it sort of off in
the side of my eye. I'm like, "Oh, right, that's
some sort of an ad."
**Q When you saw the sponsored stories of --**
**involving your friends, what was your reaction to 11:42:22AM**
**that?**
A Depends who the friends are and what the
sponsored story was.
Recently, I noticed a few friends of mine
in a sponsored story for Lululemon, which is a yoga 11:42:33AM
clothing brand. And I -- I remember I had -- I had
just -- the reason I remember is because I had, just
the night before, had a discussion with a girlfriend
of mine. I do a lot of yoga; a lot of my friends do
yoga. I live in L.A. We all do yoga. She does 11:42:53AM

**I don't recall, honestly.** **11:54:42AM**
A Late spring, early summer last year -- this year.
MR. ARNS: Just --
MR. BROWN: Well, hang on a second. If 11:54:53AM you have an objection, you can make the objection. But if you're going to try to provide content for answers, then that's not appropriate.
MR. ARNS: She gave a little bit of a different answer before. 11:55:03AM
MR. BROWN: Well, that's the way it goes, so --
MR. ARNS: No. It's like, hey --
MR. BROWN: I'm warning you, Bob, if you're going to try to shape the substance of the 11:55:09AM witness's testimony, that's a big problem.
MR. ARNS: You know, this is such an innocuous item, and if you're proud of yourself that -- of what you just think you have accomplished, I'm somewhat surprised. 11:55:21AM
But it ain't right. We have documents that we can show her that will refresh her recollection as to the exact date. She's just giving her best estimate now. Thank you.
THE WITNESS: And I'm terrible with dates. 11:55:42AM

I -- living in Los Angeles, everything happens at 11:55:44AM the same time because it's always warm. It's true. It's like, "When did that happen? What year did that happen?"
It's really hard. Like in the Northeast, 11:55:54AM you know when things happen because there is seasons. And Los Angeles, it's like what? When?
BY MR. BROWN:
**Q So when you were considering becoming a Plaintiff in the lawsuit, did you talk to anyone 11:56:13AM else about the lawsuit other than your lawyers or your husband?**
A No.
**Q What about after the lawsuit was filed?**
A No. 11:56:25AM
**Q I'm handing you what's been previously marked as Exhibit 1001.**
MR. ARNS: Thank you.
BY MR. BROWN:
**Q This is the second amended class action 11:57:22AM complaint filed in the case.**
**Have you seen this before?**
MR. ARNS: Object; asked and answered. She said she's discussed it with the attorneys before. She has not seen it before. 11:57:37AM

BY MR. BROWN: 11:57:45AM
**Q Okay. I'm going to point you to a few specific sections of this.**
A All right.
**Q So if you would turn to page 3 and look at 11:57:52AM Section 7 of paragraph 7. Do you want to just read paragraph 7 to yourself?**
A Uh-huh.
Yep, that's me.
**Q Okay.** **11:58:14AM**
**So is the information that's in paragraph 7 true?**
A Yes.
**Q Okay.**
**If you would turn to pages 15 to 16, and 11:58:40AM specifically paragraphs 70 and 71. And so paragraph 70 begins, "Sometime on or before February 12th, 2011...," and paragraph 71 starts, "On February 12th, 2011...."**
**Can you just take a minute to read those 11:59:09AM to yourself?**
A Okay.
**Q Did you do anything personally to ensure that this information that was included in paragraphs 70 and 71 was accurate?** **11:59:47AM**

MR. ARNS: Object. Did she do anything 11:59:50AM personally such as speak with her lawyers? Are you talking about review this document? She said she hasn't seen the document.
THE WITNESS: I definitely haven't seen 12:00:01PM this document.
BY MR. BROWN:
**Q So the question was: Have you done anything personally -- well, strike that.**
**Before this complaint got filed, did you 12:00:10PM do anything personally to ensure that the information here was accurate?**
MR. ARNS: I'm going to object as vague and ambiguous, what is meant by "do anything personally." 12:00:21PM
BY MR. BROWN:
**Q You can answer.**
A I spoke to my lawyers.
**Q Do you see how in paragraph 70, it first says:** **12:00:49PM**
**"Sometime on or before February 12th, 2011, Ms. Mainzer clicked on the Facebook 'Like' on the Facebook.com page for UNICEF"?**
A I see that. 12:01:01PM

It's impossible. 12:12:32PM

**Q Okay. That's -- so let me try asking a slightly different question.**

**Are there people who you are Facebook friends with who you first knew from an earlier 12:12:45PM phase in your life, who would know you as Susan Mainzer instead of Susan von Seggern? That's really the question.**

A Yes.

**Q Is there any way to give a ballpark 12:12:57PM estimate of how many people fall into that category of the 1300 plus?**

A Probably -- probably more -- oh, it's so tough. At least half, maybe more than half. But that is just an estimate. 12:13:13PM

**Q Okay. That's all I'm asking for is an estimate.**

A It's impossible to figure that out.

**Q You're saying at least a half would know you by Susan Mainzer, as opposed to Susan von 12:13:23PM Seggern? I just want to make sure --**

A Or they -- they would -- yeah, they would know that I had been Susan Mainzer.

**Q Okay.**

A And I have it right on my thing. I say -- 12:13:32PM

the official -- in Exhibit 1015 on page 4, I say on 12:13:35PM my basic information about me: "I used to be Susan Mainzer and also I love L.A." I thought that was a pertinent thing to put in there.

MR. ARNS: Can we hire you as a lawyer? 12:13:57PM

THE WITNESS: You can hire me as a publicist.

Oh, is that -- are you -- am I still on the mic?

THE VIDEOGRAPHER: Yeah. 12:14:10PM

THE WITNESS: Okay.

(Conversation held between witness and counsel outside the hearing of the reporter.)

BY MR. BROWN:

**Q So if you take a look at Exhibit 1015, 12:14:45PM which you were just pointing at --**

A Yes.

**Q -- I take it that if you look in the first page in the upper left-hand corner, that's your profile picture, correct? 12:14:54PM**

A Yes.

**Q And that is you?**

A That is me.

**Q All right.**

**Are there any of your 1300-plus Facebook 12:15:00PM**

**friends who you haven't met in person before? 12:15:03PM**

A There is probably a few.

**Q Any estimate, just ballpark, on how many people fall into that category?**

A Very -- I think it's a very small number, 12:15:14PM like maybe 50, but...

MR. BROWN: Let's mark this as Exhibit 1017.

(Defendants' Exhibit 1017 marked for identification.) 12:15:47PM

THE WITNESS: I knew this was going to come up.

BY MR. BROWN:

**Q So the court reporter has just handed you what's been marked as Exhibit 1017. And just take a 12:15:59PM minute to just flip through it real quickly so you can take a look at the whole document.**

**Are these the different profile pictures you have used on your Facebook account over the years? 12:16:28PM**

A Yes.

**Q And in the upper left-hand corner, that is your current profile picture, correct?**

A That is my current profile picture and has been for over three years -- 12:16:43PM

**Q Okay. 12:16:43PM**

A -- pretty much solidly except for Doppelganger week.

**Q Yeah, so explain what --**

**So the first picture in the -- kind of on 12:16:48PM the right-hand side of Exhibit 1017, who is that a picture of?**

A That is Mary-Louise Parker.

**Q So do you recall when --**

**Was that a profile picture that you used 12:17:03PM at one point in time?**

A For a couple of days when everybody was putting up their celebrity Dopplegangers, yes.

**Q Do you remember when that was, roughly, and for how long? 12:17:14PM**

A I'm guessing it was January 29th, 2010 and it was probably less than a week. It was probably like two or three days.

**Q And other than that picture, are there -- the rest of the pictures in Exhibit 1017 pictures of 12:17:32PM you?**

A Yeah, they are all pictures of me.

**Q So we talked a little bit earlier about different computers and mobile devices that you have, so we talked about your laptop, we talked 12:18:31PM**

**about your phone.** **12:18:34PM**
**Are there any other devices that you have that you use to access Facebook? For instance, an iPad, just as an example.**
A No. 12:18:46PM
**Q Just those two?**
A Sometimes I will look at Facebook on my husband's computer, but then I will be looking at his profile and his news feed.
**Q All right.** **12:18:56PM**
**And what about if you're traveling or otherwise? Do you use public computers to --**
A Yeah, I usually bring my laptop with me, so I don't typically use public computers.
**Q So just at a high level, generally** **12:19:53PM** **speaking, what are the different reasons you will "Like" content on Facebook?**
A If I genuinely like something; if it has a work-related function. Oh, I "Like" a lot of articles that -- that I've placed to support the 12:20:17PM journalist who's written those articles.
**Q And so when you --**
**The first thing you said, you said sometimes you will "Like" content on Facebook because you genuinely like it.** **12:20:40PM**

A (Nods head.) 12:20:42PM
**Q Is another way of saying that that you have an affinity for it? Would you use that term in some way?**
A That is -- affinity pretty much means 12:20:50PM genuinely liking something, sure.
**Q And so in addition to having an affinity for something and for promoting a client's business --**
**So those are two reasons, correct?** **12:21:04PM**
A Uh-huh.
**Q You will also sometimes "Like" things in order to promote your own business, correct?**
A That's correct.
**Q And then at times also to promote a cause** **12:21:14PM** **that you're interested in?**
A That's correct.
**Q And any other reasons beyond the ones we've just identified that you would "Like" content on Facebook?** **12:21:29PM**
A No, that's pretty much it.
**Q One of the things that you "Liked" on Facebook was NextAid, correct?**
A Correct.
MR. BROWN: Sorry, I should really spell 12:21:47PM

that. It's N-E-X-T-A-I-D. 12:21:47PM
THE WITNESS: And the second "A" is capitalized.
BY MR. BROWN:
**Q Capital "N" and capital "A," right?** **12:21:51PM**
A Yes.
**Q And then another thing that you "Liked" was for NextAid 5Alive Campaign for Maternal Health, correct?**
A That's correct. 12:22:02PM
**Q And you have been --**
**This is a group you have been involved with for quite some time?**
A I'm on their board.
**Q And when did you first join the board, if** **12:22:08PM** **you recall?**
A I think they formed the board around 2007. I've been -- I've been working with them, though, since 2002.
**Q And, by the way, it looks like a really** **12:22:21PM** **great organization.**
A Great organization.
**Q So can you just --**
**I've looked at the website, but can you just give me, you know, a brief overview of what the** **12:22:31PM**

**organization's mission is?** **12:22:33PM**
A Yes. NextAid is a group that provides sustainable -- ecologically-sustainable solutions for vulnerable children and women in Africa.
**Q And so in addition to having "Liked" the** **12:22:47PM** **main NextAid page and another piece of content regarding NextAid, you will sometimes post on the NextAid wall, correct?**
A I will.
**Q Do you have sort of admin rights to that** **12:23:00PM** **page or not?**
A I don't think I do. I -- I -- I used to be an admin on the NextAid cause page, but the causes is so -- I don't know what they are doing over there that I don't -- I don't even know if I 12:23:15PM still have that.
**Q All right.**
**And you will sometimes tweet about NextAid, as well?**
A Absolutely, yes. 12:23:27PM
**Q And I take it that when you're trying to --**
**So one of the reasons that you've "Liked" NextAid is because it's a cause that you care about and you're trying to promote that cause, right?** **12:23:39PM**

A Deeply believe in, work very hard on, yes. 12:23:41PM
**Q And I take it that when you're trying to propose -- let me get the dentures back in.**
**When you're trying to promote a cause like NextAid, you're trying to really get the word out 12:23:56PM and increase the visibility as much as possible, correct?**
A Absolutely, and ideally raise money.
**Q That's always the case for nonprofits, right? 12:24:07PM**
A Yes.
**Q Then on Facebook, if you "Like" an organization like NextAid and your friends then get wind of it, there can be sort of a viral effect, right, where they can then -- if they are 12:24:25PM interested, they can go "Like" that page, as well, and then that gets introduced to their set of friends, as well?**
A Ideally.
**Q And basically, it's part of an overall 12:24:40PM kind of campaign to sort of educate your friends and enlighten them as to the organization's mission, essentially?**
A And to raise money, yes.
**Q All of those things, right -- 12:24:54PM**

A Yes. 12:24:56PM
**Q -- at the end of the day.**
**And you -- all right. So -- strike that. Bear with me for one second.**
A Uh-huh. 12:25:13PM
**Q Just bear with me, please.**
**(Conversation held between witness and counsel outside the hearing of the reporter.)**
THE WITNESS: I kind of look like her, 12:27:47PM right?
MR. JAFFE: You do.
MR. ARNS: Totally.
THE WITNESS: If I was -- I mean, if I was thinner, really. If I was like... 12:27:52PM
MR. JAFFE: Do you know the high school students where -- there is a week or so where they were all putting up cartoon images of themselves. These things apparently go around.
THE WITNESS: Yeah, yeah, they go around, 12:28:05PM exactly.
People used to tell me that I look like Julia Louise Roberts [sic]. Remember from Seinfield? Elaine from Seinfield.
MR. BROWN: Let's mark this as 12:28:13PM

Exhibit 1018. 12:28:14PM
(Defendants' Exhibit 1018 marked for identification.)
BY MR. BROWN:
**Q So this is, I guess, a group exhibit, for 12:28:27PM lack of a better term. So this exhibit consists of the following Bates-numbered pages produced by the Plaintiffs: FACEBOOK 2842, -4862, -2849, -4865, -2854, -4868, -2858, -2860, -2873, and -2975.**
**So we'll run through this quickly. 12:29:25PM**
A Okay.
**Q So if you take a look at the first page of this exhibit --**
**Just to give you some context here so -- I'm not trying to hide the ball or anything here. 12:29:34PM These are just a bunch of pages that have, you know, different communications and the like about NextAid.**
A Okay.
**Q So it's hard to tell just looking at them on their face, but we'll just run through it real 12:29:49PM quickly.**
A Okay.
**Q So if you look at the first page on Exhibit 1018, which is -2842, this is a printout from your Facebook account, correct? 12:30:02PM**

A Yes. 12:30:03PM
**Q And if you take a look about halfway down the page, you see a post by you:**
**"...Leading Yoga Teachers [to] Join to Benefit @NextAid in 'beats 12:30:14PM EMBODIED build HOPE' at YogaWorks - Soho - New York City, October 15th."**
**Correct?**
A Yep. Yes. 12:30:30PM
**Q And so was this something that you posted on your Facebook page or on the NextAid Facebook page or was it something else?**
A This was actually something I posted on Twitter. And I have my Twitter linked to my 12:30:42PM Facebook page, so anything I post on my Twitter feed goes onto my Facebook page. And this was something I posted on Twitter that was then posted on my Facebook page.
**Q So essentially, you were trying to get the 12:30:54PM word out using Twitter about this event in New York, and something you just basically do across the board is whenever you tweet something on Twitter, it automatically gets posted on your Facebook page, as well? 12:31:10PM**

**exhibit.** **12:41:29PM**
A Can I make a comment?
**Q Sure.**
A Given how -- how passionate I am about NextAid, you can see where I might not want my name 12:41:44PM to be used in connection with other charities. That's all.
**Q All right.**
**So are there any other charitable organizations that you promote yourself? 12:41:58PM**
A Yes. I work with a group called Wells Bring Hope.
**Q Wells Bring Hope?**
A Hope.
**Q And what's the "wells" refer to? 12:42:06PM**
A Like digging wells, water wells, drilling wells.
**Q Any other groups -- charitable groups that you personally work with?**
A Those are the two big ones. 12:42:17PM
**Q Are either of those groups also clients?**
A They are pro bono clients.
**Q In other words, you're not charging them for your PR services?**
A Right. 12:42:30PM

**Q Beyond those two that you personally work 12:42:33PM with, you have got other nonprofit or charitable organizations who you've "Liked" on Facebook, correct?**
A Yes, but those are the only two that I 12:42:44PM really want people to give money to. I'm happy if people give money to UNICEF, like, "God, give money to UNICEF," but I want people to give money to NextAid and Wells Bring Hope.
**Q So when you "Liked" UNICEF in order to 12:43:07PM sort of promote their campaign at that time, I take it that you were fine if people wanted to donate money to UNICEF in order to support that campaign, correct?**
A I don't think I really thought about it. 12:43:29PM I just thought about it as me going, "Yeah, sure, UNICEF, right on."
**Q And in that campaign that they were undertaking at the time to reduce childhood deaths.**
A I -- I don't -- I don't 100 percent 12:43:43PM recall, but I somewhat slightly recall that I think if you "Liked" them, they actually got a dollar from some matching donor. And that was what really prompted me to take that action.
MR. BROWN: Okay. I think this is a good 12:44:01PM time to break for lunch. 12:44:03PM

THE VIDEOGRAPHER: This is the end of Disk Number 2. The time is 12:44 p.m. and we are now going off the record.
(Lunch recess taken.) 12:44:12PM
THE VIDEOGRAPHER: This is the beginning of Disk Number 3. The time is 1:51 p.m. and we are now going back on the record.
BY MR. BROWN:
**Q So one reason that you said that you would 1:51:57PM sometimes "Like" certain content on Facebook was to help promote your own business, correct?**
A Yeah, sometimes.
**Q Okay.**
**And so in what way does clicking on the 1:52:08PM "Like" button for certain content accomplish that objective?**
A You know, let's say I've gotten a story for one of my clients on, you know, some kind of big media, like the New York Times. So I click on 1:52:24PM "Like" for that story.
It goes on my wall, you know, "Tia's Bakery in New York Times story," or -- or it says -- it has the New York Times story and then I write in the comments, "We got Tia's Bakery in this story on 1:52:41PM

gluten-free bakeries in the New York Times." 1:52:42PM
And then maybe somebody going to my page will go, "Oh, wow, Susan got something in the New York Times. She must know what she's doing."
**Q I see. I see. 1:52:54PM**
**So Tia's Bakery in your example being a client of yours?**
A Yes.
**Q Okay.**
**And are there any other ways that you can 1:53:03PM use the "Like" button to promote your business?**
A Well, it's not really promoting my business, but it's -- like in smaller media -- like say Examiner, you know, has zillions of those columnists who write the Examiners or About, has all 1:53:18PM the -- zillions of people.
You know, they have "Like" buttons, so if I have something in -- in one of their stories or even if I don't, but I just like their story, I can "Like" that and then it will show up on my page. 1:53:31PM
And then they will be happy because they are getting the exposure and then also they are getting, you know -- I think -- I think that Examiner and About and some other businesses like that kind of track which of their journalists -- 1:53:45PM

actually, the New York Times and the L.A. Times do, too -- track which of their journalists are getting -- and CNN.com does it, too -- are getting the most "Likes" and -- and then, you know, they're choosing which journalists to assign what stories to or promote or keep or what have you. 1:53:48PM 1:54:01PM

And so it's just me being supportive of my journalist friends and then it makes them like me or, you know, think well of me and -- or, you know, so that next time I pitch them, they're like, "Oh, right, last time" -- or "Susan 'Liked' that story I did, so she's pitching me now, so maybe I should listen to her pitch more." 1:54:17PM

Very subtle, tiny things these days. I mean, it's -- you know, it used to be big things and big favors and -- and now everything is so parsed into little tiny, tiny things. The reputation economy I believe it's called. 1:54:29PM

**Q In the example you gave before where you were able to get Tia's Bakery into a New York Times article and then you -- so you "Liked" that article and then that shows up on your wall --** **1:54:42PM**

**So what I just said is accurate, right, that that's what would happen?**

A Uh-huh. Uh-huh. 1:55:00PM

**Q Yes? 1:55:01PM**

A Oh, yes. Sorry. Sorry. Out of practice. Sorry.

**Q That's okay.**

**So you understand, though, that that "Like" could potentially end up getting -- that story that's generated from that "Like" could end up being sponsored and become a sponsored story, correct?** **1:55:10PM**

A Yeah. I didn't really understand that until my lawyers informed me that that was something that could trigger a sponsored story. 1:55:26PM

**Q But you understand that now?**

A I do understand that now.

**Q And so in an instance like that, to the extent that that same story shows up again as a sponsored story maybe once, maybe more than once, that actually increases the visibility of your success in getting Tia's Bakery into the New York Times article, correct?** **1:55:36PM** **1:55:53PM**

A Yes, or it increases the people who absolutely hate the New York Times and think the New York Times is an instrument of the CIA and oppression, that they are like, "Oh, Susan likes the New York Times? I don't want to work with Susan." 1:56:08PM

And because I "Like" a story in the New York Times doesn't mean I want to promote the New York Times; it just means I'm promoting that story in the New York Times. 1:56:11PM

And if I'm promoting anything, because I -- promoting things is what I do for a living, I should get paid, and I'm not getting paid to promote the New York Times. 1:56:27PM

**Q And is it your understanding that if you were to "Like" that article in the New York Times that mentioned Tia's Bakery, that the resulting sponsored story, if there was one, would say, "Susan von Seggern likes the New York Times," or would it say, "Susan von Seggern likes this article," or would it say something different?** **1:56:41PM** **1:57:03PM**

A I mean, in the sponsored stories that I've seen on the ad section of my page, they just say, "Susan Von Seggern likes" -- or "Joe Schmoe likes X." They don't break it down further that I've seen. 1:57:17PM

**Q Okay.**

**But -- so just --**

**I'm just going to ask you to assume something for the sake of my next question. So assume that the sponsored story that came after you** **1:57:26PM**

**had "Liked" the New York Times article said, "Susan von Seggern likes this article," in contrast to it saying, "Susan von Seggern likes the New York Times," more generally.** **1:57:29PM**

**Would you agree that by virtue of having that story show up in the right-hand side of the screen, that you're simply getting more visibility for your "Like" of the article than you would simply having it in your wall?** **1:57:42PM**

A It would be giving more visibility to that story, but that's a terrible hypothetical because it wouldn't happen like that unless change -- you -- unless Facebook changes the way they do -- do that. That's not -- it's -- it's not a good hypothetical. 1:58:06PM

But, yes, if -- if Facebook changed the way they -- they handle the sponsored stories to be more specific, it would put more attention to that story. 1:58:23PM

**Q Would you ever --**

**Would you ever "Like" a page on Facebook? Not like a story on another website that has a "Like" button, but -- actually, let me just withdraw that. It was going to end up being a very, very long question.** **1:58:39PM**

**Would you ever "Like" a page on Facebook** **1:58:55PM**

**for the purpose of, you know, enhancing your own 1:58:59PM reputation as a PR professional or helping your business out?**

A Yes.

**Q And do you have -- 1:59:12PM**

**Can you give me an example of --**

A Well, like I "Like" Tia's Bakery on Facebook.

**Q And then once you "Like" the Tia's Bakery page, in what way does doing that going to help your 1:59:22PM business as a PR person?**

A Well, it's just -- it's just -- you know, being a body, it's just being another -- you know, instead of 18 people liking Tia's Bakery, 19 people like Tia's Bakery. 1:59:39PM

And then also I could go on the Tia's Bakery page and say, "Oh, my God, have you tried the black bean brownie? It's out of this world." It is, by the way.

So -- but it's more -- truly, it's more -- 1:59:50PM I would -- I would "Like" a client's page so that I can post on that page, not necessarily -- I'm trying to think if there was a case of something where I would "Like" something to enhance my reputation as a publicist. 2:00:06PM

I mean, maybe if -- like I like "Help a 2:00:08PM Reporter Out," which is a PR services e-mail. So because I'm a smart enough publicist to "Like" this PR service's e-mail service and I "Like" their page on Facebook, that might reflect well on me as a 2:00:26PM publicist.

**Q For other people who you are Facebook friends who know that you're a publicist, for instance?**

A Yeah, but it's -- it's a pretty limited... 2:00:35PM

**Q Well, so in the example where you "Like" the Tia's Bakery page, though, once you "Like" the page, you understand that then the statement that you like Tia's Bakery is going to show up in your friends' news feed, right? 2:00:56PM**

A Yeah, although I kind of disagree with that. You know, I hit a button that said I liked Tia's Bakery; I didn't say I like Tia's Bakery. There is a difference.

**Q But you have used Facebook a long -- 2:01:09PM since, what, 2007 now, right?**

A Yeah.

**Q So you understand that when you do hit the "Like" button, that's how Facebook is designed? That's what happens, right? 2:01:19PM**

A Yes. 2:01:22PM

**Q And when that does happen and that statement shows up in your Facebook friends' news feeds, that is a way of getting the word out about Tia's Bakery, right? 2:01:38PM**

A In news feeds, absolutely.

**Q Then to the extent that that "Like" statement, that story in your friends' news feed, was to get sponsored by Tia's Bakery and would then show up as a sponsored story on the right-hand side 2:01:56PM of the screen, that would further enhance the visibility --**

A Well, Tia's Bakery is a client of mine, so that's maybe not a great example.

But let's say Tia's Bakery was not a 2:02:06PM client of mine, what -- what benefit do I get from that sponsored story?

**Q Let's stick with --**

**Let's stick with the hypothetical of Tia's Bakery for a second. 2:02:18PM**

A Oh, okay.

**Q So you "Like" the --**

**Well, actually, this part is not a hypothetical, right? You said that you have "Liked" -- 2:02:26PM**

A I'm pretty sure I have "Liked" Tia's 2:02:26PM Bakery, yeah.

**Q And so my question is: If Tia's Bakery were to -- were to have a sponsored story campaign and were to pay in order to have stories about its 2:02:39PM own business sponsored and have the visibility of those stories boosted, that does, in fact, increase the visibility of that company, correct?**

A It does, but Tia's Bakery is paying me to increase their visibility. There are many sponsored 2:02:59PM stories about -- or at least there are at least four sponsored stories that I've been in where those companies, organizations, are not paying me to increase their visibility.

**Q But in the hypothetical where Tia's Bakery 2:03:11PM pays to have sponsored stories, that payment is from Tia's Bakery to Facebook, not from Tia's Bakery to you, right?**

A Right. But as their publicist, if I do a "Like" and that results in a sponsored story, that's 2:03:29PM a good example of me doing my job.

I mean, a lot of PR is -- especially these days is, you know, echo chamber amplification. So that's a case of because I'm Tia's Bakery's publicist, I "Like" Tia's Bakery. The echo chamber 2:03:45PM



Q Do you understand that sponsored stories only appear to people who are your Facebook friends, that that's the largest audience it could potentially be? 2:09:59PM

A I -- I do understand that.

Q So to the extent that you do appear in a sponsored story, it's only being shown to the people who originally saw that same "Like" statement in their news feeds, correct? 2:10:15PM

A Well, not necessarily. They -- they might not have seen it. It's not -- you know, the news feed stuff is -- is -- is tiny and over here and the ad stuff is big and over here and the -- the news feed stuff moves down really quickly. 2:10:30PM

I mean, I -- I -- as somebody who deals with -- with moving information around, I don't even consider that anything I post is going to go into anybody else's news feed, because it's that insignificant to what I do. 2:10:50PM

And -- and most people -- I mean, NextAid is a great example. I mean, Lauren is always like, "Well, but if you post it, then doesn't it go in lots of people's news feeds?" I'm like, "Barely," you know. 2:11:08PM 2:11:11PM

It -- it's not -- it's not a significant -- it's not what I would consider like a placement, like getting an article somewhere. It's not. It's just -- it's -- it's too random and it's too small. 2:11:17PM

Q So even though --

Is it your testimony that even though it's the same "Like" statement and the same name and profile picture that appears in your friends' news feeds, as well as appears in the sponsored story that also appears to those same friends, that there is a harm to you as a result of the appearance in a sponsored story? 2:11:31PM 2:11:53PM

A Well, I disagree with your statement. I don't think it's the same and, yes, I do think there is harm.

Q Okay. 2:12:03PM

MR. ARNS: Do you want to describe the harms?

THE WITNESS: Oh, yeah.

And the harms are I'm not getting compensated and there might be situations where I am getting taken out of the running for potential business because of whose page it's shown up on, since I have no control over where it shows up. 2:12:12PM 2:12:20PM

MR. BROWN: Bear with me as I look over my notes. You have to trust me on this that even though there is some pauses here, it actually ends up making the whole deposition shorter if I can exercise some judgment about what lines of questioning I'm asking. 2:12:59PM

So mark this as 1019. 2:13:23PM

(Defendants' Exhibit 1019 marked for identification.)

BY MR. BROWN:

**"Like" button on Facebook even after learning that clicking on the "Like" button can result in sponsored stories appearing to your friends?** **2:24:26PM**

A Yes.

**Q And just to be clear -- it probably went without saying in that question -- but you've continued to click on the "Like" button knowing that your name and profile picture would appear in the sponsored story that's shown to your friends?** **2:24:49PM**

MR. ARNS: Object; calls for speculation. She doesn't know if an advertiser has paid for a sponsored story or any product. Nobody ever knows but you. 2:25:03PM

BY MR. BROWN:

**Q You can answer.** **2:25:17PM**

A It's only been in the last week that I was informed by my lawyers that --

MR. ARNS: What -- by your lawyers?

THE WITNESS: By my lawyers, you guys.

MR. ARNS: Yes. Object; attorney/client privilege. 2:25:28PM

THE WITNESS: Yeah, yeah, yeah. It's -- it's only been the last week that I've been informed by my lawyers the volume of -- of times that I've appeared in the sponsored stories. So it's only -- 2:25:37PM

I -- I didn't really understand the extent of it until very recently. 2:25:41PM

BY MR. BROWN:

**Q All right.**

**But you continue to click on the "Like" button on Facebook even after knowing that by clicking on the "Like" button, it could be the case that your name and profile picture would appear in a sponsored story to your friends?** **2:25:47PM**

A I'm a communications professional and in certain situations, like all the artists on the Angel City Jazz Festival or prominent articles, it's really necessary for my -- for my profession that I appear, you know, up to date in what's going on and, you know, in the -- in the mode of communications in our culture, and also, for the Angel City Jazz Festival, specifically needed to "Like" those pages. 2:26:05PM 2:26:28PM

So, yes, I did continue to "Like" those pages, but it's part of -- it's part of my professional job to do so. 2:26:49PM

**Q But is the answer to my question that I asked "yes"?**

A Yes.

**Q Okay. So let's turn to just another subject.** **2:27:14PM**

MR. ARNS: I'm sorry for interrupting. I'm going to go in the other room for a second. No need to go off calendar -- off the record. It's all right to go in that room? 2:27:15PM

MR. BROWN: Yes. 2:27:32PM

BY MR. BROWN:

**Q So again, with respect to UNICEF, so your understanding is that your name and profile picture appeared in the sponsored story for UNICEF? Is that your understanding?** **2:28:12PM**

A Yes.

**Q And if that is true, in what way were you harmed by that, if any?**

A I wasn't compensated for my name and my likeness being used. I wasn't asked if I wanted my name to be used in -- in that story, because if I had been asked I would have said no. 2:28:30PM

Because I want -- when -- when -- when my image is appearing with charities, I want those charities to be NextAid and Wells Bring Hope. 2:28:50PM

And, you know, highly unlikely, but if somebody hated UNICEF, they could possibly have decided not to hire me based on that I "Liked" UNICEF.

**Q Realistically speaking, do you think that** **2:29:07PM**

**there is anyone out there that --** **2:29:08PM**

A Only somebody who is very mean.

**Q Let me just finish the question.**

A Sorry.

**Q I mean, I know what your answer is going to be, but let me just ask the question.** **2:29:17PM**

**Do you know of anyone out there that affirmatively hates UNICEF, though?**

A I --

MR. JAFFE: Objection; calls -- 2:29:27PM

THE WITNESS: I don't know anybody who hates UNICEF --

BY MR. BROWN:

**Q So, I mean --**

A -- that I know of. 2:29:31PM

**Q Okay.**

**But would you agree that --**

**Would you agree that it's highly unlikely for any of your friends on Facebook to actually think less of you because you appeared in a sponsored story supporting UNICEF?** **2:29:42PM**

A It is possible that my fellow NextAid board members or Wells Bring Hope compatriots who don't understand sponsored stories and how they -- how they work and how they come to be might wonder 2:30:09PM

"Q If you had friends who wanted to sing the praises of NextAid because they think it's a great organization and support what they do and, therefore, 'like' NextAid on Facebook, do you think NextAid should pay each one of those individuals who 'likes' NextAid?") 9:40:44AM 9:40:44AM

THE WITNESS: Yeah, I -- I -- I agree with him, it's a hypothetical and it's not -- it's not a good hypothetical. It's a -- it's a -- it's a hypothetical that wouldn't happen. 2:54:43PM

I mean, A, NextAid is not buying Facebook ads, and B, we have lots of people who -- who are genuinely celebrities in a certain circle and they support NextAid out of the goodness of their heart because it's a charity. 2:54:53PM

I -- I -- I would love to know what the other three -- the other three sponsored stories I was -- I was in were, because I don't -- I mean, because that's more the -- the meat of the issue is not the -- the charities, it's the commercial operations. 2:55:07PM

BY MR. BROWN: 2:55:26PM

**Q So speaking of the other three organizations that you believe had sponsored stories running that you appeared in --**

A Uh-huh. 2:55:39PM

**Q -- is there any way for us to know what those are other than just talking to your lawyers?**

A You can ask Facebook.

**Q Well, I mean, is there anything you could do to figure out what those other three are? 2:55:50PM**

A Not that I know of. Just problematic.

MR. JAFFE: Facebook has that information. We don't have it.

BY MR. BROWN:

**Q I thought earlier you told me that your understanding was that there -- you appeared in sponsored stories for three other organizations or companies other than UNICEF. 2:56:09PM**

**Is that correct?**

A That is -- that is my understanding from talking to my lawyers, yes. 2:56:25PM

MR. JAFFE: Mr. Brown, we have ad IDs, but we don't have any information from Facebook as to what the ad ID matches in terms of the advertiser. So we don't actually have that information. 2:56:37PM

We do know that she's appeared in four different ads from discovery we've received. 2:56:39PM

MR. BROWN: Just give me a moment to take a look at my notes.

MR. JAFFE: May I make a correction to that? 2:57:16PM

MR. BROWN: Yes.

MR. JAFFE: It's actually 11 ads. It's 11 ads.

THE WITNESS: Wow. 2:57:22PM

MR. ARNS: One of the things is that the member doesn't know because they don't go to their page.

THE WITNESS: Or they don't ask them if they can do that. 2:57:33PM

BY MR. BROWN:

**Q Do you believe that the value of your name or likeness was lessened at all by your appearance in sponsored stories?**

A Depends what the sponsored story was for -- 2:57:59PM

**Q So I take it, then --**

A -- and depends who was reading that sponsored story.

**Q So with respect to what you believe was a 2:58:10PM**

**sponsored story for UNICEF that contained your name or profile picture, do you believe that your name or likeness was lessened -- the value of the name and profile picture was lessened in any way by your appearance in that sponsored story? 2:58:12PM 2:58:28PM**

A Probably not.

**Q And with respect to any other sponsored stories beyond UNICEF, you just really don't have any way of knowing right now because you don't know what those other organizations are, correct? 2:58:39PM**

A Yes.

MR. ARNS: And that's one of the problems, not knowing.

THE WITNESS: Yes, that's -- that's a huge part of the problem. 2:58:45PM

BY MR. BROWN:

**Q Have you read the current terms of use on the Facebook website?**

A No.

**Q Do you recall reading the terms of use on the Facebook website at any earlier time? 2:59:19PM**

A No.

**Q So your recollection, sitting here today, is that you have never once looked at the Facebook terms of use the entire time you have been a 2:59:34PM**

**registered member?** **2:59:36PM**
A There is a chance that I might have looked at them very, very, very, very early on and not in any kind of meaningful way and certainly not read them all the way through. 2:59:50PM
**Q So in considering whether to be a named Plaintiff in this lawsuit, you never read the terms of use on the website?**
MR. ARNS: Okay. Wait a minute. Object; argumentative, asked and answered. 3:00:11PM
MR. BROWN: I've not asked and answered that question.
MR. ARNS: She's already said she didn't read them. You're saying, "So in preparation for this lawsuit, you didn't read them?" It's 3:00:20PM argumentative. She said she hasn't read them --
MR. BROWN: Well, let me just --
MR. ARNS: -- in any context.
MR. BROWN: Well, let me just make sure I've got the testimony clear. 3:00:28PM
BY MR. BROWN:
**Q So in preparing to be -- well, strike that.**
**Before the complaint was filed in this lawsuit, did you read the terms of use on the** **3:00:37PM**

Page 162

**Facebook website?** **3:00:41PM**
A No.
MR. ARNS: Yeah. The point is there may have been discussions, attorney/client-privileged discussions. There were attorney/client-privileged 3:00:49PM discussions. That does not mean that Ms. Mainzer is not fully briefed on all the issues that are of importance.
And if I could just make this comment: There can never be a better class representative 3:01:07PM than Ms. Mainzer.
THE WITNESS: Thank you.
BY MR. BROWN:
**Q Do you recall at the time that you registered for Facebook, in order to complete the** **3:01:19PM** **registration, you had to take some action acknowledging that you had read and agreed to abide by the Facebook terms?**
A I don't specifically remember, but I can imagine, based on other situations where -- that are 3:01:31PM similar, you have to check a box. I'm sure I just checked that box.
**Q And assuming that that was true, that there was -- had to be some acknowledgement that you had read and agreed to abide by the terms as a** **3:01:48PM**

Page 163

**condition of registering and you took that action** **3:01:53PM** **acknowledging that, that would have been true, correct?**
A Yes --
MR. ARNS: Object -- 3:02:05PM
THE WITNESS: -- I think.
MR. ARNS: Object; vague as to what is --
THE WITNESS: Yeah.
MR. ARNS: -- true.
THE WITNESS: I'm so confused. 3:02:08PM
BY MR. BROWN:
**Q Okay. I'll ask it again.**
A Yeah.
**Q So I want you to assume that there was some process in place where you had to acknowledge** **3:02:17PM** **that you had read and agreed to abide by the terms that were applicable to the website, okay?**
MR. ARNS: That's the hypothetical question, okay?
THE WITNESS: Okay. 3:02:29PM
MR. ARNS: That's the hypothetical that --
THE WITNESS: Assume there was --
MR. ARNS: Yeah.
THE WITNESS: Assume there was something I -- so I'm to assume that there was something that 3:02:38PM

Page 164

I had to -- some action I had to take, such as 3:02:41PM checking off a box, in order to register for Facebook and if -- and if -- under the assumption that there was such an action, did I do so? Yes, because otherwise I couldn't have registered. 3:02:55PM
MR. ARNS: Well --
BY MR. BROWN:
**Q And if you took some action that said, "I've read and agree to abide by the terms of use for this website," that would have been a true** **3:03:08PM** **statement by you, correct?**
MR. ARNS: Well, excuse me. Object; that's lack of foundation. It's also an inadequate hypothetical.
We have an expert witness that states 3:03:24PM nobody understands your terms and conditions or statements of rights and responsibility because they are intentionally complex, so people don't understand what they are agreeing to.
MR. BROWN: You can make that objection if 3:03:36PM you want, but --
MR. ARNS: I did.
MR. BROWN: That's fine.
BY MR. BROWN:
**Q So the answer is?** **3:03:42PM**

Page 165

MR. ARNS: Do you understand the question? 3:03:44PM
Do you want to have it read back? I do.
THE WITNESS: Yes.
MR. ARNS: If you would be kind enough to read it back. 3:03:51PM
(Record read as follows:
"Q And if you took some action that said, 'I've read and agree to abide by the terms of use for this website,' that 9:40:44AM would have been a true statement by you, correct?")
THE WITNESS: Oh, I see. So --
MR. ARNS: Yeah. Can you answer that?
MR. BROWN: Well, you have made your 3:04:20PM objection; now let's see if she can answer it, as opposed to suggesting that somehow she can't.
MR. ARNS: Well, I think what it is is a --
MR. BROWN: You know, Bob, we don't need 3:04:26PM to --
THE WITNESS: You know what, it was four years ago and -- over four years ago and I don't remember.

BY MR. BROWN: 3:04:34PM
**Q But what I'm asking is -- let me just try to set it up again.**
**So I want you to assume that in order to complete the registration process for Facebook -- 3:04:50PM**
THE WITNESS: It's a party.
MR. BROWN: Withdraw that question.
This may very well be the noisiest conference room to have a deposition in in the entire world. 3:05:04PM
MR. ARNS: It's just a group of happy people.
MR. BROWN: All right. Let's keep on going, but if that persists I'll have to go find out what's going on. 3:05:13PM
BY MR. BROWN:
**Q So let's assume that at the time that you registered, that you had to do something that acknowledged that you had read and agreed to abide by the terms of use for the Facebook website, okay? 3:05:28PM**
A (Nods head.) Okay.
**Q If you took whatever action was necessary to make that acknowledgement, I take it that when you took that action you were representing that you had, in fact, read and agreed to abide by the terms, 3:05:45PM**

**correct? 3:05:48PM**
MR. ARNS: Object; lack of foundation, calls for speculation. We have an expert that says nobody does that.
BY MR. BROWN: 3:05:56PM
**Q So you still need to answer the question.**
A Yeah, I am a -- I am a -- I'm -- I, like many, many, many -- possibly everyone else who is not a lawyer, will check the box that says, "Yes, I read the terms of service" to register for a website 3:06:14PM such as Facebook when asked to read -- to check such a box, even if I haven't read the terms of service and agreed to them -- and understood them, like everybody else in the world, including the birthday party next door. 3:06:35PM
MR. ARNS: This may be the last part, so...
MR. BROWN: I will tell you one thing. At this moment, I really don't want to be the one to walk into that room. 3:06:45PM
MR. ARNS: Everybody shut up.
MR. BROWN: "Can you guys just keep it down? Stop the celebration. Too much fun."
THE WITNESS: You don't want to be that guy. 3:06:54PM

MR. ARNS: "Happy holidays." It will be 3:06:55PM gone soon.
MR. BROWN: That's great for firm morale, you know?
BY MR. BROWN: 3:07:14PM
**Q And you understand that even if you don't read the terms before you register, but acknowledging the terms as a condition of registering -- well, let me withdraw that. That was going to be a confusing question. 3:07:34PM**
**You understand that even if you didn't read the Facebook terms at the time you registered, that you were still bound by them, correct?**
MR. ARNS: Object; calls for a legal conclusion, lack of foundation, misstates the 3:07:42PM evidence.
Do you know?
THE WITNESS: Yeah, I -- I -- I don't, really. I think that I -- you know, you see those terms and conditions or terms of service or whatever 3:07:55PM all the time and -- and I -- I don't think -- I don't think I or most people really understand what those are and what you're bound to and I don't -- I don't think that -- that stuff is generally understood. I think it's -- I think it's generally 3:08:14PM

**center to learn any information about sponsored stories?** 3:18:08PM
A No.
**Q Have you ever used the help center to try to learn any information about advertisements on Facebook?** 3:18:16PM
A Not that I recall.
**Q Do you know the difference between social ads on Facebook and sponsored stories on Facebook?**
MR. ARNS: Object; lack of foundation. 3:18:36PM
THE WITNESS: I don't. I mean -- well, pursuant to the discussion we've had here today, I know that sponsored stories have somebody's name in them and -- I don't know, everything else is Facebook ads or social? I don't -- I don't know. 3:18:50PM
MR. BROWN: I'm sorry, what was the lack of foundation?
MR. ARNS: Just -- you asked her if she knew the difference. I just said object; lack of foundation. 3:18:59PM
MR. BROWN: So what was the -- I just want to make sure if I need to lay foundation, I do. What foundation did it lack?
MR. ARNS: Well, first of all -- okay. I'll answer that. 3:19:08PM

"Social ads" is a term of art by Facebook. 3:19:19PM "Sponsored stories" is another term of art used by Facebook. Neither of them make any sense whatsoever and nobody knows the difference in those except for Facebook or people who have really drilled down into 3:19:33PM trying to understand this.
We know, for example, social ads are supposed to be ads that are called advertisements, whereas sponsored stories, which we believe are advertisements and everybody else in the world does, 3:19:48PM Facebook says are not advertisements, but they are the best advertisements that Facebook has and people have to pay -- advertisers have to pay a premium to get them.
How would a Facebook member know the 3:20:01PM difference between that?
MR. BROWN: All right. So I was just asking not for the -- for a little closing argument, but rather, why my question lacked foundation. So it sounds like to me there is nothing I can say 3:20:13PM that's going to lay a foundation, in your view.
MR. ARNS: That's correct. That's correct.
BY MR. BROWN:
**Q So have you ever heard the term "social** 3:20:19PM

**ad" before?** 3:20:22PM
A Not before, no.
**Q Have you ever heard of the concept of pairing social actions on Facebook with ads?**
A Not in those terms. I mean, we've been 3:20:41PM discussing the whole if you "Like" something you might become a sponsored story, so that sounds like what you're talking about. But otherwise, no.
**Q So sitting here today, you don't have any understanding of the difference between social ads** 3:20:59PM **on Facebook and sponsored stories on Facebook, correct?**
A Well, I do understand that sponsored stories have people, Facebook users, in them and social ads are something else. 3:21:14PM
MR. ARNS: And you have that understanding based on your lawyer's discussion?
THE WITNESS: Yeah, and -- and the -- and being here today.
BY MR. BROWN: 3:21:33PM
**Q Are you aware that you can prevent the appearance of your name and profile picture in sponsored stories?**
A I was not aware of that.
**Q Have you ever taken any steps to try to** 3:21:45PM

**determine whether you can prevent the appearance of** 3:21:47PM **your name or profile picture in sponsored stories?**
A No.
**Q Are you aware that you can prevent your name and --** 3:22:00PM
THE REPORTER: I couldn't hear you. I'm sorry.
MR. BROWN: I told you I would get quieter as the day went on.
BY MR. BROWN: 3:22:03PM
**Q Are you aware that you can prevent the name and profile picture -- your name and profile picture from being paired with ads on Facebook?**
A I was not aware of that.
**Q Are you familiar with the Facebook privacy** 3:22:17PM **settings pages?**
MR. ARNS: Lack of foundation.
Do you know?
THE WITNESS: Well, I'm familiar with the -- the one that -- when you go under "Account 3:22:26PM Settings" on the top right-hand corner and then there is a "Privacy Settings" page there. I've -- I've been on that "Privacy Settings" page.
If there is other ones, I don't know about them. 3:22:37PM

I'm just getting more tea. While I'm 3:23:23PM taking my microphone off, can I go to the ladies' room?

MR. BROWN: Let's go off the record for a minute. 3:23:37PM

THE VIDEOGRAPHER: This is the end of Disk Number 3. The time is 3:23 p.m. and we are now going off the record.

(Recess taken.)

THE VIDEOGRAPHER: This is the beginning 3:23:46PM of Disk Number 4. The time is 3:33 p.m. and we are now going back on the record.

(Defendants' Exhibit 1021 marked for identification.)

BY MR. BROWN: 3:33:11PM

**Q The court reporter has handed you what has been marked as Exhibit 1021. This is a printout of various settings from your account with a printout date of October 6, 2011. This is -- that was produced by your lawyers, Bates Numbers FACEBOOK 517 3:33:30PM to -528.**

**If you'll turn to page -526, and do you see at the top of that page it says "Facebook Ads"?**

A Uh-huh.

**Q And in the second half there, you see 3:34:08PM**

**there is a section that's called "Ads and Friends"? 3:34:10PM**

A Uh-huh.

**Q And then you see that there is a little hyperlink down at the bottom that says: "Edit Social Ads Setting"? 3:34:23PM**

A I see that.

**Q Now, can you turn the page to -527 -- sorry, to -528. Turn another page.**

**So I'll just represent to you that when you click on that hyperlink, this is the page to 3:34:38PM which it takes you.**

**Have you ever seen this page before?**

A No.

**Q Have you ever attempted to change the setting on this page here? 3:34:57PM**

A No.

**Q And are you aware that if you look at the bottom of that page right before the two buttons, you'll see it says: "Pair my socials actions with ads for" -- 3:35:39PM**

A Uh-huh.

**Q -- and then it's partially covered up just because that's the way it printed out, but do you see that it says: "Only my friends"?**

A Uh-huh. I see that. 3:35:45PM

**Q Have you ever tried to change that setting 3:35:48PM so that it says -- so that it says "No one" instead of "Only my friends"?**

A No, I haven't.

So -- so in order to get to that page, I 3:36:02PM would have to go into settings, click "Facebook Ads," click "Edit Social Ads Setting" at the bottom of this page, go -- look at this, and hit "Save Changes" on this to get to this page?

**Q What did you say right before that page? 3:36:33PM**

A The -- the -- the one that's -000527, I would have to -- to hit --

**Q No. You go directly from the hyperlink at the bottom that says "Edit" -- on page -526 --**

A Uh-huh. 3:36:50PM

**Q -- there's a hyperlink that says: "Edit Social Ads Setting."**

A Right. And then that takes me to that last page?

**Q That takes you to the page that's Bates 3:36:57PM numbered -528.**

A So I'd have to go into settings, go to "Facebook Ads," go to "Edit Social Ads," and then it takes me to that page and then change it and then "Save Changes"? 3:37:08PM

**Q And you've never done -- 3:37:09PM**

A I've never done that.

MR. ARNS: Can I ask for clarification? You showed her this Exhibit 1021 right after discussing sponsored stories. Are you now taking 3:37:19PM the position -- you, Facebook -- that sponsored stories are ads?

MR. BROWN: Why would you -- I don't understand how that follows. I'm just asking questions and showing her documents. 3:37:35PM

MR. ARNS: I know, but this -- this documentation she just -- you just showed her, 1021, only has to do with ads, right? Is Facebook now agreeing with our principle that sponsored stories are ads? 3:37:53PM

MR. BROWN: Allow me just to laugh out loud.

So you know what, this is actually a deposition where I get to ask questions of the witness and so I'm just going to decline to engage 3:38:00PM you on that. But...

THE WITNESS: Oh -- oh, so I understand. So this is --

MR. ARNS: Okay. No, no, no. You've already answered everything. 3:38:12PM

THE WITNESS: No. 4:56:25PM

MR. BROWN: I think that -- I think that's it. I don't think I have any further questions, you know, subject to the caveat that I mentioned earlier with respect to the -- with these tweets that are in 4:56:35PM Exhibit 1024.

Okay. We're finished. Off the record.

THE VIDEOGRAPHER: This is the end of the deposition. The time is 4:56 p.m. and we are off the record. 4:56:55PM

(Time noted: 4:56 p.m.)

STATE OF CALIFORNIA )
) :ss
COUNTY OF SAN FRANCISCO )

I, KELLI COMBS, CSR NO. 7705, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that the verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:January 9, 2012

______________________________

KELLI COMBS, CSR NO. 7705

I N D E X

December 20, 2011

SUSAN MAINZER

| EXAMINATION | PAGE |
|---|---|
| (BY MR. BROWN) | 5 |

| QUESTIONS NOT ANSWERED: | PAGE | LINE |
|---|---|---|
| | 25 | 3 |
| | 27 | 1 |
| | 27 | 19 |
| | 28 | 12 |
| | 205 | 20 |

I N D E X

EXHIBITS FOR IDENTIFICATION

| DEFENDANTS' | PAGE |
|---|---|
| Exhibit 1015 Printout of Facebook profile page as of October 6th, 2011 | 49 |
| Exhibit 1016 Printout of Facebook profile page as of October 13th, 2011 | 49 |
| Exhibit 1017 Facebook profile pictures of Ms. Mainzer | 96 |
| Exhibit 1018 Document bearing Bates Numbers FACEBOOK 002842, -4862, -2849, -4865, -2854, -4868, -2858, -2860, -2873, and -2975 | 104 |
| Exhibit 1019 Document bearing Bates Numbers FACEBOOK 002931, -4933, and -4935 | 132 |
| Exhibit 1020 Document bearing Bates Numbers FACEBOOK 000874 through -876 | 145 |
| Exhibit 1021 Printout of account settings dated October 6th, 2011, bearing Bates Numbers FACEBOOK 000517 through -528 | 182 |
| Exhibit 1022 Document bearing Bates Numbers FACEBOOK 000852 through -855 | 187 |
| Exhibit 1023 Plaintiff Susan Mainzer's Responses to Defendant's Interrogatories, Set One | 201 |

I N D E X

EXHIBITS FOR IDENTIFICATION

| DEFENDANTS' | | PAGE |
|---|---|---|
| Exhibit 1024 | Document containing tweets bearing Bates Numbers FACEBOOK 005110 through -181 | 214 |

EXHIBITS PREVIOUSLY MARKED

| NUMBER | PAGE |
|---|---|
| 1001 | 83 |

* * * *