ELECTRONIC PRIVACY INFORMATION CENTER

# epic.org

FILED
JUL X 2 2012
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

July 11, 2012

Clerk of the United States District Court for the Northern District of California
San Jose Courthouse, Courtroom 8 - 4th Floor
280 South 1st Street
San Jose, C.A. 95113

1718 Connecticut Ave NW

Suite 200

Washington DC 20009

USA

+1 202 483 1140 [tel]

+1 202 483 1248 [fax]

www.epic.org

Attention: The Honorable Lucy H. Koh

FILED
AUG X 2 2012
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Re:   **Fraley v. Facebook Proposed Settlement, No. 11-01726**

Dear Judge Koh:

The signatories of this letter are privacy, consumer protection, and academic organizations who oppose the Proposed Settlement in *Fraley v. Facebook*, No. 11-01726, as the omission of these organizations from the proposed *cy pres* recipients is contrary to the interests of the class members.[1]

In the Proposed Preliminary Settlement, the parties have set aside $10 million to be paid in *cy pres*.[2] The parties have designated several fine organizations for distribution, but hardly any of these groups has actually represented the members of this class in matters concerning privacy protection. Nor have these organizations participated in efforts to protect the statutory rights at issue in this case. This letter explains why such a result is neither fair to class members nor appropriate in this matter. We recommend that the court either reapportion the settlement funds or establish formal criteria, as other courts have done in similar matters, to ensure that the funds distributed are aligned with the interests of the class members.

I.      The *Cy Pres* Doctrine

The doctrine of *cy pres* "allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the "next best" class of beneficiaries."[3] The Ninth Circuit considers two guiding standards when approving the

---

[1] Plaintiff's Motion for Preliminary Approval of Class Action Settlement, Fraley v. Facebook, No. 11-01726, Dkt. No. 181 (9th Cir. filed Apr. 8, 2011) [hereinafter "Proposed Settlement"]. Several of these organizations have also expressed concern about the fairness of the settlement for class members as failing to provide adequate relief. With regard to the prospect that this settlement may be approved as it currently stands, the objecting organizations maintain their view that if there is to be a *cy pres* distribution, the distribution should be as proposed in this letter. To approve a settlement that provides little benefit to the class and to then distribute *cy pres* funds to organizations that do not represent class members would be to penalize doubly the class members upon which this settlement is based.

[2] *Id.* at 17.

[3] *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011).

award of *cy pres* funds: (1) the objectives of the underlying statute and (2) the interests of the silent class members.[4] The *cy pres* funds must be used "for the aggregate, indirect, prospective benefit of the class."[5] Although the overarching standard by which a judge should review a settlement is whether the settlement is fair, reasonable and adequate, "where *cy pres* is considered, it will be rejected when the proposed distribution fails to provide the 'next best' distribution."[6]

As currently proposed, the *cy pres* settlement fails to meet this standard.

II.      Excluded Organizations that Represent the Silent Class Members

In this case, plaintiff class has brought a complaint against Facebook for a variety of privacy related matters, including for statutory violations connected to Facebook's use of its users' names, photographs, likenesses, and identities for a commercial purpose without consent in connection with "Sponsored Stories."[7] Class members include both adults and minors who were the target of the alleged "unfair and deceptive" business practices.[8]

A *cy pres* distribution may be appropriate here because the class is large and because there is only potential for a small individual recovery.[9] All of the objecting organizations have well-established programs focused on Internet privacy. Several run popular privacy web sites, such as. PRIVACY.ORG and PRIVACYRIGHTS.ORG, that routinely provide information to many Internet users about privacy-related matters. However, none of these organizations were designated to receive funds in the Proposed Settlement. Instead, class counsel selected organizations to receive *cy pres* funding that are involved with general matters of Internet policy, and two with consumer protection. These are fine organizations in the abstract but they are inappropriate recipients for a *cy pres* award in this matter and the purposeful exclusion of non-profit organizations actually focused on the protection of privacy of Facebook users is contrary to the interests of class members.

The interests of the class members are best served by supporting those consumer, privacy, and academic organizations that routinely represent class members before federal and state agencies, that seek to establish stronger privacy protections for

---

[4] *See, id.* at 1039; *see also Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990).

[5] *Nashchin*, 663 F.3d at 1038.

[6] *See Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003) *overruled on other grounds by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010); *Six (6) Mexican Workers*, 904 F.2d at 1308; *see also* American Law Institute, Principles of the Law of Aggregate Litigation, § 3.07 (2010) ("The court, when feasible, should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class.").

[7] Second Amended Class Action Complaint for Damages, Fraley v. Facebook, No. 11-01726 Dkt. No. 22 (9th Cir. filed Apr. 8, 2011) [hereinafter "Proposed Settlement"].

[8] *Id.* at 2-4.

[9] *See Nachshin*, 663 F.3d 1034.

Letter to Judge Koh                                2                                July 11, 2012
Fraley v. Facebook Settlement

Facebook users, and that provide direct assistance to those who confront privacy problems.

For the reasons set forth below, the excluded organizations best satisfy the relevant factors to determine *cy pres* recipients and should not be excluded from the Proposed Settlement.

(1) Electronic Privacy Information Center

The Electronic Privacy Information Center ("EPIC") is dedicated to focusing public attention on emerging privacy issues. To fulfill that mission, EPIC has long been a defender of the privacy interests of Facebook users. In 2009, EPIC, joined by several other organizations, filed an extensive and detailed complaint with the Federal Trade Commission ("FTC") that was responsible for the subsequent Consent Agreement between the FTC and Facebook.[10] The Consent Agreement required the company to develop a "comprehensive privacy program."[11] As the Chairman of the FTC explained, this is the most significant privacy framework ever adopted by the Commission.[12]

In many other instances, EPIC has led efforts to safeguard the privacy interests of Facebook users. In 2011, EPIC filed a complaint with the FTC concerning Facebook's automated tagging of Facebook users and asked that Facebook suspend its facial recognition program pending a full investigation.[13] EPIC also asked for opt-in consent for the collection of the biometric data used to drive the service.[14] EPIC renewed its request for FTC action in comments filed with the Agency in 2012.[15] EPIC notified the FTC by a letter sent in 2011 of Facebook's practices of tracking the post-log-out Internet activity of its users, in violation of the users' reasonable expectation of privacy and Facebook's own privacy statements.[16] EPIC also urged the FTC in 2011 to determine if changes Facebook made to the profiles of its users were consistent with the terms of the Consent Agreement.[17] Recently, EPIC asked the FTC to review Facebook's decision to change the default email address of Facebook users, a practice that was widely opposed by Facebook

---

[10] *See* Complaint from EPIC to the FTC re: In the Matter of Facebook, Inc., a corporation, http://ftc.gov/os/caselist/0923184/111129facebookcmpt.pdf (2009); *see also* Supplemental Complaint from EPIC to the FTC re: In the Matter of Facebook, Inc., http://epic.org/privacy/inrefacebook/EPIC_Facebook_Supp.pdf (Dec. 17, 2009).

[11] *See* In the Matter of Facebook, Inc., a corporation (FTC File No. 0923184), Federal Trade Commission, http://ftc.gov/os/caselist/0923184/index.shtm (last visited July 3, 2012) [hereinafter "Consent Agreement"].

[12] *Id.*

[13] *See* Complaint from EPIC to the FTC re: In the Matter of Facebook, Inc. and the Facial Identification of Users (June 10, 2011), *available at* http://epic.org/privacy/facebook/EPIC_FB_FR_FTC_Complaint_06_10_11.pdf.

[14] *Id.*

[15] *See* Comments from EPIC to the FTC re: Face Facts: A Forum on Facial Recognition (Jan. 31, 2012), *available at* http://epic.org/privacy/facerecognition/EPIC-Face-Facts-Comments.pdf.

[16] Letter from EPIC to Honorable Jon Leibowitz, Chairman, FTC, *et al.* (Sept. 29, 2011), *available at* http://epic.org/privacy/facebook/EPIC_Facebook_FTC_letter.pdf.

[17] Letter from EPIC to Honorable Jon Leibowitz, Chairman, FTC, *et al.* (Dec. 27, 2011), *available at* http://epic.org/privacy/facebook/Facebook-Timeline-FTC-Ltr-FINAL.pdf.

users.[18] EPIC wrote, "Facebook's willingness to disregard user choice...raise[s] important questions about the company's ability to comply with the terms" of the Consent Agreement.[19]

A Freedom of Information Act ("FOIA") request filed by EPIC with the Government Services Administration in 2009 forced the disclosure of numerous contracts and agreements between the federal government and companies, including Facebook, demonstrating that, despite numerous identified privacy issues, privacy was not addressed in the government partnerships.[20] In 2011, EPIC filed a FOIA lawsuit against the Department of Homeland Security to force disclosure of records that concerned a program to monitor social media profiles.[21]

EPIC has also led numerous public campaigns to protect the privacy interests of Facebook users. In 2007, in response EPIC's objections, Facebook established an opt-in for the Beacon Service, which had raised concerns about the improper appropriation of user's names or likenesses, almost the exact same issue as the one that provides the basis for the settlement in this case.[22] Under Beacon, Facebook users who shopped at third-party websites would have their purchases broadcast to the Facebook network

In 2011, EPIC launched "Know What They Know," a campaign that encouraged Facebook users to request their personal data profiles from Facebook.[23] European users have a right to this information under EU law, but United States law does not have a comparable provision, and Facebook has refused to release the data dossiers.[24] EPIC's website on Facebook Privacy exists as a resource for Facebook users to educate themselves on recent news and studies regarding Facebook, and provides links to other valuable resources.[25]

(2) Center for Digital Democracy

---

[18] Letter from EPIC to the FTC (June 27, 2012), *available at* http://epic.org/privacy/ftc/facebook/EPIC-ltr-to-FTC-re-FB-Email.pdf. *See, e.g.,* Jaikumar Vijayan, "Facebook email change sparks user outcry: Many ask how Facebook could change email addresses without asking permission," Computerworld, June 26, 2012, http://www.techworld.com.au/article/428777/facebook_email_change_sparks_user_outcry/; Nick Bilton, "Like It or Not, Facebook Changes E-Mail Settings," N.Y. Times, June 25, 2012, http://bits.blogs.nytimes.com/2012/06/25/facebook-changes-e-mail-settings-without-user-consent/; http://www.forbes.com/sites/kashmirhill/2012/06/25/facebooks-lame-attempt-to-force-its-email-service-on-you/
[19] *Id.*
[20] *See EPIC Forces Disclosure of Government Contracts with Social Media Companies, Privacy Terms Missing*: EPIC, http://epic.org/2009/08/epic-forces-disclosure-of-gove.html (last visited July 10, 2012).
[21] *See EPIC v. Department of Homeland Security: Media Monitoring*: EPIC, http://epic.org/foia/epic-v-dhs-media-monitoring/ (last visited July 10, 2012).
[22] *See Facebook Privacy*: EPIC (section: Facebook Caves to Privacy Demands, Adopts Limited Opt-In), http://epic.org/privacy/facebook/ (last visited July 10, 2012); *see also* Thoughts on Beacon: the Facebook Blog, https://blog.facebook.com/blog.php?post=7584397130 (Dec. 5, 2007).
[23] *See Congress, #KWTK Presses Facebook to Disclose Secret Profiles*: EPIC, http://epic.org/2011/10/congress-kwtk-presses-facebook.html (last visited July 10, 2012).
[24] *See id. See also* EU Directive 95/46/EC, *available at* http://dataprotection.ie/viewdoc.asp?DocID=93 (last visited July 10, 2012).
[25] Facebook Privacy: EPIC, http://epic.org/privacy/facebook/ (last visited July 3, 2012).

The Center for Digital Democracy ("CDD") has been working to protect the online privacy of U.S. consumers, especially youth, since 1991. For example, it led the effort that resulted in the Congressional passage of the Children's Online Privacy Protection Act (COPPA) in 1998. CDD has actively worked to protect the privacy of Facebook users since 2007, when the social network began online marketing practices (such as "Beacon") that failed to ensure users could control their data.

CDD follows developments at Facebook closely, providing information to policymakers, press, and nonprofit groups about the impact of these practices on privacy and consumer protection (such as Sponsored Stories, Timeline, and GraphRank). Its research on Facebook's third-party data use practices led to regulatory action in the U.S. and Canada. It has filed complaints about Facebook's practices at the FTC, leading to that agency's Consent Decree requiring the company to review its privacy practices and undergo related independent audits for 20 years.

CDD has filed other complaints and issue reports focused on Facebook and its role in marketing pharmaceutical, health, and alcoholic beverages. It has also been on the forefront of efforts to ensure that both the privacy and public health of children and adolescents are protected on the Facebook platform. CDD's ongoing research and analysis about Facebook's data practices enables it to serve as an "early warning system" to the public about new and emerging concerns.

## (3) Institute for Public Representation, Georgetown University Law Center

The Institute for Public Representation (IPR) is a public interest law firm and clinical education program at Georgetown Law. IPR has advised and provided legal representation to non-profit organizations working to protect the privacy of children and teens since the mid-1990s. In 1997, IPR brought attention to threats to children's privacy by filing a complaint with the Federal Trade Commission (FTC) concerning a website's collection of children's personal information. The FTC action's on this complaint was one of the major factors leading to the passage of the Child Online Privacy Protection Act of 1998 (COPPA).

IPR was involved in drafting COPPA, as well as the FTC's rulemaking implementing COPPA, and in reviewing and commenting on applications for safe harbor programs. In 2010, IPR drafted comments filed on behalf of a broad coalition of child, health, and consumer advocates in the FTC's COPPA rule review. IPR also drafted comments filed with the FTC and Commerce Department regarding their proposed privacy frameworks. IPR has also filed complaints with the FTC regard COPPA violations. Given the recent reports that Facebook is exploring ways to let children aged 13 and under use Facebook, IPR would like to participate in the process to ensure Facebook implements adequate safeguards for children.

## (4) Privacy Rights Clearinghouse

The Privacy Rights Clearinghouse (PRC) has a two-part mission: education and advocacy. It represents members of the class in its every-day endeavors in troubleshooting consumers' questions and complaints. Individuals, including Facebook users, contact the PRC via the Online Complaint Center as well as by phone. Many individuals' questions and complaints revolve around Internet privacy and safety.

The PRC has developed a large website that contains numerous educational guides on Internet-related topics, located at www.privacyrights.org. Topics include social media, online commerce, security breaches, electronic medical records, safe smartphone use, and identity theft. The PRC's guides provide information on legal protection individuals have, and often more appropriately, do not have. They also provide practical tips as well as resources for further information.

The PRC works with a loose coalition of California advocacy groups to support worthy legislation in the California Legislature and oppose bills that are not in consumers' best interests. Each year, in the late fall after the legislative session has ended, the PRC hosts a meeting of California advocacy groups in Sacramento to discuss the gains and losses of the just-ended session and discuss issues and strategies for the upcoming year. Internet privacy topics and legislation are a major theme in our discussions. The PRC has also submitted comments regarding Internet-privacy matters to the Federal Trade Commission, the U.S. Department of Commerce, and the U.S. Department of Health and Human Services.

IV. Establishing Objective Criterion

In other similar matters, courts have asked parties to set up an objective application process that provides a basis to select *cy pres* recipients to ensure that the interests of the class are served and to protect against conflicts of interest. For example, In *in re Google Buzz Privacy Litigation* the court established a formal application process and asked each organization to provide detailed information that would justify the *cy pres* award.[26]

In *in re Google Buzz Privacy Litigation*, the parties initially proposed that Google would identity recipients of *cy pres* funds and the final recipients would be selected through a determination of counsel.[27] Judge Ware found that this process "lacked specificity and oversight required to provide a reasonable benefit to the Class."[28] Instead, the Court ordered the parties to "nominate the cy pres recipients" based on the following criteria::

    (i)    The organization's name and address;

---

[26] Order re. Nomination Process for *Cy Pres* Recipients, In re Google Buzz Privacy Litigation, 2011 WL 7460099 (No. 10-00672 JW) (N.D. Cal. entered Feb. 16, 2011) at 2.
[27] Notice of Motion and Memorandum in Support of Motion for Order Granting Final Approval of Class Settlement, Certifying Settlement Class, and Appointing Class Representatives and Class Counsel, In re Google Buzz Privacy Litigation, 2011 WL 7460099 (No. 10-00672 JW) (N.D. Cal. entered Feb. 16, 2011) at 6.
[28] Order re. Nomination Process for *Cy Pres* Recipients, *supra* n. 26 at 1.

(ii)     A description of an established program currently undertaking policy or education efforts directed specifically at Internet privacy;

(iii)    The number of years that the program has been established and focused on Internet privacy;

(iv)     A short statement as to how the particular program will benefit the Class;

(v)      The annual operating budget of the organization as a whole and the specific Internet privacy or education program; and

(vi)     The amount received, if any, in contributions from Google, Inc. in 2010, independent of the Settlement.[29]

The court made explicit its concern that absent such procedures, worthwhile recipients could be improperly excluded.[30] In the May 31, 2011 order granting final approval of the settlement, the Court acknowledged objections to the proposed *cy pres* distribution of counsel and set out a "few necessary modifications" to ensure that "the nominations list adequately represents the interests of the class . . . ."[31]

More recently, in *In re Netflix Privacy Litigation*, the parties have proposed a settlement agreement that includes an objective nomination process. The application process requests certain detailed information from potential recipients, including:

(i)      The organization's name and address;

(ii)     A description of an established program currently undertaking policy or education efforts directed specifically at issues of technology, law, and privacy;

(iii)    A short statement describing how the program benefits the Class;

(iv)     The overall annual operating budget of the organization and of the specific program;

(v)      The total amount of the cy pres distribution sought;

(vi)     Disclosure of any connections, monetary or otherwise, between the organizations and the parties;

(vii)    Disclosure of any connections, monetary or otherwise, between the organization and Class Counsel and Supporting Counsel; and

(viii)   Disclosure of the amount received, if any, in contributions from the Parties or their counsel in 2011.[32]

This Court should adopt an approach similar to that set out in the two cases above and require the parties to establish an objective application process for organizations to request *cy pres* funding under the Proposed Settlement. This is would help ensure that the

---

[29] *Id.* at 2.

[30] *See, id.*

[31] Order Granting Final Approval of Class Action Settlement; Approval of *Cy Pres* Awards; and Awarding Attorney Fees, In re Google Buzz Privacy Litigation, 2011 WL 7460099 (No. 10-00672 JW) (N.D. Cal. entered Mar. 31, 2011) at 2, *available at*

http://epic.org/privacy/ftc/googlebuzz/EPIC_Google_Buzz_Settlement.pdf [hereinafter "Google Buzz Order"]

[32] Class Action Settlement Agreement, In re Netflix Privacy Litigation (No. 11-00379 entered May 25, 2012) at 13-14.

Letter to Judge Koh                           7                           July 11, 2012
Fraley v. Facebook Settlement

settlement is fair, reasonable, and accurate, and that it provides the "'next best' distribution."[33]

The risk of improper exclusion of an appropriate *cy pres* recipient is very real. In the Google Buzz matter discussed above, Judge Ware revised the proposed settlement to ensure that EPIC received part of the settlement fund.[34] Judge Ware said that "the Court does not find good cause to exclude EPIC from the list of recipients of the *cy pres* funds. EPIC has demonstrated that it is a well-established and respected organization within the field of internet privacy and that it has sufficiently outlined how the *cy pres* funding will be used to further the interests of the class."[35]

## V. Conclusion

In the absence of a direct award to class members in this matter, it is critical that a *cy pres* distribution be aligned with the interests of the class. We ask you to consider the important work of our organizations in your assessment of the Proposed Settlement and the need for objective criteria, based on the relevant caselaw, to protect the interests of the class members.

Sincerely,

/s/
Marc Rotenberg
Electronic Privacy Information Center (EPIC)

/s/
Jeff Chester
Center for Digital Democracy (CDD)

/s/
Beth Givens
Privacy Rights Clearinghouse (PRC)

/s/
Prof. Angela Campbell
Institute for Public Representation
Georgetown University Law Center

---

[33] *See Molski*, 318 F.3d at 953; *Six (6) Mexican Workers*, 904 F.2d at 1308; *see also* American Law Institute, Principles of the Law of Aggregate Litigation, § 3.07 (2010) ("The court, when feasible, should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class.").
[34] Google Buzz Order, *supra* n. 31 at 2
[35] *Id.*