ELECTRONIC PRIVACY INFORMATION CENTER

# epic.org

July 12, 2012

Clerk of the United States District Court for the Northern District of California
San Jose Division
San Jose Courthouse, Courtroom 8 - 4th Floor
280 South 1st Street
San Jose, C.A. 95113

Attention: The Honorable Lucy H. Koh

**Re:** **Fraley v. Facebook proposed settlement, No. 11-01726**

FILED
AUG X 2 2012
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1718 Connecticut Ave NW
Suite 200
Washington DC 20009
USA
+1 202 483 1140 [tel]
+1 202 483 1248 [fax]
www.epic.org

Dear Judge Koh:

The Electronic Privacy Information Center ("EPIC"), a leading consumer privacy organization, opposes the Proposed Settlement in this matter on the grounds that it provides inadequate injunctive relief to the class members.[1] EPIC urges you to modify the Proposed Settlement to require that Facebook obtain the affirmative consent of users before featuring them in Sponsored Stories.

The privacy issues in this case are substantial. Individuals have a strong interest in controlling the use and dissemination of their image. A fundamental understanding of the right of privacy is the ability of individuals to decide for themselves when and how to disclose their actual identity to others. Furthermore, the first judicially-recognized cause of action for invasion of privacy involved the commercial appropriation of an individual's identity.[2]

## I.  Facebook Has Engaged in Similar Activity in the Past

Facebook's advertising strategies have consistently threatened the ability of consumers to control their image. Before Sponsored Stories, Facebook experimented with various methods of creating the impression that Facebook users endorsed the specific products and services of Facebook's business partners regardless of whether that was true. Facebook has always employed these methods without the explicit consent of Facebook users. In 2007, Facebook introduced "Social Ads," which displayed messages that included a user's interaction with a

---

[1] EPIC has a long history of advocating for the privacy rights of Facebook users.*See, e.g.,* EPIC Complaint, The Federal Trade Commission, In re Facebook and the Facial Identification of Users (June 11, 2011), http://epic.org/privacy/facebook/EPIC_FB_FR_FTC_Complaint_06_10_11.pdf; "EPIC Submits Comments on FTC Facebook Privacy Settlement," (Dec. 28, 2011), "EPIC Sues DHS Over Covert Surveillance of Facebook and Twitter," (Dec. 20, 2011), "EPIC Launches Campaign Urging Public Comment on Facebook Privacy Settlement," Dec. 13, 2011, "EPIC to Urge Congress to Strengthen Privacy Laws for Facebook Users," (July 18, 2010), "EPIC, Privacy Groups Recommend Further Changes for Facebook,"(June 16, 2010). "EPIC Urges Privacy Protections for Government's Use of Social Media," (June 3, 2009), "On Eve of EPIC Trade Commission Complaint, Facebook Backs Down on Revised Terms of Service," (Feb. 19, 2009), http://epic.org/privacy/socialnet/default.html.
[2] *Pavesich v New England Life Ins. Co.*, 50 S.E. 68, 68 (Ga. 1905).

EPIC Letter                                    1                        The Honorable Lucy H. Koh
*Fraley v. Facebook proposed settlement*                                          July 12, 2012

business's page, text provided by the advertiser, and the user's name and profile picture.[3] Users were typically not aware that their name and profile picture were used in this way and clearly had not given consent. EPIC was the first organization to call attention to this problem.[4]

Facebook Beacon, also introduced in 2007, was an advertising program that disclosed, through Facebook, information about consumer's commercial activity on third party websites such as Overstock.com, Ebay, or Blockbuster.[5] Facebook promised advertisers that all they need to do was "[a]dd 3 lines of code and reach millions of users."[6] Unlike with Sponsored Stories, Facebook initially experimented with various opt-out mechanisms for Beacon. Users were first shown a brief, time-limited alert which gave them the ability to opt-out of messages on an individual basis.[7] Partly in response to objections from EPIC, Facebook then added two additional controls.[8] First, users were asked to affirmatively opt-in before a new site sent messages to their friends.[9] Second Facebook allowed users to globally opt-out of Beacon, preventing all message publication.[10] Despite the addition of these two controls, a security researcher found that Beacon transmitted information from all users of third party websites to Facebook, whether they were Facebook members, members who had opted out of Beacon ads, or members who had never been Facebook members.[11]

Beacon produced class-action lawsuits against Facebook and against Blockbuster, a Facebook business partner that disclosed consumers' video rental information through Beacon. In 2009, EPIC filed an *amicus curiae* brief before the Fifth Circuit Court of Appeals supporting strong privacy safeguards for consumers' video rental data, and urging the court to enforce the Video Privacy Protection Act's protections for Facebook users who rented videos from Blockbuster.[12] In 2010, EPIC wrote to another judge in this district, urging him to reject a proposed settlement in *Lane v. Facebook*[13] that would have deprived Facebook users of remedies under the video privacy law.[14] EPIC urged the Court to reject a settlement that would have resulted in no direct compensation for users, despite the law's $2,500 statutory damages provision. EPIC also observed that the settlement would have deprived users of meaningful privacy protections by directing all settlement funds to a Facebook-controlled entity. Although

---

[3] *Facebook Privacy*, EPIC, https://epic.org/privacy/facebook/ (last visited Jul. 11, 2012).
[4] Heather Havenstein, *New Facebook Ad Techniques Raise Privacy Concerns*, PC WORLD (Nov. 10, 2007), http://www.pcworld.com/article/139494/new_facebook_ad_techniques_raise_privacy_concerns.html ("Marc Rotenberg, executive director of the Electronic Privacy Information Center in Washington said that the New York law was intended to ensure that a person's name or likeness would not be used to endorse a product without their consent.").
[5] https://epic.org/amicus/blockbuster/default.html
[6] *See Facebook Privacy*, EPIC, https://epic.org/privacy/facebook/ (last visited Jul. 11, 2012).
[7] *Id.*
[8] *See Facebook Privacy*, EPIC, (section: Facebook Caves to Privacy Demands, Adopts Limited Opt-In), http://epic.org/privacy/facebook/ (last visited Jul. 10, 2012);
[9] *Id.*
[10] *Id.*
[11] *See id.*
[12] *Harris v. Blockbuster*, No. 09-10420 (5th Cir. Nov. 3, 2009) *available at* http://epic.org/amicus/blockbuster/Blockbuster_amicus.pdf.
[13] No. 08-03845 (N.D. Cal. filed August 12, 2008).
[14] Letter from the Elec. Privacy Info. Ctr. to The Honorable Richard G. Seeborg re: *Lane v. Facebook*, proposed settlement, Jan. 15, 2010, *available at* http://epic.org/privacy/facebook/EPIC_Beacon_Letter.pdf.

EPIC Letter                2              The Honorable Lucy H. Koh
*Fraley v. Facebook proposed settlement*           July 12, 2012

flawed, the proposed settlement in *Lane* required that Facebook terminate the offending program, Beacon.[15] As explained below, the Proposed Settlement in the instant case will leave Sponsored Stories relatively unchanged.

Currently, a number of businesses have integrated with Facebook in a way that encourages individuals to automatically disclose their reading,[16] listening,[17] and potentially, viewing[18] habits. By automatically associating an individual with a product and then publicizing this association, these services convey a tacit message of endorsement. EPIC wrote to the Federal Trade Commission on this issue, noting that "under the frictionless sharing model, content sharing is a passive experience in which a social app prompts the user once, at the outset, to decide the level of privacy for the app (with "public" being a common default) and then proceeds to share every bit of information obtained thereafter."[19]

## II. The Proposed Injunctive Relief is Inadequate

Given Facebook's history of attempting to commercialize the identities of its users without their consent and the importance of the privacy issues in this case, adequate relief must restore users' ability to control the commercial use of their name and image. The Proposed Settlement purports to "ensure that the Members are apprised of the existence and mechanics of Sponsored Stories ads, and they will then also be capable of taking steps to limit their appearance in those ads."[20] However, the mechanisms contemplated by the Proposed Settlement will produce relief that is largely illusory. The Proposed Settlement simply requires Facebook to provide greater notice about the existence and nature of Sponsored Stories—achieved primarily through a new provision in Facebook's Statement of Rights and Responsibilities ("SRR")—and to create a new privacy mechanism that allows users to opt-out of future Sponsored Stories.[21] In doing so, the agreement relies on the flawed "notice and choice" approach to privacy, and establishes a default setting that places the burden on users to enforce their right to control the use of their name and image for commercial purposes.

The new SSR provision states that "you give us permission to use your name, profile picture, content, and information in connection with commercial, sponsored, or related content (such as a brand you like)" and that "you permit a business or other entity to pay [Facebook] to display your name and/or profile picture with your content or information."[22] Most of the class members will probably never see the new provision. It is widely known that consumers do not

---

[15] Plaintiffs' Notice of Motion and Motion for Final Approval of Class Action Settlement at 3, *Lane v. Facebook*, No. 08-03845 (N.D. Cal. filed Aug. 12, 2008).

[16] *The Washington Post Social Reader*, Washingtonpost.com, http://www.washingtonpost.com/ socialreader (last visited Jul. 11, 2012).

[17] *Spotify*, http://www.spotify.com/us/ (last visited Jul. 11, 2012).

[18] *The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century: Hearing on H.R. 2471 Before the Subcomm. on Privacy, Technology and the Law of the S. Comm. on the Judiciary*, 112th Cong. (2012).

[19] Letter from Elec. Privacy Info. Ctr. to Fed'l Trade Comm'n, re: Facebook Privacy, Sept. 29, 2012, *available at* https://epic.org/privacy/facebook/EPIC_Facebook_FTC_letter.pdf.

[20] Motion for Preliminary Approval of Class Action Settlement at 16.

[21] *Id.* at 6-8

[22] *Id.* at 7

read privacy policies, terms of service, end user license agreements, or similar documents.[23] The new provision achieves nothing if Facebook users do not read it.

Even those who read the new provision will remain uninformed. The provision does not explain which specific actions cause an individual's likeness to appear in a Sponsored Story. The class member who wonders whether Sponsored Stories are the result of likes, check-ins, posts, application uses, or all of the above, will not find the answer in the SSR. Given that the current SSR already gives Facebook the right to associate a user's image or profile with commercial content,[24] it is not clear that the new provision provides much added benefit. Ultimately, notice and choice has been considered a failed model by both privacy scholars[25] and the Federal Trade Commission.[26] Yet it is precisely this failed model upon which the Proposed Settlement relies.

Additionally, the Proposed Settlement does not clearly explain the new "mechanism" that will allow users to remove themselves from Sponsored Stories. The agreement states only that the mechanism will be "easily accessible" and will enable users "to control which of [their] interactions and other content are eligible to appear in additional Sponsored Stories."[27] However, if the mechanism is anything like Facebook's existing privacy settings, consumers are likely to find it confusing and unwieldy. Examinations of Facebook's privacy settings have found that they regularly fail to allow consumers to achieve their privacy preferences.[28] This is often because Facebook alters its privacy controls without notifying users or obtaining their consent. Most recently, Facebook replaced the email addresses that users had chosen to display on their profiles with the @facebook.com email address assigned to them by Facebook.[29]

The default setting of the mechanism further undermines its effectiveness. Rather than obligating Facebook to obtain the affirmative consent of users to appear in Sponsored Stories, the mechanism obligates the class members to remove such consent. Simply put, class members must opt out of Sponsored Stories, rather than affirmatively enrolling as would be the commonsense expectation, and certainly the sensible relief to provide in a matter where the defendant has previously and improperly appropriated the commercial value of its users' names

---

[23] *See* Advertising and Privacy Disclosures in a Digital World, *Comments of the Electronic Privacy Information Center et al.*, (May 11, 2012), *available at* https://epic.org/privacy/ftc/EPIC-FTC-Ad-Disclosures-FINAL.pdf (discussing the problems posed by notice-centric privacy regimes and the factors that influence consumer behavior).
[24] *Statement of Rights and Responsibilities*, FACEBOOK, https://www.facebook.com/legal/terms (last visited Jul. 11, 2012) ("You can use your privacy settings to limit how your name and profile picture may be associated with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us. You give us permission to use your name and profile picture in connection with that content, subject to the limits you place.").
[25] Helen Nissenbaum, *A Contextual Approach to Privacy Online*, 140(4) DAEDALUS 32, 36 (2011) *available at* http://www.amacad.org/publications/daedalus/11_fall_nissenbaum.pdf.
[26] FED'L TRADE COMM'N, PROTECTING CONSUMER PRIVACY IN AN ERA OF RAPID CHANGE 2 (2012), http://www.ftc.gov/os/2012/03/120326privacyreport.pdf. ("[T]he 'notice-and choice model,' which encouraged companies to develop privacy policies describing their information collection and use practices, led to long, incomprehensible privacy policies that consumers typically do not read, let alone understand.").
[27] Motion for Preliminary Approval of Class Action Settlement at 7.
[28] *See, e.g.,* YABING LIU ET AL., ANALYZING FACEBOOK PRIVACY SETTINGS: USER EXPECTATIONS VS. REALITY (2010), *available at* http://www.mpi-sws.org/~gummadi/papers/imc081s-liu.pdf (finding that "privacy settings match users' expectations only 37% of the time, and when incorrect, almost always expose content to more users than expected.").
[29] Nick Bilton, *On Facebook, the Semantics of Visibility vs. Privacy*, N.Y TIMES, (June 26, 2012), http://bits.blogs.nytimes.com/2012/06/26/for-facebook-visibility-is-not-privacy-while-others-disagree/.

and likenesses. This default setting is likely to go unchanged by the class members, as individuals tend to follow default settings, even when given the chance to change these settings.[30] By enabling Sponsored Stories by default, the Proposed Settlement essentially ensures that they will stay enabled.

The ineffectiveness of notice and opt-out mechanisms undercuts the claim that the value of the injunctive relief is $103.2 million.[31] This figure depends on the claim that "class members now have the opportunity to control the use of what is essentially a [redacted]/month advertising asset."[32] However, as explained above, this "opportunity to control" is not meaningful. The *mere opportunity* that class members might control their appearance in Sponsored Stories cannot provide a benefit to the class because this possibility already exists: users can avoid Sponsored Stories by avoiding interactions (likes, check-ins, posts, etc.) with products with which they do not wish to be associated. Instead, it is the effectiveness of the control, the extent to which it allows class members to achieve their actual privacy preferences, that provides the benefit. Here, because the relief is ineffective, the benefit is largely nonexistent.

Thus, the Proposed Settlement will not produce meaningful relief for the class. Most class members will ignore the new SSR provision, and those who read it will find that it fails to convey important information. The opt-out mechanism for controlling Sponsored Stories will go unused. The effect will be to allow Facebook to continue the very business practices that gave rise to this lawsuit.

## II. Conclusion

The Proposed Settlement arises from a variety of privacy claims, most notably involving the use of a person's name or likeness for a commercial purpose without their consent. For the above reasons, EPIC urges you to ensure that the class is afforded adequate relief by requiring that Facebook obtain the affirmative consent of users before featuring them in Sponsored Stories.

Sincerely,

/s/
Marc Rotenberg, Executive Director
Electronic Privacy Information Center (EPIC)

---

[30] RICHARD H. THALER AND CASS R. SUNSTEIN, NUDGE: IMPROVING DECISIONS ABOUT HEALTH, WEALTH, AND HAPPINESS (2008).
[31] Motion for Preliminary Approval of Class Action Settlement at 17.
[32] Fernando Torres Decl., ¶ 12 (stating that the figure "represents the pool of revenue from which the class would have been given the opportunity to negotiate compensation.").