COOLEY LLP
MICHAEL G. RHODES, SBN 116127
mrhodes@cooley.com
MATTHEW D. BROWN, SBN 196972
brownmd@cooley.com
JEFFREY M. GUTKIN, SBN 216083
jgutkin@cooley.com
101 California Street, 5th Floor
San Francisco, CA  94111-5800
Telephone:  (415) 693-2000
Facsimile:  (415) 693-2222

GIBSON, DUNN & CRUTCHER LLP
S. ASHLIE BERINGER, SBN 263977
ABeringer@gibsondunn.com
JENNIFER A. HALL, SBN 268480
JHall@gibsondunn.com
1881 Page Mill Road
Palo Alto, California  94304
Telephone:  (650) 849-5300
Facsimile:  (650) 849-5333

FACEBOOK, INC.
COLIN S. STRETCH (205144) (colin@fb.com)
SANDEEP N. SOLANKI (244005) (ssolanki@fb.com)
1601 S. California Ave.
Palo Alto, CA  94304
Telephone:  (650) 853-1300
Facsimile:  (650) 543-4800

Attorneys for Defendant FACEBOOK, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ANGEL FRALEY; PAUL WANG; SUSAN MAINZER; JAMES H. DUVAL, a minor by and through JAMES DUVAL, as Guardian ad Litem; and W.T., a minor, by and through RUSSELL TAIT, as guardian ad Litem; individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>FACEBOOK, INC., a corporation; and DOES 1-100,<br><br>                    Defendants. | CASE NO. 11-CV-01726 LHK (PSG)<br><br>**DEFENDANT FACEBOOK, INC.'S BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT** |

# TABLE OF CONTENTS

Page

I.    BACKGROUND AND INTRODUCTION ........................................................... 1

II.   ARGUMENT ........................................................................................... 4

A.   The Potential Benefits to Class Members of Continued Litigation Are Remote
     and Uncertain .................................................................................. 4

     1.   All Users Expressly Consented to Appear in Sponsored Content ................... 5

     2.   Users Impliedly Consented to Appear in Sponsored Content......................... 6

     3.   Parents of Minor Users Impliedly Consented to the Use of Their
          Children's Names and Profile Pictures in Sponsored Content......................... 7

     4.   Plaintiffs Cannot Prove Economic Injury ......................................... 7

     5.   Any Economic Damages Suffered Are *De Minimis* ....................................... 8

     6.   Plaintiffs Cannot Pursue Claims for Sponsored Content that Does Not
          Feature Names or Identifiable Photographs...................................... 10

     7.   Sponsored Content Unrelated to "Products, Merchandise, Goods or
          Services" Is Not Actionable .................................................. 10

     8.   Sponsored Content Promoting News, Public Affairs, Sports, Political
          Campaigns and Other Matters in the Public Interest Is Exempt under
          Section 3344(d) .............................................................. 11

     9.   User Expression in Sponsored Content Is Protected by the First
          Amendment .................................................................... 11

     10.  Plaintiffs Cannot Succeed on Their UCL Claim.................................. 12

     11.  Facebook's Rebroadcast of Users' Likes and Actions Is Immunized
          under Section 230 of the Communications Decency Act .......................... 13

B.   The Risks, Expense, Complexity, and Likely Duration of Further Litigation
     Support Preliminary Approval ................................................... 14

C.   The Proposed Settlement Provides Plaintiffs with Certain, Immediate Benefits
     that Directly Address the Allegedly Improper Practices and Are Substantially
     Related to the Aims of the Lawsuit............................................ 16

     1.   Enhanced Notice and New Controls for All Class Members........................ 16

     2.   Additional Settlement Benefits for the Minors' Subclass....................... 18

     3.   Substantial *Cy Pres* Award to Nationwide Online Privacy Groups............... 19

     4.   Retired Judge Edward Infante Determined that the Settlement
          "provides tremendous benefits to the class and to the public"................ 20

**TABLE OF CONTENTS**
(continued)

<u>Page</u>

D.    Settlement Ensures Clarity and Resolution for Facebook, Its Users and
      Advertisers ................................................................................................................ 22

E.    The Court Should Find that Facebook Complied with CAFA's Notice
      Procedures and Approve the Content and Manner of Transmitting the Class
      Notice. .................................................................................................................... 24

III.  CONCLUSION ................................................................................................................... 25

ii

Def. Facebook, Inc.'s Brief in Supp. of Pls.' Mot. for Prelim. Approval of Settlement
Case No. 11-CV-01726 LHK (PSG)

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abdul-Jabbar v. Gen. Motors Corp.*,
  85 F.3d 407 (9th Cir. 1996).................................................................................. 10

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009)............................................................................... 13

*Baugh v. CBS, Inc.*,
  828 F. Supp. 745 (N.D. Cal. 1993) ....................................................................... 11

*Brown v. Entm't Merchs. Ass'n*,
  131 S. Ct. 2729 (2011) .......................................................................................... 11

*C.M.D. v. Facebook, Inc.*,
  No. 3:11-cv-00461 (S.D. Ill. June 1, 2011) .......................................................... 24

*C.M.D. v. Facebook, Inc.*,
  No. 3:12-cv-01216-LHK (N.D. Cal. Apr. 20, 2012) ............................................. 22

*Carafano v. Metrosplash.com, Inc.*,
  339 F.3d 1119 (9th Cir. 2003)............................................................................... 13

*Catala v. Resurgent Capital Servs. L.P.*,
  No. 08-cv-2401 NLS, 2010 WL 2524158 (S.D. Cal. June 22, 2010) ................... 19

*Class Plaintiffs v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992)................................................................................. 4

*Cohen v. Facebook, Inc.*,
  No. C 10-5282 RS, 2011 WL 5117164 (N.D. Cal. Oct. 27, 2011) ..................... 7, 8

*D.S. ex rel. S.S. v. N.Y.C. Dep't of Educ.*,
  255 F.R.D. 59 (E.D.N.Y. 2008) ............................................................................ 19

*David Cohen v. Facebook, Inc.*,
  No. BC 444482 (L.A. Super. Ct. Apr. 26, 2011) .................................................. 22

*Donovan v. Estate of Fitzsimmons*,
  778 F.2d 298 (7th Cir. 1985).................................................................................. 24

*Erznoznik v. Jacksonville*,
  422 U.S. 205 (1975) ............................................................................................... 12

*Evans v. Jeff D.*,
  475 U.S. 717 (1986) ............................................................................................... 19

*Ferrington v. McAfee, Inc.*,
  No. 10-CV-01455-LHK, 2012 WL 1156399 (N.D. Cal. Apr. 6, 2012)................... 4

*Gionfriddo v. Major League Baseball*,
  94 Cal. App. 4th 400 (2001) .................................................................................. 11

iii

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3     *Goddard v. Google, Inc.*,
          640 F. Supp. 2d 1193 (N.D. Cal. 2009) ................................................... 13

4

5     *Goldkorn v. County of San Bernardino*,
          No. 06–707–VAP. 2012 WL 476279 (C.D. Cal. Feb. 13, 2012) ................... 25

6     *Gordon v. Virtumundo, Inc.*,
          575 F.3d 1040 (9th Cir. 2009) ................................................................ 23

7

8     *Greenstein v. Greif Co.*,
          No. B200962, 2009 WL 117368 (Cal. App. Jan. 20, 2009) ........................... 6

9     *Hanlon v. Chrysler Corp.*,
          150 F.3d 1011 (9th Cir. 1998) ................................................................. 4

10

11    *Harris v. Vector Mktg. Corp.*,
          No. C-08-5198 EMC, 2012 WL 381202 (N.D. Cal. Feb. 6, 2012) ................ 22

12    *Hoffman v. Capital Cities/ABC, Inc.*,
          255 F.3d 1180 (9th Cir. 2001) ............................................................... 12

13

14    *In re Agent Orange Prod. Liab. Litig. MDL No. 381*,
          818 F.2d 145 (2d Cir. 1987) .................................................................. 5

15    *In re Bluetooth Headset Prod. Liab. Litig.*,
          654 F.3d 935 (9th Cir. 2011) ................................................................. 21

16

17    *In re Google Buzz Privacy Litig.*,
          No. C 10-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011) ........... 19, 20

18    *In re HP Laser Printer Litig.*,
          No. 07-0667 AG,  2011 WL 3861703 (C.D. Cal. Aug. 31, 2011) ............... 21

19

20    *In re Pac. Enters. Sec. Litig.*,
          47 F.3d 373 (9th Cir. 1995) ............................................................ 4, 5, 14

21    *In re Quantcast Advertising Cookie Litig.*,
          Case No. 2:10-cv-05484-GW-JCG (C.D. Cal.) ......................................... 20

22

23    *In re Tableware Antitrust Litig.*,
          484 F. Supp. 2d 1078 (N.D. Cal. 2007) ........................................... 4, 15, 16

24    *In re TD Ameritrade Account Holder Litig.*,
          No. 07–2852 SBA, 2011 WL 4079226  (N.D. Cal. Sept. 13, 2011) ............. 25

25

26    *In re TD Ameritrade Accountholder Litig.*,
          266 F.R.D. 418 (N.D. Cal. 2009) ............................................................ 4

27    *J.N. v. Facebook, Inc.*,
          No. 11-cv-2128 (E.D.N.Y. May 3, 2011) ................................................ 22

28

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*J.N.D. v. Facebook, Inc.*,
No. 11-cv-03287 (N.D. Cal. July 5, 2011).................................................................22

*Jones v. Corbis Corp.*,
815 F. Supp. 2d 1108 (C.D. Cal. 2011) ........................................................................6

*Kirby v. Sega of Am., Inc.*,
144 Cal. App. 4th 47 (2006) .......................................................................................14

*Levitt v. Yelp! Inc.*,
No. C-10-1231 EMC, 2011 WL 5079526 (N.D. Cal. Oct. 26, 2011).........................13

*Love v. Associated Newspapers, Ltd.*,
611 F.3d 601 (9th Cir. 2010).......................................................................................14

*Lowe v. S.E.C.*,
472 U.S. 181 (1985).....................................................................................................12

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012).......................................................................................12

*Mendoza v. Tucson Sch. Dist. No. 1*,
623 F.2d 1338 (9th Cir. 1980).....................................................................................18

*Miller v. California*,
413 U.S. 15 (1973).......................................................................................................11

*Miller v. Collectors Universe, Inc.*,
159 Cal. App. 4th 988 (2008) ........................................................................................9

*Moshogiannis v. Sec. Consultants Grp., Inc.*,
No. 5:10-cv-05971, 2012 WL 423860 (N.D. Cal. Feb. 8, 2012) .................................4

*Nachshin v. AOL, LLC*,
663 F.3d 1034 (9th Cir. 2011).....................................................................................19

*Newton v. Thomason*,
22 F.3d 1455 (9th Cir. 1994).........................................................................................6

*Officers for Justice v. Civil Serv. Comm'n*,
688 F.2d 615 (9th Cir. 1982)..................................................................................16, 17

*Parker v. Time Warner Entm't Co., L.P.*,
331 F.3d 13 (2d Cir. 2003).............................................................................................9

*Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102 (9th Cir. 2007).....................................................................................23

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
487 U.S. 781 (1988).....................................................................................................12

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Rodriguez v. W. Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009)..................................................................... 14

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
904 F.2d 1301 (9th Cir. 1990)............................................................. 19, 20

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
558 U.S. 408 (2003).................................................................................... 9

*Turpin v. Sortini*,
31 Cal. 3d 220 (1982) ............................................................................... 10

*Valentine v. NebuAd, Inc.*,
No. 3:08-cv-05113-TEH (N.D. Cal. Aug. 16, 2011) ................................. 20

*Vasquez v. Coast Valley Roofing, Inc.*,
266 F.R.D. 482 (E.D. Cal. 2010)......................................................... 16, 21

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) .............................................................................. 15

*Walter v. Hughes Commcn's, Inc.*,
No. 09-2136 SC, 2011 WL 2650711 (N.D. Cal. July 6, 2011).................. 23

*Washington Mutual Bank v. Superior Court*,
24 Cal. 4th 906 (2001).............................................................................. 23

*White v. Experian Info. Solutions, Inc.*,
803 F. Supp. 2d 1086 (C.D. Cal. 2011) ........................................... 5, 9, 15

*Wright v. Schock*,
742 F.2d 541 (9th Cir. 1984)..................................................................... 14

**Statutes**

28 U.S.C. § 1715(b) ........................................................................................ 25

28 U.S.C. § 1715(d) ........................................................................................ 25

Cal. Bus. & Prof. Code § 17200 ...................................................................... 2

Cal. Civ. Code § 3344 ................................................................................. 2, 11

Cal. Civ. Code § 3344(a) ...................................................................... 5, 14, 20

Cal. Civ. Code § 3344(b)(1)............................................................................ 10

Cal. Civ. Code § 3344(d) ................................................................................ 11

Defendant Facebook, Inc. ("Facebook") hereby submits this brief in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ("Motion").

## I.        BACKGROUND AND INTRODUCTION

The proposed settlement of this long-running class action promises to resolve conclusively and on a nationwide basis the rights and interests of Facebook users in connection with an evolving form of social advertising on Facebook, providing clarity, protection, and innovative controls to millions of users of Facebook's free, advertising-supported service.  In addition to providing class members with transparency and control over the use of their names and likenesses in Sponsored Stories, the proposed settlement supplies millions of dollars of funding to organizations dedicated to protecting class members' privacy interests in the rapidly evolving online landscape.

Facebook operates the largest social networking service in the world, through which people around the globe share and connect with their friends, families, and communities.  Sharing information with others is at the heart of the Facebook experience–it is the reason that hundreds of millions of users engage with Facebook on a regular basis.  Facebook has developed a wide variety of groundbreaking tools that have created new modes of sharing and expression on the Internet.  The "Like" button, for example, allows users to express support for and affiliate with companies, causes or organizations with a single click.  Facebook users can also share their activities and connections by "Checking-in" to an event or concert, commenting on a news article, or "Voting" in a Facebook poll.

Facebook supports the operational costs of furnishing free, customized, real-time content to over 900 million users worldwide–at a current cost of almost $2 billion annually–through advertising. (Decl. of Catherine Tucker in Supp. of Def.'s Opp'n to Class Certification ("Tucker Decl.") ¶ 87, ECF No. 144; Decl. of James C. Squires in Supp. of Facebook, Inc.'s Opp'n to Pls.' Mot. for Class Certification ("Squires Decl.") ¶ 56, ECF No. 145; Decl. of Jeffrey M. Gutkin in Supp. of Facebook, Inc.'s Br. in Supp. of Pls.' Mot. in Supp. of Prelim. Approval of Settlement ("Gutkin Decl.") Ex. A, filed concurrently herewith).)  Like much of the advertising-supported Internet, Facebook has sought to engage users by personalizing promotional content on its service.  (Tucker Decl. § 4.)  Since Facebook first launched the "Fan" button more than four years ago, it has published stories about a user's interactions with Facebook's social tools to audiences approved by the user, along with his or

her name and/or profile photo and, oftentimes, with related commercial or sponsored content.  More recently, Facebook began publishing users' Likes and social actions in "Sponsored Stories," an evolving form of sponsored content displayed only to those people users have specifically authorized to view this shared content.

Plaintiffs (and other litigants raising similar claims) have targeted this practice, asserting that the rebroadcast of users' Likes and social actions to their friends in sponsored content, specifically Sponsored Stories, violates California's right of publicity statute, Cal. Civ. Code § 3344, and Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL").  Plaintiffs have asserted these claims on behalf of a nationwide class encompassing more than 100 million Facebook users in the United States whose content has been rebroadcast in the form of a Sponsored Story.

Facebook has vigorously defended these claims and invoked numerous defenses that create significant obstacles for Plaintiffs in this and other similar cases.  Most fundamentally, Facebook obtains express permission to rebroadcast users' Likes and social actions with sponsored content to their chosen audience under the Statement of Rights and Responsibilities ("SRR").  By joining and using Facebook, all members agree that their "name and profile picture may be associated with commercial, sponsored, or related content (such as a brand [the User] like[s])" and that Facebook has "permission to use [the User's] name and profile picture in connection with that content . . . ."  (Decl. of Ana Yang Muller in Supp. of Facebook, Inc.'s Opp'n to Pls.' Mot. for Class Certification ("Muller Decl.") Ex. I, at FB-FRA_000530, ECF No. 147-9, current version *available at* https://www.facebook.com /legal/terms.)  In addition to the express consent established by Facebook's user terms, overwhelming evidence and authority establishes, *inter alia*, that:  (i) users implicitly consented to the challenged practices by sharing Likes and social actions with the knowledge, or at least awareness, that this content could be rebroadcast in a commercial context to others of their choosing; (ii) users were not injured or damaged by the rebroadcast of stories about their Likes and social actions to those who already had access to that content (and, in fact, users received direct benefits from these broadcasts, such as free products and information or support for causes that they care about); (iii) sponsored content displaying users' Likes and other forms of expression–especially content related to political campaigns, religious organizations, charitable

causes and other matters in the public interest–is exempt from liability under the express language of Section 3344 and the First Amendment; (iv) Plaintiffs have no evidence of detrimental reliance or any deceptive, unlawful or unfair conduct that could support a UCL claim; and (v) Facebook's rebroadcast of user-generated Likes and social actions is immunized under Section 230 of the Communications Decency Act.

Given these (and numerous other) defenses–as well as the costs and delay that would result from continued litigation of these complex issues through class certification, judgment, and appeal–the risks of continued litigation here are particularly acute.  Furthermore, if Facebook ultimately prevailed, Plaintiffs and the class could face responsibility for paying Facebook's attorneys' fees under Section 3344's mandatory, two-way fee shifting provision.  Additionally, the potential recovery to individual class members–even in a best case outcome for Plaintiffs–would be trivial.

The proposed settlement, by contrast, offers immediate and substantial value to millions of Facebook users and squarely resolves the core complaints targeting social advertising on Facebook. After more than a year of vigorous litigation, the parties have reached a proposed settlement which would, among other things, create a series of innovative tools that will give users (and for minor users, their parents) significant transparency and additional controls over how and when the information they share is displayed in connection with sponsored content.  Indeed, if the settlement is approved, all users for the first time will have the ability to view the subset of actions and other content they have shared that have been rebroadcast as Sponsored Stories, and to prevent further rebroadcasting if they so desire.  Parents, moreover, will have the means to prevent their children from appearing in Sponsored Stories altogether.  Facebook will also contribute $10 million to leading organizations dedicated to protecting the interests and privacy of Internet and social media users–an amount that dwarfs the trivial recovery that might otherwise be obtained by individual class members here.

Finally, the settlement would resolve any doubts concerning the scope and application of Facebook's SRR to commercial and sponsored content like Sponsored Stories.  By clarifying the rights and obligations of Facebook and its users–while providing immediate and valuable relief to millions of individuals who continue to actively use Facebook–the settlement ensures that Facebook

1    can focus on innovating on behalf of users without the cost and disruption of continued class action

2    litigation.  For these reasons, Facebook supports Plaintiffs' request to preliminarily approve the

3    proposed settlement as fair, adequate, and reasonable.

4                                    **II.    ARGUMENT**

5            The Ninth Circuit has adopted a "strong judicial policy that favors settlements" in complex

6    class actions.  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992.)  Accordingly, a

7    court may approve a proposed settlement if it "'is fundamentally fair, adequate, and reasonable.'"

8    *Moshogiannis v. Sec. Consultants Grp., Inc.*, No. 5:10-cv-05971, 2012 WL 423860, at *2 (N.D. Cal.

9    Feb. 8, 2012) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).)  A proposed

10   settlement meets this standard for preliminary approval purposes where it "appears to be the product

11   of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly

12   grant preferential treatment to class representatives or segments of the class, and falls within the

13   range of possible approval."  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal.

14   2007) (citation omitted).

15   **A.     The Potential Benefits to Class Members of Continued Litigation Are Remote and
             Uncertain**

16

17           To evaluate the sufficiency of the proposed settlement here, the Court must compare the

18   anticipated rewards of litigation for Plaintiffs and the proposed class with the overall value of the

19   settlement offer.  *See, e.g.*, *Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2012 WL 1156399,

20   at *8 (N.D. Cal. Apr. 6, 2012) ("the need to compare the terms of the compromise with the likely

21   rewards of litigation" is "[b]asic to the process of deciding whether a proposed settlement is fair,

22   reasonable and adequate") (quoting *In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 422

23   (N.D. Cal. 2009).)  "Even if the potential recovery might [be] large," a proposed settlement is fair,

24   adequate, and reasonable where plaintiffs' "odds of winning [are] extremely small."  *In re Pac.*

25   *Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) (affirming class settlement where strong defenses

26   "may have adversely terminated the litigation before trial").

27           As detailed below, Plaintiffs are unlikely to obtain *any* award in the event of continued

28   litigation.  Plaintiffs face numerous and insurmountable obstacles, including several dispositive

                                                    4

defenses and numerous issues of first impression implicated by their novel claims.  Failure to overcome any one of these obstacles would drastically reduce or eliminate Plaintiffs' claims against Facebook.  *See id.; In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 173-74 (2d Cir. 1987) (holding that settlement was reasonable where plaintiffs "faced formidable hurdles" in establishing exposure, causation and liability and in overcoming the military contractor defense); *White v. Experian Info. Solutions, Inc.*, 803 F. Supp. 2d 1086, 1095 (C.D. Cal. 2011) (holding that settlement was reasonable where "[p]laintiffs' claims largely presented questions of first impression").  Retired Judge Edward A. Infante, a neutral mediator engaged by the parties, concurs. Indeed, after conducting a thorough evaluation of the strength of Plaintiffs' claims, he concluded that Plaintiffs face "substantial risk . . . with respect to summary judgment, trial and appeal."  (*See* Decl. of Hon. Edward A. Infante (Ret.) in Supp. of Pls.' Mot. for Prelim. Approval of the Proposed Class Settlement ("Infante Decl.") ¶ 12, ECF No. 178; *see also id.* ¶¶ 13-15 (discussing risks).)

### 1.    All Users Expressly Consented to Appear in Sponsored Content

Most fundamentally, Plaintiffs cannot prove an essential element of their claim:  that they did not consent to the use of their Facebook names and profile pictures in Sponsored Stories.  *See* § 3344(a).  To the contrary, consent to Sponsored Stories is established, as a matter of law, by the SRR applicable to all Facebook users.  The SRR expressly states that "your name and profile picture may be associated with commercial, *sponsored, or related content (such as a brand you like)*" and that "*[y]ou give us permission to use your name and profile picture in connection with that content*, subject to the limits you place."  (Muller Decl. Ex. I, at FB_FRA_000530 (emphasis added).) Plaintiffs concede, as they must, that all users are bound by the SRR and that *all* prior versions of the SRR contained this critical term.  (Pls.' Mem. of Law in Supp. of Mot. for Class Certification 8-9; Pls.' Reply Mem. of Law in Supp. of Mot. for Class Certification ("Reply Br.") 4.)  Although Plaintiffs originally alleged a theory of fraudulent inducement that may have been sufficient to overcome the SRR's consent provisions on a motion to dismiss (*see* Order Granting in Part and Den. in Part Def.'s Mot. to Dismiss ("MTD Order") 24, ECF No. 74), Plaintiffs apparently abandoned this theory in the absence of any factual support–removing any conceivable claim that Facebook lacked valid consent to rebroadcast users' Likes and social actions with sponsored content, such as

Sponsored Stories.

**2.      Users Impliedly Consented to Appear in Sponsored Content**

Separately, Plaintiffs also cannot prove a lack of consent because users impliedly consented to have their Likes and other social actions displayed to their friends by taking steps to share those Likes and actions with the knowledge or awareness that this content could be rebroadcast, including in sponsored contexts. *See, e.g.*, *Newton v. Thomason*, 22 F.3d 1455, 1461 (9th Cir. 1994) (plaintiff impliedly consented to the use of his name where his conduct indicated that he did not object to the use); *Jones v. Corbis Corp.*, 815 F. Supp. 2d 1108, 1113-15 (C.D. Cal. 2011) (plaintiff impliedly consented to the use of her name and photograph by posing for "red carpet" photos, knowing that photographers may use those photos to solicit sales); *Greenstein v. Greif Co.*, No. B200962, 2009 WL 117368, at *9-10 (Cal. Ct. App. Jan. 20, 2009) (plaintiff impliedly consented where he was "aware that [he was] being recorded as part of the reality television program" and "did not object"). A user's decision to, for example, "Like" a charity or "Check In" to a sporting event on Facebook–by its very nature–implies consent to publish that action to others designated by the user.  Facebook furnished overwhelming evidence that users expect and even intend for these actions to be broadcast in commercial contexts, and each Plaintiff conceded that he or she fully understood that "Likes" would be shared in this manner.  (Def. Facebook, Inc.'s Opp'n to Pls.' Mot. to Certify a Class ("Opp'n Br.") 9-15, ECF No. 141; Tucker Decl. ¶¶ 39, 42, 48-49.)

Indeed, Facebook has broadcast users' names and social actions with related commercial content for years.  Since Facebook first launched the "Fan" tool in 2007, it has published users' connections with organizations, causes, brands or products in many locations across the site. Likewise, Facebook has displayed users' Facebook names and Likes with related commercial content (in a product known as Social Ads) for over four years.  (Opp'n Br. 12; Tucker ¶ 22.)  Because the broadcast of users' Likes and social actions has long been associated with commercial content (whether displayed in users' News Feeds, their profiles or timelines, or the sponsor's Page), Plaintiffs cannot credibly show that they consented to the display of their social actions in certain commercial contexts but not in Sponsored Stories.  (Opp'n Br. 11-12; Tucker Decl. ¶¶ 20, 22-24, 29, 34, 36-37, 43.)

1
2

### 3.    Parents of Minor Users Impliedly Consented to the Use of Their Children's Names and Profile Pictures in Sponsored Content

3      Likewise, substantial evidence demonstrates parental consent–express and implied–to minor

4    class members' use of Facebook, acceptance of the SRR and, specifically, sharing of Likes and

5    actions in commercial or sponsored contexts.  (Opp'n Br. 14-15.)  Indeed, a named Plaintiff

6    representative of the minors' subclass reviewed Facebook's SRR with his father when his father

7    expressly permitted him to sign up to use Facebook by agreeing to the SRR.  (Decl. of Matthew D.

8    Brown in Supp. of Facebook, Inc.'s Opp'n to Pls.' Mot. for Class Certification ("Brown Decl.") ¶¶

9    67-70, ECF No. 146.)  As with this example, millions of parents participate actively in or are at least

10   aware of their children's activities on Facebook, are in many cases Facebook "friends" with their

11   children, have seen their children's Likes and actions published to them in social ads or other

12   commercial contexts, or even clicked on a Sponsored Story publishing their child's Like (to support a

13   school fundraising effort, for example).  (Decl. of Christopher Plambeck in Supp. of Facebook, Inc.'s

14   Opp'n to Pls.' Mot. for Class Certification ("Plambeck Decl.") ¶ 21, ECF No. 142 (over six million

15   minor users were friends with at least one of their parents as of December 2011);  *see also* Brown

16   Decl. Ex. NN, at 3, ECF No. 146-40 (recent study found that 72 percent of parents monitor their

17   teens' social networking accounts); Gutkin Decl. Ex. B, at 69, 71 (recent study found that six in ten

18   teens report that their parents have checked their social media profile); Gutkin Decl. Ex. C (recent

19   study found that 92% of parents surveyed were Facebook friends with their children and 72% have

20   access to their children's password); Gutkin Decl. Ex. D, at 11 (recent study found that 64% of

21   parents knew when their child created his or her Facebook account and helped the child create the

22   account).)

### 4.    Plaintiffs Cannot Prove Economic Injury

24      Plaintiffs also cannot demonstrate that they or the putative members of the class were

25   "injured" by the republication of their Likes and actions in sponsored content, as required to prove

26   their misappropriation claims under Section 3344 and to demonstrate Article III standing.  *See Robyn*

27   *Cohen v. Facebook, Inc.*, No. C 10-5282 RS, 2011 WL 5117164, at *3 (N.D. Cal. Oct. 27, 2011)

28   (holding that statutory damages provision in § 3344 "does not eliminate the requirement of a

7

1   cognizable injury in the first instance"). Indeed, Plaintiffs' own expert admitted that a significant

2   number of class members suffered no economic injury. (*See* Opp'n Br. 20-21.)

3         Most fundamentally, Plaintiffs cannot establish that they were economically injured by the

4   rebroadcast of their Likes and social interactions to friends who *already had* access to that content.

5   *See Cohen*, 2011 WL 5117164, at *3 (the fact that plaintiffs' "names and likenesses were merely

6   displayed on the pages of other users who were already plaintiffs' Facebook 'friends' and who would

7   regularly see, or at least have access to, those names and likenesses in the ordinary course of using

8   their Facebook accounts . . . undercuts any claim plaintiffs can make that they were somehow

9   harmed"). Indeed, discovery has confirmed that none of the named Plaintiffs can point to any

10  instance in which a Sponsored Story diminished the value of their names or likenesses or in any way

11  deprived them of an economic opportunity that they otherwise could have obtained on their own.

12  (Gutkin Decl. Exs. E-G, K-M.)

13        Moreover, because Plaintiffs alleged an economic injury, Plaintiffs must demonstrate that

14  "they were not compensated for Facebook's commercial use of their names and likenesses . . . ."

15  (MTD Order 24; *see also id.* at 11 (addressing Article III standing and finding that Plaintiffs alleged

16  that they "were economically injured when denied compensation for such unauthorized use").)

17  Discovery has confirmed, however, that millions of users–including Plaintiffs–were, in fact,

18  compensated for the rebroadcast of their Likes and actions in sponsored content. (Tucker Decl. §§ 6,

19  7.) Indeed, users receive a range of tangible and intangible benefits for sharing their affiliations on

20  Facebook, encompassing coupons, discounts, support or fundraising for a political or charitable

21  cause, or increased esteem or cache within their peer groups. (*Id.* § 6.) And, in many or even most

22  instances, these user benefits are substantially more valuable than the modest revenue (if any) earned

23  by Facebook from the rebroadcast. (*Id.* § 7.2.)

24        **5.      Any Economic Damages Suffered Are *De Minimis***

25        Even if Plaintiffs could somehow establish injury for the mere rebroadcast of their Likes and

26  social actions to the same audience that has already seen them, they would face significant challenges

27  in proving damages–which would be minimal, even in a best case outcome. As this Court noted, "at

28  summary judgment or at trial, Plaintiffs may not simply demand $750 in statutory damages in

reliance on a bare allegation that their commercial endorsement has provable value, but rather must 'prove actual damages like any other plaintiff whose name has commercial value.'"  (MTD Order 29 (quoting *Miller v. Collectors Universe, Inc.*, 159 Cal. App. 4th 988, 1006 (2008)).)  Indeed, statutory damages under Section 3344 are only "meant to compensate non-celebrity plaintiffs who suffer . . . *mental anguish* yet no discernible commercial loss."  *Miller*, 159 Cal App. 4th at 1006 (emphasis added).  Plaintiffs have not alleged mental anguish, nor could they credibly do so because Sponsored Stories are merely republications of content they previously shared with their friends.

And even if Plaintiffs could recover statutory damages here–which they cannot–an aggregate award would implicate substantial due process concerns.  *See, e.g.*, *Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003) (noting that "aggregation in a class action of large numbers of statutory damages claims potentially distorts the purpose of both statutory damages and class actions" with the result "the due process clause might be invoked" in order "to nullify that effect and reduce the aggregate damage award") (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 558 U.S. 408, 416 (2003).)  In such circumstances, it is fair for settling parties to "consider the risk that any large, cumulative statutory damages award obtained at trial ultimately might have been reduced by the trial or appellate courts."  *White*, 803 F. Supp. 2d at 1098.  Indeed, at least one court has held that this risk justified a settlement recovery constituting a 99% reduction of the minimum, aggregate amount of statutory damages available to plaintiffs.  *See id.* (given this and other risks, "it was not unreasonable for Settling Plaintiffs to decide that a guaranteed recovery [of the drastically reduced amount] was better than the risk of no recovery at all").

In any event, the maximum recovery to individual class members here is trivial.  Indeed, Plaintiffs' own expert has estimated that the average revenue earned by Facebook in 2011 that is attributable to the use of each class member's Facebook name and likeness is a mere 47 cents.  (*See* Decl. of Fernando Torres in Supp. of Pls.' Mot. for Class Certification ¶ 8(y).)  And even this *de minimis* number overestimates the value of Plaintiffs' claims, as their methodology suffers from numerous incurable flaws.  *See White*, 803 F. Supp. 2d at 1097 (rejecting contention that settlement was unfair where objectors' valuation of potential claims "rel[ied] on controversial variables").  First, Plaintiffs' expert acknowledged that his method is likely to include 5-10% of class members whose

9

endorsement values are *zero* or *negative*.  (Opp'n Br. 20-21.)  Second, his methodology attributes all of the performance differences between Sponsored Stories and other forms of advertising to a user's endorsement, and ignores numerous other factors that Facebook's expert showed accounted for most or all of any observed differences.  (*Id.*; Decl. of Randolph E. Bucklin in Supp. of Defs.' Opp'n to Class Certification ("Bucklin Decl.") ¶¶ 56-63, 72-74, ECF No. 148; Tucker Decl. ¶¶ 75-76.)  Third, it ignores that, in some cases, Facebook could have earned more revenue from serving an advertisement other than a Sponsored Story.  (Opp'n Br. 20-21; Bucklin Decl. ¶¶ 47-48, 85-87.)  Finally, it fails to consider the value of the benefits and compensation that individual class members received for the rebroadcast of their content in Sponsored Stories.  (Opp'n Br. 20-21; Section II(A)(4), *supra*); *see Turpin v. Sortini,* 31 Cal. 3d 220, 236 (1982) (any benefit conferred by a tortfeasor is considered in mitigation of damages).  Particularly given these flaws, the value of Plaintiffs' claims is minimal at best.

Moreover, as addressed below, Plaintiffs' damages calculations impermissibly include millions of rebroadcasted stories that are not actionable for multiple, independent reasons.

### 6. Plaintiffs Cannot Pursue Claims for Sponsored Content that Does Not Feature Names or Identifiable Photographs

Many of the rebroadcasted stories Plaintiffs challenge in this suit are not actionable because they do not feature users' "name[s]," "photograph[s]" or "likeness[es]" within the meaning of Section 3344.  *See, e.g.,* § 3344(b)(1) (a photograph is actionable only where "the person is readily identifiable"); *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 416 (9th Cir. 1996) (whether plaintiff's birth name, Lew Alcindor, "'equals' Kareem Abdul-Jabbar . . . is a question for the jury").  Many Facebook users–including several of the Plaintiffs–use fictitious names and/or unrecognizable photographs or images that do not give rise to a claim for misappropriation under California law.  (*See* Brown Decl. ¶¶ 55-56, 71-75, 77.)  This further reduces the potential recovery.

### 7. Sponsored Content Unrelated to "Products, Merchandise, Goods or Services" Is Not Actionable

Likewise, Plaintiffs' claims impermissibly encompass millions of Sponsored Stories relating to charitable, political or religious causes.  Indeed, there are many such organizations that elect to

sponsor stories users share with their friends.  (Opp'n Br. 17; Squires Decl. ¶ 76.)  Plaintiffs ultimately conceded that such uses are not actionable under Section 3344, because they do not involve a use in connection with "products, merchandise, goods or services," but made no effort to exclude these uses from their damages calculations.  *See* § 3344(a); Reply Br. 13 (conceding political content not actionable).

### 8.    Sponsored Content Promoting News, Public Affairs, Sports, Political Campaigns and Other Matters in the Public Interest Is Exempt under Section 3344(d)

In addition, Section 3344 exempts from liability the use of a person's name or photograph "in connection with any news, public affairs, or sports broadcast or account, or any political campaign." § 3344(d); *Baugh v. CBS, Inc.*, 828 F. Supp. 745, 754 (N.D. Cal. 1993) ("the fact that [the challenged use] generates advertising revenue does not prevent [a defendant] from claiming" immunity under § 3344(d)).  Indisputably, millions of Sponsored Stories concern uses that relate to one of these protected subject matters and thus are expressly excluded from the scope of the statute–including Sponsored Stories promoting "political campaigns" for national and local candidates, "sports . . . accounts" such as local charity races or soccer events, or "public affairs" such as breast cancer awareness.  (Squires Decl. ¶¶ 48, 76; Tucker Decl. ¶¶ 65-67); *see Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 414 (2001) (depiction of baseball players in materials promoting *baseball* excepted under § 3344(d)).

### 9.    User Expression in Sponsored Content Is Protected by the First Amendment

Likewise, chilling the republication of user content in Sponsored Stories–particularly on topics (such as politics or religion) that are afforded the highest degree of constitutional protection–raises significant First Amendment concerns.  *See Miller v. California*, 413 U.S. 15, 34-35 (1973) ("The protection given speech . . . was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.") (quotation marks and citations omitted).  Even when users "Like" or comment on corporations or products, this may, depending on the circumstances and subjective motivations of the user, advance important goals of self-expression–especially for younger users, who often cite "self-expression" as a reason for using the Facebook "Like" button.  (Tucker Decl. ¶ 53); *see Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2735

(2011) ("Minors are entitled to a significant measure of First Amendment protection") (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)); *Lowe v. S.E.C.,* 472 U.S. 181, 210 n.57 (1985) ("[W]e have squarely held that the expression of opinion about a commercial product such as a loudspeaker is protected by the First Amendment.") (citation omitted).  Because the expressive modes of sharing that can lead to a Sponsored Story are "inextricably intertwined" with the "commercial aspects" of a Sponsored Story, any constraint on Facebook's rebroadcast of these stories would likely run afoul of the First Amendment.  *See Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796 (1988); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1185 (9th Cir. 2001).

### 10.    Plaintiffs Cannot Succeed on Their UCL Claim

Plaintiffs also failed to develop any evidence that could support a claim under the UCL.  Although Plaintiffs originally alleged that the SRR somehow misled users regarding the ability to opt out of Sponsored Stories (*see* Second Am. Class Action Compl. for Damages ("SAC") ¶¶ 32-33, ECF No. 22), Plaintiffs concede that they did not detrimentally rely on these terms as required to establish "fraud" under the UCL.  *See, e.g.*, *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591 (9th Cir. 2012) (UCL "requires named class plaintiffs to demonstrate reliance").  To the contrary, the named Plaintiffs expressly disclaim having read (or having any memory of reading) the terms they challenge.  (*See* Brown Decl. ¶ 78.)  More fundamentally, Plaintiffs concede that Facebook informed users that "there is no way to opt out of seeing all or being featured in any Sponsored Stories," belying any claim that Facebook failed to inform users of these facts.  (SAC ¶ 34.)

Likewise, Plaintiffs failed to establish any support for a claim under the UCL's "unlawful" prong because, as discussed above, they cannot demonstrate that Sponsored Stories violate Section 3344 or any other California law.

Nor could Plaintiffs possibly demonstrate that the republication of Likes and social actions in sponsored content is "unfair" under the UCL.  Facebook's users–including some of the Plaintiffs– choose to Like companies and causes specifically to share that content with their friends and family, and they derive substantial benefits when their Likes and actions are rebroadcast, including in Sponsored Stories, to the same audience.  (Tucker Decl. § 6.)  Indeed, several Plaintiffs admitted they Liked content to share the story with as many people as possible.  (Brown Decl. ¶¶ 65-66.)

11.   **Facebook's Rebroadcast of Users' Likes and Actions Is Immunized under Section 230 of the Communications Decency Act**

Because Plaintiffs' claims arise exclusively from Facebook's republication of content generated entirely by the user–namely, the user's Likes and other social actions the user has decided to share on Facebook–Facebook's conduct is protected under Section 230 of the Communications Decency Act (CDA).  *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) (§ 230 "provides broad immunity [to websites that] publish[] content provided primarily by third parties").  Although Plaintiffs' complaint alleged that Facebook itself had somehow created new content in Sponsored Stories (SAC ¶¶ 57-59), discovery has disproved this bald claim.  Instead, the allegedly misappropriated content that is rebroadcast in Sponsored Stories–for example, the assertion that "Jane Doe Likes Senator X"–is generated entirely through the actions of the user.  (*See* Gutkin Decl. Ex. H, I.)  Facebook in no way contributes to the *substance* of the user's Like or action, but rather offers neutral tools in the form of a Like button or other mechanism through which users may share their support and affiliation with companies, organizations, causes and events of their choosing. *See, e.g.*, *Carafano*, 339 F.3d at 1125 (defendant immune where the information about which plaintiff complained was "transmitted unaltered to profile viewers"); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1197 (N.D. Cal. 2009) ("A website operator does not become liable as an 'information content provider' . . . when it merely provides third parties with neutral tools to create web content."). And it is well-settled that Facebook is not transformed into a content provider merely by republishing users' Likes and other social actions in a sponsored context, such as Sponsored Stories; the decision to publish or "post" user content is at the heart of CDA immunity.  *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009) (§ 230 "shields from liability *all publication decisions*, whether to edit, to remove, *or to post*, with respect to *content generated entirely by third parties*") (emphasis added); *Levitt v. Yelp! Inc.*, No. C-10-1231 EMC, 2011 WL 5079526, at *6 (N.D. Cal. Oct. 26, 2011) ("traditional editorial functions" immunized by § 230 "often include subjective judgments informed by political and financial considerations").

**B.      The Risks, Expense, Complexity, and Likely Duration of Further Litigation Support Preliminary Approval**

Given the significant likelihood that Facebook would prevail in defeating Plaintiffs' claims on one or more of the grounds addressed above, the risks of continued litigation to Plaintiffs and absent class members are particularly substantial here.  (Infante Decl. ¶ 14.)  Indeed, Section 3344 requires the court to award mandatory "attorney's fees and costs" to "[t]he prevailing party," including to a prevailing defendant.  § 3344(a); *see Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47, 62 (2006); *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 614 (9th Cir. 2010.)  In light of the mandatory, two-way fee shifting provision in Section 3344, if a litigation class were certified, Plaintiffs and absent class members that elected to remain in the class could face the prospect of satisfying a substantial fee award.  *See Wright v. Schock*, 742 F.2d 541, 545 (9th Cir. 1984) ("Absent class members have no obligation to pay attorneys' fees and litigation costs*, except when they elect to accept the benefit of the litigation*.") (emphasis added); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) (affirming approval of settlement where district court concluded "that the settlement eliminated significant risk").

These risks are compounded by the breadth and complexity of issues presented in this litigation, which would require both sides to expend substantial fees and resources to litigate the case through judgment and appeal.  Indeed, this case has been pending for more than a year, encompassing extensive discovery (more than 1,000 discovery requests and 200,000 pages of documents), and 21 depositions, including the deposition of 7 experts.  (Pls.' Mot. for Prelim. Approval of Class Action Settlement at 13, ECF No. 181; Infante Decl. ¶ 3.)  The parties would be required to spend substantial additional resources to litigate this case through summary judgment or trial, which at a minimum would consume several additional months of intensive litigation activity.  *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) (length and expense of continued litigation favored settlement where parties still had to contend with a number of "serious hurdles," such as *Daubert* motions, an anticipated motion for summary judgment, a motion to bifurcate, and appeals).

And given the differences within and the unprecedented size of the proposed class (potentially more than 100 million users), as well as the implications of Plaintiffs' claims for Facebook's

14

advertising-supported business model, Facebook would vigorously pursue an appeal of any certification order or judgment in favor of Plaintiffs and assumes that Plaintiffs would do the same in the event Facebook prevailed.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2546 (2011) (characterizing a proposed class of 1.5 million plaintiffs as "one of the most expansive class actions ever").  The extensive costs of continued litigation–particularly in the context of a mandatory, two-way fee shifting provision–weigh strongly in favor of preliminary approval.  *See In re Tableware*, 484 F. Supp. 2d at 1080 (preliminarily approving proposed settlement in light of the "expense and complexity of further litigation").

Moreover, this case raises many significant issues of first impression that would be the subject of intensive (and expensive) appeals, including:  (i) the measure of injury and damages for non-celebrity plaintiffs asserting claims under Section 3344 relating to the republication of their activity in social media; (ii) the extent to which republication of user-generated actions in social media in a sponsored context is protected by CDA Section 230; (iii) the extent of First Amendment protection for republication of user generated expression in social media, including in relation to commercial subject matter; and (iv) the extent to which classwide relief under Section 3344 would run afoul of the California Legislature's intent and the Rules Enabling Act.  The numerous, unsettled legal issues in this case further increase the risks to Plaintiffs of an adverse outcome through litigation and underscore the benefits of the proposed settlement.  *See White*, 803 F. Supp. 2d at 1095 (preliminarily approving proposed settlement "[g]iven that [p]laintiffs' claims largely presented questions of first impression").

Continued litigation would also mean that members of the class may continue to appear in sponsored content without benefit of the clarity and enhanced controls provided in the proposed settlement.  Given the rapid pace of change and innovation on Facebook and the Internet generally,[1] the forms of social advertising challenged by Plaintiffs in this case likely will be superseded by new and unforeseen models during the several years it would take for this case to wind its way through

---

[1]  Indeed, as addressed in detail in the Tucker Declaration, the modes of sponsored content and social advertising on Facebook and the Internet have evolved rapidly and substantially since Facebook first was launched in 2004.  (*See* Tucker Decl. ¶¶ 13-16, 20, 22-24, 29, 36-37, 43.)

litigation and appeal.  Thus, even in a best case litigation outcome for Plaintiffs, the modest "relief" they eventually could obtain after years of litigation and appeal may be meaningless; as noted previously, any damages award would be trivial on a per-user basis, while any injunctive relief directed to social advertising such as Sponsored Stories could be obsolete in several years due to intervening changes on the site.  The substantial delays that would result from protracted litigation of this case provide further grounds for preliminary approval here.  *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 629 (9th Cir. 1982) (approving settlement in class action where "many years may be consumed by trial(s) and appeal(s) before the dust finally settles" because "any benefits above those provided by the [proposed settlement] would likely be substantially diluted by the delay inherent in acquiring them").

**C.**     **The Proposed Settlement Provides Plaintiffs with Certain, Immediate Benefits that Directly Address the Allegedly Improper Practices and Are Substantially Related to the Aims of the Lawsuit**

While the risks of continued litigation are substantial and the potential benefits remote, the proposed settlement offers numerous significant and immediate benefits to the class.  *See In re Tableware*, 484 F. Supp. 2d at 1080 (preliminarily approving settlement given "the anticipated expense and complexity of further litigation").  These benefits are the product of extensive arms-length negotiations conducted by parties and counsel with the benefit of over a year of vigorous litigation and hard-fought discovery to inform their discussions.  (Infante Decl. ¶ 24); *see Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 489 (E.D. Cal. 2010) ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair.").

**1.**     **Enhanced Notice and New Controls for All Class Members**

Significantly, the settlement provides for enhanced notice and several innovative controls that will give all users (and minor users' parents) significant transparency and control over whether their Likes and activities are rebroadcast to their friends in a sponsored context.  This proposed relief squarely addresses the core concerns raised by Plaintiffs and would benefit all Facebook users.

Plaintiffs cannot seriously dispute that the SRR–which they concede applies to all users–establishes consent to broadcast users'  "name and profile picture [in] associat[ion] with commercial, sponsored, or related content (such as a brand [the user] like[s])" and gives Facebook "permission to

16

1  use [the user's] name and profile picture in connection with that content . . . ."  (Muller Decl. Ex. I, at

2  FB_FRA_000530.)  Rather, Plaintiffs allege that Facebook failed to provide adequate notice to users

3  that their Likes and actions could be–or had been–published in Sponsored Stories.  (SAC ¶¶ 36-41;

4  Brown Decl. Ex. AA, at 10-11.)  In addition, they allege that users were unable to prevent the

5  rebroadcast of their Likes and other actions to their friends with sponsored content through an easily

6  accessible mechanism.  (SAC ¶¶ 32-34.)  While these claims are insufficient to establish a violation

7  of Section 3344, Facebook nevertheless has agreed for settlement purposes to classwide relief that

8  addresses each of these concerns.

9       First, Facebook has agreed to eliminate any alleged ambiguity concerning Facebook's use of

10  names and/or profile pictures in sponsored content by:  (i) enhancing the notice and consent provision

11  contained in Facebook's SRR; and (ii) specifically illustrating the circumstances under which

12  Facebook may display users' Likes and actions in Sponsored Stories.  (Decl. of Robert S. Arns in

13  Supp. of Mot. for Prelim. Approval of Class Action Settlement ("Arns Decl.") Ex. 1, § 2.1(a), ECF

14  No. 184-1.)  Second, Facebook has agreed to engineer an innovative new tool that would permit each

15  user to view a log of content they have shared (if any) that has been rebroadcast in a Sponsored Story,

16  thus providing a level of transparency that is unprecedented on the Internet.  (*Id.* § 2.1(b).)  Finally,

17  Facebook will create a granular control that will allow users, upon viewing content that has been

18  rebroadcast, to prevent further publication in additional Sponsored Stories, if they so desire.

19       These proposed changes provide the very relief Plaintiffs and other litigants have sought and

20  confer substantial benefits on all Facebook users, but without the significant risks and costs

21  associated with continued litigation.  *See Officers for Justice*, 688 F.2d at 628 (approving settlement

22  that would halt practices at the core of plaintiffs' complaint even where monetary compensation was

23  "potentially less than complete").  Indeed, Facebook believes that these changes would go far beyond

24  the controls and tools offered by any other company in the online media industry.  (*See* Tucker Decl.

25  ¶ 58; Infante Decl. ¶¶ 22-23.)  Given the reluctance of courts to micro-manage the business of

26  defendants, it is likely that Plaintiffs would not obtain such comprehensive relief even if they were to

27  prevail on their claims in future litigation.  (Infante Decl. ¶ 15.)

28

---

17

### 2.     Additional Settlement Benefits for the Minors' Subclass

In addition to the significant benefits applicable to all members of the class, the settlement contains several additional benefits specifically addressing the claims asserted by the minors' subclass, which would strengthen and expand parental oversight and control over sharing by minors that may be associated with social advertising.  First, Facebook has agreed to revise the SRR to clarify and confirm that any minor using Facebook has obtained parental consent to the expanded provisions specifically addressing use of users' names and likenesses in connection with sponsored content.  (Arns Decl. Ex. 1, § 2.1(c)(i).)  Second, the settlement requires Facebook to create a new tool that gives parents a *direct mechanism to prevent the names and likenesses of their minor children from appearing in Sponsored Stories*.  (*Id.* § 2.1(c)(ii).)  And finally, Facebook has agreed to expand its efforts to educate its users about these new parental controls, including by launching a dedicated area of Facebook's existing Family Safety Center that will provide detailed information about social advertising on Facebook and advise parents of the ability to control how or whether minors may appear in Sponsored Stories.  (*Id.*)  These efforts will supplement Facebook's already extensive programs designed to protect minors on its service–which include, among other things, frequent consultations with a Safety Advisory Board comprised of independent experts in cyber-stalking, cyber-bullying, and other online risks potentially affecting children.  (Gutkin Decl. Ex. J.)

Here, minor Plaintiff W.T.–like various other plaintiffs who have purported to challenge Facebook's social advertising on behalf of minors using Facebook–has focused heavily on the absence of any parental mechanism for withholding consent or preventing minors from appearing in sponsored content.  (SAC ¶ 41; *see* Notice of Transfer of Related Action Ex. B, ECF No. 98-2.)  The proposed settlement directly addresses this complaint by creating tools–available to every parent of every user under the age of 18–that will establish ultimate control over whether their minor children's activity is rebroadcast in Sponsored Stories.  The substantial and direct benefits to the proposed minors' subclass thus is closely related to the statutory provisions and claims at issue here, as in other approved settlements on behalf of a class of minor litigants.  *See, e.g.*, *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1342 (9th Cir. 1980) (affirming settlement of school desegregation class action on behalf of minors, pursuant to which defendant agreed to adopt a desegregation plan, examine

various policies, and make a host of program improvements), *overruled on other grounds by Evans v. Jeff D.*, 475 U.S. 717 (1986); *D.S. ex. rel. S.S. v. N.Y.C. Dep't of Educ.*, 255 F.R.D. 59 (E.D.N.Y. 2008) (approving settlement of class action on behalf of minors alleging that defendant deliberately denied minority students a high school education, where settlement obligated defendant to notify students of their right to attend school until age 21, instituted a program to monitor compliance, and provided minors with an array of compensatory education services).

### 3.    Substantial *Cy Pres* Award to Nationwide Online Privacy Groups

Finally, Facebook has agreed to make a substantial *cy pres* distribution in the amount of $10 million to leading nationwide organizations that focus on the precise areas of Plaintiffs' concern. (Mot. 23-24 & Ex. 1); *see, e.g.*, *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011) ("*Cy pres* distributions must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity."). Specifically, the proposed organizations–none of which has any significant prior affiliation with Facebook–focus on consumer protection, research and education concerning online privacy and the safe use of social media technologies, with a particular emphasis on protecting the interests of minors. A detailed description of the mission of each proposed recipient and the relationship between the proposed recipient and Facebook, if any, is attached hereto as Exhibit A.

It is well-settled in the Ninth Circuit that such *cy pres* relief is particularly appropriate where, as here, there are a large number of class members but individual recovery would be modest and difficult to administer and distribute. (*See Infante Decl. ¶¶ 19-20); see, e.g.*, *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990); *In re Google Buzz Privacy Litig.*, No. C 10-00672 JW, 2011 WL 7460099, at *1, *4 (N.D. Cal. June 2, 2011); *Catala v. Resurgent Capital Servs. L.P.*, No. 08-cv-2401 NLS, 2010 WL 2524158, at *4 (S.D. Cal. June 22, 2010) ("[T]he de minimus [sic] recovery of approximately 13 cents per class member would make distribution to [195,561] class members impracticable because of the burden and expense of distribution.").

In this case, the proposed class consists of more than 100 million Facebook users whose Likes and actions have been rebroadcast in one or more Sponsored Stories. (Opp'n Br. 7.) Despite the unprecedented size of the class, the potential recovery to individual users would be trivial–measured

in cents rather than dollars for all but the most prolific Facebook users.  *See* Section II(A)(5), *supra*.

Moreover, the administrative costs and burden associated with assessing individual economic

damages for millions of individual class members would be extraordinary, given that the activities

and endorsement value of individual users, and the price of individual Sponsored Stories, vary widely

within the class.  Likewise, although Facebook believes that Plaintiffs cannot pursue statutory

damages in lieu of economic damages at all, *see id.*, assessing individual entitlement to statutory

damages would prove unduly burdensome because:  (i) statutory damages are available only to class

members who survive the fact-intensive actual damages analysis, *see* § 3344(a) (statutory damages

available only when actual damages are less than $750); and (ii) determining the appropriate

distribution of damages would require the individual analysis of *billions* of Sponsored Stories.  This

further supports the merits of *cy pres* relief here.  *See Six (6) Mexican Workers*, 904 F.2d at 1305

("Federal courts have frequently approved [*cy pres* distribution] where the proof of individual claims

would be burdensome or distribution of damages costly."); (Infante Decl. ¶¶ 16-18.)

        Notably, while the emergence of privacy-related class actions directed to online companies is

a relatively new phenomenon, virtually every approved settlement of a class action involving

Internet-based privacy claims has involved a pure *cy pres* distribution coupled with injunctive relief,

analogous to the terms of the settlement proposed here.  *See In re Google Buzz*, 2011 WL 7460099

(N.D. Cal. June 2, 2011) ($6.1 million *cy pres* distribution); Stipulation of Settlement and Release,

*Valentine v. NebuAd, Inc.*, No. 3:08-cv-05113-TEH (N.D. Cal. Aug. 16, 2011), ECF No. 233-1

($2.41 million *cy pres* distribution, less attorneys' fees, costs, and incentive awards); Final Order and

Judgment, *In re Quantcast Advertising Cookie Litig.*, No. 2:10-cv-05484-GW-JCG (C.D. Cal. June

13, 2011), ECF No. 83 ($2.4 million *cy pres* distribution, less attorneys' fees, expenses, and incentive

awards).  These settlements undoubtedly reflect the unique challenges and complexity of distributing

and determining damages in the context of a heterogeneous nationwide user base comprising millions

of individuals in actions involving rapidly changing technologies.

        **4.      Retired Judge Edward Infante Determined that the Settlement "provides tremendous benefits to the class and to the public"**

        Retired Judge Edward Infante has confirmed the substantial value of these benefits to the

20

class and the integrity of the process through which they were negotiated, providing further support for preliminary approval of the settlement.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (the "presence of a neutral mediator [is] a factor weighing in favor of a finding of non-collusiveness"); *In re HP Laser Printer Litig.*, No. 07-0667 AG,  2011 WL 3861703, at \*4 (C.D. Cal. Aug. 31, 2011) (approving settlement where neutral mediator concluded that parties had negotiated in good-faith and at arms-length to reach an appropriate compromise). In his role as a neutral mediator, Judge Infante participated extensively in the negotiations that led to the eventual settlement of this case.  Over the course of several months, he presided over an all-day mediation between the parties, supervised ongoing settlement discussions, evaluated correspondence, communicated frequently with counsel, and reviewed briefing and evidence submitted in this case. (Infante Decl. ¶¶ 2-4, 24.)  Intimately familiar with Plaintiffs' concerns and the strength of their claims, Judge Infante determined that the proposed settlement "represents a highly favorable outcome for Plaintiffs and provides tremendous benefits to the class and to the public." (Infante Decl. ¶ 24.) Moreover, having participated directly in the settlement proceedings and months of negotiations between the parties, he found "no indication whatsoever of collusion . . . ."  (*Id.*)  To the contrary, given "the intensity of the adversarial process" he observed, Judge Infante concluded that the settlement "resulted from fully-informed, arms-length negotiations" and "bears all the hallmarks of procedural fairness."  (Infante Decl. ¶ 24); *see Vasquez*, 266 F.R.D. at 490.[2]

---

[2] Facebook is aware that putative intervenors contend that certain features of the settlement, such as the attorneys' fee provision, warrant additional scrutiny.  (Proposed Pls.-Intervenors' Mot. for Intervention 8-9, ECF No. 187.)  Because the settlement agreement does not provide for a set amount of attorneys' fees and Plaintiffs' counsel has not yet moved for an award, this challenge is premature.  More fundamentally, it is wrong.  As an initial matter, Facebook has not agreed that a fee award in any particular amount would be reasonable or appropriate. (*See* Arns Decl. Ex. 1, § 2.3.)  Instead, Facebook has preserved its ability to terminate the agreement if the Court awards a fee over a certain amount.  (*Id.*)  Facebook is not alone in recognizing the propriety of this structure.  Indeed, Judge Infante's unbiased opinion that the settlement agreement "[has] no indication whatsoever of collusion" belies any self-serving accusations made by putative intervenors to the contrary.  (Infante Decl. ¶ 24); *see In re HP Laser Printer*, 2011 WL 3861703, at \*4 (approving settlement blessed by neutral mediator even where attorneys' fees were disproportionate to class compensation, where unpaid claims reverted to defendant, and where the settlement contained a "clear sailing" provision).  Moreover, unlike in the cases cited by putative intervenors, the estimated value here of the settlement to class members is not disproportionate to the potential fee award.  To the contrary, the value of the injunctive relief to the class is substantial because it squarely addresses all of Plaintiffs' core concerns.  *See In re HP Laser*

*(Cont'd on next page)*

**D.      Settlement Ensures Clarity and Resolution for Facebook, Its Users and Advertisers**

Although Facebook has numerous strong defenses to Plaintiffs' claims and fully expects that it would prevail on the merits, *see* Section II(A), *supra*, it is prepared to settle on the terms contained in the proposed settlement because it is in the best interests of Facebook, its users, and its advertisers to resolve this litigation on terms that establish clarity going forward with respect to its social advertising model.  Facebook is an advertising-supported service, and the revenue derived from sponsored content like Sponsored Stories makes it possible for Facebook to offer its customized, highly-innovative service to hundreds of millions of users for free.  (*See* Squires Decl. ¶ 56.) Moreover, Facebook's users derive significant benefits from social advertising: users choose to broadcast their Likes and actions to others on Facebook precisely because they want to share their support for the sponsor as broadly as possible, including in sponsored content.  (Tucker Decl. § 6.) Although millions of Facebook's users in the proposed class enjoy the free service that sponsored content enables–and desire to share or benefit from sharing their connections and affiliations through social advertising–Facebook has faced a continual stream of opportunistic litigation attacking this aspect of its business model.  *See* Pls.' First Am. Compl., *C.M.D. v. Facebook, Inc.*, No. 3:12-cv-01216-LHK (N.D. Cal. Apr. 20, 2012) ("*C.M.D.* FAC"), ECF No. 107) (alleging right of publicity claims based on Facebook's alleged failure to obtain parental consent for displaying minors' names and likenesses in alleged advertisements); Class Action Compl., *J.N.D. v. Facebook, Inc.*, No. 11-cv-03287 (N.D. Cal. July 5, 2011), ECF No. 1 (suing under § 3344 and the California Constitution based on same); Am. Class Action Compl., *J.N. v. Facebook, Inc.*, No. 11-cv-2128 (E.D.N.Y. May 3, 2011) ("J.N. FAC"), ECF No. 2 (suing under New York's right of publicity statute based on same); First

---

*(Cont'd from previous page)*

*Printer*, 2011 WL 3861703, at *6 ("The attorney fee award is reasonable compared to the degree of success, *particularly regarding the injunctive relief obtained*.") (emphasis added).  Even without considering the value of the injunctive relief, the $10 million *cy pres* distribution more than justifies the potential award here.  *See Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2012 WL 381202, at *5 (N.D. Cal. Feb. 6, 2012) (approving settlement where attorney's fees were "on par with the money to the class and the cy pres combined (roughly 1:1)" and the court was "not faced with a situation where fees are disproportionate to the class award as in *Bluetooth*").

Am. Class Action Compl., *David Cohen v. Facebook, Inc.*, No. BC 444482 (L.A. Super. Ct. Apr. 26, 2011) (suing under § 3344, the UCL and the California Constitution based on same).

Under these circumstances, Facebook has determined that the proposed settlement furthers the best interests of the company and its users by establishing clarity with respect to the operation of social advertising on Facebook going forward. *See Walter v. Hughes Commcn's, Inc.*, No. 09-2136 SC, 2011 WL 2650711, at *11 (N.D. Cal. July 6, 2011) (noting that "a settlement that is structured such that the interests of the class are tied to the interests of . . . the defendant demands less scrutiny"). This case presents unique opportunities to resolve claims challenging the rebroadcast of users' names and photographs in social advertising on a nationwide basis, since Plaintiffs here have asserted claims under California law–specifically Section 3344 and the UCL. As Plaintiffs have conceded, under the California Supreme Court's decision in *Washington Mutual Bank v. Superior Court*, 24 Cal. 4th 906 (2001), California law must be applied to a nationwide class in view of the exclusive choice of law provision contained in Facebook's SRR, which provides that "[t]he laws of the State of California will govern this Statement, as well as any claim that might arise between [the User] and [Facebook], without regard to conflict of law provisions." (Muller Decl. Ex. I, at FB_FRA_000531); Notice of Transfer of Related Action Ex. B, ECF No. 98-2 (holding SRR enforceable against plaintiffs).) This uniform choice of law provision is particularly critical in the context of Facebook's global social networking service; piecemeal application of different state's laws to its service would result in inconsistent decisions and would be extraordinarily disruptive to Facebook's business operations. *Cf. Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1063 (9th Cir. 2009) (uniform standards governing email ensure that businesses do "not have to guess at the meaning of various state laws when their advertising campaigns venture[] into cyberspace") (quotation marks and citation omitted); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (uniform definition of "intellectual property" under the CDA required given that "material on a website may be viewed across the Internet, and thus in more than one state at a time").

By settling claims asserted on behalf of a nationwide class under California's right of publicity statute and unfair competition law following protracted litigation, Facebook is able to resolve the released claims on a basis that applies consistently to all users in the United States. At the

same time, the settlement addresses claims filed by other plaintiffs who erroneously have challenged the display of social actions in sponsored content under different states' laws, and who purport to represent individuals whose claims are addressed, in whole or in part, by the nationwide class relief obtained through the settlement in this case.[3]

In summary, this case presents the most appropriate vehicle to provide relief and resolution to all Facebook users in the United States concerning the effect and operation of social advertising on Facebook.  On the one hand, users throughout the United States (and, where minors, their parents) will benefit from changes and tools that provide significant visibility and control over how and whether their Likes and activities are shared in Sponsored Stories, as well as a significant *cy pres* distribution to nationwide online privacy organizations.  On the other, Facebook will be able to focus on operating a free, innovative service for all users with clarity as to its rights to display social advertising under the SRR and without the distraction of continued opportunistic litigation.  *See Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 309 (7th Cir. 1985) (affirming settlement of class action against pension fund, where the resolution would have "the benefit of ending years of litigation over the past history of the Fund and freeing the current trustees and personnel to attend to the task of managing the Fund").

**E.     The Court Should Find that Facebook Complied with CAFA's Notice Procedures and Approve the Content and Manner of Transmitting the Class Notice.**

Facebook, through the settlement administrator, provided notice to the appropriate state and

---

[3]  Indeed, these analogous claims often consist of near-verbatim recitations of those raised by Plaintiffs and rest on the same proof.  *Compare* SAC ¶ 45 ("[I]f you compare an ad without a friend's endorsement, and you compare an ad with a friend's [Facebook] 'Like' . . . on average, 68% more people are likely to remember seeing the ad with their friend's name.  A hundred percent–so two times more likely to remember the ad's message; and 300% more likely to purchase.") *with C.M.D.* FAC ¶ 27 ("This study found that the addition of apparent endorsements 'strongly impact' the three key measures of an advertisement's effect.  The study documented a 60% increase in ad recall, a 100% increase in ad awareness and a 300% increase in purchase intent."); *compare* SAC ¶ 41 ("Where a Member is a minor, no consent for use of the Member's name, photograph, likeness or identity is sought or received from the minor's parent or legal guardian.") *with* Pls.' Original Compl., *C.M.D. v. Facebook, Inc.*, No. 3:11-cv-00461 (S.D. Ill. June 1, 2011) ¶ 23, ECF No. 2 ("Defendant used and continues to use Plaintiffs' name and photographs for the purpose of marketing, advertising, selling and soliciting the purchase of goods and services knowing that Plaintiffs, as minors, lack the capacity to consent to such use and without obtaining consent of Plaintiffs' parents or guardians.").

federal officials pursuant to the Class Action Fairness Act of 2005 ("CAFA").  (*See* Declaration of Jennifer M. Keough, filed concurrently herewith; Arns Decl." Ex. 1§ 3.4.)  Because the notice was sent to the proper individuals and contained the required information, 28 U.S.C. § 1715(b), the Court should find that Facebook complied with CAFA's notice procedures.  *See id.* § 1715(d).

Additionally, the Court should find that the content of the proposed notice to the Class and Minor Subclass of the Settlement meets the standard of applicable law since the notice "generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Goldkorn v. Cnty. of San Bernardino*, No. 06–707–VAP, 2012 WL 476279, at \*10-11 (C.D. Cal. Feb. 13, 2012) (citation omitted).  The long-form notice, attached as Exhibit B to the Settlement, identifies Plaintiffs and Facebook, contains sufficient information to allow class members to make an informed choice to accept or reject the Settlement, and contains detailed instructions for requesting exclusion from, objecting to, or participating in the Settlement, as well as the schedule for final approval and attorneys' fees hearings.  Additionally, the tiered notice plan, with the short-form notice by electronic mail (or Facebook messaging) and publication notice directing potential class members to the long-form notice on the Internet, is similar to plans previously approved by this Court.  *See In re TD Ameritrade Account Holder Litig.*, No. 07–2852 SBA, 2011 WL 4079226, at \*10 (N.D. Cal. Sept. 13, 2011) (granting final approval of notice plan of: "(1) summary notice mailed via postcard or email; (2) summary notice issued in USA Today; and (3) posting of a full (long-form) notice on a public website maintained by the notice provider.").

### III.     CONCLUSION

For the reasons set forth above and in Plaintiffs' Motion, the proposed settlement meets the standards for preliminary approval under Rule 23(e).  Facebook respectfully requests that the Court preliminarily approve the proposed settlement.

DATED: June 29, 2012                              Respectfully submitted,

                                                  COOLEY LLP

                                                  By: */s/ Michael G. Rhodes*
                                                         Michael G. Rhodes

                                                  Attorneys for Defendant FACEBOOK, INC.

1276081/SF