COOLEY LLP
MICHAEL G. RHODES (116127)
(mrhodes@cooley.com)
MATTHEW D. BROWN (196972)
(brownmd@cooley.com)
JEFFREY M. GUTKIN (216083)
(jgutkin@cooley.com)
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

Attorneys for Defendant Facebook, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL FRALEY; PAUL WANG; SUSAN MAINZER; JAMES H. DUVAL, a minor, by and through JAMES DUVAL, as Guardian ad Litem; and W.T., a minor, by and through RUSSELL TAIT, as Guardian ad Litem; individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC., a corporation; and DOES 1-100,<br><br>Defendants. | Case No. CV 11-01726 RS<br><br>**DEFENDANT FACEBOOK, INC.'S MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF REVISED SETTLEMENT**<br><br>**DATE:** October 25, 2012<br>**TIME:** 1:30 p.m.<br>**DEPT.:** 3<br>**JUDGE:** Hon. Richard Seeborg |

## TABLE OF CONTENTS

**Page**

I. STATEMENT OF ISSUES TO BE DECIDED .................................................. 1

II. INTRODUCTION ............................................................................................ 1

III. OVERVIEW OF THE LITIGATION AND THE REVISED SETTLEMENT ................ 4

    A.   Overview of Sponsored Stories and Plaintiffs' Allegations .................... 4

    B.   Case History Before Settlement ............................................................. 6

    C.   Revised Settlement ................................................................................ 7

IV. THE COURT SHOULD PRELIMINARILY APPROVE THE REVISED
SETTLEMENT .............................................................................................. 13

    A.   Legal Standard on a Motion for Preliminary Approval ....................... 13

    B.   The Settlement Is the Product of Fully-Informed, Non-Collusive
Negotiations ........................................................................................ 14

    C.   The Settlement Has No Obvious Deficiencies and Is in the Range of
Approval .............................................................................................. 15

        1.   Plaintiffs had exceedingly low odds of obtaining a substantial
recovery .................................................................................. 16

            a.   Plaintiffs and putative Class Members could not prove
injury ............................................................................ 17

            b.   Class Members consented to Sponsored Stories as a matter
of law ........................................................................... 18

                (1)   Users' express consent defeats their claims ...................... 18

                (2)   Users' implied consent is equally fatal to their
claims ............................................................................... 19

                (3)   COPPA preempts the parental consent requirement
asserted by Plaintiffs ....................................................... 21

                     (a) Express preemption ..................................................... 21

                     (b) Conflict preemption .................................................... 23

                  (4)   Even if Facebook were required to establish parental
consent, it could do so for millions of minor Users ......... 25

            c.   Plaintiffs could not prevail for numerous additional reasons ....... 26

        2.   Absent a settlement, it may be years before the Class recovers, if at
all ............................................................................................ 29

        3.   The relief in the Revised Settlement is fair, reasonable, and
adequate .................................................................................. 30

            a.   The monetary relief component is appropriate in light of the
strength of the claims, and the risks of continued litigation ........ 31

            b.   The *cy pres* distribution will be appropriate, if it occurs .............. 35

            c.   The proposed *Cy Pres* Recipients are appropriate. ....................... 37

TABLE OF CONTENTS
(CONTINUED)

|  |  |  |  |  | Page |
|---|---|---|---|---|---|
|  |  | d. | The injunctive relief provides substantial value to the Class | | 38 |
|  |  |  | (1) | Enhanced notice and new controls for all Class Members | 38 |
|  |  |  | (2) | Additional settlement benefits for the Minor Subclass | 39 |
|  |  |  | (3) | Compliance audit | 40 |
|  |  |  | (4) | The injunctive relief contributes to the total consideration for the release of Class Members' claims for past damages | 40 |
|  |  | 4. | The procedural posture and the views of counsel support settlement | | 42 |
|  | D. | The Settlement Does Not Grant Preferential Treatment to Segments of the Class | | | 42 |
|  | E. | The Arguments of the C.M.D. Plaintiffs and Other Third Parties Lack Merit | | | 43 |
|  |  | 1. | As discussed, any purported parental consent requirement is invalid | | 44 |
|  |  | 2. | The California Family Code has no bearing on the Settlement | | 44 |
|  |  | 3. | The injunctive relief contributes substantial value to the Settlement | | 46 |
|  |  | 4. | The injunctive relief is reasonable and adequate, notwithstanding Third Parties' injunctive relief "wish lists." | | 47 |
| V. | THE PROPOSED NOTICE PLAN SHOULD BE PRELIMINARILY APPROVED | | | | 48 |
|  | A. | Legal Standard for Approval of a Notice Plan | | | 48 |
|  | B. | The Content of the Notice Provided to Class Members Is Sufficient | | | 49 |
|  | C. | The Means of Supplying Notice to Class Members Is Sufficient | | | 49 |
|  | D. | Facebook will comply with the Class Action Fairness Act | | | 50 |
| VI. | CONCLUSION | | | | 50 |

**TABLE OF AUTHORITIES**

Page

CASES

*Abdul-Jabbar v. Gen. Motors Corp.,*
  85 F.3d 407 (9th Cir. 1996)..................................................................................... 26

*Acosta v. Trans Union, LLC,*
  243 F.R.D. 377 (C.D. Cal. 2007) ............................................................................ 47

*Animal Legal Def. Fund v. Mendes,*
  160 Cal. App. 4th 136 (2008) ................................................................................. 17

*Arizona v. United States,*
  132 S. Ct. 2492 (2012)...................................................................................... 23, 24

*AT&T Mobility LLC v. Concepcion,*
  131 S. Ct. 1740 (2011) ............................................................................................ 23

*Backpage.com, LLC v. McKenna,*
  No. C12-954-RSM, 2012 WL 3064543 (W.D. Wash. July 27, 2012)................................ 24

*Barnes v. Yahoo!, Inc.,*
  570 F.3d 1096 (9th Cir. 2009).................................................................................. 28

*Baugh v. CBS, Inc.,*
  828 F. Supp. 745 (N.D. Cal. 1993) ......................................................................... 26

*Blankenship v. Hearst Corp.,*
  519 F.2d 418 (9th Cir. 1975).................................................................................... 45

*Boyle v. Giral,*
  820 A.2d 561 (D.C. Cir. 2003) ................................................................................ 36

*Brown v. Entm't Merchs. Ass'n,*
  131 S. Ct. 2729 (2011) ............................................................................................. 27

*Browning v. Yahoo! Inc.,*
  No. C04-01463 HRL, 2007 WL 4105971 (N.D. Cal. Nov. 16, 2007)........................... 43, 50

*Carafano v. Metrosplash.com, Inc.,*
  339 F.3d 1119 (9th Cir. 2003)................................................................................... 28

*Casey Wasserman Living Trust v. Bowers,*
  No. 5:09-CV-180-JMH, 2011 U.S. Dist. LEXIS 46451 (E.D. Ky. Apr. 29, 2011)............... 45

*Catala v. Resurgent Capital Servs. L.P.,*
  Civ. No. 08cv2401 NLS, 2010 WL 2524158 (S.D. Cal. June 22, 2010)............................ 36

1

**TABLE OF AUTHORITIES**
(CONTINUED)

2

**Page**

3

*Churchill Vill., LLC v. Gen. Elec.,*
   361 F.3d 566 (9th Cir. 2004).................................................................................. 49

4

*Cohen v. Facebook, Inc.,*
   No. 10-5282 RS, 2011 WL 5117164 (N.D. Cal. Oct. 27, 2011)............................. 17

5

6

*Dennis v. Kellogg Co.,*
   --- F.3d ---, Nos. 11-55674, 11-55706, 2012 WL 3800230 (9th Cir. Sept. 4, 2012) .............. 37

7

8

*Downing v. Abercrombie & Fitch,*
   265 F.3d 994 (9th Cir. 2001)........................................................................... 17, 18

9

*Eisen v. Carlisle & Jacquelin,*
   479 F.2d 1005 (2d Cir. 1973)................................................................................ 16

10

11

*Farinella v. Paypal*
   611 F. Supp. 2d 250 (E.D.N.Y. 2009) .................................................................. 43

12

13

*First State Orthopaedics v. Concentra, Inc.,*
   534 F. Supp. 2d 500 (E.D. Pa. 2007) ................................................................... 41

14

*Fisher Bros. v. Cambridge-Lee Indus., Inc.,*
   630 F. Supp. 482 (E.D. Pa. 1985) ........................................................................ 34

15

16

*Francisco v. Numismatic Guar. Corp.,*
   No. 06-61677-CIV, 2008 WL 649124 (S.D. Fla. Jan. 31, 2008)........................... 36

17

18

*Franklin Nat'l Bank v. New York,*
   347 U.S. 373 (1954)............................................................................................. 23

19

*Geier v. Am. Honda Motor Co.,*
   529 U.S. 861 (2000)............................................................................................. 23

20

21

*Gionfriddo v. Major League Baseball,*
   94 Cal. App. 4th 400 (2001) ................................................................................ 27

22

23

*Goddard v. Google, Inc.,*
   640 F. Supp. 2d 1193 (N.D. Cal. 2009) ............................................................... 28

24

*Gordon v. Virtumundo, Inc.,*
   575 F.3d 1040 (9th Cir. 2009)......................................................................... 21, 22

25

26

*Greenstein v. Greif Co.,*
   No. B200962, 2009 WL 117368 (Cal. App. Jan. 20, 2009) .................................. 19

27

28

**FACEBOOK'S MPA ISO JT. MOT. FOR
PRELIM. APPROVAL OF REV. SETTLEMENT
CASE NO. CV 11-01726 RS**

## TABLE OF AUTHORITIES
(CONTINUED)

**Page**

*Hakes Inv. Co. v. Lyons,*
    166 Cal. 557 (1913) ............................................................................................ 45

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ...................................................................... 14, 33

*Harris v. U.S. Phys. Therapy, Inc.,*
    No. 2:10–cv–01508, 2012 WL 3277278 (D. Nev. July 18, 2012) ..................... 16

*Hoffman v. Capital Cities/ABC, Inc.,*
    255 F.3d 1180 (9th Cir. 2001) .......................................................................... 27

*In re Bluetooth Headset Prods. Liab. Litig.,*
    654 F.3d 935 (9th Cir. 2011) ............................................................................ 15

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
    216 F.R.D. 197 (D. Me. 2003) .......................................................................... 50

*In re Ferrero Litig.,*
    No. 11-CV-00205-H-KSC, 2012 WL 2802051 (S.D. Cal. July 9, 2012) ............. 38

*In re Gen. Instr. Sec. Litig.,*
    209 F. Supp. 2d 423 (E.D. Pa. 2001) ................................................................ 34

*In re Google Buzz Privacy Litig.,*
    No. C 10-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011) ..................... 36

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.,*
    851 F. Supp. 2d 1040 (S.D. Tex. 2012) ............................................................. 34

*In re HP Laser Printer Litig.,*
    No. SACV 07-0667 AG (RNBx), 2011 WL 3861703 (C.D. Cal. Aug. 31, 2011) ................ 41

*In re Immune Response Sec. Litig.,*
    497 F. Supp. 2d 1166 (S.D. Cal. 2007) .............................................................. 42

*In re Indep. Energy Holdings PLC Sec. Litig.,*
    No. 00 Civ. 6689, 2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) ..................... 15

*In re Mego Fin. Corp. Sec. Litig.,*
    213 F.3d 454 (9th Cir. 2000) ............................................................................ 34

*In re Mercury Interactive Corp. Secs. Litig.,*
    618 F.3d 988 (9th Cir. 2010) ............................................................................ 49

TABLE OF AUTHORITIES
(CONTINUED)

Page

*In re Motor Fuel Temperature Sales Practices Litigation,*
  MDL No. 1840, No. 07-MD-1840-KHV,
  2012 WL 1415508 (D. Kan. Apr. 24, 2012) ............................................................... 40, 41, 42

*In re Pac. Enters. Sec. Litig.,*
  47 F.3d 373 (9th Cir. 1995) ........................................................................................... 13, 16

*In re Pharm. Indus. Average Wholesale Price Litig.,*
  588 F.3d 24 (1st Cir. 2009) ............................................................................................ 36, 37

*In re Tableware Antitrust Litig.,*
  484 F. Supp. 2d 1078 (N.D. Cal. 2007) ........................................................................ 14, 50

*In re TD Ameritrade Account Holder Litig.,*
  Nos. C 07-2852, C 07-4903, 2011 WL 4079226 (N.D. Cal. Sept. 13, 2011) ...................... 34

*In re Warfarin Sodium Antitrust Litig.,*
  391 F.3d 516 (3d Cir. 2004) ................................................................................................ 14

*Jones v. Corbis Corp.,*
  815 F. Supp. 2d 1108 (C.D. Cal. 2011), *aff'd,* 2012 WL 2884790 (9th Cir. Jul 16,
  2012) ................................................................................................................................... 19

*Levell v. Monsanto Research Corp.,*
  191 F.R.D. 543 (S.D. Ohio 2000) ....................................................................................... 47

*Levitt v. Yelp! Inc.,*
  Nos. C-10-1321, C-10-2351, 2011 WL 5079526 (N.D. Cal. Oct. 26, 2011) ...................... 28

*Linney v. Cellular Alaska P'ship,*
  151 F.3d 1234 (9th Cir. 1998) ....................................................................................... 13, 14

*Linney v. Cellular Alaska P'ship,*
  Nos. C-96-3008, C-97-0203, C-97-0425, C-97-0457, 1997 WL 450064 (N.D. Cal.
  July 18, 1997), *aff'd,* 151 F.3d 1234 (9th Cir. 1998) ........................................................ 14

*Lowe v. S.E.C.,*
  472 U.S. 181 (1985) ............................................................................................................ 27

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ............................................................................................................ 17

*Mazza v. Am. Honda Motor Co.,*
  666 F.3d 581 (9th Cir. 2012) ............................................................................................... 28

-iv-

1

**TABLE OF AUTHORITIES**
(CONTINUED)

2

**Page**

3    *McCall v. Facebook, Inc.*,
4        --- F.3d ---, No. 10-16398 (9th Cir. Sept. 20, 2012) ........................................................ passim

5    *Miller v. California*,
        413 U.S. 15 (1973) ............................................................................................................ 27

6    *Morgan v. Morgan*,
7        220 Cal. App. 2d 665 (1963) ............................................................................................ 45

8    *Myers v. MedQuist, Inc.*,
        Civ. No. 05-4608 (JBS), 2009 WL 900787 (D.N.J. Mar. 31, 2009) ........................... 38, 41, 48
9

     *Nachshin v. AOL, LLC*,
10       663 F.3d 1034 (9th Cir. 2011) ...................................................................................... 36, 37

11   *Nat'l Rural Telecomms. Cooperative v. DIRECTV, Inc.*,
12       221 F.R.D. 523 (C.D. Cal. 2004) ................................................................................. 14, 41

13   *Newcombe v. Adolf Coors Co.*,
        157 F.3d 686 (9th Cir. 1998) ............................................................................................ 26
14

     *Newton v. Thomason*,
15       22 F.3d 1455 (9th Cir. 1994) ............................................................................................ 19

16   *Nienaber v. Citibank (South Dakota) N.A.*,
17       No. Civ. 04-4054, 2007 WL 752297 (D.S.D. Mar. 7, 2007) .................................................. 36

18   *O'Brien v. Brain Research Labs, LLC*,
        Civ. A. No. 12–204, 2012 WL 3242365 (D.N.J. Aug. 9, 2012) ............................................. 34
19

     *Officers for Justice v. Civ. Serv. Comm'n*,
20       688 F.2d 615 (9th Cir. 1982) ...................................................................................... passim

21   *Parker v. Time Warner Entm't Co., L.P.*,
22       331 F.3d 13 (2d Cir. 2003) ............................................................................................... 32

23   *Parker v. Time Warner Entm't Co., L.P.*,
        631 F. Supp. 2d 242 (E.D.N.Y. 2009) ................................................................................ 34
24

     *Perez v. Asurion Corp.*,
25       501 F. Supp. 2d 1360 (S.D. Fla. 2007) .............................................................................. 30

26   *Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C.*,
27       No. CV-04-2195 (CPS), 2006 WL 3681138 (E.D.N.Y. Dec. 11, 2006) ................................. 36

28

-v-

## TABLE OF AUTHORITIES
(CONTINUED)

**Page**

*Riker v. Gibbons,*
   No. 3:08-cv-00115-LRH-VPC, 2010 WL 4366012 (D. Nev. Oct. 28, 2010)........................ 30

*Riley v. Nat'l Fed'n of the Blind of N.C.,*
   487 U.S. 781 (1988)......................................................................................................... 27

*Rodriguez v. W. Publ'g Corp.,*
   563 F.3d 948 (9th Cir. 2009).............................................................................. 13, 14, 43

*S. Bay Chevrolet v. GMAC,*
   72 Cal. App. 4th 861 (1999) ........................................................................................... 29

*Satchell v. Fed. Express Corp.,*
   Nos. C03-2659 SI, C03-2878 SI, 2007 WL 1114010 (N.D. Cal. Apr. 13, 2007).................. 15

*Schumm v. Berg,*
   37 Cal. 2d 174 (1951) .................................................................................................... 45

*Sisco v. Cosgrove, Michelizzi, Schwabacher, Ward & Bianchi,*
   51 Cal. App. 4th 1302 (1996) ........................................................................................ 45

*Smith v. Dominion Bridge Corp.,*
   Civ. A. No. 96-7580, 2007 WL 1101272 (E.D. Pa. Apr. 11, 2007) ....................................... 50

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
   558 U.S. 408 (2003)......................................................................................................... 33

*Staton v. Boeing Co.,*
   327 F.3d 938 (9th Cir. 2003).............................................................................................. 30

*Stewart v. Rolling Stone LLC,*
   181 Cal. App. 4th 664 (2010) ......................................................................................... 18

*Thieriot v. Celtic Ins. Co.,*
   No. C 10–04462 LB, 2011 WL 1522385 (N.D. Cal. Apr. 21, 2011)...................................... 43

*Vasquez v. Coast Valley Roofing, Inc.,*
   670 F. Supp. 2d 1114 (E.D. Cal. 2009)............................................................................. 13

*W. Va. v. Chas. Pfizer & Co.,*
   314 F. Supp. 710 (S.D.N.Y. 1970)...................................................................................... 16

*White v. Experian Info. Solutions, Inc.,*
   803 F. Supp. 2d 1086 (C.D. Cal. 2011) ........................................................................ 30, 33

**TABLE OF AUTHORITIES**
(CONTINUED)

Page

**STATUTES**

California Business and Professions Code
  § 17200 ("UCL") ........................................................................... passim

California Civil Code
  § 3344 ........................................................................................... passim

California Family Code
  § 6700 ............................................................................................... 45
  § 6701 ........................................................................................... 45, 46
  §§ 6750-51 ........................................................................................ 46

Children's Online Privacy Protection Act ("COPPA"),
  15 U.S.C. §§ 6501-08 ................................................................... passim

Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C.
  § 1715 ............................................................................................... 50

Communications Decency Act ("CDA")
  § 230 ..................................................................................... 3, 27, 28, 29

**OTHER AUTHORITIES**

76 Fed. Reg. 59804, 59805 (Sept. 27, 2011) ........................................ 22

16 C.F.R. § 312.5(a) ............................................................................... 21

Federal Rules of Civil Procedure
  23 ............................................................................................... passim

*Manual for Complex Litigation* (4th ed. 2004) § 21.311 ........................ 50

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.   STATEMENT OF ISSUES TO BE DECIDED**

3       1.    Should the Court preliminarily approve the Parties' Revised Settlement?[1]

4       2.    Should the Court approve the Parties' proposed plan for notifying the putative

5  Class of the Settlement?

6  **II.   INTRODUCTION**

7       The Settlement, which is the product of over a year of hard-fought litigation, has been

8  modified significantly to address the issues raised by the Court and third parties.  Under the

9  Revised Settlement, Class Members—Facebook users ("Users") in the United States who have

10  appeared in Sponsored Stories—may claim a cash payment of up to $10 each, to be paid from a

11  $20 million total settlement fund.  If claims, attorneys' fees, administration costs, and other

12  Court-approved expenses do not exhaust the fund, the remainder will be awarded as *cy pres* to

13  Court-approved nonprofit organizations, and will not return to Facebook.  The Parties have also

14  deleted the Settlement's "clear sailing" provision, and Facebook may now oppose Plaintiffs'

15  counsel's petition for fees and expenses.  Finally, the Parties have provided greater detail about

16  how Facebook will implement the Settlement's injunctive relief provisions—which include

17  robust new disclosures and innovative controls that respond directly to the allegations in this

18  lawsuit—and have substantially augmented the injunctive relief for minor Users and their parents.

19       As a result of these changes, the Revised Settlement now combines direct monetary

20  payments with injunctive relief that removes any conceivable question as to whether Facebook

21  has adequately described its business practices.  It also gives Users a level of control over their

22  (and their minor children's) appearance in sponsored content that well exceeds what the law

23  requires.  The Revised Settlement is fair and reasonable because it secures these substantial

24  benefits for the Class, even though Plaintiffs' claims are meritless, and even though a host of

25  formidable obstacles stood in the way of their recovery if litigation had continued.

26

---

27  [1] Capitalized terms in this Motion that are not defined in the Motion have the same definition as used in the Revised Settlement Agreement ("R.A."), which is filed as an attachment to the

28  concurrently filed Joint Motion for Preliminary Approval of Revised Settlement.

Plaintiffs are Facebook Users who allege that Facebook violated California's right of publicity statute, Civil Code § 3344 ("§ 3344"), and California's Unfair Competition Law, Business and Professions Code § 17200 ("UCL"), by displaying their names and Facebook profile pictures in Sponsored Stories without valid consent.  After more than a year of discovery, however, Facebook has exposed numerous, fatal defects in Plaintiffs' case.  Most fundamentally, Plaintiffs were never able to show that they or any Class Members were harmed by Sponsored Stories, as required under Article III of the U.S. Constitution, § 3344, and the UCL.  Plaintiffs' theory of injury was that Users were harmed because Facebook allegedly earned more revenue from Sponsored Stories than it would have earned from advertisements run in their place.  Setting aside the defects with this theory (which conflates the benefit to Facebook with injury to Users), Facebook proved through expert and fact discovery that it frequently earned *less money* by running Sponsored Stories.

Equally fatal, Class Members *expressly agreed* to the display of their "names and likenesses" in the type of content challenged in the case.  As a condition of using Facebook's free website, all Users agree to Facebook's terms of use, currently known as the Statement of Rights and Responsibilities (the "Terms").  Since before Sponsored Stories launched, the Terms have disclosed that a User's "name and profile picture may be associated with commercial, sponsored, or related content (such as a brand [the User] like[s])," and have expressly granted Facebook "permission to use [the User's] name and profile picture in connection with that content."  This clear, express consent posed an insurmountable hurdle for Class Members, who had the burden to prove that Facebook *lacked consent* to display their names and profile pictures.

Facebook also adduced overwhelming evidence that Users *impliedly* consent to Sponsored Stories by, for example, continuing to use the site (and particular features), despite knowing that their names and profile pictures could be displayed in connection with sponsored content.  Through discovery, Facebook established the prevalence (if not the near-ubiquity) of implied consent among Class Members, including the named Plaintiffs themselves, who continued to take actions on Facebook that could generate Sponsored Stories long after filing suit.  One Class Member even remarked that Facebook's use of her name and likeness in Sponsored Stories was

2.

1      "███████" adding that "███████████████████████" Because implied

2  consent precludes a claim for misappropriation, these facts doomed Plaintiffs' claims.

3      Facebook's consent defenses apply with equal force to the claims of the Minor Subclass.

4  Although Plaintiffs have argued that Facebook was required to obtain parental consent for minor

5  Users, such claims are preempted by the Children's Online Privacy Protection Act ("COPPA"), as

6  a California court recently held in another case against Facebook. With COPPA, Congress made

7  a considered decision that websites should not be required to obtain parental consent to collect

8  and use online data from users 13 and older. The Minor Subclass Members, therefore, could not

9  establish their claims by showing that Facebook failed to obtain consent from their parents.

10     Apart from injury and consent, Class Members (minors and adults alike) faced an array of

11 other substantial hurdles. For example, the evidence shows that some Facebook Users do not use

12 their real names or recognizable pseudonyms and that many do not use profile pictures bearing

13 their likenesses. Both circumstances preclude liability under § 3344. In addition, Facebook's

14 display of Sponsored Stories is protected by the First Amendment, with some Sponsored

15 Stories—including those about politics, religion, and public affairs—receiving the highest degree

16 of constitutional protection. The evidence further shows that Facebook's display of Sponsored

17 Stories is immune from liability under Section 230 of the Communications Decency Act

18 ("CDA"), because Facebook acts only as a publisher of content created by third parties.

19     In light of these and other profound risks to Plaintiffs' case, the Revised Settlement

20 delivers substantial, immediate relief for the nearly 125 million Users in the Class. It provides

21 improved disclosures, new and powerful User controls relating to sponsored content, and

22 potentially millions in direct monetary payments. The Revised Settlement unquestionably meets

23 the permissive standard for preliminary approval, which should be granted whenever a non-

24 collusive settlement "falls within the range of possible approval." For these and other reasons

25 discussed below, Facebook respectfully requests preliminarily approval of the Revised

26 Settlement.

27

28

1    **III.    OVERVIEW OF THE LITIGATION AND THE REVISED SETTLEMENT**

2         **A.    Overview of Sponsored Stories and Plaintiffs' Allegations**

3         Facebook operates a free social networking website, which allows people worldwide to

4    share and connect with their friends, families, and communities.  Like many free websites,

5    Facebook funds its operations—which currently cost nearly $2 billion per year—primarily by

6    allowing marketers to display advertisements and sponsored content on the site.  Until January

7    2011, Facebook offered two principal marketing products: (1) Facebook Ads, which are designed

8    by advertisers, and are similar to traditional online-display advertisements; and (2) Social Ads,

9    which display Facebook Ads alongside social context—"stories" about Users' social actions on

10   Facebook, such as "Liking" the subject of the advertisement.

11        On January 25, 2011, Facebook launched a new social marketing product called

12   "Sponsored Stories."  Unlike Social Ads, which include content created by third parties (such as a

13   slogan or a marketing message), Sponsored Stories allow individuals, businesses, and

14   organizations to increase the visibility of User-generated content, called "stories," that have

15   already appeared (or were eligible to appear) in the News Feeds[2] of the User's Friends and in a

16   number of other places on the site.  For a small fee, a marketer can "sponsor" a story related to its

17   "Page," meaning that Facebook will redisplay the story, subject to the User's personal "privacy

18   settings," to the same audience the User chose for the original story.  The contents of the

19   Sponsored Story are virtually identical to those in the original story, including the name, profile

20   picture, and Facebook action of the User, all of which may appear in both types of stories.

21        For example, Plaintiffs alleged that the statement "Susan [Mainzer] likes UNICEF," along

22   with Ms. Mainzer's profile picture, was shown to Ms. Mainzer's Friends as a Sponsored Story.

23   This same statement was already shown (or eligible to be shown) to Ms. Mainzer's Friends when

24   she voluntarily "clicked on a Facebook 'Like' on the facebook.com page for UNICEF . . . to

25   support UNICEF in a campaign to reduce the deaths of children."  (Second Amended Class

26   Action Complaint, Dkt. No. 22 ("SAC") ¶ 70.)  As part of the ordinary operation of Facebook,

---

27   [2] The News Feed is a customized, constantly-updated stream of "stories" about the User's Friends
28   and Pages the User has connected with (representing brands, organizations, and politicians, etc.).

after clicking the Like button, Ms. Mainzer's "Like" statement may have appeared a number of times, and in a number of places on Facebook, including on Unicef's Facebook Page, on Ms. Mainzer's "Timeline," in her Friends' "Newsfeeds" and "Tickers," and more. (*See* Declaration of James Squires ISO Joint Motion for Prelim. Approval of Rev. Settlement ("Squires Decl.") ¶¶ 4-10.) Notably, except for Sponsored Stories, Plaintiffs do not challenge any of these redisplays of the content they voluntarily shared on Facebook.

Below is an example of User-created content that could be displayed on a User's Timeline or in Friends' News Feeds, which Plaintiffs do not challenge (top), and the corresponding Sponsored Stories displayed to the same Friends, which Plaintiffs claim injure Users (bottom):





In March 2011, Plaintiffs filed a putative class action alleging that Sponsored Stories misappropriated their names and likenesses, in violation of § 3344 and the UCL,[3] by displaying their Facebook names and profile pictures in connection with commercial content, without valid consent. (*E.g.*, SAC ¶¶ 109-10, 120-21.) Plaintiffs also alleged that Facebook violated the UCL by failing to adequately disclose the functioning of Sponsored Stories, and in particular, the lack of a global "opt-out," in both the Terms and the Facebook Help Center. (*See* SAC ¶¶ 32-37, 122-23; Pls.' Reply ISO Mot. for Class Cert. ("Class Cert. Reply") at 4.) Plaintiffs sought actual, punitive, and statutory damages, restitution, and injunctive relief. (SAC ¶ 136.)

### B. Case History Before Settlement

The proposed Settlement of this long-running class action, pending since March 2011, follows extensive motion practice and discovery by the Parties.

**Pre-Settlement Motion Practice:** This action was filed in Santa Clara Superior Court on March 11, 2011. (Notice of Removal of Action, Dkt. No. 1.) Plaintiffs amended the Complaint to add a subclass of minors on March 18, 2011, and Facebook removed the case to federal court on April 8, 2011. (*Id.*) Thereafter, following an initial motion to dismiss (Dkt. No. 16), Plaintiffs filed the SAC (Dkt. No. 22). Facebook then filed a second motion to dismiss (Dkt. No. 30), which Judge Koh granted in part and denied in part on December 16, 2011 (Dkt. No. 74). Plaintiffs filed a Motion for Class Certification on March 29, 2012 (Dkt. No. 106), Facebook filed an opposition (Dkt. No. 141), and Plaintiffs filed a reply. It was in the days leading up to the hearing on class certification, scheduled for May 31, 2012, that the Parties agreed to settle. (Joint Status Report re Revised Settlement Term Sheet, Dkt. No. 171.)

**Pre-Settlement Discovery:** In the fifteen months of litigation preceding settlement, the Parties engaged in extensive discovery, propounding more than 1,000 discovery requests, producing more than 200,000 pages of documents and data, and conducting 21 depositions. (Declaration of Matthew D. Brown ISO Joint Motion for Prelim. Approval of Rev. Settlement ("Brown Decl."), filed herewith, ¶ 2.) Between them, the Parties deposed seven experts, the

---

[3] A third claim for unjust enrichment has been dismissed with prejudice. (*See* Mot. to Dismiss Order, Dkt. No. 74 ("MTD Order") at 37.)

1   named Plaintiffs, and Facebook personnel knowledgeable about Sponsored Stories and

2   Facebook's systems, among other topics.  (*Id.*)  Plaintiffs issued subpoenas to five third parties.

3   (*Id.*)  The Parties also litigated a motion to compel and two motions for protective orders.  (*See,*

4   *e.g.*, Discovery Orders, Dkt. Nos. 93, 105.)

5           **Settlement Negotiations and the Original Settlement:**  On March 1, 2012, Plaintiffs and

6   Facebook mediated the case at JAMS in San Francisco before the Hon. Edward A. Infante, retired

7   Chief Magistrate Judge of the Northern District of California.  (Rhodes Decl. ¶ 4.)  Although the

8   case did not settle at that time, the Parties thereafter engaged in ongoing, direct settlement

9   discussions under the guidance of Judge Infante, while continuing to litigate the case.  (*Id.*)  The

10  Parties ultimately executed a settlement term sheet, followed by a fully articulated settlement

11  agreement.  (*Id.*)  Plaintiffs filed a motion for preliminary approval of that settlement on June 14,

12  2012 (Dkt. No. 181), and Facebook filed a brief in support of it two weeks later (Dkt. No. 188).

13          On August 2, 2012, the Court held a hearing on Plaintiffs' preliminary approval motion.

14  In an order dated August 17, 2012 (Dkt. No. 224) ("Order"), the Court denied the motion without

15  prejudice, identifying specific issues that would be better addressed before final approval

16  proceedings.  (Order at 2.)  The Order gave the Parties the option to either "negotiate for

17  modifications to their agreement" or "present a renewed motion for preliminary approval of the

18  existing agreement, with additional evidentiary and/or legal support directed at ameliorating the

19  listed concerns."  (*Id.*)  The Order further explained that "plaintiffs generally appear to have

20  satisfied the prerequisites for preliminary approval of the settlement, except with respect to the

21  issues discussed [in the Order]."  (*Id.* at 8.)

22          **C.     Revised Settlement**

23          In response to the Court's August 17 Order, the Parties had further settlement negotiations

24  that culminated in the Revised Settlement, for which the Parties now move for preliminary

25  approval.  The main terms of the Revised Settlement may be summarized as follows:

26          **Class Definition:**  As in the original settlement, the Class is defined as:  "All persons in

27  the United States who have or have had a Facebook account at any time and had their names,

28  nicknames, pseudonyms, profile pictures, photographs, likenesses, or identities displayed in a

1   Sponsored Story at any time on or before the date of entry of the Preliminary Approval Order."
2   (R.A. § 1.6.)

3   **Minor Subclass Definition:** Also unchanged from the original settlement, the Minor
4   Subclass is defined as: "All persons in the Class who additionally have or have had a Facebook
5   account at any time and had their names, nicknames, pseudonyms, profile pictures, photographs,
6   likenesses, or identities displayed in a Sponsored Story, while under eighteen (18) years of age, or
7   under any other applicable age of majority, at any time on or before the date of entry of the
8   Preliminary Approval Order." (R.A. § 1.17.)

9   **Settlement Fund:** The Revised Settlement creates a "Settlement Fund" of twenty million
10  dollars ($20,000,000). (R.A. § 1.27.) Upon preliminary approval, Facebook will deposit part of
11  this amount into an escrow account to cover the estimated costs of giving notice to the class and
12  related expenses, and it will deposit the remainder within 5 business days after final approval of
13  the Revised Settlement and the expiration of all periods for appeal. (R.A. §§ 2.2(a), (c).) All
14  interest earned on the Settlement Fund while in escrow will be added to it. (R.A. § 2.2.) The
15  Settlement Fund will be used to pay the reasonable costs of delivering notice to the class, costs
16  incurred by the Settlement Administrator and Escrow Agent, Taxes and Tax Expenses, attorneys'
17  fees and costs approved by the Court for Class Counsel, and any incentive awards approved by
18  the Court for the named Plaintiffs. (*Id.*) What remains from the $20 million will be the "Net
19  Settlement Fund," which, as detailed below, will be used to pay the claims of Authorized
20  Claimants, a *cy pres* award, or both. (R.A. §§ 1.18, 2.3, 2.4.) In no circumstance will any portion
21  of the Settlement Fund revert to Facebook. (*See* R.A. § 2.2-2.4.)

22  **Attorneys' Fees and Costs:** Class Counsel may petition the Court for an award of
23  attorneys' fees and costs from the Settlement Fund. (R.A. § 2.5.) In contrast to the original
24  settlement, Facebook now has the right to oppose Class Counsel's request. (*See id.*)

25  **Incentive Awards:** Each Plaintiff may seek payment of an incentive award of up to
26  $12,500 from the Settlement Fund, subject to Court approval. (R.A. § 2.6.)

27  **Payments to Class Members / *Cy Pres* Distributions:** Starting shortly after notice of the
28  Revised Settlement has been given to the Class, Class Members will be able to submit a claim for

payment from the Net Settlement Fund. To do so, a Class Member can access a simple, online form and attest that: (a) the Class Member understands that a story about some action he or she took on Facebook (such as liking a page, checking in at a location, or sharing a link), along with his or her name and/or profile picture, may have been displayed in a Sponsored Story shown to his or her Facebook Friends who were authorized by the Class Member to see that action; (b) the Class Member was not aware that Facebook could be paid a fee for redisplaying actions such as these, along with the Class Member's name and/or profile picture, to his or her Facebook Friends; (c) the Class Member believes that, if his or her name and/or profile picture were displayed in a Sponsored Story, he or she was injured by that display; (d) the Class Member is submitting only one claim form regardless of how many Facebook accounts the Class Member has; and (e) the Class Member understands that he or she is releasing all claims against Facebook and other Released Parties. (R.A. § 4.1.) The Class Member must also provide the email address, User ID or username, and name (or pseudonym) associated with his or her Facebook account. (R.A. § 4.1(a).) For a valid claim, Facebook's records must show that the Class Member appeared in a Sponsored Story on or before the date of preliminary approval. (*Id.*)

Class Members who submit timely, valid Claim Forms ("Authorized Claimants," *see* R.A. § 1.1) may receive payments, either by online money transfer or paper check, unless the Court orders otherwise or unless it is economically infeasible to make payments without exceeding the Net Settlement Fund, in which case the Net Settlement Fund would instead be distributed to *cy pres* recipients proposed by the Parties and approved by the Court ("*Cy Pres* Recipients"). (R.A. §§ 2.3-2.4.) Each Authorized Claimant may receive a payment of up to $10, to be paid by the Settlement Administrator from the Escrow Account, subject to the conditions below (*see generally* R.A. § 2.3):

1. If payment of $10 to all Authorized Claimants would exhaust the Net Settlement Fund, the Settlement Administrator shall distribute the Net Settlement Fund pro rata to each Authorized Claimant, subject to the following:

(a) If, given the number of Authorized Claimants, each Authorized Claimant's pro-rata share of the Net Settlement Fund would be less than $5, the Court may, in its discretion,

1 (i) order the Settlement Administrator to distribute the entire Net Settlement pro rata to each

2 Authorized Claimant, or (ii) order the Settlement Administrator to distribute the entire Net

3 Settlement Fund to the *Cy Pres* Recipients.  If, under these circumstances, the Court does not

4 make either election, the Settlement Administrator shall distribute the Net Settlement Fund pro

5 rata to each Authorized Claimant.

6    (b) Notwithstanding the foregoing, if it is not economically feasible to make

7 any payment to the Authorized Claimants without exceeding the Net Settlement Fund, the

8 Settlement Administrator shall distribute the entire Net Settlement Fund to the *Cy Pres*

9 Recipients, as described below.

10  2. If payment of $10 to all Authorized Claimants would not exhaust the Net

11 Settlement Fund, the Settlement Administrator shall first (a) distribute $10 to each Authorized

12 Claimant and then (b) distribute to the *Cy Pres* Recipients any proceeds remaining in the Net

13 Settlement Fund.  Alternatively, the Court may, in its discretion, order the Settlement

14 Administrator to (a) increase the pro rata payment to each Authorized Claimant, such that it

15 would exceed $10 (provided that doing so does not exhaust the Net Settlement Fund) and (b) then

16 distribute to the *Cy Pres* Recipients any proceeds remaining in the Net Settlement Fund.

17  The *Cy Pres* Recipients are specified in Revised Settlement Agreement (R.A. § 2.4).  The

18 Parties selected these organizations, after substantial negotiation, based on the nature of this

19 action and each organization's focus on consumer protection, research, and education concerning

20 online privacy and the safe use of social media technologies.  Some of the organizations also have

21 a particular emphasis on protecting the interests of minors.

22  The Parties have agreed to engage Garden City Group, Inc. ("GCG") as the Settlement

23 Administrator.  (R.A. § 1.26.)  GCG's estimates of the administrative costs of the Settlement,

24 including providing notice, processing Claim Forms, and paying claims, vary substantially based

25 on the assumptions made, and vary most widely based on the number of claims.  However, based

26 on GCG's expertise and the best estimation methods available, GCG estimates the following total

27 administration costs, including the costs of notice, as: (i) 200,000 claims submitted ≈ $776,000 -

28 $1.27 million; (ii) 2,000,000 claims submitted ≈ $2.55 - $3.4 million.  (Decl. of Jennifer M.

1   Keough ISO Joint Motion for Prelim. Approv. of Revised Settlement ¶ 4.)

2          **Changes to Facebook's Disclosures and the Development and Implementation of**

3   **Additional User Controls ("Injunctive Relief"):**   As with the original settlement, the Revised

4   Settlement provides for enhanced notice and several innovative tools which, together, provide

5   Class Members (and minor Class Members' parents) significant transparency and control

6   regarding how their (or their children's) social actions may be used in connection with

7   commercial or sponsored content.[4]   First, Facebook has agreed to: (i) enhance the notice and

8   consent provision in Facebook's Terms with explicit language to which the Parties have agreed;

9   and (ii) work with Plaintiffs' Counsel to identify and clarify any other information on

10  www.facebook.com that, in Plaintiffs' view, does not accurately or sufficiently explain how

11  Facebook advertising works.  (R.A. § 2.1(a), (d).)  Second, Facebook has agreed to engineer an

12  innovative new tool to enable Class Members to view, on a going-forward basis, the subset of

13  their interactions and other content on Facebook that have been displayed in Sponsored Stories (if

14  any).  This new functionality will provide a level of transparency that does not exist on the site

15  today and is unprecedented on the Internet.  Third, Facebook will create a granular control that

16  will allow Class Members, upon viewing content that has been displayed in a Sponsored Story, to

17  prevent additional displays of those Sponsored Stories, if they so desire.  (*See* R.A. § 2.1(b);

18  Brown Decl., Ex. LL.)

19          **Minor-Specific Injunctive Relief:**   In addition, as with the original settlement, the

20  Revised Settlement contains benefits comprehensively addressing the claims of the Minor

21  Subclass.  First, Facebook will revise the Terms to require minor Class Members to affirm that

22  they have obtained parental consent to Facebook's use of their names and likenesses in

23  connection with commercial, sponsored, or related content on Facebook, including Sponsored

24  Stories.  (R.A. § 2.1(c)(i).)  Second, Facebook has agreed to create a new tool whereby parents of

25  minor Class Members can affirmatively prevent their children from appearing in Sponsored

26

27  [4] For clarity, Facebook is concurrently filing working "mockups" illustrating how key pieces of
    this injunctive relief are likely to be implemented based on current functionalities on the website.
28  (*See* Brown Decl. Exs. LL - OO.)

Stories.  (R.A. § 2.1(c)(iii); *see* Brown Decl. Ex. MM.)  Third, Facebook has agreed to enhance its existing Family Safety Center with information about social advertising on Facebook, including how parents may opt their children out of Sponsored Stories and a link to the tool that enables parents to do so.  (R.A. § 2.1(c)(iv).)

Finally, in the Revised Settlement, Facebook has agreed to augment the injunctive relief targeted to minors.  Facebook has agreed to begin encouraging new Users, upon or soon after joining Facebook, to designate the Users on Facebook who are their family members (if any), including their parents and children.  (*See* R.A. § 2.1(c)(ii); Brown Decl. Ex. OO.)  Further, for both existing and new Users, where both a parent and a minor child confirm their relationship on Facebook, the parent will be able to utilize the above-described minors' opt-out tool directly from his or her Facebook account.   (R.A. § 2.1(c)(iii); *see* Brown Decl. Ex. MM.)  To apprise parents of this option, Facebook will target informational advertising to verified parents, directing them to the Family Safety Center and/or other parent-specific resources on Facebook.  (R.A. § 2.1(c)(iv).)  And, in another new and substantial benefit to the Minor Subclass, Facebook will add a control in minor Class Members' timelines that enables them to indicate that they do not have a parent on Facebook.   (R.A. § 2.1(c)(iii); *see* Brown Decl. Ex. NN.)  Where a minor User indicates that his or her parents are not on Facebook, Facebook will make the minor ineligible to appear in Sponsored Stories until he or she reaches the age of 18, until the minor changes his or her setting to indicate that he or she has a parent on Facebook, or until a confirmed parental relationship with the minor User is established.  (R.A. § 2.1(c)(iii).)

**Notice of Settlement:**  Direct notice will be given to Class Members by email, using the email addresses provided by Class Members for their Facebook accounts.  To reach Class Members for whom Facebook does not have an email address (e.g., because they have closed their accounts), the Parties will publish the settlement notice three times as a quarter-page ad in the national edition of USA Today newspaper.  Further, a press release regarding the settlement will be distributed over PR Newswire's "National U.S.1" newsline, encompassing several thousand news organizations and publications across the United States.[5]  Each notice will provide

---

[5]  *See* http://www.prnewswire.com/products-services/distribution/US1.html (listing publications)

1   the web address of a website at which Class Members can obtain additional, detailed information

2   about the lawsuit and the Settlement, including the Claim Form.  The website will be operated by

3   the Settlement Administrator, GCG.  (*See generally* § 3.3.)

4        **Opt-outs / Objections:**  As in the original settlement, Class Members may opt out within

5   sixty (60) days after transmission of notice.  (R.A. §§ 1.19, 3.8.)

6   **IV.    THE COURT SHOULD PRELIMINARILY APPROVE THE REVISED SETTLEMENT.**

7        Because the Parties renegotiated and substantially modified their agreement, Facebook

8   provides a full analysis of the Revised Settlement, emphasizing the issues raised by the Court in

9   its August 17 Order.  As shown below, the Revised Settlement is within the range of what might

10   be approved as fair, reasonable, and adequate and, therefore, merits preliminary approval.

11        **A.    Legal Standard on a Motion for Preliminary Approval.**

12        The Ninth Circuit "put[s] a good deal of stock in the product of an arms-length, non-

13   collusive, negotiated resolution," *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir.

14   2009) (citation omitted), and expressly recognizes that "[p]arties represented by competent

15   counsel are better positioned than courts to produce a settlement that fairly reflects each party's

16   expected outcome in litigation," *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).

17   For this reason, a proposed settlement "is not to be judged against a hypothetical or speculative

18   measure of what might have been achieved by the negotiators." *Linney v. Cellular Alaska P'ship*,

19   151 F.3d 1234, 1242 (9th Cir. 1998) (quotation marks omitted); *Officers for Justice v. Civ. Serv.*

20   *Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ("Ultimately, the district court's determination is

21   nothing more than an amalgam of delicate balancing, gross approximations and rough justice."

22   (quotation marks omitted)).  Therefore, on a motion for preliminary approval—the first stage of

23   the approval process[6]— the relevant inquiry is whether "[1] the proposed settlement appears to be

24

25   (last visited Oct. 5, 2012).

[6] Approval of a class action settlement entails a three-step process.  First, the court holds a
26   preliminary approval hearing to assess whether the settlement is within the range of what might
be approved as reasonable. *Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114, 1124-
27   25 (E.D. Cal. 2009).  Next, the Parties provide notice of the settlement to class members, who
have a period of time to comment on, opt out of, object to, or participate in the settlement. *Id.*
28   Last is the "Fairness Hearing," at which interested parties have an opportunity to be heard. *Id.*

   FACEBOOK'S MPA ISO JT. MOT. FOR
PRELIM. APPROVAL OF REV. SETTLEMENT
CASE NO. CV 11-01726 RS

1    the product of serious, informed, non-collusive negotiations, [2] has no obvious deficiencies,

2    [3] does not improperly grant preferential treatment to class representatives or segments of the

3    class, [4] and falls within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F.

4    Supp. 2d 1078, 1079 (N.D. Cal. 2007) (quoted in Order at 2 n.1).

5            **B.**      **The Settlement Is the Product of Fully-Informed, Non-Collusive Negotiations.**

6          A settlement is presumptively fair when it is the product of fully-informed, arm's-length,

7    non-collusive negotiations. *Linney v. Cellular Alaska P'ship*, Nos. C-96-3008, C-97-0203, C-97-

8    0425, C-97-0457, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th

9    Cir. 1998); *see Rodriguez*, 563 F.3d at 963-64 ("This circuit has long deferred to the private

10   consensual decision of the parties."); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir.

11   1998) (approval order "reflected the proper deference to the private consensual decision of the

12   parties"); *Nat'l Rural Telecomms. Cooperative v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal.

13   2004) ("A settlement following sufficient discovery and genuine arms-length negotiation is

14   presumed fair."). This presumption applies fully to the Revised Settlement here, which was

15   negotiated at arm's-length with the help of an experienced mediator after months of intense,

16   adversarial litigation. (*See* Decl. of Hon. Edward Infante ISO Pls.' Mot. for Prelim. Approval of

17   the Proposed Class Settlement, Dkt. No. 178, ¶ 24.)

18         The timing of the settlement leaves no doubt but that the settlement is fully informed. As

19   noted above, the Parties litigated two motions to dismiss, with Plaintiffs amending their

20   Complaint in response to the first and prevailing in part on the second. (*See supra* § III.B.)

21   Furthermore, discovery was extensive, involving over 1,000 discovery requests, over 200,000

22   pages of documents, and 21 depositions (including of 7 experts), as well as discovery motion

23   practice. (*Id.*) Moreover, the Parties fully briefed the class certification issue, settling just days

24   ahead of the class certification hearing. (*Id.*) Thus, the Parties—represented by counsel with

25   ample experience litigating cases like this one—were well apprised of the strengths and

26   weaknesses of their respective cases when they reached a compromise.[7] (Declaration of Michael

27

28   [7] *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) (fairness presumed
    where, among other things, "proponents of the settlement are experienced in similar litigation").

1    G. Rhodes ("Rhodes Decl."), filed herewith, ¶ 3.)

2         The active participation of Judge Infante (ret.), a neutral mediator with extensive

3    experience presiding over and mediating complex litigation, further supports a finding of fairness.

4    *See In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00 Civ. 6689, 2003 WL 22244676, at *4

5    (S.D.N.Y. Sept. 29, 2003) ("[T]he fact that the Settlement was reached after exhaustive arm's-

6    length negotiations, with the assistance of a private mediator experienced in complex litigation, is

7    further proof that it is fair and reasonable."); *Satchell v. Fed. Express Corp.*, Nos. C03-2659 SI,

8    C03-2878 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("assistance of an experienced

9    mediator in the settlement process confirms that the settlement is non-collusive").

10        Nor is there any indication of collusion. (Infante Decl. ¶ 24.)   Indeed, contrary to

11   settlements the Ninth Circuit has rejected, the Revised Settlement does not contain a "reverter"

12   agreement, a "clear sailing" provision, or an agreement by Facebook to pay fees disproportionate

13   to the Class award.  *See, e.g., In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th

14   Cir. 2011) (courts should look for "subtle signs that class counsel have allowed pursuit of their

15   own self-interests and that of certain class members to infect the negotiations").

16        In view of these facts, the presumption of fairness applies fully to the Revised Settlement.

17   **C.      The Settlement Has No Obvious Deficiencies and Is in the Range of Approval.**

18        The Revised Settlement is also "within the range of possible approval" and has no

19   "obvious deficiencies," as required for preliminary approval.

20        The Ninth's Circuit's recent decision in *McCall v. Facebook, Inc.*, --- F.3d ---, No. 10-

21   16398 (9th Cir. Sept. 20, 2012), demonstrates why the Revised Settlement merits preliminary

22   (and later, final) approval.  In *McCall*, Users sued Facebook for allegedly violating their privacy

23   rights with a new feature called "Beacon," which published certain information to the Users'

24   Friends.  The parties settled for $9.5 million, with $3 million allocated to costs and attorneys' fees

25   and $6.5 million designated for a new nonprofit to educate users, companies, and regulators about

26   online privacy and safety.

27        This Court granted preliminary approval and, later, finally approved the *McCall*

28   settlement.  That decision was recently affirmed by the Ninth Circuit, which explained:

[T]he district court found that the settlement should be approved on the basis of the following: (1) reliance on novel legal theories and unclear factual issues undermined the strength of the plaintiffs' case; (2) the complex nature of the plaintiffs' claims increased the risk and expense of further litigation; (3) the class action could be decertified at any time, which "generally weighs in favor of approving a settlement"; (4) "[i]n light of [the] litigation risks and in the context of settlement claims involving infringement of consumers' privacy rights," the class's $9.5 million recovery was "substantial" and "directed toward a purpose closely related to Class Members' interests in this litigation"; (5) the parties had engaged in significant investigation and informal discovery and research, which in addition to information about Beacon that was already publicly known enabled the plaintiff class to "make an informed decision with respect to settlement . . . ; (6) the settlement was "only achieved after intense and protracted arm's-length negotiations conducted in good faith and free from collusion," and that class counsel had "reasonably concluded that the immediate benefits represented by the Settlement outweighed the possibility— perhaps remote—of obtaining a better result at trial."

*McCall*, slip op. at 11544. *McCall* strongly supports preliminary approval in this case, because each factor analyzed by this Court and cited approvingly by the Ninth Circuit is also present here.[8]

### 1. Plaintiffs had exceedingly low odds of obtaining a substantial recovery.

Plaintiffs' exceedingly low prospects of recovering on their § 3344 and UCL claims weigh heavily in favor of approval of the Revised Settlement. *See In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) (despite potential for large recovery, settlement is fair, adequate, and reasonable where plaintiffs' "odds of winning [are] extremely small" and strong defenses "may have adversely terminated the litigation before trial"); *W. Va. v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970) (plaintiff's confidence in claims "is often misplaced"), *abrogated on other grounds by Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005 (2d Cir. 1973).

Several of the obstacles Plaintiffs would have faced in litigation are explained below.

---

[8] The preliminary approval analysis is often guided by the Ninth Circuit's six-factor criteria for final approval. *See Harris v. U.S. Phys. Therapy, Inc.*, No. 2:10–cv–01508, 2012 WL 3277278, at *4 (D. Nev. July 18, 2012). These factors include: (1) "the strength of plaintiffs' case;" (2) "the risk, expense, complexity, and likely duration of further litigation;" (3) "the risk of maintaining class action status;" (4) "the amount offered in settlement;" (5) "the extent of discovery completed, and the stage of the proceedings;" and (6) "the experience and views of counsel[.]" *Officers for Justice*, 688 F.2d at 625.