1              **a.**      **Plaintiffs and putative Class Members could not prove injury.**

2          Plaintiffs stood almost no chance of recovering because they could not prove that they

3    were injured by Facebook's conduct, which is a required element of claims under § 3344 and the

4    UCL, and a prerequisite for Article III standing. *Downing v. Abercrombie & Fitch*, 265 F.3d

5    994, 1001 (9th Cir. 2001) (§ 3344); *Animal Legal Def. Fund v. Mendes*, 160 Cal. App. 4th 136,

6    145 (2008) (UCL); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (Article III).  In

7    particular, even after discovery, Plaintiffs could not prove that Class Members were injured

8    when content they had voluntarily shared with their Facebook Friends ("John Doe Likes Nike"

9    or "John Doe checked in at Starbucks") was shown again to the very same Friends. *See Cohen v.*

10   *Facebook, Inc.*, No. 10-5282 RS, 2011 WL 5117164, at *3 (N.D. Cal. Oct. 27, 2011) (plaintiffs'

11   "names and likenesses were merely displayed on the pages of other users who were already

12   plaintiffs' Facebook 'friends' and who would regularly see, or at least have access to, those

13   names and likenesses in the ordinary course of using their Facebook accounts . . . , undercut[ting]

14   any claim plaintiffs . . . were somehow harmed").  Indeed, discovery confirmed that none of the

15   named Plaintiffs could point to any instance in which a Sponsored Story diminished the value of

16   their name or likeness or in any way deprived them of an opportunity they otherwise would have

17   had. (Brown Decl. ¶ 54.)  Instead, Plaintiffs were hoping to establish that they were harmed by

18   showing how much, if at all, Facebook benefitted from the alleged misappropriation of Users'

19   names and likenesses.  Plaintiffs' reliance on this legally untenable theory of injury—which

20   irrationally assumes that Class Members were harmed because Facebook allegedly benefited—

21   alone was sufficient to doom Plaintiffs' case.

22         In addition, Plaintiffs' theory of injury contradicted the facts.  While Plaintiffs contended

23   that a few internal testing documents suggested Sponsored Stories performed better across the

24   board than other advertisements (Brown Decl. Ex. KK, ¶¶ 8(n)-(o), (y)), Facebook analyzed

25   actual Sponsored Stories run on the site and showed that they often earned Facebook *less*

26   *revenue* than the ads that might have run in their place.  (Declaration of Randolph Bucklin, Dkt.

27   No. 148 ("Bucklin Decl.") ¶¶ 9, 81-92.)  Moreover, Plaintiffs' own expert testified that a

28   significant percentage of Users' "endorsements" generated no or even less revenue for Facebook

1    than other ads, meaning that, under Plaintiffs' theory of injury, such Users would have no injury

2    and no claim.  (Brown Decl. Ex. W, at 134-35; Facebook Opp. to Pls' Mot. to Certify a Class,

3    Dkt. No. 141 ("Class Cert. Opp.") at 19-20.)[9]

4              **b.       Class Members consented to Sponsored Stories as a matter of law.**

5                   **(1)      Users' express consent defeats their claims.**

6          Under § 3344, Plaintiffs had the burden of proving that they did not consent to the

7    challenged use of their names and likenesses.  *See*, *e.g.*, *Downing*, 265 F.3d at 1001; *Stewart v.*

8    *Rolling Stone LLC*, 181 Cal. App. 4th 664, 680 (2010).   The express agreements between

9    Facebook and putative Class Members preclude such a showing.

10         As early as 2007, three years *before* the launch of Sponsored Stories, Facebook's terms of

11   service ("Terms")—to which all Users agree when they sign up, and to which they reaffirm

12   consent every time they access the site[10]—authorized Facebook to "use" Users' "photos [and]

13   profiles (including your name, image, and likeness)" for "any purpose, commercial, advertising,

14   or otherwise . . . ."   (Yang Muller Decl., Ex. C at FB_FRA_00275.)   By 2009, the Terms

15   authorized Facebook to "use your name, likeness, and image for any purpose, including

16   commercial or advertising . . . ." (*Id.*, Ex. E at FB-FRA_00329.)   Even more explicit were the

17   Terms in place at the launch of Sponsored Stories, which provided: "You can use your privacy

18   settings to limit how your name and profile picture may be associated with commercial,

19   sponsored, or related content (such as a brand you like) served or enhanced by us.  You give us

20   permission to use your name and profile picture in connection with that content, subject to the

21   limits you place." (*Id.* ¶¶ 21-22.)

22         This unambiguous, express consent is fatal to any claim of misappropriation.

23

24   [9] In its class certification opposition, Facebook argued that uninjured Users could not be
     identified without individualized inquiry across the approximately 123.9 million class members,
25   precluding class certification.   The Revised Settlement avoids these individualized issues by
     affording injunctive relief to all Class Members and possible direct monetary relief to those Class
26   Members who can attest under oath that they *believe* they were injured (without needing to prove
     that they were, in fact, injured).
27
     [10] (Yang Muller Decl. ISO Facebook's Opp. to Pls.' Mot. for Class Cert., Dkt. No. 147 ("Yang
28   Muller Decl.") ¶¶ 2, 13.)

**(2)   Users' implied consent is equally fatal to their claims.**

Under California law, which the Parties agree governs this dispute, consent can be "implied from [a plaintiff's] conduct and the circumstances of the case." *Jones v. Corbis Corp.*, 815 F. Supp. 2d 1108, 1113-14 (C.D. Cal. 2011) (plaintiff consented by posing for "red carpet" photos, knowing they could be used to solicit sales), *aff'd*, 2012 WL 2884790 (9th Cir. Jul 16, 2012); *see Newton v. Thomason*, 22 F.3d 1455, 1461 (9th Cir. 1994) (plaintiff consented by expressing "excitement" and "flatter[y]" over use of his name); *Greenstein v. Greif Co.*, No. B200962, 2009 WL 117368, at *9-10 (Cal. App. Jan. 20, 2009) (plaintiff consented where he knew he was "being recorded as part of the reality television program" and "did not object").

Here, the record is replete with evidence that Class Members knew from using the site that their actions could be shown to their Facebook Friends in commercial contexts. Since November 2007, Facebook has displayed User "Like" statements, along with User names and/or profile pictures, in *trillions* of Social Ads. (Squires Decl. ¶ 13.) Thus, countless millions of Users have seen their Friends' social actions (and names and/or profile pictures) paired with Ads. Further, between January and August 2011 alone. U.S. Facebook Users saw over ███████ Sponsored Stories featuring their Friends. (Declaration of Christopher Plambeck ISO Joint Motion for Prelim. Approval of Rev. Settlement ("Plambeck Decl.") ¶ 6.) Since then, Users have continued to see millions more Sponsored Stories per day. These facts show that Class Members are and were clearly on notice that certain actions on the site—including Liking content and checking in—could lead to their appearance in Sponsored Stories. (*See generally* Tucker Decl. ¶ 8.)

Despite this knowledge, Class Members continued to take actions that could lead to their appearance in Sponsored Stories. Even well after the launch of Sponsored Stories, Users continued to click on 50 million Like buttons for Facebook pages *each day*. (Tucker Decl. ISO Facebook's Opp. to Plaintiffs' Mot. For Class Cert., Dkt. No. 144 ("Tucker Decl.") ¶ 91.) Many such Users Liked Pages by clicking the Like button *inside* a Sponsored Story featuring a Friend's name and profile picture (as of April 2012, ███████ unique U.S. Facebook Users did this *each day*). (Plambeck Decl. ¶ 15; Tucker Decl. ¶ 48.) Indeed, based on a sample of Users, after the launch of Sponsored Stories, roughly equal numbers of Users increased, decreased, and did

1   not change their Page-Liking rates, showing that Users did not change their behavior after

2   learning about Sponsored Stories. (Bucklin Decl. ¶¶ 99-103.)

3       Similarly, millions of Class Members knew they could use their "privacy settings" to

4   control their appearance in Sponsored Stories, but failed to do so. As of April 2012,

5   approximately ███████ Users had used their privacy controls to make a Page Like visible to

6   "Only Me," and Users "Unliked" Pages ████████████ times in the second half of 2011.

7   (Plambeck Decl. ¶¶ 13, 14.) Either of these actions prevents the associated content from

8   appearing in a Sponsored Story. (Squires Decl. ¶¶ 12, 22-23.) Users who knew of these options,

9   but failed to use them, consented to Sponsored Stories.[11]

10      The named Plaintiffs (as well as former named Plaintiff Angel Fraley) *continued to Like*

11  *Pages on Faceboo*k, even after filing this lawsuit and learning that such actions could lead to

12  Sponsored Stories. (Brown Decl. ¶ 44.) James Duval testified unequivocally that he has

13  "continued to click on the Like button knowing that [he] may . . . trigger a sponsored story in

14  which [his] name or profile picture would be displayed to [his] friends." (*Id.* ¶ 45.) Duval has

15  even Liked content to "spark" Sponsored Stories. (*Id.* ¶ 46.) Similarly, after learning about this

16  lawsuit, one putative Class Member remarked: "████████████████████████████████████

17  ████████████████████████████" (*Id.*, Ex. O.)

18      These facts establish implied consent, as a matter of law, as to millions of Class Members,

19  *see Jones*, 815 F. Supp. 2d at 1113; *Newton*, 22 F.3d at 1461, precluding Plaintiffs from proving

20  the *absence of consent* on a classwide basis.[12]

21

22

23

---

24  [11] Users have learned about Sponsored Stories in a variety of other ways, including from
    Facebook's online Help Center (Plambeck Decl. ¶ 10), its site-wide User-education campaign

25  (*see* Squires Decl. ¶ 25), and news articles (Brown Decl. Exs. X-EE). Still others learned by
    visiting the Social Ads opt-out page, which was revised prior to the launch of Sponsored Stories

26  to clarify that the setting does not apply to Sponsored Stories. (Squires Decl. ¶ 14.)

    [12] The prevalence of implied consent presented a nearly insurmountable obstacle to class

27  certification. Absent individualized inquiries, there was no conceivable way for the Court to
    exclude Users from the class who impliedly consented to Sponsored Stories. Thus, the Revised

28  Settlement provides relief to millions of User who could not have recovered otherwise.

        **(3)**      **COPPA preempts the parental consent requirement asserted by Plaintiffs.**

As to the Minor Subclass, Plaintiffs claim that Facebook was obligated to, but failed to, obtain the consent of the minor Class Members' parents.  But this ignores the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §§ 6501-08, which preempts state laws purporting to require websites to obtain parental consent to "collect" or "use" information from users 13 and older.  Indeed, as explained below, under the settled law of both express and conflict preemption, no state may require a website like Facebook to obtain parental consent for teenagers.[13]

        **(a)**      **Express preemption.**

COPPA requires an "operator of a website or online service" to obtain parental consent before it "collects" or "*use[s]*" the "personal information"[14] of a "child," but *only* where the child is "under the age of 13."  15 U.S.C. §§ 6501(1), 6502(a), 6502(b)(1)(A)(ii) (emphasis added); 16 C.F.R. § 312.5(a).  Because COPPA expressly preempts state requirements that are "inconsistent with" this "treatment," 15 U.S.C. § 6502(d), it bars any claim by Plaintiffs or Class Members seeking to impose a parental consent requirements for minors over the age of 13.[15]

As initially proposed, COPPA would have required parental consent for the collection *or use* of personal information from minors older than 13.  (*See* Brown Decl. Ex. Q (S. 2326, 105th Cong. §§ 2(1), 3(a)(2)(A)(ii)-(iii)).)  But Congress rejected that proposal,[16] acceding to criticism

---

[13] Preemption comes in three forms: "(1) express preemption, where Congress explicitly defines the extent to which its enactments preempt state law; (2) field preemption, where state law attempts to regulate conduct in a field that Congress intended the federal law exclusively to occupy; and (3) conflict preemption, where it is impossible to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress."  *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1060 (9th Cir. 2009).

[14] Under COPPA, "personal information" means "individually identifiable information about an individual collected online," including "a first and last name," any information "collected and combined with" such an identifier.  15 U.S.C. § 6501(8).

[15] Facebook has briefed COPPA preemption extensively in the *C.M.D.* case, where plaintiffs have made identical arguments.  For a comprehensive discussion, see Facebook's Motion to Dismiss, Case No. 12-cv-01216, Dkt. No. 109, at 19-21, and Facebook's Reply in Support of Motion to Dismiss, *id.*, Dkt. No. 120, at 11-14.

[16] *See* Brown Decl. Ex. R, 144 Cong. Rec. S12787 (daily ed. Oct. 21, 1998) (statement of Sen. Bryan).  *Compare* S. 2326, 105th Cong.  §§ 2(1) *and* 3(a)(2)(A)(ii)-(iii), *with* 15 U.S.C. §§6501(1), 6502(a), *and* (b)(1)(A)(ii).  *See generally* Testimony of the FTC before Subcomm. on

**FACEBOOK'S MPA ISO JT. MOT. FOR PRELIM. APPROVAL OF REV. SETTLEMENT CASE NO. CV 11-01726 RS**

1    that a parental consent requirement for teenagers would infringe their First Amendment rights.[17]

2    At the same time, Congress fortified COPPA with an express preemption clause, thereby

3    affirming that teenagers' Internet activities *should not be* subject to parental-consent

4    requirements, whether under the auspices of state or federal law.

5        Accordingly, COPPA bars states from requiring an online operator, such as Facebook, to

6    obtain parental consent for its collection *or use* of personal information from minor users 13 and

7    older. COPPA provides:

> 8    No State or local government *may impose any liability for*
> *commercial activities* or actions by operators in interstate or foreign
> 9    commerce in connection with an activity or action described in this
> title *that is inconsistent with the treatment of those activities or*
> 10    *actions under this section.*

11    15 U.S.C. § 6502(d) (emphasis added); *see also* Children's Online Privacy Protection Rule, 76

12    Fed. Reg. 59804, 59805 (Sept. 27, 2011) (to be codified at 16 C.F.R. pt. 312) ("Although teens

13    face particular privacy challenges online, COPPA's parental notice and consent approach is not

14    designed to address such issues.").

15        Under the plain meaning of this provision, a state law is "inconsistent with the treatment

16    of [the] activities or actions [described] under [COPPA]" if it imposes different standards of

17    liability on COPPA-regulated activities, for example, by imposing liability under circumstances

18    where COPPA does not. *Gordon*, 575 F.3d at 1061-63 (plaintiffs' claims expressly preempted

19    because "[i]t would be logically incongruous to conclude that Congress endeavored to erect a

20    uniform standard but simultaneously left states . . . free to . . . create more burdensome

---

21   Consumer Prot., Prod. Safety, & Ins., July 15, 2010, at 14-15 (citations omitted) (Brown Decl.

22   Ex. S) ("In the course of drafting COPPA, Congress looked closely at whether adolescents should
be covered by the law, ultimately deciding to define a "child" as an individual under age 13.").

23   [17] *See* Brown Decl. Ex. T, COPPA: Hr'g on S. 2326 Before the Commc'ns Subcomm. of the S.
Comm. on Commc'ns, Sci. & Transp., 105th Cong. 46 (1998) (testimony of A. Sackler, Time

24   Warner) ("[COPPA] should apply only to children under 13 years of age. . . . Models of parental
consent or parental notification would chill teenagers' interest in commercial websites

25   enormously, and should not be included in this legislation." (altered)); *id.* at 30 (testimony of D.
Mulligan, Ctr. for Democ. & Tech.) ("As applied to teenagers [the bill]. . . ha[s] the potential to

26   chill protected First Amendment activities and undermine rather than enhance teenagers['] 
privacy"); *id.* at 56 (testimony of Am. Library Ass'n) (COPPA "should not apply to minors over

27   the age of 12" because "[t]eenagers have independent rights to free speech and privacy that would
be severely compromised if parental notice were required each time they engaged in a transaction

28   with a commercial website").

FACEBOOK'S MPA ISO JT. MOT. FOR
PRELIM. APPROVAL OF REV. SETTLEMENT
CASE NO. CV 11-01726 RS

1  regulation"). Because Facebook forbids children under age 13 from using its site, any purported

2  parental consent requirement under state law would target *the very group of minors* whom

3  Congress determined should not be required to obtain parental consent. This application of a

4  state law would be flatly "inconsistent with the treatment" of teenagers' Internet use prescribed

5  by COPPA, and is, therefore, preempted. *See* 15 U.S.C. § 6502(d).

6       Applying COPPA's express preemption clause, a California court recently dismissed a

7  class action premised on the same parental consent requirement urged by Plaintiffs here. In

8  *David Cohen v. Facebook*, No. BC 444482 (L.A. Super. Ct.), plaintiffs sued under Civil Code

9  § 3344 and the California Constitution for Facebook's alleged failure to obtain parental consent

10  for displaying the minors' names and likenesses in alleged advertisements, just as Plaintiffs did

11  here. (Brown Decl. Ex. U (*David Cohen* FMCAC) ¶¶ 39-48.) In September 2011, Judge

12  Weintraub sustained Facebook's demurrer, ruling that "Plaintiffs' claims based on state law for

13  Facebook's alleged failure to obtain the parental consent of users aged 13 to 17 to the commercial

14  use of their name and likeness is preempted by [COPPA]." (Brown Decl. Ex. V.)

15       Here, too, Plaintiffs allege under state law that Facebook must obtain parental consent for

16  its minor Users, contrary to COPPA's express command. Like the claims of the *David Cohen*

17  plaintiffs, these claims are expressly preempted and should be rejected.

18                     **(b) Conflict preemption.**

19       Any attempt to impose a parental consent requirement likewise would fail under a conflict

20  preemption analysis, under which a state law must yield where it "stands as an obstacle to the

21  accomplishment and execution of the full purposes and objectives of Congress." *AT&T Mobility*

22  *LLC v. Concepcion*, 131 S. Ct. 1740, 1753 (2011) (internal quotations and citation omitted). As

23  shown above, a significant objective of COPPA was to preserve the First Amendment rights of

24  teenage Internet users by exempting them from COPPA's parental consent requirement. A state

25  law purporting to require teenage users to obtain parental consent conflicts with these objectives,

26  and fails under the established law of conflict preemption. *See Geier v. Am. Honda Motor Co.*,

27  529 U.S. 861, 881-82 (2000) (preempting state law imposing liability for conduct that was lawful

28  under federal law); *Franklin Nat'l Bank v. New York*, 347 U.S. 373, 377-79 (1954) (same).

FACEBOOK'S MPA ISO JT. MOT. FOR
PRELIM. APPROVAL OF REV. SETTLEMENT
CASE NO. CV 11-01726 RS

1      The Supreme Court's recent decision in *Arizona v. United States*, 132 S. Ct. 2492 (2012),

2 confirms this analysis.   There, the Court concluded that Arizona's decision to criminalize

3 undocumented workers was preempted by federal law.   Arizona argued that, because the relevant

4 federal statute did not, by its terms, address the criminal status of undocumented workers, and

5 because the state's objective was consistent with the purposes of federal law, its enactment was

6 consistent with federal law.   The Court disagreed, emphasizing that Congress had considered and

7 rejected proposals akin to Arizona's to impose criminal penalties on undocumented employees,

8 but had instead decided to impose criminal penalties only on employers.   *See id.* at 2531.   By

9 embracing a more extreme proposal that Congress had considered and rejected, the Court ruled,

10 Arizona's approach "would interfere with the careful balance struck by Congress" and stood as an

11 "obstacle to the regulatory system Congress chose." *See id.* at 2505.

12      So too here.   As discussed above, in enacting COPPA, Congress carefully considered a

13 parental consent requirement for the collection and use of personal information of minors age 13

14 and older.   (Brown Decl. Ex. Q (S. 2326, 105th Cong. § 3(a)(2)(A)(ii)-(iii)).)   Just as in *Arizona*,

15 Congress rejected that proposal—primarily for First Amendment reasons—making a considered

16 judgment that parental consent should be required only for minors under age 13.   Requiring

17 parental consent here "would interfere with the careful balance struck by Congress," thereby

18 impeding "the regulatory system Congress chose." *See Arizona*, 132 S. Ct. at 2505; *see also*

19 *Backpage.com, LLC v. McKenna*, No. C12-954-RSM, 2012 WL 3064543, at *10 (W.D. Wash.

20 July 27, 2012) (preliminarily enjoining enforcement of Washington law that purported to

21 "drastically shift[] the unique balance that Congress created").

22                                  *      *      *

23      In view of COPPA's broad preemptive effect—as dictated by established principles of

24 both express and conflict preemption—no state law can require parental consent to collect and

25 use information from teenage users.   The Minor Subclass cannot prevail on claims premised on a

26 lack of parental consent and, accordingly, Facebook's consent arguments described above apply

27 equally to minors.

28

**(4)    Even if Facebook were required to establish parental consent, it could do so for millions of minor Users.**

Even if Facebook were required to obtain parental consent for its minor Users, Plaintiffs still could not prove an absence of consent for the Minor Subclass.  For example, named Plaintiff W.T. not only had his father's permission to register for Facebook, but did so while *sitting with his father*, and *they reviewed the Terms together*.  (Brown Decl. ¶¶ 47-48.)  Mr. Tait could not even recall whether he or W.T. clicked "Sign Up," which signals agreement to Facebook's Terms.  (*Id.* ¶ 48 (Mr. Tait testified, ". . . *I think* he was the one who was doing the typing, but I was sitting right with him." (emphasis added)).)  Mr. Tait also registered for his own Facebook account to monitor W.T.'s activity on the site.  (*Id.* ¶ 49.)  These facts establish Mr. Tait's express and implied consent, as a matter of law, to his son's use of Facebook according to its Terms, including the language permitting his son's appearance in Sponsored Stories.

Facebook also adduced compelling evidence that millions of other parents impliedly consent to Sponsored Stories.  For example, as of December 27, 2011, over six million teenage Users—almost one in three members of the Minor Subclass—were Facebook Friends with at least one of their parents.  (Plambeck Decl. ¶¶ 7, 11.)  In addition, millions of parents supervise their children's Facebook use, some have access to their children's passwords, and most helped their children create their accounts.[18]  Many parents who know that their children are using Facebook would have actual (or constructive) notice of the terms governing that use, including the term permitting Facebook to use the minor's name and profile picture in commercial or sponsored content.  Moreover, many such parents—through their own use of Facebook or otherwise—were undoubtedly aware that their minor children either had or could appear in Sponsored Stories, yet took no measures to prevent that from happening (such as through privacy settings, closing their accounts, etc.).  In both respects, parents impliedly consented to the conduct challenged in this

---

[18] Brown Decl. Ex. FF, at 3 (study found that 72 percent of parents monitor their teens' social networking accounts); Brown Decl. Ex. GG (recent study found that 92% of parents surveyed were Facebook friends with their children and 72% have access to their children's passwords); Brown Decl. Ex. HH, at 11 (recent study found that 64% of parents who knew when their child created his or her Facebook account had helped the child create the account).)

FACEBOOK'S MPA ISO JT. MOT. FOR
PRELIM. APPROVAL OF REV. SETTLEMENT
CASE NO. CV 11-01726 RS

1  case. Thus, even if COPPA could be set aside, millions of minors could not carry their burden to

2  show a lack of parental consent.

3                         **c.**      **Plaintiffs could not prevail for numerous additional reasons.**

4        ***Proof of Use of Name or Likeness.***  Many Class Members' claims would also fail

5  because their User name on Facebook is neither their actual name nor a pseudonym "widely

6  known to the public as closely identified with the plaintiff," as required under § 3344. *Abdul-*

7  *Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 416 (9th Cir. 1996) (whether plaintiff's birth name,

8  Lew Alcindor, "'equals' Kareem Abdul-Jabbar . . . is a question for the jury"). Facebook

9  established through discovery that this practice is prevalent; indeed, two of the five original

10 named Plaintiffs used fictitious names, and one had scores of Facebook Friends using entirely

11 fanciful names like "████████████," "████████████" and "████████████"

12 (Brown Decl. Ex. P.)

13       Many more could not recover because they did not use photographs from which "one

14 who views the photograph with the naked eye can reasonably determine that the person depicted

15 in the photograph is the same person who is complaining of its unauthorized use." Cal. Civ.

16 Code § 3344(b)(1); *see Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998).

17 Facebook Users are not required to upload a profile picture at all, much less a picture that bears

18 their likeness. (Squires Decl. ¶¶ 2-3.) Each of the named Plaintiffs has admitted that many of

19 their Facebook Friends would not recognize certain of their profile pictures as depicting them.

20 (Brown Decl. ¶¶ 50-52.) One of the named Plaintiffs used profile pictures depicting, at various

21 times, the Oakland skyline and a cartoon of a kimono-clad ninja. (*Id.* ¶ 51.) Facebook also

22 showed, for instance, that many of Angel Fraley's Friends used profile pictures that Fraley ████

23 ████████████████████████████████ (*Id.* ¶ 52.)

24       ***Public Interest Exception of § 3344(d).***  Many, if not all, claims will fail because § 3344

25 exempts from liability the use of a person's name or photograph "in connection with any news,

26 public affairs, or sports broadcast or account, or any political campaign . . . ." Cal. Civ. Code

27 § 3344(d); *Baugh v. CBS, Inc.*, 828 F. Supp. 745, 754 (N.D. Cal. 1993) ("the fact that [the

28 challenged use] generates advertising revenue does not prevent [a defendant] from claiming"

1  immunity under § 3344(d)). Millions of Sponsored Stories relate to one of these protected
2  subjects, including Stories run by ████ (e.g., "John Smith: Here's a link to a great analysis of the
3  gun control debate"), ██████ (e.g., "Jane Doe likes ██████"), ██
4  the ██████ and the ██████ (Squires Decl. ¶¶ 11, 20; Tucker Decl. ¶¶ 65-
5  67); *see Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 414 (2001) (depiction of
6  baseball players in materials promoting *baseball* excepted under § 3344(d)). Plaintiffs admitted
7  as much at the class certification stage, where they "concede[d] that 'political' ads may be
8  excepted from the Class." (Class Cert. Reply at 13.)

9       ***First Amendment***. Facebook's display of Sponsored Stories is also protected by the First
10  Amendment, and many Sponsored Stories—including those about religion, politics, and public
11  affairs—are entitled to the highest degree of Constitutional protection. *See Miller v. California*,
12  413 U.S. 15, 34-35 (1973) (First Amendment facilitates "unfettered interchange of ideas for the
13  bringing about of political and social changes desired by the people" (internal quotations and
14  citations omitted)). Moreover, the First Amendment protects even commercially oriented
15  Sponsored Stories, many of which result from User "Likes" or shares that facilitate self-
16  expression. *See Lowe v. S.E.C.*, 472 U.S. 181, 210 n.57 (1985) ("[W]e have squarely held that
17  the expression of opinion about a commercial product such as a loudspeaker is protected by the
18  First Amendment." (citation omitted)). This is particularly true for minors. (*See* Tucker Decl.
19  ¶ 53 (minors often cite "self-expression" as a reason for using the Facebook "Like" button); *see*
20  *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2735 (2011) (recognizing minors' First
21  Amendment rights). Here, because the expressive modes of sharing that can lead to a Sponsored
22  Story are "inextricably intertwined" with any "commercial aspects," Facebook's redisplay of
23  these stories are treated as "fully protected expression." *Riley v. Nat'l Fed'n of the Blind of N.C.*,
24  487 U.S. 781, 796 (1988); *accord Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1185 (9th
25  Cir. 2001).

26       ***Communications Decency Act ("CDA") § 230.*** Because Plaintiffs' claims arise
27  exclusively from Facebook's republication of content generated by Users—namely, Users' Likes
28  and other actions they decided to share on Facebook—Sponsored Stories are immune from

1   liability under § 230 of the CDA.  *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123

2   (9th Cir. 2003) (applying § 230 to affirm dismissal of right-of-publicity claim, citing § 230's

3   grant of "broad immunity [to websites that] publish[] content provided primarily by third

4   parties").  Although Plaintiffs' complaint alleged that Facebook itself created the content in

5   Sponsored Stories (SAC ¶¶ 57-59), discovery has disproved this claim.  Facebook does not

6   contribute to the *substance* of the User's Like or action, but instead offers neutral tools such as

7   the Like button through which Users may share their support and affiliation with companies,

8   organizations, causes, and more.  *See, e.g.*, *Carafano*, 339 F.3d at 1125 (defendant immune

9   where the information about which plaintiff complained was "transmitted unaltered to profile

10  viewers"); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009) ("[A] website

11  operator does not become liable as an 'information content provider' . . . when it merely provides

12  third parties with neutral tools to create web content . . . .").[19]

13          ***UCL Claim.***  Plaintiffs also did not have viable claims under the UCL.  Although

14  Plaintiffs originally alleged that the Terms misled Users regarding their ability to opt out of

15  Sponsored Stories (*see* SAC ¶¶ 32-33), Plaintiffs conceded that they did not detrimentally rely on

16  these terms as required to establish "fraud" under the UCL.  *See, e.g.*, *Mazza v. Am. Honda*

17  *Motor Co.*, 666 F.3d 581, 591 (9th Cir. 2012) (UCL "requires named class plaintiffs to

18  demonstrate reliance").  To the contrary, the named Plaintiffs expressly disclaimed having read

19  (or could not recall reading) the Terms that allegedly misled them.  (*See* Brown Decl. ¶ 53.)

20  Plaintiffs also could not prevail under the UCL's "unlawful" prong because, as discussed above,

21  they cannot prove that Sponsored Stories violate § 3344 or any other law.  Nor do Plaintiffs have

22  a claim under the UCL's "unfair" prong because Facebook's Users—including some of the

23  named Plaintiffs—Like companies and causes specifically to share that content with friends and

24  family, and they necessarily benefited when their Likes were rebroadcast, including in Sponsored

25  _____
    [19] Nor does it matter that Facebook republishes Users' Likes and other actions in a sponsored
26  context, as the decision to publish or "post" content is at the heart of CDA immunity.  *See Barnes*
    *v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009) (§ 230 "shields from liability *all publication*
27  *decisions*, whether to edit, to remove, *or to post*, with respect to *content generated entirely by*
    *third parties*." (emphasis added)); *Levitt v. Yelp! Inc.*, Nos. C-10-1321, C-10-2351, 2011 WL
28  5079526, at *6 (N.D. Cal. Oct. 26, 2011) ("traditional editorial functions" immunized by § 230
    "include subjective judgments informed by political and financial considerations").

1   Stories, to the same audience. *See, e.g., S. Bay Chevrolet v. GMAC*, 72 Cal. App. 4th 861, 886-

2   87 (1999) ("unfair" claim entails "examination of [the conduct's] impact on its alleged victim,

3   balanced against the reasons, justifications and motives of the alleged wrongdoer" (internal

4   quotations and citations omitted)). Several Plaintiffs even admitted that when they Liked certain

5   content, they wanted their Like to be shared as widely as possible. (Brown Decl. ¶¶ 55.)

6                                 *        *        *

7        The serious risk that many or all of Plaintiffs' and Class Members' claims would have

8   fallen to one or more of these substantial defenses provides ample justification for Plaintiffs'

9   counsel's informed and considered decision to settle. In light of these risks, the Parties'

10  agreement—calling for Facebook to pay $20 million, to make substantial, wide-ranging changes

11  to its website, and to develop new tools and practices to give Class Members vastly more control

12  and information regarding Sponsored Stories than the law requires—represents an eminently fair

13  remedy for the perceived wrongs that Plaintiffs sought to redress in this action.

14          **2.    Absent a settlement, it may be years before the Class recovers, if at all.**

15       The Parties' calculated decision to avoid the expenses and delays of further litigation also

16  supports preliminary approval. Prior to reaching judgment, the Parties would have to litigate, at

17  least: (i) the vigorously contested class certification motion, (ii) summary judgment, (iii) a trial on

18  the merits, and (iv) post-trial issues, including the constitutionality of aggregating statutory

19  penalties in the class action context. In addition, appellate proceedings were highly likely given

20  the many issues of first impression raised by this case, including (i) the measure of injury and

21  damages for non-celebrity plaintiffs asserting claims under § 3344 relating to the republication of

22  their activity in social media, (ii) the extent to which republication of User-generated actions in

23  social media is protected by CDA § 230, (iii) the scope of the public interest exemption under

24  § 3344(d), (iv) the scope of First Amendment protection for republication of User-generated

25  expression in social media in a commercial context, and (iv) the extent to which classwide relief

26  under § 3344 would violate the intent of the California Legislature, the Rules Enabling Act,

27  and/or the Due Process Clause. In short, absent a settlement, it would likely be years before the

28  Class obtained any relief, and it likely would recover nothing.

As recognized in *Perez v. Asurion Corp.*, avoiding future contentious litigation and the risk and delay that litigation entails favors settlement:

> If this case were tried, the Plaintiffs would incur significant trial expenses. Experts in [liability issues] and damages calculations might all have been necessary . . . . As previously mentioned, the case would not conclude at trial, but would continue with appellate proceedings. With the uncertainties inherent in pursuing trial and appeal of this case, combined with the delays and complexities presented by the nature of the case, the benefits of a settlement are clear. . . . Absent a settlement, Defendants would have defended these three lawsuits vigorously, with potential success and no recovery of any kind for Plaintiffs.

501 F. Supp. 2d 1360, 1381 (S.D. Fla. 2007); *see also Officers for Justice*, 688 F.2d at 629 (approving settlement where "many years may be consumed by trial(s) and appeal(s) before the dust finally settles" because "any benefits above those provided by the [proposed settlement] would likely be substantially diluted by the delay inherent in acquiring them"); *Riker v. Gibbons*, No. 3:08-cv-00115-LRH-VPC, 2010 WL 4366012, at *4 (D. Nev. Oct. 28, 2010) ("In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." (citation omitted)); *White v. Experian Info. Solutions, Inc.*, 803 F. Supp. 2d 1086, 1095 (C.D. Cal. 2011) (preliminarily approving settlement in case "largely present[ing] questions of first impression").

### 3.    The relief in the Revised Settlement is fair, reasonable, and adequate.

As the Ninth Circuit recently reaffirmed in *McCall*, the district court "must evaluate the fairness of a settlement as a whole, rather than assessing its individual components." *McCall*, slip op. at 11542. In its Order, the Court asked the Parties to justify the amount of the monetary relief and to "show that the *cy pres* payment represents a reasonable settlement of past damages claims, and that it was not merely plucked from thin air . . . ." (Order at 4-5.) As explained below, the Revised Settlement's $20 million monetary payment,[20] together with its broad-ranging injunctive relief provisions, are amply justified given the amount Plaintiffs might have realistically recovered and the significant risk that they may not have recovered at all.

---

[20] This includes the costs of class notice. *See Staton v. Boeing*, 327 F.3d 938, 974 (9th Cir. 2003).

a. **The monetary relief component is appropriate in light of the strength of the claims, and the risks of continued litigation.**

The $20 million Settlement Fund is more than sufficient consideration for the release of Class Members' claims under either measure sought by Plaintiffs under § 3344: (1) Facebook's profits "attributable to" the misappropriation, which would have allowed only a modest recovery; and (2) statutory damages, which would not have been recoverable classwide, and may not have been recoverable for more than a handful of Class Members. *See* § 3344(a).

As to the first measure of damages, Facebook earned approximately ███████ in revenues between January 2011 and August 2012 from Sponsored Stories delivered in the United States that featured a User's name or profile picture. (Plambeck Decl. ¶ 9.) To determine Facebook's *profits* from the alleged misappropriation, that figure must be reduced for (1) Facebook's costs and (2) the portion attributable to the alleged misappropriation. As disclosed in Facebook's public filings, running the site costs upwards of $2 billion a year, and Facebook's profit margins are approximately 50%. (Brown Decl., Ex. JJ, at 10-11.) Plaintiffs estimated the incremental value of Users' "endorsements" as either: (1) 50% of the revenue earned from Sponsored Stories, purportedly based on internal Facebook documents; or (2) 75% of the revenue from Sponsored Stories, based on a comparison of the "effectiveness" of Sponsored Stories to that of other advertisements (measured by click rates). Even using those estimates— which Facebook does not endorse or accept—Facebook's profits attributable to the alleged misappropriation are ████████[21] or approximately ████ *per Class Member* on average. (Facebook's records indicate that approximately 123,868,976 Users in the U.S. appeared in Sponsored Stories during that time period.)[22]

Importantly, this ████ figure represents *Plaintiffs' view* of the profit attributable to the alleged misappropriation. If the action were litigated, Facebook would demonstrate that User

---

[21] Calculated as: (███████ in revenues) * (50% profit margin) * ((50% + 75%)/2) Plaintiffs' estimate of the percentage of Facebook's revenues attributable to the misappropriation).

[22] (Plambeck Decl. ¶ 7.) This is the predicted size of the Class, which the Court requested in the Order. (Order at 3 n.3.) Of these, approximately 19,761,991 of these Users appeared in Sponsored Stories while under the age of 18 (according to age information provided by the Class Members). (Plambeck Decl. ¶ 7.)

harm must be measured by quantifying actual injury to Users, separate and apart from any benefit to Facebook. Facebook would also show that Plaintiffs' methodologies are irredeemably flawed and that the ███████ figure is *grossly* overstated, in that Facebook frequently did not generate additional profits by running a Sponsored Story instead of a substitute advertisement, as confirmed by Facebook's expert. (Bucklin Decl. ¶¶ 9, 81-92.)[23]

However, even using Plaintiffs' estimates of the profit attributable to the alleged misappropriation, a settlement for 10% of Facebook's potential liability—███████—would be fair and reasonable in light of the substantial costs and risks associated with continued litigation.

In providing a $20 million net payment, the Revised Settlement also accounts for the possibility—although exceedingly remote—that Plaintiffs might have recovered statutory damages. A number of factors would have precluded a large statutory damages award in this case. First, the Court expressly cautioned Plaintiffs that, "at summary judgment or at trial, [they] may not simply demand $750 in statutory damages in reliance on a bare allegation that their commercial endorsement has provable value, but rather *must prove actual damages* like any other plaintiff whose name has commercial value." (MTD Order at 29 (internal citations, emphasis added and quotation marks omitted).) This requirement would have barred the vast majority of Class Members from recovering statutory damages. Importantly, Plaintiffs did not allege that they had emotional distress damages on which a statutory damage claim could be based, and such damages would be utterly impossible to prove for over 123,868,976 Class Members, even if the trial lasted for decades.

Further, even for Class Members who could theoretically prove "actual damages" at trial, due process would preclude the aggregation of $750 statutory penalty awards across even a tiny fraction of the putative Class. *See Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003) ("aggregation in a class action of large numbers of statutory damages claims

---

[23] Facebook considers Sponsored Stories to be better for Users, less disruptive to the website, and far more consistent with the essential purpose of Facebook, which is to provide a place for Users to see what their Friends are interested in and up to. For these reasons, Facebook often chooses to display Sponsored Stories even when its internal systems do not predict them to be the short-term revenue-maximizing advertising option.

1  potentially distorts the purpose of both statutory damages and class actions" with the result "the

2  due process clause might be invoked" so as to "reduce the aggregate damage award" (citing *State*

3  *Farm Mut. Auto. Ins. Co. v. Campbell*, 558 U.S. 408, 416 (2003))); *White*, 803 F. Supp. 2d at

4  1097-98 ("Settling Plaintiffs, however, certainly were entitled to consider the risk that any large,

5  cumulative statutory damages award obtained at trial ultimately might have been reduced by the

6  trial or appellate courts."). For these reasons, Plaintiffs had an extraordinarily remote chance of

7  obtaining a judgment awarding statutory damages on a classwide basis.

8       The recent decision in *McCall* is, again, highly instructive on this point. In *McCall*, an

9  objector challenged the settlement for affording too little relief to the class given that many class

10  members sought statutory damages against Facebook. The Ninth Circuit made clear that the

11  theoretical possibility of statutory damages ($2,500 per class member in *McCall*) does not require

12  substantial, *or even any*, monetary relief in a settlement. The Ninth Circuit explained:

13          As an initial matter, we reject Objectors' argument insofar as it
stands for the proposition that the district court was required to find

14  a specific monetary value corresponding to each of the plaintiff
class's statutory claims and compare the value of those claims to

15  the proffered settlement award. While a district court must of
course assess the plaintiffs' claims in determining the strength of

16  their case relative to the risks of continued litigation, *see Hanlon*,
150 F.3d at 1026, it need not include in its approval order a specific

17  finding of fact as to the potential recovery for each of the plaintiffs'
causes of action. Not only would such a requirement be onerous, it

18  would often be impossible—statutory or liquidated damages aside,
the amount of damages a given plaintiff (or class of plaintiffs) has

19  suffered is a question of fact that must be proved at trial. Even as to
statutory damages, questions of fact pertaining to which class

20  members have claims under the various causes of action would
affect the amount of recovery at trial, thus making any prediction

21  about that recovery speculative and contingent.

22  *McCall*, slip op. at 11549. Here too, it would be speculative or impossible for this Court to

23  resolve whether any class members would obtain statutory damages, and, if so, how many. In

24  light of the substantial relief afforded by the settlement, and the significant risks that litigation

25  would yield no relief for the class, the settlement is fair, reasonable, and adequate.

26       For these reasons, a settlement discounting Plaintiffs' maximum recovery to $20 million is

27  entirely appropriate and well within the range of acceptable, and previously approved, discounts.

28

*See, e.g., Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242, 261-62 (E.D.N.Y. 2009) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." (internal quotations and citation omitted)); *Fisher Bros. v. Cambridge-Lee Indus., Inc.*, 630 F. Supp. 482 (E.D. Pa. 1985) (approving settlement that awarded class less than 1% of maximum recovery). Indeed, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair. This is particularly true . . . where monetary relief is but one form of the relief requested by the plaintiffs." *Officers for Justice*, 688 F.2d at 628 (citation omitted); *see In re Gen. Instr. Sec. Litig.*, 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001) (settlement for "relatively small percentage of the most optimistic estimate does not, in itself, weigh against the settlement: rather, the percentage should be considered in light of the strength of the claims" (internal quotations, citation and alteration omitted)).

The Parties' decision to use a claims process is also fair and reasonable, as are their chosen criteria for making claims. Because consent and injury are prerequisites to recovering under § 3344, it is entirely appropriate to limit monetary recovery to Users who attest that (1) they were not aware their social actions could lead to their appearance in Sponsored Stories (addressing implied consent); and (2) they believe they were harmed (addressing injury). *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 461 (9th Cir. 2000) (affirming settlement approval, though "it [left] a large portion of the class without a recovery," deferring to the district court's discretion to "to determine the method of calculating damages"). Moreover, as this Court has noted, a settlement need not provide financial compensation to every member of the class because "[s]ettlement is a *compromise*, which balances the possible recovery against the risks inherent in litigating further." *In re TD Ameritrade Account Holder Litig.*, Nos. C 07-2852, C 07-4903, 2011 WL 4079226, at *9 (N.D. Cal. Sept. 13, 2011).

Nor is the settlement unfair because the claims could, in theory, exhaust the Net Settlement Fund. *See, e.g., O'Brien v. Brain Research Labs, LLC*, Civ. A. No. 12–204, 2012 WL 3242365, at *2-4 (D.N.J. Aug. 9, 2012) (approving $500,000 fund from which 270,000 class members could claim $20 cash or a coupon); *In re Heartland Payment Sys., Inc. Customer Data*

1   *Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1067 (S.D. Tex. 2012) (approving $1.65 million fund

2   for claims of up to 100 million class members).

3   Moreover, in addition to the fairness of the aggregate Settlement amount, the Parties

4   reasonably agreed upon the presumptive maximum recovery ($10 per Authorized Claimant,

5   subject to discretionary increase by the Court, if claims do not exhaust the Net Settlement Fund),

6   as well as the minimum recovery per Authorized Claimant below which the Court will have

7   discretion to divert the Net Settlement Fund to *cy pres* ($5). The $5 to $10 range represents an

8   award that is, according to Plaintiffs' methodology, ▮▮▮▮ times Facebook's average profit per

9   Class Member attributable to the alleged misappropriation (about ▮▮▮. In practical terms, the

10  Authorized Claimants who receive these payments are receiving a windfall. They voluntarily

11  signed up to use a free social-networking site and had some content they shared with their Friends

12  shared again with those very same Friends. They paid Facebook no money at all and suffered no

13  actual economic damages (much less injury), yet they are being paid an amount that far exceeds

14  any profit Facebook allegedly earned by using their names and likenesses.

15  Finally, the Parties have additionally agreed that, if the number of Authorized Claimants is

16  too great to allow for at least a $5 payment each, the Court will have discretion to order the Net

17  Settlement Fund to be paid to the *Cy Pres* Recipients. Because, as explained below, a *cy pres*-

18  only settlement would also be appropriate in this action, this approach ensures that the Net

19  Settlement Fund will be distributed in the manner most beneficial to the Class.

20  The reasonableness of these amounts, as well as the process by which the Parties selected

21  the amounts, further supports the fairness and reasonableness of the Settlement.

22              **b.      The *cy pres* distribution will be appropriate, if it occurs.**

23  In the August 17 Order the Court asked: "Can a *cy pres*-only settlement be justified on the

24  basis that the class size is simply too large for direct monetary relief? Or, notwithstanding the

25  strong policy favoring settlements, are some class actions simply too big to settle?" (Order at 3.)

26  Under the governing law, the answer to the Court's first question clearly is "yes." As to the

27  Court's second question, this case unquestionably can be—and has been—settled on terms that

28  are fair, reasonable, and adequate under established law. Therefore, the Court need not decide

1 whether a classwide settlement might be unworkable on different facts.

2     As the Ninth Circuit recently affirmed, "[t]he district court's review of a class-action

3 settlement that calls for a *cy pres* remedy is not substantively different from that of any other

4 class-action settlement except that . . . the *cy pres* remedy [must] 'account for the nature of the

5 plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class

6 members . . . .'" *McCall*, slip op. at 11543 (citation omitted) (approving $6.5 million *cy pres*-

7 only settlement as to class of 3.6 million). District courts in this Circuit have approved *cy pres*-

8 only monetary distributions where the risk-adjusted recovery per class member was too low to

9 justify the administrative expenses required to make individual payments. *See, e.g.*, *McCall*, slip

10 op. at 11543; *In re Google Buzz Privacy Litig.*, No. C 10-00672 JW, 2011 WL 7460099, at *1, *4

11 (N.D. Cal. June 2, 2011) (approving *cy pres*-only settlement fund); *Catala v. Resurgent Capital*

12 *Servs. L.P.*, Civ. No. 08cv2401 NLS, 2010 WL 2524158, at *4 (S.D. Cal. June 22, 2010)

13 ("recovery of approximately 13 cents per class member would make distribution to [195,561]

14 class members impracticable because of the burden and expense of distribution"). And, as this

15 Court has recognized, "distribution of monetary relief in the form of *cy pres* payments may be

16 appropriate where 'the proof of individual claims would be burdensome or distribution of

17 damages costly.'" (Order at 2); *see McCall*, slip op. at 11543.[24]

18     The Revised Settlement hews closely to these principles. Here, the Settlement Fund will

19 be converted to a *cy pres*-only[25] distribution *only if*, due to the number of claims, distribution to

---

20 [24] Courts in other Circuits are in accord. *See, e.g.*, *In re Pharm. Indus. Average Wholesale Price*
21 *Litig.*, 588 F.3d 24, 34 (1st Cir. 2009) ("[d]istribution of all funds to the class can be infeasible, for example, . . . when class members' individual damages—although substantial in the
22 aggregate—are too small to justify the expense of sending recovery to individuals"); *Nienaber v. Citibank (South Dakota) N.A.*, No. Civ. 04-4054, 2007 WL 752297, at *3 (D.S.D. Mar. 7, 2007)
23 (approving settlement providing $300,000 *cy pres* payment to charities); *Boyle v. Giral*, 820 A.2d 561, 569 (D.C. Cir. 2003) (*cy pres* appropriate where net monetary relief was "approximately $1"
24 per person); *Francisco v. Numismatic Guar. Corp.*, No. 06-61677-CIV, 2008 WL 649124, at *3, *9 (S.D. Fla. Jan. 31, 2008) ("The *cy pres* resolution . . . is particularly appropriate given the
25 relatively small amount of damages the Class Members are likely to be able to establish[.]"); *Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C.*, No. CV-04-2195 (CPS), 2006 WL 3681138,
26 at *7 (E.D.N.Y. Dec. 11, 2006) (approving *cy pres* of $15,000 as to class of 45,000).

[25] A partial distribution of the Net Settlement fund to *cy pres* recipients could occur if claims <u>do</u>
27 <u>not</u> exceed the Net Settlement Fund, and the Court determines not to distribute the excess funds *pro rata* to Authorized Claimants. This is a well-accepted method for distributing unclaimed
28 settlement funds. *See Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011).

FACEBOOK'S MPA ISO JT. MOT. FOR
PRELIM. APPROVAL OF REV. SETTLEMENT
CASE NO. CV 11-01726 RS

1   Authorized Claimants would be economically infeasible, or each Authorized Claimant would

2   receive less than $5 and the Court believes that the payment of the Net Settlement Fund to the *Cy*

3   *Pres* Recipients would provide greater benefit to the Class than would direct payments, taking

4   into account the administrative costs of making payments. (*See* R.A. § 2.3(a).)   As such, a *cy*

5   *pres* settlement will occur only if the potential amounts recoverable to individual Class Members,

6   "although substantial in the aggregate[,] are too small to justify the expense of sending recovery

7   to individuals."  *Pharm. Indus. Average*, 588 F.3d at 34; *see Nachshin*, 663 F.3d at 1036; *see*

8   Order at 2 ("[I]t would be impractical to the point of meaninglessness to attempt to distribute the

9   proposed $10 million in monetary relief among the members of a class that may include upwards

10  of 70 million individuals.").   Thus, if a *cy pres* distribution occurs, it will be fully consonant with

11  the principles governing *cy pres* distributions.

12              **c.       The proposed *Cy Pres* Recipients are appropriate.**[26]

13              The proposed *Cy Pres* Recipients also meet the standards for preliminary approval.   As

14  the Ninth Circuit recently reaffirmed, there must be "a driving nexus between the plaintiff class

15  and the *cy pres* beneficiaries."  *Dennis v. Kellogg Co.*, --- F.3d ---, Nos. 11-55674, 11-55706,

16  2012 WL 3800230, at *5 (9th Cir. Sept. 4, 2012) (internal quotations and citation omitted).   Thus,

17  a "*cy pres* award must be guided by (1) the objectives of the underlying statute(s) and (2) the

18  interests of the silent class members, and must not benefit a group 'too remote from the plaintiff

19  class." *Id.* (internal quotations and citation omitted).   However, "settling parties [need not] select

20  a *cy pres* recipient that the court or class members would find ideal.   On the contrary, such an

21  intrusion into the private parties' negotiations would be improper and disruptive to the settlement

22  process." *McCall*, slip op. at 11545.   The recipients proposed here have a national focus on

23  consumer protection, research, and education regarding online privacy and the safe use of social

24  media, with a particular emphasis on protecting minors—the very issues raised by Plaintiffs in

25  their complaint.[27]  (*See, e.g.*, SAC ¶¶ 32-37, 122-23.)

26  _____

27  [26] Although certain third parties challenged the Parties' proposed *cy pres* recipients, the Court
    indicated that it would defer that issue until the motion for final settlement approval.   (Mot. for
    Prelim. Approval Hr'g Tr. at 59:8-10.)

28  [27] A detailed description of the mission of each proposed recipient and the relationship between

1               **d.**     **The injunctive relief provides substantial value to the Class.**

2       Because the proposed injunctive relief accomplishes many of Plaintiffs' goals in filing this

3   action, it further supports preliminary approval of the Revised Settlement. *See Officers for*

4   *Justice*, 688 F.2d at 628 (approving settlement that "incorporates a variety of provisions to

5   accommodate" the concerns raised in the lawsuit); *In re Ferrero Litig.*, No. 11-CV-00205, 2012

6   WL 2802051, at *4 (S.D. Cal. July 9, 2012) (approving injunctive relief that required defendant

7   "to modify the product label to address the fundamental claim raised in Plaintiffs' complaint");

8   *Myers v. MedQuist, Inc.*, Civ. No. 05-4608, 2009 WL 900787, at *16 (D.N.J. Mar. 31, 2009)

9   (approving injunctive relief that "clarif[ied] the very . . . practices that led to this dispute").

10              **(1)**     **Enhanced notice and new controls for all Class Members**

11       Although Facebook denies liability, it has agreed to address head-on each of the core

12   concerns raised by Plaintiffs in this litigation. In the Revised Settlement, Facebook has agreed to:

13   (i) enhance the notice and consent provision in its Terms with explicit language to which the

14   Parties have agreed; and (ii) work with Plaintiffs' Counsel to identify and clarify any other

15   information on www.facebook.com that, in Plaintiffs' view, does not accurately or sufficiently

16   explain how Facebook advertising works. (R.A. § 2.1(a), (d).) These changes remedy the alleged

17   defects claimed by Plaintiffs in Facebook disclosures. (*See* SAC ¶¶ 32-41, 122-23.)

18       Facebook has also agreed to engineer and implement an innovative new tool that will

19   permit Users to view, on a going-forward basis, which of their actions on Facebook are being

20   redisplayed in Sponsored Stories (if any). (R.A. § 2.1(b).) This tool redresses one of Plaintiffs'

21   key and often-repeated concerns—that they did not know which of their actions on the site were

22   being republished in Sponsored Stories. Finally, Facebook will create a granular control that will

23   allow Users, upon viewing the content that has been included in a Sponsored Story, to prevent

24   publication of additional Sponsored Stories. (*Id.*) Although the site has always provided

25   the proposed recipient and Facebook, if any, is attached as Exhibit A to the Brown Declaration.

26   Many of these organizations submitted declarations explaining how their respective missions and
projects relate to the concerns raised in this litigation, and how their receipt of a *cy pres* award

27   would facilitate their work in these areas. (*See* Dkt. Nos. 193 (Center for Democracy and
Technology), 194 (Campaign for a Commercial-Free Childhood), 195 (Electronic Frontier

28   Foundation), 196 (Center for Internet and Society), 197 (Consumer Privacy Rights Fund), 199
(Consumers Federation of America).)

FACEBOOK'S MPA ISO JT. MOT. FOR
PRELIM. APPROVAL OF REV. SETTLEMENT
CASE NO. CV 11-01726 RS