1  information about how Users can prevent their appearance in Sponsored Stories, if they so

2  choose, this relief resolves another of Plaintiffs' core criticisms of Sponsored Stories—that

3  actually taking the necessary actions was too difficult.

4       Facebook believes that these changes surpass the controls and tools offered by every other

5  company in the online media industry. (*See* Tucker Decl. ¶ 58; Infante Decl. ¶¶ 22-23.) Given

6  the reluctance of courts to micro-manage the business of defendants, Plaintiffs likely could not

7  have realized these robust changes to Facebook's practices in litigation. (Infante Decl. ¶ 15.)

8                 **(2)    Additional settlement benefits for the Minor Subclass**

9       In addition to the significant benefits to all members of the Class, the Revised Settlement

10  specifically addresses the claims of the Minor Subclass by expanding parental oversight and

11  control over Sponsored Stories featuring their minor children. Many of these injunctive relief

12  provisions existed in the original settlement, including Facebook's commitment to: (1) revise its

13  Terms to require minor Users to affirm that they have obtained parental consent to Facebook's

14  use of their names and likenesses in connection with commercial, sponsored, or related content on

15  Facebook (R.A. § 2.1(c)(i)); (2) create a new tool that allows parents to prevent the names and

16  likenesses of their minor children from appearing in Sponsored Stories and to make that tool

17  accessible directly through the Facebook account of Users who have a confirmed parental

18  relationship with a minor User[28] (R.A. § 2.1(c)(iii)); and (3) educate Users about these new

19  parental controls, including by adding information to Facebook's existing Family Safety Center

20  about social advertising on Facebook and the new Sponsored Stories opt-out tool for parents

21  (R.A. § 2.1(c)(iv)).

22       The Revised Agreement provides even more substantial relief for the Minor Subclass. In

23  particular, Facebook has committed to take additional steps to encourage new Users, upon or

24  soon after joining Facebook, to identify their family members who are on Facebook, including

25  their parents and children. (R.A. § 2.1(c)(ii).) Further, for new and existing Users, Facebook has

26  agreed to create and show advertising to Users with a confirmed parental relationship with a

27
28  [28] This is a substantial and valuable component of the injunctive relief because, as of the end of
last year, over six million minor Facebook Users were Friends with at least one of their parents.

1  minor User, directing them to the Family Safety Center, and/or other parent-specific resources on
2  Facebook. (R.A. § 2.1(c)(iv).)

3      Finally, in the Revised Settlement, Facebook has agreed to add a setting in minor Users'
4  profiles that enables them to indicate that they do not have a parent on Facebook. Where minor
5  Users indicate this, Facebook has agreed to make such minors ineligible to appear in Sponsored
6  Stories until they reach the age of 18, until they change their profile to indicate that they have a
7  parent on Facebook, or until a confirmed parental relationship with the minor User is
8  established.[29] (R.A. § 2.1(c)(iii).)

9      This injunctive relief directly addresses the claims of the Minor Subclass, which focused
10 heavily on the absence of any parental mechanism for withholding consent or preventing minors
11 from appearing in sponsored content. (SAC ¶ 41; *see* Notice of Transfer of Related Action Ex. B,
12 Dkt. No. 98-2.) Because Facebook is not and cannot be legally obligated to obtain parental
13 consent for its minor Users, these fundamental changes to Facebook's practices represent
14 substantial concessions, and provide a significant value to the Minor Subclass.

15                    **(3)    Compliance audit**

16     For a period of two years following final approval, Plaintiffs' Counsel may move the
17 Court for an order requiring a third-party audit to confirm Facebook's compliance with the
18 agreed-to injunctive relief. (R.A. § 2.1(e).) Although Facebook reserves the right to oppose such
19 an audit, in the event the Court requires a third-party audit, Facebook has agreed to pay for it.

20                    **(4)    The injunctive relief contributes to the total**
21                            **consideration for the release of Class Members' claims**
                              **for past damages.**

22     It is well established that changes to a defendant's challenged business practices or
23 disclosures may constitute valuable, adequate consideration for the release of claims for monetary
24 damages. For example, in *In re Motor Fuel Temperature Sales Practices Litigation*, MDL No.
25 1840, No. 07-MD-1840-KHV, 2012 WL 1415508 (D. Kan. Apr. 24, 2012), the district court

26 _____
27 [29] These efforts will supplement Facebook's already-extensive programs to protect minors on the site, including frequent consultations with a Safety Advisory Board comprised of independent experts in cyber-stalking, cyber-bullying, and other online risks potentially affecting minors.
28 (Brown Decl. Ex. II.)

1   approved an amended agreement between plaintiffs and Costco to settle claims arising from
2   Costco's allegedly unlawful fuel sale practices.  Although class members sought both actual and
3   statutory damages, the court approved a Rule 23(b)(3) settlement for injunctive relief only,
4   awarding "no money to class members." *See id.* at *4, *7, *15.  Weighing "the real uncertainty
5   whether plaintiffs [could] prove liability on their claims,"  the court  explained that "it [was] fair,
6   reasonable and adequate for class members . . . to trade uncertain claims for money damages for
7   certain relief proposed under the amended settlement agreement, i.e. the opportunity to purchase
8   [temperature-adjusted] fuel from Costco." *Id.* at *13.  Notably, the court overruled certain
9   objectors' argument that the injunction-only settlement was unfair because it did "not account
10  for" their statutory damages claims. *See id.* at *8.

11          Numerous other courts have similarly recognized that injunctive relief can constitute
12  consideration for a release of claims for damages. *See, e.g., Myers*, 2009 WL 900787, at *16, *9
13  (approving Rule 23(b)(3) settlement awarding $1.5 million *cy pres* fund and injunctive relief that
14  "clarif[ied] the very line counting and compensation practices that led to this dispute"; amount
15  reasonable even though plaintiffs initially sought $45 million in damages, or "approximately
16  $1,600 per member"); *First State Orthopaedics v. Concentra, Inc.*, 534 F. Supp. 2d 500, 507
17  (E.D. Pa. 2007) (approving Rule 23(b)(3) settlement where sole consideration was
18  "commit[ment] to change the disclosure and business practices challenged in this action"); *Nat'l*
19  *Rural Telecomms. Coop.*, 221 F.R.D. at 526-27 (approving Rule 23(b)(3) settlement that "d[id]
20  not provide for monetary damages," but instead, "a meaningful business resolution regarding
21  contested issues"); *see also In re HP Laser Printer Litig.*, No. SACV 07-0667 AG (RNBx), 2011
22  WL 3861703, at *2 (C.D. Cal. Aug. 31, 2011) (approving Rule 23(b)(3) settlement where "[t]he
23  primary relief [was] injunctive relief, with Defendant disclosing the existence and effect of" the
24  alleged defect in defendant's products).

25          Thus, the Revised Settlement's injunctive relief provisions can, and do, serve as a
26  meaningful part of the consideration for Plaintiffs' and the Class's release of their claims for past
27  damages.  As discussed above, the Revised Settlement enhances the clarity of Facebook's
28  disclosures about Sponsored Stories and advertising on Facebook, provides Class Members with

1   tools to monitor their appearance in Sponsored Stories and to opt out of particular Sponsored

2   Stories, and allows parents to prevent their minor Class Member children from appearing in

3   Sponsored Stories altogether.  This relief responds directly to the allegations underlying Class

4   Members' claims for *past damages* (*see, e.g.*, SAC ¶¶ 32-37, 122-23; Class Cert. Reply at 4), and

5   stands to compensate these Class Members directly and substantially, as the vast majority of the

6   Class continues to use the website today.  (*See* Plambeck Decl. ¶ 8.)  As in *In re Motor Fuel*, "it is

7   fair, reasonable and adequate for class members . . . to trade uncertain claims for money damages

8   for certain relief proposed under the amended settlement agreement," i.e., the opportunity to

9   continue to use Facebook with the benefit of improved notice and innovative tools to facilitate

10  their decision-making around Sponsored Stories.  2012 WL 1415508, at *13.  This consideration

11  is particularly fair and reasonable given "the real uncertainty whether plaintiffs [could] prove

12  liability on their claims."  *Id.* at *13.

13      **4.      The procedural posture and the views of counsel support settlement.**

14          Preliminary approval is also warranted given the stage of the proceedings and the

15  informed views of counsel about the strengths and weaknesses of their respective clients'

16  positions.  As discussed above, the Parties litigated two motions to dismiss, fully briefed a class

17  certification motion, and conducted extensive discovery, including over 1,000 discovery requests,

18  twenty depositions, and hundreds of thousands of pages of documents.  (*See supra* § II.B.)  This

19  discovery well exceeds far exceeded the "investigation and informal discovery and research" that

20  was sufficient to allow an informed decision in *McCall*, slip op. at 11544.  Because the settlement

21  was fully informed, the recommendation of the Parties' counsel "is entitled to a great deal of

22  weight."  *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1174 (S.D. Cal. 2007).

23      **D.      The Settlement Does Not Grant Preferential Treatment to Segments of the Class.**

24          The Revised Settlement also merits preliminary approval because it does not grant

25  preferential treatment to Plaintiffs or segments of the Class.  First, to the extent the Settlement

26  authorizes the named Plaintiffs to seek incentive awards, such awards are routinely granted "to

27  compensate class representatives for work done on behalf of the class, to make up for financial or

28  reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness

1    to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59.

2          The Settlement is also fair and reasonable to the extent it allows monetary recovery only

3    to Class Members who timely complete Claim Forms.[30]   Claim forms represent an established

4    and accepted method for distributing settlement benefits to class members. *See, e.g., Farinella v.*

5    *Paypal*, Inc., 611 F. Supp. 2d 250, 260 (E.D.N.Y. 2009) ("The requirement that claimants return

6    claim forms that affirm their reliance on the language of the User Agreement is an appropriate

7    screening mechanism to ensure that only persons who relied upon the representations of PayPal at

8    issue are entitled to recover from the Settlement Fund.").  In addition, the Claim Form here may

9    be completed online, increasing the accessibility and convenience to Class Members.  *Cf.*

10   *Browning v. Yahoo! Inc.*, No. C04-01463 HRL, 2007 WL 4105971, at *6 (N.D. Cal. Nov. 16,

11   2007) (electronic claim form appropriate where "[c]lass members have all demonstrated their

12   ability to navigate the Internet through past dealings with Defendants").

13         The Parties' criteria for deciding who should receive payment are likewise fair and

14   reasonable, and do not unfairly discriminate against segments of the class.  As described above,

15   the statements Claimants must make on the Claim Form are directly tethered to key elements of

16   Plaintiffs' claims—lack of consent and injury—two of the biggest substantive obstacles in the

17   case.  Although Facebook submits that no Class Members could prevail on their claims, these

18   criteria are fair and reasonable because they award monetary payments to Class Members with

19   the best (albeit remote) chances of recovering.

20         **E.    The Arguments of the *C.M.D.* Plaintiffs and Other Third Parties Lack Merit.**

21         In its Order, the Court requested that Facebook "address the legal arguments raised in the

22   motion to intervene brought by the named plaintiffs in the related case, *C.M.D. v. Facebook, Inc.*,

23   No. 12-cv-01216 RS, regarding issues of obtaining valid consent from minors."  (Order at 6.)

24   The Court also asked Facebook to address "significant points" raised by third parties ("Third

25   Parties") in opposition to the Settlement.  (Order at 8.)  As explained below, none of these third-

26   party objections has any bearing on the fairness and adequacy of the Settlement.

---

27   [30] The Parties' proposed settlement administrator is the Garden City Group, Inc, a well respected
     administrator that has been approved by this Court previously. *See, e.g., Thieriot v. Celtic Ins.*
28   *Co.*, No. C 10–04462 LB, 2011 WL 1522385, at *2 (N.D. Cal. Apr. 21, 2011).

1      **1.      As discussed, any purported parental consent requirement is invalid.**

2      The *C.M.D.* plaintiffs and others claimed that the original settlement was inadequate

3  because it failed to "propose[] [a] means by which Facebook can or will verify parents' consent."

4  (*See, e.g.*, Mot. ISO Interven. to Oppose Mot. for Prelim. Approv. of Class Settlement, Dkt. No.

5  187 ("*C.M.D.* Br.") at 16.)  But, as discussed in Section 4.C.1.b.3 above, this ignores COPPA,

6  which precludes claims premised on Facebook's alleged failure to obtain parental consent for

7  teenage Users, as recently held in *David Cohen v. Facebook*, No. BC 444482 (L.A. Super. Ct.).

8      Notably, many of the lawyers in *C.M.D.* were also counsel in *David Cohen*, in which they

9  personally litigated and lost this very issue.  (*See generally* Brown Decl. ¶ 23 (identifying the

10  lawyers and firms that were counsel in both actions, including: Squitieri and Fearon, LLP (Lee

11  Squitieri, Gary T. Stevens, Jr.); Stuart Law Firm (Antony Stewart); Wexler Wallace LLP (Edward

12  A. Wallace); and John C. Torjesen & Associates, PC (John Torjesen)).)  The Court should reject

13  these attorneys' efforts to obtain a different result simply by switching venues.

14      Finally, if the *C.M.D.* plaintiffs or any other Class Members believe the Revised

15  Settlement is inadequate, they remain free to opt out and to pursue individual claims against

16  Facebook.   Indeed, § 3344 is designed to incentivize *individual actions*, providing for both

17  statutory damages and prevailing-party attorneys' fees. *See* Cal. Civ. Code § 3344(a).

18      **2.      The California Family Code has no bearing on the Settlement.**

19      The *C.M.D.* plaintiffs also argue that, "[u]nder California law, 'a minor cannot . . . [g]ive a

20  delegation of power' or '[m]ake a contract relating to any personal property not in the immediate

21  possession or control of the minor.' Cal Fam. Code § 6701(a) & (c)." (*C.M.D.* Br. at 6.)  These

22  same arguments are parroted by the Center for Public Interest Law and Children's Advocacy

23  Institute ("CPIL/CAI").   Citing no authority, CPIL/CAI claim that the proposed Settlement

24  sanctions a violation of California Family Code Section 6701(a) and (c) by (1) "pretending that a

25  minor has consented (delegated to Facebook the power) to the use of his or her name and image";

26  and (2) contracting with minors with respect to "images that are now in Facebook's possession or

27  control and not in the immediate possession or control of the minor." (*Amicus Curiae* Mem. of

28  CPIL/CAI in Opp. to Proposed Settlement Agreement, Dkt. No. 211 ("CPIL/CAI Brief") at 3-4.)

FACEBOOK'S MPA ISO JT. MOT. FOR
PRELIM. APPROVAL OF REV. SETTLEMENT
CASE NO. CV 11-01726 RS

1    These arguments represent a fundamental misunderstanding of California law and, in fact, have

2    already been rejected by the Southern District of Illinois in the *C.M.D.* action itself.

3         Under California law, "[e]xcept as provided in Section 6701, a minor may make a contract

4    in the same manner as an adult, subject to the power of disaffirmance . . . ." Cal. Fam. Code

5    § 6700.  Under Section 6701, minors are forbidden from entering only a narrow range of

6    contracts, including those that "[g]ive a delegation of power," § 6701(a), or relate to "personal

7    property not in the immediate possession or control of the minor," § 6701(c).

8         Family Code Section 6701(a) and (c) are not applicable to the *Fraley* litigation or the

9    Revised Settlement.  As confirmed by nearly 100 years of case law, Section 6701(a) "declare[s]

10   the rule that an infant [can]not execute contracts through an agent having only a delegated

11   authority executed by the infant." *Hakes Inv. Co. v. Lyons*, 166 Cal. 557, 560 (1913); *see, e.g.*,

12   *Blankenship v. Hearst Corp.*, 519 F.2d 418, 425 (9th Cir. 1975) (minor cannot enter partnership

13   because he cannot delegate power under California law); *Schumm v. Berg*, 37 Cal. 2d 174, 182

14   (1951) (contract by minor's purported agent void); *Casey Wasserman Living Trust v. Bowers*, No.

15   5:09-CV-180-JMH, 2011 U.S. Dist. LEXIS 46451, at *4-7 (E.D. Ky. Apr. 29, 2011) (collecting

16   cases).  Neither Facebook's current Terms nor the revisions contemplated by the Revised

17   Settlement purport to delegate to Facebook a power of agency (i.e., the power to enter contracts

18   on the minor's behalf).  Section 6701(a) is simply inapposite.

19        Section 6701(c) is equally irrelevant, since it only prevents minors from assigning a future

20   interest, such as designating a beneficiary under an annuity contract, *see Sisco v. Cosgrove,*

21   *Michelizzi, Schwabacher, Ward & Bianchi*, 51 Cal. App. 4th 1302, 1307 (1996), or directing the

22   minor's employer to pay his wages to a third party, *see Morgan v. Morgan*, 220 Cal. App. 2d 665,

23   675 (1963).  Seeking to force a square peg into a round hole, the *C.M.D.* plaintiffs and CPIL/CAI

24   claim that the Settlement violates § 6701(c) because the "images . . . are now in Facebook's

25   possession or control and not in the immediate possession or control of the minor." (CPIL/CAI

26   Br. 3-4.)  But this argument ignores how Facebook actually works: at all times, Facebook users

27   ("Users") have "immediate possession or control" over the images they upload to Facebook, Cal.

28   Fam. Code § 6701(c), which they may access or remove from their Facebook accounts at will.

1    This strained construction is also untenable because it conflicts with other Family Code

2    provisions. In particular, Family Code §§ 6750 and 6751 expressly contemplate contracts

3    "pursuant to which a minor . . . agrees to . . . license . . . use of a person's likeness," specifying

4    that certain such contracts may *not* be disaffirmed if approved by a court. Cal. Fam. Code §§

5    6750(a)(1), 6751. This provision would be nonsensical if Section 6701 operated as an absolute

6    prohibition on minors entering contracts to license use of their names or likenesses.

7    Given all this, it is unsurprising that these very arguments were rejected by the Southern

8    District of Illinois in the *C.M.D.* action when it was transferred that action to this Court, based on

9    the forum-selection clause in Facebook's Terms. In opposing Facebook's motion to transfer

10   venue, the *C.M.D.* plaintiffs argued that the Terms are void under California Family Code § 6701,

11   contending that "minors are statutorily forbidden from entering into a contract that purports to

12   'give a delegation of power' or that relates to 'any personal property not in the immediate

13   possession or control of the minor." (Pls.' Resp. to Mot. to Transfer, Dkt. 78 in *C.M.D.*, at 3-4.)

14   Judge Murphy rejected this argument and enforced the contract that the *C.M.D.* plaintiffs claimed

15   was void by transferring the action over their objections. (Transfer Order, Dkt. 93 in *C.M.D.*, at

16   4-6.) Again, the *C.M.D.* plaintiffs, and their counsel, are hoping that making the same arguments

17   in a different forum will produce a different result.

18   **3.    The injunctive relief contributes substantial value to the Settlement.**

19   The *C.M.D.* plaintiffs also argue that "to the extent Facebook's practices were, in fact, in

20   violation of the law, the proposed relief [in the form of changes to the Facebook website] offers

21   no value whatsoever." (*C.M.D.* Br. at 15.) They are wrong.

22   As discussed above (*supra* § IV.C.3.d), contrary to the *C.M.D.* plaintiffs' claims, the

23   changes to the Facebook website provide substantially enhanced notice and tools for Users to

24   control the rebroadcast of their social actions in a sponsored context. These changes go well

25   beyond what other social networking sites provide, and the *C.M.D.* plaintiffs do not—and

26   cannot—show how these changes are "required by the law." Facebook is free to condition the

27   use of its service on acceptance of its Terms. The injunctive relief thus provides a substantial

28   gain for Users.

1    Furthermore, the *C.M.D.* plaintiffs' argument improperly presupposes Facebook's liability
2    (i.e., that the changes are, in fact, required by the law) and that Plaintiffs would have been able to
3    achieve such relief in this litigation.  As explained by the Ninth Circuit in *Officers for Justice*, a
4    court cannot analyze a settlement as if liability has been established, but rather must examine the
5    case with the uncertainty of a plaintiff's ability to establish liability.  688 F.2d at 628 (finding
6    value in agreement to halt allegedly discriminatory practices at core of litigation).

7    The *C.M.D.* plaintiffs' own authorities confirm this proposition.  Indeed, those cases find
8    no value in a settlement's injunctive relief provisions only where the injunctive relief is legally
9    required.  For example, while the court in *Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D. Cal.
10   2007), found that certain injunctive relief provisions were of "no value" because those changes
11   were required by law, the court did find value in other parts of the injunctive relief offered by the
12   settlement.  *See id.* at 394.  Similarly, in *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543
13   (S.D. Ohio 2000), the court specifically found "value" in a settlement's injunctive relief
14   provisions that required the defendant to take actions not required by the law.  *Id.* at 554-55.

15   Here, no aspect of the Revised Settlement's injunctive relief provisions are either
16   inevitable or legally required because, as shown above, Plaintiffs were highly unlikely to prevail
17   on their claims.  (*See supra* § IV.C.1.)  Thus, for the reasons discussed throughout this brief, the
18   settlement's injunctive relief provisions afford substantial benefits to Class Members.

19          **4.     The injunctive relief is reasonable and adequate, notwithstanding**
                     **Third Parties' injunctive relief "wish lists."**
20

21   CPIL/CAI and other Third Parties contend that the proposed injunctive relief is inadequate
22   because it relies primarily on changes to the Terms and Help Center, rather than requiring Users
23   to affirmatively "opt in" to Sponsored Stories.  (CPIL/CAI Br. at 5; Letter from EPIC, Dkt. No.
24   220, at 3-5; Letter from Center for Digital Democracy, Dkt. No. 221, at 2-4.)  Some Third Parties
25   claim the relief is inadequate because it does not allow Users to "opt out" of Sponsored Stories
26   completely.  (*See, e.g.*, Letter from Consumer Watchdog, Dkt. No. 222, at 2.)  Regardless of
27   whether these Third Parties may have preferred that the Settlement incorporate these features, the
28   Settlement is more than fair without them.

1   In assessing the fairness of a settlement, the operative question is whether, "[v]iewing the

2   terms of the settlement as a whole . . . the Court finds that the settlement confers real

3   and significant benefits on the class members as individuals and the class . . . [i]n light of all the

4   attendant risks of litigation." *Myers*, 2009 WL 900787, at *17 (quotations omitted). In view of

5   the total consideration offered by Facebook in the Settlement—including each piece of injunctive

6   relief and the $20 million settlement fund—the Settlement undoubtedly represents "a good value

7   for a relatively weak case[.]" *Id*. at *15 (internal quotations and citation omitted).

8   In this analysis, the Third Parties' desire for an "opt in" consent model is irrelevant.

9   *McCall*, slip op. at 11555 (in approving settlement, district court properly disregarded objections

10   amounting to bare "disagree[ment] with the class representatives' decision not to hold out for

11   more than $9.5 million or insist on a particular recipient of *cy pres* funds . . . ."). Nor is it legally

12   required. Indeed, even if the Third Parties could somehow overcome Facebook's numerous,

13   complete defenses to liability (including CDA § 230 immunity, the First Amendment, and

14   § 3344(d)'s public interest exemption), they cannot show that an "opt in" model is required to

15   establish Class Members' consent. As discussed above, Facebook has obtained consent from

16   every User based on the explicit language in the Terms to which every User agrees by signing up

17   and using the Facebook website. An opt-in model would also be redundant. Users take social

18   actions on Facebook, such as Liking content, to share their affinities and opinions with their

19   Friends. Thus, Users effectively opt in to having their actions shown to their Friends every time

20   they take a social action. It would make no sense to require them to opt in again to share the

21   same content with the same people in a Sponsored Story.

22   Finally, in the Revised Settlement, minor Users who indicate in their profile that they do

23   not have a parent on Facebook are ineligible to appear in Sponsored Stories.

24   **V.    THE PROPOSED NOTICE PLAN SHOULD BE PRELIMINARILY APPROVED.**

25   **A.    Legal Standard for Approval of a Notice Plan**

26   "The court must direct notice in a reasonable manner to all class members who would be

27   bound by the proposal." Fed. R. Civ. P. 23(e)(1). Notice of certification of a Rule 23(b)(3) class

28   must be given "to all members who can be identified through reasonable effort" and describe

"(i) the nature of the action;" (ii) "the definition of the class certified;" (iii) "the class claims, issues, or defenses;" (iv) "that a class member may enter an appearance through an attorney if the member so desires;" (v) "that the court will exclude from the class any member who requests exclusion;" (vi) "the time and manner for requesting exclusion;" and (vii) "the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B). Generally, notice is acceptable if it "describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (internal quotations and citation omitted).

**B.     The Content of the Notice Provided to Class Members Is Sufficient.**

The Long-Form Notice, attached as Exhibit B to the Revised Settlement, identifies Plaintiffs and Facebook and describes the lawsuit and the proposed Class and Minor Subclass, describes the Settlement sufficiently to allow Class Members to make an informed choice to accept or reject it, and discloses the value and particulars of the class relief and other benefits to the Class. The Long-Form Notice will also disclose the amount sought by Plaintiffs' petition for attorneys' fees and costs.[31] Additionally, the Long-Form Notice contains detailed instructions for requesting exclusion from, objecting to, or participating in the settlement, as well as the schedule for the final approval and attorney's fees hearings.  These features meet the standards of applicable law. *See Churchill Vill.,* 361 F.3d at 575.

**C.     The Means of Supplying Notice to Class Members Is Sufficient.**

The Parties' propose a two-tiered notice plan: short-form notice by email and publication, with such notice directing potential Class Members to the long-form notice on the Internet. Class Members for whom Facebook has a facially valid email address will receive direct notice by email.[32] For any Class Members for whom Facebook does not have contact information (*e.g.*, people who may have closed their Facebook accounts),[33] the Parties will publish notice three

---

[31] Plaintiffs will file their motion for attorneys' fees and costs before notice is provided, as required by *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988 (9th Cir. 2010).

[32] In light of the class size of approximately 123.9 million people and constraints on how many emails can be transmitted each day, the Revised Settlement assumes that it may take up to sixty days to transmit email notice.

[33] The Court asked the Parties to estimate the number of Class Members who would not receive

1   times in the *USA Today* newspaper and over the PR Newswire Service, which encompasses

2   several thousand news organizations and publications across the United States.

3         This tiered notice plan is similar to the plans approved by numerous other courts. *See,*

4   *e.g.,* *Browning*, 2007 WL 4105971, at *7 (parties "use[d] . . . email to provide brief notice and to

5   direct interested class members to the website," which posted long-form notice); *In re Compact*

6   *Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 203 (D. Me. 2003) (short-form

7   notice directed class to Internet and mailing addresses for further information).

8         And, as to class members for whom Facebook does not have contact information, the

9   proposed notice publication easily satisfies Rule 23(a)(1). *See Smith v. Dominion Bridge Corp.*,

10  Civ. A. No. 96-7580, 2007 WL 1101272, at *13 (E.D. Pa. Apr. 11, 2007) (approving settlement

11  where 3,848 individual notices were mailed to "reasonably identifiable" class members, with a

12  summary notice "published in the national publication, *PR News Wire*"); *Tableware*, 484 F. Supp.

13  2d at 1080-81 (approving publication of short-form notice in USA Today).

14          **D.**    **Facebook will comply with the Class Action Fairness Act**

15        As it did with respect to the original settlement, Facebook will provide notice pursuant to

16  the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715, to the federal and all states'

17  attorneys general within ten (10) days after the Revised Settlement is filed with the Court.

18  **VI.**   **CONCLUSION**

19        For the foregoing reasons, Facebook requests that the Court grant preliminary approval of

20  the Revised Settlement and set a date for a final approval hearing 195 days after entry of the

21  Preliminary Approval Order.

22  _____

23  notice via email.  Facebook's records indicate that more than 96% of Users who appeared in Sponsored Stories still have active Facebook accounts, and Facebook has at least one email address associated with each such account. (Plambeck Decl. ¶ 8.)  For the people who no longer

24  have accounts, Facebook does not have their email addresses. (*Id.*)  For approximately 11.1% of the 123.9 million User accounts, Facebook has received at least one "bounce-back" message

25  when an email was sent to the email address associated with the account. (*Id.*)  However, there may be overlap between the approximately 11.1% of accounts for which Facebook received

26  "bounce-back" messages, on the one hand, and the approximately 4.9 million User accounts that are no longer active. (*Id.*)  Class Members for whom Facebook does not have an email address

27  will receive notice by publication. *See Tableware*, 484 F. Supp. 2d at 1080 ("Publication in magazines, newspapers, or trade journals may be necessary if class members are not identifiable

28  after reasonable effort." (quoting *Manual for Complex Litigation* (4th ed. 2004) § 21.311)).

FACEBOOK'S MPA ISO JT. MOT. FOR
PRELIM. APPROVAL OF REV. SETTLEMENT
CASE NO. CV 11-01726 RS

1

2    Dated: October 5, 2012                              COOLEY LLP

3                                                        */s/ Michael G. Rhodes*
                                                         Michael G. Rhodes (116127)
4
                                                         COOLEY LLP
5                                                        MICHAEL G. RHODES (116127)
                                                         mrhodes@cooley.com
6                                                        MATTHEW D. BROWN (196972)
                                                         brownmd@cooley.com
7                                                        JEFFREY M. GUTKIN (216083)
                                                         jgutkin@cooley.com
8                                                        101 California Street, 5th Floor
                                                         San Francisco, CA 94111-5800
9                                                        Telephone: (415) 693-2000
                                                         Facsimile: (415) 693-2222
10

11                                                       Attorneys for Defendant Facebook, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28