Robert C. Fellmeth (SBN 49897) / cpil@sandiego.edu
Elisa Weichel (SBN 149320) / eweichel@sandiego.edu
Christina Riehl (SBN 216565) / criehl@sandiego.edu
Center for Public Interest Law
Children's Advocacy Institute
University of San Diego School of Law
5998 Alcala Park
San Diego, CA  92110
Tel:  619-260-4806 / Fax:  619-260-4753

Attorney for *Amicus Curiae*
Center for Public Interest Law and Children's Advocacy Institute

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ANGEL FRALEY; PAUL WANG; SUSAN MAINZER, JAMES H. DUVAL, a minor, by and through JAMES DUVAL, as Guardian ad Litem; and W.T., a minor, by and through RUSSELL TAIT, as Guardian ad Litem; individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>FACEBOOK, INC., a corporation; and DOES 1-100,<br><br>          Defendants. | Case No. CV 11-01726 RS<br><br>**UPDATED *AMICUS CURIAE* MEMORANDUM OF THE CENTER FOR PUBLIC INTEREST LAW AND CHILDREN'S ADVOCACY INSTITUTE IN OPPOSITION TO PROPOSED SETTLEMENT AGREEMENT, AS MODIFIED**<br><br>Date:   November 15, 2012<br>Time:  1:30 p.m.<br>Courtroom: 3<br>Judge: Hon. Richard Seeborg |

**TABLE OF CONTENTS**

Page

Table of Authorities.................................................................................................ii

SUMMARY ...........................................................................................................1

I.      AMICI'S QUALIFICATIONS TO EVALUATE THE PROPOSED
        SETTLEMENT AND THE ADEQUACY OF CHILD CLASS
        REPRESENTATION ...................................................................................2

II.     CONCERNS REGARDING ADEQUACY OF REVISED PROPOSED
        SETTLEMENT AGREEMENT TO PROTECT MINORS' NAMES
        AND VISAGES FROM COMMERCIAL APPROPRIATION .........................3

        A.  The Proposed Settlement Agreement, as Revised, Retains a
            (Misleadingly Described) "Opt Out" Structure Rather than
            the Informed "Opt In" Format Required for Lawful Parental Consent........3

        B.  Under Longstanding California Law, Minors Cannot Consent to the
            Contract Proposed in the Statement of Rights and Responsibilities ...........7

        C.  COPPA Does Not Apply to or Preempt State Law as to Children 13
            and Older Nor Does It Apply to the Issues Raised in this Case ..................13

III.    THIS COURT PREVIOUSLY DECLINED TO ACCEPT FACEBOOK'S
        ARGUMENT THAT ITS NOTICES CONSTITUTE CONSENT..................14

IV.     THE PROPOSED SETTLEMENT CREATES NO BENEFIT TO
        THE SUBCLASS—IT IS, RATHER, A DETRIMENT VIS-À-VIS
        NO SETTLEMENT AND REFLECTS THE LACK OF EXPERTISE
        REGARDING THE PROTECTION OF CHILDREN .......................................16

V.      CONCERNS REGARDING MASSIVE COMPENSATION
        FOR ATTORNEYS .......................................................................................19

CONCLUSION ......................................................................................................20

# TABLE OF AUTHORITIES

Page

**CASES**

*Cruz v. Superior Court*
    121 Cal.App.4th 646, 651–52 [17 Cal.Rptr.3d 3] (2004) ................................... 9

*Gipson v. Davis Realty Co.*
    215 Cal.App.2d 190, 207 [30 Cal. Rptr. 253] (1963)........................................ 9

*Graham v. Florida*
    560 U. S. ___, 130 S.Ct. 2011 (2010) ................................................ 8

*I.B. v. Facebook, Inc.*
    2012 U.S. Dist. LEXIS 154327 (2012) ............................................. 10

*Kenny A. v. Perdue*
    454 F.Supp.2d 1260 (2006), *rev'd on other grounds, Perdue v. Kenny A.*
    *ex rel Winn*, __ U.S. __, 130 S.Ct. 1662 (2010)................................ 19

*Miller v. Alabama/Johnson v. Hobbs*
    Nos. 10-9646 and 10-9647 (2012) .................................................. 8

*Niemann v. Deverich*
    98 C.A.2d 787, 793 ]221 P.2d 178] (1950)........................................ 8

*Roper v. Simmons*
    543 U. S. 551, 560 (2005) ......................................................... 8

**STATUTES / RULES**

*Federal*

15 U.S.C. §§ 6501–08 — Children's Online Privacy Protection Act (COPPA) ..................... 6, 13

47 U.S.C. § 230(c)(1) ................................................................. 14

*California*

Family Code
    § 6701 ......................................................................... 9–11
    § 6710 ......................................................................... 9
    § 6750 ......................................................................... 11
    §§ 6750–6753 .................................................................. 11–12
    § 6751 ......................................................................... 11
    § 6752 ......................................................................... 11

**OTHER AUTHORITIES**

Federal Rules of Civil Procedure, Rule 23 .................................................................... 2

Federal Trade Commission, Notice of Proposed Rule, 16 CFR Part 312,
Fed. Reg. Vol. 76, No. 187 ............................................................................................ 14

3 Witkin Sum. Cal. Law Agency § 93 ........................................................................... 9

Commonsense Media, *Is Social Networking Changing Childhood?*
*A National Poll* (Aug. 10, 2009) ................................................................................... 18

William D. Henderson, *Clear Sailing Agreements: A Special Form of Collusion*
*in Class Action Settlements*, 77 TUL. L. REV. 813 (March 2003) at 815 .................... 19

Chris Hoofnagle, Jennifer King, Su Li, and Joseph Turow, *How Different Are Young*
*Adults from Older Adults When It Comes to Information Privacy Attitudes & Policies?*
(April 14, 2010) ............................................................................................................. 18

Javelin Strategy and Research, *2010 Identity Fraud Survey Report* (Feb.2010) .......... 18

*Transcript of Exploring Privacy, A Roundtable Series* (Mar. 17, 2010), Panel 3: Addressing
Sensitive Information ..................................................................................................... 18

**SUMMARY**

The Center for Public Interest Law (CPIL) and the Children's Advocacy Institute (CAI) respectfully oppose the Proposed Settlement Agreement—and as modified in October of 2012— ("Proposed Settlement") on the basis that it not only lacks beneficial impact, but actually achieves a negative result. Alarmingly, its terms are contrary to the interests of the subclass of children involved, and even contrary to basic standards of applicable juvenile law. Nor do the changes in the "modified" proposal adequately resolve the problems. *Amici* acknowledge that class action settlements are to be favored—they remove what may be lengthy and complex cases from the calendar and may accomplish much without delay or protracted proceedings. And we also are well aware of abuses among a population of reflexive "objectors" to settlements. CPIL and CAI are not among such objectors and make these comments as officers of the court and with substantial knowledge and experience in the subject matter here affected.

Moreover, and with all due respect, *amici* contend that this case represents many of the particular concerns we have over class action litigation abuse by purportedly adverse parties—who may sometimes engage in an arrangement that is not a fully adversary test of the propositions allegedly in dispute. This scenario involves some class representatives and counsel who have little expertise in issues involving children or privacy, and allows a major multi-national corporation to (a) arrange what is clearly envisioned to be a multi-million dollar fee to that counsel (obviously disparate from market level hours), and then (b) propose a system of largely symbolic payments to "class members" buttressed by payments to various charities—some of which were apparently potential objectors. These measures are advanced hoping to (c) lead a federal district court judge to enter an advantageous court order worth many, many times the amount awarded to class members, and which would purport to allow the defendant to effectively make use of a child's information for commercial use without actual prior approval by that child's parents.

One of the primary reasons for *Amici's* opposition to the revised Proposed Settlement Agreement, as discussed below, is the fact that it retains an improper "opt out" structure rather than the informed "opt in" standard required for lawful parental consent. *Amici* respectfully contend that any settlement on this issue of commercial third party expropriation of a child's

posted photos and information must involve the simple following element:  If Facebook wishes to use the information posted online by a child, it must secure the ADVANCE permission of the parent for EACH such capture and republication event, with detailed disclosure of what will be published to others, and to whom it will be published.

*Amici* also oppose the Proposed Settlement Agreement on the basis that counsel for the parties already had a meeting of the minds with regard to an appropriate attorneys' fee amount, as was indicated in the original proposed settlement—and the amount is excessive, especially in light of the fact that the subclass (and their parents) would continue to have their rights violated.  The revised Proposed Settlement has merely removed the $10 million dollar figure that was previously agreed upon, and now allows Facebook to oppose Plaintiffs' attorneys' fee request —hollow acts that *amici* doubt change anything.  Facebook agreed to the initial settlement that involved up to $10 million for counsel "working" a case for about one year.  In terms of the collusion danger in class settlements, that Facebook offer provides this Court with all of the information it needs.

CPIL and CAI intend to file a formal objection at any subsequent Fairness Hearing, but request that this Court consider the points made above and below, reject the proposed settlement agreement at this stage, and—rather than direct the parties to continue working to resolve the case—dismiss it in order to allow class representatives and counsel who will "adequately represent the class" do so in a future filing.  The premature entry of this order lacking such adequate representation violates a seminal requirement of FRCP 23.  The federal courts are not a proper forum for arranged violations of child rights.

## I.   *AMICI*'S QUALIFICATIONS TO EVALUATE THE PROPOSED SETTLEMENT AND THE ADEQUACY OF CHILD CLASS REPRESENTATION

CAI is an academic and advocacy center based at the University of San Diego (USD) School of Law.  It is part of CPIL, also a USD center that helped to found the currently independent Privacy Rights Clearinghouse.  *Amici* have already submitted comments as *amici curiae* in this matter and its comments have been addressed by the parties and considered by this Honorable Court.  This submission is an update of their previous submission in light of alleged "modifications" following the Court's initial rejection of preliminary approval.

---

Both CAI and CPIL were founded by a co-author of this brief, Professor Robert Fellmeth, Price Professor of Public Interest Law at the University of San Diego School of Law.  A graduate of Stanford University (AB 1967) and Harvard University (JD 1970), Professor Fellmeth has taught juvenile law courses and directed a clinic representing abused children in juvenile dependency court for the past 20 years.  He is author of the law school text *Child Rights and Remedies* (Clarity, 3rd ed., 2011).  He has been an officer of the National Association of Counsel for Children since 2006, and served as its President from 2010–12.  He has been counsel to the Board of Directors of Voices for America's Children for the last decade, and has chaired the Board of Public Citizen Foundation in Washington, D.C. for the last 20 years.[1]

In addition to the child-protection concerns raised by the proposed settlement, CPIL and Professor Fellmeth also have an interest in the class action/consumer law and legal ethics issues raised by this proposed settlement—which are profound.  Professor Fellmeth is the co-author of *California White Collar Crime* (w/ Papageorge, Tower, 3rd ed., 2010) and has taught consumer and class action law for the last 22 years.  From 1987 to 1992, he served as the State Bar Discipline Monitor, a position created by the California legislature to investigate and reform the State Bar's attorney discipline system.  Professor Fellmeth has served as a legal ethics and consumer law expert on behalf of the State Bar, the Los Angeles Office of District Attorney, the San Diego Office of District Attorney, the Attorney General acting for the Judicial Performance Commission, and the U.S. Attorney for the Southern District of California.

I.      **CONCERNS REGARDING ADEQUACY OF REVISED PROPOSED SETTLEMENT AGREEMENT TO PROTECT MINORS' NAMES AND VISAGES FROM COMMERCIAL APPROPRIATION**

A.      **The Proposed Settlement Agreement, as Revised, Retains a (Misleadingly Described) "Opt Out" Structure Rather than the Informed "Opt In" Format Required for Lawful Parental Consent**

The modification purports to make an improvement by properly prohibiting "Sponsored Story" use of a child's information and postings until he or she reaches 18 years of age—but such prohibition applies only to a minor who has affirmatively indicated that his/her parents are not

---

[1] The comments expressed herein represent only the opinion of CAI and CPIL.

Facebook users, an indication that minors are not required to make one way or the other in order to use Facebook. To recapitulate accurately the often misleading description by the parties: Under this settlement, Facebook enters a default consent by a child, combined with the child's representation that a parent has approved the use. This is not consent, but a "terms of use" clause in Facebook's Statement of Rights and Responsibilities, Section 10.1 as modified, quoted in full in section II.B. below. Failure to affirmatively contradict it or to object is necessary to stop what will be automatic license to use. Further, that consent is categorical and hands over to Facebook effective use of all postings however and wherever and to whomever made—to be selected out and repackaged and commercially used as Facebook determines.

Now the modification adds a wrinkle that to some extent underlines the continuing defect in the basic "opt out if you can find it" format for this extraordinary commercial-use license. Here is what Facebook's brief is trying to make the new settlement sound like: "We shall let the child know he or she can opt out and ask him or her to confirm that a parent has consented. If she does opt out, we do not do it. Further, we shall ask the child whether the parent is a Facebook user. If the answer is "no" we shall not use the information. If the answer is "yes" we shall facilitate a parental objection by notifying them of an easy way to bar use of the information of the child." But this characterization is sophistry.

The reality is as follows:

1.   The child will not see any of the obscure "notices" that he or she can maintain privacy and virtually none will affirmatively "opt out." Nor will any child see the "consent" clause and because of it, go to Dad and say "Dad, there is a 'terms of use' provision in here that says I automatically have gotten your consent.... well I see that here, and I certainly do not want to be part of Facebook unless you understand all of the conditions, including your need to consent. So do you consent to Facebook's unrestricted use of my postings as it chooses for commercial purposes?" *Amicus* CAI, who has represented children for 22 years, discloses the unsurprising to this Honorable Court: **This will not happen**. The "safeguard" is disingenuous. Further, the children subject to this "conditions" disclosure are minors and such contracts, as discussed below, are fatally flawed without actual, *bona fide*, knowing parental consent.

2.  Many children will not indicate whether or not their parents are on Facebook.  This will be the vast majority of the children posting.  The Proposed Settlement does not address Facebook's use of a child's information if he/she has not indicated that his/her parent is not on Facebook.  Result: Facebook would access and use the child's data.

3. For those children who do identify parents on Facebook, the default remains "now your parent must find out about what we are doing, without knowing we are about to do it, or seeing what it looks like or what information we are taking, or to whom it is being sent, and object through our procedure."

Although a tiny fig leaf has been inserted, the structure as modified has the same defect— no real or minimally lawful consent by parents.  Facebook knows this "you must opt out regime" assures virtually universal access to child postings.  The Proposed Settlement does not require any action on behalf of the parent to affirmatively consent to Facebook's use of his/her child's name and information in Sponsored Stories, it is improperly the opposite. (See § 2 (2.1) (c)(iii) of Joint Motion for Preliminary Approval of Revised Settlement at page 11.)

To restate:  The only exception to what amounts to the entry of this constructive "consent" occurs when and if a parent somehow knows about Sponsored Story use, understands the alleged implied parental "consent" to that use unless an objection is lodged, and follows the obscure warnings and notices in order to intervene to so disallow it.  And none of this would occur in the context of an actual capture and publication of a child's photos and postings, but as something that must be done on a theoretical basis in advance.

For a self-serving description of the proposed "safeguards," see Facebook's Memorandum of Points and Authorities in Support of Joint Motion for Preliminary Approval of Revised Settlement at 11–12.  Note the key provisions—that Facebook will "begin to encourage new Users...to designate the Users on Facebook that are its family members," and the parents of children who are so identified by them "will be able to utilize the above-described minors' opt out tool directly from his or her (adult) Facebook account." This is an ephemeral "opt out for your child if you find out about this generic need to do so somehow" provision—retaining the basic flaw that the settlement has always contained.

The regime in the modified settlement is neither lawful nor in the interests of the youth and families involved. *Amici* respectfully contend that any settlement on this issue of commercial third party expropriation of a child's posted photos and information must involve the simple following element:  If Facebook wishes to use the information of a child posted online by a child, it must secure the ADVANCE permission of the parent for EACH such capture and republication event, with detailed disclosure of what will be published to others, and to whom it will be published.  That permission is not just an aspirational concept— it is a legal condition precedent to any valid contract that its terms and scope by understood by both parties.  And this Proposed Settlement represents a regrettable attempt to recruit a federal district court to sanction its violation by allowing Facebook to continue using a minor's image and information for commercial purposes without prior affirmative and knowing parental consent.

Here is the baffling disappointment in the modified settlement: The modification appears to make compliance with that minimum, required standard not only feasible, but possible through a trivial adjustment.  Facebook now will encourage—but not require—its new members (including children ages 13 to 18) to include information about their family, including their parents.  Why can that query not require the child to identify the Facebook identity of his/her parent(s) and then require the parent(s) to confirm their relationship? Then Facebook could simply copy and paste what it intends to include in a proposed "Sponsored Story" (as it will be transmitted) with a note as to whom will receive it, and then transmit that electronic message to that parent through his/her Facebook account, with a request to check a box indicating whether the parent consents to that use.  Period.  That is all that *amici* ask.

Perhaps Facebook would want to follow a different procedure—and the FTC regulations under the federal Children's Online Privacy Protection Act (COPPA) (15 U.S.C. §§ 6501–08) outline alternative ways to obtain parental consent where relevant to children under 13 years of age would could also be used for children aged 13 and older.  Such methods should apply because although COPPA for political reasons protects only children under 13 years of age, a 15-year-old child has the same capacity to contract under state law as does a 13-year-old. Further, although it does not apply to the case at hand, COPPA presents numerous alternatives that could

be used to secure consent beyond the *amici* suggestion above.  It is unclear why the consent process suggested by *amici,* or some other method, could not be accomplished by a software adjustment well within Facebook's capacity.

To repeat and emphasize, before it uses a child's postings and photos, Facebook must be required to first transmit the proposed message to the minor's parent(s)—a transmission that seemingly can be accomplished within Facebook on a system-wide virtually costless basis—and then it may use the child's information if and only if the parent so consents.[2]  If Facebook resists this obvious additional element to its own modified proposal, this Court properly questions its good faith.  If Facebook wants to respect child privacy, parental prerogative, and applicable law, it will agree to this simple, but essential change to the modified settlement.  This Honorable Court should know that *amici* are not reflexively objecting to the settlement at all, we merely want children protected responsibly, parental authority respected, and the law followed.

**B.     Under Longstanding California Law, Minors Cannot Consent to the Contract Proposed in the Statement of Rights and Responsibilities**

The Proposed Settlement Agreement purports to stipulate, on behalf of all minors, to a violation of the California Family Code, which prohibits minors from contracting for the use of their names and likenesses in the manner proposed, contrary to the points and authorities just submitted to this Honorable Court from Facebook as discussed below.

Under the revised proposed agreement, section 10.1 of Facebook's Statement of Rights and Responsibilities would include the following statement:

> You give us permission to use your name, profile picture, content, and information in connection with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us. This means, for example, that you permit a business or other entity to pay us to display your name and/or profile picture with your content or information. If you have selected a specific audience for your content or information, we will respect your choice when we use it.

---

[2] If a child indicates that his/her parents are not Facebook users, or if a child makes no indication as to whether his/her parents are Facebook users, Facebook would properly have two options: (1) do not use that child's content or information in its Sponsored Stories, or (2) request contact information for the child's parent and use other means to attempt to obtain verifiable parental consent prior to using that child's content or information in its Sponsored Stories.

---

If you are under the age of eighteen (18), or under any other applicable age of majority, you represent that at least one of your parents or legal guardians has also agreed to the terms of this section (and the use of your name, profile picture, content, and information) on your behalf.

Although the second paragraph is limited to users under the age of majority, the first paragraph applies to *all* Facebook users. Thus, in addition to requiring minors to "represent" that whatever Facebook wants to do with the minor's name, image, content, and information is ok with the minor's parent, Facebook's Statement of Rights and Responsibilities continues to implicitly assume that minors grant Facebook those permissions on a personal basis as well.

That minors lack capacity to consent to many types of contracts underlies much of our system to protect them. Some of that protection is, to be sure, safeguarding them from their own immature improvidence; we have age minimums behind everything from voting to tobacco, liquor to tattoos, even sex. The inability of the adolescent brain to regulate emotional responses, resist peer influences, and calculate the harmful future consequences of present actions is the basis for the recent U.S. Supreme Court rulings abolishing the death penalty for minors and prohibiting the mandatory imposition of a sentence of life without parole, even for homicide offenses. *See Roper v. Simmons*, 543 U. S. 551, 560 (2005), *Graham v. Florida*, 560 U. S. ___, 130 S.Ct. 2011 (2010) and *Miller v. Alabama/Johnson v. Hobbs*, Nos. 10-9646 and 10-9647, decided June 25, 2012. "It is the policy of the law to protect a minor against himself and his indiscretions and immaturity as well as against the machinations of other people and to discourage adults from contracting with an infant. Any loss occasioned by the disaffirmance of a minor's contract might have been avoided by declining to enter into the contract." (*Niemann v. Deverich* (1950) 98 C.A.2d 787, 793, 221 P.2d 178.) It in no way protects the privacy and property rights of children (or their parents) to create a system for releasing the names and faces of children into the worldwide stream of e-commerce based on a provision in "terms of service" contract to which minors lack the capacity to consent.

Current California Family Code provisions echo common law prohibitions against enforcing contracts against minors, providing that certain types of contracts made by minors are

void as a matter of law.[3]  Family Code section 6701 provides the following explicit restrictions

on a minor's authority to contract:

> A minor cannot do any of the following:
> (a)  Give a delegation of power.
> (b)  Make a contract relating to real property or any interest therein.
> (c)  Make a contract relating to any personal property not in the immediate possession or control of the minor.

The proposed settlement agreement operates on the violation of both subsections (a) and

(c), and each of them separately.   Facebook claims that Family Code section 6701(a) is

inapplicable to this case because "no power of agency" is created pursuant to Facebook's terms

or the revised settlement under (a) above.    But the categorical prohibition against a delegation of

power is here violated *in extremis*.  The settlement purports to delegate to Facebook the

extremely broad power to take information posted by a child—for his or her purposes and very

possibly under parental supervision—package it, and transmit in any form and to any recipients

and for any commercial purpose, as Facebook determines.  The lone check on such a self-serving

delegation would come from affirmative parental objection—after somehow finding out that they

are expected to do so and that Sponsored Story use is in prospect.  Facebook here argues that this

kind of discretion over the child's postings that it presumes unto itself is not a "delegation of

power"?  *Amici* respectfully suggest *contra,* that it is a grant of extraordinary power to Facebook.

The existence of an agency relationship is mainly a question of fact[4] (3 Witkin Sum. Cal.

Law Agency § 93), with the distinguishing features of an agency being its representative

character and its derivative authority (*see, e.g., Gipson v. Davis Realty Co.* (1963) 215

---

[3] In addition, the Family Code provides that many other contracts made by a minor are voidable by disaffirmance (Family Code section 6710).

[4] Under some circumstances, event the parent/child relationship can be viewed as an agency:  "Although we normally do not view the relationship between minor children and their parents as a principal-agent relationship, under many circumstances parents, in fact, act on behalf of their children in a capacity difficult to distinguish from that of an agent….[The parent/child] relationship bears a significant similarity to that of principal and agent." (*Cruz v. Superior Court* (2004) 121 Cal.App.4th 646, 651–52 [17 Cal.Rptr.3d 3].)  Note that as a default matter, Facebook may here seek to operate as the fundamental agent of the child in making detailed decisions on his or her behalf (albeit without any supervision or detailed notice), but while presuming agent powers, Facebook is neither the child's properly authorized agent, nor principal, nor parent or guardian.

---

Cal.App.2d 190, 207 [30 Cal. Rptr. 253]).  Here, Facebook claims that it has the power, delegated

to it by the minor directly and through the minor's representation that a parent so consents, to

take, use and promote (represent) the minor's information and images to third parties.  Assuming

for the moment that Facebook users (principals) really do retain "immediate possession and

control" of their information and images (as Facebook contends), this relationship has all of the

telltale signs of an agency relationship—which makes the arrangement void as to minors who

lack capacity to so delegate such power in the first place.[5]

In arguing that Family Code section 6701(c) is inapplicable to this case, Facebook points

to the illusory statement it provides to its users—which *amici* no longer assume is true—that

users own all of the content and information they upload to Facebook.  If this is how Facebook

actually works, we all would be working on something else right now.  How does Facebook not

take "possession or control" of the user's content and information when it creates and publishes

its Sponsored Stories?  Clearly users give up some sort of possession or control when they upload

images or information to Facebook—at least enough for Facebook to take and transform users'

images into a different format for its own commercial gain without the assurance of a user's (or

his or her parents') knowing and valid consent.  Section 6701(c) explicitly prohibits the making

of "a contract relating to any personal property not in the immediate possession or control of the

minor."  By definition, Facebook must take control of the minor's personal property in order to

do what it is doing with it.[6]

---

[5] As to Family Code section 6701(a), the facts of this case relating to the existence of an agency relationship are distinguishable from *I.B. v. Facebook, Inc.* (2012) 2012 U.S. Dist. LEXIS 154327.  There, the court properly declined to find an agency relationship between Facebook and minor Facebook users who charged items to their parent's credit or debit cards possibly without the parent's knowledge or consent.  As Facebook argued in *I.B.*, that case involved the users' "simple act of making a purchase," which did not amount to a delegation of power to Facebook.  *I.B.* involved an arms-length transaction involving offer, acceptance and consideration; understandably, the court was unsympathetic to minor plaintiffs who received the benefit of a bargain they knowingly and affirmatively sought out.  None of those elements are present in the instant case, where Facebook is attempting to presume a delegation of authority from its users to represent the users' information and images to third parties — and here, the only entity receiving any compensation or benefit is Facebook itself.

[6] In *I.B. v. Facebook, Inc.* (2012) 2012 U.S. Dist. LEXIS 154327, plaintiffs also argued that Family Code section 6701(c) rendered the sales contracts void, in that the minors were not in the immediate possession or control of their parents' credit cards or bank accounts when the

---

In yet another attempt to avoid the roadblock that is Family Code section 6701, Facebook contends that Family Code sections 6750 and 6751 "expressly contemplate contracts 'pursuant to which a minor...agrees to...license ...use of a person's likeness' specifying that certain such contracts may *not* be disaffirmed if approved by a court." (Facebook Memorandum at 46.)  It then adds that "this would be nonsensical if Section 6701 operated as an absolute prohibition...." (*Id*.)  In a disappointing example of citation abuse, Facebook omits key information about the statute cited.  Family Code sections 6750–51 are part of a Family Code Chapter consisting of sections 6750–6753, relating only to "contracts in art, entertainment, and professional sports"— *i.e.*, contracts pertaining to minors who are entertainment figures, have guardians or trustees protecting them, and are paid.  Remarkably, Facebook appears to argue that the mere presence of sections 6750–51 somehow makes the broad prohibitions set forth in section 6701 inapplicable to the case at bar because what it is doing falls within the rubric of (some) of these sections.   The statute cited by Facebook addresses a very narrow situation and requires all sorts of safeguards set forth in the very next section of the Family Code—section 6752—that Facebook fails to mention.  Where are section 6752's many conditions and safeguards—including supervision of a parent or guardian, required compensation for the child actor, and the many other provisions—in the Proposed Settlement?   Where is the requirement for court review or any of the many required elements to narrow this exception to section 6701 manifested in this settlement?

To capture the pernicious nature of the matter before this Honorable Court, review just the beginning provisions of the very next uncited section:

**6752.  Placement of percentage of minor's gross earnings in trust; Duties of trustee, parent or guardian, minor's employer, and Actors' Fund of America; Notice to beneficiary; Fiduciary relationship between parent or guardian and minor**

(a) A parent or guardian entitled to the physical custody, care, and control of a minor who

---

purchases were made.  Contrary to Facebook's theory here, the court agreed that plaintiffs have alleged a plausible claim that the transactions at issue are void contracts "relating to any personal property not in the immediate possession or control of [a] minor" and denied Facebook's motion to dismiss the claim for declaratory relief under section 6701(c).  These facts are substantially *a fortiori* to the issue of simple credit card use by a child to pay for something legitimately received.

enters into a contract of a type described in Section 6750 shall provide a certified copy of the minor's birth certificate indicating the minor's minority to the other party or parties to the contract and in addition, in the case of a guardian, a certified copy of the court document appointing the person as the minor's legal guardian.

(b) (1) Notwithstanding any other statute, in an order approving a minor's contract of a type described in Section 6750, the court shall require that 15 percent of the minor's gross earnings pursuant to the contract be set aside by the minor's employer in trust, in an account or other savings plan, and  preserved for the benefit of the minor in accordance with Section 6753.

(2) The court shall require that at least one parent or legal guardian, as the case may be, entitled to the physical custody, care, and control of the minor at the time the order is issued be appointed as trustee of the funds ordered to be set aside in trust for the benefit of the minor, unless the court shall determine that appointment of a different individual, individuals, entity, or entities as trustee or trustees is required in the best interest of the minor.

* * *

(4) The minor's employer shall deposit or disburse the 15 percent of the minor's gross earnings pursuant to the contract within 15 business days after receiving a true and accurate copy of the trustee's statement pursuant to subdivision (c) of Section 6753, a certified copy of the minor's birth certificate, and, in the case of a guardian, a certified copy of the court document appointing the person as the minor's guardian. Notwithstanding any other provision of law, pending receipt of these documents, the minor's employer shall hold, for the benefit of the minor, the 15 percent of the minor's gross earnings pursuant to the contract.

* * *

(7) The court shall have continuing jurisdiction over the trust established pursuant to the order and may at any time, upon petition of the parent or legal guardian, the minor, through his or her guardian ad litem, or the trustee or trustees, on good cause shown, order that the trust be amended or terminated, notwithstanding the provisions of the declaration of trust. An order amending or terminating a trust may be made only after reasonable notice to the beneficiary and, if the beneficiary is then a minor, to the parent or guardian, if any, and to the trustee or trustees of the funds with opportunity for all parties to appear and be heard.

* * *

Following the above are more than twenty additional paragraphs spelling out all the safeguards required for an entertainment-related contract of a child.  *Amici* invites this Honorable Court to review all of sections 6750–6753 which are properly taken together in evaluating applicable state law on the subject.  But the gist of the many detailed provisions includes the following elements:  the contract must be controlled front to back by **"**at least one parent or legal guardian, as the case may be, entitled to the physical custody, care, and control of the minor at the time."  That is not Facebook.  And the statute provides for court review contract by contract. And it even requires minimum compensation for the child.  And it specifies how the employment

will proceed, reinforces both parental authority and the role of the court as a check — all of it intended to limit the possible exploitation of a child by private parties seeking to profit from commercial/entertainment use of the child.

Note that the cases can be confusing because they often confront collateral issues. For example, many cases address the "disaffirmance" of a contract by a minor—here not at issue. The issue here is the legitimate *formation* of an enforceable contract involving contributions by and takings from the child and the delegation of broad authority to a commercial third party in their capture and dispersion—largely to be effectively concealed in practice from parents, and certainly concealed as to its details. Nor are cases germane that involve a child taking advantage of a contract's benefits without paying (can a child's use of a credit card be acknowledged for the payment of an acknowledged benefit received still at issue in the *I.B.* case discussed in notes 4 and 5 *supra)*. *Amici* understand and agree that one exception to the lack of capacity bar to enforcing contracts against children (without parental consent) is the situation in equity where benefits have been received by the child. Here, of course, equitable doctrine carves an exception to sometimes allow recompense of those who have provided benefits to a child—regardless of the original contract and its defects. Indeed, where there has been reliance, principles of estoppel may well allow a child to enforce a contract for his or her benefit that he or she in theory lacks capacity to agree to it. These are not issues here. This settlement provision rather proposes a radical prospective regime of binding contracts applicable against children (and without compensation) and separate and apart from parental consent or assured knowledge. That is not the law in the United States, and explicitly not the law in California.

## C.    COPPA Does Not Apply to or Preempt State Law as to Children 13 and Older Nor Does It Apply to the Issues Raised in this Case

The citation of the federal Children's Online Privacy Protection Act (COPPA) (15 U.S.C. §§ 6501–08) does not assist Facebook. While that Act does to some extent preempt some state

---

*AMICUS CURIAE* MEMORANDUM OF CPIL AND CAI IN OPPOSITION TO PROPOSED
SETTLEMENT AGREEMENT, AS MODIFIED / Case No. CV 11-01726 RS                    13

law relevant to internet communications, as noted above, this statute is very narrow and pertains exclusively to the *privacy rights* of children under the age of 13—and to its credit Facebook does not make its pages available to those children.  In fact, the statute defines "child" for its purposes as only those under 13 years of age, as the FTC rulemaking proceeding during 2000 emphasizes (see FTC, Notice of Proposed Rule, 16 CFR Part 312, Fed. Reg. Vol. 76, No. 187, at 59805, middle column, on Congressional intent to confine the statute to only those children (available at http://www.ftc.gov/os/2011/09/110915coppa.pdf)).  COPPA does not deal with *any* child's ability to contract and thus is irrelevant to the issues raised here.  The body of privacy protection it does provide hardly supplants state contract law relevant to children over the age of 13 here at issue.  *I.e.,* the federal protection of a group of very young children in one area hardly creates a wholesale prohibition on state protection of somewhat older children in another area.

### III.   THIS COURT PREVIOUSLY DECLINED TO ACCEPT FACEBOOK'S ARGUMENT THAT ITS NOTICES CONSTITUTE CONSENT

It is ironic that Facebook has enjoyed categorical immunity from libel because it describes itself as nothing more than a "passive receptacle" of postings of others—with which it does nothing.  In fact, Facebook initially moved to dismiss *Fraley* based in part on the claim that a federal immunity statute—47 U.S.C. § 230(c)(1)—precludes defamation claims against providers of an "interactive computer service" (such as Facebook).  It contended that this statute afforded it immunity because "plaintiffs seek to hold Facebook liable for information provided by another party—namely, Plaintiffs themselves."  Facebook claimed that its actions turning this information into "sponsored stories" didn't change anything, as those actions were "well within the editorial functions for which websites receive immunity."  Judge Koh rejected this argument, finding that Facebook "meets the statutory definition of an information content provider" in light of Plaintiffs' claims that Facebook had transformed the character of Plaintiffs' words, photographs, and actions into a commercial endorsement to which they did not consent.  (See

Order Granting in Part and Denying in Part Defendant's Motion to Dismiss (Dec. 16, 2011) at

18.) The court found Facebook's assertion that its actions were well within the editorial function

for which websites receive immunity to be "unpersuasive" and that Facebook's actions were

distinguishable from the types of editorial actions taken by other web providers granted CDA

immunity in other cases. (*Id.* at 19.) This ruling is devastating to the rest of Facebook's argument

that "consent" is not necessary because it is not taking anything from anyone, nor making

commercial use of entries by children, *et al*.

       Judge Koh's order also rejected other arguments of Facebook, including the continuing

argument (in its points and authorities supporting this settlement) that its adhesive and obscure

"notices" allowing affirmative disapproval are somehow *de jure* "consent." (*Id.* at 23: "whether

Facebook's Statement of Rights and Responsibilities, Privacy Policy, or Help Center pages

unambiguously give Defendant the right to use Plaintiffs' names, images, and likenesses in the

form of Sponsored Story advertisements for Facebook's commercial gain remains a disputed

question of fact and is not proper grounds for dismissal at this time.") This 38-page order stands

as the "law of the case"—applicable to these parties on these issues. It is not appropriate for a

plaintiff, having received this and other rulings in its favor, to surrender on the seminal point in

dispute—that such consent may be secured by a "notice" followed simply by the failure of an

affirmative act of a parent to stop a "sponsored story" commercial use. Nor does the fig leaf help

that children must "represent" that they have their parents' permission to do something. Nor does

the fact that it will only apply to millions of parents who also happen to have Facebook pages

justify the unconscionable: "You all opt in" to our commercial use of your child's entries when,

how, and where we choose unless you somehow (a) find out we are doing it, (b) learn that you

can stop it, (c) figure out how to stop it, and (d) do so before it's too late.

## IV.   THE PROPOSED SETTLEMENT CREATES NO BENEFIT TO THE SUBCLASS —IT IS, RATHER, A DETRIMENT *VIS-À-VIS* NO SETTLEMENT AND REFLECTS THE LACK OF EXPERTISE REGARDING THE PROTECTION OF CHILDREN

The proposed settlement creates no benefit to the class, and actually amounts to a dangerous detriment as it scales back the protections currently afforded under state law.  The specific, current abuse addressed by this settlement is of special concern.  It involves the irreparable harm that comes from the necessarily final publication into a forum that can reach millions and from which the images and information are then irretrievably subject to retransmittal into the internet world—an entry portal that makes practical withdrawal problematic.  It is a bell that cannot be unrung.  It involves potential irreparable harm.

The cases of adolescence improvidence in posting photos and comments are of special concern to *amicus* Children's Advocacy Institute.  The problems of bullying and adolescent embarrassment and their consequences are easy for adults to minimize. But for teens, the retransmittal of what they post to persons and in forms they do not control can cause a kind of angst most of us have forgotten about. We used to be able to avoid bullying when in the sanctuary of our own homes, but such bullying now invades our home—often on the pages of Facebook.  It is no accident that correlations between internet embarrassment and teen suicides is not trivial. Parental concern is understandably high over the possible trauma from the mistakes their teens make in their own volitional postings and many parents do indeed put the computer in the living room and monitor what their children are entering and to whom messages are sent.  That parental relationship and role is here confronted with a third party claim to use of the postings of one's child.

*Amici* respectfully ask this Honorable Court the underlying ethical question: Would you grant advance, general permission to Facebook to decide how and to whom your child's image and information will be distributed?  Would you not want to know exactly what Facebook intends to do and reasonably expect the right to approve any such intrusive use of your child's entries in advance—and as to each such prospective third party retransmission, knowing exactly what it will include, how it will look and to whom it will be sent?

Under the Proposed Settlement, via the Statement of Rights and Responsibilities, the

1    control of this irremediable publication—likely into the homes of friends, but perhaps to others—

2    is vested with the commercial sensibilities of a corporation.  That delegation is unconscionable.

3    It violates the rationale behind limitations on the power of juveniles to contract and to suffer the

4    enforcement and consequences of those contracts.

5         CAI and CPIL share the concerns raised in the letter submitted to this Court by the Center

6    for Digital Democracy (CDD), dated July 10, 2012.  CDD presents compelling arguments made

7    by the Federal Trade Commission and computer science scholars: the "notice-and-choice" model

8    of privacy policies rarely provide actual notice and most frequently effectuate the service

9    provider's preference rather than the consumer's choice.   Nor is any settlement provision that

10   effectively kicks in *after* an initial publication conscionable.

11        The proposed settlement would require Facebook, for a limited time, to provide a highly-

12   unlikely-to-be-read notice that a user "give[s] [Facebook] permission to use [his or her] name,

13   profile picture, content and information in connection with commercial, sponsored, or related

14   content (such as a brand [the user] like[s]) served or enhanced by [Facebook]." (Sec. 2.1(a), page

15   6.)  Indeed, under the modified proposal, the "compliance audit" covers only the first two years

16   after order entry.  It is apparent that after that—we do not know what checks might exist, if any.

17        An adolescent between 13 and 18 years old cannot be expected to understand the

18   significance or consequences of giving "permission to use [his or her] name, profile picture,

19   content, and information in connection with commercial, sponsored, or related content (such as a

20   brand you like) served or enhanced by us."  The same adolescent can, similarly, not be expected

21   to understand the significance or consequences of representing "that at least one of [their] parents

22   or legal guardians has also agreed to the terms of [a given] section (and the use of [their] name,

23   profile picture, content, and information) on [their] behalf."  And the default setting is to allow

24   the uncompensated use of a user's name and likeness for commercial purposes.  While the

25   alteration to limit use to children who identify a parent also on Facebook is a positive change, it

26   exists in the context of a chasm then allowing effective blank-check use unless a parent somehow

27   knows to object.  There is a legally required condition precedent that any contract, including one

28   between a parent and a third party for use of a child's information or image, must have a meeting

of the minds as to exactly what is being contracted for. That consent is not properly a "we shall do what we will unless you discover you can stop us and act to do so." It is rather "tell the parent(s) what you intend to do, before you do it, and proceed if you receive affirmative permission."

How can these class representatives and their counsel possibly be "adequate class representatives" as required to warrant class certification when they are agreeable to not only the abuse as modified, but the original scheme of close to "blank check" use in virtually every case? The modification here did not come from any argument or objection of the class—but from the *sue sponte* and admirable intervention of this Honorable Court. Someone in this process needs to represent the interests of the children who will be much affected by the resolution—the immediate parties and their counsel are regrettably not interested in such a task.

To be fair, Facebook likely does not intend many of the inevitable consequences of its site's abuses. But embarrassment and youthful indiscretion on the one end of the spectrum, and bullying and suicides on the other end, are not part of the formulae in calculating commercial return on image and information dissemination. The proposed settlement's warnings and notices are textbook adhesive fig leaves. They do nothing for the thirteen-year-old who is striving to assert her independence yet is still simply too young to grasp the reach of her digital citizenship—a reach that could tarnish her reputation for years to come through a few thoughtless clicks of a mouse. The current settlement still creates not a world of statutory compliance, but one of rigged evasion. That is hardly to the benefit of the children involved.[7]

_____

[7] Although the FTC rule implementing COPPA emphasizes its limitation to those under 13 years of age, as discussed above, note 19 of the proposed FTC rule cited above includes an illuminating list of the citations relevant to teens not covered by COPPA, as follows: For example, research shows that teens tend to be more impulsive than adults and that they may not think as clearly as adults about the consequences of what they do. *See, e.g.,* Transcript of Exploring Privacy, A Roundtable Series (Mar. 17, 2010), Panel 3: Addressing Sensitive Information, available at *http://htc-01.media.globix.net/OMP008760MOD1/ftc_web/transcripts/031710_sess3.pdf;* Chris Hoofnagle, Jennifer King, Su Li, and Joseph Turow, *How Different Are Young Adults from Older Adults When It Comes to Information Privacy Attitudes & Policies?* (April 14, 2010), available at *http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1589864.* As a result, they may voluntarily disclose more information online than they should. On social networking sites, young people may share personal details that leave them vulnerable to identity theft. *See* Javelin Strategy and

**V.   CONCERNS REGARDING MASSIVE COMPENSATION FOR ATTORNEYS**

In the original proposed settlement, the parties agreed that plaintiffs' counsel will seek, and Facebook will not oppose, fees up to $10 million. This is apparently based on the "more than one year of vigorous litigation" cited by Facebook in its previous Memorandum.  No information suggests that $10 million in fees, or any amount approaching it, is appropriate in this case (no lodestar billing amount—actual hours times market value—has been provided) and comparison to other cases suggests this amount is not just excessive, but will likely not be appreciated by this Honorable Court.

The mere fact that the revised Proposed Settlement has deleted the reference to the $10 million figure gives *amici* no reason to believe that this previously-agreed upon sum is not still the approximate amount of fees plaintiffs' counsel will seek, and the fact that the parties have deleted what they refer to as the "clear sailing" provision contained in the original proposed settlement gives *amici* no reason to believe the matter will be contested.  "One of the main criticisms of clear sailing provisions is that they represent prima facie evidence of simultaneous negotiations of merit relief and fees, which is a practice fraught with serious ethical concerns for lawyers representing the class. Both courts and commentators have expressed apprehension that a plaintiff's counsel may be accepting a lower settlement for the class in exchange for a generous and nonadversarial treatment of fees."  William D. Henderson, *Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements*, 77 Tul. L. Rev. 813 (March 2003) at 815.  Speaking of bells that cannot be unrung, the removal of the specific dollar amount previously agreed to and the clear sailing provision does nothing to lead *amici* to believe that the deal has been undone.

Regarding the amount of fees previously agreed to—up to $10 million—note that in *Kenny A. v. Perdue* (a federal court class action case challenging the Georgia child protection

---

Research, 2010 *Identity Fraud Survey Report* (Feb.2010), available at h*ttps://www.javelinstrategy.com/uploads/files/1004.R_2010IdentityFraudSurveyConsumer.pdf.* They may also share details that could adverselyaffect their potential employment or college admissions. *See e.g.,* Commonsense Media, *Is Social Networking Changing Childhood? A National Poll* (Aug. 10, 2009), available at *http://www.commonsensemedia.org/teen-social-media* (indicating that 28% of teens have shared personal information online that they would not normally share publicly).

---

system's failure to provide minimally sufficient services to abused and neglected children in foster care), plaintiffs' counsel received a lodestar fee of just over $6 million (454 F.Supp.2d 1260, 1286-1287 (2006), rev'd on other grounds, *Perdue v. Kenny A. ex rel Winn*, __ U.S. __, 130 S.Ct. 1662 (2010)).  In *Kenny A.*, Children's Rights (a law firm with decades of experience in class action litigation pursuing children's rights and protection) recorded (after a 15% across-the-board reduction by the trial court) 25,423 hours litigating the case before the state was willing to begin settlement discussions; after being removed to federal court, the case involved a motion and full evidentiary hearing for a preliminary injunction, an unsuccessful state motion to dismiss, a motion for class certification, an unsuccessful state motion for summary judgment, discovery of nearly half a million pages of documents, and 60 depositions.

It seems doubtful that plaintiffs' counsel in this case, in one year, worked this case to point of earning seven figures, much less eight figures—to procure a settlement.  The basic posture is problematic when the settlement provides no injunctive relief beyond an agreement by Facebook that it will do *less* than the law requires.

### CONCLUSION

Although CPIL and CAI may ultimately file an objection at any future Fairness Hearing setting forth in further detail the legal and ethical concerns with the proposed settlement, CPIL and CAI respectfully request that this Court deny preliminary approval of the unfair and inadequate proposed settlement to prevent undue reliance, during a permanent approval process, on structure that is seemingly flawed at its outset.

Date:  November 7, 2012

_____
Robert C. Fellmeth

Date:  November 7, 2012

_____
Christina Riehl