1
ROBERT S. ARNS (#65071, rsa@arnslaw.com)
JONATHAN E. DAVIS (#191346, jed@arnslaw.com)
2
STEVEN R. WEINMANN (#190956, srw@arnslaw.com)
**THE ARNS LAW FIRM**
3
515 Folsom Street, 3rd Floor
San Francisco, CA 94105
4
Tel:    (415) 495-7800
Fax:   (415) 495-7888
5
JONATHAN M. JAFFE (# 267012, jmj@jaffe-law.com)
6
**JONATHAN JAFFE LAW**
3055 Hillegass Avenue
7
Berkeley, CA 94705
Tel:    (510) 725-4293
8
Fax:   (510) 868-3393
9
Attorneys for Plaintiffs
10

11
UNITED STATES DISTRICT COURT
12
NORTHERN DISTRICT OF CALIFORNIA
13
SAN FRANCISCO DIVISION
14

15
ANGEL FRALEY; PAUL WANG; SUSAN
MAINZER; JAMES H. DUVAL, a minor,
16
by and through JAMES DUVAL, as
Guardian ad Litem; and W. T., a minor, by
17
and through RUSSELL TAIT, as Guardian
ad Litem; individually and on behalf of all
18
others similarly situated,
19
                            Plaintiffs,
20
             v.
21
FACEBOOK, INC., a corporation; and
DOES 1-100,
22
                            Defendants.
23

| | |
|---|---|
| **Case No. 11-cv-01726 RS** | |
| **PLAINTIFFS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS** | |

Date:   June 28, 2013
Time:   10:00 a.m.
Courtroom:  3
Judge:  Hon. Richard Seeborg

# TABLE OF CONTENTS

STATEMENT OF ISSUES ............................................................................................... 1

MEMORANDUM OF LAW ............................................................................................. 2

I.   INTRODUCTION .................................................................................................. 2

II. STATEMENT OF FACTS AND PROCEDURAL HISTORY ............................................ 5

   A.   PROCEDURAL HISTORY ......................................................................... 5

   B.   FACTS CONCERNING DEFENDANT FACEBOOK, INC. AND THE CLASS REPRESENTATIVES ... 6

   C.   DISCOVERY ........................................................................................... 8

   D.   TERMS OF THE PROPOSED SETTLEMENT ................................................ 9

      1.   The Proposed Settlement Class ....................................................... 9

      2.   Payments to the Class / Claims Process ........................................ 10

      3.   Injunctive Relief: Changes to the SRRs and Information on Facebook's Website and Help Pages ......................................................................... 11

      4.   New Tool for Limiting Appearances in Sponsored Stories ......................................... 12

      5.   New Information and Tool for Opting Out Minors .................................................. 13

   E.   PLAINTIFFS' EXPERTS ON THE MOTION FOR CLASS CERTIFICATION PROVIDED THE GROUNDWORK FOR SETTLING THE CASE AND FOR VALUING THE INJUNCTIVE RELIEF .. 14

   F.   CLASS COUNSEL IS EXPERIENCED AND PROVIDED EXCELLENT REPRESENTATION. ......... 17

      III. THE COURT SHOULD APPROVE THE FEE APPLICATION AS FAIR AND REASONABLE .................................................................................................. 18

      IV. THE RELEVANT FACTORS EASILY JUSTIFY THE REQUESTED AWARD IN THIS CASE ON A PERCENTAGE BASIS ......................................................................... 22

   A.   THE RESULT ACHIEVED ....................................................................... 22

   B.   COURTS RECOGNIZE THAT INJUNCTIVE RELIEF OFTEN HAS GREAT VALUE EVEN IF NOT EASILY MONETIZED ............................................................................... 24

-i-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                         CASE NO. 11-CV-01726 RS

C.   THE INJUNCTIVE RELIEF IS VALUABLE AND WILL LEAD TO ECONOMIC BENEFITS TO THE CLASS MEMBERS ...................................................................................................... 27

D.   METHODS OF PLACING VALUE ON THE INJUNCTIVE RELIEF ........................................ 28

   1.   First Method for Valuing Injunctive Relief:  The Real Option Valuation. ................ 28

   2.   Second Method for Valuing Injunctive Relief:  Fair Market Valuation of Right to Control Asset Based on Past Value of Endorsements ................................................. 30

   3.   Third Method of Valuation: Minimum Value of $1 ................................................... 31

E.   THE QUALITY OF WORK PERFORMED ....................................................................... 31

F.   THE SKILL REQUIRED: THE COMPLEXITY AND DIFFICULTY OF THE ISSUES PRESENTED . 32

G.   THE HIGH CALIBER OF OPPOSING COUNSEL .............................................................. 32

H.   THE RISKS OF THIS LITIGATION ............................................................................... 33

   1.   The Risk of Not Achieving Class Certification ........................................................ 33

   2.   The Risk of COPPA Preemption .............................................................................. 34

   3.   The Risk of Going to Trial ....................................................................................... 34

I.   THE CONTINGENT NATURE OF THE FEE ..................................................................... 35

J.   THE LODESTAR SUPPORTS THE REASONABLENESS OF THE REQUESTED AWARD ............ 36

V. THE NAMED PLAINTIFFS DESERVE SERVICE AWARDS FOR THEIR EFFORTS .. 37

VI. CONCLUSION ............................................................................................................. 39

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS              CASE NO. 11-CV-01726 RS

## TABLE OF AUTHORITIES

**Constitutions**

U.S. CONST. art. III ............................................................................................. 31

**State Cases**

*Blakemore v. Super. Ct.*, 129 Cal. App. 4th 36 (2005) ........................................ 27

*Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163 (2000) ................. 26

*Rebney v. Wells Fargo Bank*, 220 Cal. App. 3d 1117 (1990) ................................ 23

*Wershba v. Apple Computers, Inc.*, 91 Cal. App. 4th 224 (2001) ..................... 23, 37

**Federal Cases**

*Activision Sec. Litig.*, 723 F. Supp 1373 (N.D. Cal. 1989) ................................... 21

*Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 U.S. Dist. LEXIS 68 (E.D. Pa. Jan. 4, 2001) ....... 37

*Air Line Stewards, etc., Loc 50 v. American Airlines, Inc.*, 455 F.2d 101 (7th Cir. 1972) ......... 23

*Antonopulos v. N. Am. Thoroughbreds, Inc.*, 1991 WL 427893 (S.D. Cal. May 6, 1991) ......... 21

*Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781 (7th Cir. 1999),

  *cert. denied*, 528 U.S. 1181 (2000) ............................................................... 34

*Carter v. Anderson Merchandisers, LP*, Nos. EDCV 08-0025-VAP (OPx), EDCV 09-0216-

  VAP (OPx), 2010 WL 1946757 (C.D. Cal. May 11, 2010) ..................................... 20

*Catfish Antitrust Litig.*, 939 F. Supp. 493 (N.D. Miss. 1996) ................................ 38

*Cosgrove v. Sullivan*, 759 F. Supp. 166 (S.D.N.Y. 1991) ..................................... 37

*Currency Fee Antitrust Litig.*, 263 F.R.D. 110 (S.D.N.Y. 2009) ............................ 26

*Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303 (C.D. Cal. 1977) ................... 32

*General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768

  (3d Cir. 1995) ................................................................................................. 22

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ........................... 20, 21, 37

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ....................................................... 23

*Hughes v. Microsoft Corp.*, Nos. C98-1646C and C93-0178C, 2001 U.S. Dist. LEXIS 5976

  (W.D. Wash. Mar. 21, 2001) ............................................................................ 38

*Immunex Sec. Litig.*, 864 F. Supp. 142  (W.D. Wash. 1994) ................................ 39

*Linney v. Cellular Alaska Partnership*, 151 F.3d 1234 (9th Cir. 1998) ................... 23

*Lorazepam & Chlorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002) ............ 38

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                                    CASE NO. 11-CV-01726 RS

*Lorazepam & Clorazepate Antitrust Litig.*, MDL No. 1290; Misc. No. 99ms276; Civ. No. 99-0790, 2003 U.S. Dist. LEXIS 12344 (D.D.C. June 16, 2003).................................... 36

*M.D.C. Holdings Sec. Litig.,* 1990 WL 454747 (S.D. Cal. Aug. 30, 1990) .............................. 21

*McCoy v. Health Net, Inc.,* 569 F.Supp.2d 448 (D.N.J. 2008) ............................................ 24, 25

*MCI Commc 'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir.), *cert. denied,* 464 U.S. 891 (1983) ............................................................................................................ 34

*McKessonHBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 844 (N.D. Cal. 2005) ............................ 39

*Mego Fin. Corp. Sec. Litig*., 213 F.3d 454 (9th Cir. 2000) .................................................. 21, 38

*NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) ............................ 37

*Nat'l Rural v. Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004) ............ 23

*New England Carpenters Health Benefits Fund v. First Databank, Inc.,* 2009 U.S. Dist. LEXIS 68419 (D. Mass. August 3, 2009)........................................................................ 26

*Nichols v. SmithKline Beecham Corp.* ("*Paxil Litigation*"), 2005 WL 950616 (E.D. Pa. Apr. 22, 2005) ....................................................................................................... 22

*Omnivision Techs., Inc.*, 2007 WL 4293467 (N.D. Cal. Dec. 6, 2007) .................................... 21

*Pacific Enters. Sec. Litig.,* 47 F.3d 373 (9th Cir. 1995)..................................................... 21, 33

*Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir. 1989) .................................. 20

*Presley v. Carter Hawley Hale Profit Sharing Plan*, No. C9704316SC, 2000 WL 16437 (N.D. Cal. 2000) ...................................................................................................................... 38

*Public Serv. Co. of New Mexico*, 1992 WL 278452 (S.D. Cal. July 28, 1992) .......................... 21

*Rite Aid Corp. Secs. Litig.*, 146 F. Supp. 2d 706 (E.D. Pa. 2001) .............................................. 36

*RJR Nabisco Sec. Litig.*, MDL No. 818; 88 Civ. 7905, 1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24, 1992) ................................................................................................ 37

*Roberts v. Texaco, Inc.*, 979 F. Supp. 185 (S.D.N.Y. 1997)...................................................... 37

*Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000) ............................ 21

*Six (6) Mexican Workers v. Ariz. Citrus Growers,* 904 F.2d 1301 (9th Cir. 1990) ........ 20, 21, 22

*Sorbates Direct Purchaser Antirust Litig.*, No. C 98-4886, 2002 U.S. Dist. LEXIS 23468 (N.D. Cal. Nov. 15, 2002) .......................................................................................... 39

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ................................................................ 38

*Triangle Indus., Inc. S'holders Litig.*, No. 10,466, 1991 Del. Ch. LEXIS 203 (Del. Ch. Dec. 19, 1991)........................................................................................................ 37

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                                                    CASE NO. 11-CV-01726 RS

*United States Football League v. Nat'l Football League*, 644 F. Supp. 1040 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988), *cert. denied*, 493 U.S. 1071 (1990) ............................... 34

*Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294 (N.D. Cal. 1995)................................ 36, 39

*Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482 (E.D. Cal. 2010)................................ 22

*Vizcaino v. Microsoft Corp.,* 142 F. Supp. 2d 1299 (W.D. Wash. 2001) ................. 25, 32, 33, 36

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002)................................... 20, 21, 22, 35

*Weddle v. Frito-Lay, Inc.*, 2001 WL 182374 (N.D. Cal. Feb. 21, 2001)................................... 39

*Weiss v. Mercedes-Benz of N. Am.*, 899 F. Supp. 1297 (D.N.J. 1995), *aff'd*, 66 F.3d 314 (3d Cir. 1995) .................................................................................................................. 37

*White v. Experian Information Solutions*, 2011 U.S. Dist LEXIS 79044 (C.D. Cal. July 15, 2011)....................................................................................................................................... 24

*WPPSS Sec. Litig.*, 19 F.3d 1291 (9th Cir. 1994) ..................................................................... 36

*Yeagley v. Wells Fargo & Co.*, 2008 U.S. Dist. LEXIS 5040 (N.D. Cal. Jan. 18, 2008)........... 20

**Statutes**

Cal. Civ. Code § 3344...........................................................................................................passim

Cal. Civ. Code § 3344(d) ............................................................................................................ 33

California's Unfair Competition Law, Bus. & Prof. Code § 17200 et seq. ..........................passim

Children's Online Privacy Protection Act 15 U.S.C. § 6502........................................................ 34

Communications Decency Act, 47 U.S.C. § 230................................................................... 32, 33

Fair Credit Reporting Act, 15 U.S.C. §1681e.............................................................................. 24

**Treatises**

*Thomas E. Willging, et al., Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* (Federal Judicial Center 1996)........ 21

**Other Authorities**

*Manual for Complex Litigation* (Second) § 30.44 ..................................................................... 23

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                                                         CASE NO. 11-CV-01726 RS

**NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES AND COSTS**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on June 28, 2013, at 10:00 a.m., or as soon thereafter as counsel may be heard, Plaintiffs and proposed Class representatives Susan Mainzer, James H. Duval, and W.T. ("Plaintiffs") shall bring on for hearing before the Honorable Richard Seeborg, United States District Judge, in the United States District Courthouse, Northern District of California, San Francisco Division, Courtroom 3, 450 Golden Gate Avenue, San Francisco, CA, 94102, their Motion for Attorneys' Fees and Costs.

The Motion seeks an Order: (1) Awarding reasonable attorneys' fees and reimbursement of costs; (2) approving a service award to the class representatives, Susan Mainzer, James H. Duval, and W.T. This Motion is based on this Notice of Motion, the attached Memorandum of Law; the Declaration of Robert S. Arns, the Declaration of Richard Pearl; the previously filed Joint Motion for Preliminary Approval of Class Action Settlement and supporting documents; the previously filed Motion for Class Certification, Appointment of Class Counsel and Appointment of Class Representatives Pursuant to Motion for Preliminary Approval and supporting documents; the Plaintiffs' original Motion for Class Certification and supporting documents; as well as the pleadings, Orders, transcripts and other papers on file in this action; and any further evidence and arguments as may be presented at the hearing of this matter.

<b>STATEMENT OF ISSUES</b>

1. Whether the Court should award Class Counsel their reasonable attorneys' fees and costs.

2. Whether the Court should approve service award for class representatives Susan Mainzer, James H. Duval, and W.T.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                         Case No. 11-CV-01726 RS

# MEMORANDUM OF LAW

## I.  INTRODUCTION

This case involves novel and complex issues and a settlement that blazes a trail in the field of privacy and publicity rights in online social advertising.  Plaintiffs and their counsel engaged one of the world's largest companies and its highly skilled attorneys in a litigation requiring tremendous acuity.  They balanced the interests of their class of over 123 million individuals who, on one hand, were used in advertisements without their permission in violation of their rights, and on the other hand, use and enjoy the world's largest social network free of charge.  Achieving a settlement that allows these individuals to continue free use of Facebook without being unknowing and unwilling endorsers for advertisers is a nearly ideal solution to a complicated dilemma and will provide a model for the future of online social advertising.

Plaintiffs Susan Mainzer, James H. Duval and W.T. bring this Motion for attorneys' fees and costs and request for class representatives service awards.[1]  Plaintiffs brought claims for their right of publicity under California Civil Code section 3344 and California's Unfair Competition Law, Business & Professions Code section 17200 et seq.  They alleged that their names and likenesses had been used without their prior consent in "Sponsored Stories" ads shown to their online friends on Facebook.com.  After hard fought litigation since March 2011, including two motions to dismiss, twenty-one depositions, and the briefing of a motion for class certification, the Parties entered into mediation and ultimately reached a proposed settlement just days before the Plaintiffs' class certification motion was to be heard.  Following denial without prejudice of Plaintiffs' first Motion for Preliminary Approval, Plaintiffs and Facebook

---

[1] In support of this Motion, Plaintiffs incorporate by reference all documents filed related to the Joint Motion for Preliminary Approval of Class Action Settlement; Plaintiffs' Motion for Class Certification, Appointment of Class Counsel and Appointment of Class Representatives Pursuant to Motion for Preliminary Approval and supporting documents; their original Motion for Class Certification, and all citations to Exhibits and Declarations are references to documents filled with those motions.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                                              Case No. 11-CV-01726 RS

negotiated substantial modifications to the terms of the Settlement.   The Court granted Preliminary Approval of the settlement on December 3, 2012.

The attorneys' fees requested here are reasonable and fully justified given the work performed and the monetary and injunctive relief provided by the Settlement.   The Settlement provides substantial, tangible relief to the Class keyed to the issues which prompted the suit. There is a $20 million settlement fund with no reversion to Facebook and no "clear sailing" agreement as to Class Counsel's attorneys' fees.   Under the Amended Settlement Agreement ("A.S.A."),[2] the balance of the $20 million fund after attorneys' fees and costs, incentive awards, and settlement administration and notice costs, will be made available on a claims-made basis for distribution to Class members.   Class members will be able to make claims starting at $10, with the actual amount being adjusted pro rata should the claims rate reach a specific threshold.[3]   In the event that the claims rate falls below $5 per claimant, the Parties have designated *cy pres* recipients which have been and are engaged in activities which will benefit the entire Class as well as the public at large.   The *cy pres* recipients will advocate for issues such as the right of protection of the Class members' right of publicity on the internet and specifically on social media websites.   They also include entities dedicated to the protection of the rights and welfare of minor children as they are affected by social media in an online context.

The crowning achievement of the Settlement is the proposed injunctive relief.   That relief will provide significant benefits to the Class Members (as well as future Facebook users) and includes an ability to opt out of Sponsored Stories ads and changes to Facebook's website. It will remain in place for at least two (2) years and make it clear to all persons with Facebook accounts ("Users") and the parents or legal guardians of minor Users that their names and

---

[2] The A.S.A. is attached as Exhibit 1 to the Declaration of Robert S. Arns in support of the Joint Motion for Preliminary Approval ("Arns J.M.P.A. Decl.").

[3] As explained further below, should the claims rate exceed the point where it is feasible to provide all claimants $10, the payment amount will be adjusted pro rata to the point where it is economically feasible.

-3-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                                       Case No. 11-CV-01726 RS

likenesses may be used in "Sponsored Stories" ads.  A.S.A § 2.1.  The public will also be benefitted as other social media sites will take notice of the type of relief here and know that they also need to comply with the law, and can follow in the footsteps of Facebook in implementing appropriate protections for users.

As Plaintiffs contended on the joint motion for preliminary approval, there are also at least three alternative methods for assigning a dollar amount to the ability of the Facebook users to now avoid being in Sponsored Stories ads, and limit their appearances in Sponsored Stories ads.  These tools are being created by virtue of this settlement and could not be forced upon Facebook in any way other than this settlement agreement.  The first valuation method establishes the value of the new educational information and user privacy control tools provided by the injunctive relief.  This new "real option" is essentially one by which users can continue to use Facebook while still maintaining control over their appearance in Sponsored Stories.  This methodology is based upon valuations assigned by economists to "call" type options in the financial markets.  This real option value methodology values the new option created by the injunctive relief in a range of $57.4 million to $145.1 million.  An alternative method for valuing the injunctive relief utilizes the previously established fair market value of the Class members' endorsements, and their newly created right to control those endorsements based in part on the value of future endorsements to Facebook.  Finally, Plaintiffs contend that the new tools and information provided is worth at minimum $1 to each Class member, which places the value of the injunctive relief at least $123 million.

Class Counsel performed efficient but comprehensive work in this case in order to bring it to settlement, amassing 8346.60 hours.  Discovery was intensive, including hundreds of thousands of pages of documents requested and reviewed, as well as interrogatories and requests for admission, and 21 depositions, many of them key Facebook personnel and experts. Motion practice included Class Counsel's defeat of Facebook's Motion to Dismiss, and the groundbreaking work done in concert with Plaintiffs' experts in crafting a method for proving

-4-
PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                                    Case No. 11-CV-01726 RS

the Class' damages for their right of publicity in the field of online advertising using social media. This work was essential to mounting the Motion for Class Certification—which in turn pushed the case towards settlement—as well as for estimating the value of the Class' damages for settlement purposes.

Class Counsels' fee request is thus justified under both the percentage of recovery method and based upon their lodestar. Measuring the cash component as well as the injunctive relief figures as a percentage of recovery, the requested fee award of $7,500,000.00 is well within the benchmark 25% of the recovery if all of the relief is taken into account. A lodestar cross-check of Counsel's hours (8346.60 hours for $5,391,030.00) amounts to only a 1.391 multiplier of the lodestar figure.[4] Given the results and the novel issues addressed in this suit, such a multiplier is warranted. Plaintiffs' costs of $282,566.49 are fully supported.

Class representatives Susan Mainzer, James H. Duval and W.T. were courageous in bringing this lawsuit in light of not only the intense media attention, but also the very real threat of attorneys' fees being assessed against them if they were to lose the case. They have devoted significant time and resources to this matter, and should be compensated with service awards. Plaintiffs have requested $12,500 for each Class representative, for a total of $37,500.

The Court should award the requested fees, costs, and service awards.

## II.      STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.      Procedural History

This action was filed in Santa Clara Superior Court on March 11, 2011. Plaintiffs amended to add a subclass of minors on March 18, 2011. The case was thereafter removed to federal court on April 8, 2011. Following an initial Motion to Dismiss after removal, Plaintiffs amended the Complaint; the operative Complaint is the Second Amended Complaint. Facebook filed a second Motion to Dismiss, which was denied on December 16, 2011.

---

[4] Class Counsel is not seeking recovery for any of the hundreds of hours of time expended by legal assistants at The Arns Law Firm. These skilled professionals provided crucial support in the promulgation of discovery and review of documents and other tasks. Arns Decl., ¶17.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                                        Case No. 11-CV-01726 RS

Plaintiffs filed their Motion for Class Certification on March 29, 2012, and their Reply on May 3, 2012.  The Motion was fully briefed at the time the Parties' original Term Sheet was entered into on May 22, 2012.  Plaintiffs filed a first motion for Preliminary Approval of Settlement on June 14, 2012.  The Honorable Lucy H. Koh recused herself after the first Motion for Preliminary Approval was filed.  After transfer of this matter to the Hon. Richard Seeborg, the motion was heard on August 2, 2012, and denied without prejudice on August 17, 2012.  Preliminary Approval of the Settlement was granted on December 3, 2012.

> **B.    Facts Concerning Defendant Facebook, Inc. and the Class Representatives**

Facebook is the world's largest social networking site that generates most of its revenue from advertising.  Ex. 1, [Second Amended Complaint] ¶ 13.[5]  As of December 2011, Facebook had over 161 million monthly active users in the United States.[6]  Ex. 28, p. 44.

On January 25, 2011, Facebook launched a new advertising service called "Sponsored Stories." Ex. 22 [RFA Response No. 1.3].  Since that time, when a Member posts, "Likes," "Checks-in", or uses an application or game, and the content relates to an ad campaign in some predetermined way, the Member's profile image and name may appear, along with content created by Facebook, as an endorsement.  Plaintiffs contend this process is a paid advertisement on the pages viewed by some or all of the Friends of that Member.  These Sponsored Stories ads typically appeared in the right-hand column along with other ads that have been paid for by Facebook's advertisers.  More recently, Sponsored Stories ads have been displayed in the Newsfeed column where they are denoted as "Sponsored."  They do **not** appear on pages seen by the Members whose names and/or likenesses are being used.  *See* Ex. 7; Ex. 4.

---

[5] All references which are designated only with "Ex." and a number are citations to exhibits to the Declaration of Jonathan E. Davis in support of the Joint Motion for Preliminary Approval of Class Action Settlement.

[6] As of August 31, 2012, 123,868,976 Facebook members had appeared in a Sponsored Story. Of that number, 19,761,991 are minors. *See* Decl. of Christopher Plambeck, filed by Defendant Facebook in support of the Joint Motion for Preliminary Approval of Class Action Settlement.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                              Case No. 11-CV-01726 RS

The Sponsored Stories ad service is already enabled for all Members when they sign up and Plaintiffs contend that Members are unable to opt-out of the service. Ex. 5, pp. 24-26; Ex. 6 [Yang Dep Tr.] at 140:3-6; Ex. 23 [Squires Dep. Tr.] at 302:20-303:02. The most common action that leads to an appearance in a Sponsored Story ad is clicking on a Facebook Like button anywhere on the Internet. Reasons for doing so include being able to thereby take advantage of some offer, or simply in order to be able to see content on a page.

Plaintiffs contend that none of the operative versions of the SRRs disclosed to Members the fact that they may appear in Sponsored Stories ads or sought their consent as to appearances in Sponsored Stories ads. Plaintiffs further contend that a problem with the voluminous "Help Center" (hundreds of linked pages) and the Settings arose from Facebook's failures to notify users of the addition of Sponsored Stories, who upon visiting the "Help Center" were told "You can edit your ad privacy settings through the 'Account Settings' link at the top of any page within Facebook or by clicking here." Ex. 35. If a Facebook user clicked on that link, they were taken to a page where it appeared that they were given the ability to "opt-out" of appearing in all advertisements. Users who did this believed that they had successfully prevented their likeness from being paired with ads. However, members who had chosen this option were still eligible to appear in Sponsored Stories ads. Facebook's "Help Center" in some areas states that Sponsored Stories ads are "different" than Facebook Ads, thus, Plaintiffs allege, leading to further confusion. Ex. 34.

Prior to January 1, 2011, Susan Mainzer uploaded a Facebook Profile picture of herself that clearly bears her likeness. Ex. 7. On March 22, 2010, Ms. Mainzer clicked on the Facebook "Like" button for UNICEF USA. Ex. 8 [Mainzer Depo. Tr. 62:11-16, 72:4-17; 77:23-78:12.] Ms. Mainzer's name and profile picture appeared in a UNICEF Sponsored Stories ad on facebook.com and was displayed to her Friends. Ex. 7. She was not paid for her appearance in that ad, or for her appearance in others since then. Ex. 9 [Mainzer Response to Int. Nos. 8, 11].

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                                      Case No. 11-CV-01726 RS

James H. Duval, a minor at the time (he turned 18 in 2012), prior to January 1, 2011, uploaded a Facebook Profile picture of himself that clearly bore his likeness.  Ex. 11.  Mr. Duval appeared in Sponsored Stories ads shown to his Friends.  Ex. 2.  Three days after Facebook launched Sponsored Stories ads—eight weeks after he clicked on the "Like" button—Mr. Duval (unbeknownst to him) began appearing in Sponsored Stories ads about Coca-Cola, shown to his friends.  Ex. 34.  At no point did Facebook seek or obtain consent from his parents or other legal guardians to use his name or likeness as required under California law.  He was not paid for his appearance in any ads.  Ex. 34.

Sometime prior to January 1, 2011, representative "W.T," a minor at the time, uploaded a Facebook Profile picture of himself that clearly bears his likeness.  Ex. 13.  On Dec. 11, 2010, W.T. clicked on the Facebook "Like" button for Craftsman. Ex. 14.  On or about March 20, 2011 W.T. (unbeknownst to him), began appearing in ads. *See* Ex. 3.  W.T. was not paid for his appearance in any of those ads.  Ex. 15.  [W.T. Response to Int. Nos. 8, 11]

### C.    Discovery

The discovery in this case has been extensive.  There have been 21 depositions taken in this action, including 7 experts and over 4,263 pages of transcripts. Arns Decl., ¶38. These included key personnel of Facebook involved in the development of Sponsored Stories ads and persons most qualified to discuss the workings of Facebook's systems. *Id.* ¶¶39-42. For each deposition, there was extensive pre-deposition preparation of exhibits, strategies, and questions. After conducting the depositions and upon receiving the deposition transcript from the court reporter, a deposition extract was created, which summarized and analyzed the content generated from the deposition.

Plaintiffs' Counsel prepared and served 11 sets of Requests for Production of Documents, for a combined total of 214 individual requests, upon Defendant; 6 sets of Requests for Admission, a total of 249 requests; and 25 Interrogatories.  *Id.* ¶¶43-44.  The documents produced by Facebook included many "natively produced" PowerPoint documents

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                              Case No. 11-CV-01726 RS

and e-mails. The document demands resulted in over 200,000 pages being produced by Facebook, not counting responses to third-party subpoenas served by Plaintiffs. Arns Decl., ¶43. Plaintiffs' counsel issued subpoenas to 5 companies who had purchased Sponsored Stories ads requesting documents provided to them by Facebook and documents provided by them to Facebook, documents regarding how Sponsored Stories ads were being promoted and marketed to advertisers and any studies regarding the effectiveness of Sponsored Stories ads as compared to non-endorsed advertisements. These subpoenas resulted in over 2,000 pages of documents, which were reviewed, analyzed, and incorporated into the facts used for the litigation of the action. *Id.* ¶46.

Plaintiffs' Counsel received, analyzed and responded to 105 interrogatories from Facebook. Arns Decl., ¶49. Responding to these interrogatories involved extensive communication with the plaintiffs, verification of their answers, and service of the responses. The demanding task resulted in over 275 pages of initial and supplemental responses from named plaintiffs. *Id.* Counsel received, analyzed and responded to 269 Requests for Production of Documents from Defendant; as well as 351 Requests for Admissions from Defendant which were reviewed, analyzed and responded to. *Id.* ¶51. The requests resulted in the production of over 7,000 pages of documents by Plaintiffs. Arns Decl., ¶50. Plaintiffs and their guardians have dedicated at least 150 hours of time staying informed, responding to discovery requests and being deposed. *Id.* ¶73.

### D.    Terms of the Proposed Settlement

The terms of the Settlement preliminarily approved by the Court are as follows:

#### 1.  The Proposed Settlement Class

The proposed Settlement Class is defined as:

> **(a)    Class:** All persons in the United States who have or have had a Facebook account at any time and had their names, nicknames, pseudonyms, profile pictures, photographs, likenesses, or identities displayed in a Sponsored Story, at any time on or before the date of entry of the Preliminary Approval Order.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                    Case No. 11-CV-01726 RS

**(b)** **Minor Subclass:** All persons in the Class who additionally have or have had a Facebook account at any time and had their names, nicknames, pseudonyms, profile pictures, photographs, likenesses, or identities displayed in a Sponsored Story, while under eighteen (18) years of age, or under any other applicable age of majority, at any time on or before the date of entry of the Preliminary Approval Order.

A.S.A §§1.6, 1.17


2.     **Payments to the Class / Claims Process**

Class Members will be able to submit a claim for payment from the Net Settlement Fund, which will be the amount of the Common Fund after attorneys' fees and costs, service awards, and settlement administration costs are deducted.  A Class member will use a simple, online form, in which he or she will attest under the penalty of perjury that (a) the Class member understands that some action he or she took on Facebook (such as liking a page, checking in at a location, or sharing a link), along with his or her name and/or profile picture, may have been displayed in a Sponsored Stories ad shown to his or her Facebook Friends who were authorized by the Class member to see that action; (b) the Class member was not aware that Facebook could be paid a fee for displaying actions such as these, along with the Class member's name and/or profile picture, to his or her Facebook Friends; (c) the Class member believes that, if his or her name and/or profile picture was displayed in a Sponsored Stories ad, he or she was injured by that display; and (d) the Class member is submitting only one claim form regardless of how many Facebook accounts the Class member has.   A.S.A. §4.1(a).

 Class Members who submit timely and valid Claims Forms ("Authorized Claimants," A.S.A. §1.1) will receive payments, either by check or through an Automated Clearing House transfers, unless the Court orders otherwise.  In the event it is mathematically impossible to make payments without exceeding the Net Settlement Fund, the available claims pool would instead be distributed to *cy pres* recipients proposed by the Parties and approved by the Court

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                                              Case No. 11-CV-01726 RS

(the "*Cy Pres* Recipients," A.S.A. §1.8).  As laid out in A.S.A. §2.3, the following criteria will be used to determine the amount of claims paid:

> 1.      Each Authorized Claimant will be issued a payment of $10.00, subject to the exceptions and qualifications below.

> 2.      If payment of $10.00 to all Authorized Claimants would exhaust the Net Settlement Fund, each Authorized Claimant's share will be reduced pro-rata.

> 3.      If, given the number of Authorized Claimants, each Authorized Claimant's pro-rata share would be less than $5.00, the Court may, in its discretion, either (i) order the pro-rata amounts to be paid to each Authorized Claimant, or (ii) order the entire Net Settlement Fund to be distributed instead to the *Cy Pres* Recipients.

> 4.      Notwithstanding the foregoing, if it is not economically feasible to make any payment to the Authorized Claimants without exceeding the amount of the Net Settlement Fund, the entire Net Settlement Fund will be distributed instead to *Cy Pres* Recipients.

> 5.      If payment of $10.00 to each Authorized Claimant does not exhaust the Net Settlement Fund, all proceeds remaining in the Net Settlement Fund will be distributed to the *Cy Pres* Recipients.  However, the Court may issue an order, at its discretion, forgoing the distribution of funds to the *Cy Pres* Recipients and, instead, increasing each Authorized Claimant's share on a pro-rata basis until the Net Settlement Fund is exhausted.

The list of *cy pres* Recipients proposed by the Parties are organizations that focus on consumer protection, research, and education concerning privacy-related interests in the rapidly evolving online landscape, and the safe use of social media technologies, with a particular emphasis on protecting the interests of minors.

### 3.      Injunctive Relief: Changes to the SRRs and Information on Facebook's Website and Help Pages

The Parties have agreed to a stipulated injunction that will provide the relief described below addressing and clarifying the issues of consent and control of the use of the Class

-11-

members' names and likenesses.  Previously, it was in Plaintiffs' view impossible even for a person who carefully pored over Facebook's Statement of Rights and Responsibilities ("SRRs") and Help Pages to discern exactly what a "Sponsored Story" was, except that it was plain that Facebook distinguished them from "ads," stating expressly that they are "different from ads."  Ex. 34.  The changes to the SRRs and Help Pages clearly identify Sponsored Stories and seek permission, provide adequate notice and the ability to modify one's behavior.  As part of the Notice in this action, the current users will learn of these changes.  Significantly, in response to this information and with the new controls, a user can then not only "avoid" taking actions which can lead to being featured in Sponsored Stories, but also subsequently limit his or her appearances. Prospective users will be informed of how Sponsored Stories work *before* they sign up, something they do not currently have available to them.

Within a reasonable time, not to exceed six months following the Final Settlement Date (provided the Settlement is approved and the Judgment is final, A.S.A. §1.13), Facebook will modify Section 10.1 of the SRRs in part to read as follows:

> **You give us permission** to use your name, profile picture, content, and information in connection with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us.  This means, for example, **that you permit a business or other entity to pay us to display your name and/or profile picture with your content or information**.  If you have selected a specific audience for your content or information, we will respect your choice when we use it.
>
> If you are under the age of eighteen (18), or under any other applicable age of majority, you represent that at least one of your parents or legal guardians has also agreed to the terms of this section (and the use of your name, profile picture, content, and information) on your behalf.

A.S.A. §2.1(a) (emphasis added).

## 4.    New Tool for Limiting Appearances in Sponsored Stories

The Settlement provides that there will be a new tool or mechanism for meaningfully limiting appearances in Sponsored Stories, something that does not currently exist.  A.S.A. §2.1(b).  Facebook will enable users, upon viewing the interactions and other content that have

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                    Case No. 11-CV-01726 RS

been used in Sponsored Stories, to control which of these interactions and other content are eligible to appear in additional Sponsored Stories. *Id.* These settings will include the ability to prevent individual interactions and other content, or categories of interactions and other content, from appearing in additional Sponsored Stories. *Id.*

### 5.    New Information and Tool for Opting Out Minors

The Injunctive Relief for Minors is even more powerful. Under the terms of the injunctive relief, parents of minor users will be able to visit a public link on the Facebook website and utilize a tool which will enable the parent to prevent the name and likeness of their child from appearing in Sponsored Stories.[7] A.S.A. §2.1(c)(iii). Further, if the minor's parent is also a Facebook user, the minor and the parent can use Facebook to indicate their relationship to each another. A.S.A. §2.1(c)(ii). Under the terms of the Amended Settlement Agreement, when the parent and minor have confirmed a parent-child relationship, the Facebook system will record this connection and allow the parent to utilize the opt-out tool through their own Facebook account, without obtaining access to their children's account. A.S.A. §2.1(c)(iii).

Facebook will also add a control in minor users' profiles that enables each minor user to indicate that his or her parents are not Facebook users.[8] Where a minor user has indicated that their parents are not Facebook members, Facebook will make the minor ineligible to appear in Sponsored Stories until the minor reaches the age of 18, changes his or her setting to indicate his or her parent is on Facebook, or a confirmed parental relationship with the minor is established. A.S.A §2.1(c) (iii).

Additionally, the A.S.A. requires Facebook to add clear, easily understandable information about how advertising works on Facebook to the "parents" section of its Family

---

[7] Currently, this tool only allows parents to prevent the names and likenesses of their children from appearing alongside Facebook Ads. The injunctive relief negotiated by the parties will extend this tool to enable parents to prevent the name and likeness of their children from appearing by Sponsored Stories. A.S.A. §2.1(c)(iii).

[8] A draft "mock up" of what this tool will potentially look like is provided as Ex. 30.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                                    Case No. 11-CV-01726 RS

Safety Center and will created and show advertising to users with a confirmed parental relationship with a minor, directing them to the Family Safety Center, and/or other parent-specific resources on Facebook. A.S.A. §2.1(c) (iv).  Further, Facebook will for a period of 90 days after settlement, also work with Plaintiffs to identify other education information which needs to be clarified.  Class Counsel shall also have the right to request the Court to order a one-time audit as to compliance with the injunctive relief, for which Facebook will pay. A.S.A. §2.1(e).  In this way, not only does the injunctive relief obtained in this settlement help to insure parents have the information needed to learn about how minor children may appear in Sponsored Stories ads, it also allows parents to opt their children out entirely from having their name and likeness appear in Sponsored Stories.  In other words, under the proposed injunctive relief changes, parents can completely opt their children out of Sponsored Stories.

**E.     Plaintiffs' Experts On The Motion For Class Certification Provided The Groundwork for Settling The Case And for Valuing The Injunctive Relief**

In assessing the settlement value of the case, Plaintiffs took into consideration the actual damages suffered by the Class members when they were deprived the fair market value of their names and likenesses being used in Sponsored Stories ads.   In their Motion for Class Certification filed May 3, 2012, Plaintiffs contended that the actual market value of their names and likenesses appearing in a Sponsored Story on Facebook, is the difference between what advertisers were willing to pay Facebook to display an advertisement containing Plaintiffs' name and likenesses (e.g., a Sponsored Story ad) and a standard ad that does not contain users' names and likenesses.  This difference in what advertisers are willing to pay for these two types of advertisements represents the actual market value that advertisers place on the appearance of the users' likenesses in Sponsored Stories ads.

Plaintiffs supported their proposed method of valuing the Class' damages through the use of highly qualified experts.  Fernando Torres is an economics expert and principal of IP Metrics, a consulting company based in San Diego, California.  He is an expert in the valuation

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                              Case No. 11-CV-01726 RS

of rights to publicity.  Mr. Torres created a formula which Plaintiffs contend can be used to calculate the value of the "friend endorsement" and hence the Class members' damages, for purposes of the class certification motion in this case.  A copy of Torres' Declaration submitted in support of Plaintiffs' Motion for Class Certification is Arns J.M.P.A. Decl. Ex. 7.  David Taber has deep background and expertise in marketing.  Taber is the founder and CEO of SalesLogistix, a company engaged in customer relationship management, whose clients include online advertising firms.  Taber Decl. in support of Plaintiff's Motion for Class Certification. ¶4 (Arns J.M.P.A Decl. Ex. 5).  Gary Frazier, the Richard and Jarda Hurd Professor of Distribution Management in the Department of Marketing Distribution at the Marshall School of Business at USC, also provided his expertise.  Richard Drogin, a renowned statistician, provided support for the extrapolation of Torres methodology to the universe of Class members.  Vincent Alberico, who has expertise in computer science and technology, showed that the necessary calculations could be performed at scale for a reasonable cost.

The value of the Class members' endorsements is measurable because friend-endorsed ads have a higher market value among advertisers than non-friend-endorsed ads. Arns J.M.P.A Ex. 7 [Torres Decl.] ¶ 8a; Arns J.M.P.A. Decl.  Ex. 6 [Frazier Decl. ¶ 11a]; Arns J.M.P.A. Ex. 5 [Taber Decl. ¶¶ 7b, 7c, 7m].  Facebook is able to obtain additional revenue from advertisers because of the Plaintiffs' appearance in the ads and the accompanying apparent endorsement by Plaintiffs; this is the commercial actual market value of the Member's identity.  Arns J.M.P.A. Decl. Ex. 7 [Torres Decl.] ¶¶ 8b, 8o, 8p, 8q; Arns J.M.P.A. Ex. 6 [Frazier Decl.] ¶ 11e.  The deprivation of that value belonging to Class members by Facebook (due to misappropriation

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                                    Case No. 11-CV-01726 RS

and the denial of the right to negotiate for it) is the Class Members' injury.[9]  In summary, Plaintiffs experts valued the Class' damages in two ways:  by calculating the damages based on Facebook's representations as to value; see Arns J.M.P.A. Decl. Ex. 7 [Torres Decl.] ¶ 8q; or through use of a formula which relies up Sponsored Stories' Click-Through-Rate ("CTR"). Arns J.M.P.A. Decl. ¶20.

Plaintiffs' statistical expert Dr. Richard Drogin's Declaration on Class Certification (Arns J. M.P.A. Decl. Exhibit 8) states that relevant CTR for Standard Ads campaigns (using a statistically similar population as that to which Sponsored Stories ads were shown during the same period) can be calculated from the data which Facebook maintains.  Drogin Decl. ¶¶ 5-16. Once an average CTR for Standard Ads is determined, the formula above can be used to calculate the "added value" of the friend endorsement.  That added value can then be apportioned on a classwide, per-plaintiff, or per-ad campaign basis.  Drogin Decl. ¶ 15.

Plaintiffs' economist Fernando Torres applied the formula to an ad campaign Facebook ran for a customer. The Class' damages for this period, calculated using the incremental ratio of 76% from that campaign for all campaigns, results in additional value for Facebook's total Sponsored Stories ads revenue for the year 2011 of $47,087,066.  *Id*., ¶ 8y.

The "added value" must then be divided among the persons whose names or likenesses were used in a particular ad campaign.  This can be done based on the number of impressions in which each Class Member appeared for each ad campaign.  Alternatively, a statistically meaningful CTR can also be determined for all ad campaigns to arrive at a class wide CTR. Drogin Decl. ¶ 15.  The amount of money attributable to the typical member's appearance in a

---

[9] Plaintiffs direct the Court's attention to the detailed discussion of the methodologies and evidentiary support for them in Plaintiffs' Memorandum of Law in support of the Joint Motion for Preliminary Approval, and to the declarations of David Taber, Fernando Torres, Gary Frazier, and Richard Drogin, submitted in support of the Motion for Class Certification, and copies of which are Exhibits 4, 6, 7 and 8 respectively to the Arns Declaration in support of the Joint Motion for Preliminary Approval of Class Action Settlement (Arns J.M.PA. Decl., as noted above).

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                         Case No. 11-CV-01726 RS

single Sponsored Stories ad can be determined using this CTR.  Facebook has data as to each Sponsored Stories ad in which each Member has appeared. Drogin Decl. ¶5.  Despite the large volume of data, the calculations necessary to determine the CTR for each ad campaign and to then multiply this for each Class member can be done inexpensively using a computer program. Alberico Decl. (Davis Decl. Ex 31), ¶¶ 11-14.

Updated information regarding the number of class members and revenue obtained from the sale of Sponsored Stories indicated that as of August 31, 2012, a total of 123,868,976 users had appeared in Sponsored Stories, generating total revenue of $233,792,612.  *See* Declaration Plambeck Decl.  Applying the formula Mr. Torres used above to these new numbers, the "actual damage" calculated by this approach for a typical Class member, is approximately $1.45 per user.  Looking at it another way, assuming the incremental increase in value due to the user's endorsement is 50% (based on Facebook's prior statements that ads including a friend's likeness are twice as effective[10]), then dividing the known revenue in half and then by the number of Class members, comes to actual damages of $0.94 per class member.

### F.    Class Counsel is Experienced and Provided Excellent Representation.

The Arns Law Firm consists of nine attorneys, five of whom, Robert Arns, Steven Weinmann, Jonathan Davis, Kevin Osborne and Robert Foss, work on class action cases as a significant amount of their practices.  *See* Arns Decl., ¶¶29-39.  All five Arns class action attorneys were also engaged in the litigation of a significant pending class action in the Northern District of California against a major bank, also involving UCL claims.  The Arns Law Firm concluded another nationwide class action case during the pendency of this lawsuit, and have commenced and continued to litigate a third, complex action involving some 64 clients. Arns Decl., ¶¶32-33.  Robert Arns, Jonathan Davis, and Steven Weinmann all litigated an action against The Home Depot and a related company for wage and hour claims, which

---

[10] *See* Ex. 1, ¶ 44.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                                                    Case No. 11-CV-01726 RS

resulted in a multimillion-dollar settlement. *Id.* ¶33. The firm is also presently part of a group of lawyers litigating several separate class actions against skilled nursing facility chains. *Id.*

Jonathan M. Jaffe, of co-counsel Jonathan M. Jaffe Law, has extensive experience in the field of computer software systems design, data privacy and data security, which amply qualifies him to deal with the complex technical issues raised in this case. Arns Decl. ¶39. He has also recently worked on several other class actions, dealing primarily with electronic discovery issues for these matters. *Id.*

Exhibit 7 to the Arns Declaration in support of this motion is a summary of the attorney hours in this case (including those of Mr. Jaffe) and Exhibit 9 a chart of the hours broken down for all attorneys (All Allocated Attorney Work Hours). Separate pie charts for each of the attorneys' law firms are Exhibit 8 thereto. The charts allocate the time worked by each attorney into ten task categories. The ten task categories, with total hours as to all attorneys, are 1) Memoranda & Research (971.60 hours), 2) Discovery, Document Review & Organization (1637.60 hours), 3) Strategy Meetings, Communication and Working Groups with Own Counsel (1045.80 hours), 4) Correspondence with Class Rep. (23.60 hours), 5) Correspondence with Experts/Others (225.50 hours), 6) Depositions, Exhibits, & Relevant Preparations (1233.00 hours), 7) Motions, Orders & Relevant Preparations (1775.90 hours), 8) Court Appearances & Relevant Preparations (423.00 hours), 9) Mediation, Settlement & Relevant Preparations (787.00 hours), and 10) Correspondence with Defendants, Meet and Confer & Relevant Preparations (223.60 hours). The Arns Law Firm and Jonathan Jaffe Law expressly avoided performing duplicative work by engaging in working groups and strategy meetings with counsel within and among the firms. Arns Decl. ¶ ¶33, 61; Jaffe Decl. ¶17.

**III.   THE COURT SHOULD APPROVE THE FEE APPLICATION AS FAIR AND REASONABLE**

The Arns Law Firm and Jonathan Jaffe Law have achieved an excellent result for the Class, including a substantial amount of money: $20 million to be paid by Facebook, a

significant proportion of which—at least $12.5 million (less administration fees and costs) — will be made available to the Class members who wish to make claims.  However, this amount is not the only benchmark against which Class Counsel's fee request should be measured.  The injunctive relief works a major change in the way Facebook does business, in terms of notifying users and the public about how Sponsored Stories work, and allows users to decide whether or not to participate.  Minors can also be opted out by their parents if there is a confirmed relationship.  While some aspects of the injunctive relief are intangible, Plaintiffs' experts—including Phillip Allman and Fernando Torres—have provided methods by which this ability to choose not to participate in Sponsored Stories can be valued in dollars.  Using real option value methodology, Allman places the value of the new option created by the injunctive relief in the range of $57.4 million to $145.1 million.  Allman Decl. in support of Joint Motion for Preliminary Approval, ¶20.  An alternative method devised by Fernando Torres utilized the previously established fair market value of the Class members' endorsements, and their newly created right to control those endorsements based in part on the value of future endorsements to Facebook, and assigns a value to the injunctive relief of $226 million.  Torres Decl. Regarding Value of Injunctive Relief (filed in Support of Joint Motion for Preliminary Approval) ¶14.  Plaintiffs also contend that the new tools and information provided are worth at minimum $1 to each Class member.  This places the value of the injunctive relief at least $123 million, at one dollar for each Class member.

Using the "Percentage of Recovery" method for calculating attorneys' fees, Class Counsel's fees are 37.5 % of the $20 million cash component, but only 9.6 % of the combined figure ($77.4 million) which results if one adds the $20 million cash component paid by Facebook to the low estimate of $57.4 million calculated by Phillip Allman for the value of the injunctive relief.  If one were to use the high estimate of $145.1 million by Allman, the percentage of that combined total value of the relief ($165.1 million) is a mere 4.5 % of the common recovery.  If Torres' figure is used ($226 million), the percentage shrinks even further.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                                                      Case No. 11-CV-01726 RS

Class Counsel have requested that attorneys' fees (not including cost *reimbursement* of $282,566.49, which will however also be taken out of the $20 million) be awarded in the amount of $7,500,000.00.  The cash component of the settlement would then include nearly $12,000,000 in cash payments to class members after the costs of administration and service awards are paid.[11]

The estimated value of the injunctive component of the settlement is estimated at between $57.4 million to $145.1 million.  There is no question that the resultant percentage fee falls on the extreme low end of percentage awards in both the Ninth Circuit courts and elsewhere.  "Under both California and Ninth Circuit precedent, a court may exercise discretion to award attorneys' fees from a common fund by applying either the lodestar method or the percentage-of-the-fund method (citations omitted)."  *Carter v. Anderson Merchandisers, LP*, Nos. EDCV 08-0025-VAP (OPx), EDCV 09-0216-VAP (OPx), 2010 WL 1946757 (C.D. Cal. May 11, 2010) (approving 25% fee award in case where claims arose under California and Federal law).  Moreover, the Ninth Circuit specifically authorizes the use of the percentage of recovery method in common fund cases with the benchmark for reasonableness in this Circuit being 25%.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998); *Six (6) Mexican Workers v. Ariz. Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir. 1990); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 n.4 (9th Cir. 2002) (finding that "a bare majority" of recent awards are "clustered in the 20-30% range").

"In cases in which the percentage-of-the recovery method is used, the Ninth Circuit has adopted a 25 percent benchmark for an award of fees."  *Yeagley v. Wells Fargo & Co.*, 2008 U.S. Dist. LEXIS 5040, at *17 (N.D. Cal. Jan. 18, 2008) (*citing Powers*, 229 F.3d at 1256 (9th

---

[11]  The costs of administration will vary according to the number of claims made, and are estimated by Garden City Group at between $776,000 to $1.27 million if 200,000 claims are filed, to $2.55 million if 2 million claims are filed.  *See* Declaration of Jennifer Keogh In Support of Revised Settlement, ¶4.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                   Case No. 11-CV-01726 RS

Cir. 2000); *see also Vizcaino.*, 290 F.3d 1043 (Ninth Circuit surveyed fee awards from dozens of large common fund settlements, finding many in which fees of 20-30% were awarded); *Hanlon*, 150 F.3d at 1029 (referring to 25% in attorneys' fees as a "benchmark" award); *Six Mexican Workers*, 904 F.2d at 1311.[12]   The district court may adjust the benchmark when special circumstances indicate a higher or lower percentage would be appropriate. *Six Mexican Workers*, 904 F.2d at 1311.

In fact, courts routinely award fees greater than this amount.   *See In re Pacific Enters. Sec. Litig.,* 47 F.3d 373,379 (9th Cir. 1995) (awarding 33% of $12 million common settlement fund); *In re Omnivision Techs., Inc.*, 2007 WL 4293467, at *10 (N.D. Cal. Dec. 6, 2007) ("in most common fund cases, the award exceeds that [25%] benchmark"); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 460 (9th Cir. 2000) (affirming award of fees equal to one-third of total recovery); *In re Public Serv. Co. of New Mexico*, 1992 WL 278452, at *1, *12 (S.D. Cal. July 28, 1992) (awarding one-third); *Antonopulos v. N. Am. Thoroughbreds, Inc*., 1991 WL 427893, at *1, *4 (S.D. Cal. May 6, 1991) (awarding one-third); *In re M.D.C. Holdings Sec. Litig.,* 1990 WL 454747, at *1, *10 (S.D. Cal. Aug. 30, 1990) (awarding 30% in fees, plus expenses); *In re Activision Sec. Litig.*, 723 F. Supp 1373, 1375 (N.D. Cal. 1989) (awarding a 32.8% fee and adopting a "policy of awarding approximately 30% of the fund as attorneys' fees in the ordinary case," as "well-justified in light of the lengthy line of cases which find such an award appropriate and reasonable .... ").

---

[12] Courts in other circuits and numerous commentators have also affirmed the reasonableness of fees in the range of 25%-30%. *See, e.g., Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 972 (E.D. Tex. 2000) ("[B]ased on the opinions of other courts and the available studies of class action attorneys' fees awards ... this Court concludes that attorneys' fees in the range from ... (25%) to ... (33.34%) have been routinely awarded in class actions."); *see also Thomas E. Willging, et al., Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules*, at 69 (Federal Judicial Center 1996) (1996 study found that the median percentage for attorneys' fees "ranged from 27% to 30%").

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                                    Case No. 11-CV-01726 RS

**IV.     THE RELEVANT FACTORS EASILY JUSTIFY THE REQUESTED AWARD IN THIS CASE ON A PERCENTAGE BASIS**

"When assessing whether the percentage requested is reasonable, courts look to factors such as: (a) the results achieved; (b) the risk of litigation; (c) the skill required, (d) the quality of work; (e) the contingent nature of the fee and the financial burden; and (f) the awards made in similar cases." *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482 (E.D. Cal. 2010), *citing Vizcaino*, 290 F.3d at 1047; *Six Mexican Workers*, 904 F.2d 1301.

### A.     The Result Achieved

This case arose because of Defendant's actions and practices in causing Class members to appear in Sponsored Stories without their consent.   As a result, in addition to cash, the settlement provides for injunctive relief as to Defendants' practices.   Thus, the settlement is perfectly tailored to address the issues raised in the Complaint. As discussed above, the common fund is worth $20 million, and the injunctive relief is of substantial value to the Class and the public of a further $57.4 million to $145.1 million as calculated by Phillip Allman. This is truly a significant recovery.   It would be difficult to imagine that a trial result would provide as well as this settlement does for the Class members, since the Court could not force the specific injunctive relief on Facebook.   Moreover, the "actual damages" suffered by the Class as calculated by Plaintiffs' experts based on Facebook's earnings from Sponsored Stories indicate that each Class member's individual damage would be in the range of $1.45 each to less than a dollar (about $0.94) each. (See pages 16- 17 above).   Yet, the Settlement provides the opportunity for a portion of the Class to receive up to $10 if they make a claim.

In making an assessment of a settlement, Courts have compared "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk for not prevailing with the amount of the proposed settlement." *Nichols v. SmithKline Beecham Corp.* ("*Paxil Litigation*"), 2005 WL 950616 (E.D. Pa. Apr. 22, 2005) (quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995)

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                                        Case No. 11-CV-01726 RS

(quoting *Manual for Complex Litigation* 2d § 30.44 at 252)).  Most importantly, "The Court must ... recognize that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and guard against demanding too large a settlement." *Id.* (internal quotations omitted).   The Settlement here provides the opportunity for a tenfold increase over what Plaintiffs would have claims for as actual damages.

Moreover, a settlement is not judged against what might have been recovered had plaintiff prevailed at trial, nor does the settlement even have to provide 100% of the damages sought to be fair and reasonable.  *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998); *Wershba v. Apple Computers, Inc.*, 91 Cal. App. 4th 224, 246, 250 (2001); *Rebney v. Wells Fargo Bank*, 220 Cal. App. 3d 1117, 1139 (1990).  "Compromise is inherent and necessary in the settlement process...even if the relief afforded by the proposed settlement is substantially narrower than it would be if the suits were to be successfully litigated, this is no bar to a class settlement because the public interest may indeed be served by a voluntary settlement in which each side gives ground in the interest of avoiding litigation." *Wershba*, 91 Cal. App. 4th at 250 (citing *Air Line Stewards, etc., Loc 50 v. American Airlines, Inc.*, 455 F.2d 101, 109 (7th Cir. 1972)).   "In assessing the consideration obtained by the class members in a class action settlement, 'it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness.'  In this regard, it is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Nat'l Rural,* 221 F.R.D. at 527 (citations omitted).  Ultimately, Courts have consistently recognized that the result achieved is a major factor to be considered in making a fee award.  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("most critical factor is the degree of success obtained").

The results achieved in settlement of this case are significant, taking into consideration the monies which were at stake compared to the risks in obtaining them.  Under Civil Code

-23-

section 3344, the minimum damage award is $750 per violation.  Given that at least 123 million Class members were featured in at least one Sponsored Story ad campaign, the statutory damages would be over $92 billion.  However, as discussed in detail below, there are significant potential problems with proof as to Plaintiffs' entitlement to those damages, and the viability of Facebook's other defenses justify a discount for settlement.

**B.    Courts Recognize that Injunctive Relief Often has Great Value Even If Not Easily Monetized**

Courts in several actions have recognized the value of injunctive relief in approving class actions and approving of the requested attorneys' fees based on that relief.  One closely analogous example, *White v. Experian Information Solutions*, 2011 U.S. Dist LEXIS 79044 (C.D. Cal. July 15, 2011) involved violations of the Fair Credit Reporting Act (FCRA) 15 U.S.C. §1681e, and the primary relief was injunctive relief to "retroactively update the credit files of all of the injunctive relief class members."  *Id*. at *7.  The District Court used a 1.9 multiplier to award fees of $5,671,778.  *Id*. at *16.  The Court also noted that the settlement not only mandated that the defendants adopt reasonable procedures to remedy the issue (credit reporting as to pre-bankruptcy debt), it also "specifies the new procedures that must be used," and "serves the public good: society at large benefits from the increased accuracy in the field of credit reporting that the injunctive relief settlement has triggered."  *Id*. at *17.  Plaintiffs here have also obtained relief beyond what they could have gotten had they prevailed at trial, in terms of new protections for minors and specifically working out what must be changed on Facebook's website.

In *McCoy v. Health Net, Inc.,* 569 F.Supp.2d 448 (D.N.J. 2008), the defendant health insurance company agreed in settlement to pay $215 million to the Class for using improper methods and data for determining health insurance claims, which had resulted in underpayment of bills.  Health Net also agreed to injunctive relief which included (1) to stop the use of the Ingenix database which had been used to determine reasonable and customary costs which

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                                    Case No. 11-CV-01726 RS

would be paid, (2) making business practice changes, including allowing 14.5% more than what the Ingenix database would have allowed until a new methodology could be put in place, (3) establishing a special appeals process for insureds who still had large bills even after the 14.5% increase, and (4) making various other business practice changes as to how it allowed fees and notified its subscribers and how information was conveyed.  *Id*. at 454.

The *McCoy* Court noted that "although the instant Settlement has a significant injunctive component <u>which has great value</u>, the bulk of the financial settlement is in the form of a $215 million common fund." *Id*. at 475 (emphasis added).  The Court noted that while "the value of the injunctive relief cannot be precisely and mathematically ascertained as to each class member....[n]evertheless, Class Members reap a sizeable financial benefit from the injunctive relief provided in this Settlement," and determined that the $26 to $38 million valuation of that injunctive relief was reasonable.  *Id*. at 478.  Class counsel was awarded $69,720,000, which was "just over 32% of the common fund" and 28% of the common fund <u>plus the parties' lowest estimate of the value of the injunctive relief</u>.  *Id*.  The court also performed a lodestar cross-check, and noted that the multiplier was just under 2.3, and was reasonable in comparison to other large verdict cases where a multiplier of 3 had been approved.  *Id*. at 479.

Other cases have also found substantial benefit to class members or the public, based upon publicity garnered by the result and its effect on other companies who learned of it.  In *Vizcaino v. Microsoft Corp.*, 142 F. Supp. 2d 1299 (W.D. Wash. 2001), involving misclassification of employees, the Court applied the common fund doctrine in allowing a recovery of 28% of a fund of $96.885 million.  The Court expressly stated that it "recognizes that Class Counsel's efforts resulted in significant nationwide public benefit."  Thus, "[a]s a result of this case and the large amount of publicity surrounding it, many employers have been advised to carefully ensure their workers are properly classified…[w]orkers who would have

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                          Case No. 11-CV-01726 RS

otherwise been misclassified as contingent workers are being properly classified as employees and receiving the benefits that are inherent in that classification." *Id*. at 1304.

Similarly, here other web-based companies will learn that they cannot misappropriate the right of publicity or mislead the public about what they are doing. *See also New England Carpenters Health Benefits Fund v. First Databank, Inc.,* 2009 U.S. Dist. LEXIS 68419 (D. Mass. August 3, 2009) (settlement provided for $350,000,000 to the Class for drugs whose prices were inflated due to antitrust violations; future injunctive relief included rolling back the prices of the affected drugs; the Court awarded $70,000,000 representing a multiplier of 8.3 time lodestar, or 20% of the common fund); *In re Currency Fee Antitrust Litig.*, 263 F.R.D. 110 (S.D.N.Y. 2009) (settlement provided for the payment of $336 million, and injunctive relief including not violating the antitrust laws, specific disclosures for any foreign currency conversion charges, and modifications of practices as to calculating base rate amounts used for conversions in certain circumstances; the court held that the injunctive relief was among the factors that "weigh[ed] strongly in favor of the settlement." *Id*. at 124.  Counsel was awarded fees of $51,250,000 representing a multiplier of 1.6).

The injunctive relief is also valuable in that it furthers the goals of California Civil Code section 3344, which is intended to require parties to seek prior consent from individuals before names and likenesses are used in ads, and which expressly requires prior consent by guardians or parents of minors.  The relief also furthers the goals of California's Unfair Competition Law, Business & Professions Code section 17200 et seq.  Section 17203 "authorizes the court to fashion remedies to prevent, deter, and compensate for unfair business practices." *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 176 (2000).   The changes to the SRRs, and other pages on Facebook will remedy the situation where Plaintiffs identified that there was no such disclosure and/or that the disclosures were inadequate or allegedly fraudulent (in the context of section 17200 jurisprudence, which does not require intent to deceive, actual

-26-
PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                     Case No. 11-CV-01726 RS

deception, or damage in a "fraud" case, *see, e.g.*, *Blakemore v. Super. Ct.*, 129 Cal. App. 4th 36, 49 (2005)).

### C.     The Injunctive Relief is Valuable and Will Lead to Economic Benefits to the Class Members

The injunctive relief is robust in that it provides for changes to the language in Facebook's SRRs which makes it crystal clear that users' permission for the use on Facebook of their names and Profile pictures in Sponsored Story ads is being sought and presumed to be given by taking action on the Facebook site. *See* A.S.A., §2.1 (b).  Further, the injunctive relief provides the users with the ability to see what Sponsored Stories ads they have appeared in, and to preclude further such appearances on an advertiser-by-advertiser basis.  Under the current state of Sponsored Stories ads, users have no meaningful way to prevent their appearance in these ads other than to stop using Facebook's sharing features such as the Facebook "Like" button.

As explained on Preliminary Approval, there are at least three alternative methods for assigning a dollar amount to the ability of the Facebook users to now avoid being in Sponsored Stories ads, and limit their appearances in Sponsored Stories ads.  These tools are being created by virtue of this settlement and could not be forced upon Facebook otherwise.  The first valuation method establishes the value of the new educational information and user privacy control tools provided by the injunctive relief, premised upon the fact that they create a "real option" for using Facebook that did not exists prior to the injunctive relief.  This new option is essentially one in which the user can continue to use Facebook free of charge while still maintaining control over their appearance in Sponsored Stories.  This methodology is based upon valuations assigned by economists to "call" type options in the financial markets.  This real option value methodology values the new option created by the injunctive relief in a range of $57.4 million to $145.1 million.  An alternative method utilizes the previously established fair market value of the Class members' endorsements, and their newly created right to control

-27-

those endorsements based in part on the value of future endorsements to Facebook. Finally, Plaintiffs contend that the new tools and information provided is worth at minimum $1 to each Class member, which places the value of the injunctive relief at least $123 million.

### D. Methods of Placing Value on the Injunctive Relief

Plaintiffs offer alternative methods for assigning a dollar value to the ability of the Class members to refuse Facebook the use of their endorsements in Sponsored Stories ads. Tools are being created by virtue of this settlement that will enable Facebook users to see the Sponsored Stories ads in which they appear, remove themselves from any ads they wish, and remove minors from Sponsored Stories ads entirely. These tools could not be forced upon Facebook by any means other than this settlement. Previously, a user had only two choices: use Facebook's features and risk being in Sponsored Stories ads (without necessarily being provided with information as to how he or she can become featured in such ads), or do not use Facebook at all or in such a limited manner as to render it virtually worthless from the users' perspective. The "new experience" created by this settlement allows Facebook users to use Facebook in ways that recognize their rights to withhold or limit their and their children's appearances in Sponsored Stories ads.

### 1. First Method for Valuing Injunctive Relief: The Real Option Valuation.

The injunctive relief gives the Class members the alternative to remove themselves from Sponsored Stories ads. The question posed by the Court during the hearing on the first motion for preliminary approval was whether this alternative provides the Class members with a real and direct economic value. Based on a "real option value" analysis, plaintiffs have provided the Court with a firmly grounded analysis that values the injunctive relief without concern for Facebook's future profits.

Real option valuation is a tool used to determine the value of a person's right to undertake or not undertake a certain activity, as explained in detail by Plaintiffs' expert Dr.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                                    Case No. 11-CV-01726 RS

Phillip Allman in his declaration on Preliminary Approval.[13]  In essence, the Class member's right to remove themselves from Sponsored Stories ads, thereby controlling the use of their endorsements, is a real option, for which a real and direct economic value can be assigned. This method is based upon the methods developed in the valuation of financial securities options, such as "call options," where two parties agree that one party will have the right to transact an asset at a set price at a later date.  Allman Decl., ¶15.  Real option valuation, unlike securities option valuation, is used to value the right to transact an asset even if there is currently no established market value for that asset, such as in the case of a patent holder who has the right to market a product that does not currently exist but will presumably have value at some time in the future.  *Id*.  As Dr. Allman explains, "[r]eal options have an economic value for the beneficiaries of these options because they provide alternatives that would not otherwise be available and may provide benefits that will prove valuable at a point in the future."  Allman Decl., ¶13.

The real option here is that the plaintiffs are being provided by the injunctive relief with the option to remain in Sponsored Stories ads in which they have appeared, or to exclude themselves from Sponsored Stories ads in which they appear.  Allman Decl., ¶15.  In essence, the Class members will be given the right to sell the use of their endorsement – to Facebook, or to another social media outlet – in the future.  It may not be apparent that such future transactions are likely as there is presently no widely-known marketplace where individual social network users have the ability to sell their endorsements to online advertisers.  Allman Decl., ¶16.  There is, however, substantial evidence that such a marketplace is blossoming and, in some cases, already exists.  Allman Decl., ¶16, Torres Decl., ¶13.

---

[13] Dr. Allman is the owner and principal of Allman & Petersen Economics, LLC, in Oakland, California.  He received a Doctor of Philosophy in Economics from Michigan State University in East Lansing, Michigan, and a Master of Science, Economics, from Arizona State University in Tempe, Arizona.   *See* Allman Decl., ¶3.  He was also an adjunct Lecturer in Economics at Golden Gate University, San Francisco, California from 1995 to 1998, and an Economics Professor at the University of the Pacific in Stockton, California from 1979 to 1986. *Id*,

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                                                Case No. 11-CV-01726 RS

Calculating the value of the injunctive relief using this method results in a range of possible values, which is the standard and reasonable method of measuring an option such as this.  The resulting range of the option price is from $1.17 per user to $0.46 per, depending on the cost to the user of exercising the option and bringing their endorsements to market. Multiplying these figures by the number of Class members over the 24-month life of the injunction for the entire Class in the aggregate, gives a range of value of between $145.1 million to $57.4 million.  Allman Decl., ¶20.

### 2.  Second Method for Valuing Injunctive Relief:  Fair Market Valuation of Right to Control Asset Based on Past Value of Endorsements

An alternative method utilizes the previously established fair market value of the Class members' endorsements and their newly created right to control those endorsements.  This method recognizes that the Class members' endorsements have a value established in the marketplace by what the advertisers would be willing to pay for Sponsored Stories "friend endorsements" over what they would pay for a Standard Ad.  The ability to withhold that endorsement increases the incentives for Facebook and the advertisers who want to use the endorsement, to preserve or enhance the enticements offered to get users to "like" things or otherwise take actions that can lead to Sponsored Stories.

Mr. Torres has provided a declaration further explaining the value of Plaintiffs' injunctive relief.  As discussed above, the value of the past "actual" damages for the Class members was calculated based on the added value of the endorsements for Sponsored Stories campaigns that were sold.  The class members now by virtue of the injunctive relief changes have the opportunity, by using the new features to control the use of what is essentially a $9.4 million/month advertising asset. Torres Decl., ¶12.  Based on this determination, the value of the injunctive relief is $226 million at a minimum for the next 24 months alone.  *Id*. ¶14

The Class members' ability to not be in Sponsored Stories ads, however is not simply the ability to "spite" Facebook by not clicking on the Like button or limiting the total number

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                                  Case No. 11-CV-01726 RS

of Sponsored Stories ads in which they will appear after they do so.  Rather, it puts the advertisers and Facebook on notice that they must accommodate the interests of the users or suffer the consequences of their electing not to participate in the system and withhold their endorsements.

### 3.  Third Method of Valuation: Minimum Value of $1

There is an established market for online reputation management services.  Companies offering this type of service charge recurring fees ($99 per year) to control and alert an individual about their appearance on the internet.[14]  This demonstrates that the ability to control and manages one's online presence has value for which people are willing to pay a service fee.  Similarly here, the injunctive relief provides class members a reputation management tool for their Facebook account.  Plaintiffs believe that as there is an established value for reputation management services, the new tools and information provided through the injunctive relief is worth at least $1 on average to each Class member.  Since there are over 123 million class members, that places the value of the injunctive relief at least $123 million.

### E.    The Quality of Work Performed

From the outset, Class Counsel undertook substantial effort to develop the facts to support a convincing case.  Before the initial complaints were filed, Class Counsel began investigating what claims, if any, were properly brought against the Defendant.  Arns Decl., ¶37.  As Class Counsel quickly learned, the litigation eventually involved numerous difficult legal and regulatory issues. *Id.*, ¶55.  The litigation further required an extensive understanding of standing under Article III of the Constitution, as Facebook moved to dismiss on standing grounds for lack of injury, asserting that the Plaintiffs could not show Article III standing or that they were injured by Facebook's violations of Civil Code section 3344 and the Unfair

---

[14] One such service, provided via Reputation.com charges $99 per year for their "Reputation Starter" package, which is recommended "….for someone with no negative content, no online presence, and little online visibility."  Other personal reputation management services they provide costa as much as $5,000 per year.  *See* Ex. 29.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                           Case No. 11-CV-01726 RS

Competition Law (Business & Professions Code §17200 et seq. ("UCL").

Facebook also moved to dismiss alleging preemption under the Communications Decency Act, 47 U.S.C. § 230 ("CDA").  Facebook also attacked the allegations as to consent, which would eliminate an element of proof under section 3344; and that its actions fell within the "newsworthy" exception of section 3344.  Facebook also asserted that there is no cause of action for unjust enrichment in California.  Thus, the lawsuit required a thorough understanding of the Unfair Competition Law, California Civil Code section 3344.  Judge Koh ruled in favor of Plaintiffs on all but the unjust enrichment claim (holding that it is a remedy), allowing the lawsuit to proceed essentially unchanged, thus showing that Class Counsel had mastered the arguments.

F.      **The Skill Required: The Complexity and Difficulty of The Issues Presented**

This was a novel, complex case that required Class Counsel to confront many difficult legal and factual issues, including issues related to complex government regulations such as the Communications Decency Act, preemption, the law of publicity, and class certification.  Arns Decl., ¶¶ 54, 55.  Class Counsel together with their experts also had to come up with a method for valuing the Class' damages and proving them at trial.  This case presented the novel circumstance of determining damages for the misappropriation of the right of publicity using social media.  Courts have recognized that the novelty and difficulty of issues in a case are significant factors to be considered in making a fee award.  *See, e.g., Vizcaino v. Microsoft Corp.*, 142 F. Supp. 2d 1299, 1306 (W.D. Wash. 2001).  Here, as described in detail below, Counsel successfully tackled many difficult legal and factual issues presented by this case in the face of a substantial risk of non-recovery.

G.      **The High Caliber of Opposing Counsel**

The caliber of opposing counsel is another important factor in assessing the quality of Class Counsel's work.  *Vizcaino*, 142 F. Supp. 2d at 1303; *In re Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303, 1337 (C.D. Cal. 1977).  Here, Class Counsel were opposed by

-32-
PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                    Case No. 11-CV-01726 RS

attorneys from one of the largest firms in the country, Cooley LLP, who were representing a company with near limitless resources.   Arns Decl., ¶53.   Despite facing such worthy adversaries, Class Counsel achieved an excellent result for the Class.  From the very beginning, Class Counsel has litigated this action vigorously and skillfully, with an eye toward maximizing any recovery, and should be compensated for their efforts.  *See* Arns Decl.

### H.      The Risks of This Litigation

Risk is an important factor in determining a fair fee award.  *Vizcaino*, 142 F. Supp. 2d at 1303-04.  In fact, Ninth Circuit courts have recognized that a high risk factor is one reason for increasing attorneys' fee awards above even the 25% benchmark fee.  *Id.*; *see also In re Pacific Enters. Sec. Litig.*, 47 F.3d at 379 (33% of the common fund as attorneys fees was justified because of the complexity of the issues and the risks).  In *Vizcaino*, the Court explained that the case was extremely risky for class counsel to pursue because of negative facts, the lack of controlling law, and the vigorous defense of the case.  *Vizcaino*, 142 F. Supp. 2d at 1303.  The *Vizcaino* court further noted that class counsel's risk in that case was even greater, and their work made more difficult, because the defendant, Microsoft, was one of the nation's largest and most formidable companies and it, and several law firms, defended the case vigorously for several years. *Id.*  As described in further detail below, here, Class Counsel faced many risks, including, but not limited to, risk at class certification, risks relating to preemption and risk of trial.

As noted above, Facebook argued in its Motion to Dismiss that the claims were preempted under the Communications Decency Act, 47 U.S.C. § 230 ("CDA"), and that the "newsworthiness" exemption of Cal. Civil Code section 3344(d).  Facebook could raise both of these defenses again on appeal.

### 1.      The Risk of Not Achieving Class Certification

Preliminarily, it is unclear whether this Court would have certified the requested Class. The Class, even if certified, could be certified only for a smaller class size or class period, or

-33-

for only certain of the claims, or for injunctive relief only, depending on the Court's findings as to typicality of the class representatives and the homogeneity of the Class, based upon variations in Facebook's SRRs.  The ability of minors to agree or disaffirm agreements is also an issue that could provide the basis for fragmenting the Class, or for the Court to carve out such a sub-class.  Moreover, even if Plaintiffs had prevailed on the motion to certify the Class that was pending at the time that the parties agreed upon the settlement, Plaintiffs would still have faced potential motions for summary judgment of their claims.  Arns Decl., ¶31.

### 2.       The Risk of COPPA Preemption

Facebook has also raised a defense under the Children's Online Privacy Protection Act, or "COPPA," 15 U.S.C. § 6502, in other matters (specifically, *David Cohen v. Facebook, Inc*, No. BC 444482, Los Angeles County Superior Court) and could raise the defense here.  There was a risk that the causes of action would be preempted under COPPA.  Arns Decl., ¶31.

### 3.       The Risk of Going to Trial

Going to trial in any case is a risk.  In fact, the records of federal courts are filled with complex cases such as this one that have been unsuccessful.  *See, e.g., In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 785-87 (7th Cir. 1999), *cert. denied*, 528 U.S. 1181 (2000) (affirming, in large part, a directed verdict during a trial held after plaintiffs obtained a reversal of summary judgments in favor of defendant pharmaceutical manufacturers); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1166-69 (7th Cir.), *cert. denied*, 464 U.S. 891 (1983) (remanding massive antitrust judgment for a new trial and damages); *United States Football League v. Nat'l Football League*, 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335, 1377 (2d Cir. 1988), *cert. denied*, 493 U.S. 1071 (1990) (culminating in a verdict of $1 before trebling after a lengthy trial).

Facebook by its second Motion to Dismiss sought to have the putative Class' claims dismissed on essentially three main grounds:  (1) federal preemption, (2) a failure to plead all

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                        Case No. 11-CV-01726 RS

elements of her Unfair Competition Law[15] claim, including especially injury, and lack of standing.  Arns Decl., ¶3.  The Motion for Class Certification was fully briefed when taken off calendar in order for the parties to proceed to mediation.  In opposition to the Motion for Class Certification, Facebook raised substantial issues as to commonality, typicality, and predominance.  Facebook also argued that Civil Code section 3344 did not allow for class action suits.  Arns Decl. ¶55.  While Plaintiffs deny that any of these contentions have any merit, there are still risks inherent in litigation, particularly as the law on preemption is subject to interpretation.  The Defendants would presumably raise further defenses as to those new causes of action if the Settlement were not approved, or if the case had not settled, which would add further risks to continued litigation.

The issue of implied consent, and minor consent particularly in light of the transfer order from the Southern District of Illinois in *E.K.D. v. Facebook*, [now *C.M.D. v. Facebook*, No. 12-cv-01216-RS] by Judge Patrick Murphy, (applying the Facebook SRRs to minors and thus implicitly finding that they could consent) presented challenges for Plaintiffs to ultimately prevail on in the end.

There were also significant risks presented by the ability of Facebook users to adopt pseudonyms and to use profile pictures which were not recognizable to their Facebook friends. Arns Decl, ¶55.  In sum, in light of the uncertainties of protracted litigation, and complex class certification issues, the Settlement constitutes a fair, reasonable and adequate recovery for the Class.  Arns Decl., ¶3.

**I.       The Contingent Nature of the Fee**

The Ninth Circuit has confirmed that a fair fee award must include consideration of the contingent nature of the fee where there is no assurance of attorneys' fees or reimbursement of expenses.  *See, e.g.,Vizcaino*, 290 F.3d at 1049-50 (approving an award of 28% of the recovery). Fee awards must be sufficient to encourage the most skilled and determined counsel

---

[15] Cal. Business & Professions Code § 17200 *et seq*. (the "UCL").

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                    Case No. 11-CV-01726 RS

to take on difficult cases and see them through to completion, which often, as here, could take years. *See In re Lorazepam & Clorazepate Antitrust Litig.*, MDL No. 1290; Misc. No. 99ms276; Civ. No. 99-0790, 2003 U.S. Dist. LEXIS 12344, at *28 (D.D.C. June 16, 2003). As noted by the court in *In re WPPSS Sec. Litig.*, it is an established practice to reward attorneys who take on the added risk of a contingency case due to the risk of non-payment by paying them a premium "as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose." *In re WPPSS Sec. Litig.*, 19 F.3d 1291,1299 (9th Cir. 1994).

The commencement of a class action is no guarantee of success. Class Counsel have received no compensation during the course of the litigation and have incurred over 8346.60 hours in time spent on this matter and $282,566.49 in expenses in litigating for the benefit of the Class. Arns Decl. ¶60. [16] Not receiving any fee award or reimbursement of expenses has always been a substantial risk for Class Counsel, and ultimately any award is completely within the Court's discretion. Here, despite the many risks faced, Class Counsel committed their financial and human resources to litigating this case and achieved a good result for the benefit of the Class. For this they should be fairly compensated.

**J.      The Lodestar Supports The Reasonableness of The Requested Award**

A lodestar cross-check of the requested fee award amounts to a 1.391 multiplier. *See* Arns Decl., ¶60 (total hourly fee before Lodestar is $5,391,030.00). In the Ninth Circuit and elsewhere, multipliers of between 3 and 4.5 have been common. *See, e.g., Vizcaino*, 142 F. Supp. 2d at 1305-06 (approving multiplier of 3.67); *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995) (approving a multiplier of 3.6); *In re Rite Aid Corp. Secs. Litig.*, 146 F. Supp. 2d 706, 736 (E.D. Pa. 2001) (recognizing that a "lodestar multiple in the

---

[16] The expenses include filing fees, research costs, as well as electronic data and computer search and retrieval systems. Arns Decl., ¶71. Class Counsel is currently in a dispute as to one item, a demand for payment for costs of responding to a subpoena to Razorfish, Inc. which made a demand for $45,000 for compliance with a records subpoena. Class Counsel has offered $500, but thus far the company has not accepted it.

-36-
PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                                          Case No. 11-CV-01726 RS

range of 4.5 to 8.5" is "unquestionably reasonable" under the cross-check approach); *Weiss v. Mercedes-Benz of N. Am.*, 899 F. Supp. 1297, 1304 (D.N.J. 1995) (awarding fee that resulted in a multiplier of 9.3 times hourly rate), *aff'd*, 66 F.3d 314 (3d Cir. 1995); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185,198 (S.D.N.Y. 1997) (awarding a 5.5 multiplier); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) (awarding a multiplier of 3.97); *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 U.S. Dist. LEXIS 68 (E.D. Pa. Jan. 4, 2001) (awarding a multiplier of 3.6); *Triangle Indus., Inc. S'holders Litig.*, No. 10,466, 1991 Del. Ch. LEXIS 203 (Del. Ch. Dec. 19, 1991) (awarding fee equal to 6.6 multiplier on $70 million recovery); *Cosgrove v. Sullivan*, 759 F. Supp. 166 (S.D.N.Y. 1991) (awarding fee equal to a multiplier of 8.84); *In re RJR Nabisco Sec. Litig.*, MDL No. 818; 88 Civ. 7905, 1992 U.S. Dist. LEXIS 12702, at * 16 (S.D. N. Y. Aug. 24, 1992) (6 multiplier); *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 255. (2001) ("Multipliers can range from 2 to 4, or even higher."). The multiplier of 1.391 sought by Class Counsel is more than reasonable compared with the range of implied multipliers that have been found to be reasonable for cross-check purposes in other class actions.

Moreover, the lodestar figure calculated from Class Counsel's time in the case does not include the amount of time that will be required of Class Counsel up through and after final judgment to fulfill their continuing obligations to the Class to monitor the claims process, and changes to Facebook's procedures.  The additional time that will be required of Class Counsel in the future can only serve to reduce the multiplier awarded by the Court.  This further supports a higher multiplier in the first instance. *See, e.g., Hanlon,* 150 F.3d at 1029 (affirming fee award because, among other things, class counsel "must remain available to enforce the contractual elements of the settlement agreement and represent any class members who encounter difficulties").

## V.   THE NAMED PLAINTIFFS DESERVE SERVICE AWARDS FOR THEIR EFFORTS

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE AWARDS                                    Case No. 11-CV-01726 RS

Facebook has agreed to pay service awards totaling $37,500, subject to court approval, comprised of $12,500 for each of the Class Representatives.   A.S.A. §2.4.   Class representatives "are eligible for reasonable incentive payments," after consideration of relevant factors, including the actions the representative has taken to protect the interests of the class and the degree to which the class has benefited from those actions.   *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003).   Courts often make an award to class representatives for their service to the Class.   *In re Lorazepam & Chlorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454,463 (9th Cir. 2000) (approving incentive awards of $5,000 to each of two class representatives of 5,400 potential class members in a settlement of $1.725 million); *see also Hughes v. Microsoft Corp.*, Nos.  C98-1646C and C93-0178C, 2001 U.S. Dist. LEXIS 5976, at *34 (W.D. Wash. Mar. 21, 2001) ("Incentive awards compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."); *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 503-4 (N.D. Miss. 1996) (acknowledging the public benefits of private enforcement efforts in antitrust and similar types of class action litigation by rewarding representative plaintiffs who have been instrumental in obtaining relief on behalf of persons other than themselves).

By shouldering the burdens associated with this litigation, these Class Representatives have made a significant contributions to the recovery obtained for the Class.   The Plaintiffs played an important role in this litigation by retaining counsel, producing documents, responding to written discovery, conferring with counsel on the litigation.   Arns Decl., ¶¶74, 75; Jaffe Decl. ¶¶8-14.   The requested service payment is quite modest and is within the amounts that Ninth Circuit courts find acceptable.   *See, e.g., Presley v. Carter Hawley Hale Profit Sharing Plan*, No. C9704316SC, 2000 WL 16437, at *2 (N.D. Cal. 2000) (approving $25,000 incentive awards); *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 300 (N.D. Cal. 1995) (approving $50,000 incentive award); *In re McKessonHBOC, Inc. ERISA Litig.*, 391 F.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                                    Case No. 11-CV-01726 RS

Supp. 2d 844, 851 (N.D. Cal. 2005) (approving $5,000 incentive awards); *In re Sorbates Direct Purchaser Antitrust Litig.*, No. C 98-4886, 2002 U.S. Dist. LEXIS 23468, at * 11 (N.D. Cal. Nov. 15, 2002); *Weddle v. Frito-Lay, Inc.*, 2001 WL 182374, at *3 (N.D. Cal. Feb. 21, 2001); *In re Immunex Sec. Litig.*, 864 F. Supp. 142, 145 (W.D. Wash. 1994) (awarding $25,000 to eleven class representatives).

Susan Mainzer is self-employed, and her time spent on this case, which was significant, came at the expense of time she could have spent tending to her publicity business. Jaffe Decl., ¶10. Her many hours and perseverance in bringing the case, and willingness to be deposed and testify at trial if need be, should be compensated through a service award. Plaintiff Mainzer has provided document discovery and monitored the progress of the action, and attended the mediation, and should be rewarded for taking the initiative to file the action, and for her role in reaching an early Settlement providing for valuable relief to the Settlement Class.

In light of the benefits conferred by the Settlement reached in this case, the role of the Class Representatives in this lawsuit should be acknowledged with a reasonable payment to compensate them for their time and expenses associated with actively participating in this litigation by awarding the requested $12,500 to each Class representative.

## VI.    CONCLUSION

For all the foregoing reasons, the Plaintiffs' Motion for Attorney's Fees and Costs should be granted, and the Arns Law Firm and Jonathan Jaffe Law should be awarded $7,500,000.00 in attorneys' fees and $282,566.49 in costs, for a total fee award of $7,782,566.49. The Court should also approve $12,500 as a service award to each named Class Representative, for a total of $37,500.

THE ARNS LAW FIRM

By:  /s/ Robert S. Arns
           Robert S. Arns
           Jonathan E. Davis
           Steven R. Weinmann

-39-
PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                                                    Case No. 11-CV-01726 RS

--and--

JONATHAN JAFFE LAW


By:___/s/ Jonathan M. Jaffe_____
        JONATHAN M. JAFFE
        Attorneys for Plaintiffs

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVES' SERVICE
AWARDS                              Case No. 11-CV-01726 RS