COOLEY LLP
MICHAEL G. RHODES (116127)
(mrhodes@cooley.com)
MATTHEW D. BROWN (196972)
(brownmd@cooley.com)
JEFFREY M. GUTKIN (216083)
(jgutkin@cooley.com)
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

Attorneys for Defendant Facebook, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL FRALEY; PAUL WANG; SUSAN MAINZER; JAMES H. DUVAL, a minor, by and through JAMES DUVAL, as Guardian ad Litem; and W.T., a minor, by and through RUSSELL TAIT, as Guardian ad Litem; individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC., a corporation; and DOES 1-100,<br><br>Defendants. | Case No. CV 11-01726 RS<br><br>**DEFENDANT FACEBOOK, INC.'S MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF REVISED SETTLEMENT**<br><br>**DATE:** October 25, 2012<br>**TIME:** 1:30 p.m.<br>**DEPT.:** 3<br>**JUDGE:** Hon. Richard Seeborg |

TABLE OF CONTENTS

**Page**

I.     STATEMENT OF ISSUES TO BE DECIDED ............................................... 1

II.    INTRODUCTION ............................................................................... 1

III.   OVERVIEW OF THE LITIGATION AND THE REVISED SETTLEMENT ................. 4

       A.    Overview of Sponsored Stories and Plaintiffs' Allegations .................... 4

       B.    Case History Before Settlement ........................................................ 6

       C.    Revised Settlement ....................................................................... 7

IV.    THE COURT SHOULD PRELIMINARILY APPROVE THE REVISED
       SETTLEMENT ................................................................................ 13

       A.    Legal Standard on a Motion for Preliminary Approval ........................ 13

       B.    The Settlement Is the Product of Fully-Informed, Non-Collusive
             Negotiations ............................................................................ 14

       C.    The Settlement Has No Obvious Deficiencies and Is in the Range of
             Approval ................................................................................. 15

             1.    Plaintiffs had exceedingly low odds of obtaining a substantial
                   recovery ........................................................................ 16

                   a.    Plaintiffs and putative Class Members could not prove
                         injury ..................................................................... 17

                   b.    Class Members consented to Sponsored Stories as a matter
                         of law .................................................................... 18

                         (1)   Users' express consent defeats their claims ..................... 18

                         (2)   Users' implied consent is equally fatal to their
                               claims .............................................................. 19

                         (3)   COPPA preempts the parental consent requirement
                               asserted by Plaintiffs .......................................... 21

                               (a) Express preemption ..................................... 21

                               (b) Conflict preemption ..................................... 23

                         (4)   Even if Facebook were required to establish parental
                               consent, it could do so for millions of minor Users ......... 25

                   c.    Plaintiffs could not prevail for numerous additional reasons ........ 26

             2.    Absent a settlement, it may be years before the Class recovers, if at
                   all ............................................................................... 29

             3.    The relief in the Revised Settlement is fair, reasonable, and
                   adequate ......................................................................... 30

                   a.    The monetary relief component is appropriate in light of the
                         strength of the claims, and the risks of continued litigation ........ 31

                   b.    The *cy pres* distribution will be appropriate, if it occurs ............. 35

                   c.    The proposed *Cy Pres* Recipients are appropriate. ...................... 37

TABLE OF CONTENTS
(CONTINUED)

Page

d.   The injunctive relief provides substantial value to the Class........ 38

(1)   Enhanced notice and new controls for all Class Members.......................................................................... 38

(2)   Additional settlement benefits for the Minor Subclass......................................................................... 39

(3)   Compliance audit ............................................................. 40

(4)   The injunctive relief contributes to the total consideration for the release of Class Members' claims for past damages .................................................... 40

4.   The procedural posture and the views of counsel support settlement....... 42

D.   The Settlement Does Not Grant Preferential Treatment to Segments of the Class ................................................................................................................ 42

E.   The Arguments of the C.M.D. Plaintiffs and Other Third Parties Lack Merit................................................................................................................ 43

1.   As discussed, any purported parental consent requirement is invalid ...... 44

2.   The California Family Code has no bearing on the Settlement ................ 44

3.   The injunctive relief contributes substantial value to the Settlement ....... 46

4.   The injunctive relief is reasonable and adequate, notwithstanding Third Parties' injunctive relief "wish lists."............................................... 47

V.   THE PROPOSED NOTICE PLAN SHOULD BE PRELIMINARILY APPROVED................................................................................................................ 48

A.   Legal Standard for Approval of a Notice Plan................................................ 48

B.   The Content of the Notice Provided to Class Members Is Sufficient................ 49

C.   The Means of Supplying Notice to Class Members Is Sufficient...................... 49

D.   Facebook will comply with the Class Action Fairness Act ................................ 50

VI.   CONCLUSION .......................................................................................................... 50

## TABLE OF AUTHORITIES

**Page**

CASES

*Abdul-Jabbar v. Gen. Motors Corp.*,
 85 F.3d 407 (9th Cir. 1996) ................................................................................... 26

*Acosta v. Trans Union, LLC*,
 243 F.R.D. 377 (C.D. Cal. 2007) ............................................................................ 47

*Animal Legal Def. Fund v. Mendes*,
 160 Cal. App. 4th 136 (2008) ................................................................................. 17

*Arizona v. United States*,
 132 S. Ct. 2492 (2012) ....................................................................................... 23, 24

*AT&T Mobility LLC v. Concepcion*,
 131 S. Ct. 1740 (2011) ............................................................................................ 23

*Backpage.com, LLC v. McKenna*,
 No. C12-954-RSM, 2012 WL 3064543 (W.D. Wash. July 27, 2012) ..................... 24

*Barnes v. Yahoo!, Inc.*,
 570 F.3d 1096 (9th Cir. 2009) ................................................................................. 28

*Baugh v. CBS, Inc.*,
 828 F. Supp. 745 (N.D. Cal. 1993) .......................................................................... 26

*Blankenship v. Hearst Corp.*,
 519 F.2d 418 (9th Cir. 1975) ................................................................................... 45

*Boyle v. Giral*,
 820 A.2d 561 (D.C. Cir. 2003) ................................................................................ 36

*Brown v. Entm't Merchs. Ass'n*,
 131 S. Ct. 2729 (2011) ............................................................................................ 27

*Browning v. Yahoo! Inc.*,
 No. C04-01463 HRL, 2007 WL 4105971 (N.D. Cal. Nov. 16, 2007) ............... 43, 50

*Carafano v. Metrosplash.com, Inc.*,
 339 F.3d 1119 (9th Cir. 2003) ................................................................................. 28

*Casey Wasserman Living Trust v. Bowers*,
 No. 5:09-CV-180-JMH, 2011 U.S. Dist. LEXIS 46451 (E.D. Ky. Apr. 29, 2011) ............... 45

*Catala v. Resurgent Capital Servs. L.P.*,
 Civ. No. 08cv2401 NLS, 2010 WL 2524158 (S.D. Cal. June 22, 2010) ................ 36

**TABLE OF AUTHORITIES**
(CONTINUED)

Page

*Churchill Vill., LLC v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004)................................................................. 49

*Cohen v. Facebook, Inc.*,
    No. 10-5282 RS, 2011 WL 5117164 (N.D. Cal. Oct. 27, 2011)........................................... 17

*Dennis v. Kellogg Co.*,
    --- F.3d ---, Nos. 11-55674, 11-55706, 2012 WL 3800230 (9th Cir. Sept. 4, 2012) ............. 37

*Downing v. Abercrombie & Fitch*,
    265 F.3d 994 (9th Cir. 2001).................................................................. 17, 18

*Eisen v. Carlisle & Jacquelin*,
    479 F.2d 1005 (2d Cir. 1973)................................................................. 16

*Farinella v. Paypal*
    611 F. Supp. 2d 250 (E.D.N.Y. 2009) ................................................................ 43

*First State Orthopaedics v. Concentra, Inc.*,
    534 F. Supp. 2d 500 (E.D. Pa. 2007) ................................................................ 41

*Fisher Bros. v. Cambridge-Lee Indus., Inc.*,
    630 F. Supp. 482 (E.D. Pa. 1985) ................................................................ 34

*Francisco v. Numismatic Guar. Corp.*,
    No. 06-61677-CIV, 2008 WL 649124 (S.D. Fla. Jan. 31, 2008)........................................... 36

*Franklin Nat'l Bank v. New York*,
    347 U.S. 373 (1954)................................................................ 23

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000)................................................................ 23

*Gionfriddo v. Major League Baseball*,
    94 Cal. App. 4th 400 (2001) ................................................................ 27

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ................................................................ 28

*Gordon v. Virtumundo, Inc.*,
    575 F.3d 1040 (9th Cir. 2009).................................................................. 21, 22

*Greenstein v. Greif Co.*,
    No. B200962, 2009 WL 117368 (Cal. App. Jan. 20, 2009) ................................................................ 19

-ii-

1

## TABLE OF AUTHORITIES
(CONTINUED)

2

**Page**

3

*Hakes Inv. Co. v. Lyons*,
4     166 Cal. 557 (1913) ........................................................................................ 45

5 *Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998)......................................................................... 14, 33

6

*Harris v. U.S. Phys. Therapy, Inc.*,
7     No. 2:10–cv–01508, 2012 WL 3277278 (D. Nev. July 18, 2012)...................... 16

8 *Hoffman v. Capital Cities/ABC, Inc.*,
    255 F.3d 1180 (9th Cir. 2001)........................................................................... 27
9

*In re Bluetooth Headset Prods. Liab. Litig.*,
10     654 F.3d 935 (9th Cir. 2011) ............................................................................ 15

11
*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
12     216 F.R.D. 197 (D. Me. 2003) ......................................................................... 50

13 *In re Ferrero Litig.*,
    No. 11-CV-00205-H-KSC, 2012 WL 2802051 (S.D. Cal. July 9, 2012) .............. 38
14

*In re Gen. Instr. Sec. Litig.*,
15     209 F. Supp. 2d 423 (E.D. Pa. 2001) ............................................................... 34

16
*In re Google Buzz Privacy Litig.*,
17     No. C 10-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011)...................... 36

18 *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
    851 F. Supp. 2d 1040 (S.D. Tex. 2012) ............................................................ 34
19

*In re HP Laser Printer Litig.*,
20     No. SACV 07-0667 AG (RNBx), 2011 WL 3861703 (C.D. Cal. Aug. 31, 2011) ................ 41

21 *In re Immune Response Sec. Litig.*,
    497 F. Supp. 2d 1166 (S.D. Cal. 2007) ............................................................ 42
22

*In re Indep. Energy Holdings PLC Sec. Litig.*,
23     No. 00 Civ. 6689, 2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) ..................... 15

24
*In re Mego Fin. Corp. Sec. Litig.*,
25     213 F.3d 454 (9th Cir. 2000).......................................................................... 34

26 *In re Mercury Interactive Corp. Secs. Litig.*,
    618 F.3d 988 (9th Cir. 2010).......................................................................... 49
27

28

TABLE OF AUTHORITIES
(CONTINUED)

Page

*In re Motor Fuel Temperature Sales Practices Litigation,*
  MDL No. 1840, No. 07-MD-1840-KHV,
  2012 WL 1415508 (D. Kan. Apr. 24, 2012) ............................................................... 40, 41, 42

*In re Pac. Enters. Sec. Litig.,*
  47 F.3d 373 (9th Cir. 1995) .................................................................................................. 13, 16

*In re Pharm. Indus. Average Wholesale Price Litig.,*
  588 F.3d 24 (1st Cir. 2009) .................................................................................................. 36, 37

*In re Tableware Antitrust Litig.,*
  484 F. Supp. 2d 1078 (N.D. Cal. 2007) ............................................................................... 14, 50

*In re TD Ameritrade Account Holder Litig.,*
  Nos. C 07-2852, C 07-4903, 2011 WL 4079226 (N.D. Cal. Sept. 13, 2011) ........................ 34

*In re Warfarin Sodium Antitrust Litig.,*
  391 F.3d 516 (3d Cir. 2004) ....................................................................................................... 14

*Jones v. Corbis Corp.,*
  815 F. Supp. 2d 1108 (C.D. Cal. 2011), *aff'd,* 2012 WL 2884790 (9th Cir. Jul 16,
  2012) .......................................................................................................................................... 19

*Levell v. Monsanto Research Corp.,*
  191 F.R.D. 543 (S.D. Ohio 2000) .............................................................................................. 47

*Levitt v. Yelp! Inc.,*
  Nos. C-10-1321, C-10-2351, 2011 WL 5079526 (N.D. Cal. Oct. 26, 2011) ........................... 28

*Linney v. Cellular Alaska P'ship,*
  151 F.3d 1234 (9th Cir. 1998) .............................................................................................. 13, 14

*Linney v. Cellular Alaska P'ship,*
  Nos. C-96-3008, C-97-0203, C-97-0425, C-97-0457, 1997 WL 450064 (N.D. Cal.
  July 18, 1997), *aff'd,* 151 F.3d 1234 (9th Cir. 1998) ................................................................ 14

*Lowe v. S.E.C.,*
  472 U.S. 181 (1985) .................................................................................................................... 27

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .................................................................................................................... 17

*Mazza v. Am. Honda Motor Co.,*
  666 F.3d 581 (9th Cir. 2012) ...................................................................................................... 28

**TABLE OF AUTHORITIES**
(CONTINUED)

Page

*McCall v. Facebook, Inc.*,
 --- F.3d ---, No. 10-16398 (9th Cir. Sept. 20, 2012) .................................................. passim

*Miller v. California*,
 413 U.S. 15 (1973) ................................................................................................................ 27

*Morgan v. Morgan*,
 220 Cal. App. 2d 665 (1963) ............................................................................................... 45

*Myers v. MedQuist, Inc.*,
 Civ. No. 05-4608 (JBS), 2009 WL 900787 (D.N.J. Mar. 31, 2009) ........................... 38, 41, 48

*Nachshin v. AOL, LLC*,
 663 F.3d 1034 (9th Cir. 2011) ....................................................................................... 36, 37

*Nat'l Rural Telecomms. Cooperative v. DIRECTV, Inc.*,
 221 F.R.D. 523 (C.D. Cal. 2004) .................................................................................... 14, 41

*Newcombe v. Adolf Coors Co.*,
 157 F.3d 686 (9th Cir. 1998) ................................................................................................. 26

*Newton v. Thomason*,
 22 F.3d 1455 (9th Cir. 1994) ................................................................................................. 19

*Nienaber v. Citibank (South Dakota) N.A.*,
 No. Civ. 04-4054, 2007 WL 752297 (D.S.D. Mar. 7, 2007) ................................................ 36

*O'Brien v. Brain Research Labs, LLC*,
 Civ. A. No. 12–204, 2012 WL 3242365 (D.N.J. Aug. 9, 2012) ............................................ 34

*Officers for Justice v. Civ. Serv. Comm'n*,
 688 F.2d 615 (9th Cir. 1982) ........................................................................................... passim

*Parker v. Time Warner Entm't Co., L.P.*,
 331 F.3d 13 (2d Cir. 2003) .................................................................................................... 32

*Parker v. Time Warner Entm't Co., L.P.*,
 631 F. Supp. 2d 242 (E.D.N.Y. 2009) .................................................................................. 34

*Perez v. Asurion Corp.*
 501 F. Supp. 2d 1360 (S.D. Fla. 2007) ................................................................................ 30

*Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C.*,
 No. CV-04-2195 (CPS), 2006 WL 3681138 (E.D.N.Y. Dec. 11, 2006) ............................... 36

**TABLE OF AUTHORITIES**
(CONTINUED)

Page

*Riker v. Gibbons*,
No. 3:08-cv-00115-LRH-VPC, 2010 WL 4366012 (D. Nev. Oct. 28, 2010) ........................ 30

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
487 U.S. 781 (1988) ....................................................................................................... 27

*Rodriguez v. W. Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) ............................................................................... 13, 14, 43

*S. Bay Chevrolet v. GMAC*,
72 Cal. App. 4th 861 (1999) ........................................................................................... 29

*Satchell v. Fed. Express Corp.*,
Nos. C03-2659 SI, C03-2878 SI, 2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ................. 15

*Schumm v. Berg*,
37 Cal. 2d 174 (1951) .................................................................................................... 45

*Sisco v. Cosgrove, Michelizzi, Schwabacher, Ward & Bianchi*,
51 Cal. App. 4th 1302 (1996) ......................................................................................... 45

*Smith v. Dominion Bridge Corp.*,
Civ. A. No. 96-7580, 2007 WL 1101272 (E.D. Pa. Apr. 11, 2007) .................................... 50

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
558 U.S. 408 (2003) ....................................................................................................... 33

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) ........................................................................................... 30

*Stewart v. Rolling Stone LLC*,
181 Cal. App. 4th 664 (2010) ......................................................................................... 18

*Thieriot v. Celtic Ins. Co.*,
No. C 10–04462 LB, 2011 WL 1522385 (N.D. Cal. Apr. 21, 2011) .................................... 43

*Vasquez v. Coast Valley Roofing, Inc.*,
670 F. Supp. 2d 1114 (E.D. Cal. 2009) ............................................................................ 13

*W. Va. v. Chas. Pfizer & Co.*,
314 F. Supp. 710 (S.D.N.Y. 1970) ................................................................................... 16

*White v. Experian Info. Solutions, Inc.*,
803 F. Supp. 2d 1086 (C.D. Cal. 2011) ...................................................................... 30, 33

## TABLE OF AUTHORITIES
(CONTINUED)

**Page**

**STATUTES**

California Business and Professions Code
§ 17200 ("UCL") ........................................................ passim

California Civil Code
§ 3344 ..................................................................... passim

California Family Code
§ 6700 ........................................................................ 45
§ 6701 .................................................................... 45, 46
§§ 6750-51 ................................................................. 46

Children's Online Privacy Protection Act ("COPPA"),
15 U.S.C. §§ 6501-08 ................................................ passim

Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C.
§ 1715 ........................................................................ 50

Communications Decency Act ("CDA")
§ 230 ........................................................... 3, 27, 28, 29

**OTHER AUTHORITIES**

76 Fed. Reg. 59804, 59805 (Sept. 27, 2011) ......................... 22

16 C.F.R. § 312.5(a) .......................................................... 21

Federal Rules of Civil Procedure
23 ........................................................................... passim

*Manual for Complex Litigation* (4th ed. 2004) § 21.311 ............ 50

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.    STATEMENT OF ISSUES TO BE DECIDED**

3        1.      Should the Court preliminarily approve the Parties' Revised Settlement?[1]

4        2.      Should the Court approve the Parties' proposed plan for notifying the putative

5  Class of the Settlement?

6  **II.    INTRODUCTION**

7        The Settlement, which is the product of over a year of hard-fought litigation, has been

8  modified significantly to address the issues raised by the Court and third parties.  Under the

9  Revised Settlement, Class Members—Facebook users ("Users") in the United States who have

10  appeared in Sponsored Stories—may claim a cash payment of up to $10 each, to be paid from a

11  $20 million total settlement fund.  If claims, attorneys' fees, administration costs, and other

12  Court-approved expenses do not exhaust the fund, the remainder will be awarded as *cy pres* to

13  Court-approved nonprofit organizations, and will not return to Facebook.  The Parties have also

14  deleted the Settlement's "clear sailing" provision, and Facebook may now oppose Plaintiffs'

15  counsel's petition for fees and expenses.  Finally, the Parties have provided greater detail about

16  how Facebook will implement the Settlement's injunctive relief provisions—which include

17  robust new disclosures and innovative controls that respond directly to the allegations in this

18  lawsuit—and have substantially augmented the injunctive relief for minor Users and their parents.

19        As a result of these changes, the Revised Settlement now combines direct monetary

20  payments with injunctive relief that removes any conceivable question as to whether Facebook

21  has adequately described its business practices.  It also gives Users a level of control over their

22  (and their minor children's) appearance in sponsored content that well exceeds what the law

23  requires.  The Revised Settlement is fair and reasonable because it secures these substantial

24  benefits for the Class, even though Plaintiffs' claims are meritless, and even though a host of

25  formidable obstacles stood in the way of their recovery if litigation had continued.

26

27  _____
[1] Capitalized terms in this Motion that are not defined in the Motion have the same definition as
used in the Revised Settlement Agreement ("R.A."), which is filed as an attachment to the

28  concurrently filed Joint Motion for Preliminary Approval of Revised Settlement.

**FACEBOOK'S MPA ISO JT. MOT. FOR
PRELIM. APPROVAL OF REV. SETTLEMENT
CASE NO. CV 11-01726 RS**

Plaintiffs are Facebook Users who allege that Facebook violated California's right of publicity statute, Civil Code § 3344 ("§ 3344"), and California's Unfair Competition Law, Business and Professions Code § 17200 ("UCL"), by displaying their names and Facebook profile pictures in Sponsored Stories without valid consent.  After more than a year of discovery, however, Facebook has exposed numerous, fatal defects in Plaintiffs' case.  Most fundamentally, Plaintiffs were never able to show that they or any Class Members were harmed by Sponsored Stories, as required under Article III of the U.S. Constitution, § 3344, and the UCL.  Plaintiffs' theory of injury was that Users were harmed because Facebook allegedly earned more revenue from Sponsored Stories than it would have earned from advertisements run in their place.  Setting aside the defects with this theory (which conflates the benefit to Facebook with injury to Users), Facebook proved through expert and fact discovery that it frequently earned *less money* by running Sponsored Stories.

Equally fatal, Class Members *expressly agreed* to the display of their "names and likenesses" in the type of content challenged in the case.  As a condition of using Facebook's free website, all Users agree to Facebook's terms of use, currently known as the Statement of Rights and Responsibilities (the "Terms").  Since before Sponsored Stories launched, the Terms have disclosed that a User's "name and profile picture may be associated with commercial, sponsored, or related content (such as a brand [the User] like[s])," and have expressly granted Facebook "permission to use [the User's] name and profile picture in connection with that content."  This clear, express consent posed an insurmountable hurdle for Class Members, who had the burden to prove that Facebook *lacked consent* to display their names and profile pictures.

Facebook also adduced overwhelming evidence that Users *impliedly* consent to Sponsored Stories by, for example, continuing to use the site (and particular features), despite knowing that their names and profile pictures could be displayed in connection with sponsored content.  Through discovery, Facebook established the prevalence (if not the near-ubiquity) of implied consent among Class Members, including the named Plaintiffs themselves, who continued to take actions on Facebook that could generate Sponsored Stories long after filing suit.  One Class Member even remarked that Facebook's use of her name and likeness in Sponsored Stories was

1   "part of the deal," adding that "nothing is free, it's how they make money."  Because implied

2   consent precludes a claim for misappropriation, these facts doomed Plaintiffs' claims.

3          Facebook's consent defenses apply with equal force to the claims of the Minor Subclass.

4   Although Plaintiffs have argued that Facebook was required to obtain parental consent for minor

5   Users, such claims are preempted by the Children's Online Privacy Protection Act ("COPPA"), as

6   a California court recently held in another case against Facebook.  With COPPA, Congress made

7   a considered decision that websites should not be required to obtain parental consent to collect

8   and use online data from users 13 and older.  The Minor Subclass Members, therefore, could not

9   establish their claims by showing that Facebook failed to obtain consent from their parents.

10          Apart from injury and consent, Class Members (minors and adults alike) faced an array of

11   other substantial hurdles.  For example, the evidence shows that some Facebook Users do not use

12   their real names or recognizable pseudonyms and that many do not use profile pictures bearing

13   their likenesses.  Both circumstances preclude liability under § 3344.  In addition, Facebook's

14   display of Sponsored Stories is protected by the First Amendment, with some Sponsored

15   Stories—including those about politics, religion, and public affairs—receiving the highest degree

16   of constitutional protection.  The evidence further shows that Facebook's display of Sponsored

17   Stories is immune from liability under Section 230 of the Communications Decency Act

18   ("CDA"), because Facebook acts only as a publisher of content created by third parties.

19          In light of these and other profound risks to Plaintiffs' case, the Revised Settlement

20   delivers substantial, immediate relief for the nearly 125 million Users in the Class.  It provides

21   improved disclosures, new and powerful User controls relating to sponsored content, and

22   potentially millions in direct monetary payments.  The Revised Settlement unquestionably meets

23   the permissive standard for preliminary approval, which should be granted whenever a non-

24   collusive settlement "falls within the range of possible approval."  For these and other reasons

25   discussed below, Facebook respectfully requests preliminarily approval of the Revised

26   Settlement.

27

28

### III.    OVERVIEW OF THE LITIGATION AND THE REVISED SETTLEMENT

#### A.    Overview of Sponsored Stories and Plaintiffs' Allegations

Facebook operates a free social networking website, which allows people worldwide to share and connect with their friends, families, and communities.  Like many free websites, Facebook funds its operations—which currently cost nearly $2 billion per year—primarily by allowing marketers to display advertisements and sponsored content on the site.  Until January 2011, Facebook offered two principal marketing products: (1) Facebook Ads, which are designed by advertisers, and are similar to traditional online-display advertisements; and (2) Social Ads, which display Facebook Ads alongside social context—"stories" about Users' social actions on Facebook, such as "Liking" the subject of the advertisement.

On January 25, 2011, Facebook launched a new social marketing product called "Sponsored Stories."  Unlike Social Ads, which include content created by third parties (such as a slogan or a marketing message), Sponsored Stories allow individuals, businesses, and organizations to increase the visibility of User-generated content, called "stories," that have already appeared (or were eligible to appear) in the News Feeds[2] of the User's Friends and in a number of other places on the site.  For a small fee, a marketer can "sponsor" a story related to its "Page," meaning that Facebook will redisplay the story, subject to the User's personal "privacy settings," to the same audience the User chose for the original story.  The contents of the Sponsored Story are virtually identical to those in the original story, including the name, profile picture, and Facebook action of the User, all of which may appear in both types of stories.

For example, Plaintiffs alleged that the statement "Susan [Mainzer] likes UNICEF," along with Ms. Mainzer's profile picture, was shown to Ms. Mainzer's Friends as a Sponsored Story. This same statement was already shown (or eligible to be shown) to Ms. Mainzer's Friends when she voluntarily "clicked on a Facebook 'Like' on the facebook.com page for UNICEF . . . to support UNICEF in a campaign to reduce the deaths of children."  (Second Amended Class Action Complaint, Dkt. No. 22 ("SAC") ¶ 70.)  As part of the ordinary operation of Facebook,

---

[2] The News Feed is a customized, constantly-updated stream of "stories" about the User's Friends and Pages the User has connected with (representing brands, organizations, and politicians, etc.).

after clicking the Like button, Ms. Mainzer's "Like" statement may have appeared a number of times, and in a number of places on Facebook, including on Unicef's Facebook Page, on Ms. Mainzer's "Timeline," in her Friends' "Newsfeeds" and "Tickers," and more.  (*See* Declaration of James Squires ISO Joint Motion for Prelim. Approval of Rev. Settlement ("Squires Decl.") ¶¶ 4-10.)  Notably, except for Sponsored Stories, Plaintiffs do not challenge any of these redisplays of the content they voluntarily shared on Facebook.

Below is an example of User-created content that could be displayed on a User's Timeline or in Friends' News Feeds, which Plaintiffs do not challenge (top), and the corresponding Sponsored Stories displayed to the same Friends, which Plaintiffs claim injure Users (bottom):





In March 2011, Plaintiffs filed a putative class action alleging that Sponsored Stories misappropriated their names and likenesses, in violation of § 3344 and the UCL,[3] by displaying their Facebook names and profile pictures in connection with commercial content, without valid consent. (*E.g.*, SAC ¶¶ 109-10, 120-21.) Plaintiffs also alleged that Facebook violated the UCL by failing to adequately disclose the functioning of Sponsored Stories, and in particular, the lack of a global "opt-out," in both the Terms and the Facebook Help Center. (*See* SAC ¶¶ 32-37, 122-23; Pls.' Reply ISO Mot. for Class Cert. ("Class Cert. Reply") at 4.) Plaintiffs sought actual, punitive, and statutory damages, restitution, and injunctive relief. (SAC ¶ 136.)

### B.    Case History Before Settlement

The proposed Settlement of this long-running class action, pending since March 2011, follows extensive motion practice and discovery by the Parties.

**Pre-Settlement Motion Practice:** This action was filed in Santa Clara Superior Court on March 11, 2011. (Notice of Removal of Action, Dkt. No. 1.) Plaintiffs amended the Complaint to add a subclass of minors on March 18, 2011, and Facebook removed the case to federal court on April 8, 2011. (*Id.*) Thereafter, following an initial motion to dismiss (Dkt. No. 16), Plaintiffs filed the SAC (Dkt. No. 22). Facebook then filed a second motion to dismiss (Dkt. No. 30), which Judge Koh granted in part and denied in part on December 16, 2011 (Dkt. No. 74). Plaintiffs filed a Motion for Class Certification on March 29, 2012 (Dkt. No. 106), Facebook filed an opposition (Dkt. No. 141), and Plaintiffs filed a reply. It was in the days leading up to the hearing on class certification, scheduled for May 31, 2012, that the Parties agreed to settle. (Joint Status Report re Revised Settlement Term Sheet, Dkt. No. 171.)

**Pre-Settlement Discovery:** In the fifteen months of litigation preceding settlement, the Parties engaged in extensive discovery, propounding more than 1,000 discovery requests, producing more than 200,000 pages of documents and data, and conducting 21 depositions. (Declaration of Matthew D. Brown ISO Joint Motion for Prelim. Approval of Rev. Settlement ("Brown Decl."), filed herewith, ¶ 2.) Between them, the Parties deposed seven experts, the

---

[3] A third claim for unjust enrichment has been dismissed with prejudice. (*See* Mot. to Dismiss Order, Dkt. No. 74 ("MTD Order") at 37.)

named Plaintiffs, and Facebook personnel knowledgeable about Sponsored Stories and Facebook's systems, among other topics.  (*Id.*)  Plaintiffs issued subpoenas to five third parties.  (*Id.*)  The Parties also litigated a motion to compel and two motions for protective orders.  (*See, e.g.*, Discovery Orders, Dkt. Nos. 93, 105.)

**Settlement Negotiations and the Original Settlement:**  On March 1, 2012, Plaintiffs and Facebook mediated the case at JAMS in San Francisco before the Hon. Edward A. Infante, retired Chief Magistrate Judge of the Northern District of California.  (Rhodes Decl. ¶ 4.)  Although the case did not settle at that time, the Parties thereafter engaged in ongoing, direct settlement discussions under the guidance of Judge Infante, while continuing to litigate the case.  (*Id.*)  The Parties ultimately executed a settlement term sheet, followed by a fully articulated settlement agreement.  (*Id.*)  Plaintiffs filed a motion for preliminary approval of that settlement on June 14, 2012 (Dkt. No. 181), and Facebook filed a brief in support of it two weeks later (Dkt. No. 188).

On August 2, 2012, the Court held a hearing on Plaintiffs' preliminary approval motion.  In an order dated August 17, 2012 (Dkt. No. 224) ("Order"), the Court denied the motion without prejudice, identifying specific issues that would be better addressed before final approval proceedings.  (Order at 2.)  The Order gave the Parties the option to either "negotiate for modifications to their agreement" or "present a renewed motion for preliminary approval of the existing agreement, with additional evidentiary and/or legal support directed at ameliorating the listed concerns."  (*Id.*)  The Order further explained that "plaintiffs generally appear to have satisfied the prerequisites for preliminary approval of the settlement, except with respect to the issues discussed [in the Order]."  (*Id.* at 8.)

**C.     Revised Settlement**

In response to the Court's August 17 Order, the Parties had further settlement negotiations that culminated in the Revised Settlement, for which the Parties now move for preliminary approval.  The main terms of the Revised Settlement may be summarized as follows:

**Class Definition:**  As in the original settlement, the Class is defined as:  "All persons in the United States who have or have had a Facebook account at any time and had their names, nicknames, pseudonyms, profile pictures, photographs, likenesses, or identities displayed in a

**FACEBOOK'S MPA ISO JT. MOT. FOR PRELIM. APPROVAL OF REV. SETTLEMENT CASE NO. CV 11-01726 RS**

1   Sponsored Story at any time on or before the date of entry of the Preliminary Approval Order."

2   (R.A. § 1.6.)

3     **Minor Subclass Definition:** Also unchanged from the original settlement, the Minor

4   Subclass is defined as:  "All persons in the Class who additionally have or have had a Facebook

5   account at any time and had their names, nicknames, pseudonyms, profile pictures, photographs,

6   likenesses, or identities displayed in a Sponsored Story, while under eighteen (18) years of age, or

7   under any other applicable age of majority, at any time on or before the date of entry of the

8   Preliminary Approval Order."  (R.A. § 1.17.)

9     **Settlement Fund:**  The Revised Settlement creates a "Settlement Fund" of twenty million

10  dollars ($20,000,000).  (R.A. § 1.27.)  Upon preliminary approval, Facebook will deposit part of

11  this amount into an escrow account to cover the estimated costs of giving notice to the class and

12  related expenses, and it will deposit the remainder within 5 business days after final approval of

13  the Revised Settlement and the expiration of all periods for appeal.  (R.A. §§ 2.2(a), (c).)  All

14  interest earned on the Settlement Fund while in escrow will be added to it.  (R.A. § 2.2.)  The

15  Settlement Fund will be used to pay the reasonable costs of delivering notice to the class, costs

16  incurred by the Settlement Administrator and Escrow Agent, Taxes and Tax Expenses, attorneys'

17  fees and costs approved by the Court for Class Counsel, and any incentive awards approved by

18  the Court for the named Plaintiffs.  (*Id.*)  What remains from the $20 million will be the "Net

19  Settlement Fund," which, as detailed below, will be used to pay the claims of Authorized

20  Claimants, a *cy pres* award, or both.  (R.A. §§ 1.18, 2.3, 2.4.)  In no circumstance will any portion

21  of the Settlement Fund revert to Facebook.  (*See* R.A. § 2.2-2.4.)

22    **Attorneys' Fees and Costs:**  Class Counsel may petition the Court for an award of

23  attorneys' fees and costs from the Settlement Fund.  (R.A. § 2.5.)  In contrast to the original

24  settlement, Facebook now has the right to oppose Class Counsel's request.  (*See id.*)

25    **Incentive Awards:**  Each Plaintiff may seek payment of an incentive award of up to

26  $12,500 from the Settlement Fund, subject to Court approval.  (R.A. § 2.6.)

27    **Payments to Class Members / *Cy Pres* Distributions:**  Starting shortly after notice of the

28  Revised Settlement has been given to the Class, Class Members will be able to submit a claim for

1   payment from the Net Settlement Fund.  To do so, a Class Member can access a simple, online

2   form and attest that: (a) the Class Member understands that a story about some action he or she

3   took on Facebook (such as liking a page, checking in at a location, or sharing a link), along with

4   his or her name and/or profile picture, may have been displayed in a Sponsored Story shown to

5   his or her Facebook Friends who were authorized by the Class Member to see that action; (b) the

6   Class Member was not aware that Facebook could be paid a fee for redisplaying actions such as

7   these, along with the Class Member's name and/or profile picture, to his or her Facebook Friends;

8   (c) the Class Member believes that, if his or her name and/or profile picture were displayed in a

9   Sponsored Story, he or she was injured by that display; (d) the Class Member is submitting only

10   one claim form regardless of how many Facebook accounts the Class Member has; and (e) the

11   Class Member understands that he or she is releasing all claims against Facebook and other

12   Released Parties.  (R.A. § 4.1.)  The Class Member must also provide the email address, User ID

13   or username, and name (or pseudonym) associated with his or her Facebook account.  (R.A.

14   § 4.1(a).)  For a valid claim, Facebook's records must show that the Class Member appeared in a

15   Sponsored Story on or before the date of preliminary approval.  (*Id.*)

16         Class Members who submit timely, valid Claim Forms ("Authorized Claimants," *see* R.A.

17   § 1.1) may receive payments, either by online money transfer or paper check, unless the Court

18   orders otherwise or unless it is economically infeasible to make payments without exceeding the

19   Net Settlement Fund, in which case the Net Settlement Fund would instead be distributed to *cy*

20   *pres* recipients proposed by the Parties and approved by the Court ("*Cy Pres* Recipients").  (R.A.

21   §§ 2.3-2.4.)  Each Authorized Claimant may receive a payment of up to $10, to be paid by the

22   Settlement Administrator from the Escrow Account, subject to the conditions below (*see*

23   *generally* R.A. § 2.3):

24         1.     If payment of $10 to all Authorized Claimants would exhaust the Net Settlement

25   Fund, the Settlement Administrator shall distribute the Net Settlement Fund pro rata to each

26   Authorized Claimant, subject to the following:

27              (a)     If, given the number of Authorized Claimants, each Authorized Claimant's

28   pro-rata share of the Net Settlement Fund would be less than $5, the Court may, in its discretion,

1   (i) order the Settlement Administrator to distribute the entire Net Settlement pro rata to each

2   Authorized Claimant, or (ii) order the Settlement Administrator to distribute the entire Net

3   Settlement Fund to the *Cy Pres* Recipients.  If, under these circumstances, the Court does not

4   make either election, the Settlement Administrator shall distribute the Net Settlement Fund pro

5   rata to each Authorized Claimant.

6             (b)     Notwithstanding the foregoing, if it is not economically feasible to make

7   any payment to the Authorized Claimants without exceeding the Net Settlement Fund, the

8   Settlement Administrator shall distribute the entire Net Settlement Fund to the *Cy Pres*

9   Recipients, as described below.

10       2.    If payment of $10 to all Authorized Claimants would not exhaust the Net

11   Settlement Fund, the Settlement Administrator shall first (a) distribute $10 to each Authorized

12   Claimant and then (b) distribute to the *Cy Pres* Recipients any proceeds remaining in the Net

13   Settlement Fund.  Alternatively, the Court may, in its discretion, order the Settlement

14   Administrator to (a) increase the pro rata payment to each Authorized Claimant, such that it

15   would exceed $10 (provided that doing so does not exhaust the Net Settlement Fund) and (b) then

16   distribute to the *Cy Pres* Recipients any proceeds remaining in the Net Settlement Fund.

17       The *Cy Pres* Recipients are specified in Revised Settlement Agreement (R.A. § 2.4).  The

18   Parties selected these organizations, after substantial negotiation, based on the nature of this

19   action and each organization's focus on consumer protection, research, and education concerning

20   online privacy and the safe use of social media technologies.  Some of the organizations also have

21   a particular emphasis on protecting the interests of minors.

22       The Parties have agreed to engage Garden City Group, Inc. ("GCG") as the Settlement

23   Administrator.  (R.A. § 1.26.)  GCG's estimates of the administrative costs of the Settlement,

24   including providing notice, processing Claim Forms, and paying claims, vary substantially based

25   on the assumptions made, and vary most widely based on the number of claims.  However, based

26   on GCG's expertise and the best estimation methods available, GCG estimates the following total

27   administration costs, including the costs of notice, as: (i) 200,000 claims submitted ≈ $776,000 -

28   $1.27 million; (ii) 2,000,000 claims submitted ≈ $2.55 - $3.4 million.  (Decl. of Jennifer M.

Keough ISO Joint Motion for Prelim. Approv. of Revised Settlement ¶ 4.)

**Changes to Facebook's Disclosures and the Development and Implementation of Additional User Controls ("Injunctive Relief"):**   As with the original settlement, the Revised Settlement provides for enhanced notice and several innovative tools which, together, provide Class Members (and minor Class Members' parents) significant transparency and control regarding how their (or their children's) social actions may be used in connection with commercial or sponsored content.[4]   First, Facebook has agreed to: (i) enhance the notice and consent provision in Facebook's Terms with explicit language to which the Parties have agreed; and (ii) work with Plaintiffs' Counsel to identify and clarify any other information on www.facebook.com that, in Plaintiffs' view, does not accurately or sufficiently explain how Facebook advertising works.  (R.A. § 2.1(a), (d).)  Second, Facebook has agreed to engineer an innovative new tool to enable Class Members to view, on a going-forward basis, the subset of their interactions and other content on Facebook that have been displayed in Sponsored Stories (if any).  This new functionality will provide a level of transparency that does not exist on the site today and is unprecedented on the Internet.  Third, Facebook will create a granular control that will allow Class Members, upon viewing content that has been displayed in a Sponsored Story, to prevent additional displays of those Sponsored Stories, if they so desire.  (*See* R.A. § 2.1(b); Brown Decl., Ex. LL.)

**Minor-Specific Injunctive Relief:**   In addition, as with the original settlement, the Revised Settlement contains benefits comprehensively addressing the claims of the Minor Subclass.  First, Facebook will revise the Terms to require minor Class Members to affirm that they have obtained parental consent to Facebook's use of their names and likenesses in connection with commercial, sponsored, or related content on Facebook, including Sponsored Stories.  (R.A. § 2.1(c)(i).)  Second, Facebook has agreed to create a new tool whereby parents of minor Class Members can affirmatively prevent their children from appearing in Sponsored

---

[4] For clarity, Facebook is concurrently filing working "mockups" illustrating how key pieces of this injunctive relief are likely to be implemented based on current functionalities on the website. (*See* Brown Decl. Exs. LL - OO.)

FACEBOOK'S MPA ISO JT. MOT. FOR
PRELIM. APPROVAL OF REV. SETTLEMENT
CASE NO. CV 11-01726 RS

Stories.  (R.A. § 2.1(c)(iii); *see* Brown Decl. Ex. MM.)  Third, Facebook has agreed to enhance its existing Family Safety Center with information about social advertising on Facebook, including how parents may opt their children out of Sponsored Stories and a link to the tool that enables parents to do so.  (R.A. § 2.1(c)(iv).)

Finally, in the Revised Settlement, Facebook has agreed to augment the injunctive relief targeted to minors.  Facebook has agreed to begin encouraging new Users, upon or soon after joining Facebook, to designate the Users on Facebook who are their family members (if any), including their parents and children.  (*See* R.A. § 2.1(c)(ii); Brown Decl. Ex. OO.)  Further, for both existing and new Users, where both a parent and a minor child confirm their relationship on Facebook, the parent will be able to utilize the above-described minors' opt-out tool directly from his or her Facebook account.   (R.A. § 2.1(c)(iii); *see* Brown Decl. Ex. MM.)  To apprise parents of this option, Facebook will target informational advertising to verified parents, directing them to the Family Safety Center and/or other parent-specific resources on Facebook.  (R.A. § 2.1(c)(iv).)  And, in another new and substantial benefit to the Minor Subclass, Facebook will add a control in minor Class Members' timelines that enables them to indicate that they do not have a parent on Facebook.   (R.A. § 2.1(c)(iii); *see* Brown Decl. Ex. NN.)  Where a minor User indicates that his or her parents are not on Facebook, Facebook will make the minor ineligible to appear in Sponsored Stories until he or she reaches the age of 18, until the minor changes his or her setting to indicate that he or she has a parent on Facebook, or until a confirmed parental relationship with the minor User is established.  (R.A. § 2.1(c)(iii).)

**Notice of Settlement:**  Direct notice will be given to Class Members by email, using the email addresses provided by Class Members for their Facebook accounts.   To reach Class Members for whom Facebook does not have an email address (e.g., because they have closed their accounts), the Parties will publish the settlement notice three times as a quarter-page ad in the national edition of USA Today newspaper.  Further, a press release regarding the settlement will be distributed over PR Newswire's "National U.S.1" newsline, encompassing several thousand news organizations and publications across the United States.[5]  Each notice will provide

---

[5] *See* http://www.prnewswire.com/products-services/distribution/US1.html (listing publications)

the web address of a website at which Class Members can obtain additional, detailed information about the lawsuit and the Settlement, including the Claim Form.  The website will be operated by the Settlement Administrator, GCG.  (*See generally* § 3.3.)

**Opt-outs / Objections:**  As in the original settlement, Class Members may opt out within sixty (60) days after transmission of notice.  (R.A. §§ 1.19, 3.8.)

## IV.   THE COURT SHOULD PRELIMINARILY APPROVE THE REVISED SETTLEMENT.

Because the Parties renegotiated and substantially modified their agreement, Facebook provides a full analysis of the Revised Settlement, emphasizing the issues raised by the Court in its August 17 Order.  As shown below, the Revised Settlement is within the range of what might be approved as fair, reasonable, and adequate and, therefore, merits preliminary approval.

### A.   Legal Standard on a Motion for Preliminary Approval.

The Ninth Circuit "put[s] a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution," *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (citation omitted), and expressly recognizes that "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation," *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). For this reason, a proposed settlement "is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quotation marks omitted); *Officers for Justice v. Civ. Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ("Ultimately, the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." (quotation marks omitted)).  Therefore, on a motion for preliminary approval—the first stage of the approval process[6]— the relevant inquiry is whether "[1] the proposed settlement appears to be

_____

(last visited Oct. 5, 2012).

[6] Approval of a class action settlement entails a three-step process.  First, the court holds a preliminary approval hearing to assess whether the settlement is within the range of what might be approved as reasonable. *Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114, 1124-25 (E.D. Cal. 2009).  Next, the Parties provide notice of the settlement to class members, who have a period of time to comment on, opt out of, object to, or participate in the settlement.  *Id.* Last is the "Fairness Hearing," at which interested parties have an opportunity to be heard.  *Id.*

1    the product of serious, informed, non-collusive negotiations, [2] has no obvious deficiencies,

2    [3] does not improperly grant preferential treatment to class representatives or segments of the

3    class, [4] and falls within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F.

4    Supp. 2d 1078, 1079 (N.D. Cal. 2007) (quoted in Order at 2 n.1).

5            **B.    The Settlement Is the Product of Fully-Informed, Non-Collusive Negotiations.**

6            A settlement is presumptively fair when it is the product of fully-informed, arm's-length,

7    non-collusive negotiations. *Linney v. Cellular Alaska P'ship*, Nos. C-96-3008, C-97-0203, C-97-

8    0425, C-97-0457, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th

9    Cir. 1998); *see Rodriguez*, 563 F.3d at 963-64 ("This circuit has long deferred to the private

10   consensual decision of the parties."); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir.

11   1998) (approval order "reflected the proper deference to the private consensual decision of the

12   parties"); *Nat'l Rural Telecomms. Cooperative v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal.

13   2004) ("A settlement following sufficient discovery and genuine arms-length negotiation is

14   presumed fair."). This presumption applies fully to the Revised Settlement here, which was

15   negotiated at arm's-length with the help of an experienced mediator after months of intense,

16   adversarial litigation. (*See* Decl. of Hon. Edward Infante ISO Pls.' Mot. for Prelim. Approval of

17   the Proposed Class Settlement, Dkt. No. 178, ¶ 24.)

18          The timing of the settlement leaves no doubt but that the settlement is fully informed. As

19   noted above, the Parties litigated two motions to dismiss, with Plaintiffs amending their

20   Complaint in response to the first and prevailing in part on the second. (*See supra* § III.B.)

21   Furthermore, discovery was extensive, involving over 1,000 discovery requests, over 200,000

22   pages of documents, and 21 depositions (including of 7 experts), as well as discovery motion

23   practice. (*Id.*) Moreover, the Parties fully briefed the class certification issue, settling just days

24   ahead of the class certification hearing. (*Id.*) Thus, the Parties—represented by counsel with

25   ample experience litigating cases like this one—were well apprised of the strengths and

26   weaknesses of their respective cases when they reached a compromise.[7] (Declaration of Michael

27   _____

28   [7] *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) (fairness presumed
     where, among other things, "proponents of the settlement are experienced in similar litigation").

G. Rhodes ("Rhodes Decl."), filed herewith, ¶ 3.)

The active participation of Judge Infante (ret.), a neutral mediator with extensive experience presiding over and mediating complex litigation, further supports a finding of fairness. *See In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00 Civ. 6689, 2003 WL 22244676, at *4 (S.D.N.Y. Sept. 29, 2003) ("[T]he fact that the Settlement was reached after exhaustive arm's-length negotiations, with the assistance of a private mediator experienced in complex litigation, is further proof that it is fair and reasonable."); *Satchell v. Fed. Express Corp.*, Nos. C03-2659 SI, C03-2878 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive").

Nor is there any indication of collusion. (Infante Decl. ¶ 24.) Indeed, contrary to settlements the Ninth Circuit has rejected, the Revised Settlement does not contain a "reverter" agreement, a "clear sailing" provision, or an agreement by Facebook to pay fees disproportionate to the Class award. *See, e.g.*, *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (courts should look for "subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations").

In view of these facts, the presumption of fairness applies fully to the Revised Settlement.

### C.   The Settlement Has No Obvious Deficiencies and Is in the Range of Approval.

The Revised Settlement is also "within the range of possible approval" and has no "obvious deficiencies," as required for preliminary approval.

The Ninth's Circuit's recent decision in *McCall v. Facebook, Inc.*, --- F.3d ---, No. 10-16398 (9th Cir. Sept. 20, 2012), demonstrates why the Revised Settlement merits preliminary (and later, final) approval. In *McCall*, Users sued Facebook for allegedly violating their privacy rights with a new feature called "Beacon," which published certain information to the Users' Friends. The parties settled for $9.5 million, with $3 million allocated to costs and attorneys' fees and $6.5 million designated for a new nonprofit to educate users, companies, and regulators about online privacy and safety.

This Court granted preliminary approval and, later, finally approved the *McCall* settlement. That decision was recently affirmed by the Ninth Circuit, which explained:

> [T]he district court found that the settlement should be approved on the basis of the following: (1) reliance on novel legal theories and unclear factual issues undermined the strength of the plaintiffs' case; (2) the complex nature of the plaintiffs' claims increased the risk and expense of further litigation; (3) the class action could be decertified at any time, which "generally weighs in favor of approving a settlement"; (4) "[i]n light of [the] litigation risks and in the context of settlement claims involving infringement of consumers' privacy rights," the class's $9.5 million recovery was "substantial" and "directed toward a purpose closely related to Class Members' interests in this litigation"; (5) the parties had engaged in significant investigation and informal discovery and research, which in addition to information about Beacon that was already publicly known enabled the plaintiff class to "make an informed decision with respect to settlement . . . ; (6) the settlement was "only achieved after intense and protracted arm's-length negotiations conducted in good faith and free from collusion," and that class counsel had "reasonably concluded that the immediate benefits represented by the Settlement outweighed the possibility—perhaps remote—of obtaining a better result at trial."

*McCall*, slip op. at 11544. *McCall* strongly supports preliminary approval in this case, because each factor analyzed by this Court and cited approvingly by the Ninth Circuit is also present here.[8]

### 1. Plaintiffs had exceedingly low odds of obtaining a substantial recovery.

Plaintiffs' exceedingly low prospects of recovering on their § 3344 and UCL claims weigh heavily in favor of approval of the Revised Settlement. *See In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) (despite potential for large recovery, settlement is fair, adequate, and reasonable where plaintiffs' "odds of winning [are] extremely small" and strong defenses "may have adversely terminated the litigation before trial"); *W. Va. v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970) (plaintiff's confidence in claims "is often misplaced"), *abrogated on other grounds by Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005 (2d Cir. 1973).

Several of the obstacles Plaintiffs would have faced in litigation are explained below.

---

[8] The preliminary approval analysis is often guided by the Ninth Circuit's six-factor criteria for final approval. *See Harris v. U.S. Phys. Therapy, Inc.*, No. 2:10–cv–01508, 2012 WL 3277278, at *4 (D. Nev. July 18, 2012). These factors include: (1) "the strength of plaintiffs' case;" (2) "the risk, expense, complexity, and likely duration of further litigation;" (3) "the risk of maintaining class action status;" (4) "the amount offered in settlement;" (5) "the extent of discovery completed, and the stage of the proceedings;" and (6) "the experience and views of counsel[.]" *Officers for Justice*, 688 F.2d at 625.

### a.      Plaintiffs and putative Class Members could not prove injury.

Plaintiffs stood almost no chance of recovering because they could not prove that they were injured by Facebook's conduct, which is a required element of claims under § 3344 and the UCL, and a prerequisite for Article III standing. *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001) (§ 3344); *Animal Legal Def. Fund v. Mendes*, 160 Cal. App. 4th 136, 145 (2008) (UCL); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (Article III).  In particular, even after discovery, Plaintiffs could not prove that Class Members were injured when content they had voluntarily shared with their Facebook Friends ("John Doe Likes Nike" or "John Doe checked in at Starbucks") was shown again to the very same Friends.  *See Cohen v. Facebook, Inc.*, No. 10-5282 RS, 2011 WL 5117164, at *3 (N.D. Cal. Oct. 27, 2011) (plaintiffs' "names and likenesses were merely displayed on the pages of other users who were already plaintiffs' Facebook 'friends' and who would regularly see, or at least have access to, those names and likenesses in the ordinary course of using their Facebook accounts . . . , undercut[ting] any claim plaintiffs . . . were somehow harmed").  Indeed, discovery confirmed that none of the named Plaintiffs could point to any instance in which a Sponsored Story diminished the value of their name or likeness or in any way deprived them of an opportunity they otherwise would have had. (Brown Decl. ¶ 54.)  Instead, Plaintiffs were hoping to establish that they were harmed by showing how much, if at all, Facebook benefitted from the alleged misappropriation of Users' names and likenesses.  Plaintiffs' reliance on this legally untenable theory of injury—which irrationally assumes that Class Members were harmed because Facebook allegedly benefited— alone was sufficient to doom Plaintiffs' case.

In addition, Plaintiffs' theory of injury contradicted the facts.  While Plaintiffs contended that a few internal testing documents suggested Sponsored Stories performed better across the board than other advertisements (Brown Decl. Ex. KK, ¶¶ 8(n)-(o), (y)), Facebook analyzed actual Sponsored Stories run on the site and showed that they often earned Facebook *less revenue* than the ads that might have run in their place.  (Declaration of Randolph Bucklin, Dkt. No. 148 ("Bucklin Decl.") ¶¶ 9, 81-92.)  Moreover, Plaintiffs' own expert testified that a significant percentage of Users' "endorsements" generated no or even less revenue for Facebook

**FACEBOOK'S MPA ISO JT. MOT. FOR
PRELIM. APPROVAL OF REV. SETTLEMENT
CASE NO. CV 11-01726 RS**

1    than other ads, meaning that, under Plaintiffs' theory of injury, such Users would have no injury

2    and no claim.  (Brown Decl. Ex. W, at 134-35; Facebook Opp. to Pls' Mot. to Certify a Class,

3    Dkt. No. 141 ("Class Cert. Opp.") at 19-20.)[9]

4            b.      **Class Members consented to Sponsored Stories as a matter of law.**

5            (1)      **Users' express consent defeats their claims.**

6            Under § 3344, Plaintiffs had the burden of proving that they did not consent to the

7    challenged use of their names and likenesses.  *See*, *e.g.*, *Downing*, 265 F.3d at 1001; *Stewart v.*

8    *Rolling Stone LLC*, 181 Cal. App. 4th 664, 680 (2010).   The express agreements between

9    Facebook and putative Class Members preclude such a showing.

10           As early as 2007, three years *before* the launch of Sponsored Stories, Facebook's terms of

11   service ("Terms")—to which all Users agree when they sign up, and to which they reaffirm

12   consent every time they access the site[10]—authorized Facebook to "use" Users' "photos [and]

13   profiles (including your name, image, and likeness)" for "any purpose, commercial, advertising,

14   or otherwise . . . ."  (Yang Muller Decl., Ex. C at FB_FRA_00275.)  By 2009, the Terms

15   authorized Facebook to "use your name, likeness, and image for any purpose, including

16   commercial or advertising . . . ."  (*Id.*, Ex. E at FB-FRA_00329.)  Even more explicit were the

17   Terms in place at the launch of Sponsored Stories, which provided: "You can use your privacy

18   settings to limit how your name and profile picture may be associated with commercial,

19   sponsored, or related content (such as a brand you like) served or enhanced by us.  You give us

20   permission to use your name and profile picture in connection with that content, subject to the

21   limits you place."  (*Id.* ¶¶ 21-22.)

22           This unambiguous, express consent is fatal to any claim of misappropriation.

23

24   [9]  In its class certification opposition, Facebook argued that uninjured Users could not be
     identified without individualized inquiry across the approximately 123.9 million class members,
25   precluding class certification.   The Revised Settlement avoids these individualized issues by
     affording injunctive relief to all Class Members and possible direct monetary relief to those Class
26   Members who can attest under oath that they *believe* they were injured (without needing to prove
     that they were, in fact, injured).
27
     [10] (Yang Muller Decl. ISO Facebook's Opp. to Pls.' Mot. for Class Cert., Dkt. No. 147 ("Yang
28   Muller Decl.") ¶¶ 2, 13.)

**(2)   Users' implied consent is equally fatal to their claims.**

Under California law, which the Parties agree governs this dispute, consent can be "implied from [a plaintiff's] conduct and the circumstances of the case." *Jones v. Corbis Corp.*, 815 F. Supp. 2d 1108, 1113-14 (C.D. Cal. 2011) (plaintiff consented by posing for "red carpet" photos, knowing they could be used to solicit sales), *aff'd*, 2012 WL 2884790 (9th Cir. Jul 16, 2012); *see Newton v. Thomason*, 22 F.3d 1455, 1461 (9th Cir. 1994) (plaintiff consented by expressing "excitement" and "flatter[y]" over use of his name); *Greenstein v. Greif Co.*, No. B200962, 2009 WL 117368, at *9-10 (Cal. App. Jan. 20, 2009) (plaintiff consented where he knew  he was "being recorded as part of the reality television program" and "did not object").

Here, the record is replete with evidence that Class Members knew from using the site that their actions could be shown to their Facebook Friends in commercial contexts.  Since November 2007, Facebook has displayed User "Like" statements, along with User names and/or profile pictures, in *trillions* of Social Ads.  (Squires Decl. ¶ 13.)  Thus, countless millions of Users have seen their Friends' social actions (and names and/or profile pictures) paired with Ads.  Further, between January and August 2011 alone, U.S. Facebook Users saw over 115 billion Sponsored Stories featuring their Friends.  (Declaration of Christopher Plambeck ISO Joint Motion for Prelim. Approval of Rev. Settlement ("Plambeck Decl.") ¶ 6.)  Since then, Users have continued to see millions more Sponsored Stories per day.  These facts show that Class Members are and were clearly on notice that certain actions on the site—including Liking content and checking in—could lead to their appearance in Sponsored Stories.  (*See generally* Tucker Decl. ¶ 8.)

Despite this knowledge, Class Members continued to take actions that could lead to their appearance in Sponsored Stories.  Even well after the launch of Sponsored Stories, Users continued to click on 50 million Like buttons for Facebook pages *each day*.  (Tucker Decl. ISO Facebook's Opp. to Plaintiffs' Mot. For Class Cert., Dkt. No. 144 ("Tucker Decl.") ¶ 91.)  Many such Users Liked Pages by clicking the Like button *inside* a Sponsored Story featuring a Friend's name and profile picture (as of April 2012, some 300,000 unique U.S. Facebook Users did this *each day*).  (Plambeck Decl. ¶ 15; Tucker Decl. ¶ 48.)  Indeed, based on a sample of Users, after the launch of Sponsored Stories, roughly equal numbers of Users increased, decreased, and did

1   not change their Page-Liking rates, showing that Users did not change their behavior after

2   learning about Sponsored Stories.  (Bucklin Decl. ¶¶ 99-103.)

3       Similarly, millions of Class Members knew they could use their "privacy settings" to

4   control their appearance in Sponsored Stories, but failed to do so.  As of April 2012,

5   approximately 5 million Users had used their privacy controls to make a Page Like visible to

6   "Only Me," and Users "Unliked" Pages more than 1.3 million times in the second half of 2011.

7   (Plambeck Decl. ¶¶ 13, 14.)  Either of these actions prevents the associated content from

8   appearing in a Sponsored Story.  (Squires Decl. ¶¶ 12, 22-23.)  Users who knew of these options,

9   but failed to use them, consented to Sponsored Stories.[11]

10      The named Plaintiffs (as well as former named Plaintiff Angel Fraley) *continued to Like*

11  *Pages on Facebo*ok, even after filing this lawsuit and learning that such actions could lead to

12  *Sponsored Stories.*  (Brown Decl. ¶ 44.)  James Duval testified unequivocally that he has

13  "continued to click on the Like button knowing that [he] may . . . trigger a sponsored story in

14  which [his] name or profile picture would be displayed to [his] friends."  (*Id.* ¶ 45.)  Duval has

15  even Liked content to "spark" Sponsored Stories.  (*Id.* ¶ 46.)  Similarly, after learning about this

16  lawsuit, one putative Class Member remarked:  "Interesting.  I think *using your info is part of the*

17  *deal* - nothing is free, it's how they make money."  (*Id.*, Ex. O.)

18      These facts establish implied consent, as a matter of law, as to millions of Class Members,

19  s*ee Jones*, 815 F. Supp. 2d at 1113; *Newton*, 22 F.3d at 1461, precluding Plaintiffs from proving

20  the *absence of consent* on a classwide basis.[12]

21

22

23

---

24  [11]  Users have learned about Sponsored Stories in a variety of other ways, including from Facebook's online Help Center (Plambeck Decl. ¶ 10), its site-wide User-education campaign

25  (*see* Squires Decl. ¶ 25), and news articles (Brown Decl. Exs. X-EE).  Still others learned by visiting the Social Ads opt-out page, which was revised prior to the launch of Sponsored Stories

26  to clarify that the setting does not apply to Sponsored Stories.  (Squires Decl. ¶ 14.)

[12]  The prevalence of implied consent presented a nearly insurmountable obstacle to class

27  certification.  Absent individualized inquiries, there was no conceivable way for the Court to exclude Users from the class who impliedly consented to Sponsored Stories.  Thus, the Revised

28  Settlement provides relief to millions of User who could not have recovered otherwise.

**FACEBOOK'S MPA ISO JT. MOT. FOR PRELIM. APPROVAL OF REV. SETTLEMENT CASE NO. CV 11-01726 RS**

(3)     **COPPA preempts the parental consent requirement asserted by Plaintiffs.**

As to the Minor Subclass, Plaintiffs claim that Facebook was obligated to, but failed to, obtain the consent of the minor Class Members' parents.  But this ignores the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §§ 6501-08, which preempts state laws purporting to require websites to obtain parental consent to "collect" or "use" information from users 13 and older.  Indeed, as explained below, under the settled law of both express and conflict preemption, no state may require a website like Facebook to obtain parental consent for teenagers.[13]

(a)     **Express preemption.**

COPPA requires an "operator of a website or online service" to obtain parental consent before it "collects" or "*use[s]*" the "personal information"[14] of a "child," but *only* where the child is "under the age of 13."  15 U.S.C. §§ 6501(1), 6502(a), 6502(b)(1)(A)(ii) (emphasis added); 16 C.F.R. § 312.5(a).  Because COPPA expressly preempts state requirements that are "inconsistent with" this "treatment," 15 U.S.C. § 6502(d), it bars any claim by Plaintiffs or Class Members seeking to impose a parental consent requirements for minors over the age of 13.[15]

As initially proposed, COPPA would have required parental consent for the collection *or use* of personal information from minors older than 13.  (*See* Brown Decl. Ex. Q (S. 2326, 105th Cong. §§ 2(1), 3(a)(2)(A)(ii)-(iii)).)  But Congress rejected that proposal,[16] acceding to criticism

---

[13] Preemption comes in three forms: "(1) express preemption, where Congress explicitly defines the extent to which its enactments preempt state law; (2) field preemption, where state law attempts to regulate conduct in a field that Congress intended the federal law exclusively to occupy; and (3) conflict preemption, where it is impossible to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress."  *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1060 (9th Cir. 2009).

[14] Under COPPA, "personal information" means "individually identifiable information about an individual collected online," including "a first and last name," any information "collected and combined with" such an identifier.  15 U.S.C. § 6501(8).

[15] Facebook has briefed COPPA preemption extensively in the *C.M.D.* case, where plaintiffs have made identical arguments.  For a comprehensive discussion, see Facebook's Motion to Dismiss, Case No. 12-cv-01216, Dkt. No. 109, at 19-21, and Facebook's Reply in Support of Motion to Dismiss, *id.*, Dkt. No. 120, at 11-14.

[16] *See* Brown Decl. Ex. R, 144 Cong. Rec. S12787 (daily ed. Oct. 21, 1998) (statement of Sen. Bryan)).  *Compare* S. 2326, 105th Cong.  §§ 2(1) *and* 3(a)(2)(A)(ii)-(iii), *with* 15 U.S.C. §6501(1), 6502(a), *and* (b)(1)(A)(ii).  *See generally* Testimony of the FTC before Subcomm. on

that a parental consent requirement for teenagers would infringe their First Amendment rights.[17] At the same time, Congress fortified COPPA with an express preemption clause, thereby affirming that teenagers' Internet activities *should not be* subject to parental-consent requirements, whether under the auspices of state or federal law.

Accordingly, COPPA bars states from requiring an online operator, such as Facebook, to obtain parental consent for its collection *or use* of personal information from minor users 13 and older.  COPPA provides:

> No State or local government *may impose any liability for commercial activities* or actions by operators in interstate or foreign commerce in connection with an activity or action described in this title *that is inconsistent with the treatment of those activities or actions under this section.*

15 U.S.C. § 6502(d) (emphasis added); *see also* Children's Online Privacy Protection Rule, 76 Fed. Reg. 59804, 59805 (Sept. 27, 2011) (to be codified at 16 C.F.R. pt. 312) ("Although teens face particular privacy challenges online, COPPA's parental notice and consent approach is not designed to address such issues.").

Under the plain meaning of this provision, a state law is "inconsistent with the treatment of [the] activities or actions [described] under [COPPA]" if it imposes different standards of liability on COPPA-regulated activities, for example, by imposing liability under circumstances where COPPA does not.  *Gordon*, 575 F.3d at 1061-63 (plaintiffs' claims expressly preempted because "[i]t would be logically incongruous to conclude that Congress endeavored to erect a uniform standard but simultaneously left states . . . free to . . . create more burdensome

---

Consumer Prot., Prod. Safety, & Ins., July 15, 2010, at 14-15 (citations omitted) (Brown Decl. Ex. S) ("In the course of drafting COPPA, Congress looked closely at whether adolescents should be covered by the law, ultimately deciding to define a "child" as an individual under age 13.").

[17] *See* Brown Decl. Ex. T, COPPA:  Hr'g on S. 2326 Before the Commc'ns Subcomm. of the S. Comm. on Commc'ns, Sci. & Transp., 105th Cong. 46 (1998) (testimony of A. Sackler, Time Warner) ("[COPPA] should apply only to children under 13 years of age. . . . Models of parental consent or parental notification would chill teenagers' interest in commercial websites enormously, and should not be included in this legislation." (altered)); *id.* at 30 (testimony of D. Mulligan, Ctr. for Democ. & Tech.) ("As applied to teenagers [the bill]. . . ha[s] the potential to chill protected First Amendment activities and undermine rather than enhance teenagers['] privacy"); *id.* at 56 (testimony of Am. Library Ass'n) (COPPA "should not apply to minors over the age of 12" because "[t]eenagers have independent rights to free speech and privacy that would be severely compromised if parental notice were required each time they engaged in a transaction with a commercial website").

1    regulation"). Because Facebook forbids children under age 13 from using its site, any purported

2    parental consent requirement under state law would target *the very group of minors* whom

3    Congress determined should not be required to obtain parental consent. This application of a

4    state law would be flatly "inconsistent with the treatment" of teenagers' Internet use prescribed

5    by COPPA, and is, therefore, preempted. *See* 15 U.S.C. § 6502(d).

6         Applying COPPA's express preemption clause, a California court recently dismissed a

7    class action premised on the same parental consent requirement urged by Plaintiffs here. In

8    *David Cohen v. Facebook*, No. BC 444482 (L.A. Super. Ct.), plaintiffs sued under Civil Code

9    § 3344 and the California Constitution for Facebook's alleged failure to obtain parental consent

10   for displaying the minors' names and likenesses in alleged advertisements, just as Plaintiffs did

11   here. (Brown Decl. Ex. U (*David Cohen* FMCAC) ¶¶ 39-48.) In September 2011, Judge

12   Weintraub sustained Facebook's demurrer, ruling that "Plaintiffs' claims based on state law for

13   Facebook's alleged failure to obtain the parental consent of users aged 13 to 17 to the commercial

14   use of their name and likeness is preempted by [COPPA]." (Brown Decl. Ex. V.)

15        Here, too, Plaintiffs allege under state law that Facebook must obtain parental consent for

16   its minor Users, contrary to COPPA's express command. Like the claims of the *David Cohen*

17   plaintiffs, these claims are expressly preempted and should be rejected.

18                              **(b) Conflict preemption.**

19        Any attempt to impose a parental consent requirement likewise would fail under a conflict

20   preemption analysis, under which a state law must yield where it "stands as an obstacle to the

21   accomplishment and execution of the full purposes and objectives of Congress." *AT&T Mobility*

22   *LLC v. Concepcion*, 131 S. Ct. 1740, 1753 (2011) (internal quotations and citation omitted). As

23   shown above, a significant objective of COPPA was to preserve the First Amendment rights of

24   teenage Internet users by exempting them from COPPA's parental consent requirement. A state

25   law purporting to require teenage users to obtain parental consent conflicts with these objectives,

26   and fails under the established law of conflict preemption. *See Geier v. Am. Honda Motor Co.*,

27   529 U.S. 861, 881-82 (2000) (preempting state law imposing liability for conduct that was lawful

28   under federal law); *Franklin Nat'l Bank v. New York*, 347 U.S. 373, 377-79 (1954) (same).

The Supreme Court's recent decision in *Arizona v. United States*, 132 S. Ct. 2492 (2012), confirms this analysis. There, the Court concluded that Arizona's decision to criminalize undocumented workers was preempted by federal law. Arizona argued that, because the relevant federal statute did not, by its terms, address the criminal status of undocumented workers, and because the state's objective was consistent with the purposes of federal law, its enactment was consistent with federal law. The Court disagreed, emphasizing that Congress had considered and rejected proposals akin to Arizona's to impose criminal penalties on undocumented employees, but had instead decided to impose criminal penalties only on employers. *See id.* at 2531. By embracing a more extreme proposal that Congress had considered and rejected, the Court ruled, Arizona's approach "would interfere with the careful balance struck by Congress" and stood as an "obstacle to the regulatory system Congress chose." *See id.* at 2505.

So too here. As discussed above, in enacting COPPA, Congress carefully considered a parental consent requirement for the collection and use of personal information of minors age 13 and older. (Brown Decl. Ex. Q (S. 2326, 105th Cong. § 3(a)(2)(A)(ii)-(iii)).) Just as in *Arizona*, Congress rejected that proposal—primarily for First Amendment reasons—making a considered judgment that parental consent should be required only for minors under age 13. Requiring parental consent here "would interfere with the careful balance struck by Congress," thereby impeding "the regulatory system Congress chose." *See Arizona*, 132 S. Ct. at 2505; *see also Backpage.com, LLC v. McKenna*, No. C12-954-RSM, 2012 WL 3064543, at *10 (W.D. Wash. July 27, 2012) (preliminarily enjoining enforcement of Washington law that purported to "drastically shift[] the unique balance that Congress created").

\*   \*   \*

In view of COPPA's broad preemptive effect—as dictated by established principles of both express and conflict preemption—no state law can require parental consent to collect and use information from teenage users. The Minor Subclass cannot prevail on claims premised on a lack of parental consent and, accordingly, Facebook's consent arguments described above apply equally to minors.

**(4)    Even if Facebook were required to establish parental consent, it could do so for millions of minor Users.**

Even if Facebook were required to obtain parental consent for its minor Users, Plaintiffs still could not prove an absence of consent for the Minor Subclass.  For example, named Plaintiff W.T. not only had his father's permission to register for Facebook, but did so while *sitting with his father*, and *they reviewed the Terms together*.  (Brown Decl. ¶¶ 47-48.)  Mr. Tait could not even recall whether he or W.T. clicked "Sign Up," which signals agreement to Facebook's Terms.  (*Id.* ¶ 48 (Mr. Tait testified, ". . . *I think* he was the one who was doing the typing, but I was sitting right with him." (emphasis added)).)  Mr. Tait also registered for his own Facebook account to monitor W.T.'s activity on the site.  (*Id.* ¶ 49.)  These facts establish Mr. Tait's express and implied consent, as a matter of law, to his son's use of Facebook according to its Terms, including the language permitting his son's appearance in Sponsored Stories.

Facebook also adduced compelling evidence that millions of other parents impliedly consent to Sponsored Stories.  For example, as of December 27, 2011, over six million teenage Users—almost one in three members of the Minor Subclass—were Facebook Friends with at least one of their parents.  (Plambeck Decl. ¶¶ 7, 11.)  In addition, millions of parents supervise their children's Facebook use, some have access to their children's passwords, and most helped their children create their accounts.[18]  Many parents who know that their children are using Facebook would have actual (or constructive) notice of the terms governing that use, including the term permitting Facebook to use the minor's name and profile picture in commercial or sponsored content.  Moreover, many such parents—through their own use of Facebook or otherwise—were undoubtedly aware that their minor children either had or could appear in Sponsored Stories, yet took no measures to prevent that from happening (such as through privacy settings, closing their accounts, etc.).  In both respects, parents impliedly consented to the conduct challenged in this

---

[18] Brown Decl. Ex. FF, at 3 (study found that 72 percent of parents monitor their teens' social networking accounts); Brown Decl. Ex. GG (recent study found that 92% of parents surveyed were Facebook friends with their children and 72% have access to their children's passwords); Brown Decl. Ex. HH, at 11 (recent study found that 64% of parents who knew when their child created his or her Facebook account had helped the child create the account).)

1  case. Thus, even if COPPA could be set aside, millions of minors could not carry their burden to

2  show a lack of parental consent.

3  **c.    Plaintiffs could not prevail for numerous additional reasons.**

4  *Proof of Use of Name or Likeness*.  Many Class Members' claims would also fail

5  because their User name on Facebook is neither their actual name nor a pseudonym "widely

6  known to the public as closely identified with the plaintiff," as required under § 3344.  *Abdul-*

7  *Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 416 (9th Cir. 1996) (whether plaintiff's birth name,

8  Lew Alcindor, "'equals' Kareem Abdul-Jabbar . . . is a question for the jury").  Facebook

9  established through discovery that this practice is prevalent; indeed, two of the five original

10  named Plaintiffs used fictitious names, and one had scores of Facebook Friends using entirely

11  fanciful names like "DanceHer IsLove," "Endearment LadyDear," and "Nu KlezmerArmy."

12  (Brown Decl. Ex. P.)

13  Many more could not recover because they did not use photographs from which "one

14  who views the photograph with the naked eye can reasonably determine that the person depicted

15  in the photograph is the same person who is complaining of its unauthorized use."  Cal. Civ.

16  Code § 3344(b)(1); *see Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998).

17  Facebook Users are not required to upload a profile picture at all, much less a picture that bears

18  their likeness.  (Squires Decl. ¶¶ 2-3.)  Each of the named Plaintiffs has admitted that many of

19  their Facebook Friends would not recognize certain of their profile pictures as depicting them.

20  (Brown Decl. ¶¶ 50-52.)  One of the named Plaintiffs used profile pictures depicting, at various

21  times, the Oakland skyline and a cartoon of a kimono-clad ninja.  (*Id.* ¶ 51.)  Facebook also

22  showed, for instance, that many of Angel Fraley's Friends used profile pictures that Fraley did

23  not recognize and could not link to any particular Friend.  (*Id.* ¶ 52.)

24  *Public Interest Exception of § 3344(d).*  Many, if not all, claims will fail because § 3344

25  exempts from liability the use of a person's name or photograph "in connection with any news,

26  public affairs, or sports broadcast or account, or any political campaign . . . ."  Cal. Civ. Code

27  § 3344(d); *Baugh v. CBS, Inc.*, 828 F. Supp. 745, 754 (N.D. Cal. 1993) ("the fact that [the

28  challenged use] generates advertising revenue does not prevent [a defendant] from claiming"

1    immunity under § 3344(d)).  Millions of Sponsored Stories relate to one of these protected

2    subjects, including Stories run by CNN (e.g., "John Smith: Here's a link to a great analysis of the

3    gun control debate"), Michele Bachmann (e.g., "Jane Doe likes Michele Bachman"), Ron Paul,

4    the Democratic Party, and the Catholic Advocate.  (Squires Decl. ¶¶ 11, 20; Tucker Decl. ¶¶ 65-

5    67); *see Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 414 (2001) (depiction of

6    baseball players in materials promoting *baseball* excepted under § 3344(d)).  Plaintiffs admitted

7    as much at the class certification stage, where they "concede[d] that 'political' ads may be

8    excepted from the Class."  (Class Cert. Reply at 13.)

9        ***First Amendment***.  Facebook's display of Sponsored Stories is also protected by the First

10   Amendment, and many Sponsored Stories—including those about religion, politics, and public

11   affairs—are entitled to the highest degree of Constitutional protection.  *See Miller v. California*,

12   413 U.S. 15, 34-35 (1973) (First Amendment facilitates "unfettered interchange of ideas for the

13   bringing about of political and social changes desired by the people" (internal quotations and

14   citations omitted)).   Moreover, the First Amendment protects even commercially oriented

15   Sponsored Stories, many of which result from User "Likes" or shares that facilitate self-

16   expression.  *See Lowe v. S.E.C.*, 472 U.S. 181, 210 n.57 (1985) ("[W]e have squarely held that

17   the expression of opinion about a commercial product such as a loudspeaker is protected by the

18   First Amendment." (citation omitted)).  This is particularly true for minors.  (*See* Tucker Decl.

19   ¶ 53 (minors often cite "self-expression" as a reason for using the Facebook "Like" button); *see*

20   *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2735 (2011) (recognizing minors' First

21   Amendment rights).  Here, because the expressive modes of sharing that can lead to a Sponsored

22   Story are "inextricably intertwined" with any "commercial aspects," Facebook's redisplay of

23   these stories are treated as "fully protected expression."  *Riley v. Nat'l Fed'n of the Blind of N.C.*,

24   487 U.S. 781, 796 (1988); *accord Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1185 (9th

25   Cir. 2001).

26       ***Communications Decency Act ("CDA") § 230.***  Because Plaintiffs' claims arise

27   exclusively from Facebook's republication of content generated by Users—namely, Users' Likes

28   and other actions they decided to share on Facebook—Sponsored Stories are immune from

27.

1   liability under § 230 of the CDA. *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123

2   (9th Cir. 2003) (applying § 230 to affirm dismissal of right-of-publicity claim, citing § 230's

3   grant of "broad immunity [to websites that] publish[] content provided primarily by third

4   parties"). Although Plaintiffs' complaint alleged that Facebook itself created the content in

5   Sponsored Stories (SAC ¶¶ 57-59), discovery has disproved this claim. Facebook does not

6   contribute to the *substance* of the User's Like or action, but instead offers neutral tools such as

7   the Like button through which Users may share their support and affiliation with companies,

8   organizations, causes, and more. *See, e.g.*, *Carafano*, 339 F.3d at 1125 (defendant immune

9   where the information about which plaintiff complained was "transmitted unaltered to profile

10  viewers"); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009) ("[A] website

11  operator does not become liable as an 'information content provider' . . . when it merely provides

12  third parties with neutral tools to create web content . . . .").[19]

13      ***UCL Claim.*** Plaintiffs also did not have viable claims under the UCL. Although

14  Plaintiffs originally alleged that the Terms misled Users regarding their ability to opt out of

15  Sponsored Stories (*see* SAC ¶¶ 32-33), Plaintiffs conceded that they did not detrimentally rely on

16  these terms as required to establish "fraud" under the UCL. *See, e.g.*, *Mazza v. Am. Honda

17  Motor Co.*, 666 F.3d 581, 591 (9th Cir. 2012) (UCL "requires named class plaintiffs to

18  demonstrate reliance"). To the contrary, the named Plaintiffs expressly disclaimed having read

19  (or could not recall reading) the Terms that allegedly misled them. (*See* Brown Decl. ¶ 53.)

20  Plaintiffs also could not prevail under the UCL's "unlawful" prong because, as discussed above,

21  they cannot prove that Sponsored Stories violate § 3344 or any other law. Nor do Plaintiffs have

22  a claim under the UCL's "unfair" prong because Facebook's Users—including some of the

23  named Plaintiffs—Like companies and causes specifically to share that content with friends and

24  family, and they necessarily benefited when their Likes were rebroadcast, including in Sponsored

---

25  [19] Nor does it matter that Facebook republishes Users' Likes and other actions in a sponsored

26  context, as the decision to publish or "post" content is at the heart of CDA immunity. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009) (§ 230 "shields from liability *all publication decisions*, whether to edit, to remove, *or to post*, with respect to *content generated entirely by*

27  *third parties*." (emphasis added)); *Levitt v. Yelp! Inc.*, Nos. C-10-1321, C-10-2351, 2011 WL 5079526, at *6 (N.D. Cal. Oct. 26, 2011) ("traditional editorial functions" immunized by § 230

28  "include subjective judgments informed by political and financial considerations").

1    Stories, to the same audience.  *See, e.g.*, *S. Bay Chevrolet v. GMAC*, 72 Cal. App. 4th 861, 886-

2    87 (1999) ("unfair" claim entails "examination of [the conduct's] impact on its alleged victim,

3    balanced against the reasons, justifications and motives of the alleged wrongdoer" (internal

4    quotations and citations omitted)).  Several Plaintiffs even admitted that when they Liked certain

5    content, they wanted their Like to be shared as widely as possible.  (Brown Decl. ¶¶ 55.)

6                                    *        *        *

7           The serious risk that many or all of Plaintiffs' and Class Members' claims would have

8    fallen to one or more of these substantial defenses provides ample justification for Plaintiffs'

9    counsel's informed and considered decision to settle.   In light of these risks, the Parties'

10   agreement—calling for Facebook to pay $20 million, to make substantial, wide-ranging changes

11   to its website, and to develop new tools and practices to give Class Members vastly more control

12   and information regarding Sponsored Stories than the law requires—represents an eminently fair

13   remedy for the perceived wrongs that Plaintiffs sought to redress in this action.

14          **2.       Absent a settlement, it may be years before the Class recovers, if at all.**

15          The Parties' calculated decision to avoid the expenses and delays of further litigation also

16   supports preliminary approval.  Prior to reaching judgment, the Parties would have to litigate, at

17   least: (i) the vigorously contested class certification motion, (ii) summary judgment, (iii) a trial on

18   the merits, and (iv) post-trial issues, including the constitutionality of aggregating statutory

19   penalties in the class action context.  In addition, appellate proceedings were highly likely given

20   the many issues of first impression raised by this case, including (i) the measure of injury and

21   damages for non-celebrity plaintiffs asserting claims under § 3344 relating to the republication of

22   their activity in social media, (ii) the extent to which republication of User-generated actions in

23   social media is protected by CDA § 230, (iii) the scope of the public interest exemption under

24   § 3344(d), (iv) the scope of First Amendment protection for republication of User-generated

25   expression in social media in a commercial context, and (iv) the extent to which classwide relief

26   under § 3344 would violate the intent of the California Legislature, the Rules Enabling Act,

27   and/or the Due Process Clause.  In short, absent a settlement, it would likely be years before the

28   Class obtained any relief, and it likely would recover nothing.

As recognized in *Perez v. Asurion Corp.*, avoiding future contentious litigation and the risk and delay that litigation entails favors settlement:

> If this case were tried, the Plaintiffs would incur significant trial expenses. Experts in [liability issues] and damages calculations might all have been necessary . . . . As previously mentioned, the case would not conclude at trial, but would continue with appellate proceedings. With the uncertainties inherent in pursuing trial and appeal of this case, combined with the delays and complexities presented by the nature of the case, the benefits of a settlement are clear. . . . Absent a settlement, Defendants would have defended these three lawsuits vigorously, with potential success and no recovery of any kind for Plaintiffs.

501 F. Supp. 2d 1360, 1381 (S.D. Fla. 2007); *see also Officers for Justice*, 688 F.2d at 629 (approving settlement where "many years may be consumed by trial(s) and appeal(s) before the dust finally settles" because "any benefits above those provided by the [proposed settlement] would likely be substantially diluted by the delay inherent in acquiring them"); *Riker v. Gibbons*, No. 3:08-cv-00115-LRH-VPC, 2010 WL 4366012, at *4 (D. Nev. Oct. 28, 2010) ("In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." (citation omitted)); *White v. Experian Info. Solutions, Inc.*, 803 F. Supp. 2d 1086, 1095 (C.D. Cal. 2011) (preliminarily approving settlement in case "largely present[ing] questions of first impression").

### 3. The relief in the Revised Settlement is fair, reasonable, and adequate.

As the Ninth Circuit recently reaffirmed in *McCall*, the district court "must evaluate the fairness of a settlement as a whole, rather than assessing its individual components." *McCall*, slip op. at 11542. In its Order, the Court asked the Parties to justify the amount of the monetary relief and to "show that the *cy pres* payment represents a reasonable settlement of past damages claims, and that it was not merely plucked from thin air . . . ." (Order at 4-5.) As explained below, the Revised Settlement's $20 million monetary payment,[20] together with its broad-ranging injunctive relief provisions, are amply justified given the amount Plaintiffs might have realistically recovered and the significant risk that they may not have recovered at all.

---

[20] This includes the costs of class notice. *See Staton v. Boeing*, 327 F.3d 938, 974 (9th Cir. 2003).

a.   **The monetary relief component is appropriate in light of the strength of the claims, and the risks of continued litigation.**

The $20 million Settlement Fund is more than sufficient consideration for the release of Class Members' claims under either measure sought by Plaintiffs under § 3344: (1) Facebook's profits "attributable to" the misappropriation, which would have allowed only a modest recovery; and (2) statutory damages, which would not have been recoverable classwide, and may not have been recoverable for more than a handful of Class Members. *See* § 3344(a).

As to the first measure of damages, Facebook earned approximately $233 million in revenues between January 2011 and August 2012 from Sponsored Stories delivered in the United States that featured a User's name or profile picture.  (Plambeck Decl. ¶ 9.)  To determine Facebook's *profits* from the alleged misappropriation, that figure must be reduced for (1) Facebook's costs and (2) the portion attributable to the alleged misappropriation.   As disclosed in Facebook's public filings, running the site costs upwards of $2 billion a year, and Facebook's profit margins are approximately 50%.  (Brown Decl., Ex. JJ, at 10-11.)  Plaintiffs estimated the incremental value of Users' "endorsements" as either: (1) 50% of the revenue earned from Sponsored Stories, purportedly based on internal Facebook documents; or (2) 75% of the revenue from Sponsored Stories, based on a comparison of the "effectiveness" of Sponsored Stories to that of other advertisements (measured by click rates).  Even using those estimates— which Facebook does not endorse or accept—Facebook's profits attributable to the alleged misappropriation are $74 million,[21] or approximately ***$0.60 per Class Member*** on average. (Facebook's records indicate that approximately 123,868,976 Users in the U.S. appeared in Sponsored Stories during that time period.)[22]

Importantly, this $74 million figure represents *Plaintiffs' view* of the profit attributable to the alleged misappropriation.  If the action were litigated, Facebook would demonstrate that User

---

[21] Calculated as: ($233,792,612 in revenues) * (50% profit margin) * ((50% + 75%)/2) Plaintiffs' estimate of the percentage of Facebook's revenues attributable to the misappropriation).

[22] (Plambeck Decl. ¶ 7.)  This is the predicted size of the Class, which the Court requested in the Order.  (Order at 3 n.3.)  Of these, approximately 19,761,991 of these Users appeared in Sponsored Stories while under the age of 18 (according to age information provided by the Class Members).  (Plambeck Decl. ¶ 7.)

harm must be measured by quantifying actual injury to Users, separate and apart from any benefit to Facebook. Facebook would also show that Plaintiffs' methodologies are irredeemably flawed and that the $74 million figure is *grossly* overstated, in that Facebook frequently did not generate additional profits by running a Sponsored Story instead of a substitute advertisement, as confirmed by Facebook's expert. (Bucklin Decl. ¶¶ 9, 81-92.)[23]

However, even using Plaintiffs' estimates of the profit attributable to the alleged misappropriation, a settlement for 10% of Facebook's potential liability—$7.4 million—would be fair and reasonable in light of the substantial costs and risks associated with continued litigation.

In providing a $20 million net payment, the Revised Settlement also accounts for the possibility—although exceedingly remote—that Plaintiffs might have recovered statutory damages. A number of factors would have precluded a large statutory damages award in this case. First, the Court expressly cautioned Plaintiffs that, "at summary judgment or at trial, [they] may not simply demand $750 in statutory damages in reliance on a bare allegation that their commercial endorsement has provable value, but rather *must prove actual damages* like any other plaintiff whose name has commercial value." (MTD Order at 29 (internal citations, emphasis added and quotation marks omitted).) This requirement would have barred the vast majority of Class Members from recovering statutory damages. Importantly, Plaintiffs did not allege that they had emotional distress damages on which a statutory damage claim could be based, and such damages would be utterly impossible to prove for over 123,868,976 Class Members, even if the trial lasted for decades.

Further, even for Class Members who could theoretically prove "actual damages" at trial, due process would preclude the aggregation of $750 statutory penalty awards across even a tiny fraction of the putative Class. *See Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003) ("aggregation in a class action of large numbers of statutory damages claims

---

[23] Facebook considers Sponsored Stories to be better for Users, less disruptive to the website, and far more consistent with the essential purpose of Facebook, which is to provide a place for Users to see what their Friends are interested in and up to. For these reasons, Facebook often chooses to display Sponsored Stories even when its internal systems do not predict them to be the short-term revenue-maximizing advertising option.

1   potentially distorts the purpose of both statutory damages and class actions" with the result "the

2   due process clause might be invoked" so as to "reduce the aggregate damage award" (citing *State*

3   *Farm Mut. Auto. Ins. Co. v. Campbell*, 558 U.S. 408, 416 (2003))); *White*, 803 F. Supp. 2d at

4   1097-98 ("Settling Plaintiffs, however, certainly were entitled to consider the risk that any large,

5   cumulative statutory damages award obtained at trial ultimately might have been reduced by the

6   trial or appellate courts."). For these reasons, Plaintiffs had an extraordinarily remote chance of

7   obtaining a judgment awarding statutory damages on a classwide basis.

8       The recent decision in *McCall* is, again, highly instructive on this point. In *McCall*, an

9   objector challenged the settlement for affording too little relief to the class given that many class

10  members sought statutory damages against Facebook. The Ninth Circuit made clear that the

11  theoretical possibility of statutory damages ($2,500 per class member in *McCall*) does not require

12  substantial, *or even any*, monetary relief in a settlement. The Ninth Circuit explained:

13          As an initial matter, we reject Objectors' argument insofar as it
            stands for the proposition that the district court was required to find
14          a specific monetary value corresponding to each of the plaintiff
            class's statutory claims and compare the value of those claims to
15          the proffered settlement award. While a district court must of
            course assess the plaintiffs' claims in determining the strength of
16          their case relative to the risks of continued litigation, *see Hanlon*,
            150 F.3d at 1026, it need not include in its approval order a specific
17          finding of fact as to the potential recovery for each of the plaintiffs'
            causes of action. Not only would such a requirement be onerous, it
18          would often be impossible—statutory or liquidated damages aside,
            the amount of damages a given plaintiff (or class of plaintiffs) has
19          suffered is a question of fact that must be proved at trial. Even as to
            statutory damages, questions of fact pertaining to which class
20          members have claims under the various causes of action would
            affect the amount of recovery at trial, thus making any prediction
21          about that recovery speculative and contingent.

22  *McCall*, slip op. at 11549. Here too, it would be speculative or impossible for this Court to

23  resolve whether any class members would obtain statutory damages, and, if so, how many. In

24  light of the substantial relief afforded by the settlement, and the significant risks that litigation

25  would yield no relief for the class, the settlement is fair, reasonable, and adequate.

26      For these reasons, a settlement discounting Plaintiffs' maximum recovery to $20 million is

27  entirely appropriate and well within the range of acceptable, and previously approved, discounts.

28

1    *See, e.g.*, *Parker v. Time Warner Entm't Co.*, *L.P.*, 631 F. Supp. 2d 242, 261-62 (E.D.N.Y. 2009)

2    ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a

3    hundredth or even a thousandth part of a single percent of the potential recovery." (internal

4    quotations and citation omitted)); *Fisher Bros. v. Cambridge-Lee Indus., Inc.*, 630 F. Supp. 482

5    (E.D. Pa. 1985) (approving settlement that awarded class less than 1% of maximum recovery).

6    Indeed, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential

7    recovery will not per se render the settlement inadequate or unfair.  This is particularly true . . .

8    where monetary relief is but one form of the relief requested by the plaintiffs."  *Officers for*

9    *Justice*, 688 F.2d at 628 (citation omitted); *see In re Gen. Instr. Sec. Litig.*, 209 F. Supp. 2d 423,

10   431 (E.D. Pa. 2001) (settlement for "relatively small percentage of the most optimistic estimate

11   does not, in itself, weigh against the settlement: rather, the percentage should be considered in

12   light of the strength of the claims" (internal quotations, citation and alteration omitted)).

13        The Parties' decision to use a claims process is also fair and reasonable, as are their

14   chosen criteria for making claims.  Because consent and injury are prerequisites to recovering

15   under § 3344, it is entirely appropriate to limit monetary recovery to Users who attest that (1)

16   they were not aware their social actions could lead to their appearance in Sponsored Stories

17   (addressing implied consent); and (2) they believe they were harmed (addressing injury).  *See In*

18   *re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 461 (9th Cir. 2000) (affirming settlement approval,

19   though "it [left] a large portion of the class without a recovery," deferring to the district court's

20   discretion to "to determine the method of calculating damages").  Moreover, as this Court has

21   noted, a settlement need not provide financial compensation to every member of the class because

22   "[s]ettlement is a *compromise*, which balances the possible recovery against the risks inherent in

23   litigating further."  *In re TD Ameritrade Account Holder Litig.*, Nos. C 07-2852, C 07-4903, 2011

24   WL 4079226, at *9 (N.D. Cal. Sept. 13, 2011).

25        Nor is the settlement unfair because the claims could, in theory, exhaust the Net

26   Settlement Fund.  *See, e.g.*, *O'Brien v. Brain Research Labs, LLC*, Civ. A. No. 12–204, 2012

27   WL 3242365, at *2-4 (D.N.J. Aug. 9, 2012) (approving $500,000 fund from which 270,000 class

28   members could claim $20 cash or a coupon); *In re Heartland Payment Sys., Inc. Customer Data*

1    *Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1067 (S.D. Tex. 2012) (approving $1.65 million fund

2    for claims of up to 100 million class members).

3        Moreover, in addition to the fairness of the aggregate Settlement amount, the Parties

4    reasonably agreed upon the presumptive maximum recovery ($10 per Authorized Claimant,

5    subject to discretionary increase by the Court, if claims do not exhaust the Net Settlement Fund),

6    as well as the minimum recovery per Authorized Claimant below which the Court will have

7    discretion to divert the Net Settlement Fund to *cy pres* ($5).  The $5 to $10 range represents an

8    award that is, according to Plaintiffs' methodology, 8 to 17 times Facebook's average profit per

9    Class Member attributable to the alleged misappropriation (about $0.60).  In practical terms, the

10   Authorized Claimants who receive these payments are receiving a windfall.  They voluntarily

11   signed up to use a free social-networking site and had some content they shared with their Friends

12   shared again with those very same Friends.  They paid Facebook no money at all and suffered no

13   actual economic damages (much less injury), yet they are being paid an amount that far exceeds

14   any profit Facebook allegedly earned by using their names and likenesses.

15       Finally, the Parties have additionally agreed that, if the number of Authorized Claimants is

16   too great to allow for at least a $5 payment each, the Court will have discretion to order the Net

17   Settlement Fund to be paid to the *Cy Pres* Recipients.  Because, as explained below, a *cy pres*-

18   only settlement would also be appropriate in this action, this approach ensures that the Net

19   Settlement Fund will be distributed in the manner most beneficial to the Class.

20       The reasonableness of these amounts, as well as the process by which the Parties selected

21   the amounts, further supports the fairness and reasonableness of the Settlement.

22                **b.      The *cy pres* distribution will be appropriate, if it occurs.**

23       In the August 17 Order the Court asked: "Can a *cy pres*-only settlement be justified on the

24   basis that the class size is simply too large for direct monetary relief?  Or, notwithstanding the

25   strong policy favoring settlements, are some class actions simply too big to settle?"  (Order at 3.)

26   Under the governing law, the answer to the Court's first question clearly is "yes."  As to the

27   Court's second question, this case unquestionably can be—and has been—settled on terms that

28   are fair, reasonable, and adequate under established law.  Therefore, the Court need not decide

1  whether a classwide settlement might be unworkable on different facts.

2       As the Ninth Circuit recently affirmed, "[t]he district court's review of a class-action

3  settlement that calls for a *cy pres* remedy is not substantively different from that of any other

4  class-action settlement except that . . . the *cy pres* remedy [must] 'account for the nature of the

5  plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class

6  members . . . .'" *McCall*, slip op. at 11543 (citation omitted) (approving $6.5 million *cy pres*-

7  only settlement as to class of 3.6 million).  District courts in this Circuit have approved *cy pres*-

8  only monetary distributions where the risk-adjusted recovery per class member was too low to

9  justify the administrative expenses required to make individual payments.  *See, e.g.*, *McCall*, slip

10  op. at 11543; *In re Google Buzz Privacy Litig.*, No. C 10-00672 JW, 2011 WL 7460099, at *1, *4

11  (N.D. Cal. June 2, 2011) (approving *cy pres*-only settlement fund); *Catala v. Resurgent Capital*

12  *Servs. L.P.*, Civ. No. 08cv2401 NLS, 2010 WL 2524158, at *4 (S.D. Cal. June 22, 2010)

13  ("recovery of approximately 13 cents per class member would make distribution to [195,561]

14  class members impracticable because of the burden and expense of distribution").  And, as this

15  Court has recognized, "distribution of monetary relief in the form of *cy pres* payments may be

16  appropriate where 'the proof of individual claims would be burdensome or distribution of

17  damages costly.'"  (Order at 2); *see McCall*, slip op. at 11543.[24]

18       The Revised Settlement hews closely to these principles.  Here, the Settlement Fund will

19  be converted to a *cy pres*-only[25] distribution *only if*, due to the number of claims, distribution to

---

20  [24] Courts in other Circuits are in accord.  *See, e.g.*, *In re Pharm. Indus. Average Wholesale Price*

21  *Litig.*, 588 F.3d 24, 34 (1st Cir. 2009) ("[d]istribution of all funds to the class can be infeasible, for example, . . . when class members' individual damages—although substantial in the aggregate—are too small to justify the expense of sending recovery to individuals"); *Nienaber v.*

22  *Citibank (South Dakota) N.A.*, No. Civ. 04-4054, 2007 WL 752297, at *3 (D.S.D. Mar. 7, 2007) (approving settlement providing $300,000 *cy pres* payment to charities); *Boyle v. Giral*, 820 A.2d

23  561, 569 (D.C. Cir. 2003) (*cy pres* appropriate where net monetary relief was "approximately $1" per person); *Francisco v. Numismatic Guar. Corp.*, No. 06-61677-CIV, 2008 WL 649124, at *3,

24  *9 (S.D. Fla. Jan. 31, 2008) ("The *cy pres* resolution . . . is particularly appropriate given the relatively small amount of damages the Class Members are likely to be able to establish[.]");

25  *Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C.*, No. CV-04-2195 (CPS), 2006 WL 3681138, at *7 (E.D.N.Y. Dec. 11, 2006) (approving *cy pres* of $15,000 as to class of 45,000).

26  [25] A partial distribution of the Net Settlement fund to *cy pres* recipients could occur if claims <u>do</u>

27  <u>not</u> exceed the Net Settlement Fund, and the Court determines not to distribute the excess funds *pro rata* to Authorized Claimants.  This is a well-accepted method for distributing unclaimed

28  settlement funds.  *See Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011).

1    Authorized Claimants would be economically infeasible, or each Authorized Claimant would

2    receive less than $5 and the Court believes that the payment of the Net Settlement Fund to the *Cy*

3    *Pres* Recipients would provide greater benefit to the Class than would direct payments, taking

4    into account the administrative costs of making payments.  (*See* R.A. § 2.3(a).)  As such, a *cy*

5    *pres* settlement will occur only if the potential amounts recoverable to individual Class Members,

6    "although substantial in the aggregate[,] are too small to justify the expense of sending recovery

7    to individuals."  *Pharm. Indus. Average*, 588 F.3d at 34; *see Nachshin*, 663 F.3d at 1036; *see*

8    Order at 2 ("[I]t would be impractical to the point of meaninglessness to attempt to distribute the

9    proposed $10 million in monetary relief among the members of a class that may include upwards

10   of 70 million individuals.").  Thus, if a *cy pres* distribution occurs, it will be fully consonant with

11   the principles governing *cy pres* distributions.

12                    **c.        The proposed *Cy Pres* Recipients are appropriate.**[26]

13          The proposed *Cy Pres* Recipients also meet the standards for preliminary approval.  As

14   the Ninth Circuit recently reaffirmed, there must be "a driving nexus between the plaintiff class

15   and the *cy pres* beneficiaries."  *Dennis v. Kellogg Co.*, --- F.3d ---, Nos. 11-55674, 11-55706,

16   2012 WL 3800230, at *5 (9th Cir. Sept. 4, 2012) (internal quotations and citation omitted).  Thus,

17   a "*cy pres* award must be guided by (1) the objectives of the underlying statute(s) and (2) the

18   interests of the silent class members, and must not benefit a group 'too remote from the plaintiff

19   class."  *Id.* (internal quotations and citation omitted).  However, "settling parties [need not] select

20   a *cy pres* recipient that the court or class members would find ideal.  On the contrary, such an

21   intrusion into the private parties' negotiations would be improper and disruptive to the settlement

22   process."  *McCall*, slip op. at 11545.  The recipients proposed here have a national focus on

23   consumer protection, research, and education regarding online privacy and the safe use of social

24   media, with a particular emphasis on protecting minors—the very issues raised by Plaintiffs in

25   their complaint.[27]  (*See, e.g.*, SAC ¶¶ 32-37, 122-23.)

26   _____

27   [26] Although certain third parties challenged the Parties' proposed *cy pres* recipients, the Court
     indicated that it would defer that issue until the motion for final settlement approval.  (Mot. for
     Prelim. Approval Hr'g Tr. at 59:8-10.)

28   [27] A detailed description of the mission of each proposed recipient and the relationship between

#### d.     The injunctive relief provides substantial value to the Class.

Because the proposed injunctive relief accomplishes many of Plaintiffs' goals in filing this action, it further supports preliminary approval of the Revised Settlement.  *See Officers for Justice*, 688 F.2d at 628 (approving settlement that "incorporates a variety of provisions to accommodate" the concerns raised in the lawsuit); *In re Ferrero Litig.*, No. 11-CV-00205, 2012 WL 2802051, at *4 (S.D. Cal. July 9, 2012) (approving injunctive relief that required defendant "to modify the product label to address the fundamental claim raised in Plaintiffs' complaint"); *Myers v. MedQuist, Inc.*, Civ. No. 05-4608, 2009 WL 900787, at *16 (D.N.J. Mar. 31, 2009) (approving injunctive relief that "clarif[ied] the very . . . practices that led to this dispute").

#### (1)     Enhanced notice and new controls for all Class Members

Although Facebook denies liability, it has agreed to address head-on each of the core concerns raised by Plaintiffs in this litigation.  In the Revised Settlement, Facebook has agreed to: (i) enhance the notice and consent provision in its Terms with explicit language to which the Parties have agreed; and (ii) work with Plaintiffs' Counsel to identify and clarify any other information on www.facebook.com that, in Plaintiffs' view, does not accurately or sufficiently explain how Facebook advertising works.  (R.A. § 2.1(a), (d).)  These changes remedy the alleged defects claimed by Plaintiffs in Facebook disclosures.  (*See* SAC ¶¶ 32-41, 122-23.)

Facebook has also agreed to engineer and implement an innovative new tool that will permit Users to view, on a going-forward basis, which of their actions on Facebook are being redisplayed in Sponsored Stories (if any).  (R.A. § 2.1(b).)  This tool redresses one of Plaintiffs' key and often-repeated concerns—that they did not know which of their actions on the site were being republished in Sponsored Stories.  Finally, Facebook will create a granular control that will allow Users, upon viewing the content that has been included in a Sponsored Story, to prevent publication of additional Sponsored Stories.  (*Id.*)  Although the site has always provided

the proposed recipient and Facebook, if any, is attached as Exhibit A to the Brown Declaration. Many of these organizations submitted declarations explaining how their respective missions and projects relate to the concerns raised in this litigation, and how their receipt of a *cy pres* award would facilitate their work in these areas.  (*See* Dkt. Nos. 193 (Center for Democracy and Technology), 194 (Campaign for a Commercial-Free Childhood), 195 (Electronic Frontier Foundation), 196 (Center for Internet and Society), 197 (Consumer Privacy Rights Fund), 199 (Consumers Federation of America).)

1   information about how Users can prevent their appearance in Sponsored Stories, if they so

2   choose, this relief resolves another of Plaintiffs' core criticisms of Sponsored Stories—that

3   actually taking the necessary actions was too difficult.

4        Facebook believes that these changes surpass the controls and tools offered by every other

5   company in the online media industry.  (*See* Tucker Decl. ¶ 58; Infante Decl. ¶¶ 22-23.)  Given

6   the reluctance of courts to micro-manage the business of defendants, Plaintiffs likely could not

7   have realized these robust changes to Facebook's practices in litigation.  (Infante Decl. ¶ 15.)

8                    **(2)      Additional settlement benefits for the Minor Subclass**

9        In addition to the significant benefits to all members of the Class, the Revised Settlement

10  specifically addresses the claims of the Minor Subclass by expanding parental oversight and

11  control over Sponsored Stories featuring their minor children.  Many of these injunctive relief

12  provisions existed in the original settlement, including Facebook's commitment to: (1) revise its

13  Terms to require minor Users to affirm that they have obtained parental consent to Facebook's

14  use of their names and likenesses in connection with commercial, sponsored, or related content on

15  Facebook  (R.A. § 2.1(c)(i)); (2) create a new tool that allows parents to prevent the names and

16  likenesses of their minor children from appearing in Sponsored Stories and to make that tool

17  accessible directly through the Facebook account of Users who have a confirmed parental

18  relationship with a minor User[28] (R.A. § 2.1(c)(iii)); and (3) educate Users about these new

19  parental controls, including by adding information to Facebook's existing Family Safety Center

20  about social advertising on Facebook and the new Sponsored Stories opt-out tool for parents

21  (R.A. § 2.1(c)(iv)).

22       The Revised Agreement provides even more substantial relief for the Minor Subclass.  In

23  particular, Facebook has committed to take additional steps to encourage new Users, upon or

24  soon after joining Facebook, to identify their family members who are on Facebook, including

25  their parents and children.  (R.A. § 2.1(c)(ii).)  Further, for new and existing Users, Facebook has

26  agreed to create and show advertising to Users with a confirmed parental relationship with a

27

28

---

[28] This is a substantial and valuable component of the injunctive relief because, as of the end of last year, over six million minor Facebook Users were Friends with at least one of their parents.

minor User, directing them to the Family Safety Center, and/or other parent-specific resources on Facebook.  (R.A. § 2.1(c)(iv).)

Finally, in the Revised Settlement, Facebook has agreed to add a setting in minor Users' profiles that enables them to indicate that they do not have a parent on Facebook.  Where minor Users indicate this, Facebook has agreed to make such minors ineligible to appear in Sponsored Stories until they reach the age of 18, until they change their profile to indicate that they have a parent on Facebook, or until a confirmed parental relationship with the minor User is established.[29]  (R.A. § 2.1(c)(iii).)

This injunctive relief directly addresses the claims of the Minor Subclass, which focused heavily on the absence of any parental mechanism for withholding consent or preventing minors from appearing in sponsored content.  (SAC ¶ 41; *see* Notice of Transfer of Related Action Ex. B, Dkt. No. 98-2.)  Because Facebook is not and cannot be legally obligated to obtain parental consent for its minor Users, these fundamental changes to Facebook's practices represent substantial concessions, and provide a significant value to the Minor Subclass.

### (3)    Compliance audit

For a period of two years following final approval, Plaintiffs' Counsel may move the Court for an order requiring a third-party audit to confirm Facebook's compliance with the agreed-to injunctive relief.  (R.A. § 2.1(e).)  Although Facebook reserves the right to oppose such an audit, in the event the Court requires a third-party audit, Facebook has agreed to pay for it.

### (4)    The injunctive relief contributes to the total consideration for the release of Class Members' claims for past damages.

It is well established that changes to a defendant's challenged business practices or disclosures may constitute valuable, adequate consideration for the release of claims for monetary damages.  For example, in *In re Motor Fuel Temperature Sales Practices Litigation*, MDL No. 1840, No. 07-MD-1840-KHV, 2012 WL 1415508 (D. Kan. Apr. 24, 2012), the district court

---

[29] These efforts will supplement Facebook's already-extensive programs to protect minors on the site, including frequent consultations with a Safety Advisory Board comprised of independent experts in cyber-stalking, cyber-bullying, and other online risks potentially affecting minors. (Brown Decl. Ex. II.)

approved an amended agreement between plaintiffs and Costco to settle claims arising from Costco's allegedly unlawful fuel sale practices. Although class members sought both actual and statutory damages, the court approved a Rule 23(b)(3) settlement for injunctive relief only, awarding "no money to class members." *See id.* at *4, *7, *15. Weighing "the real uncertainty whether plaintiffs [could] prove liability on their claims," the court explained that "it [was] fair, reasonable and adequate for class members . . . to trade uncertain claims for money damages for certain relief proposed under the amended settlement agreement, i.e. the opportunity to purchase [temperature-adjusted] fuel from Costco." *Id.* at *13. Notably, the court overruled certain objectors' argument that the injunction-only settlement was unfair because it did "not account for" their statutory damages claims. *See id.* at *8.

Numerous other courts have similarly recognized that injunctive relief can constitute consideration for a release of claims for damages. *See, e.g., Myers*, 2009 WL 900787, at *16, *9 (approving Rule 23(b)(3) settlement awarding $1.5 million *cy pres* fund and injunctive relief that "clarif[ied] the very line counting and compensation practices that led to this dispute"; amount reasonable even though plaintiffs initially sought $45 million in damages, or "approximately $1,600 per member"); *First State Orthopaedics v. Concentra, Inc.*, 534 F. Supp. 2d 500, 507 (E.D. Pa. 2007) (approving Rule 23(b)(3) settlement where sole consideration was "commit[ment] to change the disclosure and business practices challenged in this action"); *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 526-27 (approving Rule 23(b)(3) settlement that "d[id] not provide for monetary damages," but instead, "a meaningful business resolution regarding contested issues"); *see also In re HP Laser Printer Litig.*, No. SACV 07-0667 AG (RNBx), 2011 WL 3861703, at *2 (C.D. Cal. Aug. 31, 2011) (approving Rule 23(b)(3) settlement where "[t]he primary relief [was] injunctive relief, with Defendant disclosing the existence and effect of" the alleged defect in defendant's products).

Thus, the Revised Settlement's injunctive relief provisions can, and do, serve as a meaningful part of the consideration for Plaintiffs' and the Class's release of their claims for past damages. As discussed above, the Revised Settlement enhances the clarity of Facebook's disclosures about Sponsored Stories and advertising on Facebook, provides Class Members with

1    tools to monitor their appearance in Sponsored Stories and to opt out of particular Sponsored

2    Stories, and allows parents to prevent their minor Class Member children from appearing in

3    Sponsored Stories altogether.  This relief responds directly to the allegations underlying Class

4    Members' claims for *past damages* (*see, e.g.*, SAC ¶¶ 32-37, 122-23; Class Cert. Reply at 4), and

5    stands to compensate these Class Members directly and substantially, as the vast majority of the

6    Class continues to use the website today.  (*See* Plambeck Decl. ¶ 8.)  As in *In re Motor Fuel*, "it is

7    fair, reasonable and adequate for class members . . . to trade uncertain claims for money damages

8    for certain relief proposed under the amended settlement agreement," i.e., the opportunity to

9    continue to use Facebook with the benefit of improved notice and innovative tools to facilitate

10   their decision-making around Sponsored Stories.  2012 WL 1415508, at *13.  This consideration

11   is particularly fair and reasonable given "the real uncertainty whether plaintiffs [could] prove

12   liability on their claims."  *Id.* at *13.

13   **4.      The procedural posture and the views of counsel support settlement.**

14   Preliminary approval is also warranted given the stage of the proceedings and the

15   informed views of counsel about the strengths and weaknesses of their respective clients'

16   positions.  As discussed above, the Parties litigated two motions to dismiss, fully briefed a class

17   certification motion, and conducted extensive discovery, including over 1,000 discovery requests,

18   twenty depositions, and hundreds of thousands of pages of documents.  (*See supra* § II.B.)  This

19   discovery well exceeds far exceeded the "investigation and informal discovery and research" that

20   was sufficient to allow an informed decision in *McCall*, slip op. at 11544.  Because the settlement

21   was fully informed, the recommendation of the Parties' counsel "is entitled to a great deal of

22   weight."  *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1174 (S.D. Cal. 2007).

23   **D.      The Settlement Does Not Grant Preferential Treatment to Segments of the Class.**

24   The Revised Settlement also merits preliminary approval because it does not grant

25   preferential treatment to Plaintiffs or segments of the Class.  First, to the extent the Settlement

26   authorizes the named Plaintiffs to seek incentive awards, such awards are routinely granted "to

27   compensate class representatives for work done on behalf of the class, to make up for financial or

28   reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness

1    to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59.

2         The Settlement is also fair and reasonable to the extent it allows monetary recovery only

3    to Class Members who timely complete Claim Forms.[30]   Claim forms represent an established

4    and accepted method for distributing settlement benefits to class members. *See, e.g.*, *Farinella v.*

5    *Paypal*, Inc., 611 F. Supp. 2d 250, 260 (E.D.N.Y. 2009) ("The requirement that claimants return

6    claim forms that affirm their reliance on the language of the User Agreement is an appropriate

7    screening mechanism to ensure that only persons who relied upon the representations of PayPal at

8    issue are entitled to recover from the Settlement Fund.").  In addition, the Claim Form here may

9    be completed online, increasing the accessibility and convenience to Class Members.  *Cf.*

10   *Browning v. Yahoo! Inc.*, No. C04-01463 HRL, 2007 WL 4105971, at *6 (N.D. Cal. Nov. 16,

11   2007) (electronic claim form appropriate where "[c]lass members have all demonstrated their

12   ability to navigate the Internet through past dealings with Defendants").

13        The Parties' criteria for deciding who should receive payment are likewise fair and

14   reasonable, and do not unfairly discriminate against segments of the class.  As described above,

15   the statements Claimants must make on the Claim Form are directly tethered to key elements of

16   Plaintiffs' claims—lack of consent and injury—two of the biggest substantive obstacles in the

17   case.  Although Facebook submits that no Class Members could prevail on their claims, these

18   criteria are fair and reasonable because they award monetary payments to Class Members with

19   the best (albeit remote) chances of recovering.

20        **E.**    **The Arguments of the *C.M.D.* Plaintiffs and Other Third Parties Lack Merit.**

21        In its Order, the Court requested that Facebook "address the legal arguments raised in the

22   motion to intervene brought by the named plaintiffs in the related case, *C.M.D. v. Facebook, Inc.*,

23   No. 12-cv-01216 RS, regarding issues of obtaining valid consent from minors."  (Order at 6.)

24   The Court also asked Facebook to address "significant points" raised by third parties ("Third

25   Parties") in opposition to the Settlement.  (Order at 8.)  As explained below, none of these third-

26   party objections has any bearing on the fairness and adequacy of the Settlement.

27   ─────────────
     [30] The Parties' proposed settlement administrator is the Garden City Group, Inc, a well respected
28   administrator that has been approved by this Court previously.  *See, e.g.*, *Thieriot v. Celtic Ins.*
     *Co.*, No. C 10–04462 LB, 2011 WL 1522385, at *2 (N.D. Cal. Apr. 21, 2011).

**1.      As discussed, any purported parental consent requirement is invalid.**

The *C.M.D.* plaintiffs and others claimed that the original settlement was inadequate because it failed to "propose[] [a] means by which Facebook can or will verify parents' consent." (*See, e.g.*, Mot. ISO Interven. to Oppose Mot. for Prelim. Approv. of Class Settlement, Dkt. No. 187 ("*C.M.D.* Br.") at 16.)   But, as discussed in Section 4.C.1.b.3 above, this ignores COPPA, which precludes claims premised on Facebook's alleged failure to obtain parental consent for teenage Users, as recently held in *David Cohen v. Facebook*, No. BC 444482 (L.A. Super. Ct.).

Notably, many of the lawyers in *C.M.D.* were also counsel in *David Cohen*, in which they personally litigated and lost this very issue.   (*See generally* Brown Decl. ¶ 23 (identifying the lawyers and firms that were counsel in both actions, including: Squitieri and Fearon, LLP (Lee Squitieri, Gary T. Stevens, Jr.); Stuart Law Firm (Antony Stewart); Wexler Wallace LLP (Edward A. Wallace); and John C. Torjesen & Associates, PC (John Torjesen)).)   The Court should reject these attorneys' efforts to obtain a different result simply by switching venues.

Finally, if the *C.M.D.* plaintiffs or any other Class Members believe the Revised Settlement is inadequate, they remain free to opt out and to pursue individual claims against Facebook.   Indeed, § 3344 is designed to incentivize *individual actions*, providing for both statutory damages and prevailing-party attorneys' fees.   *See* Cal. Civ. Code § 3344(a).

**2.      The California Family Code has no bearing on the Settlement.**

The *C.M.D.* plaintiffs also argue that, "[u]nder California law, 'a minor cannot . . . [g]ive a delegation of power' or '[m]ake a contract relating to any personal property not in the immediate possession or control of the minor.' Cal Fam Code § 6701(a) & (c)." (*C.M.D.* Br. at 6.)   These same arguments are parroted by the Center for Public Interest Law and Children's Advocacy Institute ("CPIL/CAI").   Citing no authority, CPIL/CAI claim that the proposed Settlement sanctions a violation of California Family Code Section 6701(a) and (c) by (1) "pretending that a minor has consented (delegated to Facebook the power) to the use of his or her name and image"; and (2) contracting with minors with respect to "images that are now in Facebook's possession or control and not in the immediate possession or control of the minor." (*Amicus Curiae* Mem. of CPIL/CAI in Opp. to Proposed Settlement Agreement, Dkt. No. 211 ("CPIL/CAI Brief") at 3-4.)

FACEBOOK'S MPA ISO JT. MOT. FOR
PRELIM. APPROVAL OF REV. SETTLEMENT
CASE NO. CV 11-01726 RS

1    These arguments represent a fundamental misunderstanding of California law and, in fact, have

2    already been rejected by the Southern District of Illinois in the *C.M.D.* action itself.

3         Under California law, "[e]xcept as provided in Section 6701, a minor may make a contract

4    in the same manner as an adult, subject to the power of disaffirmance . . . ." Cal. Fam. Code

5    § 6700.  Under Section 6701, minors are forbidden from entering only a narrow range of

6    contracts, including those that "[g]ive a delegation of power," § 6701(a), or relate to "personal

7    property not in the immediate possession or control of the minor," § 6701(c).

8         Family Code Section 6701(a) and (c) are not applicable to the *Fraley* litigation or the

9    Revised Settlement.  As confirmed by nearly 100 years of case law, Section 6701(a) "declare[s]

10   the rule that an infant [can]not execute contracts through an agent having only a delegated

11   authority executed by the infant."  *Hakes Inv. Co. v. Lyons*, 166 Cal. 557, 560 (1913); *see, e.g.*,

12   *Blankenship v. Hearst Corp.*, 519 F.2d 418, 425 (9th Cir. 1975) (minor cannot enter partnership

13   because he cannot delegate power under California law); *Schumm v. Berg*, 37 Cal. 2d 174, 182

14   (1951) (contract by minor's purported agent void); *Casey Wasserman Living Trust v. Bowers*, No.

15   5:09-CV-180-JMH, 2011 U.S. Dist. LEXIS 46451, at *4-7 (E.D. Ky. Apr. 29, 2011) (collecting

16   cases).  Neither Facebook's current Terms nor the revisions contemplated by the Revised

17   Settlement purport to delegate to Facebook a power of agency (i.e., the power to enter contracts

18   on the minor's behalf).  Section 6701(a) is simply inapposite.

19        Section 6701(c) is equally irrelevant, since it only prevents minors from assigning a future

20   interest, such as designating a beneficiary under an annuity contract, *see Sisco v. Cosgrove,*

21   *Michelizzi, Schwabacher, Ward & Bianchi*, 51 Cal. App. 4th 1302, 1307 (1996), or directing the

22   minor's employer to pay his wages to a third party, *see Morgan v. Morgan*, 220 Cal. App. 2d 665,

23   675 (1963).  Seeking to force a square peg into a round hole, the *C.M.D.* plaintiffs and CPIL/CAI

24   claim that the Settlement violates § 6701(c) because the "images . . . are now in Facebook's

25   possession or control and not in the immediate possession or control of the minor."  (CPIL/CAI

26   Br. 3-4.)  But this argument ignores how Facebook actually works: at all times, Facebook users

27   ("Users") have "immediate possession or control" over the images they upload to Facebook, Cal.

28   Fam. Code § 6701(c), which they may access or remove from their Facebook accounts at will.

This strained construction is also untenable because it conflicts with other Family Code provisions.   In particular, Family Code §§ 6750 and 6751 expressly contemplate contracts "pursuant to which a minor . . . agrees to . . . license . . . use of a person's likeness," specifying that certain such contracts may *not* be disaffirmed if approved by a court.  Cal. Fam. Code §§ 6750(a)(1), 6751.  This provision would be nonsensical if Section 6701 operated as an absolute prohibition on minors entering contracts to license use of their names or likenesses.

Given all this, it is unsurprising that these very arguments were rejected by the Southern District of Illinois in the *C.M.D.* action when it was transferred that action to this Court, based on the forum-selection clause in Facebook's Terms.   In opposing Facebook's motion to transfer venue, the *C.M.D.* plaintiffs argued that the Terms are void under California Family Code § 6701, contending that "minors are statutorily forbidden from entering into a contract that purports to 'give a delegation of power' or that relates to 'any personal property not in the immediate possession or control of the minor."  (Pls.' Resp. to Mot. to Transfer, Dkt. 78 in *C.M.D.*, at 3-4.) Judge Murphy rejected this argument and enforced the contract that the *C.M.D.* plaintiffs claimed was void by transferring the action over their objections.  (Transfer Order, Dkt. 93 in *C.M.D.*, at 4-6.)  Again, the *C.M.D.* plaintiffs, and their counsel, are hoping that making the same arguments in a different forum will produce a different result.

### 3.     The injunctive relief contributes substantial value to the Settlement.

The *C.M.D.* plaintiffs also argue that "to the extent Facebook's practices were, in fact, in violation of the law, the proposed relief [in the form of changes to the Facebook website] offers no value whatsoever."  (*C.M.D.* Br. at 15.)  They are wrong.

As discussed above (*supra* § IV.C.3.d), contrary to the *C.M.D.* plaintiffs' claims, the changes to the Facebook website provide substantially enhanced notice and tools for Users to control the rebroadcast of their social actions in a sponsored context.  These changes go well beyond what other social networking sites provide, and the *C.M.D.* plaintiffs do not—and cannot—show how these changes are "required by the law."  Facebook is free to condition the use of its service on acceptance of its Terms.  The injunctive relief thus provides a substantial gain for Users.

Furthermore, the *C.M.D.* plaintiffs' argument improperly presupposes Facebook's liability (i.e., that the changes are, in fact, required by the law) and that Plaintiffs would have been able to achieve such relief in this litigation.  As explained by the Ninth Circuit in *Officers for Justice*, a court cannot analyze a settlement as if liability has been established, but rather must examine the case with the uncertainty of a plaintiff's ability to establish liability.  688 F.2d at 628 (finding value in agreement to halt allegedly discriminatory practices at core of litigation).

The *C.M.D.* plaintiffs' own authorities confirm this proposition.  Indeed, those cases find no value in a settlement's injunctive relief provisions only where the injunctive relief is legally required.  For example, while the court in *Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D. Cal. 2007), found that certain injunctive relief provisions were of "no value" because those changes were required by law, the court did find value in other parts of the injunctive relief offered by the settlement.  *See id.* at 394.  Similarly, in *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543 (S.D. Ohio 2000), the court specifically found "value" in a settlement's injunctive relief provisions that required the defendant to take actions not required by the law.  *Id.* at 554-55.

Here, no aspect of the Revised Settlement's injunctive relief provisions are either inevitable or legally required because, as shown above, Plaintiffs were highly unlikely to prevail on their claims.  (*See supra* § IV.C.1.)  Thus, for the reasons discussed throughout this brief, the settlement's injunctive relief provisions afford substantial benefits to Class Members.

**4.    The injunctive relief is reasonable and adequate, notwithstanding Third Parties' injunctive relief "wish lists."**

CPIL/CAI and other Third Parties contend that the proposed injunctive relief is inadequate because it relies primarily on changes to the Terms and Help Center, rather than requiring Users to affirmatively "opt in" to Sponsored Stories.  (CPIL/CAI Br. at 5; Letter from EPIC, Dkt. No. 220, at 3-5; Letter from Center for Digital Democracy, Dkt. No. 221, at 2-4.)  Some Third Parties claim the relief is inadequate because it does not allow Users to "opt out" of Sponsored Stories completely.  (*See, e.g.*, Letter from Consumer Watchdog, Dkt. No. 222, at 2.)  Regardless of whether these Third Parties may have preferred that the Settlement incorporate these features, the Settlement is more than fair without them.

In assessing the fairness of a settlement, the operative question is whether, "[v]iewing the terms of the settlement as a whole . . . the Court finds that the settlement confers real and significant benefits on the class members as individuals and the class . . . [i]n light of all the attendant risks of litigation." *Myers*, 2009 WL 900787, at *17 (quotations omitted).  In view of the total consideration offered by Facebook in the Settlement—including each piece of injunctive relief and the $20 million settlement fund—the Settlement undoubtedly represents "a good value for a relatively weak case[.]"  *Id.* at *15 (internal quotations and citation omitted).

In this analysis, the Third Parties' desire for an "opt in" consent model is irrelevant. *McCall*, slip op. at 11555 (in approving settlement, district court properly disregarded objections amounting to bare "disagree[ment] with the class representatives' decision not to hold out for more than $9.5 million or insist on a particular recipient of *cy pres* funds . . . .").  Nor is it legally required.  Indeed, even if the Third Parties could somehow overcome Facebook's numerous, complete defenses to liability (including CDA § 230 immunity, the First Amendment, and § 3344(d)'s public interest exemption), they cannot show that an "opt in" model is required to establish Class Members' consent.  As discussed above, Facebook has obtained consent from every User based on the explicit language in the Terms to which every User agrees by signing up and using the Facebook website.  An opt-in model would also be redundant.  Users take social actions on Facebook, such as Liking content, to share their affinities and opinions with their Friends.  Thus, Users effectively opt in to having their actions shown to their Friends every time they take a social action.  It would make no sense to require them to opt in again to share the same content with the same people in a Sponsored Story.

Finally, in the Revised Settlement, minor Users who indicate in their profile that they do not have a parent on Facebook are ineligible to appear in Sponsored Stories.

## V.  THE PROPOSED NOTICE PLAN SHOULD BE PRELIMINARILY APPROVED.

### A.  Legal Standard for Approval of a Notice Plan

"The court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  Notice of certification of a Rule 23(b)(3) class must be given "to all members who can be identified through reasonable effort" and describe

"(i) the nature of the action;" (ii) "the definition of the class certified;" (iii) "the class claims, issues, or defenses;" (iv) "that a class member may enter an appearance through an attorney if the member so desires;" (v) "that the court will exclude from the class any member who requests exclusion;" (vi) "the time and manner for requesting exclusion;" and (vii) "the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B).  Generally, notice is acceptable if it "describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (internal quotations and citation omitted).

**B.      The Content of the Notice Provided to Class Members Is Sufficient.**

The Long-Form Notice, attached as Exhibit B to the Revised Settlement, identifies Plaintiffs and Facebook and describes the lawsuit and the proposed Class and Minor Subclass, describes the Settlement sufficiently to allow Class Members to make an informed choice to accept or reject it, and discloses the value and particulars of the class relief and other benefits to the Class.  The Long-Form Notice will also disclose the amount sought by Plaintiffs' petition for attorneys' fees and costs.[31]  Additionally, the Long-Form Notice contains detailed instructions for requesting exclusion from, objecting to, or participating in the settlement, as well as the schedule for the final approval and attorney's fees hearings.   These features meet the standards of applicable law. *See Churchill Vill.,* 361 F.3d at 575.

**C.      The Means of Supplying Notice to Class Members Is Sufficient.**

The Parties' propose a two-tiered notice plan: short-form notice by email and publication, with such notice directing potential Class Members to the long-form notice on the Internet.  Class Members for whom Facebook has a facially valid email address will receive direct notice by email.[32]   For any Class Members for whom Facebook does not have contact information (*e.g.*, people who may have closed their Facebook accounts),[33] the Parties will publish notice three

---

[31]  Plaintiffs will file their motion for attorneys' fees and costs before notice is provided, as required by *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988 (9th Cir. 2010).

[32]  In light of the class size of approximately 123.9 million people and constraints on how many emails can be transmitted each day, the Revised Settlement assumes that it may take up to sixty days to transmit email notice.

[33]  The Court asked the Parties to estimate the number of Class Members who would not receive

**FACEBOOK'S MPA ISO JT. MOT. FOR PRELIM. APPROVAL OF REV. SETTLEMENT CASE NO. CV 11-01726 RS**

1  times in the *USA Today* newspaper and over the PR Newswire Service, which encompasses

2  several thousand news organizations and publications across the United States.

3      This tiered notice plan is similar to the plans approved by numerous other courts. *See,*

4  *e.g.*, *Browning*, 2007 WL 4105971, at *7 (parties "use[d] . . . email to provide brief notice and to

5  direct interested class members to the website," which posted long-form notice); *In re Compact*

6  *Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 203 (D. Me. 2003) (short-form

7  notice directed class to Internet and mailing addresses for further information).

8      And, as to class members for whom Facebook does not have contact information, the

9  proposed notice publication easily satisfies Rule 23(a)(1). *See Smith v. Dominion Bridge Corp.*,

10  Civ. A. No. 96-7580, 2007 WL 1101272, at *13 (E.D. Pa. Apr. 11, 2007) (approving settlement

11  where 3,848 individual notices were mailed to "reasonably identifiable" class members, with a

12  summary notice "published in the national publication, *PR News Wire*"); *Tableware*, 484 F. Supp.

13  2d at 1080-81 (approving publication of short-form notice in USA Today).

14      **D.**    **Facebook will comply with the Class Action Fairness Act**

15      As it did with respect to the original settlement, Facebook will provide notice pursuant to

16  the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715, to the federal and all states'

17  attorneys general within ten (10) days after the Revised Settlement is filed with the Court.

18  **VI.**    **CONCLUSION**

19      For the foregoing reasons, Facebook requests that the Court grant preliminary approval of

20  the Revised Settlement and set a date for a final approval hearing 195 days after entry of the

21  Preliminary Approval Order.

22

23  notice via email. Facebook's records indicate that more than 96% of Users who appeared in
Sponsored Stories still have active Facebook accounts, and Facebook has at least one email
address associated with each such account. (Plambeck Decl. ¶ 8.) For the people who no longer

24  have accounts, Facebook does not have their email addresses. (*Id.*) For approximately 11.1% of
the 123.9 million User accounts, Facebook has received at least one "bounce-back" message

25  when an email was sent to the email address associated with the account. (*Id.*) However, there
may be overlap between the approximately 11.1% of accounts for which Facebook received

26  "bounce-back" messages, on the one hand, and the approximately 4.9 million User accounts that
are no longer active. (*Id.*) Class Members for whom Facebook does not have an email address

27  will receive notice by publication. *See Tableware*, 484 F. Supp. 2d at 1080 ("Publication in
magazines, newspapers, or trade journals may be necessary if class members are not identifiable

28  after reasonable effort." (quoting *Manual for Complex Litigation* (4th ed. 2004) § 21.311)).

Dated: October 5, 2012

COOLEY LLP

*/s/ Michael G. Rhodes*

Michael G. Rhodes (116127)

COOLEY LLP
MICHAEL G. RHODES (116127)
mrhodes@cooley.com
MATTHEW D. BROWN (196972)
brownmd@cooley.com
JEFFREY M. GUTKIN (216083)
jgutkin@cooley.com
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

Attorneys for Defendant Facebook, Inc.

FACEBOOK'S MPA ISO JT. MOT. FOR
PRELIM. APPROVAL OF REV. SETTLEMENT
CASE NO. CV 11-01726 RS