ROBERT S. ARNS (#65071, rsa@arnslaw.com)
JONATHAN E. DAVIS (#191346, jed@arnslaw.com)
STEVEN R. WEINMANN (#190956, srw@arnslaw.com)
**THE ARNS LAW FIRM**
515 Folsom Street, 3rd Floor
San Francisco, CA 94105
Tel:   (415) 495-7800
Fax:   (415) 495-7888

JONATHAN M. JAFFE (# 267012, jmj@jaffe-law.com)
**JONATHAN JAFFE LAW**
3055 Hillegass Avenue
Berkeley, CA 94705
Tel:   (510) 725-4293
Fax:   (510) 868-3393

Attorneys for Plaintiffs

Redactions herein are confidential material not filed with the Court

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL FRALEY; PAUL WANG; SUSAN MAINZER; JAMES H. DUVAL, a minor, by and through JAMES DUVAL, as Guardian ad Litem; and W. T., a minor, by and through RUSSELL TAIT, as Guardian ad Litem; individually and on behalf of all others similarly situated, | **Case No. CV 11-01726 RS** **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |
| Plaintiffs, | Date:  November 15, 2012 |
| v. | Time:  1:30 p.m. Courtroom:  3 |
| FACEBOOK, INC., a corporation; and DOES 1-100, | Judge:  Hon. Richard Seeborg |
| Defendants. | |

# TABLE OF CONTENTS

STATEMENT OF ISSUES ......................................................................................... 1

MEMORANDUM OF LAW ....................................................................................... 1

I.     INTRODUCTION ............................................................................................. 1

II.    TERMS OF THE PROPOSED SETTLEMENT ............................................. 6

  A.   The Proposed Settlement Class.................................................................... 6

  B.   Payments to the Class / Claims Process....................................................... 6

  C.   Injunctive Relief........................................................................................... 8

  D.   Changes to the SRRs and Information on Facebook's Website and Help Pages ............ 8

  E.   New Tool for Limiting Appearances in Sponsored Stories ................................ 9

  F.   New Information and Tool for Opting Out Minors ......................................... 9

  G.   Plaintiffs' Litigation Costs and Fees.......................................................... 10

  H.   Service Payments to Class Representatives ................................................ 10

  I.   Release By Settlement Class Members........................................................ 11

  J.   Notice ........................................................................................................ 11

III.   STATEMENT OF FACTS AND PROCEDURAL HISTORY ...................... 11

  A.   Facts Concerning Defendant Facebook, Inc. .............................................. 11

  B.   Facts Concerning The Class Representatives .............................................. 13

  C.   Procedural History ..................................................................................... 14

  D.   Discovery .................................................................................................... 14

  E.   Settlement Negotiations.............................................................................. 15

IV.   THE COURT SHOULD GRANT PRELIMINARY APPROVAL OF THE
SETTLEMENT............................................................................................... 16

  A.   The Settlement Meets All Requirements For A Presumption Of Fairness.................... 16

  B.   The Total Amount Offered In Settlement Supports a Finding That it is Fair and
Reasonable. ................................................................................................ 17

i

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

C.    Calculation of Additional Revenue / Class Member's Damages for Misappropriation of Right of Publicity In Valuing Past Damages .................................................................. 18

    1.    Valuation Based on Facebook's Representations as to Value ..................................... 19

    2.    Valuation based on the Click-Through-Rate ................................................................ 20

D.    Valuation of Statutory Damages for Purposes of Settlement ......................................... 24

E.    This Case Presents Circumstances Appropriate for *Cy Pres* Distribution In Place of Damages Awards to Class Members If Distribution Becomes Impracticable................ 25

    1.    Case Law Supports the Use of Cy Pres Awards in Place of Damages Where Distribution is Impracticable.................................................................................... 26

    2.    The proposed *cy pres* recipients are appropriate under the Ninth Circuit's standards. 28

F.    The Injunctive Relief is Valuable and Will Lead to Economic Benefits to the Class Members. ......................................................................................................................... 29

G.    Courts Recognize that Injunctive Relief Often has Great Value Even If Not Easily Monetized ....................................................................................................................... 29

H.    Methods of Valuation of the Injunctive Relief ............................................................... 31

    1.    First Method for Valuing Injunctive Relief:  The Real Option Valuation. .................. 32

    2.    Second Method for Valuing Injunctive Relief:  Fair Market Valuation of Right to Control Asset Based on Past Value of Endorsements ................................................. 34

    3.    Third Method of Valuation: Minimum Value of $1 .................................................... 35

I.    The Injunctive Relief Furthers the Goals of the Statutes at Issue.................................... 35

J.    The Service Awards to the Class Representatives are Reasonable and Valuable. ......... 36

K.    Discounted Settlement Value Based on Risks of Further Litigation ............................... 36

L.    The C.M.D. Objections are Without Merit...................................................................... 38

V.    THE COURT SHOULD ORDER DISSEMINATION OF THE PROPOSED CLASS NOTICE.......................................................................................................................... 40

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

VI.    A HEARING FOR FINAL APPROVAL OF THE PROPOSED SETTLEMENT AND FOR PAYMENT OF ATTORNEYS' FEES SHOULD BE SET, ALONG WITH PRE-HEARING EXCLUSION AND OBJECTION DEADLINES ........................................ 41

VII.   THE COURT SHOULD APPOINT GARDEN CITY GROUP AS SETTLEMENT ADMINISTRATOR ..................................................................................... 42

VIII.  CONCLUSION ............................................................................................ 42

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

# TABLE OF AUTHORITIES

**State Cases**

*Blakemore v. Super. Ct.,* 129 Cal. App. 4th 36 (2005) ................................................ 37

*Cortez v. Purolator Air Filtration Products Co.,* 23 Cal. 4th 163 (2000) ................................... 37

**Federal Cases**

*Acosta v. Trans Union L.L.C.,* 243 F.R.D. 377 (C.D. Cal. 2007) ................................... 40

*Alvarado v. Nederend,* No. 1:08-CV-01099, 2011 U.S. Dist. LEXIS 2326 (E.D. Cal. Jan. 11, 2011) .......................................................................................... 16, 17

*Bebchick v. Pub. Utils. Comm'n,* 318 F.2d 187 (D.C. Cir. 1963) ................................... 27

*Bluetooth Headset Prods. Liab. Litig.,* 654 F.3d 935 (9th Cir. 2011) ................................... 40

*BMW of N. Am., Inc. v. Gore,* 517 U.S. 559 (1996) ................................................ 25

*Boyle v. Giral,* 820 A.2d 561 (D.C. 2003) ...................................................... 27

Catala v. Resurgent Capital Services L.P., No. 08CV2401 2010 U.S. Dist. LEXIS 63501 (S.D. Cal. June 22, 2010) .......................................................................... 26

*Churchill Vill., LLC v. Gen. Elec.,* 361 F.3d 566 (9th Cir. 2004) ................................... 42

*Currency Fee Antitrust Litigation,* 263 F.R.D. 110 (S.D.N.Y. 2009) ................................... 32

*Gypsum Antitrust Cases,* 565 F.2d 1123 (9th Cir. 1977) ............................................ 41

*Hanlon v. Chrysler Corp.,* 150 F.3d 1011 (9th Cir. 1998) ........................................... 17

*Heartland Payment Sys., Inc.,* No. 09-2046 2012 U.S. Dist. LEXIS 37326 (S.D. Tex. March 20, 2012) ................................................................................... 28

*Holocaust Victim Assets Litig.,* 424 F.3d 132 (2d. Cir. 2005) ...................................... 27

Lane v. Facebook, No. 08cv-3845 RS 2009 WL 2076916 (N.D. Cal. May 24, 2010), *aff'd*, 2012 US App. LEXIS 19767 (9th Cir. September 20, 2012) ................................ 17, 24, 25, 28

*Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423 (2d Cir. 2007) ............................ 27

*McCoy v. Health Net, Inc.,* 569 F.Supp.2d 448 (D.N.J. 2008) ................................... 30, 31

*MetLife Demutualization Litig.,* 689 F. Supp. 2d 297 (E.D. N.Y. 2010) ............................ 27

*Mexico Money Transfer Litig.,* 164 F.Supp.2d 1002 (N.D. Ill. 2000) ............................... 28

iv

*Nachshin v. A.O.L., LLC*, 663 F.3d 1034 (9th Cir.2011)............................................................29

*Nat'l Rural Telecomms. Coop. v. DirectTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004)...... 16, 18, 38

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 2009 U.S. Dist. LEXIS
68419 (D. Mass. August 3, 2009)..........................................................................................32

*Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24 (1st Cir. 2009)............................27

*Six (6) Mexican Workers*, 904 F.2d 1301 (9th Cir. 1990).....................................................26, 29

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ................................................................37

*Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007) .........................................16

*United States v. Truckee-Carson Irrigation Dist.*, 71 F.R.D. 10 (D. Nev. 1975)......................41

*Vizcaino v. Microsoft Corp.*, 142 F.Sup.2d 1299 (W.D. Wash. 2001) ......................................31

*White v. Experian Information Solutions*, 2011 U.S. Dist LEXIS 79044 (C.D. Cal. July 15,
2011).......................................................................................................................................30

## Statutes

Cal. Civ. Code § 1542 ................................................................................................................11

Cal. Civ. Code § 3344 .......................................................................................................passim

Cal. Fam. Code § 6701 ..............................................................................................................41

Cal. Fam. Code §6710 ...............................................................................................................41

California Unfair Competition Law, Bus. & Prof. Code § 17200 et seq................................1, 37

Children's Online Privacy Protection Act, 15 U.S.C. § 6502................................................39, 41

Class Action Fairness Act, 28 U.S.C. §1715 ..................................................................1, 42, 43

Communications Decency Act, 47 U.S.C. § 230........................................................................39

Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. .................................................................30

## Rules

Fed. R. Civ. P. 23(c) ..................................................................................................................42

Fed. R. Civ. P. 23(e) ............................................................................................................41, 42

Fed. R. Civ. P. 23(h) ...........................................................................................................10, 43

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

**Treatises**

Manual for Complex Litigation (Fourth) § 21.633 (2012) ........................................... 42

*Principles of The Law of Aggregate Litigation*, § 3.07 A.L.I. (2010) ........................................ 28

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

## STATEMENT OF ISSUES

1. Whether the Court should grant preliminary approval of the proposed Settlement with Defendant Facebook, Inc., preliminarily finding that the proposed Settlement is fair, reasonable, and in the best interests of the proposed Settlement Class, and that it warrants notifying the Settlement Class of the terms of the proposed Settlement and of their rights in connection with the proposed Settlement, and appoint Garden City Group as Settlement Administrator.

2. Whether the Court should approve the form and content of the e-mail, long form and publication notices of settlement for the Settlement Class (the "Settlement Notices"), in substantially the forms attached as Exhibits 2, 3 and 4 to the Amended Settlement Agreement, and whether the Court should direct the Settlement Notices to be disseminated in the manner described in the Amended Settlement Agreement, Section 3.3.

3. Whether the Court should establish deadlines for requests for exclusion from the Settlement Class and the filing of objections to the proposed Settlement; set a hearing date for the Fairness Hearing on Final Approval of the Settlement and its terms, and for Plaintiff's motion for an award to Plaintiffs' counsel for their attorney's fees and costs and an award to Plaintiffs for their service in this action.

4. Whether the Court should find that Facebook has satisfied the Class Action Fairness Act, 28 U.S.C. §1715 by providing the appropriate notices.

## MEMORANDUM OF LAW

## I.   INTRODUCTION

Plaintiffs Susan Mainzer, James H. Duval and W.T. bring this Motion for Preliminary Approval of Class Action Settlement. Plaintiffs bring claims for their right of publicity under California Civil Code § 3344 and California's Unfair Competition Law, Business & Professions Code § 17200 et seq. They allege that their names and likenesses had been used without their prior consent in "Sponsored Stories" ads shown to their online friends on

-1-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

Facebook.com.   After hard fought litigation since March 2011, including two motions to dismiss, twenty-one depositions, and the briefing of a motion for class certification, the Parties entered into mediation and ultimately reached a proposed settlement just days before the Plaintiffs' class certification motion was to be heard.   Following denial without prejudice of Plaintiffs' first Motion for Preliminary Approval, Plaintiffs and Facebook negotiated substantial modifications to the terms of the Settlement.

There is now a $20 million settlement fund, with no reversion to Facebook, and no "clear sailing" agreement as to Class Counsel's attorney's fees.   Under the Amended Settlement Agreement ("A.S.A.")[1] the balance of the $20 million fund after attorneys' fees and costs, incentive awards, and settlement administration and notice costs, will be made available on a claims-made basis for distribution to Class members, starting at a rate of $10 per claiming Class member and being adjusted pro rata should the claims rate be relatively high.[2]   In the event that the claims rate is such that the Court determines the monies would be better instead distributed to *cy pres* (e.g., if it should fall below $5 per claimant), the Parties have designated *cy pres* recipients.   These recipients are entities which have been and are engaged in activities which will benefit the entire Class as well as the public at large, as they will advocate for issues such as the right of protection of the Class members' right of publicity on the internet and specifically on social media websites.   The *cy pres* recipients also include entities that are dedicated to the protection of the rights and welfare of minor children, as they are affected by social media in an online context.

---

[1] The Amended Settlement Agreement ("A.S.A.") is attached as Exhibit 1 to the Declaration of Robert S. Arns in support of Joint Motion for Preliminary Approval ("Arns Decl.").  However, becaue of frequent discussion, it will be cited throughout this document as "A.S.A.".

[2] As explained further below, should the claims rate exceed the point where it is feasible to provide all claimants $10, the payment amount will be adjusted pro rata to the point where it is economically feasible.  Previously the clear sailing agreement was for $10 million in fees, but class counsel was only going to request $7.5 million in fees.  Because this is now all part of a $20 million settlement with no reversion, the benefit to the class has increased under the A.S.A. by roughly $2.5 million.

-2-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

The central focus of the Settlement remains the crucially important proposed injunctive relief, which remains in place in the Amended Settlement Agreement. That relief will provide significant benefits to the Class Members (as well as future Facebook members) and includes changes to Facebook's website, will remain in place for at least two (2) years, and make it clear to all persons with Facebook accounts ("Users") and the parents or legal guardians of minor Users that their names and likenesses may be used in "Sponsored Stories" ads. A.S.A § 2.1.

Plaintiffs have also received clarification of the methods by which Facebook will comply with the injunctive relief, including how it will make available an "opt-out" function for the parents of minors. When both minors and their parents are Facebook members, the parties can create a connection that establishes their relationship to one another. A.S.A. § 2.1(c)(ii). When a parent and their minor child confirm their relationship in the Facebook system, Facebook will provide an easily accessible tool from which parents, through their own Facebook account, can prevent the names and likeness of their minor child from appearing in Sponsored Stories. A.S.A. §§ 2.1(c)(ii), 2.1(c)(iii).

Additionally, new provisions of the injunctive relief require that Facebook add a control in minor users' profiles that enables the minor user to indicate that his or her parents are not Facebook members. A.S.A § 2.1(c)(iii). Under the new terms in the Amended Settlement Agreement, where a minor user has indicated that their parents are not Facebook members, Facebook will make the minor ineligible to appear in Sponsored Stories until the minor reaches the age of 18, changes his or her setting to indicate his or her parent is on Facebook, or a confirmed parental relationship with the minor is established. A.S.A § 2.1(c)(iii).

In total, the injunctive relief now includes relief in the form of (1) a revision of the Facebook terms (Statement of Rights and Responsibilities, or "SRR"), section 10.1 that clarifies to users that they give Facebook permission to use their name and likeness in Sponsored Stories ads; (2) a mechanism that will allow users to see which actions they have taken that have led to their being featured in Sponsored Stories ads and control whether those

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

actions continue being eligible to appear as Sponsored Stories ads;[3] (3) additional provisions requiring that Users under 18 years of age represent that they have received parental consent to be featured in Sponsored Stories ads; (4) additions to Facebook's "Family Safety Center" that explain Sponsored Stories ads and enable parents to prevent their children from being featured in Sponsored Stories ads; (5) additional information shown to users upon joining, or soon thereafter, encourage new users to include in their profile relationships, including parents and children,[4] and if a confirmed parent-child relationship is established, the parents will be able to use the control mentioned   above through their own Facebook accounts; (6) additional educational materials regarding how Facebook advertising works to the 'parents" section of the Family Safety Center; (7) the creation and display of advertising to Users with a confirmed parental relationship with a minor user, directing them to the Family Safety Center, and/or other parent-specific resources on Facebook, and; (8) an opportunity for Plaintiffs' counsel to review Facebook's website materials regarding advertising and ensure that Sponsored Stories are clearly identified as ads, with the right to move the Court to call for an independent audit (for which Facebook will pay) if necessary. A.S.A. § 2.1.

There are also at least three alternative methods for assigning a dollar amount to the ability of the Facebook users to now avoid being in Sponsored Stories ads, and limit their appearances in Sponsored Stories ads.[5]   These tools are being created by virtue of this settlement and could not be forced upon Facebook otherwise.   The first valuation method establishes the value of the new educational information and user privacy control tools provided by the injunctive relief, premised upon the fact that they create a "real option" for

---

[3] An exemplar of what this tool will potentially look like is visible in Exhibit 31 to the Declaration of Jonathan E. Davis. All references which are designated only with "Ex." and a number are citations to exhibits to the Declaration of Jonathan E. Davis ("Davis Decl."); exhibits to other persons' respective declarations are so identified.

[4] An exemplar of what this messaging will potentially look like is attached as Ex. 32.

[5] This relief and the precedent it establishes has further value in that it will also influence other social media sites such as GooglePlus. All other existing and future social media sites will look to the changes here as a model as to how to obtain consent and provide meaningful information to users as to how their right of publicity will be used, and how to deal with the issue of minor consent.

-4-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

using Facebook that did not exists prior to the injunctive relief. This new option is essentially one in which the user can continue to use Facebook while still maintaining control over their appearance in Sponsored Stories. This methodology is based upon valuations assigned by economists to "call" type options in the financial markets. This Option Value methodology values the new option created by the injunctive relief in a range of $57.4 million to $145.1 million. An alternative method utilizes the previously established fair market value of the Class members' endorsements, and their newly created right to control those endorsements based in part on the value of future endorsements to Facebook. Finally, Plaintiffs contend that the new tools and information provided is worth at minimum $1 to each Class member, which places the value of the injunctive relief at least $123 million.

In response to the Court's requests, Plaintiffs herein provide a more detailed explanation of how the amount of actual damages that the Class members have suffered from appearing in Sponsored Stories ads was calculated. The past "actual damages" can be estimated with a reasonable amount of scientific certainty by utilizing the actual valuation represented by the "additional value" of Sponsored Stories ads paid for by advertisers on Facebook. Plaintiffs' experts performed the necessary groundwork for calculating such actual damages on the motion for class certification. *See* Section IV (C), *infra*. Plaintiffs (and Facebook in its separately filed brief) also set out in more detail the risks of continued litigation, including the likelihood of success and risks if Plaintiffs were to continue to litigate and seek the statutory penalties available to them under California Civil Code section 3344.

This case presents all the factors supporting the approval of certification and settlement of a class action: millions of class members, and a policy or practice by the defendant that Plaintiffs contend is applied uniformly to all class members. The proposed distribution to the Class provides relief for Class members who feel they have been harmed, and the injunctive relief addresses the issues identified in the Complaint and will provide significant benefits in terms of information available and remedying the asserted lack of consent issues. The Court should approve the proposed Settlement.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

## II. TERMS OF THE PROPOSED SETTLEMENT

The terms of the Settlement are as follows:

### A. The Proposed Settlement Class

Plaintiffs request that, pursuant to the terms of the Settlement, the Court certify the following proposed Settlement Class:

> **(a)** **Class:** All persons in the United States who have or have had a Facebook account at any time and had their names, nicknames, pseudonyms, profile pictures, photographs, likenesses, or identities displayed in a Sponsored Story, at any time on or before the date of entry of the Preliminary Approval Order.
>
> **(b)** **Minor Subclass:** All persons in the Class who additionally have or have had a Facebook account at any time and had their names, nicknames, pseudonyms, profile pictures, photographs, likenesses, or identities displayed in a Sponsored Story, while under eighteen (18) years of age, or under any other applicable age of majority, at any time on or before the date of entry of the Preliminary Approval Order.

A.S.A §§1.6, 1.17

### B. Payments to the Class / Claims Process

Class Members will be able to submit a claim for payment from the Net Settlement Fund, which will be the amount of the Common Fund after attorneys' fees and costs, service awards, and settlement administration costs are deducted. A Class Member will use a simple, online form, in which he or she will attest under the penalty of perjury that (a) the Class Member understands that some action he or she took on Facebook (such as liking a page, checking in at a location, or sharing a link), along with his or her name and/or profile picture, may have been displayed in a Sponsored Story shown to his or her Facebook Friends who were authorized by the Class Member to see that action; (b) the Class Member was not aware that Facebook could be paid a fee for displaying actions such as these, along with the Class Member's name and/or profile picture, to his or her Facebook Friends; (c) the Class Member believes that, if his or her name and/or profile picture was displayed in a Sponsored Story, he or she was injured by that display; (d) the Class Member is submitting only one claim form regardless of how many Facebook accounts the Class Member has; and (e) the Class Member

-6-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
Case No. CV 11-01726 RS

understands that he or she is releasing all claims against Facebook, and all other Released Parties, as set forth in Section 5 of the Amended Settlement Agreement.  (A.S.A. §4.1(a).)

Class Members who submit timely and valid Claims Forms ("Authorized Claimants," A.S.A.§1.1) will receive payments, either by check or through an Automated Clearing House transfers, unless the Court orders otherwise.  In the event it is mathematically impossible to make payments without exceeding the Net Settlement Fund, the available claims pool would instead be distributed to *cy pres* recipients proposed by the Parties and approved by the Court (the "*Cy Pres* Recipients," A.S.A. § 1.8).  As laid out in A.S.A. § 2.3, the following criteria will be used to determine the amount of claims paid:

1.    Each Authorized Claimant will be issued a payment of $10.00, subject to the exceptions and qualifications below.

2.    If payment of $10.00 to all Authorized Claimants would exhaust the Net Settlement Fund, each Authorized Claimant's share will be reduced pro-rata.

3.    If, given the number of Authorized Claimants, each Authorized Claimant's pro-rata share would be less than $5.00, the Court may, in its discretion, either (i) order the pro-rata amounts to be paid to each Authorized Claimant, or (ii) order the entire Net Settlement Fund to be distributed instead to the *Cy Pres* Recipients.

4.    Notwithstanding the foregoing, if it is not economically feasible to make any payment to the Authorized Claimants without exceeding the amount of the Net Settlement Fund, the entire Net Settlement Fund will be distributed instead to *Cy Pres* Recipients.

5.    If payment of $10.00 to each Authorized Claimant does not exhaust the Net Settlement Fund, all proceeds remaining in the Net Settlement Fund will be distributed to the *Cy Pres* Recipients.  However, the Court may issue an order, at its discretion, forgoing the distribution of funds to the *Cy Pres* Recipients and, instead, increasing each Authorized Claimant's share on a pro-rata basis until the Net Settlement Fund is exhausted.

The list of *cy pres* Recipients proposed by the Parties are organizations focus on consumer protection, research, and education concerning privacy-related interests in the rapidly

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
Case No. CV 11-01726 RS

evolving online landscape, and the safe use of social media technologies, with a particular emphasis on protecting the interests of minors.

## C. Injunctive Relief

The Parties have agreed to a stipulated injunction that will provide the relief described below addressing and clarifying the issues of consent and control of the use of the Class members' names and likenesses. Previously, it was in Plaintiffs' view impossible even for a person who carefully pored over Facebook's SRRs and Help Pages to discern exactly what a "Sponsored Story" was, except that it was plain that Facebook distinguished them from "ads," stating expressly that they are "different from ads." Ex. 34.

## D. Changes to the SRRs and Information on Facebook's Website and Help Pages

The changes to the SRRs and Help Pages clearly identify Sponsored Stories and seek permission, provide adequate notice and the ability to modify one's behavior. As part of the Notice in this action, the current users will learn of these changes. Significantly, in response to this information and with the new controls, a user can then not only "avoid" taking actions which can lead to being featured in Sponsored Stories, but also subsequently limit his or her appearances. Prospective users will be informed of how Sponsored Stories work *before* they sign up, something they do not currently have available to them.

Within a reasonable time, not to exceed six months following the Final Settlement Date (provided the Settlement is approved and the Judgment is final, A.S.A. §1.13), Facebook will modify Section 10.1 of the SRRs in part to read as follows:

> **You give us permission** to use your name, profile picture, content, and information in connection with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us. This means, for example, **that you permit a business or other entity to pay us to display your name and/or profile picture with your content or information**. If you have selected a specific audience for your content or information, we will respect your choice when we use it.
>
> If you are under the age of eighteen (18), or under any other applicable age of majority, you represent that at least one of your parents or legal guardians has also agreed to the terms of this section (and the use of your name, profile

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

picture, content, and information) on your behalf.

A.S.A. § 2.1(a)(emphasis added).

### E. New Tool for Limiting Appearances in Sponsored Stories

The Settlement provides that there will be a new tool or mechanism for meaningfully limiting appearances in Sponsored Stories, something that does not currently exist. A.S.A. 2.1(b). Facebook will enable users, upon viewing the interactions and other content that have been used in Sponsored Stories, to control which of these interactions and other content are eligible to appear in additional Sponsored Stories. *Id.* These settings will include the ability to prevent individual interactions and other content, or categories of interactions and other content, from appearing in additional Sponsored Stories. *Id.*

### F. New Information and Tool for Opting Out Minors

The Injunctive Relief for Minors is even more powerful. Under the terms of the injunctive relief, parents of minor users will be able to visit a public link on the Facebook website and utilize a tool which will enable the parent to prevent the name and likeness of their child from appearing in Sponsored Stories.[6] A.S.A. § 2.1(c)(iii). Further, if the minor's parent is also a Facebook user, the minor and the parent can use Facebook to indicate their relationship to each another. A.S.A. § 2.1(c)(ii). Under the terms of the Amended Settlement Agreement, when the parent and minor have confirmed a parent-child relationship, the Facebook system will record this connection and allow the parent to utilize the opt-out tool through their own Facebook account, without obtaining access to their children's account. A.S.A. § 2.1(c)(iii).

Additionally, the Amended Settlement Agreement requires Facebook to add clear, easily understandable information about how advertising works on Facebook to the "parents" section of its Family Safety Center and will created and show advertising to users with a confirmed

---

[6] Currently, this tool only allows parents to prevent the names and likenesses of their children from appearing alongside Facebook Ads. The injunctive relief negotiated by the parties will extend this tool to enable parents to prevent the name and likeness of their children from appearing by Sponsored Stories. A.S.A. § 2.1(c)(iii). An exemplar of what this tool will potentially look like is attached as Ex. 36.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

parental relationship with a minor, directing them to the Family Safety Center, and/or other parent-specific resources on Facebook. A.S.A. § 2.1(c)(iv). Further, Facebook will for a period of 90 days after settlement, also work with Plaintiffs to identify other educational information that needs to be clarified. Class Counsel shall also have the right to request the Court to order a one-time audit as to compliance with the injunctive relief, for which Facebook will pay. A.S.A. § 2.1(e). In this way, not only does the injunctive relief obtained in this settlement help to insure parents have the information needed to learn about how minor children may appear in Sponsored Stories ads, it also allows parents to opt their children out entirely from having their name and likeness appear in Sponsored Stories. In other words, under the proposed injunctive relief changes, parents can completely opt their children out of Sponsored Stories.

Finally, Facebook will add a control in minor users' profiles that enables each minor user to indicate that his or her parents are not Facebook users.[7] If a minor indicates that his or her parents are not Facebook users, Facebook will make the minor ineligible to appear in Sponsored Stories under he or she reaches the age of 18, until the minor changes the setting to indicate their parents are on Facebook, or until a confirmed parental relationship with the minor user is established.

### G. Plaintiffs' Litigation Costs and Fees

Subject to the Court's approval at a Fed. R. Civ. P. 23(h) hearing, Class Counsel will seek their attorneys' fees and costs with respect to the Settlement of the claims of all Settlement Class Members out of the $20 million common fund. A.S.A § 2.5. There is no "clear sailing" agreement.

### H. Service Payments to Class Representatives

Subject to Court approval, Service Payments in a total amount not to exceed $12,500 will be paid to each of the Class Representatives. A.S.A. § 2.6.

---

[7] A draft "mock up" of what this tool will potentially look like is provided as Ex. 30.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

### I. Release By Settlement Class Members

The Settlement Class will release the "Released Parties" from the "Released Claims," all as defined in the Amended Settlement Agreement, including a waiver of unknown claims otherwise prohibited by California Civil Code § 1542. A.S.A. §§ 5.2, 5.3.

### J. Notice

Starting no later than thirty (30) calendar days after entry of the Preliminary Approval Order, the Settlement Administrator will set up a website and post the Long Form Notice. A.S.A. §3.3 (a). No more than 30 days following entry of order, Facebook or its designee will begin transmitting the Email Notice by email to each Class Member (including Minor Subclass Members) for whom Facebook has a valid email address, including persons who previously indicated that they do not wish to receive any communications from Facebook. A.S.A. §3.3(b). A summary notice will also be published (i) three times in an insertion in the national Monday-Thursday edition of the *USA Today* newspaper, and (ii) once by transmission through PR Newswire's US1 distribution service. A.S.A., §3.3(c). Facebook shall have up to 90 days after entry of preliminary approval of order to complete the dissemination of the Short Form Notice. A.S.A. § 3.3.

### III. STATEMENT OF FACTS AND PROCEDURAL HISTORY

#### A. Facts Concerning Defendant Facebook, Inc.

Facebook is the world's largest social networking site. It generates most of its revenue from advertising. Ex. 1, ¶13.[8] As of December 2011, Facebook had over 161 million monthly active users in the United States.[9] Ex. 28, p. 44.

On January 25, 2011, Facebook launched a new advertising service called "Sponsored Stories." Ex. 22, Resp. No. 1.3. Since that time, when a Member posts, "Likes," "Checks-in," or uses an application or game, and the content relates to an ad campaign in some

---

[8] All references which are designated only with "Ex." and a number are citations to exhibits to the Declaration of Jonathan E. Davis.

[9] As of August 31, 2012, 123,868,976 Facebook members had appeared in a Sponsored Story. Of that number, 19,761,991 are minors. *See* Decl. of Christopher Plambeck, filed concurrently by Defendant Facebook.

-11-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

predetermined way, the Member's profile image and name may appear, along with content created by Facebook, as an endorsement.   Plaintiffs contend this process is a paid advertisement on the pages viewed by some or all of the Friends of that Member.   These Sponsored Stories ads typically appeared in the right-hand column along with other ads that have been paid for by Facebook's advertisers.   More recently, Sponsored Stories ads have been displayed in the Newsfeed column where they are denoted as "Sponsored."  They do **not** appear on pages seen by the Members whose names and/or likenesses are being used.  *See* Ex. 7; and Ex. 4.

The Sponsored Stories ad service is already enabled for all Members when they sign up, and Plaintiffs contend that Members are unable to opt-out of the service.  Ex. 5, pp. 24-26; Ex. 6 p. 140:3-6; Ex. 23, pp. 302:20-303:02.  The most common action that leads to an appearance in a Sponsored Story ad, is clicking on a Facebook Like button anywhere on the Internet. Reasons for doing so include being able to thereby take advantage of some offer, or simply in order to be able to see content on a page.

At any given time, only a single user agreement was in effect between Facebook and all Class members in the United States.  See Ex. 6, pp. 166:11-168:9; 169:3-1.[10]  That agreement applied uniformly to all Class members during the time period in which it was in effect.  *Id.* The user agreement has been modified over time, but only one is in effect at a given time.  *Id.* The terms of use effective during the Class Period thus far (generally referred to as the Statement of Rights and Responsibilities, or "SRR") are Exs. 16-21 to the Davis Declaration.

Plaintiffs contend that none of the operative versions of the SRRs disclosed to Members the fact that they may appear in Sponsored Stories ads or sought their consent as to appearances in Sponsored Stories.   Plaintiffs further contend that a problem with the voluminous "Help Center" (hundreds of linked pages) and the Settings arose from Facebook's failures to notify users of the addition of Sponsored Stories, who upon visiting the "Help Center" were told "You

---

[10]  Facebook's Amended Resp. And Obj. To Plaintiffs' First Set Of Interrogatories, Response to Interrogatory No. 13. Ex. 10.

-12-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

can edit your ad privacy settings through the 'Account Settings' link at the top of any page within Facebook or by clicking here." Ex. 35. If a Facebook user clicked on that link, they were taken to a page where it appeared that they were given the ability to "opt-out" of appearing in all advertisements. Users who did this believed that they had successfully prevented their likeness from being paid with ads. However, members who had chosen this option were still eligible to appear in Sponsored Stories, even though they likely believed they were not appearing in advertisements. Facebook's "Help Center" in some areas states that Sponsored Stories are "different" than Facebook Ads, thus, Plaintiffs allege, leading to further confusion. Ex. 34.

### B.    Facts Concerning The Class Representatives

Prior to January 1, 2011, Susan Mainzer uploaded a Facebook Profile picture of herself that clearly bears her likeness, visible in Ex. 7. On March 22, 2010, Ms. Mainzer clicked on the Facebook "Like" button for UNICEF USA. Ex. 8, pp. 62:11-16, 72:4-17; 77:23-78:12. Ms. Mainzer's name and profile picture appeared in a UNICEF Sponsored Story on facebook.com and displayed to her Friends. Ex. 7. She was not paid for her appearance in that ad, or for her appearance in others since then. Ex. 9, Resp. to Int. Nos. 8, 11.

Prior to January 1, 2011, James H. Duval, a minor at the time, uploaded a Facebook Profile picture of himself that clearly bore his likeness visible in Ex. 11. Mr. Duval appeared in Sponsored Stories shown to his Friends. Ex. 2. Three days after Facebook launched Sponsored Stories ads—eight weeks after he clicked on the "Like" button—Mr. Duval (unbeknownst to him) began appearing in Sponsored Stories about Coca-Cola, shown to his friends. Ex. 34. At no point did Facebook seek or obtain consent from his parents or other legal guardians to use his name or likeness as required under California law. He was not paid for his appearance in any ads. Ex. 34.

Sometime prior to January 1, 2011, representative "W.T," a minor at the time, uploaded a Facebook Profile picture of himself that clearly bears his likeness in the form of a photograph. On Dec. 11, 2010, W.T. clicked on the Facebook "Like" button for Craftsman.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

Ex. 14. On or about March 20, 2011 W.T. (unbeknownst to him), began appearing in ads. *See* Ex. 3. W.T. was not paid for his appearance in any of those ads. Ex. 15, Resp. to Int. Nos. 8, 11.

### C.      Procedural History

This action was filed in Santa Clara Superior Court on March 11, 2011. Plaintiffs amended to add a subclass of minors on March 18, 2011. The case was thereafter removed to federal court on April 8, 2011. Following an initial Motion to Dismiss after removal, Plaintiffs amended the Complaint; the operative Complaint is the Second Amended Complaint. Facebook filed a second Motion to Dismiss, which was denied on December 16, 2011. Plaintiffs filed their Motion for Class Certification on March 29, 2012, and their Reply on May 3, 2012. The Motion was fully briefed at the time the Parties' original Term Sheet was entered into on May 22, 2012. Plaintiffs filed a first motion for Preliminary Approval of Settlement on June 14, 2012. The Honorable Lucy H. Koh recused herself after the first Motion for Preliminary Approval was filed. After transfer of this matter to the Hon. Richard Seeborg, the motion was heard on August 2, 2012, and denied without prejudice on August 17, 2012.

### D.      Discovery

The discovery in this case has been extensive. There have been twenty-one (21) depositions taken in this action, including 7 experts and over 4,263 pages of transcripts. Arns Decl., ¶29. These included key personnel of Facebook involved in the development of Sponsored Stories ads and persons most qualified to discuss the workings of Facebook's systems. *Id.* at ¶¶29-30. Plaintiffs' Counsel prepared and served 11 sets of Requests for Production of Documents, for a combined total of 214 individual requests, upon Defendant; six sets of Requests for Admission, a total of 249 requests; and 25 Interrogatories. *Id.* at ¶¶34-36. The documents produced by Facebook included many "natively produced" PowerPoint documents and e-mails. The document demands resulted in over 200,000 pages being

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

produced by Facebook, not counting responses to third-party subpoenas served by Plaintiffs. Arns Decl., ¶34. Plaintiffs issues subpoenas to five third parties. *Id.* at ¶37.

Plaintiffs' Counsel received, analyzed and responded to 105 interrogatories from Facebook. Arns Decl. ¶40. Responding to these interrogatories involved extensive communication with the plaintiffs, verification of their answers, and service of the responses. The demanding task resulted in over 275 pages of initial and supplemental responses from named plaintiffs. Arns Decl., ¶40. Counsel received, analyzed and responded to 269 Requests for Production of Documents from Defendant; as well as 351 Requests for Admissions from Defendant, which were reviewed, analyzed and responded to. *Id.* at ¶¶41-42. The requests resulted in the production of over 7,000 pages of documents by Plaintiffs. Arns Declaration ¶41.1. Plaintiffs and their guardians have dedicated at least 150 hours of time staying informed, responding to discovery requests and being deposed. Arns Decl., ¶28.

### E.     Settlement Negotiations

Plaintiffs and Defendant Facebook mediated the case at JAMS in San Francisco, before the Hon. Edward A. Infante, the retired former Chief Magistrate Judge of the Northern District of California, on March 1, 2012. Plaintiffs' settlement conference statement was 231 pages long, and also provided a 28-page long executive summary. Arns Decl., ¶2. The case did not settle at that time, but the Parties achieved a better understanding of one another's position. Subsequently, lead counsel for both parties continued to negotiate, with the mediator being kept apprised at all times of the status. *Id.* at ¶4. Eventually a framework for settlement was developed between Facebook and counsel for Plaintiffs. Following the hearing and Order on the First Motion for Preliminary approval of settlement, Plaintiffs and Defendants negotiated changes to the Settlement Agreement in an effort to address the Court's concerns. *Id.* at ¶4.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

## IV.   THE COURT SHOULD GRANT PRELIMINARY APPROVAL OF THE SETTLEMENT

### A.   The Settlement Meets All Requirements For A Presumption Of Fairness

The Court at the preliminary approval stage determines only whether "[1] the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives or segments of the class; and [4] falls within the range of possible approval," such that it is presumptively fair, and it is therefore worthwhile to give the class notice of the settlement and proceed to a formal fairness hearing. *Alvarado v. Nederend*, No. 1:08-CV-01099, 2011 U.S. Dist. LEXIS 2326, at *14-15 (E.D. Cal. Jan. 11, 2011), quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007). The proposed Settlement meets each of these requirements.

The proposed settlement is a product of arm's length negotiations by Plaintiffs' counsel, well versed in class actions, and thus is entitled to an initial presumption of fairness. *See Alvarado*, 2011 U.S. Dist. LEXIS 2326, at *15. "'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation. This is because 'parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation.' Thus, 'the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.'" *Nat'l Rural Telecomms. Coop. v. DirecTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004)("*Nat'l Rural*") (citations omitted). Here, in investigating this action thoroughly, Class Counsel has demonstrated a high degree of competence in the litigation of this case, and strongly believes that the Settlement is a fair, adequate, and reasonable resolution of the Settlement Class's disputes with Defendants and is

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

preferable to continued litigation.[11]   Arns Decl., ¶58.   In Plaintiffs' counsel's view, the Settlement contains no obvious deficiencies: it provides class relief to address all of the violations alleged in Plaintiff's complaint, as well as issues which came to light during discovery. Arns Decl., ¶57. Nor does the Settlement grant preferential treatment to the class representatives or any segment of the class, with the exception of the proposed incentive awards for the class representatives. Each class member is entitled to the same type of relief.

The settlement falls within the range of possible approval as it accomplishes much of what Plaintiff sought in the lawsuit now—without the risk of a denial of class certification, an adverse grant of summary judgment or adverse verdict at trial. *See Alvarado*, 2011 U.S. Dist. LEXIS 2326, at *16-17 (to evaluate the range of possible approval, courts primarily consider the value provided by the settlement against the claims' expected recovery if tried). Numerous factors further support the fairness of the settlement, including (1) the substantial amount offered in settlement, and (2) the risks of continued litigation.

### B.   The Total Amount Offered In Settlement Supports a Finding That it is Fair and Reasonable.

The Amended Settlement Agreement merits preliminary approval given that, among other things, it provides for a common Settlement Fund of $20 million, which will include at least $12.5 million (less administrative fees, costs, and service awards) either distributed to the Class or to *cy pres*, and injunctive relief which squarely addresses the key issues in Plaintiffs' Complaint, which will be in place for two years. A.S.A. §2.1. The injunctive relief adds further value and can be assigned a dollar value in several ways, as detailed below. Under the "real

---

[11] The 9th Circuit in *Lane v. Facebook*, No. 08cv-3845 RS 2009 WL 2076916 (N.D. Cal. May 24, 2010), *aff'd*, 2012 US App. LEXIS 19767 (9th Cir. September 20, 2012) noted that the district court's role in reviewing whether a settlement was "fair, adequate and free from collusion" should be guided by several factors: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; (8) and the reaction of the class members to the proposed settlement. *Lane* at *10 citing *Hanlon v. Chrysler Corp.,* 150 F.3d 1011 (9th Cir. 1998). Plaintiffs believe that in light of these guiding principles, the settlement is decidedly fair, adequate, and free from collusion.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

option" method, that value is in the range of $145.1 million to $57.4 million, depending upon the cost associated with exercising the option. Alternatively, control of the "asset" of the friend-endorsements is approximately $9.4 million per month (or approximately $226 million for the two-year life of the injunction). Finally, Plaintiffs contend that Class members would value the new rights being worth at least $1. "In assessing the consideration obtained by the class members in a class action settlement, '[i]t is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness.' In this regard, it is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Nat'l Rural Telecomms. Coop., supra,* 221 F.R.D. at 527 (citations omitted). Plaintiffs have taken into consideration the substantial risks of continued litigation in arriving at the monies that are being offered in settlement to the Class and the scope of the injunctive relief obtained.

The common fund is worth $20 million, and the injunctive relief is of substantial value to the Class and the public of a further $57.4 million to $145.1 million.

### C.   Calculation of Additional Revenue / Class Member's Damages for Misappropriation of Right of Publicity In Valuing Past Damages

In assessing the settlement value of the case, Plaintiffs took into consideration the actual damages suffered by the Class members when they were deprived the fair market value of their names and likenesses being used in Sponsored Stories ads. Plaintiffs contend that the actual market value of their names and likenesses appearing in a Sponsored Story on Facebook, is the difference between what advertisers were willing to pay Facebook to display an advertisement containing Plaintiffs' name and likenesses (e.g., a Sponsored Story ad) and a standard ad that does not contain users' names and likenesses. This difference in what advertisers are willing to pay for these two types of advertisements represents the actual market value that advertisers place on the appearance of the users' likenesses in Sponsored Stories advertisements.

This value is measurable because friend-endorsed ads have a higher market value among advertisers than non-friend-endorsed ads. Arns Ex. 7, ¶8a; Arns Ex. 6, ¶11a; Arns Ex.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

5, ¶¶7b,7c,7m. Facebook is able to obtain additional revenue from advertisers because of the Plaintiffs' appearance in the ads and the accompanying apparent endorsement by Plaintiffs; this is the commercial actual market value of the Member's identity.  Arns Ex. 7, ¶¶8b, 8o, 8p, 8q; Arns Ex. 6, ¶11e.  The deprivation of that value belonging to Class Members by Facebook (due to misappropriation and the denial of the right to negotiate for it) is the Class Members' injury.

### 1.    Valuation Based on Facebook's Representations as to Value

In order to determine the value of the endorsement component of a Sponsored Story ad, one can compare a Sponsored Story ad to a hypothetical "Standard Ad," which is the same as a Sponsored Story except that it does not contain the users name and likeness as an apparent endorsement component in the ad.  The amount of the *additional* revenue[12] attributable to the use of a Plaintiff's likeness is then calculated by simply subtracting the amount of revenue Facebook <u>could</u> have generated from the hypothetical Standard Ad from the revenue Facebook actually received for running a given ad campaign.  This method is thus extremely simple: each Class member's individual damage is determined by subtracting from the revenue actually received for each Sponsored Story ad campaign, the revenue Facebook would have received from selling a Standard Ad for that same campaign, and what remains is the revenue related solely to the user's appearance in the advertisement, in other words:  **Sponsored Stories Actual Revenue minus Standard Ad Revenue equals "Additional Revenue."**   This additional revenue represents the amount Class Members would have been able to negotiate for the use of their likenesses in Sponsored Stories ads, had they not been denied the opportunity. Arns Ex. 7, ¶8q.

---

[12] Additional revenue is used in these calculations, rather than additional profits for Sponsored Stories ads over other types of ads, for two reasons. First, whether Facebook makes a profit is irrelevant to whether Plaintiffs have been injured; even if Facebook sells the ads but loses money, Plaintiffs have still been denied the ability to negotiate their appearance as models in advertisements. Second, Facebook may calculate its profit in different ways; what should or should not be included is a matter of accounting. Since the incremental cost of delivering a Sponsored Stories ad is no greater than that of delivering a standard ad (Arns Ex. 27, ¶¶18,19) the additional revenue is the true measure of the difference between the two.

-19-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

For this first calculation, Plaintiffs assign a value of one-half of the value of the revenue for the actual ad campaign to the Standard Ad. The basis for this is Facebook's many public statements that "Ads shown with the names of people's friends are twice as effective as those without." One example is Facebook's "Guide to the New Facebook Ads Manager," which claims "Ads shown with the names of people's friends are twice as effective as those without...." KMO Decl. Ex. 4. The empirical claims of the Nielsen Company, working in partnership with Facebook, support these assertions. KMO Decl. Ex. 3, p. 10. Thus, from these statements it can be inferred these ads are more valuable than standard ads. Arns Ex. 5, ¶¶7m, n, o. Further, since advertisers pay in proportion to what they believe their return on investment will be, an ad that is twice as effective will command twice as much, all other things being equal in a free market. Arns Ex. 5, ¶7q; Arns. Ex. 7, ¶8r. It is standard practice for advertisers to pay model and spokespersons for use of their names and likenesses. Arns Ex. 5, ¶7k; Arns Ex. 6, ¶11d. Indeed, according to Plaintiffs' marketing expert Gary Frazier, the amount of such payment would be proportional to the relevance of that person's endorsement to the audience to which the ad is shown. Arns Ex. 6, ¶11d.

## 2.     Valuation based on the Click-Through-Rate

As Plaintiffs contended on class certification, another method of calculating their actual damages was use the click-through rate ("CTR"), a ratio Facebook tracks and records. Arns Decl. ¶20. The CTR is the ratio of the number of times an ad is clicked to the total number of times the ad is shown. Arns Decl. Ex. 7, ¶8f. For example, a 0.2% CTR would mean the ad was clicked on twice in a thousand showings, or "impressions." Plaintiffs' expert David Taber, who has extensive experience in online advertising, confirms that CTR is the most commonly used and consistent metric employed by advertisers when valuing online ad campaigns. Arns Ex. 5, ¶¶7q-t; Arns Ex. 7, ¶¶8d-f. See also Arns Ex. 4, sub Ex. 2, pp. 40:20-42:5; 41:24-42:5. Clicking on an ad is thus a good signal that the ad is relevant to the user. A more "relevant" ad is one that is, by the fact that it gets the user's attention, more effective; effective ads are what advertisers pay for. Arns Ex. 6, ¶11e; Arns Ex. 5, ¶8p.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

1    The online advertising industry therefore consistently relies on CTR as the most

2    universal proxy for effectiveness of online ads. Arns Ex. 5, ¶7s. This is because CTR

3    normalizes differences among different types of ads, different ad sizes, locations on pages,

4    colors, and all sorts of other variables. Arns Decl. Ex. 5. Facebook.com's "Suggested Best

5    Practices for Advertising on Facebook" guide tells advertisers on Facebook that for evaluating

6    an ad "[y]our click through rate (CTR) is a particularly good indicator of how well your ads are

7    doing." Arns Decl. Ex. 4, sub. Ex. 8.[13] The CTR is also important to advertisers because it

8    shows that the ad is more effective and more likely to lead to "conversion," that is, an ultimate

9    sale of the product or service being advertised. Arns Decl. Ex. 7, ¶¶8i, j, m. CTR is so

10   important to Facebook that it regularly runs controlled tests to determine the effectiveness of ad

11   products. Arns Ex. 4, sub Ex. 2, p. 165:13-21. In test after test Facebook, has found that the

12   CTR for Sponsored Stories ads is higher than that of non-friend-endorsed ads, indeed, the CTR

13   for non-endorsed ads is a fraction of that of Sponsored Stories ads. Arns Decl. Ex. 7, ¶8u.

14       Fernando Torres is an economics expert and principal of IP Metrics, a consulting

15   company based in San Diego, California. He is an expert in the valuation of rights to publicity.

16   Mr. Torres created a formula, which Plaintiffs contend, can be used to calculate the value of the

17   "friend endorsement" and hence the class members' damages, for purposes of the class

18   certification motion in this case. Arns Decl. Ex. 7.

19       Torres concludes that advertisers would seek out and pay more for an ad with a higher

20   CTR. *Id.* at ¶¶8i, 8r. "Facebook Ads" are another ad product that appears on Facebook's

21   website, but do not contain a users name and likeness, and are therefore a good stand-in for the

22   hypothetical "Standard Ads." *Id.* at ¶8v. Plaintiffs therefore use the comparison of the CTR of

23   non-friend-endorsed standard display ads ("Standard ads" in the equation) to the CTR of

24   Sponsored Stories ads in order to compare these ads' relative values:

25

26

27   [13] Facebook's internal studies of increased engagement of Sponsored Stories show that relative
     to Standard Ads, Sponsored Stories increased "Total Engagement" by ▮▮%, increasing from a
28   click rate of ▮▮% to ▮▮%. Arns Decl. Ex. 4, Ex. 5.

-21-

$$\left( \frac{Standard\ ads\ CTR}{Sponsored\ Stories\ ads\ CTR} \right) = Base\ Revenue\ Factor$$

The Base Revenue Factor is just a number representing the ratio of effectiveness. This can be used to determine how much Facebook would have made on a (hypothetical) Standard Ad compared to what it actually made when it displayed a Sponsored Stories ad, based on the differences in their respective CTRs. Arns Decl. Ex. 7, ¶8u. Multiplying the actual revenue collected for a Sponsored Stories ad by the Base Revenue Factor yields the amount an advertiser would have paid for a less-effective Standard Ad. *Id.* at ¶8v. Then one simply subtracts the price of the Standard Ad from the actual price paid for the Sponsored Stories ad to find the "additional value" which was due to the friend-endorsement.

For example, if users click on a Sponsored Stories ad 4 times for every 100 times it is shown on a group of users' pages, then the CTR for that Sponsored Stories ad is 4 percent, or .04. This represents the percentage of people viewing an ad who were interested enough in the ad to find out more information about the product or service advertised by clicking on it. *Id.* at ¶8e. An otherwise identical but non-friend-endorsed ad shown to the same users might have a lower CTR, such as .01. The Standard Ad's value relative to the Sponsored Stories ad, comparing their CTRs as a ratio, is calculated as follows 0.010 / 0.040 = 0.25.

The Standard Ad's CTR value (Base Revenue Factor) in this scenario is thus 0.25 of that of the Sponsored Stories ad, meaning the Sponsored Stories ad would be four times more valuable. Multiplying the Base Revenue Factor by the monies (revenue) actually charged for the Sponsored Stories ad campaign by Facebook, determines Facebook's revenue had it served "Standard Ads" instead of a Sponsored Stories ads. *Id.* at ¶8v. Subtracting the Standard Ad revenue from the revenue Facebook actually charged for the Sponsored Stories ad campaign leaves the additional revenue Facebook earned from using the names and likeness of the Class Members.

Plaintiffs' statistical expert Dr. Richard Drogin's Declaration on Class Certification states that relevant CTR for Standard Ads campaigns (using a statistically similar population as that to which Sponsored Stories ads were shown during the same period) can be calculated

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

from the data that Facebook maintains. Arns Decl. Ex. 8, ¶¶5-16. Once an average CTR for Standard Ads is determined, the formula above can be used to calculate the "added value" of the friend endorsement. That added value can then be apportioned on a class wide, per-plaintiff, or per-ad campaign basis. *Id.* at ¶15.

Plaintiffs' economist Fernando Torres applied the formula to an ad campaign Facebook ran for ████. The campaign had a CTR of 0.000104, and a CPC (cost per click price charged by Facebook) of $0.17. Torres Decl. ¶8y. The Class' damages for this period, calculated using the incremental ratio of 76% from that campaign for all campaigns, results in additional value for Facebook's total Sponsored Stories ads revenue for the year 2011 of $47,087,066. *Id.* at ¶8y.

The "added value" must then be divided among the persons whose names or likenesses were used in a particular ad campaign. This can be done based on the number of impressions in which each Class Member appeared for each ad campaign. Alternatively, a statistically meaningful CTR can also be determined for all ad campaigns to arrive at a class wide CTR. Arns Decl. Ex. 8, ¶15. The amount of money attributable to the typical member's appearance in a single Sponsored Stories ad can be determined using this CTR. Facebook has data as to each Sponsored Stories ad in which each Member has appeared. *Id.* at ¶5. Despite the large volume of data, the calculations necessary to determine the CTR for each ad campaign and to then multiply this for each Class member can be done inexpensively using a computer program. Ex. 27, ¶¶11-14.

Facebook has recently provided updated information regarding the number of class members and revenue obtained from the sale of Sponsored Stories. These new numbers indicated that as of August 31, 2012, a total of 123,868,976 users had appeared in Sponsored Stories, generating total revenue of $233,792,612. *See* Declaration of Christopher Plambeck. Applying the incremental ratio Mr. Torres used above to these new numbers, the "actual damages" calculated by this approach for a typical Class member, is approximately $1.45 per user. Assuming the incremental value of the user's endorsement is 50% (i.e. Facebook's prior

statements that ads including a friend's likeness are twice as effective[14]) then actual damages calculated by this approach is $0.94 per class member.

### D.   Valuation of Statutory Damages for Purposes of Settlement

Civil Code section 3344 provides for $750 statutory damages.  However, as discussed in detail *infra*, there are significant potential problems with proof as to Plaintiffs' entitlement to these damages and the viability of Facebook's other defenses, which justify a discount for settlement.

This Court also approved a settlement that was recently upheld by the Ninth Circuit, and which involved *cy pres* and injunctive relief.  *Lane v. Facebook*, No. 08cv-3845 RS 2009 WL 2076916 (N.D. Cal. May 24, 2010), *aff'd*, 2012 US App. LEXIS 19767 (9th Cir. September 20, 2012).  The Ninth Circuit held that the $9.5 million in funds—exclusively for cy pres—was properly found to be fair and reasonable in settlement, notwithstanding that some of the class members might have significant claims for statutory damages if they were successful at trial.  The Court noted that the fact that the claims of some class members might be more valuable than others did "not cast doubt on the district court's conclusion as to the fairness and adequacy of the overall settlement amount to the class *as a whole*."  Further, it noted that:

> a class-action *settlement* necessarily reflects the parties' pre-trial assessment as to the potential recovery of the entire class, with all of its class members' varying claims. So even if some of the class members in this case would have successful claims for $2,500 in statutory damages under the VPPA, those individuals represent, to use the candid phrasing of Objectors, "only a fraction of the 3.6 million-person class." Their presence does not in itself render the settlement unfair or the $9.5 million recovery among all class members too low.

*Lane*, at *25-26 (emphasis in original)(citation omitted).  Similarly here, the fact that only a percentage of the Class will receive between $5 and 10 in cash does not render the amount in settlement—here more than $12.5 million (less administration fees and costs) potentially distributed to the Class—too low, even in light of the $750 statutory damages provision in Cal. Civ. Code. §3344.  Most Class members' actual damages will be below a dollar.  To the extent

---

[14] *See* Ex. 1, ¶44.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

that certain Class members do not receive a cash payment, they are still receiving the benefit of the injunctive relief changes and the impact on the online industry that the lawsuit will bring. Further, persons who believe that they have viable claims for more can opt out and bring a separate suit, as the Ninth Circuit noted in *Lane.*

### E. This Case Presents Circumstances Appropriate for *Cy Pres* Distribution In Place of Damages Awards to Class Members If Distribution Becomes Impracticable

The facts of this case do not lend themselves to the distribution of an award of meaningful monetary relief to the <u>entire</u> Class, due to the size of the Class—over 123 million individuals who have been in at least one Sponsored Story ad. The size of the award that would be necessary to provide each Class member in a nationwide class with an amount of money such that they would be likely to be interested in seeking out the award would just be too large. Facebook.com has over 153 million Members in the United States; over 51 million of these are minors. Ex. 1, ¶13.

A damage award of only one dollar for each and every Class member assuming 123 million Class members would be $123 million. Ten dollars ($10) to each Class member would require a settlement fund of over one billion dollars. *Id.*[15] Furthermore, based on the calculations above, the class members' individual damages are not large. Based on figures provided by Facebook, the average additional revenue that Facebook is calculated to have earned per class member was only between approximately $0.94 to $1.45. *See* Section IV(B)(1)(b), *supra.* Thus, the amounts offered of $5 to $10 to the claiming Class members (assuming a claims rate of no more than 2.5% of the total Class) is not disproportionate to the damage suffered by the vast majority of class members.

---

[15] Further, the potential statutory damage award under Cal. Civil Code §3344 would be of such size that it could potentially serve as a basis for appeals by Facebook on due process grounds. This would be similar to the arguments which led to a ruling that punitive damages must be proportional to the wrong. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

**1.    Case Law Supports the Use of Cy Pres Awards in Place of Damages Where Distribution is Impracticable.**

The Parties believe that, should the claims rate not permit a meaningful distribution to the claiming Class members, a *cy pres* award of over $10 million in the common fund to the suggested recipients will provide the next best relief to benefit the Class. The Court of Appeals for the Ninth Circuit, and other jurisdictions, have recognized that in some cases, the inability to award meaningful amounts in damages to class members justifies the use of *cy pres* to further the interest of a class. In *Catala v. Resurgent Capital Services L.P.*, No. 08CV2401 2010 U.S. Dist. LEXIS 63501 (S.D. Cal. June 22, 2010), for example, a *cy pres* only settlement was approved where the amounts available to the Class would have been trivial when divided among the class members (about 13 cents per class member). The Ninth Circuit has also explained that "when a class action involves a large number of class members but only a small individual recovery, the cost of separately proving and distributing each class member's damages may so outweigh the potential recovery that the class action becomes infeasible ... *cy pres* distribution avoids these difficulties ... federal courts have frequently approved this remedy in the settlement of class actions where the proof of individual claims would be burdensome or distribution of damages costly." *Six (6) Mexican Workers,* 904 F.2d 1301, 1305 (9th Cir. 1990) (citations omitted).

Circuit courts across the country have also noted their approval of or adopted the "infeasibility" test (the use of *cy pres* awards where economic damages is infeasible) and approved settlements which consisted of "*cy pres* only awards" in lieu of damages, or awards of *cy pres* where funds available would not result in meaningful individual awards even if large in the aggregate. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 34 (1st Cir. 2009); *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 436 (2d Cir. 2007)(recognizing the principle but holding that the case at bench did not meet the criteria for *cy pres* distribution); *In re Holocaust Victim Assets Litig.*, 424 F.3d 132, 146 (2d. Cir. 2005) ("distribution would have resulted in the payment of literally pennies to each of the millions of individuals who would fall into the Looted Assets Class.... [W]e have previously affirmed the

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

District Court's use of a *cy pres* remedy in this case"); *Bebchick v. Pub. Utils. Comm'n*, 318 F.2d 187 (D.C. Cir. 1963) (impossibility of individual refunds for train and bus tickets led to the creation of a fund to benefit public transit riders); *see also In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 323 (E.D. N.Y. 2010)(*cy pres* allocation of $2.5 million where administrative costs of distributing it would reduce payments to $2.00 per claimant).

In *Boyle v. Giral*, 820 A.2d 561, 569 (D.C. 2003), an antitrust case concerning vitamin products, the District of Columbia Court of Appeals approved a *cy pres* only award to organizations promoting the health of District of Columbia residents where only $1 would have been available for each Class member. The Court of Appeals noted:

> Such distributions, including the **entire amount** of the consumer **settlement fund rather than just the residue,** are being used or advocated increasingly where direct distribution of settlement funds to individual class members is impractical; and where important consumer goals, such as disgorgement of ill-gotten gains from and deterrence of future over-pricing and manipulation of market allocation by the offending entities, can be achieved … . We are satisfied that the fund will benefit consumers.

*Id.* at 569 (emphasis added). *See also In re Heartland Payment Sys., Inc.*, No. 09-2046 2012 U.S. Dist. LEXIS 37326 (S.D. Tex. March 20, 2012)(approval of a *cy pres* award of $1 million in settlement where only 290 valid claims out of a class of 130 million persons who had suffered from a data security breach by hackers as to their payment cards).

The American Law Institute has also expressed approval of the use of *cy pres* in such circumstances, where even though the class members can be identified through reasonable effort, (a) the distributions are insufficiently large to make individual distributions economically viable, and (b) the case is not one where funds remain after distributions because some class members could not be identified or chose not to participate. *Principles of The Law of Aggregate Litigation*, § 3.07 (a), (b) A.L.I. (2010)(emphasis added)("The P.O.A.L."). In a case such as this, The P.O.A.L. advises that if the court finds that individual distributions are not economically viable, "the settlement may utilize a cy pres approach." The P.O.A.L, § 3.07 (c). Under the Amended Settlement Agreement, if distributions based on the claims made fall below a certain level, neither subsections (a) nor (b) of The P.O.A.L., § 3.07 are fulfilled,

-27-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

distribution to the class members would be economically infeasible, and *cy pres* is appropriately used under the A.L.I. guidelines.

This Court approved the distribution of *cy pres* to a privacy foundation as the primary relief in *Lane v. Facebook*, No. 08cv-3845 RS 2009 WL 2076916 (N.D. Cal. May 24, 2010), *aff'd*, 2012 US App. LEXIS 19767 (9th Cir. September 20, 2012)); Despite this being an all *cy pres* settlement, the benefit to the class was considered so beneficial to the class the Court awarded a multiplier of 2.0 to the fees for Plaintiffs' counsel. As noted, other courts have also endorsed the use of cy pres in lieu of damages awards, where it is impracticable to distribute monies to them. *See In re Mexico Money Transfer Litig.*, 164 F.Supp.2d 1002 (N.D. Ill. 2000) ($4.6 million in cy pres). Thus, should the amounts that would be available for individual Class Members not be significant enough, a cy pres distribution would be appropriate.

### 2. The proposed *cy pres* recipients are appropriate under the Ninth Circuit's standards

In this case, the proposed *cy pres* recipients are consonant with the rules in the Ninth Circuit. Ninth Circuit case law has held as follows:

> The *cy pres* doctrine allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the "next best" class of beneficiaries. **Cy pres distributions must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity.**

*Nachshin v. A.O.L., LLC,* 663 F.3d 1034, 1036 (9th Cir.2011) (citing *See Six Mexican Workers v. Ariz. Citrus Growers*, *supra*, 904 F.2d at 1307-8 (emphasis added)). The proposed recipients meet each of these requirements. The proposed *cy pres* grants here will be used to address issues of the commercialization of personal information online, and will go to organizations which are involved in educational outreach that teaches adults and children how to use social media technologies safely, or are involved in research of social media, with a focus on critical thinking around advertising and commercialization, particularly of the commercialization of children. They will be of use to all Facebook users and children and parents nationwide.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

**F.     The Injunctive Relief Is Valuable and Will Lead to Economic Benefits to the Class Members.**

The injunctive relief is robust in that it provides for changes to the language in Facebook's Statement of Rights and Responsibilities ("SRRs") which makes it crystal clear that users' permission for the use on Facebook of their names and Profile pictures in Sponsored Story ads is being sought and presumed to be given by taking action on the Facebook site. *See* A.S.A. §2.1 (b).   Further, the injunctive relief provides the users with the ability to see what Sponsored Stories ads they have appeared in, and to preclude further such appearances on an advertiser-by-advertiser basis.   Under the current state of Sponsored Stories ads, users have no meaningful way to prevent their appearance in these ads other than to stop using Facebook's sharing features such as the Facebook "Like" button.

**G.     Courts Recognize that Injunctive Relief Often has Great Value Even If Not Easily Monetized**

Courts in several actions have recognized the value of injunctive relief in approving class actions and approving of the requested attorneys' fees based on that relief.   One closely analogous example, *White v. Experian Information Solutions*, 2011 U.S. Dist LEXIS 79044 (C.D. Cal. July 15, 2011) involved violations of the Fair Credit Reporting Act (FCRA), and the primary relief was injunctive relief to "retroactively update the credit files of all of the injunctive relief class members." *Id.* at *7.   The District Court used a 1.9 multiplier to award fees of $5,671,778. *Id.* at *16.   The Court also noted that the settlement not only mandated that the defendants adopt reasonable procedures to remedy the issue (credit reporting as to pre-bankruptcy debt), it also "specifies the new procedures that must be used," and "serves the public good: society at large benefits from the increased accuracy in the field of credit reporting that the injunctive relief settlement has triggered." *Id.* at *17.   Plaintiffs here have also obtained relief beyond what they could have gotten had they prevailed at trial, in terms of new protections for minors and specifically working out what must be changed on Facebook's website.

-29-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

In *McCoy v. Health Net, Inc.*, 569 F.Supp.2d 448 (D.N.J. 2008), the defendant health insurance company agreed in settlement to pay $215 million to the Class for using improper methods and data for determining health insurance claims, which had resulted in underpayment of bills.  Health Net also agreed to injunctive relief which included (1) to stop the use of the Ingenix database which had been used to determine reasonable and customary costs which would be paid, (2) making business practice changes, including allowing 14.5% more than what the Ingenix database would have allowed until a new methodology could be put in place, (3) establishing a special appeals process for insureds who still had large bills even after the 14.5% increase, and (4) making various other business practice changes as to how it allowed fees and notified its subscribers and how information was conveyed.  *Id.* at 454.

The *McCoy* Court noted, "although the instant Settlement has a significant injunctive component which has great value, the bulk of the financial settlement is in the form of a $215 million common fund."  *Id.* at 475 (emphasis added).  The Court noted that while "the value of the injunctive relief cannot be precisely and mathematically ascertained as to each class member … [n]evertheless, Class Members reap a sizeable financial benefit from the injunctive relief provided in this Settlement," and determined that the $26 to $38 million valuation of that injunctive relief was reasonable.  *Id.* at 478.  Class counsel was awarded $69,720,000, which was "just over 32% of the common fund" and 28% of the common fund plus the parties' lowest estimate of the value of the injunctive relief.  *Id.*  The court also performed a lodestar cross-check, and noted that the multiplier was just under 2.3, and was reasonable in comparison to other large verdict cases where a multiplier of 3 had been approved.  *Id.* at 479. [16]

Other cases have also found substantial benefit to class members or the public, based upon publicity garnered by the result and its effect on other companies who learned of it.  In

---

[16] Plaintiffs' Counsel The Arns Law Firm recently settled a case involving improper bank late fees.  *Carducci v. Wachovia Bank*, Case No. 4:11-cv-00181-PJH (N.D. Cal. 2012). The value of the injunctive relief there could be readily calculated, on the assumption that the same percentage of bank customers would otherwise incur a similar number of improper mortgage late fees going forward, absent the injunctive relief. Here, there are no such easy calculations due to the nature of the rights being violated.

-30-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
Case No. CV 11-01726 RS

*Vizcaino v. Microsoft Corp.,* 142 F. Supp. 2d 1299 (W.D. Wash. 2001), involving misclassification of employees, the Court applied the common fund doctrine in allowing a recovery of 28% of a fund of $96.885 million. The Court expressly stated that it "recognizes that Class Counsel's efforts resulted in significant nationwide public benefit." Thus, "[a]s a result of this case and the large amount of publicity surrounding it, many employers have been advised to carefully ensure their workers are properly classified…[w]orkers who would have otherwise been misclassified as contingent workers are being properly classified as employees and receiving the benefits that are inherent in that classification." *Id.* at 1304.

Similarly, here other web-based companies will learn that they cannot misappropriate the right of publicity or mislead the public about what they are doing. *See also New England Carpenters Health Benefits Fund v. First Databank, Inc.,* 2009 U.S. Dist. LEXIS 68419 (D. Mass. August 3, 2009) (settlement provided for $350,000,000 to the Class for drugs whose prices were inflated due to antitrust violations; future injunctive relief included rolling back the prices of the affected drugs; the Court awarded $70,000,000 representing a multiplier of 8.3 time lodestar, or 20% of the common fund); *In re Currency Fee Antitrust Litigation,* 263 F.R.D. 110 (S.D.N.Y. 2009) (settlement provided for the payment of $336 million, and injunctive relief including not violating the antitrust laws, specific disclosures for any foreign currency conversion charges, and modifications of practices as to calculating base rate amounts used for conversions in certain circumstances; the court held that the injunctive relief was among the factors that "weigh[ed] strongly in favor of the settlement." *Id.* at 124. Counsel was awarded fees of $51,250,000 representing a multiplier of 1.6).

## H.    Methods of Valuation of the Injunctive Relief

Plaintiffs offer alternative methods for assigning a dollar value to the ability of the Class members to refuse Facebook the use of their endorsements in Sponsored Stories ads. Tools are being created by virtue of this settlement that will enable Facebook users to see the Sponsored stories ads in which they appear, remove themselves from any ads they wish, and remove minors from Sponsored Stories ads entirely. These tools could not be forced upon Facebook by

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

any means other than this settlement.  These changes create a "new experience" for using Facebook.  Previously, a user had only two choices: use Facebook's features and risk being in Sponsored Stories ads (without necessarily being provided with information as to how he or she can become featured in such ads), or do not use Facebook at all or in such a limited manner as to render it virtually worthless from the users' perspective.  The "new experience" created by this settlement allows Facebook users to use Facebook in ways that recognize their rights to withhold or limit their and their children's appearances in Sponsored Stories ads.

### 1.   First Method for Valuing Injunctive Relief:  The Real Option Valuation.

The injunctive relief gives the Class members the alternative to remove themselves from Sponsored Stories ads.  The question posed by the Court during the hearing on the first motion for preliminary approval was whether this alternative provides the Class members with a real and direct economic value.  Based on a "real option value" analysis, plaintiffs have provided the Court with a firmly grounded analysis that values the injunctive relief without concern for Facebook's future profits.

Real option valuation is a tool used to determine the value of a person's right to undertake or not undertake a certain activity, as explained in detail by Plaintiffs' expert Dr. Phillip Allman in his declaration.[17]  In essence, the Class member's right to remove themselves from Sponsored Stories ads, thereby controlling the use of their endorsements, is a real option, for which a real and direct economic value can be assigned.  This method is based upon the methods developed in the valuation of financial securities options, such as "call options," where two parties agree that one party will have the right to transact an asset at a set price at a later date.  Allman Decl., ¶15.  Real option valuation, unlike securities option valuation, is used to value the right to transact an asset even if there is currently no established market value for

---

[17] Dr. Allman is the owner and principal of Allman & Petersen Economics, LLC, in Oakland, California.  He received a Doctor of Philosophy in Economics from  Michigan State University in East Lansing, Michigan, and a Master of Science, Economics, from Arizona State University in Tempe, Arizona.  *See* Allman Decl., ¶3.  He was also an adjunct Lecturer in Economics at Golden Gate University, San Francisco, California from 1995 to 1998, and an Economics Professor at the University of the Pacific in Stockton, California from 1979 to 1986. *Id*,

-32-

that asset, such as in the case of a patent holder who has the right to market a product that does not currently exist but will presumably have value at some time in the future. *Id.* As Dr. Allman explains, "[r]eal options have an economic value for the beneficiaries of these options because they provide alternatives that would not otherwise be available and may provide benefits that will prove valuable at a point in the future." Allman Decl., ¶13.

The real option here is that the plaintiffs are being provided by the injunctive relief with the option to remain in Sponsored Stories ads in which they have appeared, or to exclude themselves from Sponsored Stories ads in which they appear. *Id.* at ¶16. In essence, the Class members will be given the right to sell a "call option" for the use of their endorsement – to Facebook, or to another social media outlet – in the future. It may not be apparent that such future transactions are likely as there is presently no widely known marketplace where individual social network users have the ability to sell their endorsements to online advertisers. *Id.* There is, however, substantial evidence that such a marketplace is blossoming and, in some cases, already exists. Allman Decl., ¶16; Torres Decl., ¶13.

The key inputs required to calculate the real option value in this case are the "spot price" of the asset underlying the option and the "volatility" of the underlying asset's value. Allman Decl. ¶16. The spot price is based in part on the estimated number of users in the plaintiff class who can be featured as endorsers in Sponsored Stories ad campaigns (approximately 123 million users) and the approximate market price of a single user endorsement (determined by plaintiffs' experts to be approximately $1.55). Allman Decl., ¶19. This is derived from the additional revenue that has historically been generated by the Class members' endorsements in advertisements. *Id.* The appropriate volatility in this instance (variability of the price of the asset) is .54. This is based on the actual volatility in Facebook stock options, which is a measure of the expected value of Facebook products, including user endorsed Sponsored Stories ads. *Id.*

Calculating the value of the injunctive relief using this method results in a range of possible values, which is the standard and reasonable method of measuring an option such as

-33-

this.  The resulting range of the option price is from $1.17 per user to $0.46 per, depending on the cost to the user of exercising the option and bringing their endorsements to market. Multiplying these figures by the number of Class members over the 24-month life of the injunction for the entire Class in the aggregate, gives a range of value of between $145.1 million to $57.4 million.  Allman Decl., ¶20.

### 2. Second Method for Valuing Injunctive Relief:  Fair Market Valuation of Right to Control Asset Based on Past Value of Endorsements

An alternative method utilizes the previously established fair market value of the Class members' endorsements and their newly created right to control those endorsements.  This method recognizes that the Class members' endorsements have a value established in the marketplace by what the advertisers would be willing to pay for Sponsored Stories "friend endorsements" over what they would pay for a Standard Ad.  The ability to withhold that endorsement increases the incentives for Facebook and the advertisers who want to use the endorsement, to preserve or enhance the enticements offered to get users to "like" things or otherwise take actions that can lead to Sponsored Stories.

Mr. Torres has provided a declaration further explaining the value of Plaintiffs' injunctive relief.  As discussed above, the value of the past "actual" damages for the Class members was calculated based on the added value of the endorsements for Sponsored Stories campaigns that were sold.  The class members now by virtue of the injunctive relief changes have the opportunity, by using the new features to control the use of what is essentially a $9.4 million/month advertising asset.  Torres Decl., ¶¶12, 15.  Based on this determination, the value of the injunctive relief is $226 million at a minimum for the next 24 months alone.  *Id.* at ¶15.

The Class members' ability to not be in Sponsored Stories ads, however is not simply the ability to "spite" Facebook by not clicking on the Like button or limiting the total number of Sponsored Stories ads in which they will appear after they do so.  Rather, it puts the advertisers and Facebook on notice that they must accommodate the interests of the users or suffer the consequences of their electing not to participate in the system and withhold their

endorsements. Plaintiffs can now take advantage of the "enticements" which will be offered to them by advertisers with the understanding that they may be featured in a Sponsored Story, and they may later choose to limit further such appearances if that occurs.[18]   The enticements offered are also likely to increase in value, as advertisers will have to work harder to ensure that users are not deterred from interacting with them due to the risk of being in a Sponsored Story ad.

### 3.     Third Method of Valuation: Minimum Value of $1

Courts recognize that injunctive relief often has great value even if not easily monetized, but the cases state that does not mean a value should not be placed on the injunctive relief. *See* Section G *supra*. There is an established market for online reputation management services.   Companies offering this type of service charge recurring fees ($99 per year) to control and alert an individual about their appearance on the internet.[19]  This demonstrates that the ability to control and manages one's online presence has value for which people are willing to pay a service fee.  Similarly here, the injunctive relief provides class members a reputation management tool for their Facebook account.  Plaintiffs believe that as there is an established value for reputation management services, the new tools and information provided through the injunctive relief is worth at least $1 on average to each Class member.  Since there are over 123 million class members, that places the value of the injunctive relief at least $123 million.

### I.     The Injunctive Relief Furthers the Goals of the Statutes at Issue

The injunctive relief furthers the goals of California Civil Code §3344, which is intended to require parties to seek prior consent from individuals before names and likenesses

---

[18] As explained above, Sponsored Stories ads are often the result of a user seeking to take advantage of a "perk" or enticement provided by an advertiser that has chosen to boost the action required to access that perk.  Such perks include free software, such as the Rosetta Stone trial software which was accessed by one of the class representatives, or the access to content or a coupon for later redemption.

[19] One such service, provided via Reputation.com charges $99 per year for their "Reputation Starter" package, which is recommended "….for someone with no negative content, no online presence, and little online visibility."  Other personal reputation management services they provide costa as much as $5,000 per year. *See* Ex. 29.

-35-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
Case No. CV 11-01726 RS

are used in ads, and which expressly requires prior consent by guardians or parents of minors. The relief also furthers the goals of California's Unfair Competition Law, Business & Professions Code §17200 et seq. Section 17203 "authorizes the court to fashion remedies to prevent, deter, and compensate for unfair business practices." *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 176 (2000). The changes to the SRRs, and other pages on Facebook will remedy the situation where Plaintiffs identified that there was no such disclosure and/or that the disclosures were inadequate or allegedly fraudulent (in the context of section 17200 jurisprudence, which does not require intent to deceive, actual deception, or damage in a "fraud" case, *see, e.g., Blakemore v. Super. Ct.,* 129 Cal. App. 4th 36, 49 (2005)).

## J. The Service Awards to the Class Representatives are Reasonable and Valuable.

Facebook has agreed to pay service awards totaling $37,500, subject to court approval, which includes $12,500 for each of the Class Representatives. A.S.A. §2.6. Class representatives "are eligible for reasonable incentive payments," after consideration of relevant factors, including the actions the representative has taken to protect the interests of the class and the degree to which the class has benefited from those actions. *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003). Plaintiffs have provided documentary discovery, had their depositions taken at length, and monitored the progress of the action and mediation and should be rewarded for taking the initiative to file the action, and for their role in reaching a Settlement providing for valuable relief to the Settlement Class. Arns Decl., ¶28. In addition, Plaintiffs by litigating this case potentially exposed themselves to the fee shifting under Civil Code §3344. Arns Decl., ¶64. Indeed, the Ninth Circuit has approved incentive awards to class representatives that far exceed the modest award proposed to be awarded Plaintiffs, $12,500 each. *Staton*, 327 F.3d at 976-77.

## K. Discounted Settlement Value Based on Risks of Further Litigation

Approval of a settlement is proper where "the settlement terms compare favorably to the uncertainties associated with continued litigation regarding the contested issues in this case

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
Case No. CV 11-01726 RS

[including where] . . . the Settlement provides Class Members with a meaningful business resolution regarding contested issues." *Nat'l Rural,* 221 F.R.D. at 526.   Comparing the uncertainties of future litigation against the risks detailed below, settlement on the terms proposed is clearly warranted.   As also set forth in Facebook's brief in support of the Joint Motion, Plaintiffs faced significant risks in pursuing these claims, including, *inter alia,* conflicting views with Facebook on liability and issues on appeal as well as vastly differing analyses and assertions regarding the scope, dollar amount and legal basis on which to recover potential damages.   Arns Decl., ¶¶45-54.   These factors made it apparent that litigation of these issues would continue to be hotly contested, perhaps for many years in the appellate courts, and that both sides would face substantial litigation risks.   *Id.*   Further, the issues of class certification, implied consent, and minor consent (particularly in light of the transfer order from the Southern District of Illinois in *E.K.D. v. Facebook,* [now *C.M.D. v. Facebook,* No. 12-cv-01216-RS]) by Judge Patrick Murphy, applying the Facebook Statement of Rights and Responsibilities to minors) present challenges for Plaintiffs to ultimately prevail on in the end. *Id.* at ¶48.

The following arguments which Facebook has made and which it could make on summary judgment or at trial should the case continue represent risks of litigation:

- The defense of implied consent. The continued use of facebook.com by members, Facebook has argued, has led to increasing amounts of awareness by members of Sponsored Stories ad by virtue of the members having seen such ads, raising the possibility of a finding of implied consent.

- Facebook Members' use of pseudonyms as opposed to their actual (legal) names and the posting of images as "profile pictures" which are not the likeness of the individual Class members.

- The contention (rejected by the Judge Koh on the Motion to Dismiss, but available for summary judgment or appeal) that the claims are preempted under the Communications Decency Act, 47 U.S.C. § 230 ("CDA"), and that the "newsworthy" exemption of Cal. Civil Code § 3344(d) grants an exception to the consent requirement of subdivision (a), for use of a likeness "in connection with any news, public affairs, or sports broadcast or account, or any political campaign."

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

- Facebook has also raised a defense under the Children's Online Privacy Protection Act, or COPPA, 15 U.S.C. § 6502, in other matters and could raise the defense in this case. *Id.*

- The risk that the Court might not be inclined to order the types of changes to Facebook's practices that Class Counsel has been able to negotiate.

Class certification also posed a potentially difficult hurdle.   In its opposition to the Motion for Class Certification, Facebook argued that California Civil Code § 3344 was not intended by the Legislature to be brought as a class action. California Civil Code § 3344 also includes a prevailing party attorneys' fees provision.   This is obviously a substantial risk of litigation in this case, and Facebook has pursued such claims in other cases.   While Plaintiffs deny that any of Facebook's contentions have any merit, there are still risks inherent in further litigation, particularly as the facts and laws at issue present a case of first impression and the laws are subject to interpretation.

### L. The C.M.D. Objections are Without Merit

The objections by objector in the *C.M.D. v. Facebook*, No. 12-CV-01216-RS, in the motion to intervene as to inadequacy of the settlement and as to collusion or conflicts of interest as to counsel for the *Fraley* plaintiffs are unsupported by facts or law.   There are no conflicts of interest between the plaintiffs and counsel in this case and the putative Class in *C.M.D.*   Each of the cases cited by *C.M.D.* for conflicts of interest, or that state that there is no value in "promises" by the defendants to do what the law requires, are distinguishable from the facts of this case.   Unlike in those cases, absent this lawsuit, Facebook would not be compelled to change its SRRs to clearly seek consent to the use of a user's name and likeness, or allow the users to review and prevent further appearances in Sponsored Stories ads.[20]

Nor is there any evidence of collusion; and there is ample evidence to the contrary.   As noted above, the discovery was hard-fought and involved over 200,000 pages of documents, and 21 depositions as well as a motion to compel and two motions for protective orders. *See*

---

[20] Compare the relief here with, *e.g.*, *Acosta v. Trans Union L.L.C.*, 243 F.R.D. 377, 395-96 (C.D. Cal. 2007)(changes to the defendants' credit reporting procedures were possibly "inevitable" as they violated federal law).

-38-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

*supra* pp. 14-15, and Arns Decl., ¶¶29-34. Furthermore, there were two rounds of motions to dismiss, with Plaintiffs amending in response to the first and prevailing on second. There were seven experts who were deposed in connection with the class certification motion. Arns Decl. ¶41. The settlement negotiations were initiated in mediation before Judge Infante, the respected retired Chief Magistrate Judge for the United States District Court for the Northern District of California and an experienced mediator with JAMS. Arns Decl., ¶4; Arns Decl. Ex. 2.

C.M.D.'s comparison to the *Bluetooth* case was also off the mark. In *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011), the Ninth Circuit Court of Appeal vacated an order approving a settlement due to issues dealing with attorney's fees including the procedural point that the district court never announced a lodestar figure. *Id.* at 943. The ratio of the *cy pres* award to the attorneys' fees in *Bluetooth* (the fees being eight times greater than the *cy pres*) was also obviously far different from that presented here in *Fraley*, and there is no clear sailing agreement here. Furthermore, there was no significant injunctive relief in *Bluetooth* of the type that is being imposed by the Settlement here, thus the entire value of that settlement was in the *cy pres* award.

The objections of *C.M.D.* and some other objectors that minors can never consent to being in Sponsored Stories based on various statutes is without merit, as such statutes do not apply by their own terms to the conduct at issue.[21] Similarly, the objection that the notice to minors and the proposed relief is insufficient as to them ignores the impracticability of requiring provable, express parental consent on a social media website. The potential problem of fraudulent e-mails as to consent is only one issue that must be addressed. Additional practical difficulties associated with obtaining such express parental consent include determining what type of proof of a parental or guardian relationship a social media website should require, and how to obtain such proof in a verifiable manner that is not so burdensome

---

[21] Plaintiffs join in and incorporate by reference the arguments raised by Facebook against the *C.M.D.* claims as to the applicability of California Family Code sections 6701 and 6710, with the exception of the applicability of the Children's Online Privacy Protection Act ("COPPA") COPPA 15 U.S.C. §§ 6501-08. Plaintiffs agree that COPPA preemption may be viewed as a risk of litigation, but do not join in Facebook's characterization of its preemptive reach.

-39-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

as to be impractical.  The injunctive relief devised provides for increased parental controls and the ability to prevent their children from being in ads, and the acknowledgement by the minors (over age 13, as Facebook does not allow children under 13 to have Facebook accounts) that they have parental permission, is also proof that actual consent was obtained.

## V.    THE COURT SHOULD ORDER DISSEMINATION OF THE PROPOSED CLASS NOTICE

Before finally approving a class settlement, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e).   What constitutes reasonable notice depends on the circumstances of the case.  *See id.* Courts have broad discretion in fashioning an appropriate notice program.  *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1127 (9th Cir. 1977) (matters of notice are "left to the court's discretion to be dictated by the circumstances of each case.") (quoting *United States v. Truckee-Carson Irrigation Dist.*, 71 F.R.D. 10, 18 (D. Nev. 1975)).  Generally, notice is acceptable if it "describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard."  *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (quotation omitted).

The parties have agreed on a notice plan that would provide class members with individual notice by e-mail.  *See* A.S.A. §3.3.  Plaintiffs propose e-mailed notice to all identified Class Members, to be sent out by Facebook; a third party notice / claims administrator may assist.  Facebook will also cause a summary of the settlement terms to be published (i) three times in an insertion in the national Monday-Thursday edition of USA Today, and (ii) once by transmission through PR Newswire's US1 distribution service. A.S.A., §3.3(c).  Plaintiffs request that the Court approve this method of notice as the best practicable under the circumstances.

The form of notice proposed by the parties complies with the requirements of Fed. R. Civ. P. 23(c)(2)(B).  It clearly and accurately informs the class members of the material terms of the settlement and their rights pertaining to it, including the right to opt out from or object to

-40-

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

the settlement. *See* A.S.A. Exs. 2, 3, and 4. Plaintiffs thus request that the Court approve the form of notice as well. Class members will have 60 days after notice goes out to opt out or exclude themselves from the Class. A.S.A. §3.6. Notice of the proposed settlement will also be provided to the appropriate federal official and the appropriate State officials of all 50 states, as required by the Class Action Fairness Act, 28 U.S.C. § 1715. A.S.A. §3.4.

## VI.   A HEARING FOR FINAL APPROVAL OF THE PROPOSED SETTLEMENT AND FOR PAYMENT OF ATTORNEYS' FEES SHOULD BE SET, ALONG WITH PRE-HEARING EXCLUSION AND OBJECTION DEADLINES

"Once the judge is satisfied as to the certifiability of the class and the results of the initial inquiry into the fairness, reasonableness, and adequacy of the settlement, notice of a formal Rule 23(e) fairness hearing is given to the class members." Manual for Complex Litigation (Fourth) § 21.633 (2012). Following dissemination and publication of the Notices, Settlement Class Members will have 60 days in which to mail in their requests for exclusion or written objections, allowing for sufficient time thereafter for the parties to address any written objections in the moving papers. A.S.A. §§ 3.3, 3.6.

Moreover, by the time of the Fairness Hearing, the Court will be in a position to rule on Class Counsel's Rule 23(h) motion for attorneys' fees, and for Service Awards to Plaintiffs; the Motion will be filed prior to the issuance of notice. Plaintiff requests that the Fairness Hearing and Rule 23(h) hearing be set for no earlier than 185 days after Preliminary Approval. Submitted herewith is a proposed Preliminary Approval Order, which has been approved by Defendants. A.S.A. Ex. 1. A chart setting forth the dates as to notice, and the setting of the fairness hearing and the dates for the implementation of the relief by Facebook is Exhibit 2 hereto.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS

## VII. THE COURT SHOULD APPOINT GARDEN CITY GROUP AS SETTLEMENT ADMINISTRATOR

As is set forth in the resume for Garden City Group, it has provided settlement administration for numerous class action settlements. Arns Decl., Ex. 14. As such, they have the requisite experience to act as Settlement Administrator in this case. The Parties have agreed to recommend and request the appointment of Garden City Group as Settlement Administrator. The Court should approve their appointment.

## VIII. CONCLUSION

For all the foregoing reasons, the Motion for Preliminary Approval of the Settlement should be granted, the Notices should be approved, and Garden City Group should be confirmed as the Settlement Administrator. The Court should also direct dissemination of the class notice, and set a hearing for the purpose of deciding whether to grant final approval of the settlement and Plaintiff's motion for attorneys' fees and costs, and whether to grant a service award for the Class Representative, and find that Facebook, Inc. has complied with the Class Action Fairness Act, 28 U.S.C. § 1715 by notifying the appropriate government authorities.

THE ARNS LAW FIRM

By: _____
Robert S. Arns
Jonathan E. Davis
Steven R. Weinmann


JONATHAN JAFFE LAW


By:  /s/ Jonathan M. Jaffe
JONATHAN M. JAFFE
Attorneys for Plaintiffs


-42-
PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
CASE NO. CV 11-01726 RS