Pages 1 - 49

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG

ANGEL FRALEY, et al.,              )
                                   )
            Plaintiffs,            )
                                   )
   VS.                             ) NO. C 11-1726 RS
                                   )
FACEBOOK, INC.,                    )
                                   )  San Francisco, California
            Defendant.            )  Thursday
                                   )  November 15, 2012
_____ )  1:34 p.m.

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:          THE ARNS LAW FIRM
                         515 Folsom Street
                         Third Floor
                         San Francisco, California  94105
                    BY:  ROBERT S. ARNS, ESQ.
                         ROBERT C. FOSS, ESQ.
                         STEVEN R. WEINMANN, ESQ.
                         JONATHAN E. DAVIS, ESQ.
                         KEVIN M. OSBORNE, ESQ.


For Defendant:           COOLEY LLP
                         101 California Street
                         Fifth Floor
                         San Francisco, California  94111-5800
                    BY:  MICHAEL RHODES, ESQ.
                         BENJAMIN H. KLEINE, ESQ.
                         JEFFREY GUTKIN, ESQ.
                         MATTHEW D. BROWN, ESQ.


Reported by:             BELLE BALL, CSR #8785, CRR, RDR
                         Official Reporter, U.S. District Court

```
 1   THURSDAY, NOVEMBER 15, 2012                        1:34 P.M.

 2                        P R O C E E D I N G S

 3           THE CLERK:   C-11-1276, Fraley, et al. versus

 4   Facebook.   Counsel, please state your appearances.

 5           MR. ARNS:   Good afternoon, Your Honor.   Robert Arns

 6   for Plaintiffs.

 7           THE COURT:   Good afternoon.

 8           MR. RHODES:   Good afternoon, Your Honor.   Mike Rhodes

 9   of Cooley on behalf of Facebook, along with the assembled

10   multitudes (Indicating).

11           THE COURT:   Good afternoon.

12     This matter is on calendar for the preliminary approval

13   hearing with respect to the proposed disposition of this class

14   action.

15     I have reviewed all your papers.   What I think I would

16   like to do is, I have some questions.   The context of this

17   particular matter is, as all recall, we had a request for

18   preliminary approval of a prior proposed disposition.   I did

19   not approve that.   And then the new proposal is, in part, in

20   response to that, as I understand it.

21     So what I would like to do is ask whoever wants to begin

22   the discussion to highlight for me the particular terms, how

23   the parties view those terms, as responding to some of the

24   concerns that were mentioned in the order that I issued, and

25   then also just highlight what you think I need to have
```

1    highlighted.

2        As I say, as we go along, I do have some questions that I

3    want to cover with you.  I don't know which of you wishes to

4    commence the discussion.

5            **MR. ARNS:**  Yes, Your Honor.  I think Mr. Rhodes

6    should, at this point.

7            **THE COURT:**  Okay.

8            **MR. ARNS:**  Since he's dealt more closely with

9    Facebook.  I have all the answers, but he's Facebook's

10   attorney, so --

11           **THE COURT:**  Okay.  Actually, before you do that,

12   Mr. Rhodes, maybe we can address a couple of housekeeping

13   matters.

14           **MR. RHODES:**  Yes.

15           **THE COURT:**  One is you have the case management

16   conference scheduled the first week of December.  I'm going to

17   vacate that.  I don't think we need that conference.

18       Also, there was a reference in the papers that I received

19   to a -- an actual motion for class certification that was going

20   to be filed, and I didn't see if it ever was filed.

21           **MR. ARNS:**  Well, there was two motions filed by

22   Plaintiff, Your Honor.

23           **THE COURT:**  Yes.

24           **MR. ARNS:**  And one was motion to certify the class,

25   the other to approve the settlement.  So, they're really the

1   same, but --

2         **THE COURT:**  No, no, in the motion -- there was no

3   discussion about the -- the certification of the proposed

4   settlement class.

5      There's a discussion about -- in the -- in the amended

6   settlement agreement and release, there's a reference to the

7   prospect of filing a contemporaneous motion to certify.  And I

8   don't know whether or not you were operating on the notion that

9   your prior -- the prior motion you had filed accomplishes that

10   purpose, but unless I missed something, I didn't see a

11   contemporaneous discussion of the -- of the certification issue

12   with respect to the proposed class.  But, maybe I missed

13   something.

14         **MR. RHODES:**  Your Honor, I think the idea that the

15   Plaintiffs were proposing is that there would be a settlement

16   class if the Court ultimately approved the case, and I think

17   therefore that motion, albeit it was filed, I don't think we

18   need to entreat that motion today.

19         **MR. ARNS:**  Yes.  And it was filed, Your Honor.  There

20   was two separate motions.  One for cert -- class certification,

21   appointment of class counsel, and appointment of class

22   representatives.

23         **THE COURT:**  And when did that get filed?

24         **MR. ARNS:**  The same time that our Plaintiffs'

25   memorandum of law in support of joint motion for preliminary

```
1   approval of class action.
2            THE COURT:  Okay.  I'll go back and look.  We didn't
3   see it on the docket.  But --
4            MR. RHODES:  It's a the matter we would take up, I
5   think, at the final approval hearing, with respect to any order
6   that you would then issue.
7            THE COURT:  Okay.  All right.
8            MR. ARNS:  I don't think it really adds anything,
9   Your Honor, because all the issues are --
10            THE COURT:  Okay.  There was a reference to it, and I
11   didn't see it.  So I just wanted to know what the status of it
12   was.
13        Mr. Rhodes.
14            MR. RHODES:  So, taking credit for being slightly
15   clairvoyant, I anticipated the Court's request.  I have a
16   demonstrative I would like to hand up to the Court --
17            THE COURT:  Okay.
18            MR. RHODES:  -- which tracks the prior order, and
19   compares what we tried to do to address your concerns.  If I
20   may.
21            THE COURT:  Okay.
22        (Document handed up to the Court)
23            MR. RHODES:  So, I can do this one of two ways.  I
24   think maybe the easiest thing to do is work off of this chart.
25   We tried to excise from your order the things that you
```

1  expressed concern about, and tried to tell you how we think

2  we've addressed those to give you comfort.

3      So, you will see in the first part of the chart I handed

4  out, the issue of no monetary relief going to the class.

5  Obviously, that's been a sea change.  We have provided -- just

6  at the macro level, the $20 million number is now all in, of

7  course.  We took away the free writing (Phonetic) and reversion

8  elements.  So the pot is, in fact, 20 million.

9      And we've set up a claims process by which essentially two

10 primary elements will have to be shown on the form, which is:

11 You identify that you appeared in a sponsored story, and you

12 claim that you didn't have knowledge of that, number one.  So,

13 go to the issue of consent.

14     And number two, that somehow you are aggrieved by that.

15 We don't make you spell that out, but we just want you to say,

16 kind of check the box that you think you were harmed in some

17 measure, and you get some amount of money for it.

18     You will see that the parties -- in the ratchets that are

19 inherent in the agreement, the parties tried to negotiate in

20 anticipation of how many claims we might actually get.  And

21 we've actually provided some scenarios to the Court in the

22 record, if you recall seeing that, about what might happen

23 under various circumstances.

24     But basically what we tried to do is to say to you, if for

25 some reason the amount of claims submitted go below that

1  $5 floor, we kind of flip it to you.  We say you --

2          **THE COURT:**  That's --

3          **MR. RHODES:**  You have the discretion to tell us what

4  you want us to do.

5          **THE COURT:**  And that's my first problem.  I don't

6  think that throwing the discretion to me, it's not for me to

7  decide what I like or don't like, or what -- the way I view my

8  role is that the parties present a proposed disposition, and I

9  make an assessment of whether or not I think it is adequate and

10 fair and the other criteria that I have.

11         But I have -- I recognize that you may have looked at this

12 as, well, let's give the Judge maximum discretion, and -- but

13 I -- I don't think that's discretion that I should have.  I

14 mean, it's not my choice to say, "Well, if it drops below a

15 certain level, I'd rather it go to a *cy pres* distribution."

16         What I think is the more appropriate approach is for you

17 to make a proposal to me and justify it.  Say, "We think this

18 is fair because..." and then I assess it.

19         But, you know, I think there have been other cases -- and

20 I was going to go back and look -- where judicial officers who

21 were reviewing this, reviewing similar dispositions, say "Well,

22 I like this charity, and I'm going to send it off to this

23 particular entity," or the like.

24         And I think courts have expressed some concern, appellate

25 courts, about that, and I think for good reason.  I don't think

1    it should just be my choice.

2              **MR. RHODES:**  We actually think we address that in the

3    agreement, Your Honor.

4              **THE COURT:**  Okay.

5              **MR. RHODES:**  If you look at Section 2.3(a)(ii), there

6    is a scenario that we envision that you would say that exact

7    thing to us.  And therefore, that option is you don't do

8    anything.  And then the agreement suggests to you what happens.

9              **THE COURT:**  Okay.  So I'm at 2.3(a)(ii).  And you're

10   saying --

11             **MR. RHODES:**  So if you just kind of work through the

12   language -- I don't need to read it out because it will burden

13   the reporter.  But if you read that language, you will see that

14   if the number -- if the pro rata share...

15             **THE COURT:**  Yes.

16             **MR. RHODES:**  ...would be less than $5...  I'm

17   paraphrasing, of course.

18             **THE COURT:**  Right.

19             **MR. RHODES:**  ...the Court may...  And it gives it in

20   order.

21        Then look at that next sentence, at the very -- the first

22   -- it's the last sentence on the page, and it continues on the

23   next page.

24             **THE COURT:**  Yes.

25             **MR. RHODES:**  Says, if the Court does not address

1    it...

2           THE COURT:  You need a "the" in there, by the way.

3    You missed the article.  But, go ahead.  "If the Court, in its

4    Final Order and Judgment..."

5           MR. RHODES:  "If the Court," yeah.

6           THE COURT:  "...does not address..."

7           MR. RHODES:  I'm so familiar with you at this point,

8    we're just calling you "Court," Your Honor.

9           THE COURT:  "...does not address the disposition of

10   the Net Settlement..."

11          MR. RHODES:  It defaults to a prorated distribution.

12          THE COURT:  All right.  Okay.  Well, I'm glad --

13          MR. RHODES:  So actually, we anticipated that you

14   would say the very thing you said to you us, and we said,

15   "Okay, we'll build in..."

16          THE COURT:  Okay.

17          MR. RHODES:  And, I know the case law you're

18   referring to.  And we're not trying to give you discretion, but

19   we're trying to say that if you order us, you can order us to

20   do one or the other, we'll take that.  If do you nothing, this

21   tells you what happens.

22      The last eventuality is in the next paragraph.  It says if

23   it becomes impossible to do it, and there's a -- there's a way

24   that it becomes sort of impossible, mathematically, it then

25   just goes -- it defaults the other way.

1              THE WITNESS:  Okay.

2              MR. RHODES:  So we did try to actually build in those

3    ratchets, Your Honor, to address that.  So --

4              THE COURT:  Your assessment of the amount -- and we

5    had some discussion about this last time, but the $20 million

6    settlement fund I recognize, as you've set it out, that it

7    doesn't -- it's non-reversionary.

8         What was the mind set, the process that established it at

9    that level, and then also, started from the prospect that the

10   -- that the per-claim amount would be $10?  And I recognize

11   there are various scenarios which might adjust that, as we've

12   just discussed.

13        But, what is the mind set?

14             MR. RHODES:  Let's go back to a question you asked me

15   last time.  And then, let's also take the benefit of the fact

16   that you and I personally had an intervening event in the form

17   of the *McCall* (Phonetic) decision that came out.

18        And it teaches us -- and this is at Page 11549 of the Sup.

19   opinion that we don't, in fact, have to go into this granular

20   calculus, claim by claim.  And it suggests that what you should

21   do is actually put aside for a moment the statutory damages and

22   liquidated damages, and make a calculation.

23        So, we've done that.  And let me give you the math, if you

24   will.

25             THE COURT:  You're embroiled in the en banc request

1  in that case still.

2          **MR. RHODES:**  My opposition is due next week,

3  Your Honor.  I appreciate you keeping abreast of my practice.

4          **THE COURT:**  Okay.

5          **MR. RHODES:**  And this number was under seal, but I'll

6  just say it out loud for simplicity.

7      What Mr. Arns and I tried to do is we said to ourselves,

8  let's try to address the Court's question this way, which was,

9  your question was:  What is the -- what is the dollar figure

10 that you would ascribe to the injury?  And then we can debate

11 what deductions and adjustments should be made to that, and

12 then let's compare that number to the pot.  Right?

13     And we were -- we were not very well armed for bear with

14 regard to that issue last time.  So, here's the math that we

15 have.  And there will be some forks in the road, depending on

16 what method you use.

17     The total revenue from sponsored stories, which is what we

18 are talking about here -- and the date range, Your Honor, is

19 January 1st of 2011 through August of 2012, so we're a couple

20 of months out of date, but that is the date range -- is

21 233 million.

22     If you look at Facebook's publicly-facing SEC materials,

23 they claim an operating margin of about 50 percent.  And even

24 though they don't break out the -- you know, necessarily by ad

25 product or sponsored content product, what the margins are, we

 1    -- we assumed that, take that margin, we can fairly assume that

 2    the earnings, the income, therefore is around 117 million.

 3         And then what we did was we took each one of our

 4    respective models, and we sort of crunched them together.  And

 5    we come up with about three different metrics, but they all

 6    point to a similar range.

 7         The Plaintiffs have one model that they argue would put

 8    the damages per capita at about 94 cents a head against that

 9    $117 million income target.

10         We took another one of their methods and averaged them,

11    because they had 50 percent of the income -- or 75 percent of

12    the income, we averaged that into the sixties, and we applied

13    that to the 117 million.

14         There's another figure that I think Bob has, that puts it

15    in the 60-70 cents per capita range.  So I said, okay, let's

16    just do kind of boxcar numbers.  That would put the injury that

17    we're talking about in the 75 to $110 million range.

18              **THE COURT:**  Okay.

19              **MR. RHODES:**  Are you with me?

20         Then, I said, what are we comparing it to?  Comparing it

21    to 20 million.

22         Now, last time, Mr. Arns tried to convince you that you

23    should put more gold in the pile that was 20 million to get a

24    higher number to make the comparison more favorable for

25    purposes of preliminary approval.

1    And I said to you, you should reduce the -- in this

2  instance, 75 to $110 million number against the procedural

3  risk -- class cert, namely -- and claim risk.  And those claim

4  risks are discussed in Page 16 through 30 of my brief.  And I

5  can actually go through them ad nauseam, if you would like to.

6          **THE WITNESS:**  I did review those.

7          **MR. RHODES:**  What I suggest to you, then we can stop

8  right there.  Because I think that if you took the low and high

9  end of the range and compared it to the 20 million, the math is

10  16 to 26 percent.  And that's before any downward adjustment to

11  reflect the intrinsic risks of the litigation.  Both on the

12  merits, what I call claim risk, and procedurally, which is

13  what's going to happen to us when we come back and argue class

14  cert.  Right?  What are the odds that they can maintain the

15  case as a class cert.

16    And it also does not take into account any of the claimed

17  economic benefit that the Plaintiffs would ask you to consider

18  with regard to injunctive relief.  Right?

19    So I'm just saying to you at a gross level, 20 million

20  compared to the adjusted number of 74 to 110 million, which

21  reflects the parties' attempt to take the earnings from the

22  product and actually assign endorsement value to it, we say

23  it's too high.  But we say we'll take his methodology only, and

24  it's in that range.  A 16 to 26 percent relationship between

25  the settlement pot and the -- the injury at issue, that's well

1  within the bandwidth of approvability.

2      So, I was hoping I could come before you today and

3  convince you of that so we could, in a sense, skip the very

4  granular exercise of assessing each one of the -- the things

5  that we pointed out in our papers, whether it's implied consent

6  or express consent --

7          **THE COURT:**  The defenses.

8          **MR. RHODES:**  -- or CDA 230 of the defenses, and skip

9  the process by which we have to convince you that class cert

10 was never going to be viable, and further skip the process by

11 which we convince you of some dollar figure that the injunctive

12 relief represents and add it to the $20 million to convince you

13 that we are within the bandwidth of possibility.

14     I think that math, in and of itself, satisfies really by

15 any standard both preliminary and final approval.  If you

16 accept that math.

17         **THE COURT:**  Okay.

18         **MR. RHODES:**  Does that answer the Court's question?

19         **THE COURT:**  Yes.  It does.

20         **MR. RHODES:**  Now, let me ask you -- the answer to

21 your other question about the numbers we picked.

22         **THE COURT:**  Yes.

23         **MR. RHODES:**  They reflected two things.  We remain of

24 the view, as now -- at least by the majority panel in *McCall*,

25 we remain of the view that there is a point at which the

1  logistical challenges and the economic futility of trying to

2  make a cash payment available to a class of this size really

3  does say that that's an appropriate *cy pres* structure if you

4  can meet that, quote-unquote, driving nexus test that we talked

5  about last time, of *Kellogg*, which I think we -- we do.

6      And we've given you the percentages and the people that --

7  the money --

8          **THE COURT:**  I indicated in the last -- that was not

9  one of the issues of particular concern to me.

10          **MR. RHODES:**  Yes, right.

11          **THE COURT:**  Because I didn't think there was a

12  *Kellogg* issue in this instance.

13          **MR. RHODES:**  Right.  So, we -- we argued about that,

14  and we war-gamed it out.  And our conclusion was at about five

15  bucks per capita, it starts to be kind of, you know, why are we

16  trying to get one or two dollars, three dollars to an

17  individual class member?

18      But we structured it so that if you do nothing, it will

19  kind of just go out pro rata.  If you tell us that you would

20  rather have it be *cy pres* at that dollar figure, based on

21  guidance, we will make it a hard principle so that there's not

22  this inherent discretion that you're concerned about.

23      But, it reflected the parties', you know, essentially,

24  negotiation and decision-making about where the point of

25  futility starts to creep into the equation.  And that's why we

1   kind of settled there.

2       We also, frankly, consulted with our class action

3   administrator, Garden City Group.  We spoke to them several

4   times.  And they gave us a bevy of data about take rates and

5   redemption rates in cases that -- of the type that you're

6   familiar with.

7       For example, in these TCPA class actions, I know you're

8   familiar with those, where people are suing over tens of

9   millions of text messages where you try to opt out or something

10  of that order, there have been settlements that are open-ended

11  that look like they're a lot on the face value of the paper,

12  but the redemption rates are very low.

13      And we've tried to characterize in our own thinking what

14  the likely take rights are.  We've gotten data from the class

15  action administrators.  And that was put into the sausage

16  grinder by which we picked the ten -- five-dollar baseline to

17  get cash to the members of the class.

18      And obviously, the people that are actually going to go

19  through the process of submitting a claim and making an

20  averment that they didn't consent and were injured, we're

21  assuming that those are people that are most deserving of the

22  cash because they're the ones who think that they've actually

23  got the injury.  And there is just, obviously, going to be a

24  relatively low takeaway at the end of the day, on that.

25      So, that was how we came up with that math.  And it drove

1  the analysis, if that makes sense.

2        **THE COURT:**  Okay.  All right.

3        **MR. RHODES:**  All right?  So, that's the first issue

4  that you really focused on in your order, which was the lack of

5  monetary relief.

6        **THE COURT:**  (Nods head)

7        **MR. RHODES:**  And then the second question here,

8  whether *cy pres* relief is adequate consideration for past

9  damages claims, I think we've now addressed that with the

10  structure.

11      And because the way the math ends up working, you're only

12  doing a *cy pres* deal in this instance when we have that point

13  of economic futility, which we do think is sort of square

14  within the bandwidth of what the cases teach as to when you can

15  do a *cy pres*.  So, we're not starting with that.

16        **THE COURT:**  Okay.

17        **MR. RHODES:**  And, we really heard you.  We heard that

18  that was the principal concern you have, and we just flipped

19  the deal to reflect that.  So, I think I've addressed that.

20      On attorneys' fees, again, your true core concerns have

21  been completely resolved.

22        **THE COURT:**  By virtue of the fact that the clear

23  sailing --

24        **MR. RHODES:**  That's gone.

25        **THE COURT:**  -- that you -- well, okay.

1          **MR. RHODES:**  It's gone.  In other words, there's no

2    earmark for what it should be.  He will file his petition.  I

3    -- frankly, I'm not sure what he's going to ask for.  I can

4    object, be heard.  You could query us, just as well as you

5    query him.  And there's no -- Facebook get no benefit from it.

6    Whatever --

7          **THE COURT:**  Because it's nonreversionary.

8          **MR. RHODES:**  It's nonreversionary.

9          **THE COURT:**  And your proposal, as I read the papers,

10   is you would file I think it was something like 23 days out

11   from preliminary approval.  Then fairness hearing not less

12   than, I guess, 195 days, something along those lines, so that

13   following *Mercury Interactive*, the putative class -- or the

14   class members would have an opportunity to review the fee

15   petition when they're determining --

16         **MR. ARNS:**  That's correct, Your Honor.

17         **THE COURT:**  -- how they're going -- what they're

18   going to do.  Okay.

19         **MR. RHODES:**  All right.  You expressed some concerns,

20   or at least we had a discussion around the clarity of

21   injunctive relief.

22        Now, if I may, with the Court's indulgence, let me walk

23   you through it a little bit, and cite for the record where you

24   can actually see it now.

25         **THE COURT:**  Go ahead.

1            **MR. RHODES:**  As I did last time, I want you to think

2    about it in two sort of scenarios.  One is the scenario where

3    you're entering the Facebook ecosystem, and one where you're

4    already in the ecosystem.

5         So, with regard to as you enter the Facebook ecosystem --

6    and to address the Court's concern about clarity, Item 1 of

7    injunctive relief is that we are rewriting Section 10.1 of the

8    statement of rights and responsibilities.

9         It's referred in our nomenclature here, Your Honor, as

10    "SRR."

11            **THE COURT:**  Right.

12            **MR. RHODES:**  And that --

13            **THE COURT:**  The terms of use is the other way to

14    describe it.

15            **MR. RHODES:**  Yes.  For whatever reason, they call it

16    a statement of rights and responsibilities.  And Your Honor,

17    that is at the amended settlement agreement, Section 2.1(a).

18         And it specifies the exact language that is now going to

19    be written into that section.  So, there's no mystery about

20    what it's going to say.

21         And, it makes clear that minors entering the ecosystem are

22    representing that they have parental consent.

23            **THE COURT:**  I don't know, though, if this is the

24    point to address -- I think you've got it later on your chart,

25    perhaps.

1        But the minor, the sub -- minor subclass issues -- and I

2   did receive a brief from -- styled as an amicus brief in

3   connection with some concerns.  This was from the Center for

4   Public Interest Law and Child Advocacy Institute.

5        I don't know if you want to address that in --

6            **MR. RHODES:**  Well, let me just digress on that for a

7   second.  First, it violates Docket Order -- Entry 226.  And

8   it's really something -- it's -- as I suggested last time --

9   and I agree with you that we should go through the exercise

10  now.

11       But that's really something -- if somebody wants to be

12  heard, that's really a final settlement approval process, from

13  just a procedural standpoint.

14       But secondly, I've got seven pages of notes, and I can go

15  through every one of their arguments and demonstrate to the

16  Court why I think they're wrong, if you want to do that.

17           **THE COURT:**  Well, I do want to know -- I mean,

18  putting aside a question of the timing, and as you point out, I

19  wanted to limit the flood of material coming in at this

20  juncture of the proceedings.

21       It's important, if there are concerns, I think it's in

22  your interest to be able to address them, --

23           **MR. RHODES:**  You will see --

24           **THE COURT:**  -- and address them now.  So, I do --

25  yes.  Go ahead.

1          **MR. RHODES:**  You will see in the chart that I have a

2    section right after the one we're about to discuss.  So --

3          **THE COURT:**  That's why I said -- that's right.  So,

4    if you want to finish up on the general injunctive

5    provisions --

6          **MR. RHODES:**  Yes.

7          **THE COURT:**  -- and then go into the minor injunctive

8    provisions, that's fine.

9          **MR. RHODES:**  Yeah.  Because I think if you understand

10   exactly what we're now doing on injunctive relief, it addresses

11   some of these issues.

12         **THE COURT:**  Okay.

13         **MR. RHODES:**  So, secondly, as you enter -- again, as

14   you enter the ecosystem, the statement of rights and

15   responsibilities is being revised so that minors are being

16   queried to represent that they have parental consent.  So now

17   there's a -- there's a representation, a contractual statement,

18   if you will.

19       And again, that's found in the amended settlement

20   agreement at 2.1(c)(i).  And I won't read it to you, but it's

21   there.

22         **THE COURT:**  Right.

23         **MR. RHODES:**  And I would argue right there, to stay

24   on that point for a second, Your Honor, that that's above and

25   beyond what COPA requires.

1     COPA represented a Congressional mandate that said

2 websites don't have to get parental consent to allow teenagers

3 to use the Internet.  And they expressed it as a matter of

4 expression and First Amendment principles.

5     But, we're saying to you that as a matter of contract,

6 we're willing to go above and beyond what we believe is a

7 pretty ironclad COPA defense to this issue.  And that's one of

8 the things that we worked out subsequent to the time we were

9 here last time, Your Honor.

10     Next, new users are encouraged to specify a parent or

11 minor relationship.  And we have a mockup in the record

12 Your Honor, which is Exhibit MM as in "Mary," and NN as in

13 "Nancy," two M's, two N's, to the Brown declaration.

14     And I brought large versions of these (Indicating).  If

15 the Court wants them, I have them, if you want to see them.

16     **THE COURT:**  Go ahead, hand them up.  I think I have

17 them attached here, but --

18     **MR. RHODES:**  They're a little tough to read, which is

19 why I blew them up.  At least, to my eyes.

20     So, let's see.  Let me give you -- do you have copies?

21     (Document handed up to the Court)

22     **MR. RHODES:**  And, just to take for a second,

23 Your Honor, let's take a look at MM.

24     **THE COURT:**  Okay.

25     **MR. RHODES:**  So, you see where we have a box at the

1   bottom, in red?

2              **THE COURT:**  Yes.

3          **MR. RHODES:**  That's new.  That would be new.  That

4   would be added.  This is something that Mr. Arns and I

5   discussed and negotiated for.  So, that would be new.

6       And if that box gets clicked -- I'm jumping ahead.

7              **THE COURT:**  Go ahead.

8          **MR. RHODES:**  But, the injunctive relief that's in the

9   ecosystem kicks in.  And if you click that, you are no longer

10  going to be in a sponsored story until one of several things

11  happens.  A, you turn 18.  B, you establish a parental

12  relationship.

13      Okay?

14             **THE COURT:**  Okay.

15         **MR. RHODES:**  And then if you look at the next one,

16  which is NN as in "Nancy," again, you see the red box

17  (Indicating).  That's new.

18      And, this will be an e-mail that will come to you once

19  you're in the ecosystem.  And it's querying people, to

20  establish these relationships.

21      And, if I may just for a second, Your Honor, give you some

22  metrical data, because I -- I figured you'd ask me about this.

23             **THE COURT:**  Go ahead.

24         **MR. RHODES:**  We believe the size of the class is

25  123 million, more or less.  That's in the record at Plambeck --

1   P-L-A-M-B-E-C-K -- declaration, Paragraph 7.

2       We believe the size of the minor subclass is -- it's a

3   granular number, but I'm just going to give you the

4   approximation -- 19.7 million.  Same declaration, same

5   paragraph.

6       And, to illustrate the point of why we think these are

7   actual real tools and not just sort of fictional tweaks, same

8   declaration, Paragraph 11 establishes that there are currently

9   more than 6 million minors who have established those

10  relationships with parents.

11      And, that will inform you as to why we're doing certain

12  other of the injunctive relief tools I'm about to tell you

13  about.

14      The point is, people already do this.  And so we're trying

15  to build on, that in order to fulfill -- to try to solve the

16  fundamental issue that's being raised in the case.

17      So, let me go on with the injunctive relief.

18      The next thing that we will do is based upon these tools

19  you see, we will start logging the existence of these

20  relationships.  And that will help us administer the practices

21  that we're going to agree to do as part of the settlement.

22      That logging is reflected in, again, the amended

23  settlement agreement, at Section 2.1(c)(ii).  Okay?

24          **THE COURT:**  Uh-huh.

25          **MR. RHODES:**  To stimulate better awareness of what

1   the ecosystem does and doesn't do, we've agreed to enhancements

2   to the area of the help area that's called the Family Safety

3   Center.  This is reflected in the amended settlement agreement

4   at Section 2.1(c)(iv), Your Honor.

5              **THE COURT:**  Right.

6              **MR. RHODES:**  And so, again, going back to these two

7   forms I just showed you, for users with a confirmed

8   parent-minor relationship, we're going to target advertising to

9   those people to alert them to the presence of the Family Safety

10  Center, and what is disclosed on there about the use of name

11  and likeness in sponsored content.

12      That is found in the same section I just cited to you of

13  the --

14             **THE COURT:**  Right.

15             **MR. RHODES:**  And then to administer it, we're going

16  to do a new tool -- so this is new -- that will show all users

17  which sponsored stories they have appeared in, going forward.

18      So, let me hand you up -- this, for the record,

19  Your Honor, is Exhibit LL as in "LL Cool J" to the Brown

20  declaration.

21      (Document handed up to the Court)

22             **MR. RHODES:**  Your Honor, I'm going to point, but

23  what's depicted here is this (Indicating) would be new.  This

24  doesn't exist today.

25             **THE COURT:**  Okay.

1      **MR. RHODES:**  And we think this is fairly

2  unprecedented in this world of these online regimes.  We will

3  allow people to see -- starting at some point going forward.

4  It won't capture -- to be candid, it won't capture what has

5  transpired.  But when it's launched going forward, you will be

6  able to go in here in your activity log.

7      And, this is not hard to get to.  If you go to your

8  Facebook home page, what the timeline is, there's a bar right

9  now, right at the very top, called "Activity Log."  And you

10  just click on that, and you'll be into this scheme here

11  (Indicating).  And so, you'll be able to see each sponsored

12  story in which you've appeared.

13      We've popped up for illustration purposes in the lower

14  right-hand corner, a dialogue box.  Do you see that, Your Honor

15  (Indicating)?

16          **THE COURT:**  I do.

17          **MR. RHODES:**  And you'll see that -- what you can do.

18  Delete, allow, don't allow.  We're going to give people,

19  sponsored story by sponsored story, prospective control over

20  whether they want it to occur, or not want it to occur, or take

21  it down.

22      That's -- we think that's radical, and it's unprecedented.

23  But it ties in with the -- the injunctive relief is tying in

24  with the purposes that the complaint was brought.

25      And then, last, Your Honor, in terms of -- this one's a

```
1   little harder to follow.  This is OO.  Can you give me that

2   one?  This is Exhibit OO to the Brown declaration.

3       (Document handed up to the Court)

4       MR. RHODES:  Let me hand you a different version of

5   the same thing, which is page by page, which might be easier

6   for the Court to follow.

7       But, what we're trying to represent here, this is another

8   new tool that doesn't currently exist.  And the idea is

9   twofold, which is:  If you are a parent, and you are a

10  non-Facebook user, you will now be given a tool, a way in which

11  to opt your minor out of sponsored stories.

12      And that flow -- the one with the three boxes underneath

13  the big box, that flow shows you that.  And then the second

14  document that's the stapled shows you the individual pages and

15  the process by which a parent would do that.

16      And then, by the same token, if you are a Facebook parent,

17  if you will, and you have a confirmed relationship with a

18  minor, we're going to allow you within your own account to

19  control what the minor does or doesn't do.

20      THE COURT:  Okay.

21      MR. RHODES:  So, that's the totality of the

22  injunctive relief, which we think is clearer.

23      We've provided for the Court and for the -- you know,

24  obviously, for the record, the mockups of how we're going to do

25  it, what it's going to look like, how it's going to operate.
```

```
 1        And we think that that provides a much more clear and sort
 2   of straightforward answer to the Court about what you expressed
 3   concern in your order and our discussion of last time.
 4             THE COURT:  Okay.
 5             MR. RHODES:  And therefore, now we segue into the
 6   concerns that were expressed at the hearing last time by the
 7   Dawes (Phonetic) Plaintiffs, and again in the -- the purported
 8   amicus brief.
 9             MR. ARNS:  Could I interject one thing, if I could,
10   Your Honor?
11             THE COURT:  Go ahead.
12             MR. ARNS:  Another part of the injunctive relief at
13   2.1(d) states that (As read):
14             "Additional educational information and clarification
15             of web page will be put in to accurately and
16             sufficiently explain how advertising works on
17             Facebook."
18        And this is going to be developed, Your Honor.  We've
19   already agreed on 21 different web pages within Facebook that
20   changes are going to be made, so that it will be very easy to
21   understand how the advertisings works, and how sponsored
22   stories are advertising.
23        And just going back, Your Honor, if I could again to the
24   first item that Mr. Rhodes mentioned, which is the changing of
25   the statement of rights and responsibilities, Section 10.  And
```

```
 1   I'm just going to read a short segment of that.  But, it
 2   doesn't mince its words at all.
 3       It makes very clear (As read):
 4           "You give us permission to use your name, profile
 5           picture, content and information in connection with
 6           commercial-sponsored or related content such as the
 7           brand you like, served or enhanced by us.  This
 8           means, for example, that you permit a business or
 9           other entity to pay us to display your name and/or
10           profile picture with your content or information."
11       Nothing could be more clear than that.  And these
12   educational sections which will be at the help center, the
13   family center, will make very clear what that is.
14       Your Honor, one of the things --
15           THE COURT:  You're reading from 2.1(a)?
16           MR. ARNS:  Yes, I was, Your Honor.
17           THE COURT:  Okay.
18           MR. ARNS:  So, and there's other sections of 12.1(a)
19   that are as powerful.  But that is mainly the guts of it.
20       So, these changes that have been made that Mr. Rhodes
21   pointed out, very accurately, and the changes in the SRR plus
22   the educational materials that are going to be included are
23   going to exactly tell the Facebook user what is happening with
24   respect to the advertising.
25       And again, if I could just point out one thing,
```

1   Your Honor, the reason we made this settlement is we know that

2   for all the Facebook members, this approximately 170 million

3   Facebook members now in the United States, nobody's ever paid

4   anything for that.  We know that Facebook obtains a large part

5   of its income from advertising.  As does Google.  As does every

6   other website.  Advertising.

7       And, we believe this makes it perfectly clear, so that

8   there won't be any questions.  And if you ask the question:

9   "Are people going to read the statements on rights and

10  responsibilities -- of rights and responsibilities," those that

11  are concerned about these issues will, we believe.  Those that

12  might not be as concerned are going to get the e-mails that we

13  talked about, and the rest.

14      So, at any rate, I wanted to add that, Your Honor.  We

15  think that's a very significant part of the injunctive relief,

16  and we're still going to add to it, other than those 21 web

17  pages within Facebook that are going to be enhanced.

18          MR. RHODES:  The other thing I would point out to the

19  Court is that -- and I forgot to mention this -- if you don't

20  trust us, you can order us to do an audit.  We built that into

21  the agreement.

22          THE COURT:  I saw that.  One audit.

23          MR. RHODES:  One audit.  Yeah.  We -- you know, we

24  figured a Federal Court order is probably good enough, but if

25  -- again, if there's a legitimate concern, we've given the

1   Court that opportunity, we've given the Court the jurisdiction.

2       I know you hate that when parties say the Court's going to

3   retain jurisdiction.  But, you know, we -- we tried to solve

4   this problem both at the consideration level, given the math I

5   went through, but at the injunctive relief level, to do a

6   panoply of things:  Disclosures as you enter, targeted

7   advertising to people when you're there.  And then, give people

8   tools -- namely parents -- tools to enable them to control what

9   actually happens, and set some defaults that are actually

10  against Facebook's economic interests, if you think about it.

11      And, I would entreat the Court to consider the problem

12  thusly:  We are not here as a legislative exercise.  We are not

13  here as a panel discussion on best practices in the privacy

14  realm.  We are not advocates for Beltway privacy interest

15  groups to design a -- a system that favors the privacy wonks

16  over all else.

17      This is, after all, a multi-billion-dollar cost center,

18  and it's offered to the world for free.  And the principle of

19  what Facebook's about is to do what?  It is to share

20  information.

21      So, the Court has to take a step back and holistically

22  assess what we've tried to accomplish to solve this particular

23  case, given the totality of risk, the profile -- the

24  characteristics of the case, and consider what we've tried to

25  do to engineer a fair and adequate and reasonable solution to

1  the problem in a way that's fairly unique, much like, I would

2  submit, what we did in *Beacon*.

3      And, it's not for the Court to over-emphasize the concerns

4  that come from Beltway or law professor privacy advocates, that

5  it wasn't done the way they want to.  Because that's not the

6  Court's province.

7          **THE COURT:**  I suppose I come at it, contrary to the

8  -- either of the different alternatives that I hear you

9  suggesting.

10     I look at it as there's a lawsuit.  And the lawsuit

11 alleges a violation of 3344.  And, I assess whether or not this

12 is a settlement that addresses what has been identified as a

13 claim, with all the -- the adjustments with respect to defenses

14 and the like.

15     But I'm not -- trust me, I am not proposing to set grand

16 policy with respect to privacy issues writ large.  I'm

17 resolving this case (Indicating).  And --

18          **MR. RHODES:**  I appreciate that, Your Honor.

19          **THE COURT:**  That's my focus.

20          **MR. ARNS:**  Your Honor, from our standpoint, if I

21 could just say something, is this is mentioned in -- by a lot

22 of the Ninth Circuit cases.

23     Irrespective, this settlement, we believe from the

24 Plaintiffs' side, does the public good, and society at large

25 benefits.  Because this is new territory that's being entered

1    in this digital age.  Google Plus, every other social website

2    will look at this.  And we believe that we've cracked the code

3    so that it's fair to the class, and fair to the minors.

4         Also, we are very proud of how we have crafted this,

5    Your Honor.  It would be very easy to make something that's

6    Draconian so that nobody can use these social media platforms.

7    And we believe that the class would not be happy with that,

8    Your Honor.  There might be some children's privacy groups that

9    would be.

10        And by the way, if I could point out, we're not dealing

11   with children in this case at all.  The definition of a "child"

12   is from birth to age of puberty.  We are dealing with

13   adolescents.  We are dealing with teenagers.  No teenager wants

14   to be called a child.  And, by definition, they are not.

15        We are dealing with probably the most -- as far as the

16   minor --

17            THE COURT:  These are minors, which, a minor is under

18   18.

19            MR. ARNS:  Well, yes.  "Minors" could be everything.

20   But we are dealing with a sector of minors.  The teenage sector

21   of minors.

22            THE COURT:  That's just -- that's on the assumption

23   those are the only people that are using Facebook.

24            MR. ARNS:  Well, that's what this case is addressing,

25   because no one under age 13, by Facebook law, can get on

1  Facebook.

2          THE COURT:  I understand.

3          MR. ARNS:  They can lie about their age, but --

4          THE COURT:  I understand.

5          MR. RHODES:  I also want to retort that, having kids

6  in their early twenties, I disagree with the notion that you

7  could be in your teens, and not be a child.  But -- Your Honor,

8  let me just run quickly through my chart with respect to the

9  high points of the objections that were made by the *C.M.D.*

10 lawyers last time.

11         THE COURT:  Yes.

12         MR. RHODES:  And again, I'm not going to repeat

13 what's in my brief.  I'll just say Pages 16 through 31 identify

14 a dozen separate and discrete risks that we would -- we would

15 suggest should reduce the total figure that is the risk figure

16 being compared to the settlement figure.

17      These are some of the highlights.  COPA, we think, is a

18 big one.  We established that in the David Cohen state court

19 case, they walked away from that opinion.  They were given a

20 chance to keep on with that case, and they abandoned it.  Same

21 lawyers.

22      They talk about the minor contract issue.  You've been

23 over this ground with us before.  But again, Judge Murphy's

24 transfer order settles that.

25      They -- the third point, you know, they kind of assume

1  that we have -- there's a remedy available to you.  So, let's

2  play it out differently.  We go to trial.  You've certified a

3  class, we've had a trial.  And, you and I are now arguing over

4  remedies.

5      Would you have the legal power to institute what we have

6  put forward as injunctive relief, as a matter of a remedy for

7  these claims?  I mean, you know, some of that would be pretty

8  far afield, I think, of what the Court's power would be under

9  those circumstances.

10     So, I think the fallacy in their thinking is that they get

11 to argue with us about, "Well, you should do more."

12     And I'm saying, you can only get this kind of injunctive

13 relief in the form of a negotiated settlement.  And that has to

14 be taken into account.

15     Their preference for an opt-in regime.  Again, no basis in

16 law, no basis in regulatory requirement.  It's simply a

17 different end point than this negotiation produced.

18     And the -- the test is not -- and I think you said this to

19 me almost three or four years ago in connection with *Beacon*.

20 It's not whether you think this is the outcome you would have

21 negotiated.  It's one, whether it falls within the realm of

22 possibility today to be deemed at the final approval hearing as

23 fair, reasonable and adequate.

24     And of course, the most fundamental point to those folks

25 is:  If they don't like the deal, they can opt out.  They don't

1    have to be part of the deal.  Right?  They don't have to take

2    the deal.

3        And I would submit to you -- and we would have made this

4    argument foursquare in the class cert context, but 3344 is a

5    potent statute, because it says that if you prevail, you can

6    get exemplary damages, and your attorneys' fees.

7        So, it's not one of those situations where a small dollar

8    figure claim, even if you were entitled to statutory damages of

9    750, it's not like you can't get a lawyer to bring that claim.

10   You can.  Because that lawyer can get his or her attorneys'

11   fees, he can get his or her costs, and he has the potentiality

12   to get something more than that if the facts are there.

13       So, I think that is the reason why their arguments

14   ultimately don't --

15           **THE COURT:**  So, the opt-out is not illusory.

16           **MR. RHODES:**  It's not illusory in that context.  And

17   that's why I would have said to you at class cert, that's one

18   of the reasons why you don't need to cert the case, because

19   it's not suitable, given that there's an adequate remedy,

20   absent class treatment.

21       And then, I just make it a placeholder, because one of

22   your other concerns that you expressed in your order was how to

23   come up with the notion that we can look to injunctive relief

24   in addition to the cash compensation as a way of providing

25   consideration for the release of past claims.

```
1         And, this is the way I think about it.  What we have here
2    is really a license dispute.  The Plaintiffs are saying, "You
3    didn't have the right to use my name and likeness in sponsored
4    content."
5         Can I have that -- the first one, and the one that shows
6    the actual SR -- I want to show you something to address this
7    head-on.
8         We're saying we did have that right.  So, that's the
9    dispute.  Because 3344 presumes you don't have consent.  So,
10   we're saying we did have the right.  They're saying we don't.
11        And, if I hand to you -- and these are marked in the
12   record, this is Yang Muller Declaration, Exhibit B.
13        (Document handed up to the Court)
14        MR. RHODES:  This is the original form of the SRR.
15   And -- and this is whether Judge Koh, you know, dealt with in
16   her original order.  And you've seen that.
17        And let me hand to you Miller (sic) Declaration Exhibit H.
18        (Document handed up to the Court)
19        MR. ARNS:  I have this, that's fine.
20        MR. RHODES:  And what I'm suggesting to the Court is
21   that in the context of a license dispute, I'm saying this
22   language here gave me the right to use it, because I said I
23   could use your name and likeness in sponsored content.
24        Mr. Arns' theory of the case is that:  "No, it's not clear
25   enough."  Right?  "You need to be more clear in your license so
```

1   that we know that a name and likeness can go into something

2   called 'a sponsored story,' which didn't exist when these

3   documents (Indicating) were created."  So, that's the issue

4   that's joined.

5        In that context, for people -- unlike a single purchase or

6   single economic privity transaction, where you -- where the

7   likelihood is the vast majority of the class members are still

8   in the Facebook ecosystem, still using the product, telling

9   them to solve your dispute with me over what that language

10  meant and what rights it conferred to me, I'm going to change

11  the way we deal with it going forward, between you and me.  The

12  cases we cite in our brief say that is an acceptable way of

13  addressing past damage claims through injunctive relief.

14       But as I posited at the outset, I think my math of a

15  relationship between the pot of consideration and the actual

16  injury that we're talking about of 16 to 26 percent means we

17  never have to go through that exercise.

18       I will simply point out that Mr. Arns has proffered three

19  different models.  That -- one is one dollar per capita, one is

20  a fair market value, one is an option value.  And if the Court

21  were to entreat any of those numbers, then there is no dispute

22  whatsoever about the fairness, reasonability, or adequacy of

23  the consideration.

24       And that's where I conclude my remarks, Your Honor.  I

25  think I've now addressed all of the concerns the Court had

1  expressed in the order.

2              MR. ARNS:  If I can add one thing, Your Honor?

3              THE COURT:  Go ahead.

4              MR. ARNS:  With respect to one of the major issues --

5  and this is part of injunctive relief that we -- that's pointed

6  out in our papers -- is that Facebook took the position that

7  sponsored stories were not advertisements.  Sponsored stories

8  flow from a social action that actually go into the person's

9  news feed.  So, they know about it.  But then, it goes from the

10 news feed into the sponsored story.

11     So, they were saying this was republication.  One of the

12 reasons -- the fact that Facebook said they were not

13 advertisements is how we got out of the SRRs.  That was very

14 important, because the SRRs did address advertisements.  So,

15 that's just part of the changes that have taken place.

16     And I think I mentioned last time, Your Honor, that, was

17 Facebook being disingenuous when they said this was not an

18 advertisement?  And the answer is:  I thought so, to start

19 with.

20     And after taking 23 depositions, I think they believe that

21 it was not an advertisement; that it was a republication.  But

22 at any rate, that gave us the -- a very important part of the

23 viability of this case.

24     I would like to just point out one other thing --

25             MR. RHODES:  This is an example --

1          **MR. ARNS:**  Yes.

2          **MR. RHODES:**  Your Honor, let me just interrupt his

3    remarks, and hand to you what is exactly a sponsored story.

4        (Document handed up to the Court)

5          **MR. RHODES:**  Sometimes we take these things for

6    granted, but it's actually helpful to see exactly the point

7    that Mr. Arns is making.

8          So, this is an example.  So, what is a sponsored story?

9    You see that on Page 1, there's a "Like."  Page 2, there's a

10   red box.  That's what happens when you click the "Like" button.

11         And then on Page 3 of the demonstrative, you will see that

12   is, in fact, in the red box, what the sponsored story is that

13   the -- presumably, in this instance, the campaign paid to have

14   republished.  Right?

15         And I just want to emphasis that, because it does kind of

16   go to what problem we're trying to solve.

17         In our -- in our context, sponsored stories, you will see,

18   includes no advertising, creative, derived from the advertiser.

19   That's the key issue.  It is literally a republication of that

20   which already ran on Page 2.

21         And when it ran on Page 2 (Indicating), it was subject to

22   the settings that the Plaintiff used.  The people could have

23   had the setting be "To myself only."  We didn't show it to any

24   other broader audience.

25         So, that's the crux of that point.

1            **MR. ARNS:**  Yes.  And Your Honor, just to make --

2            **THE COURT:**  I assume this one (Indicating) isn't

3  running anymore.

4            **MR. RHODES:**  Well, I thought I would use a little

5  humor today, Your Honor, in that particular instance, because

6  that was not a "Like" that I personally would have made.  And

7  therefore, I'm feeling much better about things today than I

8  was last week.

9            **MR. ARNS:**  Your Honor, as I said, that -- and in this

10 issue Mr. Rhodes just raised -- that Facebook's position was it

11 was republication.  And there is absolute immunity for

12 republication.

13     We spent dozens and dozens of hours arguing about that.

14 Our position is, of course, that it wasn't republication.

15 That's just one of the many issues in the case.

16     One other thing, you mentioned that -- that amicus by

17 Children's Advocacy Institute.  We can address all those

18 issues, Your Honor.  We have them.  But I would just like to

19 follow up on one thing Mr. Rhodes said.

20     And that is, in Judge Murphy's order from Illinois that

21 came in, that stated the SRRs apply.  And again, the *C.M.D.*

22 case is solely minors.  Judge Murphy concluded the SRRs apply.

23 And that California law applies in California venue.  Thus, the

24 transfer took place.

25     Now, in the opposition to that transfer, the C.M.D.

```
 1   lawyers argued, "You're gutting our case.  This no longer -- we

 2   want to have a declaratory relief that the SRRs don't apply."

 3        And they -- you know, similarly, other entities have cited

 4   to the Family Code 6701, et cetera.  If 6701 -- which we don't

 5   think applies at all for the reasons we've already addressed --

 6   if, for some reason, that did apply, hypothetically, then we

 7   don't get the SRRs with the California law, which makes the

 8   national class far more viable in the rest, Your Honor.

 9        So, we don't think any of those arguments are well thought

10   out.  But again, after doing three years of discovery in 18

11   months, Your Honor, we believe that we have got a grasp on all

12   of the issues, and can easily address any of these objector

13   issues.

14        And --

15             THE COURT:  Of course, they will have the opportunity

16   in the context, should I gave this preliminary approval to make

17   these points --

18             MR. RHODES:  I'm sure they're not going to be the

19   other one.

20        And, Your Honor, I have an answer to your housekeeping

21   question.  The memo of class cert was lodged and not filed, and

22   therefore it's not on ECF.

23             THE COURT:  All right.  Okay.  I'll find it.

24        Well, thank you.  Let me go through some other

25   housekeeping-related questions.  I'll go back on the big, big
```

1    question, and go through what you presented, which has been

2    very helpful, and I'll provide with you an order.  But let me

3    just touch on a few things in the actual paperwork that I got,

4    and some questions.

5        On the notice, both the long form notice and I think the

6    other proposed forms of notice, the denial of wrongdoing by

7    Facebook is underlined in each of these documents.

8            **MR. RHODES:**  It was originally in pink ink,

9    Your Honor.

10           **THE COURT:**  And lit up, I'm sure.  But --

11           **MR. RHODES:**  Would you like us to strike that?

12           **THE COURT:**  Well, I just -- it was more a question.

13   I mean, is there a particular reason to do it?  I mean, I

14   understand you really mean it, that you don't think there was

15   liability here.

16       But I'm not sure -- I'm just confused -- I'm concerned

17   that in any form of notice that goes out, when there are things

18   that are underlined and not underlined, people might ascribe

19   things to it that are not intended.

20           **MR. RHODES:**  To make your life easier -- my client's

21   nodding.  We can give in on the underlining.

22           **THE COURT:**  Okay.  There is -- and this is apropos of

23   our discussion about discretion to the Court, and the like.

24       In the notice provisions, the various forms of notice,

25   there is discussion about that.  And it talks about, at various

```
 1  places, the Court in its discretion can order the entire amount
 2  to be distributed to not-for-profit organizations, or in its
 3  discretion it can do this, that or the other thing.
 4      This is more just perhaps alerting you, I want to go back
 5  and think about, in light of my view, which you don't seem to
 6  have a problem with, that I think the -- it's probably not the
 7  right phrase, but the default to the non-discretionary
 8  operation is more the one that I'm inclined to think is the
 9  appropriate one, that could mean some recrafting of the
10  notices.
11          MR. RHODES:  I see, Your Honor -- I'm just looking at
12  it with you.  I see that it doesn't say that "If you do
13  nothing, this is what happens."
14          THE COURT:  Correct.
15          MR. RHODES:  Even though that's what the agreement
16  says.  So, you're right.  That may need to be tweaked.
17          THE COURT:  Let's see.  With respect to the notice,
18  the -- and, just logistically run through this with me.  If the
19  fee petition is filed 23 days after preliminary approval is
20  provided, in the long form notice, there is a -- a blank for
21  class counsel are requesting up to...for fees, and up to...for
22  costs.
23      How can the notice go out -- notice was contemplated to go
24  out before your fee petition, wasn't it?
25          MR. RHODES:  May I hand you a timeline?
```

```
 1              THE COURT:  Yes.

 2        (Document handed up to the Court)

 3              MR. RHODES:  This is just meant to be an example of

 4   how we thought it would work.  And you will see that we have

 5   keyed it to your date of preliminary approval.  So, the motion

 6   is due 23 days after.

 7              THE COURT:  Oh, I see.

 8              MR. RHODES:  And then, the beginning of direct notice

 9   would come after that.  So at that point, you know what the

10   request is.

11              THE COURT:  Okay.

12              MR. ARNS:  It was my position, all along, Your Honor,

13   that --

14              MR. RHODES:  Does that make sense?

15              THE COURT:  Yes.

16              MR. ARNS:  In every case we've ever done, the fee

17   petition is done before the notice goes out.  So, the exact

18   numbers are in there.

19              THE COURT:  All right.  In fact, now, that's

20   California law.

21              MR. RHODES:  And then, just to see whether you were

22   comfortable with the actual calendar because it is a little bit

23   laborious, and I can explain why, you can see we tried to dope

24   out the dates and just give you an example of what it would

25   look like.
```

1          **THE COURT:**  Okay.  That's very helpful.

2      Okay.  Let me see if there was any other -- you -- and

3  this goes again to the fee petition issue.

4      In the long form notice on Page 12 under 20, you correctly

5  have a notification that to the extent class members want to

6  review the papers, you're talking about the fee application can

7  be found, and it would be posted on the website that's referred

8  to here.

9      I would think that some reference to that should also be

10  in the provision we were just talking about before Paragraph 12

11  on Page 8 that's talking about up to a certain amount may be

12  requested.  And I think at that point there ought to be a

13  reference where they could look at the fee petition, because

14  that's where they're going to be focused on.

15      At the end, it's kind of a throwaway, and I'm not sure

16  people would particularly focus on that.  So I think you would

17  want to put that there.

18          **MR. ARNS:**  All right.

19          **MR. RHODES:**  That's fine, Your Honor.

20          **THE COURT:**  Okay.

21          **MR. RHODES:**  In other words, you want the link and

22  the reference to be in that section of the notice.

23          **THE COURT:**  Correct.

24          **MR. RHODES:**  Not the later section.

25          **THE COURT:**  Correct.

1          **MR. RHODES:**  I got it.

2          **THE COURT:**  The other truly momentous issue is I

3    don't use my middle initial, generally.  So, if you take that

4    out of the various places --

5          **MR. ARNS:**  We have to leave that in, Your Honor.

6          **THE COURT:**  That one, I figured you wouldn't have a

7    problem with.  Okay.

8          **MR. RHODES:**  We got that from your Facebook account,

9    Your Honor, so --

10         (Laughter)

11         **THE COURT:**  Okay.  As -- as you will know, I am not a

12   Facebook member, because you provide me with so much work, I

13   think it's just as well to stay away from all Facebook-related

14   matters.

15         Okay.  So, I have all your papers.  I appreciate it.  You

16   certainly endeavored to address the concerns, which were

17   serious concerns on my part.  And, I will go back and spend

18   time with what you've provided.

19         I know that you are looking to have a decision, and to

20   move forward.  And I will endeavor to do that for you.  And I

21   now have the benefit of kind of your -- in the event I do give

22   preliminary approval, what will flow from that.

23         And so, I will take it back, and do that, and hopefully,

24   give you an order fairly shortly.

25         **MR. RHODES:**  Thank you very much, Your Honor.

1          **MR. ARNS:**  Your Honor, we have submitted orders, just

2    for the Court's benefit, if they want.  And, it's --

3          **THE COURT:**  A proposed order.  I saw that.  You mean

4    a preliminary approval order.

5          **MR. ARNS:**  Yes.

6          **THE COURT:**  Yes.  I see that you have that.  And, I

7    will take a look at that and --

8          **MR. ARNS:**  If I could just give to the Clerk, also,

9    the order for class certification also (Indicating).

10         **THE COURT:**  Okay.  The one that was lodged?

11         **MR. ARNS:**  We have two, so I'm just going to -- if I

12   may, Your Honor, may I give the Clerk both of these?  If we

13   want digital formats of those, I'll get those.

14         **THE COURT:**  Sure.

15         **MR. RHODES:**  Do you want us -- I suppose you could

16   ask us in the order, but I was going to propose, if you'd like

17   us to take a shot at revising the notice in the way you've

18   outlined today, and lodge with the Court, we will do that if it

19   will help the Court.

20         **THE COURT:**  Yes.  I would appreciate it if you would

21   do that.

22         **MR. RHODES:**  We will do that.

23         **MR. ARNS:**  Have that by next week, Your Honor.

24         **THE COURT:**  That would be good.

25         **MR. ARNS:**  Thank you very much.

1       (Off-the-Record discussion between the Court and Clerk)

2               **THE COURT:**  Yes.  And just to remind you, the CMC is

3  vacated.

4               **MR. RHODES:**  Correct.

5               **THE COURT:**  All right.  Thank you.

6       (Conclusion of Proceedings)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States

Court, Northern District of California, hereby certify that the

foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

/s/  Belle Ball

Friday, March 22, 2013

Belle Ball, CSR 8785, CRR, RDR