CHILDREN'S ADVOCACY INSTITUTE
CENTER FOR PUBLIC INTEREST LAW
University of San Diego School of Law
Robert C. Fellmeth (CA SBN 49897)
Christina McClurg Riehl (CA SBN 216565)
Elisa D'Angelo Weichel (CA SBN 149320)
5998 Alcala Park
San Diego, California  92110
Telephone: 619.260.4806
Facsimile: 619.260.4753
cpil@sandiego.edu

**Attorneys for Objectors**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL FRALEY; PAUL WANG; SUSAN MAINZER; JAMES H. DUVAL, a minor, by and through JAMES DUVAL, as Guardian ad Litem; and W.T., a minor, by and through RUSSELL TAIT, as Guardian ad Litem; individually and on behalf of all others similarly situated, | **Case No11-CV-01726 RS** |
| | **OBJECTION AND NOTICE OF INTENTION TO APPEAR** |
| Plaintiffs, | Date:     June 28, 2013 |
| v. | Time:     10:00 a.m. |
| | Ctrm:     Courtroom 3 |
| FACEBOOK, INC., a corporation; and DOES 1-100, | Judge:    Honorable Richard Seeborg |
| Defendants. | |

DEPOT OBJECTION
Case No. 11-cv-01726 RS

1

## <u>TABLE OF CONTENTS</u>

2

INTRODUCTION ........................................................................................................... 1

3

ARGUMENT

4

5

I.     THE OBJECTORS ARE MEMBERS OF THE CLASS AND, SPECIFICALLY, ARE MEMBERS OF A SUBCLASS ALLEGEDLY PROTECTED BY THE SETTLEMENT AGREEMENT ....... 4

6

7

II.    THE NATURE OF THE INTERNET MAKES IT A PARTICULARLY DANGEROUS MEDIUM REQUIRING HEIGHTENED CHILD PRIVACY PROTECTION ............................................................................. 5

8

9

III.   THE PRELIMINARILY APPROVED SETTLEMENT DOES NOT ADEQUATELY CONSIDER THE UNIQUE NEEDS OF THE MINOR SUBCLASS IN CONSTRUCTING ITS ALLEGED PROTECTIONS ........ 10

10

11

a.    Under California Law, Minors Cannot Consent to the Contract Included in the Proposed Statement of Rights and Responsibilities Which is a Part of the Settlement Agreement .......................................... 10

12

13

b.    Several States Share a Heightened Protection for Children Entering Into Contracts ................................................................................. 16

14

15

c.    Because Children, Themselves, do not have the Capacity to Enter into the Contract Contemplated in the Settlement Agreement, the Contract Must be with the Child's Parents and the "Opt Out" Structure of the Contract in the Proposed Statement of Rights and Responsibilities Does Not Adequately Provide for the True Parental Consent that is Required  18

16

17

18

19

IV.   CLASS COUNSEL LACK ADEQUATE EXPERIENCE TO PROTECT THE UNIQUE INTERESTS OF CHILDREN AS REFLECTED IN A SETTLEMENT THAT CREATES NO BENEFIT TO THE SUBCLASS ... 21

20

21

V.    THE INFORMATION BEFORE THE COURT SHOWS A FEE-DRIVEN SETTLEMENT ......................................................................................... 23

22

23

CONCLUSION ........................................................................................................... 25

24

25

26

27

28

# TABLE OF AUTHORITIES

Page

**CASES**

*Cruz v. Superior Court* (2004) 121 Cal.App.4th 646, 651–52
    [17 Cal.Rptr.3d 3] ...........................................................................................12

*David Cohen v. Facebook,* No. BC 44482 (L.A. Super. Ct) (2011) ................................ 15

*Easton & Co. v. Mutual Ben. Life Ins. Co.,* Fed. Sec. L. P. (CCH) P. 97248,
    1993 WL 89146 at *5 (D.N.J. 1993) ........................................................................ 23

*Eddings v. Oklahoma*, (1982) 455 U.S. 104 ................................................................ 6

*E.K.D. v Facebook* (2012) 855 F. Supp. 2d 894,
    [2012 U.S. Dist. LEXIS 113761] ........................................................................ 2, 15

*Gipson v. Davis Realty Co.* (1963) 215 Cal.App.2d 190, 207
    [30 Cal. Rptr. 253] ............................................................................................ 13

*I.B. v. Facebook, Inc.* (2012) 2012 U.S. Dist. LEXIS 154327 ............................ 10, 13, 14

*Johnson v. Texas,* (1993) 509 U.S. 350 ...................................................................... 6

*Kenny A. v. Perdue* (2006) 454 F.Supp.2d 1260, rev'd on other grounds,
    *Perdue v. Kenny A. ex rel Winn*, __ U.S. __, 130 S.Ct. 1662 (2010) ........................ 24

*Roper v. Simmons*, (2005) 543 U.S. 551 ................................................................. 1, 6

*Sparks v. Sparks* (1950) 101 Cal.App.2d 129 ............................................................. 10

*UAW v. GMC*, 497 F.3d 615, 626 (6th Cir. 2007) ......................................................... 22

**STATUTES**

**Federal**

The Children's Online Privacy Protection Act (COPPA) Title 15, United States Code:
    Section 6501 – 08 (2013) .................................................................................... 9, 20
    Section 6501 (1) (2013) ...................................................................................... 15
    Section 6502 (a) (2013) ...................................................................................... 15
    Section 6502 (d) (2013) ...................................................................................... 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Communications Decency Act, Title 47, United States Code:
Section 230 (2013) ................................................................................ 14
Section 230 (f)(2) (2013) ........................................................................ 3
Section 230 (f)(3) (2013) ........................................................................ 3

**State**

California Family Code
Section 6701 .............................................................. 12, 13, 18, 22
Section 6710 ...................................................................... 12
Sections 6750, *et seq.* ............................................................ 14
Section 6752 ................................................................... 14, 15

Idaho Code, Title 32
Section 32-106 .............................................................. 17

Louisiana Civil Code
Article 1918 ................................................................ 16

Montana Annotated Code
Section 41-1-301 ......................................................... 16

North Dakota Century Code, Title 9
Section 9-02-01 .......................................................... 17

Oklahoma Contracts Code, Title 15
Section 17 .................................................................. 16

South Dakota Codified Laws, Title 26
Section 26-2-1 ............................................................ 16

**RULES**

Children's Online Privacy Protection Rule, Title 16, Code of Federal Regulations
Section 312.3 (b) ......................................................... 9

Federal Rule of Civil Procedure 23(g) ....................................... 21, 22

Federal Trade Commission, Notice of Proposed Rule, 16 CFR Part 312,
Fed. Reg. Vol. 76, No. 187 at 59805, *available at*
http:///www.ftc.gov/os/2011/09/110915coppa.pdf ................................. 9

**OTHER MATERIALS**

3 Witkin Sum. Cal. Law Agency § 93 (2013) ................................................................... 12

Alice Marwick and Danah Boyd, *The Drama!  Teen Conflict, Gossip, and Bullying in
Networked Publics* presented at "A Decade in Internet Time:  Symposium on
the Dynamics of the Internet and Society" (September, 2011), available at
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1926349 .......................... 10

Amanda Lenhart, Mary Madden, Aaron Smith, Kristen Purcell, Kathryn Kickuhr &
Lee Rainie, *Teens Kindness and Cruelty of Social Network Sites,* Pew Research
Center's Internet & American Life Project (Nov. 09, 2011), http://pewinternet.org/
Reports/2011/Teens-and-social-media.aspx ..............................................................7, 8

*Facebook may let children under age 13 use the site,* Consumer Reports (Jun. 4, 2012),
http://news.consumerreports.org/electronics/2012/06/facebook-may-let-children-
under-age-13-use-the.html ................................................................................. 7

National Crime Prevention Council's page regarding Cyberbullying
http://www.ncpc.org/cyberbullying (last visited April 29, 2013)......................... 7

*Tween Spending and Influence*, EPM Communications Inc.,
http://www.researchandmarkets.com/reports/696286/tween_spending_and_influence
(last visited Apr. 22, 1013) ............................................................................... 9

*What is Cyberbullying,* U.S. Department of Health and Human Services,
http://www.stopbullying.gov/cyberbullying/what-is-it/index.html (last visited
Apr. 22, 2012) .................................................................................... 7

*Why Facebook Has it Wrong About our Kids*,
http://www.childrenonline.org/articles/WhyFacebookHasItWrongAboutKids.pdf,
(last visited April 29, 2013) ................................................................................ 8

William D. Henderson, *Clear Sailing Agreements: A Special Form of Collusion in
Class Action Settlements*, 77 Tul. L. Rev. 813 (March 2003) ...........................23

**INTRODUCTION**

In this case we have a class action affecting many persons who are Facebook subscribers and who will subscribe. Objector Michael S. Depot, as *Guardian Ad Litem* for his children, Katelyn Depot and Christopher Depot, are representative of the millions of Facebook users who are children. Katelyn and Christopher Depot are between the ages of thirteen and eighteen and are subject to the terms of the Settlement Agreement. (*See* Declaration of Michael S. Depot in Support of Objection, Declaration of Katelyn Depot in Support of Objection, and Declaration of Christopher Depot in Support of Objection.) Objectors do not here address the class of adults and the overall format of "sponsored stories." Objectors are lodging this objection to the Preliminarily Approved Settlement Agreement ("Settlement Agreement") because the subclass of minor Facebook users receives no beneficial impact and, in fact, is subjected to a negative result if this settlement is approved. The order that would be entered by this Honorable Court would define privacy rights of that subclass *vis-à-vis* a private corporation. Alarmingly, the terms of the Settlement Agreement are even contrary to basic standards of applicable juvenile law.

A particular danger in the class action process is the use of the federal courts – of an official judicial order – for private advantage. Objectors respectfully urge this Honorable Court to resist the normal-course presumption that this case is merely a matter between those who are parties before him. The case before this Court involves a proposed order applicable to millions of children. The adolescents here at issue have unique features that the Supreme Court is increasingly acknowledging. (*Roper v. Simmons*, (2004) 543 U.S. 551, discussed *infra,* in which the court found it is unconstitutional to impose the death penalty for crimes committed by a youth under the age of eighteen; *Graham v. Florida,* (2010) 130 S. Ct. 2011, 2026 in which the court cited, "developments in psychology and brain science [which] continue to show… parts of the brain involved in behavior control continue to mature through late adolescence" and found it

unconstitutional to sentence a youth under the age of eighteen to life without paroled for a non-homicide offense.) These differences lie behind the limitations on a child's right to contract and the parental consent required to find any "meeting of the minds" which is a precursor to an enforceable contract.

Of specific concern for the Objectors is the portion of the Settlement Agreement which allows Facebook to take a child's identity and utilize that identity, together with text and pictures, in such a way as to transform the character of the child's own actions into a commercial endorsement that works as a profit center for Facebook and to which the children do not consent. Facebook does this through one of its advertising services known as "sponsored stories". As this court is aware, a sponsored story is a form of paid advertisement that appears on a facebook.com user's profile page and that generally consists of another friend's name, profile picture, and an assertion that the person 'likes' the advertiser. A sponsored story may be generated whenever a facebook.com user utilizes the website's post, like, or check-in features, or uses an application or plays a game that integrates with facebook.com, and the content relates to an advertiser in some way determined by Facebook." (*E.K.D. v Facebook* (2012) 855 F. Supp. 2d 894, 2012 U.S. Dist. LEXIS 113761, 3.)

The sponsored story operates, "in effect as an endorsement by the facebook.com user of the company or its product and services to the facebook.com user's friends." (*Id.* at 4.) The fig leaf allegedly allowing this capture, selection and mass transmission of the child's postings is an alleged consent found in the "terms and conditions" small print which purports to grant blanket consent. The current version of the Settlement Agreement does create a possible "opt out" opportunity – but this opportunity is framed in such a way as to effectively preclude knowing consent for the children involved and for virtually all parents whose children will be subject to Facebook image and information expropriation, as discussed below.

In contrast to the current terms of the Settlement Agreement, Objectors propose a very simple and technologically feasible alternative.  If Facebook intends to act not as the passive "interactive computer service" under the Communications Decency Act (*see* 47 U.S.C. § 230(f)(2)) but rather as an "information content provider" (*see* 47 U.S.C. § 230(f)(3)) by creating messaging decisions for millions of American youth, it need only identify to the child and the child's parents what message will be created and to whom it will be disseminated with a simple "I consent" button.  If the child and at least one parent click the button, Facebook may proceed with the intended transmission.  Where that does not occur, Facebook does not have consent to use the child's likeness and information and, therefore, Facebook may not proceed with the use of that child's identity.  Shouldn't youth, with the guidance of their parents, have control over the cyber footprint they are leaving behind?  Shouldn't they be the ones to control their overall cyber citizenship identity?  Should they not know what is being sent under their own auspices?  Should they not know to whom it is being sent?  Should they not know what product they are being used to promote?  Or, should we leave all of these decisions to a corporation intent on creating profit and pleasing its investors based on an alleged consent by a child to such momentous decisions?

Objectors are concerned that this case accepts as class representatives and counsel for the youth of America who are under age 18, or other age of majority, and who have a Facebook account, persons who have little expertise in issues involving children or privacy.  This lack of adequate representation is discussed at length below and has led to a situation in which a major corporation has been permitted to (a) lead a federal district court to enter a defendant-advantageous court order which is contrary to applicable law and would allow the defendant to effectively make use of a child's information for commercial use without prior approval by that child's parent, as discussed below, and (b) arrange what is clearly envisioned to be a multi-million dollar fee to opposing counsel (obviously disparate from market level hours).  The

Settlement Agreement transparently awards a $7.5 million fee to plaintiffs' counsel for arranging a settlement contrary to the interests of America's youth – purportedly their client.

Objectors file this Objection to bring these matters to the Court's attention, to oppose approval of the settlement in this context of harm to the minor subclass and unjust enrichment to Plaintiff's attorneys and to propose corrective actions that would help remedy these failures.[1]  We have specifically proposed a revision to the proposed final order consistent with applicable law and the genuine interests of the subclass—one which costs the defendant little to implement, but which will bring their practices into compliance with the law, consistent with the respect due to child and parental consent rights.

## ARGUMENT

### I.
### THE OBJECTORS ARE MEMBERS OF THE CLASS AND, SPECIFICALLY, ARE MEMBERS OF A SUBCLASS ALLEGEDLY PROTECTED BY THE SETTLEMENT AGREEMENT

The Objectors and their counsel are *bona fide* and superior representatives of the class of youth identified in the instant pleadings.  Indeed, Objectors are part of the subclass of youth. Objectors are minors who established Facebook accounts prior to January 25, 2011, did not consent to the use or his or her name, photo or likeness in any advertisement, their parents did not give such consent, and yet, to the best of their knowledge, they have appeared in a sponsored story.  (*See* Declarations of Katelyn Depot, Christopher Depot, and Michael S. Depot in Support of Objection.)  The children have interests typical of the subclass of minors.

---

[1] If this Court is so inclined to request that Objectors act instead as Interveners, Objectors stand ready to so act and Objectors' attorneys stand ready to so act.  Objectors do not desire to burden this Court with more work.  Objectors wish to lodge their grave concern and alert this Court to their willingness to take on any role most beneficial to this Court and to ensure that this Court has all the appropriate information to protect the rights of the Subclass of Minors who are most appropriately guided by their parents.

Counsel for the Objectors is the Children's Advocacy Institute (CAI) whose interest is solely the protection of child interests.  (*See* Declaration of Robert Fellmeth in Support of Objection ("Fellmeth Declaration") at ¶ 2.)  CAI is part of the Center for Public Interest Law (CPIL), based at the University of San Diego, School of Law.  CPIL was the progenitor of the Privacy Rights Clearinghouse (see www.privacyrights.org), one of the nation's leading centers of privacy rights education.  CAI itself is directed by Professor Robert Fellmeth, a graduate of Stanford University and the Harvard Law School, and author of the law text *Child Rights and Remedies* (Clarity, 3d edition, 2011).   He has been part of the governance of the National Association of Counsel for Children for the past decade, and similarly serves as longstanding counsel to the Board of Voices for America's Children.  CAI is far from merely being a "policy wonk" as orally accused at the prior hearing of this settlement; CAI has in fact worked directly to represent children in court for more than twenty years, sponsored more than thirty statutes which are currently law, and argued more than twenty major appellate cases involving child rights – including four before the United States Supreme Court.  CAI's professional staff includes six attorneys with experience in the representation of children in various capacities, including in juvenile court, before agencies, and in the daily troubles plaguing homeless youth.  (*See*, Fellmeth Declaration.)  CAI includes qualified counsel in the subject matter of this litigation.

## II.
### THE NATURE OF THE INTERNET MAKES IT A PARTICULARLY DANGEROUS MEDIUM REQUIRING HEIGHTENED CHILD PRIVACY PROTECTION

The specific and current abuse addressed by the Settlement Agreement – namely, Facebook's use of a Facebook user's identity and online information in paid advertisements without receiving their advanced consent – is of special concern.  Facebook rearranges text and images provided by its members, grouping such content in such a way to transform the character

of the member's words, photographs, and actions into a commercial endorsement to which they do not consent.  This can lead to the irreparable harm that comes from the final republication of images and information in a forum that can reach millions—and is the ultimate bell that cannot be unrung.  This is particularly troubling to Objectors with respect to the publication and seemingly endless availability of images and information posted by children.

In the case of *Roper v. Simmons*, (2005) 543 U.S. 551, 569-570, the U.S. Supreme Court outlined three general differences between children under the age of eighteen and adults that demonstrate why children need special protections.  First, "a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and…[t]hese qualities often result in impetuous and ill-considered actions and decisions." *Id.* at 569, citing *Johnson v. Texas,* (1993) 509 U.S. 350, 367.  Second, youth is "a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Id.* citing *Eddings v. Oklahoma*, (1982) 455 U.S. 104, 115.  And finally, because the character of a child is not yet as well formed as the character of an adult, "[t]he personality traits of juveniles are more transitory, less fixed." *Id.* at 570 citing, generally, E. Erikson, Identity: Youth and Crisis (1968).

These three differences outline the underlying need for heightened protections for children – protections which, as explained below, currently exist at law but are violated by the Settlement Agreement.  Further, these differences are amplified when looking at the permanent republication of a child's information shared, initially, with a chosen, discreet, group of friends.  A child's lack of maturity may easily lead to ill-considered decisions.  When these decisions occur once on the internet, it is bad enough.  But when Facebook chooses to capitalize on these decisions for its own financial gain by republishing these decisions in sponsored stories, they perpetuate and amplify the harm that may stem from one impetuous decision.  This amplification of the harm comes at a time of the child's life when they are most susceptible to psychological damage.  This

amplification then lives forever in cyberspace for these children who, as the *Roper* Court so appropriately observed, have personality traits which are transitory and less fixed than the personality traits of adults.

Even though Facebook claims that users must be 13 or older to join, in June 2012, *Consumer Reports* reported that 5.6 million children under 13 utilize Facebook. (*See* http://news.consumerreports.org/electronics/2012/06/facebook-may-let-children-under-age-13-use-the-site.html, last viewed April 22, 2013.) Facebook can't even enforce the protections they currently have in place. And, unfortunately, the internet is not always a supportive place, especially for teens. And, while the problems of bullying and adolescent embarrassment and their consequences are easy for adults to minimize, they are actually quite pervasive. (Amanda Lenhart, Mary Madden, Aaron Smith, Kristen Purcell, Kathryn Kickuhr & Lee Rainie, *Teens Kindness and Cruelty on Social Network Sites*, Pew Research Center's Internet & American Life Project, (Nov. 9, 2011), http://pewinternet.org/Reports/2011/Teens-and-social-media.aspx, ("88% of social-media using teens have witnessed other people being mean or cruel on social network sites").) Beyond simply observing "meanness", according to various sources, between one third and one-half of all kids online have experienced some form of online harassment, including cyberbullying[2]. (*See*, for example, National Crime Prevention Council's page regarding Cyberbullying available at http://www.ncpc.org/cyberbullying and last visited April 29, 2013.) We used to be able to avoid bullying when in the sanctuary of our own homes, but such bullying now invades our home – often on the pages of Facebook.

---

[2] According to the U.S. Department of Health and Human Services, cyberbullying occurs whenever someone uses a social network or other form of electronic communication to harm or demean others in a deliberate or hostile manner. Instances could range from something seemingly innocent, like the sharing of an unflattering picture, to something more serious, like a threat with malicious intent. *See* http://www.stopbullying.gov/cyberbullying/what-is-it/, a website managed by the U.S. Department of Health and Human Services, defining cyberbullying and last viewed April 22, 2013.

It's not surprising that a child's online network is not a particularly safe place.  Studies show that more than two-thirds of teens confess they have accepted a Facebook friend request from someone they did not know, and nearly one in ten teens admit to accepting all friend requests they receive.  (*See* ChildrenOnline.org's report, *Why Facebook Has it Wrong About our Kids*, at pp. 6-7, available at http://www.childrenonline.org/articles/WhyFacebookHasItWrongAboutKids.pdf, last visited April 29, 2013.)  Perhaps as an acknowledgement that everything they post is not appropriate for their entire (and sometimes unknown) network, a significant percentage of teens have admitted to posting content to Facebook that they have hidden from certain friends and/or parents by using privacy settings.  (*Teens, Kindness and Cruelty on Social Network Sites*, *supra*, (indicating that most exchanges occurring on social network sites "are not taking place in full public view, as the majority of teens take various steps to manage their privacy online").)  This self-editing by teens themselves is particularly troubling in light of the sponsored stories and Settlement Agreement here at issue.  There are unique features to these Facebook retransmissions of information that are of particular concern.  These are, as follow:

(a)  There is little to no practical remedy for a transmission that selects messages or photos that would libel a child.  The child or the parent cannot respond effectively to the same audience.  In fact, a posting rebutting a false impression will not necessarily go to the same persons.  They are not assured any access to the reader of the objectionable disclosures.

(b) The internet posting is not on a bulletin board, but goes into the homes of potentially millions.

(c) Information published on the internet does not go away but will commonly be accessible for years.

1
2
3
4
5
6
7
8
9
10
11
12
13
14

The tween audience (children aged 8 to 14) alone is responsible for $43 billion in annual spending. (*See*, *Tween Spending and Influence,* EPM Communications, Inc., http://www.researchandmarkets.com/reports/696286/tween_spending_and_influence, (last visited April 22, 2013).) Given marketers' strong pull toward this young demographic, there is little that leave Objectors feeling comforted that minors' online behaviors will not be exploited beyond their originally intended audience. The argument by Facebook that they are merely republishing information previously provided is not accurate. They unilaterally choose *what* to select, *how* it will be arranged, and to *whom* it will be sent. The mischief implicit in this power – even if exercised in complete good faith – is troublesome. Indeed, through their sponsored stories, Facebook has become an information content provider that repackages information for their own commercial gain. (See Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, filed by Judge Lucy Koh in this case on December 16, 2011 ("Koh Order") at p. 19.)

15
16
17
18
19
20
21
22
23
24
25
26
27
28

The need for heightened privacy protections for children using the internet has been recognized by our federal government. The Children's Online Privacy Protection Act (COPPA) (15 U.S.C. §§ 6501 – 08), effective April, 2000 imposes certain obligations on internet service providers requiring, among other things, operators to "[o]btain verifiable parental consent prior to collection, use and/or disclosure of personal information from children" under 13 years of age. (Children's Online Privacy Protection Rule, 16 CFR 312.3 (b).) While, to its credit, Facebook does not make its pages available to children under the age of 13, the protections found in COPPA are still illuminating. The Federal Trade Commission ("FTC") has emphasized, after much research, that it is "essential that teens, like adults, be provided with clear information about uses of their data and be given meaningful choices about such uses." (Federal Trade Commission, Notice of Proposed Rule, 16 CFR Part 312, Fed. Reg. Vol. 76, No. 187 at 59805, right column, (available at http://www.ftc.gov/os/2011/09/110915coppa.pdf).) The FTC is

concerned with the privacy protections currently available and continues to explore new privacy approaches for teens and adults. (*Id.*)

Heightened privacy protections for teens are particularly important because, as researchers have pointed out, teenagers' cultural frames of reference leave them ill-equipped to tolerate with equanimity their own victimization. (*See* Alice Marwick and Danah Boyd article, *The Drama! Teen Conflict, Gossip, and Bullying in Networked Publics* presented at "A Decade in Internet Time: Symposium on the Dynamics of the Internet and Society" in September, 2011 and available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1926349.) Teenagers feel empowered and strong (sometimes even invincible), which is precisely why they are not equipped to unilaterally make decisions about how and when they will be transmitting their image and information to the internet society – one that, even when limited to their own social circles, include individuals likely not known to them, individuals who are then practically empowered to retransmit the information to additional unknown persons – *en masse*.

### III.
### THE PRELIMINARILY APPROVED SETTLEMENT DOES NOT ADEQUATELY CONSIDER THE UNIQUE NEEDS OF THE MINOR SUBCLASS IN CONSTRUCTING ITS ALLEGED PROTECTIONS

> **a. Under California Law, Minors Cannot Consent to the Contract Included in the Proposed Statement of Rights and Responsibilities which is a Part of the Settlement Agreement.**

California "law shields minors from their lack of judgment and experience and confers upon them the right to avoid their contracts in order that they may be protected against their own improvidence and the designs and machinations of other people, thus discouraging adults from contracting with them." (*Sparks v. Sparks* (1950) 101 Cal.App.2d 129, 137 (citing *Niemann v. Deverich,* 98 Cal.App.2d 787); *see, also, I.B. v. Facebook,* (2012) 2012 U.S. Dist. LEXIS 154327 at 16.) The Settlement Agreement purports to stipulate, on behalf of all minors, to a violation of these protections and specifically, to a violation of California Family Code, which prohibits minors from contracting for the use of their names and likenesses in the manner proposed, as

discussed below.

Under the Settlement Agreement, section 10.1 of Facebook's Statement of Rights and Responsibilities would include the following statement:

> You give us permission to use your name, profile picture, content, and information in connection with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us. This means, for example, that you permit a business or other entity to pay us to display your name and/or profile picture with your content or information. If you have selected a specific audience for your content or information, we will respect your choice when we use it.

> If you are under the age of eighteen (18), or under any other applicable age of majority, you represent that at least one of your parents or legal guardians has also agreed to the terms of this section (and the use of your name, profile picture, content, and information) on your behalf.

Although the second paragraph is limited to users under the age of majority, the first paragraph applies to *all* Facebook users. Thus, in addition to requiring minors to "represent" that whatever Facebook wants to do with the minor's name, image, content, and information is ok with the minor's parent, Facebook's Statement of Rights and Responsibilities continues to implicitly assume that minors grant Facebook those permissions on a personal basis as well.

Minors lack the capacity to consent to precisely the type of contract contemplated by the Settlement Agreement at common law in many states, California included.  Protection of minors from entering into certain types of contracts underlies much of our system to protect them.  Some of that protection is, to be sure, safeguarding them from their own immature improvidence; we have age minimums behind everything from voting, to tobacco, liquor, to tattoos, and, of course, sex.  It in no way protects the privacy and property rights of children (or their parents) to create in this extraordinary Proposed Order, a system for releasing the names and faces of children into the worldwide stream of e-commerce based on a provision in a "terms of service" contract to which minors lack the capacity to consent.

Current California Family Code provisions echo common law prohibitions against enforcing contracts against minors, providing that certain types of contracts made by minors are

void as a matter of law.[3]  Family Code section 6701 provides the following explicit restrictions on a minor's authority to contract:

> A minor cannot do any of the following:
>
> (a) Give a delegation of power.
> (b) Make a contract relating to real property or any interest therein.
> (c) Make a contract relating to any personal property not in the immediate possession or control of the minor.

The Settlement Agreement operates in violation of both subsections (a) and (c), and each of them separately.  The Settlement Agreement purports to delegate to Facebook the extremely broad power to take information posted by a child, re-package it, and transmit it in any form and to any recipients and for any commercial purpose, as Facebook determines.  This is a delegation of extraordinary power to Facebook, and a grant of power that is unwise given the cyber world in which this power is being wielded, as described above, and not permitted under California law.

Facebook argues that when children agree to allow Facebook to use their name, profile picture, content, and information in connection with commercial, sponsored, or related content, the children are not making a delegation of power.  (Facebook's Memorandum of Points and Authorities in Support of Joint Motion for Preliminary Approval of Revised Settlement, Filed October 6, 2012, p. 45 ("Joint Motion for Approval of Settlement")).  When analyzing whether a delegation of power has occurred, the court should look to the existence of an agency relationship which is mainly a question of fact[4] (3 Witkin Sum. Cal. Law Agency § 93), with the distinguishing features of an agency being its representative character and its derivative authority

---

[3] In addition, the Family Code provides that many other contracts made by a minor are voidable by disaffirmance (Family Code section 6710).

[4] Under some circumstances, even the parent/child relationship can be viewed as an agency: "Although we normally do not view the relationship between minor children and their parents as a principal-agent relationship, under many circumstances parents, in fact, act on behalf of their children in a capacity difficult to distinguish from that of an agent….[The parent/child] relationship bears a significant similarity to that of principal and agent." (*Cruz v. Superior Court* (2004) 121 Cal.App.4th 646, 651–52 [17 Cal.Rptr.3d 3].)  Note that as a default matter, Facebook may here seek to operate as the fundamental agent of the child in making detailed decisions on his or her behalf (albeit without any supervision or detailed notice), but while presuming agent powers, Facebook is neither the child's properly authorized agent, nor principal, nor parent or guardian.

(*see, e.g., Gipson v. Davis Realty Co.* (1963) 215 Cal.App.2d 190, 207 [30 Cal. Rptr. 253]).

Despite its protestations to the contrary, with regard to sponsored stories, any authority Facebook

claims to have to take, use and promote (represent) a user's information and images would have

to be delegated to it by the user.  Assuming for the moment that Facebook users (principals)

really do retain "immediate possession and control" of their information and images (as Facebook

contends (Joint Motion for Approval of Settlement at p. 45)), this relationship has all of the

telltale signs of an agency relationship—which makes the arrangement void as to minors who

lack capacity to so delegate such power in the first place.[5]

Facebook has also argued that Family Code section 6701(c) is inapplicable to this case

because users own all of the content and information they upload to Facebook and Facebook does

not take possession or control of that content or information.  (*Id.*)  If this was the case, we all

would be working on something else right now.  How does Facebook not take possession or

control of the user's content and information when it creates and publishes its sponsored stories?

Users clearly give up possession or control when they upload images or information to

Facebook—at least enough for Facebook to take and transform users' images into a different

format for its own commercial gain without the assurance of a user's (or his or her parents')

knowing and valid consent.  Section 6701(c) explicitly prohibits the making of "a contract

relating to any personal property not in the immediate possession or control of the minor."  By

definition, Facebook must take control of the minor's personal property, their photographs, in

---

[5] As to Family Code section 6701(a), the facts of this case relating to the existence of an agency relationship are distinguishable from *I.B. v. Facebook, Inc.* (2012) 2012 U.S. Dist. LEXIS 154327.  There, the court properly declined to find an agency relationship between Facebook and minor Facebook users who charged items to their parent's credit or debit cards possibly without the parent's knowledge or consent.  As Facebook argued in *I.B.,* that case involved the users' "simple act of making a purchase," which did not amount to a delegation of power to Facebook.  *I.B.* involved an arms-length transaction involving offer, acceptance and consideration; understandably, the court was unsympathetic to minor plaintiffs who received the benefit of a bargain they knowingly and affirmatively sought out.  None of those elements are present in the instant case, where Facebook is attempting to presume a delegation of authority from its users to represent the users' information and images to third parties — and here, the only entity receiving any compensation or benefit is Facebook itself.

DEPOT OBJECTION
Case No. 11-cv-01726 RS

13

order to do what it is doing with it.[6]  (See Koh Order at pp. 17 – 19), finding that Facebook is more than an interactive computer service but also meets the definition of a content provider by taking Plaintiff's information and whether and in what re-packaged manner Plaintiff's information is to be republished.)[7]

In a similar context to the one at issue here, the California Legislature set forth specific safeguards to protect a child's interest in his/her image.  California Family Code sections 6750 *et seq.* underscore the importance of adequately protecting children when they are attempting to contract away the use of their likeness.  These code sections comprise the Family Code Chapter relating to "contracts in art, entertainment, and professional sports"—*i.e.*, contracts pertaining to minors who are entertainment figures, have guardians or trustees protecting them, and are paid. While the code sections may not fully pertain to contracts for likeness that are used in a marketing campaign outside of the traditional entertainment field (such as a contract with a social media mogul such a Facebook), these statutory protections that exist for children entering into contracts in the area of entertainment illuminate the policy behind the underlying issue of child capacity. Specifically, Family Code section 6752 requires all sorts of safeguards, including explicit, individualized consent of a parent or guardian for each such contract, and even required specified compensation for the child, as well as many other protections before the child can contract away use of their likeness for entertainment purposes.  The gist of the many detailed provisions found in Family Code section

---

[6] In *I.B. v. Facebook, Inc.* (2012) 2012 U.S. Dist. LEXIS 154327, plaintiffs also argued that Family Code section 6701(c) rendered the sales contracts void, in that the minors were not in the immediate possession or control of their parents' credit cards or bank accounts when the purchases were made.  Contrary to Facebook's theory here, the court agreed that plaintiffs have alleged a plausible claim that the transactions at issue are void contracts "relating to any personal property not in the immediate possession or control of [a] minor" and denied Facebook's motion to dismiss the claim for declaratory relief under section 6701(c).  Similarly, in this case, the children's pictures are no longer in their control and, therefore, the children may not engage in contracts relating to that personal property not in their immediate possession or control.

[7] Note:  this finding similarly precludes Facebook's assertion that "Facebook's display of sponsored stories is immune from liability under Section 230 of the Communications Decency Act ('CDA'), because Facebook acts *only* as a publisher of content created by third parties." (Joint Motion for Approval of Settlement, *supra*, at 3.)

is that the contract must be controlled front to back by **"**at least one parent or legal guardian, as the case may be, entitled to the physical custody, care, and control of the minor at the time." (*See,* for example, Calif. Family Code Section 6752 (b)(2).) All of these protections are intended to limit the possible exploitation of a child by private parties seeking to profit from commercial/entertainment use of the child. The Settlement Agreement stands in stark contrast – with *none* of these protections and more important, the denial of the underlying and generally applicable consent requirements for child contracts.

Facebook has attempted to argue that because COPPA only protects internet users under the age of 13, children 13 and over are entitled to no protections whatsoever *vis-à-vis* their minority, even those explicitly provided by their own state's laws. (Joint Motion for Approval of Settlement, p. 21 – 23.) Facebook has provided no authority for this position, which ignores basic rules of statutory interpretation.[8] COPPA does indicate that "no state or local government may impose any liability for commercial activities or actions by operators in interstate or foreign commerce in connection with an activity or action described in this title that is inconsistent with the treatment of those activities or actions under this section." (15 U.S.C.S. § 6502 (d).) The activity and actions "described in this title" deal, specifically, with the collecting of personal information from a child by an operator of a website or online service. (15 U.S.C.S. § 6502 (a).) For the purposes of this title, "[t]he term 'child' means an individual under the age of 13." (15

---

[8] The lone case cited by Facebook in support of its position is a Los Angeles Superior Court case, *David Cohen v. Facebook,* No. BC 44482 (L.A. Super. Ct). In addition to citing a case that has no precedential authority, Facebook has mischaracterized the sequence of events in *Cohen.* Implying a direct nexus between the court's ruling and its dismissal of the case, Facebook states, "[a]pplying COPPA's express preemption clause, a California court recently dismissed a class action premised on the same parental consent requirement urged by Plaintiffs here." (Joint Motion for Approval of Settlement at p. 23.) While the case was dismissed (*see,* Fellmeth Declaration at ¶ 12 referencing the November 28, 2011 Minute Order), the *Cohen* plaintiffs never moved for class certification and no class had been certified (*see* Fellmeth Declaration at ¶ 13 referencing Plaintiffs' Request for Voluntary Dismissal Without Prejudice). Further, the *Cohen* plaintiffs requested the dismissal without prejudice not as a direct result of the superior court's rulings alone, but also in light of the pendency of *E.K.D. v. Facebook* (Civil Case No. 11-461-GPM, U.S. District Court for the Southern District of Illinois) which Plaintiffs believed would protect their interests and those of putative class members in the action (*see* Fellmeth Declaration at ¶ 14 referencing the Declaration of Antony Stuart in Support of Plaintiffs' Request for Voluntary Dismissal).

U.S.C. S. § 6501 (1).)  COPPA does not deal, at all, with the operator of a website or online service's collecting of personal information from youth aged 13 and over.  Therefore, COPPA's preemption clause, similarly, does not apply to this group of children for what is not included in law is deemed excluded.   It defies logic that the actions of our federal government to raise the bar of acceptable behavior when dealing children below the age of thirteen, through the enactment of COPPA, simultaneously removes all protections provided by state laws for older children not covered by the federal law.  Raising the floor high for children under the age of thirteen hardly implies the federally compelled removal of the state and common laws for those aged thirteen to eighteen.

### b.  Several States Share a Heightened Protection for Children Entering into Contracts.

California is not alone in crafting laws to protect minors from contracting against their own improvidence.  Other states recognize that a child's diminished capacity limits their ability to aptly enter into contracts delegating power.  (*See, for example*, Montana Code. Ann. § 41-1-301, "[a] minor cannot make a contract delegating power"; 15 Okl. St. § 17, "[a] minor cannot give a delegation of power…"; and South Dakota Codified Laws § 26-2-1, "[n]o minor may give a delegation of power…".)  Similarly, states have recognized that when a child is not in immediate possession of personal property, they lose some of their perspective regarding how to treat the property and, thus, their also lose their ability to contract with respect to that personal property.  (*See, for example*, 15 Okl. St. § 17, "[a] minor cannot…make a contract…relating to any personal property not in his possession or control…"; and South Dakota Codified Laws § 26-2-1, "[n]o minor may…make a contract…relating to any personal property not in his immediate possession or control.")  Finally, several states where members of the minor subclass reside have completely limited a child's right to contract whatsoever.  (*See, for example*, Louisiana Civil Code Art. 1918, "[a]ll persons have capacity to contract *except* unemancipated minors…" (emphasis added);

North Dakota Century Code § 9-02-01, "[a]ll persons are capable of contracting *except* minors…"

(emphasis added); and Idaho Code § 32-106, "[a] person entirely without understanding has no

power to make a contract of any kind…".)  The common thread amongst all of these state

protections is an understanding that the child has an immature mind, a mind that cannot fully

comprehend the ramifications of entering into contracts – particularly when those contracts are

for intangibles or for tangibles not immediately in the child's possession.  The protections

afforded California's children against the ability to enter into contracts for a delegation of power

or regarding personal property not in their immediate possession and control (and, to instead,

require parents to enter into those types of contracts on their behalf) are not unique to California.

Analyzing a Settlement Agreement that will affect the rights of children in these various states,

this Court must ensure that the Settlement Agreement does not reduce the rights these children

have under their own state laws.  Contrary to the argument of Facebook, there is no federal law in

any way preempting these applicable protections.  Certainly the fact of a statute mandating a

higher federal floor for those aged 0 to 12 in age hardly implies the *removal* of extant state floors

for those aged 13 to 18.

To be sure, there are cases where children are able to enforce contracts that benefit them,

especially where there is reliance.  However, enforcing a contract *against* a person lacking full

capacity to arrive at a "meeting of the minds" is another matter.  Facebook cannot credibly argue

that its social network's positive attributes infer the right to an add-on codicil for

(uncompensated) commercial exploitation and privacy intrusion.  The latter is hardly a part of the

advertising and promotion for the rather different product of finding and connecting with friends

on Facebook.  Indeed, the "bait and switch" aspect to this expropriation claim only adds to its

offensive character.

1
2
3
4

     **c. Because Children, Themselves, do not have the Capacity to Enter into the Contract Contemplated in the Settlement Agreement, the Contract Must be with the Child's Parents and the "Opt Out" Structure of the Contract in the Proposed Statement of Rights and Responsibilities Does Not Adequately Provide for the True Parental Consent that is Required.**

5
6
7
8
9
10
11
12
13

     As explained above, children cannot enter into the contract contemplated in the Settlement Agreement. Because contracting with Facebook to have an account is not one of the types of contract explicitly restricted in Family Code section 6701, children do have the capacity to contract with Facebook for use of a Facebook account. However, they are unable, under California law and the heightened protections of several other states, to enter into a contract allowing Facebook to use their information in likeness for Facebook's own commercial gain. Therefore, for this portion of the contract, Facebook must obtain the child's parent(s) permission to use the child's information and likeness. No proper parental consent is required through the Settlement Agreement in this case.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

     The Statement of Rights and Responsibilities, which will be modified pursuant to the Settlement Agreement, purports to prohibit "sponsored story" use of a child's information and postings until he or she reaches 18 years of age—but this prohibition applies only to a minor who has affirmatively indicated that his/her parents are not Facebook users, an indication that minors are not required to actually make in order to use Facebook. In other words, if this Settlement Agreement is approved, Facebook will automatically enter default consent by a child, combined with the child's representation that a parent has approved use of their information and likeness in sponsored stories. This is not consent, but a "terms of use" clause in Facebook's Statement of Rights and Responsibilities, Section 10.1 as modified, quoted in full in section III (a), above. There will, therefore, be an automatic license for Facebook to use a child's information and likeness in sponsored stories absent an affirmative action by the child. Even worse, this automatic consent is categorical and hands over to Facebook effective use of all postings however and wherever and to whomever made—to be selected out and repackaged and commercially used as Facebook determines. Nor will even *post hoc* withdrawal of consent be realistic. There is not even assurance that the child or parent will know that the expropriation of the child's postings has

occurred when it happens, nor can it be withdrawn once transmitted.

There are additional flaws with this "opt out" structure, particularly when it is applied to infer affirmative and informed consent by a child.  First, the child will likely not see any of the obscure "notices" and, therefore, virtually none will affirmatively "opt out."  For any child who is already a member of Facebook, these revised Statements of Rights and Responsibilities will not require any new affirmative action on behalf of the user – so, even assuming that such a requirement would mean actual notice to a child, there is no requirement that the child again review any such notices.  Nor will any child see the "consent" clause and because of it, go to Dad and say "Dad, there is a 'terms of use' provision in here that says I must get your consent, and I certainly do not want to be part of Facebook unless you understand all of the conditions, including your need to consent. So do you consent to Facebook's unrestricted use of my postings as it chooses for its own commercial purposes?" Such a "safeguard" is disingenuous.

Second, many children will not indicate whether or not their parents are on Facebook. The Settlement Agreement does not address Facebook's use of a child's information if he/she has not indicated that his/her parent is not on Facebook and neither Plaintiffs nor Defendants have offered any evidence regarding how often this is the case.  As written, the Settlement Agreement would allow Facebook to access and use a child's data if the child has not indicated whether or not his/her parent is on Facebook.

Finally, for those children who do identify parents on Facebook, the default remains "now your parent must find out about what we are doing, without knowing whether we are about to do it, or seeing what it looks like or what information we are taking, or to whom it is being sent, and object through our procedure."

Although a tiny fig leaf has been inserted in the Settlement Agreement, the structure retains a major defect—there is no real or minimally lawful consent given by parents.[9]  Critical

---

[9] For a self-serving description of the proposed "safeguards," see Joint Motion for Approval of Settlement at 11-12.  Note the key provisions – that Facebook will "begin to encourage new Users…to designate the Users on Facebook that are its family members," and the parents of children who are so identified by them "will be able to utilize the above-described minors' opt out tool directly from his or her (adult) Facebook account."  This is an ephemeral

(Footnote continues on next page.)

1  analysis of an "opt out" structure reveals that Facebook will, in reality, have virtually universal

2  access to child postings because the children will not, under the Facebook format, be given an

3  actual and knowing option to "opt out." Even those, who by some fortuity, notice the small print

4  are unlikely to know that it means their postings can be expropriated unless they affirmatively act

5  to deny consent. The Settlement Agreement does not require any action on behalf of the parent to

6  affirmatively consent to Facebook's use of his/her child's name and information in sponsored

7  stories; it is improperly the opposite. (See § 2 (2.1) (c)(iii) of Joint Motion for Approval of

8  Settlement at page 11.)

9        Any valid contract must have its terms and scope understood by both parties. Here is the

10  baffling disappointment in the Settlement Agreement: The modification appears to make

11  compliance with that required standard not only feasible, but possible through a trivial

12  adjustment. Facebook now will encourage—but not require—its new members (including

13  children aged 13 to 18) to include information about their family, including their parent(s). Why

14  can that query not require the child to identify the Facebook identity of his/her parent(s) and then

15  require the parent(s) to confirm their relationship? Then Facebook could simply contact that

16  parent through his/her Facebook account and copy and paste what it proposes to send and to

17  whom, with a request to check a box indicating whether the parent consents to the commercial

18  use of their child's likeness and information. Period. If that provision were included (one easily

19  administered by Facebook given modern internet technology), and Facebook agreed to only use

20  the images and information of child users whose parents have so affirmatively consented to the

21  proposed use, Objectors would withdraw their opposition.[10]

---

(Footnote continued from previous page.)

"opt out for your child if you find out about this generic need to do so somehow" provision –
retaining the basic flaw that there will be no true assent by the child's parent(s).

[10] Perhaps Facebook would instead want to follow a different procedure and receive
parental consent through a various alternative outlined in the federal Children's Online Privacy
Protection Act (COPPA) (15 U.S.C. §§ 6501-08) or the related FTC regulations. While COPPA
only specifically applies to children under 13 years of age, the politics which barred its
application to children age 13 years or older certainly should not bar it's protections for an older
child and, certainly, have no bearing over an older child's ability to contract under state law.
Facebook has many talented employees who could certainly implement the objector's suggested

(Footnote continues on next page.)

To repeat and emphasize, before it uses a child's postings and photos, Facebook must be required to first transmit its intent to use the child's information to the child's parent(s), and then it may use the child's information if and only if the parent so consents.[11]  Anything less violates current law.

## IV.
### CLASS COUNSEL LACK ADEQUATE EXPERIENCE TO PROTECT THE UNIQUE INTERESTS OF CHILDREN AS REFLECTED IN A SETTLEMENT THAT CREATES NO BENEFIT TO THE SUBCLASS

As outlined above, the Settlement Agreement creates little benefit to the subclass of minors and illuminates the lack of experience of Plaintiff's counsel in protecting the unique privacy interests of children.

While class certification (and the certification of the attorneys for the class) has already occurred in this case, it is useful, now, to review the test for the adequacy of class counsel. Federal Rule of Civil Procedure 23 (g) sets out a list of factors that a court must consider in appointing class counsel: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions and complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law, and; (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g). While it may have appeared, at the time of class certification, that counsel was adequate, the

---

(Footnote continued from previous page.)

means of consent or one of the various means outlined in COPPA through a simple software adjustment.

[11] If a child indicates that his/her parents are not Facebook users, or if a child makes no indication as to whether his/her parents are Facebook users, Facebook would properly have two options: (1) do not use that child's content or information in its sponsored stories, or (2) request contact information for the child's parent and use other means to attempt to obtain verifiable parental consent prior to using that child's content or information in its sponsored stories.

Settlement Agreement that leaves the subclass of minors at a detriment creates a renewed need to assess if counsel for the class are best situated to represent this unique subclass.

Although it is readily apparent that the Plaintiff's attorneys have experience in a wide array of legal fields, their expertise does not have strong connection to the representation of children or privacy issues. Because counsel's experience factors into the adequacy of their presentation for the class, the subclass of minors is at a disadvantage. Their unique interests as children are not fully protected. (*Compare with*, *UAW v. GMC*, 497 F.3d 615, 626 (6th Cir. 2007) (attorney was well qualified to represent class in retiree healthcare class action when he had practiced labor law for almost 24 years and had litigated almost 50 similar class actions). The attorneys from Arns Law Firm and the Law Offices of Jonathan M. Jaffe do not appear to have previous work experience with representing the interest of children, or in dealing with privacy issues.

The combined work experience and expertise of Plaintiffs' attorneys focuses heavily on serious injury and death cases involving work-related injuries, products liability cases, construction defect incidents, and medical negligence. (*See* Fellmeth Declaration at ¶ 15.) While this background could have been adequate, in general, for the representation of adult clients in a claim against Facebook, the factors set out in Fed. R. Civ. P 23(g) outline the deficiency. In particular, the rationale behind the second and third prongs concerning the attorney's work experience is relevant given the detrimental nature of the negotiated settlement on behalf of children. It is unclear whether the previous experience of existing class counsel is adequate to represent the unique needs and interests of the child subclass in this class action. The fact that this subclass includes millions of minors presents complex issues that do not apply when representing adult clients. Different statutes and common law protect children. (*See, for example,* Calif. Family Code § 6701.) The experience of existing counsel does not lend itself to effective and

responsible advocacy required for the representation of children. (*Compare with*, *Easton & Co. v. Mutual Ben. Life Ins. Co.*, Fed. Sec. L. Rep. (CCH) 1993 U.S. Dist. LEXIS 21262, 16 (D.N.J. 1993) (finding counsel's experience with securities litigation was a factor that qualified them to "well represent" the class).[12]

## V.
## THE INFORMATION BEFORE THE COURT SHOWS A
## FEE-DRIVEN SETTLEMENT

The Settlement Agreement terms protect the financial interests of Plaintiff's attorneys, limit the financial losses to the Defendants and, simultaneously, do not improve or protect the rights of the child subclass. In the original proposed Settlement, the parties agreed that plaintiffs' counsel will seek, and Facebook will not oppose, fees up to $10 million. This is apparently based on the "more than one year of vigorous litigation" cited by Facebook in its previous Memorandum. No information suggests that $10 million in fees, or the revised request of $7.5 million in fees, is appropriate.

The mere fact that the revised Settlement Agreement has deleted the "clear sailing" provision contained in the original proposed Settlement is little comfort given the figure in the revised proposal of $7.5 million. There is no reason to believe this amount will be contested, given the filed history. "One of the main criticisms of clear sailing provisions is that they represent *prima facie* evidence of simultaneous negotiations of merit relief and fees, which is a practice fraught with serious ethical concerns for lawyers representing the class. Both courts and commentators have expressed apprehension that a plaintiff's counsel may be accepting a lower settlement for the class in exchange for a generous and nonadversarial treatment of fees." William D. Henderson, *Clear Sailing Agreements: A Special Form of Collusion in Class Action*

---

[12] This lack of experience should be considered in direct juxtaposition with the more on-point expertise in this area held by Objector's Counsel as outlined in Section I, above.

*Settlements*, 77 TUL. L. REV. 813 (March 2003) at 815.  The removal of the specific dollar amount previously agreed to and the clear sailing provision does nothing to show the deal has been undone.

In fact, the revised Settlement Agreement provides no incentive for Defendants to contest any amount of attorneys' fees sought by Plaintiffs.  The Defendants are agreeing to pay $20 million to the Settlement Fund.  (Facebook's Memorandum of Points and Authorities for Preliminary Approval of Revised Settlement, Filed October 6, 2012, at p. 8.)  From this $20 million will come attorneys' fees, incentive awards, payments to class members, and *Cy Pres* distributions, if any.   (*Id.,* at 8-9.)  Defendants have no incentive to contest any amount of attorneys' fees payments up to $20 million—the amount Defendants have to pay.  It is doubtful Defendants hold much concern regarding whether this $20 million goes to Plaintiff's attorneys, Plaintiffs, members of the class, or *Cy Pres* recipients.

Regarding the $7.5 million attorneys' fees and costs presently claimed, note that in *Kenny A. v. Perdue* (a federal court class action case challenging the Georgia child protection system's failure to provide minimally sufficient services to abused and neglected children in foster care), plaintiffs' counsel received a lodestar fee of just over $6 million (454 F.Supp.2d 1260, 1286-1287 (2006), rev'd on other grounds, *Perdue v. Kenny A. ex rel Winn*, __ U.S. __, 130 S.Ct. 1662 (2010)).  In *Kenny A.*, Children's Rights (a law firm with decades of experience in class action litigation pursuing children's rights and protection) recorded (after a 15% across-the-board reduction by the trial court) 25,423 hours litigating the case before the state was willing to begin settlement discussions; after being removed to federal court, the case involved a motion and full evidentiary hearing for a preliminary injunction, an unsuccessful state motion to dismiss, a motion for class certification, an unsuccessful state motion for summary judgment, discovery of nearly half a million pages of documents, and 60 depositions.

It seems doubtful that plaintiffs' counsel in this case, in just over one year, worked this case to the point of earning seven figures, much less close to eight figures—to procure a settlement. The basic posture is problematic when the settlement provides no injunctive relief for the subclass of minors beyond an agreement by Facebook that it will do *less* than the law requires.

### CONCLUSION

Objectors ask that this Honorable Court recognize the differences between adults and children in contract law, respect children's rights and the rights of their parents, follow applicable law and take one of two courses of action: (a) order the excision of any provision in your court order applicable to the minor subclass or their parents, approving only those elements the Court determines to be fair and reasonable as to adult class members and relevant to their own postings. Or, in the alternative, (b) maintain children in the case, but order that any capture and retransmission of information for commercial or other purposes by Facebook of the entries of children must be preceded by child and parent consent as to the content of the proposed retransmission, and a description of the persons to whom it will be sent.

By this objections and notice, I hereby indicate my intention to appear at the fairness hearing relating to this settlement. Copies of this notice have been furnished to counsel for Plaintiffs and Defendants in accordance with the requirements set forth in the Class Notice.

Dated: May 1, 2013

Robert C. Fellmeth
Attorney for Objectors

1

2

## DECLARATION OF SERVICE

3

I, Elisa Weichel, declare as follows:

4

I am employed in the County of San Diego, State of California; I am over the age of 18

5

years and am not a party to this action; my business address is 5998 Alcalá Park, San Diego, CA

6

92110, in said County and State.  On May 1, 2013, I served the within **OBJECTION AND**

7

**NOTICE OF INTENTION TO APPEAR** to all named counsel of record as follows:

8

9

☒ **BY ECF (ELECTRONIC CASE FILING)**: I e-filed the above-detailed documents
utilizing the United States District Court, Northern District of California's mandated ECF
(Electronic Case Filing) service. Counsel of record are required by the Court to be
registered e-filers, and as such are automatically e-served with a copy of the documents
upon confirmation of e-filing.

10

11

12

13

I certify under penalty of perjury that the foregoing is true and correct, that the foregoing

14

document(s) were printed on recycled paper, and that this Declaration of Service was executed by

15

the undersigned on May 1, 2013 at San Diego, California.

16

17

*Elisa Weichel*

18

ELISA WEICHEL

19

20

21

22

23

24

25

26

27

28

DEPOT OBJECTION
Case No. 11-cv-01726 RS