1   Scott Michelman (D.C. Bar No. 1006945) (pro hac vice pending)
      smichelman@citizen.org
2   Scott L. Nelson (D.C. Bar No. 413548)
      snelson@citizen.org
3   PUBLIC CITIZEN LITIGATION GROUP
    1600 20th Street NW
4   Washington, DC 20009
    Telephone: 202.588.1000
5   Facsimile: 202.588.7795

6   Jay Rorty (SBN 135097)
      jayrorty@gmail.com
7   LAW OFFICES OF JAY RORTY
    835 Cedar Street
8   Santa Cruz, CA 95060
    Telephone: 831.316.0722
9   Facsimile: 831.295.6734

10  *Attorneys for Objectors John Schachter (on behalf of himself and his
    minor son S.M.S.), J.J.R. (through his mother Judy Reidel), Kim Parsons*
11  *(on behalf of herself and her minor daughter C.B.P.), Ann Leonard (on
    behalf of herself and her minor daughter D.Z.), R.P. (through her mother*
12  *Margaret Becker), and J.C. (through his father Michael Carome)*

13

14                    **UNITED STATES DISTRICT COURT**
                   **NORTHERN DISTRICT OF CALIFORNIA**
15                      **SAN FRANCISCO DIVISION**

16  ANGEL FRALEY, et al., individually and on          Case No. CV 11-01726 RS
    behalf of all other similarly situated,
17                                                      **OBJECTIONS TO PROPOSED**
                                                        **SETTLEMENT AND NOTICE OF**
                       Plaintiffs,                      **INTENT TO APPEAR**
18          v.

19  FACEBOOK, INC., et al.,                             Date:       June 28, 2013
                                                        Time:       10:00 a.m.
20                     Defendants.                      Department: 3
                                                        Judge:      Hon. Richard Seeborg
21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2   TABLE OF AUTHORITIES .......................................................................................ii

3   STATEMENT OF ISSUES ........................................................................... 1

4   INTRODUCTION ......................................................................................... 1

5   BACKGROUND ........................................................................................... 2

6        A.    The Underlying Class Action ............................................... 2

7        B.    The Proposed Settlement...................................................... 4

8   IDENTITY OF OBJECTORS AND INTENT TO APPEAR ......................... 7

9   STANDARD UNDER RULE 23(e)(2)......................................................... 8

10  ARGUMENT ................................................................................................ 9

11       I.    The Settlement Should Be Rejected Because The Injunctive Relief
12             Perpetuates Violations Of State Laws As To The Minor Subclass....................... 9

13             A.    The settlement would permit Facebook to use a minor's likeness
                     without parental consent in violation of state laws. .................................. 9

14             B.    State laws prohibiting the use of a minor's likeness without
15                   parental consent are not preempted.......................................... 12

16       II.   The Settlement Should Also Be Rejected Because The Monetary Relief Is
               De Minimis, The Injunctive Relief Expires After Two Years And Is
               Inadequate To Prevent Future Violations Of Class Members' Rights, And
17             The Release Is Overly Broad. ........................................................ 14

18             A.    The monetary relief is de minimis. ......................................... 15

19             B.    The sunset clause and design of the injunctive relief limit its value........ 16

20             C.    The release is unreasonably broad. ........................................ 18

21             D.    The size of the incentive awards relative to the results obtained
22                   suggests that inquiry into the incentives of the named plaintiffs
                     may be appropriate................................................................. 19

23  CONCLUSION .......................................................................................... 20

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

## CASES

3

*Amchem Products, Inc. v. Windsor*,
4     521 U.S. 591 (1997) ................................................................................................ 9

5 *In re Baby Products Antitrust Litigation*,
6     708 F.3d 163 (3d Cir. 2013) .................................................................................. 8

7 *In re Bluetooth Headset Products Liability Litigation*,
8     654 F.3d 935 (9th Cir. 2011) ................................................................................ 8

9 *Brooks v. State Board of Elections*,
10     848 F. Supp. 1548 (S.D. Ga. 1994) ...................................................................... 9

11 *C.M.D. v. Facebook, Inc.*,
12     No. 3:12-cv-01216 (N.D. Cal.) ................................................................... 2, 15, 20

13 *Clement v. American Honda Finance Corp.*,
14     176 F.R.D. 15 (D. Conn. 1997) ........................................................................... 14

15 *Cohen v. Facebook, Inc.*,
16     798 F. Supp. 2d 1090 (N.D. Cal. 2011) .............................................................. 16

17 *In re Compact Discount Minimum Advertised Price Antitrust Litigation*,
18     216 F.R.D. 197 (D. Me. 2003) ............................................................................ 14

19 *Dennis v. Kellogg Co.*,
20     697 F.3d 858 (9th Cir. 2012) ................................................................................ 9

21 *Faught v. American Home Shield Corp.*,
22     668 F.3d 1233 (11th Cir. 2011) ............................................................................ 8

23 *In re Ford Motor Co. Bronco II Product Liability Litigation*,
24     981 F. Supp. 969 (E.D. La. 1997) ...................................................................... 14

25 *Fraley v. Facebook, Inc.*,
26     830 F. Supp. 2d 785 (N.D. Cal. 2011) ......................................................... *passim*

27 *Grunin v. International House of Pancakes*,
28     513 F.2d 114 (8th Cir. 1975) ................................................................................ 9

*Isby v. Bayh*,
  75 F.3d 1191 (7th Cir. 1996)........................................................................ 9

*In re Katrina Canal Breaches Litigation*,
  628 F.3d 185 (5th Cir. 2010)................................................................... 8, 14

*Lane v. MRA Holdings, LLC*,
  242 F. Supp. 2d 1205 (M.D. Fla. 2002) ...................................................... 10

*Officers for Justice v. Civil Service Commission*,
  688 F.2d 615 (9th Cir. 1982)......................................................................... 8

*Radcliffe v. Experian Information Solutions, Inc.*,
  ___ F.3d ___, 2013 WL 1715422 (9th Cir. Apr. 22, 2013) ............................ 19

*Robertson v. National Basketball Ass'n*,
  556 F.2d 682 (2d Cir. 1977)......................................................................... 9

*Rodriguez v. West Publishing Corp.*,
  563 F.3d 948 (9th Cir. 2009)...................................................................... 19

*Sprietsma v. Mercury Marine*,
  537 U.S. 51 (2002) .................................................................................... 13

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003)................................................................... 8, 19

*True v. American Honda Motor Co.*,
  749 F. Supp. 2d 1052 (C.D. Cal. 2010)......................................................... 9

*United States v. City of Miami*,
  614 F.2d 1322 (5th Cir. 1980)...................................................................... 8

*Vassalle v. Midland Funding LLC*,
  708 F.3d 747 (6th Cir. 2013)...................................................................... 17

*Williamson v. Mazda Motor of America, Inc.*,
  131 S. Ct. 1131 (2011) .............................................................................. 13

1                               **STATUTES AND RULES**

2   15 U.S.C. § 6501 ................................................................................................ 12

3   15 U.S.C. § 6502 ................................................................................................ 12

4   47 U.S.C. § 230 .................................................................................................... 3

5   Fed. R. Civ. P. 23(e) ........................................................................................ 1, 8

6   Cal. Civ. Code § 3344(a) ............................................................................ 3, 8, 10

7   Fla. Stat. Ann. § 540.08(1), (2), (6) .................................................................. 10

8   N.Y. Civ. Rights Law § 50 ........................................................................... 8, 10

9   Okla. Stat. Ann. tit. 21, § 839.1 ........................................................................ 10

10  Tenn. Code Ann. § 47-25-1105(a) .............................................................. 8, 10

11  Va. Code Ann. § 8.01-40(A) ...................................................................... 8, 10

12  Wis. Stat. Ann. § 995.50(2)(b) ........................................................................ 10

13                          **OTHER AUTHORITIES**

14  Restatement (Second) of Contracts § 14 ........................................................... 10

15  Donald T. Kramer, 1 Leg. Rts. Child. § 10:1 (2d ed. updated Nov. 2012) ................................... 10

16

17

18

19

20

21

22

23

24

25

26

27

28

1      **STATEMENT OF ISSUES**

2      1.  Can a court approve a proposed settlement that authorizes violations of state law?

3      2.  Is the proposed settlement in this case otherwise "fair, reasonable and adequate" within

4          the meaning of Fed. R. Civ. P. 23(e)?

5      **INTRODUCTION**

6          Class members John Schachter, on behalf of himself and his minor son S.M.S.; the minor

7      child J.J.R. (through his mother Judy Reidel); Kim Parsons, on behalf of herself and her minor

8      daughter C.B.P.; Ann Leonard, on behalf of herself and her minor daughter D.Z.; the minor child

9      R.P. (through her mother Margaret Becker); and the minor child J.C. (through his father Michael

10     Carome), object to the proposed class settlement of this case.

11         The proposed settlement fails to remedy one of the core problems for which the plaintiff

12     class is seeking relief: Facebook's use of minors' likenesses without the parental consent that is

13     required by state law. In fact, the proposed settlement itself would perpetuate and purport to

14     authorize ongoing violations of the laws of multiple states by authorizing Facebook to continue

15     using minors' likenesses without parental consent. Seven states, including all the home states of

16     objectors here (California for Leonard and her daughter D.Z. and for Reidel's son J.J.R.; New

17     York for Becker's daughter R.P.; Tennessee for Parsons and her daughter C.B.P.; and Virginia

18     for Schachter and his son S.M.S. and for Carome's son J.C.), have laws specifically prohibiting

19     the use of a minor's likeness without the consent of his or her parent; the remaining states

20     provide that contracts with minors — including agreements to the use of a minor's likeness for

21     commercial purposes — are voidable. Thus, the proposed settlement fails to meet a threshold

22     requirement of a valid settlement: that the terms of the settlement be legal.

23         Additionally, the substantive relief for the class as a whole is largely illusory, and the

24     release of class members' claims is too broad. The provision for a $10 recovery per class

25     member is no more than nominal relative to the $750 in statutory damages that the class

26     members stand to recover if the lawsuit is successful. In any event, the promise of $10 per class

27     member is hollow, because the limited fund is so small that class members who file claims

28     would receive $10 only if less than 2% of the 70-million-member class seek payment. The value

OBJECTIONS TO PROPOSED SETTLEMENT AND NOTICE OF INTENT TO APPEAR

1    of the injunctive relief is undermined by its two-year sunset clause. After that time, the plaintiffs

2    will have no more protection from Facebook's misappropriation of their likenesses than they

3    have today. The promised mechanism to opt out of Facebook's use of likenesses is, moreover,

4    flawed by design, because there is no requirement that a user be able, on a categorical basis, to

5    block *all* uses of his or her likeness, and the proposed opt-out mechanism cannot be exercised *in*

6    *advance* of future uses of likenesses. In exchange for these uncertain, fleeting, and flawed forms

7    of relief, plaintiff class members will release all their claims for Facebook's past

8    misappropriations of their likenesses, as well as the opportunity to participate in another class

9    action with overlapping claims, *C.M.D. v. Facebook, Inc.,* No. 3:12-cv-01216 (N.D. Cal.,

10   amended compl. filed Apr. 20, 2012) (putative class action "challeng[ing] Facebook's practice of

11   using children's names and pictures to advertise goods and services without consent"). In

12   addition, class members must release *all* other claims they may have against Facebook that they

13   could have asserted in this action, regardless of whether they are related to Sponsored Stories.

14           The proposed settlement should be rejected.

15                                          **BACKGROUND**

16   **A.      The Underlying Class Action**

17           Plaintiffs are members of the online social networking site Facebook, which allows

18   members to create and maintain personal accounts on which they can post information about

19   themselves, designate other members as "friends," and interact with "friends" in various ways.

20   Doc. 22 (Second Am. Compl. or "SAC") ¶¶ 13, 18. The actions members can take on Facebook

21   include creating a "post" consisting of text, photographs, or videos chosen by the member;

22   "liking" content by clicking on a "Like" button displayed alongside that content either on

23   Facebook or elsewhere on the internet; and using an external application or game that interacts

24   with Facebook. *See Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 791 (N.D. Cal. 2011) (order

25   granting in part and denying in part motion to dismiss).

26           Plaintiffs' class-action complaint charges that when Facebook determines that a member

27   has performed one of the actions listed above, and that the action relates to an advertiser,

28   Facebook's "Sponsored Stories" advertising program uses that content to create an advertisement

1    that displays the member's name, likeness, or image in a manner that suggests the member

2    endorses the product. *Id.*; *see also* SAC ¶¶ 26, 29. This advertisement is visible within Facebook

3    on webpages that can be viewed by some or all of the member's Facebook "friends." SAC ¶ 26.

4          As alleged in the complaint, Facebook's officers believe that advertisements containing

5    endorsements from someone a member knows are highly valuable to advertisers. Facebook CEO

6    Mark Zuckerberg stated in an interview that "[n]othing influences people more than a

7    recommendation from a trusted friend." *Id.* ¶ 43. Facebook COO Sheryl Sandberg has said

8    "[m]arketers have always known that the best recommendation comes from a friend." *Id.* The

9    "Guide to the New Facebook Ads Manager" states that advertisements "shown with the names of

10   people's friends are twice as effective as those without." *Id.* ¶ 44.

11         Plaintiffs allege that Facebook did not request their consent to appear in Sponsored

12   Stories; at no time did they provide consent; and where the member was a minor, his or her

13   parents did not provide consent. *Id.* ¶¶ 28, 36-41, 62. In addition, Plaintiffs allege that members

14   were unaware that their actions relating to Facebook were being used by Facebook in this

15   manner, and that Plaintiffs have not received any compensation for the use of their names,

16   likenesses, or images in Sponsored Stories. *Id.* ¶¶ 26, 47.

17         Plaintiffs brought this class action on behalf of all Facebook members in the United

18   States whose names, photographs, likenesses, or identities were used by Facebook in a

19   Sponsored Story. *Id.* ¶ 95. Plaintiffs alleged that Facebook's misappropriation of their names,

20   likenesses, or images without their consent and for a commercial purpose violated California

21   Civil Code § 3344 ("§ 3344"), California Unfair Competition Law ("UCL"), and the common-

22   law doctrine of unjust enrichment. *Fraley*, 830 F. Supp. 2d at 790.

23         Facebook moved to dismiss, claiming that Plaintiffs lacked standing, that Facebook was

24   entitled to immunity under the federal Communications Decency Act ("CDA"), 47 U.S.C. § 230,

25   and that Plaintiffs failed to state a claim. *See Fraley*, 830 F. Supp. 2d at 790-91. This Court

26   largely denied the motion, holding that Plaintiffs alleged injury sufficient to confer standing, that

27   Facebook is not immune under the CDA, that Sponsored Stories do not fall within the

28   "newsworthy" exception to § 3344, that Plaintiffs' lack of consent is a disputed issue of fact

1    because Facebook's Terms of Use do not clearly provide that members consent to use of their

2    likenesses in advertising, and that the complaint adequately alleged injury based on the

3    commercial value of the names, likenesses, photographs, or identities used by Facebook. *Id.* at

4    801, 803, 805, 806, 810. The Court also held that Plaintiffs had made out the elements of a UCL

5    claim. *See id.* at 810-14. The Court thus denied the motion to dismiss the § 3344 and UCL

6    claims; it dismissed only the unjust enrichment claim, which the California Court of Appeal had

7    recently clarified is not a recognized cause of action under California law. *Id.* at 815.

8        The parties then proposed a settlement agreement, but this Court denied preliminary

9    approval of that agreement on August 17, 2012. Doc. 224. The original settlement agreement

10   required Facebook to make changes to its Statement of Rights and Responsibilities and to

11   provide its members with more information about and control over how their names and

12   likenesses would be used in relation to Sponsored Stories, but the agreement provided no

13   monetary relief to class members, only a $10 million cy pres payment. *Id.* at 1-2. Among the

14   Court's reasons for rejecting that proposed settlement were questions about the propriety of a

15   settlement providing no monetary relief to the class members; the "clear sailing" provision for

16   and size of the attorneys' fees award; and the lack of specificity regarding the policy changes

17   Facebook would make. *See id.* at 4-7. The Court also requested that any renewed motion for

18   settlement approval discuss the issue of obtaining the valid consent of minors. *Id.* at 6.

19   **B.    The Proposed Settlement**

20       The parties now seek approval of an agreement that is similar in key respects to the one

21   that this Court refused to approve last August. Under the agreement, all class members who do

22   not opt out will release all known or unknown claims against Facebook (and related entities and

23   individuals) that were or could have been asserted in the case. Doc. 235-1 (Amended Settlement

24   Agreement and Release, or "ASAR"), § 5.2. In exchange, Facebook will agree to injunctive

25   relief consisting of policy changes that Facebook will be required to implement for only two

26   years; to pay monetary relief of no more than (and most likely less than) $10 per class member;

27   and to pay up to $7.5 million in fees for class counsel, plus costs and $12,500 incentive awards

28   for the named plaintiffs.

1   More specifically, Facebook will add to its Statement of Rights and Responsibilities

2   language indicating that "you" (i.e., the user)

3   give us permission to use your name, profile picture, content, and information in
    connection with commercial, sponsored, or related content (such as a brand you
4   like) served or enhanced by us. This means, for example, that you permit a
    business or other entity to pay us to display your name and/or profile picture with
5   your content or information. If you have selected a specific audience for your
    content or information, we will respect your choice when we use it.

6

7   *Id.* § 2.1(a). The prescribed language goes on to address minors as follows:

8   If you are under the age of eighteen (18), or under any other applicable age of
    majority, you represent that at least one of your parents or legal guardians has also
9   agreed to the terms of this section (and the use of your name, profile picture,
    content, and information) on your behalf.

10

11  *Id.* Facebook will also create a method for members to be able to see what content related to

12  them has been used in Sponsored Stories, and to prevent specific content or categories of content

13  from appearing in future Sponsored Stories. *Id.* § 2.1(b). The settlement does not require

14  Facebook to allow members to opt out of *all* Sponsored Stories categorically, or to provide an

15  opt-out control that a user can exercise in advance of appearing in a Sponsored Story. Rather,

16  only after being featured in a Sponsored Story and "upon viewing the interactions and content

17  that are being displayed in Sponsored Stories" will a user have the ability to "prevent individual

18  interactions and other content (or categories of interactions and other content) from appearing in

19  *additional* Sponsored Stories." *Id.* (emphasis added).

20  Regarding minors, the proposed settlement requires Facebook to "encourage" new users

21  to identify family members in their Facebook account. *Id.* § 2.1(c)(ii). When a minor child and a

22  parent mutually confirm their relationship, Facebook will allow the parent to block the use of the

23  minor child's name or likeness in Sponsored Stories. *Id.* § 2.1(c)(ii), (iii). Facebook will also

24  "enable[]" a minor user to indicate that his or her parents are not Facebook members, in which

25  case Facebook will not use that minor's name or likeness in Sponsored Stories until the minor

26  reaches age 18, indicates his or her parents are on Facebook, or otherwise confirms a parental

27  relationship. *Id.* § 2.1(c)(iii). Under the agreement, Facebook need not *require* a minor to

28  indicate whether their parents are Facebook members. In the absence of (1) a minor's affirmative

1    indication that his or her parents are not on Facebook, or (2) the exercise of parental controls by

2    an individual who has asserted a parental relationship with a minor and had that relationship

3    confirmed by the minor, the agreement does not prevent Facebook from continuing to use the

4    minor's likeness in Sponsored Stories.

5            The settlement requires Facebook to maintain the policy changes for at least two years

6    after the settlement becomes final, but Facebook is under no obligation to maintain these changes

7    after that time. *Id.* § 2.1.

8            The agreement also holds out the possibility of a small cash payment to class members,

9    from a settlement fund of $20 million. *See id.* § 1.27. The $20 million fund, which will cover

10   administrative expenses, attorneys' fees and costs, and incentive awards as well as monetary

11   payments to the class, *see id.* § 2.2, is the maximum Facebook will be required to pay. *Id.* §

12   2.3(f). Each class member who submits a claim form and who is identified in Facebook's records

13   as having appeared in a Sponsored Story is eligible for a $10 cash payment from the settlement

14   fund, but the payment is contingent on the number of claimants. *Id.* §§ 1.1, 2.3. If paying $10 to

15   each eligible class member who submits a claim would exhaust the fund, it will be distributed

16   pro rata to the eligible claimants; if the pro rata shares are less than $5 each, the Court may order

17   the entire fund to be distributed to designated cy pres recipients; and if distributing pro rata

18   shares to the eligible claimants is economically infeasible, then the fund *must* be distributed to

19   the cy pres recipients. *See id.* § 2.3(a). Any cy pres distribution will be allocated according to

20   defined percentages among a wide array of organizations: Center for Democracy and

21   Technology, Electronic Frontier Foundation, MacArthur Foundation, Joan Ganz Cooney Center,

22   Berkman Center for Internet and Society at Harvard Law School, Information Law Institute at

23   NYU Law School, Berkeley Center for Law and Technology at Berkeley Law School, Center for

24   Internet and Society at Stanford Law School, High Tech Law Institute at Santa Clara University

25   School of Law, Campaign for Commercial-Free Childhood, Consumer Federation of America,

26   and Consumer Privacy Rights Fund. *Id.* § 2.4(a).

27           Out of the $20 million fund, class counsel is requesting attorney's fees of up to $7.5

28   million, and costs of up to $282,566.49, for a total of just over $7.78 million. *See* Doc. 235-3

1    (Long Form Notice), at 12. If the full amount of fees and costs are awarded, approximately $12.2

2    million would remain to cover payments for the class members, costs of the Escrow Agent and

3    Settlement Administrator, taxes, the costs of delivering notice, and incentive awards of $12,500

4    per named plaintiff. *See* ASAR § 2.6. As this Court has noted, the class could comprise more

5    than seventy million members, Doc. 224, at 2, making the total recovery (after attorneys' fees

6    and costs, but not accounting for other expenses) approximately 17 cents per class member. For

7    anyone to receive the promised $10 payment, the number of class members filing claims must be

8    no more than 1.2 million, or less than 2% of the class. Even if only 5% of the class members

9    filed claims, each member's share would be less than $5 and so the proceeds might go entirely to

10    the cy pres recipients. ASAR § 2.3(a)(ii).

11    **IDENTITY OF OBJECTORS AND INTENT TO APPEAR**

12       These objections are filed on behalf of class members John Schachter, on behalf of

13    himself and his minor son S.M.S.; the minor child J.J.R. (through his mother Judy Reidel); Kim

14    Parsons, on behalf of herself and her minor daughter C.B.P.; Ann Leonard, on behalf of herself

15    and her minor daughter D.Z.; the minor child R.P. (through her mother Margaret Becker); and

16    the minor child J.C. (through his father Michael Carome). *See* Exs. 1-6. Facebook has created

17    Sponsored Stories involving objectors; for instance, D.Z. saw a Sponsored Story featuring her

18    mother Ann Leonard, Carome saw a Sponsored Story featuring his son J.C., Becker's daughter

19    R.P. saw a Sponsored Story featuring herself, and Parsons' daughter C.B.P. received email

20    notification that she is a class member because Facebook has used her in one or more Sponsored

21    Stories. Most of the parents know that their children use the "Like" function and will continue to

22    do so; Reidel is unsure how her son will use Facebook and lacks the capacity to monitor his

23    usage. All of the parents are united in their objection to the use of their children's names, images,

24    and/or likenesses without parental consent, and all of the objectors further oppose the settlement

25    because of the insufficient monetary relief, flawed injunctive relief, and overly broad release. All

26    of the objectors reside in states (California for Leonard and Reidel and their respective children;

27    New York for Becker and her daughter, Tennessee for Parsons and her daughter; and Virginia

28    for Schachter and Carome and their respective sons) that prohibit the use of a minor's likeness

1  without parental consent. *See* Cal. Civ. Code § 3344(a); N.Y. Civ. Rights Law § 50; Tenn. Code

2  Ann. § 47-25-1105(a); Va. Code Ann. § 8.01-40(A). Objectors intend to appear at the Final

3  Approval Hearing through counsel and present argument in support of these objections.

4  <u>**STANDARD UNDER RULE 23(e)(2)**</u>

5       A district court may approve a class action settlement "only after a hearing and on

6  finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "The primary concern

7  of this subsection is the protection of those class members, including the named plaintiffs, whose

8  rights may not have been given due regard by the negotiating parties." *Officers for Justice v.*

9  *Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982); *see also United States v. City of Miami*,

10  614 F.2d 1322, 1331 (5th Cir. 1980) (describing the role of a judge reviewing a settlement as that

11  of a "fiduciary serving as guardian for the unrepresented class members").

12       The Ninth Circuit has recognized eight factors to guide courts in evaluating the

13  substantive fairness of a proposed settlement:

14       (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely
     duration of further litigation; (3) the risk of maintaining class action status
15   throughout the trial; (4) the amount offered in settlement; (5) the extent of
     discovery completed and the stage of the proceedings; (6) the experience and
16   views of counsel; (7) the presence of a governmental participant; and (8) the
     reaction of the class members of the proposed settlement.

17

18  *In re Bluetooth Headset Products Liability Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). Other

19  circuits rely on similar factors. *See, e.g., Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240

20  (11th Cir. 2011); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 194-95 (5th Cir. 2010).

21  These factors do not constitute a rigid test; rather, "[t]he factors in a court's fairness assessment

22  will naturally vary from case to case." *In re Bluetooth*, 654 F.3d at 946; *accord Staton v. Boeing*

23  *Co.*, 327 F.3d 938, 959 (9th Cir. 2003).

24       No matter how the factors are described, the essence of the inquiry is whether the

25  settlement reflects a reasonable compromise in light of the prospects of further litigation. "The

26  court must be assured that the settlement secures an adequate advantage for the class in return for

27  the surrender of litigation rights against the defendants." *Canal Breaches*, 628 F.3d at 195; *see*

28  *also In re Baby Products Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013) (explaining that "a

1     thorough analysis of settlement terms" includes consideration of "the degree of direct benefit

2     provided to the class"); *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1070 (C.D. Cal.

3     2010) (court must determine whether "settlement is reasonable in relation to the value of the

4     claims surrendered").

5         Additionally, "where, as here, a settlement agreement is negotiated prior to formal class

6     certification, consideration of these eight . . . factors alone is not enough to survive appellate

7     review." *Id.* Rather, "[i]n such a case, settlement approval requires a higher standard of fairness

8     and a more probing inquiry than may normally be required under Rule 23(e)." *Dennis v. Kellogg*

9     *Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (citation and internal quotation marks omitted); *accord*

10     *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620-21 (1997).

11                                **ARGUMENT**

12     **I.**   **The Settlement Should Be Rejected Because The Injunctive Relief Perpetuates**
           **Violations Of State Laws As To The Minor Subclass.**

13

14         Courts have long recognized that "a settlement that authorizes the continuation of clearly

15     illegal conduct cannot be approved." *Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d

16     Cir. 1977); *accord Isby v. Bayh*, 75 F.3d 1191, 1197 (7th Cir. 1996); *Grunin v. Int'l House of*

17     *Pancakes*, 513 F.2d 114, 123-24 (8th Cir. 1975). As one district court has put it, "[A] court must

18     examine the totality of the circumstances and must determine, under that broad inquiry, whether

19     the proposed settlement is fair, adequate, reasonable, *and legal.*" *Brooks v. State Bd. of Elections*,

20     848 F. Supp. 1548, 1552 (S.D. Ga. 1994) (emphasis added); *see also id.* at 1577 (denying

21     approval where "certain provisions . . . would violate Georgia statutory and constitutional law").

22     Because the proposed settlement here would "authorize the continuation of clearly illegal

23     conduct," *Robertson*, 556 F.2d at 686, it must be rejected.

24         **A. The settlement would permit Facebook to use a minor's likeness without**
               **parental consent in violation of state laws.**

25

26         At least seven states, including all the home states of objectors here (California for

27     Leonard and her daughter D.Z. and for Reidel's son J.J.R.; New York for Becker's daughter

28     R.P.; Tennessee for Parsons and her daughter C.B.P.; and Virginia for Schachter and his son

1   S.M.S. and for Carome's son J.C.), require parental consent for the commercial use of a minor's

2   likeness. *See* Cal. Civ. Code § 3344(a); Fla. Stat. Ann. § 540.08(1), (2), (6); N.Y. Civ. Rights

3   Law § 50; Okla. Stat. Ann. tit. 21, § 839.1; Tenn. Code Ann. § 47-25-1105(a); Va. Code Ann. §

4   8.01-40(A); Wis. Stat. Ann. § 995.50(2)(b).[1] Of these seven laws, five (in California, Florida,

5   Tennessee, Virginia, and Wisconsin) provide for civil liability for violations; in New York and

6   Oklahoma, the use of a minor's likeness without parental consent is punishable as a

7   misdemeanor. In the other forty-three states, "a natural person has the capacity to incur *only*

8   *voidable* contractual duties until the beginning of the day before the person's eighteenth

9   birthday." Restatement (Second) of Contracts § 14 (emphasis added); *see generally* Donald T.

10  Kramer, 1 Leg. Rts. Child. § 10:1 (2d ed. updated Nov. 2012).

11       The proposed settlement agreement authorizes violations of all of these laws, and in

12  particular the explicit parental-consent requirements of California, Florida, New York,

13  Oklahoma, Tennessee, Virginia, and Wisconsin. Under the proposed settlement, Facebook

14  agrees to insert into its Terms of Use language that substantially states,

15       You give us permission to use your name, profile picture, content, and
16       information in connection with commercial, sponsored, or related content (such as
         a brand you like) served or enhanced by us. . . . If you are under the age of
17       eighteen (18), or under any other applicable age of majority, *you represent that at*
         *least one of your parents or legal guardians has also agreed to the terms of this*
18       *section (and the use of your name, profile picture, content, and information) on*
         *your behalf.*

19  ASAR § 2.1(a) (emphasis added). This provision is inadequate to ensure that no minor's likeness

20  will be used without his or her parent's consent. Accepting a minor's *representation* that a parent

21

22  [1] A federal court has suggested that Florida's parental-consent provision applies "only with
23  regards to publication of likeness *for compensation*, and not with respect to the ability of a minor
    to consent generally to the publication of his or her likeness." *Lane v. MRA Holdings, LLC*, 242
24  F. Supp. 2d 1205, 1219 (M.D. Fla. 2002) (emphasis added). However, this interpretation is not
25  binding on Florida courts and is at odds with the plain language of the statute, which provides
    that "No person shall publish, print, display or otherwise publicly use for purposes of trade or for
26  any commercial or advertising purpose the name, portrait, photograph, or other likeness of any
    natural person without the express written or oral consent to such use," Fla. Stat. Ann.
27  § 540.08(1), and specifies that "Any consent provided for in subsection (1) shall be given on
    behalf of a minor by the guardian of her or his person or by either parent," *id.* § 540.08(6). The
28  statute's text does not limit its application to publications for compensation.

1  has consented is not the same as actually obtaining the parent's consent to those terms; on the

2  contrary, it effectively dispenses with parental consent requirements by permitting a minor

3  unilaterally to consent to the use of his or her image.

4        The proposed settlement includes additional measures that purport to ensure parental

5  consent is obtained. But none of these provisions in fact *requires* parental consent before using a

6  minor's likeness. First, the proposed settlement provides a method by which family members

7  *may* (but need not) identify their relationships to one another in their Facebook profiles. ASAR §

8  2.1(c)(ii). If parents and minor children identify each other as such, Facebook will allow parents

9  to control the commercial use of the names and likenesses of those children. *Id.* § 2.1(c)(iii).

10  Second, if a minor child *voluntarly* indicates that his or her parents are *not* Facebook members,

11  Facebook will not use his or her name or likeness in Sponsored Stories. *Id.* Unfortunately, these

12  two situations in which Facebook has agreed not to use a minor's likeness without parental

13  consent are quite narrow and depend on affirmative actions by the minor user (and, in one case,

14  his or her parent as well).

15        These measures are inadequate to prevent the use of a minor's likeness without parental

16  consent. It is easy to imagine many minors who do not want their parents involved in their social

17  lives — of which Facebook is an integral part in the modern era — and who therefore will not

18  confirm their relationship with their parents. It is also possible that many minors, when presented

19  with the option to indicate that their parents are not on Facebook, will decline to do so, fearing

20  that so indicating might somehow jeopardize their ability to use Facebook. The settling parties

21  may hypothesize other patterns of user behavior, but it cannot be denied that the agreement's

22  prophylactic measures require affirmative action on the part of minors and parents and provide

23  no assurance that they will actually be used. There is no requirement that minors and parents

24  confirm their relationship, and there is no requirement that a minor indicate the membership

25  status of his or her parents one way or the other. For those minors who indicate nothing

26  regarding their parents, there is no requirement that Facebook refrain from using their names or

27  likenesses. Even if a parent and minor do confirm their relationship, the parent must then take an

28  additional affirmative step, using the new parental controls, to opt the child out of Sponsored

1    Stories. The purported safeguards are therefore no safeguards at all in most instances and leave

2    users with no protection other than the minor's "represent[ation]" of the parent's consent. Asking

3    for the representation of parental consent is not the equivalent of obtaining parental consent.

4    Even where a parent-minor relationship is confirmed, the fact that a parent does not take the

5    additional step of opting the child out of Sponsored Stories is also not the equivalent of parental

6    consent: a passive failure to object is not consent.

7           In short, the proposed settlement agreement does not ensure parental consent will be

8    obtained before a minor agrees to Facebook's Terms of Use and thereby subjects himself or

9    herself to Facebook's Sponsored Stories program. Rather, the agreement allows Facebook to

10   create advertisements with images of users it *knows* to be minors without parental consent.

11   Accordingly, the proposed settlement authorizes Facebook to violate the law of at least seven

12   states and purports to validate contracts that every other state would consider voidable. For this

13   reason alone, the settlement should be rejected as authorizing violations of law.

14         **B.  State laws prohibiting the use of a minor's likeness without parental consent are
              not preempted.**
15

16         Facebook's argument that the Child Online Privacy Protection Act ("COPPA") preempts

17   the state laws concerning minors' consent and misappropriation of likeness, *see* Doc. 259, at 21-

18   24, is easily rejected. COPPA addresses the collection and use of personal information of a child

19   under age 13. *See* 15 U.S.C. § 6501(1), 6501(8); 6502(a), 6502(b)(1)(A)(ii). "Personal

20   information" means "individually identifiable information about an individual collected online"

21   including name, address, email, telephone number, and other information about the child or his

22   or her parents. *Id.* § 6501(8). Only children under age 13 are covered. *See id.* § 6501(1). COPPA

23   preempts state laws that "impose any liability for commercial activities or actions by operators in

24   interstate or foreign commerce in connection with an activity or action described in this chapter

25   that is inconsistent with the treatment of those activities or actions under this section." *Id.* §

26   6502(d) (emphasis added).

27         Facebook first argues that COPPA expressly preempts the state laws concerning minors.

28   However, the preemption provision covers only "an activity or action described in this chapter,"

1    and the chapter does not address either likenesses or any activity with respect to a child 13 or

2    older. A state law that regulates Facebook's use of a likeness of a minor aged 13 or older is not

3    "inconsistent with the treatment of those activities or actions under" COPPA, because COPPA

4    does not address these activities or actions at all.[2]

5          Facebook also argues that the state laws are barred by implied conflict preemption.

6    According to Facebook, any conduct or action that Congress did not explicitly forbid in COPPA

7    cannot be addressed by a State that wishes to impose higher protection for its citizens. The

8    Supreme Court has soundly rejected that proposition. *See Sprietsma v. Mercury Marine*, 537

9    U.S. 51, 65 (2002) (holding that it is "quite wrong" to view a decision not to issue a federal

10   regulation "as the functional equivalent of a regulation prohibiting all States and their political

11   subdivisions from adopting such a regulation."); *see also Williamson v. Mazda Motor of Am.*,

12   Inc., 131 S. Ct. 1131, 1139-40 (2011) (holding that stricter state common-law standard was not

13   preempted by federal decision to impose less stringent regulation).

14         Although it is true that, in certain circumstances, "a federal decision to forgo regulation in

15   a given area may imply an authoritative federal determination that the area is best left

16   *un*regulated" entirely, *see Sprietsma*, 537 U.S. at 66 (citation and internal quotation marks

17   omitted), Facebook has made no such showing here. Instead, Facebook notes only that *witnesses*

18   *at a congressional hearing* expressed some concern that federal regulation of the collection of

19   information from minors aged 13 and over might violate their First Amendment rights. *See* Doc.

20   259, at 22 n. 17. Facebook offers no support for the notion (nor does any appear in the statutory

21   language) that Congress intended COPPA to preclude generally applicable state laws protecting

22   older minors, such as longstanding state statutes protecting against use of their images for

23   advertising without parental consent or the longstanding common-law rules governing the

24   capacity of minors to enter into binding contracts.

25

26   _____

27   [2] Because Facebook by its terms is not open to users younger than 13 years old, *see* Doc. 259, at 23, this brief addresses only preemption as it affects individuals age 13 and over. Objectors'
     preemption argument should not be taken to imply that COPPA *would* have any preemptive

28   effect with respect to consent requirements for minors younger than 13 years old.

1    Moreover, Facebook's preemption theory has no limiting principle. If Facebook were

2    correct that COPPA's regulation of the collection of *personal information* from minors *under 13*

3    preempted state laws regulating the use of *likenesses* of minors *13 and over*, then any state law

4    regulating any conduct on the internet by anyone of any age would be in jeopardy because, under

5    Facebook's theory, states cannot regulate anything that is excluded from federal regulation. That

6    is not the law.

7    Because the proposed settlement runs afoul of state laws around the country, and these

8    laws are not preempted, the settlement should be rejected.

9    **II. The Settlement Should Also Be Rejected Because The Monetary Relief Is De Minimis,
     The Injunctive Relief Expires After Two Years And Is Inadequate To Prevent Future**

10   **Violations Of Class Members' Rights, And The Release Is Overly Broad.**

11   In August 2012, this Court rejected the first proposed settlement in this case, because it

12   provided no monetary relief to class members and the usefulness of its injunctive relief was

13   unclear. The parties' second try is little better than their first.

14   A fair settlement should provide real value to the class, particularly when class counsel is

15   receiving $7.5 million and the named plaintiffs are receiving incentive awards of $12,500 each.

16   *See, e.g., Canal Breaches*, 628 F.3d at 195-96 (rejecting $21 million class settlement because

17   there was no assurance that the class would receive any monetary benefit after costs were paid);

18   *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 220-21 (D. Me.

19   2003) (rejecting settlement for discount coupons not shown "to have any significant benefit to

20   the members of the class as a whole"); *In re Ford Motor Co. Bronco II Product Liability Litig.*,

21   981 F. Supp. 969, 971-72 (E.D. La. 1997) (rejecting settlement because value to plaintiffs was

22   minimal and included none of the relief sought in the complaint); *Clement v. Am. Honda Finance

23   Corp.*, 176 F.R.D. 15, 28 (D. Conn. 1997) (rejecting settlement where the value to the class

24   members was "too speculative" and there was "a strong danger that the settlement will have

25   absolutely no value to the class").

26   Here, the complaint alleges misappropriation of likeness under § 3344 and violation of

27   the UCL. For each violation of § 3344, Facebook would be liable for statutory damages of $750.

28   In exchange for releasing these claims, along with *all* other claims of any nature whatsoever that

1     could have been asserted against Facebook, such as those asserted in *C.M.D. v. Facebook, Inc.,*

2     No. 3:12-cv-01216 (N.D. Cal., amended cmpt. filed April 20, 2012) (putative class action

3     "challeng[ing] Facebook's practice of using children's names and pictures to advertise goods and

4     services without consent"), class members would receive little value under this settlement. The

5     monetary relief is de minimis — a mere 17 cents per class member once fees and expenses are

6     deducted from the settlement fund — and it is unlikely to be paid to class members at all. The

7     value of the injunctive relief is compromised by its time-limited nature and flawed design. And

8     the breadth of the release represents a windfall to Facebook, because class members are giving

9     up not only claims related to Sponsored Stories but also any other claims they may have been

10     able to assert.

11         **A.**     **The monetary relief is de minimis.**

12         The proposed settlement holds out the possibility of a payment that is no more than

13     nominal relative to the damages sought on behalf of the class. Moreover, the size of the

14     settlement fund is so disproportionately small relative to the class size that it is unlikely that any

15     class member will receive any compensation at all.

16         The complaint sought $750 in statutory damages for each misappropriation of a class

17     member's likeness. The settlement offers the class members at most $10 apiece. Relative to the

18     potential recovery, this amount is nominal. Additionally, the respective sizes of the settlement

19     fund ($20 million) and of the class — which this Court has previously estimated at "upwards of

20     70 million individuals," Doc. 224, at 2 — virtually guarantee that no class members will actually

21     receive what little money the settlement purports to provide. After deducting attorneys' fees and

22     costs, and putting aside the proposed incentive awards and the costs of notice and administration,

23     the settlement fund will contain no more than $12.2 million. Therefore, assuming a class size of

24     70 million people, no one would receive the promised $10 unless fewer than 2% of the class (1.2

25     million people) filed claims. Even if only 5% of the class members filed claims, each member's

26     share would be less than $5 and so the proceeds might go entirely to the cy pres recipients.

27     ASAR § 2.3(a)(ii). And of course, if a substantial fraction of the class members file claims, then

28

OBJECTIONS TO PROPOSED SETTLEMENT AND NOTICE OF INTENT TO APPEAR

1    distribution would quickly become infeasible and the entire fund would be distributed to the cy

2    pres recipients. *Id.* § 2.3(a)(iii).

3          A vanishingly small possibility of a vanishingly small payment is not meaningfully

4    different than no payment at all. Therefore, one of the central reasons for this Court's rejection of

5    the parties' first proposed settlement applies to this proposed settlement as well.

6          To the extent the settling parties might argue that the class members would benefit from

7    the cy pres award, this contention founders because of the amount of the award. Regardless of

8    who gets the money, providing a fund of at most $12.2 million to a class of at least 70 million

9    effectively values each class member's claim at approximately 17 cents, even though the

10   plaintiffs have already survived a motion to dismiss in which the Court rejected Facebook's

11   justiciability and CDA immunity defenses. *See Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785,

12   801, 803 (N.D. Cal. 2011). Although the issue of consent is a question of fact, two district court

13   decisions (including one in this case) have held that Facebook's Terms of Use are insufficient on

14   their face to establish users' consents to the use of their likenesses for advertising, *see id.* at 805-

15   06; *Cohen v. Facebook, Inc.*, 798 F. Supp. 2d 1090, 1094-96 (N.D. Cal. 2011), and it is difficult

16   to imagine how Facebook could prove a meeting of minds between itself and its users regarding

17   the use of their likenesses. And there can be no valid consent defense to the claims of the minors.

18   *See* Part I.A, *supra*. Unless the claims here are essentially valueless, a remedy of 17 cents per

19   claim is inadequate whether it goes to the class or to cy pres, regardless of how worthy the cy

20   pres recipients may be.

21          **B.      The sunset clause and design of the injunctive relief limit its value.**

22          The complaint seeks a remedy for the misappropriation of Facebook users' likenesses.

23   The injunctive relief will neither make class members whole for past violations nor suffice to

24   prevent future ones. Instead, because the proposed settlement provides that Facebook must

25   change its practices "until, at least, a date that is two years after the Final Settlement Date,"

26   ASAR § 2.1, the injunctive relief grants users who affirmatively opt out at best a temporary

27   reprieve from the conduct for which this lawsuit sought relief. The fleeting nature of the policy

28   changes compromises their value to the class, who are faced with the likely possibility of having

1    to return to court two years hence to vindicate the exact same rights they assert now. *See*

2    *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 756 (6th Cir. 2013) (characterizing injunctive

3    relief lasting only one year as being "of little value" in part because after that time, the defendant

4    "is free to resume its predatory practices should it choose to do so").

5           Worse, because the injunctive provisions fail to require Facebook to notify its users when

6    it reverts to its prior practices after two years, users may make decisions about how they

7    communicate on Facebook in reliance on the opt-out opportunity in this settlement, only to have

8    the protections of the opt-out later evaporate without their knowledge. For example, a user who

9    is concerned about the use of her likeness might feel free, once the preconditions for exercising

10   the limited opt-out under the agreement are satisfied, to click the "Like" button more frequently

11   and to use the opt-out feature of this settlement, because she assumes that she can prevent

12   Facebook from using those interactions in Sponsored Stories. But when the two years expire,

13   Facebook can again use her interactions in Sponsored Stories, even where she had opted out,

14   because the agreement would no longer require Facebook to provide an opt-out option or to

15   adhere to opt-out preferences previously expressed by users. By luring privacy-conscious

16   Facebook users into expressing more "Facebook likes" based on the protections of this

17   settlement, the injunctive relief might ultimately benefit Facebook more than its users, for whom

18   the settlement is a bait-and-switch.

19          The value of the opt-out opportunity is also limited by its design. Although the settlement

20   permits users to "prevent individual interactions and other content (or categories of interactions

21   and other content) from appearing in additional Sponsored Stories," ASAR § 2.1(b), there is no

22   indication that users will be able to opt out of Sponsored Stories on a categorical basis. Indeed,

23   Facebook itself describes the new opt-out mechanism as a "*granular* control that will allow Class

24   Members . . . to prevent additional displays of *those* Sponsored Stories" that users have already

25   observed. Doc. 259, at 11 (emphasis added). And users will not be able to opt out at all prior to

26   experiencing further violations of their privacy. Instead, the settlement contemplates that users

27   will be able to exercise their limited opt-out ability "upon viewing the interactions and other

28   content that are being displayed in Sponsored Stories." *Id.*; *see also* Doc. 259, at 11 (describing

1  tool allowing users "to view, on a going-forward basis, the subset of their interactions and other

2  content on Facebook that have been displayed in Sponsored Stories" and then to opt out). In

3  other words, users must continue to subject themselves to precisely the practices this lawsuit

4  seeks to prevent in order to take limited steps to avoid being subject to those practices in the

5  future. Plaintiffs do not have any prospect of being compensated (not even the theoretical

6  possibility of a $10 payment) for the *new* Sponsored Stories in which they will have to appear in

7  order to exercise their opt-out rights going forward. Meanwhile, because Facebook can continue,

8  at least initially, to create Sponsored Stories from Plaintiffs' interactions, Facebook gets

9  something for nothing — even from users who ultimately exercise their ability to opt out.

10      **C.    The release is unreasonably broad.**

11          Under the agreement, in exchange for nominal monetary relief and flawed and time-

12  limited injunctive relief, class members would broadly release claims against Facebook

13  completely unrelated to Sponsored Stories. Specifically, the agreement releases

14  all manner of action, causes of action, claims, demands, rights, suits, obligations,
   debts, contracts, agreements, promises, liabilities, damages, charges, penalties,
15  losses, costs, expenses, and attorneys' fees, of any nature whatsoever, known or
   unknown claims, in law or equity, fixed or contingent, which the Releasing
16  Parties have or may have against the Released Parties arising out of or relating to
   any of the acts, omissions, or other conduct *that was or could have been alleged*
17  *in the Action*, including *but not limited to* any and all acts, omissions, or other
   conduct related to the display of any Class Member's name, nickname,
18  pseudonym, profile picture, photograph, likeness, or identity in a Sponsored Story
   ("Released Claims").
19

20  ASAR § 5.2 (emphasis added). In other words, the settlement would require class members to

21  give up not only claims related to Sponsored Stories, but also any other claims they might have

22  been able to assert against Facebook with respect to other aspects of their relationship with

23  Facebook, such as additional claims for invasion of privacy or claims for breach of contract or

24  defamation, for example. Particularly given the limited relief provided in the agreement, there is

25  no justification for such a broad release.

26

27

28

1        **D.**    **The size of the incentive awards relative to the results obtained suggests that**
2            **inquiry into the incentives of the named plaintiffs may be appropriate.**

3        Given the meager results obtained for the class, the incentive payments to the named

4    plaintiffs are surprisingly large ($12,500). "[U]ncovering conflicts of interest between the named

5    parties and the class they seek to represent is a critical purpose of the adequacy inquiry" under

6    Rule 23(e), and this task includes the discovery of any incentive *agreements* between class

7    counsel and the named plaintiffs that might undermine the alignment of interests between the

8    representative plaintiffs and the class. *Rodriguez v. West Pub. Corp.*, 563 F.3d 948, 959 (9th Cir.

9    2009). In light of the great disparity between the incentive awards and the class recovery, the

10   Court should require production of any agreements between counsel and the named plaintiffs and

11   make whatever other inquiries are necessary to determine whether there are circumstances that

12   would create a conflict of interest between the class representatives and the absent class

13   members. *See, e.g., Radcliffe v. Experian Info. Solutions Inc.*, ___ F.3d ___, 2013 WL 1715422,

14   at *1 (9th Cir. Apr. 22, 2013) (reversing approval of class settlement where named plaintiffs'

15   incentive award depended on their support for the settlement); *Rodriguez*, 563 F.3d at 957, 960

16   (expressing disapproval of an incentive structure that increased the award to named plaintiffs

17   based on the total amount of the settlement); *see generally Staton v. Boeing Co.*, 327 F.3d 938,

18   975 (9th Cir. 2003) (noting that representative plaintiffs who are promised incentive awards

19   "may be tempted to accept suboptimal settlements at the expense of the class members whose

20   interests they are appointed to guard" (citation and internal quotation omitted)). The disparity

21   between the $10-plus-flawed-injunctive-relief for the absent class members and the $12,500

22   incentive awards for the named plaintiffs is even worse than the disparity that troubled the Ninth

23   Circuit in *Radcliffe*. *See* 2013 WL 1715422, at *4 ("There is a serious question whether class

24   representatives could be expected to fairly evaluate whether awards ranging from $26 to $750 is

25   a fair settlement value when they would receive $5,000 incentive awards."). Therefore it is

26   appropriate for the Court to satisfy itself that no conflicts of interest affected the settlement

27   process here.

28

1       * * *

2       In sum, the relief provided in the settlement is fundamentally flawed and therefore

3   inadequate. Although Facebook presents a laundry list of possible pitfalls for this litigation

4   should it continue, Plaintiffs have already survived a motion to dismiss and obtained a ruling

5   rejecting many of Facebook's defenses. Settlement would give up not only the class members'

6   claims asserted in this case but also any other claims they may have against Facebook, such as

7   the claims in *C.M.D. v. Facebook, Inc.,* No. 3:12-cv-01216. A minimal chance of receiving a

8   minimal amount of money (or a cy pres award of 17 cents per class member), combined with

9   time-limited and flawed injunctive relief, is of insufficient value to compensate the class

10  members for the misappropriation of their likenesses for Facebook's commercial gain and for

11  releasing all other claims they may have against Facebook.

12                              **<u>CONCLUSION</u>**

13      The Court should deny final approval of the proposed class action settlement.

14

15  Dated: May 2, 2013                      Respectfully submitted,

16                                          /s/ Scott Michelman

17                                          Scott Michelman (D.C. Bar No. 1006945)
                                                (pro hac vice pending)
                                            smichelman@citizen.org
18                                          Scott L. Nelson (D.C. Bar No. 413548)
                                              snelson@citizen.org
19                                          PUBLIC CITIZEN LITIGATION GROUP
                                            1600 20th Street NW
20                                          Washington, DC 20009
                                            Telephone: 202.588.1000
21                                          Facsimile: 202.588.7795

22                                          Jay Rorty (SBN 135097)
                                              jayrorty@gmail.com
23                                          LAW OFFICES OF JAY RORTY
                                            835 Cedar Street
24                                          Santa Cruz, CA 95060
                                            Telephone: 831.316.0722
25                                          Facsimile: 831.295.6734

26                                          *Attorneys for Objectors*

27

28