Theodore H. Frank (SBN 196332)
**CENTER FOR CLASS ACTION FAIRNESS**
1718 M Street NW
No. 236
Washington, DC 20036
Voice: (703) 203-3848

*Attorneys for Objectors Sam Kazman and Theodore H. Frank*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL FRALEY; PAUL WANG; SUSAN MAINZER; JAMES H. DUVAL, a minor, by and through JAMES DUVAL, as Guardian ad Litem; and W.T., a minor, by and through RUSSELL TAIT, as Guardian ad Litem, individually on behalf of and all others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>FACEBOOK, INC., a corporation; and DOES 1-100,<br><br>     Defendants,<br>_____<br>Sam Kazman and Theodore H. Frank,<br><br>     Objectors. | Case No. CV-11-01726 RS<br><br>**OBJECTION TO PROPOSED SETTLEMENT AND FEE REQUEST**<br><br>Date:   June 28, 2013<br>Time:   10:00 a.m.<br>Courtroom: 3<br>Judge:  Hon. Richard Seeborg |

# TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................................................................ii

TABLE OF AUTHORITIES..........................................................................................................iii

INTRODUCTION ..........................................................................................................................1

I.      The objectors are members of the class...........................................................................2

II.     The court has a fiduciary duty to the unnamed members of this class. .........................2

III.    The 43% fee request is excessive under Ninth Circuit law; appropriate reduction will augment class recovery. ...................................................................................................................4

        A.      Prospective injunctive relief should is not a class benefit and should not be included in the common fund denominator at any estimated value. ...........................8

        B.      The lodestar cross-check does not support the fee request. .......................................12

        C.      A multiplier is inappropriate here..........................................................................16

IV.     The Court should exercise every discretion afforded to it by the settlement to favor distribution to the class over *cy pres*...........................................................................17

V.      Arbitrarily required attestations on the claim form unfairly freeze out a segment of the class and undermine class representatives' ability to satisfy Rule 23(a)(4)'s requirement of adequate representation. ...........................................................................21

VI.     A class should not be certified when the primary beneficiaries are the class representatives and class counsel. ....................................................................................24

VII.    A showing of explicit collusion is not required to demonstrate settlement unfairness. ...................27

VIII.   This objection is brought in good faith. .........................................................................28

CONCLUSION.............................................................................................................................29

OBJECTION TO PROPOSED SETTLEMENT AND FEE REQUEST

# TABLE OF AUTHORITIES

## Cases

*Am. Amusement Mach. Ass'n v. Kendrick,*
244 F.3d 572 (7th Cir. 2001).......................................................................................................... 20

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997) ............................................................... 3, 22

*Besinga v. United States*, 923 F.2d 133 (9th Cir. 1991) ....................................................................5

*Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331 (4th Cir. 1998)......................................23

*Bruno v. Outen Research Inst., LLC*, No. SACV 11-00173 DOC(Ex), 2013 U.S. Dist. LEXIS
35066 (C.D. Cal. Mar. 13, 2013) ................................................................................................13

*Callendar v. Coastal Int'l Sec., Inc.,* No. 5:10-cv-220, 2012 U.S. Dist. 32692 (W.D. Ky. Mar. 12,
2012)............................................................................................................................................23

*Churchill Vill., L.L.C. v. Gen. Elec.,* 361 F.3d 566 (9th Cir. 2004). ...................................................4

*City of Burlington v. Dague,* 505 U.S. 557 (1992). ............................................................................8

*Contreras v. City of L.A.,* No. 2:11-cv-1480-SVW-SH, 2013 U.S. Dist. LEXIS 49412 (C.D. Cal.
Mar. 28, 2013) ...........................................................................................................................14

*Cotton v. City of Eureka,* 889 F. Supp. 2d 1154 (N.D. Cal. 2012)....................................................14

*Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 43 F.3d 1311 (9th Cir. 1995). ...............................11

*Davis v. City & Cnty. of San Francisco,* 976 F.2d 1536 (9th Cir. 1992).........................................13

*Dennis v. Kellogg Co.,* 697 F.3d 858 (9th Cir. 2012). ..............................................3-4, 6-7, 10, 17, 19

*Dewey v. Volkswagen AG,* 681 F.3d 170 (3d Cir. 2012) ..........................................................1, 23

*Diaz v. Trust Territory of Pacific Islands,* 876 F.2d 1401 (9th Cir. 1989)...................................3-4

*FB-Stark, LLC v. White*, No. CV-12-00095-PHX-PGR, 2012 U.S. Dist. LEXIS 137892 (D.
Ariz. Sept. 26, 2012 .................................................................................................................15

*Ferrington v. McAfee Inc.*, No. 5:10-cv-01455-LHK, 2012 U.S. Dist. LEXIS 49160 (N.D. Cal.
Apr. 6, 2012) ........................................................................................................................ 18, 22-23

*Fraley v. Facebook, Inc.*, No. C 11-1726 RS, 2012 U.S. Dist. LEXIS 116526 (N.D. Cal. Aug. 17,
2012).................................................................................................................................11, 18, 23

*Gabriel Techs. Corp. v. Qualcomm Inc.*, No. 08-cv-1992 AJB (MDD), 2013 U.S. Dist. LEXIS
14105 (S.D. Cal. Feb. 1, 2013)...............................................................................................13, 15

*Galloway v. Kan City Landsmen*, No. 4:11-1020-CV-W-DGK, 2012 U.S. Dist. LEXIS 147148
(W.D. Mo. Oct. 12, 2012) ........................................................................................................9

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997). ........................................................................ 11

*Gonzalez v. S. Wine & Spirits of Am. Inc*, No. 11-cv-5849, 2012 U.S. Dist. LEXIS 46401 (C.D. Cal. Mar. 29, 2012). ............................................................................................................. 17

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998). .................................................... 4, 10

*Hecht v. United Collection Bureau*, 691 F.3d 218 (2d Cir. 2012). .............................................. 5

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) .................................................................... 8, 15, 17

*Hopkins v. Stryker Sales Corp.*, No. 11-CV-02786-LHK, 2013 U.S. Dist. LEXIS 16939 (N.D. Cal. Feb. 6, 2013) ................................................................................................................. 7-8, 18

*In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748 (7th Cir. 2011) ........................................... 26

*In re Baby Prods. Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013) ............................. 4-6, 17-18, 21

*In re Bank of Am. Credit Protection Mktg. and Sales Practices Litig.*, No. 3:11-md-02269-TEH, *terms of settlement available at* https://www.creditprotectionsettlement.com ............................. 20

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ............. 4-8, 10, 13, 17, 27

*In re Bluetooth Headset Prods. Liab. Litig.*, 07-ML-1822 DSF (Ex), 2012 U.S. Dist. LEXIS 168324 (C.D. Cal. Jul. 31, 2012) ................................................................................................ 16

*In re Cell Therapeutics, Inc.*, No. C 10-414 MJP, 2012 U.S. Dist. LEXIS 105235 (W.D. Wash. Jul. 25, 2012) ........................................................................................................................... 7

*In re Checking Account Overdraft Litig.*, No. 1:09-md-2036-JLK (S.D. Fla. Apr. 15, 2013) ........ 20

*In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 U.S. Dist. LEXIS 83480 (W.D. Wash. Jun. 15 2012) ......................................................................................................... 6

*In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768 (3d. Cir. 1995) .......... 3, 8, 13, 22-23

*In re Google Buzz User Privacy Litig.*, No. 10-cv-00672-JW (Dkt. 128) (N.D. Cal. May 31, 2011) ...... 18

*In re Heartland Payment Sys. Inc.*, 851 F. Supp. 2d. 1040 (S.D. Tex. 2012) .......................... 19, 21

*In re HP Inkjet Printer Litig.*, No. 5:05-cv-3580 JF, 2011 WL 1158635 (N.D. Cal. Mar. 29, 2011) ...... 5

*In re Joint Eastern and Southern Dist. Asbestos Litig.*, 982 F.2d 721 (2d Cir. 1992) ................ 23

*In re Literary Works Litig.*, 654 F.3d 242 (2d Cir. 2011) .................................................. 1, 23

*In re Livingsocial Mktg. and Sales Practices Litig.*, MDL No. 2254, 2013 U.S. Dist. LEXIS 40059 (D.D.C. Mar. 22, 2013) .................................................................................................. 12, 17

*In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010) ............................ 2-3

*In re Oracle Secs. Litig.*, 132 F.R.D. 538 (N.D. Cal. 1990) ................................................ 8, 27

*In re Pet Food Prods. Liab. Litig.*, 629 F. 3d 333 (3d Cir. 2010) ........................................ 17

*In re Prudential Ins. Co. America Sales Practices Litig.*, 148 F.3d 283 (3d Cir. 1998) ............... 5

*In re Relafen Antitrust Litig.*, 360 F. Supp. 2d 166 (D. Mass. 2005) ................................................. 3

*In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418 (N.D. Cal. 2009) ............................... 5, 10

*In re Thornburg Mortg. Inc Secs. Litig.*, No. CIV 07-0815 JB/WDS, 2012 WL 3150408, 2012 U.S. Dist. LEXIS 107934 (D.N.M. Jul. 24, 2012) ................................................................................. 18

*In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291 (9th Cir. 1994) ............................ 4, 6

*In re Wells Fargo Sec. Litig.*, 157 F.R.D. 467 (N.D. Cal. 1994) .................................................. 4, 27

*Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468 (5th Cir. 2011) ...................................................... 19

*Ko v. Natura Pet Prods.*, No. C 09-02619 SBA, 2012 U.S. Dist. LEXIS 128615 (N.D. Cal. Sept. 10, 2012) ..................................................................................................................................... 7, 14

*Lane v. Facebook*, 696 F.3d 811 (9th Cir. 2012) ............................................................................ 19

*Lane v. Facebook*, 709 F.3d 791 (9th Cir. 2013) ............................................................................ 19

*Levell v. Monsanto Research Corp.*, 191 F.R.D. 543 (S.D. Ohio 2000) ............................................ 9

*MacDougal v. Catalyst Nightclub*, 58 F. Supp. 2d 1101 (N.D. Cal. 1999) ...................................... 16

*Masimo Corp. v. Tyco Health Care Group, L.P.*, No. CV 02-4770 MRP (AJWx), 2007 U.S. Dist. LEXIS 101987 (C.D. Cal. Nov. 5, 2007) .................................................................................... 14

*Masters v. Wilhelmina Model Agency*, 473 F.3d 423 (2d Cir. 2007) ............................................... 20

*Mazza v. Am. Honda Co.*, 666 F.3d 581 (9th Cir. 2012) ................................................................. 22

*McClintic v. Lithia Motors, Inc.*, No. C11-859RAJ, 2012 U.S. Dist. LEXIS 3846 (W.D Wash. Jan. 12, 2012) .................................................................................................................................. 9

*McCown v. City of Fontana*, 565 F.3d 1097 (9th Cir. 2009) ............................................................. 8

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) ....................................................... 21

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ......................................................................... 3, 17-18

*Moreno v. City of Sacramento*, 534 F.3d 1106 (9th Cir. 2008) ....................................................... 15

*Murray v. GMAC*, 434 F.3d 648 (7th Cir. 2006) ....................................................................... 2, 25-26

*Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011) .......................................................... 17-18, 21

*Nguyen v. BMW of N. Am. LLC*, No. C 10-02257 SI, 2012 U.S. Dist. LEXIS 56018 (N.D. Cal. Apr. 20, 2012) ............................................................................................................................... 13

*Nickey Gregory Co., LLC v. Agricap, LLC*, 3:10-MC-80297 JSW (NC), 2011 U.S. Dist. LEXIS 106370 (N.D. Cal. Sept. 1, 2011) ............................................................................................. 15

*Nilsen v. York County*, 228 F.R.D. 60 (D. Me. 2005) ................................................................... 21

*Pabst v. Genesco Inc.*, No. C 11-01592 SI, 2012 U.S. Dist. LEXIS 129389 (N.D. Cal. Sept. 11, 2012) ............................................................................................................................................ 14

*Perdue v. Kenny A*, 130 S. Ct. 1662 (2010) ..................................................................................16-17

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)................................................................................ 24

*Powers v. Eichen*, 229 F.3d 1249 (9th Cir. 2000) ...............................................................................7

*Radcliffe v. Experian Info. Solutions*, __F.3d__, No. 11-56376, 2013 U.S. App. LEXIS 7932 (9th Cir. Apr. 22, 2013)................................................................................................................. 22, 25-26

*Reich v. Wlater W. King Plumbing & Heating Contractor, Inc.*, 98 F.3d 147 (4th Cir. 1996)............9

*Reno v. ACLU*, 521 U.S. 844 (1997) ................................................................................................. 20

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) ........................................................3

*Silber v. Mahon*, 957 F.2d 697 (9th Cir. 1992) ...................................................................................3

*Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990) ........................ 6-7

*Sobel v. Hertz*, No. 3:06-CV-00545-LRH-RAM, 2011 U.S. Dist. LEXIS 68984 (D. Nev. Jun. 27, 2011) ......................................................................................................................................... 6, 17

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003). ....................................................3-4, 6, 8, 12, 26-27

*Stonebrae, L.P. v. Toll Bros.*, No. C-08-0221 EMC, 2011 U.S. Dist. LEXIS 39832 (N.D. Cal. Apr. 7, 2011). .................................................................................................................................... 14

*Synfuel Tech. Inc. v. DHL Express*, 463 F.3d 646 (7th Cir. 2006) ................................................9-10

*Theme Promotions, Inc. v. News Am. Mktg. FSI, Inc.*, 731 F. Supp. 2d 937 (N.D. Cal. 2010) ................................. 14

*True v. American Honda Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010) ............................... 4, 9, 24

*Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222 (11th Cir. 1998) .......................................................5

*Ursic v. Bethlehem Mines*, 719 F.2d 670 (3d Cir. 1983) ................................................................... 15

*Van Horn v. Naionwide Prop. & Cas. Ins. Co.*, 436 Fed. Appx. 496 (6th Cir. 2011) ........................... 16

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) .............................................................4

*Vought v. Bank of Am., N.A..*, No. 10-CV-2052, 2012 U.S. Dist. LEXIS 143595 (C.D. Ill. Oct. 4, 2012) ........................................................................................................................................ 10

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) .............................................6

*Weeks v. Kellogg Co.*, No. 09-cv-8102, 2011 U.S. Dist. LEXIS 155472 (C.D. Cal. Nov. 23, 2011)............. 17, 19

*Yahoo!, Inc. v. Net Games, Inc.*, 329 F. Supp. 2d 1179 (N.D. Cal. 2004) ....................................... 15

*Young v. Polo Retail, LLC.*, 2007 WL 951821, 2007 U.S. Dist. LEXIS 27269 (N.D. Cal. Mar. 28, 2007)........................................................................................................................................14-15

*Zucker v. Occidental Petroleum Corp.*, 968 F. Supp. 1396 (C.D. Cal. 1997) ...............................15-16

**Rules and Statutes**

Cal. Civ. Code § 3344 ................................................................................................ 1, 22

Fed. R. Civ. Proc. 23................................................................................................... 22

Fed. R. Civ. Proc. 23(a)(4) ...................................................................................1, 21-26

Fed. R. Civ. Proc. 23(e) ...............................................................................................3

Fed. R. Civ. Proc. 23(e)(4) .......................................................................................... 21

Fed. R. Civ. Proc. 23(e)(5) ............................................................................................2

Fed. R. Civ. Proc. 23(g) ...........................................................................................26-27

Fed. R. Civ. Proc. 23(h) .............................................................................................. 27

Notes of Advisory Committee on 2003 Amendments to Rule 23 ................................5-6, 21


**Other Authorities**

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010) ......................3

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.07 (2010) ...................18-20

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.07(b) (2010) ..............18-19

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.07 *comment b* (2010) ................................................................................................................ 18

AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.13 (2010) ....................... 5-6

Brunet, Edward, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403 (2003) ............................................................................................ 28

Erichson, Howard, *The Problem of Settlement Class Actions*, (forthcoming in Geo. Wash. L. Rev.), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2243155............................................ 2, 26

Federal Judicial Center, *Manual for Complex Litigation (Fourth)* § 21.71 (2004) .......................5-6

Fitzpatrick, Brian, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009) ............................ 29

Frankel, Allison, "Legal Activist Ted Frank Cries Conflict of Interest, Forces O'Melveny and Grant & Eisenhofer to Modify Apple Securities Class Action Deal," AMERICAN LAWYER LIT. DAILY (Nov. 30, 2010). ................................................................................. 28

Jones, Ashby, "A Litigator Fights Class-Action Suits" WALL ST. J. (Oct. 31, 2011). ........................ 28

Karlsgodt, Paul & Raj Chohan, *Class Action Settlement Objecotrs: Minor Nuisance or Serious Threat to Approval*, BNA: Class Action Litig. Report (Aug. 12, 2011)............................................ 28

Newberg, Herbert & Alba Conte, Newberg on Class Actions § 13:20 (4th ed. 2002)..........................3

OBJECTION TO PROPOSED SETTLEMENT AND FEE REQUEST

Schiffrin et. al, *Helping or Hovering? The Effects of Helicopter Parenting on College Students' Well-Being,*
    J. Child and Fam. Studies (Feb. 2013).................................................................................................... 20

OBJECTION TO PROPOSED SETTLEMENT AND FEE REQUEST

# INTRODUCTION

Plaintiffs filed a complaint admittedly alleging billions of dollars of statutory damages—and settled it for $17.45 million plus an extraordinary $2.55 million in administration costs. And it is uncertain whether class members may see a dime of the proceeds. Indeed, there is a potentially fatal problem that class members cannot know whether they are waiving all of their rights for nothing by the opt-out deadline: a class member may be satisfied with the settlement if they are to receive cash, but are not given notice or the opportunity to opt out if they are not. Yet class counsel asks to be paid as if they won more than a nuisance settlement of less than a penny on the dollar: $7.5 million, or 43% of the class benefits.

The departure from the Ninth Circuit's 25% benchmark cannot be justified. The amorphous prospective injunctive relief does not distinguish between class members and non-class members, and cannot be considered compensation for the claims released by the settlement; the proper valuation under Ninth Circuit law of the injunctive relief is zero, rather than as a concocted assertion of millions to rationalize an excessive attorney fee.

Furthermore, the class certification suffers from a fatal problem. Though there is a single settlement class and the parties have alleged that the class representatives are similarly situated to the rest of the class, the claims process treats class members differently based on arbitrary distinctions that do not affect the statutory rights alleged in the complaint. Either all class members have equal rights and equal claims, or there needs to be subclassing with separate representation to satisfy Fed. R. Civ. Proc. 23(a)(4). *Dewey v. Volkswagen AG*, 681 F.3d 170 (3d Cir. 2012); *In re Literary Works*, 654 F.3d 242 (2d Cir. 2011).

The disproportion between the claimed damages and the settlement relief should also be fatal to the class certification. Plaintiffs alleged tens of billions of dollars of statutory damages,[1] but are settling for less than 0.1% of that. Such a settlement can only be fair if the plaintiffs have less than a 1% chance of success; if the odds of prevailing are as high as one percent, then the proposed relief shortchanges the class. But if plaintiffs have brought a class action with less than a 1% chance of success, it is inequitable for them to profit from bringing a meritless case at the expense of their clients, and the class should be decertified.

---

[1] This is not an exaggeration: plaintiffs concede this to be the possible recovery, based on the $750 per incident statutory damage figure in Cal Civ. Code § 3344. *See* Mem. in Support of Mot. for Fees ("Fee Mem.") (Dkt. 253) 24.

*Murray v. GMAC*, 434 F.3d 648 (7th Cir. 2006); Howard Erichson, *The Problem of Settlement Class Actions*, (forthcoming in Geo. Wash. L. Rev.) (attached as Exhibit 2).[2]

## I.     The objectors are members of the class.

Objectors Sam Kazman and Theodore H. Frank and are United States residents who both have Facebook accounts; on information and belief they have appeared in Sponsored Stories. *See* Declarations of Sam Kazman and Theodore H. Frank. They are therefore members of the settlement class with standing to object to the settlement. Fed. R. Civ. Proc. 23(e)(5).

Kazman's business mailing address is 1899 L Street NW, Washington, DC 20036 and his business phone number is 202-331-1010. His email address is skazman@cei.org and sam.kazman@facebook.com. His GCG control number is 3151685699; on April 29, 2013, he filed a claim, which is claim number 1757872. Kazman Decl. ¶¶ 2, 4.

Frank's mailing address is 1718 M Street NW, #236, Washington DC 20036 and his phone number is (703) 203-3848. His email address is tfrank@gmail.com. Frank's class number is 391647493. Though Frank is a class member in the same class as Kazman and other claimants, Frank was unable to file a claim because the claims process required him to assert under oath that he was unaware that Facebook profited from Sponsored Stories. Frank Decl. ¶¶ 2-6.

Attorney Theodore H. Frank represents Kazman *pro bono* as well as himself *in pro per*, and gives notice of his intent to appear at the fairness hearing in this case, where he will discuss matters raised in this Objection. Objectors do not intend to call any witnesses at the fairness hearing, but reserve the right to make use of all documents entered on to the docket by any settling party or objector. Objectors reserve the right to cross-examine any witnesses who testify at the hearing in support of final approval or to supplement this objection if the parties introduce new arguments for settlement approval or valuation after the objection deadline. Objectors join the objections of any other objectors or *amici* to the extent those objections are not inconsistent with this one.

## II.     The court has a fiduciary duty to the unnamed members of this class.

A district court must act as a "fiduciary for the class," "with a jealous regard" for the rights and

---

[2] Available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2243155.

OBJECTION TO PROPOSED SETTLEMENT AND FEE REQUEST

interests of absent class members. *In re Mercury Interactive Corp.*, 618 F.3d 988, 994–95 (9th Cir. 2010) (internal quotation and citation omitted). "Both the United States Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust Litigation*, 360 F.Supp.2d 166, 192–94 (D. Mass. 2005) (*citing, inter alia, Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 623 (1997) ("Rule 23(e) protects unnamed class members from 'unjust or unfair settlements' agreed to by 'fainthearted' or self-interested class 'representatives.'")); *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279–80 (7th Cir. 2002) ("district judges [are] to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions").

"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members.... [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 785 (3d. Cir. 1995) (internal quotation and citation omitted). "A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class." Herbert Newberg & Alba Conte, Newberg on Class Actions § 13:20 (4th ed. 2002). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mahon,* 957 F.2d 697, 701 (9th Cir. 1992). *Accord Diaz v. Trust Territory of Pacific Islands,* 876 F.2d 1401, 1408 (9th Cir. 1989) ("The district court must ensure that the representative plaintiff fulfills his fiduciary duty toward the absent class members").

There should be no presumption in favor of settlement approval: "[t]he proponents of a settlement bear the burden of proving its fairness." *True v. American Honda Co.*, 749 F. Supp. 2d 1052, 1080 (C.D. Cal. 2010) (*citing* 4 Newberg on Class Actions § 11:42 (4th ed. 2009)). *Accord* American Law Institute, *Principles of the Law of Aggregate Litig.* § 3.05(c) (2010) ("*ALI Principles*").

"[W]here the court is '[c]onfronted with a request for settlement-only class certification,' the court must look to the factors 'designed to protect absentees.'" *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003) (*quoting Amchem*, 521 U.S. at 620). "[S]ettlements that take place prior to formal class certification require a higher standard of fairness." *Molski*, 318 F.3d at 953. "[P]re-certification settlement agreements require that we carefully review the entire settlement, paying special attention to 'terms of the agreement contain[ing]

convincing indications that the incentives favoring pursuit of self-interest rather than the class's interest in fact influenced the outcome of the negotiations.'" *Dennis v. Kellogg Co.*, 697 F.3d 858, 867 (9th Cir. 2012) (*quoting Staton v. Boeing*, 327 F.3d 938, 960 (9th Cir. 2003)). "These concerns warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). Where the Court confronts a pre-certification settlement, consideration of the eight *Churchill*[3] factors "alone is not enough to survive appellate review." *In re Bluetooth Headset Prod. Liab. Lit.*, 654 F.3d 935, 946 (9th Cir. 2011).

It is insufficient that the settlement happened to be at "arm's length" without express collusion between the settling parties; because of the danger of conflicts of interest, third parties must monitor the reasonableness of the settlement as well. *Bluetooth*, 654 F.3d at 948 (*quoting Staton*, 327 F.3d at 960). "Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs." *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1052 (9th Cir. 2002) (*quoting In Re Washington Public Power Supply Syst. Lit.,* 19 F.3d 1291 (9th Cir. 1994)). "Accordingly, fee applications must be closely scrutinized." *Vizcaino*, 290 F. 3d at 1052.

## III. The 43% fee request is excessive under Ninth Circuit law; appropriate reduction will augment class recovery.

The settlement creates a fund of $20 million—but immediately subtracts up to $2.55 million for administration costs.[4] As the Third Circuit has noted, class members are "not indifferent" whether settlement funds go to class members or to *cy pres* recipients. *In re Baby Products Antitrust Lit.*, 708 F.3d 163, 178 (3d Cir. 2013). If class members prefer cash in their pockets to cash to charity, they surely prefer cash in their pockets to cash provided to a highly profitable settlement administrator. *See, e.g., In re Wells Fargo Sec. Litig.*, 157 F.R.D. 467, 470-72 (N.D. Cal. 1994) (class cares about minimizing expenses). Any other conclusion would imply that class members would be just as happy with a gold-plated settlement administration that extracted $10 million from the $20 million settlement fund as one that efficiently cost only $1 million; any other

---

[3] *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

[4] Fee Mem. 20 n.11.

conclusion awards class counsel a commission on moneys paid to the settlement administrator and gives class counsel no incentive to ensure that the class is maximizing its recovery.[5]

The percentage-of-recovery approach is supposed to be percentage of *recovery*, not the percentage of a *fund*. The proper evaluation of the settlement is what the class *actually receives*. *See* Notes of Advisory Committee on 2003 Amendments to Rule 23 ("it may be appropriate to defer some portion of the fee award until *actual payouts* to class members are known" (emphasis added)); *id.* ("fundamental focus is the result *actually achieved* for class members" (emphasis added); *id.* (*citing* 15 U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6) (fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest *actually paid* to the class" (emphasis added))). *See also ALI Principles* § 3.13; Federal Judicial Center, *Manual for Complex Litigation (Fourth)* § 21.71(2004) ("the fee awards should be based only on the benefits *actually delivered*."). "[N]umerous courts have concluded that the amount of the benefit conferred logically is the appropriate benchmark against which a reasonable common fund fee charge should be assessed." *In re Prudential Ins. Co. America Sales Practices Litig.,* 148 F.3d 283, 338 (3d Cir. 1998). The "key consideration in determining a fee award is reasonableness in light of the benefit *actually conferred*." *In re HP Inkjet Printer Litig.,* No. 5:05–cv-3580 JF, 2011 WL 1158635, at *10 (N.D. Cal. Mar. 29, 2011) (emphasis in original) (internal citation and quotation omitted). Here, that can be no more $17.45 million, which is the proper denominator for evaluating class counsel's fee request. While many courts have unreflectively assumed that a settlement fund is a settlement

---

[5] Nor can the cost of notice be considered a class benefit. The defendant has every incentive to fund notice, because constitutionally adequate notice is a prerequisite for the defendant to obtain the only consideration it receives from a settlement: the waiver and release of class members' claims. *See e.g., Besinga v. United States*, 923 F.2d 133, 137 (9th Cir. 1991) (reversing dismissal of plaintiff's case because no notice was given in prior class action) (citing cases); *Hecht v. United Collection Bureau*, 691 F.3d 218 (2d. Cir. 2012) (permitting relitigation of class action because of inadequacy of class notice in previous settlement); *Twigg v. Sears, Roebuck & Co.,* 153 F.3d 1222, 1226-29 (11th Cir. 1998) (same). Notice enables class members to make claims, but those amounts claimed are already included in the final tabulation of settlement value, there is no need for double-counting by including the costs of the notice in addition to its yield. As such, the expense of class notice should not be counted as a benefit on the class's side of the ledger. Refusing to count notice costs is just one instantiation of this Circuit's general principle that costs imposed on the defendant— divorced from class benefits—are not the measure of compensable class value. *See Bluetooth*, 654 F.3d at 944 ("[T]he standard [under Rule 23(e)] is not how much money a company spends on purported benefits, but the value of those benefits to the class.") (*quoting In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D. Cal. 2009)).

fund regardless of who gets the money, none of those considered the reasoning of *Baby Products,* the 2003 Amendments to Rule 23, the *Manual for Complex Litigation*, or the *ALI Principles*.

Class counsel seek an award of $7.5 million in fees. Fee Mem. 39. Assuming that the settlement fund goes to class members rather than unrelated third-party charities, this is 43% of the actual benefit to the class. But the benchmark in the Ninth Circuit is 25%; an award of the magnitude class counsel requests would be "clearly excessive under [Ninth Circuit] guidelines." *Dennis v. Kellogg Co.*, 697 F.3d 858, 868 (9th Cir. 2012).

The plaintiffs' Fee Memorandum properly recognizes that Percentage of Recovery ("PoR") is the superior method for awarding fees. Fee Mem. 19-21. In contrast, the "lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). As one court described the unsuitability of lodestar in a case where the class received a tiny fraction of the amounts claimed, "Class Counsel has requested for itself an uncontested cash award based on lodestar, rather than the value of the class recovery, with only a modest discount from the claimed lodestar amount. In other words, the class is being asked to 'settle,' yet Class Counsel has applied for fees as if it had won the case outright." *Sobel v. Hertz*, No. 3:06-CV-00545, 2011 U.S. Dist. LEXIS 68984, at *44 (D. Nev. Jun. 27, 2011).[6] "[T]he lodestar method in this case wholly overvalues class counsel's work in light of the minimal success it achieved in this litigation." *In re Classmates.com Consol. Litig.*, No.09-cv-0045-RAJ, 2012 U.S. Dist. LEXIS 83480, at *19 (W.D. Wash. Jun 15, 2012).

The Ninth Circuit establishes a benchmark reasonable fee of 25% of the common fund in cases alleging economic injury. *See, e.g., Bluetooth*, 654 F.3d at 942; *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). Certainly, the Ninth Circuit's benchmark PoR approach has outer limitations (*e.g.*, the common fund should not include difficult-to-value injunctive relief, *see Staton*, 327 F.3d at 974), and the benchmark may be appropriately adjusted because of special circumstances. *E.g., In re Wash. Pub. Power Supply Secs. Litig.*, 19 F.3d 1291 (9th Cir. 1994) (court deviated downward from benchmark in megafund case); *Six Mexican Workers*, 904 F.2d at 1311 (considering the length of litigation degree of success obtained,

---

[6] Of course, this case is *worse* than *Sobel*, as class counsel seeks a 1.39 multiplier on their already inflated lodestar. *See infra* § III.B.

and complexity of the issues and ultimately deciding to adhere to the benchmark). But overall, the strength and flexibility of this approach provides a superior method of aligning the interests of class counsel and class members. In light of this strength, the Ninth Circuit has been firm in requiring "adequate explanation in the record of any special circumstances justifying a departure." *Bluetooth*, 654 F.3d at 942; *Powers v. Eichen*, 229 F.3d 1249, 1256-58 (9th Cir. 2000) (reversing decision to award 30% without explanation why the district court departed from the benchmark).

A fee award of 43% of the $17.45M available to the class is 172% of the benchmark and is thus disproportionate to class recovery. The recently decided *Dennis* decision highlights the problem. In *Dennis*, the Ninth Circuit reversed the district court's approval of a class action settlement because the *cy pres* award was defective. 697 F.3d at 867. The Court warned the parties to carefully examine the value of any revised settlement on remand because, after discounting the defective *cy pres* relief, "the $2 million attorneys' fees award becomes 38.9% of the total, which is clearly excessive under our guidelines." *Id.* at 868. *Dennis* is not alone. In *Bluetooth*, the Ninth Circuit reversed the district court's fee award, holding that even assuming the costs of notice were properly included in the fund as a class benefit, the fee award still accounted for 37.2% of the fund, in contrast with the reasonable 25% benchmark. 654 F.3d at 945.

In the wake of these decisions, in-circuit district courts have taken care to hew near to the benchmark. *See e.g.*, *Ko v. Natura Pet Prods.*, No. C 09-02619 SBA, 2012 U.S. Dist. LEXIS 128615 (N.D. Cal. Sept. 10, 2012) (reducing 35% fee request to 25%); *In re Cell Therapeutics, Inc.*, No. C 10-414 MJP, 2012 U.S. Dist. LEXIS 105235 (W.D. Wash. Jul. 25, 2012) (reducing fees from 30% to 23%). This range holds even where class counsel achieves an exemplary settlement. In *Hopkins v. Stryker Sales Corp.*, each class member recovered $30,000 at between 85-100% of maximum recovery without even requiring those class members to file a claim form. No. 11-CV-02786-LHK, 2013 U.S. Dist. LEXIS 16939 (N.D. Cal. Feb. 6, 2013). Nonetheless, Judge Koh declined counsel's request for a 33.3% fee outside the "usual range" of "20 to 30 percent." *Id.* at *14. If 33.3% is excessive for a pecuniary settlement little different than complete victory, surely 43% is excessive when the recovery available to the class was less than 0.1% of statutory damages— especially when the allocation formula might give the class no cash at all.

If the *Hopkins* settlement was not deserving of an upward departure based on the results obtained, there can be no question that one is undeserved here. There is an absolutely glaring discrepancy between the

OBJECTION TO PROPOSED SETTLEMENT AND FEE REQUEST

measure of success in that case and this. Rather than the 85%-100% recovery obtained in *Hopkins*, class counsel have here obtained a recovery of $20 million, which amounts to just over 0.02% of a possible $92 billion recovery based on statutory damages alone.

The "foremost" consideration in the reasonableness of a fee award is the benefit obtained for the class. *Bluetooth*, 654 F.3d at 942 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 434-36 (1983); *McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009)); *accord* Fee Mem. 23 (quoting *Hensley*). It is this factor that ultimately precludes the upward departure class counsel seeks.[7]

### A. Prospective injunctive relief should is not a class benefit and should not be included in the common fund denominator at any estimated value.

Class counsel rationalize their fee request under the PoR method by attributing extraordinary—and extraordinarily implausible—value to it. *See* Fee Mem. 19. This is wrong. This practice of inventing fictive valuations of inestimable injunctive relief is a recurring, well-chronicled and particularly pestilent problem of class action settlement proceedings. *E.g., In re Oracle Secs. Litig.*, 132 F.R.D. 538, 544-45 (N.D. Cal. 1990) (opinion of Walker, J.) (referring to injunctive relief "expert valued at some fictitious figure" coupled with "arrangements to pay plaintiffs' lawyers their fees" to be the "classic manifestation" of the class-action agency problem). Fortunately, the Ninth Circuit has stepped in to give guidance to district courts:

> Precisely because the value of injunctive relief is difficult to quantify, its value is also easily manipulable by overreaching lawyers seeking to increase the value assigned to a common fund. We hold, therefore, that only in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees. [*Staton v. Boeing*, 327 F.3d 938, 974 (9th Cir. 2003)].

When one investigates the precise injunctive relief afforded under the Amended Settlement Agreement ("A.S.A.") (Dkt. 235-1), one quickly discerns that this is not the "unusual instance where the

---

[7] Contrary to plaintiffs' suggestion (Fee Mem. 35-36), the bare fact that class counsel was compensated on a contingency fee rather than a fixed fee basis is no longer a grounds for enhancement. *See City of Burlington v. Dague*, 505 U.S. 557, 567 (1992); *Bluetooth*, 654 F.3d at 942 n.7 (contingent-fee factor "no longer valid" in lodestar cross-check); *In re GMC Pickup Truck Fuel Tank Prods. Liab. Litig*, 55 F.3d 768, 822 (3d Cir. 1995) ("[T]o the extent that the district court relied on the lodestar method, it erred by applying a multiplier" for contingency after *Dague*).

value to individual class members of benefits deriving from injunctive relief can be accurately ascertained." §

2.1(a)-(d) of the A.S.A. offer general descriptions of the injunctive relief package ranging from a revision of

Facebook's terms of use (2.1(a)), to implementation of some user controls of sponsored stories (2.1(b)),

implementation of some parental control mechanisms (2.1(c)), and future provision of additional educational

information (2.1(d)). Immediately, the relief is vague and undeveloped in its particulars. This counsels against

assigning any specific value to the injunctive relief. *E.g., True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052,

1077 (C.D. Cal. 2010) (finding it "difficult for the Court to discern the value of the yet-to-be produced DVD

at this time.").

        To begin, the terms of use revision effectively amounts to an injunction to follow the law,

which courts have described as "meaningless" and "valueless." *McClintic v. Lithia Motors, Inc.*, No. C11-

859RAJ, 2012 U.S. Dist. LEXIS 3846, at *12 (W.D. Wash. Jan. 12, 2012); *see also Levell v. Monsanto Research

Corp.*, 191 F.R.D. 543, 544-45 (S.D. Ohio 2000) ("[A] defendant's promise to do that which the law already

requires is not a valuable benefit.") (citing *Franks v. Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir. 1981) (finding

little benefit to class members from settlement agreement provisions that obligated defendant "to do what

the law generally requires"); *Reich v. Walter W. King Plumbing & Heating Contractor, Inc.*, 98 F.3d 147, 151 (4th

Cir. 1996) (defendant was the "prevailing party" under a settlement that merely obligated it to do that which

the law already required). To the extent that the revision of terms of use is of value to anyone, it is to

Facebook in order that they may forestall future lawsuits. *See Galloway v. Kan. City Landsmen*, No. 4:11-1020-

CV-W-DGK, 2012 U.S. Dist. LEXIS 147148, at *18 (W.D. Mo. Oct. 12, 2012) (If defendant doesn't comply

with the law "a new lawsuit could be filed and the plaintiff could easily prove a willful violation.").

        More fundamentally, just as *True* noted that "[n]o changes to future advertising by [the defendant]

will benefit those who already were misled by [the defendant]'s representations," no changes to future

procedures by Facebook compensate those who have suffered actual or statutory injury by Facebook's past

conduct. 749 F. Supp. 2d at 1077. This is a proper recognition of the principle the class is composed of

people who have done business with Facebook *in the past*; while the prospective injunctive relief can only

benefit those who do business with Facebook *in the future*. Because the relief, by definition, cannot

compensate the class other than incidentally, it cannot be evaluated as part of the settlement; even opt-outs

and non-class-members are entitled to the "injunctive relief," so it is not consideration for waiving claims. As

Judge Wood has explained, "[t]he fairness of the settlement must be evaluated primarily based on how it compensates class members for these past injuries." *Synfuel Tech. Inc. v. DHL Express,* 463 F.3d 646, 654 (7th Cir. 2006). In this same vein, each of the supposed injunctive benefits of the settlement will accrue to all future users of Facebook, whether or not they are class members, and whether or not they opt out of this very settlement. Benefits that accrue to class members and opt-outs alike cannot be adjudged to be settlement benefits. *See Vought v. Bank of Am., N.A.,* No. 10-CV-2052, 2012 U.S. Dist. LEXIS 143595, at *51-*52 (C.D. Ill. Oct. 4, 2012) (remarking on the slender "difference between an individual who opts out of the proposed settlement and an individual who does not opt out," ultimately disapproving the settlement).[8]

Plaintiffs propose three alternative methods for assigning economic value to the prospective ability of Facebook users to opt-out from Sponsored Stories: (1) The "fair market value" calculation, (2) The "real option" calculation, and (3) The minimum $1 valuation. Fee Mem. 4. All three valuations "must be examined with great care to eliminate the possibility that [they serve] only the self-interests of the attorneys and the parties, and not the class, by assigning a dollar number to the fund that is fictitious." *Dennis*, 697 F.3d at 868.

The "fair market value" method is calculated by measuring the premium associated with ad revenue that Facebook derived from "friend endorsed" ads over non-friend-endorsed ads. Declaration of Fernando Torres (Dkt. 282) ¶10. Torres estimates this revenue at $9.4 million/month so over the 24 month period of injunction; Facebook will lose roughly $226 million. ¶15. This valuation is flawed because the cost to the defendant is not the benefit to the class. "[T]he standard [under Rule 23] is not how much money a company spends on purported benefits, but the value of those benefits to the class." *Bluetooth*, 654 F.3d at 944 (quoting *In re TD Ameritrade Accountholder Litig.*, 266 F.R.D. 418, 423 (N.D. Cal. 2009)). Under plaintiffs' absurd reasoning, a settlement that requires Facebook to hold a bonfire burning $200 million in cash is worth $200

---

[8] Note that this is ***not*** an argument that injunctive relief is ***never*** a benefit to the class. There are class actions where a class members receive injunctive relief that addresses their past injuries. For example, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998), is an injunction-only settlement approved by the Ninth Circuit. *Hanlon* is consistent with *Synfuel's* holding. *Hanlon* plaintiffs alleged a product defect, and class members received "a redesigned improved replacement latch to be installed free of charge." This is retrospective injunctive relief, compensatory and potentially appropriate. But the injunctive relief here is not meant to make class members whole, and is thus not a benefit to class counsel's clients.

million to the class. This Court has already properly rejected this methodology once and should do so again. *See Fraley v. Facebook, Inc.*, No C 11-1726 RS, 2012 U.S. Dist. LEXIS 116526, at *12-*13 (N.D. Cal. Aug. 17, 2012) ("Plaintiffs have derived that figure, however, by calculating an estimated dollar value to Facebook , of being able to use its members' names and likenesses in Sponsored Stories over the next two years. Plaintiffs' theory is that the ability of Facebook members to exercise control over the degree to which their names and likenesses appear in Sponsored Stories translates to economic value to them in that same dollar amount. Plaintiffs have presented no reason in logic or law that supports calculating the value of the injunctive relief in such a manner.").[9]

Doctor Allman's "Real Option" methodology does nothing to ameliorate the problem. It is still grounded in the $9.4 million/month projected profit streams of Facebook. Declaration of Phillip Allman (Dkt. 281) ¶19.   Although Allman concedes that "[t]he asset underlying this option, the plaintiff class members' endorsements, presently has no market" (*id.* at ¶16), he presumes that a market will come into being immediately (the injunction lasts for two years only) and then haphazardly selects possible dollar amounts that class members will be paid by buyers of their advertising rights. *Id.* at ¶20. This methodology is facially unreasonable and unreliable, to the point where the expert testimony should be excluded entirely. *See Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("[T]he expert's bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology."); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

The third proposed valuation, $123 million is based on *ipse dixit* assertion that the injunctive relief as worth $1 on average to each class member. This is a number picked randomly out a hat; it may as well be based on the cost of sending virtual gifts on Facebook or the per-pound price of chickpeas. The fact that so few Facebook customers spend so little as a minute of their time opting out of Sponsored Stories suggest that the injunctive relief is not even worth a dollar to them. Plaintiffs' reference to "reputation management

---

[9] And if plaintiffs' calculation were even remotely non-fictional, it demonstrates a breach of fiduciary duty to the class, who surely would have preferred another $200 million in cash instead of a $226 million penalty to Facebook.

services" that charge up to $99 per year (Fee Mem. 31) is utterly inapposite. How does the injunctive relief purport to do the same thing as a management service? How many people actually purchase such services? Myriad questions remain and a valuation cannot be accurately made on this basis.

*In re LivingSocial Marketing and Sales Practices Litigation* is directly on point. MDL No. 2254, 2013 U.S. Dist. LEXIS 40059 (D.D.C. Mar. 22, 2013). There, Judge Huvelle was confronted with a settlement that was ostensibly worth $7.5 million, with class counsel seeking fees of $3 million or 40% of the fund. But rather than acknowledge that they were asking for an above benchmark award, plaintiffs' counsel, as here, submitted an expert valuation of $54 million for a hodgepodge of prospective injunctive relief. The court rebuffed the expert report as "of marginal value" and noted that "the Court is unable to assess the reliability of the report." 2013 U.S. Dist. LEXIS, at *47 n.16. Continuing, the court found that "the major thrust of the injunctive relief is, in essence, an agreement by LivingSocial to abide for three years by what plaintiffs claim is required by law… and that the injunctive relief provides limited direct benefit to class members [*i.e.,* past purchasers]…and the injunctive relief applies only to prospective purchasers." *Id.* at *50 (bracketed material added). Expressly following *Staton*, the court declined to include any valuation of the injunctive relief in the common fund. *Id.* at *46-*47.

While concluding that the settlement was approvable, the Court slashed the fee award from the requested $3 million (40%) to $1.35 million (18%). *Id.* at *65. "Rather than attempting to disguise the size of their fee request by painting it as 'less than 5%' of a $62 million fund, it would have been preferable for counsel to have acknowledged that the common fund consists only of the monetary relief plus fees and costs (or $7.5 million) and then to have requested a fee of $3 million, which amounts to 40% of the fund." *Id.* at *51. This Court is confronted with an identical situation and Kazman and Frank recommend resolving it in an identical manner.

**B.    The lodestar cross-check does not support the fee request.**

As mentioned above, in a settlement of this size, the PoR method is right way to go. But to the extent the Court wishes to closely scrutinize lodestar, the plaintiffs' lodestar calculation is exaggerated.

Plaintiffs assert that their $7.5 million request represents a mere "1.391 multiplier of the lodestar figure." Fee Mem. 5. There are two cardinal concerns here. *First,* the lodestar is distended and unreasonably top-heavy, to the extent that the entire blended hourly rate of the lodestar figure comes to $645/hr. More

than 39% of the plaintiffs' hours on the case were billed by Robert S. Arns, and all of his hours regardless of the task were billed at a rate of $950/hr. *See* Combined Hours Spreadsheet (Dkt. 254-7). In total, Arns personally and individually accrued more than $3 million of the $5.3 million lodestar. *Second*, multipliers are no longer granted as a matter of course. No exceptional circumstances are present that warrant any multiplier in this case. Indeed, why should class counsel receive any multiplier when their only victory was 0.02% of the statutory damages—a nuisance settlement?

The Ninth Circuit encourages cross-checking the percentage award using the lodestar in order to "confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate." *Bluetooth*, 654 F.3d at 945 (quoting *GMC Trucks*, 55 F.3d at 821 n.40). Awarding class counsel the fee they seek would in fact result in the type of "exorbitant hourly rate" that the crosscheck seeks to protect against. The full $7.5 million award would result in an hourly rate of nearly $900 over the 8346.6 hours expended. Even before considering the multiplier, the rate is a blended rate is a bloated $645/hr. That is well beyond what constitutes a normal blended rate in this circuit. *See e.g, Bruno v. Quten Research Inst., LLC*, No. SACV 11-00173 DOC(Ex), 2013 U.S. Dist. LEXIS 35066, at *9 (C.D. Cal. Mar. 13, 2013) (class counsel's blended rate was $366.87/hr); *Nguyen v. BMW of N. Am. LLC*, No. C 10-02257 SI,  2012 U.S. Dist. LEXIS 56018 , at *9 (N.D. Cal. Apr. 20, 2012) (finding reasonable blended rate to be $470/hr); *see also Gabriel Techs. Corp. v. Qualcomm Inc.*, No. 08-cv-1992 AJB (MDD), 2013 U.S. Dist. LEXIS 14105, at *33-*34 (S.D. Cal. Feb. 1, 2013) (finding Cooley LLP's[10] blended rate of $447/hr to be "in line with that of the community" when compared to peers in Los Angeles, Silicon Valley, San Francisco, and San Diego).

The blended rate appears to be so exaggerated because lead counsel Arns billed by himself nearly 40% of the hours on the case at $950/hr. There exist attorneys with such experience and skill that they can command $950/hour from paying clients. But the Arns Declaration (Dkt. 254) does not establish what rates paying clients are willing to pay him. "Billing rates should be established by reference to the fees that private attorneys of an ability and reputation comparable to that of prevailing counsel charge their **paying clients** for legal work of similar complexity." *Davis v. City & Cnty. of San Francisco*, 976 F.2d 1536, 1545 (9th Cir. 1992), *vacated in part on other grounds*, 984 F.2d 345 (1993) (emphasis added).

---

[10] Cooley is counsel for defendant here.

Certainly, if Arns could show that he turned away over 3000 hours of $950/hour work from paying clients so that he could prosecute this case, the hourly-rate claim would be reasonable—for certain tasks at least. But Arns simply asserts *ipse dixit* that his "billing rate is $950 per hour." Arns Decl. at ¶19. "To determine a reasonable hourly rate, the court disfavors reliance on claimed billing rates." *Theme Promotions, Inc. v. News Am. Mktg. FSI, Inc.*, 731 F. Supp. 2d 937, 945 (N.D. Cal. 2010). The purpose of lodestar is to determine the opportunity cost of attorneys working on the case. In the absence of evidence that real-life paying clients would have been willing to pay Arns $950/hour and that Arns sacrificed the opportunity to charge paying clients that much, he has failed to carry his burden. Federal courts in California only permit such high rates in rare circumstances, and attorneys with similar or greater national renown have had lower rates rejected. *See, e.g., Pabst v. Genesco Inc.*, No. C 11-01592 SI, 2012 U.S. Dist. LEXIS 129389, at *6 (N.D. Cal. Sept. 11, 2012) (rejecting $900/hour for nationally prominent class-action attorney Joe R. Whatley); *Stonebrae, L.P. v. Toll Bros.,* No. C-08-0221 EMC, 2011 U.S. Dist. LEXIS 39832, at *50 (N.D. Cal. Apr. 7, 2011) (rejecting rates between $675/hour and $950/hour); *Contreras v. City of L.A.*, No. 2:11-cv-1480-SVW-SH, 2013 U.S. Dist. LEXIS 49412, at *7 (C.D. Cal. Mar. 28, 2013) (reducing hourly rate by partner of 30 years experience from $800 to $675); *see also Cotton v. City of Eureka*, 889 F. Supp. 2d 1154, 1161 (N.D. Cal. 2012) (overruling objection to magistrate's decision to lower rate from $700/hr requested to $525/hr). The only case we have found in this circuit permitting a rate as high as $950/hr involved the founding partner of a leading national firm—and then only because the Court rejected a multiplier. *See Masimo Corp. v. Tyco Health Care Group, L.P.*, No. CV 02-4770 MRP (AJWx) , 2007 U.S. Dist. LEXIS 101987 (C.D. Cal. Nov. 5, 2007) ($900-$1100/hour rates reasonable for Stephen D. Susman, founding partner of Susman Godfrey LLP; rejecting augmentation of lodestar).

In *Ko v. Natura Pet Prods.*, the court refused even to accept that claimed rates of "$245/hr. to $595/hr., are reasonable and customary in this district" for this type of complex class action litigation. 2012 U.S. Dist. LEXIS 128615, at *33-*35 (N.D. Cal. Sept. 10, 2012). Aside from surveying other cases, the Court can consult the current *Laffey* Matrix.[11] One court found that "adjusting the Laffey matrix figures upward by approximately 9% will yield rates appropriate for the Bay area." *Young v Polo Retail, LLC*, 2007 WL 951821,

---

[11] Available at http://www.justice.gov/usao/dc/divisions/Laffey_Matrix_2003-2013.pdf.

2007 U.S. Dist. LEXIS 27269 at *21 (N.D Cal. Mar. 28, 2007). That methodology yields current rates of $550/hr for those of Arns' experience.[12] Other courts in district have looked to public data published by the Census Bureau and Bureau of Labor Statistics. *See e.g. Yahoo!, Inc. v. Net Games, Inc.*, 329 F. Supp. 2d 1179, 1189 (N.D. Cal. 2004). Judging by the 2013 case of *Gabriel Techs. Corp.*, $950/hour exceeds what Facebook's attorneys are charging for their similar roles in the same litigation. Whatever methodology is selected, $950/hr seems overhigh in the absence of evidence of lost opportunity to bill at that rate.

More troubling than Arns's claimed base rate is the failure to delegate tasks to less expensive attorneys in an efficient manner. For one example, of class counsel's 971.6 hours expended on "Legal Research, Case Review and Memos," work generally done by junior associates, Arns himself accounted for 359.3 (or 37%) of those hours. *See* Combined Hours Spreadsheet (Dkt. 254-7). Of class counsel's 1637.6 hours expended on "Discovery Work, Document Review or File Organization," work generally done by junior associates or even temporary contract attorneys paid less than $40/hour, Arns himself accounted for 819.7 (or 50%) of those hours. *Id.* Arns also expended more than half of class counsel's time on "Depositions and Exhibit Preparations," at least some of which is normally done by paralegals. *Id.* In total, he billed nearly 40% of the hours on the case.

The inefficiency of such a top-heavy pyramid is unacceptable when it leads to overbilling on tasks where far less than $950/hr top-tier skill is necessary. Although a district court should not overstep too far in second guessing the particular staffing decisions of plaintiffs' counsel, it is firmly within the ambit of this Court's discretion to inquire what level of skill was necessary to perform certain tasks. *Moreno v. City of Sacramento*, 534 F.3d 1106, 1114 (9th Cir. 2008) (citing *Hensley,* 461 U.S. at 430 n.3). As the Third Circuit put it: "A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn." *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983). *Accord FB-Stark, LLC v. White*, No. CV-12-00095-PHX-PGR, 2012 U.S. Dist. LEXIS 137892, at *4-*5 (D. Ariz. Sept. 26, 2012) (criticizing partner that performed tasks "that could have, and should have, been done by the lesser-paid employees who worked on this litigation, such as the two associate attorneys and the paralegal assigned to the case"); *Nickey Gregory Co., LLC v. Agricap*, LLC,

---

[12] That said, the *Laffey* matrix does not appear to have fully captured the rise in hourly rates over the last fifteen years for top-of-the-line attorneys. Frank has billed private clients (and turned down the opportunity to bill private clients) at $750/hour rates, which is above the *Laffey* matrix prediction.

1   3:10-MC-80297 JSW (NC), 2011 U.S. Dist. LEXIS 106370, at *9 (N.D. Cal. Sept. 1, 2011) (rejecting

2   $650/hour rate for administrative tasks that could have been delegated to an associate or paralegal); *Zucker v.*

3   *Occidental Petroleum Corp.*, 968 F. Supp. 1396, 1402 (C.D. Cal. 1997) ("[L]egal research [is] a task that most

4   certainly could have been tackled by an associate billing at a lower rate.").

5         Did over a third of the legal research, case review and memo writing necessitate $950/hr skill? Did ½

6   of the discovery work, document review and file organization require $950/hr skill? Did more than ½ of

7   deposition and exhibit preparation time occasion $950/hr skill? It is inconceivable that a paying client would

8   tolerate upside-down-pyramid staffing for tasks that can be readily accomplished by junior associates, and the

9   class should not be treated differently.

10        Any "excuse" that lead counsel "had [no] lower level attorneys to assist them" is not "convincing." *In*

11  *re Bluetooth Headset Prods. Liab. Litig.*, 07-ML-1822 DSF (Ex), 2012 U.S. Dist. LEXIS 168324, at *8 (C.D. Cal.

12  Jul. 31, 2012).  "Had the Court known that neither firm had the proper staffing available, it likely would not

13  have found them to be appropriate as class counsel. Certainly no reasonable paying client would find this to

14  be justification for billing a partner rate for paralegal or secretarial work." *Id.* If Arns had to perform such

15  relatively low-level tasks himself, he should have billed those tasks at junior associate rates. *See MacDougal v.*

16  *Catalyst Nightclub*, 58 F. Supp. 2d 1101, 1106-07 (N.D. Cal. 1999) (holding that it was inappropriate for a

17  senior attorney to bill $325 per hour for routine and clerical tasks).

18        Bringing the lodestar figure in line with a reasonable blended hourly rate results in an approximate

19  40% reduction, from $5.39 million to $3.23 million. A 2.32 multiplier would then be required to reach the

20  requested $7.5 million. But under current law, no multiplier should be granted.

21        **C.   A multiplier is inappropriate here.**

22        "[T]here is a strong presumption that the lodestar is sufficient" without an enhancement multiplier.

23  *Perdue v. Kenny A*, 130 S. Ct. 1662, 1669 (2010). A lodestar enhancement is only justified in "rare and

24  exceptional" circumstances where "specific evidence" demonstrates that an unenhanced "lodestar fee would

25  not have been adequate to attract competent counsel." *Id.* at 1674. *Kenny A*'s limitation on enhancements was

26  made in the context of interpreting 42 U.S.C. § 1988's language of "reasonable" fee awards, but there's little

27  justification for claiming that "reasonable" in § 1988 means something different than "reasonable" in class

28  action fee awards made under Fed. R. Civ. P. 23(h). *See e.g., Van Horn v. Nationwide Prop. & Cas. Ins. Co.,* 436

Fed. Appx. 496, 500 (6th Cir. 2011); *Gonzalez v. S. Wine & Spirits of Am., Inc.*, No. 11-cv-5849,2012 U.S. Dist. LEXIS 46401, at *12-*16 (C.D. Cal. Mar. 29, 2012) (citing *Kenny A* and denying enhancement multiplier of 1.5); *Weeks v. Kellogg Co.*, No. 09-cv-8102, 2011 U.S. Dist. LEXIS 155472, at *129-*135 & n.157 (C.D. Cal. Nov. 23, 2011) (citing *Kenny A* and finding "little basis for an application of a multiplier" when calculating lodestar cross-check); *cf. also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 361 (3d Cir. 2010) (Weis, J. concurring/dissenting) (referring to *Perdue* as an "analogous statutory fee-shifting case."). Each and every case cited by the plaintiffs (*see* Fee Mem. 36-37) that awarded a significant multiplier predates *Kenny A*.

Appropriate use of the lodestar calibrates the award downward, not upward, where the degree of success achieved is disproportionately small. *See Bluetooth*, 654 F.3d at 942-44 (citing *Hensley*, 461 U.S. at 434-36 (1983)). "The class is being asked to 'settle,' [here for .02% of possible damages], yet Class Counsel has applied for fees as if it had won the case outright." *Sobel*, 2011 U.S. Dist. LEXIS 68984, at *44.

All in all, the lodestar cross-check in this case underscores the overindulgence of the $7.5 million request. As in *Livingsocial*, an 18%—slightly below benchmark—fee is suitable. This $3.6 million amounts to a slight premium on a fair valuation of their lodestar.

## IV. The Court should exercise every discretion afforded to it by the settlement to favor distribution to the class over *cy pres*.

At least two notable portions of the settlement permit the Court to decide whether money should be diverted to *cy pres* or should be remitted to class members. Section 2.3(a)(ii) operates in the event that the claims rate is unusually high, and permits the Court to either distribute the fund *pro rata* to claimants even where the amount would be less than $5 or to distribute the entirety of the funds to the *cy pres* beneficiaries. Section 2.3(b) operates in the more likely event that payment of $10 to all authorized claimants would not exhaust the net fund, in which case the Court may elect to augment the pro rata distributions above $10 or to permit the excess funds to go straight to *cy pres*. Kazman and Frank respectfully urge the Court to maximize direct class recovery.

Non-compensatory *cy pres* distributions, disfavored among both courts and commentators alike, remain an inferior avenue of last resort. *See e.g., Dennis*, 697 F.3d at 868 (*cy pres* settlement can easily become "a paper tiger"); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011) ("[A] growing number of scholars and courts have observed, the cy pres doctrine…poses many nascent dangers to the fairness of the

distribution process") (citing authorities); *Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir. 2003) (holding *cy pres* to be an inadequate substitute for individual compensation); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013) ("Cy pres distributions imperfectly serve that purpose by substituting for that direct compensation an indirect benefit that is at best attenuated and at worse illusory"); *Fraley*, 2012 U.S. Dist. LEXIS 116526, at *4-*7 (N.D. Cal. Aug. 17, 2012) (questioning propriety of an all *cy pres* settlement); *ALI Principles* § 3.07 cmt. b (2010) (rejecting position that "cy pres remedy is preferable to further distributions to class members").

The *cy pres* in this case is troubling in an especially extraordinary fashion. This case was originally assigned to Judge Koh, a district court judge who has historically provided a greater-than-average degree of scrutiny to class action settlements and attorneys' fees. *E.g.*, *Hopkins, supra*; *Ferrington v. McAfee, Inc.,* No. 10-CV-01455-LHK, 2012 U.S. Dist. LEXIS 49160 (N.D. Cal. Apr. 6, 2012). But the settling parties chose a *cy pres* recipient—the Santa Clara High Tech Law Institute—with a relationship to Judge Koh, who sits on the Santa Clara University School of Law's High Tech Advisory Board.[13] Shortly afterwards, Judge Koh recused herself. Dkt. 209. Were the parties attempting to judge-shop through the use of *cy pres*—or hoping to influence the court by favoring a particular charity? Though the happenstance of the draw did not result in less scrutiny, as this Court's admirable refusal to let the original settlement go forward demonstrates, it is not hypothetical that a different judge might have provided a lighter touch to a zero-dollar settlement. *E.g., In re Google Buzz User Privacy Litig.,* No. 10-cv-00672-JW (Dkt. 128) (N.D. Cal. May 31, 2011) (approving zero-dollar settlement after *sua sponte* decision to shift *cy pres* funds to university where judge taught). The ability of settling parties to manipulate *cy pres* to manufacture grounds for recusal is yet another reason that *cy pres* should be disfavored.

Thus, the mere existence of the *cy pres* doctrine in the class-action context is controversial with good reason. *See generally In re Thornburg Mortg., Inc. Sec. Litig.,* No. CIV 07-0815 JB/WDS, 2012 WL 3150408, 2012 U.S. Dist. LEXIS 107934 (D.N.M. Jul. 24, 2012). "Class members are not indifferent to whether funds are distributed to them or to *cy pres* recipients." *Baby Prods.*, 708 F.3d at 178. It is class members who should be the "foremost beneficiaries" of the settlement. *Id.* at 179. "If the settlement involves individual distributions

---

[13] *See* http://law.scu.edu/bulletin/high-tech-advisory-board.cfm (last accessed May 1, 2013).

to class members and funds remain after distributions…the settlement should presumptively provide for further distributions to participating class members unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair." *ALI Principles* § 3.07(b). This rule follows from the precept that "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011).

A dollar that goes to *cy pres* is less valuable than a dollar that goes directly to a class member. *Cf. In re Heartland Payment Sys., Inc.*, 851 F. Supp. 2d 1040, 1077 (S.D. Tex. 2012) (discounting *cy pres* for purposes of awarding fees); *Weeks v. Kellogg Co.*, No. CV 09-08102 (MMM) (RZx), 2011 U.S. Dist. LEXIS 155472, at *103-*104 (C.D. Cal. Nov. 23, 2011) (same). This is particularly true in this settlement where Facebook is already donating to or has existing relationships with several of the recipients. Of the designated recipients, Facebook is a current benefactor of, at the very least, the Center for Democracy and Technology[14] and ConnectSafely.org.[15]   *Dennis* holds that this sort of *cy pres* is not actually valuable to the class; after all, it is merely a shifting of accounting entries. *Dennis*, 697 F.3d at 867-68; *but cf. Lane v. Facebook*, 696 F.3d 811 (9th Cir. 2012), *rehearing en banc denied with six judges dissenting*, 709 F.3d 791 (2013)).[16]

It is also true where, as here, any nexus between the goals of the lawsuit and the missions of the *cy pres* recipients is attenuated to near absentia. *See Lane*, 709 F.3d 791, 2013 U.S. App. LEXIS 3935, at *7-*8 (dissental) ("[A]n organization that focuses on protecting privacy solely through "user control" can *never* prevent unauthorized access or disclosure of private information where the alleged wrongdoer *already has unfettered access* to a user's records. [An educational organization] can teach Facebook users how to create strong passwords, tinker with their privacy settings, and generally be more cautious online, but it can't teach users how to protect themselves from Facebook's deliberate misconduct.") (emphasis in orginal). Several of the proposed non-profits attempt to educate and in some cases protect minors from their own internet usage or receiving certain speech online. *See* Campaign for a Consumer-Free Childhood; ConnectSafely.org;

---

[14] *See* CDT Funding 2012, https://www.cdt.org/financialsdocs/2012FundingbyCategory.pdf.

[15] *See* http://connectsafely.org/our_supporters.

[16] Kazman and Frank side with the dissents: *Lane* is incorrectly decided both in terms of public policy and consistency with Ninth Circuit precedent. But it does not affect the objection here.

WiredSafety.org. Although these organizations are assuredly well-intentioned, it is far from obvious that curtailing the internet freedom of minors and shielding them from commercial speech is an unambiguous social good.[17]

All the above uncertainties regarding the value of the potential *cy pres* donations counsel strongly in favor of distributing as much as reasonably possible to the class. In the more likely scenario where claims are low, the Court should countenance no suggestion that a *pro rata* increase above $10 per claim would amount to a windfall, given the legal backdrop of $750 available in statutory damages, and the other grounds for monetary relief sought in the amended complaint. *See Masters v. Wilhemina Model Agency,* 473 F.3d 423, 436 (holding district court has discretion to award up to legal measure of damages in lieu of a *cy pres* distribution); *Klier, supra* (favoring second round of *pro rata* distribution over *cy pres* of unclaimed funds); *cf. Bluetooth*, 654 F.3d at 945 n.8 (examining whether relief obtained in settlement matched theory of the complaint). *Pro rata* adjustment upward is a common and effective method of distributing funds. *See e.g. In re Bank of Am. Credit Protection Mktg. and Sales Practices Litig.*, No. 3:11-md-02269-TEH (N.D. Cal. 2012) (*terms of settlement available at* https://www.creditprotectionsettlement.com (last visited Apr. 22, 2013)); *see also In re Checking Account Overdraft Litig.*, No. 1:09-md-2036-JLK (S.D. Fla. Apr. 15, 2013) (Dkt. 3430) (attached as Exhibit 1) (citing *ALI Principles* § 3.07, denying parties motion to distribute funds to *cy pres* recipient, and instead ordering parties to propose a *pro rata* distribution plan to class members).

In the scenario where claims are high and class member payouts will be less than $5 per claim, these payouts are still preferable to *cy pres* distributions, even if administrative costs eat into them to some degree. The convenient ACH direct payment mechanism will help to mitigate any serious problems of class members not cashing very small checks. A fraction of direct benefit is better than *cy pres* that may be not even

---

[17] *See Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001) ("[P]eople are unlikely to become well-functioning, independent-minded adults and responsible citizens if they are raised in an intellectual bubble."). *See generally Reno v. ACLU*, 521 U.S. 844, 853 (1997) (extolling the virtues of the internet's expansion of the marketplace of ideas). In fact, many reasonable people would see such endeavors as a kind of outsourcing of the helicopter-parenting urge. *See generally* Holly H. Schiffrin et. al., *Helping or Hovering? The Effects of Helicopter Parenting on College Students' Well-Being*, J. Child and Fam. Studies (Feb. 2013) (surveying social scientific literature, conducting study, and concluding that pro-autonomy parenting correlates with positive outcomes and over-controlling parenting correlates with higher levels of depression, anxiety and other negative outcomes).

constitute an indirect benefit. "There is no indirect benefit to the class from giving the defendant's giving the money to someone else." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004).

Moreover, if the Court was to nullify all cash distributions to class members in favor of an all-*cy pres* plan of allocation, then equity requires giving class members a second chance to opt out. *See Nilsen v. York County*, 228 F.R.D. 60, 61-62 (D. Me. 2005) (refusing to approve a class action settlement unless it "affords a new opportunity for exclusion" under which class members could consider the finalized plan of allocation under the settlement); Advisory Committee Notes to 2003 Amendments to Rule 23 (explaining that factors a court may consider when allowing a second opportunity to opt out under Fed. R. Civ. P. 23(e)(4) are "the information available to class members since expiration of the first opportunity to request exclusion, and the nature of the individual class members' claims."). Moving from a monetary settlement to a non-monetary settlement constitutes a material alteration to which "class members are not indifferent." *Baby Prods.*, 708 F.3d at 178. That should give one pause as to whether class members need to be given a second opportunity to opt out and preserve their $750 statutory damages claims. To sidestep this thorny issue, the Court can and should exercise its discretion to avoid an all *cy pres* result.

Although *cy pres* has been given a narrow berth in the Ninth Circuit, for the foregoing reasons and as its name suggests, it should not be a first option.[18] Distributing funds directly to class members is a clear-cut best option; the Court should not hesitate to embrace it as the settlement permits, especially if a fee reduction would permit *pro rata* class member claim to be over the distribution threshold.

If, however, the number of claims makes distribution to class members infeasible, fees should be reduced accordingly to reflect that the settlement was less valuable to the class than a pure-cash settlement. *Baby Prods.*, 708 F.3d at 178-79 (*citing, inter alia*, two Ninth Circuit decisions); *Heartland*, 851 F. Supp. 2d at 1077.

## V.   Arbitrarily required attestations on the claim form unfairly freeze out a segment of the class and undermine class representatives' ability to satisfy Rule 23(a)(4)'s requirement of adequate representation.

Neither the exaggerated fee request nor the potential for an unnecessary *cy pres* preclude the final

---

[18] "The *cy pres* doctrine takes its name from the Norman French expression, *cy pres comme possible*, which means as near as possible." *Nachshin*, 663 F.3d at 1038 (internal quotation omitted).

approval of the settlement. The settlement behooves itself with mechanisms that permit the Court to correct these issues. However, there is one flaw in this settlement that the Court has no power to fix and requires denying final approval: unjustified stipulations on the Claim Form that exclude many class members from recovery.

There are two arbitrary stipulations required on the claim form. *First*, class members must attest that they were "not aware that Facebook could be paid a fee for displaying actions such as these, along with [the class member's] name and/or profile picture, to [the class member's] Facebook Friends." *See* Claim Form, Exhibit 5 to A.S.A. (Dkt. 235-6) at 3. *Second*, class members must declare that they "believe [they were] injured by that display." *Id.* Neither required stipulation is justifiable because neither is tethered to the strength or weakness of one's claim under the operative right-of-publicity statute, Cal. Civ. Code § 3344.[19] Liability under § 3344 revolves around the simple objective questions of whether a defendant "knowingly uses" the name, likeness, image, etc... of another person without that individual's (or that individual's parent's) "prior consent." As such, the stipulations effectively freeze out many class members that retain claims equally viable to those of class members entitled to collect. This artificial division of a single class without subclassing and separate representation prevents the class representatives from satisfying the adequate representation requirement of Fed. R. Civ. P. 23(a)(4) and necessitates rejection of the settlement.

As a first principle, it is "altogether proper" to inspect the terms of settlement when evaluating whether adequacy is met. *See Amchem Prods. Inc., v. Windsor*, 521 U.S. 591, 619-20 (1997); *accord Radcliffe v. Experian Info. Solutions*, __F.3d__, No. 11-56376, 2013 U.S. App. LEXIS 7932, at *20 (9th Cir. Apr. 22, 2013) ("[O]ur [23(a)(4)] analysis focuses on the agreement."). "A judge must focus on the settlement's distribution terms (or those sought) to detect situations where some class members' interests diverge from those of others in the class. For example, a settlement that offers considerably more value to one class of plaintiffs than to another may be trading the claims of the latter group away in order to enrich the former group." *Ferrington v. McAfee, Inc.,* No. 10-CV-01455-LHK, 2012 U.S. Dist. LEXIS 49160, at *22 (N.D. Cal. Apr. 6,

---

[19] It is questionable *ab initio* whether non-California citizens have rights against Facebook under § 3344. *Mazza v. Am. Honda Co.*, 666 F.3d 581 (9th Cir. 2012). But the parties, by successfully stipulating to the certification of a single nationwide class that complies with Rule 23, are judicially estopped from claiming that class members have materially dissimilar rights to collect against Facebook, unless the class is to be decertified.

1   2012) (quoting *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 797 (3d Cir.

2   1995)). When the "structure of the settlement agreement itself…divides a single class into two groups of

3   plaintiffs that receive different benefits, [it] supports the inference that the representative plaintiffs are

4   inadequate." *Dewey v. Volkswagen AG*, 681 F.3d 170, 187 (3d Cir. 2012).

5       Both *Ferrington* and *Dewey* are prime examples of a situation in which a segment of a class was

6   arbitrarily turned into a zero recovery subclass. In *Ferrington*, Judge Koh reasoned that denial of final approval

7   was "necessary… to protect the rights of the absent class members of the subclass of claimants who

8   downloaded the Arpu software and who are essentially releasing their claims against McAfee and Arpu for

9   no consideration." 2012 U.S. Dist. LEXIS 49160, at * 42. A decisive factor is that the settlement released all

10  of the uncertified subclasses claims "despite the potential viability of some of [them]" *Id. Dewey*, likewise

11  found a 23(a)(4) problem where a uncertified subclass was excluded from access to the common fund. 681

12  F.3d at 188-90. On remand, the parties amended the settlement to incorporate the uncertified subclass back

13  into the general pool of class members allowed access to the fund.

14      These decisions are not outliers. *See, e.g., Literary Works, supra; In re Joint Eastern and Southern Dist.*

15  *Asbestos Litig.*, 982 F.2d 721, 741-43 (2d Cir. 1992), *modified on reh'g on other grounds sub nom. In re Findley*, 993

16  F.2d 7 (2d Cir. 1993); *Callendar v. Coastal Int'l Sec., Inc.*, NO. 5:10-CV-220, 2012 U.S. Dist. LEXIS 32692, at

17  *12-*13 (W.D. Ky. Mar. 12, 2012) ("[O]nly class members who were employed at Fort Campbell would

18  receive compensation in release of their claims; the subset of class members who were employed at Fort

19  Knox would receive nothing of value in consideration for a release of their claims…the Court finds that the

20  proposed class does not satisfy the Rule 23(a)(4) requirement").

21      As this Court has already held, "[r]egardless of the importance and value to plaintiffs of the injunctive

22  relief, it cannot serve as meaningful consideration for a release of class members' claims for damages,

23  statutory or actual." *Fraley*, 2012 U.S. Dist. LEXIS 116526, at *8. It is unclear if the parties are trying to

24  reduce eligible monetary claimants in hopes that it results in more leftover money for non-party *cy pres*

25  recipients. If the named representatives are disregarding the zero recovery subclass, or worse, affirmatively

26  favoring non-class charities at the expense of class members, then they are not adequate representatives. *See*

27  *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 338 (4th Cir. 1998) ("The premise of a class action is

28  that litigation by representative parties adjudicates the rights of all class members, so basic due process

requires that named plaintiffs possess undivided loyalties to absent class members."). Or perhaps the parties believed that it was necessary to winnow the eligible claimants down so that the pot of cash was not overextended. But this is no reason to exclude this particular subset of class members. Nor was there reason to make this subset wholly ineligible, in the possible event that there were funds remaining due to a miniscule claims rate.

The only viable justification for the freeze out would be an explanation that the claims of these class members were legally weaker, and the funds available were necessary to compensate the legally stronger claims. But the fact that a class member is aware that Facebook is paid for Sponsored Stories does not mean she has given Facebook "prior consent" to that arrangement, and that is the touchstone of a successful claim. Nor does a class member's subjective belief that he was injured or not have anything to do with whether an objective statutory injury occurred. In *True v. Honda*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010), the Central District rejected analogous attempts to infuse their settlement with an eligibility requirement based on class members' subjective beliefs. The court explained: "Those class members who complained to class counsel did not suffer any different injuries, do not have different legal claims, and are no more 'aggrieved' than those class members who contacted other attorneys or no attorneys at all." *Id.* at 1068. This gerrymandering, the court held, constituted a "patently unfair" "arbitrary distinction among class members with identical legal claims and injuries, [allowing] some to receive a cash award, and others only [injunctive relief]." *Id.* at 1069.

"[I]ntraclass equity" is a "requirement" of any settlement. *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 858, 863 (1999). Here, the disparate treatment of identically situated class members undermines that requirement and demands rejection of the settlement for failure to satisfy Rule 23(a)(4).

## VI.    A class should not be certified when the primary beneficiaries are the class representatives and class counsel.

Odds are that the number of claims will overwhelm the settlement fund and leave class members with no compensation for alleged past wrongs; if it does not, it is only because, as discussed in Section V before, the parties agreed to arbitrarily freeze out vast swaths of the class from any ability to make an honest claim. Meanwhile, the class representatives are seeking incentive awards of $12,500—more than 16 times their alleged statutory damages, with no evidence of actual damages above that. A recent Judge Easterbrook

OBJECTION TO PROPOSED SETTLEMENT AND FEE REQUEST

opinion noted the problem when plaintiffs settle a large class action for an infinitesimal percentage of the claimed statutory damages:

> This looks like the sort of settlement that we condemned in *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832 (7th Cir. 1999), and *Crawford v. Equifax Payment Services*, 201 F.3d 877 (7th Cir. 2000), two appeals arising from the same litigation. … We treated the disproportion—$2,000 one class member, nothing for the rest—as proof that the class device had been used to obtain leverage for one person's benefit. [citations omitted] Here the proposed award is $3,000 to the representative while other class members are frozen out. The payment of $3,000 to Murray is three times the statutory maximum, while others don't get even the $100 that the Act specifies as the minimum. …
>
> Such a settlement is untenable. We don't mean by this that all class members must receive $100; risk that the class will lose should the suit go to judgment on the merits justifies a compromise that affords a lower award with certainty. [citation omitted] But if the reason other class members get relief worth about 1% of the minimum statutory award is that the suit has only a 1% chance of success, then how could Murray personally accept 300% of the statutory maximum? And, if the chance of success really is only 1%, shouldn't the suit be dismissed as frivolous and no one receive a penny? If, however, the chance of success is materially greater than 1%, as the proposed payment to Murray implies, then the failure to afford effectual relief to any other class member makes the deal look like a sellout.

*Murray v. GMAC*, 434 F.3d 948, 952 (7th Cir. 2006). The situation here is even worse than the one called "untenable" in *Murray*. There was one class representative in *Murray* who received $3,000, three times maximum possible statutory damages; here, there are three class representatives seeking a total of $37,500, 16.66 times maximum possible statutory damages.  In *Murray*, the 1.2 million unnamed class members were entitled to split a fund of $947,000, about 75 cents a class member; here, a class more than hundred times as large will end up with zero, or, at best, with an artificially constrained subset splitting a net $10 million, about eight cents a class member (and still only fourteen cents a class member if fees were reduced to zero).  And to top it all off, the Putative Class Attorneys are seeking attorneys' fees more than eighteen times as high as those in *Murray*.

Just last month, the Ninth Circuit again disavowed these types of disproportionate incentive awards in *Radcliffe*. Judge Gould, writing for the *Radcliffe* court, determined that incentive awards conditioned upon

endorsement of the settlement proposed were impermissible. But more than that, "the significant disparity between the incentive awards and the payments to the rest of the class members further exacerbated the conflict of interest caused by the conditional incentive awards." 2013 U.S. App. LEXIS 7932, at *16. "There is a serious question whether class representatives could be expected to fairly evaluate whether awards ranging from $26 to $750 is a fair settlement value when they would receive $5,000 incentive awards." *Id.* at *17. As the disparity here is starker, the question becomes proportionally more serious. In such situations there is a well-founded fear that named representatives will be "more concerned with maximizing [their own gain] than with judging the adequacy of the settlement as it applies to class members at large." *Id.* (*quoting Staton*, 327 F.3d at 977).[20]

Class counsel is settling for less than 0.1% of statutory damages. If the litigation has even so much as a 1% chance of success, the settlement for less than 0.1% is a massive undervaluation and undercompensation of the underlying rights of individual class members by an order of magnitude. But on the other hand, if the litigation has less than a 1% chance of success, equity and sound public policy requires the Court to refuse to incentivize the behavior of class counsel in bringing such a socially wasteful lawsuit where the "class device had been used to obtain leverage for one person's benefit." *Murray*, 434 F.3d at 952. Class certification is inappropriate under Rule 23(a)(4) when the class representative and class counsel bring a lawsuit to benefit not the class, but themselves. *In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011) (Easterbrook, J.).

Perhaps class counsel will argue that the underlying claims have some merit, but the real risk is that class certification would be denied. Indeed, class counsel's preliminary approval brief heavily trumpets the risk of class certification denial. Dkt. 280 at 5, 36-38. If so, waiving the class's rights on such unfavorable terms without giving the unnamed class members notice that they would be better off if they opt out and bring a small-claims case is a *per se* breach of fiduciary duty and demonstrates the need for class decertification under Rules 23(a)(4) and (g). This principal-agent problem is why Howard Erichson argues that class action settlements should not be permitted in the absence of demonstrating the ability to certify the class. Exh. 2.

---

[20] *Staton* had also repudiated disproportionate incentive awards.

**VII.    A showing of explicit collusion is not required to demonstrate settlement unfairness.**

This objection also does not argue that the settlement is a product of explicit collusion. However, demonstrating that a settlement lacks collusion does not thereby demonstrate that the settlement passes muster. Lack of collusion is *necessary* for settlement approval, but it is not *sufficient*. Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Bluetooth,* 654 F.3d at 947. An objector need not demonstrate collusion to demonstrate an unfair settlement, for all it takes to make a settlement unfair is a defendant's indifference to class counsel's self-dealing. *Staton,* 327 F.3d at 964. *Bluetooth's* distinction between collusion and impermissible self-dealing is at the heart of this objection: when the Rule 23(h) attorney award is too large, this is evidence of self-dealing whether collusion is established or not.

At the preliminary approval stage, counsel from a competing class action objected that the settlement relief here is inadequate. Dkt. 187. They may have a point: the principal-agent problem and incentive to self-deal is magnified when class counsel is not only concerned about litigation risk internal to their own case, but also worried that failure to accept an inferior settlement offer might result in a competing class action settling and pulling the rug out from under their own claims.[21] Kazman and Frank take no position on the adequacy question, but note that it is easy to determine whether the competing class counsel truly believes it is the victim of a reverse auction or whether it is simply unhappy about being frozen out of a settlement that accurately reflects the risks of the litigation.  Rather than allowing the defendant to pick which class action it will use to create a global settlement, the Court should conduct an auction of its own for the benefit of the class: allow competing bids from qualified firms about what they believe the litigation is actually worth, and how much of that they will pass along to the class, and make the Rule 23(g) determination based on the best bid. *See Wells Fargo* and *Oracle*, *supra*. If objecting class counsel is unwilling to assure that it can recover more than $10 million net for the class (which is all this class counsel proposes to provide to class members after its fee request and administration costs are deducted from the settlement fund), its assertions of a settlement

---

[21]  The problem of an explicit or implicit reverse auction is another reason that courts should be skeptical of class action settlements where the possibility of class certification is low but class counsel is handsomely compensated. *See* Section VI above.

on the cheap should be discounted.

**VIII.   This objection is brought in good faith.**

Theodore Frank, founder of the non-profit Center for Class Action Fairness is representing Kazman (and himself) *pro bono*. The Center's mission is to litigate on behalf of class members against unfair class-action procedures and settlements, and it has won millions of dollars for class members. *See, e.g.,* Ashby Jones, *A Litigator Fights Class-Action Suits*, Wall St. J. (Oct. 31, 2011); Allison Frankel, *Legal Activist Ted Frank Cries Conflict of Interest, Forces O'Melveny and Grant & Eisenhofer to Modify Apple Securities Class Action Deal*, American Lawyer Lit. Daily (Nov. 30, 2010) (successful objection resulting in a reversion of $2.5 million from *cy pres* to class members); *In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 U.S. Dist. LEXIS 83480, at *29 (W.D. Wash. Jun. 15, 2012) (noting that the Center's client "was relentless in his identification of the numerous ways in which the proposed settlements would have rewarded class counsel (and a *cy pres* charity) at the expense of class members" and "significantly influenced the court's decision to reject the first settlement and to insist on improvements to the second").

Because it has been the Center's experience that class action attorneys often employ *ad hominem* attacks in attempt to discredit objections, it is perhaps relevant to distinguish this objector's intentions from the agenda of those who are often styled "professional objectors." A "professional objector" is a specific legal term referring to for-profit attorneys who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees; thus, some courts presume that the objector's legal arguments are not made in good faith. Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403, 437 n.150 (2003). This is not the Center's *modus operandi*. Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: Class Action Litig. Report (Aug. 12, 2011) (distinguishing the Center from professional objectors). While Frank has brought several objections to unfair class action settlements on behalf of himself and other clients, the majority of which have been successful, he refuses to engage in *quid pro quo* settlements and does not extort attorneys; he has never withdrawn an objection in exchange for payment.

Nonetheless, to preempt any possibility of a false and unjustifiable accusation of objecting in bad faith and seeking to extort class counsel, Kazman and Frank are willing to stipulate to an injunction

prohibiting himself and his attorneys from accepting compensation in exchange for the settlement of this objection. *See* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (suggesting inalienability of objections as solution to objector blackmail problem).

## CONCLUSION

The settlement cannot be approved because the class certification does not meet Rule 23(a)(4) or 23(g)(4) standards. But if the settlement is approved, the attorney fee request is far too disproportionate to the class relief, and must be substantially reduced.

Dated: May 2, 2013                    Respectfully submitted,


                                      */s/ Theodore H. Frank*
                                      Theodore H. Frank (SBN 196332)
                                      **CENTER FOR CLASS ACTION FAIRNESS**
                                      1718 M Street NW
                                      No. 236
                                      Washington, DC 20036
                                      Email: tfrank@gmail.com
                                      Voice: (703) 203-3848


                                      *Attorney for Objectors Kazman and Frank*

**CERTIFICATE OF SERVICE**

   I hereby certify that on this day I electronically filed the foregoing Objection (and its attached declarations and exhibits) using the CM/ECF filing system thus effectuating service of such filing on all ECF registered attorneys in this case. I further certify that I caused these documents to be sent via first class mail to the following participants at the addresses listed below:

Robert S. Arns, Esq.
The Arns Law Firm
515 Folsom Street, 3rd Floor
San Francisco, CA 94104

Michael G. Rhodes, Esq.,
Cooley LLP
101 California Street, 5th Floor
 San Francisco, CA 94111

DATED this 2nd day of May, 2013.

                                        _/s/ Theodore H. Frank_

                                        Theodore H. Frank