**BRONSON & ASSOCIATES**
ATTORNEYS AND COUNSELORS AT LAW
**MARTHA BRONSON, ESQ. #133396**
672 WEST 11TH STREET, SUITE 330
TRACY, CA  95376
 209-830-0400 Fax: 209-832-5000
*Dedicated Website:  www.thelaw.bz*  E-Mail: mslawyer@thelaw.bz

Attorneys for  OBJECTORS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ANGEL FRALEY, ET AL.<br><br>                    Plaintiffs,<br><br>vs.<br><br>FACEBOOK, INC.,<br><br>                    Defendant(s). | CASE NO.:   CV 11-01726<br><br>OBJECTIONS TO SETTLEMENT, CERTIFICATION AND TO MOTION FOR FEES; NOTICE OF APPEARANCE AT HEARING;<br><br>DATE:     June 28, 2013<br>TIME:     10:00 a.m.<br>DEPT:     3<br><br>HONORABLE RICHARD SEEBORG |

Case:  No: 11-01726

## Table of Contents

Table of Authorities

I. INTRODUCTION ........................................................................................................... 3

II. THE OBJECTORS ARE CLASS MEMBERS ................................................................. 4

III. THE SETTLEMENT IS UNLAWFULLY SELF DEALING .............................................. 4

IV. THE SETTLEMENT DOES NOT PROVIDE ANY MEANINGFUL RELIEF .................. 8

    A. THE INJUNCTIVE RELIEF IS MEANINGLESS BECAUSE EVIDENCE PROVES THAT MEMBERS DO NOT READ THE RRS AND EVEN IF THEY DID, BY FACEBOOK'S OWN ADMISSION, IT IS INCOMPREHENSIBLE ........................................................ 9

    B. THE INJUNCTION PERMITS FACEBOOK TO MAKE CHANGES TO ITS RRS WITHIN THE FIRST TWO YEARS AND ABANDON ALL CHANGES IN TWO YEARS ............................ 9

V. THIS CASE IS NOT SUITABLE FOR CERTIFICATION ............................................. 10

    A. THE CLASS DEFINITION IS UNCONSTITUTIONALLY OVERBROAD ........................... 10

        *i. The Expansion of the Definition to Include People Displayed in Advertisements Before "Sponsored Stories" were Launched Is Unconstitutionally Overbroad* ............................................................. 11

        *ii. Class Definition Can Not Include Anyone Who Has Been Actually Injured, Emotional or Otherwise* ......................................................... 12

        *iii. 117 Million Class Members Makes Certification Improper* .................... 12

        *iv. Class Definition Can Not Include Anyone Who Consented* ................... 13

    B. THE RELEASE IS UNCONSTITUTIONALLY OVERBROAD ......................................... 13

VI. FINAL APPROVAL MUST BE REJECTED AS THE PARTIES HAVE NOT COMPLIED WITH RULE 23 ........................................................................................................... 14

VII THE MOTION FOR FEES AND AWARDS SHOULD BE DENIED ............................ 14

THE FEES ARE ASTRONOMICAL, UNREASONABLE AND SHOULD NOT BE ORDERED RECOVERABLE, PARTICULARLY IN LIGHT OF THE FACT THAT THEY CERTAINLY HAVE NOTHING TO SHOW FOR THEM. OBJECTORS RESERVE THE RIGHT TO PRESENT FURTHER OBJECTS AND ARGUE AT HEARING. ........................................................................................ 14

VIII CONCLUSION .......................................................................................................... 14

Exhibit 1 – List of Objectors

# Table of Authorities

## CASES

*Alsup v. Montgomery Ward & Co.*, 57 F.R.D. 89, 92-93 (N.D. Cal. 1972) — 12

Amchen Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997) — 5

*Blanco v. CEC Entm '1 Concepts, L.P.*, No. CV 07-0559 GPS(JWJx), 2008 WL 239658 (CD. Cal. Jan. 10, 2008) — 12

*Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 944 (9th Cir. 2011) — 9

Crawford v. Equfax Payment Services, Inc., 201 F.3d 877   (7th Cir. 2000) — 9

*Forman v. Data Transfer*, 164 F.R.D. 400 (ED. Pa. 1995) — 12

Grant v. Bethlehem Steel Corp., 823 F.2d 20, 23 (2d Cir. 1987) — 5

Hanlon v. Chrysler Corp, 150 F.3d 1011, 1021 (9th Cir. 1998) — 6

*In re TransUnion Corp. Privacy Lit.*, 211 F.R.D. 328, 342 (ND. 111. 2002) — 12

**Jackson v. County of Los Angeles (1997) 60 Cal.App.4th 171, 183.** — 14

Li v. A Perfect Franchise, Inc., No. 5:1 0-CV-O 1189 2011 U.S. Dist. LEXIS 114821 (ND. Cal. Oct. 5, 2011) — 10

London v. Wal-Mart, 340 F.3d 1246, 1255 (11th Cir. 2003) — 13

Masters V. Wilhemina Model Agency, Inc. , 473 F.3d 423 (2d Cir. 2007) — 7

Mirfasihi v. Fleet Mortg. Corp. , 356 F.3d 78 1 , 784 (7th Cir. 2004) — 7

Molski v. Gleich, 318 F.3d 937 — 6

Murray v. GMAC, 434 F.3d 948, 952 (7th Cir. 2006) — 4

*Shields v. First Nat'l Bank*, 56 F.R.D. 442 (D. Ariz. 1972) — 13

Silberblatt v.   MorganStanley, 2007 WL 4145403 (S.D.N.Y. Nov. 19, 2007) — 8

Synfuel Tech. v. DHL Thdus.,   Inc., 463 F.3d 646, 654 (7th Cir. 2006 — 7

Vasquez-Torres v. StubHub, Inc., Case No. CV 07-1328 FMC (FFMx), 2008 U.S. Dist. LEXUS 22503 (C.D. Cal. Mar. 4, 2008) ............................................................................................................. 13

*Wilcox v. Commerce Bank, 474 F.2d 336 (10th Cir. 1973)* ............................................................. 12

Wilson v. Am. Cablevision, 133 F.R.D. 57 (W.D. Mo. 1990) ......................................................... 12

Zinser v Accu/Ix Research Inst., Inc.. 253 F.3d 1180. 1186, amended by 273 F.3d 1266 (9th Cir. 2001) ............................................................................................................................................. 10

RULES

Fed. R. Civ. P. 23(b)(3) ................................................................................................................... 10

Fed. R. Civ. P. 23(h) ....................................................................................................................... 10

## I. INTRODUCTION

This is a putative class action lawsuit against Facebook regarding its use of members name and likeness in third party paid advertisements, without members valid consent, which Facebook calls "Sponsored Stories". They are FACEBOOK created advertisements paid by third parties for profit. The are triggered by a member clicking on various interactive buttons which triggers use of an algorithm which transform the users content into the FACEBOOK sponsored story advertisement which is placed in the members friends' facebook page, often without the member ever knowing it occurred. Members can NOT prevent the ads from showing up in their friends' news feed. However, with a few ambiguously worded paragraphs in Facebooks RRSs Facebook tells the member you can opt out but in reality you can only opt out of the Facebook Ads ( SAC ¶ 33-35) To be distinguished from the Sponsored Stories are the FACEBOOK ADS which are not sponsored, but ads created by FACEBOOK to promote its own services. This lawsuit does NOT include claims or releases regarding Facebook Ads (See Second Amended Complaint Docket ("D") #22, ¶29-36; see also Hearing Transcript Hearing D. #73, Page 45:6-9 …

> MR. ARNS: ….WHAT THIS GETS DOWN TO IS THAT FACEBOOK IS NOT TRANSPARENT ON THIS ISSUE OF SPONSORED STORIES. THAT'S WHY WE FOCUSED ON SPONSORED STORIES. WE ARE NOT DOING FACEBOOK ADS, WE'RE JUST DOING SPONSORED STORES….

Objectors find the proposed settlement is unconscionable. Objectors seek the court's oversight to deny final approval because it is plainly the product of self dealing rather than anything even close to a good faith settlement providing something of value to the millions of class members. Class Members are not being adequately represented as evidenced by the fact that the representatives and putative class counsel are willing to sell out class members in a deal they receive nothing of meaningful value on the one hand, and then force an unconstitutional, overly broad release of liability for claims that are not even part of this lawsuit, on the other hand. Objectors further object because this is not a case suitable for certification and violates the members due process rights. They object because the Putative Class Attorneys and Representatives have secreted documents from them, failed to be transparent, and have kept documents under seal through protective orders, interfering with class members rights to be informed. The fact that plaintiff's counsel has the right to seek up to $10 million (ten million) in fees and the class representatives $12,500 when none of them have out of pocket loss or any injury or damage, highlights the point that they are not acting in the best

interests of the class members. Under these circumstances the court should reject the settlement as unfair. Further the fact that they are willing to sell out the class members' right for nothing of meaningful value in exchange is an undeniable, inexcusable breach of fiduciary duty owed to class member objectors. Neither can they turn back the hands of time and pretend that they did not try and sell out class members' rights in the deal the court already rejected. This deal is no better and should be rejected for all the same reasons the first settlement was rejected. The revised settlement agreement is as offensive as the first and is evidence of a breach of duty to the class members just as the first agreement was.

## II. THE OBJECTORS ARE CLASS MEMBERS

As the declarations of the various objectors establish, each is believed to be a member of the class, each can be reached through their attorney of record, whose address is listed above, and each has an e-mail associated with their facebook account as follows shown on the redacted attachment, Exhibit 1.

In the event that this court approves the settlement, it is respectfully requested by each objector to be EXCLUDED from the settlement.

## III. THE SETTLEMENT IS UNLAWFULLY SELF DEALING

In Murray v. GMAC, 434 F.3d 948, 952 (7th Cir. 2006), the Seventh Circuit held that a similar settlement was

> untenabl[y]" beyond the pale of approval: This looks like the sort of settlement that we condemned in Blair v. Equafax Check Services, Inc., 181 F.3d 832 (7th Cir. 1999), and Crawford v. Equifax Payment Services, 201 F.3d 877 (7th Cir. 2000), two appeals arising from the same litigation. That suit had been settled for $2,000 to the named plaintiff, $5,500 to a legal-aid society that had not been injured by the defendant's conduct, and $78,000 in legal fees. We treated the disproportion—$2,000 one class member, nothing for the rest— as proof that the class device had been used to obtain leverage for one person's benefit. [citations omitted] Here the proposed award is $3,000 to the representative while other class members are frozen out. The payment of $3,000 to Murray is three times the statutory maximum, while others don't get even the $100 that the Act specifies as the minimum. ... Such a settlement is untenable. We don't mean by this that all class members must receive $100; risk that the class will lose should the suit go to judgment on the merits justifies a compromise that affords a lower award with certainty. [citation omitted] But if the reason other class members get relief worth about 1% of the minimum statutory award is that the suit has only a 1% chance of success, then how could Murray personally accept 300% of the statutory maximum? And, if the chance of success really is only 1%, shouldn't the suit be dismissed as frivolous and no one receive a

penny? If, however, the chance of success is materially greater than 1 % as the proposed payment to Murray implies, then the failure to afford effectual relief to any other class member makes the deal look like a sellout.

The FACEBOOK settlement is significantly more evil than the settlement criticized in Murray as "untenable." There was one class representative in *Murray* who received $3,000, three times maximum possible statutory damages; here, there are three putative class representatives seeking a total of $37,500 over misappropriation of their name and likeness without any out of pocket loss and without any alleged emotional or physical injury. The 1.2 million absent class members in *Murry*, supra, were entitled to split a fund of $947,000; here, many more class members are positioned to wind up with nothing. To add insult to injury, Putative Class Counsel are seeking attorneys fees nearly 10 times as high as those in *Murray*.

There are only two possibilities here. The Putative Class Attorneys have brought either (1) a meritorious case that is being settled for a minute fraction of the case's value in a "sell out" of the attorney's and representative's obligations and fiduciary duties to the class; or (2) a meritless case where the "class device had been used to obtain leverage for one person's benefit." *Murry* 434 F. 3d at 952. In either event, the Settling Parties' actions should be deterred, rather than rewarded; the court should not award attorney fees. If there is to be any observance of Rule 23(e)(2), this settlement must be rejected.

A "district court ha[s] a fiduciary responsibility to the silent class members." Grant v. Bethlehem Steel Corp., 823 F.2d 20, 23 (2d Cir. 1987). "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." Mirfasihi v. Fleet Mortgage Corp., 356 F.3d 781, 785 (7th Cir. 2004). Where a court is confronted with a settlement-only class certification, the court must look to factors "designed to protect absentees." Amchen Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997); "Settlements

that take place prior to formal class certificationrequire a higher standard of fairness." Molski v. Gleich, 318 F.3d 937 at 953 (quoting Dunleavy v. Nadler, 213 F.3d 454, 458 (9th Cir.2000)), 953 .

"These concerns warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement, or when the class received no monetary distribution but class counsel are amply rewarded." Hanlon v. Chrysler Corp, 150 F.3d 1011, 1021 (9th Cir. 1998)

The settlement proposed by Plaintiffs is substantially worse than other settlements rejected by the Seventh and Ninth Circuits under Rule 23(e). Compare this case with Murray, 434 F.3d at 952 ("untenable"); Mirfasihi, 356 F.3d 781; Crawford v. Equifax Payment Services, inc., 201 F.3d 877 (7th Cir. 2000) ("substantively troubling"); Moiski, 318 F.3d at 956 ("unfair, inadequate, and unreasonable"):

|  | Murry | Mirfsihi | Crawford | Molski | Bluetooth | Facebook |
|---|---|---|---|---|---|---|
| Absent Class Member | Up to $947,000 | $243,000 and $2.64 Million | Zero | Zero | Zero | Up to $10 or nothing if judge decides impractical |
| Plaintiff Represent. | $3,000 | $250 | $2,000 | $5,000 | $12,000 | $12,500 |
| Attorney Fees | $400,000 | $750,000 | $78,000 | 50,000 | $800,000 | $7.5 MILLION plus $300,000 costs |
| Status | Rejected on appeal; remanded | Reversed as abuse of discretion | Reversed as abuse of discretion | Reversed as abuse of Discretion | Reversed a as absue of discretion | ? |

VI    THE CHARITABLE AWARD CANNOT BE JUSTIFIED AS CY PRES, A BENEFIT TO THE CLASS OR AS A BASIS FOR ATTORNEY FEES

The left over charitable contribution which could be as high as $12.5 million dollars is not a *cy pres* award, because it does not benefit the class directly or indirectly. Mirfasihi v.

Fleet Mortg. Corp. , 356 F.3d 78 1 , 784 (7th Cir. 2004). But even if the charitable payment were characterized as a cy pres award, it should not be used to justify the fairness of the settlement or the award of attorneys' fees, In Masters V. Wilhemina Model Agency, Inc. , 473 F.3d 423 (2d Cir. 2007), the Second Circuit addressed the distribution of cypres awards, rejecting as an abuse of discretion the trial court's awarding a common fund to third parties. The Second Circuit suggests that *cypres* should be limited "to circumstances in which direct distribution to individual class members is not economically feasible, or where funds remain after class members are given a full opportunity to make a claim." Id. at 436. Here, class members are given an opportunity to recover up to $10.00 which itself does not reasonably represent the class members reasonable value of the case. However, the class is to receive nothing if the total claims made bring the pro rata distribution down to under $5.00. At the point, there is not telling what will happen because the settlement agreement leaves it to the judge to decide. The possibility of the class getting nothing is existent and likely. The lessons of the Class Action Fairness Act ("CAFA") do not apply "only to coupons." As CAFA itself states, Congress enacted the statute out of concern over abuses of the class action device that "harmed" class members, "such as where ... counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value." Pub.L. 109-2, § 2(a)(3)(A) (emphasis added); Synfuel Tech. v. DHL Thdus., Inc., 463 F.3d 646, 654 (7th Cir. 2006); Jeffrey S. Jacobson, Defining "Coupon" Under the Class Action Fairness Act, Product Liability Law 360, Jan. 15, 2008. This case, offering a settlement of zero value to the class, is squarely within the concern of CAFA. It is perfectly appropriate to omit noncash compensation to the class when considering the fairness of the settlement or the calculation of a reasonable fee. E.g., Silberblatt v. MorganStanley, 2007 WL 4145403 (S.D.N.Y. Nov. 19, 2007)

. There is not post-CAFA Ninth Circuit precedent on cy pres awards. Even under the pre-

CAFA precedent, the settling parties' initial submission to the court did not provide "evidence that proof of individual claims would be burdensome or that distribution of damages would be costly." Molski, 318 F.3d at 954-55. Cy pres awards are therefore inappropriate. Id. But even if the court permitted the late submission of such proof, the awards would still be inappropriate. Cypres awards to third parties are poor public policy, create conflicts of interest and unseemly political lobbying of judges by third-party charities, and are a means for plaintiffs' attorneys to exaggerate the benefit to the class. Theodore H. Frank, Cy Pres Settlements, Class Action Watch, March 2008 at , available at http://www.fed6 soc.org!publications/pubid.887/pubdetail.asp. As such, the determination ofwhether a settlement is fair, adequate, or reasonable settlement under Rules 23(e) and 23(h) should not include attorneys ' fees based on cy pres awards to third parties except when explicitly authorized by the legislature. Jd. While Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1 30 1 , 1 305 (9th Cir. 1990), approves of the use of cy pres, that case predates both CAFA and the Seventh Circuit precedent rejecting the use of such settlements. Six Mexican Workers should be understood as abrogated by CAFA. If the Court disagrees, then to the extent this court reads Ninth Circuit precedent as requiring a court to use a cypres award to a third party to justify the reasonableness of the settlement and of the attorneys' fees, even when the cy pres award does not benefit the class, there is a circuit split, as the Seventh Circuit has repeatedly explicitly held that cy pres awards are not to be construed as a benefit to the class. Murray v. GMA C, 434 F.3d at 952; Mirftisihi v. Fleet Mortg. Corp., 356 F.3d 781, 784 (7th Cir. 2004) ("There is no indirect benefit to the class from the defendant's giving the money to someone else."); Crawford v. Equfax Payment Services, Inc., 201 F.3d 877 (7th Cir. 2000). Objectors therefore raise the good-faith argument to preserve this issue for further appeal.

IV.   THE SETTLEMENT DOES NOT PROVIDE ANY MEANINGFUL RELIEF

Plaintiffs bear the burden of establishing that they are providing a meaning benefit to the class members. (*See Bluetooth Headset Products Liab. Litig., 654 F.3d 935, 944 (9th Cir. 2011)*)

### A. THE INJUNCTIVE RELIEF IS MEANINGLESS BECAUSE EVIDENCE PROVES THAT MEMBERS DO NOT READ THE RRS AND EVEN IF THEY DID, BY FACEBOOK'S OWN ADMISSION, IT IS INCOMPREHENSIBLE

The injunctive relief consists entirely of Facebook making some changes to its Terms of Use which are set forth in its Rights and Responsibilities ("RRS"), as well as and providing some educational information about Sponsored Stories. They have not provided any evidence to establish that these changes will ever be seen by any of the past, present or future members. Whereas, more than 13 million facebook users are known to have not "Touched Their Privacy Settings." (Bob Al-Greene, author "13 Million Facebook Users Haven't Touched Their Privacy Settings"). It is plaintiffs' burden of proof to provide evidence that these changes are meaningful. This they have not done. The court can not simply assume that the changes will be seen, particularly when evidence and common sense says they will not be seen. The only true way to be sure that members are aware of the hazards involved in Facebook Sponsored Ads, is to make them an Opt-In, just like they did when Beacon was launched and flopped due to an uproar from members who complained about privacy right violation.

The foregoing applies equally to the promise injunctive relief to add educational material.

Moreover, although the court expressed deep concerns about being left with the discretion to decide the disposition of funds if the claims brought the recovery to $5.00 or under, and the court told the parties he did not find it appropriate to be the one to decide, the Settling Attorneys left that discretionary provision in the agreement. Again, the revised agreement should be rejected.

### B. THE INJUNCTION PERMITS FACEBOOK TO MAKE CHANGES TO ITS RRS WITHIN THE FIRST TWO YEARS AND ABANDON ALL CHANGES IN TWO YEARS

In the Court's Order denying Approval of Settlement #224, the court requested the Settling Parties to describe with clarity what will be required of Facebook, with particular

attention to explaining the extent to which Facebook will retain discretion implementing features and revising the SRRs under the agreement." (D #224, Page 6:4-7) The record is not clear as to whether they actually provided that information to the court, but the fact that the court granted a preliminary approval of the agreement certainly suggests this was never addressed.

According to the RSA the following significant loopholes remains for Facebook to change its SRRs: " Nothing ..will inhibit, prevent, or limit Facebook from making …changes to its terms of use…" (D. # 235-1, Page 8, ¶2.1(e)).   "In addition to other changes Facebook reserves the right to make to section 10.1 of its Statement of Rights and Responsibilities, Facebook will revise section 10.1 …" (Id. (a))

Finally, Facebook has the right to remove all the changes its makes at the end of two years following final approval.  Since Plaintiffs have not met their burden to prove meaningfulness to the class, the settlement should be rejected.

V.   THIS CASE IS NOT SUITABLE FOR CERTIFICATION

The Putative Plaintiff bears the burden of meeting the requirements of' Rule 23. See Amchen Prods., Inc. v Windsor, 521 U.S. 591, 619-20 (1997); Manual for Complex Litigation (Fourth) § 21.632 (2012). The prerequisites for certifying a class are (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation, each of' which is NOT satisfied here, See Fed. R. Civ. P. 23(a). Plaintiffs bear the burden of establishing that all four requirements of' Rule 23(a) are met, as well as one requirement of Rule 23(h). Zinser v Accu/lx Research Inst., Inc.. 253 F.3d 1180. 1186, amended by 273 F.3d 1266 (9th Cir. 2001). Whether or not to certify a class is within the broad discretion of the Court. Li v. A Perfect Franchise, Inc., No. 5:1 0-CV-O 1189 2011 U.S. Dist. LEXIS 114821 (ND. Cal. Oct. 5, 2011) at *7()21 Id. Plaintiffs seek certification of a Class under Fed. R. Civ. P. 23(b)(3), but as will be shown below, this case is not suitable for certification, not to mention that the settlement agreement essentially sells out the class members for nothing of value in exchange.

A.   THE CLASS DEFINITION IS UNCONSTITUTIONALLY OVERBROAD

Second Amended Complaint ("SAC"), Docket ("D") Number ("#") 22, ¶95 defines the class as including all those in the U.S. who had an account registered as of 1/24/11 and had their name or likeness "associated with the account used in a Facebook Sponsored Stories

advertisement."[1]  Plaintiffs' Certification Motion (D# 233) expands the definition to include people who had their name or likeness displayed in a "Sponsored Story", at any time on or before entry of the Preliminary Order ( Id. Page 5, Section II)

### i. The Expansion of the Definition to Include People Displayed in Advertisements Before "Sponsored Stories" were Launched Is Unconstitutionally Overbroad

Historically, since at least 2004 Facebook has been using different types of advertising schemes, each carrying its own significant risk of liability for numerous public wrongs.  For example, in Lane v. Facebook, Facebook was sued for violating the right to privacy.  While the facts seem to also lend themselves to a suit for violation of the rights alleged in this lawsuit, no such allegations were made.  The lawsuit was settled with an injunctive order prohibiting Facebook from using the Beacon advertising[2]  Public reports reveal that Facebook never really completely stopped using Beacon.  Instead, Facebook moved onto to using another name "Facebook Connect" which  launched July, 2008.  According to Josh Catone of Sitepoint.com "Facebook Connect is a better Beacon." (http://www.sitepoint.com/facebook-connect-is-beacon-done-right last  visited: 5/2/13)

Then there is "Sponsored Stories" admittedly launched January 24, 2011 which some say it is "kind of bait and switch for the company to launch check-ins as a way to connect with friends on the go, then turn that action into an unavoidable advertising medium in only five months." ( Rob Pegoraro, (1/27/11)author "Facebook 'Sponsored Stories' Turn You Into The Ad.)

The problem created by having an unnecessarily overbroad definition of the class and with loose definitions about what the wrongful activities are, is easily seen in a case where, as here, the defendant is engaged in various different, but similar, advertising ventures/programs, each of which have their own risk of liability to the public.  It is particularly harmful to the absent

---

[1] "Sponsored Stories" is defined in the Revised Settlement Agreement (RSA) ¶1.29 and inexcusably  jumbles  "Facebook "Service" Ads (which this court has no jurisdiction over and which are not included in the settlement) with third party paid ads triggered by using certain  Facebook interactive sections  ( e.g. it states that the "term 'Sponsored Stories' or Sponsord Story' means content displayed by or on behalf of Facebook….Without limiting the generality of the foregoing definition, [they] are typically posts about or from a Facebook user or entity that a business, organization, or individual has paid to promote..typically include a display of …user's Facebook name…and/or profile picture…with a statement describing the user's interaction with the ***Facebook service*** , such as "John smith likes UNICEF,"John Smith played Farmville"(Emphasis).".  This definition is inherently contradictory because first it defines it as typically being an advertisement paid for by a third party, at then at the end refers to it being an advertisement which "describes the user's interaction with the Facebook service" such as Farmville.  Farmville is one of Facebook's money making games, and NOT included in the complaint while UNICEG and other third party paid  advertisements are.  This court does not have jurisdiction to resolve disputes related to Facebook's Advertisement.

[2] In the absence of a stipulated order an appropriate request for judicial notice will be filed before hearing.

class members because the release of liability language is even more overbroad than the definition of the class member. The Inclusion of people who had their name and likeness displayed in advertisements before January 24, 2011 expands the release language to potentially include releasing liability for advertisements related to Facebook's Beacon advertising, Facebook Connect related advertisements and various other Facebook advertising schemes, none of which are part of this case. Granted, there is a settlement in the Beacon debacle, however, and res judicata can be raised, it is nonetheless possible that Facebook still has exposure to liability for the type of action alleged in this case. It would be unconstitutional to release any liability other than that related to post Sponsored Stories launch on 1/24/11.

### ii. Class Definition Can Not Include Anyone Who Has Been Actually Injured, Emotional or Otherwise

Plaintiffs do not allege that they suffered any harm or damage. They do not even allege emotional, physical or actual loss. Therefore, they can not represent, much less include, anyone in the class definition, who has been harmed. Accordingly, the class, as defined, can not be certified and an order should enter denying final approval.

### iii. 117 Million Class Members Makes Certification Improper

The disparity between statutory damages and actual harm has prompted a great many courts to deny certification on superiority grounds. See, e.g., *Alsup v. Montgomery Ward & Co., 57 F.R.D. 89, 92-93 (N.D. Cal. 1972)* (denying certification of a class where plaintiff sought statutory damages of $20 million, but alleged no actual harm).[3]

Courts in this District refuse to certify classes where, as here, no actual harm or injury was alleged, yet defendants have disproportionate and exposure to ruinous statutory damages. In Vasquez-Torres v. StubHub, Inc., Case No. CV 07-1328 FMC (FFMx), 2008 U.S. Dist. LEXUS 22503 (C.D. Cal. Mar. 4, 2008). the court denied certification of a 2 million

---

[3] See also *Forman v. Data Transfer, 164 F.R.D. 400 (ED. Pa. 1995*) (denying certification because minimum recovery of $500 per violation under the Telephone Consumer Protection Act bore no relation to actual harm); Wilson v. Am. Cablevision, 133 F.R.D. 57 (W.D. Mo. 1990) (denying certification under the Cable Communications Act where plaintiffs sought $198 million but suffered no actual harm); *Blanco v. CEC Entm '1 Concepts, L.P., No. CV 07-0559 GPS(JWJx), 2008 WL 239658 (CD. Cal. Jan. 10, 2008)* (denying class certification where the statutory damages are grossly disproportionate to the harm, especially when defendant had rectified the problem); *Wilcox v. Commerce Bank, 474 F.2d 336 (10th Cir. 1973)* (upholding denial of TILA certification where 180,000 class members sought statutory damages but did not allege actual harm) *In re TransUnion Corp. Privacy Lit., 211 F.R.D. 328, 342 (ND. 111. 2002)* (denying class certification because the disproportionate damage award has little relation to the harm actually suffered by the class); *Shields v. First Nat'l Bank, 56 F.R.D. 442 (D. Ariz. 1972)* (denying class certification where 180,000 class members sought statutory damages but did not allege actual harm); London v. Wal-Mart, 340 F.3d 1246, 1255 (11th Cir. 2003) (doubting that superiority requirement is met where defendants' potential liability would be enormous and completely out of proportion to any harm suffered by the plaintiff)

member class that alleged no actual harm but sought statutory damages between $36 million and $2 billion.

Here, the Settling Attorneys argue the class is to big to pay the millions of putative class members the statutory fees they would otherwise be entitled, and to big to pay anything but pittance. For obvious reasons, they do not address the inherent conflict of interest which they put themselves in when they created one pot to take attorney's fees and costs from, with the rest being distributed to the class members. If the class members were narrowed down to include only those members which should be included ( see above), and if the attorneys were not allotting such an exorbitant amount to themselves, it is doubtful their position could be maintained. Putting that aside, Settling Parties conclude the court should nonetheless certify the class and approve up to ten (10) million dollars to the two attorneys, $37,500 to the representatives and nothing of meaning value to the class members. The appropriate disposition is to deny approval of the settlement so that class members' rights are not sold off to the Settling Attorneys and their clients.

      iv.    Class Definition Can Not Include Anyone Who Consented

Those who actually were aware of Facebook's back door advertising scheme with the Sponsored Stories and who actually agreed voluntarily to allowing their name and likeness to be used without being paid, must be excluded from the class as a matter of law. If they are not excluded then the court is put in a position of ordering Facebook to pay people who are not entitled to recover. By including people who are not entitled to recover, the distribution of the funds are reduced and by that reduction expose those who are entitled to be paid, to receive a lesser amount. Therefore, the final approval shold be denied.

    B. THE RELEASE IS UNCONSTITUTIONALLY OVERBROAD

In Putative Class Counsel's Motion for Preliminary Approval, D.# 233, ¶ 7, Page 9:6-8, counsel represents (or misrepresents appears more accurate) that "The release claims as defined, will include all claims raised or which could have been raised in the Complaint based on the factual allegations." Aside from the fact that releasing liability for over 117 million people for claims not brought but could have been brought in exchange for nothing, is a violation of due process and unconscionable, the actual release goes even further than that and includes cutting off a class member's right to make a claim if it turns out Facebook's

representations, upon which the settlement is based, are false. Accordingly, if it turns out Facebook made $10 billion on the unlawful ads instead of the $233 million it represented, and upon which this settlement was made, there is no recourse. (RSA , ¶5.2)

**VI.** FINAL APPROVAL MUST BE REJECTED AS THE PARTIES HAVE NOT COMPLIED WITH RULE 23

For all the reasons stated in Facebook's opposition to motion to certify filed one year ago today, D. #141, Pages 8 through 29 inclusive, which Objectors incorporate by reference herein as though fully set forth, the Settling Parties have failed to meet their burden of proving, with admissible evidence, all of the elements necessary for compliance with Rule 23. Objectors further incorporate by reference as though fully set forth in, the memorandum of authorities filed in support of motion to intervene ( D. #224) and adopt them as their own for purposes of this action only.

Further, Objectors assert that both the Settling Attorneys and their clients are each bound by the stances taken in their pleadings in support of and in opposition the motion to certify the class. To the extent that the Settling Attorneys and/or their clients have taken an inconsistent stance from that plead in relation to the motion to certify, Objectors contend that the law of judicial estoppel, precludes any such inconsistency.

The purpose of the doctrine has been stated in multiple, but substantially similar, forms: to "protect the integrity of the judicial process," *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 183.) to "protect against a litigant playing fast and loose with the courts"; and to implement "general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings," *Prilliman v. United Air Lines, Inc* 1997) 53 Cal. App. 4th 935.

**VII** THE MOTION FOR FEES AND AWARDS SHOULD BE DENIED

The fees are astronomical, unreasonable and should not be ordered recoverable, particularly in light of the fact that they certainly have nothing to show for them. Objectors reserve the right to present further objects and argue at hearing.

**VIII** CONCLUSION

Based upon the foregoin Objectors respectfully request the court reject the settlement agreement and in any event, enter an order excluding each of the objectors from the subject settlement to allow them to pursue their rights.

Dated: Thursday, May 02, 2013

**BRONSON & ASSOCIATES**

1. **By: MARTHA BRONSON /s/**
   MARTHA BRONSON, ESQ.
2.
3.
4.
5.
6.
7.
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.

LIST OF NAMES OF OBJECTORS
e-mail addresses redacted and to be provided direct to counsel

1. Matina Battaglia
2. John Garza
3. Charrise Holder
4. Jeffrey Fagen
5. Leanne Louis
6. Jessica Martin
7. Peter Martin
8. Patty Ward