ROBERT S. ARNS (#65071, rsa@arnslaw.com)
JONATHAN E. DAVIS (#191346, jed@arnslaw.com)
STEVEN R. WEINMANN (#190956, srw@arnslaw.com)
**THE ARNS LAW FIRM**
515 Folsom Street, 3rd Floor
San Francisco, CA 94105
Tel:    (415) 495-7800
Fax:    (415) 495-7888

JONATHAN M. JAFFE (# 267012, jmj@jaffe-law.com)
**JONATHAN JAFFE LAW**
3055 Hillegass Avenue
Berkeley, CA 94705
Tel:    (510) 725-4293
Fax:    (510) 868-3393

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL FRALEY; PAUL WANG; SUSAN MAINZER; JAMES H. DUVAL, a minor, by and through JAMES DUVAL, as Guardian ad Litem; and W. T., a minor, by and through RUSSELL TAIT, as Guardian ad Litem; individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>            v.<br><br>FACEBOOK, INC., a corporation; and DOES 1-100,<br><br>                    Defendants. | Case No. CV 11-01726 RS<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date:   June 28, 2013<br>Time:  10:00 a.m.<br>Courtroom:  3<br>Judge:  Hon. Richard Seeborg |

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................i

NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION
         SETTLEMENT.....................................................................................1

STATEMENT OF ISSUES ......................................................................................2

MEMORANDUM ..................................................................................................2

I.      INTRODUCTION ....................................................................................2

II.     TERMS OF THE PROPOSED SETTLEMENT ..........................................6

   A.   The Proposed Settlement Class...............................................................6

   B.   Injunctive Relief.....................................................................................6

   C.   Payments to the Class / Claims Process...................................................7

   D.   Changes to the SRRs and Information on Facebook's Website and Help Pages .............7

   E.   Notice and Control: New Tool for Limiting Appearances in Sponsored Stories ............8

   F.   New Information and Tool for Opting Out Minors .....................................8

   G.   Plaintiffs' Litigation Costs and Fees.......................................................9

   H.   Service Payments to Class Representatives ..............................................9

   I.   Release By Settlement Class Members.....................................................10

   J.   Notice .................................................................................................10

III.    STATEMENT OF FACTS AND PROCEDURAL HISTORY.......................10

   A.   Facts Concerning Defendant Facebook, Inc. ...........................................10

   B.   Facts Concerning The Class Representatives ...........................................12

   C.   Discovery ...........................................................................................13

   D.   Settlement Negotiations ........................................................................14

   E.   Procedural History ...............................................................................14

IV.     THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT......15

   A.   The Settlement Meets All Requirements For Final Approval .......................15

   B.   The Strength of Plaintiffs' Case.............................................................17

   C.   Risk, expense, complexity, and likely duration of further litigation ..............17

   D.   Valuation of Statutory Damages for Purposes of Settlement .......................19

   E.   The Total Amount Achieved by Plaintiffs In Settlement Supports a Finding That it is
        Fair and Reasonable..............................................................................19

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT            CASE NO. CV 11-01726 RS

F.  Calculation of Additional Revenue / Class Member's Damages for Misappropriation of Right of Publicity In Valuing Past Damages ................................................. 20

G.  This Case Presents Circumstances Appropriate for Cy Pres Distribution for Unclaimed Sums ................................................................................................................... 22

H.  The proposed *cy pres* recipients are appropriate under the Ninth Circuit's standards ... 25

I.  The Court Should Place A Value On The Injunctive Relief ............................................. 25

J.  Methods of Valuation of the Injunctive Relief ................................................................ 27

K.  The Service Awards to the Class Representatives are Reasonable .................................. 28

L.  The Response of the Class ............................................................................................... 29

M.  The Experience and Views of Counsel ........................................................................... 30

V.  THE CLASS WAS GIVEN ADEQUATE NOTICE ...................................................... 31

VI.  THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES AND PLAINTIFFS' COUNSEL APPOINTED AS CLASS COUNSEL ........................................................................................................ 31

A.  Numerosity is Satisified ................................................................................................. 32

B.  The Claims are Typical and There is Commonality Under Rule 23(a) ........................... 32

C.  Adequacy of Representation. .......................................................................................... 34

D.  A Class Action is the Superior Means of Adjudication .................................................. 35

E.  Nationwide Certification And Application of California Law ........................................ 36

F.  Appointment of Class Counsel Under Rule 23(g) .......................................................... 37

VII.  CONCLUSION ............................................................................................................... 38

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

## TABLE OF AUTHORITIES

**Constitutions**

U.S. Const. art. III ....................................................................................................... 5, 15

**State Cases**

*Diamond Multimedia Systems, Inc. v. Superior Court*, 19 Cal. 4th 1036 (1999)..................... 37

*Wash. Mutual Bank, FA v. Super. Court*, 24 Cal. 4th 906 (2001) ............................................ 37

*Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224 (2001)............................................... 37

**Federal Cases**

*Alvarado v. Nederend*, No. 1:08-cv-01099, 2011 U.S. Dist. LEXIS 2326
   (E.D. Cal. Jan. 11, 2011) ....................................................................................................... 17

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................................31, 34

*Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708 (9th Cir. 2010) ........................................ 36

*BMW of N. America v. Gore*, 517 U.S. 559, 116 S.Ct. 1589 (1996) ........................................ 19

*Boyle v. Giral*, 820 A.2d 561 (D.C. 2003) .............................................................................. 23

*Catala v. Resurgent Capital Services L.P.*, No. 08CV2401 2010 U.S. Dist. LEXIS 63501
   (S.D. Cal. June 22, 2010) ....................................................................................................... 23

*Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524 (N.D. Cal. 2004) ......................................... 36

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004)..................................16, 31

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ........................................... 15

*Fraley v. Facebook*, 830 F.Supp.2d 785, 809-811 (N. D. Cal. 2011)....................................... 19

*Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147 (1982) ....................................................... 32

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)..........................................32, 33, 34

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) .................................................. 32

*In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011) .............. 26

*In re Currency Fee Antitrust Litigation*, 263 F.R.D. 110 (S.D.N.Y. 2009) ............................. 26

*In re Gypsum Antitrust Cases*, 565 F.2d 1123 (9th Cir. 1977)................................................. 31

*In re Heartland Payment Sys., Inc.*, No. 09-2046 2012 U.S. Dist. LEXIS 37326
   (S.D. Tex. March 20, 2012)..................................................................................................... 24

*In re Heritage Bond Litig.*, No. 02-ML-1475, 2005 U.S. Dist. LEXIS 13627
   (C.D. Cal. June 10, 2005) ....................................................................................................... 16

*In re Holocaust Victim Assets Litig.*, 424 F.3d 132 (2d Cir. 2005) ........................................... 23

*In re Lucent Techs., Inc., Sec. Litig.*, 307 F. Supp. 2d 633 (D.N.J. 2004) ............................... 29

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000)............................................... 16

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000)........................... 24

*In re Pacific Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995) ................................................... 30

*In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24 (1st Cir. 2009) .................. 23

*In re Sumitomo Copper Litig.*, 189 F.R.D. 274 (S.D.N.Y. 1999).............................................. 30

*Lane v. Facebook*, No. 08cv-3845 RS 2009 WL 2076916 (N.D. Cal. May 24, 2010),

   *aff'd*, 2012 US App. LEXIS 19767 (9th Cir. Sept. 20, 2012) ................................................ 24

*Leuthold v. Destination Am. Inc.*, 224 F.R.D. 462 (N.D. Cal. 2004)........................................ 36

*Li v. A Perfect Franchise, Inc.*, No. 5:10-CV-01189 2011 U.S. Dist. LEXIS 114821

   (N.D. Cal. Oct. 5, 2011) ........................................................................................................... 32

*Marr v. E. State Hosp.*, 2002 U.S. Dist. LEXIS 28460 (E.D. Wash. Apr. 29, 2002)............... 35

*McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448 (D.N.J. 2008)............................................... 26

*McNary v. Am. Sav. and Loan Ass'n*, 76 F.R.D. 644 (N.D. Tex. 1977) ................................... 30

*Nachshin v. A.O.L., LLC*, 663 F.3d 1034 (9th Cir.2011) .......................................................... 25

*Nat'l Rural Telecomms. Coop. v. DirectTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004) 17, 20, 29, 30

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*,

   2009 U.S. Dist. LEXIS 68419 (D. Mass. Aug. 3, 2009)........................................................ 26

*Officers for Justice v. Civil Serv. Comm'n of S. F.*, 688 F.2d 615 (9th Cir. 1982)................... 16

*Parkinson v. Hyundai Motor Am., Inc.*, 258 F.R.D. 580 (C.D. Cal. 2008) .............................. 33

*Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990).............23, 25

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ................................................................. 29

*Thomas v. Baca*, 231 F.R.D. 397 (C.D. Cal. 2005) ................................................................. 34

*United States v. Truckee-Carson Irrigation Dist.*, 71 F.R.D. 10 (D. Nev. 1975)...................... 31

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996)............................................. 35

*Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943 (9th Cir. 1976) .............................................. 15

*Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935 (9th Cir. 2009) ................................. 34

*Vizcaino v. Microsoft Corp.,* 142 F. Supp. 2d 1299 (W.D. Wash. 2001) ................................ 26

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)........................................................... 33

*White v. Experian Information Solutions*, 2011 U.S. Dist LEXIS 79044

   (C.D. Cal. July 15, 2011) ........................................................................................................ 26

*Wilson v. Airborne, Inc.*, No. EDCV 07-770-VAP (OPx), 2008 U.S. Dist. LEXIS 110411,
 2008 WL 3854963 (C.D. Cal. Aug. 13, 2008) ...................................................... 29

*Wolin v. Jaguar Land Rover N. Am.*, 617 F.3d 1168 (9th Cir. 2010) ....................................... 33

*Wolph v. Acer Am. Corp.*, 272 F.R.D. 477 (N.D. Cal. 2011) ...................................................... 35

*Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, amended by 273 F.3d 1266
 (9th Cir. 2001) .................................................................................................32, 34

**Statutes**

Cal. Civ. Code § 3344 ............................................................................................ passim

Children's Online Privacy Protection Act, 15 U.S.C. § 6502 .................................................. 18

Class Action Fairness Act, 28 U.S.C. § 1715 ................................................................... 31

Communications Decency Act, 47 U.S.C. § 230 ..........................................................5, 14, 18

Unfair Competition Law, Bus. & Prof. Code § 17200 et seq. .......................................... passim

**Rules**

Fed. R. Civ. P. 23 ................................................................................................. 31

Fed. R. Civ. P. 23(a) ........................................................................................... passim

Fed. R. Civ. P. 23(b) ........................................................................................... passim

Fed. R. Civ. P. 23(c) .......................................................................................1, 2, 31

Fed. R. Civ. P. 23(e) ............................................................................................. 31

Fed. R. Civ. P. 23(g) ............................................................................................. 37

**Treatises**

Charles Alan Wright, et al., 7A Federal Practice and Procedure § 1778
 (3d ed. 2005) ........................................................................................................ 34

Manual for Complex Litigation (Fourth) § 21.632 (2012) ............................................... 31

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT          Case No. CV 11-01726 RS

**NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on June 28, 2013, at 10:00 a.m., or as soon thereafter as counsel may be heard, Plaintiffs and proposed Class representatives Susan Mainzer, James H. Duval, and W.T. ("Plaintiffs") shall bring on for hearing before the Honorable Richard Seeborg, United States District Judge, in the United States District Courthouse, Northern District of California, San Francisco Division, Courtroom 3, 450 Golden Gate Avenue, San Francisco, CA, 94102, their Motion for Final Approval of Class Action Settlement. The Motion seeks an Order: (1) Granting Final Approval of the proposed Settlement with Defendant Facebook, Inc.; (2) certifying the Settlement Class (as defined below) because the Settlement Class satisfies the requirements of Rules 23(a), (b), and (c) of the Federal Rules of Civil Procedure; (3) appointing Plaintiffs as Class Representative and their counsel as Class Counsel; (4) Entering the Stipulated Injunction as to the changes to Defendant's website; and (5) dismissing with prejudice all claims by the Settlement Class that were asserted in this action.

This Motion is based on this Notice of Motion and the attached Memorandum of Law; the concurrently filed Declarations of Robert S. Arns, Kevin M. Osborne, Steven R. Weinmann, Jonathan M. Jaffe and Jennifer M. Keough; the previously filed Joint Motion for Preliminary Approval of Class Action Settlement and supporting declarations and documents; the previously filed Motion for Class Certification, Appointment of Class Counsel and Appointment of Class Representatives Pursuant to Joint Motion for Preliminary Approval and supporting declarations and documents; Plaintiffs' original Motion for Class Certification and supporting declarations and documents; the previously filed Motion for Attorneys' Fee and Costs and supporting declarations and documents; the concurrently filed Response To Objections To Settlement And Fee Motion;  as well as the pleadings, Orders, transcripts and other papers on file in this action; and any further evidence and arguments as may be presented at the hearing of this matter.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

### STATEMENT OF ISSUES

1. Whether the Court should grant final approval of the proposed Settlement with Defendant Facebook, Inc., finding that the proposed Settlement is fair, reasonable, and in the best interests of the proposed Settlement Class.

2. Whether the Court should certify the Settlement Class (as defined below) because the Settlement Class satisfies the requirements of Rules 23(a), (b), and (c) of the Federal Rules of Civil Procedure;

3. Whether the Court should appoint Plaintiffs as Class Representative and their counsel as Class Counsel;

4. Whether the Court should enter the Stipulated Injunction as to the changes to Defendant's website; and

5. Whether the Court should dismiss with prejudice all claims by the Settlement Class that were asserted in this action.

### MEMORANDUM

## I.    INTRODUCTION

Plaintiffs Susan Mainzer, James H. Duval and W.T. bring this Motion for Final Approval of Class Action Settlement. Plaintiffs' claim, and the settlement, is about giving Facebook users notice and control, and about Facebook getting informed consent from users appearing in ads. The proposed settlement accomplishes this. The Settlement brings significant injunctive relief to more than 150 million Facebook users in the United States so that users will finally know when they are appearing in advertisements, can give their informed consent to appear in those advertisements, and can discontinue such appearances if they so wish.

In addition to injunctive relief, every Class member who so wished and filed a claim will receive a cash payment that fully compensates them for the actual harm suffered. The Claims process has resulted in over 614,000 claims being made by Class members.[1] Thus, over $6.1 million out of the $20 million settlement fund will be distributed, $10 for each validly

---

[1] Declaration of Jennifer M. Keough Regarding Settlement Administration, ¶14. Note all subsequent references to declarations in support of the present motion will be stated as "[last name of declarant] Decl."

-2-

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

filed claim. Now that the claims period has closed, it is feasible to determine the final numbers for funding to the class. We are pleased that the Garden City Group expenditures are less than expected; it is anticipated that they will be about $900,000, which is $1.5 million less than expected. There are thus more than anticipated funds available to go to the class.

After deducting the requested attorneys' fees of up to $7.5 million, $280,000 in costs of litigation, and $900,000 for claims administration, and the $37,500 in requested service awards from the $20 million gross settlement fund, the net settlement fund will now have $11.2 million for the class and cy pres. If the monies distributed to each class member were increased from $10 to $15, then $9.2 million would go to the class. This $15 payment to the class would leave approximately $2 million for cy pres. Based on these figures, Plaintiffs believe that an increased payment of $15, rather than $10, can and should now be made to the claiming Class Members if the Court believes that would be beneficial to the Class. Pursuant to the Amended Settlement Agreement ("A.S.A."),[2] Plaintiffs therefore request that the Court increase the amounts going to each Class Member to $15, and direct the balance of the $20 million fund after attorneys' fees and costs, incentive awards, and settlement administration and notice costs, to the *cy pres* recipients the Parties have designated. These have been and are engaged in activities that will benefit the entire Class as well as the public at large, as they will advocate for issues such as the right of protection of the Class members' right of privacy on the internet. The *cy pres* recipients also include entities that are dedicated to the protection of the rights and welfare of minor children as they are affected by social media in an online context.

As previously described in Plaintiffs' Memorandum in Support of the Joint Motion for Preliminary Approval of Class Action Settlement ("Prelim Approval Memorandum"), this action arose because Facebook instituted a novel advertising service – which Facebook refused to call "advertising" (see footnote 5, *infra*) – that misappropriated the names and likenesses of Facebook users, sought no consent to do so, gave users no notice they were being used in the ads, and provided no way to prevent the misappropriation. The proposed injunctive relief will

---

[2] Plaintiffs attached the A.S.A. as Exhibit 1 to the Declaration of Robert S. Arns in Support of Joint Motion for Preliminary Approval ("Arns P.A. Decl."). However, because of frequent discussion, it will be cited throughout this document as "A.S.A."

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

provide significant benefits to the Class Members as well as future Facebook members. It seeks user consent to be in Sponsored Stories; it provides real notice and control mechanisms for all Class members and special notice and control mechanisms tailored exclusively for minors and their parents; and it makes available important information necessary for users to make informed decisions about being in Sponsored Stories. A.S.A § 2.1. The settlement also provides for Plaintiffs' counsel the opportunity to review Facebook's website regarding advertising and ensure that Sponsored Stories are clearly identified as ads, with the right to move the Court to call for an independent audit (for which Facebook will pay) if necessary. A.S.A. § 2.1.

With regard to minors, the notice and controls are particularly significant. In conjunction with additional information and links on the website encouraging minors and their parents to establish verified online relationships, Facebook will make available an "opt-out" function for the parents of minors, providing an easily accessible tool from which parents, through their own Facebook account, can prevent the names and likeness of their minor child from appearing in Sponsored Stories. A.S.A. §§ 2.1(c)(ii), 2.1(c)(iii). Facebook will also add a control in minor users' profiles that enables the minor user to indicate that his or her parents are not Facebook members. A.S.A § 2.1(c)(iii). Where a minor has indicated that his or her parents are not Facebook members, he or she will be ineligible to appear in any Sponsored Stories until the minor reaches the age of 18, changes his or her setting to indicate his or her parent is on Facebook, or establishes a confirmed parental relationship. A.S.A § 2.1(c)(iii). Facebook users under 18 years of age will be encouraged – rather than dissuaded – from doing the right thing and not lying about their age: they will be asked to represent that they have received parental consent to appear in Sponsored Stories.

Plaintiffs in the Prelim Approval Memorandum offered three alternative methods for assigning a dollar value to the injunctive relief, namely the features of informed consent and control created by the relief. The first was a valuation based on the financial concept of "real options." This model contended the tools created by the injunctive relief gives users control of their endorsements, which have value ranging from $57.4 million to $145.1 million. An alternative method utilized the previously established fair market value of the Class members'

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT          CASE NO. CV 11-01726 RS

endorsements.  Under this model, users' newly created right to control their endorsements was valued at $74 million over the next 17 months.  Lastly, Plaintiffs contend that other services for tracking use of one's personal data established a value of a minimum of $1 for each of the Class members, or $150 million.[3]

In their Prelim Approval Memorandum, Plaintiffs provided a detailed explanation of how the amount of actual damages suffered by the Class members from appearing in Sponsored Stories was calculated. See Plaintiffs' Motion for Preliminary Approval (ECF No. 280), at 19-25. In summary, the past "actual damages" to Class members can be estimated with a reasonable amount of scientific certainty by utilizing the actual valuation of Class members' appearances in the ads. The actual valuation is the additional value paid by advertisers for Sponsored Stories over what they would pay for similar ads without friend-endorsements. Plaintiffs' experts performed the necessary groundwork for calculating such actual damages on the motion for class certification. *See* section IV(F), *infra*. Plaintiffs (and Facebook in its separately filed brief) also set out in more detail the risks of continued litigation, including the likelihood of success and risks if Plaintiffs were to continue to litigate and seek the statutory penalties available to them under California Civil Code section 3344.  Among other defenses, Facebook in its Motion to Dismiss raised issues of (a) lack of injury and thus standing under Article III of the Constitution and also (b) under the Unfair Competition Law (Business & Professions Code § 17200 et seq.) (c) an exemption for "newsworthy" items under Cal. Civil Code § 3344(d), and (d) preemption under the Communications Decency Act, 47 U.S.C. § 230 ("CDA").  While Plaintiffs prevailed against these defenses on the Motion to Dismiss, they were nonetheless available to Facebook had the case gone to trial or appeal without Settlement approval.

The reaction of the Class to the Settlement has been overwhelmingly positive; over 630,000 persons have made claims.  Further, there have been only 104 objections (83 short e-mails, 16 letters and 11 briefs). *See* ECF No. 335. Of these, the principal objections are 1) the

---

[3] Plaintiffs' Response to Objections Brief at pages 25-30 explains why even the sole objection containing any attempt at analysis of the economic valuation of injunctive relief, the Kazman/Frank objection, is riddled with inaccuracies and unfounded assumptions of fact.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

relief does not include a default opt-out or mandatory parental approval for minors; 2) minors cannot consent to the settlement; 3) the monetary amount offered to the Class is inadequate in light of the potential statutory damages; 4) the injunction has no value because it simply forces Facebook to follow the law; 5) there are additional remedies available under the laws of other States; 6) the release is too broad, and 7) that counsel's fee request and the incentive awards are too high compared to the relief and /or the result of collusion with Facebook.  Plaintiffs will respond to each assertion in the accompanying Plaintiffs' Response To Objections To Settlement And Fee Motion. Here Plaintiffs note, however, none of the objections have merit.

The Court should approve the proposed Settlement.

## II.   TERMS OF THE PROPOSED SETTLEMENT

The terms of the Settlement are as follows:

### A.   The Proposed Settlement Class

Plaintiffs request that, pursuant to the terms of the Settlement, the Court certify the following proposed Settlement Class:

> **(a) Class:**  All persons in the United States who have or have had a Facebook account at any time and had their names, nicknames, pseudonyms, profile pictures, photographs, likenesses, or identities displayed in a Sponsored Story, at any time on or before the date of entry of the Preliminary Approval Order.
>
> **(b) Minor Subclass:**  All persons in the Class who additionally have or have had a Facebook account at any time and had their names, nicknames, pseudonyms, profile pictures, photographs, likenesses, or identities displayed in a Sponsored Story, while under eighteen (18) years of age, or under any other applicable age of majority, at any time on or before the date of entry of the Preliminary Approval Order.

A.S.A §§1.6, 1.17.

### B.   Injunctive Relief

The Parties have agreed to a stipulated injunction that will provide the relief described below addressing and clarifying the issues of consent, notice and control of the use of the Class members' names and likenesses.  Previously, it was in Plaintiffs' view impossible even for a person who carefully pored over Facebook's SRRs and Help Pages to discern exactly what a "Sponsored Story" was, except that it was plain that Facebook distinguished them from "ads,"

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

stating expressly that they are "different from ads." Ex. 34. [4]  In fact, Facebook took the legal

position that Sponsored Stories are not advertisements at all. [5]

### C.  Payments to the Class / Claims Process

Class Members were able to submit a claim for payment from the Net Settlement Fund,

which will be the amount of the Common Fund after attorneys' fees and costs, service awards,

and settlement administration costs are deducted. (A.S.A. §4.1(a).) Class Members who

submitted timely and valid Claims Forms ("Authorized Claimants," A.S.A.§1.1) will receive

payments, either by check or through an Automated Clearing House transfer. The excess after

the claims and costs are paid will be distributed to *cy pres* recipients proposed by the Parties

and approved by the Court (the "*Cy Pres* Recipients," A.S.A. § 1.8), or the Court may issue an

order, at its discretion, increasing each Authorized Claimant's share on a pro-rata basis.  As

noted above, Plaintiffs request that the Court exercise its discretion to thus increase the

distributions to $15 each, leaving approximately $1.8 million still to go to *cy pres*.

### D.  Changes to the SRRs and Information on Facebook's Website and Help Pages

The changes to the SRRs and Help Pages will seek permission for Facebook to place

users' names and likeness in the advertisements, and finally identify Sponsored Stories as

advertisements.  As current users learn of these changes, they will implement the new controls,

described below, to stop or limit their appearances in Sponsored Stories, should they so chose.

Within a reasonable time, not to exceed six months following the Final Settlement Date

(provided the Settlement is approved and the Judgment is final, A.S.A. §1.13), Facebook will

modify Section 10.1 of the SRRs in part to read as follows to clearly seek permission to use

names and likenesses:

> **You give us permission** to use your name, profile picture, content, and
> information in connection with commercial, sponsored, or related content (such

---

[4]  All references designated only with "Ex." and a number are citations to exhibits to the Declaration of Jonathan E. Davis filed in support of the Joint Motion for Preliminary Approval (ECF Nos. 283-285).

[5]  Facebook in response to Request For Admission, No. 6 [1.6], Set 1 Facebook denied "that Sponsored Stories are advertisements for members.") Ex. 22. Jim Squires of Facebook testified: "Yes, Sponsored Stories are not ads. I'm not sure what the distinction is to members, advertisers, or anybody else. Sponsored Stories are not advertisements period."  Ex. 23, p. 33.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

as a brand you like) served or enhanced by us. This means, for example, **that you permit a business or other entity to pay us to display your name and/or profile picture with your content or information**. If you have selected a specific audience for your content or information, we will respect your choice when we use it.

If you are under the age of eighteen (18), or under any other applicable age of majority, you represent that at least one of your parents or legal guardians has also agreed to the terms of this section (and the use of your name, profile picture, content, and information) on your behalf.

A.S.A. § 2.1(a)(emphasis added).[6]

### E.  Notice and Control: New Tool for Limiting Appearances in Sponsored Stories

The Settlement provides notice and controls through the addition of new tools or mechanisms for meaningfully limiting appearances in Sponsored Stories, something that does not currently exist. A.S.A. 2.1(b).  First, Facebook will create a tool whereby users can easily see what actions they have taken that have caused them to be in Sponsored Stories, and what those Sponsored Stories are.  Next, Facebook will add a new feature to the site that will allow users to control which actions and content they will allow to appear in Sponsored Stories. *Id*. Finally, these settings will allow users to prevent new appearances in ads from that advertiser, or from entire categories of interactions and content from appearing in Sponsored Stories. *Id.*

### F.  New Information and Tool for Opting Out Minors

Under the terms of the injunctive relief, parents of minor users will be able to visit a public link on the Facebook website and utilize a tool which will enable the parent to prevent the name and likeness of their child from appearing in Sponsored Stories.[7]  A.S.A. § 2.1(c)(iii). Further, if the minor's parent is also a Facebook user, the minor and the parent can use Facebook to indicate that relationship. A.S.A. § 2.1(c)(ii).  In fact, Facebook will encourage user to do so.  *Id.*  Under the terms of the A.S.A., when the parent and minor have confirmed a

---

[6] See Weinmann Decl., ¶¶ 14 and 15 for a comparison of the old and proposed new SRRs.

[7] Currently, this tool only allows parents to prevent the names and likenesses of their children from appearing alongside "Facebook Ads." Facebook Ads are completely distinct from Sponsored Stories, and are not a part of Plaintiffs' claims. The injunctive relief negotiated by the parties will extend this tool to enable parents to prevent the name and likeness of their children from appearing by Sponsored Stories. A.S.A. § 2.1(c)(iii). Ex. 36 is an exemplar of what this tool will potentially look like.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

parent-child relationship, the Facebook system will then allow the parent to utilize the opt-out tool through their own Facebook account, without obtaining access to their children's account. A.S.A. § 2.1(c)(ii)-(iii).

The Amended Settlement Agreement requires Facebook to add clear, easily understandable information about how advertising works on Facebook to the "parents" section of its Family Safety Center.  It also provides that Facebook shall create and show advertising to users with a confirmed parental relationship with a minor, directing them to the Family Safety Center, and/or other parent-specific resources on Facebook. A.S.A. § 2.1(c)(iv).  Further, Facebook will for a period of 90 days after settlement, work with Plaintiffs to identify other educational information that needs to be clarified.  Class Counsel shall also have the right to request the Court to order a one-time injunctive relief compliance audit, for which Facebook will pay. A.S.A. § 2.1(e).  In this way, not only does the injunctive relief help to ensure parents have the information needed to learn about how minor children may appear in Sponsored Stories, it also allows parents to opt their children out entirely from having their name and likeness appear in Sponsored Stories.

Finally, Facebook will add a control in minor users' profiles that enables each minor user to indicate that his or her parents are not Facebook users.[8]  If a minor indicates that his or her parents are not Facebook users, Facebook will make the minor ineligible to appear in Sponsored Stories until he or she reaches the age of 18, until the minor changes the setting to indicate his or her parents are on Facebook, or until a confirmed parental relationship with the minor user is established.

**G. Plaintiffs' Litigation Costs and Fees**

Subject to the Court's approval, Class Counsel submitted an application seeking their attorneys' fees and costs with respect to the Settlement of the claims of all Settlement Class Members out of the $20 million common fund. A.S.A § 2.5.  There is no "clear sailing" agreement. Class Counsel's request is for $7.5 million.

**H. Service Payments to Class Representatives**

---

[8] Ex. 30 is a draft "mock up" of what this tool will potentially look like.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

Subject to Court approval, Service Payments in a total amount not to exceed $12,500 will be paid to each of the Class Representatives. A.S.A. § 2.6.

**I.  Release By Settlement Class Members**

The Settlement Class will release the "Released Parties" from the "Released Claims," all as defined in the Amended Settlement Agreement, including a waiver of unknown claims otherwise prohibited by California Civil Code § 1542. A.S.A. §§ 5.2, 5.3.

**J.  Notice**

The Settlement Administrator published website and posted the Long Form Notice. A.S.A. § 3.3 (a). Notices were sent by email to each Class member (including Minor Subclass members) for whom Facebook had a valid email address, including persons who previously indicated that they do not wish to receive any communications from Facebook. A.S.A. §3.3(b). A summary notice was also published (i) three times in an insertion in the national Monday-Thursday edition of the *USA Today* newspaper, and (ii) once by transmission through PR Newswire's US1 distribution service. A.S.A., § 3.3(c).

**III.    STATEMENT OF FACTS AND PROCEDURAL HISTORY**

**A.  Facts Concerning Defendant Facebook, Inc.**

As of December 2011, Facebook had over 161 million monthly active users in the United States.[9] Ex. 28, p. 44.  On January 25, 2011, Facebook officially launched a new advertising service called "Sponsored Stories." Ex. 22, Resp. No. 1.3. Facebook created a legal fiction, refusing to call Sponsored Stories "Advertising" (see footnote 6) in order to obtain immunity from some Federal Statutes.  Since that time, when a user takes a "social action," i.e. posts, "Likes," "Checks in," uses an application, or plays a game, and the content relates to an ad campaign in some predetermined way, the user's profile image and name may appear along with content created by Facebook as an endorsement in a Sponsored Story.  It does not matter that the social action may have occurred in the past.  A user's "Like" action taken months, or even years, earlier makes a user eligible to appear in Sponsored Stories.  Plaintiffs contend that

---

[9] As of August 31, 2012, 123,868,976 Facebook members had appeared in a Sponsored Story. Of that number, 19,761,991 are minors. *See* Decl. of Christopher Plambeck, filed by Defendant Facebook in support of the Motion for Preliminary Approval (ECF No. 261).

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT          CASE NO. CV 11-01726 RS

Sponsored Stories are paid advertisements shown to some or all of the Facebook "Friends" of that user. Sponsored Stories typically appeared in the right-hand column, known as the ad column.[10]  More recently, Sponsored Stories have been displayed in the Newsfeed column where they are denoted as "Sponsored."  They do not appear on pages seen by the user whose identities are appropriated into the ads. *See* Ex. 7; and Ex. 4.  Advertisers pay to have users' actions turned into Sponsored Stories, using either a cost-per-click ("CPC") or cost per impression ("CPM") method.  Thus, there is and was a direct connection between Sponsored Stories and revenue to Facebook.

The Sponsored Stories service is already enabled for all users when they sign up, and Plaintiffs contend that users are unable prevent their appearance in such ads, much less completely opt-out. Ex. 5, pp. 24-26; Ex. 6 p. 140:3-6; Ex. 23, pp. 302:20-303:02. The most common action that leads to an appearance in a Sponsored Story is clicking on a Facebook "Like" button anywhere on the Internet. Reasons for doing so include being able to thereby take advantage of some offer or see content on a page. At any given time, only a single user agreement was in effect between Facebook and all Class members in the United States. See Ex. 6, pp. 166:11-168:9; 169:3-1.[11]  That agreement applied uniformly to all Class members during the time period in which it was in effect. *Id.*  The user agreement has been modified over time, but only one is in effect at a given time. *Id.*  The terms of use effective during the Class Period thus far (generally referred to as the Statement of Rights and Responsibilities, or "SRR").[12]

Plaintiffs contend that none of the operative versions of the SRRs disclosed to users the

---

[10] These other ads are called "Facebook Ads." "Facebook Ads" are not the same as Sponsored Stories. They are sold as distinct products, and have existed for years prior to the creation of Sponsored Stories. These ads, when they have social content, also incorporate a user's name or likeness. The SRRs have included language that spells out that a Facebook user's name or likeness may be used in a Facebook Ad with social content. See footnote 13, *infra*; see Plaintiffs Response to Objections Brief, filed concurrently herewith, at page 16.  Since Facebook took the position that Sponsored Stories are not advertisements, the SRRs did not cover Sponsored Stories.
[11]  Facebook's Amended Resp. And Obj. To Plaintiffs' First Set Of Interrogatories, Response to Interrogatory No. 13. Ex. 10.
[12] *See* Declaration of Steven R. Weinmann, Exs. 8 to 13 attaching all operative versions of the SRRs during the Class Period, and the proposed changes pursuant to the injunctive relief.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT               CASE NO. CV 11-01726 RS

fact that they may appear in Sponsored Stories or sought their consent as to appearances in Sponsored Stories.[13] Plaintiffs further contend that a problem with the voluminous "Help Center" (hundreds of linked pages) and the Settings arose from Facebook's failures to notify users of the addition of Sponsored Stories, who upon visiting the "Help Center" were told "You can edit your ad privacy settings through the 'Account Settings' link at the top of any page within Facebook or by clicking here." Ex. 35.  If a Facebook user clicked on that link, they were taken to a page where it appeared that they were given the ability to "opt-out" of appearing in all advertisements.  Users who did this believed that they had successfully prevented their likeness from being used in all ads.  However, users who had chosen this option were still eligible to appear in Sponsored Stories, even though they likely believed they were not appearing in any advertisements; the option has no bearing on Sponsored Stories. Facebook's "Help Center" in some areas states that Sponsored Stories are "different" than Facebook Ads, thus, Plaintiffs allege, leading to further confusion. Ex. 34. Facebook contended in this litigation that Sponsored Stories are not ads. See footnote 5, *supra*.

**B. Facts Concerning The Class Representatives**

Prior to January 1, 2011, Susan Mainzer uploaded a Facebook Profile picture of herself that clearly bears her likeness, visible in Ex. 7.  On March 22, 2010, Ms. Mainzer clicked on the Facebook "Like" button for UNICEF USA. Ex. 8, pp. 62:11-16, 72:4-17; 77:23-78:12. Ms. Mainzer's name and profile picture appeared in a UNICEF Sponsored Story on facebook.com and displayed to her Friends. Ex. 7.  She was not paid for her appearance in that ad, or for her appearance in others since then. Ex. 9, Resp. to Int. Nos. 8, 11.

Prior to January 1, 2011, James H. Duval, a minor at the time, uploaded a Facebook

---

[13] In contrast, as discussed in Plaintiffs' Opposition to C.M.D.s' Motion to Intervene (ECF No. 191) at page 15, and more fully in Plaintiffs' Response to Objections Brief (pages 11-12), the SRRs expressly discuss "Facebook Ads" with social content, and made it clear that a Facebook User could appear in them and thus was giving consent by using the site. This is one of the reasons why Plaintiffs did not bring claims as to Facebook ads with social content, and a reason why the claims in the *C.M.D. v. Facebook* case are not viable. See Weinmann Decl. Exs. 8-13 (attaching versions of SRRs discussing Facebook ads). Facebook took the position that Sponsored Stories are not advertisements, thus Plaintiff contended that they were not covered by the SRRs.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                CASE NO. CV 11-01726 RS

Profile picture of himself that clearly bore his likeness visible in Ex. 11. Mr. Duval appeared in Sponsored Stories shown to his Friends. Ex. 2. Three days after Facebook launched Sponsored Stories – eight weeks after he clicked on the "Like" button – Mr. Duval, unbeknownst to him, began appearing in Sponsored Stories shown to his friends about Coca-Cola. Ex. 34. At no point did Facebook seek or obtain consent from his parents to use his name or likeness as required by California law. He was not paid for his appearances in Sponsored Stories. Ex. 34.

Sometime prior to January 1, 2011, representative "W.T.," a minor at the time, uploaded a Facebook Profile picture of himself that clearly bears his likeness in the form of a photograph. On Dec. 11, 2010, W.T. clicked on the Facebook "Like" button for Craftsman. Ex. 14. On or about March 20, 2011 W.T. (unbeknownst to him), began appearing in Sponsored Stories without parental consent. *See* Ex. 3. W.T. was not paid for his appearance in any of those Sponsored Stories. Ex. 15, Resp. to Int. Nos. 8, 11.

### C. Discovery

The discovery in this case has been extensive. There have been 21 depositions taken in this action, including 7 experts and over 4,263 pages of transcripts. Arns P.A. Decl, ¶ 29. These included key personnel of Facebook involved in the development of Sponsored Stories and persons most qualified to discuss the workings of Facebook's systems. *Id.* at ¶¶ 29-30. Plaintiffs' Counsel prepared and served 11 sets of Requests for Production of Documents with a total of 214 individual requests upon Defendant; 6 sets of Requests for Admission totaling 249 requests; and 25 Interrogatories. *Id.* at ¶¶ 34-36. The documents produced by Facebook included "natively produced" PowerPoint, Word, Excel and documents and e-mails totaling over 200,000 pages. This number does not count responses to third-party subpoenas served by Plaintiffs. Arns P.A. Decl, ¶ 34. Plaintiffs issues subpoenas to five third parties. *Id.* at ¶ 37.

Plaintiffs' Counsel received, analyzed and responded to 105 interrogatories from Facebook. Arns P.A. Decl. ¶ 40. Responding to these interrogatories involved extensive communication with the plaintiffs, verification of their answers, and service of the responses. The demanding task resulted in over 275 pages of initial and supplemental responses from named plaintiffs. Arns P.A. Decl, ¶ 40. Counsel received, analyzed and responded to 269

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

Requests for Production of Documents from Defendant; as well as 351 Requests for Admissions from Defendant, which were reviewed, analyzed and responded to. *Id.* at ¶¶ 41-42. The requests resulted in the production of over 7,000 pages of documents by Plaintiffs. Arns P.A. Decl ¶ 41.1. Plaintiffs and their guardians have dedicated at least 150 hours of time staying informed, responding to discovery requests and being deposed. Arns P.A. Decl, ¶ 28.

### D.  Settlement Negotiations

Plaintiffs and Defendant Facebook mediated the case at JAMS in San Francisco before the Hon. Edward A. Infante, the retired former Chief Magistrate Judge of the Northern District of California, on March 1, 2012.  Plaintiffs' settlement conference statement was 231 pages long and provided a 28-page long executive summary. Arns P.A. Decl, ¶ 2.  The case did not settle at that time, but the Parties achieved a better understanding of one another's position. Subsequently, lead counsel for both parties continued to negotiate, with the mediator being kept apprised at all times of the status. *Id.* at ¶ 4.  Eventually a framework for settlement was developed between Facebook and counsel for Plaintiffs.

### E.  Procedural History

This action was filed in Santa Clara Superior Court on March 11, 2011.  Plaintiffs amended to add a subclass of minors on March 18, 2011.  The case was thereafter removed to federal court on April 8, 2011. Following an initial Motion to Dismiss after removal, Plaintiffs amended the Complaint; the operative Complaint is the Second Amended Complaint. Facebook filed a second Motion to Dismiss, which raised issues of lack of standing under Article III of the Constitution, and that the UCL claim fails, both based on the incorrect assertion that Plaintiffs had not alleged any injury, an exemption under the "newsworthy" exemption of Cal. Civil Code Section 3344(d), and preemption under the Communications Decency Act, 47 U.S.C. § 230 ("CDA").[14]  The Motion to Dismiss was denied on December

---

[14] Plaintiffs' responses to Facebook's arguments on the Motion to Dismiss are responded to as follows: lack of Article III standing, Mem. Opp. Dismiss (ECF No. 52) at page 5;  Cal. Civil Code § 3344(d) "newsworthy" exemption, page 12; First Amendment, page 12; implied consent to use under the SRRs, pages 15-16; and  C.D.A. preemption on the ground that Sponsored Stories are "republications," pages 20-26.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

16, 2011, with only the claim for unjust enrichment being deemed untenable on the ground that it is not a separate cause of action. Many of these and other defenses will be available to Facebook if the case were to go to trial, or on appeal should the Settlement be rejected.

Plaintiffs filed their Motion for Class Certification on March 29, 2012, and their Reply on May 3, 2012.  The Motion was fully briefed at the time the Parties' original Term Sheet was entered into on May 22, 2012. Plaintiffs filed a first motion for Preliminary Approval of Settlement on June 14, 2012.  The Hon. Lucy H. Koh recused herself after the first Motion for Preliminary Approval and the case was transferred to the Hon. Richard Seeborg, the motion was heard on August 2, 2012, and denied without prejudice on August 17, 2012.

Following the hearing and Order on the First Motion for Preliminary Approval of the settlement, Plaintiffs and Defendants negotiated changes to the Settlement Agreement in an effort to address the Court's concerns. *Id.* at ¶ 4.  This Court conditionally approved the Settlement, certified the Settlement Class and authorized notice to go out to the Class on December 3, 2012.  Notice was duly sent to 146,617,076 e-mail addresses, and a notice was published on January 3, 16, and 28, 2013. Weinmann Decl., ¶ 19; Keough Decl., ¶ 4. A PR Newswire story was also generated on January 3, 2013, and a dedicated website was set up and has been live to answer questions since January 2, 2013.  Keough Decl., ¶ 4.  Through May 19, 2013, the Settlement Administrator, Garden City Group, received over 18,000 e-mails and 2,227,455 visits to the website. Keough Decl., ¶¶ 6,11.  Class Counsel has received over 11,000 e-mails and over 4,700 phone calls from Class members, and have responded to them either on the telephone or through e-mails. Osborne Decl., ¶14. Only 6,946 persons excluded themselves from the settlement, less than 0.006 % of the Class. Keough Decl., ¶12.

## IV.    THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT

### A.  The Settlement Meets All Requirements For Final Approval

The Ninth Circuit has a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). *See also Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976) (noting "overriding public interest in settling and quieting litigation" that "is

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

particularly true in class action suits … which frequently present serious problems of management and expense") (footnote omitted). The Court may also consider the absence of collusion in the settlement process. *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004).

The settlement is prima facie fair because it was negotiated at arm's length by experienced counsel after significant discovery, multiple mediation sessions and months of intensive settlement discussions. *See In re Heritage Bond Litig.*, No. 02-ML-1475, 2005 U.S. Dist. LEXIS 13627, at *16-19 (C.D. Cal. June 10, 2005) (approving settlement and awarding one-third of common fund as fees). As described above, the settlement was reached only after significant discovery had been conducted. The Hon. Edward Infante (Ret.) oversaw the mediation and Plaintiffs were represented by Class Counsel with extensive class action experience. Arns P.A. Decl., ¶¶4, 29-39, and Exs.2, 9-13.

On a motion for Final Approval, the settlement must be found to be "fundamentally fair, adequate and reasonable" as is required under Federal Rule of Civil Procedure 23(e) and applicable Ninth Circuit authority. *See Churchill Vill.*, 361 F.3d at 576; *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000); *Officers for Justice v. Civil Service Commission*, 688 F.2d at 625.

> Assessing a settlement proposal requires a district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining a class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; … and the reaction of the class members to the proposed settlement.

*In re Mego Fin.*, 213 F.3d at 458 (citation omitted). The district court also must satisfy itself that the settlement is not the product of collusion among the negotiating parties. *Id.* A proposed settlement "is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Officers for Justice v. Civil Serv. Comm'n of S. F.*, 688 F.2d 615, 625 (9th Cir. 1982). The court must consider the settlement "as is" and cannot rewrite terms or conditions drafted by the parties. *Id.* at 630.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

In Class Counsel's view, the settlement is of great value to the Class, as it provides relief to address all of the violations alleged in Plaintiffs' complaint, as well as issues which came to light during discovery. The settlement grants no preferential treatment to the class representatives or any segment of the class. Each class member is entitled to the same type of relief. The settlement accomplishes now – without the risk or prejudicial delay associated with further litigation, a trial, or appeals – much of what Plaintiffs sought in the lawsuit. *See Alvarado v. Nederend*, No. 1:08-cv-01099, 2011 U.S. Dist. LEXIS 2326 (E.D. Cal. Jan. 11, 2011) at *16-17 (to evaluate the range of possible approval, courts primarily consider the value provided by the settlement against the claims' expected recovery if tried). Numerous factors weigh in favor of the fairness of the settlement.

**B. The Strength of Plaintiffs' Case**

If this case continued to be litigated, the contested factual and legal issues of liability under the state right of publicity and unfair competition laws, along with contested class certification issues, would be extensive. Approval of a settlement is proper where "the settlement terms compare favorably to the uncertainties associated with continued litigation regarding the contested issues in this case [including where] the Settlement provides Class Members with a meaningful business resolution regarding contested issues."   *Nat'l Rural Telecomms. Coop. v. DirectTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004).

**C. Risk, expense, complexity, and likely duration of further litigation**

"In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."   *Id.* (citations omitted). The proposed Settlement Agreement is not "clearly inadequate," given that, among other things, it provides substantial injunctive relief which will be in place for years and that specifically addresses all claims raised by Plaintiffs, and a Settlement Fund of $20 million. Comparing the uncertainties of future litigation against the risks detailed below, settlement on the terms proposed is clearly warranted.

As to the risk of continued litigation, and as also set forth in Facebook's brief in support of the Joint Motion, Plaintiffs faced significant risks in pursuing these claims, including, *inter*

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

*alia*, numerous factors which made it apparent that litigation of these issues would continue to be hotly contested, perhaps for many years in the appellate courts. Further, the issues of class certification, implied consent, and minor consent (particularly in light of the transfer order from the Southern District of Illinois in *E.K.D. v. Facebook*, [now *C.M.D. v. Facebook,* No. 12-cv-01216-RS]) by Judge Patrick Murphy, applying the Facebook Statement of Rights and Responsibilities to minors) present challenges for Plaintiffs to ultimately prevail on in the end. *Id*. at ¶ 48.

The following arguments which Facebook has made and which it could make on summary judgment or at trial should the case continue represent risks of litigation:

- The defense of implied consent. The continued use of facebook.com by members, Facebook has argued, has led to increasing amounts of awareness by members of Sponsored Stories by virtue of the members having seen such ads, raising the possibility of a finding of implied consent.

- Facebook Members' use of pseudonyms as opposed to their actual (legal) names and the posting of images as "profile pictures" which are not the likeness of the individual Class members.

- The contention (rejected by the Judge Koh on the Motion to Dismiss, but available for summary judgment or appeal) that the claims are preempted under the Communications Decency Act, 47 U.S.C. § 230 ("CDA"), and that the "newsworthy" exemption of Cal. Civil Code § 3344(d) grants an exception to the consent requirement of subdivision (a), for use of a likeness "in connection with any news, public affairs, or sports broadcast or account, or any political campaign."

- Facebook has raised a defense under the Children's Online Privacy Protection Act, or COPPA, 15 U.S.C. § 6502, in other matters and could raise the defense in this case. *Id.* [15]

- Class certification also posed a potentially difficult hurdle. In its opposition to the Motion for Class Certification, Facebook argued that California Civil Code § 3344 was not intended by the Legislature to be brought as a class action.

---

[15] Co-counsel in the *C.M.D.* case lost on the issue of COPPA preemption as to minors between the ages of 13 and 17 in a demurrer in *David Cohen v. Facebook,* No. BC 444482, Superior Court of California, dated December 13, 2011. Weinmann Decl., Exs. 6, 7.   That action was then dismissed without prejudice. *Id*., Ex.7.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

- California Civil Code § 3344 also includes a prevailing party attorneys' fees provision. Facebook has pursued such claims in other cases.[16]

The potentially enormous statutory penalties available, also presented a further potential defense for Facebook. If Plaintiffs were able to achieve a judgment for such an amount in litigation, it would create a due process issue for Facebook to appeal, as discussed below.

**D.  Valuation of Statutory Damages for Purposes of Settlement**

In evaluating the Amended Settlement, Plaintiffs considered the value of the statutory damages provided under Cal. Civil Code § 3344, which are $750 per violation. Given the size of the Class at over 150 million, and assuming each of the 150 million Class Members were each in only one Sponsored Story, the damages would be in excess of $112,500,000,000. There are, however, significant potential problems with proof as to Plaintiffs' entitlement to these damages and the viability of Facebook's other defenses, which justify a discount for settlement.

The Hon. Lucy Koh held on the Motion to Dismiss that Plaintiffs must prove actual damages first before being entitled to seek the statutory damages under Cal. Civil Code § 3344, and that plaintiffs do not have a vested interest in receiving the statutory penalties.  *Fraley v. Facebook*, 830 F. Supp. 2d 785, 809-811, 812 (N. D. Cal. 2011).  Proving such damages was yet another hurdle which Plaintiffs faced, and which bears directly on their ability to secure the statutory penalties under § 3344.  Furthermore, as the Hon. Edward Infante (ret.) noted in his declaration in support of the Settlement, the potentially enormous statutory damages lead to a due process problem, which would be a great risk of continued litigation. Decl. of Edward Infante, Arns P.A. Decl Ex. 2 at ¶18; (ECF No. 286); *see also BMW of N. America v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589 (1996) (holding that courts must consider the proportionality of punitive damages awards to the harm suffered).

**E.  The Total Amount Achieved by Plaintiffs In Settlement Supports a Finding That it is Fair and Reasonable.**

---

[16] Facebook sought attorneys' fees of over $700,000 in another Civil Code § 3344 action before this Court, and also sought fees in a similar dismissed State Court action. Weinmann Decl., Exs.5 and 6. While Plaintiffs deny that any of Facebook's contentions have any merit, these are still risks inherent in further litigation, particularly in cases such as this in which there are numerous issues of first impression.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

The Amended Settlement Agreement merits final approval given that, among other things, it provides for a common Settlement Fund of $20 million (less attorneys' fees, administrative fees, costs, and service awards), which will include at least $11.2 million either distributed to the Class or to *cy pres*, and injunctive relief which squarely addresses the key issues in Plaintiffs' Complaint, which will be in place for two years. A.S.A. §2.1. The injunctive relief adds further value and can be assigned a dollar value in several ways, as detailed below. Under the "real option" method, that value is in the range of $145.1 million to $57.4 million, depending upon the cost associated with exercising the option. Alternatively, control of the "asset" of the friend-endorsements is approximately $9.4 million per month (or approximately $226 million for the two-year life of the injunction). Finally, Plaintiffs contend that Class members would value the new rights being worth at least $1.

The common fund is worth $20 million, and the injunctive relief is of substantial value to the Class and the public of a further $57.4 million to $145.1 million.

> In assessing the consideration obtained by the class members in a class action settlement, "[i]t is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." In this regard, it is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial.

*Nat'l Rural Telecomms. Coop., supra,* 221 F.R.D. at 527 (citations omitted). Plaintiffs have taken into consideration the substantial risks of continued litigation in arriving at the monies that are being offered in settlement to the Class and the scope of the injunctive relief obtained.

## F.  Calculation of Additional Revenue / Class Member's Damages for Misappropriation of Right of Publicity In Valuing Past Damages

In assessing the settlement value of the case, Plaintiffs took into consideration the actual damages suffered by the Class members when they were deprived the value of their endorsements in Sponsored Stories. Plaintiffs contend that the actual market value of their endorsements in a Sponsored Story is the difference between what advertisers were willing to pay Facebook for a friend-endorsed ad (e.g., a Sponsored Story) and a standard ad with no endorsement. This represents the premium that advertisers place on friend endorsements.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

Class members were deprived of this amount upon the use of their endorsements.[17]

This value is measurable because friend-endorsed ads have a higher market value among advertisers than non-friend-endorsed ads. Arns P.A. Decl Ex. 7, ¶ 8a; Arns P.A. Decl Ex. 6, ¶11a; Arns P.A. Decl. Ex. 5, ¶¶ 7b,7c,7m. Facebook is able to obtain additional revenue from advertisers because of the Plaintiffs' appearance in the ads and the accompanying apparent endorsement by Plaintiffs; this is the commercial market value of the Member's endorsement. Arns P.A. Decl Ex. 7, ¶¶ 8b, 8o, 8p, 8q; Arns P.A. Decl Ex. 6, ¶11e. The deprivation of that value belonging to Class Members by Facebook (due to misappropriation and the denial of the right to negotiate for it) is the Class Members' injury.   The additional revenue Facebook achieved through Sponsored Stories versus standard ads represents the amount Class Members would have been able to negotiate for had they been given the opportunity. Arns P.A. Decl Ex. 7, ¶ 8q. According to Plaintiffs' marketing expert Gary Frazier, the amount of such payment would be proportional to the relevance of that person's endorsement to the audience to which the ad is shown. Arns P.A. Decl Ex. 6, ¶ 11d.

One method Plaintiffs employ to calculate damages is to assign a value of one-half of the value of the revenue for the actual ad campaign to the Standard Ad. The basis for this is Facebook's many public statements that "Ads shown with the names of people's friends are twice as effective as those without."[18]   Thus, from these statements it can be inferred these ads are more valuable than standard ads. Arns P.A. Decl Ex. 5, ¶¶ 7m, n, o.  As of August 31, 2012, a total of 123,868,976 users had appeared in Sponsored Stories, generating total revenue of $233,792,612.  See Declaration of Christopher Plambeck ISO Joint Motion for Final Approval (ECF No. 261). Assuming the incremental value of the user's endorsement is 50% more effective, as Facebook has stated, then actual damages calculated by this approach, taking half

---

[17] The determination of damages is complex and Plaintiffs refer the Court to and incorporate by reference their Memorandum in support of the Joint Motion for Preliminary Approval (ECF No. 280) (particularly pages 17-23) and the supporting declarations of Gary Frazier, David Taber, Richard Drogin and Fernando Torres (RSA P.A. Decl. Exs. 5-8, ECF No. 287).

[18] One example is Facebook's "Guide to the New Facebook Ads Manager," which claims "Ads shown with the names of people's friends are twice as effective as those without...." Weinmann Decl., Ex. 14. The empirical claims of the Nielsen Company, working in partnership with Facebook, support these assertions. Weinmann Decl., Ex. 15.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

of the revenue from Sponsored Stories and dividing it among the Class members (and assuming one Sponsored Story per Class Member), actual damages were $0.94 per class member.

Another method of calculating actual damages is to use the click-through rate ("CTR"), a ratio Facebook tracks and records. Arns P.A. Decl ¶ 20. The CTR is the ratio of the number of times an ad is clicked to the total number of times the ad is shown. Arns P.A. Decl Ex. 7, ¶ 8f. For example, a 0.2% CTR would mean the ad was clicked on twice in a thousand showings, or "impressions." Plaintiffs' expert David Taber, who has extensive experience in online advertising, confirms that CTR is the most commonly used and consistent metric employed by advertisers when valuing online ad campaigns. Arns P.A. Decl Ex. 5, ¶¶ 7q-t; Arns P.A. Decl Ex. 7, ¶¶ 8d-f; *see also* Arns P.A. Decl. Ex. 4, sub Ex. 2, pp. 40:20-42:5; 41:24-42:5.

Fernando Torres, Plaintiffs' expert in the economic valuation of rights to publicity, created a formula which can be used to calculate the value of the "friend endorsement" and hence the class members' damages. Arns P.A. Decl Ex. 7.  Knowing that advertisers would seek out and pay more for an ad with a higher CTR, Mr. Torres compares the effectiveness of Sponsored Stories ads to that of standard ads.[19]  *Id.* at ¶¶ 8i, 8r.  Torres expresses the added effectiveness of Sponsored Stories ads as the "incremental revenue" Sponsored Stories generate.  Applying this concept to the number of users who had appeared in Sponsored Stories up through August 2011, the "actual damages" calculated by this approach for a typical Class member is approximately $1.45 per user. Torres Decl. Regarding the Value of Injunctive Relief, (ECF No. 282). Plaintiffs' expert statistician Dr. Richard Drogin found that Facebook maintains all data he would need to determine damages available to each class member on a class-wide, per-plaintiff, or per-ad campaign basis.  Arns P.A. Decl Ex. 8, ¶¶ 5-16.

### G.  This Case Presents Circumstances Appropriate for Cy Pres Distribution for Unclaimed Sums

As noted above, based on figures provided by Facebook, the average additional revenue that Facebook is calculated to have earned per class member was only approximately $1.45.

---

[19] "Facebook Ads" are another ad product that appears on Facebook's website, but in some instances do not contain a user's name and likeness, and are therefore a good stand-in for the hypothetical "Standard Ads." *Id.* at ¶ 8v.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

Thus, the amounts offered of $10 to $15 to the claiming Class members was not disproportionate to the damage suffered by the vast majority of class members. However, over 614,000 persons made claims, and thus $6.1 to $9.2 million will actually be distributed to class members.

Plaintiffs believe that since the claims rate to the claiming Class members, plus the amount requested for attorneys' fees and costs does note exhaust the Settlement Fund, a *cy pres* award of the remaining funds, which will be over $2 million, to the suggested recipients will provide the next best relief to benefit the Class, rather than increasing the amounts to the claiming Class Members above $15.  The Court of Appeals for the Ninth Circuit, and other jurisdictions, have recognized that the use of *cy pres* to further the interest of a class is warranted in appropriate circumstances – even where that is the *only* relief. See *Catala v. Resurgent Capital Services L.P.*, No. 08CV2401 2010 U.S. Dist. LEXIS 63501 (S.D. Cal. June 22, 2010) (*cy pres* only settlement approved where the amounts available to the Class would have been trivial when divided among the class members); *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990) ("when a class action involves a large number of class members but only a small individual recovery, the cost of separately proving and distributing each class member's damages may so outweigh the potential recovery that the class action becomes infeasible … *cy pres* distribution avoids these difficulties … federal courts have frequently approved this remedy in the settlement of class actions where the proof of individual claims would be burdensome or distribution of damages costly.")

Circuit and District courts across the country have noted their approval of or adopted the "infeasibility" test (the use of *cy pres* awards where monetary damages are infeasible) and approved settlements which consisted of "*cy pres* only awards" in lieu of damages, or awards of *cy pres* where funds available would not result in meaningful individual awards even if large in the aggregate. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 34 (1st Cir. 2009); *In re Holocaust Victim Assets Litig.*, 424 F.3d 132, 146 (2d Cir. 2005).

In *Boyle v. Giral*, 820 A.2d 561, 569 (D.C. 2003), an antitrust case concerning vitamin products, the District of Columbia Court of Appeals approved a *cy pres* only award to

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

organizations promoting the health of District of Columbia residents where only $1 would have been available for each Class member. The Court of Appeals noted:

> Such distributions, including the **entire amount** of the consumer **settlement fund rather than just the residue**, are being used or advocated increasingly where direct distribution of settlement funds to individual class members is impractical; and where important consumer goals, such as disgorgement of ill-gotten gains from and deterrence of future over-pricing and manipulation of market allocation by the offending entities, can be achieved […]. We are satisfied that the fund will benefit consumers.

*Id.* at 569 (emphasis added). *See also In re Heartland Payment Sys., Inc.*, No. 09-2046 2012 U.S. Dist. LEXIS 37326 (S.D. Tex. March 20, 2012) (approval of a *cy pres* award of $1 million in settlement where only 290 valid claims out of a class of 130 million persons who had suffered from a data security breach by hackers as to their payment cards). Thus, *cy pres* awards have been approved where the benefit to the Class will result, after whatever distribution is practicable is made, even if distribution of the remainder was not technically impossible. Distribution of the remaining funds, after an increase of the distribution to claiming Class Members to $15, is thus appropriate and a benefit to the rest of the Class.

This Court approved the distribution of *cy pres* to a privacy foundation as the primary relief in *Lane v. Facebook*, No. 08cv-3845 RS 2009 WL 2076916 (N.D. Cal. May 24, 2010), *aff'd*, 2012 US App. LEXIS 19767 (9th Cir. Sept. 20, 2012). Despite *Lane* being an all *cy pres* settlement, the benefit to the class was considered so beneficial to the class the Court awarded a multiplier of 2.0 to the fees for Plaintiffs' counsel. As noted, other courts have also endorsed the use of *cy pres* in lieu of damages awards, where it is impracticable to distribute monies to them. *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000) ($4.6 million in *cy pres*). A *cy pres* distribution would be appropriate.

The Ninth Circuit in *Lane* noted that the fact that the claims of some class members might be more valuable than others did "not cast doubt on the district court's conclusion as to the fairness and adequacy of the overall settlement amount to the class *as a whole*." Further, it noted that:

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

a class-action *settlement* necessarily reflects the parties' pre-trial assessment as to the potential recovery of the entire class, with all of its class members' varying claims. So even if some of the class members in this case would have successful claims for $2,500 in statutory damages under the VPPA, those individuals represent, to use the candid phrasing of Objectors, "only a fraction of the 3.6 million-person class." Their presence does not in itself render the settlement unfair or the $9.5 million recovery among all class members too low.

*Lane*, at *25-26 (emphasis in original) (citation omitted). Similarly here, the fact that only a percentage of the Class will receive between $5 and 10 in cash does not render the amount in settlement – here more than $12.5 million less administration fees and costs potentially distributed to the Class – too low, even in light of the $750 statutory damages provision in Cal. Civil Code. § 3344. Most Class members' actual damages will be below a dollar. To the extent that certain Class members do not receive a cash payment, they are still receiving the benefit of the injunctive relief changes and the impact on the online industry that the lawsuit will bring. Further, persons who believe that they have viable claims for more can opt out and bring a separate suit, as the Ninth Circuit noted in *Lane*.

### H. The proposed *cy pres* recipients are appropriate under the Ninth Circuit's standards

Ninth Circuit case law has held, "[c]y pres distributions must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity." *Nachshin v. A.O.L., LLC*, 663 F.3d 1034, 1036 (9th Cir.2011) (citing *See Six Mexican Workers v. Ariz. Citrus Growers*, *supra*, 904 F.2d at 1307-8 (emphasis added)). The proposed recipients meet each of these requirements. The proposed *cy pres* grants here will be used to address issues of the commercialization of personal information online, and will go to organizations which are involved in educational outreach that teaches adults and children how to use social media technologies safely, or are involved in research of social media, with a focus on critical thinking around advertising and commercialization, particularly of the commercialization of children. They will be of use to all Facebook users and children and parents nationwide.

### I. The Court Should Place A Value On The Injunctive Relief

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

Courts in several actions have recognized the value of injunctive relief in approving class actions and attorneys' fees based thereon. See *White v. Experian Information Solutions*, 2011 U.S. Dist LEXIS 79044 (C.D. Cal. July 15, 2011) (where the primary relief was injunctive relief to "retroactively update the credit files" of class members, the District Court used a 1.9 multiplier to award fees of $5,671,778); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448 (D.N.J. 2008). In the case of *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011) the Court of Appeal indicated it will consider justifying attorney's fees based on injunctive relief if the District Court has assessed a value for it.[20] While the Settlement can and Plaintiffs contend should be approved even if a value is difficult to be placed on the injunctive relief, the Court should assign a value to the injunctive relief obtained. Plaintiffs here have obtained relief beyond what would be attainable at trial in new protections for minors and changes on Facebook's website.[21]  The notice and control components of the injunctive relief provide the users with the ability to see what Sponsored Stories they have appeared in, and to preclude further such appearances on an advertiser-by-advertiser or categorical basis, A.S.A. 2.1(b), none of which is currently possible.  Furthermore, the relief provides new tools for opting minors out of Sponsored Stories altogether, and gives parents

---

[20] The circumstances of *Bluetooth* were quite dissimilar to this case. The Court of Appeals noted in a footnote that the value of the injunctive relief "is not apparent to us from the face of the complaint, which seeks to recover significant monetary damages for alleged economic injury, nor from the progression of the settlement talks, the last of which occurred after defendants had voluntarily added new warnings to their websites and product manuals." *Bluetooth*, 654 F.3d at 945, n. 8. Here, Facebook has not yet instituted the changes provided for in the ASA Agreement, and those changes are far more significant than those in *Bluetooth*, including the tools to actually stop appearances in ads and an opt-out for minors.

[21] Courts have also acknowledged injunctive relief often generates substantial benefit to class members and the public at large through publicity garnered by settlements.  See *Vizcaino v. Microsoft Corp.*, 142 F. Supp. 2d 1299, 1304 (W.D. Wash. 2001)("[a]s a result of this case and the large amount of publicity surrounding it, many employers have been advised to carefully ensure their workers are properly classified…"); *see also New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 2009 U.S. Dist. LEXIS 68419 (D. Mass. Aug. 3, 2009)(future injunctive relief resulted in rolling back certain drug prices); *In re Currency Fee Antitrust Litigation*, 263 F.R.D. 110, 124 (S.D.N.Y. 2009) (court held that the injunctive relief was among the factors that "weigh[ed] strongly in favor of the settlement."). In the present settlement, other online advertisers are on notice that they cannot mislead users or misappropriate their right of publicity.  The social value of this should not be ignored.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                        CASE NO. CV 11-01726 RS

controls to do the same. A.S.A. § 2.1(c)(iii). The relief also changes the language in Facebook's SRRs, removing all ambiguity about whether users' permit Facebook to use their names and profile pictures in Sponsored Stories. *See* A.S.A. § 2.1 (b).

For all of the reasons set forth more fully in Plaintiffs' Motion for Attorneys' Fees, and in the accompanying Response to Objections Brief, the Court should consider the value of the injunctive relief and approve Class Counsel's Fee Request.

**J.   Methods of Valuation of the Injunctive Relief**

Plaintiffs in their preliminary approval brief offered alternative methods for assigning a dollar value to the ability of the Class members to control the use of their endorsements in Sponsored Stories. These included the Real Option Valuation method, Fair Market Valuation and Minimum Valuation.

<u>Real Option Valuation</u>: Real option valuation is a financial tool used to determine the value of a person's right to undertake or not undertake a certain activity, as explained in detail by Plaintiffs' expert Dr. Phillip Allman in his declaration in support of the Motion for Preliminary Approval. The injunctive relief in this case grants the Class members the right to exercise or not exercise control over the use of their endorsements.  Under the real option value analysis, this right is viewed as a right to sell a "call option" for the endorsement.  The call option can be sold in the marketplace of social media outlets. A commonly known marketplace for the purchase and sale of endorsements on social networks may not be apparent. Allman Decl. in support of Preliminary Approval (ECF No. 281), ¶16; Torres Decl. in support of Preliminary Approval (ECF No. 282), ¶13. There is, however, substantial evidence that such a marketplace is blossoming and, in some cases, users can currently sell such endorsements. *Id.*

The analysis calculates the value of the injunctive relief by considering the "spot price" of the asset underlying the option (a single user's endorsement, determined to be \$1.55) and the "volatility" of the underlying asset's value (variability of the price of the asset, determined to be .54). Allman Decl. ¶ 16; ¶ 19.  With these inputs, Dr. Allman calculates results in a range of possible values for the control of the endorsements.  Specifically, the value ranges from \$1.17 per user to \$0.46 per, depending on the cost to the user of exercising the option and bringing

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

their endorsements to market.  Multiplying these figures by the number of Class members over the 24-month life of the injunction for the entire Class in the aggregate, gives a range of values of between $145.1 million to $57.4 million. *Id.*, ¶ 20.

       <u>Fair Market Value Method:</u> Alternatively, the Court can consider the value of the injunctive relief as measured by the established fair market value of the Class members' endorsements. The fair market value method recognizes that the Class members' endorsements have a value established in the marketplace by what the advertisers would be willing to pay for Sponsored Stories "friend endorsements" over what they would pay for a Standard Ad. The injunctive relief gives the Class members control of their endorsements, thereby generating incentives for advertisers who want to use the endorsement to enhance the enticements offered to get users to "like" things or otherwise take actions that can lead to Sponsored Stories.

       Mr. Torres further explained the value of Plaintiffs' injunctive relief.  As discussed above, the value of the past "actual" damages for the Class members was calculated based on the added value of the endorsements for Sponsored Stories campaigns that were sold.  The class members now by virtue of the injunctive relief changes have the opportunity, by using the new features to control the use of what is essentially a $9.4 million/month advertising asset. Torres Decl., ¶¶12, 15.  Based on this determination, the value of the injunctive relief is $226 million at a minimum for the next 24 months alone. *Id.* at ¶15.

       <u>Minimum Valuation:</u> Finally, the injunctive relief provides class members a reputation management tool for their Facebook account.  Plaintiffs believe that as there is an established value for reputation management services, the new tools and information provided through the injunctive relief is worth at least $1 on average to each Class member.  Since there are over 150 million class members (the number of Facebook users increased from 123 million after Preliminary Approval), that places the value of the injunctive relief at least $150 million.

**K. The Service Awards to the Class Representatives are Reasonable**

       Plaintiffs have requested and Facebook has agreed to pay service awards totaling $37,500, subject to court approval, which includes $12,500 for each of the Class Representatives. A.S.A. § 2.6. Class representatives "are eligible for reasonable incentive

payments," after consideration of relevant factors, including the actions the representative has taken to protect the interests of the class and the degree to which the class has benefited from those actions. *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003). Plaintiffs have assisted in responding to voluminous documentary discovery about their personal lives, had their depositions taken at length, and monitored the progress of the action and mediation and should be rewarded for taking the initiative to file the action, and for their role in reaching a Settlement providing for valuable relief to the Settlement Class. Arns P.A. Decl., ¶ 28. Plaintiffs Mainzer, Duval and W.T. have expended an estimated 150 hours related to their duties in this matter. Arns P.A. Decl. ¶ 28.

In addition, Plaintiffs by litigating this case potentially exposed themselves to massive attorneys fees and costs under the fee shifting provision in Civil Code § 3344. Arns P.A. Decl., ¶64.[22]   Furthermore, Facebook's lawyers attempted to use this to intimidate all Class Representatives during depositions, repeatedly asking each Class Representative if they were aware they could be liable for Facebook's fees and costs. Weinmann Decl., Exs. 1 (Maizner Tr. at 27:16-21) and Ex. 2 (W.T. Tr. at 173:16-19; 174:11-13). This was not an idle threat. As noted above in footnote 16, Facebook has sought fees in the hundreds of thousands of dollars in other actions under Civil Code § 3344. Indeed, the Ninth Circuit has approved incentive awards to class representatives that far exceed the modest award proposed by Plaintiffs, $12,500 each. *Staton*, 327 F.3d at 976-77.

## L.  The Response of the Class

"It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Nat'l Rural*, 221 F.R.D. at 529 (citing cases); *accord In re Lucent Techs., Inc., Sec. Litig.*, 307 F. Supp. 2d 633, 644 (D.N.J. 2004) ("The absence of objections from the overwhelming majority in response to the Notice to Class

---

[22] An incentive award is particularly appropriate where class representatives have attracted significant media attention and notoriety as a result of the litigation. *See, e.g.*, *Wilson v. Airborne, Inc.*, No. EDCV 07-770-VAP (OPx), 2008 U.S. Dist. LEXIS 110411, 2008 WL 3854963, *13 (C.D. Cal. Aug. 13, 2008).

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

Members should be considered in approving the Settlement."); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999) ("the absence of substantial objections and relative absence of opt-outs strongly favors approval") (citing cases). Here, the response from Class members has been overwhelmingly positive. Out of the nearly 146,617,076 e-mails delivered to Settlement Class Members (Weinmann Decl., ¶ 19), and also after publication Notice, only 104 objections to the settlement were filed.   Further, only 6,946 Class members excluded themselves. *Id.*, ¶ 2.   In addition, as noted above, 614,994 persons made claims, thereby expressing their approval.

### M. The Experience and Views of Counsel

"'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation. This is because 'parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation.'   Thus, 'the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.'" *Nat'l Rural*, 221 F.R.D. at 528 (citations omitted). The basis for such reliance is that "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). Indeed, absent fraud, collusion, or the like, a district court should be hesitant to substitute its own judgment for that of counsel when evaluating a proposed settlement. *E.g.*, *McNary v. Am. Sav. and Loan Ass'n*, 76 F.R.D. 644, 649 (N.D. Tex. 1977) ("Courts have consistently refused to substitute their business judgment for that of counsel, absent evidence of fraud or overreaching").

Class Counsel in investigating this action thoroughly, has demonstrated a high degree of competence in the litigation of this case, and strongly believes that the Settlement is a fair, adequate, and reasonable resolution of the Settlement Class's disputes with Defendants and is preferable to continued litigation. Arns P.A. Decl, ¶¶ 56 69.   There is no evidence of fraud or collusion in the settlement negotiations, which were conducted at arms' length, before Judge Infante, a respected retired Judge for the California Superior Court and experienced mediator

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                          CASE NO. CV 11-01726 RS

with JAMS. Arns P.A. Decl, ¶4 and Ex. 2.  Accordingly, Plaintiff respectfully requests that the proposed Settlement Agreement be finally approved.

## V.        THE CLASS WAS GIVEN ADEQUATE NOTICE

Before finally approving a class settlement, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e). What constitutes reasonable notice depends on the circumstances of the case. *See id*. Courts have broad discretion in fashioning an appropriate notice program. *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1127 (9th Cir. 1977) (finding matters of notice are "left to the court's discretion to be dictated by the circumstances of each case.") (citation omitted). Generally, notice is acceptable if it "describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (quotation omitted).

The notice plan provided Class members with individual notice by email. *See* A.S.A. § 3.3. This resulted in 146,617,076 emails being sent to Class Members. Weinmann Decl. ¶ 19. Facebook also caused a summary of the settlement terms to be published (i) three times in an insertion in the national Monday-Thursday edition of USA Today, and (ii) once by transmission through PR Newswire's US1 distribution service. A.S.A., § 3.3(c).

The form of notice proposed by the parties was found by this Court to comply with the requirements of Fed. R. Civ. P. 23(c)(2)(B). Class members had 60 days after notice went out to opt out or exclude themselves from the Class. A.S.A. §3.6. Notice of the proposed settlement was also provided to the appropriate federal official and the appropriate State officials of all 50 states, as required by the Class Action Fairness Act, 28 U.S.C. § 1715. A.S.A. § 3.4.

## VI.       THE PROPOSED SETTLEMENT CLASS SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES AND PLAINTIFFS' COUNSEL APPOINTED AS CLASS COUNSEL

The Court should determine that the proposed settlement class meets the requirements of Rule 23. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619-20 (1997); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.632 (2012). The prerequisites for certifying a class are (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation, each of which

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

is satisfied here. *See* Fed. R. Civ. P. 23(a). Plaintiffs bear the burden of establishing that all four requirements of Rule 23(a) are met, as well as one requirement of Rule 23(b). *Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180, 1186, amended by 273 F.3d 1266 (9th Cir. 2001). Whether or not to certify a class is within the broad discretion of the Court. *Li v. A Perfect Franchise, Inc*., No. 5:10-CV-01189 2011 U.S. Dist. LEXIS 114821 (N.D. Cal. Oct. 5, 2011) at *20-21. *Id*. Plaintiffs seek certification of a Class under Fed. R. Civ. P. 23(b)(3), as questions of law and fact predominate over any individual issues

### A. Numerosity is Satisified

"The prerequisite of numerosity is discharged if 'the class is so large that joinder of all members is impracticable.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) Facebook stated that as of August 31, 2012, approximately 123 million users who fit the Plaintiff Class definition had appeared in at least one Sponsored Stories ad. *See* Declaration of Christopher Plambeck, ¶ 7. Of that number, 19.7 million fit the Subclass of Minors definition of minors. *Id*. This number far exceeds the numbers where the joinder of the members of the class action is impractical beyond any doubt. *See Hanlon*, 150 F.3d at 1019.

### B. The Claims are Typical and There is Commonality Under Rule 23(a)

Rule 23(a)(3) requires that the claims of the representative plaintiff be typical of those of the class. Commonality and typicality "tend to merge," such that factors that support a finding of commonality also support a finding of typicality. *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).

Plaintiffs' claims are typical of the Class they seek to represent because all claims relating to Facebook's use of user's names and likenesses in Sponsored Stories arise under California law as made applicable under the SRR (and thus under Cal. Civil Code § 3344). Also, typicality applies because Plaintiffs' claims arise from Facebook's creation of Sponsored Stories and the showing of those ads without obtaining permission, all Plaintiffs have been

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

injured in the same manner. Plaintiffs' claims are based on the same facts and legal theories as the Class and are, therefore, typical. *See Hanlon,* 150 F.3d at 1020 (typicality satisfied where plaintiffs' claims are "reasonably coextensive with those of absent class members"). For similar reasons, Plaintiffs' claims also meet the commonality requirement in that they raise "questions of law or fact common to the class," including whether Facebook's policies violated State law, and whether they caused injury to the Class. *See* Fed. R. Civ. P. 23(a)(2); *see Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

A subclass of minors represented by James H. Duval, and W.T, through his guardian ad litem Russell Tait, should also be certified. Cal. Civil Code § 3344 expressly states that liability attaches for failure to obtain consent "in the case of a minor, the prior consent of his parent or legal guardian." Facebook uniformly does not seek consent as to any minors. Each of the other requirements of proof – other than consent – are identical for the Subclass.

"In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Fed. R. Civ. P. 23(b)(1), (2), or (3)." *Hanlon*, 150 F.3d at 1022. The proposed class is maintainable under Rule 23(b)(3) as common questions predominate over any questions affecting only individual members and class resolution is superior to other available methods for a fair resolution of the controversy. *Id.* at 1022-23. Because Facebook is an Internet company and all of its dealings with its Members are all through its website, all of the Class Members are similarly situated and exposed to the same policies, practices and procedures. This applies to the SRRs, the Privacy Policy, as well as the means by which Sponsored Stories are generated. *See* Ex. 6, 166:11-170:4 (single version of the terms applies to all users at a given time). Each of the issues that are the subject of common proof or determination as a matter of law can be addressed (in this case through settlement) for all class members at once, justifying certification of these claims for settlement purposes. *See*, *e.g.*, *Wolin v. Jaguar Land Rover N. Am.*, 617 F.3d 1168, 1173 (9th Cir. 2010); *Parkinson v. Hyundai Motor Am., Inc.*, 258 F.R.D. 580, 596-97 (C.D. Cal. 2008).

Class members' claims satisfy the predominance requirement, as the proposed Class and subclass are "sufficiently cohesive to warrant adjudication by representation," because of the

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

legal and factual questions, "qualify each class member's case as a genuine controversy." *Thomas v. Baca*, 231 F.R.D. 397, 402 (C.D. Cal. 2005) (quoting *Amchem*, 521 U.S. at 623). A "central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'" *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting *Zinser, supra*, 253 F.3d at 1189). Thus, courts must determine whether common issues constitute such a significant aspect of the action that "there is a clear justification for handling the dispute on a representative, rather than on an individual basis." CHARLES ALAN WRIGHT, ET AL., 7A FEDERAL PRACTICE AND PROCEDURE § 1778 (3d ed. 2005).

In this case, Plaintiffs have alleged not just a single common issue, but several. These questions of law and fact include, but are not limited to, the following:

- Whether Plaintiffs and the Class consented to the use of their names, photographs, likenesses, or identities in Sponsored Stories.

- Whether FACEBOOK gained a commercial benefit by using Plaintiff and the Class' names, photographs, likenesses in Sponsored Stories.

- Whether Class Members are entitled to damages as a result of FACEBOOK's conduct, and, if so, what is the measure of those damages.

- Whether Sponsored Stories are ads. Plaintiffs contended that they are, Facebook denied in this litigation that they are ads.[23]

- Whether Facebook's conduct violated Cal. Civil Code § 3344 and California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, et seq.).

Any one of these common questions is sufficient to establish commonality in this action. Together, they overwhelmingly satisfy Rule 23(a)(2).

### C. Adequacy of Representation.

The final requirement of Rule 23(a), adequacy of representation, is also satisfied. Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." *Hanlon, supra,* 150 F.3d at 1020. The adequacy of representation issue focuses on whether the plaintiff's attorney is qualified to conduct the proposed litigation and whether

---

[23] See footnote 5, *supra*.

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

the plaintiff's interests are antagonistic to the interests of the class. *Marr v. E. State Hosp.*, 2002 U.S. Dist. LEXIS 28460, *15 (E.D. Wash. Apr. 29, 2002). Plaintiffs have hired experienced class counsel to prosecute the action. As set forth more fully below, The Arns Law Firm and its lawyers, Robert S. Arns, Jonathan E. Davis, Steven R. Weinmann, Kevin M. Osborne, and Robert C. Foss are experienced in class action cases. Arns P.A. Decl, ¶¶29-39. Jonathan M. Jaffe, the other Class Counsel, is uniquely qualified to address the issues raised in this case. *See* Arns P.A. Decl, ¶39.

Second, Plaintiffs' interests are co-extensive with those of the Class.  Plaintiffs had Sponsored Stories ads created about them and were not asked for their consent nor were they paid for appearing in such ads, as were all other class members.  Plaintiffs seek relief that is identical to the relief sought by members of the class.  Plaintiffs do not have any conflicts with the other members of the Class.  Rather, they have exactly the same incentives to prove their cases as do the other Class members, and their interests are thus perfectly aligned and Plaintiffs clearly are adequate representatives of the Class.  Plaintiffs and their counsel have shown, through their prosecution of this action and negotiation of this proposed settlement, that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Proposed Settlement Class Meets the Requirements of Rule 23(b) (3).

**D.  A Class Action is the Superior Means of Adjudication**

Rule 23(b)(3) requires that a court determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23 (b)(3).  "A plaintiff can satisfy the superiority requirement when he or she can show that 'class-wide litigation of common issues will reduce litigation costs and promote greater efficiency.'" *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 488 (N.D. Cal. 2011), (quoting *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)). "In order to make this determination, the Court should consider the following factors: 'the interest of members of the class in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; the desirability or undesirability of concentrating the litigation of the claims in the

-35-

particular forum; the difficulties likely to be encountered in the management of a class action.' Fed. R. Civ. P. 23(b)(3)(A)-(D)." *Wolph*, 272 F.R.D. at 488; *accord Leuthold v. Destination Am. Inc.*, 224 F.R.D. 462, 469 (N.D. Cal. 2004).

A class action is also superior to any alternatives because "few potential class members could afford to undertake individual litigation against [Defendant] to recover relatively modest damages." *Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524, 527 (N.D. Cal. 2004); *accord*, *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 718 (9th Cir. 2010). Furthermore, to the extent that individuals would bring suit if class certification would be denied, judicial economy and efficiency, and the risk of inconsistent verdicts, all weigh in favor of class certification. The courts do not need millions of individual actions burdening their dockets. A key part of the relief sought in this case is injunctive relief in the form of an injunction requiring Facebook to make significant changes to its practices with regard to securing consent from both adults and minors. It is obviously crucial that Facebook be directed to make only one set of changes. Prosecution of Plaintiffs' claims on a classwide basis is the only viable means to resolve Plaintiffs' and other Class members' claims, and the Court should certify this action.

**E.  Nationwide Certification And Application of California Law**

A nationwide class is plainly appropriate in the circumstances. Because Facebook is an Internet company and all of its dealings with its Members are through its website, all of the Class Members are similarly situated and exposed to the same policies, practices and procedures. This applies to the SRR, Terms of Use, and Privacy Policy, as well as the means by which Sponsored Stories ads are generated. Ex. 2 (types of actions leading to SS ads); see Ex. 6 Muller Dep., 166:11-170:4 (single version of Terms applies to all users at a given time); Ex. 4 Hegeman Dep., 154:19-185:20 (the elements of a SS ad are the same).

California law is specifically made applicable to all claims against Facebook under the user agreement. Exs. 18, 20, 21, Section 15.1.  Facebook's terms of use contain the following choice of law clause:

> You will resolve any claim, cause of action or dispute ("claim") you have with us arising out of or relating to this Statement or Facebook exclusively in a state or federal court located in Santa Clara County. The laws of the State of

-36-

California will govern this Statement, **as well as any claim that might arise between you and us, without regard to conflict of law provisions.** You agree to submit to the personal jurisdiction of the courts located in Santa Clara County, California for the purpose of litigating all such claims.

Statement of Rights and Responsibilities, Section 15.1. Exs. 18, 20, 21 (emphasis added). Facebook has thus stated that California law applies across the board to disputes with its members / users.

The claims in this case are based upon violation of a pair of California laws, the Unfair Competition Law and the Consumer Legal Remedies Act. In *Wash. Mutual Bank, FA v. Super. Court*, 24 Cal. 4th 906, 921 (2001), the California Supreme Court established that courts must enforce a California choice of law as to a nationwide class so long as "the chosen state has a substantial relationship to the parties or their transactions." California has a substantial relationship to the parties through the residency here of both two of the three class representatives, and the presence of Facebook's headquarters, and one-eighth of the nation's population, many of whom are Facebook users.

Furthermore, California law is the appropriate law as the challenged actions originate out of Facebook's California headquarters. California has an interest in preventing unlawful, unfair, or fraudulent behavior from originating in California. *Diamond Multimedia Systems, Inc. v. Superior Court*, 19 Cal. 4th 1036 (1999) (out of state plaintiffs can sue for actions originating in California). Thus, the UCL can be used to support a nationwide class against Facebook –since Facebook is headquartered in California – and because the challenged practices were implemented at Facebook's California headquarters. "Where the defendant is a California corporation and some or all of the challenged conduct emanates from California," it is proper to apply California statutes to non-California members of a nationwide class. *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 243 (2001). Accordingly, nationwide certification is proper.

### F.  Appointment of Class Counsel Under Rule 23(g)

In connection with any order certifying a class, Rule 23(g)  requires that the Court formally appoint Class Counsel. Of the 9 attorneys practicing at the Arns Law Firm, 5 of

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS

whom, Robert Arns, Steven Weinmann, Jonathan Davis, Kevin Osborne and Robert Foss, work on class action cases as a significant amount of their practices. *See* Arns P.A. Decl, ¶¶ 29-39. During this case, all 5 were also engaged in the litigation of a significant pending class action in the Northern District of California against a major bank, also involving UCL claims. The Arns Law Firm concluded another nationwide class action case during the pendency of this lawsuit, and has commenced and continued to litigate a third, complex action involving some 64 clients. Arns P.A. Decl, ¶¶ 32-33. Robert Arns, Jonathan Davis, and Steven Weinmann all litigated an action against The Home Depot and a related company for wage and hour claims, which resulted in a multi-million dollar settlement. *Id*. ¶ 33. The firm is also presently part of a group of lawyers litigating four separate class actions against skilled nursing facility chains. *Id*.

Jonathan M. Jaffe, of co-counsel Jonathan M. Jaffe Law, has extensive experience in the field of computer software systems design, data privacy and data security, which amply qualifies him to deal with the complex technical issues raised in this case. Arns P.A. Decl ¶39. He has also recently worked on several other class actions, dealing primarily with electronic discovery issues for these matters. *Id*.

## VII.   CONCLUSION

For all the foregoing reasons, the Motion for Final Approval of the Settlement should be granted, the Settlement Class should be certified, the Court should appoint Plaintiffs as Class Representative and their counsel as Class Counsel; the Court should enter the Stipulated Injunction as to the changes to Defendant's website; Plaintiffs' pending motion for attorneys' fees and costs and the requested service awards for the Class Representatives should be granted; and the Court should also dismiss the action with prejudice.

THE ARNS LAW FIRM

By:___/s/Robert S. Arns_____
         Robert S. Arns

JONATHAN JAFFE LAW
By:___/s/ Jonathan M. Jaffe_____
         JONATHAN M. JAFFE
         Attorneys for Plaintiffs

PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT                    CASE NO. CV 11-01726 RS