ROBERT S. ARNS (#65071, rsa@arnslaw.com)
JONATHAN E. DAVIS (#191346, jed@arnslaw.com)
STEVEN R. WEINMANN (#190956, srw@arnslaw.com)
**THE ARNS LAW FIRM**
515 Folsom Street, 3rd Floor
San Francisco, CA 94105
Tel:    (415) 495-7800
Fax:    (415) 495-7888

JONATHAN M. JAFFE (# 267012, jmj@jaffe-law.com)
**JONATHAN JAFFE LAW**
3055 Hillegass Avenue
Berkeley, CA 94705
Tel:    (510) 725-4293
Fax:    (510) 868-3393

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL FRALEY; PAUL WANG; SUSAN MAINZER; JAMES H. DUVAL, a minor, by and through JAMES DUVAL, as Guardian ad Litem; and W. T., a minor, by and through RUSSELL TAIT, as Guardian ad Litem; individually and on behalf of all others similarly situated,<br><br>                   Plaintiffs,<br><br>      v.<br><br>FACEBOOK, INC., a corporation; and DOES 1-100,<br><br>                 Defendants. | **Case No. CV 11-01726 RS**<br><br>**PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION**<br><br><br>Date:  June 28, 2013<br>Time:  10:00 a.m.<br>Courtroom:  3<br>Judge:  Hon. Richard Seeborg<br>Trial Date: None Set |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     CERTAIN OBJECTORS AND THEIR COUNSEL HAVE AN AGENDA OUTSIDE WHAT IS BEST FOR THE CLASS ............................................................ 3

III.    OBJECTIONS REGARDING CLASS CERTIFICATION REQUIREMENTS ARE WITHOUT MERIT ................................................................................. 6

IV.     OBJECTIONS REGARDING THE RELIEF FOR THE MINOR SUBCLASS ARE WITHOUT MERIT ........................................................................... 10

V.      OBJECTIONS REGARDING THE ISSUE OF PARENTAL CONSENT ARE WITHOUT MERIT ......................................................................... 12

VI.     OBJECTIONS REGARDING NOT MAKING CLAIMS UNDER TENNESSEE LAW OR OTHER STATES ARE WITHOUT MERIT ........................................... 14

VII.    OBJECTIONS REGARDING METHOD OF DISTRIBUTION OF CLASS MEMBERS' SHARES AND DISTRIBUTION TO *CY PRES* ARE WITHOUT MERIT ................................................................................................ 18

A.      The Cash Distribution Should Be Increased and Funds Remaining After the Cash Distribution and Fees and Costs Should Go to The Cy Pres Recipients ........................ 18

B.      The Cash Component Of The Settlement Provides Support For The Fairness Of the Settlement ............................................................................................ 19

VIII.   OBJECTIONS REGARDING THE TERM OF THE INJUNCTION ARE WITHOUT MERIT ................................................................................................ 24

IX.     OBJECTIONS REGARDING THE VALUATION OF THE INJUNCTIVE RELIEF ARE WITHOUT MERIT ................................................................................ 25

X.      OBJECTIONS REGARDING THE REQUEST FOR ATTORNEYS' FEES ARE WITHOUT MERIT ................................................................................ 29

A.      The Attorneys' Fees Requested Are Commensurate With Attorneys' Fees Charged In This Market And In Other Cases ................................................................. 29

C.      The Value of the *Cy Pres* Payments and Injunctive Relief Are Properly Included In Assessing the Attorneys' fees ........................................................................ 34

XI.     OBJECTIONS REGARDING CLAIMS OF CONFLICTS AND COLLUSION ARE WITHOUT MERIT ........................................................................... 36

XII.    OBJECTIONS REGARDING ADEQUATE REPRESENTATION OF CLASS BY CLASS REPRESENTATIVES ARE WITHOUT MERIT AND SERVICE AWARDS ARE APPROPRIATE ........................................................................... 38

XIII.   THE RECORD BEFORE THE COURT SUPPORTS THE SIZE OF THE SERVICE
         AWARDS.................................................................................................................... 40

XIV.   THE OBJECTIONS REGARDING ADEQUACY OF NOTICE AND CLAIM FORMS
         ARE WITHOUT MERIT............................................................................................ 42

XV.    OBJECTIONS REGARDING THE RELEASE ARE WITHOUT MERIT .................... 45

XVI.   CONCLUSION ........................................................................................................... 46

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**

**State Cases**

*Winter v. Window Fashions Professionals, Inc.*, 166 Cal. App. 4th 943 (2008) ....................... 17

**Federal Cases**

*Acosta v. Trans Union L.L.C.*, 243 F.R.D. 377 (C.D. Cal. 2007) ................................................. 9

*Alsup v.  Montgomery Ward & Co.*, 57 F.R.D. 89 (N. D. Cal. 1972) .......................................... 7

*Blessing v. Sirius XM Radio Inc.*, 775 F. Supp. 2d 650 (S.D.N.Y. 2011) .................................... 5

*Browning v. Yahoo! Inc.,* 2006 U.S. Dist. LEXIS 100686 ........................................................ 46

*Cassese v. Washington Mutual, Inc.*, 743 F. Supp. 2d 148 (E.D.N.Y. 2010) .............................. 5

*Catala v. Resurgent Capital Services L.P.*, No. 08CV2401 2010 U.S. Dist. LEXIS 63501

   (S.D. Cal. June 22, 2010) ........................................................................................................ 21

*Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ............................................. 46

*Comcast Corp v. Behrend*, 133 S. Ct. 1426 (2013) ............................................................. 30, 31

*Craigslist, Inc. v. Naturemarket, Inc.*, 694F. Supp. 2d 1039 (N.D. Cal. 2010) ......................... 17

*Crawford v. Equifax*, 201 F.3d 952 (7th Cir. 2000) ................................................................. 43

*Fraley v. Facebook, Inc.* 830 F. Supp. 2d 785 (N. D. Cal. 2011) .............................................. 18

*Gonzalez v. Southern Wine & Spirits of Am., Inc.*, No. 11-CV5849, 2012 U.S. Dist. LEXIS

   46401 (C.D. Cal. Mar. 29, 2012) ............................................................................................. 38

*Grunin v. Int'l House of Pancakes,* 513 F.2d 114 (8th Cir. 1975) ............................................. 47

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ....................................................... 28

*Hopkins v Stryker Sales Corp.,* No. 11-CV-02786-LHK 2013 U.S. Dist. LEXIS 16939

   (N.D. Cal. Feb. 6, 2013) .......................................................................................................... 37

*I.B. ex rel. Fife v. Facebook, Inc.*, No. c12-1894 CW (N.D. Cal. October 25, 2012) ............... 13

*In re Baby Products Litigation In re Baby Products Litigation*, 708 F.3d 163 (3rd Cir. 2013) . 39

*In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011) ........ 27, 37

*In re Bridgestone / Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002) .......................................... 20

*In re Cell Therapeutics, Inc.* No. C 10-414 MJP, 2012 U.S. Dist. LEXIS 105235

   (W.D. Wash. Jul. 25, 21012) ................................................................................................... 37

*In re Cendant Corp. Securities Litigation*, 264 F.3d (3rd Cir. 2001) ....................................... 40

*In re EasySaver Rewards Litig.*, No. 09cv2094, 1013 WL 435032 (S.D Cal. Feb. 4, 2013) ..... 41

*In re Google Buzz Privacy Litigation*, No. C10-00672 JW (N.D. Cal. June 7, 2011)................25

*In re HP Inkjet Printer Litig.* 2011 WL 1158635 (N.D. Cal. Mar. 29, 2011) ...........................36

*In re Literary Works Inc. Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011)........13

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000)...................................32

*In re Mexico Money Transfer Litigation*, 267 F.3d 743 (7th Cir. 2001)....................................16

*In re Netflix Privacy Litigation*, Docket No. 13-15754 (N.D. Cal..) ..............................4, 24, 25

*In re Omnivision Techs., Inc.*, No. C-04-2297 SC, 2007 WL 4293467

(N.D. Cal. Dec. 6, 2007)....................................................................32

*In re Online DVD Rental Antitrust Litigation*, Docket No. 12-16038 (N.D. Cal.)......................5

*In re Oracle Securities Litigation*, 132 F.R.D. 538 (N.D. Cal. 1990) ......................................40

*In re Pacific Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995).....................................32

*In re TD Ameritrade Account Holder Litig.*, C 07–2852 SBA, 2011 WL 4079226 (N.D. Cal.

Sept. 13, 2011)...................................................................22

*In Re TFT-LCD (Flat Panel) Anti Trust Litigation*, Case No. MDL No. 1827 ..........................5

*In re: Oil Spill*, MDL 2179, 2013 WL 144042 (E.D. La. Jan. 11, 2013) ...................................5

*Ko v. Natura Pet Prods.*, No. C 09-02619 SBA, 2012 U.S. Dist. LEXIS 128615

(N.D. Cal. Sept 10, 2012) ....................................................33, 37

*Lane v. Facebook*, No. 08cv-3845 RS, 2009 WL 2076916 (N.D. Cal. May 24, 2010),

*aff'd*, 2012 US App. LEXIS 19767 (9th Cir. Sept. 20, 2012) .........................................passim

*Laxmi Investments, LLC v. Golf USA*, 193 F.3d 1095 (9th Cir. 1999) .....................................17

*Levell v. Monsanto Research Corp.*, 191 F.R.D. 543 (S.D. Ohio 2000) ....................................8

*Linney v. Cellular Alaska P'ship.*, 151 F.3d 1234 (9th Cir. 1998) ...........................................21

*Lundell v. Dell, Inc.*, 2006 U.S. Dist. LEXIS 90990, 2006 WL 3507938

(N.D. Cal. Dec. 5, 2006).......................................................46

*McClintic v. Litha Motors, Inc.*, No. C11-859RAJ, 2012 U.S. Dist. LEXIS 3846

(W.D. Wash.12 Jan. 2012) ...................................................8

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) ...............................................43

*Murray v. GMAC*, 434 F.3d 948 (2006) ...........................................................23, 43

*Nat'l Rural Telecomms. Coop. Coop. v. DirectTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004).......22

*Officers for Justice v. San Francisco*, 688 F.2d 615 (9th Cir. 1982)..........................................3

*Perdue v. Kenny A.*, 454 F. Supp. 2d 1260 (2006) ...........................................................35, 38

*Powers v. Eichen*, 229 F.3d 1249 (9th Cir. 2000)..................................................36, 37

*Radcliffe v. Experian Information Solutions, Inc.*, 2013 U.S. App. LEXIS 9216

   (May 2, 2013) ....................................................................................... 42, 43

*Rodriguez v. West Publishing*, 563 F.3d 948 (9th Cir. 2009) ................................. 8, 47

*Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990)......... 21, 37, 38

*Staton v. Boeing*, 327 F.3d 938 (9th Cir. 2003) ...................................................passim

*Steven Brody, et al. v. Merck & Co Inc., et al.*, Case No. 13-2019 (3rd Cir. 2013) ................... 5

*Sullivan v. DB Invs., Inc.*, 2011 U.S. App. LEXIS 25185 (3rd Cir. Dec. 20, 2011).................. 20

*Synfuel Tech. Inc. v. DHL Express*, 463 F.3d 646 (7th Cir. 2006) ................................. 8

*Tetra Tech, Inc. v. Performa Entertainment Real Estate, Inc.*, No. W2007-03344-COA-R3-CV,

   Tenn. App. LEXIS 595 (Tenn. Ct. App. Oct 3, 2008) ......................................... 17

*Ticketmaster v. Tickets.com,* CV99-7654-HLH(VBKx) 2003 U.S. Dist. LEXIS 6483 9

   (C.D. Cal Mar. 7, 2003) ....................................................................... 17

*True v. American Honda*, 749 F. Supp.2d 1052 (C.D. Cal. 2010)............................. 48

*UAW v. GMC*, 497 F.3d 615 (6th Cir. 2007) ................................................... 47

*Vasquez-Torres v. StubHub, Inc.*, No. 07-1328 FMC, 2009 U.S. Dist LEXIS 22503

   (C.D. Cal. Mar. 4, 2009)....................................................................... 7

*Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2012) .................................... 15, 19

*Weeks v. Kellogg Co.*, No. 09-cv-8102 (2011 U.S. Dist. LEXIS 155472

   (C.D. Cal. Nov. 23, 2011)....................................................................... 38

**Statutes**

15 U.S.C. § 77.......................................................................................... 36

Cal. Civ. Code § 3344..........................................................................passim

Cal. Fam. Code § 6701 ............................................................................. 11

Cal. Fam. Code § 6710 ............................................................................. 11

Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501-08 ....................... 11, 12

Personal Rights Protection Act of 1984, Tenn Code. Ann. §§ 47-25-1101 et seq. ...........passim

The Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78 ............... 36, 40

Unfair Competition Law, Bus. & Prof. Code § 17200 et seq. ....................... 16, 17, 18

**Rules**

Fed. R. Civ. P. 23(c) ................................................................................ 47

Fed. R. Civ. P. 23(e) ................................................................................ 47

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

**Treatises**

MANUAL FOR COMPLEX LITIGATION (FOURTH) 2004 § 21.71 ....................................................36

**Other Authorities**

*Nagareda*, Class Certification in the Age of Aggregate Proof, 84 N. Y. U. L. Rev. 97
 (2009)....................................................................................................................................15

# I.      INTRODUCTION

Plaintiffs submit this Memorandum in response to the objections to the Proposed Settlement (the "Settlement") and to Class Counsel's Motion for Attorneys' Fees, Costs and Class Representative Service Awards ("Fee Motion").   Subsequent to the Court conditionally certifying the Settlement Class and approving notice, a comprehensive e-mail notice program notified approximately 146,000,000 class members.  The Class' reaction to the Settlement has been resoundingly in favor: only 104 objections were filed, 17 of which the class administrator deemed valid; 87 were deemed invalid.[1]  Of those, 11 objectors filed legal briefs; most objections by letter or e-mail contained a paucity of information. (*See* matrices description, *infra*.) Thus, substantially less than 1 out of every 1 million Class members have objected, even including the invalid objections. Furthermore, only 6,946 persons have opted out.

The dearth of objections and small number of opt-outs in a case of this size, and the lack of objections going to the fundamental fairness, adequacy and reasonableness of the Settlement in light of the risks of this litigation are further grounds for the Court to grant final approval to the Settlement.   Several of the objections in the form of briefs include "serial" or "professional" class action objectors who fail to state any good faith objections to the Proposed Settlement, or have other interests beyond simply benefiting the Class.  Counsel in the *C.M.D. v. Facebook, Inc.*, No. 12-1216-RS action pending before this Court have previously argued that the release pursuant to the Settlement would effectively wipe out their claims for a class of minor children.[2]  A self-represented lawyer, Robert Bowman, proudly stated "I am not like those other (*adjectives deleted*) objectors since I have never objected to a class action settlement in all of my eighteen years of practice."[3] Although this attorney stated that the Right of Privacy Laws of Tennessee should apply in his objection, he stated that "I will make a demand to settle

---

[1] According to the Class administrator, Garden City Group ("GCG"), the main reasons for the invalidity of the objections include (1) missing declarations, (2) lack of contact information (3) failure to list the case name and (4) specific reasons for objection in a declaration.  Declaration of Kevin M. Osborne ("Osborne Decl."), Ex. 1, filed herewith. Unless otherwise noted, all declarations filed in support of this motion are heretofore denoted as "[declarant's name] Decl."
[2] Osborne Decl., Ex. 8.
[3] Jaffee Decl.; Arns Decl.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

this case that will not be outrageous, but I am not going to low ball it"[4] without requiring any changes to benefit the class. Thus, the *bona fides* of many objectors and their counsel should cause the Court to approach their objections with great wariness.[5] Section II of this brief will address some of the objectors counsel having an agenda outside what is best for the class.

The following exhibits are provided to aid the Court in organizing the objectors and the issues raised:

| Table 1 (Osborne Decl., Ex. 1) | GCG's Table re the validity of the objections and assignment of objector "numbers" |
| --- | --- |
| Table 2 (Osborne Decl., Ex. 2) | The Arns Law Firm audit of Table 1 |
| Table 3 (Osborne Decl., Ex. 3) | Table of all objections listing their form and content. Totals:<br>• 83 e-mails (63 of which are less than 1 page; all of which are 2 pages or less)<br>• 16 letters (9 of which are 1 page or less)<br>• 11 briefs (ranging from 3 to 29 pages) |
| Table 4 (Osborne Decl., Ex. 4) | Summary of all objections by subject with reference to all objectors raising the named objections |

The following objection categories are discussed as being without merit:

| § III. | Class Certification Requirements |
| --- | --- |
| § IV. | Relief for the Minor Subclass |
| § V. | Issue of Parental Consent |
| § VI. | Not Making Claims Under Tennessee Law or Other States |
| § VII. | Method of Distribution of Class Members' Shares and Distribution to *Cy Pres* |
| § VIII. | Term of the Injunction |
| § IX. | Valuation of the Injunctive Relief |
| § X. | Request for Attorneys' Fees |
| § XI. | Conflicts of Class Counsel and Collusion |
| § XII. | Adequate Representation of Class by Class Representatives & Service Awards |
| § XIII. | Adequacy of Notice and Claim Forms |
| § XIV. | The Release |

As to the objections to the request for attorneys' fees and the proposed service awards, the distribution and fee issues are not among the factors utilized to arrive at the determination to approve a settlement as an appropriate end to class litigation. Instead, "the universally applied

---

[4] See footnote 3, *supra*.

[5] Moreover, the Court should make specific findings regarding the lack of standing of certain objectors and the ethical violations of certain objector counsel. These objectors do nothing more than create a stay of judgment for the class in hopes of earning their own attorneys' fees.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

standard is where the settlement is fundamentally fair, adequate and reasonable." *Officers for Justice v. San Francisco,* 688 F.2d 615, 625 (9th Cir. 1982).  The factors to be balanced by the Court, and which are not implicated by the objections raised here, include:

> The strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience of views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Id.* at 625 (internal citations omitted).  As discussed more fully in Plaintiffs' Memorandum in Support of Motion for Final Approval ("Final Approval Memorandum"), there is strong evidence supporting the Settlement utilizing the above factors.   Accordingly, the Court should overrule all objections as meritless and approve the Settlement and award attorneys' fees, costs, and service awards pursuant to the Fee Motion.

## II.   CERTAIN OBJECTORS AND THEIR COUNSEL HAVE AN AGENDA OUTSIDE WHAT IS BEST FOR THE CLASS

Certain of the Objectors have ulterior motives with respect to this Settlement. Their objections should be scrutinized harshly by the Court and rejected. The law firm Korein Tillery, also lead counsel in *C.M.D. v. Facebook*, No. 12-1216-RS matter, brings the objections of Objector Sheila Shane and others ("Shane Objectors"). The *C.M.D.* plaintiffs made a motion to intervene, and previously posed unsupported objections to the first Motion for Preliminary Approval of the Settlement. Their Motion to Intervene was denied and their objections overruled by the Court in conditionally certifying the Class and granting Preliminary Approval of the Revised Settlement. Korein Tillery's reason for finding an objector to bring an objection to this Settlement is evident: if the Settlement is approved, as Korein Tillery attorney Aaron Zigler has admitted, the *C.M.D.* case will be wiped out because it will not include Sponsored Stories. See Osborne Decl., Ex 10.  This is because, despite the fact that C.M.D. counsel never referred to Sponsored Stories in the filed complaints, it has now latched on to Sponsored Stories as its only viable claim. C.M.D.'s case is about ads involving minors, but the only other type of ad on Facebook besides Sponsored Stories which features the names and likenesses of users are "Social Ads," or "Facebook Ads with social content."  Any claim involving Facebook

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

Ads with social content runs into the substantial argument that there is consent, since the SRRs clearly identify Facebook Ads as something in which social content may appear, in a way that is not currently the case as to Sponsored Stories.

Ted Frank is a lawyer, represented here by himself and his own law organization, the "Center for Class Action Fairness," along with attorney Sam Kazman ("Kazman/Frank Objectors"). Mr. Frank's "Non-Profit" organization lacks credibility as an objector until such time as he reveals the names of the organizations and individuals who are contributors. Mr. Frank's history and writings show that he is a political ideologue and pro-tort reform, anti-lawsuit zealot who would prefer that no company ever be subject to any class action or litigation of any kind.[6] Mr. Frank questions the validity of the class action system and is critical of plaintiff attorneys and judges, which is relevant because it colors his agenda as an objector. Mr. Frank has stated "[t]he whole point of a class action is to generate efficiency that wouldn't be possible in individual actions – so why are the attorneys taking a one-third contingent fee instead of a much smaller percentage?" John O'Brien, *The Incentive of A Class Action*, W. VA. RECORD, Dec. 4, 2011. Thus, he does not have the best interests of the Class, or any plaintiffs at heart, but rather seems to have a goal of making life difficult for contingency lawyers so as to chill their desire to pursue class actions for plaintiffs. Plaintiffs' lawyers would fight to protect Mr. Frank's First Amendment right of free speech, but his history puts in question his motives as an objector.

Several objectors to the settlement have a patterned history of objecting to class action settlements in conjunction with each other. Objectors Katie Sibley, Tracey Cox Klinge (identified in this case as simply "Tracey Klinge"), and Thomas Cox, all from Dallas, Texas, are often linked as objectors in class action settlements. Thomas Cox represents Tracey Cox Klinge in *In re Netflix Privacy Litigation*, No. 13-15754 (N.D. Cal.), pending appeal and *In re Online DVD Rental Antitrust Litigation*, Docket No. 12-16038 (N.D. Cal.), pending appeal. Gary Sibley of Dallas, represents Tracey Cox Klinge in *In re Online DVD Rental Antitrust*

---

[6] See Ted Frank, *End Open Ended Litigation*, WASH. POST, Sept. 7, 2006; Ted Frank, *Arbitrary and Unfair*, WALL ST. J., May 31, 2007.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

*Litigation*, No. 12-16038 (N.D. Cal.) (appeal pending).

Objectors Jo Batman, Ted Frank, and Joseph Darrell Palmer are also serial objectors.  Jo Batman, previously represented by Christopher Batman have both appeared as non-party litigants in one form or another in *Steven Brody, et al. v. Merck & Co Inc., et al.*, Case No. 13-2019 (3rd Cir. 2013); *Cassese v. Washington Mutual, Inc.*, 743 F. Supp. 2d 148 (E.D.N.Y. 2010); and *Blessing v. Sirius XM Radio Inc.*, 775 F. Supp. 2d 650 (S.D.N.Y. 2011).  The same Christopher Batman also appeared with objectors Ted Frank and Joseph Darrell Palmer in the *Blessing* case.  Numerous courts have labeled Mr. Palmer a "serial objector."  He has also been chastised by courts for unethical behavior.[7]

Finally, Objector Robert Bowman's objections are not brought in good faith. On May 17, 2013, after filing his objections, Mr. Bowman initiated communications to Class Counsel stating that he was willing to dismiss or withdraw his objection in return for monetary compensation. *See* Jaffe Decl., ¶¶ 2-15; Arns Decl. ¶¶ 3-12. Objector Bowman's only interest in bringing forward objections is his personal financial gain. As such, his arguments are disingenuous and should not be considered by the Court.

It is requested that these objectors be required to post bonds to pay interest on the payment to the class, *cy pres* awards, service awards, costs and attorneys' fees that are

---

[7] *In re: Oil Spill*, MDL 2179, 2013 WL 144042, at *48 n.40 (E.D. La. Jan. 11, 2013) (noting "Mr. Palmer has been deemed a 'serial objector' by several courts;" and citing a transcript wherein "Mr. Palmer admit[ed] it was 'regrettable' that he had been found to have engaged in 'bad faith and vexatious conduct'"); *In re: Uponor, Inc.*, F1807 Plumbing Fittings Prods. Liab. Litig., 11-MD-2247 ADM/JJK, 2012 WL 3984542, at *3 (D. Minn. Sept. 11, 2012) (noting "the Palmer Objectors appear to be represented by an attorney who has not entered an appearance in this case and who is believed to be a serial objector to other class-action settlements […].  This attorney, Darrell Palmer, paid the appellate filing fee on behalf of the Palmer Objectors"). *See also* Osborne Decl., Exs. 6 & 7.  Further, with respect to Mr. Palmer in the transcript attached as Osborne Decl. Ex. 6, Hon. James L. Robart of the United States District Court for the Western District of Washington called Mr. Palmer a professional objector "not in any favorable sense…" *Id*. at 16:11-14.  Further, Judge Robart stated that Mr. Palmer made at least three misrepresentations to the court in his motion for attorneys' fees, in addition to the false statement on the *pro hac vice* application.  *Id*. at 16:15-18. Finally, Osborne Decl. Ex. 7 is an Appendix A from pleading in the *In Re TFT-LCD (Flat Panel) Anti Trust Litigation*, Case No. MDL No. 1827, which lays our Mr. Palmer's failed "objection" history.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

approved by the Court if they file an appeal and are unsuccessful.

## III.   OBJECTIONS REGARDING CLASS CERTIFICATION REQUIREMENTS ARE WITHOUT MERIT

The "Battalgia Objectors" (represented by attorney Martha Bronson) contend that the case is not suitable for certification because the class definition is unconstitutionally overbroad. They claim the definition includes people who were in Sponsored Stories before they were officially launched and could include Beacon ads and Facebook Connect. Battaglia Objectors admit, however, that there is a Beacon settlement, which means those claims are already gone. The Beacon service was also launched and ended before Sponsored Stories began. This case and its Release only involve Sponsored Stories; there is no release of claims outside of Sponsored Stories. *See* Long Form Notice: Class Definition Exhibit 1-2 to the Declaration of Robert Arns in Support of Preliminary Approval ("Arns P.A. Decl."), Ex. 1-2, (ECF No. 286-3). These objectors also assert that Plaintiffs fail to allege actual harm or damage, so they cannot represent class members who have been harmed and that the sheer size of the Class makes certification improper. (Battalgia, at 13).  First, all Class members have "actual" injuries, in that they were not paid for appearing in Sponsored Stories. Indeed, Plaintiffs defeated a Motion to Dismiss on the very issue of lack of Article III injury on that ground.[8]  Second, there are no limits on certification of a class simply due to size and Objectors cite no such authority. A class action is superior to individual actions here precisely because (1) the claims would be

---

[8] Battaglia Objectors' reliance on cases such as *Vasquez-Torres v. StubHub, Inc.*, No. 07-1328 FMC, 2009 U.S. Dist LEXIS 22503 (C.D. Cal. Mar. 4, 2009) is misplaced.  That case involved a technical violation prohibiting the inclusion of more than five digits of consumer's credit card number on receipts.  There were no allegations of identity theft or other damages, but the statutory damages would have been over $36 million to $2 billion if certified and proven. Thus, the Court found that the class action was not a superior method of litigation since consumers could bring individual actions if they chose, and get attorneys' fees.  Here, the Class has suffered actual damage in form of lost payments for appearing in Sponsored Story ads. The other cases cited for "disproportionate" damages such as *Alsup v. Montgomery Ward & Co.*, 57 F.R.D. 89, 92-93 (N. D. Cal. 1972), point up the potential due process or other problems that may be a risk of litigation but do not rule out certification for settlement purposes.  These cases were all decided on motions for class certification which did not involve a settlement. See Battalgia, at 12 fn. 3 and cases cited therein.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

too costly and difficult to bring individually, for too little reward; and (2) there would be conflicting decisions issued for the various suits. Battaglia Objectors offer no explanation of how claims for emotional distress damages could possibly be brought as a class action in this case (or indeed in any class action), or why they should be brought when anyone who has a significant claim for emotional distress is free to opt out and pursue it.

The objections by the Shane Objectors are the same as those made previously by their counsel Korein Tillery, including that there was no value to the injunctive relief, because Facebook would have to change its SRRs in any event to comply with the law.[9] Unlike in the cases cited by the Shane Objectors and Kazman/Frank Objectors, absent this lawsuit, Facebook might comply by changing its SRRs, but it could not be forced to also further clarify throughout the website that Sponsored Stories are, indeed, ads, nor be compelled to create the extensive notice and control features. *See* Amended Settlement Agreement ("A.S.A."), Ex. 1 to the Arns P. A. Decl., § 2.1 (ECF No. 286-1).

The cases cited by Kazman/Frank purporting to show that Facebook is only being required to follow the law are unavailing as they all involved promises to do specific things which were required by a specific law or failed to require that specific practices be ended. *See, e.g., McClintic v. Litha Motors, Inc.*, 2012 U.S. Dist. LEXIS 3846, *12 (W.D. Wash.12 Jan. 2012) (No. 11-859-RAJ ).[10]  In contrast, as noted above, Facebook is being required to make specific changes to its practices and under the injunction, cannot change them back for two years.

---

[9] Battaglia Objectors purport to adopt the arguments posited in the Motion to Intervene, *C.M.D. v. Facebook, Inc.*, No. 12-1216-RS, ECF No. 224, to argue that Final Approval must be rejected because the parties have not complied with Rule 23, and similarly purports to adopt Facebook's arguments in its Opposition to the Motion to Certify in the present case (ECF No. 141, pages 8-29). The arguments fail for all of the same reasons noted above and in opposition to the Motion to Intervene. See Plaintiffs' Memo of Law In Opposition to Motion to Intervene (ECF No. 191), and Plaintiffs' papers filed in support of the Motion for Class Certification and Joint Motion for Preliminary Approval (ECF No. 280).

[10] In *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543 (S.D. Ohio 2000), the court noted that an injunction requiring compliance is generally not a benefit, but actually held that "[i]n the present case, however, the Court concludes that this aspect of the Settlement Agreement is of value to bargaining-unit employees.." *Id.* at 554. Here, the injunctive relief goes well beyond simple "compliance" with the law.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

*Synfuel Tech. Inc. v. DHL Express*, 463 F.3d 646 (7th Cir. 2006) is also inapposite. The Seventh Circuit Court of Appeals in *Synfuel* was considering injunctive relief changing DHL's procedures which would mostly benefit those who had never used the company before.[11] Here, anyone using Facebook is benefitted by having clarifications of how they or their children might appear in Sponsored Stories. There is no evidence that people will cease using Facebook or its features. Thus, the vast majority of the Class will derive benefits from the relief.[12]

The revisions of the SRRs might, as Kazman/ Frank state, insulate Facebook from further suits. This fact, however, is a good thing if it means Facebook is complying with the law and respecting the rights of its users. Public policy and the Class are served by a defendant taking actions which prevent misunderstandings and clarify rights, especially if they go well beyond the strict minimum required for technical compliance with the law, as they do here. Even more clearly, Facebook could not have been ordered to create notice and control tools that make users aware of, and allow them to review and prevent appearances in Sponsored Stories, or to add further information and similar tools for parents to completely opt out their minor children from Sponsored Stories.[13] Instead, minor changes to the SRRs may have been deemed adequate consent for both adults and minors, and those who explored beyond the SRRs would

---

[11] Also, contrary to the citation of it by the Shane objectors (Shane Brief at 6), the approach of the *Synfuel* court and of the Seventh Circuit in determining the worth of a settlement by measuring it against the "quantified" expected value was expressly disapproved of by the Ninth Circuit Court of Appeals in *Rodriguez v. West Publishing*, 563 F.3d 948, 965 (9th Cir. 2009). Similarly, *Vought v. Bank of America, N.A.*, No. 10-CV-2052, 2012 U.S. Dist LEXIS 14395 (C.D. Ill. October 4, 2012) involved a situation where a bank had agreed to restore monies even to persons who opted out. The Court also found that the settlement was not "egregiously unfair," and that "[s]urely the expected value of the injunctive relief of continued litigation matches closely with the settlement amount; both give a full remedy. *Id*. at *75-76.

[12] Objector Barrett in her Declaration states she has recently used "existing Facebook privacy settings to opt-out of appearing in Sponsored Stories," yet no such feature exists. Jaffe Decl., ¶16. Barrett's lack of understanding of the basic functionality of the Facebook service underscores the value of the Settlement: users will have controls which are currently non-existent.

[13] Compare the relief here with, *e.g.*, *Acosta v. Trans Union L.L.C.*, 243 F.R.D. 377, 395-96 (C.D. Cal. 2007) (changes to the defendants' credit reporting procedures were possibly "inevitable" as they violated federal law).

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

have had no way to determine exactly what Sponsored Stories were, or how they could avoid being in them.

The assertion by the Kazman/Frank Objectors (at 8) that the injunctive relief is of no benefit to the Class members who have suffered in the past because it operates prospectively is sophistry. Class members were never informed of how Sponsored Stories were created. Even savvy users would be unable to opt out their minor children or themselves from particular "stories." Even the "opt outs" who have closed their accounts get the benefit of the injunctive relief, again because they may renew their accounts. There are only 6,946 opt outs from a Class of over 150 million.  *See* Keough Decl., ¶ 12.

Objector Battaglia ignores the Settlement Terms, asserting falsely that "the injunctive relief consists entirely of Facebook making some changes to its Terms of Use which are set forth in its Rights and Responsibilities ('RRS')[sic], as well as and providing some educational information about Sponsored Stories." Battaglia, at 9. Battaglia misses or ignores all of sections 2.1 (b) and (c), wherein the extensive new mechanisms of notice and control are discussed. Objector M.M. (at 2) also misreads the Settlement terms, and states that users only get to stop their appearance in existing ads.  But he fails to acknowledge that users will be able to prevent all appearances in any future advertisements by that same advertiser based on the selected interactions. See A.S.A. § 2.1(c).[14]  But the terms do not stop there: "these settings will include the ability to enable users to prevent individual interactions and other content (**or categories of interactions and other content**) from appearing in additional Sponsored Stories." *Id.* (emphasis added.) The injunctive relief addresses and remediates the harm at the core of Plaintiffs' claims – that Class members were never given notice and have no meaningful way to

---

[14] For example, a user who at one point "Liked" Wal-Mart to get a coupon some time in the past would see on the new notification page that she is now appearing in a Sponsored Stories ad to her friends, caused by that "Like" action she took in the past. She will be able to "control which of these interactions and other content are eligible to appear in additional Sponsored Stories." A.S.A. § 2.1(b). In other words, she controls whether she appears in *any* future Sponsored Stories by advertiser Walmart which arise out of that interaction. A new or different interaction would be necessary for her to appear in any additional Wal-Mart ads.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

control their appearances in Sponsored Stories. The Settlement finally gives Class members notice and control.

Battaglia Objectors (at 11) argue that because some Class members joined before the January 2011 launch of Sponsored Stories, and some joined after, there should be sub-classes created on the basis of that date.  Yet, no rationale is provided for why there should be sub-classes, except the bare conclusion that it would be "unconstitutional" to include claims other than those related to Sponsored Stories' January 2011 launch. Battaglia, at 12.  The plain language of the section of the release regarding its scope shows the released claims only deal with Sponsored Stories and Objectors' reading of the Release otherwise is unsupported. The Class members were affected in exactly the same way by Facebook's conduct and the problems which Plaintiffs identified with the SRRs, irrespective of when they appeared in Sponsored Stories. Thus, further sub-classes are unnecessary.

## IV.   OBJECTIONS REGARDING THE RELIEF FOR THE MINOR SUBCLASS ARE WITHOUT MERIT

The Shane Objectors' contentions of inadequacy and collusion or conflicts of interest are the same as those made on behalf of the *C.M.D.* plaintiffs in their Motion to Intervene with regard to the First Motion for Preliminary Approval. Those objections were implicitly overruled by this Court in granting the second Motion for Preliminary Approval of the Settlement. The objections are still unsupported by any facts or law.

The objections contend minors can never consent to being in Sponsored Stories based on various statutes, such as the Children's Online Privacy Protection Act ("COPPA") 15 U.S.C. §§ 6501-08, and Cal. Family Code §§ 6701 and 6710. These objections lack merit, as such statutes do not apply by their own terms to the conduct at issue. COPPA only applies to minors below the age of 13, and Facebook's SRRs do not allow for minors below age 13.[15]  As to Cal. Family

---

[15] Objector Schacter's conclusion that the Settlement should not be approved because the laws of other states which require parental consent are "not preempted" by COPPA, does not follow. The laws of the other States are not preempted, but claims under those statutes may be part of the Settlement.  Again, those who wished to try to bring such claims in the face of the choice of law provision in the SRRs, had the chance to do so by opting out.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

Code §§ 6701 and 6710, § 6701 (a) only apply to a "delegation of power" and § 6701(c) states that minors cannot "make a contract relating to any personal property not in the immediate possession or control of the minor." Contrary to what Shane Objectors argue, the proposed changes to the SRR language is not a delegation of power or a making "of a contract relating to any personal property not in the immediate possession or control of the minor" under Cal. Family Code § 6701(c). Shane Objectors provide no citations to any cases holding that this type of thing is a "delegation," or that the right of publicity is a piece of "personal property" not in the "immediate possession" of the minor users of Facebook.

Shane Objectors assert (at 4) that the minor sub-class claim is "substantially stronger" than that of the class as a whole, but that since they were not represented by separate counsel, this lack of "adequate structural assurances" (being represented by separate counsel) means that they were not adequately represented. The subclass' claims are only "stronger" under this argument if the lack of consent issue were a given as to them.[16] But Judge Murphy held in transferring the *C.M.D.* case that the SRRs were enforceable as to the venue provision. Osborne Decl., Ex. 11. Thus, the concept that minors cannot consent at all to anything in the SRRs has been decided against *C.M.D.*[17]

Also, like the overall Class, the minor subclass has significant risks of litigation.[18] See Final Approval Mem., at 17-18. Nor do the arguments that counsel is not experienced in the unique issues facing minors carry any weight. Robert Arns has been representing minor

---

[16] The Ninth Circuit in *Lane v. Facebook* noted that the fact that the claims of some Class Members might be more valuable than others did "not cast doubt on the district court's conclusion as to the fairness and adequacy of the overall settlement amount to the class *as a whole*." Further, it noted that "a class-action *settlement* necessarily reflects the parties' pre-trial assessment as to the potential recovery of the entire class, with all of its Class Members' varying claims." *Lane*, 2009 WL 2076916 at *25-26 (emphasis in original) (citation omitted).

[17] Korein Tillery for *C.M.D.* attempted to make a motion for reconsideration, which was denied. In that motion, it was contended by *C.M.D.* that the decision to enforce the venue provision could prove "ruinous to their claims." Osborne Decl., Ex. 8 (*C.M.D.* Motion to Reconsider), at page 1). Korein Tillery did not appeal the denial of the motion to reconsider.

[18] Korein Tillery's co-counsel in *C.M.D.* were also counsel in *David Cohen v. Facebook, Inc.*, No. BC 444482, Superior Court of California , in which the Superior Court ruled that COPPA preemption applied against the claims of the minor class. Weinmann Decl., Ex. 5. Rather than amend or appeal, plaintiffs' counsel in that case chose to dismiss the action. *Id.*, Ex. 7.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

children in actions for 38 years. Arns Decl. ¶ 1. Facebook did not challenge adequacy of counsel in its opposition to the motion for class certification. Each of the Arns Firm and Jaffe Law lawyers have expertise in various areas of the law, including class actions, economics, and computer and web design and interaction design. *Id.* at pp 28-32 (ECF No. 254); Jonathan Jaffe Declaration in Support of Fee Motion, pp 2-6 (ECF No. 256).

Shane Objectors also cite *In re Literary Works Inc. Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011), in which the court found that there was a conflict between holders of different types of claims. The interests of the holders of some of the claims were not protected because the class representatives had an incentive to maximize their own recovery, at the expense of Class members who held only less-valuable claims. Here, there is no similar conflict here as all minors were as equally eligible for the $10 claim as were the adults. Even under Shane Objectors' reasoning, the supposed "strength" of the minor claims would only mean they were less likely to have their claims defeated – there were no enhanced penalties associated with being a minor.[19]   The specific needs of the minor Subclass are reflected in additional protections and information as part of the injunctive relief, including the ability to be opted-out by one's parent. This does not come at a cost to the adult class, and there is no need for separate representation of the minor sub-class.

## V.       OBJECTIONS REGARDING THE ISSUE OF PARENTAL CONSENT ARE WITHOUT MERIT

Currently, neither minors nor their parents are notified the minor children can appear in Sponsored Stories, parental consent is not sought, and no reasonable mechanism exists whereby parents can prevent their minor children from being featured in the ads. Under the Settlement,

---

[19] The decision in *I.B. ex rel. Fife v. Facebook, Inc.*, No. 12-1894 CW (N.D. Cal. Oct. 25, 2012) is distinguishable because the minor plaintiff in *Fife* had purchased Facebook Credits with his parent's credit card without authorization. Thus, the "contract" that was sought to be disaffirmed was the contract to purchase the Facebook credits, and Judge Wilken noted that the claim sought to disaffirm the entire contract, not just parts of it.   Here, few minor Class members would likely want to disaffirm the entire contract with Facebook if that meant they could no longer use the service, and they could not selectively choose to simply disaffirm the aspect relating to potential consent to appearing in Sponsored Stories.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

the new SRRs will require minor users to represent their parent or legal guardian consents to the user of their names and likenesses in Sponsored Stories. A.S.A. Section 2.1(c) (i) Second, Facebook will encourage new users to include in their profile information parent and child relationships. A.S.A. § 2.1 (c) (ii) Where those relationships are confirmed, Facebook will give the parent easy-to-use controls to prevent the minor child from appearing in any Sponsored Stories, all without having to log into the child's account. A.S.A. § 2.1 (c) (iii) Such controls are unprecedented, and are likely to set the bar for all social networks. The proposed changes to the SRRs are sufficient to bring Facebook into compliance with Cal. Civil Code § 3344, in that they expressly seek consent to appearance in Sponsored Stories.

Objectors take issue with minors representing that they have their parents' consent. If it is acceptable for a person to self-identify as a minor, then it should also be acceptable for the Court to recognize that those same persons will be likely to also follow the procedures for acknowledging the parent-child relationship, or state that their parents are not on Facebook and thus removing them from being in Sponsored Stories. Anyone who continues to use Facebook in the light of the new SRRs once they are implemented, is on notice that such consent has been sought and is deemed granted through further use and actions taken which can trigger Sponsored Stories.

Objector Fellmeth argues that Facebook should require children to identify their parents on Facebook, then receive that parent's explicit consent to appear in each ad. Fellmeth, at 20. This suggestion makes several assumptions, including that minors have parents on Facebook, and that parents are willing to have their mailboxes filled with notifications regarding every single ad. Finally, it assumes parents will then proceed to log in to Facebook and grant explicit permission to Facebook to show that ad. It is a system designed to fail from the start. The Fellmeth's thought experiment further ignores that Facebook is a popular service among tens of millions of minor Class members, the service is provided at no charge to minors, which service costs Facebook money to provide. If Facebook could not show advertisements to minors, it might not be able to offer the service to minors at all. This is likely not in accordance with the

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

wishes of the millions of minor Class members or their parents.

Furthermore, Fellmeth's procedure would cause more harm than good. Registration on Facebook (as on almost all other websites) works on the honor system as far as users self-identifying as minors. If minors were to be told that they could not use Facebook's features unless an adult signed-off on each individual ad, then they would simply create accounts as adults. Facebook currently has in place controls which explicitly protect minors based on the age indicated when they register. For example, unknown adults are unable to contact minors. Inappropriate ads such as alcohol ads and dating service or sexually-relevant ads are not shown to minors. Minors forced to lie about their age would end up subverting these safety controls, and become at risk of being exposed to these hazards.  Instead, parents under the Settlement will have significant notice and control that did not exist prior to the Settlement without any increased risk to the minors.

## VI.      OBJECTIONS REGARDING NOT MAKING CLAIMS UNDER TENNESSEE LAW OR OTHER STATES ARE WITHOUT MERIT

Objector Robert Bowman (a practicing attorney acting in pro per), complains that the fact that Plaintiffs did not bring claims under Tennessee law, specifically the Personal Rights Protection Act of 1984, Tenn Code. Ann. §§ 47-25-1101 et seq., ("PRPA"). Bowman misapprehends the test for commonality after *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2012). *Dukes* did hold that the action must resolve issues that will "generate answers apt to drive the resolution of the litigation." *Id*. at 2550-25511, quoting *Nagareda*, Class Certification in the Age of Aggregate Proof, 84 N. Y. U. L. Rev. 97, 131-132 (2009). But this case clearly does that, as noted in the Final Approval Memorandum. Bowman's claim is really only that the failure to assert in the Complaint the laws of the State of Tennessee has rendered the Class Representatives inadequate. This argument fails for several reasons. First, it is not incumbent upon the Class representatives to raise the laws of every state when bringing a nationwide class. As the Court of Appeal for the Seventh Circuit held in considering a similar objection, nationwide class actions are routinely brought notwithstanding differences in proof under similar statutes in other States:

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

> Nonetheless, the objectors imply, these class representatives are inadequate because they failed to investigate and deploy every potential state-law theory. Why they should have an obligation to find some way to defeat class treatment is a mystery. It is best to bypass marginal theories if their presence would spoil the use of an aggregation device that on the whole is favorable to holders of small claims. Instead of requiring the plaintiffs to conduct what may be a snipe hunt, district judges should do what the court did here: Invite objectors to identify an available state-law theory that the representatives should have raised, <u>and that if presented would have either increased the recovery or demonstrated the inappropriateness of class treatment.</u>

*In re Mexico Money Transfer Litigation*, 267 F.3d 743, 747 (7th Cir. 2001) (emphasis added). The Court of Appeals, affirming certification of a nationwide class, also noted that certifying a class for settlement purposes avoided the "pitfall" of individual issues that would have to be decided under the materially varying laws of various states which could otherwise militate against certification.

Second, Objector Bowman does not explain how the PRPA would be superior to the claims under Cal. Civil Code § 3344 and the Unfair Competition Law, or that it would have increased the recovery. Indeed, § 3344 unlike the PRPA has a statutory penalty of $750 that vastly exceeds the profits which were made from any individual class member (even were those actual damages or profits as to them trebled), as borne out by Plaintiffs' experts damages assessments. *See* Final Approval Memorandum, at 20-25.   § 3344 applies to claims by users against Facebook because of the choice of law provision in the SRRs. Weinmann Decl., Ex. 13. The idea that under Tennessee law (or California law) this "meeting of the minds" requirement would result in the SRRs being entirely unenforceable is mistaken. Many courts have held that consent to at least some of the terms of use can arise from continued use of a website.[20]   This

---

[20] "[A] contract can be formed by proceeding into the interior web pages after knowledge (or, in some cases, presumptive knowledge) of the conditions accepted when doing so." *Ticketmaster v. Tickets.com,* CV99-7654-HLH(VBKx) 2003 U.S. Dist. LEXIS 6483 9 (C.D. Cal. Mar. 7, 2003); *see Craigslist, Inc. v. Naturemarket, Inc.*, 694F. Supp. 2d 1039, 1052 (N.D. Cal. 2010) (party consented to forum selection clause in website's terms of service by accessing website). Cases such as *Winter v. Window Fashions Professionals, Inc*., 166 Cal. App. 4th 943 (2008) and *Laxmi Investments, LLC v. Golf USA*, 193 F.3d 1095, 1097 (9th Cir. 1999), involving parties who had engaged in contract negotiations (a franchise agreement in both *Winter* and in *Laxmi*) are inapposite as to the type of "meeting of the minds" which occurs when one uses a website.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

includes Judge Murphy in the *C.M.D.* matter; he enforced the venue provision in Facebook's SRRs, as to a class of minors. Osborne Decl., Ex. 5.  Thus, a Tennessee plaintiff (or indeed any plaintiff from another State) would have to try to assert their PRPA or Tennessee common law (or other) claims in California. Further, he or she would likely not be able to take advantage of Tennessee contract law because it is likely that the choice of California law in the SRRs (Compl. ¶ 48) would also be enforced. The Tennessee statutes are subject to the same defenses of implied consent, use of pseudonyms, and other that were raised by Facebook (and which could be raised again by Facebook if the Settlement were to be rejected, at trial and on appeal). As Bowman admits, disgorgement of all profits was a claim made in the Complaint in this matter under the Unfair Competition Law, Business & Professions Code § 17200 et seq.

Recovery of all possible damages is not realistic in a settlement context, regardless of which laws are sued under. Claims under Tennessee common law also would not be amenable to class treatment, given that it would be a question of fact whether there would be a "meeting of the minds" for each individual. *See* Bowman Brief, at 10, citing *Tetra Tech, Inc. v. Performa Entertainment Real Estate, Inc.*, No. W2007-03344-COA-R3-CV, Tenn. App. LEXIS 595, at * 12 (Tenn. Ct. App. Oct 3, 2008). Anyone bringing such a claim would also have to prove their individual damages, which would be both difficult and not worth it to most, given the small amount of actual damages as explained by Plaintiffs' experts, and the high cost of proving such damages. [21] The claims could not readily be brought as individual actions due to the issues proving damages for a single plaintiff who is not a celebrity or does not have a record of being paid for his or her endorsement or likeness.

Bowman also asserts that Plaintiffs "abandoned" the statutory claims under Cal. Civil Code § 3344 and "ignored" its statutory penalty and disgorgement of profits remedy. Bowman at 12. Plaintiffs took the statutory penalties under § 3344 them into consideration and also the substantial risks associated with certifying/bringing them to trial. Not only did Plaintiffs discuss

---

[21] Again, Judge Koh held on the Motion to Dismiss that Plaintiffs must prove actual damages before being entitled to seek the statutory damages under § 3344.  *Fraley v. Facebook*, *Inc.* 830 F. Supp. 2d 785, 809-811, 812 (N. D. Cal. 2011).

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

disgorgement of profits on Preliminary Approval, <u>their entire theory of damages is based upon</u> <u>the calculation of profits generated from the appearance of Class members in Sponsored</u> <u>Stories</u>.[22]  Further, there are contested issues associated with determining what "profits" and "damages" are for purposes of asserting claims under either § 3344 (or under the Unfair Competition Law, Business & Professions Code § 17200 et seq., which also allows for restitutionary disgorgement of profits). Such issues also exist as to any "profits" sought to be disgorged or "damages" on which treble damages could be based (Bowman also argues for treble damages under the PRPA).  Damages must be determined even to support the statutory penalty under § 3344 or to provide a base figure for calculating treble damages.  § 3344 allows additional damages from, "any profits from the unauthorized use that are attributable **to the use** and are not taken into account in computing the actual damages." (emphasis added). Whether Facebook can include its costs of creating the ad platform itself in its costs to determine profits is just one issue presented.  Bowman offers no explanation of how he would calculate "profits" under the PRPA or § 3344. Moreover, Plaintiffs' expert's calculations are that the "profits" or "damages" per class member is less than $1 – far less than the $10 for which Class members were eligible under the Settlement.

Bowman also raises the possibility of collusion with Facebook to ignore the PRPA and other statutes that would increase Facebook's exposure. Bowman, at 13-14. As if the $112.5 billion or more attributable to California statutory damages for the 150 million Class members were not sufficient. Even if Plaintiffs were able to achieve a judgment for such an amount in litigation, while Facebook's practices continued, it would create a due process issue for Facebook to appeal.[23]

---

[22] See Plaintiffs' Memorandum in Support of Joint Motion for Preliminary Approval of Class Action Settlement, at 18-24 (ECF No. 280).

[23] Mediator in this case, Hon. Edward Infante (ret.) noted in his declaration in support of the Settlement that $100 million net fund would be necessary to pay each and every Class member $1 if the class were 100 million strong, and a $10 recovery for all would cost $1 billion.  Again the statutory damages provided in California Civil Code § 3344 are $750 per violation, or $75 billion even on this smaller assumed class. An award of such size leads to a due process problem which would be a great risk of continued litigation.  Declaration of Hon. Edward A. Infante ISO MPA of Proposed Class Settlement at ¶ 18 (ECF No. 178); Arns P.A. Decl. Ex. 2.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

Bowman's arguments that the proposed Class violates the Rules Enabling Act or "principles of federalism" are without merit. *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. at 2541 is inapposite because there are no substantive rights being "abridged." In *Dukes*, the issue was whether Wal-Mart would be deprived of any defenses it might have had under the laws of the several States if a nationwide class were certified. *Id.* This argument is just another way of saying they should not be deprived of their PRPA claim. Here, any Class members who prefer to litigate under other laws, are free to opt out which of course, a defendant cannot. Courts have approved nationwide class action settlements for years and they do not violate the Act or principles of federalism.[24]

## VII. OBJECTIONS REGARDING METHOD OF DISTRIBUTION OF CLASS MEMBERS' SHARES AND DISTRIBUTION TO *CY PRES* ARE WITHOUT MERIT

### A. The Cash Distribution Should Be Increased and Funds Remaining After the Cash Distribution and Fees and Costs Should Go to The Cy Pres Recipients

As noted in the Final Approval Memorandum, Class Counsel has concluded that the cash distributions should be increased to $15 per claimant.   The residual monies after the distribution, and after costs and attorneys' fees, should be distributed to *cy pres*, as remains a good way to ensure the maximum number of people benefits by the Settlement monies. This increased *cy pres* distribution removes the already minimal force of the objections by Objectors Wasserman and Kazman/Frank, who request that the Court distribute the balance of the undistributed money in the Settlement Fund to the Class members.   The benefits to the Class of the *cy pres* award, and hence part of the justification for it, are discussed in Section IV(H) of the Final Approval Memo.

---

[24] The best that Bowman can muster in support of this argument for case law is a general statement from a Seventh Circuit opinion about policy decisions of the states (*In re Bridgestone / Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002), and a dissenting opinion in a Third Circuit case (*Sullivan v. DB Invs., Inc.*, 2011 U.S. App. LEXIS 25185 (3rd Cir. Dec. 20, 2011) (Jordan, J. dissenting). The proposition in *Sullivan* is, as Bowman points out, almost exactly the reverse of the point he is attempting to make.  See Bowman brief at 15-16.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

As to the notion that monies should not go to *cy pres* until the Class members are "made whole," the claiming Class members will have been made whole. Based on figures provided by Facebook, the average additional revenue that Facebook is calculated to have earned per class member was only between approximately $0.94 to $1.45. *See* Final Approval Memo, 21-22.[25] Thus, the amounts offered of $10 to $15 to the claiming Class members is not disproportionate to the damage suffered by the vast majority of Class members. As 614,997 persons made claims, over $6,140,000 will actually be distributed to Class members who made claims with $10 going to each claimant; if $15 is distributed, then almost $9.2 million will be distributed.

Plaintiffs estimate that after distribution and the amount requested for attorneys' fees and costs, if $15 to each Class members is distributed, a *cy pres* award of approximately $2 million to the suggested recipients will remain for the benefit the Class. The Court of Appeals for the Ninth Circuit, and other jurisdictions, have recognized that *cy pres* awards are justified to further the interest of a class. *See Lane v. Facebook*, 2009 WL 2076916 (N.D. Cal. May 24, 2010) (No. 08-3845-RS), *aff'd*, 2012 US App. LEXIS 19767 (9th Cir. Sept. 20, 2012); *Catala v. Resurgent Capital Services L.P.*, No. 08CV2401 2010 U.S. Dist. LEXIS 63501 (S.D. Cal. June 22, 2010); *Six (6) Mexican Workers,* 904 F.2d 1301, 1305 (9th Cir. 1990).

**B. The Cash Component Of The Settlement Provides Support For The Fairness Of the Settlement**

A settlement is not an outright win, and there is not enough money to pay everyone in the entire class a meaningful amount. That a party <u>may</u> have achieved a "better result" in settlement is also simply not a supportable argument. *Linney v. Cellular Alaska P'ship.*, 151 F.3d 1234, 1242 (9th Cir. 1998);  *see also In re TD Ameritrade Account Holder Litig.*, C 07–

---

[25] The determination of damages is complex, and Plaintiffs refer the Court to and incorporate by reference their Memorandum in Support of their Joint Motion for Preliminary Approval (ECF No. 280) (particularly pages 17-23, and the supporting papers, including the Declarations of Robert S. Arns, Jonathan E. Davis, and their attachments, particularly the Declarations of Gary Frazier, David Taber, Richard Drogin and Fernando Torres (Arns P.A. Decl. Exs. 5-8).

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

2852 SBA, 2011 WL 4079226, at *12-13 (N.D. Cal. Sept. 13, 2011).[26] The District Court for the Central District of California has held:

> In assessing the consideration obtained by the class members in a class action settlement, '[i]t is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness.'  In this regard, it is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial.

 *Nat'l Rural Telecomms. Coop. Coop. v. DirectTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) (citations omitted).

Similarly here, the fact that only a percentage of the Class will receive $10-15 (if the Court agrees to increase the distributions to $15) does not render the amount in settlement – here $9.2 million potentially distributed to the Class – too low, even in light of the $750 statutory damages provision in Cal. Civil Code. § 3344. Again, most Class members' actual damages will be below a dollar.[27] To the extent that certain Class members do not receive a cash payment, they are still receiving the benefit of the injunctive relief, the *cy pres* award, and the impact on the online industry that the Settlement will bring. Persons who believed that they have viable claims for more were free to exclude themselves and bring a separate suit, as the Ninth Circuit noted in *Lane*.

The related contention that the amount of the Settlement is inadequate based upon the idea that the cash value alone is worth 1% of a theoretical maximum has to mean there was only a 1% chance of recovery is specious. This "argument" is based upon the Seventh Circuit Court of Appeals' offhand comments in *Murray v. GMAC*, 434 F.3d 948, 952 (2006), that the settlement

---

[26] Battaglia Objectors also seem to complain that Facebook Ads are not part of the lawsuit. This case has never involved Facebook Ads, and the release does not affect (or release) any claims concerning Facebook Ads, as Battaglia Objectors admit. In footnote 1 of the Battaglia Objectors Brief, they mistakenly assert that "Farmville" is a Facebook "service."  It is not. It is a game created and run by the company Zynga. *See* http://company.zynga.com/about. Thus, the objection that the Court has no jurisdiction over Facebook's "Advertisement" is incorrect in that this is not advertising a Facebook service but rather a third party game.

[27] Even trebling the amounts per class member, would net the Class members far less than the $10-$15 claimants will receive.  Even using what was referred to in the Joint Motion, profits of $74 million being settled for $20 million is hardly unreasonable but is more than fair.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

at issue there was settling for less than 1% of the minimum statutory award and the Court's dissatisfaction with the amount of the proposed service awards. Using a faulty view of the facts, Frank twists the analogy past the breaking point by asserting that the Settlement here will result in only 8 cents per Class Member by including the <u>entire Class</u> rather than those who choose to make a claim and dividing up the cash equally. Claiming Class members <u>will</u> get $10 each. In the *Murray* case, if <u>all</u> of the unnamed Class members had claimed, they would have each received 75 cents. This is a settlement, and the amount of settlement cannot be equated with the maximum possible damages.  The Seventh Circuit's dicta does not translate into a rule of proportionality in theoretically achievable statutory damages and the amount of the class representatives' service awards, let alone a hard and fast rule as to the amount for which a case should settle.

The assertion that the "vast majority" of Class members were not "eligible" for monetary compensation is simply untrue. The entire Class was eligible to make a claim, and 614,994 did so. The criticisms that it was possible that the Class would get "nothing," in terms of cash distributions, have been mooted by those 614,994 claims. Thus, the references to the Class Action Fairness Act's concerns that offering a "zero" value settlement to the Class is inappropriate, are without any force whatsoever. The Class also gets the benefit of the injunctive relief and *cy pres*, so this is in no sense a "zero" value settlement. Similarly moot is the argument that the Class payments should not be reduced on a pro-rata procedure if there are too many claimants. In fact, there is money left which can be distributed to *cy pres* recipients.

Objectors contend that the amount to go to *cy pres* is minimal, and not appropriate and seems to be a nuisance payment by Defendant. Should the Court approve a $15 per claim distribution of the entire residual Settlement Fund amount after fees, costs and the Class Member cash distribution, the amount to go to *cy pres* will be approximately $5 million. This is not an inconsiderable sum of money. Plaintiffs contend that it is certainly more effectively put to use as a benefit to the Class in *cy pres* than if it were distributed to the existing claimants to increase their payments above $15 by a few dollars.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

Kazman/Frank Objectors argue that the Court should exercise discretion afforded in the Settlement to favor distribution to the Class over *cy pres*; that distribution to *cy pres* is disfavored as compared to direct payments.  The Court does have the power to augment as to the underline{claiming} Class members  (and possibly *cy pres* recipients) under A.S.A. 2.3(b), rather than using it to pay *cy pres*.[28] However, the recent decisions in *Lane v. Facebook*, 696 F.3d 811 (9th Cir. 2012) and in *In Re Netflix Privacy Litigation*, No. 5:11-CV-00379, 2013 U.S. Dist. LEXIS 37286 (N.D. Cal. March 18, 2013) (Davila, J.) ("Netflix") support the idea that *cy pres* distributions are appropriate in cases such as this.

While Objectors Kazman/Frank "side with the dissents" in the refusal to rehear the *Lane* case en banc and declare that it was "incorrectly decided," Kazman/Frank Brief at 19 n.16, the published existing opinion is the law and the Court of Appeals held that distribution to *cy pres* recipients was appropriate, including one which was created with Facebook personnel on the board of directors. Further, the Court of Appeals noted:

> Objectors' argument misunderstands the *cy pres* doctrine and the principle from our case law that a *cy pres* remedy must provide the "next best distribution" absent a direct monetary payment to absent class members. We do  not require as part of that doctrine that settling parties select a *cy pres* recipient  that the court or class members would find ideal. On the contrary, such an intrusion into the private parties' negotiations would be improper and disruptive to the settlement process.

*Lane*, 696 F.3d at 820-21 (Citation omitted and emphasis added). *Lane* also included an injunctive relief component, in that Facebook agreed to permanently terminate its *Beacon* program, and the Court held that this agreement was not illusory even though it had already stopped using it, because it would otherwise have been free to restart the program at any time. *Id*. at 826.

In *Netflix*, the overall settlement was for $9 million, with the "cash" component of the settlement consisting entirely of *cy pres* distribution to twenty "not-for-profit organizations,

---

[28] Indeed Plaintiffs have suggested to the Court that it increase the distribution to $15 each, however, they believe the residual after that distribution, likely about $2 million, should still go to *cy pres* recipients for the benefit of the Class.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

institutions, and programs for the purpose of educating 'users, regulators, and enterprises regarding issues relating to protection of privacy, identity, and personal information through user control, and to protect users from online threats.'" 2013 U.S. Dist. LEXIS 37286 at *5-6. The District Court also noted that given the size of the class, 62 million persons, "each class member would receive a de minimus payment in the event of a direct class cash payout." *Id*. at *20. Thus the Court held that the distribution to the *cy pres* recipients, to a list of organizations it expressly noted "is similar to that of the Google Buzz *cy pres* distribution," was appropriate.[29] Tellingly, the Court also held "the settlement amount—**which includes the size of the cash distribution, the *cy pres* method of distribution, and the injunctive relief**—to be a factor that weighed in favor of approval." *Id*. at *21 (emphasis added). The District Court in approving the settlement, noted that many of the objectors "present philosophical attacks on the law providing for *cy pres* settlements," and express disapproval that the charitable *cy pres* organizations, and not the Class members, receive the monetary settlement funds." *Id*. at *34 The court held: "Objections of this nature find no support in the law; as the Court has explained, *cy pres* distribution has been found to be an appropriate relief mechanism." *Id*. at *34-35 (citing *Lane*, 696 F.3d at 819, and *Nachsin*, 663 F.3d at 1036).

Kazman/Frank take the polar opposite approach from Objector Fellmeth as to minors: they posit that it is "far from obvious that curtailing the internet freedom of minors and shielding them from commercial speech is an unambiguous social good." Kazman/Frank Brief at 20. They therefore advocate for an increased cash distribution to the claiming Class members. Plaintiffs have suggested to the Court than an increase distribution to $15 may be ordered by the court, but believe that any remainder after that, projected to be approximately $2 million should be distributed to *cy pres*, which would benefit the entire class. Given the known claims rate, the alternative suggestions as to what to do if the claims rate were lower, and the suggestion that an all-*cy pres* distribution would require additional notice, are each now moot. Objectors argue that the Settlement is nothing but a donation to non-profits the lawyers like.

---

[29] *See In re Google Buzz Privacy Litigation*, No. C10-00672 JW (N.D. Cal. June 7, 2011).

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

Again, there is no serious discussion of any deficiencies in the Settlement or of the non-profits themselves or their goals. These *cy pres* recipients are worthy under the Ninth Circuit's standards, and will employ the monies in ways which will benefit the Class.

Similarly, to say that the *cy pres* awards are not appropriate because no proof was submitted that cash payments would be burdensome or costly, and *cy pres* awards are poor public policy (Battaglia, at 8, citing Ted Frank) assumes incorrectly that this is a requirement. It is not. There are 123 million Class members, and it is certainly costly and burdensome to try to distribute to everyone. The only realistic options were to try to give some money directly for those who wanted it, but only if it was going to be a meaningful amount, or to give it to *cy pres*.

## VIII.  OBJECTIONS REGARDING THE TERM OF THE INJUNCTION ARE WITHOUT MERIT

Objectors including Shane, Shachter, and Battaglia, among others, complain that the injunction permits Facebook to change its SRRs in two years' time. However, Facebook can be sued again. Because of the dynamic nature of internet-based companies, as Facebook has argued, a rigid injunction lasting indefinitely that dictated exactly how they comply down the road would hamstring the company. That there is no further notice of any changes back to prior procedures, and that no one will realize it, is not a realistic concern. Facebook and any other website may change their policies; they cannot be enjoined to keep them the same forever. Because Facebook is such a part of so many peoples' lives, it is closely watched by privacy advocates. If anything, to the extent there is a concern, it is another reason why residual monies should go to the *cy pres* recipients, who will be among the many entities and persons closely watching Facebook.

Once users are given notice and control, the expectation for them to always be there will be set. Massive user backlash was followed by immediate reversal of policy when Instagram attempted such a move shortly after being acquired by Facebook. The two-year term benefits Facebook users by reasonably minimizing legal constraints on technological development. Preventing Facebook from developing even better notice and control features than those won by the Settlement would not be in the Class' best interest. And of course, if Facebook undoes

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

the changes made in the SRR, or otherwise engages in illegal conduct, Class members will have a new cause of action.

## IX.    OBJECTIONS REGARDING THE VALUATION OF THE INJUNCTIVE RELIEF ARE WITHOUT MERIT

The Settlement provides injunctive relief in the form of not only the changes to the SRRs which give notice to the Class and seek users' consent to appearance in Sponsored Stories, but also easy-to-use features that give heretofore non-existent, meaningful controls to Class members. Class members can stop existing Sponsored Stories from running, but more significantly, prevent *future* appearances in Sponsored Stories. Objectors assert that the injunctive relief is without value, but make numerous false assumptions and errors in logic and fact. The injunctive relief is extremely valuable, and fully supports both the fairness of the Settlement and the attorneys' fee and service award requests.[30]

Plaintiffs proposed two theories for valuing the latter component of the injunctive relief in this settlement. First, the valuation proposed by expert economist Francisco Torres treated the commercial use of Plaintiffs' names and likenesses as a commercially valuable asset. He placed an economic value on that asset and argued that allowing the Plaintiffs' to opt out of Sponsored Stories gave Plaintiffs control of that value. Second, expert economist Phillip Allman concluded that the injunctive relief gives plaintiffs the right to control the commercial use of their name and likeness in Sponsored Stories. As an alternative to the Torres method, Professor Allman calculated the value of this right using a "real option value" analysis. Objectors contend

---

[30] While the Settlement can be approved without placing a value on the injunctive relief, this Court can and should place a value on the injunctive relief as a part of ruling on the fairness of the settlement and the attorneys' fee application. *See In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011) (reversing approval of fees based on failure to quantify lodestar). The Ninth Circuit Court of Appeals held that injunctive relief could not be considered in evaluating an attorney's fee application if the District Court failed to place a value upon it. *Bluetooth* is, however, otherwise inapposite as the requested attorneys' fees were far greater as a proportion of even the cash recovery (indeed, far exceeded them) than the fees here. In *Bluetooth*, $100,000 was to be distributed in cy pres awards and "zero dollars for economic injury," and the settlement set aside up to $800,000 in attorney's fees. 654 F.3d at 945. The complaint therein had neither sought significant injunctive relief, nor was its value to the Class weighed by the Court below.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

these methods improperly or inaccurately value of the injunctive relief. Namely, they contend the following:

- The relief cannot be counted in the common fund because its value cannot be accurately ascertained
- The methods improperly rely on Facebook's profits from Sponsored Stories [GCG Obj. #s 135, 136].
- The value of the injunctive relief cannot stand in place of statutory penalties [GCG Obj. #s 119]
- The injunctive relief should not be included in accounting for the value of the settlement because it does not relate to the alleged violations of privacy rights [GCG Obj. #s 23]

The objectors rely on *Staton v. Boeing*, 327 F.3d 938 (9th Cir. 2003) for the proposition that the Court should not consider the value of the injunctive relief as a part of the settlement's total "common fund" value. Kazman/Frank, at 8. In that employment discrimination class action, the plaintiffs' attorneys requested the district court approve a fee based on a percentage of the common fund, which included injunctive relief in the form of measures meant to prevent future discriminatory acts against African-American employees. The Ninth Circuit held that the value the settlement agreement assigned to the injunctive relief, $3.65 million, could not be included in the common fund because that amount was derived not from the benefit the settlement conferred upon the class but from the amount the defendant would have to pay to implement the relief. *Staton*, 327 F.3d at 973. The decision noted, however, that a district court acts properly when including injunctive relief in the common fund so long as the relief can be measured "with some degree of accuracy." *Id.*, citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998). The Ninth Circuit further ruled "courts **should** consider the value of the injunctive relief obtained as a 'relevant circumstance' in determining what percentage of the common fund class counsel should receive as attorneys' fees, rather than as part of the fund itself." (*Staton*, 974, citing *Vizcaino*, 290 F.3d at 1049) (emphasis added).

In this case, the injunctive relief is (1) economically measurable, and (2) measured with sufficient certainty. Therefore, the Court should consider the value of injunctive relief as a "relevant circumstance" in measuring the value of the total settlement. The injunctive relief in this case gives control of economically valuable assets – the use of Plaintiffs' endorsements in advertisements – to the Class members. The California Legislature acknowledged such

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

endorsements are valuable when, in drafting Cal. Civil Code § 3344, it assigned a statutory damage equal to the greater of either $750 or "actual damages."  Furthermore, as Plaintiffs' experts have pointed out, there is a burgeoning market where individuals have the ability to literally sell their endorsements on social networking sites. Torres Decl. Regarding the Value of Injunctive Relief, p. 4, ¶ 13 (ECF No. 282.  This gives further support to the argument that the right to control one's endorsements is valuable. By examining the existing market for Sponsored Stories through the lens of financial tools, such as the historical fair market value (Torres Decl., *supra*) and real options (Phillip Allman Decl. Regarding the Value of Injunctive Relief (ECF No. 281)), Plaintiffs have presented two theories that accurately measure the value of this control. These valuations have nothing to do with the amount of money Facebook will spend on the creation of the injunctive relief and, therefore, this settlement is completely unlike the settlement considered in *Staton*. What's more, under the guideline established in *Staton*, the values presented by Plaintiffs give a valuation of the injunctive relief that easily meets the threshold of "some degree of accuracy."

Plaintiffs' experts calculated the value of the injunctive relief by drawing on data from numerous sources. One such source was the established market value of the commercial use of the Plaintiffs' names and likenesses as measured by the revenue that use generated when Facebook sold its Sponsored Stories product.[31]  Objectors now contend that drawing on these numbers is tantamount to using Facebook's earnings instead of the injury to the Plaintiffs to calculate Plaintiffs' damages, a method previously rejected by the Court. This argument fails. The Court has not held that earning cannot be considered, and in fact, Plaintiffs would have sought disgorgement of profits, a remedy based entirely on defendant's earnings, had the case proceeded to trial. Second, the experts' calculations do not <u>substitute</u> Facebook's earnings for Plaintiffs' damages. Rather, the experts use the income generated by the Facebook's sale of advertising using Plaintiffs' publicity to calculate the market value of Plaintiffs' publicity as an

---

[31] This data was used to calculate the monthly incremental revenue in the Torres declaration and the spot price of the real option in the Allman declaration.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

asset. Thus, while the revenue Sponsored Stories generated was an element in Plaintiffs' injunctive relief valuation, it was not a substitute for it.

Lastly, the injunctive relief aspect of this settlement centers entirely on the plaintiffs' right to privacy and any argument to the contrary ignores the elements of the injunctive relief. The right to publicity, as plaintiffs have taken pains to point out, is a subset of the right of privacy. Cal. Civil Code § 3344, upon which this case is based, protects individuals' right of publicity by preventing advertisers from misappropriating their publicity without their consent. Consent is the essence of the injunctive relief.  Facebook users will, because of the injunctive relief, have an ability no verdict could have allowed – the ability to remove themselves from Sponsored Stories if they did not consent to their appearance. Plaintiffs' valuation of the injunctive relief identifies the dollar value of that control to the Class.

Citing *Comcast Corp v. Behrend*, 133 S. Ct. 1426 (2013), the objectors contend that the methods of calculating the value of injunctive relief in the present case lack a nexus to the harm suffered by the Plaintiff class. Objectors misread the *Behrend* decision and misapply its holding. In *Behrend*, the plaintiff asserted claims under four theories of antitrust against the defendants. At the class certification stage, three of those claims were rejected and one withstood certification challenges. The plaintiff's method for calculating damages, however, could not segregate the rejected claims from the accepted claim. "Calculations need not be exact," the Court held, "but at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'" *Behrend*, 133 S. Ct. at 1433 (citations omitted). The objectors in the case at bench stretch this holding to support a confused argument that using economic models based on financial tools does not relate to privacy violations. M.M. Objection, at 3. The objectors fail to recognize that economic models using financial tools are used in *all* calculations of damages and are the standard in valuing rights to publicity, as set forth in Plaintiffs' expert declarations.

Bowman's criticism of Plaintiffs' reliance on expert testimony as to the value of the injunctive relief is not supported. Only a small portion of Facebook's $1 billion profit is

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

attributable to the Class members' appearances in Sponsored Stories. Indeed, Facebook received $557 million from "Facebook payments" as to games. See Osborne Decl. Ex. 5. Facebook states its *revenue* for the relevant advertisements were approximately $233 million. Defendant's Memorandum of Points and Authorities in Support of Joint Motion for Preliminary Approval of Revised Settlement, p. 31 (ECF No. 259). From this, costs must be deducted to arrive at profits. The profits which Plaintiffs' experts calculated as to Sponsored Stories were on the order of $74 million. Bowman is also dead wrong that Facebook has "acknowledged" that $74 million is the right number for Facebook's profits as to Sponsored Stories. *Id*.

In summary, Plaintiffs' injunctive relief valuation is appropriate in its methods and the manner it related to the harm to the class. The Objectors' arguments are based on faulty logic and should be overruled.

## X.   OBJECTIONS REGARDING THE REQUEST FOR ATTORNEYS' FEES ARE WITHOUT MERIT

### A.  The Attorneys' Fees Requested Are Commensurate With Attorneys' Fees Charged In This Market And In Other Cases

In this case Plaintiffs' attorneys had exerted a constant tsunami of discovery, preparation of briefs against Facebook, and organized and analyzed a huge number of facts into a cogent analysis.  This was directed, orchestrated and personally carried out by Robert Arns.  Objectors claim that the attorney fees requested exceed the so-called "percentage of recovery benchmark" of 25% in common fund cases by (1) claiming the injunctive relief is valueless and/or (2) improperly claiming the recovery to plaintiffs is less than $20 million despite logic, the record, and case law to the contrary.  The value of the injunctive relief is significant, and the objections to its valuation are discussed more fully in section IX, *supra.* Furthermore, Plaintiffs' fees are also supported by their lodestar and the results achieved in the case.  A full discussion of the support for the requested fees is clearly outlined and explained in the Fee Motion and the supporting Declaration of Robert S. Arns. (ECF Nos. 253 & 254).

Objectors arguing for the common fund calculation of attorney fees attempt to convince the court that the 25% "benchmark" must be strictly adhered to.  However, Courts in other cases have awarded higher fees and higher multipliers to reward superior representation.  *See In re*

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

*Pacific Enters. Sec. Litig.,* 47 F.3d 373,379 (9th Cir. 1995) (awarding 33% of $12 million common settlement fund); *In re Omnivision Techs., Inc.*, No. C-04-2297 SC, 2007 WL 4293467, at *10 (N.D. Cal. Dec. 6, 2007) ("in most common fund cases, the award exceeds that [25%] benchmark"); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 460 (9th Cir. 2000) (affirming award of fees equal to one-third of total recovery).[32]

Kazman/Frank Objectors find fault with the hourly rate charge by the lead Plaintiffs' counsel Mr. Arns ($950 per hour), claiming that his rate is too high, and unsubstantiated.   Mr. Arns is a seasoned trial attorney with 38 years' experience preparing and trying cases.   Arns F.A. Decl., ¶1.   He has tried over 60 cases to a jury verdict, is an active professor teaching trial practice at the University of San Francisco School of Law, where he was named Professor of the Year in 2011. Arns Fee Decl. at 8.   Mr. Arns has received numerous professional awards related to his trial performance and has significant experience settling complex cases.   *Id.*

Kazman/Frank Objectors claim "attorneys with similar or greater national renown have had lower rates rejected."[33]   Kazman/Frank, at 14. "National renown" is subjective and has nothing to do with efficacy in pursuing a claim on behalf of a class in a particular matter. Similarly, the use of the *Laffey* matrix for attorneys' fees would also ignore the realities of complex trial

---

[32]  See additional cases cited in Plaintiffs' Memorandum in Support of Motion for Fee and Service Awards, at page 21 and note 12.

[33]  Kazman/Frank dubiously claim that the *Ko* case stated Judge Armstrong "refused even to accept that claimed rates of '$245/hr. to $595/hr. are reasonable and customer in this district" for this type of complex class action litigation." Kazman/Frank at 14., citing *Ko v. Natura Pet Prods.*, 2012 U.S. Dist. LEXIS 128615 (N.D. Cal. Sept. 10, 2012) (No. 9-2619-SBA).  This is either a wild misreading of the sentence in the opinion, or an attempt to mislead this Court. The court in *Ko* merely noted that in that matter, the "Class Counsel *did not submit evidence* showing that the hourly rates charged, i.e., $245/hr. to $595/hr., [were] reasonable and customary in this district for the type of work performed." *Ko* at *11 (emphasis added). Further, the court in *Ko* noted it was "not convinced that [the] case involve[d] complex factual or legal issues." *Ko* at *10.  Here, Plaintiffs have submitted significant evidence that the fee rates are reasonable and customary as well as extensive discussion of the complex factual and legal issues of the case.  *See* Arns Fee Decl. (ECF No. 254); Decl. of Richard M. Pearl (ECF No. 255); Memo of Law ISO Motion for Atty. Fees (ECF No. 253); Memo of Law ISO Joint Motion for Preliminary Approval (ECF No. 280); as well as the documents filed concurrently with this motion.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

litigation fees in cases similar to this matter for several reasons.[34]  The "updated" *Laffey* matrix generally lumps together all attorneys with more than 20 years experience. *Laffey* Matrix Explanatory Note 1.[35]  As Mr. Arns has been practicing for 38 years, he is thus closer to having *double* the 20-years of experience base. Arns F.A. Decl., ¶ 1.  Further, courts in the Northern District have noted that rates charged by attorneys outside this district are "not germane" to the issues of the case and reliance on such rates are misplaced when it comes to establishing the appropriateness of lodestar request rates.  *Ko v. Natura Pet Prods.*, 2012 U.S. Dist. LEXIS 128615 (N.D. Cal. Sept. 10, 2012) (No. 9-2619-SBA) at *12. Plaintiffs contend that it is more useful to consider the rates examined in the Declaration of Richard Pearl, whose survey of San Francisco Bay Area and California fees found reasonable by courts in recent years supports the fees requested herein. *See* Declaration of Richard M. Pearl In Support of Motion for Attorneys' Fees and Costs and Class Representatives' Services Awards (ECF No. 255).

Kazman/Frank Objectors' allegations regarding the distribution of work among attorneys and the percentages of categories of work performed by those attorneys, are ill-conceived and betray a lack of understanding of how cases are litigated and the novel issues presented in this case.  For example, Kazman/Frank criticize the types and amount of work performed by Mr. Arns, particularly that he spent 618.4 hours on depositions and exhibit preparation. Kazman/Frank, at 15.  However, Mr. Arns prepared for and took eight all-day depositions of Defendant's employees and experts, defended four plaintiffs' experts' depositions, and defended seven Plaintiffs' depositions.  The 21 depositions required extensive preparation and document review.  Arns Fee Decl., ¶¶ 39-42.  Ultimately the file produced included over 1,300 pages of deposition transcripts and extracts.  *Id.* ¶ 42.  Written discovery in the case was also substantial, with 11 sets of Requests for Production, for a total of 214 combined categories

---

[34] A copy of the 2013 *Laffey* matrix with limited explanatory notes is Osborne Decl., Ex. 9.

[35] Further, the *Laffey* matrix is also a flawed tool in that its original research dates to the years 1981 and 1982, and it bases its adjustments on cost of living changes in the Washington DC area, not on actual changes to the cost of legal services in the area, let alone in California.  *Id.* n. 3.  It also appears to be based on general rates for legal services, not for those requiring significant trial and settlement experience related to addressing novel issues, as was required here.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

propounded, and over 200,000 documents being delivered. *Id.* ¶ 43.  These had to be received, sorted, organized, and analyzed by Plaintiffs' counsel, and Plaintiffs made use of a digital document management software (Autonomy) to speed this process.   *Id.* at ¶¶ 44-47. Ultimately, Plaintiffs counsel marked 725 exhibits which were used in the depositions and other filings. *Id.* at ¶ 48.

Regardless of how much initial preparatory work was done, all of this had to be intimately understood by the person in charge of litigation strategy, performing the depositions, and overseeing settlement negotiations.[36]  The research done by Mr. Arns was mainly involved with constantly researching Facebook's policies as set forth in the 200,000 documents produced by Facebook to create a 231-page settlement conference statement, mainly authored by Mr. Arns, that would serve as the receptacle for every relevant document and an explanation of its importance. Arns P.A. Decl., ¶ 2. This settlement conference statement and a 20-page executive summary of it were given to Hon. Edward Infante (Ret.) at the mediation of this matter.  This document would then supply the basis for the opening statement, Plaintiffs' case in chief, and final argument.  The creation of this document took innumerable hours (only some of which were captured and included in the lodestar, which was also reduced through the use of billing discretion, (*see* Arns Fee Decl. ¶62) of researching the law, documents and theories of liability and proof, and was critical in moving the case toward settlement.

---

[36] Fellmeth's citation to *Perdue v. Kenny A.*, 454 F. Supp. 2d 1260 (2006) is inapposite. There, the Plaintiffs' counsel spent 25,423 hours, and the court reduced the attorney hours in the case by 15%, noting the firm's excessive time expenditure, including: 1,648.41 hours spent drafting the complaint and completing mandatory disclosures, over 7,000 hours spent on document production and analysis (in addition to another 13,500 hours spent by outside case-readers whose time recovery was sought as an cost/expense), and over 1,800 hours on expert witnesses and reports. *Kenny A.* at 1275-76.  If anything, this underlines the focused nature of the Plaintiffs' attorneys in this matter, a case with 200,000 pages of documents, and significant pre-settlement litigation by the parties. Arns Fee Decl. pp 15-23. The actual size of the fee award in *Kenny A.* is completely irrelevant, as that was a different market and attorneys than the case at hand, whereas the market rates for Plaintiffs' counsel in this matter are in line with the non-contingent market rates charged for reasonably similar services by California attorneys of reasonably similar qualifications and experience. *See* Decl. of Richard M. Pearl, ¶ 8.

-32-

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

The personal attention given the case by Mr. Arns is reflective of the importance accorded and dedication to the case by Plaintiffs' counsel. The novel issues presented, the complexity of the claims asserted, and the significant resources of the defendant frequently required his experience and abilities.

Kazman/Frank try to reduce the clearly defined $20 million monetary portion of the Settlement, contending that the settlement administration fee is up to $2.55 million,[37] and thus the common fund against which to compare attorneys' fees "can be no more than $17.45 million." Kazman/Frank, at 4-5. The language cited by Kazman/Frank to support this proposition, however, relates to settlements significantly different than the settlement at hand, or are not related to the percentage of recovery calculation.[38] Moreover, the Court of Appeals for the Ninth Circuit has clearly stated that when evaluating the reasonableness of the attorney fees, "[t]he post-settlement cost of providing notice to the class can reasonably be considered a benefit to the class." *Staton,* 327 F.3d at 975. The Ninth Circuit has also found "the choice of whether to base an attorneys' fee award on either net or gross recovery should not make a difference so long as the end result is reasonable. [The] case law teaches that the reasonableness of attorneys' fees is not measured by the choice of the denominator." *Powers v. Eichen*, 229 F.3d 1249, 1258 (9th Cir. 2000).

---

[37] These numbers are also based a complete misreading of the exemplars offered by the settlement administrator (Garden City Group) as to the possible cost of the administration. The GCG representative, Jennifer Keough, offers in her Decl. in Support of Revised Settlement (ECF No. 239) the $2.55 million number (along with others) was merely an example of how the costs of administration are tied to the number of claimants. Worse, Kazman/Frank base all of their percentage of recovery calculations in their brief on a denominator which removes this amount from the settlement fund. As such the Court should disregard the calculations contained in the Kazman/Frank brief as fundamentally flawed.

[38] *See* Kazman/Frank, at 4-5, citing MANUAL FOR COMPLEX LITIGATION (FOURTH) 2004 § 21.71, (immediately preceded by a limitation to "cases involving a claims procedure or a distribution of benefits over time."); the citations to the Notes of Advisory Committee on 2003 Amendments to Rule 23 (where the amount of future payouts may not result in significant actual payments to the class); and language targeted solely at Private Securities Litigation settlements relying on 15 U.S.C. §§ 77z-1(a) (6); 78u-4(a) (6); or language discussing coupon settlements. *In re HP Inkjet Printer Litig.* 2011 WL 1158635 (N.D. Cal. Mar. 29, 2011).

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

### C. The Value of the *Cy Pres* Payments and Injunctive Relief Are Properly Included In Assessing the Attorneys' fees

Regardless of whether a court is evaluating fees through the Percentage of Recovery Method or through the lodestar method, the inclusion of the *cy pres* payments in the calculation of the total recovery for the Class is proper.   In *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990), the Court of Appeals for the Ninth Circuit, relying on *Staton*, *supra*, held that the district court did not abuse its discretion in using the total fund, including the *cy pres*, amount as its benchmark. *Id*. at 1311.   However, the *Six Mexican Workers* guideline of 25% is merely a "benchmark" against which fees, if awarded under the common fund method, can be judged. Courts can deviate from it when exceptional results are achieved, and when a lodestar plus multiplier method are employed. *See Six Mexican Workers*, 904 F.2d at 1311.   Defendants' cases cited for the proposition that there has been some sort of sea change in fee award jurisprudence since the decision in cases like *Powers* and *Bluetooth*, is mistaken.[39] Each case is decided based on particular facts, and it is dangerous to generalize from cases with   differences such as no injunctive relief or other distinguishing factors.[40]

*Perdue v. Kenny A*, 130 S.Ct. 1662, 1669 (2010), for example, cited by Objectors Frank and Fellmeth, involved a suit under 42 U.S.C. § 1988 for inadequate care in a foster children system in Georgia.   The fees of the attorneys were thus calculated only on the lodestar method, with no monetary damages, the relief being only injunctive and declaratory relief, and the enhancement

---

[39] See footnote 30, *supra*, as to why *Bluetooth* is distinguishable.

[40] *See Powers v. Eichen,* 229 F.3d 1249 (2000) (securities common-fund case remanded on the basis that the lower *court* failed to explain the basis for granting a fee award greater than the benchmark); *Ko v. Natura Pet Products*, No. C-09-02619, 2012 U.S. Dist. LEXIS 128615 (N.D. Cal. Sept. 20, 2012) (a case with no substantial injunctive relief component, awarding attorney fees larger than the lodestar submitted in the fee application, but noting class counsel's failure to appropriately substantiate the rates and hours spent); *In re Cell Therapeutics, Inc.*, 2012 U.S. Dist. LEXIS 105235 (W.D. Wash. Jul. 25, 21012) (No. 10-414-MJP) (no showing of great burden to attorneys, where no depositions set, case was not complex, and no particular benefits to the class beyond cash settlement amount); *Hopkins v Stryker Sales Corp.*, 2013 U.S. Dist. LEXIS 16939 (N.D. Cal. Feb. 6, 2013) (No. 11-2786-LHK) (awarding a multiplier of 2.76, amounting to 30% of the common fund). The multiplier requested in this matter is 1.391, and even a minimal valuation of the injunctive reliefs' value of $5 million would place a $7.5 million fee award well within the usual range.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

granted by the District Court was 75% greater than the lodestar, or a 1.75 multiplier – after the

District Court had reduced the lodestar considerably.    Here, Class Counsel are only seeking a

multiplier of 1.5 times lodestar.    Further, the lodestar that has been presented to the Court is

the result of reduced billing in that it does not account for paralegal time, and the attorney hours

have been scrutinized and reduced by Counsel before submission.   Arns Fee Decl., ¶ 62 (ECF

No. 254).   Additionally, Plaintiffs' counsel has continued to provide benefit to the class through

their post-fee application attorney efforts, consisting of over 275 hours preparing the motion for

final approval and addressing the objectors in the matter in the hopes of getting the relief to the

class in a timely manner. Arns F.A. Decl., ¶ 2.   (Counsel is not seeking payment for these

efforts, but if it were, these additional hours would further reduce the multiplier requested in

the case.) Plaintiffs' counsel will also continue to provide benefits to the class in the form of

working with Facebook to determine the necessary changes to the Facebook.com website, as

well as the ongoing monitoring of the website for compliance over the next two years, and

potentially future motions to the court and an audit if Defendant does not comply with terms of

the settlement.   *See* A.S.A. §§ 2.1(d)-(e).   The "post *Kenny A*" cases cited by Kazman/Frank (at

16-17) are also distinguishable.[41]   Kazman/Frank claim that the Ninth Circuit Court of Appeals

in the *Staton* and *Six Mexican Workers* cases did not consider the issues raised in *In re Baby*

*Products Litigation In re Baby Products Litigation*, 708 F.3d 163, 178 (3rd Cir. 2013), but in

fact the Court of Appeals for the Third Circuit there <u>declined</u> to hold that the *cy pres*

distribution should be disregarded from the calculation of attorney fees.   It stated; "[W]e think

it unwise to impose, as [the appellant] requests, a rule requiring district courts to discount

attorneys' fees when a portion of an award will be distributed *cy pres.*" *Id.* at 178 (instead

arguing for a case-by-case analysis).   Courts in several actions have recognized the value of

---

[41] *See Gonzalez v. Southern Wine & Spirits of Am., Inc.*, No. 11-CV5849, 2012 U.S. Dist.
LEXIS 46401 (C.D. Cal. Mar. 29, 2012) (case was only litigated for only 4 months, class
certification was stipulated to, court found attorney hours excessive and cut lodestar); *Weeks v.
Kellogg Co.*, 2011 U.S. Dist. LEXIS 155472, at *126-127 (C.D. Cal. Nov. 23, 2011) (No. 09-
cv-8102) (attorneys failed to provide virtually any detail beyond just raw numbers as to what
their hours was spent on; recovery for class was small compared with analogous case).

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

injunctive relief in approving class actions and approving of the requested attorneys' fees based on that relief.  *See* Final Approval Memo, at 25-27.  The injunctive relief is a valuable benefit to the class, and the *cy pres* acts to keep additional funds in the Settlement Fund from reverting to the defendant and also provides indirect benefits to the entire Class.  The full $20 million cash fund plus the value of the injunctive relief should be considered when benchmarking the lodestar against the total complete value of the Settlement.

## XI.  OBJECTIONS REGARDING CLAIMS OF CONFLICTS AND COLLUSION ARE WITHOUT MERIT

Class Counsel has adequately represented the Class in obtaining the Settlement, and the objectors who advocate for the objections raised by *C.M.D.* in the Motion to Intervene and Motion for Class Certification should be overruled. The Court has already rejected *C.M.D.*'s assertions as to collusion. There was no collusion and the case was hard fought, as summarized in the Final Approval Memorandum and Declaration of Robert Arns in Support of Final Approval.

Nor is the Court's failure to engage in an auction to find the cheapest counsel to represent the Class an appropriate objection. This procedure (championed by retired Judge Vaughan Walker), never became prevalent for various reasons, among them that it is most suited to securities cases where there are multiple firms with similarly situated class representatives.[42] The first problem with this idea here is the current posture of the case, where there is an actual settlement in hand. Cases where it was employed such as *In re Oracle Securities Litigation*, 132 F.R.D. 538 (N.D. Cal. 1990) were at the class certification stage.  This settlement was achieved by *Fraley* counsel, which fought for the settlement and put in the hours to achieve it, and the time for an auction – which Plaintiffs strenuously contend is almost never appropriate – would have been at the class certification stage.  Since there is a settlement agreement on the table, that is what the Court needs to consider.

---

[42]The Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(a) (3), has also done away with the process in securities cases. See *In re Cendant Corp. Securities Litigation*, 264 F.3d, 273-280 (3rd Cir. 2001) (PSLRA is exclusive means to determine lead counsel in securities cases).

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

Complaints that the Attorneys' fee award will come from "one pot" of money and in some sense reduce the Class' total recovery ignore the fact that this is always present with a common fund case.  It is appropriate that the Class pay for representation, as they would have to in any other legal matter, especially as they are reaping the benefits from it. It is also contended that the "disproportionate" attorneys' fees show a conflict of interest for class counsel. Considering the injunctive relief, the potential for over $11 million to go to the Class, and the more than $9.2 million actually going to the Class directly based on the claims made, the requested fees are reasonable. As stated in the Motion for Final Approval Memorandum fees section, the fees are in line with precedent. The absence of a clear sailing agreement does weigh against there being any conflict of interest between Counsel and the Class. Kazman/Frank state that this change is "little comfort" since the requested fees are $7.5 million. Contrary to Objector's assertion, Facebook does have reason to contest the attorneys' fees, as it wants to discourage future suits.

The fact that Arns Law Firm associate Kevin Osborne is a graduate of Santa Clara Law and one of the recipients of the *cy pres* money is the Santa Clara High Tech Law Institute, is not the type of conflict with which the Courts are concerned. *See In re EasySaver Rewards Litig.*, 1013 WL 435032 at *7 (S.D Cal. Feb. 4, 2013) (No. 09-2094) (Attorney status as alma mater of *cy pres* recipient school insufficient to create impropriety). Mr. Osborne has no direct interest in his *alma mater* and is not receiving any monies from it.  Osborne Decl., ¶13.  Kazman/Frank have shown by this that they will seize on any fact, however off-topic and unlikely to have affected anything, and try to twist it to their advantage.

The insinuation by Kazman/Frank that the parties perhaps chose this *cy pres* recipient in the hopes that Judge Koh would recuse herself and that a judge who would be more favorably disposed to the settlement is inaccurate (in that Class Counsel were unaware of the connection with Judge Koh's husband), offensive, and flat out illogical given Judge Koh's ruling on the Motion to Dismiss and the odds that she would recuse herself on that ground (and in fact, no ground was stated).  As these objectors note, this Court has not been anything but impartial and diligent in examining the terms of the proposed original Settlement.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

Nor is there any evidence of collusion; and there is ample evidence to the contrary. As noted in the Final Approval Memo, the discovery was hard-fought and involved over 200,000 pages of documents, and 21 depositions as well as a motion to compel and two motions for protective orders. *See* Final Approval Memo, at 14-15, and Arns Fee Decl., ¶¶ 29-34. Furthermore, there were two rounds of motions to dismiss, with Plaintiffs amending in response to the first and prevailing on second. There were seven experts who were deposed in connection with the class certification motion. Arns Fee Decl., ¶ 41. The settlement negotiations were initiated in mediation before Judge Infante, the respected retired Chief Magistrate Judge for the United States District Court for the Northern District of California and an experienced mediator with JAMS. Arns P.A. Decl., ¶ 4 & Ex. 2.

## XII.    OBJECTIONS REGARDING ADEQUATE REPRESENTATION OF CLASS BY CLASS REPRESENTATIVES ARE WITHOUT MERIT AND SERVICE AWARDS ARE APPROPRIATE

Objectors contend that the Class Representatives are not able to evaluate the settlement since they are getting so much more in terms of their service awards versus the $10 (or $15 if increased as requested) made available to absent Class members, given in part that they did not testify at class certification hearing. The contention that the size of the service awards to the Class Representatives makes them inadequate because they are only concerned about the $12,500 requested for them is unfounded. The Class Representatives took on these roles because they are concerned about remedying the problems and knew they were representing a large group of people. *See* W.T. Dep. at 165:19-166:8, Susan Mainzer Dep. at 23:8-22, Weinmann Decl. Exs. 1 and 2.  Further, class representatives in other actions have received higher service awards. *See, e.g.*, *Staton*, 327 F.3d at 976-77, Final Approval Memo at 28-29.

These arguments attempt to minimize the involvement of the Class Representatives, which was substantial in this case. Objectors ignore that the Representatives were subjected to substantial discovery. Plaintiffs have provided documentary discovery, had their depositions taken at length, and monitored the progress of the action and mediation and should be rewarded for taking the initiative to file the action, and for their role in reaching a Settlement providing

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

for valuable relief to the Settlement Class. Arns P.A. Decl., ¶28. In addition, Plaintiffs by litigating this case potentially exposed themselves to the fee shifting under Cal. Civil Code § 3344. Arns P.A. Decl., ¶ 64. Indeed, the Ninth Circuit has approved incentive awards to class representatives that far exceed the modest award proposed to be awarded Plaintiffs, $12,500 each. *Staton*, 327 F.3d at 976-77.

The Schachter Objectors (at 19) also claim that *Radcliffe v. Experian Information Solutions, Inc.*, 2013 U.S. App. LEXIS 9216 (May 2, 2013) (amending the opinion at 2013 U.S. App. LEXIS 7932 (9th Cir. Cal., Apr. 22, 2013) stands for the proposition that the incentive awards requested here are too large. The Ninth Circuit in *Radcliffe* questioned the conflict of interest created between the class representatives and the class where the settlement agreement "provides for incentive awards to named plaintiffs 'in support of the [s]ettlement.'" *Id*. at *9. Thus, where there is a conditional incentive award agreement, the representative simply objecting would wipe out his or her service award.

Unlike in *Radcliffe*, however, the A.S.A. does not require that the Class representatives support the settlement at risk of any service award. The A.S.A. merely states that such awards will be requested. It was the compunction to support the settlement that troubled the Court of Appeal. The Court of Appeal did hold that the disparity between the award and the monies going to the Class "exacerbated" the problem. *Radcliffe*, 2013 U.S. App. LEXIS 7932 at *16. Thus, it rejected the argument that the incentive awards could be upheld on the ground that such awards are typical in class actions, because the requirement of support rendered this particular settlement agreement and incentive award arrangement not typical. The court did <u>not</u> state that incentive awards are not common in class actions or disapprove of them where they lack such a "requirement for support" clause. Nor does *Radcliffe* speak to incentive award amounts relative to any overall award amount which includes a valuable injunctive relief component. The opinion simply does not address that issue.

The objections contending that the requested attorneys' fees and service awards are disproportionate to the recovery are distinguishable in that the classes there were getting less or

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

nothing; here real value is going to the Class. The Seventh Circuit's opinions in cases such as *Murray, supra,* 434 F.3d 948, *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004), and *Crawford v. Equifax*, 201 F.3d 952 (7th Cir. 2000), are distinguishable as to the "disproportion" between class reps' award and what the Class members will receive. Claiming Class members are actually getting $10 or more, and the *Murray* plaintiffs, for example, effectively got nothing because each claim would not be worth their while. Class counsel fees and service awards need to be measured in part against the monies actually being distributed (which will likely be closer to $12 million) and the injunctive relief. Plaintiffs are free to object to portions, or all, of the settlement, and would still receive their incentive award if they settlement is ultimately approved by the court. *See* A.S.A. § 2.6.

## XIII. THE RECORD BEFORE THE COURT SUPPORTS THE SIZE OF THE SERVICE AWARDS

Objectors Wassman and Barrett argue that nothing in the record supports the incentive award to the objectors. *See* Wasserman, at 6; Barrett, at 8. Barrett cites to cases that approved lower incentive awards than requested here, although one case is over 25 years old (cited twice with different award amounts), none are more recent than 1999, and none hail from the Ninth Circuit. Barrett also cites to a 1996 study of class actions for the proposition the incentive award is too high. Barrett, at 8.  That study, now 17 years old, and the cases it used as data, should not be considered in any way indicative of the current size of incentive awards, nor presumed to represent a sampling of cases that imposed burdens of litigation as significant as are present here.

The incentive awards in this case are justified by the significant burdens born by the named plaintiffs in this action. *See* Final Approval Memo, at 28-29.  The named Plaintiffs for whom service awards are sought have expended an estimated 150 hours related to their duties in this matter. Arns Fee Decl. ¶ 74. Each had their deposition taken at length, which included examination of private and potentially embarrassing communications. The impositions associated with being a class representative here were so significant, that two of the initially-

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

named representatives withdrew from participation in the case.[43]

Plaintiffs in this case were also exposed to the fee shifting provisions of Cal. Civil Code § 3344. The threat of facing a request of attorney fees under § 3344 is significant. This same defendant, Facebook, sought attorneys' fees of over $700,000 in another § 3344 action before this court, and also sought fees in a dismissed state court action.  Weinmann Decl., Exs. 4 & 5. At the time it was dismissed, *R. Cohen v. Facebook* had significantly less discovery performed than in this matter, nor had class certification briefs been filed, whereas here a class certification motion was fully briefed and experts had been retained by the defendants.  Thus, Defendant's fees and costs were likely much higher in this matter than the *R. Cohen* case.

The Shane Objectors also attack the size of the requested incentive award, basing their argument on the holding in *Staton v. Boeing, Co.*, 327 F.3d 938 (9th Cir. 2008) which is also factually and procedurally dissimilar to the situation here. In *Staton*, the plaintiffs' attorneys identified 264 individuals that actively participated in the case, and earmarked them to receive $3.77 million: <u>over 50%</u> of the $7.3 million monetary award was available for the entire class. *Id.* at 948. The court went on to examine the incentive awards to the named class representatives: 29 individuals designated to receive payments totaling $890,000, or <u>over 12%</u> of the $7.3 million fund. *Id.* at 977.  The Court of Appeals noted that compared to other incentive awards approved, the consent decree before the court proposed numbers orders of magnitude larger in terms of number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment (up to $50,000 each, with an average of more than $30,000). *Staton* at 976. Here, we have three named Plaintiffs with an aggregate requested fee award of less than 0.2% of the $20 million fund.

---

[43] See the Motions for Withdrawal as Class Representative of Angel Fraley and Paul Wang, (ECF No. 86), and supporting documents, citing imposition on time and privacy as being to significant to make remaining as a class representative desirable. Ms. Fraley has filed an objection to this Settlement, requesting that she be compensated for her service. She has made no other objections to the Settlement. Class Counsel are sympathetic to Ms. Fraley's request, which further underscores the equity as to the service awards here, but are unaware of any authority to support Ms. Fraley's request in these circumstances.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

## XIV.   THE OBJECTIONS REGARDING ADEQUACY OF NOTICE AND CLAIM FORMS ARE WITHOUT MERIT

Several objectors contend that the pro-rata reduction theory does not give the Class members enough to decide if they want to remain in the class, be excluded, or object.[44] Generally, notice is satisfactory if it "describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (quotation omitted).

Despite the notice meeting these requirements, the objectors raise boilerplate complaints about the notice which are without merit. The objections raised fall into two categories: (1) that the Notice was procedurally defective, or (2) that it did not contain information the objectors claim is relevant and necessary.[45]   In addition to national publication, the Notice was primarily achieved through email messages sent to Class members. Courts have approved email notice and recognized it as particularly suitable where "Settlement Class Members' allegations arise from their visits to Defendants' Internet websites, demonstrating that the Settlement Class Members are familiar and comfortable with email and the Internet."   *Browning v. Yahoo! Inc.,* 2006 U.S. Dist. LEXIS 100686 at *24. See also, *Lundell v. Dell, Inc.,* 2006 U.S. Dist. LEXIS 90990, 2006 WL 3507938, at *1 (N.D. Cal. Dec. 5, 2006).[46]   Additionally, here, provision of notice via the US Postal Service was not feasible because Facebook members are not required to input a physical address when joining Facebook.

---

[44] *See* Matrix of Objectors, Osborne Decl., Ex. 3.

[45]  Objector Jennifer Deachin, without any degree of specificity or support, claims the notice fails to meet Constitutional requirements with notice and an opportunity to be heard. (Deachin Obj. at 2.) Objector Michael M., Through his Guardian *ad litem* Janine R. Menhennet also complains the email notice is insufficient. (Menhennet Obj at 2).

[46] Class members were mailed a "short-form" notice via email and directed to the website for more information, where they could download the "long-form" notice, file a claim, see Frequently Asked Questions, and could download relevant case documents. *Browning* also approved a notice plan which included a concise, plain language email and the establishment of website where the class could view the long-form notice, recognizing that it was appropriate not to attach the long form notice as attachments often trigger spam filters. *Browning* at *24.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

Many of the complained-of omissions are either unnecessary to achieve the desired effects of the notice, or the information is actually contained within the notice.[47]   Other facts which objectors complain is omitted includes the statutory penalties under Cal. Civil Code § 3344; the size of the class; and the exact administrative costs.[48]   None of these facts were required to be in the notice. Due process "does not require the notice to set forth every ground on which Class Members might object to the settlement." *UAW v. GMC*, 497 F.3d 615, 629 (6th Cir. 2007). All that the notice must do is "fairly apprise the prospective members of the class of the terms of the proposed settlement" so that Class members can decide whether to opt out or object. *Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 122 (8th Cir. 1975).  None of these facts identified as "omitted" by Objectors are required by Fed. R. Civ. P. 23(c) (2) (B) or Rule 23(e) (1) (B).

Nor must the notice must include a full explanation of statutory penalties *possibly* available under § 3344. The notice standard set forth in *Rodriguez, supra*, "does not require a detailed analysis of the statutes or causes of action forming the basis for the plaintiff class' claims, and it does not require an estimate of the potential value of those claims."  *Lane v. Facebook, Inc.,* 696 F.3d 811, 826 (9th Cir. 2012) (citing *Rodrguez v. West Publ'g Corp.* supra at 962). Similarly, the exact cost of administration was correctly excluded from the Notice, as it could not be known at the outset of the notice period, and would have been speculative.  The "failure" to include the total number of Class members is irrelevant, as it is the total number of *claims filed* that affects how much a class member would receive. The explanation that it is the total number of claims filed which could affect a claimants' monetary recover explained on the first page of the notice, as well as in detail in Section 7 of the Notice. *See* "Long Form Notice", Ex. 2 to the A.S.A. (ECF No. 286-3).

---

[47] *See* Deachin Obj., asserting omission of fact that court can order payment to cy pres if pro-rata share falls below $5 (in Notice, Sec. 7); Menhennt & Batman assert attorney fee amount omitted (in Notice, Sec. 12); Menhennet alleges omission of explanation that settlement fund reduced by attorney fee payment before distribution (in Notice, sec. 7);   Batman alleges omission of identity of cy pres recipients (in Notice, Sec. 7).
[48] See Deachin objection (at 2-4) and Cox Objection at 1-2.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

Kazman/Frank Objectors complain that the attestations in the claim forms that they did not know Facebook could be paid a fee for the ads, and that they were injured were unnecessary. They fail to recognize Facebook's biggest defense in this case, which is implied consent based upon usage of the site given the SRRs. Under Facebook's theory, anyone who continues to use the website may be deemed to have consented to the use of their images. This position has support in various cases. *See* footnote 20 *supra*. Battaglia Objectors (at page 13) thus assert that the Class definition cannot include anyone who consented to their appearance in Sponsored Stories; by including people who are not entitled to recover, they argue, the amount of money for the others is reduced.

Plaintiffs included the "attestation" as to damages for just these reasons; a claiming Class member must state that he or she was unaware that Facebook was making money off of Sponsored Stories, and thus had not consented to such use, before recovering money damages. The attestations thus serve two purposes, establishing that there was no consent by establishing lack of prior knowledge, and that they believe they had damages. This prevents persons who may have discovered that Sponsored Stories were paid ads and who may have intentionally tried to trigger such an ad. If they do not say they didn't know, then arguably they consented by continuing to use Facebook and by taking the actions which would lead to Sponsored Stories and there was no violation.

*True v. American Honda*, 749 F. Supp.2d 1052 (C.D. Cal. 2010), cited by Kazman/Frank, is inapposite. In *True*, the court criticized a sub-class that was created for person from whom Honda had received complaints, whose members could receive cash if they had complained to Honda or to class counsel. It was not a "subjective belief of injury" as Kazman/Frank portray it, but a matter of proof. The Central District Court held that this distinction did not make sense in part because it was out of the class members' hands whether Honda kept such records, and it created a perverse incentive for Honda not to keep such records. Here, the requirement of an attestation as to a lack of knowledge about whether Facebook made money from Sponsored Stories is not arbitrary, but rather goes directly to the element of consent written right into the statute. Because there could be implied consent in the form of continuing to take actions which

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

could lead to Sponsored Stories with knowledge of what can happen, the Class member's claim is significantly weaker than someone who was unaware of that fact.

Kazman/Frank Objectors argue that if the underlying claims have merit, given the terms of the settlement the Class members should have been told that they would be "better off" opting out and bring small claims actions, as there was a risk of not certifying the class. They then argue that this justifies decertification. (Kazman/Frank, at 26). This argument ignores the facts that (1) Plaintiffs only averred that there was a *risk* that a class could not be certified, but did not say that there was less than a 50% chance; (2) the claims could not be brought individually, due to the problems of proof of damages as noted above; (3) the Class members who stay in the Class may prefer $10 over any theoretical small claims recovery that would take significantly more effort than simply filing a claim; and (4) § 3344 was referred to in the Notice.[49] Facebook claims to have expend millions in defending these claims in other actions and has also sought those fees, and indeed sought recovery of them in its action in California state court under § 3344. The claims of the individual Class members if made under § 3344, would potentially subject the Class members to Facebook's Attorneys' fees – which the absent Class members are not currently subject to. Advising the Class members that they "should" opt out would be to suggest a course of action and imply that they had an increased chance of recovery if they did so, when the reverse is true: without a class action, the Class members stand little chance of prevailing against Facebook.

## XV.   OBJECTIONS REGARDING THE RELEASE ARE WITHOUT MERIT

Objectors Bowman (at 2), Schachter (at 14), Shane (at 9), and Bronson (at 13) argue that the Settlement is overbroad. Shane objects to a "broadened" definition of Sponsored Stories to include other types of advertisements, yet fails to actually cite such broadened language. Shane, at 11. All of these objections fail, as the definition of Sponsored Stories in the Release is clear:

---

[49] Objector Jo Batman asserts that the fee motion did not include the lodestar multiplier, that there was a blank there instead. However, this is untrue. Page 4 of the Memorandum in support of the Fee Motion states that Plaintiffs request a multiplier of 1.391. Furthermore, there is no requirement that Plaintiffs state the requested multiplier in the Notice.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

"The term 'Sponsored Stories' or 'Sponsored Story' means content displayed by or on behalf of Facebook that Facebook refers to or markets as 'Sponsored Stories.'" A.S.A. § 1.29. The Settlement's definition then goes on to give examples, and goes so far as to include actual sample Sponsored Stories exhibits. The Release also does not go beyond Sponsored Stories, and includes only:

> all manner of action, causes of action, claims, demands, rights, suits, obligations, debts, contracts, agreements, promises, liabilities, damages, charges, penalties, losses, costs, expenses, and attorneys' fees, of any nature whatsoever, known or unknown claims, in law or equity, fixed or contingent, which the Releasing Parties have or may have against the Released Parties arising out of or relating to any of the acts, omissions, or other conduct that was or could have been alleged in the Action, including but not limited to any and all acts, omissions, or other conduct related to the display of any Class Member's name, nickname, pseudonym, profile picture, photograph, likeness, or identity **in a Sponsored Story** ("Released Claims").

A.S.A. § 5.2. Emphasis added.

Objectors Bowman (at 15), Schachter (at 18), Shane (at 11), and Battaglia (at 13) try to read a meaning into the Release unsupported by the plain language of the text.  Schachter, for example, italicizes the phrases, "that was or could have been alleged in the Action" and "but not limited to," to try to make them appear to modify the noun, "Sponsored Story". Schachter, at 18. However, those phrases modify the verb phrase "relating to the display." Objector's revision of the terms is grammatically incorrect. The only way to read the terms to create a wide release would be to modify the prepositional phrase, "in a Sponsored Story" with "not limited to". The resulting sentence fragment simply makes no sense: "…, but not limited to in a Sponsored Story." The Court should not be swayed by these language gymnastics; the meaning is clear. The release only applies to claims arising out of having had one's name or likeness appear Sponsored Stories.

## XVI.   CONCLUSION

For all the foregoing reasons, the objections should each be overruled. The Motion for Final Approval of the Settlement and Plaintiff's Motion for Attorneys' Fees and Costs and the requested service awards for the Class Representatives should be granted.

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS

THE ARNS LAW FIRM                              JONATHAN JAFFE LAW


By:__/s/Robert S. Arns_____        By:__/s/ Jonathan M. Jaffe_____
Robert S. Arns                                           Jonathan M. Jaffe
Jonathan E. Davis
Steven R. Weinmann

ATTORNEYS FOR PLAINTIFFS

PLAINTIFFS' RESPONSE TO OBJECTIONS TO SETTLEMENT AND FEE MOTION
Case No. CV 11-01726 RS