COOLEY LLP
MICHAEL G. RHODES (116127)
(mrhodes@cooley.com)
MATTHEW D. BROWN (196972)
(brownmd@cooley.com)
JEFFREY M. GUTKIN (216083)
(jgutkin@cooley.com)
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

Attorneys for Defendant Facebook, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGEL FRALEY; PAUL WANG; SUSAN MAINZER; JAMES H. DUVAL, a minor, by and through JAMES DUVAL, as Guardian ad Litem; and W.T., a minor, by and through RUSSELL TAIT, as Guardian ad Litem; individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC., a corporation; and DOES 1-100,<br><br>Defendants. | Case No. CV 11-01726 RS<br><br>**DEFENDANT FACEBOOK, INC.'S MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>**DATE:** June 28, 2013<br>**TIME:** 10:00 a.m.<br>**DEPT.:** 3<br>**JUDGE:** Hon. Richard Seeborg |

Cooley LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION AND SUMMARY OF ARGUMENT .................................................. 1

II.    OVERVIEW OF THE LITIGATION AND THE SETTLEMENT .................................. 4

    A.     Overview of Sponsored Stories and Plaintiffs' Allegations ..................... 4

    B.     Case History Before Settlement ................................................................ 5

    C.     The Revised Settlement ............................................................................ 6

    D.     The Provision of Notice to the Proposed Class ....................................... 11

    E.     Claims, Objections, and Exclusion Requests .......................................... 13

    F.     Monetary Relief to Claimants and *Cy Pres* Recipients .......................... 14

III.   LEGAL STANDARD FOR GRANTING FINAL APPROVAL OF
       SETTLEMENT .................................................................................................... 15

IV.    THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT ........ 16

    A.     The Class Relief Is Fair, Reasonable, and Adequate ............................. 16

        1.     The Settlement is presumptively fair ...................................... 16

        2.     Plaintiffs had low odds of obtaining a substantial recovery .................... 18

        3.     Absent a settlement, it may be years before the Class recovers, if at
                all .................................................................................................. 30

        4.     The relief in the Settlement is fair, reasonable, and adequate .................. 31

            a.     The monetary relief component is appropriate in light of the
                     weakness of the claims and the risks of continued litigation ........ 31

            b.     The injunctive relief provides substantial value to the Class ........ 36

                (1)     Enhanced notice and new controls for Class
                          Members ............................................................................. 36

                (2)     Additional Settlement benefits for the Minor
                          Subclass ............................................................................. 37

                (3)     The injunctive relief provides additional
                          consideration for release of Class Members' claims
                          for past damages .............................................................. 39

            c.     The *cy pres* distribution is a valuable benefit to the Class ........... 40

        5.     Very few Class Members objected to or opted out of the Settlement ....... 42

        6.     The remaining factors favor final approval .............................................. 43

    B.     Notice Provided to Class Members Was Sufficient and Satisfied Due
              Process ................................................................................................... 44

        1.     The content of the notice provided to Class Members is sufficient .......... 44

        2.     The means of supplying notice to Class Members is sufficient ............... 45

    C.     None of the Objectors Provides Any Reason for the Court to Conclude that
              the Settlement Is Not Fair, Reasonable, and Adequate. ........................ 47

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

**TABLE OF CONTENTS**
(CONTINUED)

Page

1. The monetary relief provided to individual Class Members is fair, reasonable, and adequate, and far exceeds any sum Class Members are likely to recover at trial ........................................................................ 47

2. The proposed *Cy Pres* Recipients are appropriate and do not prevent final approval ............................................................................ 49

3. The proposed attorneys' fees do not prevent final approval ..................... 50

4. The proposed incentive awards sought by the named Plaintiffs do not warrant denial of final approval ........................................................ 51

5. The Settlement relief is not inadequate due to the existence of other state publicity laws .................................................................................... 53

6. The Rules Enabling Act and principles of federalism do not prevent final approval ........................................................................................... 56

7. The proposed release is not overly broad under Ninth Circuit precedent ................................................................................................. 56

8. The injunctive relief contributes substantial value to the Settlement ....... 58

9. The proposed relief is reasonable and adequate, notwithstanding alternative relief "wish lists" ................................................................... 60

   a. Opting in and opting out of Sponsored Stories ........................... 61

   b. Other requests for alternative relief ............................................ 63

10. The attestations on the Claim Form are appropriate ................................. 64

D. None of the Minors-Related Objections Undermine the Fairness, Reasonableness, or Adequacy of the Settlement .................................................. 70

1. The objectors' parental consent arguments do not undermine the Settlement ................................................................................................. 70

2. The injunctive relief is reasonable and adequate as to the Minor Subclass ..................................................................................................... 75

3. The California Family Code has no bearing on the Settlement ................. 77

4. Other states' laws do not render the Settlement inadequate as to minors ....................................................................................................... 80

5. Separate counsel was not required for the Minor Subclass ...................... 81

E. Objectors do not identify any legitimate deficiencies in the notice ..................... 83

1. The notice did not need to identify the precise size of the Class ............. 83

2. The notice is not inadequate for failing to provide the number of claimants or an approximate value of damages, which were unknown and disputed, respectively, at the time the notice was issued ......................................................................................................... 84

V. CONCLUSION ......................................................................................................... 84

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii.

**FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS**

TABLE OF AUTHORITIES

**Page**

CASES

*Abdul-Jabbar v. Gen. Motors Corp.*,
  85 F.3d 407 (9th Cir. 1996)..................................................................................................... 27

*Ackal v. Centennial Beauregard Cellular, LLC*,
  700 F.3d 212 (5th Cir. 2012).................................................................................................... 13

*Acosta v. Trans Union, LLC*,
  243 F.R.D. 377 (C.D. Cal. 2007) ............................................................................................. 59

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................................................................................. 81

*Animal Legal Def. Fund v. Mendes*,
  160 Cal. App. 4th 136 (2008) (UCL) ...................................................................................... 18

*Arizona v. United States*,
  132 S. Ct. 2492 (2012) ........................................................................................... 25, 26, 71, 73

*Ashley v. Reg'l Transp. Dist.*,
  05-cv-01567, 2008 U.S. Dist. LEXIS 13069 (D. Colo. Feb. 11, 2008)................................... 70

*AT&T Mobility LLC v. Concepcion*,
  131 S. Ct. 1740 (2011) ............................................................................................................ 25

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
  789 F. Supp. 2d 935 (N.D. Ill. 2011) ...................................................................................... 66

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009)................................................................................................. 29

*Battle v. Liberty Nat'l Life Ins. Co.*,
  770 F. Supp. 1499 (N.D. Ala. 1991) ........................................................................................ 44

*Baugh v. CBS, Inc.*,
  828 F. Supp. 745 (N.D. Cal. 1993) .......................................................................................... 28

*Beach Cmty. Bank v. Labry*,
  No. 11-cv-1583, 2012 WL 2196174 (Tenn. Ct. App. Jun. 15, 2012) ..................................... 55

*Beard v. PayPal, Inc.*,
  No. 09-cv-1339, 2010, 2010 WL 654390 (D. Or. Feb. 19, 2010) .......................................... 55

*Blankenship v. Hearst Corp.*,
  519 F.2d 418 (9th Cir. 1975)................................................................................................... 77

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1

**TABLE OF AUTHORITIES**
(CONTINUED)

2

Page

3

*In re Bluetooth Headset Prods. Liab. Litig.*,
4    654 F.3d 935 (9th Cir. 2011)........................................................................................ 51

5

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996) ................................................................................................... 34

6

*Boeing Co. v. Van Gemert*,
7    444 U.S. 472 (1980).................................................................................................... 51

8

*Bond v. Ferguson Enters., Inc.*,
    No. 09-cv-1662, 2011 WL 284962 (E.D. Cal. Jan. 25, 2011) ................................. 58

9

*Boyd v. Bechtel Corp.*,
10    485 F. Supp. 610 (N.D. Cal. 1979) ......................................................................... 43

11

*Brodsky v. Match.com LLC*,
12    No. 09-cv-5328, 2009 WL 3490277 (S.D.N.Y. Oct. 28, 2009)................................. 55

13

*Brown v. Entm't Merchs. Ass'n*,
    131 S. Ct. 2729 (2011) ............................................................................................... 28

14

*Browning v. Yahoo! Inc.*,
15    No. C04-01463 HRL, 2007 WL 4105971 (N.D. Cal. Nov. 16, 2007)..................... 46

16

*Browning v. Yahoo! Inc.*,
17    No. C04-01463 HRL, 2006 WL 3826714 (N.D. Cal. Dec. 27, 2006) ..................... 46

18

*In re Cal. Micro Devices Corp. Sec. Litig.*,
    No. C 94-2817 VRW, 2001 U.S. Dist. LEXIS 7994 (N.D. Cal. June 4, 2001) ..................... 57

19

*California v. Levi Strauss & Co.*,
20    41 Cal. 3d 460 (1986) ................................................................................................ 41

21

*Carafano v. Metrosplash.com, Inc.*,
22    339 F.3d 1119 (9th Cir. 2003)................................................................................... 29

23

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981) ..................................................................................................... 69

24

*Caterpillar Inc. v. Williams*,
25    482 U.S. 386 (1987) ................................................................................................... 63

26

*Chavez v. Netflix, Inc.*,
27    162 Cal. App. 4th 43 (2008) ............................................................................... 45, 83

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii.

**FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS**

**TABLE OF AUTHORITIES**
(CONTINUED)

Page

*Churchill Vill., L.L.C. v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) ................................................................................... 16

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) .................................................................................... 49

*Class Plaintiffs v. City of Seattle*,
    955 F.2d 1268 (9th Cir. 1992) ........................................................................... 56, 69

*Cobell v. Salazar*,
    679 F.3d 909 (D.C. Cir. 2012) ................................................................................ 68

*David Cohen v. Facebook, Inc.*,
    No. BC 444482 (L.A. Super. Ct.) ................................................................... *passim*

*Cohorst v. BRE Props., Inc.*,
    No. 10-cv-2666, 2011 WL 7061923 (S.D. Cal. Nov. 14, 2011) ............................ 59

*Collado v. Toyota Motor Sales, U.S.A., Inc.*,
    2011 U.S. Dist. LEXIS 133572 (C.D. Cal. Oct. 17, 2011) ................................... 56

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    216 F.R.D. 197 (D. Me. 2003) ............................................................................... 46

*Cox v. Clarus Mktg. Grp., LLC*,
    No. 11-cv-2711, 2013 U.S. Dist. LEXIS 60941 (S.D. Cal. Apr. 29, 2013) ..................... 56, 57

*Dennis v. Kellogg Co.*,
    697 F.3d 858 (9th Cir. 2012) ............................................................................ 16, 41

*Dewey v. Volkswagen AG*,
    681 F.3d 170 (3d Cir. 2012) ................................................................................... 67

*Downing v. Abercrombie & Fitch*,
    265 F.3d 994 (9th Cir. 2001) ............................................................................ 18, 19

*E.K.D. ex rel. Dawes v. Facebook, Inc.*,
    885 F. Supp. 2d 894 (S.D. Ill. 2012) .............................................................. *passim*

*In re Easysaver Rewards Litig.*,
    No. 09-cv2094, 2013 WL 435032 (S.D. Cal. Feb. 4, 2013) ...................... 40, 49, 66

*Eisen v. Carlisle & Jacquelin*,
    479 F.2d 1005 (2d Cir. 1973) ................................................................................. 18

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii.

**FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS**

1

**TABLE OF AUTHORITIES**
(CONTINUED)

2

**Page**

3

*Estrella v. Freedom Fin. Network LLC*,
  No. CV 09-03156-SI, 2012 WL 4645012 (N.D. Cal. Oct. 1, 2012) ...................................... 15

4

5

*Facebook, Inc. v. Power Ventures, Inc.*,
  No. 08-cv-5780, 2010 WL 3291750 (N.D. Cal. July 20, 2010)............................................. 55

6

*Feldman v. Google, Inc.*,
  513 F. Supp. 2d 229 (E.D. Pa. 2007) ................................................................................... 55

7

8

*In re Ferrero Litig.*,
  No. 11-CV-00205, 2012 WL 2802051 (S.D. Cal. July 9, 2012) .................................... 36, 60

9

*Ferrington v. McAfee, Inc.*,
  No. 10-cv-1455, 2012 WL 1156399 (N.D. Cal. Apr. 6, 2012)............................................. 67

10

*First State Orthopaedics v. Concentra, Inc.*,
  534 F. Supp. 2d 500 (E.D. Pa. 2007) ............................................................................. 39, 66

11

12

*Fisher Bros. v. Cambridge-Lee Indus., Inc.*,
  630 F. Supp. 482 (E.D. Pa. 1985) ....................................................................................... 35

13

14

*Fleury v. Richemont N. Am., Inc.*,
  No. C-05-4525 EMC, 2008 WL 4680033 (N.D. Cal. Oct. 21, 2008)................................... 64

15

16

*Franklin Nat'l Bank v. New York*,
  347 U.S. 373 (1954)............................................................................................................ 25

17

18

*Fteja v. Facebook, Inc.*,
  841 F. Supp. 2d 829 (S.D.N.Y. 2012) .................................................................................. 55

19

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000)...................................................................................................... 25, 72

20

21

*In re Gen. Instr. Sec. Litig.*,
  209 F. Supp. 2d 423 (E.D. Pa. 2001) ................................................................................... 35

22

*Gionfriddo v. Major League Baseball*,
  94 Cal. App. 4th 400 (2001) ............................................................................................... 28

23

24

*Goddard v. Google, Inc.*,
  640 F. Supp. 2d 1193 (N.D. Cal. 2009) ............................................................................... 29

25

26

*Gomez v. H & R Gunland Ranches*,
  No. 10-cv-1163, 2011 WL 5884224 (E.D. Cal. Nov. 23, 2011)........................................... 59

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv.

**FACEBOOK'S MPA ISO PLS.' MOT. FOR**
**FINAL APPROVAL OF SETTLEMENT**
**CASE NO. CV 11-01726 RS**

**TABLE OF AUTHORITIES**
(CONTINUED)

**Page**

*Goodwin Bros. Leasing, Inc. v. H&B Inc.*,
   597 S.W. 2d 303 (Tenn. 1980) ............................................................................................. 55

*Gordon v. Virtumundo, Inc.*,
   575 F.3d 1040 (9th Cir. 2009) ....................................................................................... 22, 24

*Greenstein v. Greif Co.*,
   No. B200962, 2009 WL 117368 (Cal. Ct. App. Jan. 20, 2009) ............................................ 20

*Hakes Inv. Co. v. Lyons*,
   166 Cal. 557 (1913) .......................................................................................................... 77

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ............................................................... 17, 61, 64, 75

*Harris v. McCutchen*,
   214 Cal. App. 4th 1399 (2013) ........................................................................................ 55

*Hesse v. Sprint Corp.*,
   598 F.3d 581 (9th Cir. 2010) ........................................................................................... 57

*Hoffman v. Capital Cities/ABC, Inc.*,
   255 F.3d 1180 (9th Cir. 2001) ........................................................................................ 29

*In re Holocaust Victim Assets Litig.*,
   413 F.3d 183 (2d Cir. 2005) ........................................................................................... 68

*I.B. ex rel. Fife v. Facebook, Inc.*,
   905 F. Supp. 2d 989 (N.D. Cal. 2012) ........................................................................... 79

*In re Immune Response Secs. Litig.*,
   497 F. Supp. 2d 1166 (S.D. Cal. 2007) .................................................................. 16, 43

*In re Indep. Energy Holdings PLC Sec. Litig.*,
   No. 00 Civ. 6689, 2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) ...................................... 17

*Isby v. Bayh*,
   75 F.3d 1191 (7th Cir. 1996) .......................................................................................... 70

*Jones v. Corbis Corp.*,
   815 F. Supp. 2d 1108 (C.D. Cal. 2011),
   *aff'd*, 489 F. App'x 155 (9th Cir. 2012) ............................................................... 20, 22, 65, 74

*Kakani v. Oracle Corp.*,
   No. 06-cv-6493, 2007 WL 1793774 (N.D. Cal. June 19, 2007) ....................................... 58

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

v.

**FACEBOOK'S MPA ISO PLS.' MOT. FOR**
**FINAL APPROVAL OF SETTLEMENT**
**CASE NO. CV 11-01726 RS**

**TABLE OF AUTHORITIES**
(CONTINUED)

Page

*Kent v. Hewlett-Packard Co.*,
No. C 09-05341 JF, 2011 U.S. Dist. LEXIS 106831 (N.D. Cal. Sept. 20, 2011) .................. 57

*Klein v. O'Neal, Inc.*,
705 F. Supp. 2d 632 (N.D. Tex. 2010) .................................................................................. 69

*Ko v. Natura Pet Prods., Inc.*,
No. C-09-02619 SBA, 2012 WL 3945541 (N.D. Cal. Sept. 10, 2012) ........................... 14, 54

*Lane v. Facebook, Inc.*,
696 F.3d 811 (9th Cir. 2012), *reh'g en banc denied*, 709 F.3d 791 (9th Cir. 2013) ........ *passim*

*Lane v. Facebook, Inc.*,
709 F.3d 791 (9th Cir. 2013) (dissenting) ............................................................................. 42

*Levitt v. Yelp! Inc.*,
Nos. C-10-1321, C-10-2351, 2011 WL 5079526 (N.D. Cal. Oct. 26, 2011) ........................ 29

*Linney v. Cellular Alaska P'ship*,
151 F.3d 1234 (9th Cir. 1998) .............................................................................................. 43

*Linney v. Cellular Alaska P'ship*,
Nos. C-96-3008, C-97-0203, C-97-0425, C-97-0457, 1997 WL 450064 (N.D. Cal.
July 18, 1997), *aff'd*, 151 F.3d 1234 (9th Cir. 1998) ............................................................. 17

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011) .......................................................................................... 68, 81

*Lonardo v. Travelers Indem. Co.*,
706 F. Supp. 2d 766 (N.D. Ohio 2010) ............................................................................ 60, 67

*Lowe v. S.E.C.*,
472 U.S. 181 (1985) .............................................................................................................. 28

*Lubliner v. Maxtor Corp.*,
No. C-89-1807 WHO, 1990 U.S. Dist. LEXIS 3930 (N.D. Cal. Feb. 14, 1990) .................. 58

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .............................................................................................................. 18

*In re Lupron Mktg. & Sales Practices Litig.*,
677 F.3d 21 (1st Cir. 2012) .............................................................................................. 41, 66

*Lymburner v. U.S. Fin. Funding, Inc.*,
No. 08-cv-0325, 2012 U.S. Dist. LEXIS 14752 (N.D. Cal. Feb 7, 2012) ............................ 45

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vi.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

**TABLE OF AUTHORITIES**
(CONTINUED)

Page

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012)...................................................................................... 29

*In re Mego Fin. Corp. Secs. Litig.*,
213 F.3d 454 (9th Cir. 2000).............................................................................. *passim*

*Meier v. Midwest Recreational Clearinghouse, LLC*,
No. 10-cv-1026, 2010 WL 2738921 (E.D. Cal. July 12, 2010) .............................. 55

*Mendoza v. Tucson Sch. Dist. No. 1*,
623 F.2d 1338 (9th Cir. 1980), *overruled on other grounds by Evans v. Jeff D.*,
75 U.S. 717 (1986) ........................................................................................... 45, 82

*In re Merrill Lynch & Co., Inc. Research Sec. Litig.*,
No. 02 MDL 1484(JFK), 2007 WL 4526593 (S.D.N.Y. Dec. 20, 2007) .............................. 48

*In re Mexico Money Transfer Litig.*,
267 F.3d 743 (7th Cir. 2001)...................................................................................... 54

*Miller v. California*,
413 U.S. 15 (1973) .................................................................................................... 28

*Morgan v. Morgan*,
220 Cal. App. 2d 665 (1963).................................................................................... 77

*Morrow v. Norwegian Cruise Line Ltd.*,
262 F. Supp. 2d 474 (M.D. Pa. 2002) ...................................................................... 78

*In re Motor Fuel Temperature Sales Practices Litig.*,
No. 07-md-1840, 2012 WL 1415508 (D. Kan. Apr. 24, 2012) ................................ 39, 40, 65

*Muniz v. Pilot Travel Centers LLC*,
No. CIV 2-07-0325 FCD, 2007 WL 1302504 (N.D. Cal. May 1, 2007)............................... 63

*Murray v. GMAC Mortgage Co.*,
434 F.3d 948 (7th Cir. 2006)...................................................................................... 52

*Myers v. MedQuist, Inc.*,
No. 05-cv-4608, 2009 WL 900787 (D.N.J. Mar. 31, 2009)............................... *passim*

*Nachshin v. AOL, LLC*,
663 F.3d 1034 (9th Cir. 2011)........................................................................ 40, 50, 51

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
221 F.R.D. 523 (C.D. Cal. 2004) ............................................................... 17, 39, 43

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vii.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

TABLE OF AUTHORITIES
(CONTINUED)

Page

*Nedlloyd Lines B.V. v. Super. Ct.*,
  3 Cal. 4th 459 (1992) ................................................... 55, 79

*In re Netflix Privacy Litig.*,
  No.11-cv-0379, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013)....................................... 45, 75

*Newcombe v. Adolf Coors Co.*,
  157 F.3d 686 (9th Cir. 1998)................................................ 27

*Newton v. Thomason*,
  22 F.3d 1455 (9th Cir. 1994)........................................ 20, 22

*Novak v. Overture Servs., Inc.*,
  309 F. Supp. 2d 446 (E.D.N.Y. 2004) ................................... 55

*Officers for Justice v. Civil Serv. Comm'n*,
  688 F.2d 615 (9th Cir. 1982)......................................... *passim*

*In re Oracle Sec. Litig.*,
  No. C-90-0931-VRW, 1994 WL 502054 (N.D. Cal. June 18, 1994) ................................... 65

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999)............................................... 68, 81

*In re Pac. Enters. Sec. Litig.*,
  47 F.3d 373 (9th Cir. 1995)........................................... 18

*Parker v. Time Warner Entm't Co.*,
  331 F.3d 13 (2d Cir. 2003)............................................ 33

*Parker v. Time Warner Entm't Co.*,
  631 F. Supp. 2d 242 (E.D.N.Y. 2009) ................................. 35

*Perez v. Asurion Corp.*,
  501 F. Supp. 2d 1360 (S.D. Fla. 2007) ............................... 31

*Person v. Google Inc.*,
  456 F. Supp. 2d 488 (S.D.N.Y. 2006)................................. 55

*In re Pet Food Prods. Liab. Litig.*,
  629 F.3d 333 (3d Cir. 2010)........................................... 68

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985).................................................. 61

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

viii.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

**TABLE OF AUTHORITIES**
(CONTINUED)

Page

*In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998).................................................................................. 56

*Radcliffe v. Experian Information Solutions Inc.*,
    --- F.3d ---, 2013 WL 1831760 (9th Cir. May 2, 2013) .................................. 33, 51

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
    442 F.3d 741 (9th Cir. 2006)................................................................................. 57

*Riker v. Gibbons*,
    No. 08-cv-00115-LRH-VPC, 2010 WL 4366012 (D. Nev. Oct. 28, 2010)..................... 16, 31

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
    487 U.S. 781 (1988)............................................................................................. 29

*Roberts v. Am. Bank & Trust Co.*,
    835 F. Supp. 2d 183 (E.D. La. 2011) ................................................................... 79

*Robertson v. Nat'l Basketball Ass'n*,
    556 F.2d 682 (2d Cir. 1977)................................................................................. 70

*Robyn Cohen v. Facebook*,
    No. 10-5282-RS (N.D. Cal. Nov. 10, 2011) ........................................................ 53

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009)............................................................... 17, 43, 48, 82

*S. Bay Chevrolet v. GMAC*,
    72 Cal. App. 4th 861 (1999) ................................................................................ 30

*Sambreel Holdings LLC v. Facebook, Inc.*,
    --- F. Supp. 2d ---, 2012 WL 5995240 (S.D. Cal. Nov. 29, 2012)................... 20, 59

*Satchell v. Fed. Express Corp.*,
    Nos. C03-2659 SI, C03-2878 SI, 2007 WL 1114010 (N.D. Cal. Apr. 13, 2007).................. 17

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) .............................................................. 67, 71

*Schumm v. Berg*,
    37 Cal. 2d 174 (1951) ......................................................................................... 77

*SEC v. Certain Unknown Purchasers*,
    817 F.2d 1018 (2d Cir. 1987)............................................................................... 67

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ix.

**TABLE OF AUTHORITIES**
(CONTINUED)

Page

*Segal v. Amazon.com, Inc.*,
    763 F. Supp. 2d 1367 (S.D. Fla. 2011) ................................................................. 55

*Shames v. Hertz Corp.*,
    No. 07-CV-2174-MMA, 2012 U.S. Dist. LEXIS 148148 (S.D. Cal. Oct. 15, 2012) ............. 53

*Shames v. Hertz Corp.*,
    No. 07–CV–2174–MMA(WMC), 2012 WL 5392159 (S.D. Cal. Nov. 5, 2013) .................. 67

*Sisco v. Cosgrove, Michelizzi, Schwabacher, Ward & Bianchi*,
    51 Cal. App. 4th 1302 (1996) ........................................................................ 78

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) ....................................................................... 51

*Smith v. Dominion Bridge Corp.*,
    No. 96-7580, 2007 WL 1101272 (E.D. Pa. Apr. 11, 2007) ................................... 46

*Sprietsma v. Mercury Marine*,
    537 U.S. 51 (2002) ............................................................................. 71, 72

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ............................................................................. 33, 34

*Staton v. Boeing*,
    327 F.3d 938 (9th Cir. 2003) ....................................................................... 82

*Stewart v. Rolling Stone LLC*,
    181 Cal. App. 4th 664 (2010) ........................................................................ 19

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011) ..................................................................... 54, 56

*In re Tableware Antitrust Litig.*,
    484 F. Supp. 2d 1078 (N.D. Cal. 2007) ............................................................. 46

*In re TD Ameritrade Account Holder Litig.*,
    Nos. 07-cv-2852 & 07-cv-4903, 2011 WL 4079226 (N.D. Cal. Sept. 13, 2011) ........ 35,42, 67

*Thompson v. Metro. Life Ins. Co.*,
    216 F.R.D. 55 (S.D.N.Y. 2003) ....................................................................... 83

*Tijero v. Aaron Bros., Inc.*,
    No. 10-cv-1089, 2013 WL 60464 (N.D. Cal. Jan. 2, 2013) ................................... 58

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

x.

**TABLE OF AUTHORITIES**
(CONTINUED)

**Page**

*Torrisi v. Tuscon Elec. Power Co.*,
    8 F.3d 1370 (9th Cir. 1993)...................................................................................................... 64

*TradeComet.com LLC v. Google, Inc.*,
    693 F. Supp. 2d 370 (S.D.N.Y. 2010)..................................................................................... 55

*True v. Am. Honda Motor Co.*,
    749 F. Supp. 2d 1052 (C.D. Cal. 2010) ........................................................................... 10, 65

*Vasquez v. Coast Valley Roofing, Inc.*,
    670 F. Supp. 2d 1114 (E.D. Cal. 2009).................................................................................. 15

*Vincent v. Reser*,
    No. C 11-03572 RRB, 2013 U.S. Dist. LEXIS 22341 (N.D. Cal. Feb. 19, 2013)................. 51

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) .................................................................................... 57

*Vought v. Bank of America, N.A.*,
    No. 10-CV-2052, 2012 U.S. Dist. LEXIS 143595 (C.D. Ill. Oct. 4, 2012) ........................... 65

*W. Va. v. Chas. Pfizer & Co.*,
    314 F. Supp. 710 (S.D.N.Y. 1970).......................................................................................... 18

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541 (2011) ............................................................................................................ 30

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004)..................................................................................................... 54

*Weeks v. Kellogg Co.*,
    2011 U.S. Dist. LEXIS 155472 (C.D. Cal. Nov. 23, 2011).................................................... 56

*In re Wells Fargo Loan Processor Overtime Pay Litig.*,
    2011 U.S. Dist. LEXIS 84541 (N.D. Cal. Aug. 2, 2011)........................................................ 56

*White v. Experian Info. Solutions, Inc.*,
    803 F. Supp. 2d 1086 (C.D. Cal. 2011) .................................................................................. 33

*Williams v. Boeing Co.*,
    517 F.3d 1120 (9th Cir. 2008).................................................................................................. 57

*Williamson v. Mazda Motor of America, Inc.*,
    131 S. Ct. 1131 (2011) ...................................................................................................... 72, 73

**TABLE OF AUTHORITIES**
(CONTINUED)

**Page**

**CONSTITUTIONS**

U.S. Constitution, Article III ........................................................................................ 2, 18, 19

**FEDERAL STATUTES**

Children's Online Privacy Protection Act,
   15 U.S.C. § 6501 *et seq.* ................................................................................... *passim*

Communications Decency Act
   47 U.S.C. § 230 ..................................................................................................... 29, 31

15 U.S.C.
   § 1681n ...................................................................................................................... 53
   § 1681o ...................................................................................................................... 53

28 U.S.C.
   § 1715(b) ................................................................................................................... 44
   § 78U–4(a)(3)(B) ...................................................................................................... 69

**STATE STATUTES**

California Business and Professions Code
   § 17200 ....................................................................................................................... 1

California  Civil Code
   § 3344 ................................................................................................................. *passim*

California Family Code
   § 6700 ....................................................................................................................... 77
   § 6701 ................................................................................................................. *passim*
   § 6750 .................................................................................................................. 78, 79
   § 6751 .................................................................................................................. 78, 79

Idaho Code
   § 32-103 .................................................................................................................... 80

N.D. Cent. Code
   §§ 14-10-10 to -11 .................................................................................................... 80

Tenn. Code
   § 47-25-1106(d)(2) ................................................................................................... 54

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

xii.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

**TABLE OF AUTHORITIES**
(CONTINUED)

**Page**

**RULES AND REGULATIONS**

Federal Rules of Civil Procedure
Rule 23 ............................................................................................................. *passim*

16 C.F.R. § 312.5(a) .......................................................................................... 23

**LEGISLATIVE MATERIALS**

144 Cong. Rec. S12785, 12787, 12789 (daily ed. Oct. 21, 1998) .......................... 23, 24

S. 2326, 105th Cong. (1997-1998) ........................................................................ 23, 25

Hr'g on S. 2326 Before the Commc'ns Subcomm. of the S. Comm. on Commc'ns, Sci. &
Transp., 105th Cong. 46 (1998) ....................................................................... 23

**OTHER AUTHORITIES**

Black's Law Dictionary  (9th ed. 2009) .............................................................. 78

Restatement (Third) of Agency (2006) ............................................................... 78

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

xiii.

**FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS**

MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

The settlement reached in the Amended Settlement Agreement and Release (the "Settlement," "Settlement Agreement," or "S.A.")[1]—the product of over a year of hard-fought litigation—is fair, reasonable, and adequate and should be finally approved.   The benefits Plaintiffs have delivered to the provisional settlement class (the "Class") are substantial.   First, over 600,000 provisional settlement class members ("Class Members") submitted valid claims and will receive a cash payment of at least $10 (or more at the Court's discretion).   Second, the Settlement will channel millions of dollars to Internet watchdog and advocacy groups working to protect the online safety and privacy of Class Members, thereby advancing the interests underlying this case for years to come.   Third, Facebook will implement the Settlement's wide-ranging injunctive provisions, which were unobtainable through continued litigation.   These include: (1) robust new disclosures and greater transparency concerning Sponsored Stories; (2) innovative new tools for Class Members to control their appearances in Sponsored Stories; and (3) new educational materials targeted at parents of minor Facebook users, new tools that allow parents to opt their children out of Sponsored Stories entirely (whether the parents use Facebook or not), and a new set of rules that make certain minors ineligible to appear in Sponsored Stories altogether, without requiring any parental action at all.   The Settlement is particularly fair, because it secures these important and far-reaching benefits for the Class (including, collectively, millions of dollars of direct cash payments to Class Members who never paid Facebook anything) despite the host of formidable obstacles that stood in the way of Class Members prevailing on any of their claims had litigation continued.

Plaintiffs are Facebook users ("Users") who allege that Facebook displayed their names and Facebook profile pictures in Sponsored Stories without valid consent, violating California's right of publicity statute, California Civil Code § 3344 ("§ 3344"), and California's Unfair Competition Law, Business and Professions Code § 17200 ("UCL").   More than a year of

---

[1] Capitalized terms in this Motion that are not defined herein have the same definition as used in the Amended Settlement Agreement and Release (Dkt. No. 235-1).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

discovery, however, has confirmed numerous, critical defects in Plaintiffs' case.  First and foremost, Plaintiffs were never able to show that they, or any Class Members, were harmed by their appearance in Sponsored Stories, as required under Article III of the U.S. Constitution, § 3344, and the UCL.  At bottom, this is a case about Facebook Users purportedly being harmed when content they voluntarily shared with their chosen friends was shared again with the very same friends.  This alone makes demonstrating any actual harm to anyone impossible.  Moreover, Plaintiffs' theory of injury unjustifiably presumed that Users were injured simply because Facebook allegedly earned more money from Sponsored Stories than it would have earned from alternative advertisements.  Setting aside this theory's significant conceptual fallacies (it conflates the alleged benefit to Facebook with supposed harm to Users), Facebook proved through expert and fact discovery that it frequently earned *less money* by running Sponsored Stories than it would have earned from other advertising content.  In short, Plaintiffs would never have successfully proven that they were harmed by Sponsored Stories.

Equally fatal to Plaintiffs' claims is that they *expressly agreed* to the display of their names and likenesses in the manner challenged in the case.  As a condition of using Facebook's free website, all Users agree to Facebook's terms of use, known as the Statement of Rights and Responsibilities (the "Terms").  Since before Sponsored Stories existed, the Terms have clearly stated that a User's "name and profile picture may be associated with commercial, sponsored, or related content (such as a brand [the User] like[s])," and under the Terms, Users have "give[n] [Facebook] permission to use [the User's] name and profile picture in connection with that content."  This consent posed an insurmountable challenge for Plaintiffs and Class Members.

Facebook also adduced overwhelming evidence that Users consent to Sponsored Stories (through the recognized doctrine of implied consent under § 3344) by, for example, continuing to use the site and particular features despite knowing that their names and profile pictures could be displayed in connection with sponsored content.  Through discovery, Facebook established the prevalence (if not the near-universality) of consent among Class Members, including the named Plaintiffs themselves, who continued to take actions on Facebook that could generate Sponsored Stories long after learning about Sponsored Stories and filing suit.  One User even remarked that

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1    Facebook's display of her name and likeness in Sponsored Stories was "part of the deal," adding

2    that "nothing is free, it's how they make money."

3         Apart from injury and consent, Plaintiffs and Class Members (minors and adults alike)

4    faced an array of other considerable hurdles to their success.  For example, substantial evidence

5    shows that some Facebook Users use fake names or unrecognizable pseudonyms, and that many

6    use profile pictures that do not bear their likeness.  The First Amendment presents an additional

7    barrier to liability, and, indeed, many Sponsored Stories—including those about politics, religion,

8    and public affairs—are entitled to the highest possible degree of constitutional protection.

9         Yet, despite these and other very substantial risks to Class Members' prospects for

10   recovering anything at all, the Plaintiffs obtained a Settlement that delivers meaningful and

11   immediate relief to the over 150 million Users in the Class.  Notice of the Settlement was

12   delivered to Class Members in plain, easily understood language, which informed them of the

13   nature of the action, the claims and defenses asserted, and their right to opt out of the Settlement

14   or object to it (and millions of Users went to the Settlement Website to review the Terms). Yet

15   only a miniscule portion of Class Members withdrew from or objected to the deal, and the size of

16   the group who did is dwarfed by those who filed claims for monetary relief.

17        Finally, as discussed extensively below, the tiny fraction of Class Members who objected

18   to the Settlement presented no valid criticisms.  Many Class Members objected not to the

19   Settlement, but to the lawsuit itself, calling it "frivolous," "a waste of time and resources," and

20   noting, for example, that "[b]y maintaining their accounts [Users] appear to consider facebook's

21   practices worth the cost of free social networking."  Many other objectors focused their attack, in

22   whole or in part, on the attorneys' fees sought by Plaintiffs' Counsel.  While Facebook submits

23   that counsel obtained a very good result for a Class with highly problematic claims, Facebook

24   agrees, as discussed in its previously-filed opposition to Plaintiffs' fee application, that the

25   attorneys' fees counsel seeks are excessive.  This, however, is no basis to deny final approval, and

26   should be addressed instead in the Court's ruling on counsel's fee application.

27        As to those objectors who actually challenge the terms of the Settlement, most are

28   complaining that the relief obtained is not precisely the relief that they would consider optimal if

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1   the case had been litigated to the end and won.  But this is not the relevant standard, and this

2   Court cannot second-guess the Parties' arm's-length agreement, particularly given that the

3   Settlement is fair and reasonable under the circumstances.  Other objectors see conflicts among

4   the Class (adults and minors; claimants and non-claimants) where none exist.  This Settlement

5   provides all Class Members with substantial relief and provides direct monetary relief to all those

6   who established that they have the strongest claims.  It is thus fair to all Class Members, both in

7   the relief it affords them today and the protections it gives them tomorrow.

8       Facebook respectfully submits that the Settlement unquestionably meets the standard for

9   final approval, and squarely addresses every concern this Court raised regarding the earlier

10  version of the Settlement.  It is a non-collusive, fair, reasonable, and adequate resolution of the

11  claims brought, and final approval should be granted.

12  **II.    OVERVIEW OF THE LITIGATION AND THE SETTLEMENT**

13      **A.    Overview of Sponsored Stories and Plaintiffs' Allegations.**

14      Facebook operates a free social networking website that allows people worldwide to share

15  and connect with their friends, families, and communities.  Like many free websites, Facebook

16  funds its operations—which currently cost more than $4.5 billion per year—primarily by

17  allowing marketers to display advertisements and sponsored content on the site.

18      On January 25, 2011, Facebook launched a new social marketing product called

19  "Sponsored Stories."  Sponsored Stories contain User-generated content that has already appeared

20  (or was eligible to appear) in the News Feeds[2] of the User's Facebook friends ("Friends") and in a

21  number of other places on the site (called "stories").[3]  (*See* Declaration of James Squires ISO

22  Joint Motion for Prelim. Approval of Rev. Settlement, Dkt. No. 260 ("Squires Decl.") ¶¶ 4-10.)

23  With Sponsored Stories, individuals, businesses, and organizations can increase the visibility of

24  these User social actions—for a small fee, a marketer can "sponsor" a story, meaning that

25  _____

[2] The News Feed is a customized, constantly-updated stream of stories generated by actions taken

26  by the User's Friends and the Facebook pages ("Pages") that the User has connected with
    (representing brands, organizations, politicians, games, etc.).

27  [3] Notably, Plaintiffs do not challenge any of these other redisplays (such as on Plaintiffs'
    Timeline, in their Friends' News Feeds, on the Facebook Page for the Liked content, etc.) of the

28  content they voluntarily shared on Facebook.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4.

**FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS**

Facebook will redisplay the story, subject to the User's personal privacy settings, to the same audience the User chose for the original story.[4]

In March 2011, Plaintiffs filed a putative class action alleging that Sponsored Stories misappropriate their names and likenesses.  (*See, e.g.*, Sec. Amd. Class Action Compl., Dkt. No. 22 ("SAC") ¶¶ 109-10, 120-21.)   Plaintiffs sought actual, punitive, and statutory damages, restitution, and injunctive relief.  (*Id.* ¶ 136.)

### B.   Case History Before Settlement.

The proposed Settlement of this long-running class action follows extensive motion practice and discovery by the Parties.

**Motion Practice:**  The action was originally filed in Santa Clara Superior Court on March 11, 2011.  (Notice of Removal of Action, Dkt. No. 1.)  Plaintiffs amended the Complaint to add a subclass of minors on March 18, 2011, and Facebook removed the case to federal court on April 8, 2011.  (*Id.*)  Thereafter, following an initial motion to dismiss (Dkt. No. 16), Plaintiffs filed the SAC (Dkt. No. 22).  Facebook then filed a second motion to dismiss (Dkt. No. 30), which Judge Koh granted in part and denied in part on December 16, 2011 (Dkt. No. 74).  Plaintiffs filed a motion for class certification on March 29, 2012 (Dkt. No. 106), Facebook filed an opposition (Dkt. No. 141), and Plaintiffs filed a reply.  The Parties agreed to settle in the final days leading up to the hearing on class certification, which was then scheduled for May 31, 2012.  (Joint Status Report re Revised Settlement Term Sheet, Dkt. No. 171.)

**Discovery:**  In the 15 months of litigation preceding settlement, the Parties engaged in extensive discovery, which included over 1,000 discovery requests, more than 200,000 pages of documents, and 21 depositions.  (*See* Decl. of Matthew D. Brown ISO Jt. Mot. for Prelim. Appr. of Rev. Settlement, Dkt. No. 262 ("Brown Decl.") ¶ 2.)  Between them, the Parties deposed seven experts, the three named Plaintiffs, former named Plaintiff Angel Fraley, three parents of the minor named Plaintiffs, and multiple Facebook employees.  (*Id.*)  At the time of the settlement,

---

[4] An example of how a typical social action can appear in both the News Feed of a User's Friends and in a Sponsored Story displayed to those same Friends is provided in the accompanying Declaration of Jeffrey M. Gutkin in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement ("Gutkin Decl.").

Cooley LLP
Attorneys At Law
San Francisco

5.

Facebook's MPA ISO Pls.' Mot. for
Final Approval of Settlement
Case No. CV 11-01726 RS

1   the Parties were fast approaching the close of factual discovery.  (*See* Dkt. No. 51.)

2          **Settlement Negotiations and the Original Settlement:**  On March 1, 2012, Plaintiffs and

3   Facebook mediated the case at JAMS before the Hon. Edward A. Infante, retired Chief Magistrate

4   Judge of the Northern District of California.  (*See* Declaration of Michael G. Rhodes, Dkt. No.

5   238 ("Rhodes Decl.") ¶ 4.)  Although the case did not settle at that time, the Parties subsequently

6   engaged in ongoing, direct settlement discussions under the guidance of Judge Infante, while

7   continuing to litigate.  (*Id.*)  The Parties ultimately executed a settlement term sheet, followed by

8   a fully articulated settlement agreement (the "Original Settlement").  (*Id.* ¶ 5.)  Plaintiffs filed a

9   motion for preliminary approval of that settlement on June 14, 2012 (Dkt. No. 181), and

10  Facebook filed a brief in support of the motion two weeks later (Dkt. No. 188).

11         On August 2, 2012, the Court held a hearing on Plaintiffs' preliminary approval motion.

12  In an order dated August 17, 2012 (Dkt. No. 224) ("August Order"), the Court denied the motion

13  without prejudice, identifying specific issues that would be better addressed before final approval

14  proceedings.  (August Order at 2.)

15         **C.      The Revised Settlement.**

16         In response to the Court's August Order, the Parties conducted further settlement

17  negotiations that culminated in the Settlement Agreement.  On October 5, 2012, the Parties filed a

18  Joint Motion for Preliminary Approval of Revised Settlement, and appeared before the Court in

19  support of the Joint Motion on November 15, 2012.  (Dkt. No. 235.)  On December 3, 2012, the

20  Court granted the motion, finding that the Settlement appeared to be the product of serious,

21  informed, non-collusive negotiations and fell within the range of possible approval as fair,

22  reasonable, and adequate.  (*See* Preliminary Approval of Class Settlement and Provisional Class

23  Cert. Order, Dkt. No. 252 ("Preliminary Approval Order" or "Prelim. App. Order").)

24         The main terms of the Settlement are as follows:

25         **Class Definition:**  The Class is defined as: "[A]ll persons in the United States who have

26  or have had a Facebook account at any time and had their names, nicknames, pseudonyms, profile

27  pictures, photographs, likenesses, or identities displayed in a Sponsored Story, at any time on or

28  before the date of entry of the Preliminary Approval Order."  (S.A. § 1.6.)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

**Minor Subclass Definition:**   The Minor Subclass is defined as: "[A]ll persons in the Class who additionally have or have had a Facebook account at any time and had their names, nicknames, pseudonyms, profile pictures, photographs, likenesses, or identities displayed in a Sponsored Story, while under eighteen (18) years of age, or under any other applicable age of majority, at any time on or before the date of entry of the Preliminary Approval Order."  (*Id.* § 1.17.)

**Settlement Fund:**  The Settlement creates a $20,000,000 "Settlement Fund." (*Id.* § 1.27.) The Settlement Fund will be used to pay the reasonable costs of delivering notice to the Class, costs incurred by the Settlement Administrator and Escrow Agent, taxes and tax expenses, attorneys' fees and costs approved by the Court for Class Counsel, and any incentive awards approved by the Court for the named Plaintiffs.  (*Id.*)  What remains from the $20 million will be the "Net Settlement Fund," which, as detailed below, will be used to pay the claims of "Authorized Claimants" and, in all likelihood, a *cy pres* award.  (*Id.* §§ 1.18, 2.3, 2.4.)  In no circumstance will any portion of the Settlement Fund revert to Facebook.  (*See id.* §§ 2.2-2.4.)

**Payments to Class Members / *Cy Pres* Distributions**:   Class Members were able to submit a claim for payment from the Net Settlement Fund using an online form or a paper form. The claim deadline was May 2, 2013 (i.e., 150 days after entry of the Preliminary Approval Order).  (S.A. § 4.1(b).)  The forms required Class Members to attest that: (a) the Class Member understands that a story about some action he or she took on Facebook (such as Liking a Page, checking in at a location, or sharing a link), along with his or her name and/or profile picture, may have been displayed in a Sponsored Story shown to his or her Facebook Friends who were authorized by the Class Member to see that action; (b) the Class Member was not aware that Facebook could be paid a fee for redisplaying actions such as these, alongside the Class Member's name and/or profile picture, to his or her Facebook Friends; (c) the Class Member believes that, if his or her name and/or profile picture were displayed in a Sponsored Story, he or she was injured by that display; (d) the Class Member is submitting only one Claim Form regardless of how many Facebook accounts the Class Member has; and (e) the Class Member understands that he or she is releasing all claims against Facebook and other Released Parties, as

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7.

**FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS**

described in § 5 of the Settlement.  (S.A. § 4.1.)  The Class Member also had to provide the email address, User ID or username, and name (or pseudonym) associated with his or her Facebook account (or for his or her minor child's Facebook account).  (*Id.* § 4.1(a).)  For a valid claim, Facebook's records had to show that the Class Member appeared in a Sponsored Story on or before the preliminary approval date (i.e., Dec. 3, 2012).  (*Id.*)

Class Members who submitted timely, valid Claim Forms will receive payments, either by online money transfer or paper check.  (*See generally id.* § 2.3).  Because the Net Settlement Fund will not be exhausted by $10 payments to Authorized Claimants, the Court may distribute the remaining proceeds to the *Cy Pres* Recipients, or, in its discretion, order the Settlement Administrator to (a) increase the payment to each Authorized Claimant, so that it would exceed $10 (provided that doing so does not exceed the Net Settlement Fund) and (b) then distribute to the *Cy Pres* Recipients any remaining proceeds in the Net Settlement Fund.  (*Id.* § 2.3.)  As discussed further below, the Parties agree that it would also be appropriate for the Court to exercise its discretion to increase payments to Authorized Claimants to $15.[5]

The *Cy Pres* Recipients are specified in the Settlement Agreement.  (S.A. § 2.4.)  The Parties selected these organizations after substantial negotiation based on the nature of this action and the organizations' focus on consumer protection, research, and education concerning online privacy and the safe use of social media technologies.  Some of the organizations also have a particular emphasis on protecting the interests of minors.  (*See* Brown Decl. ¶ 3, Ex. A.)

**Attorneys' Fees and Costs:**  The Settlement allows Class Counsel to petition the Court for an award of attorneys' fees and costs from the Settlement Fund (*id.* § 2.5), which they have done, seeking $7,500,000 in fees and $282,566.49 in costs.  (*See* Pls.' Mot. and Mem. of Law ISO Attorneys' Fees and Costs and Class Reps.' Service Awards, Dkt. No. 253 ("Fee Motion").)  On June 7, 2013, Facebook filed a memorandum in opposition to the fee request, which identified various grounds for reducing the award of fees and costs to Class Counsel and advocated for a fee award of between approximately $3 and $3.5 million.  (*See* Facebook's Opp. to Plaintiffs' Motion

---

[5] As discussed below, final approval of the Settlement would be entirely appropriate if the Court does not exercise its discretion and leaves the payments to Authorized Claimants at $10.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

for Attorneys' Fees and Costs, Dkt. No. 344 ("Fee Opposition").)

**Incentive Awards:**  The Settlement allows each Plaintiff to seek payment of an incentive award of *up to* $12,500, subject to Court approval.  (S.A. § 2.6.)  Plaintiffs have moved for $12,500 incentive awards for each Class representative.  (*See* Fee Motion.)

**Notice of Settlement:**  The Settlement provides for direct notice to Class Members by email, using email addresses Class Members provided for their Facebook accounts, and requires Facebook to publish a notice of Settlement and to distribute a press release in order to reach Users for whom Facebook no longer has an email address.  The Settlement requires that the notices include the web address of the Settlement Website, at which Class Members were able to obtain detailed information about the lawsuit and the Settlement.  As discussed below, Facebook and the Settlement Administrator have complied with these notice requirements.

**Administrative Fees:**  The Settlement provides that the costs incurred by the Escrow Agent and Settlement Administrator, as well as the costs of delivering notice to the Class, shall be paid from the Settlement Fund.  (S.A. § 2.2.)  The Parties have engaged Garden City Group, Inc. ("GCG") as the Settlement Administrator and as Escrow Agent.  (S.A. §§ 1.10, 1.26.)  Through April 30, 2013, GCG's fees and expenses for administering the Settlement, including providing publication notice, setting up the Settlement Website, and processing Claim Forms total $447,777.71.  (Decl. of Jennifer M. Keough re Settlement Administration, Dkt. No. 341 ("Keough Decl.") ¶ 15.)  GCG's estimate for the remaining expenses, including the costs of paying claims is $487,000.  (*Id.*)  GCG's expenses related to its work as Escrow Agent are $1,050.50.  (*Id.*)  GCG's total estimated costs for settlement administration and escrow work are therefore $935,828.21.[6]  Notably, while Facebook's estimates of GCG's costs submitted in connection with the Motion for Preliminary Approval included substantial costs related to sending the Email Notice to Class Members, Facebook itself handled this task.  (*See* Decl. of

---

[6] One objector argues that the administrative costs were not disclosed.  (*See* Inv. Obj. No. 92 (defined *infra* n.12).)  But estimated administrative costs were disclosed in the preliminary approval briefing (*see* Dkt. No. 259 at 10), which was available on the Settlement Website.  And GCG has now provided up-to-date estimates.  It was not possible to provide more accurate estimates previously because none of the administrative functions had yet been performed.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

Peter Vulgaris ISO Pls.' Mot. for Final Approval of Class Action Settlement ("Vulgaris Decl.") ¶ 5.)  By internalizing this cost, Facebook prevented approximately $240,000 in expenses from being deducted from the Net Settlement Fund.  (*See* Gutkin Decl. ¶ 16.)

**Changes to Facebook's Disclosures and Additional User Controls ("Injunctive Relief"):**  The Settlement provides for enhanced notice and several innovative tools that, together, provide Class Members (and minor Class Members' parents) significant transparency and control regarding how their (or their children's) social actions may be used in connection with commercial or sponsored content.[7]  First, Facebook has agreed to (i) enhance the notice and consent provision in Facebook's Terms with explicit language to which the Parties have agreed, and (ii) work with Plaintiffs' Counsel to identify and clarify any other information on Facebook that, in Plaintiffs' view, does not accurately or sufficiently explain how Facebook advertising works.  (S.A. §§ 2.1(a), (d).)  Second, Facebook has agreed to engineer a new tool enabling Class Members to view, on a going-forward basis, the subset of their interactions and other content on Facebook that have been displayed in Sponsored Stories (if any).  This new functionality will provide a level of transparency that does not exist on the site today and is unprecedented on the Internet.  Third, Facebook will create a granular control that will allow Class Members, upon viewing content that has been displayed in a Sponsored Story, to prevent additional displays of those Sponsored Stories, if they so desire.  (*See* S.A. § 2.1(b); Brown Decl. Ex. LL.)

**Minor-Specific Injunctive Relief:**  In addition, the Settlement contains benefits comprehensively addressing the claims of the Minor Subclass.  First, Facebook will revise the

---

[7]  Facebook previously filed working "mockups" with its papers in support of preliminary approval, illustrating how key pieces of this injunctive relief are likely to be implemented based on the then-current functionality on the website.  (Brown Decl. Exs. LL - OO.)

The detailed descriptions of the proposed injunctive relief herein, and the mock-ups provided by Facebook, belie Objector Frank's assertion that the "relief is vague and undeveloped in its particulars."  (*See* Obj. No. 11  at 9 (defined *infra* n.11).)  Further, the case Mr. Frank cites in support, *True v. American Honda Motor Co.*, 749 F. Supp. 2d 1052, 1077 (C.D. Cal. 2010), is incompletely quoted and inapposite.  First, Mr. Frank omits the second half of the sentence he quotes, wherein the court concludes the injunctive relief has value.  *See True,* 749 F. Supp. 2d at 1077 ("Although it is difficult for the Court to discern the value of the yet-to-be produced DVD at this time, **the Court agrees with Plaintiffs that the DVD will likely be of *some* value to class members"**) (emphasis added, italics in original).  Further, in contrast to *True*, Facebook has provided substantial detail about the new tools, including graphic mock-ups.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

Terms to require minor Class Members to affirm that they have obtained parental consent to Facebook's use of their names and likenesses in connection with commercial, sponsored, or related content on Facebook, including Sponsored Stories. (S.A. § 2.1(c)(i).) Second, Facebook has agreed to create a new online tool that will allow parents of minor Class Members to prevent their children from appearing in Sponsored Stories, which will be available to parents whether or not they are Facebook Users. (S.A. § 2.1(c)(iii); *see* Brown Decl. Ex. MM.) Third, Facebook has agreed to enhance its existing Family Safety Center with information about social advertising on Facebook, including how parents may opt their children out of appearing in Sponsored Stories, and a link to the tool that enables parents to do so. (S.A. § 2.1(c)(iv).)

Facebook has also agreed to begin encouraging new Users, upon or soon after joining Facebook, to designate Facebook Users who are their family members (if any), including their parents and children. (*See* S.A. § 2.1(c)(ii); Brown Decl. Ex. MM.) Further, for both existing and new Users, where both a parent and a minor child confirm their relationship on Facebook, the parent will be able to utilize the above-described minors' opt-out tool directly from his or her Facebook account. (S.A. § 2.1(c)(iii); Brown Decl. Ex. OO.) To apprise parents of this option, Facebook will target informational advertising to verified parents, directing them to the Family Safety Center and/or other parent-specific resources on Facebook. (S.A. § 2.1(c)(iv).)

Finally, Facebook will also add a control in minor Class Members' timelines that enables them to indicate that they do not have a parent on Facebook. (S.A. § 2.1(c)(iii); Brown Decl. Ex. MM.) Where a minor User indicates that his or her parents are not Facebook Users, Facebook will make the minor ineligible to appear in Sponsored Stories until he or she reaches the age of 18, until the minor changes his or her settings to indicate that he or she has a parent on Facebook, or until a confirmed parental relationship with the minor User is established. (S.A. § 2.1(c)(iii).)

**Opt-outs / Objections:** The Settlement Agreement allowed Class Members to opt out or object to the Settlement within 150 days of the entry of the Court's December 3, 2012 Preliminary Approval Order, i.e., by May 2, 2013. (S.A. §§ 1.19, 3.7(c), 3.8.)

### D.   The Provision of Notice to the Proposed Class.

As part of the Preliminary Approval Order, the Court ordered the Parties to provide notice

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1    to the Class as required under § 3.3 of the Settlement.  (Dkt. No. 252 at 4.)

2           **Settlement Website (S.A. § 3.3(a))**:  On January 2, 2013, the Settlement Administrator

3    made available an official Settlement Website at www.fraleyfacebooksettlement.com.  (Keough

4    Decl. ¶ 6.)  The Settlement Website included a copy of the Long Form Notice included as Exhibit

5    2 to the Settlement Agreement (Dkt. No. 235-3).  (Keough Decl. ¶ 6, Ex. C.)  It also included a

6    form for submitting claims, substantially similar to the Claim Form attached as Exhibit 5 to the

7    Settlement Agreement (Dkt. No. 235-6), a form to opt-out of the Settlement, substantially similar

8    to the Opt-Out Form attached as Exhibit 6 to the Settlement Agreement (Dkt. No. 235-7),

9    instructions on how to object to the Settlement, court filings submitted by the Parties in support of

10   preliminary approval, and Class Counsel's Fee Motion.  (Keough Decl. ¶ 6, Exs. D, E.)

11          **Short Form Notice by Email (S.A. § 3.3(b)**:  On January 2, 2013, Facebook began

12   transmitting the Email Notice to each Class Member for whom Facebook had a valid email

13   address.  (Vulgaris Decl. ¶ 5, Ex. A; *see also* S.A. § 3.3(b).)  The notice provided the Internet

14   address of the Settlement Website.  (Vulgaris Decl. Ex. A.)  From January 2, 2013 through

15   February 28, 2013, Facebook sent the Email Notice to 146,617,076 Class Members for whom

16   Facebook had valid email addresses.  (Vulgaris Decl. ¶ 5.)[8]

17          **Publication Notice (S.A. § 3.3(c)**:  On three separate dates—Thursday, January 3, 2013,

18   Wednesday, January 16, 2013, and Monday, January 28, 2013—the Settlement Administrator

19   caused notice of the Settlement, substantially in the form of the Publication Notice attached as

20   Exhibit 4 to the Settlement Agreement (Dkt. No. 235-5), to be published as a quarter-page ad in

21   the national edition of *USA Today*.  (Keough Decl. ¶ 4; *see also* S.A. § 3.3(c).)  These notices also

22   provided the web address of the Settlement Website.  (*Id.* ¶ 5.)  Additionally, on January 3, 2013

23   the Settlement Administrator caused notice of the Settlement, substantially in the form of the

24   Publication Notice, to be transmitted over the PR Newswire.  (Keough Decl. ¶ 4.)

25          The notices and transmission over the PR Newswire resulted in extensive press coverage.

26   For instance, news outlets such as the *Chicago Tribune*, the *L.A. Times*, Reuters.com, the *San*

---

[8] Emails to 11.3 % of Class Members could not be delivered because of bounce-backs.  (Vulgaris Decl ¶ 6.)  Many of these likely result from, for example, Users changing their email addresses without updating their email addresses on Facebook.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1   *Jose Mercury News*, and CNET News, to name a few, all distributed stories regarding preliminary

2   approval of the Settlement.  (*See* Gutkin Decl. ¶¶ 2-6, Exs. A-E.)

3       **E.      Claims, Objections, and Exclusion Requests.**

4       The notices informed Class Members that the deadline to make a claim, submit a request

5   for exclusion, or object to the Settlement was May 2, 2013, and that Class Members could visit

6   the Settlement Website for additional information, including information regarding how to take

7   these actions.  (Keough Decl. ¶ 5; *see also* S.A. §§ 3.3(b) & (c).)  6,825 Class Members have filed

8   timely, valid requests to be excluded from the Settlement.   (Decl. of Jennifer M. Keough

9   Regarding Exclusions, Dkt. No. 348 ("Keough Exclusion Decl.") ¶ 3.)[9]   In addition, 614,994

10  Class Members have made valid and timely claims for payment.  (Keough Decl. ¶ 14.)

11      The Settlement Website also informed Class Members that in order to object to the

12  Settlement, the attorneys' fees and costs sought by Class Counsel, or the Incentive Awards to the

13  named Plaintiffs, Class Members had to deliver a written Objection to the Settlement

14  Administrator by mail or email, or, if represented by counsel, file their Objection with the Court.

15  (Keough Decl. ¶ 8; *see also* Prelim. App. Order § 6.)  Pursuant to the Preliminary Approval

16  Order, the Settlement Website informed Class Members that valid Objections must be verified by

17  a declaration under the penalty of perjury or a sworn affidavit, and include (a) the name of the

18  Action and case number, "Fraley v. Facebook, Inc., Case No. CV-11-01726 RS"; (b) the full

19  name, address, telephone number, and email address associated with the Facebook account of the

20  person objecting; and (c) an explanation detailing the specific reasons for each Objection,

21  including any legal and factual support the objector wishes to bring to the Court's attention and

22  any evidence the objector wishes to introduce in support of the Objection(s).  (Keough Decl. ¶ 8;

23  Prelim App. Order § 6.)[10]  As of the May 2, 2013 deadline, 17 Objections that complied with the

24  _____

25  [9] One Objection asserts that any class should be "opt in" rather than "opt out."  (*See* Inv. Obj. No.
    75 (defined *infra* n.12).)  This is inconsistent with Rule 23, which specifically permits class
26  actions involving exclusions.  *See* Rule 23(c)(2)(B).  Such "opt-in" classes have been repeatedly
    rejected as inconsistent with the purposes of Rule 23.  *See Ackal v. Centennial Beauregard*
27  *Cellular, LLC*, 700 F.3d 212, 216-17 (5th Cir. 2012).

28  [10] The Settlement Administrator prepared a chart that lists all Objections, both valid and invalid,
    received by the Settlement Administrator or filed with the Court (Keough Decl. ¶ 13), which

1   requirement of the Settlement and Preliminary Approval Order had been received by the Court

2   and/or the Settlement Administrator.[11]   (Keough Decl. ¶ 13.)   In addition, Class Members

3   submitted 87 Objections that did not conform to the requirements of the Settlement and

4   Preliminary Approval Order.[12]   (*Id.* ¶ 13.)

5        Notably, many valid and invalid Objections asserted that the objecting Class Member had

6   not been injured by Sponsored Stories, had consented to his or her appearance in sponsored

7   content, and did not believe the lawsuit warranted any relief being given to Facebook Users.

8   (*See, e.g.*, Obj. No. 3; Inv. Obj. Nos. 28, 31, 34, 35, 36, 38, 39, 45.)

9        **F.    Monetary Relief to Claimants and *Cy Pres* Recipients.**

10       Based on the number of claims submitted to the Settlement Administrator, each of the

11  614,994 Authorized Claimants is eligible to receive direct monetary relief.   Furthermore, even

12  after attorneys' fees and costs and any incentive awards to the named Plaintiffs, the Net

13  Settlement Fund will not be exhausted by the initial monetary relief ($10) to Authorized

14  Claimants.   As discussed below, final approval of the Settlement is warranted regardless of

15  whether (or how) the Court exercises its discretion to increase the direct payments.   However, the

16  Parties agree that it would be consistent with the intent of the Settlement and the interests of the

17  Class for the Court to exercise its discretion to order the Settlement Administrator to (i) increase

18  the pro rata payment to each Authorized Claimant to $15 and (ii) distribute the remaining funds to

19  the Court-approved *Cy Pres* Recipients.   (*See* S.A. § 2.3(b).)   Such an increase would be an

20

21  Plaintiffs filed with the Court along with a copy of each Objection (*see* Dkt. No. 335).  The chart
    assigns an identification number to each Objection.

22  [11] References herein to "Obj. No." are to the Objections numbered 1- 17, that can be found in

23  Dkt. Nos. 335-1 through 335-4.   Although these Objections are occasionally referenced as
    "valid," Facebook specifically disclaims that the substance of these objections provide grounds to

24  deny final approval.

25  [12] References herein to "Inv. Obj. No." signify that the Objection did not comply with Paragraph
    6(a) of the Preliminary Approval Order, as determined by the Settlement Administrator.  (*See*

26  Keough Decl. ¶ 13.)  These invalid Objections are numbered 18 to 104, and can be found in Dkt.
    Nos. 335-5 through 335-8.   Although these Objections are not valid under the Preliminary

27  Approval Order and therefore do not require the Court's attention (*see Ko v. Natura Pet Prods.,*
    *Inc.*, No. C-09-02619 SBA, 2012 WL 3945541, at *6 (N.D. Cal. Sept. 10, 2012)), Facebook has

28  nevertheless addressed the issues they raise in this Memorandum.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1    appropriate exercise of the Court's discretion in light of the number of valid Claim Forms actually

2    filed and the lower-than-expected estimated administrative costs.

3    **III.    LEGAL STANDARD FOR GRANTING FINAL APPROVAL OF SETTLEMENT.**

4              Approval of a class action settlement involves a three-step process.  First, the court holds a

5    hearing to determine whether to preliminarily approve the settlement as within the range of

6    acceptable settlements.  *Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114, 1124-25

7    (E.D. Cal. 2009) (quoting Manual for Complex Litigation § 30.41 (3d ed. 1995)).  Second, notice

8    of the settlement and its terms are provided to Class Members, who are then given a period of

9    time to submit claims, opt-out of the settlement, or object to the settlement.  *Id.*  Third, the court

10   conducts a "Fairness Hearing,"[13] at which all interested parties are afforded an opportunity to be

11   heard.  *Id.*  This case is now at the final step of the process.

12             Two questions are presented at fairness hearings.  First, the court must address whether

13   the settlement is fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e)(2).  Second, the court must

14   address whether the notice to the class was appropriate.  *See Estrella v. Freedom Fin. Network*

15   *LLC*, No. CV 09-03156-SI, 2012 WL 4645012, at *2 (N.D. Cal. Oct. 1, 2012).

16             Regarding the first question, several factors bear on whether a settlement is fair,

17   reasonable, and adequate: (1) "the strength of plaintiffs' case;" (2) "the risk, expense, complexity,

18   and likely duration of further litigation;" (3) "the risk of maintaining class action status

19   throughout the trial;" (4) "the amount offered in settlement;" (5) "the extent of discovery

20   completed, and the stage of the proceedings;" (6) "the experience and views of counsel;" (7) "the

21   presence of a governmental participant;" and (8) "the reaction of the class members to the

22   proposed settlement."  *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir.

23   1982); *accord Lane v. Facebook, Inc*., 696 F.3d 811, 819 (9th Cir. 2012), *reh'g en banc denied*,

24   709 F.3d 791 (9th Cir. 2013).  This list is not exclusive and different factors may be entitled to

25   different weight in different contexts.  *Officers for Justice*, 688 F.2d at 625.  Furthermore, "[t]o

26   survive appellate review, the district court must show it has explored comprehensively all factors,

---

[13] One objector suggested that Facebook should pay for him to attend the Fairness Hearing or provide remote access to the hearing.  (Inv. Obj. No. 41.)  Nothing in either the Settlement or case law obligates Facebook to pay for such costs.  (S.A. § 3.7.)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1   and must give a reasoned response to all non-frivolous objections." *Dennis v. Kellogg Co*., 697

2   F.3d 858, 864 (9th Cir. 2012) (internal quotations and citation omitted).

3         Courts favor voluntary conciliation between civil parties and settlement is the preferred

4   means of resolving complex class actions.  *Officers for Justice*, 688 F.2d at 625.  Although the

5   proponents carry the burden of establishing that the settlement is fair, *Riker v. Gibbons*, No. 08-

6   cv-00115-LRH-VPC, 2010 WL 4366012, at *2 (D. Nev. Oct. 28, 2010), a presumption of fairness

7   arises where the court finds that "the settlement agreement was reached in arm's length

8   negotiations after relevant discovery."  *In re Immune Response Secs. Litig*., 497 F. Supp. 2d 1166,

9   1171 (S.D. Cal. 2007).

10        As to the second question, "[t]he court must direct notice in a reasonable manner to all

11  class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  Notice must be

12  given "to all members who can be identified through reasonable effort" and describe "(i) the

13  nature of the action;" (ii) "the definition of the class certified;" (iii) "the class claims, issues, or

14  defenses;" (iv) "that a class member may enter an appearance through an attorney if the member

15  so desires;" (v) "that the court will exclude from the class any member who requests exclusion;"

16  (vi) "the time and manner for requesting exclusion;" and (vii) "the binding effect of a class

17  judgment on members under Rule 23(c)(3)."  Fed. R. Civ. P. 23(c)(2)(B).  Generally, notice of a

18  settlement is acceptable if it "describes the terms of the settlement in sufficient detail to alert

19  those with adverse viewpoints to investigate and to come forward and be heard."  *Churchill Vill.,*

20  *L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (internal quotations and citation omitted).

21  **IV.   THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT.**

22        The Settlement at issue is fair, reasonable, and adequate, particularly given that Plaintiffs'

23  claims suffered from serious deficiencies, and they were likely to recover nothing if litigation

24  went forward.  Class Members' reactions to the Settlement's terms further support approval.

25  Additionally, notice to Class Members was sufficient and fully satisfied due process.

26       **A.   The Class Relief Is Fair, Reasonable, and Adequate.**

27          **1.   The Settlement is presumptively fair.**

28  A settlement is presumptively fair when it is the product of fully informed, arm's-length,

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1   non-collusive negotiations. *Linney v. Cellular Alaska P'ship*, Nos. C-96-3008, C-97-0203, C-97-

2   0425, C-97-0457, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th

3   Cir. 1998); *see Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("This circuit

4   has long deferred to the private consensual decision of the parties."); *Hanlon v. Chrysler Corp.*,

5   150 F.3d 1011, 1027 (9th Cir. 1998) (approval order "reflected the proper deference to the private

6   consensual decision of the parties"); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D.

7   523, 528 (C.D. Cal. 2004) ("A settlement following sufficient discovery and genuine arms-length

8   negotiation is presumed fair."). This presumption applies to the Settlement here, which was

9   negotiated at arm's-length with the help of an experienced mediator, after months of intense,

10   adversarial litigation. (*See* Decl. of Hon. Edward Infante ISO Pls.' Mot. for Prelim. Approval of

11   the Proposed Class Settlement, Dkt. No. 178 ("Infante Decl.") ¶ 24.)

12   The Settlement reflects counsel's fully informed views on the strengths and weaknesses of

13   Class Members' claims. Given the significant motion practice, including a full briefing of class

14   certification issues, as well as the extensive discovery that had taken place in this litigation, the

15   Parties—represented by counsel with ample experience—were well apprised of the strengths and

16   weaknesses of their respective cases when they reached a compromise. (Rhodes Decl. ¶ 3.)

17   The active participation of Judge Infante (ret.), a neutral mediator with extensive

18   experience presiding over and mediating complex litigation, further supports a finding of fairness.

19   *See In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00 Civ. 6689, 2003 WL 22244676, at *4

20   (S.D.N.Y. Sept. 29, 2003) ("[T]he fact that the Settlement was reached after exhaustive arm's-

21   length negotiations, with the assistance of a private mediator experienced in complex litigation, is

22   further proof that it is fair and reasonable."); *Satchell v. Fed. Express Corp.*, Nos. C03-2659 SI,

23   C03-2878 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("assistance of an experienced

24   mediator in the settlement process confirms that the settlement is non-collusive"). Judge Infante

25   noted that "[t]here is no indication of collusion in the case and, on the contrary, a short review of

26   the Parties' discovery correspondence reveals the intensity of the adversarial process." (Infante

27   Decl. ¶ 24.) He concluded, "it is my opinion that the process leading to the proposed settlement

28   bears all the hallmarks of procedural fairness." (*Id.*)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1    In view of these facts, the Court should presume that the Settlement is fair.

2         **2.    Plaintiffs had low odds of obtaining a substantial recovery.**

3    Plaintiffs' chances of prevailing on their claims were slim.  The Objections submitted in

4    response to the Settlement make it clear that many Class Members agree.  Many Objections are

5    not actually objections to the Settlement *per se*, but to the lawsuit itself, calling it "frivolous," "a

6    waste of time and resources," and noting, for example, that "[b]y maintaining their accounts

7    [Users] appear to consider facebook's practices worth the cost of free social networking."  (*See*

8    Inv. Obj. Nos. 28, 34; *see also* Obj. No. 2 (noting Class Members "never had any realistic

9    expectation of being paid for their services"); Obj. No. 3 (stating "Facebook has never made any

10   representations to me that the items I post on my 'page' could not, or would not, be used in any

11   form of advertising."); Obj. No. 9 (offering her portion of the Settlement to Class Counsel "in

12   return for their assistance in understanding just exactly how my rights were violated").)

13   Plaintiffs' poor prospects for recovery weigh heavily in favor of approving the Settlement.

14   *See In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) (settlement is fair, reasonable,

15   and adequate where plaintiffs' "odds of winning [are] extremely small" and strong defenses "may

16   have adversely terminated the litigation before trial"); *Myers v. MedQuist, Inc.*, No. 05-cv-4608,

17   2009 WL 900787, at *1 (D.N.J. Mar. 31, 2009) ("this settlement represents a good value to the

18   class for what has proved to be a very weak case"); *see also W. Va. v. Chas. Pfizer & Co.*, 314 F.

19   Supp. 710, 743-44 (S.D.N.Y. 1970) (plaintiff's confidence in claims "is often misplaced"),

20   *abrogated on other grounds by Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005 (2d Cir. 1973).

21   Several of the obstacles Plaintiffs would have faced in litigation are explained below.

22   ***Injury.***    Plaintiffs could not prove that they were injured by Facebook's conduct, a

23   required element for claims under § 3344 and the UCL, and a prerequisite for Article III

24   standing.  They therefore stood little chance of recovering any substantial relief for the Class.

25   *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001) (§ 3344); *Animal Legal

26   Def. Fund v. Mendes*, 160 Cal. App. 4th 136, 145 (2008) (UCL); *Lujan v. Defenders of Wildlife*,

27   504 U.S. 555, 560-61 (1992) (Article III).  As an initial matter, Plaintiffs faced the daunting task

28   of trying to prove that they and every Class Member were injured when content they voluntarily

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18.

**FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS**

shared with their Facebook Friends was redisplayed to those very same Friends.  Discovery confirmed that no Plaintiff could point to any instance in which a Sponsored Story diminished the value of their name or likeness, or in any way deprived them of an opportunity they otherwise would have had.  (Brown Decl. ¶ 54.)  Instead, Plaintiffs hoped to establish injury by showing how much, if at all, Facebook benefitted from allegedly misappropriating Users' names and likenesses.  (*See* Facebook Opp. to Pls.' Mot. to Certify a Class, Dkt. No. 141 ("Class Cert. Opp.") at 18.)  But Plaintiffs' reliance on this legally dubious theory of injury—which assumes that Class Members were injured by harmless conduct solely because Facebook allegedly benefited from that conduct—was, on its own, sufficient to doom Plaintiffs' case.

Plaintiffs' theory of injury also contradicted the facts.  While they contended that a few internal testing documents suggested Sponsored Stories outperformed other advertisements (Brown Decl. Ex. KK, ¶¶ 8(n)-(o), (y)), Facebook's analysis of Sponsored Stories that were actually displayed revealed that they often generate *less revenue* for Facebook than alternative ads.  (Declaration of Randolph Bucklin, Dkt. No. 148 ("Bucklin Decl.") ¶¶ 9, 81-92.)  Plaintiffs' own expert even conceded, under oath, that some Users' "endorsements" would either generate no additional revenue (when compared with other ads), or would cause Facebook to lose revenue.  In other words, under Plaintiffs' already-faulty theory of injury, such Users would have no injury and thus no claim.  (Brown Decl. Ex. W at 134-35; Class Cert. Opp. at 19-20.)[14]

***Express Consent.***  Under § 3344, Plaintiffs had the burden of proving that every Class Member did not consent to Facebook's alleged use of their names and likenesses.  *See, e.g.*, *Downing*, 265 F.3d at 1001; *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 680 (2010).  Express agreements between Facebook and putative Class Members, however, preclude such a showing.  As early as 2007, *three years before the launch of Sponsored Stories*, Facebook's

---

[14] In its class certification opposition, Facebook argued that uninjured Users could not be identified without individualized inquiry across the millions of Class Members, precluding class certification.  (Class Cert. Opp. at 17-22.)  The Settlement avoids these individualized issues by affording injunctive relief to all Class Members and direct monetary relief to those Class Members who can attest under oath that they *believe* they were injured (without needing to prove that they were, in fact, injured).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

Terms—to which all Users agree when they sign up and use the site[15]—authorized Facebook to "use" Users' "photos [and] profiles (including your name, image, and likeness)" for "any purpose, commercial, advertising, or otherwise . . . ." (Yang Muller Decl. Ex. C at FB_FRA_00275.) By 2009, the Terms authorized Facebook to "use your name, likeness and image for any purpose, including commercial or advertising . . . ." (*Id.*, Ex. E at FB_FRA_00329.) When Sponsored Stories launched, the Terms stated: "You can use your privacy settings to limit how your name and profile picture may be associated with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us. You give us permission to use your name and profile picture in connection with that content, subject to the limits you place." (*Id.* ¶¶ 21-22.)

This unambiguous, express consent is fatal to Plaintiffs' claims. Using Facebook has always has been contingent on a User's willingness to abide by, and be subject to, Facebook's Terms. *See Sambreel Holdings LLC v. Facebook, Inc.*, No. 12-cv-0668, --- F. Supp. 2d ---, 2012 WL 5995240, at *3 (S.D. Cal. Nov. 29, 2012) ("As an overarching premise, the Court is persuaded that Facebook has a right to control its own product, and to establish the terms with which its users, application developers, and advertisers must comply in order to utilize this product."). Because these Terms explicitly authorized Sponsored Stories, all Class Members, therefore, consented to their appearance in Sponsored Stories.

***Implied Consent.*** Under California law, which the Parties agree governs here, consent can also be "implied from [a plaintiff's] conduct and the circumstances of the case." *Jones v. Corbis Corp.*, 815 F. Supp. 2d 1108, 1113-14 (C.D. Cal. 2011) (plaintiff consented by posing for "red carpet" photos, knowing they could be used to solicit sales), *aff'd*, 489 F. App'x 155 (9th Cir. 2012); *see Newton v. Thomason*, 22 F.3d 1455, 1461 (9th Cir. 1994) (plaintiff consented by expressing "excitement" and "flatter[y]" over use of his name); *Greenstein v. Greif Co.*, No. B200962, 2009 WL 117368, at *9-10 (Cal. Ct. App. Jan. 20, 2009) (plaintiff consented because he knew he was "being recorded as part of the reality television program" and "did not object").

---

[15] Yang Muller Decl. ISO Facebook's Opp. to Pls.' Mot. for Class Cert., Dkt. No. 147 ("Yang Muller Decl.") ¶¶ 2, 13.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

Here, Class Members knew, based on their use of and familiarity with Facebook, that their actions on the site could be shown to their Facebook Friends in commercial contexts. The record is replete with evidence demonstrating as much and, indeed, sharing content with Friends is the reason Users take these actions in the first place. Since November 2007, Facebook has displayed User Like statements, along with User names and/or profile pictures, in *trillions* of Social Ads.[16] (Squires Decl. ¶ 13.) Thus, millions of Users have seen their Friends' social actions (and names and/or profile pictures) paired with ads. Further, between January and August 2011 alone, U.S. Facebook Users saw over 115 billion Sponsored Stories featuring their Friends. (Declaration of Christopher Plambeck ISO Joint Motion for Prelim. Approval of Rev. Settlement, Dkt. No. 261, ("Plambeck Decl.") ¶ 6.) Users continue to see millions more Sponsored Stories each day. These facts show that Class Members were clearly aware that certain actions on the site—including Liking content and checking in—could lead to their appearance in Sponsored Stories. (*See generally* Tucker Decl. ISO Facebook's Opp. to Pls' Mot. For Class Cert., Dkt. No. 144 ("Tucker Decl.") ¶ 8.)

Despite this knowledge, however, Class Members continued to take actions that could lead to their appearance in Sponsored Stories. Even well after Sponsored Stories launched, Users continued to click the Like button for Facebook Pages 50 million times *each day*. (Tucker Decl. ¶ 91.) Many times, Users Liked Pages by clicking the Like button *inside a Sponsored Story*—as of April 2012, some 300,000 unique U.S. Facebook Users did this *each day*. (Plambeck Decl. ¶ 15; Tucker Decl. ¶ 48.) To claim that these Users did not understand that their actions could be featured in a Sponsored Story is not credible. Indeed, after the launch of Sponsored Stories, a sampling of Users showed that they did not change their behavior after learning about Sponsored Stories, as roughly equal numbers of Users increased, decreased, and did not change their Page-Liking rates. (Bucklin Decl. ¶¶ 99-103.)

Moreover, millions of Class Members knew they could control their appearance in Sponsored Stories through their privacy settings, but chose not to do so. As of April 2012,

---

[16] Social Ads pair advertisements with stories about actions (such as Like statements) that Users have taken with respect to the advertised brand, organization, or company.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1   approximately 5 million Users adjusted their privacy controls to make a Page Like visible to

2   "Only Me," and Users "Unliked" Pages more than 1.3 million times in the second half of 2011.

3   (Plambeck Decl. ¶¶ 13, 14.)   Either of these actions prevents the associated content from

4   appearing in a Sponsored Story.  (Squires Decl. ¶¶ 12, 22-23.)  Users who knew of these options

5   but decided not to use them consented to Sponsored Stories.[17]

6       In fact, the named Plaintiffs (as well as former named Plaintiff Angel Fraley) *continued*

7   *to Like Pages on Facebook* even after filing this lawsuit and learning that such actions could lead

8   to Sponsored Stories.  (Brown Decl. ¶ 44.)  James Duval testified unequivocally that he has

9   "continued to click on the Like button knowing that [he] may . . . trigger a sponsored story in

10  which [his] name or profile picture would be displayed to [his] friends." (*Id.* ¶ 45.)  Duval has

11  even Liked content <u>in order to</u> "spark" Sponsored Stories.  (*Id.* ¶ 46.)  Similarly, after learning

12  about this lawsuit, one User remarked:  "I think *using your info is part of the deal* - nothing is

13  free, it's how they make money." (*Id.*, Ex. O) (italics added).

14      These facts establish that millions of Class Members impliedly consented to Sponsored

15  Stories as a matter of law, precluding Plaintiffs from proving the absence of consent on a

16  classwide basis.  *See Jones*, 815 F. Supp. 2d at 1113; *Newton*, 22 F.3d at 1461.

17      ***COPPA Preemption.***  Regarding the Minor Subclass, Plaintiffs claimed that Facebook

18  was required to obtain parental consent from minor Class Members' parents and failed to do so.

19  This ignores the Children's Online Privacy Protection Act ("COPPA"), which preempts state laws

20  that require websites to obtain parental consent to "collect" or "use" information from users 13

21  and older.   Indeed, as explained below, under the law of express preemption and conflict

22  preemption, states cannot require websites to obtain parental consent for teenagers.[18]

---

23  [17] Users have learned about Sponsored Stories in a variety of other ways, including from
24  Facebook's online Help Center (Plambeck Decl. ¶ 10 (over 130,000 Users visited pages related to
    Sponsored Stories between October 2011 and March 2012)), its site-wide User-education
25  campaign (*see* Squires Decl. ¶ 25), and news articles (Brown Decl. Exs. X-EE).

26  [18] Preemption comes in three forms: "(1) express preemption, where Congress explicitly defines
    the extent to which its enactments preempt state law; (2) field preemption, where state law
27  attempts to regulate conduct in a field that Congress intended the federal law exclusively to
    occupy; and (3) conflict preemption, where it is impossible to comply with both state and federal
    requirements, or where state law stands as an obstacle to the accomplishment and execution of the
28  full purpose and objectives of Congress." *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1060 (9th

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

***Express Preemption.*** COPPA requires an "operator of a website or online service" to obtain parental consent before it "collects" or "*use[s]*" the "personal information"[19] of a "child," but *only* where the child is "under the age of 13." 15 U.S.C. §§ 6501(1), 6502(a), 6502(b)(1)(A)(ii) (emphasis added); 16 C.F.R. § 312.5(a)(1). Because COPPA expressly preempts state requirements that are "inconsistent with" this "treatment," 15 U.S.C. § 6502(d), it bars any efforts by Plaintiffs or Class Members to use state law to impose a parental consent requirement for minors over the age of 13.[20]

As initially proposed, COPPA would have required parental consent for the collection or use of personal information from minors older than 13. (*See* Brown Decl. Ex. Q (S. 2326, 105th Cong. §§ 2(1), 3(a)(2)(A)(ii)-(iii)).)[21] But, facing substantial criticism that a parental consent requirement for teenagers would infringe First Amendment rights,[22] lawmakers rejected that proposal, stripping the bill of its provisions requiring parental consent for teenagers, *see* 144 Cong. Rec. 12785, 12787 (1998) (statement of Sen. Bryan) (explaining that these revisions "were

---

Cir. 2009).

[19] Under COPPA, "personal information" means "individually identifiable information about an individual collected online," including "a first and last name," and any information collected and combined with such an identifier. 15 U.S.C. § 6501(8).

[20] Facebook has briefed COPPA preemption extensively in the related *C.M.D.* case, where plaintiffs have made identical arguments. For a comprehensive discussion, see Facebook's Motion to Dismiss, Case No. 12-cv-01216, Dkt. No. 109 at 19-21, and Facebook's Reply ISO Motion to Dismiss, *id.*, Dkt. No. 120 at 11-14.

[21] *See* Brown Decl. Ex. R, 144 Cong. Rec. S12787 (daily ed. Oct. 21, 1998) (statement of Sen. Bryan)). *Compare* S. 2326, 105th Cong. §§ 2(1) *and* 3(a)(2)(A)(ii)-(iii), *with* 15 U.S.C. §§ 6501(1), 6502(a), *and* (b)(1)(A)(ii). *See generally* Brown Decl. Ex. S, Testimony of the FTC before Subcomm. on Consumer Prot., Prod. Safety, & Ins., July 15, 2010, at 14-15 ("In the course of drafting COPPA, Congress looked closely at whether adolescents should be covered by the law, ultimately deciding to define a 'child' as an individual under age 13.") (citations omitted).

[22] *See* Brown Decl. Ex. T, COPPA: Hr'g on S. 2326 Before the Commc'ns Subcomm. of the S. Comm. on Commc'ns, Sci. & Transp., 105th Cong. 46 (1998) (testimony of A. Sackler, Time Warner) ("[COPPA] should apply only to children under 13 years of age. . . . Models of parental consent or parental notification would chill teenagers' interest in commercial websites enormously, and should not be included in this legislation." (altered)); *id.* at 30 (testimony of D. Mulligan, Ctr. for Democ. & Tech.) ("As applied to teenagers [the bill] . . . ha[s] the potential to chill protected First Amendment activities and undermine rather than enhance teenagers['] privacy"); *id.* at 56 (testimony of Am. Library Ass'n) (COPPA "should not apply to minors over the age of 12" because "[t]eenagers have independent rights to free speech and privacy that would be severely compromised if parental notice were required each time they engaged in a transaction with a commercial website").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1    worked out carefully with the participation of the marketing and online industries, the Federal

2    Trade Commission, privacy groups, and First Amendment organizations"). The revised bill also

3    contained an express preemption clause, fortifying COPPA against "inconsistent" state laws. 15

4    U.S.C. §6502(d); *see* 144 Cong. Rec. 12789. Thus, Congress adopted a clear policy that

5    teenagers' Internet activities *should not be* subject to parental consent requirements, even under

6    the auspices of state law. *See* 144 Cong. Rec. 12789.

7        Accordingly, COPPA bars states from requiring an online operator, like Facebook, to

8    obtain parental consent in order to collect *or use* personal information from minor users 13 and

9    older: "No State or local government *may impose any liability for commercial activities* or actions

10    by operators in interstate or foreign commerce in connection with an activity or action described

11    in this title *that is inconsistent with the treatment of those activities or actions under this section.*"

12    *See* 15 U.S.C. § 6502(d) (italics added). Under the plain meaning of this provision, a state law is

13    "inconsistent with" COPPA if it imposes different standards of liability on COPPA-regulated

14    activities, for example, by imposing liability where COPPA does not. *See Gordon*, 575 F.3d at

15    1061-63 (plaintiffs' claims expressly preempted because "[i]t would be logically incongruous to

16    conclude that Congress endeavored to erect a uniform standard but simultaneously left states . . .

17    free to . . . create more burdensome regulation"). Because Facebook forbids children under age

18    13 from using its site, any parental consent requirement under state law for a website operator's

19    "use" of teenagers' personal information would target *the very group of minors* whom Congress

20    determined should not be subject to a parental consent requirement. Applying state law in this

21    manner would be flatly "inconsistent with the treatment" of teenagers' Internet use prescribed by

22    COPPA, and is, therefore, preempted. *See* 15 U.S.C. § 6502(d).

23        Applying COPPA's preemption clause, a California court dismissed a class action against

24    Facebook premised on the same parental consent requirement urged by Plaintiffs in this case. In

25    *David Cohen v. Facebook, Inc.*, No. BC 444482 (L.A. Super. Ct.), plaintiffs sued under § 3344

26    and the California Constitution based on Facebook's alleged failure to obtain parental consent for

27    displaying minors' names and likenesses in alleged advertisements. (Brown Decl. Ex. U (*David*

28    *Cohen* FMCAC) ¶¶ 39-48.) In September 2011, Judge Weintraub sustained Facebook's

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

demurrer, ruling that "Plaintiffs' claims based on state law for Facebook's alleged failure to obtain the parental consent of Users aged 13 to 17 to the commercial use of their name and likeness is preempted by [COPPA]."  (Brown Decl. Ex. V.)

**Conflict Preemption.**  A parental consent requirement would likewise fail under a conflict preemption analysis, under which a state law must yield where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1753 (2011) (internal quotations and citation omitted).  One of COPPA's significant objectives was preserving the First Amendment rights of teenage Internet users by exempting them from COPPA's parental consent requirement.  A state law purporting to require teenage users to obtain parental consent conflicts with this objective, and would fail under the established law of conflict preemption.  *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881-82 (2000) (preempting state law imposing liability for conduct that was lawful under federal law); *Franklin Nat'l Bank v. New York*, 347 U.S. 373, 377-79 (1954) (same).

*Arizona v. United States*, 132 S. Ct. 2492 (2012), confirms this analysis.  There, the Court addressed the conflict between an Arizona law, which sought to impose criminal penalties on undocumented workers, and a federal law, which imposed such penalties only on *employers*, but was silent as to the status of the undocumented workers themselves.  *See id.* at 2503-04. Applying "ordinary principles of preemption," the Court ruled that federal law preempted the Arizona law, emphasizing that Congress had considered and rejected proposals, akin to Arizona's, to impose criminal penalties on undocumented employees.  *See id*. at 2505.  By embracing a more extreme proposal that Congress had considered and rejected, the Court ruled, Arizona's approach "would interfere with the careful balance struck by Congress" and stood as an "obstacle to the regulatory system Congress chose."  *See id*.

The same analysis applies here.  In enacting COPPA, Congress carefully considered a parental consent requirement for the collection and use of personal information of minors age 13 and older.  (Brown Decl. Ex. Q (S. 2326, 105th Cong. § 3(a)(2)(A)(ii)-(iii)).)  As in *Arizona*, Congress rejected that proposal, making a considered judgment that parental consent should be required only for minors under age 13.  Requiring parental consent here "would interfere with the

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

careful balance struck by Congress," thereby impeding "the regulatory system Congress chose." *See Arizona*, 132 S. Ct. at 2505.

\* \* \*

In view of COPPA's broad preemptive effect—as dictated by established principles of both express and conflict preemption—no state law can require parental consent to collect and use information from teenage Internet users. Therefore, the Minor Subclass cannot prevail on claims premised on a lack of parental consent and, accordingly, Facebook's consent arguments described above apply equally to minors.

***Parental Consent.*** Even if Facebook were required to obtain parental consent for its minor Users, Plaintiffs still could not prove an absence of consent for the Minor Subclass on a classwide basis. For example, named Plaintiff W.T. not only had his father's permission to register for Facebook, but did so while sitting at a computer with his father, with whom he reviewed—and agreed to—Facebook's Terms. (Brown Decl. ¶¶ 47-48.) W.T.'s father could not even recall whether it was he or his son who actually clicked "Sign Up," which signals agreement to Facebook's Terms. (*Id.* ¶ 48 (Mr. Tait testified, ". . . *I think* he was the one who was doing the typing, but I was sitting right with him." (italics added)).) Mr. Tait also registered for his own Facebook account to monitor W.T.'s activity on the site. (*Id.* ¶ 49.) These facts establish that Mr. Tait gave express and implied consent, as a matter of law, to his son's use of Facebook according to its Terms, including the language permitting his son's appearance in Sponsored Stories.

Facebook also adduced compelling evidence that millions of other parents impliedly consent to Sponsored Stories. For example, as of December 27, 2011, over six million teenage Users—almost one in three members of the Minor Subclass—were Facebook Friends with at least one of their parents. (Plambeck Decl. ¶¶ 7, 11.) In addition, millions of parents supervise their children's Facebook use, some have access to their children's passwords, and most helped their children create their accounts.[23] Many parents who know that their children are using Facebook

---

[23] Brown Decl. Ex. FF at 3 (study found that 72% of parents monitor their teens' social networking accounts); Brown Decl. Ex. GG (recent study found that 92% of parents surveyed were Facebook Friends with their children and 72% have access to their children's passwords); Brown Decl. Ex. HH at 11 (recent study found that 64% of parents who knew when their child created his or her Facebook account had helped the child create the account).)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    would have actual (or constructive) notice of the Terms governing that use, including the term

2    permitting Facebook to use a minor's name and profile picture in commercial or sponsored

3    content.  Moreover, many of these parents—through their own use of Facebook or otherwise—

4    were undoubtedly aware that their minor children either had appeared or could appear in

5    Sponsored Stories, yet took no measures to prevent that from happening (by altering privacy

6    settings, closing their accounts, etc.).  These parents impliedly consented to the conduct

7    challenged in this case.

8         Thus, even if COPPA could be set aside, which it cannot, millions of minors could not

9    carry their burden to show a lack of parental consent.

10        ***Proof of Use of Name or Likeness*.**  Many Class Members' claims would also fail

11   because their name on Facebook is neither their actual name nor a pseudonym widely known to

12   the public as identified with the Class Member, as required under § 3344.  *Abdul-Jabbar v. Gen.*

13   *Motors Corp.*, 85 F.3d 407, 416 (9th Cir. 1996) (whether plaintiff's birth name, Lew Alcindor,

14   "'equals' Kareem Abdul-Jabbar . . . is a question for the jury").  Facebook established that this

15   practice is widespread; indeed, two of the five original named Plaintiffs used fictitious Facebook

16   names, and one had scores of Facebook Friends using fanciful names like "DanceHer IsLove,"

17   "Endearment LadyDear," and "Nu KlezmerArmy."  (Brown Decl. Ex. P.)

18        Even more Class Members would be precluded from recovery given the prevalence of

19   Facebook Users whose profile pictures do not contain their likeness.  Specifically, such profile

20   pictures do not contain photographs from which "one who views the photograph with the naked

21   eye can reasonably determine that the person depicted in the photograph is the same person who

22   is complaining of its unauthorized use."  Cal. Civ. Code § 3344(b)(1); *see Newcombe v. Adolf*

23   *Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998).  Facebook does not require Users to upload a

24   profile picture at all, much less a picture that bears their likeness.  (Squires Decl. ¶¶ 2-3.)  Each

25   of the named Plaintiffs admitted that many of their Facebook Friends would not recognize profile

26   pictures they have used as depicting them.  (Brown Decl. ¶¶ 50-52.)  Indeed, one of the named

27   Plaintiffs used profile pictures depicting, at various times, the Oakland skyline and a cartoon of a

28   kimono-clad ninja.  (*Id.* ¶ 51.)  Facebook also showed that many of Angel Fraley's Friends used

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

27.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1    profile pictures that Fraley herself did not recognize.  (*Id.* ¶ 52.)

2           ***Public Interest Exception of § 3344(d).***  Many (if not all) claims would additionally fail

3    because § 3344 exempts from liability the use of a person's name or photograph "in connection

4    with any news, public affairs, or sports broadcast or account, or any political campaign . . . ."

5    Cal. Civ. Code § 3344(d); *Baugh v. CBS, Inc.*, 828 F. Supp. 745, 753 (N.D. Cal. 1993) ("the fact

6    that [the challenged use] generates advertising revenue does not prevent [a defendant] from

7    claiming" immunity under § 3344(d)).  Millions of Sponsored Stories relate to one of these

8    protected subjects, including Stories run by CNN (e.g., "John Smith: Here's a link to a great

9    analysis of the gun control debate"), Michele Bachmann (e.g., "Jane Doe likes Michele

10   Bachman"), Ron Paul, the Democratic Party, and the Catholic Advocate.  (Squires Decl. ¶¶ 11,

11   20; Tucker Decl. ¶¶ 65-67); *see Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 415

12   (2001) (depiction of baseball players in materials promoting *baseball* excepted under § 3344(d)).

13   Plaintiffs admitted as much at the class certification stage, where they "concede[d] that 'political'

14   ads may be excepted from the Class."  (Class Cert. Reply at 13.)

15          ***First Amendment***.  The First Amendment also protects Facebook's display of Sponsored

16   Stories, and many Sponsored Stories—including those about religion, politics, and public

17   affairs—receive the highest degree of Constitutional protection.  *See Miller v. California*, 413

18   U.S. 15, 34-35 (1973) (First Amendment facilitates "unfettered interchange of ideas for the

19   bringing about of political and social changes desired by the people") (internal quotations and

20   citations omitted).  The First Amendment protects commercially-oriented Sponsored Stories,

21   many of which result from User Likes or shares that facilitate self-expression.  *See Lowe v.*

22   *S.E.C.*, 472 U.S. 181, 210 n.58 (1985) ("[W]e have squarely held that the expression of opinion

23   about a commercial product such as a loudspeaker is protected by the First Amendment.")

24   (citation omitted).  This is true for minors as well.  (*See* Tucker Decl. ¶ 53 (minors often cite

25   "self-expression" as a reason for using the Facebook Like button); *see Brown v. Entm't Merchs.*

26   *Ass'n*, 131 S. Ct. 2729, 2735 (2011) (recognizing minors' First Amendment rights)).  Here,

27   because the expressive modes of sharing that can lead to a Sponsored Story are "inextricably

28   intertwined" with any "commercial aspects," Facebook's redisplay of these stories are treated as

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

28.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

"fully protected expression."  *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796 (1988);

*accord Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1185 (9th Cir. 2001).

    *Communications Decency Act ("CDA") § 230.*  Because Plaintiffs' claims arise exclusively from Facebook's republication of content generated by Users—namely, Users' Likes and other actions they decided to share on Facebook—Sponsored Stories are immune from liability under § 230 of the CDA.  *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) (applying § 230 to affirm dismissal of right-of-publicity claim, citing § 230's grant of "broad immunity [to websites that] publish[] content provided primarily by third parties").  Although Plaintiffs alleged that Facebook itself created the content in Sponsored Stories (SAC ¶¶ 57-59), discovery has disproved this claim.  Facebook does not contribute to the *substance* of the Users' social actions on Facebook, but instead offers neutral tools, such as the Like button, through which Users may share their support for and affiliation with companies, organizations, causes, and more.  *See, e.g.*, *Carafano*, 339 F.3d at 1125 (defendant immune where the information about which plaintiff complained was "transmitted unaltered to profile viewers"); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009) ("[A] website operator does not become liable as an 'information content provider' . . . when it merely provides third parties with neutral tools to create web content . . . .").  Further, the fact that Facebook was *paid* to display Sponsored Stories does not preclude CDA immunity.  *See Levitt v. Yelp! Inc.*, Nos. C-10-1321, C-10-2351, 2011 WL 5079526, at *6 (N.D. Cal. Oct. 26, 2011) ("traditional editorial functions" immunized by § 230 "include subjective judgments informed by political and financial considerations"); *see also Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009) (§ 230 "shields from liability *all publication decisions*, whether to edit, to remove, *or to post*, with respect to *content generated entirely by third parties.*") (italics added).

    *UCL Claim.*  Plaintiffs' UCL claims were also untenable.  Although Plaintiffs originally alleged that the Terms misled Users regarding their ability to opt out of Sponsored Stories (*see* SAC ¶¶ 32-33), Plaintiffs conceded that they did not detrimentally rely on these Terms as required to establish "fraud" under the UCL.  *See, e.g.*, *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591 (9th Cir. 2012) (UCL "requires named class plaintiffs to demonstrate reliance").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

29.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

To the contrary, the named Plaintiffs expressly disclaimed having read (or could not recall reading) the Terms that allegedly misled them.  (*See* Brown Decl. ¶ 53.)  Plaintiffs also could not prevail under the UCL's "unlawful" prong because, as discussed above, they cannot prove that Sponsored Stories violate § 3344 or any other law.  Nor do Plaintiffs have a claim under the UCL's "unfair" prong because Facebook Users—including some of the named Plaintiffs—Like companies and causes specifically to share that content, and their affinity for it, with Friends, and they necessarily benefited when their Likes were rebroadcast to the same audience, including in Sponsored Stories.  *See, e.g.*, *S. Bay Chevrolet v. GMAC*, 72 Cal. App. 4th 861, 886-87 (1999) ("unfair" claim entails "examination of [the conduct's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer") (internal quotations and citations omitted).  Several Plaintiffs even admitted that when they Liked certain content, they wanted that Like to be shared as widely as possible.  (Brown Decl. ¶ 55.)

*        *        *

The serious risk that one or more of these substantial defenses would have precluded many or all of Plaintiffs' and Class Members' claims provides ample justification for Plaintiffs' counsel's informed, considered decision to settle.  The Parties' agreement—calling for Facebook to pay $20 million and make substantial changes that give Class Members control over, and information regarding, Sponsored Stories, even though not required by law—represents an eminently fair remedy for the perceived wrongs that Plaintiffs sought to redress in this action.

### 3.        Absent a settlement, it may be years before the Class recovers, if at all.

The Parties' calculated decision to avoid the expense and delay of further litigation also supports final approval under the second *Officers for Justice* factor—"the risk, expense, complexity, and likely duration of further litigation."  Prior to reaching judgment, the Parties would have had to litigate through the vigorously contested class certification stage,[24] summary

---

[24] Because class certification would have been hotly contested and Plaintiffs would face a tough hurdle to prevail, the third *Officers for Justice* factor ("the risk of maintaining class action status throughout the trial") is met.  *See Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011) ("A party seeking class certification . . .  must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

30.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

judgment (where Facebook's Terms were likely to be dispositive), and trial.  Further, appellate proceedings were highly likely given the many novel and complex issues the case raised, many of which were issues of first impression.  In short, absent a settlement, even if the Class could obtain a recovery, which is doubtful, it would likely be years before any relief would be actually realized.  *See Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360 (S.D. Fla. 2007) ("With the uncertainties inherent in pursuing trial and appeal of this case, combined with the delays and complexities presented by the nature of the case, the benefits of a settlement are clear."); *Officers for Justice*, 688 F.2d at 629 (approving settlement where "many years may be consumed by trial(s) and appeal(s) before the dust finally settles"); *Riker*, 2010 WL 4366012, at *4 ("[U]nless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.") (citation omitted).

### 4.   The relief in the Settlement is fair, reasonable, and adequate.

As the Ninth Circuit recently reaffirmed in *Lane*, the district court "must evaluate the fairness of a settlement as a whole, rather than assessing its individual components."  *Lane*, 696 F.3d at 818-19.  The Settlement's $20 million monetary payment and broad injunctive relief provisions are more than fair and reasonable.

#### a.   The monetary relief component is appropriate in light of the weakness of the claims and the risks of continued litigation.

The total amount of the Settlement Fund, as well as the direct monetary relief to Authorized Claimants, further supports a finding that the Settlement is fair, reasonable, and adequate.  Facebook's $20 million payment to the Settlement Fund is more than sufficient consideration for the release of Class Members' claims under either measure of damages Plaintiffs sought under § 3344, namely: (1) Facebook's profits "attributable to" the alleged misappropriation,[25] which would have allowed only a modest recovery; and (2) statutory damages, which would have been unrecoverable on a classwide basis, and may not have been recoverable for more than a handful of Class Members.  *See* § 3344(a).

---

[25] Some objectors assert that Facebook's profits will be over $1 billion during the relevant time frame.  (*See, e.g.*, Obj. No. 14 at 2.)  But these Objections do not establish that this profit was related to Sponsored Stories, and they concede that this forecast is related to all mobile ad revenue, which cannot serve as a rational alternative basis for damages in this litigation.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

31.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

As to Facebook's profits from Sponsored Stories, even using Plaintiffs' flawed estimates of those figures, the Settlement provides more monetary relief than was otherwise recoverable. When the Parties negotiated the Revised Settlement in August 2012, Facebook had earned approximately $233 million in revenues from Sponsored Stories delivered in the U.S. since January 2011, when Sponsored Stories launched. (Plambeck Decl. ¶ 9.) As disclosed in Facebook's public filings, operating the site in 2011 cost upwards of $2 billion per year, and Facebook's profit margins were approximately 50%. (Brown Decl. Ex. JJ at 10-11.) Plaintiffs estimated the incremental value of Users' "endorsements" as either: (1) 50% of the revenue earned from Sponsored Stories, purportedly based on internal Facebook documents; or (2) 75% of the revenue from Sponsored Stories, based on a comparison of the "effectiveness" of Sponsored Stories to that of other advertisements (measured by click rates). Even using those estimates— which Facebook does not endorse or accept—Facebook's profits attributable to the alleged misappropriation would be $73.1 million,[26] or approximately *$0.60 per Class Member* on average (Facebook's records indicate that approximately 123 million Users in the U.S. appeared in Sponsored Stories during that time period).

Importantly, this $73 million figure represents *Plaintiffs' view* of the profit attributable to the alleged misappropriation. If litigation continued, Facebook would demonstrate that User harm must be measured by quantifying actual injury to Users, as distinct from any benefit to Facebook, which would result in a finding of zero damages. Facebook would also show that Plaintiffs' methodologies are irredeemably flawed and that the $73 million figure is *grossly* overstated, because, as confirmed by Facebook's expert, Sponsored Stories frequently generated no incremental profits compared to alternative advertisements. (Bucklin Decl. ¶¶ 9, 81-92.)

However, even using Plaintiffs' estimates, a settlement for $7.3 million—10% of Facebook's potential liability—would be fair and reasonable given the serious risks and costs of ongoing litigation. *See Officers for Justice*, 688 F.2d at 628 (finding settlement for fraction of potential liability fair, reasonable, and adequate given risks and delay plaintiff faced in further

---

[26] Calculated as: ($233,792,612 in revenues) * (50% profit margin) * (62.5%, i.e., the average of Plaintiffs' estimate of the percentage of Facebook's revenues attributable to misappropriation).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

32.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

litigation).  The $20 million Settlement equals 27% of Facebook's alleged liability, without even accounting for deductions for litigation risk.

As to Plaintiffs' second proposed measure of damages, the Settlement's $20 million net payment also accounts for the possibility—although exceedingly remote—that Plaintiffs might have recovered statutory damages.  Several factors would have precluded a statutory damages award in this case, particularly on a classwide basis.  First, the Court expressly cautioned Plaintiffs that, "at summary judgment or at trial, [they] may not simply demand $750 in statutory damages in reliance on a bare allegation that their commercial endorsement has provable value, but rather *must prove actual damages* like any other plaintiff whose name has commercial value." (MTD Order at 29 (italics added, internal citations and quotations omitted).)[27]  This requirement would have barred the vast majority of Class Members from recovering.

Further, even if certain Class Members could theoretically prove "actual damages," they could not aggregate those damages because of due process concerns.  *See Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 25 (2d Cir. 2003) ("aggregation in a class action of large numbers of statutory damages claims potentially distorts the purpose of both statutory damages and class actions" such that "the due process clause might be invoked" so as to "reduce the aggregate damage award") (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003)). Plaintiffs thus had extraordinarily remote (if not non-existent) prospects for recovering statutory damages on a classwide basis.  *See White v. Experian Info. Solutions, Inc.*, 803 F. Supp. 2d 1086, 1097-98 (C.D. Cal. 2011) ("Settling Plaintiffs, however, certainly were entitled to consider the risk that any large, cumulative statutory damages award obtained at trial ultimately might have been reduced by the trial or appellate courts."), *overruled on other grounds by Radcliffe v. Experian Info. Solutions, Inc*, --- F.3d ----, 2013 WL 1831760 (9th Cir. May 2, 2013).

Similarly, due process concerns would likely preclude Class Members from recovering

---

[27] Several objectors assume that Class Members are entitled to $750 in statutory damages by simply making a claim.  (*See* Obj. No. 10 at 6; Inv. Obj. Nos. 99 at 3, 102 at 4.)  On this erroneous basis, they assert that the proposed Class relief is insufficient.  But as Judge Koh's decision makes clear, Class Members would have faced a considerable evidentiary burden to qualify for statutory damages.  Thus, statutory damages do not provide a useful comparison for whether the individual relief provided by the Settlement is fair, reasonable, and adequate.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

damages at trial equivalent to the monetary relief in the Settlement.  Although certain Class Members have objected that $10 per Authorized Claimant (subject to discretionary increase by the Court) is insufficient (*see, e.g.*, Obj. No. 1), such an award would be, according to Plaintiffs' methodology, ***17 times*** Facebook's average profit per Class Member attributable to the alleged misappropriation from January 2011 to August 2012 (about $0.60).  The Supreme Court has explained that, in the rare instances in which punitive damages are available, the ratio of actual damages to punitive damages should not exceed single digits.  So, here, a recovery that is 17 times higher than what a Class Member might recover in actual litigation is more than reasonable.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 (1996); *State Farm*, 538 U.S. at 425 (noting "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process") (citing *BMW*, 517 U.S. at 581).

Additionally, as a practical matter, Authorized Claimants will receive a windfall.  They voluntarily signed up to use a free social-networking site and had some content they shared with their Friends shared again with those very same Friends.  They paid Facebook no money at all and suffered no actual economic damages, much less injury.  Yet they are being paid an amount that far exceeds any profit Facebook allegedly earned by using their names and likenesses.

As the Ninth Circuit made clear in *Lane*, settlements need not include monetary relief simply because statutory damages might theoretically be available if plaintiffs were to recover at trial.  In *Lane*, an objector challenged a settlement with Facebook, claiming it afforded too little relief given that many class members sought statutory damages.  The Ninth Circuit explained that courts need not compare proposed settlement relief to potential damages, statutory or otherwise:

> Not only would such a requirement be onerous, it would often be impossible—statutory or liquidated damages aside, the amount of damages a given plaintiff (or class of plaintiffs) has suffered is a question of fact that must be proved at trial.  Even as to statutory damages, questions of fact pertaining to which class members have claims under the various causes of action would affect the amount of recovery at trial, thus making any prediction about that recovery speculative and contingent.

*Lane*, 696 F.3d at 823.  Similarly, here it would be unduly speculative, if not impossible, for the Court to wade into potential statutory damages recoveries for Class Members.

Cooley LLP
Attorneys At Law
San Francisco

34.

Facebook's MPA ISO Pls.' Mot. for
Final Approval of Settlement
Case No. CV 11-01726 RS

Discounting Plaintiffs' maximum recovery to $20 million is thus entirely appropriate and well within the range of acceptable, and previously approved, settlements.  *See, e.g.*, *Parker v. Time Warner Entm't Co.*, 631 F. Supp. 2d 242, 261-62 (E.D.N.Y. 2009) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.") (internal quotations and citation omitted); *Fisher Bros. v. Cambridge-Lee Indus., Inc.*, 630 F. Supp. 482, 489-90 (E.D. Pa. 1985) (approving settlement that awarded class less than 1% of maximum recovery).  Indeed, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair.  This is particularly true . . . where monetary relief is but one form of the relief requested by the plaintiffs."  *Officers for Justice*, 688 F.2d at 628 (citations omitted); *see also In re Gen. Instr. Sec. Litig.*, 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001) (settlement for "relatively small percentage of the most optimistic estimate does not, in itself, weigh against the settlement: rather, the percentage should be considered in light of the strength of the claims") (internal quotations and citation omitted).

Finally, the Settlement's claims process, and the criteria for making claims, which limits recovery to Class Members who can attest they meet the requirements for recovery under § 3344, is also entirely fair and reasonable.  Because recovery under § 3344 requires lack of consent and injury, it is entirely appropriate to limit monetary recovery to Users who attest that: (1) they were not aware their social actions could lead to their appearance in Sponsored Stories (addressing implied consent); and (2) they believe they were harmed (addressing injury).  *See In re Mego Fin. Corp. Secs. Litig.*, 213 F.3d 454, 461 (9th Cir. 2000) (affirming settlement approval, even though "it [left] a large portion of the class without a recovery").  Indeed, a settlement need not provide financial compensation to every class member, as "[s]ettlement is a *compromise*, which balances the possible recovery against the risks inherent in litigating further."  *In re TD Ameritrade Account Holder Litig.*, Nos. 07-cv-2852 & 07-cv-4903, 2011 WL 4079226, at *9 (N.D. Cal. Sept. 13, 2011) (dismissing objector argument that settlement that provided no monetary benefits to certain class members should be rejected on that basis) (italics added).

Nor was the claims process in any way designed to deter Class Member participation, as

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

35.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1    some objectors claim.  (*See, e.g.*, Inv. Obj. No. 102 at 2.)[28]   Rather, the Settlement's claims

2    process was necessary to protect Class Members from potentially fraudulent claims.  In fact, one

3    individual filed over 157,000 separate Claim Forms in this action.  (Keough Decl. ¶ 14.)

4                    **b.**       **The injunctive relief provides substantial value to the Class.**

5            Because the proposed injunctive relief accomplishes many of Plaintiffs' goals in filing this

6    action, it further supports final approval of the Settlement.  *See Officers for Justice*, 688 F.2d at

7    628 (approving settlement that "incorporates a variety of [injunctive] provisions to accommodate"

8    concerns raised in the lawsuit); *In re Ferrero Litig.*, No. 11-CV-00205, 2012 WL 2802051, at *4

9    (S.D. Cal. July 9, 2012) (approving injunctive relief that required defendant to "address the

10   fundamental claim raised in Plaintiffs' complaint"); *Myers*, 2009 WL 900787, at *16 (approving

11   injunctive relief that "clarif[ied] the very . . . practices that led to this dispute").

12                   **(1)**      **Enhanced notice and new controls for Class Members.**

13           Although Facebook denies liability,  it has agreed to address each of the core concerns

14   Plaintiffs raised in this litigation head-on.  Pursuant to the Settlement, Facebook has agreed to: (i)

15   enhance the notice and consent provision in its Terms with explicit language to which the Parties

16   have agreed; and (ii) work with Plaintiffs' Counsel to identify and clarify any other information

17   on Facebook that, in Plaintiffs' view, does not accurately or sufficiently explain Facebook

18   advertising.  (S.A. § 2.1(a), (d).)   These changes remedy the alleged defects in Facebook

19   disclosures claimed by Plaintiffs.  (*See* SAC ¶¶ 32-41, 122-23.)

20           Facebook has also agreed to implement an innovative new tool that will permit Users to

21   view, on a going-forward basis, which of their actions on Facebook are being redisplayed in

---

22   [28] Objector Jo Batman contends the claims process was deficient because it provided only a "P.O.
23   Box and an email address" for Class Members to submit Claim Forms or Objections, which
     precluded submission by "private carriers, like Federal Express and UPS, [which] will deliver
24   only to a physical street address . . . ." (*See* Obj. No. 14 at 4.)  She offers no authority in support
     of this argument, which is partly based on faulty facts, as FedEx offers delivery to P.O. boxes
25   through its "SmartPost" service.  *See* http://www.fedex.com/us/smart-post (last visited June 7,
     2013) ("FedEx SmartPost reaches every U.S. address, including P.O. boxes.").  Even then, the
26   day of the postmark—not the day of receipt—controlled the timeliness of Objections and claims
     (*see* Preliminary Approval Order 6(d)), meaning expedited shipping would not have benefitted
27   Class Members.  Of course, all Class Members could submit claims and Objections virtually
     instantaneously over the Internet via the Settlement Website (for claims) and via email (for
28   Objections).  Because every Class Member has accessed Facebook online, *every single Class
     Member* was presumably capable of submitting a claim or Objection online.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

36.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

Sponsored Stories (if any).  (S.A. § 2.1(b).)  This tool redresses one of Plaintiffs' key and often-repeated concerns—that they did not know which of their actions on the site were republished in Sponsored Stories.  Facebook will also create a granular control that will allow Users, upon viewing content that has been included in a Sponsored Story, to prevent additional Sponsored Stories based on that content.  (*Id.*)[29]  Although since the launch of Sponsored Stories the site has provided mechanisms for Users to prevent or limit their appearance in Sponsored Stories (as well as instructions regarding how to use those mechanisms), this relief resolves another of Plaintiffs' core criticisms—that taking the necessary actions was too difficult or complicated.

Further, for a period of two years following final approval, Plaintiffs' Counsel may move the Court for an order requiring a third-party audit to confirm Facebook's compliance with the agreed-to injunctive relief.  (S.A. § 2.1(e).)  If the Court decides a third-party audit is appropriate, Facebook has agreed to pay for it.

Facebook believes that these changes surpass controls and tools offered by every other company in the social media industry.  (*See* Tucker Decl. ¶ 58; Infante Decl. ¶¶ 22-23.)  Given the reluctance of courts to micro-manage the business of defendants (especially considering the highly-competitive and rapidly changing nature of the Internet), Plaintiffs could not have obtained these robust changes through adversarial litigation.  (*Cf.* Infante Decl. ¶ 15.)

**(2)      Additional Settlement benefits for the Minor Subclass.**

In addition to the significant classwide benefits, the Settlement specifically addresses the Minor Subclass's claims by expanding parental oversight and control over Sponsored Stories featuring minor children.  This includes Facebook's commitment to: (1) revise its Terms to require minor Users to affirm that they have obtained parental consent to Facebook's use of their

---

[29]  One objector erroneously asserts that this tool will only permit Users to remove existing Sponsored Stories.  (Inv. Obj. No. 99 at 2.)  This misunderstands Sponsored Stories, which are displayed contemporaneously, not for lengthy periods such that they must be "removed."  Further, the objector is incorrect that Users will not be able to *prevent* future Sponsored Stories via the new tool.  For example, using the new tool a User will be able to see that he has appeared in a Sponsored Story for XYZ Company after he Liked it on Facebook.  He will also be able to use the new granular control to prevent that Like from appearing in future Sponsored Stories.  These new controls, of course, are additive of the various options that Users have long had to prevent their appearance in sponsored content.  (*See supra* p. 21-22; *see also* Squires Decl. ¶¶ 21-23.)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

37.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

names and likenesses in connection with commercial, sponsored, or related content on Facebook (S.A. § 2.1(c)(i)); (2) create a new tool that allows parents (whether or not they are Facebook Users) to prevent the names and likenesses of their minor children from appearing in any Sponsored Stories, which will be accessible directly through the Facebook accounts of parent-Users who have a confirmed parental relationship with a minor User[30] (*id.* § 2.1(c)(iii)); and (3) educate Users about these new parental controls, which includes adding information to Facebook's existing Family Safety Center about social advertising on Facebook and about the new Sponsored Stories opt-out tool for parents (*id.* § 2.1(c)(iv)).  Facebook has also committed to take additional steps to encourage new Users, upon or soon after joining Facebook, to identify their family members on Facebook, including their parents and children.  (*Id.* § 2.1(c)(ii).) Further, for Users with a confirmed parental relationship with a minor User, Facebook has agreed to create and show advertising directing them to the Family Safety Center, and/or other parent-specific resources on Facebook.  (*Id.* § 2.1(c)(iv).)

Finally, Facebook has agreed to add a setting in minor Users' profiles that enables them to indicate that they do not have a parent on Facebook.  Where minor Users indicate this, Facebook has agreed to make such minors ineligible to appear in Sponsored Stories until they reach the age of 18, until they change their profile to indicate that they have a parent on Facebook, or until a confirmed parental relationship with the minor User is established.[31]  (*Id.* § 2.1(c)(iii).)

This injunctive relief directly addresses the claims of the Minor Subclass, which focused on the absence of a way for parents to prevent minors from appearing in Sponsored Stories. (SAC ¶ 41; *see also* Ntc. of Transfer of Related Action, Ex. B, Dkt. No. 98-2.)  It represents a substantial concession by Facebook and provides a significant value to the Minor Subclass.

---

[30] This is a substantial and valuable component of the injunctive relief because, as of the end of 2011, over six million minor Facebook Users were Friends with at least one other User that they had indicated was a parent.  (Plambeck Decl. ¶¶ 7, 11.)

[31] These efforts will supplement Facebook's already-extensive programs to protect minors, including an online Family Safety Center with detailed information about safe Internet use and frequent consultations with a Safety Advisory Board comprised of independent experts in cyber-stalking, cyber-bullying, and other online risks affecting minors.  (Brown Decl. Ex. II.)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

38.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

**(3)** **The injunctive relief provides additional consideration for release of Class Members' claims for past damages.**

It is well established that changes to a defendant's challenged business practices or disclosures may constitute valuable and adequate consideration for releasing monetary damages claims.[32] For example, in *In re Motor Fuel Temperature Sales Practices Litigation*, No. 07-md-1840, 2012 WL 1415508 (D. Kan. Apr. 24, 2012), the court approved a Rule 23(b)(3) settlement *for injunctive relief only*, awarding "no money to class members," even though they had sought both actual and statutory damages. *See id.* at *4, *7, *15. Weighing "the real uncertainty whether plaintiffs [could] prove liability on their claims," the court explained that "it [was] fair, reasonable and adequate for class members . . . to trade uncertain claims for money damages for certain relief proposed under the amended settlement agreement." *Id.* at *13. Notably, the court overruled objector arguments that the injunction-only settlement was unfair because it did "not account for" their statutory damages claims. *See id.* at *8.

Numerous other courts have similarly recognized that injunctive relief can constitute consideration for a release of damages claims. *See, e.g.*, *Myers*, 2009 WL 900787, at *9, *16 (approving Rule 23(b)(3) settlement awarding a $1.5 million *cy pres* fund and injunctive relief that "clarif[ied] the very line counting and compensation practices that led to this dispute" even though plaintiffs initially sought $45 million in damages, or "approximately $1,600 per member"); *First State Orthopaedics v. Concentra, Inc.*, 534 F. Supp. 2d 500, 507 (E.D. Pa. 2007) (approving Rule 23(b)(3) settlement where sole consideration was "commit[ment] to change the disclosure and business practices challenged in this action"); *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 526-27 (approving Rule 23(b)(3) settlement that provided "a meaningful business resolution regarding contested issues" but "d[id] not provide for monetary damages").

Thus, the Settlement's injunctive relief provisions can, and do, serve as a meaningful part of the consideration for Plaintiffs' and Class Members' release of claims for past damages (*see, e.g.*, SAC ¶¶ 32-37, 122-23; Class Cert. Reply at 4), and will provide direct and substantial

---

[32] Counsel for the *C.M.D.* plaintiffs argue that the injunctive relief has "no relevance to whether the settlement provides adequate compensation for Facebook's past wrongs." (Inv. Obj. No. 101 at 10.) For the reasons discussed in this section, that argument lacks merit.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

39.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1   compensation to these Class Members, since the vast majority of the Class continues to use and

2   benefit from the website today.  (*See* Plambeck Decl. ¶ 8.)  As in *In re Motor Fuel*, 2012 WL

3   1415508, at *13, Class Members trade their uncertain claims for damages for the relief proposed

4   in the Settlement—i.e., the opportunity to continue using Facebook with the benefit of improved

5   notice and innovative tools to facilitate decision-making around Sponsored Stories.

6                    **c.**        **The *cy pres* distribution is a valuable benefit to the Class.**

7            Based on the number of claims made, there will be a substantial amount left in the Net

8   Settlement Fund after distribution of the $10 payments to Authorized Claimants and deduction of

9   attorneys' fees and costs, and administrative costs.  Indeed, even if 100% of the award Plaintiffs

10  seek in attorneys' fees and costs were granted (which Facebook does not believe would be

11  appropriate (*see* Fee Opposition)), after payment of $6,149,940 to 614,994 Authorized Claimants,

12  $940,000 to GCG in administrative costs, $7,500,000 in attorneys' fees and costs, and $37,500 in

13  incentive awards to the three named Plaintiffs, $5,372,560 would remain in the Net Settlement

14  Fund.   Additionally, if the Court were to exercise its discretion and increase payments to

15  Authorized Claimants to $15, which the Parties agree would be appropriate,[33] there would still be

16  $2,297,590 left in the Net Settlement Fund after payment of costs, 100% of the requested

17  attorneys' fees, and the incentive awards.   This proposed *cy pres* distribution is plainly

18  appropriate, since *cy pres* is a well-accepted method for distributing unclaimed settlement funds.

19  *See Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011).[34]

20          *Cy pres* distribution will also benefit absent Class Members who have not made claims,

21  providing broader benefits to the Class as a whole.  This issue was recently addressed in *In re*

22  *Easysaver Rewards Litigation*, --- F. Supp. 2d ----, No. 09-cv2094, 2013 WL 435032, at *9 (S.D.

23  Cal. Feb. 4, 2013).   There, an objector argued that if it is feasible to make further payments to

24  class members, a *cy pres* distribution is improper.  *Id.*  The court rejected this argument, noting

25  _____

26  [33] Such an increase would be an appropriate exercise of the Court's discretion in light of the
    number of valid Claim Forms actually filed and the lower-than-expected administrative costs
27  associated with administering the Settlement.

28  [34] This authority belies certain Objections that *cy pres* distributions are improper in any context.
    (*See, e.g.*, Obj. No. 11 at 17; Inv. Obj. No. 100 at 8-9.)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

40.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

that additional class member payments would come at the expense of absent class members, who would benefit from the *cy pres* recipients' creation of Internet privacy programs. *Id.* The First Circuit has also approved this concept in a settlement involving medical marketing, noting that "[b]ecause the consumer fund was established for the benefit of all consumer purchasers of Lupron, not just the 11,000 who filed claims [and received cash payments], the court appropriately determined that the 'next best' relief would be a *cy pres* distribution which would benefit the potentially large number of absent class members." *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 34 (1st Cir. 2012); *see also California v. Levi Strauss & Co.*, 41 Cal. 3d 460, 476 (1986) ("[C]laimant fund sharing [of residual funds after the payment of claims] provides no benefits to silent class members"). Thus, even if the Court does not increase payments to Authorized Claimants, the *cy pres* distribution would be appropriate.

The proposed *Cy Pres* Recipients also meet the standards for final approval. As the Ninth Circuit recently reaffirmed, *cy pres* distributions are appropriate where there is "a driving nexus between the plaintiff class and the *cy pres* beneficiaries." *Dennis*, 697 F.3d at 865 (internal quotations and citation omitted). "[S]ettling parties [need not] select a *cy pres* recipient that the court or class members would find ideal. On the contrary, such an intrusion into the private parties' negotiations would be improper and disruptive to the settlement process." *Lane*, 696 F.3d at 821. The recipients proposed here focus on consumer protection, research, education regarding online privacy, the safe use of social media, and the protection of minors—the very issues Plaintiffs raised in their Complaint.[35] (*See, e.g.*, SAC ¶¶ 32-37, 122-23.) For example, among the proposed *Cy Pres* Recipients, the Electronic Frontier Foundation "works to protect consumer privacy on social networks" and helps "users better understand how to strengthen online privacy and to opt out of sharing information." (Brown Decl. Ex. A.) And the Consumers Federation of

---

[35] A detailed description of the mission of each proposed recipient is attached as Exhibit A to the Brown Declaration. Several of these organizations submitted declarations explaining how their respective missions and projects relate to the concerns raised in this litigation, and how their receipt of a *cy pres* award would facilitate their work in these areas. (*See* Dkt. Nos. 193 (Center for Democracy and Technology), 194 (Campaign for a Commercial-Free Childhood), 195 (Electronic Frontier Foundation), 196 (Center for Internet and Society), 197 (Consumer Privacy Rights Fund), 199 (Consumers Federation of America).)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

41.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

America "conducts research and educational outreach concerning behavioral targeting of online advertising." (*Id.*) The stated goals and purposes of these organizations demonstrate a direct nexus to the Class, as well as the claims Plaintiffs raised.[36] (*See id.*)

**5.     Very few Class Members objected to or opted out of the Settlement.**

The extremely low number of Objections and opt-outs from the Settlement strongly favors final approval. Out of over 150 million Class Members, there were only 17 valid and timely Objections made on behalf of 29 Class Members. In addition, 87 statements purporting to be Objections were filed on behalf of 95 Class Members, which lacked some or all of the information required by the Preliminary Approval Order and Settlement. But even counting these invalid Objections, only 0.000082% of the Class expressed any opposition to the Settlement.

Substantively, the Objections reveal that many objectors take issue with the lawsuit itself, not Facebook's alleged conduct. 41 objectors—over one third of all Objections—actually stated that ***they believe that Facebook's conduct was <u>not</u> a violation of their rights***, and/or that ***the lawsuit is without merit***. For instance, two Objections note that "Facebook has never made any representations to me that the items I post on my 'page' could not, or would not, be used in any form of advertising" (*see* Obj. No. 3); and "class members have had no monetary damages because they never had any realistic expectation of being paid for their services" (*see* Obj. No. 2). Another objector states: "I believe it to be a waste of time and resources. This is a frivolous lawsuit and needs to be dropped. If you don't like the way Facebook is run, don't use Facebook." (Inv. Obj. No. 28.)[37] And another states that "[b]y maintaining their accounts [Plaintiffs] appear to consider facebook's practices worth the cost of free social networking." (Inv. Obj. No. 34.)

---

[36] Indeed, Objector Frank's assertion that the "nexus between the goals of the lawsuit and the missions of the cy pres recipients is attenuated to near absentia" is objectively false. (*See* Obj. No. 11 at 19.) Moreover, not only is the dissenting opinion he cites denying rehearing *en banc* in *Lane* not controlling, it is distinguishable, as the dissenters' primary concern with the approved *cy pres* relief was that one *cy pres* recipient was a charity that had no history or track record because it was established by the settlement process itself. *See Lane v. Facebook, Inc.*, 709 F.3d 791, 793 (9th Cir. 2013) (dissenting).

[37] Many Objections claim the lawsuit is a "frivolous" case that clogs the court system. Approving the Settlement will, of course, alleviate pressure the case has placed on the legal system. Further, such Objections do not establish a basis to deny final approval. *See In re TD Ameritrade*, 2011 WL 4079226, at *11-13 (overruling objections that lawsuit was "frivolous" and "driven by 'greedy lawyers'").

Cooley LLP
Attorneys At Law
San Francisco

42.

Facebook's MPA ISO Pls.' Mot. for
Final Approval of Settlement
Case No. CV 11-01726 RS

1    The fact that so few Class Members have objected, and that over one-third of those who have

2    expressed opposition to the lawsuit itself, strongly supports a finding that the Settlement is fair,

3    reasonable, and adequate.  *See Nat'l Rural Telecomms.*, 221 F.R.D. at 529 ("[T]he absence of a

4    large number of objections to a proposed class action settlement raises a strong presumption that

5    the terms of a proposed class settlement action are favorable to the class members."); *Boyd v.*

6    *Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (finding that objections from 16 percent of

7    the class was not persuasive evidence that the settlement was inadequate); *Rodriguez*, 563 F.3d at

8    967 (settlement approval favored where only 54 out of 376,301 class members filed objections).

9        Similarly, only 6,825 Class Members exercised their right to opt out of the Settlement.

10   (Keough Exclusion Decl. ¶ 3.)  Against an estimated class size of 150,908,256 (Vulgaris Decl.

11   ¶ 3), this means only 0.0045% of the Class Members did not wish to participate in the Settlement.

12   Further, as suggested by the Objections discussed above, these figures may well include Class

13   Members who are opting out because they do not believe they have been injured.  Regardless,

14   that so few Class Members have opted out supports a conclusion that the Settlement is fair,

15   reasonable, and adequate.  *Mego*, 213 F.3d at 459 (only one of 5,400 (0.018%) class members

16   opted out and only "a handful of objectors" came forward, weighing in favor of approving the

17   Settlement).

18           **6.        The remaining factors favor final approval.**

19       Final approval is also warranted given the stage of the proceedings, the informed views of

20   counsel about the strengths and weaknesses of their respective clients' positions, and the absence

21   of any governmental participant.  As discussed above, *supra* § II(B), the Parties litigated

22   vigorously for over a year and conducted extensive discovery, far exceeding the requirement that,

23   for final approval, the parties have sufficient information to make an informed decision.  *See*

24   *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239-40 (9th Cir. 1998).  Even "investigation

25   and informal discovery and research" can support such a finding, *see Lane*, 696 F.3d at 820,

26   which is certainly established by the comprehensive discovery conducted here.  Because the

27   Settlement was fully informed, the recommendation of the Parties' counsel "is entitled to a great

28   deal of weight."  *Immune Response*, 497 F. Supp. 2d at 1174.  Finally, neither the United States

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

43.

**FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS**

1  Attorney General nor any state attorney general has filed an Objection to the Settlement, even

2  though they received notice of the Settlement pursuant to the Class Action Fairness Act, 28

3  U.S.C. §1715(b).  (*See* Decl. of Jennifer Keough re Ntc. Given Pursuant to the Class Action

4  Fairness Act, Dkt. No. 247.)

5         **B.**      **Notice Provided to Class Members Was Sufficient and Satisfied Due Process.**

6         Federal law vests the Court with broad discretion in fashioning an appropriate notice

7  program.  *Battle v. Liberty Nat'l Life Ins. Co.*, 770 F. Supp. 1499, 1521 (N.D. Ala. 1991).  Under

8  Rule 23, notice must be provided in "plain, easily understood language," and must inform

9  potential class members of the nature of the action, the definition of the class, the claims, issues,

10  or defenses asserted, the binding effect of a class judgment on class members, and of class

11  members' rights to opt out or to enter an appearance through separate counsel.  Fed. R. Civ. P.

12  23(c)(2)(B).  What constitutes adequate notice will depend on the circumstances of each case.  *Id.*

13  (court must direct "notice that is practicable under the circumstances").  The notice plan here

14  fully satisfies Rule 23's requirements.

15         **1.**      **The content of the notice provided to Class Members is sufficient.**

16         The 10-page Long Form Notice provided substantial information about the case and the

17  Settlement.  It identified the Parties, and described the claims in the case, the Settlement terms,

18  and the Settlement Class definition.  (Keough Decl. ¶ 9, Ex. C.)  Importantly, the Long Form

19  Notice explained the binding effect of a class judgment, so as to allow Class Members to make an

20  informed choice to accept or reject the Settlement.  (*Id.*)  Additionally, it described the particulars

21  of the Class relief and other benefits to the Class.  (*Id.*)  It also disclosed the amount of Plaintiffs'

22  request for attorneys' fees and costs.[38]  (*Id.*)  Further, the Long Form Notice contained detailed

23  instructions for requesting exclusion from, objecting to, or participating in the Settlement, as well

24  as the schedule for the hearings on final approval and attorneys' fees and costs.  (*Id.*)  In sum, the

---

[38] One objector argues that the Long Form Notice failed to define a maximum percentage for the payment of legal fees and instead only stated that attorneys' fees will come from the $20 million fund.  (*See* Obj. No. 14 at 2.)  This is a mischaracterization of the Long Form Notice, which clearly states that "Class Counsel are requesting up to $7.5 million for their attorneys' fees and up to $282,566.49 to cover their costs."  (Keough Decl. Ex. C at 7.)

Cooley LLP
Attorneys At Law
San Francisco

44.

**Facebook's MPA ISO Pls.' Mot. for
Final Approval of Settlement
Case No. CV 11-01726 RS**

notice fully complied with Rule 23(c)(2)(B)[39] and "generally describe[d] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard."  *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir. 1980), *overruled on other grounds by Evans v. Jeff D.*, 475 U.S. 717, 725 n.10 (1986).

### 2.     The means of supplying notice to Class Members is sufficient.

Pursuant to the Settlement Agreement and the Preliminary Approval Order, Facebook sent Email Notice to 146,617,076 Class Members for whom Facebook had a valid email address. (Vulgaris Decl. ¶ 5.)  For Class Members for whom Facebook did not have accurate contact information (e.g., former Users who closed their Facebook accounts), Facebook arranged for the Publication Notice to appear three times in *USA Today* and to be disseminated over the PR Newswire Service, which encompasses several thousand news organizations and publications across the U.S.  (Keough Decl. ¶ 4.)  Both the Email Notice and Publication Notice directed Class Members to the Long Form Notice on the Settlement Website.[40]  (*Id.* ¶ 9.)  Under the circumstances, the notice plan reached the largest possible number of Class Members, which was all or nearly all.  *See* Fed. R. Civ. P. 23(c).

---

[39] One objector claims the notice was inadequate because the Settlement Website "contains a list of at least 120 court documents," which "may be discoverable to some but surely not all potential class members."  (*See* Obj. No. 14 at 3.)  But the notice process should not be criticized for transparency.  Courts routinely approve notice procedures that, like here, include settlement websites containing abundant information about the settlement.  *See, e.g., In re Netflix Privacy Litig.*, No. 11-cv-0379, 2013 WL 1120801, at *9 (N.D. Cal. Mar. 18, 2013) (approving notice plan that included "a settlement website containing pertinent and detailed information regarding the settlement."); *Lymburner v. U.S. Fin. Funding, Inc.*, No. 08-cv-0325, 2012 U.S. Dist. LEXIS 14752, at *5 (N.D. Cal. Feb 7, 2012) (approving notice that included "website that contained links to court filings").  The objector's additional argument that "[t]he Proposed Settlement section of the Long Form Notice" provides no "instruction to readers that they should refer to the website to access settlement documents" ignores the fact that the last line of *every page* of the Long Form Notice states: "QUESTIONS? VISIT WWW.FRALEYFACEBOOKSETTLEMENT. COM."  (*See* Keough Decl. Ex. C) (emphasis and capitalization in original).

[40] One objector argued that the Email Notice should have provided a hyperlink allowing Class Members to file an Objection by email without having to review the procedures in the Long Form Notice on the Settlement Website.  (*See* Inv. Obj. No. 83.)  Given that this Objection was filed via the Settlement Website, the objector himself demonstrates that the lack of a hyperlink does not pose a barrier to submission of Objections.  Further, the Email Notice is intended to provide a concise summary that will alert Class Members to the primary issues, not to provide every relevant Settlement detail.  *See Chavez v. Netflix, Inc.*, 162 Cal. App. 4th 43, 58 (2008) (noting a succinct description that alerts class members to their claim and directs them to more detailed information may be preferable to a long detailed notice that some recipients may ignore).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

45.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1    Numerous other courts have approved similar tiered notice plans.  *See, e.g.*, *Browning v.*

2  *Yahoo! Inc.*, No. C04-01463 HRL, 2006 WL 3826714, at *8 (N.D. Cal. Dec. 27, 2006) (where

3  allegations arise from use of a website, the class is "familiar and comfortable with email and the

4  Internet," such that email notice may be most appropriate); *Browning v. Yahoo! Inc.*, No. C04-

5  01463, 2007 WL 4105971, at *7 (N.D. Cal. Nov. 16, 2007) (parties "use[d] . . . email to provide

6  brief notice and to direct interested class members to the website," which posted long form

7  notice); *see also, e.g.*, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D.

8  197, 203 (D. Me. 2003) (short-form notice directed class to Internet and mailing addresses for

9  further information).  As stated by the California Court of Appeal (under a standard that is

10  identical or nearly identical to the federal standard): "Using a summary notice that direct[s] the

11  class member wanting more information to a Web site containing a more detailed notice, and

12  providing hyperlinks to that Web site, [is] a perfectly acceptable manner of giving notice . . . ."

13  *Chavez*, 162 Cal. App. 4th at 58.

14    Furthermore, the Publication Notice easily satisfies Rule 23(a)(1) for the purposes of

15  providing notice to Class Members for whom Facebook does not possess a valid email address.

16  *See Smith v. Dominion Bridge Corp.*, No. 96-7580, 2007 WL 1101272, at *13 (E.D. Pa. Apr. 11,

17  2007) (approving settlement where 3,848 individual notices were mailed to "reasonably

18  identifiable" class members, with a summary notice "published in the national publication, *PR*

19  *News Wire*"); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080-81 (N.D. Cal. 2007)

20  (approving publication of short-form notice in *USA Today*).  Moreover, countless Class Members

21  likely learned of the Settlement—if they had not known of it already—through the extensive

22  press coverage this case has received.  News outlets across the country, as well as online news

23  sources, published stories regarding preliminary approval of the Settlement.  (*See* Gutkin Decl.

24  ¶¶ 2-6, Exs. A-E.)  News coverage continued throughout the notice period, with several news

25  organizations writing stories about the Settlement's terms.  As just one example (there are many

26  others), CNN.com ran a story on January 28, 2013 regarding the Settlement, which included a

27  hyperlink to the Settlement Website.  (*See id.* ¶ 7, Ex. F.)  This coverage supplemented the

28  extensive notice campaign, which alone fully satisfied Rule 23's notice requirement.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

46.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

**C.    None of the Objectors Provides Any Reason for the Court to Conclude that the Settlement Is Not Fair, Reasonable, and Adequate.[41]**

    **1.    The monetary relief provided to individual Class Members is fair, reasonable, and adequate and far exceeds any sum Class Members are likely to recover at trial.**

Some objectors assert that the monetary payment to each Class Member is insufficient and should be increased.  (*See, e.g.*, Inv. Obj. No. 42 (asserting that $10 cannot compensate for the alleged harm).)  These Objections are without merit.

First, many of these Objections incorrectly assume that no payment would be made to Class Members, and on that basis object that the proposed relief is insufficient.  (*See, e.g.*, Obj. No. 6 (stating that the Class size and number of likely claims, "will make the payout of $10 dollars to each class member not happen."); Obj. Nos. 10 at 7, 17 at 2; Inv. Obj. No. 102 at 4.)  In fact, as described above, *supra* § II(F), each Class Member who submitted a valid claim will receive (at least) the full proposed payment of $10 dollars.

Second, Objections claiming that even $10 is an insufficient remedy should be rejected.[42]  (*See, e.g.*, Inv. Obj. No. 52 (asserting each claimant should receive $100).)  As discussed *supra* pp. 18-19, given the absence of any actionable (or even real) injury here, the $10 award is beyond full compensation given the challenges Plaintiffs and the Class would face in continued litigation.  Indeed, as many objectors note, it is entirely unclear that Class Members could have proven damages.  (*See* Obj. No. 2 ("class members have had no monetary damages because they never had any realistic expectation of being paid for their services").)  Further, as discussed *supra* p. 34, under Plaintiffs' damages models, $10 payments would be *17 times* Facebook's average profit per Class Member attributable to the alleged misappropriation from January 2011 to August 2012

---

[41] For the Court's convenience, Facebook addresses the generally applicable Objections first, then those applicable to the minor subclass, followed by Objections regarding notice.

[42] One invalid Objection mistakenly assumes that the Settlement relates to Facebook's use of copyrighted photos, and on that basis argues the $10 recovery is insufficient.  (*See* Inv. Obj. No. 62.)  Because the Settlement is unrelated to any copyright claims and addresses § 3344 exclusively, this Objection provides no basis to deny final approval.  Another objector requests $10,503,650 from Facebook, which he alleges used his company's "intellectual property" worth "$250,000.00 if subject to FBI regulations . . . ." (*See* Obj. No. 8.)  But the objector, who is free to opt out and pursue individual claims, fails to explain how § 3344 protects his *company's* intellectual property, and offers no basis to deny final approval.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

47.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1   (about $0.60).

2           Theodore Frank and Sam Kazman (collectively the "Frank objectors") argue that the

3   Settlement can only be fair if Plaintiffs had less than a 1% chance of success, since "Plaintiffs

4   alleged tens of billions of dollars of statutory damages, but are settling for less than 0.1% of that."

5   (Obj. No. 11 at 1.)  Initially, Plaintiffs had virtually no chance of obtaining the full amount of

6   statutory damages on a classwide basis.  *See supra* pp. 33-34.  But the Court should also disregard

7   the Frank objectors' call for a formulaic approach to settlement review, which the Ninth Circuit

8   has rejected.  *See Rodriguez*, 563 F.3d at 965 (rejecting objectors' argument that "the court should

9   have specifically weighed the merits of the class's case against the settlement amount and

10  quantified the expected value of fully litigating the matter" and stating, "[w]e put a good deal of

11  stock in the product of an arms-length, non-collusive, negotiated resolution."); *Lane*, 696 F.3d at

12  823 (a district court "need not include in its approval order a specific finding of fact as to the

13  potential recovery for each of the plaintiffs' causes of action.  Not only would such a requirement

14  be onerous, it would often be impossible. . . .").  Further, the percentage of recovery in the

15  Settlement is around *27% of Plaintiffs' estimated damages* of $73 million.  *See supra* p. 33.

16          Other objectors assert that the Settlement will not sufficiently deter Facebook from future

17  bad acts.  (*See* Obj. No. 4 (the Settlement "will not prevent Facebook from continuing to push the

18  boundaries of legal use of my user data in new and inventive ways."))  Settlements focus on

19  resolving the particular case at issue, not deterring future, hypothetical, undefined conduct.

20  Further, these objectors ignore the fact that $20 million is far in excess of anything they were

21  likely to recover at trial.  *See In re Merrill Lynch & Co., Inc. Research Sec. Litig.*, No. 02 MDL

22  1484(JFK), 2007 WL 4526593, at *11 (S.D.N.Y. Dec. 20, 2007) (rejecting objection that

23  settlement amount would not deter future conduct, which ignored risks of proceeding with

24  litigation).  Therefore, even if a deterrent effect were properly considered at final approval, a

25  certain $20 million payment has a greater deterrent effect than a recovery of nothing at trial.

26          Finally, Objections that the Class relief is inadequate are contradicted by the extremely

27  low number of Objections (104 valid & invalid Objections on behalf of 124 Class Members, or

28  0.000082% of the Class, of which over one-third object that the lawsuit is meritless) and

Cooley LLP
Attorneys At Law
San Francisco

48.

Facebook's MPA ISO Pls.' Mot. for
Final Approval of Settlement
Case No. CV 11-01726 RS

exclusions (6,8256, or 0.0045% of the Class).  *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974) ("Any claim by appellants that the settlement offer is grossly and unreasonably inadequate is belied by the fact that, from all appearances, the vast preponderance of the class members willingly approved the offer."), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).  The trivial percentage of Class Members who objected to or excluded themselves from the Settlement stands in stark contrast to the more than $600,000 Class Members who chose to participate in the Settlement by making claims.

### 2.   The proposed *Cy Pres* Recipients are appropriate and do not prevent final approval.

Certain objectors argue for alternative *Cy Pres* Recipients or assert that the proposed recipients would not adequately protect their interests.  (*See, e.g.*, Obj. No. 4 and Inv. Obj. Nos. 51, 92.)  For instance, objector Jason Brodsky objects that ConnectSafely.org will not legitimately protect his legal rights because it is funded, in part, by donations from Facebook (a fact that Facebook disclosed from the outset).  (Obj. No. 4; *see* Brown Decl., Ex. A.)  This objection has no merit.  First, Connectsafely.org is a nonprofit organization dedicated to educating parents and teens about civil and safe Internet use—the same issues that were raised in this lawsuit.  (*See* Brown Decl. Ex. A.)  Mr. Brodsky, who asserts that his own rights were violated by Facebook, not those of his child, is not the population ConnectSafely.org endeavors to educate about safe Internet use.  Furthermore, there is no reason to believe (and Mr. Brodsky provides none) that Facebook has any undue influence over this independent organization.

Similarly, objectors Boisvert and Frank insist that Santa Clara Law School should not receive any *cy pres* funds because one of the Class Counsel, Kevin Osborne, is an alumnus, and because Judge Koh, who previously presided over the case, is a member of Santa Clara's High Tech Advisory Board.  (*See* Obj. Nos. 11 at 18; 15.)  But there is no evidence that Mr. Osborne has any special connection to the school, other than being an alumnus, and Santa Clara will receive only 6% of the *cy pres* funds.  *See In re Easysaver Rewards*, 2013 WL 435032, at *7 (rejecting objection to *cy pres* award to law school where there were no allegations that counsel had any significant relationship with the institution other than being alumni and the privacy issues

underlying the lawsuit were rationally connected to the school).  Mr. Frank insinuates that the Parties selected Santa Clara in an attempt to "judge-shop" due to Judge Koh's connection to the school.  (Obj. No. 11 at 18.)  In reality, the Parties selected Santa Clara's High Tech Law Institute because it is one of the nation's leading centers devoted to high tech law, including advertising and privacy law (*see* Brown Decl., Ex. A.), and its absence would be arbitrary and counterproductive.

Similarly, certain objectors insist that Class Members should have some say in selecting the *Cy Pres* Recipients.  (*See, e.g.*, Inv. Obj. Nos. 51, 92.)  Mr. Thomas Moore, for example, asserts that the Court should add the Electronic Privacy Information Center ("EPIC") as a *Cy Pres* Recipient.  (*See* Inv. Obj. No. 51.)  But Class Members are not entitled to a selection of their "ideal" *cy pres* recipient in order for a settlement to warrant final approval.  *See Lane*, 696 F.3d at 821.[43]  Requiring a Class-directed selection of *cy pres* recipients would interfere with the private negotiated aspect of settlements, and would improperly disrupt the settlement process.  *Id.*  Moreover, Mr. Moore's suggestion that EPIC will "hold Facebook's feet to the fire" improperly assumes that *cy pres* relief is intended to punish the defendant (against whom no liability has been established here) rather than to address the concerns raised by the Complaint.  *See Nachshin*, 663 F.3d at 1039 (noting that distribution of *cy pres* relief must be guided by the objectives of the underlying statute and the interests of the silent class members).

### 3.    The proposed attorneys' fees do not prevent final approval.

Many objectors assert that the size of the attorneys' fees and costs sought by Plaintiffs' Counsel is impermissibly high compared to the Class recovery.  (*See, e.g.*, Obj. No. 6.)  In many instances, these Objections are based on the faulty assumption that Class Members would not actually receive any monetary award.  (*See, e.g.*, *id.*)  Putting that aside, Facebook has addressed Plaintiffs' Counsel's requested fees and costs in its Fee Opposition, in which Facebook argued that their request should be substantially reduced.[44]  Notably, the Settlement is not contingent

---

[43] One objector proposed that Class Members should select the *Cy Pres* Recipients if no monetary award was provided to them. (*See* Inv. Obj. No. 41.) Because all Class Members who filed valid claims will receive cash payments, this Objection does not weigh against final approval.

[44] One objector contends that "the parties should have negotiated an award of fees under § 3344"

1  upon an award of attorneys' fees in any particular amount (or any award at all) (S.A. § 2.7), a

2  factor that supports approval of the Settlement. *Cf. In re Bluetooth Headset Prods. Liab. Litig.*,

3  654 F.3d 935, 947 (9th Cir. 2011).  Moreover, because fees will be paid out of the Settlement

4  Fund (and there is no reverter clause), any reduction in the requested fees will inure to the benefit

5  of the Class through distribution to *Cy Pres* Recipients, or, at the Court's discretion, to claimants

6  *pro rata*.  (S.A. § 2.3(b).)  Regardless, the fact that fees will be paid out of the Settlement Fund

7  does not make the Settlement unfair or unreasonable. *See Boeing Co. v. Van Gemert*, 444 U.S.

8  472, 478 (1980) ("[A] litigant or a lawyer who recovers a common fund for the benefit of persons

9  other than himself or his client is entitled to a reasonable attorney's fee from the fund as a

10  whole."); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.

11  1990) (affirming portion of final approval providing recovery of attorneys' fees from a common

12  fund).

13  **4.     The proposed incentive awards sought by the named Plaintiffs do not warrant denial of final approval.**

14

15  Other Objections insist that the incentive awards sought by the named Plaintiffs create an

16  impermissible conflict of interest between the named Plaintiffs and absent Class Members.  (*See,*

17  *e.g.*, Obj. No. 11 at 24-26; Inv. Obj. No. 101 at 8.)  A settlement agreement that includes

18  incentive awards, however, is common and unobjectionable by itself. *See Vincent v. Reser*, No. C

19  11-03572 RRB, 2013 U.S. Dist. LEXIS 22341, at *15 (N.D. Cal. Feb. 19, 2013) ("Incentive

20  awards are fairly typical in class action cases.") (internal citation omitted); *see also, e.g.*, *Mego*,

21  213 F.3d at 463 (approving incentive awards).

22  The Objections point to a recent decision from the Ninth Circuit, *Radcliffe v. Experian*

23  *Information Solutions Inc.*, --- F.3d ---, 2013 WL 1831760, at *5 (9th Cir. May 2, 2013).  This

24

25  because, in that case, "this court's review would have focused on the reasonableness of the fee
   request under the lodestar calculation method."  (*See* Obj. No. 12, ¶ 7.)  As Facebook argued in

26  its Fee Opposition, the Court *must* use the lodestar method to calculate fees under California law.
   (*See* Fee Opposition at 4-7.)  Furthermore, there is no reason why the Parties should have

27  negotiated for fees to be awarded under § 3344.  That section has a *prevailing party* fee-shifting

28  provision, and neither party (Facebook nor Plaintiffs) "prevails" by virtue of this Settlement.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

51.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

case is inapposite to the facts here.  In *Radcliffe*, the court took issue with a settlement agreement that explicitly conditioned incentive awards on the class representatives' support for the settlement.  The court held that this "conditional incentive award" removed a check on the settlement's fairness and created an impermissible conflict between the plaintiffs who supported the settlement and the rest of the class.  *Id*.  The discussion the objectors cite, regarding the disparity between the proposed incentive award and the recovery by class members, is dictum, and does not signal that all incentive awards create a conflict, which would be a sharp departure from precedent.  Importantly, the incentive awards here are not conditioned on the named Plaintiffs' support for the Settlement, which expressly states that its terms are not conditioned on *any* award to the named Plaintiffs.  (S.A. § 2.7.)  Thus, even if the Court denies incentive awards, the Class still recovers the full relief afforded under the Settlement, and the named Plaintiffs agreed to the Settlement knowing that their personal awards could be reduced or eliminated.[45]

Further, these objectors overlook other critical differences between the Class representatives here and those in *Radcliffe*.  First, unlike the Fair Credit Reporting Act at issue in *Radcliffe*, § 3344 contains a fee-shifting provision, providing that the prevailing party in any action can recover fees and costs.[46]  *Compare* Cal. Civil Code § 3344(a), *with* 15 U.S.C. §§ 1681n, 1681o.  Thus, unlike the plaintiffs in *Radcliffe*, the Class representatives here shouldered the significant risk that if they were unsuccessful in their claims, they would have to pay Facebook's attorneys' fees.  This risk is not merely hypothetical—Facebook has sought prevailing-party fees and costs in other cases brought under § 3344, successfully recovering its

---

[45] Although *former* named Plaintiff Angel Fraley filed an Objection in this case, her primary complaint is her belief that she deserves "half or twice as much" as the other named Plaintiffs because of her previous service in the case.  (*See* Obj. No. 13.)  Ms. Fraley voluntarily withdrew as a named Plaintiff in March 2012, before Plaintiffs even sought class certification.  Thus, she relinquished any benefits that may inure to the named Plaintiffs who remained in the case.  She had no involvement with the settlement process and is in a materially different position than the objecting plaintiffs in *Radcliffe*, who were involved with the litigation through settlement.

[46] Objector Frank (Obj. No. 11) also relies on language from another Fair Credit Reporting Act case, *Murray v. GMAC Mortgage Co.*, 434 F.3d 948 (7th Cir. 2006), which, like *Radcliffe*, is distinguishable given § 3344's fee-shifting provision.  In *Murray*, the Seventh Circuit vacated the district court's denial of class certification, and commented on a potential settlement the parties reached after class certification briefing, which the "district judge refused to read."  *Id*. at 951.  The commentary was dictum, and the appellate court rejected the district judge's ruling that plaintiff Murray was an inadequate class representative, vacating the denials of class certification.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

52.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1    costs from the plaintiffs in one such case.  (*See* Order re Pl.'s Mot. to Tax Costs, *David Cohen v.*

2    *Facebook, Inc.*, No. BC 444482 (L.A. Super. Ct.  May 31, 2012); *see also* Mot. for Attorneys'

3    Fees & Costs (Dkt. No. 81) at 2, *Robyn Cohen v. Facebook*, No. 10-5282-RS (N.D. Cal. Nov. 10,

4    2011).)  The Class representatives thus took on significant, personal financial risk in bringing this

5    action, which distinguishes their involvement here from the named plaintiffs in *Radcliffe*.

6          **5.     The Settlement relief is not inadequate due to the existence of other**
           **state publicity laws.**
7

8          Objector Bowman asserts generally that the Settlement relief is inadequate because it fails

9    to account for the more favorable right of publicity laws of Tennessee.  (Obj. No. 7 at 10-11.)  As

10   an initial matter, Mr. Bowman's recent correspondence with the Parties makes clear that his

11   Objection is primarily motivated by a desire to appropriate a portion of the Net Settlement Fund

12   for his personal gain through a side deal with the Parties.  Mr. Bowman has offered to withdraw

13   his Objection if the Parties allocate $50,000 of the Net Settlement Fund to an elementary school

14   and a middle school in Mr. Bowman's hometown.  (*See* Gutkin Decl., Ex. L; *see also* Decl. of

15   Robert S. Arns ISO Mot. Final Appr. of Class Action Settlement, Dkt. No. 337, ¶¶ 3-11

16   (recounting telephone call in which Mr. Bowman proposed "dismiss[ing] or withdraw[ing] [his]

17   objection in return for monetary compensation").)  *See, e.g.*, *Shames v. Hertz Corp.*, No. 07-CV-

18   2174-MMA, 2012 U.S. Dist. LEXIS 148148, at *10-13 (S.D. Cal. Oct. 15, 2012) (characterizing

19   "Objectors' counsel's attempt to extract $30,000[] from class counsel in exchange for Objector

20   not filing objections" as "bold and improper"); Manual for Complex Litigation § 21.643 (4th ed.

21   2004) (explaining that some objections "are made for improper purposes, and benefit only the

22   objectors and their attorneys (e.g., by seeking additional compensation to withdraw even ill-

23   founded objections)" and that such objections may merit sanctions).

24         Even if his Objection were based on proper motives, it should be rejected.  Initially, the

25   premise of the Objection—that Tennessee law would provide greater relief than the Settlement—

26   is incorrect.  He insists that under Tennessee's Personal Rights Protection Act of 1984 ("PRPA"),

27   Class Members could recover the $1 billion in profits that Facebook allegedly earned in 2011

28   (from all sources), because the statute provides for disgorgement of illegally earned profits.  Yet

53.

1    Mr. Bowman makes no attempt to demonstrate what portion of Facebook's total profits stem from

2    Sponsored Stories featuring U.S. (or Tennessee) Users or what, if any, incremental profit

3    Facebook made from Sponsored Stories compared to alternative ads.  Mr. Bowman also insists

4    that under Tennessee law, the Class could have recovered treble damages.  (Obj. No. 7 at 13.)

5    But the PRPA only provides for such damages when a defendant "knowingly uses or infringes the

6    rights of a member *of the armed forces* . . . ."  *See* Tenn. Code § 47-25-1106(d)(2) (italics added).

7    Mr. Bowman does not claim that he is or was a member of the armed forces, nor has he put

8    forward any evidence about what portion of the Class are members of the armed forces.

9        Next, several circuits have recognized that in the settlement context, courts largely need

10   not consider whether variations in state law could render the class unmanageable or defeat

11   certification, since the settlement eliminates the burden of establishing liability under disparate

12   state laws, or instructing the jury on such laws.  *See, e.g.*, *Sullivan v. DB Invs., Inc.*, 667 F.3d 273,

13   303-04 (3d Cir. 2011) (the "key" difference between settlement and litigation classes eliminates

14   concerns regarding manageability or certification in a settlement-only context); *In re Warfarin*

15   *Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004) (variations in state law are largely

16   "irrelevant to certification of a settlement class"); *In re Mexico Money Transfer Litig.*, 267 F.3d

17   743, 747 (7th Cir. 2001) ("no one need draw fine lines among state-law theories of relief" when

18   considering approval of settlement-only class action).  In fact, considering how the risk, expense,

19   complexity, and duration of further litigation impacts the adequacy of a proposed settlement,

20   differences among state laws actually favors approval of a settlement.  *See Ko*, 2012 WL

21   3945541, at *4 (granting final approval of a nationwide settlement under the UCL and noting that,

22   absent settlement, plaintiffs could have faced problems litigating further due to manageability

23   concerns and choice-of-law questions under other state laws).

24       Even if variations in state law were relevant to settlement approval, that inquiry would be

25   moot here, as Facebook's Terms require that California law applies to all claims.  As both the

26   Plaintiffs and Mr. Bowman concede, the Terms explicitly require that California law govern "any

27   claim that might arise" between Facebook and its Users, "without regard to conflict of law

28   provisions."   Both California and Tennessee recognize and favor the enforceability of such

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

54.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

choice-of-law provisions.  *See  Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal. 4th 459, 464-65 (1992) (California courts have a strong policy favoring enforcement of choice-of-law provisions); *Harris v. McCutchen*, 214 Cal. App. 4th 1399 (2013); *Goodwin Bros. Leasing, Inc. v. H&B Inc.*, 597 S.W. 2d 303, 306 (Tenn. 1980) (Tennessee courts will ordinarily recognize choice-of-law provisions); *Beach Cmty. Bank v. Labry*, No. 11-cv-1583, 2012 WL 2196174, at *3 (Tenn. Ct. App. Jun. 15, 2012) ("As a rule, Tennessee courts will honor a contractual choice of law provision.") (citation omitted).

Further, contrary to Mr. Bowman's assertions that the choice-of-law provision must fail because there has not been a "meeting of the minds," Facebook's Terms have been found enforceable even in the face of a User's challenge.  *See Facebook, Inc. v. Power Ventures, Inc.*, No. 08-cv-5780, 2010 WL 3291750, at *7, n.20 (N.D. Cal. July 20, 2010) (plaintiff "acceded to the Terms of Use and became bound by them" by accessing and using the Facebook website); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839-40 (S.D.N.Y. 2012) (finding Terms enforceable against plaintiff, noting he was prompted to examine the Terms, and whether or not he read them was irrelevant);  *E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 900 (S.D. Ill. 2012) (forum-selection clause in Terms was enforceable "even if the contract was never negotiated and in effect was dictated by one party to the other party").  Moreover, other online operators' terms are routinely enforced.  *See TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 376 (S.D.N.Y. 2010) (enforcing choice-of-law provision in Google's terms of use and applying California law); *Segal v. Amazon.com, Inc.*, 763 F. Supp. 2d 1367, 1369 (S.D. Fla. 2011)*; Meier v. Midwest Recreational Clearinghouse, LLC*, No. 10-cv-1026, 2010 WL 2738921, at *3 (E.D. Cal. July 12, 2010); *Beard v. PayPal, Inc.*, No. 09-cv-1339, 2010 WL 654390, at *2-3 (D. Or. Feb. 19, 2010); *Brodsky v. Match.com LLC*, No. 09-cv-5328, 2009 WL 3490277, at *1 (S.D.N.Y. Oct. 28, 2009); *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 237 (E.D. Pa. 2007); *Person v. Google Inc.*, 456 F. Supp. 2d 488, 496–97 (S.D.N.Y. 2006)*; Novak v. Overture Servs., Inc.*, 309 F. Supp. 2d 446, 451 (E.D.N.Y. 2004).  Thus, California law applies to all claims.

Cooley LLP
Attorneys At Law
San Francisco

55.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

6.     **The Rules Enabling Act and principles of federalism do not prevent final approval.**

Mr. Bowman also objects that the Settlement abridges state laws and thus violates the Rules Enabling Act and principles of federalism.  (Obj. No. 7 at 14.)  In fact, however, the very case Mr. Bowman cites for this proposition, *Sullivan*, 667 F.3d 273, explicitly holds that "a court does not abridge, enlarge, or modify any substantive right by approving a voluntarily-entered class settlement agreement," nor "violate principles of federalism" because a court approving a settlement "merely recognizes the parties' voluntary compromise of their rights," and does not engage in any "substantive adjudication of the underlying causes of action."  *Id*. at 312-13 (citation and quotation omitted); *see also In re Prudential Ins. Co. of Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 324 (3d Cir. 1998).  Further, his general assertion that the mere certification of nationwide class actions violates federalism is belied by the number of such classes which have been successfully certified in California district courts alone.[47]

7.     **The proposed release is not overly broad under Ninth Circuit precedent.**

Certain objectors, including Mr. Bowman and the Bronson, Shane, and Schachter objectors, insist that the Settlement's release provision is overly broad because it may include claims not alleged in the underlying operative Complaint, thereby preventing Settlement approval.  (*See* Obj. Nos. 7 at 16; 10 at 18; Inv. Obj. Nos. 100 at 13; 101 at 11.)  But the Ninth Circuit has explicitly and repeatedly held that a settlement may release claims not specifically alleged in the operative complaint, as long as the claims are based on the same underlying factual predicates.  *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287-88 (9th Cir. 1992) ("a federal court may release not only those claims alleged in the complaint, but also a claim based

---

[47] *See, e.g.*, *Cox v. Clarus Mktg. Grp., LLC*, --- F.R.D. ----, No. 11-cv-2711, 2013 U.S. Dist. LEXIS 60941, at *27-32 (S.D. Cal. Apr. 29, 2013) (certifying nationwide settlement class under California's UCL, among others); *Weeks v. Kellogg Co.*, No. 09-cv-8102, 2011 U.S. Dist. LEXIS 155472, at *4 (C.D. Cal. Nov. 23, 2011) (certifying nationwide settlement class under UCL and CLRA); *Collado v. Toyota Motor Sales, U.S.A., Inc.*, No. 10-cv-3113, 2011 U.S. Dist. LEXIS 133572, at *23 (C.D. Cal. Oct. 17, 2011) (same); *In re Wells Fargo Loan Processor Overtime Pay Litig.*, No. 07-cv-1841, 2011 U.S. Dist. LEXIS 84541, at *36 (N.D. Cal. Aug. 2, 2011) (certifying nationwide settlement class under UCL).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

56.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action") (internal quotation and emphasis omitted); *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) ("A settlement agreement may preclude a party from bringing a related claim in the future 'even though the claim was not presented and might not have been presentable in the class action,' [if] 'based on the identical factual predicate as that underlying the claims in the settled class action.'" (quoting *Williams v. Boeing Co*., 517 F.3d 1120, 1133 (9th Cir. 2008))); *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 749 (9th Cir. 2006) (affirming release of claims alleging different legal theory where same facts and injury giving rise to claims were settled in earlier class action).  Thus, a release is not impermissibly broad simply because it may apply beyond the claims specifically alleged in the complaint.

Here, the Settlement's release provisions are tailored to Plaintiffs' allegations and are appropriately limited to any claim that "was or could have been alleged in th[is] Action."  (S.A. § 5.2; *see also id.* § 1.29, Ex. 8.)  This language is similar, if not identical, to release language commonly approved in class action settlements.  *See, e.g.*, *Reyn's Pasta*, 442 F.3d at 748 (refusing to hear claims based on release in prior settlement in *In re Visa Check/Mastermoney Antitrust Litig*., 297 F. Supp. 2d 503 (E.D.N.Y. 2003) that had released all claims "which have been asserted or could have been asserted in this litigation," *id.* at 512); *Cox*, 2013 U.S. Dist. LEXIS 60941, at *9-10  (approving settlement where class members "agree to release all claims against Defendants that are based on facts, omissions or other conduct that have been or could have been alleged in this action"); *Kent v. Hewlett-Packard Co*., No. C 09-05341 JF, 2011 U.S. Dist. LEXIS 106831, at *13-14 (N.D. Cal. Sept. 20, 2011) (releasing "any and all claims, demands, rights, damages, obligations, suits, debts, liens, and causes of action of every nature and description whatsoever . . . that were brought or that could have been brought against the Released Parties . . . that relate in any way to . . . the facts, conduct, omissions, transactions, occurrences, or matters that were alleged or could have been alleged in any of the complaints filed in the Action."); *In re Cal. Micro Devices Corp. Sec. Litig*., No. C 94-2817 VRW, 2001 U.S. Dist. LEXIS 7994, at *6-7 (N.D. Cal. June 4, 2001) (releasing "[a]ny and all claims, demands,

1   rights, liabilities, and causes of action of every nature and description whatsoever, known or

2   unknown . . . in connection with the facts, transactions, events, occurrences, acts, failures to act or

3   omissions which were or could have been alleged in the Class Actions, including, but not limited

4   to, the claims alleged in the Class Actions . . .” and “[a]ny existing or future claim, accrued or not

5   yet accrued . . .”); *Lubliner v. Maxtor Corp*., No. C-89-1807 WHO, 1990 U.S. Dist. LEXIS 3930,

6   at *5 (N.D. Cal. Feb. 14, 1990) (releasing “any and all manner of actions . . . foreseen or

7   unforeseen, matured or unmatured, known or unknown, accrued or not accrued, suspected or

8   unsuspected, fixed or contingent, and whether or not controlled or hidden, based upon, related to,

9   from or connected with any matters raised or referred to in the pleadings in this action or during

10  discovery in this litigation . . .”).

11      Moreover, the Second Circuit authority the Shane objectors cite is not only irrelevant

12  given the applicable Ninth Circuit authority discussed above, it is also inapposite: it dealt with

13  releases where there was no unifying underlying factual predicate, and where the majority of class

14  members were entitled to no recovery but only a small portion of the class actually recovered.

15  Similarly, the authorities Mr. Bowman cites are each distinguishable, as they address statutory

16  settlements that require an opt-in class or releases that are wholly unlimited.  *See Tijero v. Aaron*

17  *Bros., Inc*., No. 10-cv-1089, 2013 WL 60464, at *7-8 (N.D. Cal. Jan. 2, 2013) (rejecting release

18  of FLSA claims, which statutorily requires that class members opt in, regardless of whether they

19  received notice); *Kakani v. Oracle Corp*., No. 06-cv-6493, 2007 WL 1793774, at *7 (N.D. Cal.

20  June 19, 2007) (same); *Bond v. Ferguson Enters., Inc.*, No. 09-cv-1662, 2011 WL 284962, at *7

21  (E.D. Cal. Jan. 25, 2011) (rejecting release of all claims of “any kind or nature” up to the date of

22  the agreement).

23      **8.**      **The injunctive relief contributes substantial value to the Settlement.**

24      Some objectors insist that the injunctive relief is overvalued, “as all Defendant has agreed

25  to do is follow the law.”  (Inv. Obj. No. 92; *see also* Obj. No. 11 at 9, Inv. Obj. No. 101 at 6-7.)

26  But, as discussed *supra* § IV(A)(4)(b), the significant changes Facebook will implement under the

27  Settlement’s injunctive relief provisions go well beyond what other social networking sites

28  provide, and the objectors do not—and cannot—show how these changes are “required by the

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

58.

FACEBOOK’S MPA ISO PLS.’ MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

law." Setting aside the many statutory and constitutional defenses set out above, all the law requires is consent, which, as described above, can be (and has been) established through acceptance of Facebook's Terms (express consent) and through continued use of and other activity on the site (implied consent). Facebook is free to structure its Terms as it deems necessary, and to condition the use of its service on acceptance of those Terms. *See Sambreel*, 2012 WL 5995240, at *3 ("As an overarching premise, the Court is persuaded that Facebook has a right to control its own product, and to establish the terms with which its users, application developers, and advertisers must comply in order to utilize this product."). The injunctive relief thus provides substantial benefits to Class Members and cannot plausibly be characterized as Facebook merely agreeing to comply with the law.

Furthermore, these arguments improperly presuppose Facebook's liability (i.e., that any changes are, in fact, required by the law) and that Plaintiffs would have been able to achieve such relief in this litigation. As explained by the Ninth Circuit in *Officers for Justice*, a court cannot analyze a settlement as if liability has been established, but rather must consider the uncertainty that a given plaintiff will be able to establish liability in the first place. 688 F.2d at 628. The Shane objectors' own authority confirms this proposition. While the court in *Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D. Cal. 2007), found that certain injunctive relief provisions were of "no value" because they were required by law, the court found value in other parts of the injunctive relief, such as improved dispute resolution processes and changes in reporting practices, which were not required by law. *See id.* at 395-96 (citation omitted).

Some objectors insist that because Facebook has agreed to enact the injunctive relief provisions for at least two years following the Final Settlement Date, the relief has no value. (*See, e.g.*, Obj. No. 10 at 14; Inv. Obj. No. 100 at 9.) These Objections are at odds with the many settlements that provide injunctive relief for only a specified period of time. *See Cohorst v. BRE Props., Inc.*, No. 10-cv-2666, 2011 WL 7061923, at *7 (S.D. Cal. Nov. 14, 2011) (rejecting objection that settlement was inadequate because the injunctive provision would last only one year); *Gomez v. H & R Gunland Ranches*, No. 10-cv-1163, 2011 WL 5884224, at *3 (E.D. Cal. Nov. 23, 2011) (granting final approval of settlement providing injunctive relief for three years);

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

59.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1    *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 776 (N.D. Ohio 2010) (same).  Moreover,

2    these Objections assume that two years after the Final Settlement Date, Facebook will

3    immediately rescind the changes enacted under the Settlement.  As the Settlement notes, the

4    changes will stay in place for "at least" two years.  (S.A. § 2.1.)  Further, these Objections

5    overlook the rapid evolution that is inherent in social media websites.  A legal promise to provide

6    specified tools over an extended period of time may detrimentally limit Facebook's provision of

7    services and fail to account for technological advances in ways that are unforeseeable today.  For

8    example, Facebook could be prevented from providing superior methods of explaining

9    Facebook's functioning or from providing opt-outs for certain Facebook features in two years.

10           Additionally, some objectors insist the Parties must prove the specific monetary value of

11   the injunctive relief.  (*See, e.g.*, Obj. No. 6 (insisting Facebook must establish the value of any

12   injunctive relief by creating a "secondary market" for the use of Sponsored Stories); Inv. Obj. No.

13   99 at 3-5.)    As discussed *supra* § IV(A)(4)(b), the proposed injunctive relief provides

14   considerable value to the Class, providing changes that directly address concerns raised in the

15   underlying lawsuit.  The Court is not required to assign a particular monetary valuation to these

16   changes in order to grant final approval of the Settlement.  *See Lane*, 696 F.3d at 823 (rejecting

17   objection that court must find a specific monetary value for each plaintiff's claim to finally

18   approve a settlement); *see also Officers for Justice*, 688 F.2d at 628 (affirming final approval

19   without assigning a particular monetary value to the injunctive relief); *In re Ferrero*, 2012 WL

20   2802051, at *4 (same); *Myers*, 2009 WL 900787, at *16 (same).

21           **9.      The proposed relief is reasonable and adequate, notwithstanding
                        alternative relief "wish lists."**

22

23           Several objectors raise other proposed forms of relief and procedures for distributing that

24   relief.  These suggestions are simply wish lists, and do not establish that the Settlement fails to

25   meet the standard for final approval.  Settlements need not (and usually cannot) provide relief that

26   every Class Member considers optimal.  Rather, approval is warranted if the settlement is fair,

27

28

60.

1  reasonable, and adequate.[48]  *See Hanlon*, 150 F.3d at 1027 ("Settlement is the offspring of

2  compromise; the question we address is not whether the final product could be prettier, smarter or

3  snazzier, but whether it is fair, adequate and free from collusion.").

4  **a.  Opting in and opting out of Sponsored Stories.**

5  Several objectors insist that the proposed injunctive relief is inadequate because it does

6  not require Users to affirmatively "opt in" to having their social actions displayed in Sponsored

7  Stories.  (*See* Obj. No. 14 at 4; Inv. Obj. Nos. 98 at 24-26.)  Other objectors claim the relief is

8  inadequate because it does not allow Users to "opt out" of Sponsored Stories globally through a

9  single settings change.  (*See* Obj. Nos. 13 at 2, 17 at 2-3; Inv. Obj. No. 102 at 5.)  But the

10  Settlement is more than fair without these features, and will provide significant changes that

11  directly address the heart of Plaintiffs' claims.  In assessing the fairness of a settlement, the

12  operative question is whether, "[v]iewing the terms of the settlement as a whole . . . the Court

13  finds that the settlement confers real and significant benefits on the class members . . . [i]n light of

14  all attendant risks of litigation."  *Myers*, 2009 WL 900787, at *17 (quotation omitted).  In view of

15  the total consideration Facebook has offered in the Settlement—including each piece of

16  injunctive relief and the $20 million Settlement Fund—the Settlement undoubtedly represents "a

17  good value for a relatively weak case."  *Id.* (internal quotation and citation omitted).

18  The desire of some parties for an "opt-in" consent model is irrelevant to this analysis.

19  *Lane*, 696 F.3d at 826 (in approving settlement, district court properly disregarded objections

20  amounting to bare "disagree[ment] with the class representatives' decision. . . .").  Moreover,

21  even putting aside Facebook's numerous, complete defenses to liability, there would be no reason

22  that Facebook would have to allow Users to "opt in" to Sponsored Stories to establish Users'

23  ---

[48]  Objector Orenduff claims he was denied an opportunity to select his own counsel and participate in negotiating the Settlement terms, which denied him due process.  (*See* Inv. Obj. No. 27.)  Due process does not require that an absent Class Member have the right to negotiate settlement terms prior to preliminary approval under Rule 23(b)(3).  Instead, a settlement class member's rights are protected by adequate notice, the right to be heard and participate in the fairness hearing, and an opportunity to opt out.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).  All of these protections are present here, and absent Class Members have been afforded full due process.  *Id.*  Class Members who disagreed with the Settlement had the opportunity to exclude themselves from the Class and thus preserve their claims.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

61.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

consent.  As discussed above, Facebook has obtained consent from every User based on the explicit language in the Terms, to which every User agrees by signing up and using the Facebook website.  Users thus "opt in" and consent by agreeing to the Terms.

In addition, an opt-in model would be redundant.  First, Users' decisions to take social actions on Facebook, such as Liking content, are entirely voluntary, and their very purpose is to share Users' affinities and opinions with their Friends.  Thus, every time they take a social action, Users effectively opt in to having that action shown to their Friends.[49]  It would be illogical to require Users to opt in again to share the same content with the same people in a Sponsored Story.  Second, Users can always opt out of Sponsored Stories in a variety of ways, such as by changing their privacy settings to display their actions on Facebook to "Only Me," by declining to take actions that may be redisplayed in a Sponsored Story, or by "unliking" content they previously Liked.  (*See* Squires Decl. ¶¶ 12, 22-23.)  And, of course, the Settlement provides new, additional features, as discussed *supra* § IV(A)(4)(b), which will provide enhanced clarity and add to the considerable control Users already have over their appearance in Sponsored Stories.

The Schachter objectors' claim—that Users cannot opt out of appearing in Sponsored Stories until their rights have been violated through a post-Settlement first appearance—reveals their misunderstanding of how Facebook works.  (*See* Obj. No. 10 at 17-18.)  As an initial matter, all Facebook Users are free to deactivate or delete their account at any time, for any reason, particularly if they object to how the site operates.  No one is obligated to use Facebook's free service, and when Users delete their accounts, their past social actions become automatically ineligible to appear in Sponsored Stories.  Additionally, all Users can preemptively disqualify their past social actions from appearing in Sponsored Stories from the Activity Log (e.g., by unliking content, deleting a previous check-in, etc.).  (*See* Squires Decl. ¶ 12.)  Users can also avoid taking social actions that they do not want to share with their Friends.  In addition to all of this, the Settlement provides Users with new tools to see which, if any, of their social actions

---

[49]  One objector incorrectly assumes he allegedly appeared in Sponsored Stories because Facebook forced him to "Like" an item in Facebook Messages.  (*See* Inv. Obj. No. 33.)  He thus suggests additional injunctive relief, including an opt-in model.  The objector's understanding of how Facebook works is inaccurate, as Facebook does not "force" users to "Like" any content.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

62.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1    appear in Sponsored Stories and prevent unwanted further appearances.

2                    **b.    Other requests for alternative relief.**[50]

3        Objector Jason Brodsky argues that a clear legal ruling on Class Members' rights would

4    be of greater benefit than the proposed monetary or injunctive relief, asserting that the Settlement

5    will not "affirm that social networks may not use my name and likeness for advertising purposes

6    or affirm that such a use is permissible."  (Obj. No. 4.)  This Objection is meritless, as the

7    Settlement in no way precludes Mr. Brodsky from obtaining such a ruling.  Like all Class

8    Members, Mr. Brodsky may exclude himself from the Settlement and pursue an individual action

9    against Facebook.  (S.A. § 3.8.)  Further, as just discussed, Mr. Brodsky can discontinue using the

10   free website, delete his account, change his privacy settings, or avoid social actions that may

11   trigger a Sponsored Story.  Thus, his Objection does not undermine the Settlement.[51]

12       Objector Akram Tabet insists that the Class definition is improperly limited to Users in

13   the United States.  (*See* Inv. Obj. No. 73.)  But Plaintiffs are the masters of their Complaint and

14   they had no obligation to include foreign residents in the Class definition.  *See Caterpillar Inc. v.*

15   *Williams*, 482 U.S. 386, 392 (1987) (plaintiffs are the master of their complaint); *Muniz v. Pilot*

16   *Travel Centers LLC*, No. CIV 2-07-0325 FCD, 2007 WL 1302504, at *4 (N.D. Cal. May 1, 2007)

17   (noting plaintiff may "narrow the scope of the putative class").

18       Objector Thomas Cox insists, without factual or legal support, that the Court should have

19   created subclasses differentiating between Class Members who joined before the launch of

20   Sponsored Stories and those who joined after.  (*See* Inv. Obj. No. 92.)  He also insists that the

21

22   ───────────────
     [50] Some Objections are wholly unrelated to the Settlement or this litigation, and thus do not
23   provide any basis for finding the Settlement is not fair, reasonable, and adequate.  (*See, e.g.*, Inv.
     Obj. No. 73 at 4 (claiming he was wronged by his former employer and that "the whole
24   settlement is based on illegal hacking, and hence an act of unethics"); Inv. Obj. No. 50 (asserting
     harassment and defamation from other Facebook Users unrelated to Sponsored Stories); Inv. Obj.
     No. 91 (asserting she was threatened by her former employer and a labor union).)

25   [51] Objector Brodsky also claims that the fact that Facebook admits no wrongdoing undermines the
26   propriety of final approval.  (Obj. No. 4.)  This Objection should be rejected because settlements
     are not premised on establishing or admitting liability.  *See Officers for Justice*, 688 F.2d at 625
27   (courts need not "reach any ultimate conclusions on the contested issues of fact and law which
     underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and
28   avoidance of wasteful and expensive litigation that induce consensual settlements").

63.

1    Court should have appointed separate counsel for these subclasses.  (*Id.*)  Mr. Cox does not,

2    however, explain in any way how these subclasses conflict with each other such that separate

3    counsel might be necessary.  *See Fleury v. Richemont N. Am., Inc.*, No. C-05-4525 EMC, 2008

4    WL 4680033, at *5 (N.D. Cal. Oct. 21, 2008) (rejecting objection that settlement was inadequate

5    due to lack of separate counsel for subclasses, noting there was no conflict between the classes

6    even where recovery differed); *see also Torrisi v. Tuscon Elec. Power Co*., 8 F.3d 1370, 1373,

7    1378 (9th Cir. 1993) (finding subclasses that received different recoveries were not entitled to

8    separate counsel where the majority of the class approved of the settlement).  Here, all Class

9    Members are entitled to the same relief regardless of the date they joined Facebook.  Because

10   there is no conflict of interest between theoretical members of Mr. Cox's proposed subclasses, no

11   need for separate counsel exists, and thus Mr. Cox provides no basis to deny final approval.

12        Other Objections simply describe wishes for different or additional relief, but do not

13   explain how the relief in the Settlement is not fair, reasonable, and adequate.  (*See, e.g.*, Inv. Obj.

14   No. 64 (requesting a summary of every use of Class Member information and a permanent

15   injunction against Facebook's use of images or names without express written consent).)  The

16   question at final approval is not whether different or additional relief is hypothetically possible,

17   and these Objections provide no basis to deny final approval.  *See Hanlon*, 150 F.3d at 1027.

18                    **10.    The attestations on the Claim Form are appropriate.**

19        The Frank objectors seek to preclude the Class from receiving the benefits provided by the

20   Settlement, arguing that Plaintiffs are inadequate Class representatives under Rule 26(a)(4)

21   because there are two allegedly "arbitrary stipulations required on the claim form."  (Obj. No. 11

22   at 21-26.)  Specifically, the Frank objectors contend that persons who cannot make the Claim

23   Form's attestations will receive "nothing of value in consideration for a release of their claims,"

24   and that the attestations demonstrate the "named representatives are disregarding" such Class

25   Members or "favoring non-class charities."  (*Id.* at 23 (citations omitted).)  They are wrong.

26        First, the attestations on the Claim Form directly relate to the relative strengths and merits

27   of similarly situated claims, because Class Members who cannot attest that they did not consent

28   and that they were injured by appearing in a Sponsored Story have far weaker claims than those

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

64.

**FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS**

1   who can.  *See In re Oracle Sec. Litig.*, No. C-90-0931-VRW, 1994 WL 502054, at *1 (N.D. Cal.

2   June 18, 1994) ("A plan of allocation that reimburses class members based on the extent of their

3   injuries is generally reasonable. . . .  It is also reasonable to allocate more of the settlement to

4   class members with stronger claims."); (*see also* Obj. No. 11 at 24 ("The only viable

5   justification" for the attestations on the claim form "would be an explanation that the claims of

6   these class members were legally weaker. . . .").)  As noted *supra* pp. 19-22, if a person consents

7   to appearing in a Sponsored Story, such consent is fatal to a claim under § 3344.  Because consent

8   can be "implied from [a plaintiff's] conduct," *Jones*, 815 F. Supp. 2d at 1113-14, Users who took

9   actions on Facebook (such as Liking a Page), knowing that Facebook could be paid for displaying

10  such actions to their Facebook Friends, impliedly consented to such paid display.  *Id.*

11      Likewise, Class Members who were unwilling to attest that they were injured by

12  appearing in Sponsored Stories have far weaker claims.  For this reason, the Frank objectors'

13  citation of *True*, 749 F. Supp. 2d 1052, for the proposition that "a class member's subjective

14  belief that he was injured or not [does not] have anything to do with whether an objective

15  statutory injury occurred" is inapposite.  (*See* Obj. No. 11 at 24.)  The *True* court found that there

16  was no legal basis for making cash payments to only those persons who lodged qualifying pre-

17  lawsuit complaints.  749 F. Supp. 2d at 1067.  Here, in contrast, differential treatment of Class

18  Members is appropriate since "the settlement terms are rationally based on legitimate

19  considerations," namely, whether Class Members believe they were injured, which, in turn,

20  affects their theoretical ability to recover.  *Id.* (citation omitted).

21      Second, Class Members who cannot make the attestations on the Claim Form *do receive*

22  consideration for the release of their claims through the combination of injunctive relief and *cy*

23  *pres*.  The injunctive relief is appropriate consideration, as Class Members will benefit from new

24  disclosures and information concerning Sponsored Stories and new tools that allow Users greater

25  control over their (and their minor children's) appearances in Sponsored Stories.[52]  *See, e.g., In re*

26  ───────────────────────────────

[52] The Frank objectors' argument that the injunctive relief is valueless since "even opt-outs and

27  non-class-members are entitled to the 'injunctive relief'" should also be rejected.  (Obj. No. 11 at 9.)  In *Vought v. Bank of America, N.A.*, No. 10-CV-2052, 2012 U.S. Dist. LEXIS 143595 (C.D.

28  Ill. Oct. 4, 2012), the defendant had (a) provided the injunctive relief to class members as well as non-class members and opt-outs because doing so was easier than trying to distinguish between

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

65.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

*Motor Fuel*, 2012 WL 1415508, at *4, *7, *13, *15 ("it [was] fair, reasonable and adequate for class members . . . to trade uncertain claims for money damages for certain relief proposed under the amended settlement agreement."); *Myers*, 2009 WL 900787, at *16, *9 (approving Rule 23(b)(3) settlement awarding *cy pres* and injunctive relief where plaintiffs initially sought $1,600 per class member); *First State Orthopaedic*, 534 F. Supp. 2d at 507 (approving settlement where sole consideration was "commit[ment] to change the disclosure and business practices challenged in this action"). Moreover, the injunctive relief is not merely prospective, but has *retrospective* aspects, as it also applies to social actions taken before the Settlement to the extent such actions appear in Sponsored Stories after the Effective Date. (*Cf.* Obj. No. 11 at 9 (Frank objectors argue that "the prospective injunctive relief can only benefit those who do business with Facebook in the future.") (emphasis omitted).) Additionally, the injunctive relief is coupled with monitoring by Plaintiffs' counsel (and potential Court monitoring), which will ensure that the Class will receive these benefits. Finally, the *cy pres* funding of advocacy and watchdog groups benefits Class Members who cannot make the attestations on the Claim Form. There is a direct nexus between such groups and the interests Plaintiffs raised in this litigation, and funding the *Cy Pres* Recipients will raise public awareness of issues raised in this action. *See Easysaver Rewards*, 2013 WL 435032, at *9 (holding that "the *cy pres* remedy bears a direct and substantial nexus to the interests of absent class members" and that it will thus benefit all users); *Lane*, 696 F.3d at 821 (distribution of funds to *cy pres* recipients with a nexus to the lawsuit "will benefit absent class members"); *Lupron Mktg.*, 677 F.3d at 34 ("*cy pres* distribution . . . would benefit the potentially large number of absent class members").

Third, even where some Class Members (or even a majority) do not receive a cash payment, this does not impede approval because settlements need not provide monetary relief to

these groups; and (b) had *already* implemented the injunctive relief prior to final approval. The court thus held that the defendant would have provided the injunctive relief "regardless of the settlement (or for that matter, the suit)." *Id.* at *51-52. Here, by contrast, it would be impossible to restrict the changes to Class Members and non-opt-outs only given the nature of Facebook's service. Further, Facebook has not yet made changes that the Settlement would require, and nothing indicates it would do so absent this Settlement. *See In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 960 (N.D. Ill. 2011) (injunctive relief in settlement is valuable if defendant would not have made the required changes absent the settlement).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

66.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

all class members.  In *Mego*, 213 F.3d 454, the Ninth Circuit addressed an objector's argument that a settlement did not merit approval "because it [left] a large portion of the class without a recovery."   It disagreed that the structure was problematic, holding that "[i]t is within the discretion of the district court to determine the method of calculating damages."  *Id.* at 461. Many other cases have reached similar results.[53]

The Frank objectors' attempt to overcome this body of authority fails.   Unlike in *Ferrington v. McAfee, Inc.*, No. 10-cv-1455, 2012 WL 1156399 (N.D. Cal. Apr. 6, 2012), silent Class Members here receive *cy pres* and injunctive relief, whereas in *Ferrington*, "absent class members of the subclass" were "essentially releasing their clams against McAfee and Arpu for no consideration."  *Id.* at *13.  Similarly, *Dewey v. Volkswagen AG*, 681 F.3d 170 (3d Cir. 2012), does not undermine the propriety of the Settlement.  In *Dewey*, "one group of class members (the 'reimbursement group') received the right to reimbursement for certain qualifying damages . . . [and] [t]he remaining class members (the 'residual group') were required to wait until the reimbursement group made its claims."  *Id.* at 173.  The Third Circuit rejected the settlement because the line between the reimbursement group and the residual group was based on claims rates, not on criteria pertaining to the strength of individual claims, *id.* at 187, and the representative plaintiffs "could not adequately represent the entire class" because they "were [all] in the reimbursement group" *id.* at 189.  Here, in contrast to *Dewey*, no persons with legally

---

[53]  *See, e.g.*, *SEC v. Certain Unknown Purchasers*, 817 F.2d 1018, 1020-21 (2d Cir. 1987) (affirming approval of settlement that only provided compensation class members with out-of-pocket losses); *In re TD Ameritrade*, 2011 WL 4079226, at *9 ("The fundamental flaw" in an argument that a settlement must compensate every member of a class "is that it ignores that the Settlement is a *compromise,* which balances the possible recovery against the risks inherent in litigating further.  The possibility that the Settlement does not provide for a payout to every conceivable . . . [class member] does not establish that the Settlement is unfair or unreasonable.") (emphasis in original); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 594 (N.D. Ill. 2011) ("The option to file (or to not file) a claim gives customers who were aware of and assented to Defendant's re-sequencing policies the ability to opt out of receiving a payment that they feel they do not deserve."); *Lonardo*, 706 F. Supp. 2d at 784 (approving settlement that required class members to affirm in a claim form "that they would have purchased a lower-priced policy had it been offered to them"); *Shames v. Hertz Corp.*, No. 07–CV–2174–MMA(WMC), 2012 WL 5392159, at *9 (S.D. Cal. Nov. 5, 2013) ("[T]here is nothing inherently objectionable with a claims-submission process, as class action settlements often include this process, and courts routinely approve claims made settlements.").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

67.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

identical claims to Plaintiffs are placed in a category that would afford them less relief under the Settlement.[54]

Finally, the Frank objectors' position is undermined by "two practical considerations" recognized by the Ninth Circuit. *See Mego*, 213 F.3d at 463. First, persons who cannot make the attestations on the Claim Form "were free to opt-out of the class" and pursue their own claims separately.[55] *Id.*; *accord Lane*, 696 F.3d at 825 (emphasizing that ability to opt out of settlement provides protection to class members who disagree with a settlement); *Cobell v. Salazar,* 679 F.3d 909, 920 (D.C. Cir. 2012) ("[T]he existence of the opt-out alternative effectively negates any inference that those who did not exercise that option considered the settlement unfair."). Second, as recognized in *Mego*, if the Court failed to approve the Settlement, "it is possible that no one will recover anything from [Facebook]. The present Settlement at least allows damages for some members of the class where damages might otherwise be unobtainable for any member of the class." *Mego*, 213 F.3d at 463 (rejecting objection on Rule 23(a)(4) grounds).[56]

---

[54] For similar reasons the Frank objectors' citation of *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011), does not undermine the Settlement. Contrary to the claims of the Frank objectors, in *Literary Works*, the Second Circuit stated that "[w]e . . . disagree with objectors to the extent that they cite" the inferior recovery of the class members with weaker claims "as determinative evidence of inadequate representation." *Id.* at 253. Rather, the Second Circuit found that class certification was inappropriate since (1) there was no record before the court as to whether the amount paid to class members with weaker claims "appropriately reflects that weakness," and (2) because a settlement provision reduced payouts to class members with weaker claims, but not those with stronger claims, in the event the total value of all claims made surpassed $18 million. *Id.* There is substantial evidence in the record that Class Members who are not able to make the necessary attestations related to injury and lack of consent have weaker claims as a matter of law, and the Settlement does not improperly increase the recovery of Authorized Claimants at the expense of other Class Members. *Id.*; *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 346 (3d Cir. 2010) (rejecting argument for subclasses and noting that "varied relief among class members with differing claims in class settlements is not unusual"); *see also In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2005) (per curiam) (district court did not exceed its discretion in allocating the bulk of class action settlement funds to one claimant group because "allocation of a settlement of this magnitude and comprising such different types of claims must be based, at least in part, on the comparative strengths and weaknesses of the asserted legal claims").

[55] That this Settlement allows Class Members to opt out is just one of the ways it is distinguishable from the settlement at issue in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999).

[56] The Frank objectors also reference the Objection filed by counsel for the *C.M.D.* plaintiffs and suggest that the Court conduct an "auction" to "allow competing bids from qualified firms about what they believe the litigation is actually worth, and how much of that they will pass along to the class . . . ." (Obj. No. 11 at 27.) This is nonsensical. In the pre-15 USC § 78U–4(a)(3)(B) securities cases the Frank objectors cite, the competitive bidding processes utilized occurred at

---

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

### D.    None of the Minors-Related Objections Undermine the Fairness, Reasonableness, or Adequacy of the Settlement.

Several Objections raise issues specific to Facebook's minor Users, including issues related to parental consent, the adequacy of the injunctive relief for minor Users and their parents, the applicability of California Family Code § 6701, whether other states laws purportedly more protective of minors bar approval, and whether the Minor Subclass requires separate counsel.

#### 1.    The objectors' parental consent arguments do not undermine the Settlement.

Counsel for the *C.M.D.* plaintiffs (acting as counsel for the Shane objectors), the Center for Public Interest Law and Children's Advocacy Institute ("CPIL/CAI") (as counsel for objector Depot), and objector Schachter claim that the Settlement would permit Facebook to use a minor's likeness without parental consent, purportedly in violation of several states' laws.  (Obj. No. 10 at 9-10; Inv. Obj. No. 98 at 16-17; Inv. Obj. No. 101 at 5.)  This boils down to a claim that "the proposed settlement agreement does not ensure parental consent [to Sponsored Stories] will be obtained before a minor agrees to Facebook's Terms of Use."  (Obj. No. 10 at 12.)  This argument fails for four basic reasons.[57]

*First*, and most fundamentally, because the issue before the Court is final approval of a settlement, the Court should not—and, under established Ninth Circuit law, must not—"reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of the outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements."  *Officers for Justice*, 688 F.2d at 625 ("[n]either the trial court nor this court is to" decide merits); *see also Class Plaintiffs*, 955 F.2d at 1291 (same); *accord, e.g.*, *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981) ("Courts

the start of the litigations, unrelated to settlement.  Here, extensive discovery has occurred and litigation has progressed through class certification briefing and has involved extensive settlement discussions.    Attorneys who have not been party to the litigation thus far would likely misunderstand or underestimate the obstacles to recovery that continued litigation would present, and their bids would reflect such naiveté.  *See Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 649 (N.D. Tex. 2010) ("[W]hether another team of negotiators might have accomplished a better settlement is a matter equally comprised of conjecture and irrelevance." (citation omitted)).

[57] Not all objectors agree that a paternalistic approach to regulating teenagers' Internet use is a good thing.  (*See* Obj. No. 11 at 20 ("[I]t is far from obvious that curtailing the internet freedom of minors and shielding them from commercial speech is an unambiguous social good.").)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

69.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement.  *They do not decide the merits of the case or resolve unsettled legal questions*." (italics added; citation omitted)). Indeed, "[t]he object of settlement is to avoid, not confront, the determination of contested issues: therefore, the approval process should not be converted into an abbreviated trial on the merits." *Ashley v. Reg'l Transp. Dist.*, 05-cv-01567, 2008 U.S. Dist. LEXIS 13069, at *11-12 (D. Colo. Feb. 11, 2008).  In asking the Court to decide contested issues of parental consent *now—during settlement—*the objectors betray a basic misunderstanding of both the relevant legal standards and the Court's role.

*Second*, to the extent the objectors claim that the Settlement perpetuates a purported illegality (i.e., Facebook's practice of not requiring parental consent for minor Users), that claim also fails.  A settlement may be rejected as perpetuating illegality only if such illegality has been clearly established by judicial precedent.  *See, e.g.*, *Isby v. Bayh*, 75 F.3d 1191, 1197 (7th Cir. 1996) ("[W]e are mindful that the court must not decide unsettled legal questions . . . .  [I]n determining whether to reject a settlement as initiating or authorizing a clearly illegal or unconstitutional practice, *prior judicial decisions must have found that practice to be illegal or unconstitutional as a general rule*."  (italics added; citations and internal quotation marks omitted)); *Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977) ("[A] court in approving a settlement should not in effect try the case by deciding unsettled legal questions."). Indeed, as discussed further below, the relevant judicial precedent on this issue confirms that COPPA preempts state laws that purport to impose parental consent requirements for Facebook's use of a minor's name and likeness.  *David Cohen v. Facebook, Inc.*, No. BC 444482 (L.A. Super. Ct.).[58]  Thus, the Settlement cannot be rejected on this basis.

*Third*, even were the Court to reach the merits of the objectors' parental consent arguments (which it must not do), those arguments fail on the merits.  Indeed, those arguments ignore (or misinterpret) COPPA, discussed *supra* pp. 22-26, which precludes claims premised on

---

[58] The next-closest case on the issue, *E.K.D.*, 885 F. Supp. 2d at 900, which enforced the Terms against minor plaintiffs, over their objections, also supports Facebook.

Cooley LLP
Attorneys At Law
San Francisco

70.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1   Facebook's alleged failure to obtain parental consent for teenage Users.

2          Although the objectors attempt to dispute Facebook's reading of COPPA, they make little

3   effort to distinguish Facebook's authorities that confirm COPPA's preemptive reach.   Most

4   strikingly, they largely ignore *David Cohen v. Facebook, Inc.*, No. BC 444482 (L.A. Super. Ct.),

5   which held that COPPA preempted claims virtually identical to those here, which were premised

6   on Facebook's alleged failure to obtain parental consent for the commercial use of minors' names

7   and likenesses.   Only CPIL/CAI attempts to address *David Cohen*, arguing it is distinguishable

8   because "plaintiffs never moved for class certification and no class had been certified."  (Inv. Obj.

9   No. 98 at 15 n.8.)  However, CPIL/CAI does not explain how the procedural posture in *Fraley*

10  could somehow shield the purported parental consent requirement from preemption (it could not).

11  The blind eye the Shane Objectors turn to *David Cohen* is particularly telling, given that their

12  counsel lost that case on the basis of COPPA preemption, as also discussed above.[59]

13         The objectors also uniformly fail to address the Supreme Court's decision in *Arizona v.*

14  *United States*, 132 S. Ct. 2492 (2012), which found preemption in circumstances highly

15  analogous to those here, as detailed *supra* pp. 25-26.  *Arizona* is irreconcilable with the objectors'

16  premise that, because COPPA excludes teenagers from its purview, it does not prevent states

17  from requiring teenagers to obtain parental consent for Internet use.

18         Unwilling to (and unable to) contend with these authorities, the objectors cite a handful of

19  irrelevant cases.  For example, the Schachter objectors cite *Sprietsma v. Mercury Marine*, 537

20  U.S. 51 (2002), which found that a federal statutory and regulatory regime governing boating

21  safety did not preempt state common law claims premised on a manufacturer's failure to equip its

22  motors with propeller guards.   The Court declined to find express preemption because the

23  relevant preemption provision expressly preserved "liability at common law or under State law,"

---

24  [59] *See generally* Brown Decl. ¶ 23 (identifying the lawyers and firms that were counsel in both
    actions, including: Squitieri and Fearon, LLP (Lee Squitieri, Gary T. Stevens, Jr.); Stuart Law
25  Firm (Antony Stewart); Wexler Wallace LLP (Edward A. Wallace); and John C. Torjesen &
    Associates, PC (John Torjesen)).   The Court should reject these attorneys' efforts to obtain a
26  different result simply by switching venues.

27  CPIL/CAI also attempts to explain why the *David Cohen* plaintiffs voluntarily dismissed their
    case following dismissal on COPPA grounds.  (*See id.*)   This is equally irrelevant, since the
28  dismissal occurred after the unfavorable (and fatal) ruling on COPPA preemption.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

71.

**FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS**

1   the precise type of claim asserted.  *Id*. at 63.  The Court also rejected the defendant's conflict

2   preemption theory, which posited that states could not require boats to employ propeller guards

3   because the Coast Guard had decided not to mandate them.  *Id*. at 66.  The regulations not only

4   expressly contemplated state legislation as to "matters not covered by the federal regulations," but

5   both the Coast Guard and Solicitor General had taken the position that the plaintiff's claims were

6   not preempted.  *Id*. at 66-67, 68.  In sum, the Court saw no "'authoritative' message of a federal

7   policy against" the use of propeller guards.  *Id*. at 67.  Here, by contrast, COPPA's express

8   preemption provision contains no savings clause, no federal regulation contemplates state

9   legislation as to "matters not covered" by the federal law, and COPPA's legislative history sends

10  a clear and "authoritative message against" laws subjecting teenage Internet users to intrusive

11  parental consent requirements.  *See supra* pp. 23-24.

12      Nor does *Williamson v. Mazda Motor of America, Inc.*, 131 S. Ct. 1131 (2011), support

13  the objectors' claims.  In *Williamson*, the relevant federal regulations allowed car manufacturers

14  to install either lap-and-shoulder belts or simple lap belts in new vehicles.  *Id.* at 1137.  Plaintiffs

15  brought state-law claims premised on a duty to install lap belts, and the defendant argued that the

16  claims were preempted.  *Id.*  The Court disagreed.  Although regulators had concluded in 1989

17  that lap-and-shoulder belts would improve safety, they declined to require them for reasons of

18  cost (which regulators acknowledged were declining).  *Id.* at 1137-39.  The regulatory history

19  contained no evidence that regulators declined to require lap belts in an effort to provide

20  manufacturers with options; and they expressed no intent for the regulation to set a *ceiling*, rather

21  than a floor, for safety requirements.  *Id.* at 1139.  Additionally, as in *Sprietsma*, the preemption

22  provision contained a savings clause, and the Solicitor General took the position that there was no

23  preemption.  *Id.*  In these circumstances, the Court saw no conflict, ruling that providing

24  manufacturers a choice was not a "substantial" objective of the federal regulations.  *Id.* at 1140.

25      The Court's earlier decision in *Geier*, 529 U.S. 861, which *Williamson* distinguished at

26  length, bears a far stronger resemblance to this case.  *Geier* involved a clash between a 1984

27  federal regulation allowing carmakers a choice among passive restraint systems (e.g., airbags and

28  automatic seatbelts) and a state-law tort claim premised on an alleged failure to install airbags.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

72.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1    *Id.* at 876.  According to the regulatory history, regulators had considered mandating airbags in

2    1984, but had "deliberately" opted for "a mix of several different passive restraint systems,"

3    which they achieved by "allowing manufacturers to choose among different passive restraint

4    mechanisms."  *Id.* at 878.  This "mix of devices," in turn, was intended to "develop data on

5    comparative effectiveness," "allow the industry time to overcome" safety and cost issues with

6    airbags, and "facilitate the development of alternative, cheaper, and safer passive restraint

7    systems."  *Id.* at 879.  Given this history, and the Solicitor General's view that the regulations

8    foreclosed states from requiring airbags, the Court held that the state claim (premised on a duty to

9    install airbags) was preempted because it "would stand as an 'obstacle' to the accomplishment of"

10   regulators' objectives (of allowing carmakers a choice).  *Id.* at 886.

11          In the context of COPPA, *Geier* is plainly more analogous than *Williamson*.  Similar to

12   the regulations in *Geier*, COPPA's legislative history reveals that a significant objective of

13   COPPA was to protect children's online privacy while preserving the First Amendment rights of

14   teenagers.  This concern was so strong that Congress stripped the provisions applicable to

15   teenagers from the original COPPA bill, crediting expert and industry testimony that parental

16   consent requirements should not apply to teenagers.  *See supra* § IV(A)(2); pp. 24-25.  By

17   contrast, the COPPA analysis implicates none of the factors that barred preemption in

18   *Williamson*—namely, a savings clause and evidence that Congress intended the regulations to

19   operate as a floor, not a ceiling.

20          To avoid this result, the objectors distort COPPA's legislative history, claiming that only

21   "witnesses at a congressional hearing" expressed First Amendment concerns about applying

22   parental consent requirements to teenagers.  Not so.  As discussed above, lawmakers themselves

23   removed the teenage parental consent requirement from the original bill in direct response to

24   criticism that the requirement would infringe teenagers' First Amendment rights.  *See supra*

25   pp. 24-25.  As the Supreme Court confirmed in *Arizona*, this type of legislative history is directly

26   relevant to determining the preemptive reach of a statute.  *See Arizona*, 132 S. Ct. at 2504; *cf.*

27   *Williamson*, 131 S. Ct. at 1136 ("significant objectives" appropriately gleaned from regulatory

28   history, including evidence that particular requirements (mandatory airbags) were rejected in light

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

73.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1  of concrete concerns (safety and consumer backlash)).  COPPA's legislative history demonstrates

2  clear Congressional intent to exempt teenagers from parental consent requirements, thereby

3  preempting state law to the contrary.

4      The Schachter objectors' statement that, under Facebook's interpretation of COPPA, "any

5  state law regulating any conduct on the internet by anyone of any age would be in jeopardy," is

6  also clearly hyperbole.  (Obj. No. 10 at 14.)  COPPA only prevents states from imposing *a*

7  *parental consent requirement* on teenagers who use the Internet for permissible purposes.  It does

8  not prevent states from otherwise regulating the conduct of websites serving their residents, or

9  from forbidding certain Internet activities altogether (e.g., gambling, child pornography, etc.).

10 For these reasons, the objectors' parental consent arguments would fail on the merits.

11     *Fourth and finally,* even if the Court reached the merits of the objectors' parental consent

12 arguments (it should not), and even if the objectors could overcome COPPA (they cannot),

13 Plaintiffs could not have proven an absence of parental consent on a classwide basis.  As

14 discussed above, the record on class certification demonstrated that express parental consent was

15 given for at least one of the two minor named Plaintiffs.  *See supra* p. 26.  Additionally, the

16 doctrine of implied consent—well recognized under California law—would have made it

17 impossible for the majority of the Minor Subclass to prove a lack of consent.  *See Jones*, 815 F.

18 Supp. 2d at 1113-14.  Thus, the absence of parental consent could not be established even among

19 the small sample of minor named Plaintiffs, and could never be established on a classwide basis.

20 The objectors' parental consent arguments do nothing to undermine the Settlement's fairness.

21      **2.      The injunctive relief is reasonable and adequate as to the Minor**
                  **Subclass.**
22

23      Several objectors attack the injunctive relief provisions applicable to minors.  Some

24 complain that the Settlement should require new minor members to identify their parents on

25 Facebook and should require Facebook to seek affirmative consent from parents in all cases.

26 (Inv. Obj. No. 98 at 23-24; Obj. No. 10 at 9-12; Inv. Obj. No. 101 at 11.)  CPIL/CAI claims that

27 Facebook should apply the COPPA parental consent regime (applicable to children 12 and under)

28 to the teenagers who use Facebook.  (Obj. No. 98 at 25 n.10.)  None of the Objections has merit.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

74.

**FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS**

As an initial matter, Facebook has no obligation to require parental consent for teenager's use of its site, and, as discussed, any state law imposing such an obligation would run afoul of COPPA. *See supra* pp. 22-26, 70-74. But, more importantly, that is not the relevant question before the Court on final approval. The objectors are merely arguing that they would have preferred different or additional injunctive relief, and that is not a proper basis to challenge the fairness or adequacy of the actual Settlement reached. *See Hanlon*, 150 F.3d at 1027 ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."); *In re Netflix Privacy Litig.*, 2013 WL 1120801, at \*12 ("these Objections merely suggest a different or arguably better settlement award rather than sufficiently calling into question the fairness or adequacy of the Agreement").

The Settlement requires tangible and meaningful changes to Facebook's practices regarding minors, and the use of their voluntary social actions in connection with Sponsored Stories. Among other measures, Facebook will: (i) create new tools allowing parents of minor Facebook Users to prevent their children from appearing in Sponsored Stories (whether or not those Parents use Facebook); (ii) make minors ineligible to appear in Sponsored Stories if they indicate that their parents are not Facebook Users; (ii) encourage new Users to designate the Facebook Users who are their family members; and (iv) provide additional information to parents about social advertising on Facebook, including how parents can opt their children out of Sponsored Stories. *See supra* pp. 10-11 and § IV(A)(4)(b)(2). This relief is highly beneficial to the minor Class Members and addresses the claims in this lawsuit. Whether or not a particular objector considers these to be the best possible changes not relevant.

CPIL/CAI additionally takes issue with revised Terms that will require minor children to represent that they have obtained parental consent to Facebook's use of their names and likenesses in commercial content. (Inv. Obj. No. 98 at 16-17.) These objectors appear to presume that this change to Facebook's Terms is of no value because minor's representations will be dishonest. Yet the objectors have no evidence to support this unjustified assumption. Considered in conjunction with all the other changes to the site that ensure parents have multiple

Cooley LLP
Attorneys At Law
San Francisco

75.

Facebook's MPA ISO Pls.' Mot. for
Final Approval of Settlement
Case No. CV 11-01726 RS

1   avenues of recourse if they do not consent to their children's social actions appearing in

2   connection with Sponsored Stories, this change to the Terms simply provides an additional layer

3   of assurance of parental consent (even though none is required).  Additionally, if Facebook's

4   minor Users are as dishonest as the objectors claim, a more onerous requirement, such as one that

5   prevents the use of the site without proof of parental consent, would only incentivize minors to

6   bypass the restrictions by signing up for Facebook as adults.  This, in turn, would undermine

7   other protections for minors that are built into the site (e.g., screening minors from alcohol-related

8   advertisements).  This would not benefit the class.

9       The injunctive relief the Parties agreed to is substantial and designed to directly address

10   the concerns raised by this action.  Nothing more is required.

11   **3.    The California Family Code has no bearing on the Settlement.**

12       CPIL/CAI and counsel for the *C.M.D.* plaintiffs (on behalf of the Depot objector and the

13   Shane objectors, respectively) also object that the California Family Code renders the Revised

14   Settlement inadequate as to the Minor Subclass.  CPIL/CAI claims that the Settlement sanctions a

15   violation of California Family Code § 6701(a) and (c) by (1) "purport[ing] to delegate to

16   Facebook the extremely broad power to take information posted by a child, re-package it, and

17   transmit it in any form and to any recipients, and for any commercial purpose," and (2) "tak[ing]

18   control of the minor's personal property, their photographs, in order to do what it is doing with

19   it."  (Inv. Obj. No. 98 at 12, 13-14.)  The Shane objectors echo this argument, contending further

20   that the Settlement is inadequate because it fails to account for these provisions—which allegedly

21   invalidate minors' consent under the Terms—giving the Minor Subclass stronger claims against

22   Facebook than the adult Class.  (*See* Inv. Obj. No. 101 at 4-5.)  These arguments represent a

23   fundamental misunderstanding of California law and of the allegations at issue in the case.

24   Family Code § 6701(a) and (c) are not applicable to the *Fraley* litigation or the Settlement.

25       Under California law, "[e]xcept as provided in Section 6701, a minor may make a contract

26   in the same manner as an adult, subject to the power of disaffirmance . . . ."  Cal. Fam. Code

27   § 6700.  Under § 6701, minors are forbidden from entering only a narrow range of contracts,

28   including those that "[g]ive a delegation of power," § 6701(a), or relate to "personal property not

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

76.

**FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS**

1    in the immediate possession or control of the minor," § 6701(c).  Courts have never applied these

2    sections of § 6701 in circumstances remotely similar to those at issue here.  As confirmed by

3    nearly 100 years of case law, § 6701(a) "declare[s] the rule that an infant [can]not execute

4    contracts through an agent."  *Hakes Inv. Co. v. Lyons*, 166 Cal. 557, 560 (1913); *see, e.g.*,

5    *Blankenship v. Hearst Corp.*, 519 F.2d 418, 425 (9th Cir. 1975) (minor cannot enter partnership

6    because he cannot delegate power under California law); *Schumm v. Berg*, 37 Cal. 2d 174, 182

7    (1951) (contract by minor's purported agent void).  Neither Facebook's current Terms nor the

8    revisions contemplated by the Settlement purport to delegate to Facebook a power of agency (i.e.,

9    the power to enter contracts on the minor's behalf).  Section 6701(a) is thus inapposite.

10           CPIL/CAI appears to concede that § 6701(a) only forbids delegation to an agent, but

11   argues that an agency relationship exists because Facebook purportedly has authority "to take, use

12   and promote (represent) a user's information . . . ."  (Inv. Obj. No. 98 at 12-13.)  This argument

13   ignores the hallmark of agency, in which the purported agent "normally binds not himself but his

14   principal by the contracts he makes."  Black's Law Dictionary 72 (9th ed. 2009).  Agency also

15   carries with it a "fiduciary relationship" between the agent and principal, and requires that the

16   "agent shall act on the principal's behalf and subject to the principal's control."  Restatement

17   (Third) of Agency § 1.01 (2006).  Here, the Terms do not authorize Facebook to enter contracts

18   on Users' behalf, do not purport to make Facebook a fiduciary, and do not subject Facebook to

19   Users' "control."  Thus, the Terms plainly do not appoint Facebook as its Users' agent.

20           Section 6701(c) is equally irrelevant, since it only prevents minors from assigning a future

21   interest, such as designating a beneficiary under an annuity contract, *see Sisco v. Cosgrove,*

22   *Michelizzi, Schwabacher, Ward & Bianchi*, 51 Cal. App. 4th 1302, 1307 (1996), or directing a

23   minor's employer to pay his wages to a third party, *see Morgan v. Morgan*, 220 Cal. App. 2d 665,

24   675 (1963).  Seeking to force a square peg into a round hole, CPIL/CAI claims that the Settlement

25   violates § 6701(c) because "Facebook must take control" and "Users clearly give up possession

26   or control when they upload images or information to Facebook . . . ."  (Inv. Obj. No. 98 at 13-14

27   & n.6.)  But this argument ignores how Facebook actually works—at all times, Facebook Users

28   have "immediate possession or control" over the profile pictures they upload to Facebook, which

Cooley LLP
Attorneys At Law
San Francisco

77.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

they may change or remove at will (in addition to the option of deleting their account).[60]  Cal. Fam. Code § 6701(c).  Family Code § 6701(c) does not void contracts under which minors transfer property in their immediate control to another.  Thus, CPIL/CAI's claim that "Facebook takes possession" when Users upload their information—which effectively concedes that Users had possession and control in the first place—confirms that § 6701(c) does not apply.

The objectors' strained construction is also untenable because it conflicts with other Family Code provisions.  In particular, Family Code §§ 6750 and 6751 expressly contemplate contracts "pursuant to which a minor . . .  agrees to . . . license . . . use of a person's likeness," specifying that certain such contracts may *not* be disaffirmed if approved by a court.  Cal. Fam. Code §§ 6750(a)(1), 6751.  This provision would be nonsensical if § 6701 operated as an absolute prohibition on minors entering contracts to license use of their names or likenesses.[61, 62]

Given all this, it is unsurprising that these very arguments were rejected by the Southern District of Illinois in the related *C.M.D.* case when it transferred that action to this Court, based on the forum-selection clause in Facebook's Terms.  In opposing Facebook's motion to transfer venue, the *C.M.D.* plaintiffs (who share counsel with the Shane objectors) argued that the Terms are void under  § 6701(a) and (c), contending that "minors are statutorily forbidden from entering

---

[60] This is one of numerous inaccuracies in CPIL/CAI's brief, demonstrating a fundamental misunderstanding of the facts.  For example, CPIL/CAI appears to suggest, incorrectly, that Sponsored Stories may be shared with a different, broader audience than the User has authorized. (*See, e.g.*, Inv. Obj. No. 98 at 8-9.)

[61] The Public Citizens Law Group argues in conclusory fashion that the Settlement is invalid because it "purports to validate contracts that every other state would consider voidable."  (Obj. No. 10 at 12.)  That unsubstantiated theory, of course, ignores the valid choice-of-law provision in the Terms, which makes the laws of other states irrelevant to both the litigation and the Settlement.  Additionally, this theory has already been rejected by a court in the Southern District of Illinois.  *See E.K.D.*, 885 F. Supp. 2d at 900 ("Plaintiffs have used and continue to use facebook.com. The Court concludes that Plaintiffs cannot disaffirm the forum-selection clause in Facebook's TOS, although Plaintiffs were minors when they entered the agreement containing the clause.").  Indeed, because all minors in the Class have used Facebook (and millions continue to use Facebook), they cannot avoid the Terms by seeking to disaffirm it.  *See id.*; *cf. Morrow v. Norwegian Cruise Line Ltd.*, 262 F. Supp. 2d 474, 476 (M.D. Pa. 2002) (refusing to allow minor plaintiff to disaffirm contract because she had already received the benefit of the bargain).

[62] Although CPIL/CAI claims that sections 6750 and 6751 demonstrate the type of protections that should apply when minors "contract away the use of their likeness," they concede that these provisions do not apply.  (Inv. Obj. No. 98 at 14 (admitting that sections 6750 and 6751 "may not fully pertain to contracts . . . outside of the traditional entertainment field").)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

78.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

into a contract that purports to 'give a delegation of power' or that relates to 'any personal property not in the immediate possession or control of the minor.'"  (Pls.' Resp. to Mot. to Transfer, Dkt. No. 78 in *C.M.D.*, at 3-4) (citation omitted.)  Judge Murphy rejected this argument and enforced the contract that the *C.M.D.* plaintiffs claimed was void by transferring the action over their objections.  *E.K.D.*, 885 F. Supp. 2d at 900-03.  The Shane objectors and their counsel simply hope that making the same arguments in a different forum will produce a different result.

Nor does the ruling in *I.B. ex rel. Fife v. Facebook, Inc.*, 905 F. Supp. 2d 989 (N.D. Cal. 2012), alter this result.  The court in *Fife* refused to dismiss the plaintiffs' claims seeking to void minors' online purchases of Facebook "Credits," which were made using their parents' credit cards, allegedly without permission.  *Id.*  The court ruled that the plaintiffs had alleged a "plausible" claim that the relevant transactions were void under § 6701(c) because the "minor Plaintiffs did not have immediate possession or control of their parents' credit or bank accounts" when they entered the transactions.  *Id.*  Although Facebook believes *Fife's* discussion of § 6701(c) misapplies California law, the dispute is beside the point for present purposes, as *Fife* is plainly distinguishable.  Unlike in *Fife*, Users here have no plausible claim that, at the time they consented to the use of their names and likenesses, some *other person* actually had exclusive possession or control of those things.[63]

### 4.  Other states' laws do not render the Settlement inadequate as to minors.

CPIL/CAI also suggests that the Settlement will undermine the rights of minors under state laws that are purportedly more protective than those of California.  (Inv. Obj. No. 98 at 16-17.)  This argument fails for several reasons.  First, as discussed *supra* § IV(C)(5), differences in state law are irrelevant because the Terms mandate application of California law to all claims made by Facebook Users.  As noted above, California law prescribes a strong policy favoring the enforcement of choice-of-law provisions.  *See Nedlloyd Lines*, 3 Cal. 4th at 464-65.

---

[63]  Further, the *Fife* decision *expressly* distinguishes the *C.M.D.* case, noting that unlike the minors in *Fife*, the *C.M.D.* plaintiffs, like millions of Class Members here, alleged that they had "continued to use the Facebook site," which—the *Fife* court noted—Judge Murphy relied on in holding that "the minors could not disaffirm the forum selection clause of the Terms of Service."  *Fife*, 905 F. Supp. 2d 989.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

79.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

Second, the laws of other states do not materially differ from California law. CPIL/CAI claims that laws in Louisiana, North Dakota, and Idaho forbid a minor from contracting altogether. (Inv. Obj. No. 98 at 16-17.) Contrary to CPIL/CAI's claims, however, there is no material difference between these states' laws and California laws governing minors' capacity to contract. For example, Louisiana law allows rescission by minors, *Roberts v. American Bank & Trust Co.*, 835 F. Supp. 2d 183 (E.D. La. 2011), but requires that minors restore whatever benefit they received under the contract. *See* La. C.C. Arts. 1919, 1921. In Idaho and North Dakota, minors' contracts are not void, but may be disaffirmed in limited circumstances. *See* Idaho Code § 32-103; N.D. Cent. Code §§ 14-10-10 to -11. These purportedly more restrictive state laws thus accord minors virtually the same protection as they receive under California law.

Finally, CPIL/CAI also cites a handful of state statutes purportedly forbidding minors from contracting, including three statutes forbidding minors from giving "a delegation of power," or contracting with respect to "property not in [the minor's] possession or control," similar to California Civil Code §6701(a) and (c). As discussed with respect to § 6701, however, such provisions operate only to prevent minors from appointing an agent or contracting with respect to a future interest. Neither prevents a minor from using a website subject to its terms of service. These arguments do not undermine the fairness and reasonableness of the Settlement.

**5.     Separate counsel was not required for the Minor Subclass.**

The Shane objectors contend that the Settlement underscores a conflict between members of the Class and Minor Subclass, in terms of both the relief afforded and the releases obtained. (Inv. Obj. No. 101.) In particular, the Shane objectors argue that, because minors purportedly cannot consent to the Terms and adults can, "the claims of the minor sub-class are substantially stronger than the claims of the class as a whole . . . ." (*Id.* at 4.) On this basis, the Shane objectors contend that (1) the Settlement is unreasonable because "the settlement fails to account for the strength of those claims," and (2) it is structurally defective because the Minor Subclass was not represented by separate counsel. (*Id.*) Neither argument withstands scrutiny.

As an initial matter, Facebook does not concede the Shane objectors' premise that the Settlement provides identical benefits to adult and minor class members. Minors benefit from the

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

80.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

injunctive relief applicable to the entire Class, but the Settlement also includes substantial minor-specific relief, including new educational materials targeted at parents of minor Facebook users, new tools that allow parents to opt their children out of Sponsored Stories entirely (whether the parents use Facebook or not), and a new set of rules that make certain minors ineligible to appear in Sponsored Stories altogether, without requiring any parental action at all. *See supra* pp. 10-11. Additionally, several of the organizations designated to receive the *cy pres* donations have a particular focus on protecting the interests of minors. (*See* Brown Decl., Ex. A.)

In addition, that the Minor Subclass receives the same *monetary* relief as the Class as a whole does not render the Settlement unreasonable. First, as discussed above, because of COPPA, the Minor Subclass would have been required to prove that minors themselves did not consent to the use of their names and likenesses in Sponsored Stories. Also as discussed above, nothing in the California Family Code invalidates the minors' consent, through the Terms, to the use of their names and likenesses in Sponsored Stories. Indeed, the *C.M.D.* decision confirms that the Terms are enforceable as to minors. *E.K.D.*, 885 F. Supp. 2d at 900. Moreover, the record provides substantial evidence that both minors and their parents consented to Sponsored Stories through their conduct, as was the case when W.T. signed up for Facebook and reviewed the Terms with his father. Thus, it is clear that consent would have presented an equally formidable obstacle to recovery by the Minor Subclass.

Second, the Minor Subclass would not have been entitled to separate counsel under Rule 23. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between *named parties* and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (italics added) (citation omitted). Here, two of the three named Plaintiffs are members of the Minor Subclass, which refutes any notion that the interests of the Minor Subclass were subordinated to those of the Class. *See, e.g.*, *Literary Works*, 654 F.3d at 250 (assessing conflicts based on divergence of interests of "the named plaintiffs" from class members with different claims). This is especially true given that the Class and Minor Subclass pursued the same claims, allegedly suffered violations of the same laws, and allegedly suffered the same injury to the same extent. *Cf. Ortiz*, 527 U.S. at 857 (requiring separate subclasses and counsel

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

81.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1    where some had been injured by asbestos, and others had only potential future injuries).   In

2    reality, the Shane objectors' claims reflect their counsel's desire to represent the Minor Subclass

3    in the separate *C.M.D.* litigation—in which plaintiffs already lost their bid to invalidate minors'

4    assent to the Terms—not a legitimate concern about this Settlement's adequacy.[64]

5             **E.        Objectors do not identify any legitimate deficiencies in the notice.**

6                      **1.        The notice did not need to identify the precise size of the Class.**

7             Several objectors have asserted that the notice was insufficient because it did not "inform

8    class members of the size of the class."   (*See, e.g.*, Obj. No. 12, ¶ 3; Obj. No. 15.)   But Rule

9    23(c)(2) does not require this information and Facebook is unaware of any case that has read Rule

10   23(c)(2) to require information regarding class size.   Notice is sufficient if it "generally describes

11   the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate

12   and come forward and be heard."   *Mendoza*, 623 F.2d at 1352.   The Notices here provide clear

13   information about the total Settlement Fund and the plan for allocating payments, including

14   several different hypotheticals regarding the potential disbursement.   *See Rodriguez*, 563 F.3d at

15   962 (finding a settlement notice adequate when it described "the aggregate amount of the

16   settlement fund and the plan for allocation").   The notices also directed potential Class Members

17   to the Settlement Website, which included, among other documents, Facebook's submissions in

18   support of preliminary approval, stating that as of August 31, 2012, Facebook's records indicated

19   that approximately 123.9 million Users had appeared in Sponsored Stories.   (*See* Facebook's

20   MPA ISO Jt. Mot. Prelim. Appr. Rev. Settlement, Dkt. No. 259, at 18 n.9, 49 n.32; Plambeck

21   Decl. ¶ 7.)   Thus, Class Members were notified of the likely size of the Class based on then-

22   current information.[65]

23

24

25

26   [64] The recovery of the Minor Subclass is also not at "the mercy of the claims rate" of the Class. (Inv. Obj. No. 101 at 4.)   All Class Members, including Minor Subclass members, will receive at least the full cash award contemplated by the Settlement.

27   [65] Also, contrary to some objections (*see, e.g.*, Obj. No. 11 at 5 n.5), costs of notice are properly

28   considered a benefit to the Class.   *See Staton v. Boeing*, 327 F.3d 938, 974 (9th Cir. 2003).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

82.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

**2.    The notice is not inadequate for failing to provide the number of claimants or an approximate value of damages, which were unknown and disputed, respectively, at the time the notice was issued.**

Another objector argues that "[u]ntil Class Representatives ascertain an approximate value of damages or number of claimants, Class Representatives cannot claim to adequately protect the interests of the class." (*See, e.g.*, Obj. No. 15; *see also* Obj. No. 11 at 1 (Frank objectors assert that because Class Members do not know whether they will receive a cash payment, they cannot determine whether to make a claim[66]).)  But notice need not inform Class Members about the estimated value of damages available.  *See Lane*, 696 F.3d at 826 ("Rule 23(e) . . . does not require an estimate of the potential value of [the plaintiff class's] claims."); *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 67 (S.D.N.Y. 2003) ("Neither Rule 23 nor due process, however, requires that the notice report the estimated value of damages."); *see also Chavez*, 162 Cal. App. 4th at 56 ("[Objector] Ellis's claim that the notices were deficient for failing to provide a dollar estimate of the overall value of the settlement in relation to the damages sought by plaintiffs is also without merit.  Ellis cites no authority requiring that such notice be given.").  Moreover, it is impossible for the notice to identify the number of claimants because notice is the mechanism by which potential claimants were apprised of the Settlement.

## V.    CONCLUSION

For the foregoing reasons, Facebook requests that the Court grant final approval of the Settlement.

---

[66]  Bizarrely, it appears the Frank objectors are of two completely opposite minds regarding predictions as to whether Class Members will receive a cash payment.  They state both that "[o]dds are that the number of claims will overwhelm the settlement fund and leave class members with no compensation," and that it is a "more likely event that payment of $10 to all authorized claimants would not exhaust the net fund . . . ."  (Obj. No. 11 at 17, 24.)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

83.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS

1

2
Dated:  June 14, 2013                           COOLEY LLP

3                                                */s/ Michael G. Rhodes*
                                                 Michael G. Rhodes (116127)

4
                                                 COOLEY LLP
5                                                MICHAEL G. RHODES (116127)
                                                 mrhodes@cooley.com
6                                                MATTHEW D. BROWN (196972)
                                                 brownmd@cooley.com
7                                                JEFFREY M. GUTKIN (216083)
                                                 jgutkin@cooley.com
8                                                101 California Street, 5th Floor
                                                 San Francisco, CA 94111-5800
9                                                Telephone: (415) 693-2000
                                                 Facsimile: (415) 693-2222
10

11                                               Attorneys for Defendant Facebook, Inc.

12

13       1322634/SF

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

84.

FACEBOOK'S MPA ISO PLS.' MOT. FOR
FINAL APPROVAL OF SETTLEMENT
CASE NO. CV 11-01726 RS