Pages 1 – 110

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
BEFORE THE HONORABLE RICHARD SEEBORG

ANGEL FRALEY, et al.,                    )
                                         )
            Plaintiffs,                  )
                                         )
  VS.                                    ) NO. C 11–1726 RS
                                         )
FACEBOOK, INC.,                          )
                                         ) San Francisco, California
            Defendant.                   ) Friday
                                         ) June 28, 2013
_____ ) 10:01 a.m.

                     TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:          THE ARNS LAW FIRM
                         515 Folsom Street
                         Third Floor
                         San Francisco, California  94105
                 BY:  ROBERT S. ARNS, ESQ.
                      ROBERT C. FOSS, ESQ.
                      STEVEN R. WEINMANN, ESQ.
                      KEVIN M. OSBORNE, ESQ.
                      and
                      JONATHAN JAFFE LAW
                      3055 Hillegass Avenue
                      Berkeley, California  94705
                 BY:  JONATHAN JAFFE, ESQ.


For Defendant:           COOLEY LLP
                         101 California Street
                         Fifth Floor
                         San Francisco, California  94111–5800
                 BY:  MICHAEL RHODES, ESQ.
                      JEFFREY GUTKIN, ESQ.
                      MATTHEW D. BROWN, ESQ.



Reported by:             BELLE BALL, CSR #8785, CRR, RDR
                         Official Reporter, U.S. District Court


(Appearances continued, next page)

APPEARANCES, CONTINUED:

For Objectors:          CENTER FOR CLASS ACTION FAIRNESS
                        1718 M Street
                        No. 23-6
                        Washington, DC 20036
                   BY:  THEODORE HAROLD FRANK, ESQ.

                        CHILDREN'S ADVOCACY INSTITUTE
                        5998 Alcala Park
                        San Diego, California  92110
                   BY:  ROBERT CHARLES FELLMETH, ESQ.

                        LAW OFFICE OF ALAN J. SHERWOOD
                        1300 Clay Street
                        Suite 600
                        Oakland, California  94612
                   BY:  ALAN J. SHERWOOD, ESQ.

                        LAW OFFICES OF JAY RORTY
                        835 Cedar Street
                        Santa Cruz, California  95062
                   BY:  JAY ADAM RORTY, ESQ.

                        KOREIN TILLERY
                        505 North 7th Street
                        Suite 3600
                        St. Louis, MO 63101
                   BY:  AARON MICHAEL ZIGLER, ESQ.

                        Public Citizen Litigation Group
                        1600 20th Street N.W.
                        Washington, DC 20009
                   BY:  SCOTT MATTHEW MICHELMAN, ESQ.

                        JOHN C. TORJESEN & ASSOCIATES
                        612 North Sepulveda Boulevard
                        Los Angeles, California 90049
                   BY:  JOHN TORJESEN, ESQ.


Reported by:            BELLE BALL, CSR #8785, CRR, RDR
                        Official Reporter, U.S. District Court

```
 1  FRIDAY, JUNE 28, 2013                          10:01 A.M.

 2                    P R O C E E D I N G S

 3          THE CLERK:  Calling Case C-11-01726, Fraley, et al.

 4  versus Facebook.

 5      Counsel, please state your appearances.

 6          MR. ARNS:  Good morning, Your Honor.  Robert Arns for

 7  Plaintiffs.

 8          THE COURT:  Good morning.

 9          MR. RHODES:  Good morning, Your Honor.  Mike Rhodes,

10  of Cooley, and my team here at the table (Indicating), on

11  behalf of Facebook.

12          THE COURT:  Good morning.

13          MR. WEINMANN:  Good morning, Your Honor.  Steve

14  Weinmann for the Plaintiffs.

15          MR. JAFFE:  Good morning, Your Honor.  Jonathan

16  Jaffe, Jonathan Jaffe Law, for the Plaintiffs.

17          THE COURT:  Good morning.

18          MR. FOSS:  Good morning, Your Honor.  Robert Foss for

19  the Plaintiffs.

20          MR. OSBORNE:  Kevin Osborne for the Plaintiffs.

21          THE COURT:  Good morning.

22      We're here on the hearing to determine whether or not

23  final approval is appropriate with respect to the proposed

24  settlement of this class action.  This is how I would like to

25  proceed so we can have an orderly process.
```

1        First, I will invite the proponents of the settlement to

2   make a short presentation.  I just was handed up a very

3   lengthy -- it appears to be a PowerPoint presentation.  I don't

4   want that.  I really want to just have a -- a back-and-forth,

5   as opposed to a lecture.

6        So what I would like to do is to have, as I say, the

7   Plaintiffs and counsel for Facebook go ahead and summarize for

8   me their points.  I have read through the voluminous papers, so

9   we don't need to repeat all that.  I'll have some questions for

10  all of you.

11       Then I will hear from the objectors who wish to make any

12  presentations that they wish to make.  I'll then allow the

13  settlement proponents to respond.  I request that the fees

14  issue we put at the end, and we can have a discussion about

15  that once we have gone through the basic particulars of the

16  proposed settlement.

17       So, with that, I'll go ahead and invite Plaintiffs to

18  begin the process.

19            **MR. ARNS:**  Thank you very much, Your Honor.

20       First of all, the class has spoken, and we have had

21  614,944 claims filed.  There's been 6,825 opt-outs.  There's

22  104 objections, and as you know, Your Honor, most of those are

23  e-mail with one sentence.

24       There's eleven briefs.  Of all the  objections,

25  Your Honor, 60 percent -- 40 percent of them state that class

```
 1   actions are bad, there shouldn't be class actions.  So that --
 2   really aren't objections.
 3        That leaves approximately 60-point --
 4            THE COURT:  Well, they're more than class actions are
 5   bad; they're questioning your case.
 6            MR. ARNS:  That's correct, Your Honor.
 7            THE COURT:  Right.
 8            MR. ARNS:  That's correct.  And so what we have, in
 9   essence, Your Honor, is .04 objections per million people in
10   this class.  And we think that the class has overwhelmingly
11   endorsed this settlement.
12        Now, Your Honor, I would just like to take a few seconds.
13   We're prepared to go any way you want on this, and fully
14   understand this has been fully briefed.
15        One of the things that I would like to talk about is what
16   is Facebook.  And we know that it's a social media site, that
17   it costs $2 billion a year to run it at this time.  It's free
18   to its members.  And it's a marketing site, it's an advertising
19   site, as is Google and many other sites.  That's what pays for
20   these online services.
21            THE COURT:  Let me ask you some specific things with
22   respect to the proposed settlement that I want you to address
23   for me.  Let's talk for a moment about your valuation of the
24   injunctive relief.
25        Now, that has relevance, and we can talk about it later
```

1  with respect to your request for fees.  I'm not sure it is as

2  necessary to put a dollar figure on the injunctive relief for

3  purposes of assessing whether or not this is a fair, reasonable

4  and adequate settlement.  So that is sort of the preamble to my

5  question.

6      I have some trouble understanding your various theories of

7  how you value the injunctive relief.  You have got a fair

8  market valuation and another --

9          **MR. ARNS:**  Option.

10         **THE COURT:**  -- form of option that your experts are

11 opining on.  My concern is, you seem to continue to conflate

12 benefit you assess to Facebook as damage to the class members,

13 and I think that's a logical leap that is not entirely clear to

14 me.

15     But beyond that, I just don't -- most of it seems very

16 highly speculative, and I don't -- I am having trouble with all

17 of the theories of your valuation.

18         **MR. ARNS:**  Your Honor, let me respond to that.  We

19 have the theories summarized on Slide 41.  And it's all

20 briefed, and you know exactly what they are.

21     But, one of the most important parts of the injunctive

22 relief is that 99 percent of this class of 150 million class

23 members, members on Facebook, will get the benefit of this

24 injunctive relief now, and in the future.

25     There are many class actions, Your Honor, where the

1  injunctive relief only is provided if somebody buys another

2  product, if somebody does this --

3          **THE COURT:**  My question is the valuation issue.  I

4  understand that there is injunctive relief, and your position

5  is that it is of great benefit to the class.  I'm not saying

6  that I have concluded it anything but that.

7      But I'm -- I don't see how you value it at between -- I

8  believe it's 54 and $140 million dollars.  I'm having trouble

9  seeing how you do that.

10      So you can assume for purposes of my question that I'm

11  not -- I'm not doubting there's some benefit to the class.

12  Although I note that one of the objectors, I think, yesterday

13  filed something that said -- I'll ask Mr. Rhodes about this --

14  that Facebook is not even going to do sponsored stories any

15  more.

16      But we'll get into that later --

17          **MR. ARNS:**  Right -- we have that --

18          **THE COURT:**  -- in terms of the value of the

19  injunctive relief that you place on it.

20          **MR. ARNS:**  Yes.  Your Honor, all my life, as a

21  plaintiffs' attorney since 1975, I have been asking juries to

22  put price on the priceless.  And this is something, we know it

23  provides great value to the class.

24      How do you put a monetary value on that?  You can look at

25  the different analyses.  You can compare the common fund that

1  we are dealing with, $20 million.

2      And, Your Honor, I want to thank you very much for your

3  direction that you did at our first preliminary approval

4  hearing, because we were -- we're in love with the injunctive

5  relief on the Plaintiff's side.

6      We think that it sets a new standard for all social media

7  sites in the United States.  We believe that they know if they

8  don't -- if there is not full notice and full control on

9  advertising -- and this what -- this is the new form of

10 advertising that --

11         **THE COURT:**  Well, let me stop you, Mr. Arns.  I -- I

12 understand that.  I think we are ships that are passing in the

13 night, on my question.  Your responses to me are that this is a

14 real benefit.  And let's assume I agree with you, that there's

15 benefit in the injunctive relief.

16     What I'm trying to get at is, you then put a price tag on

17 that.  And the analysis, I'm having trouble following as to how

18 you quantify this with the numbers, which are rather large,

19 that you place on the value of this injunctive relief.  And I'm

20 trying to, in fairness to you, understand how you get there.

21         **MR. ARNS:**  Perhaps this, Your Honor, that we know

22 that the analytics of this case show that those that have been

23 included in sponsored stories, and that was -- when Judge Koh

24 issued her motion -- ruling on the motion to dismiss, she said

25 that the statutory damages of 3344 are not a vested right.  You

1    must show that there was actual damage first.

2         We spent a lot of time, Your Honor, with respect to our

3    experts -- we had five experts, as you know -- before the

4    motion for class certification.  The case settled approximately

5    two days before the motion for class certification.  And the

6    whole thing, all of -- they were all marketing experts and

7    economists, with a couple of software folks.  And the issue

8    was: What was the actual damage?  And the actual damage was

9    approximately 94 cents per person.  We had to prove that in

10   order to get to the 3344.

11        Now, at that time people did not have notice or control.

12   Now they have notice and control.  And what I would say,

13   Your Honor, just citing the case, the Netflix privacy decision

14   that just came out, Judge Davila said (As read):

15             "The settlement amount -- which includes the size of

16             the cash distribution, *the cy pres* method of

17             distribution, and the injunctive relief -- to be a

18             factor that weighs in favor of approval."

19        And the case law, as you know, Your Honor, on the

20   valuation of injunctive relief is that just because it's

21   difficult to evaluate doesn't mean we shouldn't put a value on

22   it.

23        I have done a lot of banking cases, Your Honor, where we

24   know exactly what the late charges that were improper were, in

25   the past and in the future.  That's very easy to work with.

1   Because this is a little more difficult, I would implore the

2   Court to try to put a value on it.

3       I believe the Court could say that although it is

4   difficult to put a value on this, it is of great value to the

5   class.  And again, the class members every day who use Facebook

6   will get that benefit, and they have the notice and control.

7       And perhaps you could say, Your Honor, that the value is

8   at least that of the common fund that's paid here.  We know --

9           **THE COURT:**  Twenty million?

10          **MR. ARNS:**  We could say that, Your Honor.  We believe

11  it's a lot more.

12          **THE COURT:**  I understand that, but I understand you

13  say that it's worth a lot more.  And that's what I'm trying to

14  get at: How do you calculate that?

15      And I understand you have got this real option valuation

16  and fair market value, or minimum value.  And as I read through

17  the presentation, as I said, I'm having trouble seeing where

18  this is not just, you know, a speculative theory as opposed to

19  something that I think really supports those numbers.  That's

20  what I'm trying to give you an opportunity to explain to me.

21          **MR. ARNS:**  This is difficult to evaluate.  There's no

22  question about it, Your Honor.  And we will fully admit that.

23  But again, the crown jewel of this settlement is the injunctive

24  relief.  As I said at our first preliminary approval hearing,

25  that if there were no common fund at all, we still think this

1    is a great settlement, getting this injunctive relief.  That's

2    what we worked hardest on, from the Plaintiffs' side, to

3    change.

4              **THE COURT:**  When I didn't approve it the first time,

5    my view was contrary to yours.

6              **MR. ARNS:**  That's correct.  And we had a different

7    valuation method.  And we know that the case law does address

8    that what it cost Facebook is not -- or what it costs the

9    Defendant is not the way to value the injunctive.  We know

10   those cases, Your Honor.  We took these different valuation

11   methods.  We think the option value method is the best.  But

12   looking at all of the methods, Your Honor, irrespective, we

13   know it has great value.

14        And again, I would implore the Court to say:  This is

15   difficult to evaluate, but the Court knows that it has great

16   value to the members, and every member will benefit from this,

17   that's in the class.

18        Additionally, Your Honor, this provides the message, the

19   legal message, to every one of these online sites, as we have

20   discussed -- Facebook said this is the holy grail of

21   advertising now, having a friend endorsement.  We don't care if

22   some celebrity endorses a product.  We know that celebrity has

23   been paid a lot of money to endorse the product.  But when a

24   friend endorsed the product, that has value.

25        Do friends become celebrities --

1    **THE COURT:**  They have value to Facebook.  The

2    question is, is there a damage to the class members.  And one

3    does not automatically equal the other.

4    **MR. ARNS:**  Just as Judge Koh mentioned, it is not a

5    vested right that we have to prove that damage.  We spent a lot

6    of time proving damages in this case.

7    **THE COURT:**  Okay.  Let me shift to a different

8    subject.

9    And I will ask you about this as well, Mr. Rhodes, but I

10   want to give Mr. Arns the first chance to address it with me.

11   There is some discussion in the papers that perhaps an

12   additional, an adjustment upwards, because the way the numbers

13   are shaking out in your proposal, that those class members that

14   have made claims could go from $10 up to $15.  And as I'm

15   seeing your papers, you are almost suggesting that that would

16   be appropriate.

17   The settlement papers themselves, when they went out, the

18   notice -- and my concern about that, and I'm not indicating

19   that in the event I approve it, I'm not going to go that path.

20   But what occurred to me was how clear is it, or was it, to

21   class members that that might occur.  Because I think what you

22   have told me, over 6,000 people opted out -- is that correct?

23   **MR. ARNS:**  That's correct, Your Honor.

24   **THE COURT:**  And my concern, quite frankly, is would

25   they have opted out if they thought -- was it clear to them

1   that it might be $15?

2       So, on the one hand, I'm not averse to the idea that some

3   enhancement of the amount is some path that would be

4   appropriate, but I'm just a little concerned on the fairness

5   notion, that when the settlement was presented, was it clear

6   that it might be more than $10.

7           MR. ARNS:   Yes, Your Honor.  On Slide 35 -- and I

8   might point out to the law clerks, the slides are behind you,

9   if you want to grab those and look at them (Indicating).

10          THE COURT:   Okay.  Go ahead.

11          MR. ARNS:   Now, Your Honor, Slide 35, we quote the

12  language on the bottom, which is from the long-form Notice of

13  Settlement, Page 6.  It specifically says --

14      (Off-the-Record discussion between counsel)

15          MR. ARNS:   Yes, Exhibit 2 to the amended settlement

16  agreement, Your Honor.

17          THE COURT:   Okay.

18          MR. ARNS:   (As read):

19          "If paying $10 to each Authorized Claimant does not

20          exhaust the Net Settlement Fund, the remaining funds

21          will be distributed to the not-for-profit

22          organizations identified below, unless the Court

23          orders otherwise as discussed in Section 2.3(b) of

24          the Settlement Agreement."

25      You know, Your Honor, I'm not going to quote the whole

1  language.  It basically says that you have the right to

2  increase the pro rata payment to each authorized claimant.

3      But the key language, going back to the long-form notice,

4  Page 6, after that first paragraph it says (As read):

5          *"Again, no one knows in advance how much, if*

6          *anything, Authorized Claimants may receive, and no*

7          *one will know until the deadline for submitting*

8          *claims passes."*

9      So that is in italics, and it makes it very clear.  And,

10 by nature of notice, case law and notice, everyone in the class

11 has notice of that.  So we believe, Your Honor, there is not a

12 notice problem at all.

13          **THE COURT:**  Okay.  Or, the related concept, any

14 unfairness to someone who has opted out.  You think they were

15 on -- they were --

16          **MR. ARNS:**  Correct.

17          **THE COURT:**  They were on notice that it might be more

18 than $10.

19          **MR. ARNS:**  Yes.

20          **THE COURT:**  Okay.

21          **MR. ARNS:**  And we know, Your Honor, the monetary

22 benefit would go from 1.6 million, approximately, to 9 million,

23 224 million.

24      (Reporter interruption)

25          **MR. ARNS:**  9,224,000.

1      **THE COURT:**  Okay.  Let me shift -- and I realize I'm

2    bumping around.  That's the reason, not -- and you can

3    certainly refer to what you have prepared.  I didn't mean to

4    suggest it's not something that is useful.  I just didn't want

5    you to launch into it in a lecture form because I have

6    questions rather than that.

7      **MR. ARNS:**  Yes, Your Honor.

8      **THE COURT:**  But you can certainly continue to refer

9    to it, and it is helpful.

10     **MR. ARNS:**  I had a pretty good lecture prepared.  I

11   would never lecture Your Honor, but --

12     **THE COURT:**  I'm sure it was very good.

13     A completely different subject, but -- and in the grand

14   scheme of life, not an enormous amount of money, but a concern

15   that I want to address with you, and that's the incentive

16   payments for the class representatives.

17     I read through the *Radcliffe* decision again, and I agree

18   that this is not a *Radcliffe* situation, at least as I

19   understand it, because there isn't any tie, either in the

20   retainer agreements -- I want you to confirm this for me -- or

21   in the settlement documents, that essentially require the class

22   representatives to support the settlement.  And that was the

23   particular concern in *Radcliffe*.

24     **MR. ARNS:**  Right.  That's correct.

25     **THE COURT:**  Okay.  But *Radcliffe* does -- I know

1  Mr. Rhodes's papers say *in dicta*, but the *Radcliffe* case does

2  talk about concern of the disparity between what class members

3  are receiving, and a big delta between that and an incentive

4  payment award.  And in this instance, let's use the 15-dollar

5  figure for purposes of discussion, class members would be

6  receiving $15, but you're proposing that the three class

7  representatives receive $12,500.

8          **MR. ARNS:**  That's correct, Your Honor.

9          **THE COURT:**  That's an enormous difference when you

10  just look at the gap between the two.  Doesn't the *Radcliffe*

11  decision suggest that that is a problem?

12          **MR. ARNS:**  No, Your Honor.  And let me explain why.

13      *Radcliffe* again, as you know, was that if you do not

14  support the settlement, then you are, in essence, opted out as

15  a class rep.

16          **THE COURT:**  And actually, let me just stop you there

17  because I asked you to confirm it for me, neither the retainer

18  agreements nor the settlement documentation ties incentive

19  payments to support for the disposition.

20          **MR. ARNS:**  Absolutely not, Your Honor, they do not.

21          **THE COURT:**  Okay.

22          **MR. ARNS:**  Now, let me just say this:  I would like

23  to talk about discovery later, but in every deposition -- and

24  we have two minor class reps, and then we have Susan Mainzer,

25  who is an adult; J.D. has now reached the age of majority.

1    And again on Facebook, Your Honor, as you know, you have

2 to be a teenager.  There are no children allowed --

3          **THE COURT:**  Below 13.

4          **MR. ARNS:**  -- on Facebook; 13 and above.  So between

5 13 and 17, before the age of majority, are the only minors on

6 Facebook.

7    In every deposition, J.D., W.T., and Susan Mainzer -- and

8 for that matter, Angel Fraley, because her deposition went,

9 although she dropped out -- the question --

10          **THE COURT:**  She is an objector, isn't she?

11          **MR. ARNS:**  She is an objector in that she wants some

12 money.  She supports the settlement -- as a matter of fact,

13 Your Honor, I think she deserves something.  I mean, she gets

14 more phone calls and media requests than anybody, and she

15 dropped out because of privacy concerns.

16    And I would say this, Your Honor.  We made a motion to

17 preclude her deposition.  It was denied because she was a class

18 rep.  And she had her deposition taken too.  And I would ask

19 that we transmute 5 million -- excuse me -- $5,000 of our fees

20 to her, if the Court would approve that, if we have case law to

21 support that, because of what she went through.

22    But what I want to point out, Your Honor, what the class

23 reps did, and this is one of the key parts of this case, and

24 that's the 3344 fee-shifting statement, 3344(a), the prevailing

25 party is entitled to costs and fees.

1    In every one of those depositions, including the minor

2    depositions, Facebook asked the question:  "Do you understand

3    that you are responsible for all of the fees and costs that is

4    being generated in the defense of this case?"

5    And it was first asked:  "Have your attorneys explained

6    that to you?"

7    I, of course, objected:  "Objection, invades

8    attorney/client privilege."

9    But that was a fact of life.  Every one of those

10   depositions went the full seven hours.

11   Now, query, Your Honor:  Is it ethical for a lawyer to

12   hold a client harmless in this situation?

13   And this is a for-real situation, as you know, in *Friend*

14   *Finder*, your case, the *Robyn Cohen* case, Facebook came in and

15   asked for over $700,000 in fees.  And the response at that

16   time, I believe, was that the Court never got jurisdiction,

17   motion to dismiss was granted.

18           **THE COURT:**  That was my conclusion, right.

19           **MR. ARNS:**  Yes.  And we got by the motion to dismiss.

20   This was very real.  And this is something -- if I can just

21   save a little time by talking about this, as far as the

22   objectors are concerned also.

23           **THE COURT:**  Okay.

24           **MR. ARNS:**  The objectors never have any skin in the

25   game.  They -- I believe the Court should rule, if they fail on

1  their appeals -- should be subject to 3344 fee shifting and

2  have to pay the fees that were generated.

3      Now, we have the case law on that, Your Honor.  We know

4  the --

5          **THE COURT:**  I'm not sure -- even if that was

6  something I was inclined to entertain, I'm not sure that would

7  be part of the approval process.

8          **MR. ARNS:**  It is not, Your Honor.  And we believe,

9  although the First Circuit in the *Skolnick* (Phonetic) case

10 recommends that, we believe the Ninth Circuit, in the *Azizia*n

11 (Phonetic) case, states that the District Court should not do

12 that, it should be the Appellate Court that does that, but

13 recommendations could be made.

14     Now, this -- not only the *Robyn Cohen* case, the *D. Cohen*

15 case where the demurrer was granted with leave to amend --

16         **THE COURT:**  So, down in L.A. Superior?

17         **MR. ARNS:**  That's correct.  And that is one of the

18 precursor cases of CMD  That team is on CMD

19         **THE COURT:**  Right.

20         **MR. ARNS:**  They dismissed that case.  They didn't

21 want to take it up on appeal.  And that was dismissed -- or

22 excuse me, the demurrer was granted with leave to amend based

23 on COPPA, the Children's Online Privacy Protection Act.

24     And Her Honor ruled in that case that -- that the demurrer

25 was granted with leave to amend because COPPA only dealt with

1   12 and under, they protected minors 12 and under.  The minors

2   on Facebook, as we have discussed, are 13 to 17; thus, case

3   thrown out.

4       Now, that case did not involve sponsored stories.  It

5   involved Facebook ads with social content.  So in that case

6   over $800,000 were requested in fees by Facebook.

7       And by the way, we found out what Mr. Rhodes' hourly

8   billing was on that issue, Your Honor, and this goes in the fee

9   motion, it was $930 an hour, if I could just say this for a

10  second?

11          **MR. RHODES:**  It's an absolute bargain, Your Honor.

12          **MR. ARNS:**  Can I say this, Your Honor?  I would wager

13  that those -- those hourlies were ratcheted down for purposes

14  of the Court.  I believe Mr. Rhodes is worth more than that,

15  and I bet he charges more than that.

16      But at any rate, our class reps --

17          **THE COURT:**  Of course, you all have hourly fees way

18  in excess of mine, so -- but go ahead.

19          **MR. ARNS:**  Your Honor --

20          **MR. RHODES:**  We are not going to establish or quarrel

21  with the value proposition represented by our hourly rates,

22  Your Honor.

23          **THE COURT:**  That is all right.

24      Go ahead.

25          **MR. ARNS:**  As I said, Your Honor, the A-students

1  become the judges.  So --

2         **THE COURT:**  Okay.

3         **MR. ARNS:**  At any rate, so this was a tremendous

4  concern of these class reps and, if you have 150 million

5  members in a class, and the class reps are supposed to have an

6  equation similar to that, in our wage-and-hour cases.

7  Your Honor, in our wage-and-hour cases where we get $200,000,

8  $150,000 per member of the class, and the class is made up of

9  500 people, that applies, that 100 percent applies.  That is a

10  frivolous objection, as are all of them.

11        And I think there is one objection -- I'm sorry for --

12  maybe we can cover this.  There's one objection that

13  potentially had some validity.  And that is, if Facebook is

14  going to change the name of sponsored stories, and then go out

15  and do this under a different name -- and I can tell Your Honor

16  that I spent a lot of time crafting the definition of

17  "sponsored stories," additionally in our settlement.  So even

18  if they change the name it doesn't matter.  And I don't -- so

19  we have that covered.

20        Additionally, Your Honor, you have the right to do an

21  audit, and we would request that.

22        Additionally, Your Honor, one of our continuing

23  responsibilities is to monitor Facebook.  And Mr. Rhodes --

24  Mr. Rhodes and I had a meeting based on that.  And we don't

25  talk a lot, but we did have a meeting on that.  And the meeting

1    had to do with what is happening here.

2        And Mr. Rhodes, who, as counsel of Facebook, can explain

3    it further because he has spoken with Facebook on that -- maybe

4    you want him to address that right now, because he has the

5    press release that that objection was based on.

6        But irrespective, Your Honor, I can go right to our

7    release provision that addresses that.  And it --

8            **THE COURT:**  We'll get there in a moment.  And now you

9    have covered for me -- remember, we started with the incentive

10   payment issue in terms of my question.

11           **MR. ARNS:**  Yes.

12           **THE COURT:**  And I understand why you, why you have

13   gone where you have gone.  But let me ask you a couple more

14   things, and then I'll ask Mr. Rhodes to address some issues.

15       I do -- and this actually takes us to the objectors'

16   points, so perhaps I ought to wait on this.  But I do want to

17   cover with you at some point the minor subclass issues because

18   those tend to be, I think, the -- the bulk, if you will, of the

19   objections, and I want to go over that with you.

20       Actually, why don't you go ahead and address that --

21           **MR. ARNS:**  Sure.

22           **THE COURT:**  -- in summary fashion because I know we

23   are going to hear more about it.  But, go ahead.

24           **MR. ARNS:**  Yes, Your Honor.  We like to call it the

25   teenager subclass.  Because we know, Your Honor, that first of

1    all, the teen subclass claims are not stronger than the

2    subclass claims.  Judge Murphy, when he transferred CMD here,

3    stated the SRRs apply; the SRRs, the California venue

4    provision, California law provision.

5         And, in essence, we have a situation, Your Honor, where,

6    the teenagers continue to use Facebook.  We have the implied

7    consent situation as well as the actual consent.  And --

8              **THE COURT:**  "A situation" meaning defenses.

9              **MR. ARNS:**  Yes.  Well, not only defense, but that's

10   what's happening, the teenagers don't want to leave Facebook.

11   They say:  "Oh, my God, I'm going to sponsor a story, I'm never

12   going to use Facebook again."

13        They continue to use it, continue to commit the social

14   actions which create the sponsored stories.  Now, every one of

15   those sponsored stories, they are going to see every one

16   they're in.

17        When we talk about the injunctive relief, actually, again,

18   Mr. Rhodes, when we were talking about the objection pertaining

19   to the -- the pseudonym of sponsored stories, which was going

20   to create a problem, I asked him to present the slides on the

21   injunctive because he deals with Facebook and they have how the

22   injunctive is going to change the mockups on that.

23        I have everything in my presentation also, Your Honor, but

24   I believe a --

25             **THE COURT:**  The actual mockups for -- yeah, I did --

1          **MR. ARNS:**  Mr. Rhodes has those.

2          **THE COURT:**  Right.

3          **MR. ARNS:**  And he gave me some of those, but he's

4   better equipped because -- to talk about that.

5      Now, one-third of the teens on Facebook already have --

6   are linked up to their parents already.  And I'm not going to

7   talk about the injunctive necessarily too much right now, but I

8   would like Mr. Rhodes to follow up on the teenage issue, with

9   the parents' ability, whether they're on Facebook or not, to

10  opt out the teens.  The fact that they check a box, whether or

11  not they have a parent on Facebook.  If they don't, they're

12  out, they're opted out.  This teen subclass faces the exact

13  same risk.

14     And again, Judge Murphy's decision from the Southern

15  District of Illinois is very important on this analysis.  We

16  get into family law, we don't think that family law issue at

17  all applies.  And if you look at the Family Code --

18          **THE COURT:**  This is Judge Murphy's decision in CMD.?

19          **MR. ARNS:**  Yes, yes.

20     And he didn't address the family law issue, but with

21  respect to that issue, this is not a delegation of power by

22  using Facebook.  This is not in any way covered by the family

23  law.

24     If -- if we had a situation that blew out those -- the

25  statements of rights and responsibilities, the terms of use, so

1    to speak, if -- if that occurred, then minors would not be

2    allowed to use Facebook because they aren't complying, and they

3    have to comply with SRRs.

4          Now, the minors want to keep using it.  The teen subclass

5    is eligible for the monetary award also.  The teen subclass, by

6    the way, got actual notice of the sponsored stories through the

7    notice -- the notices in this settlement.

8          You know, Your Honor, one of our minors basically bought a

9    sponsored story on Facebook, one of our class members, because

10   he had a -- one of the ways he made money is doing sound

11   systems for bands.

12         And the point is, this group, 13 to 17, extremely

13   intelligent group.  Yes, there is going to be some immature

14   minors that are going to do stupid things on Facebook.  That's

15   not the issue in this case.  There's a lot of immature adults

16   who do stupid things on Facebook.  That is not the subject of

17   this case.

18         So the relief also, all the injunctive relief for the

19   minor class is exactly for -- like that of the adult class, and

20   it's better.  There's no enhanced remedies of law available to

21   the minor subclass.  And all current minors -- again, you look

22   at the COPPAPPA demurrer that was granted in *D. Cohen*, look at

23   that.

24         Now, one of the comments that was made by Mr. Fellmeth was

25   that, "I don't represent minors."

1          And, Your Honor, in 38 years of being a plaintiffs' lawyer

2     in San Francisco, I have represented thousands of minors.  And

3     I am proud of that fact, and we know that is something, as far

4     as experience.  The minors represent about 13 percent of the

5     class.

6          Now, with respect -- so at any rate, Your Honor, Judge

7     Murphy's ruling on CMD -- and again, as the plaintiffs' counsel

8     in CMD said, "If you say that the SRRs apply, that is ruinous

9     to our case," because they want to get them out of the SRRs.

10          But do the minor subclass, do they want to keep using

11     Facebook?  Let's ask that question.  Any one of them can stop

12     using Facebook now.  You can't -- high school coaches, junior

13     high coaches, put when practices take place on Facebook.

14     Assignments, the teachers now put on Facebook.  They don't use

15     e-mail any more.  And it is part of the culture, for better or

16     for worse.

17          And actually, I would like to say this:  Having spent time

18     with the inner circle at Facebook, not in what I would call an

19     affable way, I tip my hat to the American ingenuity that has

20     created Facebook.  It is an amazing product.

21          I remember when my son said, "Dad, do you want to see my

22     Facebook page?"

23          I have all the inside information on him.  I said,

24     "Absolutely not.  I don't."

25          And then he showed it to me.  And he showed me his

1   preschool friends, his junior-high friends, his grade-school

2   friends, his college friends.  He -- and it's amazing that the

3   connections that -- all the good -- there is a tremendous

4   amount of good on Facebook.

5       And I want to say from a marketing standpoint, also, I

6   believe in free enterprise.  And marketing creates sales which

7   creates jobs.  Silicon Valley and what happens there is an

8   amazing driver of our economy.

9       Now, CMD counsel basically had a press conference before

10  the IPO, of Facebook, and said:  Tens of billions of dollars

11  are at stake.

12      I don't do press conferences that are blackmail to a

13  company.  Let's find out what happens in the case, let His

14  Honor make the decisions, then we may have a press conference.

15          **THE COURT:**  Okay.  Let me ask Mr. Rhodes to weigh in

16  on whatever -- in whatever order.  Or if there are other issues

17  you want to start with, go ahead.

18          **MR. RHODES:**  I think I can self-direct through the

19  Court's questions.  I would like -- I do have a PowerPoint

20  presentation, not to go through but because it contains a lot

21  of detail for you.

22      I would like to hand you and direct your attention to

23  Page 5 of that, if I may.

24      (Document handed up to the Court)

25          **THE COURT:**  Okay.

1          **MR. RHODES:**  For the Court's benefit, the prior

2     slides are basically just metrical data that you may be

3     interested in, timelines of what happened when, the deadlines

4     that are intrinsic to your approval order.

5          So your first question to counsel was:  How do you value

6     the injunctive relief?

7          And my response to you is:  You don't need to.

8          And you recall that we discussed this last fall when we

9     came before you on a preliminary approval order, and I want to

10    recast the economic framework because I agree with Mr. Arns,

11    that in the abstract there is intrinsic and perhaps very

12    substantial value.

13         I'm not going to weigh in to whether the methodologies and

14    the models that you have been given in the record give you a

15    concrete basis to make that determination for determining how

16    to calibrate the strengths and weaknesses of the case versus

17    what's been circled up in terms of consideration.

18         **THE COURT:**  My understanding of your position, just,

19    if I can summarize it, and you can tell me if this is wrong, is

20    that just looking at the terms of the settlement as it

21    currently sits, the 20 million actual cash, and then a finding,

22    if you will, that there is value in the injunctive relief, that

23    that is a sufficient overall value to warrant approval of the

24    settlement.

25         **MR. RHODES:**  That's correct, Your Honor.  And without

1   belaboring the math on the page I gave you, remember, the

2   starting point has to be what did the Plaintiffs seek by way of

3   damages in the case.  The objectors make a lot to do about the

4   statutory damages bogey, but *Lane* clearly says you don't go

5   through that analysis at all.  You don't look at the statutory

6   damages metrics because it would be impossible to assess them.

7           And in the context of this case --

8                **THE COURT:**  Let me stop you there.

9           You don't because it is not a given that every class

10  member would be able to recover the statutory damages.

11               **MR. RHODES:**  You took the words out of my mouth.  We

12  can look at Judge Koh's decision.  I think it is Page 27.  You

13  have seen a quote from it already.

14          What's interesting about her quote is not the language

15  that Counsel just gave you, it's the sentence right after that.

16  She refers to the word "Proveable."

17          She says:  Not only -- you don't just come in and wave

18  your hands and say, "statutory damages," you have to show

19  actual injury and actual damages, and they have to be proveable

20  at trial.

21          And that's where the case starts to fall apart.  So if you

22  assume that *Lane* is correctly decided, which is the current

23  Ninth Circuit articulation, and you take her at her word, the

24  math that's on that page is where you leave off.

25          And remember, just as a very quick reminder, the

1  Plaintiffs proffered two theories of economic harm.  Theory 1

2  was that, of the net profits associated with sponsored stories,

3  remember, gross was about -- I grossed it up through the date

4  of your preliminary approval order, by the way.  So it's about

5  260.  Fifty percent operating margin takes you to 130.  They

6  said two models.  One is 75 percent of the net income, or

7  50 percent.

8       So we just pushed them together and said, "Okay, your

9  average is 62.5 percent, that is your theory.  We disagree with

10  it, but that's your theory."

11       And so the starting point is a net damage figure in the

12  75 to 90 million-dollar range.  And that is before you do any

13  litigation risk assessment of all the problems they were going

14  to face, which I won't burden you with now, but if you go

15  through the following slides you will see all the deductions.

16       So if you just compare that number with the consideration

17  in cash, you are in the 20 percent range of total consideration

18  to the damage model without adjustment.  And that's well within

19  the bandwidth of acceptability in the Ninth Circuit.

20       And that is really the point I'm making, which is, I'm not

21  suggesting that the Court should or shouldn't put a value on

22  the injunctive relief; I'm suggesting you don't need to do it

23  in order to find that the settlement meets the test of being

24  fair, reasonable, and adequate.  So that is my response on

25  Point No. 1.

1      On Point No. 2, you asked about whether class members were

2   aware that they could go up to $15.  You expressed some

3   concern.  We see some resonance of that within the objecting

4   community.  How would people know?  What would have happened?

5      We specifically contemplated that eventuality in the

6   notice regime.  But, let me give you a couple of record cites

7   for that.  If you go to the Keough declaration -- she is the

8   class action administrator, Your Honor, and this is Docket

9   No. 341 -- and you look at Exhibit C, which is the long-form

10  notice, you can see for yourself exactly how it looks.  This is

11  actually what went out to people.

12          **THE COURT:**  Right.

13          **MR. RHODES:**  And it tells them three things which are

14  important:  One, you may not even get to $10.  Because,

15  remember, there was this provision that said we didn't know how

16  many people would submit claims, and if it went over what we

17  thought would be the target range, it may reduce it down to as

18  low as $5, at which point maybe we do all *cy pres*.  We ended up

19  with valid claims.

20      And this is on Page 2 or 3 of the presentation I gave you.

21  I actually give you the actual breakout of how it all works

22  out.  Notice, e-mail numbers, claim numbers.  If you want to

23  see it in person.

24      You end up with 780,000 claims, of which about 170,000

25  were bogus.  One guy was particularly industrious, he submitted

1  160,000 bad claims, somebody named Antoine.  But this is

2  Slide 4, Your Honor.

3          **THE COURT:**  Okay.

4          **MR. RHODES:**  Those people made claims, they

5  understood that they could get $10, less than $10, or more than

6  $10, but we couldn't tell them in advance what they would end

7  up with.  So we think it was in the notice, Page 6, Exhibit 2,

8  of the amended settlement agreement.

9      The third issue you raised has to do with the incentive

10  awards.  And I'm going to take this as an opportunity to

11  comment on that because in the settlement agreement I said I

12  wouldn't affirmatively comment on it, but the Court has raised

13  it.

14      Let's take a look at the *Radcliffe* case again -- excuse

15  me, let's take a look at the incentive awards again.  In the

16  *Experian* case, they were relying on those *Rodriguez* cases, and

17  those are the cases that stood for the proposition that, in the

18  retainer agreement itself, or in the engagement agreement

19  itself, there was an actual clause that made it conditional

20  that the named representative plaintiff would support the

21  settlement in exchange for an incentive award.  That was sort

22  of a *de jure* finding of inadequate representation and made the

23  settlement suspect.

24          **THE COURT:**  Right.  Indeed, it was the basis on which

25  the settlement was --

1          **MR. RHODES:**  Invalidated.

2          **THE COURT:**  -- said should be invalidated.

3          **MR. RHODES:**  Exactly.  And so, *Experian* and *Radcliffe*

4   picks up that thread.

5       Now, the facts in *Experian* are -- and the Court actually

6   noticed this -- the Court says explicitly that incentive awards

7   are absolutely commonplace.  And, indeed, we see them all the

8   time.

9       But what the Court notes is that we rarely see one like

10  this where the approval or support for the approval of the

11  settlement is made conditional on the receipt of an incentive

12  award.

13      And I did suggest in *dicta* -- that it is *dicta* about the

14  size of the award.  I mean, you have to have some record,

15  obviously, upon which the Court makes its decision.  I'm not

16  quarreling with that.

17      But if you look at what the case actually says, they hold

18  that, quote (As read):

19              "The conditional incentive awards themselves are

20              sufficient to invalidate the settlement."

21      And then they just go on to express some opinions about

22  the relationship between the level of activity investment by

23  the named representative plaintiffs and the award they get.

24      The game-changer here is the one that Mr. Arns

25  represented, which is that these Plaintiffs, unlike a lot of

1   other cases, because of the unique nature of the statute under

2   which their claims were being made, they faced a fee risk.

3           **THE COURT:**  But you do agree that 3344 does change

4   the dynamic for purposes of assessing the incentive --

5           **MR. RHODES:**  Yes.  Because --

6           **THE COURT:**  -- because the risk is different for

7   class reps in that circumstance.

8           **MR. RHODES:**  And, it's not mythical in this case.

9   Because last fall, you and I were arguing about whether you

10  were going to give me $700,000 against similarly situated

11  people.  So, you've seen that we have made that motion before.

12      We believe that in the appropriate case, we would be

13  entitled to those fees if we prevailed, and that that is an

14  intrinsic risk that these people face.  And I think that is a

15  variable that does change the calculation.

16      Your last question, explicit question, was on the minor

17  subclass.  And a lot of the objectors are making the point,

18  pushing the argument that they should be carved out or

19  separated.  So, let me give you a couple of things to think

20  about.

21      First of all, the claims were identical for the minors as

22  for the parents.  They were made under 3344.  The complaint was

23  exactly the same:  "I pushed the 'like' button, a story ran in

24  some feed, and then a third party could pay Facebook a fee to

25  boost that same story."

1      That was a sponsored story.  The claims were identical, no

2  difference at all.

3      Two:  Two of the three named representative Plaintiffs

4  currently in the case were minors.

5      Now, interestingly, Mr. Duvall has transitioned from a

6  minor to an adult because the case has been around at the time

7  where he straddled the ages of 17 to 18.  But you actually had

8  a majority of the named representative Plaintiffs were minors.

9      Three:  COPPA preempts the landscape of state law.  I

10  really don't think this is a debatable proposition, although

11  the objectors want to go there.

12      **THE COURT:**  This is the L.A. Superior decision you

13  were going to direct me to?

14      **MR. RHODES:**  Yeah.  Judge Weintraub.  But more

15  fundamentally, just the structure of the statute.

16      At one point in the drafting, they expressly contemplated

17  the sub-13-year-old verifiable consent of a parent regime

18  (Indicating quotation marks) for teenagers.  They got a lot of

19  objections about First Amendment and other rights.  They took

20  it out, and then they expressly said:  Anything to the contrary

21  is preempted.

22      So there is a unitary interest across the minor class

23  relative to the state lawsuits that these objectors are going

24  to champion.

25      Next, and I can't give you a precise number, but I asked

1   Ms. Keough:  Can you tell me whether or not the people seeking

2   cash out of the pot, any of them were minors?

3        I don't know the number, but it is more than 10,000, it is

4   many thousands of claimants were minors.  So the process is

5   working the same for minors as it is for parents.

6        Next, they -- the objectors, I should say, cite that *Fife*

7   case, F-I-F-E.  Judge Wilken.  Right?  Are you familiar with

8   this case?

9            **THE COURT:**  Right.

10           **MR. RHODES:**  And what's very interesting about that

11  case, Your Honor, and this is Case No. 12-1894, Document 44, in

12  the docket, Page 17.  She expressly distinguishes Judge

13  Murphy's opinion on a very simple factual ground.

14       What she notes there is that -- in Judge Murphy's case,

15  the case that was transferred and is now before you and is

16  currently stayed, she says, in that case there was nothing in

17  the record to suggest that the minors weren't going keep using

18  Facebook.  They don't get to come in and disaffirm a contract

19  while continuing to reap the benefits of the service that

20  Facebook provides.  So, she says that decision is correctly

21  decided.

22       And then again on Page 17, Lines 15 through 17, she says

23  but my case is different.

24       And remember, this is just a motion-to-dismiss case.  This

25  is a pleading case.

1          **THE COURT:**  Correct.

2          **MR. RHODES:**  She says, "Based on the allegations I'm

3     given, I'm told that the minors want to disaffirm the entire

4     contract."  And so she says that's a meaningful distinction

5     about whether or not there's a distinction between the consent.

6          The reason I mention that, the objectors are trying to use

7     the *Fife* decision to as a way to say that the minors can't

8     consent at all to the SRRs.  And even Judge Wilken's opinion

9     says no, that's not true; it has to do with what the intent may

10    be.

11         We don't think you get to those analyses for the reasons

12    you have seen in our papers, with COPPA and whatnot.  But I

13    want to point out to you that the objectors, like much of their

14    argument, it is not tethered to the record.  And they misstate

15    the facts, and they misstate the law, repeatedly.

16         Next, both minors and parents are governed by the same

17    SRR, governed the same body of law, California.  So in terms of

18    trying to identify whether there are meaningful and substantial

19    dissimilarity between the interests of the minors and the

20    interests of the parents, in this case, on this record

21    (Indicating), there isn't.

22         And so these are fictional arguments raised by Mr. Zigler

23    and his -- his like, in order to preserve some ability to sue

24    Facebook for something.  That's what this is really about.  But

25    there was complete symmetry of interest across the board.

1          **THE COURT:** The -- again, this sort of is one that I

2   assume we will deal with, with some of the objections, but

3   what -- recently, what was submitted to me yesterday, which was

4   the suggestion that Facebook was going to go in a different

5   path, Mr. Arns has already made some reference to that. But,

6   do you want to comment on that now?

7          **MR. RHODES:** Yes, Your Honor. May I hand you two

8   documents? And, just for the Record, one is Exhibit 8 to the

9   amended settlement agreement. The other one is a printout from

10  the official Facebook blog (Indicating) on this issue that they

11  have raised.

12      (Document handed up to the Court)

13          **THE COURT:** Go ahead.

14          **MR. RHODES:** So, if you go to the papers to which you

15  were alluding -- these were submitted by the Schachter

16  objectors, let's refer to them as -- they assert falsely that

17  the injunctive relief that we are proposing here is fictional

18  because Facebook is going to pull the rug out from underneath

19  the Court and no longer do sponsored stories.

20      So if you look at the docket that you are currently

21  holding --

22          **THE COURT:** Just relabel it in some fashion.

23          **MR. RHODES:** Right. And this was something that was

24  expressly contemplated during the negotiations here.

25      And as you recall, you and I have crossed this bridge

1    before.  I think it was 2009.  Because you raised the question

2    from the bench at that hearing about *Bekin* (Phonetic), about

3    how do you define a function?

4         And we gave some thought to this.  And if you look at the

5    amended settlement agreement, and you look at the definition,

6    it basically has three specific parts to the definition of what

7    a sponsored story is.

8         So if you look at the definition it says, first, it's

9    anything that Facebook calls a sponsored story.  Without

10   limiting the generality of that, it also includes and then

11   lists a whole series of examples.

12        Third, it says, without limiting the generality of that,

13   why don't we prepare a lengthy chart (Indicating) of examples

14   of the ad products that would meet this definition.

15        And all three of those definitions together comprise the

16   definition for purposes of what you are being asked to order as

17   an injunction that pertain to sponsored stories.

18        And what I would ask you to do is take a look at the

19   Facebook blog posting and Exhibit 8, and compare the two.  And

20   you'll see that it's very clear that Facebook isn't saying

21   sponsored stories are gone.  They're saying the name of that ad

22   format is being phased out and, as the author of the blog post

23   says, sponsored stories will be part of the ad formats going

24   forward.

25        It's too cute by half to suggest that I can just stop

1    doing sponsored stories under one name and avoid the injunctive

2    relief.

3         But, again, let me give you a concrete example of this, in

4    practice.  So if you take a look at the bound material I gave

5    you, there is an example in here, if you go back, and I'll find

6    the page number for you in a second.

7         Take a look at Page 25.  Now, what we try to do in these

8    series of pages -- and again, I'm not going to go through these

9    today, I just gave this as a reference guide for you, for

10   purposes of crafting your opinion.  If you look at the

11   right-hand column on Page 25, and you see the highlighted

12   language in yellow, that is what's new.  What is on the left is

13   what's old.  So this is an example of one part of the

14   injunctive relief package that is being proposed.

15        And you will see that under the revised terms, Your Honor,

16   there is a reference in that first revision to sponsored

17   stories.  You see that?

18             **THE COURT:**  Yes.

19             **MR. RHODES:**  And the modifier is "such as," which

20   means "for example."

21        But then look at the body below that, where it says "You

22   give us permission", and if you read the totality of that

23   language, including the new language that starts, "This means,

24   for example...," there's no reference to any particular ad

25   format in that language.  We understood that.

1         The point of this case was the Plaintiffs were saying, "We

2    don't think you described the process well enough by which you

3    might get paid for boosting one of these stories."

4         And so we defined it in a very holistic, very broad way.

5    And we gave you concrete examples, textually, graphically, and

6    in a more title way.  And the totality of that tells you that

7    this, you know, eleventh-hour argument (Indicating) is just,

8    sort of, made of whole cloth.

9         More fundamentally, if you go look at the Schachter

10   exhibits themselves, and read them, it says things like,

11   "Include the best of sponsored stories for all."  The exhibits,

12   themselves, that they attach don't support the proposition they

13   are advancing.

14        The *L.A. Times* article, Exhibit 1, it says, quote

15   (As read):

16              "One of the ad formats that Facebook is ditching is

17              sponsored stories."

18        But then look what it says.  This is Page 1 of 2 of

19   Exhibit 1, Your Honor.

20              **THE COURT:**  Right.

21              **MR. RHODES:**  "It is folding it into other types of

22   advertising," consistent with the blog post.

23        Exhibit 2 to the Schachter objection -- this is the

24   article from *Advertising Age* -- on Page 2, Mr. Boland

25   (Phonetic) states (As read):

1       "Sponsored stories as an idea doesn't go away.

2       Sponsored stories as a product goes away."

3     They're just doing away with the name of that format.

4 They're trying to simplify their advertising formats.  So,

5 there's nothing in the record to support this objection.

6     And even if there were, I would submit to you that we

7 built in a safeguard, which is, if you think about the

8 tripartite consideration that is at issue here, which is the

9 bucket of economic relief, the *cy pres*, and the injunctive

10 relief -- the *cy pres* and the injunctive relief, part of the

11 implicit message there is that:  We are funding and empowering

12 a community of watchdog and advocacy groups to keep an eye on

13 us, and there's a built-in audit right, so if anybody thinks

14 that we are not complying with the Court's injunction because

15 we're playing games (Indicating quotation marks) with the

16 definition of "sponsored stories," you can order me to account

17 for it.  And you also have that inherent power through the

18 discretion of the Court.

19     And then, Your Honor, let me give you one last document,

20 as an aid to the Record.

21     There were 104 objections of one kind or another lodged.

22 We said there were 17 valid, and 87 invalid.  But we responded

23 to every one of them, regardless of how we characterized it.

24     So what I've done is, I've created an index for you, of

25 every single objection.  Summarized the basis of it, and cited

1   to the Record where there is a response to that objection.

2       I'd like to give that to you, if I can.

3           **THE COURT:**  Okay.

4       (Document handed up to the Court)

5           **MR. FRANK:**  Could the objectors get a copy of that?

6           **THE COURT:**  Pardon?

7           **MR. FRANK:**  Can the objectors get a copy of that?

8           **THE COURT:**  I don't know how many copies he has here.

9           **MR. ARNS:**  The objectors have the briefs, Your Honor.

10  They know where every response is.

11          **THE COURT:**  All this is, is just an index of

12  summarizing where to find things.  It's not making an

13  additional argument.

14          **MR. RHODES:**  I'll happily answer any specific

15  questions, Your Honor.  I've tried to give you some materials

16  that summarize, obviously, a very voluminous record.  I don't

17  want to repeat what we have said in our materials.

18          **THE COURT:**  Okay.  I appreciate that, and I think

19  what I will do at this point is look to the objectors, to go

20  ahead and give them an opportunity to elaborate on their

21  objections, although not an open-ended opportunity.  I want to

22  move it along, because we do have several people that have

23  indicated a desire to address the Court.

24      So, let me start with Mr. Fellmeth.  Have I pronounced

25  that correctly?

1          **MR. MICHELMAN:**  Actually, Judge, would -- if you will

2    permit me, Scott Michelman, Public Citizen, on behalf of the

3    Schachter objectors.  I've coordinated with my fellow

4    objectors, including Mr. Fellmeth, Mr. Frank, Mr. Zigler, and

5    Mister -- Mr. Sherwood, all of whom are here today, and we have

6    agreed upon an order and a division of labor which we hope will

7    minimize repetition and streamline the presentation of the

8    arguments.

9        Would you have --

10          **THE COURT:**  I always encourage that.

11          **MR. MICHELMAN:**  -- or would --

12          **THE COURT:**  That's fine, if you are representing to

13   me that that is exactly what this is going to do.  I don't want

14   repetition, and so I appreciate your comment.

15       Are you suggesting that you will now be presenting the

16   argument, but am I -- do all the people who have listed

17   themselves as wanting to speak, all still want to speak?

18          **MR. MICHELMAN:**  My understanding, Your Honor, is that

19   myself, Mr. Fellmeth, Mr. Sherwood, Mr. Zigler, and Mr. Frank

20   are the five objecting counsel who are here today to speak.

21       I would first propose to outline to you what we plan to

22   cover, and then cover my piece, and then turn it over to the

23   other objecting counsel to cover their pieces.

24          **THE COURT:**  Well, okay.  Go ahead.

25          **MR. MICHELMAN:**  Thank you, Your Honor.  Once again,

1   Scott Michelman, Public Citizen, on behalf of the Schachter

2   objectors.

3       Your Honor, this is the order in which objecting counsel

4   proposes to proceed today.  I'll be addressing, on behalf of

5   the Schachter objectors, the issues of minors and the

6   misappropriation statutes, including California Civil

7   Code 3344, and the possibility that it's preempted by COPPA.

8       I'll then be addressing the argument we made this week

9   about the redefinition or abandonment of the sponsored stories

10  program.

11      Then a fellow objector, Robert Fellmeth, of the Children's

12  Advocacy Institute, will be addressing provisions of the

13  California Family Code, and broader concerns about minors'

14  rights.

15      Mr. Sherwood, Alan Sherwood, will be addressing notice

16  deficiencies and fees.

17      Mr. Frank, of the Center for Class Action Fairness, will

18  be addressing structural problems, including class definition

19  and the claim rate.

20      And finally, Aaron Zigler of Korein Tillery will be

21  addressing the over-breadth of the release.

22          **THE COURT:**  Okay.  The individual who wants to speak

23  about the fees, I would put that person after we conclude the

24  other objections, because as I indicated before, I put that at

25  the end of the discussion.  So, I'll give that person an

1  opportunity to make whatever comments they want to make, but I

2  want to hold that off from the initial part.

3      And also, just for timing purposes, I did block the

4  morning out, but that -- the morning, in my mind, and we are

5  probably going to take a break at some point so that the court

6  reporter can rest her hands, the outside of this is 12:30,

7  because I have to move on to other things.  But, just keep that

8  in mind.

9      So, go ahead.

10          **MR. MICHELMAN:**  Understood, Your Honor.  I'll try to

11  be very direct.

12      So beginning with the issue of minors and

13  misappropriation, the parties actually do not dispute that

14  California Civil Code 3344, and the laws of six other states

15  referenced in our brief, including the laws of Virginia,

16  Wisconsin, Tennessee, Oklahoma, New York, and Florida, prohibit

17  the use of a minor's likeness for advertising without parental

18  consent.  They don't dispute that.  And they don't dispute that

19  this proposed settlement does not solve that problem.  There

20  are proposed safeguards which will help in some cases.

21      Mr. Arns said today that one-third of minors are linked to

22  their parents on Facebook.  I would say, what about the other

23  two-thirds?  Because --

24          **THE COURT:**  How do you police that?  What is your

25  proposal as to -- your premise is that minors -- and in this

1   instance we are talking about 13 to 17 -- without parental

2   consent should simply be precluded from participation?

3               **MR. MICHELMAN:**  Either precluded or --

4               **THE COURT:**  How do you do that?

5               **MR. MICHELMAN:**  Well, I think -- I mean, I'm -- I

6   don't have the technological capacity, but I imagine that

7   Facebook does.  In fact, in this very settlement, Facebook has

8   said if minors indicate affirmatively, take the step to

9   indicate their parents are not on Facebook, they -- Facebook

10  will stop using their images.

11      I would propose a better settlement would say unless the

12  minor is connected to a parent, and the parent affirmatively

13  consents, then Facebook does not use the minor's likeness.  And

14  that's in order to comply with the laws of --

15              **THE COURT:**  Aren't we in a universe where, whatever

16  you craft, at the end of the day you're -- to use the honor

17  system is not a precise way to describe what I'm getting at,

18  but you're always going to be dependent on the input you are

19  receiving from the user.  I mean, there's no way to know the

20  age of the person on the other end of the electronic

21  communication.

22              **MR. MICHELMAN:**  That is true, Your Honor.  But

23  contrast what will happen in the bulk of cases, where minors

24  will simply, quote-unquote, represent -- and that is the

25  language of the settlement agreement -- that their parents

1  consent?  What happens if everybody -- if the users jump

2  through the hoops set out through the settlement agreement?

3      In that case, the parents would indicate his or her

4  relationship to the minor, the minor would indicate his or her

5  relationship to the parent, and then the parent would use the

6  controls to either opt the child out or consent.

7      Now, obviously, there, one can imagine fraud, one can

8  imagine people pretending other people are their parents.  And

9  I agree with Your Honor, at some -- at the end of the day

10  there -- some things are going to slip through.  But, that is a

11  much more serious safeguard and protection for the rights of

12  these minors, all these state laws, accepting a mere

13  representation by the minor that his or her parent consents.

14      And, and the reason that these state laws are so important

15  is, in part, that they're state laws, and there are seven of

16  them, and they cover -- they include three of the largest four

17  states by population, California, New York, and Florida.

18      But, furthermore, both Facebook and class counsel have

19  argued, and they have repeated the argument here today, that

20  California law should control.  And if that's the case, then

21  California law, Section 3344, which clearly prohibits this

22  practice, would govern all Facebook users.

23      Now, they don't actually dispute any of this.  But

24  instead, Facebook in particular presses the preemption

25  argument, the COPPA preemption argument.  And Mr. Rhodes finds

 1   it not debatable that COPPA preempts this -- all of these

 2   statutes.

 3        I'm -- I should -- understated, I find that conclusion

 4   surprising.  It is true that there is the *David Cohen* case out

 5   there, that is a summary decision with no analysis of a state

 6   superior court.  When --

 7             **THE COURT:**  Is there any case going the other way?

 8             **MR. MICHELMAN:**  Not specifically on this issue,

 9   Your Honor.  But when we look to the law of the United States

10   Supreme Court on preemption, the controlling decision is

11   *Sprietsma versus Mercury Marine*, in which the Supreme Court

12   held that the Coast Guard's failure to provide a specific type

13   of propeller guard -- they considered it and decided against it

14   -- did not expressly or impliedly preempt tort laws in other

15   states that would require the propeller guards.

16             **THE COURT:**  Well, there's lots of preemption law out

17   there.  I mean, there's not just that case.  I mean, we have

18   all sorts of precedent we can look to about how we analyze a

19   preemption argument, and it's either expressly preempted or the

20   various other stages along the path.

21        But the simple fact is in this particular area there's

22   only, I guess, one decision out there, and that is contrary to

23   your view.  Now, I understand it's from a state court, so a

24   state trial-level court, I understand that, but the fact is --

25             **MR. MICHELMAN:**  Without a lot of analysis.

1     **THE COURT:**  But the fact is, there is nothing going

2  the other way.

3     **MR. MICHELMAN:**  There is nothing going the other way

4  specifically on this issue, but the -- the arguments are quite

5  weak.  The express preemption argument relies on a clause that

6  prohibits treatment, quote, "inconsistent with the treatment of

7  those activities or actions under this section."

8     Well, the treatment of the activities and actions under

9  this section is treatment of activities and actions with

10 respect to 12 and under.  It just doesn't say anything either

11 way about 13 to 17.  So the express argument, I would submit,

12 is not -- is facially not -- not very persuasive.

13    As to implied conflict management, the Supreme Court has

14 held that it is possible for Congressional or regulatory

15 inaction to have a preemptive effect.  But that is only true

16 where, either by Congressional or regulatory design, the choice

17 of the -- the area that has not been regulated has been a

18 deliberate area of nonregulation, that -- that the Federal

19 Government has chosen to leave open.

20    And for example, in *Geyer*, you have a 15-year regulatory

21 history of the Department of Transportation deciding

22 specifically that it wanted to leave the choice open, in the

23 area of auto safety, and not have state laws that provided

24 different standards.

25    Here you have nothing like that.  You have a few witnesses

1    at a hearing, and the deletion of a provision that is not --

2    that is never explained, in terms of preempting state laws to

3    the contrary or making sure that minors 13 to 17 have all the

4    kinds of freedom that one could imagine they might have.

5              **THE COURT:**  Let me shift the focus for a moment with

6    you.  What -- the nature of the harm that is being -- that you

7    identify, that the users are incurring here -- and I -- I

8    realize that this may get into the various statutes that you

9    say are particularly targeted at protecting minors.

10        But, the nature of the injury that you identify, how is it

11   any different between an adult and a 13- to 17-year-old, in

12   terms of using their likeness for purposes of, in this

13   instance, sponsored stories?

14        How is it at all different, and why is it more pronounced

15   for a minor than it is for an adult?

16             **MR. MICHELMAN:**  I'm glad you asked that question,

17   Your Honor, and particularly since the parties argue that

18   everybody's claims are the same.  And we agree, the claims are

19   the same.  But the protections provided by statute are not.

20        The State of California, and six other states as well,

21   have decided that because of minors' youth, there should be

22   more safeguards in place that protect them against rash

23   decisions that they may make when they are 14 years old.  That

24   puts the parent in a position to -- to give consent and to have

25   some oversight.  That's -- and so even if the injury is the

1  same, the states have chosen to provide a greater level of

2  protection.  And the problem with this settlement agreement is,

3  it does not respect that choice.  In fact, it authorizes --

4      **THE COURT:**  I guess what I'm trying to ask is, what

5  is it about the status of an individual, as a 13- to

6  17-year-old, that you can point me to that says they have

7  incurred this harm, and it's more pronounced because they are a

8  13- to 17-year-old, there's something about the nature of this

9  that is identified as the harm here, which is the use of the

10  likeness without consent, for advertising purposes.

11      Why is that more harmful to a 13- to 17-year-old than it

12  is to an adult?  I'm just trying to get a handle on -- I

13  understand your point, and I'm not minimizing it, that

14  legislatively there is some extra protection that you say is

15  there for that particular group of the population.

16      But what is it about the nature of this particular conduct

17  that you think is -- has a particularly pronounced effect on a

18  13- to 17-year-old, as opposed to an adult?

19      **MR. MICHELMAN:**  Well, minors -- and the Supreme Court

20  has said this as well -- minors have, in certain respects,

21  diminished capacity for judgment and diminished, for example,

22  culpability in the criminal sphere.  And so it's been

23  recognized as a matter of public policy.

24      **THE COURT:**  That's why they may click "like" without

25  the benefit of maturity, if such there be.  I understand that.

1 But what I'm asking about is, having done that, how have they

2 been injured in a way that is particularly pronounced?  In a

3 way that is different from the adult putative class members?

4       **MR. MICHELMAN:**  Well, they may have made decisions,

5 they may have chosen to like things and be tagged that way on

6 the Internet forever, without having necessarily thought

7 through the consequences in the manner an adult would.  And I

8 sense I may have not --

9       **THE COURT:**  So they made a bad decision about what to

10 like.

11       **MR. MICHELMAN:**  They made a bad decision, but it is a

12 decision that the legislators of seven states have said they

13 should be protected from.  And this settlement authorizes

14 conduct that violates all of those laws, including the law of

15 California, which a party says governs.  And that's a serious

16 problem with this settlement.

17     And, several courts have said that courts should not be in

18 the business of approving settlements that authorize or

19 perpetuate violations of other laws.  And this does that.

20 Because, as the parties do not dispute, minors' images will

21 continue to be used, under this settlement, without parental

22 consent.  And that violates these laws.

23     I would like to address one more point on the minors

24 before I move to the issues of changing the name of sponsored

25 stories.  And that is, it's been suggested today by the

1   parties' counsel that minors have all the protection they need

2   because they can just get off Facebook.

3        That was true before this suit was filed.  So, in terms of

4   whether this settlement provides any benefit, it doesn't.  The

5   minor can always make the decision, "You know what, I'm going

6   to get off Facebook, and withdraw all of this, and step out of

7   this whole area."

8        That's not what the settlement purports to give them.  The

9   settlement purports to give them more, purports to give them

10  new options and more protections, and it doesn't do that.  For

11  most minors, the law will continue to be violated.

12       So I would like to move on now to the issue of the change

13  in the name of sponsored stories.  Both Plaintiffs and

14  Defendants put a lot of stock in the definition section, and I

15  think that's absolutely the right place to turn.

16       This is Section 129 of the proposed settlement agreement,

17  quote (As read):

18            "The term 'sponsored stories' or 'sponsored story'

19            means content displayed by or on behalf of Facebook,

20            that Facebook refers to or markets as sponsored

21            stories."

22       I think that last phrase, "that Facebook refers to or

23  markets as sponsored stories," is critical.  The definition of

24  the -- of what this injunctive relief covers, and the term

25  "sponsored stories" is used repeatedly in the injunctive relief

1  provisions of Section 2.1, that term is defined by reference to

2  how Facebook refers to and markets it.

3      So Mr. Rhodes makes slighting reference to the exhibits we

4  have cited, saying thing like, "The idea of sponsored stories

5  isn't going away, just the name is changing."

6      Well, I understand why Mr. Rhodes would like the idea to

7  be the critical thing, but that's not what the words say in

8  this settlement agreement.  The words say that the words, what

9  Facebook refers to and markets as "sponsored stories," is the

10  critical thing.

11          **THE COURT:**  Well, but he, in fairness, has pointed

12  out that it's a bit broader than that.  It's not -- if they

13  simply, tomorrow, labeled "sponsored stories" as "fun facts,"

14  and put it out there, or something like that, and didn't abide

15  by the injunctive relief, they would be subject to the audit,

16  and they would have various ramifications.

17      I mean, in other words, you are not simply suggesting that

18  they could, under the terms of the settlement agreement, simply

19  put a new name on it and blissfully go about without

20  implementing any aspects of the settlement agreement.

21          **MR. MICHELMAN:**  I am, Your Honor.

22          **THE COURT:**  I don't agree with you.

23          **MR. MICHELMAN:**  I think if we were here -- if they

24  violated these provisions and they were dragged into court,

25  Mr. Rhodes would be up here arguing that "sponsored stories"

1  only means, just as it says in 129, what Facebook refers to or

2  markets as sponsored stories.

3      **THE COURT:**  Well, he just said the contrary.  So he

4  couldn't say that, because he's already said that's not the

5  case.

6      Now, where is it that you think it is so limited?  Because

7  I do see it as saying -- effectively what sponsored stories is

8  doing, whatever label, whatever one may put as the label and

9  the name for it, that's covered.

10     **MR. MICHELMAN:**  Well, I think it is whatever they

11 called "sponsored stories."  And the rest of the paragraph is

12 just giving examples of the things they currently call it.

13     But even taking Your Honor's point that this could be read

14 broader, and perhaps Facebook would be judicially estopped -- I

15 would hope they would -- to deny that it covers a

16 reincarnation, because Facebook is changing its practices, we

17 don't know exactly what that reincarnation looks like.  We

18 don't know if the terms of the settlement in 2.1 are going to

19 be meaningful, as against whatever new product Facebook comes

20 up with.

21     And that's a source of concern to objectors, because what

22 limited relief this offers, in terms of the rights of -- the

23 rights of certain minors to get parental consent, and the

24 rights of certain -- certain users to opt out of certain

25 categories after they have seen a sponsored story, again, these

1  are all fairly limited, but we don't even know how they would

2  apply, because we don't know --

3           **THE COURT:**  But of course, the release wouldn't

4  necessarily cover that conduct.  Because the language of the

5  release is also important.  If the point you are trying to make

6  is they could come up with an entirely new program that you

7  think does harm to minors, amongst others, that wouldn't

8  necessarily be covered by the release that they have agreed to

9  in this agreement.

10          **MR. MICHELMAN:**  Well, the release is fairly broad

11  because -- and Mr. Zigler will discuss this in more detail, but

12  one point on the release is that it covers claims which the

13  releasing parties have or may have against the released parties

14  arising out of, or relating to, any of the acts, omissions, or

15  other conduct that was or could have been alleged in this

16  action, including but not limited to sponsored stories.  So it

17  -- it goes beyond what they are doing now, and could be read to

18  release additional conduct as well.

19       And, and again, you know, I would welcome hearing

20  Facebook, and -- well, in particular, Facebook say, oh, that --

21  that -- you know, in front of you, and in a manner that would

22  create judicial estoppel -- that this release is much more

23  limited than that.

24       But I'll -- I'll defer to my fellow objecting counsel,

25  Mr. Zigler, in discussing the release further.

1          **THE COURT:**   Okay.  Why don't you summarize, or bring

2     it to a conclusion.

3          **MR. MICHELMAN:**   Sure.  To sum up, the lack of

4     protection for minors for continuing violations of state law

5     is, by itself, a reason to object -- to reject this settlement.

6     Because the courts, the federal courts should not be in the

7     business of authorizing agreements that perpetuate or authorize

8     the violations of state law.

9          There is no dispute, this will continue to do that by

10    permitting Facebook to use minors' likenesses without their

11    parents' consent.

12         And now I'll turn it over to objecting counsel, Robert

13    Fellmeth, on behalf of the Children's Advocacy Institute.

14         **THE COURT:**   Thank you.  We will hear from

15    Mr. Fellmeth, and then we will take a brief break after

16    Mr. Fellmeth.

17         **MR. FELLMETH:**   Thank you, Your Honor.  May it please

18    the Court, I have as Exhibit 12 from the materials here I would

19    like to hand to the Court, and I have eight copies here for

20    everybody --

21         **THE COURT:**   Very well.

22        (Document handed up to the Court)

23         **MR. FELLMETH:**   -- the terms and conditions -- or not

24    -- rights and responsibilities of Facebook, followed by the

25    changes being made under this court -- proposed court order.

1          **THE COURT:**  Very well.

2      (Reporter interruption)

3          **MR. FELLMETH:**  Sorry.

4      Your Honor, I apol -- --

5          **THE COURT:**  Just -- yes, go ahead.  You're about to

6  tell me what I was going to ask, which is to identify who

7  you're representing.  Go ahead.

8          **MR. FELLMETH:**  I'm Bob Fellmeth, of the Children's

9  Advocacy Institute, on behalf of the Depot family.  And also on

10  behalf of child advocates generally, I must say.

11      Now, I want to cover some points here that the Court's

12  already raised:  Why are teenagers different?  Because they

13  post things without thought, because they post things they

14  shouldn't post, because they post things they regret.  Because

15  they're engaged in cyber bullying.  Because they're not mature

16  adults yet.

17      And I represent them, and have for 22 years.

18          **THE COURT:**  Although the premise of they post things

19  without thought is certainly not confined to minors, but --

20  okay.

21          **MR. FELLMETH:**  It is not, but it is a worse problem

22  with teenagers.  And I think any parent with a teenager will

23  verify this.  It is a particular problem with teenagers.  And

24  the damage that comes is enhanced with teenagers.

25      Now, I agree with the Court that whether it's sponsored

1   stories or called "sponsored stories," I don't care about that.

2   I am more concerned that, if you look at the last two pages of

3   what I've given you, laying out what the changes being made

4   here, it moves from (As read):

5               "You can use your privacy settings to limit how your

6               name and profile picture..."

7         (Reporter interruption)

8               **THE COURT:**  You need to slow down.

9               **MR. FELLMETH:**  Sorry.  This is a bad habit I have.

10  Reporters always hate me.  (As read)

11              "...may be associated with commercial, sponsored, or

12              related content, such as a brand you like, served or

13              enhanced by us.  You give us permission to use your

14              name and profile picture in connection with the

15              content, subject to the limits you place.  We do not

16              give your content or information to advertisers

17              without your consent.  You understand that we may not

18              always identify paid services and communications as

19              such."

20        Now, I submit that the changed one is much worse for

21  children, much more -- much broader, much more -- of much

22  greater concern.  And, as the Court has mentioned, not at all

23  confined to sponsored stories. (As read)

24              "You give us permission..."

25        This no longer a permission with regard to a particular

1  recasting of your postings that we are going to send to some

2  unnamed group.  Now we are saying "You give us permission"

3  categorically here, automatically, as a term and condition,

4  No. 10 of 18, in the small-print list:

5          "...to use your name, profile picture, content, and

6          information, in connection with commercial,

7          sponsored, or related content, such as a brand you

8          like..."

9      "Such as."

10         "...served or enhanced by us.  This means, for

11         example..."

12     And then there's an example:

13         "...permit a business or other entity to pay us,

14         display your name and/or profile picture with your

15         content or information.  If you have selected a

16         specific audience for your content or information, we

17         will respect what choice...your choice when we use

18         it."

19     Keep in mind, though, that the limits on where the stuff

20  goes is in a very difficult-to-find place in the settings area,

21  which is not -- you can't get access to that from your profile

22  page.  You've got to go out, and you've got to go in, and

23  you've got a default entry of "Public."  Everybody gets it.

24     So, let me recast this in terms of the teenage problem we

25  have here.

1          **THE COURT:**   Okay.  And I'll let do you that, but I

2     want you to keep in mind, to step back in this process.

3          My function here is not to craft the perfect policy for

4     minors.  That's not what I'm entitled to do.  What I am to do

5     here is to determine whether or not this particular settlement

6     that has been proposed to me for approval is fair, reasonable,

7     and adequate.  Not could I craft a better policy, or could you

8     craft a better policy?  That is not the -- that isn't the world

9     in which I operate.

10         So when you are making your arguments, to the extent that

11    the argument is "Boy, there's a better way do this," that

12    really doesn't go to the -- the function that I have to engage

13    in at the moment.

14         It really is, this -- this particular remedy is valueless,

15    it's not fair, it's not reasonable.  I mean, adequate, there,

16    you may be closer to it, in terms of what you are arguing.

17    But, just to keep in mind, it is not "Can this be done with

18    more protection for a minor," because I am not in a position to

19    craft it.  I am here to either accept or reject.

20         So just keep that in mind, and go ahead, Mr. Fellmeth.

21         **MR. FELLMETH:**   I understand, Your Honor.  I wanted to

22    emphasize, in terms of what is fair and reasonable, the bottom

23    line about what this means, you're giving to a third-party

24    commercial entity, based on this terms and conditions sign-off

25    (Indicating), the right to take anything you post, to select

1  from it without telling you in advance that you are doing it,

2  without telling you exactly where you're sending it or what

3  you're doing, recast it, then send out to a group of people.

4  You don't know who they are, and you may never know who they

5  are.

6      Now, this is going on, on the Internet.  So that when

7  somebody gets it, the recalculation, the recasting of what you

8  have posted -- and I know this is all atmospheric here about,

9  "Oh, these are sponsored stories, it's 'Like,' it's all

10  benign."  It doesn't have to be benign.  It may not be benign.

11  It may be very, very horrible for the kid involved.

12      So, it goes out.  It's permanent.  It goes out, and it's

13  there.  And whoever receives it, resends it to other people.

14  This is a very momentous thing that is happening for a teenager

15  posting things many times they should not be posting.  We want

16  to have the parent involved in this.  There's a fundamental

17  liberty interest apparent in this country.

18      And I want to add something to the COPPA issue.  Because

19  we have statutes to protect kids, and there's a reason for

20  them, the statutes in this area and on this subject matter.  I

21  was involved in COPPA.  I have been involved in the FTC

22  regulations to implement it.  Yes, the 13- to 18-year-olds were

23  not included, because we wanted 0 to 12 very harshly included.

24  And for the 0 to 13, including 12-year-olds, you can't even

25  collect the information, they can't even get into Facebook,

1   without verifiable parental.  In other words, it is a very high

2   floor.

3        Because you create a very high floor for 0 to 13 does not

4   mean you have destroyed the floor that exists for 13 to 18.

5   That is not what that means.  And that is not a reasonable

6   interpretation of a preemption theory in this regard.

7        So if you then look at 3344, and see what it says and read

8   it, is it not being violated?  If you look at the Family Code,

9   and look at it, and say is it not being violated?  They say,

10  "Oh, no, this is not a delegation.  The Family Code says you

11  can't require delegation.  This isn't a delegation."

12       Really?  You are saying, "Facebook, you can do whatever

13  you want, whenever you want, to whomever you want, without

14  telling me in advance what you are doing and to whom and

15  where."  That is not a delegation?

16       So A is met; C, under *Fife*, is met there.  I think that is

17  a very weak case.  I don't even know if I agree with *Fife*,

18  on C.  I agree that if you are paying for something, a child

19  can be held to that contract.  They're receiving the benefits,

20  there's an estoppel concept, fine.

21       But keep in mind that what we're talking about here is not

22  a one-dollar addition to the Facebook charge or something.  It

23  is the imposition of an entirely different service.  There are

24  two different services here.  A former antitrust prosecutor,

25  I'm always looking at relevant market.  There's a relevant

1  service market here of social networking.  Very attractive,

2  excellent product.  I'm a member of Facebook.  My kids are.

3  Excellent product.

4      There's a separate market called "commercial

5  endorsements."  A different market, different service market.

6  Different people are involved.  The advertisers are involved.

7  It's separate.

8      It's a mistake to tie the two together and say it's all

9  the same thing, which is what they're doing, and consent for

10  one means consent for the other.

11      Indeed, in antitrust law, if you have market power in one

12  service-relevant market, and you use it to jack up distorted

13  advantage in the other market, that's a per-se tie-in.  You

14  can't do that.  They've got to be kept separate.  They are

15  logically separate.  You can't use a power in one to get an

16  advantage in the other.

17      Now, my point there is that you can't give consent -- say

18  consent of one is consent to the other when they're not the

19  same.  They're different.  Different things are happening here.

20  You've got -- now, I'm not saying that the Court has to say it

21  has to be perfect, it has to be exactly as Fellmeth wants it,

22  or whatever.  I'm not saying --

23      (Reporter interruption)

24          **MR. FELLMETH:**  I'm not saying that it has to be

25  perfect.  I'm not saying that the Court has to impose some kind

1   of arbitrary anything.

2          **THE COURT:**  I can't impose an arbitrary --

3          **MR. FELLMETH:**  I know you can't.  All you can do is

4   say no.  What I'm suggesting is you say no to any inclusion of

5   minors, given 3344, given the fact that COPPA is not preempt,

6   given that California law applies -- and you're talking to a

7   California attorney for 45 years -- California law applies --

8   who wrote some of these statutes.  And the statutes are not

9   preempted.  They are there to protect the kids.  There is a

10  reason for them.

11         And if they wanted -- if they want to have a settlement

12  that says -- and it's not hard to do, not hard to do -- to say,

13  "Kid, if you have a parent on Facebook, let us know, and if you

14  want to do it, we will take whatever we're going to be doing,

15  whatever -- we're going to be recasting your posts, we're going

16  to be recasting them, we're going to be sending them to a

17  group, we'll copy and paste."

18         That takes them no time at all.  That's nothing.  Copy and

19  paste, send it to the parent, and say, "Click 'yes,'" just

20  "Click 'yes.'"

21         Can that be evaded in some way?  Can the kids cheat?  You

22  know, kids come home, say, you know, "The dog ate my homework,"

23  signed "Mom"?  I mean, yeah, sure, they can.  Sure, they can.

24  But all we are asking on behalf of children is the bona fide

25  attempt -- and their parents -- to get parental consent to

1   something that is very momentous, permanent, going out without

2   prior warning.  It doesn't work.  It's not beneficial.  It's

3   not adequate, it's not fair, it's not reasonable.

4       I'm asking for the Court to take a close look and to think

5   about this.  This is a -- this is a "wears no clothes" issue.

6   The kid is wearing clothes (Indicating), but the knights behind

7   me (Indicating) are not wearing clothes here.

8       I'm asking the Court to *tabula rasa,* look at what it does

9   and whether or not it complies reasonably with minimum state

10  statute, minimum common law, with regard to the fundamental

11  interest of parents, with regard to 3344, with regard to the

12  Family Act.

13      And by the way, one other just side issue, they say, well,

14  the Family -- the Family Code has this provision in it that

15  selects out actors, that is, people who get paid for acting or

16  art or singing or whatever.  And that demonstrates that nobody,

17  that -- that unless you're in that category, you're not covered

18  at all.  And again, it's the opposite.  Again, it is a really

19  high standard for those people, eight pages of standards,

20  including even how much they're going to get paid, a minimum

21  amount they have to get paid is in the statute.  Doesn't mean

22  that the kids who are not getting money for doing things, art

23  or athletics or whatever, are bereft.  It's, again, a higher

24  standard for them.

25      And by the way, those kids are going to be in this

1   (Indicating) as well.  Even the kids who are receiving money

2   for art or whatever are going to be subject to this

3   expropriation of their postings.  Direct violation of the

4   detail they paid for.  They don't have any mechanism for that

5   either.

6        So, okay, I'm sorry for -- I'm emotional because I've had

7   teenage sons.

8             **THE COURT:**  Okay.  Well --

9             **MR. RHODES:**  Your Honor --

10            **THE COURT:**  Okay.

11            **MR. RHODES:**  For the Record, what counsel, I believe,

12  is attempting to put before the Court is in the Record at

13  Docket No. 339, which is Paragraph 12 to the Weinmann

14  declaration.  I don't think it was ever established on the

15  Record what it was he was waving around.

16       And I would note that this is, I believe, the SRR in

17  effect for the period of October of 2010, and through October,

18  2011.  So it's kind of a -- really doesn't apply to anything.

19       Thank you.

20            **MR. FELLMETH:**  It's what essentially is being

21  changed.  It was a -- not immediately preceding, but very close

22  to immediately preceding.

23            **THE COURT:**  Thank you.  Let's take a -- so that the

24  court reporter who has been in a challenging situation in terms

25  of following all the comments, let's take a break, and we'll

1   resume at quarter of.

2       And, again, I'm looking to conclude these proceedings at

3   12:30, so please do keep that in mind.  Okay?

4       (Recess taken from 11:33 to 11:41 a.m.)

5           **THE CLERK:**  Remain seated.  Please come to order.

6           **THE COURT:**  Very well, we are back on the Record.

7       And, Counsel, you may proceed.  If you could identify

8   yourself and who you are representing.

9           **MR. SHERWOOD:**  Thank you very much, Your Honor.  Good

10  morning.  My name is Alan Sherwood.  I represent Objector

11  Jennifer Deachin.

12      Ms. Deachin has asked us to request that the Court not

13  approve the proposed settlement at this time.  Our basic

14  position has been briefed, so I don't want to repeat what is in

15  the brief.

16      We believe that Ms. Deachin and all the members in the

17  class should get a second notice after determining the number

18  of participants that want to be in the class, and fairness

19  would then entitle the participants to be told, based on the

20  number of people in the class, whether or not to opt out at

21  that point.  That it was premature with the notice that's been

22  presented.

23      I also had some comments to make about the fees, which

24  I'll reserve for later, but that is basically the two issues

25  that we wanted the Court to look at.

1          **THE COURT:**  So you are saying, a second opportunity

2    to opt out is what you are thinking should be provided?

3          **MR. SHERWOOD:**  Because of the vagueness of what the

4    proposed settlement would actually be to the class members.

5          **THE COURT:**   In terms of the amount of money they

6    would receive?

7          **MR. SHERWOOD:**  Exactly.  That it would be more

8    reasonable, and that it would be a more informed consent-type

9    of notice, if they were given notice after the number of

10   participants was determined.

11          **THE COURT:**  Suppose, though, that if they -- the

12   initial notice said $10, but it could be a different amount, if

13   the amount then is increased, why would somebody then want to

14   be opting out at that point?  It's only getting more.

15          **MR. SHERWOOD:**  Well, Your Honor, I don't have a good

16   explanation for that.

17          **THE COURT:**  Okay.  Okay.  Thank you.

18          **MR. SHERWOOD:**  Very .  Thank you.

19          **MR. FRANK:**  Good morning, Your Honor.

20          **THE COURT:**  Good morning.

21          **MR. FRANK:**  Theodore H. Frank, with the nonprofit

22   Center for Class Action Fairness, on behalf of Objector Sam

23   Kazman and myself.

24          **THE COURT:**  Very well.  And you expressed an interest

25   in seeing the summary, and I'm happy to provide it to you, if I

1   can find where I put it.

2              **MR. FRANK:**  I can forego that at the moment.

3              **THE COURT:**  All right.  Okay.  Go ahead.

4              **MR. FRANK:**  I would like to raise two 23(a)(4)

5   issues.  First of all, the *Radcliffe* issue.  And the animating

6   concern of the Ninth Circuit in *Radcliffe* is whether the

7   incentive fee paid to the class representative so distorts

8   their incentives to agree to a settlement that their interests

9   diverge from the class that they are supposedly representing.

10       And that's not just the Ninth Circuit.  That's the

11   Eleventh Circuit, in *London versus Wal-Mart*; that's the Sixth

12   Circuit, in *Midland Funding*.  The D.C. Circuit's a bit on the

13   other side on that.

14       The parties argued that the $12,000 that the parties are

15   getting is okay because they are facing a risk from 3344 fee

16   shifting.  I would argue that that cuts in exactly the opposite

17   direction.  Because what the parties are getting are not just

18   $12,000, but they're freeing themselves from the risk of

19   3344 fee shifting that the class does not have.

20       And so they are getting more than $12,000.  They are

21   getting $12,000, plus the option value or the expected value of

22   the risk of 3344 fee shifting.  And that's exactly the sort of

23   distorted --

24              **THE COURT:**  How do the class members have that risk?

25              **MR. FRANK:**  Because the 3344 fee shifting would

1   not -- Facebook would not say, "Okay, here's our $5 million

2   attorney bill, and we are going to bill every class member

3   28 cents."  That's not how that works.

4          **THE COURT:**  Right.

5          **MR. FRANK:**  At least the class members would have the

6   opportunity to opt out before --

7          **THE COURT:**  I'm not sure I follow you, why the fact

8   that the named class representatives could be at risk under

9   3344 in a fee shifting; that, therefore, is it -- your point is

10  that they have an extra interest in agreeing to the settlement

11  to avoid the prospect of a fee shift?

12         **MR. FRANK:**  That's exactly right, Your Honor.

13         **THE COURT:**  Okay.  We had a long discussion about the

14  language in *Radcliffe*, and the focus of *Radcliffe*.  And I do

15  think it is a fair reading of that opinion by Judge Gould, that

16  the particular issue that was in play was the nature of that

17  agreement by which the named plaintiffs essentially tied

18  themselves to joining forces seeking approval of the

19  settlement.  And that is not what we have here.

20         **MR. FRANK:**  I completely agree with that.  What

21  happened in *Radcliffe* was certainly sufficient to trigger the

22  23(a)(4) problem.  It isn't necessary.  And we see that in

23  *Rodriguez*, where the Court criticized an incentive payment

24  agreement that was capped out depending on how much the class

25  received.

1    And there, well, then the class might have an incentive to

2  settle at that capped-out amount and not seek anything more so

3  that they could guarantee the maximum incentive.  And the

4  *Rodriguez* court held that that was problematic.

5        **THE COURT:**  The remedy for the concern that you are

6  presenting to me is that I simply reduce the incentive fee

7  amount?

8        **MR. FRANK:**  That's one way to approach it.  That

9  still creates -- there would still be the 23(a)(4) problem,

10  that the class wouldn't be an adequate representative because

11  they're facing a completely different set of risks and benefits

12  that the rest of the class isn't having.

13        **THE COURT:**  But to some extent, isn't that

14  ameliorated by the fact that the Court has to make the

15  determination on whether or not the proposed settlement is

16  fair, reasonable, and adequate?

17    So, to the extent that your concern is, by -- by

18  definition, these class representatives are in a conflict

19  situation such that they agreed to something that perhaps they

20  shouldn't have agreed to, I -- I understand that being part of

21  the argument.

22    But then, at the point that it is presented to me, if I,

23  on the one hand, reduced the incentive awards, and, number two,

24  I deem it to be fair, adequate, and reasonable, I'm not sure

25  how the process has been infected, if you will, by these class

1    reps.

2         **MR. FRANK:**  Certainly, the incentive payments might

3    be unfair under 23(e), and you could fix that 23(e) unfairness

4    by reducing the incentive payments.

5         We're taking a different position, that there's a 23(a)(4)

6    problem.  That the class representatives have an incentive to

7    agree to a settlement without regard to whether they are fairly

8    representing the class, because of this risk that they face.

9    And, and, according to class counsel, that was a very

10   substantial risk that, in part, motivated the settlement.

11        Our second 23(a)(4) point is that we're talking about the

12   class members who get this $15, which I think the Court should

13   exercise its discretion enough at 17 or 18 dollars to exhaust

14   the settlement fund, rather than have money to go to *cy pres*.

15        But what's really happening is that there are two

16   subgroups, one of whom gets the $15, like my client,

17   Mr. Kazman; and then another subgroup of potentially millions

18   of class members, who get zero under the settlement because

19   they are not allowed to make a claim without perjuring

20   themselves.  And that's the subgroup that includes me.  I could

21   not make a claim because before I can make a claim, I had to

22   attest to things that just weren't true.

23        These two subgroups are uncertified.  They're not

24   separately represented.  The parties argue it's okay that

25   Kazman gets $15, and Frank gets zero dollars, because they have

1   completely different claims.  Kazman has one type of cause of

2   action, and Frank has a completely different cause of action,

3   because we would have affirmative defenses against Frank that

4   we wouldn't have against Kazman.

5       But that's just a concession that the class shouldn't be

6   certified.  That this isn't one single unitary class.  That

7   there are really two subclasses here that haven't been

8   separately represented, that haven't been separately certified,

9   and haven't been requested to be separately certified.

10      And that creates the 23(a)(4) problem that we identified.

11  That's *Amchem*, that's the *Literary Works*, that's *Dewey versus*

12  *Volkswagen*.  And all of them have slightly different facts, but

13  the principle is the principle.

14      Under *Comcast versus Behrend*, when you have those sorts of

15  individualized differences, you can't group them together into

16  a single class.  You either need to say the class is equally

17  situated, and you treat every class member alike, or you say

18  the class is differently situated, and they have individualized

19  differences, and you subclass accordingly, and you separately

20  represent accordingly so that the disfavored subclass is fairly

21  represented at the settlement discussions.

22      We've extensively briefed a lot of other issues.  I'm

23  happy to answer questions on those.  I do want to raise one

24  rebuttal point.  We heard here that there are just very few

25  objections, whatever the infinitesimal amount is.  And,

1   Your Honor, that's why we have class actions.  Because it would

2   be un- -- infeasible for an individual to bring the individual

3   claim, you group them together and you aggregate the

4   litigation.

5       And I got attacked in the papers:  I hate class actions.

6   Well, I don't hate class actions.  It's a good way to aggregate

7   these sorts of claims.  It's a good procedural device.  But

8   then you can't turn and say, "Aha, all these objectors who have

9   even less incentive than individual class members to bring

10  claims, you didn't have 71 million objectors, and, therefore,

11  the majority of the class supports the settlement."

12      And you can't make that inference.  I think if you were to

13  poll a thousand Facebook members and say, "Here's a settlement,

14  and it pays some class members $15, and it pays other class

15  members zero dollars, and it pays the attorneys $1,000 an hour,

16  do you think that's fair?"  We know that they're never going to

17  conduct that study because they would find that a majority of

18  class members answering it would say, "That's outrageous.  It

19  shocks the conscience."

20      And you can't say that there are only 104 objectors who

21  jumped through all the hoops, and, in fact, we're going to say

22  that 87 of them didn't jump through the hoops because we were's

23  going to impose a different requirement that wasn't in the

24  notice or in the preliminary order, and call those objections

25  invalid.

1        Your Honor, I won *Bluetooth* in the Ninth Circuit, I won

2    *Inkjet* in the Ninth Circuit, I won *Nachshin versus AOL* in the

3    Ninth Circuit on class action settlement appeals from

4    approvals.  And every one of those, there are fewer objections

5    than here.

6        It's not the number of objections, but it's the quality of

7    the objections that matters when you're looking at the

8    reactions of the class.  If they came here, and the class had

9    had full notice and nobody objected, they can say, "See, the

10   class doesn't have a problem with this."

11           **THE COURT:**  At the end of the day -- so your view as

12   to what should happen -- obviously you're saying I should

13   reject the settlement.  But is effectively what you are saying,

14   is that this case, this particular case should simply run the

15   distance?

16       I mean, that it's not a -- it is not a settleable case

17   from a class action perspective?  The Court should just either

18   try it, or rule, or dismiss it?  Or -- I mean, I'm trying to

19   get a handle on where you think this all goes if I went down

20   the path you ask me to go.

21           **MR. FRANK:**  I think that's a fundamental problem with

22   3344.  If you look at the statute and why it was passed, it was

23   passed to protect actors from being unfairly taken advantage

24   of, and Fred Astaire dancing with the vacuum cleaner and all

25   that.

1      It's -- or, or, nobody ever envisioned when they passed

2  the statute that common everyday people that normally nobody

3  cares about would be grabbed to use for endorsements.  And

4  they're trying to shoehorn that square peg into the circular

5  hole of 3344.

6      And it may be the case that 3344 isn't conducive to class

7  actions, at least class action settlements.  And that is a risk

8  that parties have to take going forward, as the Supreme Court

9  held --

10          **THE COURT:**  It puts the defendant in a rather

11  difficult bind because the defendant then, who wants to settle,

12  then has to continue to litigate.  And you've sort of won the

13  battle, perhaps lost the war for them.  I mean, in a way you're

14  saying this shouldn't be subject to -- you just decide the

15  question and litigate the case.  And --

16          **MR. FRANK:**  Well, if the Defendant is really

17  concerned about that, and they want a settlement more than

18  anything else, they can remove the 3344 Sword of Damocles over

19  the class members' head, and they can say before settlement

20  negotiations start, "We will not seek 3344 fee shifting in this

21  case."

22      And once they do that, then the class representatives can

23  fairly decide, "Yes, I want to go forward with the litigation,"

24  "No, the settlement is good for the class," without concern

25  that they have bound themselves to the mast and are facing a

1 financial disaster if they don't agree to a settlement that may

2 or may not be unfair.

3     And the concern is under 23(a)(4), not are the parties

4 adequate representatives.  And that is a preliminary question

5 before you get to the 23(e) question.  It's not, "Well, because

6 they negotiated a settlement that is conceptually conceivably

7 fair, that could have been possibly negotiated by somebody who

8 wasn't facing these conflicts, then I'm going to go back and

9 decide that they were adequate representatives."

10         **THE COURT:**  Okay.  Thank you.

11         **MR. FRANK:**  Thank you, Your Honor.

12         **THE COURT:**  Thank you.

13         **MR. ZIGLER:**  Thank you, Your Honor.  My name is Aaron

14 Zigler.  I'm here on behalf of the Shane objectors.  I'm going

15 to try to bring us home.

16     My comments are going to be limited to the release, the

17 proposed release to the settlement.  And then I'm going to try

18 to bring that, steer that back to the ultimate question which

19 is before the Court, which is whether or not the settlement is

20 fair, reasonable, and adequate, which I think we're getting a

21 little far from at times.

22     The release that's before the Court, to put it kindly, is

23 ambiguous.  There's been several arguments on every side of

24 that.  There's been arguments that the release, itself, covers

25 far more than sponsored stories.  You have heard those.

1        Mr. Arns, on behalf of Plaintiffs, has argued that no, it

2    is limited to just the sponsored-stories claims.  Then, when

3    prompted with an argument that, you know, maybe sponsored

4    stories are going away or changing, we were directed to the

5    definition of "sponsored stories," which was very broad, and

6    included not just things called "sponsored stories," but other

7    things that looked or acted like sponsored stories.  Which then

8    brings us back to the release.

9        What is released?  Just those things that are called

10   sponsored stories?  Or anything that looks or acts like a

11   sponsored story, as well?

12       And the reason that that's important, and the reason that

13   it affects whether or not you can determine if this settlement

14   is fair, reasonable, or adequate, is because without knowing

15   what the class is giving up, you can't properly measure what

16   the value to them was.

17           **THE COURT:**  How can you ever craft a release that's

18   going to be as precise as you suggest?

19           **MR. ZIGLER:**  I'm not suggesting I'm precise.  I'll

20   give you a concrete example, Your Honor.  We can do it in the

21   context of the *CMD* litigation, and it goes this way:

22       As has been discussed, the *CMD* covers advertisements where

23   it has a name or likeness.  It includes both sponsored stories

24   and another group of ads that are called "social ads," --

25           **THE COURT:**  Uh-huh.

1        **MR. ZIGLER:**  -- right?

2        So the question then is:  Does this release knock out just

3    sponsored stories, or social ads?

4        Mr. Arns has said just sponsored stories.  Facebook stood

5    silent.  I would really like to hear from Facebook today that

6    it's just social ads and not -- not -- social ads.  We haven't

7    heard that from them yet.

8        But then, when you look at this definition of "sponsored

9    stories" here today, and the question of what the release

10   really gets rid of, and what the injunctive relief really deals

11   with, if you look at this definition of "sponsored stories,"

12   and not just those things called "sponsored stories," but also

13   those things that act like sponsored stories, it looks a lot

14   more like it covers more than sponsored stories, and also

15   social ads.

16       And here's why that's important:  If it covers more than

17   sponsored stories, then the math that Mr. Rhodes gave you

18   earlier is off by a factor of ten.  Because the information

19   that he gave you was limited to the profits and the earnings

20   that they earned on sponsored stories only, not on social ads.

21   That's why this -- this point --

22           **THE COURT:**  You know, that goes back to questions

23   I've had all the way along.

24       The focus on -- on the revenue, or the profit or what have

25   you that Facebook may or may not have enjoyed by virtue of

1  these programs does not -- the premise of your argument seems

2  to be it automatically then gives us a -- the boundaries of the

3  harm that individuals have incurred.  And one does not follow

4  from the other.

5          **MR. ZIGLER:**  No, that's exactly right, Your Honor.

6  And that's one of the reasons why you correctly rejected the

7  settlement the first time.

8      The value to Facebook does not equal the harm to the

9  Plaintiffs.  All of that should be thrown out.  There's no way

10  that you can measure the settlement on those grounds.

11          **THE COURT:**  But then, I thought you just told me that

12  because I -- I thought you were telling me that because

13  Facebook -- depending on the position that they take in terms

14  of the scope of the release, that their revenue or their profit

15  for activities beyond sponsored stories should go into the

16  hopper.  I thought I heard you say that.

17          **MR. ZIGLER:**  If you're going to use that as your

18  basis, then you have to use the proper universe.

19          **THE COURT:**  I see.  Okay.

20          **MR. ZIGLER:**  But here's the way that it should be

21  done, Your Honor.  When determining -- you look at this as an

22  individual case.

23      If I came in here and said, "My likeness has been used,

24  and I want to sue under 3344, I'm entitled to $750, that is

25  what I like," Mr. Rhodes says, "Well, I'm going to offer you

1  50 bucks," you know, we would talk about that.

2      I know that at the end I could get $750-plus attorneys'

3  fees, or I could take Mr. Rhodes off for $50 now.  That's where

4  we do the math there.  That's *Mars Steel*, from where I come

5  from.

6          **THE COURT:**  So you are focusing in on the statutory

7  damages?

8          **MR. ZIGLER:**  Your Honor, I was just using that as an

9  example.

10          **THE COURT:**  Okay.

11          **MR. ZIGLER:**  You look at what the Plaintiffs could

12  recover.  Okay.  And here is why the release is important

13  there.

14      So, to determine what the Plaintiffs here can recover, on

15  that side of the equation, we have limited it to sponsored

16  stories.  123 million people were in a sponsored story, and the

17  parties have agreed to limit their analysis, for whatever

18  reason, to just one.

19      We haven't looked at the number of times that their

20  likeness was used, which is probably the proper manner, right?

21  Because if I have been used in ten sponsored stories, I should

22  be entitled to more than some person who was used once.  Right?

23      So, let's say it was 123 million sponsored stories,

24  instead of people, which is what the math should be.  If you

25  add in ads to that, now it's 300 million.  And that throws off

1  the math again.

2       So now, instead of the $5 compensating me for the handful

3  of sponsored stories I'm in, they're offering $15 now for not

4  only the sponsored stories that I was in, but also the social

5  ads and whatever else this release might cover.  Without

6  knowing what the release covers, we can't know if the offer is

7  adequate, under the requirements of Rule 23.

8       For the rest of our objections, Your Honor, we will rest

9  on our briefs.

10          **THE COURT:**  Very good.

11          **MR. ZIGLER:**  Thank you.

12          **THE COURT:**  Thank you.

13       Do we have any other objector counsel or objectors who

14  wish to make any presentation?

15       (No response)

16          **THE COURT:**  Okay.

17          **MR. RHODES:**  Your Honor, let me jump in.  On the last

18  point, *Lane* teaches -- this is 696 F.3d, 811, Page 8231 -- *Lane*

19  teaches, quote (As read):

20          "We reject objectors' argument insofar as it stands

21          for the proposition that the District Court was

22          required to find a specific monetary value

23          corresponding to each of the Plaintiffs' statutory

24          claims and compare the value of those claims to the

25          proffered settlement award."

1        Mr. Zigler is legally infirm.

2        Two, if you look at the cases cited in our brief, *Officers*

3   *for Justice*, 688 F.2d, 615, and its progeny, as you have

4   alluded to, this, today, is not a trial.  This, today, is not

5   an adjudication of claims.  This, today, is not an evidentiary

6   hearing.  The question presented is a very different one, and

7   the Court is very mindful of that standard.

8        But the premise of all these objections, as if you were

9   adjudicating claims that are disputed -- Mr. Michelman said

10  that there's a body of law that says you can't sanction, as a

11  settlement in a class action, the imposition of injunctive

12  relief where you are enjoining compliance with law.  But the

13  underlying premise there is that there has been a definitive

14  ruling of law to which the injunction is identical.

15       And here we have a diaspora, a myriad set of claims that

16  are subject to debate.  Things like does COPPA preempt

17  everything.

18       There's a fundamental misunderstanding about 3344.  The

19  body of jurisprudence under that statute says consent can be

20  manifested in a variety of ways.  Implied consent.  Express

21  consent.

22       So, the assumption that we're litigating and, therefore,

23  adjudicating these claims today is fundamentally false and

24  wrong.

25            **THE COURT:**  I understand your overriding comment here

```
1  is that no one has made any decisions on the applicability of
```
```
2  the defenses, of which there are many, that you have presented.
```
```
3          MR. RHODES:  Many.
```
```
4          THE COURT:  Let me ask you some specific things that
```
```
5  have been brought up, and let's go to Mr. Zigler's point, he
```
```
6  being the most recent person up here.  And that is the scope of
```
```
7  the release.
```
```
8          MR. ARNS:  Your Honor --
```
```
9          THE COURT:  Sure -- well --
```
```
10         MR. ARNS:  Let me address that, please.
```
```
11         THE COURT:  Each of you will get your chance to
```
```
12 address --
```
```
13         MR. ARNS:  May I go first?
```
```
14         THE COURT:  Go ahead, Mr. Rhodes.
```
```
15         MR. RHODES:  There's a case on point.  This is the
```
```
16 Hesse case.  I think the Court is familiar with it.  I've
```
```
17 pulled it.  This is 598 F.3d, 581, Your Honor.  This is a 2010
```
```
18 Ninth Circuit case.  And Page 7 of the slip opinion -- I
```
```
19 apologize, I can't give you the jump site.  But what the court
```
```
20 says there is, the release is absolutely permitted to include
```
```
21 unknown claims.
```
```
22     And the question presented, then, in a second class
```
```
23 action, in this instance -- I assume Mr. Zigler would say the
```
```
24 Dawes case that is before you -- is when you have a final
```
```
25 judgment in the first class-action settlement, that goes to say
```

1  we have wended ourselves through the appeals and we have a

2  final judgment, what Ninth Circuit says is the test that you

3  would then be asked to do, assuming we had a settled complaint

4  in *Dawes*, which we don't (As read):

5          "A settlement agreement may preclude a party from

6          bringing a related claim in the future, even though

7          the claim was not presented and might not have been

8          presentable in the class action where the release

9          claim is 'based on the identical factual predicate.'"

10     So the question about the scope of the release is

11  essentially a phantom.  The release is specifically modified at

12  the end of that same set of clauses that Mr. Zigler referred

13  to, as modified by "sponsored stories."  And this goes back to

14  this argument about the definition.

15          **THE COURT:**  So, just being specific about it, the

16  program, it's called "social ads," is that the program that

17  Facebook has --

18          **MR. RHODES:**  We're not sure what Mr. Zigler's

19  complaints really reaches.  This case (Indicating) is about

20  sponsored stories.

21          **THE COURT:**  Okay.  So let me ask you:  Is it your

22  position that -- is there -- there is a program called "social

23  ads"?

24          **MR. RHODES:**  There are ads on Facebook that would not

25  meet the Facebook definition of "sponsored stories."

1          **THE COURT:**  Okay.

2          **MR. RHODES:**  Some of those ads have what you might

3   consider to have social content.

4          **THE COURT:**  And is your view that the release in this

5   case reaches those -- any claims that arise out of those

6   programs?

7          **MR. RHODES:**  My answer is I don't know until I have a

8   final judgment in this case, an operative complaint in another

9   case, and you comply with the *Hesse* factors (Indicating) as to

10  how you go about determining whether or not the release covers

11  the one or the other.

12      And that's why we gave you a definition, contrary to what

13  Mr. Michelman said, that is both in the title and in the

14  function of what a sponsored story was.  It's not simple as

15  what Facebook calls a sponsored story.  It is meant to be

16  broader than that.  I'm entitled to that release.  That's what

17  this case was about.  We've described it for you three

18  different ways.

19      And if what Mr. Zigler ends up suing us about in his case

20  is, in fact, the same thing as what was covered by that

21  release, then I would submit to you, I would be well within my

22  grounds to say that case is dismissed.  Indeed, his words to

23  you were prophetic, weren't they?  He says it covers him.

24      But to say that it covers everything on Facebook, that's

25  too much.  And I'm not saying that.  I'm saying it covers

1   sponsored stories, as defined.  And I can't speak to what he

2   may ultimately bring as a cause of action.

3              **MR. ARNS:**  Your Honor --

4              **MR. ZIGLER:**  Your Honor --

5              **THE COURT:**  No, no.  Thank you.

6              **MR. RHODES:**  You dismissed that complaint, as you

7   know.

8              **THE COURT:**  I know.

9         Go ahead.

10             **MR. ARNS:**  If I can say this, Your Honor.  Slide 51,

11   in anticipation of this argument, lays out again the definition

12   of "sponsored stories."  And the release claims talk about

13   "sponsored stories."  A sponsored story is a sponsored story.

14   We know the difference between different types of advertising

15   on Facebook.  It's complicated.  But this case dealt with

16   sponsored stories.

17        So -- and the great news, Your Honor, is that his case,

18   *CMD*, is allegedly coming in here for another objector.

19   Mr. Zigler also happens to be the attorney for CMD/Dawes, as

20   you know.

21             **THE COURT:**  I'm aware of that.

22             **MR. ARNS:**  And you know that that's in front of you.

23   That's the great thing, Your Honor.  It is all in front of you.

24   So --

25             **THE COURT:**  Well, that's -- whether or not that's

1   great is another story.  But, okay.  Well --

2              MR. ARNS:  You will know the exact scope of this

3   release.

4              THE COURT:  Yes.

5              MR. ARNS:  And our case dealt with sponsored stories.

6              THE COURT:  Okay.

7              MR. RHODES:  The test in *Hesse*, Your Honor, is

8   whether there's identicality of the underlying factual pattern,

9   and not the names that are put in the release.  That's the

10  point that the Ninth Circuit is trying to make.

11             THE COURT:  Okay.  Let me ask you on the point that

12  Mr. Frank brought up, and that is that the 3344 -- presence of

13  3344 actually works in a contrary fashion in terms of the

14  incentive payments because, if I was following his argument,

15  the -- with this Sword of Damocles over the representative

16  Plaintiffs, they have a vested interest, and a contrary

17  interest in some respects, to do a deal so they can get out

18  from under 3344, and, therefore, they are conflicted in some

19  sense as class representatives.

20             MR. ARNS:  Your Honor, as their --

21             THE COURT:  You can go first on this one, Mr. Arns.

22             MR. ARNS:  Thank you very much, Your Honor.

23     As their attorney, I had numerous conversations with them

24  about this, that I'm not going to get into because of the

25  attorney/client privilege.  And I can represent to you that the

1   spectra of 3344(a) fee shifting never stopped anything in our

2   prosecution of this case.

3          **THE COURT:**  Well, you know, I'm sure that the -- the

4   counsel in *Radcliffe* would have said it didn't affect at all,

5   and perhaps it -- it never did

6          **MR. ARNS:**  (Nods head)

7          **THE COURT:**  But the question is more:  Is there a

8   problem in terms of -- you know, as you know, often in conflict

9   situations, it doesn't mean the actual conflict was created and

10  impacted the situation.  It's the presence of the potential

11  conflict that's the problem.

12      So, I'm perfectly willing to accept your representation

13  that not a single decision was made with the -- with the

14  particular concern to get class representatives out from under.

15  But his point is just, as -- if I was following you correctly,

16  just like in *Radcliffe*, there is an aspect of the reality that

17  puts those class representatives in a very different posture

18  than those they purport to represent, and that, therefore, they

19  have structurally an incentive to -- to agree when perhaps

20  that's not in the interest of the class who are not going to be

21  subject to a 3344 obligation.

22         **MR. ARNS:**  Understood, Your Honor.

23         **THE COURT:**  Okay.

24         **MR. ARNS:**  You know, one of the things that Mr. Frank

25  said in his papers is that every one of these cases should have

1  been individual cases, everybody should have the right to

2  prosecute the 3344 issue, themselves.

3      And Mr. Frank, as we know, has never met a lawsuit that he

4  liked.  Mr. Frank, when he comes in, he doesn't want the class

5  reps to get any money because that promotes class actions.

6          **THE COURT:**  Well, but that doesn't really matter, for

7  purposes of my question.  He's -- I don't care what his

8  motivation is for presenting a particular argument.  My

9  question is to address the argument, itself.

10     I have -- I -- it's triggered the thought in my mind that

11 there is an issue at least to be addressed with respect to

12 whether or not that puts the class representative in a very

13 different posture in a 3344 situation.

14     And so I want you to address that.  Not why he may have

15 made the argument, or his grand view on the -- on the facility

16 of class actions.

17         **MR. ARNS:**  Yes.  Your Honor, what I would say is that

18 was probably one of the 100 factors that are used in this --

19 that were used in this case to make a determination whether, on

20 two days before the class cert hearing was going to take place,

21 whether we could hammer out a deal.  That was something that

22 was discussed.

23     But how do you get away -- how could there ever be a class

24 rep in this type of case?

25         **THE COURT:**  I'm not sure.

 1          **MR. ARNS:**   And the point is, I don't see a conflict

 2   there.  And that's why people have to step forward.  We had

 3   amazing class reps.  We had people who were very devoted to

 4   this cause, and were willing to take on the cause.

 5          **THE COURT:**   None of that is -- I'm not, for purposes

 6   of this question, questioning any of that.  They could be the

 7   greatest class representatives of all times.

 8      The question is a structural question, and that is what

 9   I'm trying to get a handle on.  I'm not suggesting that I think

10   it does create that conflict, but it's an interesting issue in

11   a 3344 case.

12          **MR. RHODES:**   He's trying to erect a structural

13   disincentive argument.  He's saying that there's a structural

14   built-in disincentive to take the case to distance.

15          **THE COURT:**   Right.

16          **MR. RHODES:**   He's wrong factually because, unlike

17   *Experian*, the *Radcliffe* case, where there was a built-in

18   *de jure* condition that the court didn't like, here there was

19   the opposite.

20      Section 2.7 of the amended settlement agreement says,

21   whatever incentive award -- because that has to be the *quid pro*

22   *quo* that he's trying to generate here -- "I took a larger

23   incentive award to shirk myself from that exposure."  That's

24   his argument, I think.  And he says that's a structural bias

25   that you can never run away from.

1      The fact of the matter is --

2          **THE COURT:**  I don't hear it that way.  I don't hear

3  it as controlling the amount of the incentive award.  I hear it

4  more as an interesting issue as to whether or not, because of

5  the nature of 3344, a class representative has different,

6  different issues.

7          **MR. RHODES:**  Give up the ghost earlier, right?  Isn't

8  that the argument?

9          **THE COURT:**  Yes.

10          **MR. RHODES:**  But the fact of the matter is:  When the

11  did the case settle?  It settled after seven expert reports.

12  Thousands of documents were produced.  Full-scale litigation,

13  motions to dismiss.  Rulings.  Fully-briefed class cert.  We

14  were two days before the hearing.

15      This case settled when you want it to settle.  Fully

16  discovered, fully investigated, fully litigated.

17          **THE COURT:**  Of course, the other answer, perhaps, is

18  that 3344 is there.  So if it is, in fact, such a Sword of

19  Damocles, no one would be -- step forward to be a class

20  representative.

21      So, the fact that they stepped forward is somewhat

22  indicative of the fact that it is not the reason that the class

23  will be sold out by the class representatives.

24          **MR. RHODES:**  Right.  And, what -- I'm making the

25  point that the fact that they litigated it to the extent they

1  did, knowing that the fees on the other side are accruing all

2  the time -- I mean, the fact of the matter is, for an

3  individual in a class action, the cost bill, if it has to

4  shift, that, in itself, in a fully-lited litigated case, is

5  going to be sufficient.  And there's no case law to suggest

6  that.

7          **THE COURT:**  Okay.  Let's now talk about the

8  objectors' points with respect to the minor subclass, and then

9  we will -- I want to move to the fees issue right at the end.

10 So --

11         **MR. RHODES:**  So, there are two points that were

12 raised, I thought, which is:  We need to have separate

13 representation for them, and that there wasn't symmetry of

14 interests.  I think I already identified for you a whole host

15 of factors on the latter.

16     Let me tell you a story about W.T.  He's a named

17 representative Plaintiff.  He's a minor.  His father and him

18 sat at a computer one day, and signed up for Facebook.  And

19 they did it together.  The father opened a Facebook account,

20 and W.T. opened a Facebook account.

21     We took their depositions.  And we asked them, "Did you

22 have your dad's consent?"  Because the heart of these arguments

23 all go to:  Did you get consent; what kind of consent; was it

24 implied; was it express?

25     But this is what's telling about whether this settlement,

1  from the standpoint of the minor class, is fair, reasonable,

2  and adequate.  Mr. Tate, the father, said at his deposition, he

3  couldn't even remember who pushed the button.  He looked over

4  his son's shoulder as they signed up together.  They went

5  through the flow, they looked at the documents.  They had done

6  research before because he was very concerned, as a parent,

7  about what would be involved with having his teenage son on

8  Facebook.  And they went through that flow together.  And then

9  he joined Facebook, himself.  And then they friended each

10 other, so the father could then monitor the son.

11       That man and his son stand up here today, in Court, and

12 say, "This is a fair, reasonable, and adequate settlement."

13       He was the most informed actor on this stage because he

14 represented the very crux of what this case was about:  "What

15 is going to happen to my minor child on Facebook?"

16       He signed up with his son, he approved it, he consented to

17 it.  And I will submit to you that he is a lot better judge of

18 whether this settlement is fair, reasonable, and adequate for

19 the purposes of the minors, and whether there's some

20 distinction between minors and parents than these professional

21 objectors, Your Honor.

22            THE COURT:  What I hear the objectors saying, though,

23 is that that scenario you just described is -- that's

24 wonderful, that's the way -- it would be great if it always

25 worked that way.  But the injunctive relief terms here don't

1   always mean it's going to work that way.

2          **MR. RHODES:**  No system is perfect.  But, you know

3   what?  If we were trying this case -- which it seems is what

4   Mr. Frank wants me to do, spend a bunch of my clients' money

5   out in the audience -- and I'm glad they're here to hear

6   that -- and try the case, would you be empowered as a judge?

7   Could you, as a remedy, order me to create that new tool that

8   tells you what sponsored stories you have been to?  Could you

9   order me, as a remedy, the things that Mr. Arns negotiated for?

10  Could you order me to put a tool inside the parent's account to

11  delete their minor child from all sponsored stories going

12  forward?  Could you order me to give a tool to a parent who is

13  not on Facebook?

14     Remember, that's lost in the shuffle here.  If you're a

15  parent and you're not on Facebook, I'm going to give you a tool

16  now to come into the ecosystem and default your child.

17     Can you order me to do that?  Or are those the kinds of

18  injunctive relief you can only get through a negotiated

19  arms-length non-collusive settlement?

20          **MR. ARNS:**  Your Honor, you have the mockups of the

21  injunctive relief.  We haven't even had a chance to go through

22  those.

23          **THE COURT:**  I have them, though.

24          **MR. ARNS:**  Yes.  And we negotiated very hard to get

25  that, because we wanted the minors to do the right thing.

1      And this settlement allows the minors to do the right

2   thing.  And that is, say exactly what their age is.  As opposed

3   to finding out if there's going to be an e-mail to my mom and

4   dad every day.  And that would never work, in a million years.

5   They're just going to say they're a different age.

6      So, there's a lot of issues at play here, Your Honor.  And

7   that's how our negotiation worked.

8      And also, with Mr. Frank, with Mr. Fellmeth, would they be

9   willing to take on this case, going back to 3344?  Do they want

10  to put $20 million in trust?  Do they want to ensure that there

11  is going to be the same amount of injunctive relief that the

12  Court cannot order?  Do they want to be subject to the 3344 fee

13  and cost shifting, and take over this case?

14     I had a case in Oregon one time, Your Honor, that I

15  settled for about $4 million.  It was a death case.  And we had

16  the clients basically -- we had the waiver of the conflict --

17              **UNIDENTIFIED MAN:**  Objection, Your Honor.

18          **THE COURT:**  Don't -- no, audience comments are not

19  part of the proceedings.

20     Go ahead, Mr. Arns.

21        **MR. ARNS:**  And the court had to approve it, even

22  though minors weren't involved.  Then the attorneys came on to

23  settle the proration of who would get what, the wife or the

24  parents.

25     And basically what happened, Your Honor, is the attorneys

1  came in for the parents and said, "It was the worst settlement

2  in the world, you didn't get enough money.  You should have got

3  a lot more."

4      And I said, "Fine.  Put $4 million in trust, take over the

5  case."

6      Next day, "This is a fantastic settlement."

7      There's no skin in the game with these objectors.  And

8  when we talk about the issues, we -- we have developed this so

9  the minors, going back to the minors, gone through all the

10 issues before, so they can do the right thing.

11     And we believe this will set the appropriate standard for

12 Google Plus and every other social media site that exists.

13         **MR. RHODES:**  Your Honor, let me just make a final

14 rhetorical point to you.

15     I was struck by the Schachter objectors and some of the

16 other objectors.  And they're complaining, as you point out,

17 that they really want to engineer new social policy in this

18 realm.

19     But the Court should be asking himself:  Why didn't they

20 just opt out then?

21         **MR. ARNS:**  I would --

22         **MR. RHODES:**  Why don't they opt out?  If this is such

23 a terrible deal, opt out, bring your individual cause of action

24 and see what happens under 3344.

25     Because I'm going to go back to Judge Koh, in her ruling

1   on Page 29 (As read):

2           "To win..."

3       She says to survive, they're going to have to prove,

4   quote:

5           "...proveable commercial value to their name and

6           likeness."

7       And that is what became untenable in this case.  And as

8   the case was litigated and the parties realized that

9   fundamentally the notion that you could prove that for a

10  noncelebrity endorsement, which is the heart of this case, it

11  doesn't ultimately end up being a case that has the merits that

12  these people want you to believe.

13          **MR. ARNS:**  I disagree with that, Your Honor.

14          **THE COURT:**  I understand, I understand.  And that is

15  well-covered in the briefs.  And I recognize that each side

16  still has a very strong view of the merits of the case and the

17  defenses, and I understand that.

18      So let's now address the fee issue, and we will call it a

19  day.

20          **MR. RHODES:**  For your benefit, Your Honor, we have

21  said what we have to say on the subject in our brief.

22          **THE COURT:**  Yes, thank you.  And I have reviewed your

23  presentation.

24      So, Mr. Arns.

25          **MR. ARNS:**  Yes.  Your Honor.  With respect to the

1  discovery in this case, Slide 15 sets forth all the discovery.

2  It's all fully been briefed.

3      There was a lot of futile jousting that went on in this

4  case, Your Honor.  We were trying not -- to knock each other

5  off our horses.  This was not pretty discovery.  Twenty-one

6  depositions, over 200,000 pages of documents, and multiple

7  briefs having to do with every subject.  This was a very

8  hard-fought case.  And Facebook knew we learned it all.  We

9  also knew that we could try this case.  This case was ready to

10 try.

11     If we go to Slide No. 16, expert discovery, Your Honor --

12     **THE COURT:**  Why shouldn't this -- and let me

13 introduce my question by stipulating, for purposes of this

14 discussion, that a great deal of work was done at a very high

15 level from the perspective of the lawyering that went on.

16     Why shouldn't this be a lodestar case, and not a

17 percentage of the fund?

18     And you know that I have some problems with the -- with

19 the valuation placed on the injunctive relief.  So, why

20 shouldn't this be approached from the lodestar perspective?

21     **MR. ARNS:**  It could be approached from the lodestar,

22 but we're still going to ask for a multiplier, Your Honor, on

23 that.

24     And if I could just say one thing.  If you want to take

25 the state standard or federal standard on that, we can approach

1    it many different ways.  We can have a lodestar crosscheck to

2    the percent.  And that could work.  But we're going to ask for

3    that multiplier.

4         One of the things that happened, Your Honor, in our expert

5    depositions, there was another firm brought in.  Facebook hired

6    another law firm.  The Cooley firm had represented some of the

7    expert witnesses.  Gibson & Dunn was brought in for other

8    expert witnesses.

9         Now, I did all of those depositions, all of the

10   preparation, all of the questioning of the defense experts.

11   And what happened -- I considered that a tremendous compliment,

12   Your Honor, that they had to -- that Facebook had to bring in

13   another firm.

14        That being said, let me just say this:  If I had a social

15   media company and I got in a problem, I would hire the Cooley

16   team to represent me.  I don't think they had to bring in

17   Gibson & Dunn.

18        And there have been comments, when we talk about fees, the

19   small firm versus the large firm, the different overhead, they

20   don't know what overhead is, Your Honor, of large firms,

21   because everything is paid for by the client.  Nothing is paid

22   for by any clients, as a plaintiffs' contingency lawyer, which

23   I've done all my life.  And I'm very proud to be in that

24   situation, Your Honor.  And --

25             **THE COURT:**  So it's not just a question of how much

1    the other side paid.  The corporate defendant makes its own

2    decision about how much it is going to pay for its lawyers, and

3    that is their business.

4                **MR. ARNS:**  That's correct.

5                **THE COURT:**  The reason your fees are my business is

6    because you are proposing to have it come out of the fund that

7    goes to the class members.

8                **MR. ARNS:**  That's correct, Your Honor.

9                **THE COURT:**  So that's why I am focused on yours.  So,

10   the fact that there may be very expensive lawyers on the other

11   side goes -- is really not -- it is -- I can see why you point

12   to it, to say this is a very complicated, difficult case, and

13   that you were against formidable opponents.  And that is a fair

14   point.

15       But, how much these firms charge the corporate defendant

16   is really not particularly of consequence in terms of assessing

17   your fees, I don't think.

18                **MR. ARNS:**  Well, Your Honor, the question is:  Is it

19   a question of what I am worth?  And I would be glad to have an

20   in-camera session, showing you my last ten years of tax

21   returns.  I would be happy --

22                **THE COURT:**  One of the concerns that is expressed in

23   Facebook's brief is that there isn't -- and I know, for senior

24   counsel who are experienced, it can be frustrating, but in

25   terms of declarations that support various billing rates, I

1    don't have that.

2            **MR. ARNS:**  We do, Your Honor, we have submitted two

3    declarations of that.

4            **THE COURT:**  Okay.  Which ones?

5        (Off-the-Record discussion between counsel)

6            **MR. ARNS:**  Yeah, the Richard Pearl declarations, we

7    have two of those, Your Honor, that lay it out.

8            **THE COURT:**  You are talking about in this community,

9    comparable work, and the like?  I'll go back and look at it.

10           **MR. ARNS:**  Exactly.  And, you know, in my 38 years of

11   experience, if it's getting down to my billing rates,

12   Your Honor, I don't think anybody has done more Masters in

13   Trials presentations than I have, in ABOTA.

14       I've written two best-selling treatises for The Rutter

15   Group, which I think is the best California legal publisher,

16   *The Evidence Wheel* and *The Trial Wheel*, which is federal and

17   state version, Your Honor, both; that basically I have been

18   practicing for 38 years.

19       The largest plaintiff trial bar in the United States is

20   the Consumer Attorneys of California.  I have been nominated as

21   Trial Lawyer of the Year numerous times; been Trial Lawyer of

22   the Year, San Francisco Trial Lawyers; a professor at the

23   University of San Francisco Law School, and was Professor of

24   the Year, teaching trial practice for the last 15 years, or

25   12 years.

1          I have numerous succession of cases, of victories that

2     aren't -- I don't know if anybody else has, in trials.  With

3     respect to class actions, I've done approximately 17 of them

4     now; none have gone to trial.

5          **THE COURT:**  I'm focusing now on the rates.  All of

6     this is in the pleadings, --

7          **MR. ARNS:**  That's correct, Your Honor.

8          **THE COURT:**  -- and I'll go through it.  What I should

9     do, whoever -- whichever objector wanted to make a specific

10    comment with respect to the fees, and there was one --

11         **MR. ARNS:**  Yes.

12         **THE COURT:**  I'll let whoever that is come up, very

13    briefly, and make whatever particular objection.  I have a very

14    lengthy submission -- come forward -- from Facebook on the

15    fees, and so I have a good deal of information already, but I

16    will -- and I'll let you respond, Mr. Arns.

17         **MR. ARNS:**  Thank you.

18         **THE COURT:**  But, let's go ahead.  And remind me

19    again, sir, your --

20         **MR. SHERWOOD:**  Thank you, Your Honor.  My name is

21    Alan Sherwood.  I'm appearing for objector Jennifer Deachin.

22         **THE COURT:**  Yes.

23         **MR. SHERWOOD:**  At this point, Your ,Honor I'll submit

24    on the briefs that have been submitted.

25         **THE COURT:**  Very well.

1          MR. SHERWOOD:  It's a late hour; we've had a lot of

2     argument.

3          THE COURT:  Thank you.  Go ahead, Mr. Arns.

4          MR. ARNS:  Your Honor, again, the hallmark of our

5     settlement is the injunctive relief.

6        Now, Mr. Kevin Osborne, one of the attorneys in my office

7     who has a master's degree in economics, I would like him to

8     spend one minute just addressing the option method of

9     evaluating.

10          THE COURT:  Okay.

11          MR. ARNS:  He knows a little bit more about economics

12     than I do, Your Honor.  Whenever I call an economist in to

13     trial, they don't even like me to ask questions, because I have

14     a little problem with it.

15          THE COURT:  Very well.

16          MR. OSBORNE:  Thank Your Honor.  Kevin Osborne for

17     the Plaintiffs.  Good afternoon.

18          THE COURT:  Good afternoon.

19          MR. OSBORNE:  I'll cut to the chase.  What we have

20     presented to the Court was a series of economic models for

21     valuing the injunctive relief in this case.

22        All economic models rely on foundations.  And in this

23     particular instance, there are three foundations -- three

24     pillars of the foundation for all of our economic models.

25        First, the idea behind the case was that Facebook, through

1    its sponsored stories programs, was misappropriating

2    endorsements of users.  The question that follows that is

3    whether an endorsement is worth any money.  If it's a valuable

4    asset.  And the answer must be yes, because Facebook was

5    driving its ad revenues through the use of sponsored stories

6    because they have a high CTR, because this is the holy grail of

7    advertising.  This is what advertisers want, and they'll pay

8    more money for it.

9         So, assuming those two pillars to be true, the next pillar

10   would be since the thrust of our injunctive relief is giving

11   control of this asset to the users, have we given control of a

12   valuable asset to the users?

13        Now, based on the fact that sponsored stories derive -- or

14   deprive --

15        **THE COURT:**  Value, of course, is only limited to the

16   particular network that the user has decided to create within

17   the Facebook world.  We're not talking about celebrities,

18   right?

19        **MR. OSBORNE:**  That's absolutely true.  And that leads

20   to the question of:  So what?  If it is a valuable asset, what

21   is an individual user who is not a celebrity going to do?  If

22   they discontinue their use of sponsored stories, are they going

23   to then go sell their endorsement to someone else?

24        **THE COURT:**  If the likeness has no value in the

25   marketplace, other than the -- the network created by that

1   particular individual, the models of that -- that's where I

2   continue to have difficulty seeing how you can simply look at

3   and -- take an example, you know, Facebook achieves a $1 profit

4   from using my name within the network that I have.

5       And you then say, well, that's the value to me, I get the

6   dollar, I get a subset of the dollar.  And I -- I don't think

7   one flows from the other.  It's easy with a celebrity or

8   somebody who is marketing their likeness.  But we are in a very

9   different world.

10      And I'm not saying I wouldn't necessarily, at the end of

11  the day, find that there was some value.  But --

12          **MR. ARNS:**  Your Honor.

13          **THE COURT:**  -- these theories all seem to just take

14  -- to operate in a marketplace that is not this marketplace.

15          **MR. ARNS:**  The brilliant thing that occurs on

16  Facebook, Your Honor, is they get the friend endorsement.  And

17  the friend endorsement -- the sponsored stories only go to

18  friends, or you can dictate who you want it to go to.  You can

19  dictate you don't want it to go to your parents, or it can go

20  to your parents.  But the point is -- or friends in a certain

21  group.

22      The point is Facebook knows and online media operations

23  know the best endorsement is the friend endorsement, not a

24  celebrity.

25          **THE COURT:**  That is again focusing entirely on the

1  benefit to Facebook.  Where's the harm to the user?  Where is

2  the harm?

3        **MR. ARNS:**  Okay.  This is not a benefit to Facebook.

4  This is a benefit, first of all, to the advertiser.  And

5  they're willing to pay the money because they want your friend

6  endorsement.

7        And that's why we determined that there are damages on

8  that.  And that we got by the harm in this case, Your Honor.

9  And that's why this injunctive relief, having control over that

10  is extremely valuable.  And, we would request that you put --

11  that you say it's extremely valuable, difficult to evaluate.

12  We think this option value is the way to go on it, Your Honor.

13        And --

14        **THE COURT:**  That's your -- you've got a fair market

15  value and a real option value and a minimum value.  So you're

16  saying the real option value is your preferred method.

17        **MR. ARNS:**  Yes.  And that's Slide No. 44, Your Honor.

18        Again, Judge Davila specifically stated -- we have the

19  cite for that -- that you have to look at the value of the

20  injunctive, also.

21        But at any rate, Your Honor, we're past time.  Thank you

22  very much.  We submit.  And --

23        **THE COURT:**  Very well.

24        **MR. ARNS:**  Appreciate it.

25        **THE COURT:**  Thank you.  Very good argument.  And I'll

1  go back and do my work, and give you an order.

2          **MR. RHODES:**  Thank you, Your Honor.

3          **THE COURT:**  Thank you.

4      (Conclusion of Proceedings)

**<u>CERTIFICATE OF REPORTER</u>**

I, BELLE BALL, Official Reporter for the United States
Court, Northern District of California, hereby certify that the
foregoing is a correct transcript from the record of
proceedings in the above-entitled matter.


*/s/  Belle Ball*_____

Thursday, November 21, 2013

Belle Ball, CSR 8785, CRR, RDR